IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Criminal No.: WDQ-10-0770</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>GERMAN DE JESUS VENTURA, <em>et al.</em>,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

German de Jesus Ventura[1] ("Ventura") and Kevin Garcia Fuertes[2] ("Fuertes") (together, the "Defendants") are charged with interstate transportation for prostitution, in violation of the Mann Act,[3] and other crimes.  Pending are numerous motions.[4]

---

[1] Also known as "Chino," "Chalo," "Pancho," "Chaco," and "Oscar." ECF No. 51.

[2] Also known as "Kerlin Esquivel-Fuertes" and "Flaco."  *Id.*

[3] 18 U.S.C. § 2421.

[4] Ventura has moved to continue preliminary hearing; for speedy trial (*pro se*); to suppress statements; to dismiss the indictment (*pro se* and separately through counsel); to suppress tangible and derivative evidence; and to suppress in-court identifications.  Fuertes has moved to sever; for disclosure of Rule 404(b) and 609 materials; to compel prosecution witness review; for disclosure of evidentiary basis for Rule 801(d)(2)(E) materials; for disclosure of Rule 12 materials; and to suppress statements.  Both defendants have moved to adopt each other's motions, for leave to file additional motions, in opposition to the Government's motion for Rule 15 deposition of

An evidentiary hearing was held on Wednesday, April 3, 2013 ("Hr'g"), and the Court heard legal argument on Monday, April 8, 2013.

For the following reasons, Ventura's motions to suppress statements; to dismiss the indictment; to suppress evidence relating to Ventura's September 24, 2009 stop and arrest; to suppress evidence obtained by the November 15, 2010 search of 1913 Nova Avenue; and to suppress in-court identifications will be denied.  Ventura's motion to suppress evidence obtained through GPS surveillance will be granted in part and denied in part.  Fuertes's motions to sever; for disclosure of Rule 404(b) and 609 materials; to compel prosecution witness review; for disclosure of evidentiary basis for Rule 801(d)(2)(E) materials; and for disclosure of Rule 12 materials will be denied. Fuertes's motion to suppress statements will be granted.  The Defendants' motion *in limine* to exclude evidence of threats directed to third parties will be denied.  The Defendants' motions to adopt each other's motions will be granted in part and denied in part.  The Defendants' motions for leave to file additional motions will be granted.[5]

---

Maximilliano Zelaya Rapalo, and *in limine* to exclude evidence of threats to third persons.

[5] Ventura's motions to continue preliminary hearing and for speedy trial, as well as the Defendants' "motion" in opposition

I.    Background

  A. Factual Background[6]

      Ventura--a native and citizen of El Salvador--is the

alleged leader of an enterprise engaged in interstate

prostitution, which also entices or coerces others to engage in

interstate prostitution, in Annapolis, Maryland, Easton,

Maryland, and elsewhere.  ECF No. 2 (Aff. in Supp. of Crim.

Compl.) ¶ 11.  Fuertes--a native and citizen of Honduras--

allegedly assisted Ventura in the operation.  Id.[7]

      The Government's investigation into the Defendants began at

about midnight on September 13, 2008, when the APD received a

call for shots fired in the area of Janwall Street and Marda

Lane in Annapolis.  ECF No. 2 ¶ 12; Hr'g.  Detective Hartlove

responded to the call.  Hr'g.  At the scene, Hartlove found a

Hispanic male and female who had been shot "execution style"

---

to the Government's motion to depose Zelaya-Rapalo, will be
denied as moot.

[6] The facts are taken from the affidavit in support of the
criminal complaint, this Court's recollection of the evidentiary
hearing, and hearing exhibits.  See also Fed. R. Evid. 104(a)
(in deciding whether evidence is admissible, the court is not
bound by evidence rules, except those on privilege).  Facts
common to the Defendants are included here; facts unique to
individual defendants' motions are included in the analysis of
the respective motion.

[7] Annapolis Police Department ("APD") Criminal Investigations
Division Detective Jeffrey Hartlove testified that Ventura is
also known as "Chino" and "Pancho;" Fuertes is known as
"Fuentes" and "Flaco."  Hr'g.

while sitting in a car.  ECF No. 2 ¶ 12; Hr'g.[8]  The man was
identified as Ricardo Humberto Rivas Ramirez ("Ramirez"), also
known as "Victor" and "Pelon."  ECF No. 2 ¶ 12.  Paramedics
pronounced Ramirez dead and his death was ruled a homicide.  *Id.*

The female passenger, since identified as Nancy Marin Ayala
("Ayala"), survived the shooting and was taken to the hospital;
after her release, she told law enforcement that she was a
prostitute and had traveled from New York to Maryland by bus on
September 12, 2008.  ECF No. 2 ¶ 13; Hr'g.  Ramirez had then
taken her to the Annapolis area to "service" Hispanic males.
ECF No. 2 ¶ 13.[9]  Ayala also had a notebook containing phone
numbers of persons she identified as "pimps."  *Id.*  One of the
numbers--410-963-0903 (the "0903 number")--was associated with
someone named "Poncho."  *Id.*  Other witnesses in the homicide
investigation revealed that Ramirez had been transporting and
delivering prostitutes to the Annapolis area and, in the weeks
before his death, had been threatened by a Hispanic male "pimp"

---

[8] Ramirez had been shot eight times in the back of his head.
Hr'g.

[9] Ayala identified 134 Janwall Street in Annapolis as the
location where she had provided commercial sexual services the
night before the shooting.  ECF No. 2 ¶ 13.

operating in Annapolis and known to the witnesses as "Poncho,"
"El Chino," "El-Choco," and "Chelle." *Id.* ¶ 16.[10]

On a "later date," a witness "known" to the APD gave a
written statement that a man named "Poncho" had threatened to
kill his friend "Victor," whom the witness identified as
"Ricardo Rivas." ECF No. 2 ¶ 18. According to this witness, in
April 2008, "Poncho" and "La Flaco" had driven to the witness's
house in Annapolis. *Id.* "Poncho" showed the witness a 9mm
Beretta and told him that he was going to kill "Victor" if he
did not stop bringing girls to Annapolis, because Annapolis was
"his territory." *Id.* The witness also said that "Victor" would
tell him about run-ins and threats made by "Poncho" soon after
this incident. *Id.*[11] Specifically, two days before "Victor" was
killed, "Victor" called the witness and told him that "Poncho"
was following him in a white Ford Expedition. *Id.* Ramirez also
said that "Poncho" told him he had been involved in the March

---

[10] Further, Ramirez's girlfriend told law enforcement that the
threatening calls had come from two phone numbers--410-320-1397
(the "1397 number") and 240-606-5015 (the "5015 number"). *Id.* ¶
17. The 5015 number was listed to Dulce Maria Benites Ventura,
at 31 Carver Street, Apartment F, Annapolis, Maryland 21401.
*Id.* Further investigation revealed that "Kerlin Esau Esquivel
Fuentes"--allegedly one of Fuertes's aliases--had provided the
5015 number as a contact number after a February 20, 2008
traffic arrest. *Id.* ¶ 20; *see* Gov't Hr'g Ex. 1a.

[11] A search of Ramirez's phone records confirmed that a phone
number associated with "Poncho" had called his phone on
September 11, 2008, and again after Ramirez's murder. ECF No. 2
¶ 19.

2008 shooting of two Hispanic men on Forest Hills Avenue in Annapolis. *Id.* "Poncho" had told Ramirez that he was "next." *Id.* This witness identified Ventura's photograph as the man he knew as "Poncho". *Id.*

While investigating the homicide, APD officers came into repeated contact with Fuertes and Ventura. On September 24, 2008, APD Corporal Dave Cochran stopped Fuertes's black Nissan Altima after observing a faulty light. Hr'g; Gov't Hr'g Ex. 1h. Fuertes initially told Cochran his name was Portillo. Hr'g. Fuertes was arrested for driving without a license and under a false name. Gov't Hr'g Ex. 1i. At booking, Fuertes said his name was Kerlin Esau Esquivel-Fuertes. Gov't Hr'g Ex. 1i. Fuertes's car was towed and, when it was not retrieved, searched in the impound lot. Hr'g. In the car, officers discovered a machete and other items. Gov't Hr'g Ex. 2a.

The next day, after discovering two outstanding arrest warrants for Fuertes,[12] and that Fuertes had provided as a contact the 5015 number associated with threatening calls to Ramirez, Hartlove arrested Fuertes in the area of Hilltop Lane and Spa Road in Annapolis. Hr'g; ECF No. 2 ¶ 21. Fuertes told Hartlove his name was Kerlin Esau Esquivel Fuentes. *See* Gov't Hr'g Ex. 3g. Officers searched Fuertes incident to the arrest,

---

[12] For driving without a license and selling tobacco products to a minor. Hr'g; *see also* Gov't Hr'g Ex. 3g.

and found on his person the 5015 cell phone.  ECF No. 2 ¶ 21.

Officers brought Fuertes back to the APD station for an

interview.  Hr'g.  During that interview, Fuertes gave his

written consent to officers to search his home--at 1009 Madison

Court Annapolis, Maryland 21403--and cell phone, and to take a

saliva sample. *See* Gov't Hr'g Ex. 3c.  Fuertes initialed the

following caution on the form: "I have also been advised that

the above items described, if seized, can be used against me in

a court of law.  This written permission and consent is being

given by me, voluntarily and without threat or promise of any

kind, and I am fully aware that charges, if any, will or can be

placed against me as a result of the evidence found or that the

evidence found can be used in support of the state's case

against me." *Id.*

At about 3:00 a.m. on September 26, 2008, Hartlove and

other officers arrived to conduct the search of Fuertes's

residence at 1009 Madison Court.  ECF No. 2 ¶ 22; Hr'g.  Rebeca

Duenas Franco answered the door and signed a consent form

allowing the officers entry.  Hr'g.  Fuertes's bedroom was

searched and officers seized a freezer bag full of condoms.  ECF

No. 2 ¶ 22; *see* Gov't Hr'g Exs. 4a, 4c.  An "occupant" gave

consent to search the basement, where officers observed a bed,

rubbing alcohol, and condoms.  ECF No. 2 ¶ 22; *see also* Gov't

Hr'g Exs. 4i, 4j.[13]  Also during the search, a cell phone was located in the living room and an "occupant" gave law enforcement permission to examine it.  ECF No. 2 ¶ 23.  The phone rang several times in the interim.  *Id.*  The calls were placed by Spanish-speaking males calling to schedule "appointments" for women at 31 F Carver Street in Annapolis. *Id.*  The cell phone listed contact numbers for "Pancho" as the 1397 number and the 0903 number.  *Id.*

On October 17, 2008, a telephone service provider informed law enforcement that the 0903 number was listed to German de Jesus Ventura, at 1913 Nova Avenue, Capitol Heights, Maryland 20743.  ECF No. 2 ¶ 24.  A motor vehicle administration ("MVA") photograph was obtained for Ventura and included in later photo arrays to witnesses identifying "Pancho," "Chino," and other aliases allegedly used by Ventura.  *Id.*

On December 10, 2008, while the investigation into Ramirez's murder was ongoing, Hartlove encountered Fuertes at the Maryland District Court for Anne Arundel County.  Hr'g. Hartlove spoke to Fuertes and asked him whether he would return to the APD to speak with him further.  *Id.*  Fuertes agreed, and

---

[13] At the hearing, Hartlove testified that, "for the most part," the people from whom he and other officers obtained consent to search were prostitutes or others working for Ventura.  Hr'g.

arrived at the station later that day.  *Id.*[14]  With the aid of a Spanish interpreter, Hartlove asked Fuertes for permission to search his wallet, and Fuertes orally consented.  *Id.*  In Fuertes's wallet, Hartlove found and seized several business cards and a Social Security card in the name of Carlos Eduardo Ramirez.  *Id.*; *see* Gov't Hr'g Exs. 5a, 5b.

On March 25, 2009, APD Officer E. Caraballo received information from a "reliable source" that a wanted person named Kevin Garcia Fuentes was staying at 112 South Villa Avenue, Apartment 1 in Annapolis, which apartment was in use as a brothel house.  ECF No. 2 ¶ 26.  Hartlove and Carabella arrived at the apartment at about 9:00 p.m.; Fuertes answered the door and was arrested on the outstanding warrant.  *Id.* ¶ 27; Hr'g.  During a search incident to arrest, officers found $696.00 on his person.  *Id.* ¶ 30; *see* Gov't Hr'g Ex. 6f.  Fuertes also gave Hartlove written consent to search a Sprint Blackberry cell phone.  Hr'g; *see* Gov't Hr'g Ex. 6e.  At the top of the consent form, Fuertes indicated his name was Kevin Garcia Fuentes; however, he initialed the form as "Kerlin Esau."  Gov't Hr'g Ex. 6e.

While waiting for backup officers to arrive, Hartlove conducted a sweep of the apartment.  Hr'g.  Hartlove found two

---

[14] Hartlove testified that he could not remember how Fuertes traveled from the court to APD Headquarters.  Hr'g.

Hispanic women in a back bedroom closet; he ordered them to the main living room area. *Id.* One woman was identified from the September 2008 search of 1009 Madison Court as Rebeca Duenas Franco. *Id.* ¶ 27. Officers also found KY liquid, condoms, rubbing alcohol, water bottles, baby-wipes, towels, and hand creams in the bedrooms. *Id.* ¶ 28. The rooms were furnished with twin beds. *Id.* The women admitted they were prostitutes, and stated that "Kerlin" or "Kevin" was in charge of the home. *Id.* ¶ 29; Hr'g.

On September 1, 2009, APD officers went to 31 Carver Street, Apartment F in Annapolis, where they intended to arrest Fuertes on another arrest warrant. ECF No. 2 ¶ 31; Hr'g.[15] Fuertes was not at the apartment. Hr'g. Persons who were present gave oral consent to officers to search the apartment. *Id.* During the search, officers found business cards and other items suggesting that a brothel was operating at 112 South Villa, where Fuertes had been arrested about six months earlier. *Id.* APD officers returned to the South Villa address, where

---

[15] Fuertes had used the 31 F Carver as an address in the past, and witnesses had also reported having seen him there. Hr'g. In addition, one of Fuertes's phones was associated with the address. *Id.*

they similarly received oral consent to search and discovered evidence of prostitution activity.  *Id.*; ECF No. 2 ¶ 31.[16]

On or about September 24, 2009, Hartlove discovered that there was an outstanding warrant in the District of Columbia for Ventura's arrest.  Hr'g; *see* Def. Hr'g Ex. 2.  Hartlove located Ventura at about 5:56 p.m. at 809 Chesapeake Avenue--also believed to be a brothel--in Annapolis.  ECF No. 2 ¶ 33; Hr'g.  A search of Ventura's person incident to the arrest revealed $859.00 in currency.  ECF No. 2 ¶ 34; *see* Gov't Hr'g Ex. 13a.  In Ventura's wallet, officers also found "tally sheets" appearing to annotate how many customers prostitutes serviced daily.  ECF No. 2 ¶ 34; *see* Hr'g; Gov't Hr'g Exs. 13b/1 to 13b/3.  "Carver" and "Southville" were written on one of the tally sheets.  *See* Gov't Hr'g Ex. 13b/1.  The wallet also contained Ventura's Maryland driver's license.  *See* Gov't Hr'g Ex. 13b/6.  A Mexican license displayed Ventura's picture with the name "Bartolo Simon Contreras Cruz."  Gov't Hr'g Ex. 13c.  Also among Ventura's possessions was a receipt for the "Chapa Law Office."  Hr'g.

---

[16] One of the arrested prostitutes was provided temporary lodging by a neighbor at the South Villa address.  ECF No. 2 ¶ 32; Hr'g.  Soon thereafter, the family received threatening calls from a "Hispanic-sounding" male calling from the 0903 number.  *Id.*; Hr'g.  Several days later, gasoline was poured in the hallway of this family's building and the family car's window was broken.  *Id.*  When a male family member called the 0903 number, the call was answered by a Hispanic male, who asked if the caller wanted a girl.  *Id.*

Ventura was taken to the APD station for questioning.
Hr'g.[17]  Before the interview began at about 11:40 p.m., Hartlove
advised Ventura--in English--of his *Miranda* rights, using a
standard APD form.  *Id.*  According to Hartlove, translation into
Spanish was unnecessary because he and Ventura were having a
conversation "back and forth" without difficulty in English.
*Id.*  Ventura allegedly waived his right to counsel and agreed to
speak with Hartlove, but would not sign a form to that effect.
*Id.*[18]  Ventura informed Hartlove that he lived at 1913 Nova
Avenue in Capitol Heights, Maryland.  ECF No. 2 ¶ 35.  He stated
he did not have a phone, although two were found on his person.
*Id.*  When asked about these phones, Ventura said he had found
one in a mall and borrowed the other from a taxi driver.  *Id.*;
Hr'g.[19]  During the interview, Hartlove also asked questions
about Ventura's involvement in prostitution, homicides, and the

_____

[17] Ventura was not provided *Miranda* warnings, or questioned, at
the scene of arrest.  Hr'g.

[18] According to Hartlove's report of the interview, Ventura
stated that he would not sign anything "unless his lawyer was
present."  Hr'g.

[19] A search and seizure warrant was issued for the two phones
taken from Ventura.  ECF No. 2 ¶ 36; *see* Gov't Hr'g Ex. 32a.
The LG phone taken from him had the 0903 number, and the
Blackberry phone was assigned the number 347-423-7742.  *Id.*  A
review of Ventura's records showed his work phone as the 1397
number.  ECF No. 2 ¶ 36.  Maryland Income Tax Returns for 2007
and 2008 also showed his daytime phone numbers as the 1397
number.  ECF No. 131 at 13.  By subpoena, the APD obtained one
year's phone records for the 0903 number, which revealed about
47,000 incoming call and outgoing calls.  ECF No. 2 ¶ 38.

Washington, DC burglary from which the arrest warrant had derived. Hr'g.  Hartlove did not ask Ventura about the law office receipt. *Id.*  The interview--which continued until about 12:40 a.m. on September 25, 2009--was not tape recorded. *Id.* The interview ended when Ventura asked for a lawyer. *Id.*

Also on September 24, APD Detective Amy Miguez returned to 31 Carver Street, Apartment F to look for a wanted person named Kerlin Fuentes.  ECF No. 2 ¶ 37; Hr'g.  An occupant of the apartment gave Miguez oral consent to search.  Hr'g.[20]  Three occupants were arrested, and evidence of brothel activity was seized.  ECF No. 2 ¶ 37; Hr'g.  All arrested persons identified Ventura as the brothel's owner/operator.  ECF No. 2 ¶ 37.

Late at night on February 17, 2010, or in the early morning of February 18, 2010, the APD received a 911 call reporting a robbery.  ECF No. 2 ¶ 39; Hr'g; *see* Gov't Hr'g Ex. 14i/2.  The call came in from phone number 301-418-3124, which was allegedly "known" to be used by Ventura and associated with false reports and threats to cooperating witnesses.  ECF No. 2 ¶ 39.  The caller said that he was on the phone with his brother and heard his brother being robbed. *Id.* ¶ 40.  The caller would not give

---

[20] Hartlove testified that he could not remember who consented to Miguez's search.  Hr'g.

his name[21] or his brother's, but indicated that the robbery was occurring at "Forest Hills, building 4, door 3." *Id.* Officers began checking the area of Forest Hills Avenue and Bricin Steet, Forest Hills Apartments. *Id.* ¶ 41. One officer observed three Hispanic men walking near Janwall Street; the men began to run away when they saw the police car, but were stopped by other officers on Crows Nest Court. *Id.* After frisking them, officers discovered multiple cell phones and wallets on their persons. *Id.*

Officers "located" 5 Melrob Court, Apartment 3 as a "possible" match to the location of the robbery. ECF No. 2 ¶ 42. Upon arriving at the apartment, officers treated the location as a crime scene. Hr'g. The occupants gave police permission to enter and search the area. *Id.* Occupants also told the officers that three Hispanic men had used a pistol, machete, and knife to rob them before fleeing the scene. ECF No. 2 ¶ 43. The description matched that of the three subjects the officers had stopped. *Id.* After beginning their search of the apartment, officers suspected that the location was being used as a brothel. *Id.* They secured the location and obtained a search warrant and, upon executing the warrant, discovered "numerous" items indicating the residence was being used as a

---

[21] Hartlove testified that the caller's voice "sounded like" Ventura's and that, at a later point, Ventura admitted he had made the call. Hr'g.

brothel, including egg yolks, ledgers, condoms, and rubbing alcohol. *Id.*; *see* Gov't Hr'g Exs. 14h/6 to 14h/16.[22]

On March 5, 2010, the APD sought and obtained orders from the Circuit Court for Prince George's County, Maryland authorizing the placement of GPS tracking devices on a 1995 green Ford Expedition--later determined to be an Explorer--with license plate 53563M6, and a 2000 white Chevrolet Astro Van with license plate A205926, both of which were believed to be associated with Ventura's alleged prostitution activity.  Hr'g; *see also* Gov't Hr'g Ex. 33(10) and (11).  Both orders provided that, in the absence of any extension, the devices "will be removed" 30 days after they were first installed.  *Id.*  The orders further provided that removal should "normally" be accomplished within 10 days after the 30-day period expired.

---

[22] During a February 18, 2010 interview, one of the robbery suspects--Maximilliano Zelaya Rapolo--stated that he had worked for a prostitution business at 5 Melrob Court for about three weeks and had not been paid, which was why he had robbed the location.  ECF No. 2 ¶ 45.  Zelaya Rapolo said he was working for a man named "Chalo"; he denied knowing where Chalo lived, but said that "Chalo" spent "several nights" of the week at 5 Melrob Court.  *Id.*  Zelaya Rapolo described "Chalo" as the self-proclaimed "boss" of Annapolis prostitution.  *Id.*  Zelaya Rapolo also said that another man called "the Dominican" owned prostitution houses in Annapolis and was "Chalo's" only competition.  *Id.*  "Chalo" frequently talked of killing the Dominican.  During one conversation, Zelaya Rapolo overheard "Chalo" admit to having killed "el Palone."  *Id.*  Zelaya Rapolo identified Ventura's MVA photograph as the man he knew as "Chalo."  *Id.*

*Id.*  After the orders expired,[23] the APD continued to track Ventura through GPS devices on his cars, albeit under HSI Special Agent Kelly's and the U.S. Attorney's Office--as opposed to a court order's--authority.  Hr'g.[24]  In September 2010, after discovering that the tracking device on the Ford was "missing" and possibly compromised, law enforcement removed all remaining tracking devices from the relevant cars.  *Id.*

In addition to tracking Ventura's cars, the APD obtained orders from various judges in the Circuit Court for Anne Arundel County, Maryland authorizing the installation and use of pen registers/trap & trace and cellular tracking devices on nine cell phones believed to be used by Ventura and his associates. Hr'g; *see* Gov't Ex. 33(1) to (9).[25]  The orders authorized use of

---

[23] The device placed on the green Ford failed in April but was replaced.  Hr'g.

[24] Another GPS was placed on a Nissan on July 29, 2010.  Hr'g.

[25] Orders were signed for the following cell phones in 2010:
- (1)  301-418-3124 (signed on June 2, July 16, September 9, and October 29);
- (2)  302-250-9346 (signed on May 7);
- (3)  202-491-4064 (signed on March 10 and June 2);
- (4)  443-510-5211 (signed on November 5);
- (5)  757-759-0710 (signed on September 24);
- (6)  757-362-1815 (signed on August 5 and September 9);
- (7)  302-250-9346 (signed on July 8);
- (8)  757-575-4168 (signed on July 29 and September 1); and
- (9)  252-207-2762 (signed on September 1).

Gov't Hr'g Ex. 33(1) to (9).  Hartlove testified that tracking on the 3124 phone was authorized in April; however, the Government has not yet provided the order to the Court.  Hr'g.

the tracking devices for 60 days from the date of their installation, "without geographical limits."  Gov't Ex. 33(1) to (9).  The first of these orders was signed on March 10, 2010; the last was signed on November 5, 2010.  *See id*.  Hartlove testified that the trackers functioned by sending him email "alerts" every 15 minutes containing a Google map of a phone's location.  Hr'g.  Hartlove stated that, in "most cases," the cell trackers were accurate to within three or six feet of the location but there were "times" when the information was accurate only to within 4999 feet.  *Id*.[26]

According to Harlove, the cell phone information "assisted" the APD in setting up surveillance of Ventura and other operatives.  Hr'g.  Specifically, Hartlove was "checking both [cell phone and vehicle trackers] at the same time most of the time."  *Id*.

By November 2010, law enforcement had taken over 1000 photographs of Ventura and his associates allegedly transporting women in Maryland, the District of Columbia, and Virginia.  ECF No. 2 ¶ 50.  According to Hartlove, surveillance was conducted-- and photographs were taken--on "specific" days, namely, April 5, May 8, June 14, July 12, August 2, September 13, and September

---

[26] On cross-examination, Hartlove stated that the cell phone trackers were "fairly accurate" as long as there was a "good signal."  Hr'g.  Hartlove further testified that GPS devices on vehicles may experience similar technical difficulties.  *Id*.

19.  Hr'g.  Thus, with the exception of the April 5 surveillance
evidence, data collected as a result of GPS tracking devices on
cars came from the devices installed by ICE.  *Id.*

On November 3, 2010, one of Ventura's alleged competitors,
Hector Avila, was assaulted by three men with a shotgun.  ECF
No. 2 ¶ 94; Hr'g.  One of the assailants later reported that
Ventura had hired him to murder Avila.  Hr'g.  Believing that
the threat of violence had dangerously escalated, law
enforcement sought and obtained numerous warrants to arrest and
search, which were executed on November 15, 2010.  *Id.*

Ventura was among those arrested on November 15, 2010.
After Ventura was brought to the APD station, at 7:43 p.m.,
Hartlove began to question him in the presence of Detective
Oriano, a Spanish-speaking officer.  Hr'g.  The 7:43 p.m.
interrogation terminated after about one minute and 30 seconds,
when Hartlove believed that Ventura had invoked his right to
counsel.  *Id.*[27]  Ventura was taken down to a jail cell.  *Id.*

---

[27] Specifically, at the outset of the 7:43 p.m. interrogation,
the following exchange occurred (the italicized language was in
Spanish):

    HARTLOVE: Can you state your full name?
    ORIANO: *Your name?*
    VENTURA: Oh, German Ventura.
    HARTLOVE: And, and, it, and we're doing an audio
    recording and I have your permission to do that?
    ORIANO: That's correct.  *Oh, say "we have your*
    *permission to record this, this…"*
    VENTURA: *If I have a lawyer yes.*
    ORIANO: If he, if he has a lawyer yes.

About one hour later, Ventura pressed a buzzer in his jail cell and indicated to the dispatcher that he wanted to speak with the detectives again. *Id.* Hartlove went downstairs, where Ventura told him he had something important to say. *Id.* Hartlove escorted Ventura back to the interview room, where he was joined by Homeland Security Investigations ("HSI") Special Agent Ed Kelly and Spanish civilian liaison Joe Hudson. *Id.* The following exchange occurred:

> HARTLOVE: All right. First I'm gonna grab, grab just general information from you. I'm gonna read you your rights just like they do in the movies, okay? You're the one that reinitiated the, the, the interview by pushing the button down in your cell block, correct?
> HUDSON: *That he's going to ask you some things like where you live and things like that. He's going to tell you your constitutional rights. That you asked to speak because you touched the bell downstairs, right? Yes or no?*
> VENTURA: Yes.
> * * *
> HARTLOVE: All right. Joe Hudson is gonna read your rights to you. Okay?
> HUDSON: *I'm going to read your rights. If you understand what I'm telling you I need you to put your initials on each line.*

---

> HARTLOVE: Okay, you want a lawyer? Perfect?
> VENTURA: Yes, because you stole my money the first time.
> HARTLOVE: All right. The recording stopped. Uh, it's right now…
>
> **[VOICES OVERLAP]**
>
> VENTURA: Yeah, he took my money; nine hundred dollars…for nothing…
>
> **[VOICES OVERLAP]**
>
> HARTLOVE: It's right now seven forty three (7:43). Uh, close, uh, seven forty three (7:43). Again, the audio is rec… uh, stopped. He wants a lawyer.

7:43 p.m. Interrogation Tr. at 2.

VENTURA: *No, no, no, no.  I'm going to speak, I'm not going to sign anything.*

HUDSON: He says he's gonna talk, he's not gonna sign nothing.

VENTURA: *I'm going to talk, it's rec, it's recording this. I'm not going to sign anything.*

HUDSON: He says you're recording it, he's not gonna sign nothing.

VENTURA: *Until I know* [Unintelligible].

**[VOICES OVERLAP]**

HARTLOVE: Okay, well, I'm gonna read it to you then.

HUDSON: *He's gonna read it.*

HARTLOVE: And then, and then from there I'm gonna fill the rest of it out and I'm just gonna put down again that you refused to sign, but you are on the audio, but I need your permission again.  Uh, after I read these rights to you, that the last one is do you want a lawyer.  Okay?

HUDSON: *He's going to…*

HARTLOVE: So your first question…

HUDSON: Hold on.

HARTLOVE: …that I'm gonna ask you.

HUDSON: *He's going to read it to you.  At the end he's going to ask you if you understand everything.  If you want to speak without a lawyer, okay?*

VENTURA: *Of course I want to speak to a lawyer.*

HUDSON: *Everything is being recorded.*

VENTURA: *Of course I want to speak to a lawyer to know what is going on.*

HUDSON: He said he wants, *you want a lawyer?*

VENTURA: *Of course.*

HUDSON: He says he wants a lawyer 'cause he wants to know what's going on.

VENTURA: *Of course.*

HARTLOVE: All right, well, that's, that's, that's…

VENTURA: But I do want to speak with, with him.

**[VOICES OVERLAP]**

HARTLOVE: End of the questions again.

HUDSON: *You want to speak right now without a lawyer?*

**[VOICES OVERLAP]**

VENTURA: *Of course, I want to speak, I want to speak with, no, I want to speak with him.  Of course, but afterwards if he gives me a chance to, to a lawyer as well.*

HUDSON: *So you want to speak with now and then you want a lawyer?*

VENTURA: *Exactly.*

HUDSON: He says he wants to talk now and then he wants a lawyer.
VENTURA: *Or is there a problem that I have with…?*
HUDSON: Okay, let me read these to you first.  Just to make sure you understand.

**[VOICES OVERLAP]**

HUDSON: [Unintelligible] *the rights, okay?*
HARTLOVE: You have the absolute right to remain silent.  Do you understand that?
HUDSON: *You have the right to not say anything. Do you understand?*
VENTURA: *So why am I here?*
HUDSON: He says then why am I here?
HARTLOVE: Okay, you're here because you're charged with a federal offense.
HUDSON: *You are here because you are charged federally.*
VENTURA: *But what, what is that?*
HUDSON: What is that?
HARTLOVE: You're charged with the Mann Act, transport, transporting females uh, for prostitution.
VENTURA: *Do you have proof?*
HUDSON: Hmm? Do you have proof?
VENTURA: *Do you have proof?*
HARTLOVE: [Sighs].

**[PAUSE]**

HARTLOVE: You done, Ed?
KELLY: Yeah, I'm done.
HARTLOVE: All right.
VENTURA: *What I was going to talk about is very important for, for him.*
HUDSON: He says what he has to tell you is very important.
KELLY: Then listen to him explain your rights and say if you want to use your rights or not…
VENTURA: Okay.
KELLY: And quit screwing around.  You get me?
VENTURA: Okay.
KELLY: If you want to use your rights, use then. I don't care.  I got a family to go home to. I don't know what you got to go home to.  I imagine, it's not much, sir.
VENTURA: Okay.
KELLY: Okay? But if you want to do this, do it. Otherwise, you gotta go to central booking and the way you spoke on the phone the other night, I don't think you're gonna like it too much.

21

VENTURA: Yeah.
HUDSON: *You understand everything?*
VENTURA: *No, I understood a little.*
HUDSON: *If you want to play around, everything ends right now and they're going to take you to jail.*
VENTURA: Hmm.
HUDSON: *We here have families and we want to go to our families.*
VENTURA: Um-hmm.
HUDSON: *But how you spoke the other day, I don't think you want to go to jail that way.  Okay? So this is on you, if you want him to read the rights right now, he's going to read them and don't play around anymore because if you want to play, let's go right now.*
VENTURA: *No, because I'm not playing.  You know?  It's something serious.  What I want is…*
HUDSON: *Okay then let's see.  I'm going to read it to you.  If you understand you say yes or no and we'll go, okay?*
HARTLOVE: All right.  What did you, you just say to him?
HUDSON: Same thing you had told him.  I said, dude, we're not playing here.  I said you're gonna read him his rights.  He's gonna say yes or no that he understands.  If he wants to play around, he can go on now.
HARTLOVE: All right.  You have the absolute right to remain silent.  Do you understand that?
HUDSON: *You have the absolute right to remain silent. Do you understand?*
VENTURA: *Then how am I going to speak? That's what I don't understand.*
HUDSON: [Stutters] *you have the right to say nothing. It's your constitutional right, okay?*
VENTURA: *Okay.*
HUDSON: *If you want to say* yes, no, *say nothing, it ends right now and we go.  Okay?*
VENTURA: *Okay.*
HUDSON: I just explained to him what the right to not say anything is.  I said if you don't want to say anything, you don't have to say anything, if you want to tell us yes you understand or no you don't understand.  *You understand?*
VENTURA: *Um-hmm.  A little bit.*
HUDSON: *Yes or no?*
VENTURA: *Yes, yes, I, I understand.*
HUDSON: Yes.

22

HARTLOVE: Anything you say can and will be used against you in a court of law. Do you understand that?
HUDSON: *Anything that you say right now can be used against you in a court. You understand?*
VENTURA: *Yes, yes.*
HUDSON: Yes.
HARTLOVE: You are not promised anything to talk to me and no threats are or will be made against you.
HUDSON: *We are not promising you anything. We are not going to, we are not threatening you to speak with us. Yes or no?*
VENTURA: *How? I mean, if I talk, it's not of use to me then?*
HUDSON: Huh?
VENTURA: *So if I talk to you, if I work with you it's of no use then?*
HUDSON: Not, he says, if I talk, it's not gonna do me any good?
HARTLOVE: Depends on what you say.
HUDSON: *Depends on what you say.*
HARTLOVE: I, yeah, I can't promise anything at this point.
HUDSON: *He can't promise you something until he hears what you say.*
VENTURA: *There is something I want to say to those two (2).*
HUDSON: He says there's something I want to tell the two (2) of you.
VENTURA: *And anything that I say…*
HUDSON: *But you understand this right?*
VENTURA: *Let me sir, let me, I agree. I, either way I'm going to say something.*
HUDSON: He said no matter what I'm going to tell you something anyway.
VENTURA: *Everything that I say, if I tell you, please, protect my family.*
**[VOICES OVERLAP]**
HUDSON: Okay, yeah everything I tell you, everything I'm gonna tell you is to protect my family.
HARTLOVE: All right, but you…
HUDSON: *You understand this right?*
VENTURA: *Yes, sir.*
HUDSON: Uh, he understands his right.
HARTLOVE: All right. Number four (4), you have the right to talk to a lawyer and have him present during any time during any questioning. If you should

precede [sic] to answer the questions without a
lawyer, the questioning will stop if you should change
your mind and request the presence of a lawyer.  Do
you understand that?

HUDSON: *You have the right to speak to a lawyer and
have one present during the interrogation.  If you
want to speak without a lawyer, you can ask for a
lawyer at any moment.  You understand?*

VENTURA: *And the public one here, can they help me?*

HUDSON: Can a public defender help him here?

VENTURA: *Depending on the problem, right?*

HUDSON: Depending on what the problem is.

HARTLOVE: If you want to call a lawyer, just tell me.
You want to call, talk to a lawyer.

HUDSON: If you want, if you want to speak to a lawyer
right now, just tell him that you need a lawyer right
now.

VENTURA: *Of course, I need a lawyer, but I need to
talk to them.*

HUDSON: He says…

VENTURA: *And it is something very important.*

HUDSON: He says "I will need a lawyer, but I want to
talk to you too 'cause this is very important."

VENTURA: *That has happened in my life.*

HUDSON: *Do you understand this right?*

VENTURA: *Yes, sir.*

HUDSON: Yes, he understands his right.

HARTLOVE: If you cannot afford a lawyer one will be
provided to you without any cost before any
questioning if you so desire.  Do you understand this?

HUDSON: *If you can't pay for a lawyer, it can, uh,
receive one to represent you without cost to you.  You
understand?*

VENTURA: *Yes.*

HUDSON: Yes, he understands.

HARTLOVE: Do you understand each of these rights I
just advised you?

HUDSON: *Do you understand all the rights that he, he
has explained to you?*

VENTURA: *Yes, yes.*

HUDSON: Yes.

HARTLOVE: Okay.  Will you talk to me without the
presence of a lawyer right now?

HUDSON: *Do you want to talk to him without a lawyer
right now?*

VENTURA: *But afterwards yes.  Yes, right now I can
talk.  Yes.*

24

**[VOICES OVERLAP]**

HUDSON: *Do you want to talk?*  Yes, he wants to talk to you right now without a lawyer, later he wants one.

At 8:50 p.m., Hartlove completed--but Ventura did not sign— the APD's Advisement of Rights form.  8:45 p.m. Interrogation Tr. at 2, 6-14.  The interview continued for about one and one half hours after the above conversation.  Hr'g.

B. Procedural History

On November 15, 2010, Ventura was charged by criminal complaint with interstate transportation for prostitution, in violation of 18 U.S.C. § 2421.  ECF No. 1.  Ventura initially appeared on November 16, 2010.  ECF No. 4.  That day, U.S. Magistrate Judge Beth P. Gesner appointed the Federal Public Defender to represent Ventura.  ECF No. 6.  Ventura was temporarily committed pending his detention hearing.  ECF No. 8. On November 18, 2010, the Office of the Federal Public Defender moved to withdraw.  ECF No. 10.  After a November 22, 2010 hearing, Ventura was ordered detained.  ECF Nos. 13, 15.  On November 23, 2010, the Public Defender's motion to withdraw was granted.  ECF Nos. 17, 18.  Richard Bittner, Esq. was appointed as counsel for Ventura.  On November 24, 2010, Ventura moved to continue the preliminary hearing.  ECF Nos. 19, 20.  On November 29, 2010, the motion to continue was granted.  ECF No. 21.  On December 2, 2010, Ventura waived his right to the preliminary hearing.  ECF No. 22.  A one-count indictment followed on

December 14, 2010.  ECF No. 23.[28]  On February 4, 2011, Manuel J.
Retureta, Esq. replaced Bittner as counsel for Ventura after an
attorney inquiry hearing before Judge Gesner.  ECF Nos. 25, 27,
28.  On April 1, 2011, Ventura was arraigned.  ECF No. 30.

On April 4, 2011, trial was scheduled for June 6, 2011.
ECF No. 31.  On May 24, 2011, the parties moved to exclude time
under the Speedy Trial Act from December 14, 2010, through June
30, 2011.  ECF No. 32.  On May 25, 2011, the motion to exclude
time was granted.  ECF No. 33.  On July 15, 2011, trial was
rescheduled for January 23, 2012.  ECF No. 35.  On July 21,
2011, the parties moved to exclude time from December 14, 2010
to the new trial date.  ECF No. 36.  The motion was granted that
day.  ECF No. 37.  On August 23 and September 7, 2011, Ventura
submitted letters to the Court seeking to "fire" Retureta.  ECF
Nos. 38, 39.  Also on September 7, Ventura moved *pro se* for
"speedy trial."  ECF No. 40.  Judge Legg denied Ventura's *pro se*
motion to appoint new counsel on September 16, 2011.  ECF No.
41.

On November 4, 2011, Ventura moved to suppress November 15,
2010 statements to law enforcement.  ECF No. 49.  On November 9,
2011, Ventura moved *pro se* to dismiss the indictment.  ECF No.
50.

---

[28] The case was initially Judge Legg's.

On November 29, 2011, the Grand Jury returned a superseding
indictment, which added new charges against Ventura and Fuertes
as a defendant. ECF No. 51.[29]  On December 13, 2011, Ventura
moved *pro se*, for the second time, to dismiss the indictment.
ECF No. 57.  On January 3, 2012, Michael D. Montemarano, Esq.
entered an appearance on behalf of Fuertes.  On January 6, 2012,
Fuertes made an initial appearance and was ordered detained by
U.S. Magistrate Judge Susan K. Gauvey.  ECF Nos. 62, 65.  Also
on January 6, 2012, Ventura was arraigned on the superseding
indictment.  ECF No. 63.  On January 17, 2012, Judge Legg
rescheduled trial for May 14, 2012.  ECF No. 67 at 2.

On March 19, 2012, Ventura submitted additional
correspondence seeking new counsel.  ECF No. 72.  After an

---

[29] The superseding indictment contains seven counts:
  (1)  Conspiracy to commit interstate prostitution, in
       violation of 18 U.S.C. § 371 (the Defendants);
  (2)  Interstate transportation for prostitution, from
       September 2008 through March 2009, in violation of 18
       U.S.C. § 2421 (the Defendants);
  (3)  Coercion and enticement to engage in interstate
       prostitution, in violation of 18 U.S.C. § 2422(a)
       (Ventura);
  (4)  Interstate transportation for prostitution, on August 2,
       2010, in violation of 18 U.S.C. § 2421 (Ventura);
  (5)  Interstate transportation for prostitution, on November
       15, 2010, in violation of 18 U,S.C. S 2421 (Ventura);
  (6)  Sex trafficking by force, fraud, and coercion, in
       violation of 18 U.S.C. § 1591(a) (the Defendants); and
  (7)  Possession of a firearm in furtherance of a crime of
       violence, in violation of 18 U.S.C. § 924(c) (Ventura).
ECF No. 51.  The Defendants were also charged with aiding and
abetting the crimes charged in Counts Two through Seven.  *See
id.*

attorney inquiry hearing before Judge Gesner, A. Eduardo

Balarezo, Esq. replaced Retureta as counsel for Ventura.  ECF

Nos. 76, 78, 80; *see* docket.

The case was reassigned from Judge Legg to this Court on

April 4, 2012.  *See* docket.  On April 12, 2012, trial was

rescheduled to Monday, April 8, 2013.  ECF No. 79.  On April 20,

2012, the parties moved to exclude time under the Speedy Trial

Act from December 14, 2010 until the new trial date.  ECF No.

81.  The motion was granted the same day.  ECF No. 82.  On May

10 and July 10, 2012, Ventura submitted letters to the Court

objecting to the postponement.  ECF Nos. 83, 86.

On July 20, 2012, Balarezo moved to withdraw as counsel for

Ventura.  ECF No. 87.  The motion was granted; Gerald C. Ruter,

Esq. replaced Balarezo.  ECF Nos. 88, 92.

On January 17, 2013, Fuertes moved for leave to file

additional motions; to sever; for disclosure of Rule 404(b) and

609 material; to compel prosecution witness review; to adopt his

codefendant's motions; for disclosure of evidentiary basis of

Rule 801(d)(2)(E) material; and for disclosure of Rule 12

material.  ECF Nos. 104-06, 108-11.[30]  On January 18, 2013,

Ventura moved for leave to file additional motions; to adopt his

---

[30] Fuertes's memorandum in support of his motion to disclose Rule 404(b) and 609 material was mistakenly docketed as a separate motion.  *See* ECF No. 107.  The Court will direct the Clerk to correct the error.

codefendant's motions; to suppress statements; to suppress tangible evidence; to suppress a stop, search, statements, and other derivative evidence; and to suppress in-court identification. ECF Nos. 112-13, 115-20.  On January 21, 2013, Ventura moved to suppress evidence obtained through illegal use of GPS devices.  ECF No. 121.  Also on January 21, Ventura moved--this time through counsel--to dismiss the indictment on speedy trial grounds.  ECF No. 122.  On February 25, 2013, the Government filed a consolidated opposition to most of the Defendants' pending pretrial motions.  ECF No. 131; *see* ECF Nos. 124, 130.

On February 25, 2013, the Government moved to take a Rule 15 deposition of alleged coconspirator Maximilliano Zelaya Rapalo.  ECF No. 132.  On March 4, 2013, the Defendants opposed the Rule 15 motion.  ECF No. 139.[31]  On March 5, 2013, the Court granted the Government's motion to take deposition.  ECF No. 140.  Also on March 5, the Court scheduled the pretrial motions hearing.  ECF No. 141.  The hearing was held on April 3, 2013. *See* docket.  On April 5, 2013, the Defendants moved *in limine* to exclude evidence of threats to third persons from trial.  ECF No. 159.

---

[31] The Defendants' opposition was mistakenly docketed as a separate motion.  *See* ECF No. 139.

II.  Analysis

 A. The Defendants' Motions to Suppress Statements

     To be admissible, a defendant's statement must comply with
two provisions of the Fifth Amendment: the right to due process,
and the privilege against self-incrimination.

     "A statement is involuntary under the Fifth Amendment only
if it is 'involuntary' within the meaning of the Due Process
Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir.
1997), *cert. denied*, 522 U.S. 874 (1997).  The test for
determining whether a statement is voluntary under the Due
Process Clause is "whether [it] was extracted by any sort of
threats or violence, [or] obtained by any direct or implied
promises, however slight, [or] by the exertion of any improper
influence."  *Id.* (internal quotation marks omitted).  Coercive
police activity is a "necessary predicate" to the finding of Due
Process Clause involuntariness.  *Id.* (internal quotation marks
omitted).  The proper inquiry is whether the defendant's "will
has been overborne or his capacity for self-determination
critically impaired."  *Id.* (internal quotation marks omitted).
"[C]ourts must consider the totality of the circumstances,
including the characteristics of the defendant, the setting of
the interview, and the details of the interrogation."  *Id.* at
781 (internal quotation marks omitted).

To protect a suspect's right against self-incrimination,
police must provide *Miranda* warnings[32] before subjecting him to
custodial interrogation.  *See Miranda v. Arizona*, 384 U.S. 436,
444 (1966).  "If . . . he indicates in any manner and at any
stage of the process that he wishes to consult with an attorney
before speaking there can be no questioning."  *Id.* at 444-45.
Similarly, if he "indicates in any manner that he does not wish
to be interrogated, the police may not question him."  *Miranda*,
384 U.S. at 445.  However, a defendant may "waive effectuation
of the rights conveyed in the [*Miranda*] warnings," provided the
waiver is made "voluntarily, knowingly and intelligently."
*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation
marks omitted).  Courts "engage in the same inquiry when
analyzing the voluntariness of a *Miranda* waiver as when
analyzing the voluntariness of statements under the Due Process
Clause."  *United States v. Cristobal*, 293 F.3d 134, 140 (4th
Cir. 2002), *cert. denied*, 537 U.S. 963 (2002).  Thus, the
critical inquiry remains whether the suspect's will was
"overborne" or his capacity for self-determination "critically
impaired."  *Braxton*, 112 F.3d at 780.  Coercive police activity
similarly remains a necessary predicate to a finding that a

---

[32] Police must warn the suspect that "he has a right to remain
silent, that any statement he does make may be used as evidence
against him, and that he has a right to the presence of an
attorney, either retained or appointed."  *Miranda*, 384 U.S. at
444.

waiver of *Miranda* rights is not voluntary.  *Cristobal*, 293 F.3d at 141.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  The Sixth Amendment right to counsel "attaches only at or after the initiation of adversary judicial proceedings against the defendant."  *United States v. Gouveia*, 467 U.S. 180, 187 (1984).[33]

1. Ventura's Motions to Suppress Statements

a. September 24, 2009 Statements (ECF No. 118)

Ventura moved to suppress his September 24, 2009 statements to Hartlove on the grounds that they were taken in violation of his Fifth Amendment right against self-incrimination and to counsel and his Sixth Amendment right to counsel, and were involuntary.  ECF No. 118 at 3.

It is undisputed that Ventura was in custody and subjected to questioning for *Miranda* purposes while at the APD station. *See United States v. Pope*, 212 F. App'x 214, 218 (4th Cir. 2007) (an arrestee is in custody for purposes of *Miranda*); Hr'g.[34]  The

---

[33] "The filing of a federal criminal complaint does not commence a formal prosecution."  *United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006).  Nor does the right attach immediately after arrest and before arraignment.  *Id.*

[34] Ventura was not questioned at the scene of arrest.  Hr'g. Thus, no *Miranda* violation could have occurred there.  *See*

issue, then, is whether Ventura was provided adequate *Miranda*
warnings and waived his rights pursuant thereto.  At the
hearing, Hartlove credibly testified that he advised Ventura in
English of his *Miranda* rights before the interview began.  Hr'g.
According to Hartlove, translation into Spanish was unnecessary
because he and Ventura were having a conversation "back and
forth" without difficulty and Ventura seemed to understand the
questions asked.  *Id*.  Hartlove testified that Ventura orally
waived his right to counsel and to remain silent, but refused to
do so in writing.  *Id*.[35]  Further, Ventura acknowledged that his
statements conceivably could be used against him.  *Id*.  There is
no evidence that Hartlove or another officer threatened Ventura,
made any promises, or exerted improper influence to extract this
waiver, or any other statements.  *See Braxton*, 112 F.3d at 780.

Under a totality of the circumstances, the Government met
its burden of showing, by a preponderance of the evidence, that

---

*Miranda*, 384 U.S. at 444 (warnings only required before
custodial interrogation).

[35] In his report of the interview, which was not tape-recorded,
Hartlove wrote that Ventura stated he would not sign the waiver
form "unless his lawyer was present."  Hr'g.  Of course, a
suspect's refusal to sign a written waiver does not, in itself,
render his oral waiver insufficient.  *United States v. Thompson*,
417 F.2d 196, 197 (4th Cir. 1969) (per curiam).  Nor did
Ventura's statement "unless his lawyer was present" operate as
an invocation of his right to counsel.  *See Burket v. Angelone*,
208 F.3d 172, 198 (4th Cir. 2000) ("[T]o invoke the right to
counsel and prevent further interrogation, a suspect must
*unambiguously request* the assistance of counsel." (emphasis
added)).

Ventura knowingly and voluntarily waived his *Miranda* rights,
rendering his September 24, 2009 statements admissible under
*Miranda* and principles of Due Process. *See United States v.
Robinson*, 404 F.3d 850, 860 (4th Cir. 2005), *cert. denied*, 546
U.S. 916, 955 (2005). Moreover, Ventura had no Sixth Amendment
right to counsel, as he had not yet been charged. *Gouveia*, 467
U.S. at 187. Thus, Ventura's motion to suppress those
statements will be denied.

b. November 15, 2010 Statements (ECF Nos. 49, 117)[36]

Ventura also moved to suppress his November 15, 2010
statements to law enforcement, on the grounds that the
statements were taken in violation of his Fifth Amendment right
against self-incrimination and to counsel, and were involuntary.
*See generally* ECF Nos. 49, 117. The Government contended that
Ventura was "fully informed" of his *Miranda* rights and waived
them. ECF No. 131 at 18. According to the Government, the
interviews were also conducted in a "non-coercive manner," with
opportunities for eating, drinking, using the restroom, and
making telephone calls. *Id.*; *see id.* at 25-26.

---

[36] Ventura's first motion to suppress the November 15, 2010
statements (ECF No. 49) was filed by Retureta before he was
terminated as Ventura's counsel. Ventura's second motion to
suppress his November 15, 2010 statements (ECF No. 117), which
was filed by Ventura's current counsel Ruter, largely parallels
the first motion to suppress; thus, the motions will be
discussed together.

As discussed at length in Part I, the November 15, 2010 interview transpired in two parts: the first at 7:43 p.m. and the second at 8:45 p.m.  Hr'g.  The first part ended after about one minute, when Hartlove believed Ventura had invoked his right to counsel by stating in response to a request for permission to record "If I have a lawyer yes."  *Id.*; 7:43 p.m. Interrogation Tr. at 2.  The parties do not appear to dispute that the officers honored Ventura's perceived request for counsel by terminating the interview.  Instead, the principal dispute concerns whether the officers properly "resumed" the interrogation about one hour later.

When a suspect under interrogation requests counsel, "the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474.  The Supreme Court "reconfirm[ed]" the *Miranda* principles regarding the right to counsel during custodial interrogation by holding that, once a suspect invokes that right, police may not interrogate the suspect further "until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*"  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  After Hartlove believed Ventura had invoked his right to counsel at the 7:43 p.m. interrogation, the interrogation ceased and he was returned to a jail cell.  Hr'g. Hartlove testified that, about one hour later, Ventura pressed a

35

buzzer in his jail cell and told to the responding dispatcher that he wanted to speak with the detectives again. *Id*. Hartlove went downstairs, where Ventura reiterated that he had something important to say. *Id*. This Court found Hartlove to be credible. Moreover, after Ventura was brought back to the interview room, he was directly asked to confirm whether he had, in fact, wished to speak with detectives again. 8:45 p.m. Interrogation Tr. at 2 (confirming that he asked to speak by pressing the buzzer). Thus, the officers decision to question Ventura further did not violate the mandate in *Edwards*.

Of course, that the officers complied with *Edwards* in resuming communications does not necessarily render Ventura's subsequent statements admissible. Specifically, because the officers proceeded to subject Ventura to custodial interrogation, *Miranda* warnings were required and the issue becomes whether, having been provided the warnings, Ventura waived--or invoked--his accompanying rights. The evidence on this point is less than clear. After Hartlove told Ventura that he would read him his rights, the following occurred (the italicized language was in Spanish):

> HUDSON: *He's going to read it to you. At the end he's going to ask you if you understand everything. If you want to speak without a lawyer, okay?*
> VENTURA: *Of course I want to speak to a lawyer.*
> VENTURA: *Of course I want to speak to a lawyer to know what is going on.*
> HUDSON: He said he wants, *you want a lawyer?*

36

VENTURA: *Of course.*
HUDSON: He says he wants a lawyer 'cause he wants to know what's going on.
VENTURA: *Of course.*
HARTLOVE: All right, well, that's, that's, that's…
VENTURA: But I do want to speak with, with him.
                    **[VOICES OVERLAP]**
HARTLOVE: End of the questions again.

8:45 p.m. Interrogation Tr. at 7.

As the above exchange illustrates, Hartlove appeared to have perceived Ventura's statement "Of course I want to speak to a lawyer" as an invocation of his *Miranda* right to counsel. However, after Hudson asked Ventura: "*You want to speak right now without a lawyer?*," Ventura responded: "*Of course, I want to speak, I want to speak with, no, I want to speak with him.  Of course, but afterwards if he gives me a chance to, to a lawyer as well.*"  *Id.* at 7-8.  Hudson translated Ventura's statement as "he wants to talk now and then he wants a lawyer."  *Id.* Hartlove proceeded to read Ventura's rights, and Ventura indicated that he understood each of them.  *Id.* at 11, 12, 13 Upon being informed of his right to an attorney, Ventura told Hartlove that "I will need a lawyer, but I want to talk to you too 'cause this is very important."  *Id.* at 13.  Hartlove asked Ventura to confirm whether he would speak without the presence of a lawyer, to which Ventura responded: "*But afterwards, yes. Yes, right now I can talk.  Yes.*"  *Id.* at 14.  Whereupon, the interview began.  *See id.*

Assuming that Ventura's initial statement, "*Of course I want to speak to a lawyer*" invoked his right to counsel, Ventura waived that right through his repeated assertions that he wanted to talk to the detectives immediately, and he indicated that he did. *See supra.* Thus, the Government met its burden of showing, by a preponderance of the evidence, that Ventura knowingly and voluntarily waived his *Miranda* rights, rendering his November 15, 2010 statements admissible. *See Robinson*, 404 F.3d at 860. Ventura's motion to suppress those statements will be denied.

  c. Fuertes's Motion to Suppress Statements (ECF No. 115)

Fuertes moved to suppress "certain statements" made by him to law enforcement officials "at or temporally proximate to the place and time of certain arrests and other custodial interrogations," on the grounds that the statements were procured in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. ECF No. 115. Specifically, Fuertes asserted that the statements were made in a "coercive atmosphere" and in response to representations and inducements that his cooperation would not result in his being charged. *Id*. at 2. The Government argued that Fuertes was "fully informed" of his *Miranda* rights and waived them. ECF No. 131 at 18. According to the Government, the interviews were also conducted in a "non-coercive manner," with opportunities

for eating, drinking, using the restroom, and making telephone calls. *Id.*

At the hearing, Hartlove testified that Fuertes came into contact with law enforcement on September 24, 2008, September 25, 2008, December 10, 2008, and March 25, 2009. Hr'g. The parties provided minimal details about these encounters. For instance, there are no facts to suggest whether Fuertes was subjected to interrogation after his arrests on September 24 and 25, 2008 and March 25, 2009, or whether Fuertes was in "custody" for purposes of *Miranda* when he was asked to come to the APD station on December 10, 2008. Hr'g; *see J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). Also unclear is whether Fuertes was provided *Miranda* warnings on any of these four occasions. Hr'g. Because the Government has not shown that Fuertes was provided *Miranda* warnings, let alone that he waived those warnings, Fuertes's motion to suppress statements will be granted.

B. Ventura's Motion to Suppress In-Court Identification (ECF No. 119)

The facts pertinent to Ventura's motion are as follows.[37] Throughout the Government's investigation of Ventura and Fuertes, various witnesses identified the Defendants as they were known to them. Specifically, identifications were made by:

---

[37] The following facts are taken from Ventura's motion to suppress in-court identification, ECF No. 119.

(1)   Carlos Ascencio, Helen Melendez-Carbaja,[38] and Margarita
      Laona Santiago (September 29, 2009);

(2)   Amparo "Wendy" Reyes (December 1, 2009);

(3)   Maximilliano Rapalo (January 17, 2010);

(4)   Alba Luz Garcia (March 14, 2010);

(5)   Fredi Soriano Leguisamon (March 14, 2010);

(6)   Carlos Ascencio (October 7, 2010);

(7)   Ferman Martinez Hernandez (November 15, 2010);

(8)   Norma Vargas Padilla (November 15, 2010); and

(9)   Ginger Duvall (December 9, 2010).

The Government further indicated it would offer in-court identifications by Carlos Campos, who met both Fuertes and Ventura in his electronics repair shop in 2004, as well as Rebeca Duenas Franco, who had worked for both men as a prostitute from 2008 to 2010.  Hr'g.

Ventura moved to suppress any in-court identification by the listed witnesses.  ECF No. 119 at 1.  The Government argued that the motion should be denied because "[v]irtually all" of the people to whom the Defendants' photographs were shown knew and had contact with Ventura and/or Fuertes.  ECF No. 131 at 18-19, 29-30.

---

[38] Melendez-Carbaja's identification issue is moot, as the Government will not seek to introduce it.  Hr'g.

An in-court identification is permissible only if it is
untainted by an improper pretrial identification. *United States
v. Crews*, 445 U.S. 463, 471-73 (1980).  The defendant must show
an impermissibly suggestive pretrial identification. *See id.*[39]
If he does, the Government must prove by clear and convincing
evidence that the in-court identification is "based upon
observations of the suspect other than [the photo array]."
*United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995).
Factors such as familiarity with the defendant "have an
important bearing upon the true basis of the witness['s] in-
court identification." *United States v. Wade*, 388 U.S. 218, 241
n.33 (1967).

The in-court identifications can be grouped into two
categories: (1) not suggestive and (2) reliable even if
suggestive.  In the first category are Ascencio, Reyes, Padilla,
and Duvall, who were shown photo arrays of six men--including
Ventura--of similar ages and with similar complexions, facial
hair, and expressions.  Hr'g; *see* Gov't Hr'g Exs. 32e (Reyes),

---

[39] "A procedure is unnecessarily suggestive if a positive
identification is likely to result from factors other than the
witness's own recollection of the crime." *United States v.
Greene*, 704 F.3d 298, 306 (4th Cir. 2013) (internal quotation
marks omitted).

32(f) (Ascencio).[40]  The arrays instructed the identifying witness that he or she was not under any obligation to identify anyone.  *Id.*  The arrays further cautioned that facial hair may be easily changed, and photographs may not always depict the true complexion of a person.  *Id.*  Hartlove further testified about his efforts to avoid suggestiveness.  Hr'g.  Because Ventura has not shown that the above witnesses' pretrial identification procedure was unnecessarily suggestive, the motion will be denied as to those identifications.

In the second category of identifications are persons who, assuming the pretrial identifications were suggestive, were sufficiently familiar with Ventura that an in-court identification would be reliable.  These witnesses include Santiago (who had met Ventura in 2009 and worked for him for two weeks); Rapalo (who had met Ventura in 2009); Garcia (a prostitute who had seen Ventura "several times"); Leguisamon (who delivered prostitutes and had seen Ventura "several times"); Ferman Martinez Hernandez, also known as Jayassiman Martinez-Hernandez, who met Ventura "several times" while working for him as a doorman; and Campos and Duenas.  Hr'g. Assuming that the pretrial identification as to these witnesses was impermissibly suggestive, the Government has met its burden

---

[40] The Government has not submitted the photo arrays shown to Padilla and Duvall, but proffered at the hearing that they were shown a variation of those shown to Ascencio and Reyes.  Hr'g.

of proving by clear and convincing evidence that their in-court
identification would be based on independent bases.  Thus,
Ventura's motion to suppress in-court identifications will be
denied.[41]

### C. Ventura's Motions to Suppress Tangible and Derivative Evidence

The Fourth Amendment prohibits unreasonable searches and
seizures, and no warrant may issue without probable cause.  U.S.
Const. amend. IV.  Probable cause exists for a search when there
is a "fair probability that contraband or evidence of a crime
will be found in a particular place." *Illinois v. Gates*, 462
U.S. 213, 238 (1983).  Probable cause does "not require
officials to possess an airtight case before taking action," and
officers "must be given leeway to draw reasonable conclusions"
from information.  *Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th
Cir. 1993).  Under the "fruit of the poisonous tree" doctrine,
"a confession obtained through custodial interrogation after an
illegal arrest should be excluded unless intervening events
break the causal connection between the illegal arrest and the
confession so that the confession is sufficiently an act of free
will to purge the primary taint." *Oregon v. Elstad*, 470 U.S.
298, 306 (1985) (internal quotation marks omitted).

---

[41] The Court determines only that the identifications are not
inadmissible; the parties may make further arguments as to
admissibility upon the relevant witnesses' testimony at trial.

"In reviewing [a] magistrate's probable cause determination, [the Court] must accord great deference to the magistrate's assessment of the facts . . . ." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (internal citation and quotation marks omitted). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant[s]." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).[42]

A warrantless search is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). There are, however, numerous exceptions to this rule. The "consent" exception "recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*,

---

[42] In addition to the probable cause requirement, a valid warrant must be issued by a "neutral and detached magistrate" and must state with particularity the place to be searched and the items or person to be seized. *See* U.S. Const. amend IV; *United States v. U.S. Dist. of Mich.*, 407 U.S. 297, 316 (1972). Under the "good faith" exception, when officers rely on a facially valid warrant and the supporting affidavit is later found to lack probable cause, the evidence seized is not subject to the exclusionary rule and is admissible in the Government's case in chief. *United States v. Leon*, 468 U.S. 897, 913 (1984). The evidence will be suppressed only if (1) the issuing judge was misled by information that the affiant knew or should have known was false, (2) the judge "wholly abandoned" her neutral role, (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is so facially deficient that no reasonable officer could presume it to be valid. *Id.* at 923.

547 U.S. 103, 109 (2006). To determine whether consent to search was voluntary, the fact-finder must examine the totality of the circumstances surrounding the consent,[43] which "may be inferred from actions as well as words."[44] A person with authority "might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent." *Id.* (internal citations omitted).[45] The consent exception also extends to "entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Randolph*, 547 U.S. at 109.[46] The Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search. *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007).

---

[43] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

[44] *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003).

[45] "A physically present inhabitant's express refusal of consent to a police search is dispositive as to h[er], regardless of the consent of a fellow occupant." *Randolph*, 547 U.S. at 122-23.

[46] The existence of "apparent authority" is "judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (internal quotation marks omitted); *see also United States v. Cazun*, 62 F. App'x 441, 442 (4th Cir. 2011) (per curiam) ("[A] court must assess whether the facts available . . . would justify a reasonable person to believe the consenting party had authority to allow entry.").

1. The September 24, 2009 Stop (ECF Nos. 116, 118)

    a. The Arrest Warrant (ECF No. 118)

Ventura moved to suppress "any and all evidence" relating to the September 24, 2009 stop, arrest, and seizures, on the grounds that the Washington, DC arrest warrant was illegally issued and executed, and that "no law enforcement officer executing it could [have] harbor[ed] a good faith belief in its legality," rendering the stop and seizure unconstitutional and Ventura's subsequent statements inadmissible.  ECF No. 118 at 1-3.[47]  The Government argued that the stop and arrest were lawful and the searches resulted from that "lawful exercise of arrest authority."  ECF No. 131 at 18.

"[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense."  *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) (internal quotation marks omitted).  "In reviewing [a] magistrate's probable cause determination, [the Court] must accord great deference to the magistrate's assessment of the facts . . . ."  *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (internal citation and quotation marks omitted).

---

[47] Ventura also asserts that he should have been presented to judicial officials in Washington, DC, where the alleged arrest warrant issued.  ECF No. 118 at 3.

"[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant[s]." *Upton*, 466 U.S. at 728.   Here, the affidavit in support of the arrest warrant detailed a robbery that occurred on September 2, 2006 at the John G. Davis Construction company.   Def. Hr'g Ex. 2.   A car was found outside the building with stolen items in the truck.   *Id.* The car was registered to Ventura.   *Id.*   Ventura's supervisor verified that he was a plumber who frequently worked on jobs at the site.   *Id.*   About one hour after Ventura's car was seized, Ventura filed a stolen auto report.   *Id.*

There is, at the very least, "substantial evidence in the record" supporting the judge's decision to issue the arrest warrant for Ventura.   *Upton*, 466 U.S. at 728.   Thus, his arrest- -and the search of his person incident to arrest--were lawful. *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979).   Ventura's motion to suppress evidence seized or derived from his stop and arrest will be denied.

b. The Cell Phones Search Warrant (ECF No. 116)

Ventura also moved to suppress "any and all evidence" obtained as a result of the search of Ventura's cell phones, on the grounds that the Anne Arundel County Circuit Court's search

warrant authorizing search of the phones was defective in numerous ways.  ECF No. 116 at 1-2.

As discussed above, probable cause exists for a search when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.  The warrant must also state with particularity the place to be searched and the items or person to be seized. *See* U.S. Const. amend IV; *United States v. U.S. Dist. of Mich.*, 407 U.S. at 316.  Here, the warrant described the things to be searched as "Sprint Wireless Blackberry Phone, ESN 07607122531" and "Sprint Wireless LG Phone, ESN A00000181E9B1, S/N 904CYXM0283266."  Gov't Hr'g Ex. 32a.  In support of the application, Hartlove submitted an affidavit explaining the recent searches of the Carver Street and South Villa addresses, which had yielded arrests for prostitution, as well as Ventura's September 24, 2009 arrest and the evidence seized from him that suggested involvement in prostitution activity. *Id.*  Hartlove further noted that, despite the relevant phones having been found with Ventura upon his arrest, Ventura claimed that they were not his. *Id.*

The above evidence established probable cause to search Ventura's phones. *Upton*, 466 U.S. at 728.  Ventura's motion to suppress evidence seized or derived from the phones will be denied.

2. The November 15, 2010 Search (ECF No. 120)

Ventura moved to suppress "any and all evidence" obtained as a result of a search warrant executed at 1913 Nova Avenue, Capitol Heights, Maryland on November 15, 2010, on the grounds that the warrant lacks probable cause and is otherwise defective. *See generally* ECF No. 120.  The Government argued that the search was authorized by a judge upon showing in a sworn affidavit of probable cause to believe that evidence, fruits, and instrumentalities of crimes would be discovered in the places to be searched.  ECF No. 131 at 19.

The Government attached to its opposition a 48-page affidavit submitted in support of applications for search warrants and criminal complaints, including for the search of 1913 Nova Avenue.  *See* ECF No. 131-1.  The affidavit details the investigation history into Ventura and Fuertes's criminal activity, and particularly addresses Ventura's connection to that address.  *See, e.g., id.* 22-23, 31-32, 33-34.  "[P]robable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location." *United States v. Lawlor*, 996 F.2d 1578, 1582 (4th Cir. 1993).

There is, at the very least, "substantial evidence in the record" supporting the magistrate judge's decision to issue the search warrant of 1913 Nova Avenue.  *Upton*, 466 U.S. at 728.

49

Thus, Ventura's motion to suppress evidence seized in the November 15, 2010 search will be denied.

    3. Evidence Obtained from GPS Monitoring (ECF No. 121)

    Ventura moved to suppress "any and all evidence obtained by law enforcement as the result of the unconstitutional placement of GPS devices on certain vehicles." ECF No. 121 at 1. Assuming arguendo that the installation and use of the GPS's violated the Supreme Court's recent decision in *United States v. Jones*, 132 S. Ct. 945 (2012), the Government argued that suppression is inappropriate because (1) the officers who placed the GPS's were relying in "good faith" on authorized practices predating *Jones*, and (2) the evidence obtained from the trackers was independently obtained or inevitably would have been discovered. ECF No. 131 at 30-36.

    In *Katz v. United States*, 389 U.S. 347 (1967), Justice Harlan announced that whether a government actor engaged in a Fourth Amendment "search" depended on whether the person subjected to the search exhibited an actual (subjective) expectation of privacy that was objectively "reasonable." *Id.* at 360 (Harlan, J., concurring). In the past decades, courts have struggled to apply *Katz* to new technologies--specifically, the use of GPS and other tracking devices. In *United States v. Knotts*, 460 U.S. 276, 285 (1983), the Court held that no search occurred when a beeper placed in a container was monitored to

50

determine the car's public location, because "a person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," *id.* at 281.  By contrast, in *United States v. Karo*, 468 U.S. 705 (1984), the Court held a search occurred when the beeper was brought inside someone's home.

In 2012, however, the U.S. Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" for Fourth Amendment purposes.  *United States v. Jones*, 132 S. Ct. 945, 949 (2012) (footnote omitted). Although the Justices agreed that a search had occurred, they differed as to why.  The five-Justice majority held that a search occurred because "[t]he Government physically occupied private property for the purpose of obtaining information."  *Id.* The majority opinion emphasized that the Government had committed a trespass at common law by installing the tracker on the defendant's car.  *See id.* at 949–50.  Justice Sotomayor agreed that a search occurs when the Government obtains information via a physical intrusion, *id.* at 954 (Sotomayor, J., concurring), but wrote separately to note that "physical intrusion is now unnecessary to many forms of surveillance," and to suggest that "some unique attributes of GPS surveillance . . . will require particular attention" in the future, *id.* at 955.

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, disfavored the majority's trespass approach but found that a search had occurred under *Katz*. *See id*. at 957-64 (Alito, J., concurring in the judgment).

On March 5, 2010, the APD sought and obtained orders from the Circuit Court for Prince George's County, Maryland authorizing the placement of GPS tracking devices on a 1995 green Ford Expedition--later determined to be an Explorer--with license plate 53563M6, and a 2000 white Chevrolet Astro Van with license plate A205926, both of which were believed to be associated with Ventura's alleged prostitution activity.  Hr'g; *see also* Gov't Hr'g Ex. 33(10) and (11).  Both orders provided that, in the absence of any extension, the devices "will be removed" 30 days after they were first installed.  *Id*.  The orders further provided that removal should "normally" be accomplished within 10 days after the 30-day period expired. *Id*.  After the orders expired,[48] however, the APD continued to track Ventura through GPS devices on his cars, albeit under HSI Special Agent Kelly's and the U.S. Attorney's Office--as opposed to a court order's--authority.  Hr'g.[49]

---

[48] The device placed on the green Ford failed in April but was replaced.  Hr'g.

[49] Another GPS was placed on a Nissan on July 29, 2010.  Hr'g.

On its face, the unauthorized placement and use of GPS
devices on Ventura's cars violated *Jones*.  The Government
nevertheless argued that the evidence is admissible because
*Jones* had not yet been decided when the GPS monitoring occurred
and, under the so-called "good faith exception" to the
exclusionary rule, evidence should not be suppressed when the
police conduct a search in objectively reasonable reliance on
binding appellate precedent that is later overruled.  *See Davis
v. United States*, 131 S. Ct. 2419, 2423 (2011).[50]  After *Jones*
and *Davis*, other courts have applied the good-faith exception to
the use of GPS tracking devices pre-*Jones*.  *See, e.g.*, *United
States v. Sparks*, Nos. 11-1134, 11-1143, 2013 WL 1197741, at *8
(1st Cir. Mar. 26, 2013).  Critically, however, *Davis* "d[id] not
present the markedly different question whether the exclusionary
rule applies when the law governing the constitutionality of a
particular search is unsettled."  *Davis*, 131 S. Ct. at 2435
(Sotomayor, J., concurring in the judgment).  The Government has
not cited—and there does not appear to have been--binding
appellate precedent in the Fourth Circuit at the time that law
enforcement officials attached the GPS devices to the relevant

_____

[50] In so ruling, the *Davis* Court recognized that suppression in
such cases "would do nothing to deter police misconduct" and
"would come at a high cost to both the truth and the public
safety."  *Id*.  The Court reiterated that, "[f]or exclusion to be
appropriate, the deterrence benefits of suppression must
outweigh its heavy costs."  *Id*. at 2427.

cars.  And, the Fourth Circuit has expressly declined to resolve the issue.  *United States v. Sellers*, Nos. 10-4701, 10-4702, 10-4917, 2013 WL 749512, at *6 (4th Cir. Feb. 28, 2013) (per curiam).  Thus, *Davis* does not render the evidence admissible.

Assuming that the GPS tracking violated *Jones* and is not protected by *Davis*, the Government argued that the evidence was obtained from an independent, lawful source, and/or would have inevitably been discovered.  ECF No. 131 at 34.  The "independent source" doctrine permits the introduction of evidence initially discovered during, or as a result of, illegal government conduct, but later obtained independently, from lawful activities untainted by the initial illegality.  *Murray v. United States*, 487 U.S. 533, 537 (1988).  The "inevitable discovery" doctrine allows admission of evidence if the prosecution can establish that the information "ultimately or inevitably would have been discovered by lawful means."  *Nix v. Williams*, 467 U.S. 431, 444 (1984).  In either case, the Government must prove admissibility by a preponderance of the evidence.  *Id.*; *United States v. Apple*, 915 F.2d 899, 906 (4th Cir. 1990).

In addition to tracking Ventura's cars, the APD obtained orders from various judges in the Circuit Court for Anne Arundel County, Maryland authorizing the installation and use of pen registers/trap & trace and cellular tracking devices on numerous

cell phones believed to be used by Ventura and his associates.
Hr'g; *see* Gov't Ex. 33(1) to (9).  The orders authorized use of
the tracking devices for 60 days from the date of their
installation, "without geographical limits."  Gov't Ex. 33(1) to
(9).  The first of these orders was signed on March 10, 2010;
the last was signed on November 5, 2010.  *See id.*  Hartlove
testified that the trackers functioned by sending him email
"alerts" every 15 minutes containing a Google map of a phone's
location.  Hr'g.  Hartlove stated that, in "most cases," the
cell trackers were accurate to within three or six feet of the
location but there were "times" when the information was
accurate only to within 4999 feet.  *Id.*[51]  According to Harlove,
the cell phone information "assisted" the APD in setting up
surveillance of Ventura and other operatives.  Hr'g.
Specifically, Hartlove was "checking both [cell phone and
vehicle trackers] at the same time most of the time."  *Id.*

The Government has not met its burden of proving that the
independent source or inevitable discovery doctrines apply.  As
to the independent source doctrine, the Government has not shown
by a preponderance of the evidence that they obtained the same
surveillance evidence through use of authorized cell phone

_____

[51] On cross-examination, Hartlove stated that the cell phone
trackers were "fairly accurate" as long as there was a "good
signal."  Hr'g.  Hartlove further testified that GPS devices on
vehicles may experience similar technical difficulties.  *Id.*

tracking.  As to the inevitable discovery doctrine, the Court is
not persuaded that law enforcement "inevitably" would have
obtained the same evidence, particularly given the duration and
scope of the surveillance and the officers' necessarily limited
resources.

Thus, Ventura's motion to suppress will be granted in part
and denied in part: only evidence obtained through Court-
authorized use of tracking devices on cars or phones will be
admissible at trial.

D. The Defendants' Motions to Adopt Codefendant's Motions (ECF
   Nos. 109, 113)

The Defendants' motions to adopt are unopposed, and will be
granted in part and denied in part.  *See* ECF Nos. 129, 131 at
2.[52]

E. The Defendants' Motions for Leave to File Additional
   Motions (ECF Nos. 104, 112)

The Defendants' motions for leave to file additional
motions are unopposed, and will be granted.  *See* ECF Nos. 129,
131 at 2.

F. The Defendants' Motion *in Limine* to Exclude Evidence of
   Threats to Third Parties (ECF No. 159)

The Defendants moved *in limine* to exclude the evidence of
threats directed to third persons, and related evidence, on the
grounds that such evidence is irrelevant and prejudicial under

---

[52] The motions will be denied as to motions that are herein
denied.

Federal Rules of Evidence 401 and 403.   ECF No. 159 at 2.   The Government argued that threats and acts of claimed and actual violence against competitors were part of the conspiracy and other substantive offenses.   ECF No. 160 at 2.

To be admissible, evidence must be relevant.   Fed. R. Evid. 402.   Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence."   Fed. R. Evid. 401.   Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403. Here, evidence of threats to third parties is relevant to the indictment's allegations that Fuertes and Ventura threatened competitor "pimps" to ensure the success of their own prostitution business.   ECF No. 51.   This evidence is not substantially outweighed by unfair prejudice, or any other factors under Rule 403.

Thus, the Defendants' motion *in limine* will be denied.

G. Other Motions

   1. Ventura

     a. *Pro Se* Motion for Speedy Trial (ECF No. 40)

On September 7, 2011, Ventura moved *pro* se for a speedy trial, asking the Court "not [to] consider any motion for postponement in the above case" without his "direct" consent, and to set a trial date "no more than [70] days from [the date of] this motion." ECF No. 40. The Government does not specifically address Ventura's motion. *See generally* ECF No. 131.

"Although there is a paucity of Fourth Circuit precedent directly addressing this issue, every Circuit Court of Appeals to have considered the phenomenon of a *pro se* motion filed by a represented party has determined that a court does not have to accept or entertain these motions." *United States v. White*, No. 7:08-CR-00054, 2010 WL 1462180, at *1 (W. D. Va. Apr. 12, 2010); *see id.* at *1-2 (collecting cases). As of September 7, 2011, Ventura was represented by Retureta. *See* docket. However, because Ventura's motion can be denied as moot, the memorandum will address it here.

"The Speedy Trial Act requires that a criminal trial must commence within 70 days of the latest of a defendant's indictment, information, or appearance, barring periods of excludable delay." *Henderson v. United States*, 476 U.S. 321,

326 (1986).  The Speedy Trial Act excludes from its 70-day limit

certain periods of pretrial delay.  *See* 18 U.S.C. § 3161(h).

Further, several courts have held that the 70-day clock is reset

by the filing of a superseding indictment.  *E.g.*, *United States*

*v. Harris*, 566 F.3d 422, 429 (5th Cir. 2009) (holding that, when

superseding indictment widens scope of criminal prosecution to

try other conspirators, starting point for speedy trial clock is

reset to date of arraignment on superseding indictment);  *United*

*States v. Wells*, 160 F. App'x 885, 889 (11th Cir. 2005)

(agreeing with the district court that the superseding

indictment "effectively dismissed" the charges in the original

indictment" (internal quotation marks omitted)).

Ventura was initially indicted on December 14, 2010.  ECF

No. 23.  Ventura moved "for speedy trial" on September 7, 2011.

ECF No. 40.  On November 29, 2011, the Grand Jury returned a

superseding indictment that added charges against Ventura and

added Fuertes as a defendant.  ECF No. 51.  In light of the

superseding indictment, Ventura's motion for speedy trial will

be denied as moot.

> b. Motions to Dismiss the Indictment (ECF Nos. 50, 57,
>    122)

Ventura has filed two *pro se* motions to dismiss, and one

through counsel, arguing that the delays in Ventura's trial date

violate the Speedy Trial Act and Ventura's Sixth Amendment and

Due Process rights.  ECF No. 122 at 7.[53]  The Government did not
address Ventura's *pro se* motions to dismiss (ECF Nos. 50, 57).
As to Ventura's motion filed through counsel (ECF No. 122), the
Government argued only that "the scheduled trial of this case
fully complies with the Speedy Trial Act."  ECF No. 131 at 19;
*see id.* at 36.  The Government also noted that a "substantial"
period of the delay resulted from Ventura's "decision" to
terminate his relationship with Bittner and Retureta.  *Id.*

Under Fed. R. Crim. P. 48(b), a court may dismiss an
indictment if unnecessary delay occurs in, *inter alia*, "bringing
a defendant to trial."  The rule "vests much discretion in the
trial court, and dismissal is mandatory only if the defendant's
constitutional rights have been violated."  *United States v.
Butler*, 792 F.2d 1528, 1533 (11th Cir. 1986).

i. Sixth Amendment

The Sixth Amendment guarantees a defendant a speedy trial.
U.S. Const. amend. VI.  This constitutional right is triggered
when a defendant is "indicted, arrested, or otherwise officially

---

[53] In his *pro se* motions, Ventura additionally argues that the
Court "erred" by excluding the period between February and May
2011 from his speedy trial time calculation because the Court
"cannot grant a motion for continuance retroactively."  ECF No.
50 at 2; ECF No. 57 at 2.  Ventura further argues that the order
excluding time from July 21, 2011 to December 14, 2011 was "in
error" because "the record supports no findings of the reason(s)
for the exclusion."  ECF No. 50 at 2; ECF No. 57 at 2.  Finally,
Ventura argues that Retureta provided ineffective assistance by
failing to pursue his right to a speedy trial.  ECF No. 50 at 2;
ECF No. 57 at 2.

accused." *United States v. MacDonald*, 456 U.S. 1, 6 (1982).  In
determining whether the Sixth Amendment right to a speedy trial
has been violated, a court considers (1) the length of the
delay, (2) reason for the delay,[54] (3) the defendant's assertion
of his right, and (4) prejudice to the defendant.[55]  *Barker v.
Wingo*, 407 U.S. 514, 530 (1972).  Generally, if the delay is
less than one year, the other factors need not be examined.
*United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009).  The
defendant must establish that "on balance, [the factors] weigh
in his favor."  *United States v. Thomas*, 55 F.3d 144, 148 (4th
Cir. 1995).

As to the length of the delay, more than two years have
passed since Ventura was first indicted in this case.  *See* ECF
No. 23 (initial indictment filed December 14, 2010).  This
factor favors dismissal.  The delays resulted from, *inter alia*,
the filing of a superseding indictment, the addition of a second

---

[54] The reasons for the delay should be characterized as "valid,
improper, or neutral."  *United States v. Hall*, 551 F.3d 257, 272
(4th Cir. 2009) (*citing United States v. Grimmond*, 137 F.3d 823,
828 (4th Cir. 1998)).

[55] Prejudice "should be assessed in the light of the interests .
. . the speedy trial right was designed to protect."  *Grimmond*,
137 F.3d at 829 (internal quotation marks omitted).  These
interests include preventing oppressive pretrial incarceration,
minimizing the defendant's anxiety and concern, and limiting the
possibility of an impaired defense.  *Id.*  An impaired defense
may result when witnesses become unavailable or unable to
accurately recall past events, exculpatory evidence has been
lost, or evidence becomes unavailable because of the delay.  *Id.*
at 830.

defendant, Ventura's rejection of three appointed counsel, and the case's ultimate reassignment from Judge Legg to this Court. At worst, this factor is neutral.  Ventura's assertion of his speedy trial right--which he has asserted in three motions to dismiss and one motion for speedy trial--is "entitled to strong evidentiary weight." *Barker*, 407 U.S. at 531-32.  However, Ventura has not identified how he has been prejudiced by the delay.  *See generally* ECF Nos. 50, 57, 122.  Thus, Ventura's Sixth Amendment right to speedy trial was not violated.

ii.  Due Process

"[T]he Due Process Clause has a limited role to play in protecting against oppressive delay."  *United States v. Lovasco,* 431 U.S. 783, 789 (1977).  To prevail on such a claim, the defendant must prove (1) the delay resulted in substantial prejudice to his rights, and (2) the prosecution intentionally delayed prosecution in order to gain a tactical advantage. *United States v. Wood*, 207 F.3d 1222, 1234 (10th Cir. 2000); *see also Lovasco*, 431 U.S. at 790 (Fifth Amendment Due Process Claim must consider both prejudice to the defendant and the reasons for the delay).  Ventura has shown neither.  Thus, Ventura's Due Process rights have not been violated.

iii. Speedy Trial Act

Under the Speedy Trial Act, 18 U.S.C. §§ 3161, *et seq.*, "[i]n any case in which a plea of not guilty is entered, the

62

trial of a defendant charged in an information or indictment
with the commission of an offense shall commence within seventy
days from the filing date . . . of the information or indict-
ment, or from the date the defendant has appeared before a
judicial officer of the court in which such charge is pending,
whichever date last occurs." *Id.* § 3161(c)(1). However, the
Act permits exclusions of time in the interests of justice, so
long as findings are made on the record contemporaneously or
before ruling on any motion to dismiss. § 3161(h)(7)(A); *Zedner
v. United States*, 547 U.S. 489, 506-07 (2006).[56] Those findings
were made in this case in the Orders issued on May 25, 2011
(excluding time from December 14, 2010 through June 30, 2011);
July 21, 2011 (excluding time from December 14, 2010 through

---

[56] Section 3161(h) provides, in relevant part, that "[t]he
following periods of delay shall be excluded in computing the
time within which an information or an indictment must be filed,
or in computing the time within which the trial of any such
offense must commence":

> (7)(A)   Any   period   of   delay   resulting   from   a
> continuance granted by any judge on his own motion or
> at the request of the defendant or his counsel or at
> the request of the attorney for the Government, if the
> judge  granted  such  continuance  on  the  basis  of  his
> findings  that  the  ends  of  justice  served  by  taking
> such action outweigh the best interest of the public
> and the defendant in a speedy trial.   No such period
> of delay resulting from a continuance granted by the
> court  in  accordance  with  this  paragraph  shall  be
> excludable under this subsection unless the court sets
> forth, in the record of the case, either orally or in
> writing,  its  reasons  for  finding  that  the  ends  of
> justice served by the granting of such continuance
> outweigh  the  best  interests  of  the  public  and  the
> defendant in a speedy trial.

January 23, 2012); and April 20, 2012 (excluding time from December 14, 2010 through April 8, 2013).  ECF Nos. 33, 37, 82. These exclusions of time satisfy the Speedy Trial Act and do not require dismissal.

Thus, Ventura's motions to dismiss the indictment will be denied.

2. Fuertes

a. Motion to Sever (ECF No. 105)

Fuertes moved to sever under Fed. R. Crim. P. 14, on the grounds that the "substantially differing quanta and nature of the evidence" against him and Ventura could lead to prejudice. ECF No. 105 at 4.  The Government contended that joinder is appropriate because Fuertes and Ventura are charged with participating in a common scheme to engage in human trafficking-related crimes, and because Fuertes has not carried his burden of showing prejudice that would result from a joint trial.  ECF No. 131 at 17; *see id.* at 19-22.

Under Fed. R. Crim. P. 8(b), an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Generally, defendants indicted together should be tried jointly, especially if they are charged with participating in the same conspiracy. *United States v. Shealey*, 641 F.3d 627, 632 (4th Cir. 2011);

64

*United States* v. *Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999).

However, Fed. R. Crim. P. 14 provides:

> If the joinder of offenses or defendants in an
> indictment, an information, or a consolidation for
> trial appears to prejudice a defendant or the
> [G]overnment, the [C]ourt may order separate trials of
> counts, sever the defendants' trials, or provide any
> other relief that justice requires.

Under Rule 14, "[t]he defendant bears the burden of showing

that a joint trial would be so unfairly prejudicial that a

miscarriage of justice would result." *United States* v.

*Williams*, 10 F.3d 1070, 1080 (4th Cir. 1993).

Mutually antagonistic defenses are not per se prejudicial,

and a Rule 14 severance should be granted only if there is a

"serious risk" that a joint trial would compromise one of the

defendant's specific trial rights. *Zafiro v. United States*, 506

U.S. 534, 539 (1993). Further, the joined defendants must show

that the "conflict is of such magnitude that the jury will

unjustifiably infer that this conflict alone demonstrates that

both are guilty." *United States v. Smith*, 44 F.3d 1259, 1267

(4th Cir. 1995). Severance is not warranted merely because

defendants may have a better chance of acquittal if tried

separately. *Zafiro*, 506 U.S. at 540.

Here, joinder is proper under Fed. R. Crim. P. 8(b) because

Ventura and Fuertes are charged with participating in the same

conspiracy to transport persons in interstate commerce for

prostitution, and to entice and coerce persons to travel in interstate commerce for prostitution.  ECF No. 51 (Count One). Further, Fuertes has not carried his Rule 14 burden of demonstrating a "strong showing of prejudice" that will result from joinder.  *See United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008); *see also, e.g., United States v. Allen*, 491 F.3d 178, 189 (4th Cir. 2007) ("Without a strong showing of prejudice, severance is not justified based on the mere disparity of the evidence adduced against individual defendants."); *Akinkoye*, 185 F.3d at 197 ("A defendant is not entitled to severance merely because separate trials would more likely result in acquittal, or because the evidence against one defendant is not as strong as that against the other."). Finally, to the extent that Fuertes's concerns about the "prosecution of these disparate individuals filling disparate roles" arise at trial, ECF No. 105 at 3, the concerns can be adequately addressed by the Court's instructing the jury to assess the evidence against each defendant separately.  *United States v. Lighty*, 616 F.3d 321, 351 (4th Cir. 2010).

Fuertes's motion to sever will be denied.

b. Motion for Disclosure of Rule 404(b) and 609 Materials (ECF No. 106)

Fuertes seeks an order directing the Government to disclose notice of its intention to use evidence of crimes, wrongs, or

acts allegedly committed by Fuertes or a coconspirator, or "any other information which the prosecution will seek to admit pursuant to Fed. R. Evid. 404(b) or 609." ECF No. 106 at 1. According to Fuertes, pretrial notice is necessary to enable him to consider the potential for prejudice to his case and to respond thereto. *Id.* at 2. Fuertes also requested the Court to undertake a pretrial balancing test under Rule 403. *Id.* at 3. The Government argued that the motion should be denied because, "with few exceptions," the evidence in the case relates solely to the charged offenses. ECF No. 131 at 17. The Government acknowledged that it *will* seek to introduce evidence of Ramirez's murder, but only to show that Ventura (who has moved to adopt Fuertes's motions, *see supra*) took credit for the murder and used it to intimidate prostitutes and other men in the prostitution business; the Government stated that it will not attempt to show that Ventura and/or Fuertes are responsible for the crime. *Id.*; *see id.* at 22-23.

Rule 404(b) prohibits the admission of evidence of a prior crime or other bad act "to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2). Evidence of uncharged

conduct is intrinsic to the charged offense and not barred by Rule 404(b) if it "arose out of the same series of transactions as the charged offense, or if [it] is necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks and alteration omitted). Evidence "necessary to provide context relevant to the criminal charges" is also intrinsic. *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009). If evidence is intrinsic, it must also "satisfy Rule 403's balancing test."[57] *Id.* at 329.

Extrinsic evidence is admissible under Rule 404(b) if "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *Siegel*, 536 F.3d at 317 (internal quotation marks omitted). "Evidence is necessary whe[n] it is an essential part of the crimes on trial, or whe[n] it furnishes part of the context of the crime." *United States v. Byers*, 649 F.3d 197, 209 (4th Cir. 2011) (internal quotation marks omitted). Evidence of prior bad acts is reliable if a jury could reasonably find, by a preponderance of the evidence, that the act was committed by the defendant. *Huddleston v. United*

---

[57] Rule 403 states: "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

*States*, 485 U.S. 681, 690 (1988); *United States v. Hadaway*, 681 F.2d 214, 218 (4th Cir. 1982).

"Additionally, the probative value of the evidence must not be substantially outweighed by the danger that it will cause unfair prejudice." *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004) (*citing* Fed. R. Evid. 403).[58]   A court may guard against unfair prejudice by (1) providing a limiting instruction, when requested, and (2) enforcing the requirement in criminal cases, when requested, that advance notice be given of the intent to produce prior act evidence. *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).   Rule 404(b) is an inclusionary rule; evidence of other crimes or acts is admissible unless it tends to prove only criminal disposition or propensity. *See id.* at 994-95.

Under Fed. R. Evid. 609(a), evidence of a witness's conviction of a serious crime[59] or a crime involving dishonesty or false statement may be used to attack his character for truthfulness.

Evidence of Ramirez's murder is admissible under Rule 404(b)(2) to show Ventura's intent, motive, or preparation.

---

[58] Limiting jury instructions can provide additional protection to defendants. *Hodge*, 354 F.3d at 312.

[59] "[E]vidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year . . . ."   Fed. R. Evid. 609(a)(1).

Further, the evidence is intrinsic to the conspiracy count
(Count One), which alleges that the "means" of the conspiracy
included Ventura's and Fuertes's threatening to use and using
violence against those also engaged in prostitution activities
in Maryland, as well as Ventura's claiming responsibility for
the murder of "multiple" competitor pimps to intimidate other
competitors and employees.  *See* ECF No. 51 ¶¶ 17, 19.   The
evidence's probative value is not substantially outweighed by a
danger of unfair prejudice, confusing the issues, misleading the
jury, undue delay, wasting time, or needlessly presenting
cumulative evidence.  Fed. R. Evid. 403.

   The motion for disclosure of Rule 404(b) and 609 material
will be denied.

> c. Motion to Compel Prosecution Review of Witness
>    Backgrounds (ECF No. 108)

   Fuertes moved the Court to enter an order directing the
Government to "verify" that it has properly vetted its
prospective law enforcement witnesses, cooperators, and experts,
and has further provided all necessary and required background
information.  ECF No. 108 at 1.  Fuertes noted the recent fraud
perpetrated by former Baltimore City and Maryland state Police
Officer Joseph Kopera.  The Government argued that there is
"simply no basis" for granting the motion because it "has
already begun the process" of compiling *Giglio* and *Jencks*

material for its witnesses, and intends to comply with all requirements.  ECF No. 131 at 17-18; *see id.* at 23-24.

Fuertes has not shown that the Government has neglected its obligations with regard to reviewing witnesses' backgrounds. Thus, Fuertes's motion to compel such review will be denied.

> d. Motion for Disclosure of Evidentiary Basis for Rule 801(d)(2)(E) Materials (ECF No. 110)

Fuertes moved the Court to compel the Government to identify, disclose, and produce the statements of any co-defendant or co-conspirator that the Government intends to offer against Fuertes or Ventura under Fed. R. Evid. 801(d)(2)(E), and the evidentiary basis for doing so.  ECF No. 110 at 1. According to Fuertes, "requiring the [G]overnment to put the Defendants on notice . . . will prevent the necessity for hearings during trial on such issues."  *Id.* at 2.  The Government stated that it has already produced all available copies of written or recorded statements and reports of interviews in this case, and will make additional disclosures as information becomes available.  ECF No. 131 at 18; *see id.* at 24.  The Government stated that, as it prepares for trial, it will produce additional disclosure as it becomes available.  *Id.* at 24.

Because the Government has agreed to produce any disclosure under the rule, Fuertes's motion for an order compelling its compliance will be denied.

> e. Motion for Disclosure of Rule 12 Materials (ECF No. 111)

Fuertes moved the Court to order the Government to disclose notice of its intention to use any evidence that may be subject to a motion to suppress under Fed. R. Crim. P. 12(b)(3)(C) and 12(b)(4)(B). According to the Government, it "has met its obligations with respect to Fed. R. Crim. P. 12, and will continue to do so." ECF No. 131 at 5-6; *id.* at 18, 24-25. Specifically, defense counsel were invited to review documentary and tangible physical evidence; agents were available to assist defense counsel and to allow them to view all the evidence in APD and HSI custody. *Id.* at 25. The Government has further "taken the extraordinary step" of copying "virtually all the files in . . . APD possession" to an external hard drive, which "are being presented" to defense counsel. *Id.* The Government states that, as it prepares for trial and meets with witnesses, any additional discoverable materials identified will be promptly provided to the defense. *Id.*

Fuertes has not shown that the Government has neglected its obligations with regard to Rule 12 disclosures. Thus, his motion will be denied.

III. Conclusion

For the reasons stated above, Ventura's motions to suppress statements; to dismiss the indictment; to suppress evidence relating to Ventura's September 24, 2009 stop and arrest; to suppress evidence obtained by the November 15, 2010 search of 1913 Nova Avenue; and to suppress in-court identifications will be denied.  Ventura's motion to suppress evidence obtained through GPS surveillance will be granted in part and denied in part.  Fuertes's motions to sever; for disclosure of Rule 404(b) and 609 materials; to compel prosecution witness review; for disclosure of evidentiary basis for Rule 801(d)(2)(E) materials; and for disclosure of Rule 12 materials will be denied. Fuertes's motion to suppress statements will be granted.  The Defendants' motion *in limine* to exclude evidence of threats directed to third parties will be denied.  The Defendants' motions to adopt each other's motions will be granted in part and denied in part.  The Defendants' motions for leave to file additional motions will be granted.

_4/8/13_
Date

_____
William D. Quarles, Jr.
United States District Judge

73