IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

_____
                              )
UNITED STATES OF AMERICA       )
                              )
                              )
        v.                     )  Criminal Docket No. WDQ-10-0770
                              )  Volume III
GERMAN de JESUS VENTURA and    )
KEVIN GARCIA FUERTES,          )
        Defendants             )
_____)

                              Baltimore, Maryland
                              April 10, 2013
                              9:32 AM to 5:52 PM

**THE ABOVE-ENTITLED MATTER CONTINUED ON FOR
JURY TRIAL
BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**

A P P E A R A N C E S

On behalf of the Government:

        Michael Cunningham, Assistant U.S. Attorney
        Rachel Yasser, Assistant U.S. Attorney

On behalf of Defendant German de Jesus Ventura:

        Gerald Ruter, Esquire

On behalf of Defendant Kevin Garcia Fuertes:

        Michael D. Montemarano, Esquire

```
1                A P P E A R A N C E S (CONT.)

2     Also present:

3            HSI Special Agent Edward Kelly
             Victoria Kirchgessner, Spanish Interpreter
4            Marta Goldstein, Spanish Interpreter
             Carlos Wesley, Spanish Interpreter
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                       Reported by:

23            Martin J. Giordano, RMR, CRR, FOCR
              U.S. Courthouse, Room 5515
24            101 West Lombard Street
              Baltimore, Maryland 21201
25            410-962-4504
```

| 1 | <u>**PROCEEDINGS OF APRIL 10, 2013**</u> |

1     <u>**PROCEEDINGS OF APRIL 10, 2013**</u>

2          **THE CLERK:**  All rise.  The United States District

3     Court for the District of Maryland is now in session, The

4     Honorable William D. Quarles, Jr. presiding.

5          **THE COURT:**  Good morning.  Please be seated.

6          Please swear the interpreter.

7          **THE CLERK:**  No.  They switched before you came out.

8     I'm sorry.

9          **THE COURT:**  Okay.  Mr. Cunningham?

10         **MR. CUNNINGHAM:**  Good morning, Your Honor.  I had

11    asked to have a moment of the Court's time this morning to

12    address the subject of our early cessation of the proceedings

13    yesterday for the proceeding in front of Judge Gallagher.  I

14    hope the Court will appreciate, in light of the Supreme

15    Court's *Laffer* and *Frye* decisions, the Government's

16    consternation at times over matters about which we, in some

17    cases, know nothing, and, in any event --

18         **THE REPORTER:**  Can you hold on one second, please.

19    And just talk if you would.

20         **MR. CUNNINGHAM:**  Excuse me?  I'm sorry?

21         **THE REPORTER:**  Okay.

22         **THE COURT:**  He's setting a voice level.

23         **MR. CUNNINGHAM:**  Oh, okay.  That better?

24         **THE REPORTER:**  I think we're good now.  Sorry.

25         **MR. CUNNINGHAM:**  In any event, Judge, we simply

1      wanted to make sure the record was clear that there was no

2      impediment to proceeding forward with Mr. Ventura's

3      representation, being comfortable with the representation.  As

4      I said, I think that the Government feels some consternation

5      in light of those decisions about not being able to do certain

6      things and that are cloaked with -- appropriately cloaked with

7      attorney-client privilege.

8              **THE COURT:**  Well, the hearing was recorded.  The

9      decision is here.  Counsel is ready to proceed.  Let's get the

10     jury.  Jury, please.

11             (Jury enters.)

12             **THE COURT:**  Good morning, ladies and gentlemen.

13             **JURORS:**  Good morning.

14             **THE COURT:**  Good morning.  You may be seated.

15             Members of the jury, please remember:  I can't get

16     started until I've got all of you here.

17             Okay.  Remind the witness, please.

18             **THE CLERK:**  I'd like to remind you:  You are still

19     under oath.  And would you state your name again for the

20     record.

21             **THE WITNESS:**  Yes, ma'am.  Jeffrey Scott Hartlove.

22     Hartlove is H-A-R-T-L-O-V-E.

23             **THE COURT:**  Mr. Ruter?

24             **MR. RUTER:**  Your Honor, thank you.

25

1  **JEFFREY SCOTT HARTLOVE**

2  **WAS PREVIOUSLY DULY SWORN TO TELL THE TRUTH**

3  **CROSS-EXAMINATION (CONT.)**

4  **BY MR. RUTER:**

5  Q.   Detective, yesterday you were asked on cross-examination

6  whether or not, during the course of this investigation, you

7  ever came into contact with anyone except the Defendant,

8  Mr. Fuertes, who allegedly had the name of El Flaco.  Do you

9  recall that questioning by Mr. Montemarano?

10  A.   Yes.

11  Q.   And do you recall that your answer was, to your

12  knowledge, he was the only El Flaco that you ran across in

13  terms of this investigation?  Do you recall that?

14  A.   Yes, in Annapolis, that's correct.

15  Q.   Okay.  Do you recall, on September 30th of 2008,

16  interviewing Rebeca Dueñas Campos about a photograph that you

17  had shown her of one Henry Morales?

18  A.   Rebeca Dueñas Franco, yes.

19  Q.   Yes.  And do you recall that she picked out a photograph

20  of a man named Henry Morales?

21  A.   That's correct.

22  Q.   And you recall that she referenced his name as being

23  El Flaco?

24  A.   She -- at that point, she did -- we -- we transported

25  Rebeca down to Prince George's County.  She was going to

Cross-Examination of Jeffrey Scott Hartlove (Ruter)          T-III-390

 1    assist us that day, which was, again, on the 30th of September
 2    2008, to help locate an address where she said one of the
 3    persons was that was held -- she was being held against her
 4    will, yes.
 5    Q.   Okay.  And, as a result of that contact, though, you had
 6    occasion to show her at least one photograph on that day; is
 7    that not correct?
 8    A.   I showed her a -- six photographs that day.
 9    Q.   Okay.  My interest this morning was simply asking you
10    about one photograph that you showed her, and the photograph
11    was of a man named Henry Morales?
12    A.   Yes.
13    Q.   And she said that she knew him as El Flaco?
14    A.   She did say at that time that he was El Flaco --
15    Q.   Okay.
16    A.   -- or Flaco.
17    Q.   Yeah.  Mr. Ventura, to your knowledge, owns a company
18    called VVV Construction Company; is that correct?
19    A.   Yes.
20    Q.   He's had one or more vehicles registered under the name
21    of VVV Construction?
22    A.   Yes.
23    Q.   You have actually seen him at work, my understanding, in
24    the Washington, D.C. area working, what appears to be
25    construction work?

1    A.    I saw him at the beginning of the surveillance on two

2    days doing construction, and then, towards the end of the

3    surveillance, in November, the last day that was -- actually,

4    there was two days at the end where he was doing construction.

5    Q.    Did you look inside of his vehicle that he would drive,

6    the Astrovan, on occasion?  Did you have occasion to look

7    inside there?

8    A.    I did when I -- when it was out in front of -- about a

9    house away from the post office on that 24th of September

10   2009.

11   Q.    Okay.  Did you see what appeared to be any construction

12   type materials inside the vehicle?

13   A.    No.

14   Q.    Did you ever see any construction type equipment in that

15   vehicle?

16   A.    No.

17   Q.    You had indicated that, when you had met with him the

18   first time when he was arrested, I think on September 24th of

19   '09, that he indicated to you that he had information he

20   wished to give you, but he wanted to be paid for it.  Is that

21   your testimony from yesterday?

22   A.    That's one of his statements he made, yes.

23   Q.    Okay.  Is it fair to say, however, that, from time to

24   time, your office, yourself included, occasionally do pay

25   people for information?  Is that not accurate?

1    A.   There are confidential informants that get paid time and

2    time, yes.

3    Q.   Okay.  And, on other occasions, if you don't reward

4    people financially, you sometimes exchange information or will

5    give them or do favors for them in any manner of things; is

6    that not also correct?

7    A.   I'm sorry.  What's that?

8    Q.   If you don't give some people who might assist you

9    financial rewards, you may give them other kinds of

10   non-financial rewards as well; is that not true?

11   A.   I never have -- can you advise further?  I don't know

12   what you're talking about --

13   Q.   Well, it can take any form, Detective Hartlove, but let's

14   take, in this case, some of the witnesses that the jury is

15   going to see here in the next several days, are here

16   illegally, correct?

17   A.   Are what?

18   Q.   Are here illegally.

19   A.   Some of them are, yes.

20   Q.   Okay.  And is it not true that you or others involved in

21   the investigation saw to it that they were not deported?

22   A.   No.

23   Q.   It's not true?

24   A.   No.

25   Q.   So you or anyone in this investigation never requested

1    the INS not to deport illegals to allow them to stay in this

2    country for a further period of time, in exchange for which

3    the Government could receive information from them?  That

4    didn't happen?

5    A.   No.

6    Q.   All right.  When you spoke to him the first time in 2009,

7    did you ask him any questions about prostitution?

8    A.   I did ask him about prostitution.

9    Q.   Did you ask him about shootings or killings?

10   A.   Yes.

11   Q.   Okay.  ████████████████ was robbed sometime in 2010; is

12   that right?

13   A.   Yes.

14   Q.   And we understand that it's your belief that Mr. Ventura

15   actually called 911 to report the fact that a robbery was

16   taking place at ████████████?

17   A.   Yes.

18   Q.   And is it also our understanding that Mr. Maximilliano

19   Zelaya Rapalo was one of the individuals who had robbed

20   ████████████?

21   A.   Yes.

22   Q.   And is it also our understanding that it's your

23   assertion -- the Government's position that Mr. Rapalo was

24   working for Mr. Ventura?

25   A.   At one time, yes.

1   Q.   And also that Mr. Ventura owed Mr. Rapalo money?

2   A.   Yes.

3   Q.   And the reason that Mr. Rapalo robbed ████████████ was

4   to be paid the money that Mr. Ventura had failed to pay him;

5   is that correct?

6   A.   Yes.

7   Q.   When the search took place of ███████████, were there

8   any weapons found?

9        (Witness reviewing document.)

10  A.   Excuse me just a minute while I refresh my memory.

11  Q.   Certainly.

12       (Witness reviewing document.)

13  A.   There was many items recovered, but I do not recall any

14  type of weapon.

15  Q.   Okay.

16  A.   I know there was no type of gun.

17  Q.   A gun --

18  A.   There was no type of weapon that I recall at all.

19  Q.   All right.  And do you recall whether or not any of the

20  assailants, including Mr. Rapalo -- whether or not they had

21  any guns?  Did you find any guns on them, or other weapons?

22  A.   No.

23  Q.   All right.  Alba Garcia Garcia was stopped in a vehicle

24  with Mr. Rapalo; is that correct?

25  A.   Alba Garcia Garcia was stopped in a car with

1    Freddy Soriano.

2    Q.   I mean Mr. Soriano.  Do you know whether or not

3    Ms. Garcia Garcia was a prostitute during that time?

4    A.   She was.

5    Q.   You did a lot of surveillance on Mr. Ventura; is that a

6    fair statement?

7    A.   Yes.

8    Q.   Over a lengthy period of time?

9    A.   Yes.

10   Q.   During the surveillance times, did you see any evidence

11   of any of -- from what you could observe, of any of the women

12   appearing to be held against their will?

13   A.   No.  I particularly didn't see the women being grabbed or

14   forced or anything like that.  It -- no.

15   Q.   Okay.  Did it appear to you that the women, for lack of a

16   better word, seemed to be casual about either getting in one

17   vehicle and then out of the vehicle, going inside of a house,

18   coming out of a house, getting into a car, all those things

19   that we've been -- we've heard about from your testimony

20   yesterday -- would that be a fair characterization, that they

21   appeared to be casual in their movements, in their facial

22   expressions and the like?

23   A.   It appeared to be, yes, casual; however, you know, what I

24   noticed was, you know, there was no sense of, you know,

25   togetherness.  It was the, you know, male helping with the

1   bag, walking in front, them following behind.  There was

2   surveillance one time at a CVS on Riva Road.  The females went

3   inside the business.  The males stayed right there near the

4   doorway waiting for the females to come back out.  Then they

5   all got into the car together.  So I don't know if that

6   answers your question or not.

7   Q.   Yes.  Thank you very much.

8        You testified yesterday that, on July 7th of 2010,

9   you all believed it was necessary to execute a search warrant

10  at a location in Talbot County on ██████████ in Easton; is

11  that correct?

12  A.   Yes.

13  Q.   And do we understand the reason that you thought that you

14  needed to do that was because you were of the belief that

15  there was a 17-year-old individual -- a female who may be

16  involved in prostitution at that address?  Is that also

17  correct?

18  A.   Correct, yes.

19  Q.   And you knew that because one of the persons that

20  answered a telephone call the day before in -- I think your

21  informant made a phone call to the address at ██████████; is

22  that correct?

23  A.   That's correct.

24  Q.   And some Hispanic male said that, "Oh, we have a young

25  17-year-old girl here" --

1    A.    Yes.

2    Q.    -- is what happened, and that's what alerted you to do

3    what you actually did, which was execute a search warrant at

4    that occasion; is that right?

5    A.    Yes.

6    Q.    And did you find a 17-year-old when you executed that

7    warrant on the following day?

8    A.    No 17-year-old was found there, no.

9    Q.    Okay.  When you executed the warrant at ▮▮▮▮▮▮▮▮,

10   photographs were shown to you -- I think one photograph was

11   Photograph 17b/7.  If we need to see it, we'll try to find it,

12   but what I saw were some condoms that I -- they appeared to be

13   called Lifestyle condoms.  Did you recall that?

14   A.    Yes.

15   Q.    Okay.  Is that inconsistent with what you ordinarily see,

16   which were so-called Crown condoms that were bought in large

17   numbers?

18   A.    The Crown condoms are usually purchased in large numbers,

19   and, again, it's not in a package material; it's usually in a

20   big freezer bag, and it's sold in large strips.  The Lifestyle

21   condoms obviously -- yes, they can go into stores.  Obviously

22   the victim in this case, the -- German Ventura in this case,

23   they went to different stores at times and did purchase other

24   brands as well.

25   Q.    Detective, is it fair to say that the statue known as

1    Santa Muerte is not associated, to your knowledge, with
2    prostitution itself, is it?
3    A.    No.  It's more of a religious type, you know, prayer-to
4    thing.  I don't know if it's particular to prostitution
5    itself.
6    Q.    You simply don't know?
7    A.    Yeah.  I've seen it in other houses of prostitution,
8    but -- and other houses of individuals.  Not the Santa Muerte,
9    but other statues of -- that they pray to.
10   Q.    Okay.  "They" meaning Latinos?
11   A.    I'm sorry.  Yes.  Latinos.  Hispanic.
12   Q.    Okay.  Surveillance was performed on September 13th of
13   2010, and you were shown a series of photographs, some of
14   which were the image of Mr. Ventura, and do you recall that
15   one of them -- my recollection is it's Exhibit 28f/17 was the
16   picture of Mr. Ventura holding the hand of a child near a
17   vehicle.  Do you recall that?
18   A.    Yes.
19   Q.    Could you recall whether or not that child appeared to be
20   Mr. Ventura's child?
21   A.    It is.
22   Q.    It was his child?
23   A.    It's the child from his home, and I was -- indicated that
24   it was his child from Yenis.
25   Q.    Okay.

 1               **MR. RUTER:**  If I could have just one moment, Your

 2   Honor?

 3               **THE COURT:**  Yes.

 4               **MR. RUTER:**  I think just two questions, Your Honor.

 5               **THE COURT:**  Yes.

 6               **MR. RUTER:**  Thank you.

 7   **BY MR. RUTER:**

 8   Q.   Detective, you did help investigate the ███████

 9   robbery?

10   A.   I -- I did assist in that afterwards.  I wasn't there on

11   the scene.  I did some follow up to it, absolutely, yes.

12   Q.   Okay.  And you were advised, were you not, by all the

13   victims in the house -- I think each one -- that the

14   assailants who came in, one of which was Mr. Rapalo, in fact,

15   were carrying a handgun?

16               **MR. CUNNINGHAM:**  Objection.

17               **THE COURT:**  Basis?

18               **MR. CUNNINGHAM:**  Hearsay, Your Honor.

19               **THE COURT:**  Okay.  Overruled.

20               **THE WITNESS:**  I wasn't told in particular.  I'd have

21   to look at the report itself and see what they wrote.  I do

22   remember that a gun was mentioned.  I don't know which person

23   mentioned it, but I do remember that, yes.

24   **BY MR. RUTER:**

25   Q.   Would it surprise you if the reports indicate that all

1    four mentioned it?

2    A.   I -- it wouldn't surprise me.  I just would have to look

3    at the report and refresh my memory of that.

4    Q.   We -- you do recall that a gun wasn't found that day?

5    A.   I was -- the gun was not found that day.

6    Q.   Okay.  And, if we understand, some personal property that

7    belonged to the four victims was found on either Mr. Rapalo or

8    the two people that were with him; is that also accurate?

9    A.   Yes, and they were charged.

10   Q.   And last area:  When you saw Mr. Ventura go into a CVS or

11   some kind of a store and he came out with a bag in his hand,

12   do you know whether or not he had purchased condoms?

13   A.   Yes, he did.

14   Q.   And how do we know that?

15   A.   Again, what the officer took pictures of inside is --

16   observed there and sat there and watched him.

17   Q.   Okay.  What you're saying is an officer was inside the

18   store when Mr. Ventura was in there?

19   A.   Yes.  Detective Lee.

20   Q.   Okay.  And Detective Lee saw Mr. Ventura purchase condoms

21   and then have them placed in the bag?

22   A.   Yes.

23   Q.   Okay.  All right.

24        **MR. RUTER:**  If I could have just one more second,

25   Your Honor, I believe I'm done.

```
 1              (Counsel conferring with the Defendant.)

 2              MR. RUTER:  Your Honor, thank you.  No further

 3    questions.

 4              THE COURT:  That was ten questions.

 5              Redirect?

 6              MR. CUNNINGHAM:  Very briefly, Your Honor.

 7                      REDIRECT EXAMINATION

 8    BY MR. CUNNINGHAM:

 9    Q.   Detective Hartlove, you were just asked a question about

10    the robbery at ████.  Did you, after the robbery, have an

11    opportunity to interview either the putative victims or the

12    perpetrators of that crime?

13    A.   Yes.  The perpetrator.

14    Q.   And that was the individual identified as Maximilliano

15    Zelaya Rapalo?

16    A.   Yes.

17    Q.   And was Mr. Zelaya Rapalo charged with any offense as a

18    result of that crime?

19    A.   Yes.

20    Q.   Was he detained pending disposition of the charges?

21    A.   Yes.

22    Q.   And do you know approximately how long he was detained?

23    A.   Incarcerated for?  In jail, waiting?

24    Q.   Well, was he convicted, do you know?

25    A.   I don't believe he was convicted.  I --
```

Redirect Examination of Jeffrey Scott Hartlove

1    Q.    And do you know why there was no conviction?

2    A.    Because they couldn't get a hold of the victims in the

3    case.

4    Q.    And were the victims people who had been employed at the

5    ████████████ location?

6    A.    Yes.

7    Q.    Do you know what their Immigration status was?

8    A.    No.

9    Q.    Now, you had questions as to the occasions of when you

10   saw Mr. Ventura actually engaging in what appeared to be

11   construction work, and, if I counted correctly, I thought you

12   said, over the course of time, you saw him engage in

13   construction work maybe four times; is that correct?

14   A.    While doing -- yes, that's correct.

15   Q.    And was that between the period of March of 2010 and

16   November 15th of 2010?

17   A.    Yeah.  It was at the very beginning of the surveillance.

18   He was doing construction on Pennsylvania Avenue that we were

19   out there doing surveillance on, and then it was at -- in

20   November -- I believe it was two days right before the

21   takedown on November 15th.

22   Q.    And, between that, those periods of time, March or the

23   end of March, beginning of April, and November 15th, can you

24   tell us approximately how many days you physically conducted

25   surveillance of him?

1    A.   I would say, out of the month, again, it was an extreme

2    amount that I know almost every Monday -- Sunday and Monday,

3    we would watch the area.  There was times maybe once out of

4    the month we wouldn't, but it was -- it was a lot.

5    Q.   Now, the surveillance on one occasion, it appeared that a

6    woman who was then transported by Defendant Ventura in his

7    vehicle arrived in her own vehicle, the one with the Florida

8    tags.

9    A.   Yes.

10   Q.   With the exception of that woman, did you ever, in the

11   course of surveillance or in the scope of your investigation,

12   determine that another woman working for Mr. Ventura had her

13   own means of transportation?

14   A.   No.

15   Q.   And did you learn how, if a woman needed food or supplies

16   or any personal effects, she was to acquire them during a week

17   when she was working in a brothel?

18   A.   Yes.

19   Q.   And how would that happen?

20   A.   When she was working in a brothel, usually the doormen or

21   the guard or somebody there at the -- the male at the house

22   that would be taking care of -- sometimes they're the -- they

23   call them the enforcers, the protecters.  They would go and

24   retrieve food.  On several occasions when -- what I saw was,

25   when the girls were also dropped off, either saw, again,

 1    Mr. Ventura -- he would go to McDonald's, again, picking them

 2    up.  He would -- or drop them off.  He would then go to the

 3    McDonald's, pick up something, take it back, and, again,

 4    mainly it was the guys inside the house -- the doormen going

 5    out and retrieving that -- items for them.

 6    Q.   Detective Hartlove, we can conclude with just a few other

 7    questions on two other subject areas.  One, the questions

 8    regarding identification of an individual named Flaco, you

 9    recall those?

10    A.   Yes.

11    Q.   And, in Government Exhibit 41, this was the page that I

12    believe was seized during the search of ███████.  It was

13    one page from a notebook.  Do you recall that exhibit?

14    A.   I'd have to look at it again.

15    Q.   Bear with me, and I'll --

16            MR. MONTEMARANO:  It's 41, Mr. Cunningham.

17            MR. CUNNINGHAM:  Thank you.

18    BY MR. CUNNINGHAM:

19    Q.   Let me put it on the screen, then.  If necessary, I'll

20    hand it up to you, Detective Hartlove.

21    A.   Yes.

22    Q.   This is Government Exhibit 41.

23    A.   Yes, I recall the item.

24    Q.   Can you see, at the bottom, the annotation for what

25    appears to be Flaco or Floco?

1    A.    Yes.

2    Q.    And do you see a phone number that appears to be

3    associated with that name?

4    A.    Yes.

5    Q.    And what is that number?

6    A.    It appears to be ███████-4717.

7    Q.    And, Detective Hartlove, are you familiar with the area

8    codes assigned to telephones subscribed to within the

9    Maryland, D.C., Virginia area?

10   A.    Yes.

11   Q.    And is 914 one of those area codes?

12   A.    No.  Not that I'm aware of.

13   Q.    Now, with regard to Ms. Dueñas Franco and her

14   identification of an individual named Flaco, did she at any

15   time ever identify Defendant Fuertes as Flaco?

16   A.    No.  Not at first, I should say.

17   Q.    Well, that was my question.  Did she, at any time, ever,

18   identify him as Flaco?

19   A.    No.  Not -- not at the initial investigation.  When I was

20   talking to her --

21   Q.    Detective Hartlove, did she later identify --

22   A.    Yes.

23   Q.    -- Mr. Fuertes as Flaco?

24   A.    Yes.

25   Q.    Did she explain why initially she hadn't identified him

1    as Flaco?

2    A.    I don't think she was asked directly why, but --

3            **MR. MONTEMARANO:**  Objection.  Move to strike.

4            **THE COURT:**  Basis?

5            **MR. MONTEMARANO:**  Can we approach, Your Honor?

6            **THE COURT:**  Come up.

7            (Whereupon, the following discussion occurred at the

8    bench.)

9            **MR. MONTEMARANO:**  This is nothing more than

10   impermissible vouching by Detective Hartlove for a witness and

11   a perceived deficit in that witness' testimony.  These

12   questions can be posed of Ms. Dueñas when she takes the stand.

13           **MR. CUNNINGHAM:**  I'm just following up with the --

14           **THE REPORTER:**  I'm sorry.  I can't hear you.

15           **MR. CUNNINGHAM:**  I'm just following up with the

16   identification questions, Your Honor, and submit that the door

17   was opened by the direct question.

18           **THE COURT:**  Okay.  Overruled.

19           (Whereupon, the bench conference was concluded.)

20   **BY MR. CUNNINGHAM:**

21   Q.    Detective Hartlove, during the course of surveillance and

22   observation of brothels, did you ever see any of the women

23   depart during the period between Monday and Saturday or

24   Sunday?

25           **MR. MONTEMARANO:**  Objection, Your Honor.  Basis for

1    knowledge.

2              THE COURT:  Overruled.  "Did you see" was the

3    question.  Overruled.

4              THE WITNESS:  Did I see the women depart from --

5              MR. CUNNINGHAM:  Yes.

6              THE WITNESS:  -- the brothels?

7    BY MR. CUNNINGHAM:

8    Q.   Yes.  Did you ever see them leaving the brothels?

9    A.   Yes.

10   Q.   And where would you see them go?

11   A.   Again, from the house right to the vehicle.

12   Q.   My question was:  Other than, say, the arrival on Monday

13   and a subsequent departure either the following Sunday or

14   Monday, during the period of time they were working, did you

15   ever see them leaving the brothel?

16   A.   No.

17   Q.   Now, there were some questions as to the Santa Muerte

18   statue that you discovered in Defendant Ventura's residence on

19   November 15th, 2011.  Do you remember -- 2010.  Do you

20   remember those questions?

21   A.   Yes.

22   Q.   And, the picture, was that a picture that you took?  The

23   image that was introduced from that search, did you take that

24   picture?

25   A.   Yes.

1    Q.   And, prior to taking that picture, had you moved the

2    Santa Muerte statue?

3    A.   No.

4    Q.   Did you do anything to the window dressing or covering,

5    or whatever it's called -- the background -- of that image

6    prior to taking the picture?

7    A.   Of the blinds?  No.

8    Q.   And you have seen the images -- actually, images were

9    given to you.  The one that was introduced was an image from

10   Mr. Soriano?

11   A.   Yes.

12   Q.   And did you see a similar image from another individual?

13   A.   Yes.

14   Q.   Who was that?

15   A.   Hector Avila.

16   Q.   And you had an opportunity to look at those images and

17   look at the Santa Muerte statue.  Did the background appear to

18   you to be similar?

19   A.   Yes.

20           **MR. CUNNINGHAM:**  Nothing further of this witness,

21   Your Honor.

22           **THE COURT:**  Recross?

23           **MR. RUTER:**  Now, Your Honor?

24           **THE COURT:**  Yes.

25

1              **RECROSS-EXAMINATION**

2     **BY MR. RUTER:**

3     Q.   Detective, these young prostitutes, did you find that any

4     of them owned a car?

5     A.   Just learned of one.

6     Q.   Pardon?

7     A.   Just learned of one recently, that they did own a car,

8     yes.

9     Q.   You mean --

10    A.   One did.

11    Q.   -- back in 2008?

12    A.   In 2008?

13    Q.   Yes.

14    A.   No.  During the investigation of the surveillance in

15    2010.

16    Q.   Okay.  And who was it that owned a car?

17    A.   That was Bridgett Alicar (sic), A-L-I-C-A-R.  I believe

18    that's how --

19    Q.   Was Bridgett the lady who had the long --

20    A.   Blondish hair.

21    Q.   -- blondish hair we saw --

22    A.   Yes.

23    Q.   -- yesterday?

24         Did you find -- did she have a driver's license?

25    A.   She had a car that was registered to her.  I didn't check

1    her license status.

2    Q.   She's the sole exception as to prostitutes that owned a

3    car?  She was the only one?

4    A.   Yes.

5    Q.   Besides her, do you know of any of the ladies who had a

6    Maryland driver's license?

7    A.   No.

8    Q.   Do you know of any of the girls who had parents who lived

9    here in Maryland?

10   A.   No, not that I recall.

11   Q.   Do you know of any of the girls who had relatives,

12   brothers or other sisters, who lived here in Maryland?

13   A.   Yeah.  No, not that I recall.

14   Q.   And then, finally, if I understand, perhaps without

15   exception, all the girls were here illegally?

16   A.   No.  Some were -- one was legal.

17   Q.   Okay.  Which one was that?

18   A.   I believe Bridgett --

19   Q.   Bridgett was here legally, and she had a license, and she

20   had a car?

21   A.   Yes.

22   Q.   Okay.  All right.

23          MR. RUTER:   Thanks.  No further questions, Your

24   Honor.

25          MR. MONTEMARANO:   Just a couple questions, Your

1    Honor.

2                    **RECROSS-EXAMINATION**

3    **BY MR. MONTEMARANO:**

4    Q.   Mr. Cunningham was asking you about whether or not you

5    had seen any of the prostitutes leave the brothels during the

6    time that you had the brothels under surveillance, correct,

7    sir?

8    A.   Yes.

9    Q.   And your answer was no, correct?

10   A.   Correct.

11   Q.   Would I be correct in understanding that your

12   surveillance of the brothels was not undertaken on a 24-hour

13   basis?

14   A.   It was not on a 24-hour basis; however, I would do the

15   surveillance -- it was not 24 hours, no.

16             **MR. MONTEMARANO:**  No further questions, Your Honor.

17   Thank you.

18             **THE COURT:**  Thank you, sir.  You may step down.

19             **THE WITNESS:**  Thank you, Your Honor.

20             (Witness excused.)

21             **THE COURT:**  Call your next witness.

22             **MS. YASSER:**  Yes, Your Honor.  The United States

23   calls Sandra Flores.

24             **THE COURT:**  Ms. Yasser, Ms. Flores, will she testify

25   in English, or Spanish?

1         **MS. YASSER:**  Spanish, Your Honor.

2         **THE COURT:**  Okay.  Belinda, would you make sure the

3    interpreter has the mic, not the witness.

4         **THE CLERK:**  Yes.

5         **THE COURT:**  Please swear the witness.

6         **THE CLERK:**  Raise your right hand.

7              **SANDRA MAME FLORES SAN MARON**

8         **WAS THEN DULY SWORN TO TELL THE TRUTH**

9         **THE WITNESS:**  Yes, the truth.

10        **THE CLERK:**  Okay.  Be seated.

11        **THE WITNESS:**  Okay.  Thank you.

12        **THE CLERK:**  Will you state your name and spell it

13   for the record.

14        **THE WITNESS:**  My name is Sandra Mame Flores San

15   Maron (phon).

16        **THE CLERK:**  Can you spell it?

17        **THE WITNESS:**  I don't know how to spell.

18        **THE CLERK:**  Okay.  Thank you.

19        **THE COURT:**  Question?

20        **MS. YASSER:**  Yes.  Thank you, Your Honor.

21                **DIRECT EXAMINATION**

22   **BY MS. YASSER:**

23   Q.   Good morning, ma'am.

24   A.   Good morning.

25   Q.   Ms. Flores, where are you from?

Direct Examination of Sandra Mame Flores San Maron                    T-III-413

```
 1    A.    From El Salvador.

 2    Q.    And how long have you been in the United States?

 3    A.    I've been here for twelve years.

 4    Q.    And you have a work permit to be here; is that correct?

 5    A.    Yes.  Yes.  Correct.

 6    Q.    Approximately three and a half years ago, in September of

 7    2009, did you live at ███████████████████, ma'am?

 8    A.    Yes, uh-huh.

 9    Q.    And, that address, that's in Annapolis, Maryland; is that

10    correct?

11    A.    Yes, correct.

12    Q.    Who did you live with at ███████████?

13    A.    With my husband.

14    Q.    Do you have any children?

15    A.    Yes.  I have four children.

16    Q.    And how old are they?

17    A.    My oldest son is twelve years old.  The second one is

18    nine years old.  My daughter just turned eight, and my other

19    child is two -- no -- three years old.

20    Q.    And what is your husband's name?

21    A.    My husband's name is Juan, Juan Escobar.

22    Q.    You mentioned you have a work authorization.  What kind

23    of work do you do?

24    A.    I work in cleaning.

25    Q.    What kind of hours do you keep?
```

```
1    A.    From 5:00 p.m. to 9:00 p.m.

2    Q.    I want to show you what's been previously marked

3    Government's Exhibit 10a/16 and ask if you recognize what's

4    depicted there.

5    A.    Oh, the apartment, or what?

6    Q.    Do you recognize that to be the apartment building where

7    you lived about three and a half years ago?

8    A.    Yes.

9    Q.    I'm going to show you Government 10a/18.  You mentioned

10   you lived in ████████████████, Ms. Flores.  Can you, by just

11   taking your finger and indicating by marking an "X" on this

12   exhibit where ██████████ is located.

13   A.    Here (indicating).

14   Q.    And that's -- for the record, the witness has indicated

15   the upper right side of the building.

16   A.    Yeah, that's it.  The one where the air conditioning is.

17   Q.    Thank you.

18   A.    You're welcome.

19   Q.    I'm going to put 10a/18 back on the screen.  Ms. Flores,

20   do you know, by looking at this photograph, where ███████████

21   of █████████████ is located?

22   A.    It's here, this apartment.

23   Q.    And, if you could, just by using your finger, to mark an

24   "X" over that apartment.

25   A.    (Indicating).
```

1    Q.    Thank you, Ms. Flores.

2    A.    You're welcome.

3    Q.    Ms. Flores, did you ever notice anything strange going on

4    at ▮▮▮▮▮▮▮▮ in ▮▮▮▮▮▮▮▮▮▮▮?

5              **MR. MONTEMARANO:**  Objection.

6              **THE COURT:**  Basis?

7              **MR. MONTEMARANO:**  "Strange"?

8              **THE COURT:**  Overruled.

9              **THE WITNESS:**  I saw there were people coming there,

10   but I did not know what happened until the girl came, and I

11   supported her, but I did not know what was going on.

12             **MR. MONTEMARANO:**  Objection, Your Honor.  Move to

13   strike.  It's hearsay.

14             **THE COURT:**  Overruled.

15   **BY MS. YASSER:**

16   Q.    Ms. Flores, did you see people waiting around outside ▮▮▮

17   ▮▮▮▮▮▮▮▮▮?

18             **MR. MONTEMARANO:**  Objection.  Leading.

19             **THE COURT:**  Overruled.

20             **THE WITNESS:**  Yes.

21   **BY MS. YASSER:**

22   Q.    And were those men, or women?

23   A.    Men.

24   Q.    Ms. Flores, I want to direct your attention to the

25   evening hours of September 1st, 2009, okay?

1    A.    Okay.

2    Q.    Do you recall if you worked that day in cleaning, or that

3    evening, I should say, in cleaning?

4    A.    I worked that night.

5    Q.    And, when you were done with work, did you return to your

6    apartment?

7    A.    Yes.  Yes.

8    Q.    Did you learn that the police had been to your apartment

9    building that day?

10   A.    Yes.  My husband told me all that.

11   Q.    Now, later that evening, did you see the police come back

12   to your apartment building?

13   A.    Yes, because we called them for them to come and see,

14   because they had spilled gas in the apartment.

15   Q.    Well, we'll get there, Ms. Flores, but, right now, with

16   respect to just this evening, September 1st, 2009, did the

17   police return to the apartment building with a girl that

18   evening?

19   A.    I'm sorry.  Oh, yes.  Yes.

20   Q.    And had you ever seen the girl that was with the police

21   that night before?

22   A.    No.

23   Q.    Did you know her name?

24   A.    No, I don't know her name.

25   Q.    And did you have a conversation with either the girl or

 1    the police that evening?

 2    A.   No.  I did not have a conversation with her, but she just

 3    asked me --

 4              **MR. RUTER:**  Objection.

 5              **THE WITNESS:**  She just asked to borrow --

 6              **MR. RUTER:**  Objection.

 7              **THE COURT:**  Overruled.

 8              **THE WITNESS:**  Asked to borrow my phone, and I lent

 9    it to her.

10    **BY MS. YASSER:**

11    Q.   Ms. Flores, did you agree to help this girl?

12    A.   Yes.  I agreed to help her so that she could locate her

13    family.

14    Q.   And, in part of helping her, did you agree to let her

15    inside of your apartment?

16              **MR. MONTEMARANO:**  Objection, Your Honor.  May we

17    approach?

18              **THE COURT:**  Yes.  Come up.

19              (Whereupon, the following discussion occurred at the

20    bench.)

21              **THE COURT:**  Is someone listening to the bench

22    conference?  Is someone -- thanks.

23              Ms. Kirchgessner is monitoring the bench conference.

24              **MR. MONTEMARANO:**  Okay.

25              **THE COURT:**  Okay.

1        **MR. MONTEMARANO:**  Thank you, Your Honor.  If

2   Ms. Yasser is going to testify, why doesn't she just get on

3   the stand and do so.  We can dispense with the interpreter.

4   We can save the Court costs and time.

5        **THE COURT:**  Is that a rhetorical question?

6        **MR. MONTEMARANO:**  Yes, Your Honor.

7        **THE COURT:**  I don't -- obviously, a witness with a

8   language difficulty, the examiner is permitted some leeway, as

9   she would be with a child.

10        **MR. MONTEMARANO:**  I understand, Your Honor, but she

11   is asking questions which provide no need for anything other

12   than an affirmative or a negative answer.  She's putting all

13   of the facts into the question, not in the general direction

14   of, and now we are getting closer to the meat of the

15   testimony, and I submit that the Court, in my view, needs to

16   prune back on this.

17        **THE COURT:**  Be careful with the meat, Ms. Yasser.

18        **MS. YASSER:**  No problem, Your Honor.

19        **MR. RUTER:**  Your Honor, while we're here, can I be

20   heard briefly?

21        **THE COURT:**  Yes.

22        **MR. RUTER:**  We expect that the witness is going to

23   testify that, after helping this young lady, they had received

24   some threatening phone calls, and those calls are associated

25   with a number associated with Mr. Ventura.

1        We're going to object, Your Honor, to any such

2    references.  It's our belief that it's not relevant.  It's our

3    belief that, under the statute for which Mr. Ventura stands

4    charged, the threats have to be directed towards someone

5    involved in the trade, such as the women themselves.  A threat

6    alleged to have been made to a third party who has nothing to

7    do with the industry at all is not relevant to whether or not

8    any of the elements of the offense are met, and it's

9    extraordinarily prejudicial, needless to say, and, even

10   collaterally, we don't see how it's relevant to the charges

11   that are pending.

12        **THE COURT:**  It is your understanding that the threat

13   cannot be in furtherance of the trade?

14        **MR. RUTER:**  Your Honor, it can be in furtherance,

15   but it has to be in furtherance directed to someone who is

16   involved in the trade.  It's the way that we see it, and, if

17   the Court disagrees, we would argue that that would not be in

18   furtherance of the trade directed at a third party.

19        **THE COURT:**  Well, you're agile.

20        Yes?

21        **MS. YASSER:**  If I may, first of all, this is an

22   overt act.  This threatening call and this experience are

23   actually overt acts charged in the conspiracy in this case,

24   conspiracy, Count 1, in furtherance of the prostitution

25   operation, and obviously evidence that Mr. Ventura placed

1    threatening calls to witnesses who were perceived to have

2    either called the police on him or were assisting his women

3    after they needed help is evidence that they were, in fact --

4    that Ventura was, in fact, engaged in this trade.

5            **THE COURT:**  So you're saying this was generally in

6    pursuit of the business --

7            **MS. YASSER:**  Absolutely.

8            **THE COURT:**  -- this was done in?

9            **MS. YASSER:**  This is to threaten --

10           **THE COURT:**  The Government takes a different view of

11   the restrictions on the threat, Mr. Ruter, and that will be,

12   here, the prevailing view, but you do have your objection.

13           **MR. RUTER:**  Thank you, Judge Quarles.

14           **THE COURT:**  It is overruled.

15           **MS. YASSER:**  Thank you, Your Honor.

16           (Whereupon, the bench conference was concluded.)

17           **MS. YASSER:**  I see the interpreters are switching

18   over.

19           **INTERPRETER GOLDSTEIN:**  Okay.

20   **BY MS. YASSER:**

21   Q.   Ms. Flores, I had asked you if you had agreed to help

22   this woman that you saw that evening?

23   A.   Yes.

24   Q.   And how did you agree to help her?

25   A.   I was willing to let her stay overnight, and then to find

Direct Examination of Sandra Mame Flores San Maron

1    a place for her to go later.

2    Q.   And you mentioned earlier that this woman asked to use

3    your phone; is that correct?

4    A.   Yes.  She asked me to lend her a phone.

5    Q.   Did you allow her to do so?

6    A.   Yes.  I let her have it, because I didn't think she was

7    going to hurt me with the phone in any way.  I didn't know.

8    Q.   Ms. Flores, did you see whether or not this woman

9    actually used your phone to make a call?

10   A.   Yes, she used it.  She went outside.

11   Q.   So you didn't hear what she said on the phone, is that

12   correct, or did you?

13   A.   All I heard was she said she was going to talk to her

14   family.  That's what I heard.

15   Q.   After this woman used your phone, what happened next?

16   A.   It was after that that we got a call that said they were

17   going to do away with the whole family.

18   Q.   Now, when you received that call, let me back you up to

19   before you received that call.  Was the woman still in your

20   apartment at the time you received the call?

21   A.   No.  She wasn't there anymore.

22   Q.   When did you realize that she had left?

23   A.   I got up to give a baby bottle to my child, and she had

24   already left.  It was after 10:00.

25   Q.   So she didn't say anything to you when she left?

Direct Examination of Sandra Mame Flores San Maron                    T-III-422

```
1    A.    No.  She didn't say anything to me, no.

2    Q.    Had she given you your phone back, though, before she

3    left?

4    A.    Yes.  She had already given me the telephone.  I'm sorry.

5    Q.    Now, after you got up to give I guess your baby a bottle

6    and you realized the woman was gone, did you go back to bed?

7    A.    Yes.

8    Q.    And was your husband with you at that time?

9    A.    Yes, my husband was there.

10   Q.    What is his name, by the way?

11   A.    ███████████ -- oh, Juan Escobar.  I was mentioning my

12   son's name.  I'm -- well, Juan Escobar.

13   Q.    Now, after you went to bed for presumably the second

14   time, were you awakened at some point?

15   A.    Yes.  I woke up.  I was scared because they said they

16   were going to do something to us.

17   Q.    What woke you up, Ms. Flores?

18   A.    The threat that we got.  We got a call saying that they

19   were going to do away with the whole family.

20   Q.    Somebody called your phone?

21   A.    Yes.

22   Q.    And who answered that phone call?

23   A.    It was my husband who answered them.

24   Q.    And where was he in relation to you when he answered that

25   phone call?
```

Direct Examination of Sandra Mame Flores San Maron

1   A.   He was towards my right.  I was on the other side.

2   Q.   Were you in bed?

3   A.   Yes.  We were already in bed asleep.

4   Q.   So could you hear what the person on the phone was

5   saying?

6   A.   Yes.  I heard him say they were going to do away with the

7   whole family, they were going to kill everybody.

8   Q.   And was this a man, or a woman on the phone?

9   A.   A man.

10   Q.   And did you recognize his voice?

11   A.   I didn't recognize it.

12   Q.   Ms. Flores, can you describe his tone of voice?

13   A.   I don't know.  I can't.

14   Q.   Was he speaking loudly, or softly?

15   A.   Uh-huh.  It was a strong voice, yes.

16   Q.   Was he speaking in Spanish, or in English?

17   A.   In Spanish.

18   Q.   Now, you said that the man threatened to do away with

19   your whole family, to kill you.  Did he say why?

20   A.   I don't know why he said that.  I don't know.

21   Q.   Ms. Flores, how did you feel after receiving this

22   threatening phone call?  How did it make you feel?

23           **MR. RUTER:**  Objection.  Objection.

24           **THE COURT:**  Basis?

25           **MR. RUTER:**  Relevance.

1        **THE COURT:**  Okay.  Overruled.

2        **THE WITNESS:**  I felt very nervous, very weird.  I

3   don't know.

4   **BY MS. YASSER:**

5   Q.   And what did you or your husband do after receiving this

6   threatening phone call?

7   A.   We stayed awake.  We called the police, and then we gave

8   the police the telephone number that had called us.

9   Q.   So you could see the telephone number as it appeared on

10  the phone; is that correct?

11  A.   Uh-huh, right.  They called directly on that phone.

12  Q.   And you provided that number to the police; is that

13  correct?

14  A.   Yes.  I gave it to the police.

15  Q.   Did you also provide your telephone number to the police?

16  A.   Yes.  We gave them our number as well.

17  Q.   And is that number ███████-6177?

18  A.   Yes.

19  Q.   Ms. Flores, after you received this call on September 1st

20  of 2009, did anything happen to you or your family that caused

21  you to call the police again?

22  A.   Yes, because they came to put gas on our door.

23        **MR. RUTER:**  Object, Your Honor.

24        **THE COURT:**  Basis?

25        **MR. RUTER:**  Could we approach?

 1          THE COURT:  Yes.  Come up.

 2          (Whereupon, the following discussion occurred at the

 3   bench.)

 4          THE COURT:  Yes, sir?

 5          MR. RUTER:  Your Honor, although the Government can

 6   certainly argue that the phone calls that occurred, evidently

 7   within moments, maybe hours of the lady coming to the Escobar

 8   household, if I understand it now, the lady is now long gone,

 9   and we're now into many more hours have now elapsed, I think,

10   and it seemed to me that, A, the Government has nothing but

11   speculation that this next incident is in any way related to

12   the fact that the lady was in the house with the Escobars, and

13   then of course that further had anything to do with

14   Mr. Ventura and his prostitution.

15          DEFENDANT VENTURA:  I hear nothing.

16          MS. YASSER:  I can't hear anything.

17          MR. RUTER:  Oh, he said he can't hear.

18          THE COURT:  Okay.

19          INTERPRETER GOLDSTEIN:  Your Honor, may we have a

20   moment, please?

21          THE COURT:  Yes.

22          MR. MONTEMARANO:  Is technology our servant, or the

23   other way around?

24          THE COURT:  It's our cruel master -- a cruel and

25   capricious master.

Direct Examination of Sandra Mame Flores San Maron

1          **MR. MONTEMARANO:**  I get the same -- I used to get

2    the same feeling when I was walking my dog, may he rest in

3    peace.

4          **INTERPRETER GOLDSTEIN:**  Thank you, Your Honor.

5          **THE COURT:**  Oh, I never had any illusion; my dog

6    clearly owned us.

7          Okay.  Wait a minute.  Mr. Ventura, can you hear the

8    interpreter?

9          **DEFENDANT VENTURA:**  Yes.

10         **THE COURT:**  Mr. Fuertes, can you hear the

11   interpreter?

12         **DEFENDANT FUERTES:**  Yes, Your Honor.

13         **THE COURT:**  Thank you.  Yes.

14         Okay, Mr. Ruter?

15         **MR. RUTER:**  Your Honor, if I could repeat?

16         **THE COURT:**  Yes.

17         **MR. RUTER:**  Your Honor, we understand that the

18   Government may believe that it's relevant to show that,

19   directly after the young lady was brought to the Escobar

20   household, that this phone call was made.  We understand

21   they're going to show that the phone numbers that came into

22   the Escobar home is associated with Mr. Ventura; however, now

23   we're going to get into, I think, three more incidents.  Some

24   happened a day or two or three later, some maybe three or

25   four, five days later, but that they were not contemporaneous

1    with the young lady spending just a few hours at their

2    household, the first incident being the sprinkling of some

3    gasoline outside of the apartment.

4              It's our view, Your Honor, that that is -- first of

5    all, there is no nexus that can be shown that those events

6    have anything to do with this lady having spent a few hours at

7    the Escobar household days and days before, and, because there

8    is no nexus, it's going to be highly prejudicial to

9    Mr. Ventura, who will have no way, quite frankly, to

10   effectively cross-examine Ms. Escobar given the fact that she

11   has no idea who they were when these subsequent events

12   actually took place.

13             So we would ask the Court not to permit any further

14   delving into the other events that were occasioned to the

15   Escobars.

16        **MS. YASSER:**  These events were in close temporal

17   proximity to the threatening phone call.  They all occurred at

18   the Escobars' residence or outside the residence, to their

19   vehicles.  I will ask Ms. Escobar if she was ever the

20   recipient of such threats before, and I think it's a

21   reasonable inference for the jury to draw that these events

22   were connected to the threatening phone call.

23        **THE COURT:**  Will they be connected up, to use that

24   old expression, in any other way?

25        **MS. YASSER:**  Other than -- let me think about that

1    question, Your Honor.  Mr. Escobar could testify, if

2    necessary, that, on the phone call, Mr. Ventura -- the number

3    associated with Ventura, the man, also asked him if he was the

4    owner of a red van.

5            **THE COURT:**  Is the woman calling -- going to be

6    called?

7            **MS. YASSER:**  I'm sorry?

8            **THE COURT:**  The victim.  That woman --

9            **MS. YASSER:**  She will not be called.

10           **THE COURT:**  Okay.

11           **MS. YASSER:**  She will not be called, but, like I

12   said, as far as the events themselves, they were all within

13   ten days after receiving this threatening phone call, three

14   events within ten days.  They never before experienced any

15   such threatening behaviors, and, again, this is charged

16   conspiracy conduct in the Indictment itself.

17           **THE COURT:**  Well, ten days is fairly attenuated, but

18   I'll permit it.

19           **MS. YASSER:**  Thank you, Your Honor.

20           **MR. RUTER:**  Thank you, Your Honor.

21           And, Your Honor, I have, of course, a standing --

22           **THE COURT:**  Continuing objection?

23           **MR. RUTER:**  Yes, sir.

24           **THE COURT:**  You have that.

25           **MR. RUTER:**  Thank you.

1        **THE COURT:**  Both sides.

2        **MR. RUTER:**  Thank you.

3        (Whereupon, the bench conference was concluded.)

4    **BY MS. YASSER:**

5    Q.   Ms. Flores, I had asked you what, if anything, happened

6    to you and your family in the days that followed this

7    threatening phone call?

8    A.   They came to throw like little rocks at the window.

9    Q.   And you had mentioned -- did you call the police when

10   that happened?

11   A.   Yes.  I'd call the police.

12   Q.   And did the police respond?

13   A.   Yes.  They came to the house, and then they went around

14   the apartment to see what was going on.

15   Q.   The other incident that you mentioned was some gasoline

16   being poured in your house or outside your house; is that

17   correct?

18   A.   Yes.  Right at -- touching the front door.

19   Q.   Can you explain how you came to realize there was

20   gasoline outside your front door, how you discovered it.

21   A.   A neighbor called us to tell us that they had thrown that

22   gas by the door.

23   Q.   And did you --

24        **MR. RUTER:**  Object, Your Honor.  Objection.  Move to

25   strike what the neighbor said.

Direct Examination of Sandra Mame Flores San Maron

1      **THE COURT:**  Overruled.

2  **BY MS. YASSER:**

3  Q.   Did you yourself go to your door that day?

4  A.   Yes.  My husband and I went to look.

5  Q.   And could you smell gasoline?

6  A.   Yes, uh-huh.  We smelled the gasoline, the gas.

7  Q.   And what did you do in response?

8  A.   We called the police.  They came to look, and then we

9  cleaned it up.

10  Q.   And were the police, if you know, able to determine who

11  poured the gasoline at your door?

12  A.   Nobody knew anything, no.

13  Q.   Now, was there also an incident involving your husband's

14  car, I think you said?

15  A.   Yes.

16  Q.   What happened?

17  A.   They broke the windows on the van.

18  Q.   Which windows did they break?

19  A.   The glass.  The one that's in the back, the whole glass.

20  Q.   And what, if anything, did you do when you realized the

21  windows in your husband's van had been broken?

22  A.   We called the police again, and I think they did

23  something, because we called the insurance so that they would

24  fix the window.

25  Q.   And did the insurance fix the window?

1      A.    Yes.

2      Q.    Did you have to pay something out of pocket as well?

3      A.    We paid $100.

4      Q.    Ms. Flores, the things that you described happening to

5      you and your family, how did they make you feel?

6                  **MR. MONTEMARANO:**  Objection.

7                  **THE COURT:**  Overruled.

8                  **THE WITNESS:**  I was very sad, very -- I didn't know

9      where to go sleep at night with the children.

10     **BY MS. YASSER:**

11     Q.    And did you change any of your behaviors at home as a

12     result?

13     A.    Yes.  It was really bad.  It was ugly.

14     Q.    Ms. Flores, all these incidences, did they happen within

15     days after receiving this threatening phone call?

16     A.    Yes.  They came and did all these things within a few

17     days.

18     Q.    And this was after you helped the woman from downstairs?

19     A.    Uh-huh.  After.

20     Q.    And this was a woman you had never seen before?

21     A.    I had never seen her before.

22     Q.    You knew nothing about her?

23     A.    Nothing.  I didn't know anything.

24     Q.    And, the man on the phone, you didn't know who he was,

25     did you?

1    A.    No.  I didn't know that either.

2    Q.    Prior to September 1st of 2009, had you or your family

3    ever been the recipients of threatening calls or threatening

4    behaviors before?

5    A.    No.

6              **MS. YASSER:**  No further questions.

7              **THE COURT:**  Cross?

8              **MR. RUTER:**  Thank you, Your Honor.

9                        **CROSS-EXAMINATION**

10   **BY MR. RUTER:**

11   Q.    Good morning, Ms. Flores.

12   A.    Good morning.

13   Q.    Ms. Flores, you said that you learned that this young

14   lady had no family?

15   A.    I don't know if she had family or not.  She was there by

16   herself.  I don't know.

17   Q.    You testified, though, that she wanted to make a phone

18   call in order to communicate with her family; is that correct?

19   A.    She did say that.  I don't know.

20   Q.    And then you saw her go outside?

21   A.    Uh-huh.

22   Q.    And you actually saw her using your cell phone?

23   A.    Yes.

24   Q.    Could you hear her actually speaking any words?

25   A.    No.  She just told me she needed my phone to call her

1    family.  I didn't know who she was talking to.

2    Q.    Okay.  She arrived at your household at approximately

3    what time, Ms. Flores?

4    A.    It was around 9:00.  It was -- it was 9:00.

5    Q.    9:00 p.m.?

6    A.    Yes.

7    Q.    And what time was it, if you can recall, that you retired

8    for the evening to go sleep?

9    A.    We went to bed after I got home, made some food.  I asked

10    her if she wanted to eat anything.  I told her to go to bed on

11    the sofa.  Well, I told her that she could use the bed, that I

12    was going to go use the sofa.  No.  She said she would stay on

13    the sofa that was in the kitchen.

14    Q.    Okay.  And what time was it that you actually went to

15    bed?

16    A.    It was 10:00 -- a little after 10:00 is when we went to

17    bed.

18    Q.    You and your husband?

19    A.    Uh-huh, yes.

20    Q.    And do we understand that the lady stayed out and slept

21    or sat on the sofa while you and your husband slept?

22    A.    No.  She sat down on the chair in the kitchen, and she

23    didn't want to lie down on the sofa or anything.

24    Q.    Did she advise you that she was waiting for someone to

25    come pick her up?

Cross-Examination of Sandra Mame Flores San Maron (Ruter)          T-III-434

```
 1    A.   No.  She didn't say anything to me, no.
 2    Q.   Okay.  And you then testified that there came a time when
 3    you were awakened.  You awoke?
 4    A.   Uh-huh.  I woke up to make the baby bottle for the child.
 5    Q.   And approximately what time was that?
 6    A.   10:00 -- 10:00, 11:00.  I don't remember the time.  I
 7    don't remember.
 8    Q.   Well, we know that you went to bed at 10:00, correct?
 9    A.   Uh-huh.
10    Q.   And, if you can recall, evidently you had a very young
11    child at this time; is that right?
12    A.   I had a little girl.
13    Q.   And, at that time, was your child more or less on a
14    schedule when your daughter would get up and need a bottle?
15    A.   Uh-huh, yes.
16    Q.   And, having said that, can you recall what time she would
17    ordinarily want to have some milk in the evening hours?
18    A.   She would get up around 11:00, but, that day, she got up
19    at 10:00, or after 10:00.
20    Q.   Is it likely, then, Ms. Flores, that you got the bottle
21    for your child somewhere around the 11:00 p.m. time?
22    A.   I didn't see the time.  11:00?  I don't know.  I didn't
23    see the time.  I don't remember.
24    Q.   Okay.  When you went to get your baby's bottle, do we
25    understand the lady was already gone?
```

1    A.    She had already left, yes.

2    Q.    Okay.  Ms. Flores, how would she have gotten out of your

3    house?  Would she have to go down some steps, or was there a

4    door she could get out of, because, if I understand it, your

5    house -- your apartment is on the second floor?

6    A.    Uh-huh, yes.

7    Q.    So did she have to go down some steps to get outside?

8    A.    Uh-huh, yes.

9    Q.    And would she have had to have opened up one door to your

10   apartment in order to leave the apartment?

11   A.    Yes.

12   Q.    And, when she left, you did not hear your door open and

13   close; is that correct?

14   A.    No.

15   Q.    No?  Would it be fair to say, then, based upon your best

16   recollection, that she may have been in your apartment for no

17   more than an hour or perhaps two hours at the very most?

18   A.    Two -- two hours.

19   Q.    Okay.  Do we understand, then, that, later on, after you

20   fed your baby, you went back to bed?

21   A.    Yes.

22   Q.    Okay.  And we also understand that you were awakened then

23   a second time.  This time it was not to feed your baby.  You

24   were awakened a second time?

25   A.    Yes.  I was scared.

Cross-Examination of Sandra Mame Flores San Maron (Ruter)          T-III-436

```
 1    Q.   And why were you scared, ma'am?

 2    A.   Because he had threatened us.  He called us and

 3    threatened us after she had left.

 4    Q.   Your phone rang?

 5    A.   Yes.  The telephone rang, and it was really loud, because

 6    my husband sets it loud.

 7    Q.   Okay.  And the phone was inside your bedroom?

 8    A.   Yes.

 9    Q.   Okay.  And it was that time that you had heard these

10    threats which you already testified to; is that correct?

11    A.   Yes.

12    Q.   Okay.  And you called the police?

13    A.   Yes.

14    Q.   All right.  Can you recall what time you believe it was

15    that you received that phone call?

16    A.   It was about 12:00, 12:30.

17    Q.   Would it be fair to say, then, that the lady who was in

18    your apartment had left probably about an hour before you got

19    the phone call?

20    A.   About -- well, three hours.  She was in the apartment for

21    three hours.  Yes, because we were called at 12:00, and that's

22    when the man threatened us and said he was going to get rid of

23    all of us.

24    Q.   Yes.  Okay.  You went back to bed, correct?

25    A.   Yes.
```

```
 1     Q.   This is after you called the police?

 2     A.   Uh-huh.

 3     Q.   Because you called the police immediately after you were

 4     called by this man; is that correct?

 5     A.   Yes, uh-huh.  Yes.

 6     Q.   And, when you talked with the police, did they ask you

 7     whether or not there was any activity in your apartment

 8     complex on the first floor?

 9     A.   No, they didn't ask that.  I -- I don't remember.

10     Q.   You didn't tell them?

11     A.   No.  We didn't say anything.

12     Q.   Okay.  Now, there came a time, then, when these other

13     incidences occurred.  Do you recall what the first incident

14     was?  Was it the rocks at the window, or was it the gasoline,

15     or was it the window being broken out of your van?  Which one

16     occurred next after the threatening phone calls?

17     A.   Well, first they came to throw the gasoline.

18     Q.   Okay.  And when did that happen?  How long after the

19     phone call did the gasoline appear at the ground level of your

20     apartment?

21     A.   It was about three days after the call, they came and did

22     that.

23     Q.   Okay.  And, by the way, Ms. Flores, you drew an "X" on a

24     photograph as to where I think people enter the house.  You

25     recall putting an "X" on that photograph?
```

1    A.    Uh-huh, yes.

2    Q.    Is that the entrance for you, or is that the entrance for

3    everyone who lives in that building?

4    A.    For all of us that live there.

5    Q.    And how many different people live there, if you know?

6    A.    Four.  There is four -- well, it's one -- just one

7    building, but there is four apartments.

8    Q.    And everyone has to go through that same door to get into

9    their apartments; is that correct?

10   A.    Yes, uh-huh, everyone.

11   Q.    Okay.  And, Ms. Flores, you do not know who threw stones

12   at your window, do you?

13   A.    No.  No.  I don't know anything, and I told -- oh, I

14   called my husband, but, by then, no one was there, so I don't

15   know.

16   Q.    Yeah.

17          **INTERPRETER GOLDSTEIN:**  Excuse me.  The interpreters

18   are going to switch.

19          **MR. RUTER:**  Sure.  Thank you.

20   **BY MR. RUTER:**

21   Q.    Ms. Flores, you do not know who poured gasoline outside

22   your front door, do you?

23   A.    No.  We don't know, no.

24   Q.    And, Ms. Flores, isn't it true that you don't even know

25   whether or not the gasoline was accidentally spilled, or

1    whether or not it was purposely spilled, do you?

2    A.   No.  There was nobody there.  They just came to pour the

3    gasoline, and it went right under the door.  We don't know who

4    came to pour the gasoline.

5    Q.   And let me try it again, Ms. Flores.  The fact is you

6    don't know if someone, on purpose, put the gasoline near the

7    front door, do you?

8    A.   We don't know who went to pour it, no.

9    Q.   You do not know who it was that broke the back window out

10   of your van, do you?

11   A.   No, nobody knows.

12   Q.   And you did not know why, do you?

13   A.   No, I don't know why.

14          **MR. RUTER:**  I have no further questions.  Thank you,

15   Ms. Flores.

16          **THE WITNESS:**  You're welcome.

17          **THE COURT:**  Cross?

18                    **CROSS-EXAMINATION**

19   **BY MR. MONTEMARANO:**

20   Q.   Good morning, Ms. Flores.

21   A.   Good morning.

22   Q.   I have one question:  If I understood your testimony

23   correctly, these events about which you have testified took

24   place in September of 2009; is that correct?

25   A.   Yes, that's correct.

1        **MR. MONTEMARANO:**  Thank you.

2        **MS. YASSER:**  Just a few questions, Your Honor.

3        **THE COURT:**  Redirect?

4                    **REDIRECT EXAMINATION**

5    **BY MS. YASSER:**

6    Q.   Ms. Flores, you were asked questions about entrances and

7    stairs to your building.  Do you recall those questions?

8    A.   Yes.

9    Q.   Would you also have to walk upstairs to get to your

10   apartment?

11   A.   Uh-huh, yes.

12   Q.   And would you pass the same area that you testified where

13   the men would be waiting outside Apartment 1?

14   A.   Uh-huh, yes.

15   Q.   Would you have to pass these men sometimes even with your

16   children with you?

17   A.   Yes.  I had to walk by, because how was I going to do it

18   otherwise?

19   Q.   All right.  You were also asked questions, Ms. Flores,

20   about the gasoline that you discovered outside your door.  Do

21   you recall that?

22   A.   Yes.  The police came to see that, and then they left,

23   and they told us to clean that.

24   Q.   Now, when you discovered this gasoline outside your door,

25   did you notice if there was gasoline anywhere else other than

1    outside your door?

2    A.   No.

3    Q.   And, just to be clear, we're talking about the door to

4    your apartment, correct?

5    A.   Yeah.   The door -- the door to the apartment, like that.

6    Q.   And that's Apartment Number 4?

7    A.   Yes.

8    Q.   Was the gasoline poured outside Apartments Number 1, 2,

9    or 3?

10   A.   The other apartment that's right next door, the gasoline

11   was going down --

12   Q.   Did it trickle down --

13   A.   -- the steps.

14   Q.   And that gasoline that you discovered, that was just

15   three days after receiving this threatening phone call; is

16   that correct?

17   A.   Yes, correct.

18   Q.   And, with respect to your husband's vehicle, was anyone

19   else's vehicle smashed through outside of your apartment

20   building?

21   A.   No.   Just our van.

22              **MS. YASSER:**   No further questions.

23              **MR. RUTER:**   Your Honor, thank you.

24              **THE COURT:**   Recross?

25              **MR. RUTER:**   Thank you.

1          **RECROSS-EXAMINATION**

2     **BY MR. RUTER:**

3     Q.    Ms. Flores, you testified that, from time to time, there

4     would be men standing outside of the house; is that correct?

5     A.    Correct, yes.  Yes, that's correct.  They were sitting

6     there on the steps.  They wouldn't let anybody go by.

7     Q.    And did that happen before September 1st of 2009?

8     A.    Yes.

9     Q.    And did that happen after September 1st, 2009?

10    A.    Uh-huh, yes.

11    Q.    So, to be clear, after the phone call and after the

12    gasoline and after the stones on the window and after the

13    broken-out back of your van, men still sat outside of your

14    home; is that correct?

15    A.    No.  After they took the girl, then nobody came anymore.

16    Q.    After when?

17    A.    No.  After they took the girl, nobody came to the

18    apartment anymore.

19    Q.    After September the 1st of 2009?

20    A.    Yes.

21          **MR. RUTER:**  Thank you very much.  No further

22    questions.

23          **MR. MONTEMARANO:**  No, Your Honor.  Thank you.

24          **THE COURT:**  Thank you.  You may step down.

25          **THE WITNESS:**  Thank you.

```
 1                    (Witness excused.)

 2            THE COURT:  Next witness.

 3            MS. YASSER:  Yes.  The United States calls

 4    Sergeant Kirchner.

 5            THE COURT:  Come up, please.

 6            THE CLERK:  Raise your right hand.

 7                 SGT. JESSICA KIRCHNER

 8         WAS THEN DULY SWORN TO TELL THE TRUTH

 9            THE CLERK:  Okay.  Be seated.  You can scoot your

10    chair up and pull that mic down and speak directly toward it.

11    State your name, and then spell it for the record, please.

12            THE WITNESS:  Sergeant Jessica Kirchner,

13    K-I-R-C-H-N-E-R.

14                  DIRECT EXAMINATION

15    BY MS. YASSER:

16    Q.   Thank you.  Good morning, Sergeant Kirchner.

17    A.   Good morning.

18    Q.   Where do you work now?

19    A.   I work at the Annapolis Police Department.

20    Q.   How long have you been with the Annapolis Police

21    Department?

22    A.   Fifteen years.

23    Q.   And what is your position there?

24    A.   Currently, I am the supervisor of the Community Services

25    Section.
```

1    Q.    And are you a sergeant?

2    A.    Yes, I am.

3    Q.    What is -- I'm sorry.  Which section do you supervise?

4    A.    Currently, I'm the supervisor of the Community Services

5    Section.

6    Q.    And were you a supervisor of a unit before that?

7    A.    Yes, I was.

8    Q.    What was that unit?

9    A.    I was the supervisor of the Criminal Investigations

10   Division, as well as the Intelligence Division.

11   Q.    And what do those divisions do?

12   A.    Criminal Investigations investigates crimes against

13   persons, such as robbery, rape, murder, and crimes against

14   property -- burglary, theft.  And Intelligence Unit, we work

15   on developing crime trends, repeat criminals, career

16   criminals, *et cetera*, new trends that are happening in

17   crime --

18           THE REPORTER:  A little bit slower, if you would.

19           THE WITNESS:  Oh, I'm sorry.

20           MS. YASSER:  Sergeant Kirchner, we have interpreters

21   in the room, so you might have to slow down just a bit.

22           THE WITNESS:  Thank you.

23           MS. YASSER:  Okay.  If you could continue.

24           THE WITNESS:  And, in the Intelligence Unit, career

25   trends that are changing in criminal enterprises, to that

1    extent.

2    **BY MS. YASSER:**

3    Q.   And were you a sergeant in your capacity leading those

4    two units as well?

5    A.   Yes, I was.

6    Q.   Now, before you were a sergeant with the APD, did you

7    hold any other positions or roles?

8    A.   Yes, I did.

9    Q.   And what were those?

10   A.   I started with the agency in the Patrol Division, and

11   then I worked in a street-level drug unit, and then I moved to

12   Criminal Investigations, where I was a detective, and also the

13   supervisor of the Crime Lab.

14   Q.   And, over the course of your many years at the APD, did

15   you participate in investigations to include the execution of

16   search warrants at particular locations?

17   A.   Yes, I did.

18   Q.   How many approximate searches would you say you

19   participated in in your years?

20   A.   Over 50.

21   Q.   I'm going to direct your attention to the time frame of

22   September 2008 to December of 2010 approximately.  Did you

23   hold the same position that you do now back then?

24   A.   No, I did not.

25   Q.   What position were you in back then?

1   A.   In September of 2008, I was the sergeant and supervisor

2   of Criminal Investigations.

3   Q.   And, as such, were you charged with supervising the

4   investigation of the murder of Ricardo Humberto Rivas Ramirez,

5   as well as the attempt murder of the female he was

6   transporting at that time?

7   A.   Yes.

8   Q.   And did you also personally participate in the

9   investigation yourself?

10   A.   To some extent, yes, I did.

11   Q.   I'm going to walk through that with you now very briefly,

12   Sergeant Kirchner, starting first with December of 2008.  Do

13   you recall assisting in an encounter with Defendant Fuertes at

14   that time?

15   A.   Yes, I do.

16   Q.   And what was that encounter, and where did it take place?

17   A.   That was encountered with Detective Hartlove in one of

18   the interview rooms in the Annapolis Police Department lobby.

19   Q.   And were you present during that entire encounter?

20   A.   Yes, I was.

21   Q.   And did you assist Detective Hartlove with translation?

22   A.   Yes, I did.

23   Q.   Do you, in fact, speak Spanish?

24   A.   Yes, I do.

25   Q.   And what is your level of fluency in Spanish?

1    A.    I started to speak Spanish -- I started in school,

2    seventh grade.  I took it through middle school, high school,

3    and college.  I did a couple of immersion programs where I

4    lived, spoke Spanish and English, et cetera.  I translated at

5    a Children's Hospital in Philadelphia, and then I just used it

6    more or less with working now off and on.

7    Q.    Now, when you were with Detective Hartlove that day, did

8    he ask Defendant Fuertes permission to look in his wallet?

9    A.    Yes, he did.

10   Q.    And, before he did that, did he administer *Miranda*

11   rights?

12         **MR. MONTEMARANO:**  Objection, Your Honor.  Can we

13   approach?

14         **THE COURT:**  Come up.

15         (Whereupon, the following discussion occurred at the

16   bench.)

17         **MR. MONTEMARANO:**  I have not objected previously to

18   allusions to the consent provided by my client to search

19   apartments and/or wallets, because my understanding is that

20   was not part of what was suppressed by the Court.  I want it

21   to be clear where we're going on this, in light of the Court's

22   ruling relative to the suppression of my client's

23   statements -- I mean, there is no need to go into the question

24   of *Miranda*.  I'm not going to argue that he wasn't Mirandized.

25         **THE COURT:**  I assume she's going to restrict it to

1    booking information?

2           **MS. YASSER:**  I'm going to ask -- Your Honor, I'm

3    well aware the Court's ruling that the statements are

4    suppressed.  I don't intend to ask what was elicited from him.

5    I'm simply setting up the voluntariness of the permission to

6    look through the wallet and then what was found in the wallet.

7           **MR. MONTEMARANO:**  I don't think you have to

8    Mirandize for that, number one.  I'm not going to argue he

9    wasn't, so I am not sure I see any purpose or relevance.

10   *Miranda* only comes in relative to a statement, it seems to me.

11          **THE COURT:**  Any more *Miranda* questions?

12          **MS. YASSER:**  No, Your Honor.

13          **THE COURT:**  Okay.  Overruled.

14          **MS. YASSER:**  Other than did he appear to understand

15   what was happening?

16          **THE COURT:**  Okay.  Ah, one more.  Okay.

17          (Whereupon, the bench conference was concluded.)

18   **BY MS. YASSER:**

19   Q.   Sergeant Kirchner, when you translated for

20   Defendant Fuertes, did he appear to be understanding what you

21   were saying?

22   A.   Yes, he did.

23   Q.   And did he grant Detective Hartlove permission to look

24   through his wallet?

25   A.   Yes, he did.

1    Q.   Do you recall generally what Detective Hartlove seized

2    from Defendant Fuertes' wallet on that day?

3    A.   I know there were a few business cards taken from the

4    wallet, as well as some phone numbers.

5    Q.   And were those business cards familiar to you in terms of

6    your training and experience as it relates to prostitution?

7    A.   Yes, they were.

8    Q.   And can you just explain what that significance was.

9    A.   They appeared to be business cards that I had seen in the

10   community in Annapolis that are advertising a service, such as

11   cleaning, car service, flower service, et cetera, which are

12   actually a number that provides someone to call for

13   prostitution services.

14   Q.   I'm going to skip ahead, Sergeant Kirchner, to your next

15   involvement in this case, which is September 1st, 2009.  Do

16   you recall arriving at ███████████████ on that day?

17   A.   Yes, I do.

18   Q.   And do you know why you were called to that location and

19   why officers were present at that location on that day?

20   A.   Officers were -- of the police department were present

21   because they were attempting to serve a warrant on a wanted

22   subject, and, when they were attempting the service, they

23   encountered a local prostitution brothel.

24   Q.   Do you recall who the officers were seeking to serve the

25   open arrest warrant on?

1    A.   It was on Kerlin Esquivel Fuentes.

2    Q.   And do you know if the officers successfully arrested

3    Fuertes on that day?

4    A.   They did not.

5    Q.   Now, did you, in fact, respond to that location?

6    A.   Yes, I did.

7    Q.   And who was there when you responded?  Were there

8    individuals who had been encountered there?

9    A.   Yes.  There were a few officers from the Annapolis Police

10   Department, the Hispanic liaison, as well as three subjects

11   were in the apartment itself.

12   Q.   I'm sorry.  I think you said three individuals; is that

13   correct?

14   A.   Aside from the officials from the police department,

15   correct.

16   Q.   And were those individuals -- those three other

17   individuals, aside from the police officers, were they men, or

18   women?

19   A.   They were two women, and one male.

20   Q.   What did you observe when you arrived at ████████?

21   Generally speaking, what did you observe in the location?

22   A.   When I walked into the apartment, I noticed that there

23   was a small kitchen table, there was a couch in the living

24   room, and the subjects were in this general area.  It's an

25   open area.  Upon further investigation, I walked through the

1   apartment, and I noticed the bedrooms had a bed and a bedside

2   table, and that's it, in each of the bedrooms.

3   Q.   And did you note any items of significance contained

4   within the apartment itself?

5   A.   When I first walked into the apartment, in the kitchen,

6   there were the playing cards as well as some folded phone

7   cards -- the telephone numbers that you buy to purchase, some

8   of those folded up.  There was, in the bedrooms, paper towels,

9   rubbing alcohol, some lotions, and feminine products for

10  freshening up in both of the bedrooms on the bedside tables.

11  Q.   Were there any indicia of permanent occupancy,

12  Sergeant Kirchner?

13           **MR. MONTEMARANO:**  Objection, Your Honor.

14           **THE COURT:**  Basis?

15           **MR. MONTEMARANO:**  Basis of knowledge.

16           **THE COURT:**  Overruled.

17           **THE WITNESS:**  To my knowledge, it appeared that no

18  one was living there, that that was their bedroom.  There was

19  no clothes other than a few pieces of items in a closet, and

20  no clothing in the bedside tables, no pictures on the wall,

21  nothing that would indicate it was a bedroom.

22  **BY MS. YASSER:**

23  Q.   Were photographs taken of that location on that day?

24  A.   Yes, they were.

25  Q.   And was evidence also seized?

1    A.    Yes.

2    Q.    I'm going to walk through the photographs first with you,

3    Sergeant Kirchner, and, if you could, just describe what's

4    first depicted in Government's 9a/17.

5    A.    This is a picture of the apartment complex to include █████

6    ███████████, Annapolis, Anne Arundel County, Maryland.  This

7    is a street view of the photo.

8    Q.    Government's 9a/18, please?

9    A.    This is the entrance from -- as if you're walking from

10   where that first picture was taken to ████████████████████.

11   Q.    Government's 9a/1?

12   A.    And that is the front door to the exterior of the

13   building, the photo previous.

14   Q.    9a/2, please?

15   A.    That is the entrance door to ████████████.

16   Q.    And is ████████████, do you recall, located on the first

17   floor, or the second floor?

18   A.    It is on the -- I think it's on the second floor, but I

19   don't remember off the top of my head.

20   Q.    I'm going to show you Government's 9a/3.  What is

21   depicted in Government's 9a/3?

22   A.    That is one of the bedrooms that was in ████.

23   Q.    9a/4?

24   A.    That is a close-up photograph of the bedside table.

25   Q.    Any items of significance on that bedside table?

1    A.    The rubbing alcohol, the K-Y Jelly, the feminine hygiene

2    products, as well as some of the lotions.

3    Q.    And, in the far right corner, lower right corner, do you

4    also see a playing card?

5    A.    Yes, I do.

6    Q.    In your experience and training, what are those playing

7    calls used for, Sergeant Kirchner?

8    A.    The playing cards or similar -- something similar to that

9    is often given to the male client as somewhat of a receipt.

10   He then gives that to the female for service -- after he is

11   serviced or before service so there can be a tally to make

12   sure that the amount of cards given out and service matches

13   the record of payment received.

14   Q.    Thank you.  Government's 9a/5?

15   A.    A photograph of a -- one of the closets in the bedroom.

16   Q.    9a/6?

17   A.    Another photograph of the interior of the closet.

18   Q.    9a/7?

19   A.    That is a photograph of another closet in the bedroom.

20   Q.    9a/8, please?

21   A.    And that is a photograph of the second bedroom.

22   Q.    Were these the only two bedrooms located within █████

23   ████████████?

24   A.    Yes, they were.

25   Q.    9a/9?

1    A.   That is just a different angle of the same bedroom, the

2    bed and the bedside table.

3    Q.   And, other than the backpack or any other luggage, as

4    well as the items indicated in the closets, were there any

5    other indicia of clothing?

6    A.   No, there were not.

7    Q.   9a/10?

8    A.   That is a close-up photograph of the bedside table.

9    Q.   9a/11?

10   A.   That is a photograph of condoms that were seized from the

11   ▉▉▉▉▉▉▉.

12   Q.   Do you recall where those condoms were seized?

13   A.   From the kitchen.  Without seeing the specific evidence

14   log, I wouldn't know?

15   Q.   We'll get to that.  Government's 9a/12?

16   A.   This is a photograph of the broken-up cell phone calling

17   cards as well as some playing cards that were on the table,

18   the indicators of receipts of payment or service.

19   Q.   9a/13?

20   A.   Is receipt from -- well, a photograph from one of the

21   bedrooms of a playing card.

22   Q.   I'm going to show you next some photographs of

23   individuals and ask if you could identify the individuals

24   depicted in these photographs, starting with 9a/16.

25   A.   That is Casey Esquivel Fuentes.  I know him as Casey.  I

1    think his full name may be Werder Casey Esquivel Fuentes.

2    Q.    And do you know where this individual was when he was

3    encountered at ████████?

4    A.    I believe this is the subject they encountered outside of

5    the apartment door looking for the wanted subject.

6    Q.    9a/14?

7    A.    Is one of the females that was in the residence, and that

8    is Angalas Hernandez Garcia.

9    Q.    I apologize.  There is a glare there.

10            And where was Ms. Garcia located within the

11   apartment?

12   A.    She was -- when I got there, she was in the living room/

13   kitchen common area with the officers.

14   Q.    And, finally, 9a/15?

15   A.    Marthza Martinez.

16   Q.    And was she is inside the apartment as well?

17   A.    Yes, she was.

18            **MR. MONTEMARANO:**  Is it 15, Ms. Yasser, 1-5.

19            **MS. YASSER:**  a/15.

20            **MR. MONTEMARANO:**  Thank you.

21   **BY MS. YASSER:**

22   Q.    Now, I'd like to walk with you through the evidence that

23   was seized on that location back on September 1st of 2009 if I

24   could.

25            **MS. YASSER:**  May I approach, Your Honor?

1      **THE COURT:**   Yes.

2  **BY MS. YASSER:**

3  Q.   Sergeant Kirchner, first I'd like to show you

4  Government's 9b/1 through 3, and if you could identify those

5  items and what they are and where they were seized.

6  A.   These are three cell phones, and they were seized from

7  ███████████, Annapolis.

8  Q.   Were they throughout the apartment?

9  A.   Yes, they were.

10  Q.   Government's 9d?

11  A.   This is a package of condoms that was just off of the

12  kitchen in a room that contained the hot water heater.

13  Q.   Do you know approximately how many condoms are contained

14  within Government's 9d?

15  A.   114 in this package here.

16  Q.   And, Sergeant Kirchner, I note that these are Crown

17  condoms.  Is there anything of significance to you about the

18  manufacturer of these condoms?

19  A.   The Crown condoms are condoms that we typically found in

20  brothels in the area.  They are purchased overseas, or

21  manufactured overseas, and they're cheaper.  You can't walk

22  into Safeway or Rite Aid or anything and just purchase them.

23  Q.   Government's 9e?

24  A.   These are some K-Y and feminine hygiene products from one

25  of the bedrooms.

1    Q.   Government's 9g?

2    A.   Rubbing alcohol that was also in the bedrooms with the

3    female.

4    Q.   9c?

5    A.   Is a Baltimore Gas & Electric bill for ███████████,

6    ████████, Annapolis, Maryland.

7    Q.   And who is that electric bill made out to?

8    A.   The bill is made out to Amparo de Jesus Gonzalez.

9    Q.   At what address?

10   A.   ███████████, ████████████, Annapolis, Maryland,

11   21401.

12   Q.   Thank you.

13        Government's 9h/1 and 9h/2, do you recognize those?

14   A.   These are two notebooks that were in the residence, and

15   they're also the tally ledgers.

16   Q.   And Government's 9f?

17   A.   Business cards for a car wash with an address in

18   Annapolis.

19   Q.   And what is that address?

20   A.   ████████████, Annapolis, Maryland, 21401.

21   Q.   And is there a phone number associated with that address?

22   A.   There is.

23   Q.   What is it?

24   A.   It's area code ██████-1643.

25   Q.   Now, I want to put up on the projector a page from

1    Government's 9h/1 if I could, or -- I'm sorry -- 9h/2.  Now,

2    you mentioned you speak Spanish; is that right,

3    Sergeant Kirchner?

4    A.   Yes.

5    Q.   Can you tell me what bounty refers to, if you know, or --

6    I'm sorry -- what "papal" references, if you know?

7    A.   Paper, as in the paper towels.

8    Q.   And alcohol?

9    A.   Is the rubbing alcohol.

10   Q.   And what is --

11           **MR. MONTEMARANO:**  Objection, Your Honor.  Move to

12   strike.

13           **THE COURT:**  Basis?

14           **MR. MONTEMARANO:**  Basis for knowledge.

15           **THE COURT:**  Okay.  Overruled.

16   **BY MS. YASSER:**

17   Q.   Sergeant Kirchner, can you just go through the days of

18   the week in Spanish for us?

19   A.   Starting with Sunday?

20   Q.   Lunes.

21   A.   Okay.  Lunes is Monday, martes is Tuesday, miércoles is

22   Wednesday, jueves is Thursday, viernes is Friday, sábado is

23   Saturday, and domingo is Sunday.

24   Q.   Thank you, Sergeant Kirchner.  Now, drawing your

25   attention back to Government's Exhibit 9f for a moment.  You

Direct Examination of Sgt. Jessica Kirchner

 1    mentioned there was an address associated with this card that

 2    was recovered from ▬▬▬▬▬, and that address was the ▬▬▬

 3    ▬▬▬▬▬ address; is that correct?

 4    A.    That's correct.

 5    Q.    What, if anything, did you or officers with you do in

 6    response to obtaining this card from ▬▬▬▬▬?

 7    A.    Officers from the Annapolis Police Department, after some

 8    left ▬▬▬▬▬, they responded to ▬▬▬▬▬.

 9         **MS. YASSER:**  Your Honor, I'm moving into a new area,

10    and, seeing the time, would you like to take the

11    mid-morning --

12         **THE COURT:**  Yes.  Members of the jury, we're going

13    to take the morning break now.  Please remember:  Don't

14    discuss the case among yourselves or with anyone else.  I will

15    call for you at ten minutes before noon.  11:50, we will

16    resume.

17         **THE CLERK:**  All rise.  This Honorable Court stands

18    in short recess.

19         (Jury excused.)

20         (Recess taken, 11:28 a.m. - 11:48 a.m.)

21         **THE CLERK:**  All rise.  This Honorable Court now

22    resumes in session.

23         **THE COURT:**  Ready for the jury, counsel?

24         **MS. YASSER:**  Yes, Your Honor.

25         (Jury enters.)

1        **THE COURT:**  Please be seated.

2   **BY MS. YASSER:**

3   Q.   Sergeant Kirchner, before the break, we were talking

4   about Government's 9f, which is a card or a series of business

5   cards that you found at ████████.  Do you recall me asking

6   what you and the officers did with the information that you

7   obtained from these cards?

8   A.   Yes, I do.

9   Q.   What did you do?

10  A.   Officers from the Annapolis Police Department then

11  responded to ████████████████.

12  Q.   And do you know if any individual or individuals were

13  encountered at that location?

14  A.   One female was encountered at that location.

15  Q.   Were photos taken of that location, and was evidence

16  seized?

17  A.   Yes.

18  Q.   And what, in your experience and training, from your

19  review of those photographs and that evidence was the

20  operative purpose of ██████████████████████, on that

21  date?

22  A.   It looked also like a brothel used in the sex-trafficking

23  industry.

24  Q.   I'm going to show you, Sergeant Kirchner, a series of

25  photographs now and ask you to please identify what's

1    contained within, first starting with 10a/18?

2    A.   That is the exterior of ▮▮▮▮▮▮▮▮, that street

3    view.

4    Q.   Government's 10a/16?

5    A.   That is the same street view of ▮▮▮▮▮▮▮▮, just at

6    a different angle.

7    Q.   a/17?

8    A.   A close-up photograph of the same.

9         **MS. YASSER:**  And this is all, for Court purposes, a

10   series of the 10 exhibit, Exhibit Number 10.

11   Q.   a/1, please?

12   A.   Is indicating ▮▮▮▮▮▮▮▮, as well as the

13   mailboxes for ▮▮▮▮, ▮▮▮▮▮▮▮▮.

14   Q.   Government's a/2?

15   A.   That is the entrance into the apartment that officers

16   arrived when they arrived at the scene.  That's the apartment

17   that the officers made contact with Ms. Maldonado in.

18   Q.   And Government's a/3?

19   A.   It's another photograph of the interior of the apartment.

20   Q.   And is this the main area of the apartment, the main

21   living area?

22   A.   Yes.

23   Q.   And what does it appear to you to be set up as?

24   A.   It appears to be set up as a waiting room.

25   Q.   Government's 10a/11?

```
 1    A.    Is a photograph of a cup or canister, a CD, some sort of

 2    receipt on a chair.

 3    Q.    And these items were seized from the living area?

 4    A.    Yes, they were.

 5    Q.    Similarly, 10a/12?

 6    A.    Is a photograph of some papers and some sort of book, and

 7    then it also has like a handmade business card with the ████

 8    ████████████████ address.

 9    Q.    10a/13?

10    A.    And it's playing cards.

11    Q.    10a/14?

12    A.    Condoms, a cell phone, playing cards, and some of the

13    same business cards advertising the car wash.

14    Q.    Now, you mentioned some of the same business cards

15    advertising the car wash.  What are you referring to?

16    A.    The same business cards that were found in ████████████.

17    Q.    And is that Government Exhibit 10 -- I'm sorry -- 9f?

18    A.    Yes, that's correct.

19    Q.    10a/15?

20    A.    Is a photograph of the interior of a closet with the

21    business cards that were just shown in the previous photo as

22    well as ████████████████ address.

23    Q.    10a/5?

24    A.    Photograph of rubbing alcohol and shampoo in a closet.

25    Q.    a/6?
```

1     A.    Photographs, again, of the closet, with condoms and some

2     other miscellaneous papers.

3     Q.    a/7?

4     A.    A close-up photograph of the condoms.

5     Q.    a/8?

6     A.    A photograph of rubbing alcohol, a portion of the towel,

7     condoms, and duct tape.

8     Q.    a/9?

9     A.    A photograph of a bed in a bedroom.

10    Q.    And a/10?

11    A.    And another bed with some other items in the other

12    bedroom in the apartment.

13    Q.    Sergeant Kirchner, was there more than two bedrooms in

14    this particular apartment?

15    A.    No, there is not.

16    Q.    Now, you mentioned that evidence was seized as well, and

17    I want to very quickly go through that with you now.

18          **MS. YASSER:**   If I may approach the witness, Your

19    Honor?

20          **THE COURT:**   Yes.

21    **BY MS. YASSER:**

22    Q.    Starting first with Government's 10e/1 and e/2, what is

23    contained in these two packages, please?

24    A.    A cell phone and charger in this bag, as well as a cell

25    phone and charger in the second bag.



1   Q.   And were those seized within █████████████?

2   A.   Yes, they were.

3   Q.   And were they further subjected to analysis --

4   A.   Yes.

5   Q.   -- by someone other than you?

6   A.   Yes.

7   Q.   Okay.  10d, please?

8   A.   The rubbing alcohol that was seized from ███████████.

9   Q.   10f?

10   A.   The business cards that were seized from ██████████.

11   Q.   10c?

12   A.   The condoms that were seized from ██████████.

13   Q.   10b, please?

14   A.   This is the homemade business card with the ████████

15   address seized from ██████████.

16   Q.   And, finally, 10g?

17   A.   Tin cup containing the playing cards, as well as the cell

18   phone calling card, minutes card.

19   Q.   Now, Sergeant Kirchner, you mentioned that there was a

20   woman that was encountered at that location as well at ████

21   ████████, ████████; is that correct?

22   A.   Yes.

23   Q.   I'm going to show you Government's 10a/4 and ask you to

24   identify the woman contained in that photograph.

25   A.   Olivia Maldonado.

1    Q.   And is this the woman who was encountered at ▮▮▮▮▮

2    ▮▮▮▮, ▮▮▮▮▮▮▮▮?

3    A.   Yes.

4    Q.   Now, do you know what happened to Ms. Oldonado -- is that

5    right?

6    A.   Maldonado.

7    Q.   -- Maldonado after she was encountered there?

8    A.   I know she was brought to the Annapolis Police

9    Department, and we spoke to her, and she was processed,

10   criminally charged, and, after being released, she was

11   transported back to ▮▮▮▮▮▮▮▮.

12   Q.   Do you know why she was taken back to ▮▮▮▮▮▮▮▮?

13   A.   She was not local from the area.  She was from out of

14   state and didn't have any place to stay, and she may have had

15   something else in the apartment.  That, I'm not sure of.

16          MS. YASSER:  No further questions, Your Honor.

17          THE COURT:  Cross?

18          MR. RUTER:  Yes, briefly.

19                    **CROSS-EXAMINATION**

20   **BY MR. RUTER:**

21   Q.   Good morning, ma'am.

22          The utility bill which you found at ▮▮▮▮ in the

23   name of Amparo Gonzalez, did you find out who that person was?

24   A.   We attempted to locate her via phone -- a couple officers

25   did that day, and I have never had contact with her --

1    Q.    Okay.

2    A.    -- or him.

3    Q.    To your knowledge, we don't know where she is or whether

4    she's still here or anything else; is that right?

5    A.    That's correct.

6    Q.    Do we know that she's a real person?

7    A.    I do not know.

8    Q.    Okay.  Ms. Maldonado was returned within hours after she

9    was arrested, back to the same place where you found her on

10   the ██████████████████; is that correct?

11   A.    Yes, that's correct.

12          **MR. RUTER:**  Okay.  Great.  Thanks very much.  No

13   further questions.

14          **THE COURT:**  Cross?

15          **MR. MONTEMARANO:**  Thank you, Your Honor.

16                     **CROSS-EXAMINATION**

17   **BY MR. MONTEMARANO:**

18   Q.    Good morning, Sergeant Kirchner.  How are you?

19   A.    Good morning.  Good.  How are you?

20   Q.    Made it by a minute.  I'd like to take you back to your

21   testimony concerning your encounter with the person Ms. Yasser

22   asked about, Defendant Fuertes, in December of 2008.  For

23   starters, Defendant Fuertes, you're referring to this

24   gentleman in the striped shirt I've been sitting next to this

25   morning?

1   A.   Yes.

2             **MR. MONTEMARANO:**   For the record, Your Honor.

3   Q.   Now, you met with Mr. Fuertes at the Annapolis Police

4   Department; is that correct?

5   A.   Yes, that's correct.

6   Q.   And that was because you were requested to meet there

7   with him by Detective Hartlove, correct?

8   A.   Yes.

9   Q.   And you were asked to meet with my client, who was not my

10  client at the time, and Detective Hartlove based upon the fact

11  that you speak Spanish, correct?

12  A.   That's correct.

13  Q.   And Detective Hartlove suggested to you that Mr. Fuertes

14  spoke very little, if any, English, and that the only way

15  you'd be able to communicate with him adequately -- only way

16  he'd be able to communicate with him adequately was with the

17  intervention of someone who spoke Spanish, correct?

18  A.   I think that Detective Hartlove wanted me there because

19  he spoke Spanish, but he didn't relay all of those concerns to

20  me.

21  Q.   Okay.  But would that be a fair way of describing what

22  actually took place?

23  A.   Yes, that's correct.

24  Q.   Okay.  And, so I understand, Mr. Fuertes came to the

25  Annapolis Police Department under his own power, correct?

1     A.    Yes, that's correct.

2     Q.    Voluntarily, correct?

3     A.    Yes.

4     Q.    He was free to leave, correct?

5     A.    Yes, he was.

6     Q.    He was not in cuffs, correct?

7     A.    Correct.

8     Q.    Neither you, nor Detective Hartlove, nor anybody else

9     from the APD beat on him or anything else to get him to talk,

10    correct?

11    A.    No, we did not, that's correct.

12    Q.    I just want to be clear, okay?

13          And he voluntarily provided consent to search his

14    wallet, correct?

15    A.    Yes, he did.

16    Q.    And voluntarily -- no.  I think that's enough.

17          **MR. MONTEMARANO:**  Thank you, Your Honor.

18          **THE COURT:**  Redirect?

19          **MS. YASSER:**  Very briefly.

20                    **REDIRECT EXAMINATION**

21    **BY MS. YASSER:**

22    Q.    On that day that you assisted Detective Hartlove in

23    speaking with Defendant Fuertes, did you know or did it appear

24    to you in any way whether Defendant Fuertes understood some

25    English?

1    A.    To me, yes, it appeared he understood English.

2    Q.    Okay.  And, without getting into the substance of

3    anything he may have said, what was it that led you to that

4    conclusion?

5    A.    Based on conversations that Detective Hartlove and I

6    would have briefly, there would be some sort of motion that

7    Mr. Fuentes would make as though he appeared he understood

8    what we were speaking of.

9    Q.    And you were obviously speaking with Detective Hartlove

10   in English?

11   A.    That's correct.

12            MS. YASSER:   No further questions.

13            THE COURT:   Thank you.

14                     RECROSS-EXAMINATION

15   BY MR. MONTEMARANO:

16   Q.    Let's talk about those motions.  Those motions indicated

17   that he appeared to understand something?

18   A.    (Witness nodding head in the affirmative.)

19   Q.    You didn't inquire of him if he did, correct?

20   A.    That's correct.

21   Q.    And, in your time, in translating for people who speak

22   Spanish, it's happened -- and I would submit to you

23   frequently -- that people have thought they understood things,

24   and ended up really not so understanding; is that a fair

25   statement?

1    A.   That does happen at times, yes.

2         MR. MONTEMARANO:  No further questions, Your Honor.

3    Thank you.

4         THE COURT:  Thank you.  You may step down.

5         (Witness excused.)

6         MR. CUNNINGHAM:  The United States calls

7    Corporal Mark Cochran.  May I, Your Honor?

8         THE COURT:  Yes.

9         MR. CUNNINGHAM:  Corporal Cochran, please approach

10   the witness stand, face the Courtroom Clerk, and raise your

11   right hand.

12                   **CPL. MARK COCHRAN**

13         **WAS THEN DULY SWORN TO TELL THE TRUTH**

14         THE CLERK:  Be seated.  You could scoot up and pull

15   that mic down.  Speak directly toward it, state your name, and

16   then spell it for the record, please.

17         THE WITNESS:  It's Corporal Mark Cochran,

18   C-O-C-H-R-A-N.

19         THE CLERK:  Thank you.

20                   **DIRECT EXAMINATION**

21   **BY MR. CUNNINGHAM:**

22   Q.   Corporal Cochran, you are currently an officer with the

23   Annapolis Police Department; is that correct?

24   A.   That's correct.

25   Q.   How long have you served in the police department?

1    A.    About 15 years.

2    Q.    And is that the entirety of your service as a police

3    officer?

4    A.    Yes, sir.

5    Q.    Were you performing duties on September 23rd of 2008?

6    A.    Yes, I was.

7    Q.    Do you remember what your specific duties were on that

8    date?

9    A.    I believe the day in question was September 24th, sir,

10   the traffic stop.

11   Q.    Okay.  This was a -- excuse me -- a traffic stop that you

12   executed on September 24th?

13   A.    Yes, sir.

14   Q.    And what were your specific duties on that day?

15   A.    I was in the Patrol Section, so patrolling the

16   neighborhoods, responding for calls for service, enforcing

17   laws, including traffic laws.

18   Q.    And do you remember having an encounter with an

19   individual in which you stopped a vehicle and discovered the

20   driver was operating without a license?

21   A.    That's correct.

22   Q.    I want to talk about that specific incident.  First of

23   all, do you remember the ultimate identity of the person

24   operating the car?

25   A.    The name that I knew him as at the stop, that I

1    identified him as, was Kerlin Esau Esquivel Fuentes.

2    Q.   Okay.  Speaking of the stop, first of all, where did the

3    stop occur?

4    A.   It occurred in the city of Annapolis, the interaction of

5    Hilltop Lane and Merryman Road.

6    Q.   Do you remember approximately what time this occurred?

7    A.   It was just prior to midnight.

8    Q.   Okay.  Actually, Corporal Cochran, I'm going to show

9    Government Exhibit 1b and then hand it to you.  Do you recall

10   having been able to recover copies of some citations you

11   issued to the operator of the car?

12   A.   That is correct.

13   Q.   And are Government Exhibit 1b copies of the three

14   citations that you issued?

15   A.   Two of them are citations, and one is what's referred to

16   as a repair order.

17   Q.   Okay.  And, speaking of repair order, why was it that you

18   stopped the vehicle in the first place?

19   A.   The passenger side headlight was not working.

20   Q.   And, upon stopping, did you perform the standard routine

21   a police officer goes through when you stop a vehicle?

22   A.   Yes, sir.

23   Q.   And what was that?

24   A.   I approached the driver.  I identified myself.  I told

25   him the reason for the stop, and he told me that he knew his

1    headlight wasn't working.

2    Q.   Now, were you in uniform at the time?

3    A.   Yes, sir.

4    Q.   And were you operating a police vehicle with lights and

5    all the other appurtenances?

6    A.   Yes, sir.  Lights and siren.

7    Q.   And do you speak Spanish?

8    A.   Very little, just from high school.

9    Q.   And, when you approached the vehicle, did you speak

10   English to the driver?

11   A.   Yes.

12   Q.   At least to your satisfaction, did it appear that he

13   understood when you identified yourself and asked him

14   questions?

15   A.   Yes, and he answered in English.

16   Q.   Okay.  And what was the first question you would ask?

17   A.   Well, I introduced myself and just told him the reason

18   for the stop.  He told me that the light wasn't working, and

19   then I asked to see his license and the vehicle's

20   registration.

21   Q.   And did he provide you a license and a registration for

22   the vehicle?

23   A.   No.  He told me that he did not have a license.

24   Q.   And did you ask him for any kind of identification?

25   A.   That's correct.  Yes, I did.

1    Q.   And did he identify himself?  Did he give you a name?

2    A.   He handed me a piece of paper and said, "This is me."

3    Q.   I'm going to show you Government Exhibit 1c.  Is this the

4    document that he handed you?

5    A.   Yes, sir.

6    Q.   And are you able to see -- although the document appears

7    to be largely in Spanish, are you able to see a name on there?

8    A.   Yes, sir.

9    Q.   And is that the name he gave you?

10   A.   Yes, sir.  I asked him -- once I read the document, I

11   asked him, "Is your name Wilson Portillo," and he said that it

12   was.

13   Q.   Now, you mentioned that he said he didn't have a license,

14   right?

15   A.   That's correct.

16   Q.   And was that an offense for which you took additional law

17   enforcement action?

18   A.   Yes, sir.

19   Q.   What was that?

20   A.   I asked him to exit the vehicle.  I walked him back to my

21   patrol car, and I placed him under arrest.

22   Q.   And the arrest was for operating without a license?

23   A.   That's correct.

24   Q.   Now, at the time you arrested him, did you search his

25   person?

1    A.   Yes, sir.

2    Q.   And, in the course of the search, did you discover any

3    other documents on him?

4    A.   Yes, I did.

5    Q.   And I'm going to show you now Government Exhibit 1d.   Is

6    this a document that you found on him?

7    A.   Yes, sir.

8    Q.   And, if you can recall, where was this document?

9    A.   It was in the left rear pocket of the jeans that he was

10   wearing.

11   Q.   And was it a copy such as this, or did he have a passport

12   on his person?

13   A.   He had a passport.

14   Q.   Okay.   I'm going to hand you Government Exhibit 3a.   If

15   you'll look at that.   Is that the actual passport that he had

16   in his back pocket?

17   A.   Yes, sir.

18   Q.   When you recovered this, did you inquire if this was his

19   real identity?

20   A.   I did.

21   Q.   Did he acknowledge that he was, in fact, the name that's

22   on this Honduran passport as opposed to what he first gave?

23   A.   Eventually, yes, sir.

24   Q.   When you say "eventually," what intervened between when

25   you asked him that and when he finally --

Direct Examination of Cpl. Mark Cochran

1   A.   At first, he told me it was his friend's passport, and

2   then, when I realized that the picture looked identical to the

3   man that I had stopped, I asked him again whose it was, and he

4   said it was his brother's, and so I asked him, "Well, is it

5   your brother's, or is it your friend's," and then he told me

6   that he didn't speak enough English.  So I asked him in

7   Spanish, the limited Spanish that I have, if it was his

8   friend's, or his brother's, and he told me that it was his

9   brother's, but then, later in the encounter, he told me that

10  indeed it was him.

11  Q.   Now, let me ask you this:  Was there anybody else in the

12  car at the time?

13  A.   Yes, sir.

14  Q.   Do you remember or were you able to describe the person

15  who was also in the car?

16  A.   There was a younger Hispanic female in the passenger

17  seat, and there was a Hispanic male in the back seat, but I

18  don't remember which side he was sitting on.

19  Q.   And do you remember what happened to either of those

20  individuals?

21  A.   When -- when I towed the vehicle, I offered to provide

22  them with a ride or tried to arrange transportation for them,

23  and they both declined, so they were released there at the

24  scene.  I had no business with them, so they were free to go

25  on their way.

1    Q.    Okay.  Now, did you ever inquire as to the registration

2    of the vehicle?

3    A.    Yes, sir.

4    Q.    I'm showing you Government Exhibit 1e.  Do you recognize

5    what this document is?

6    A.    Yes, sir.

7    Q.    Tell the jury:  Does this reflect the registry of the

8    vehicle at that time?

9    A.    Yes, sir.  This is a printout that I get from our

10   dispatch center.  When they run the vehicle through the

11   computer, they can print out the information and provide it to

12   me.

13   Q.    Given that you released the other man and the woman and

14   took the person you cited into custody, what happened to the

15   vehicle?

16   A.    It was towed by one of our local tow companies.

17   Q.    Now, Corporal Cochran, to the best of your recollection,

18   was this the first time you had an encounter with that

19   particular vehicle operator?

20   A.    Yes, sir.

21   Q.    And can you estimate the approximate duration of your

22   contact with him that evening?

23   A.    I would estimate maybe an hour, maybe an hour and a half,

24   if that.

25   Q.    If you saw him again, do you think you'd recognize him?

1    A.   Yes, sir.

2    Q.   Look around the courtroom and tell me if you recognize

3    the person.

4    A.   Yes, sir.  He's sitting at the defense table in the blue

5    and white striped shirt.

6          **MR. CUNNINGHAM:**  Your Honor, may the record reflect

7    that Corporal Cochran has identified Defendant Fuertes.

8          **THE COURT:**  It will.

9    **BY MR. CUNNINGHAM:**

10   Q.   Now, before the vehicle was towed, was an inventory

11   taken?

12   A.   Yes, sir.

13   Q.   And I'm showing you Government Exhibit 1f.  Is this the

14   inventory?

15   A.   Yes, sir.  That's the form I filled out.

16   Q.   And do you recognize that your signature is on the bottom

17   left corner?

18   A.   Yes, sir.

19   Q.   Did you become aware that later the vehicle was

20   inventoried by other officers in the police department?

21   A.   Yes, sir.

22   Q.   Did you conduct any kind of a search of the car the night

23   you took and cited Defendant Fuertes and took him into

24   custody?

25   A.   Just a very brief search for the inventory form.

1    Q.    And were you alone -- I should have asked you initially:

2    Were you alone when you executed the traffic stop?

3    A.    Originally, but I did have a backup officer arrive.

4    Q.    Okay.  Finally, I'm going to show you Government

5    Exhibit 1g.  Do you recognize what this document is?

6    A.    Yes, sir.

7    Q.    And tell the jury, please, what this is.

8    A.    That is our booking information form.  It's the form that

9    we used to use when we arrested someone, to fill out their

10   personal information and the charges, et cetera.

11   Q.    And did you fill out this particular form?

12   A.    Yes, sir.

13   Q.    And your name is on the bottom left corner?

14   A.    Yes, sir, and on the right -- middle of the right side.

15           **MR. CUNNINGHAM:**  Your Honor, if I may approach and

16   recover Government 1b?

17           **THE COURT:**  Yes.

18   **BY MR. CUNNINGHAM:**

19   Q.    Corporal Cochran, other than the night you just

20   described, the night of September 24th, do you know of any

21   other contact you had with Defendant Fuertes subsequently?

22   A.    Yes, sir.

23   Q.    Subsequent to that?  When was that?

24   A.    I'd be guessing to be honest with you, sir, but I do

25   remember seeing him in one of the buildings a couple times.  I

1  believe I was on a call for a broken window at one point, and

2  I saw him in the living room.  I again saw him at the District

3  Court when the -- when these charges came to the Maryland

4  District Court.

5          **MR. CUNNINGHAM:**  I have no further questions of this

6  witness, Your Honor.  Thank you.

7          **THE COURT:**  Cross?

8          **MR. MONTEMARANO:**  Thank you, Your Honor.

9          **CROSS-EXAMINATION**

10  **BY MR. MONTEMARANO:**

11  Q.  Good morning, Corporal Cochran.  How are you?

12  A.  I'm great, sir.  Thank you.

13  Q.  Just a couple of questions.  So, at some point on the

14  evening of the 24th of -- or, no, the morning of the 24th of

15  September, correct?

16  A.  It was evening.  It was just prior to midnight.

17  Q.  Okay.  Just prior to midnight.

18          You had cause to pull over a vehicle operated by

19  Mr. Fuertes, correct?

20  A.  That's correct.

21  Q.  And you were operating a marked vehicle, correct?

22  A.  Yes, sir.

23  Q.  So the ladies and gentlemen of the jury understand, we're

24  talking about a roof rack, light bar, whatever you want to

25  call it, emergency equipment?

1    A.   Yes, sir.

2    Q.   And so you flip on your lights.  It's at night.  Can't be

3    missed or anything like that, correct?

4    A.   That's correct.

5    Q.   Vehicle didn't flee, correct?

6    A.   That's correct.

7    Q.   Driver engaged you, correct, spoke to you, correct?

8    A.   Yes, sir.

9    Q.   Did you at some point get him out of the vehicle?

10   A.   Yes, sir.

11   Q.   In fact, you had to take him out of the vehicle to put

12   him in custody, correct?

13   A.   That's correct.

14   Q.   And, as a part of putting him in custody, you cuffed him

15   and put him in the back of your cruiser?

16           THE REPORTER:  A little bit slower.

17           MR. MONTEMARANO:  I'm sorry.

18   BY MR. MONTEMARANO:

19   Q.   As a part of your putting him in custody, you cuffed him

20   and put him in the back of your cruiser?

21   A.   Yes, sir.

22   Q.   Didn't attempt to flee?

23   A.   No, he did not.

24   Q.   And then you saw him again at the Maryland District

25   Court, correct?

1   A.   Yes, sir.

2   Q.   Now, he made bail; did he not?

3   A.   There was no -- I released him from the station.  There

4   was no bail involved that night.

5   Q.   You released him.  He was on the street, correct?

6   A.   Yes, sir.

7   Q.   He showed up for court?

8   A.   As best I recall.  I know at one point.  I don't remember

9   if it was the first hearing or -- but, at some point, yes,

10   sir.

11   Q.   Well, you were at court for this case, and you saw him

12   there?

13   A.   Yes, sir.

14          **MR. MONTEMARANO:**  No further questions, Your Honor.

15   Thank you.

16          **THE COURT:**  Thank you.

17          **MR. RUTER:**  None.  Thank you, Your Honor.

18          **THE COURT:**  Thank you.

19          **MR. CUNNINGHAM:**  No redirect, Your Honor.

20          **THE COURT:**  Thank you.  Good day, Officer.

21          **THE WITNESS:**  Thank you, sir.

22          (Witness excused.)

23          **MS. YASSER:**  Your Honor, the United States calls

24   Carlos Campos.

25          **INTERPRETER GOLDSTEIN:**  Excuse me.  The Interpreter

 1    would like to know if this is going to be interpreted in

 2    Spanish.

 3              **MS. YASSER:**  Yes.  Thank you very much.

 4              **INTERPRETER GOLDSTEIN:**  Thank you.  We have to set

 5    up.

 6              **THE CLERK:**  Raise your right hand.

 7              **CARLOS ALBERTO HERNANDEZ CAMPOS**

 8         **WAS THEN DULY SWORN TO TELL THE TRUTH**

 9              **THE CLERK:**  Thank you.  Be seated.  You can scoot

10    up, and will you state your name and then spell it for the

11    record, please.

12              **THE WITNESS:**  Okay.  My name is Carlos Alberto

13    Hernandez Campos, C-A-R-L-O-S, A-L-B-E-R-T O, Campos is

14    C-A-M-P-O-S, Hernandez is H-E-R-N-A-N-D-E-Z.

15              **THE CLERK:**  Thank you.

16              **MS. YASSER:**  Thank you, Your Honor.

17              **DIRECT EXAMINATION**

18    **BY MS. YASSER:**

19    Q.   Mr. Campos, I noticed you answered a question in English.

20    Do you speak a little bit of English?

21    A.   Yes.

22    Q.   You speak English pretty well actually?

23    A.   I try my best, yes.

24    Q.   But you also expressed a preference that your testimony

25    be taken through a Spanish-language interpreter so that it was

1    perfectly understandable; is that correct?

2    A.   Yes.

3    Q.   And, for that reason, I'm going to ask that your answers

4    be in Spanish as well.

5    A.   Okay.

6    Q.   Now, Mr. Campos, where are you from?

7    A.   From El Salvador.

8    Q.   And how far did you go in school?

9    A.   High school.

10   Q.   And did you have any college?

11   A.   Yes.

12   Q.   How old are you, sir?

13   A.   Forty-three.

14   Q.   And when did you come to the United States?

15   A.   1992.

16   Q.   And which part of the United States did you first come

17   to?

18   A.   Vienna, Virginia.

19   Q.   And, the first time you came to the United States, did

20   you come with or without Immigration papers?

21   A.   Without papers.

22   Q.   And, at some point, did you move from Virginia up to

23   Maryland?

24   A.   Yes.

25   Q.   When was that?

```
 1    A.    In '97.

 2    Q.    Where in Maryland did you come?

 3    A.    Just to Annapolis.

 4    Q.    Now, did you have work in Annapolis?

 5    A.    Yes.  I had my own business.  Electronics.

 6    Q.    You had an electronic business?

 7    A.    Yes.

 8    Q.    And where was that located within Annapolis?

 9    A.    ████████████████  -- no.  ████████████, Annapolis.

10          MS. YASSER:  Thank you.

11    Q.    And what sort of services did your electronics shop

12    provide?

13    A.    I did house calls, I know, so I sold spare parts from the

14    factories.

15    Q.    Sir, do you have advanced technical or electronic skills?

16    A.    Yes.  I'm a technician -- electronics technician.

17    Q.    And did your shop service members of the Hispanic

18    community in Annapolis as well as the community at large?

19    A.    Yes, in general.

20    Q.    And you mentioned that you came to Annapolis -- I believe

21    you said 1997; is that correct?

22    A.    Yes.

23    Q.    How long did you live in Annapolis?

24    A.    Since 1997 until 2008.

25    Q.    And what happened in 2008?  Did you leave?
```

1    A.    Yes.  I had a deportation for having missed court for

2    Immigration in 1997 in Virginia.

3    Q.    And so you were deported.  Was it January 2009?  Does

4    that sound familiar, Mr. Campos?

5    A.    Uh-huh.

6         **THE REPORTER:**  If you would, just say "yes" and

7    "no."

8         **THE WITNESS:**  Yes.

9    **BY MS. YASSER:**

10   Q.    And, Mr. Campos, you're back here on a temporary basis

11   because you're under subpoena to testify here today?

12   A.    Yes.

13   Q.    During the time that you were living in Annapolis, sir,

14   did you come to know somebody named Ricardo Humberto Ramirez

15   Rivas, also known as Victor?

16   A.    Yes, I knew him.

17   Q.    And how did you know -- actually, let me ask you:  By

18   what name did you call Mr. Ramirez Rivas?

19   A.    I knew Victor as Victor all the time that he came to my

20   business.

21   Q.    And do you know if Victor had any nicknames that he went

22   by as well?

23   A.    I knew he was called Victor, and he was called El Pelon.

24   Q.    What does El Pelon mean?

25   A.    It's a person that has no hair.

1   Q.   And was Victor, in fact, bald?

2   A.   Yes.  Shaved.  He shaved his head.

3   Q.   Mr. Campos, how did you come to know Victor or El Pelon?

4   A.   Well, my business is -- my shop is in the area where the

5   Hispanic community lives.  They have restaurants, clothing

6   stores, and liquor stores.

7   Q.   And did you come to know Victor, or El Pelon, through

8   your shop?

9   A.   Yes.  Yes.  He came to my business, and we started

10   talking.  He also bought some television sets, and we started

11   talking.  I also did some parties for the Hispanic community

12   at a restaurant called Suicide Seven.  I would bring -- I

13   would bring bands from El Salvador to play.

14   Q.   How long would you say you knew Victor, or El Pelon, for?

15   A.   About eight years.

16   Q.   Did you know what El Pelon did for money?

17   A.   I knew that, during the day, he worked in installing

18   sheetrock for the walls in the houses, and, in the evening, he

19   worked -- he was selling prostitution.

20   Q.   How did you know that Victor, or El Pelon, was selling in

21   prostitution?

22   A.   Well, because he would come to the community and --

23   because of the advertising, and he would also come sometimes

24   even with his girlfriend.  Her name is Carla, I believe.

25   Q.   Would you see El Pelon with women?

1    A.   Yes.

2    Q.   And do you know what kind of prostitution business he

3    had?  Was it houses, or deliveries, or both?

4    A.   Yes, he did delivery.

5    Q.   Now, during your time in Annapolis, did you also come to

6    know a man called Pancho?

7    A.   Yes.  About three years after I met Victor.

8    Q.   And you said you knew Victor for about eight years?

9    A.   Uh-huh.

10           **THE REPORTER:**  Again, if you would, "yes" or "no."

11           **THE WITNESS:**  Yes.

12   **BY MS. YASSER:**

13   Q.   And how did you meet or know Pancho?

14   A.   Well, since I was in my shop there within the community,

15   I also saw him come into the shop with the same business as --

16   the prostitution business, the same as Victor.

17           **INTERPRETER KIRCHGESSNER:**  The Court's indulgence.

18   Q.   And how many times would you say you saw --

19           **THE REPORTER:**  Just one --

20           **MS. YASSER:**  Oh, I'm sorry.  Excuse me.  Just for

21   the record, we were just adjusting for the interpreters.

22   **BY MS. YASSER:**

23   Q.   How many times would you say you saw Pancho, Mr. Campos?

24   A.   During what period of time?

25   Q.   Let me rephrase the question.  Would you say you've seen

1    Pancho many times over the years?

2    A.   Yes.

3    Q.   And do you know if Pancho went by any other names other

4    than Pancho?

5    A.   No.

6    Q.   Now, Mr. Campos, I want you to take a look around the

7    courtroom and tell me if you see Pancho in the courtroom here

8    today.

9    A.   Yes, of course.  He's the young man over there.

10              **MS. YASSER:**  Let the record reflect that the witness

11   has identified Defendant German Ventura, please.

12              **THE COURT:**  It does.

13   **BY MS. YASSER:**

14   Q.   Now, you mentioned that Pancho was in the same business

15   as El Pelon; is that correct?

16   A.   Yes.

17   Q.   And what business was that?

18   A.   Prostitution.

19   Q.   And how do you know that Pancho was in the same

20   prostitution business as El Pelon?

21   A.   Well, because of the business cards that they used to put

22   out, and they would hand them out to the whole community.

23   Q.   Now, do you know if Pancho had houses, or did deliveries,

24   or both?

25   A.   Yes.  I knew of two places that he had.

1    Q.   And what were those places?

2    A.   When I first met him, he had one that was right around

3    the corner from my shop, and the other was around by the

4    police department.

5    Q.   Did you also, during your time in Annapolis, Mr. Campos,

6    come to know a man called Flaco, or La Flaco?

7    A.   It was one of the -- one of the people --

8              **INTERPRETER GOLDSTEIN:**   Interpreter corrects.

9    A.   It was someone that he worked for, for him -- who worked

10   for him.

11   Q.   Now, the "him" that you're referring to is who,

12   Mr. Campos?

13   A.   El Pancho.  For Pancho.

14   Q.   Flaco worked for Pancho?

15   A.   Yes.

16   Q.   In the prostitution business?

17   A.   Yes.

18   Q.   And how did you meet Flaco?

19   A.   They were always together.

20   Q.   So did you meet or see Flaco once, or more than once?

21   A.   Yes.  Pretty much all the time.

22   Q.   And do you know if Flaco goes by any other names or

23   nicknames?

24   A.   I didn't know him by any other.

25   Q.   I want you to look around the courtroom and tell me if

1    you see Flaco here in the courtroom today.

2    A.   Okay.  It's the young guy that's over here.

3         **MS. YASSER:**  And let the record reflect that the

4    witness has identified Defendant Fuertes.

5         **THE COURT:**  It does.

6    **BY MS. YASSER:**

7    Q.   Mr. Campos, I want to direct your attention to a certain

8    period in time back in March or April of 2008.  Do you recall

9    seeing Pancho and Flaco together at that time?

10   A.   Yes.

11   Q.   Where did you see them?

12   A.   It was in the afternoon before I went back to Miami,

13   sometime in March.  Pancho and Flaco came in a Ford

14   Expedition.

15   Q.   Do you remember what color?

16   A.   White.

17   Q.   And where did they come, sir?

18   A.   Well, they came to -- by the way, I'm separated from my

19   ex-wife, and I was renting a room on ███████████.  He said --

20   he came and he said, "Carlos, look, I want you to look at my

21   car -- the stereo in the car."

22   Q.   And who is it that asked you to look at the stereo in the

23   car?

24   A.   Pancho.  Pancho.

25   Q.   And did you agree to look at this car stereo on that day?

1    A.   Yes.  I went outside to look at it.  Yes.  I went out and

2    looked at it, and then he said he had problems with Victor.

3    Q.   And what, if anything, did Pancho say were those

4    problems?

5            MR. RUTER:  Objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  He told me --

8            INTERPRETER GOLDSTEIN:  Interpreter requests a

9    moment, please.

10           THE WITNESS:  Yes.  He told me he was having

11   problems with this asshole.

12   BY MS. YASSER:

13   Q.   Sorry.  Who was he having problems with?

14   A.   With Victor.

15   Q.   And did Pancho say why he was having problems with

16   Victor?

17   A.   Yes.  Then he said it was because he was in his territory

18   working.

19   Q.   And did Pancho say what, if anything, he was going to do

20   about this problem?

21           MR. RUTER:  Same objection, Your Honor.

22           THE COURT:  Overruled.

23           THE WITNESS:  Yes.  At that time, he went to the

24   car.  He took out a shoebox, and inside the shoebox was a 9mm.

25   It's a Pietro Beretta, and it had a box of bullets with it.

1    It was about half full, maybe about 25 shells.

2    **BY MS. YASSER:**

3    Q.   And, now, was El Flaco present for this conversation as

4    well?

5    A.   Yes.  Actually, he sent Flaco to the car to get the

6    weapon.

7    Q.   So it was Flaco who got the weapon out of the car?

8    A.   Yes.

9    Q.   And where did he take the shoebox out of?  From which

10   part of the car?

11   A.   From the back.

12   Q.   Now, you mentioned the type of gun that it was, and I

13   think you said a 9mm?

14   A.   Yes.

15   Q.   And did you note the manufacturer as well?

16   A.   Yes.  Yes.  I knew it was a Pietro Beretta.

17   Q.   And, sir, do you know about guns?  I mean, how did you

18   know what kind of gun this was?

19   A.   I do know.

20   Q.   How do you know?

21   A.   I'm a war veteran.  I was part of the Special Forces in

22   El Salvador.

23   Q.   Sir, after Flaco got this shoebox with the gun out of the

24   back of the car, what, if anything, did he do with it?

25   A.   He took the weapon, and he pulled back the --

| | |
|---|---|
| 1 | **INTERPRETER GOLDSTEIN:**  The interpreter corrects |
| 2 | that he says that he pulled the red point back. |
| 3 | **MR. RUTER:**  I'm sorry.  The what? |
| 4 | **INTERPRETER GOLDSTEIN:**  The red point back. |
| 5 | **BY MS. YASSER:** |
| 6 | Q.   Did he rack the gun? |
| 7 | A.   Yes.  Like on the charger.  To charge it, to take it off? |
| 8 | Q.   Okay.  Now, sir, do you know if there were any bullets |
| 9 | inside the weapon at that time? |
| 10 | A.   Yes, but it wasn't full. |
| 11 | Q.   And there were other bullets in a box next to the gun; is |
| 12 | that right? |
| 13 | A.   Yes.  It's a small box, so originally what they come in, |
| 14 | a small box. |
| 15 | Q.   Did either Pancho or Flaco tell you to relay their |
| 16 | message to El Pelon? |
| 17 | A.   No. |
| 18 | Q.   Do you know, sir, if Pelon was actually killed sometime |
| 19 | later? |
| 20 | A.   What do you mean? |
| 21 | Q.   Do you know if Pelon is alive now? |
| 22 | A.   No, he's dead. |
| 23 | Q.   And did you have any conversations with either Pancho or |
| 24 | Flaco after Pelon died? |
| 25 | A.   No. |

1    Q.   Do you know how El Pelon was killed?

2              **MR. RUTER:**   Objection, Your Honor.

3              **THE COURT:**   Overruled.

4    **BY MS. YASSER:**

5    Q.   Not who did it; how he was killed.

6    A.   The day that Victor was killed, he had been at my place

7    of business.  I had been opening a new place of business on

8    West Street and was remodeling that new business.  Victor had

9    called me and, actually, I was looking for someone that would

10   do the job for me a lot cheaper, because I was going to put up

11   new sheetrock.  So Victor said he was going to come over to

12   give me an estimate.

13              He told me -- well, he arrived around 10 o'clock at

14   night, about 10:30, maybe something like that.  Since we were

15   friends, he would always bring like a twelve-pack or a six-

16   pack of beer, and it was Coronas, and then he would also bring

17   the girl with him.  Since he was only there and he knew that

18   he was only coming over to give me an estimate for the

19   business, he left the girl in the car.  She was on the phone

20   talking.  He came in, and I said, "This is what I need you to

21   do."

22              And he said, "Okay, Carlos, I'll do it for a

23   thousand dollars if you give me a television set I can give to

24   my mom."  Then he said, "I'll be back, because I'm going to go

25   to the pharmacy.  I need to buy some pills for my cold."

1      So he left, and we were always listening to music

2    from the '70s, like the Bee Gees and Clearance Clearwater.

3    Q.   And let me stop you there.  You said El Pelon left at

4    that time; is that correct?

5    A.   Yes.  Yes.

6    Q.   And was that the last time you saw El Pelon before you

7    learned he had been killed?

8    A.   No.  He came back.

9    Q.   Okay.  What happened next?

10   A.   He came back.  I put on the video.  We sat down.

11        **THE COURT:**  Please shorten the narrative.

12        **MS. YASSER:**  I'm sorry?

13        **THE COURT:**  Please shorten the narrative.

14        **MS. YASSER:**  Yes, sir.

15   **BY MS. YASSER:**

16   Q.   Mr. Campos --

17        **MS. YASSER:**  And if the interpreter could at least

18   interpret what he did answer.

19   Q.   Mr. Campos, at some point that evening, did Pelon leave

20   your shop?

21   A.   Yes.  The second time.

22   Q.   Okay.  And, after that point, was that the last time you

23   saw El Pelon before you learned he had been killed?

24   A.   Yes.

25   Q.   Now, after El Pelon was killed, were you approached by

 1    law enforcement and asked questions about his murder?

 2    A.    In my shop?

 3    Q.    At some point, was he approached -- were you approached,

 4    sir, by law enforcement and asked questions about the murder

 5    of El Pelon?

 6    A.    Yes, but it was about two days later.

 7    Q.    And, without getting into the substance of those

 8    conversations, did you cooperate with law enforcement?

 9    A.    Yes.

10    Q.    And ultimately, as you testified earlier, you were

11    deported in January of 2009; is that correct?

12    A.    Correct.

13    Q.    Before you were deported, sir, did you provide telephone

14    numbers that you had for Pancho and Flaco to the police?

15    A.    Yes.

16    Q.    Do you recall what those numbers were?

17    A.    No.  I -- I don't remember.

18    Q.    Is there something, sir -- let me ask you this:  Do you

19    recall meeting with Detective Hartlove and him assisting you

20    in providing a written statement which you then signed?

21    A.    Yes.

22          **MS. YASSER:**  The Court's indulgence for a moment,

23    Your Honor.  I apologize.

24          **THE COURT:**  Yes.

25    **BY MS. YASSER:**

1    Q.   Well, perhaps I'll be able to find that statement and ask

2    you on redirect if reviewing it would refresh your memory as

3    to the numbers that you provided law enforcement at that time.

4    And I'm seeing -- with the assistance of Mr. Ruter, I've

5    located that prior statement, and I'm going to ask you to take

6    a look at it.

7         **MS. YASSER:**  I'm going to ask that the interpreter

8    interpret the document in Spanish quietly, and then, when

9    you're done, to please turn the document over and tell me if

10   that refreshes your recollection as to the numbers that you

11   provided to law enforcement at that time.

12        **THE COURT:**  What is the document, counsel, for the

13   record?

14        **MS. YASSER:**  For identification only,

15   Government's 1.

16        **THE WITNESS:**  I've read it, and the telephones are

17   here.

18   **BY MS. YASSER:**

19   Q.   Now, sir, starting first with the telephone number you

20   provided for Flaco, can you please inform the ladies and

21   gentlemen of the jury what that telephone number was?

22   A.   Flaco's is ▇▇▇▇▇-5015.

23   Q.   Now, same question for Pancho, sir:  What was the number

24   that you provided to law enforcement for Pancho at that time?

25   A.   It's ▇▇▇▇▇-1397.

1          **MS. YASSER:**  Thank you, sir.

2          With that, I have no further questions.

3          **THE COURT:**  Cross?

4          **MR. RUTER:**  Thank you, Your Honor.

5          If I could have that statement back.  Thank you.

6                          **CROSS-EXAMINATION**

7   **BY MR. RUTER:**

8   Q.   Good afternoon, Mr. Campos.

9   A.   Good afternoon, sir.

10  Q.   Mr. Campos, do I understand that today you are in this

11  country legally, or illegally?

12  A.   Legal.  Legally.

13  Q.   Now, you were deported in 2009, you testified?

14  A.   Yes.

15  Q.   And how was it and when was it that you came back into

16  the United States after you were deported in 2009?

17  A.   How?

18  Q.   Yes.  How?

19  A.   Are you interrogating me regarding my status?

20  Q.   Yes.

21  A.   Are you Immigration, or what?

22          **THE COURT:**  Mr. --

23          **MR. RUTER:**  Answer my question, please.

24          **THE COURT:**  Mr. Campos, it works by him asking

25  questions and you answering questions.  You don't get to ask

 1     him questions.  You have to answer his question.  If you two

 2     were to question each other, we'd be here all year.  So,

 3     again, his questions, your answers.

 4              **THE WITNESS:**  Okay.

 5     **BY MR. RUTER:**

 6     Q.   Mr. Campos, I understand that you were deported in 2009;

 7     is that correct?

 8     A.   Yes.

 9     Q.   And were you deported because you were here at the time

10     illegally?

11     A.   Yes.

12     Q.   Okay.  Now, when was it that you returned to this country

13     after you had been deported in 2009?

14     A.   It was in, now, December of 2012.

15     Q.   Okay.  And, when you came back in this country in

16     December of 2012, you reentered legally; is that correct?

17     A.   With a paroled visa, yes.

18     Q.   Yes.  And you reentered the country legally because the

19     United States Government wanted you to testify in this case

20     today; is that correct?

21     A.   Correct.

22     Q.   Okay.  And, since you were here in December of 2012,

23     Mr. Campos, have you been in custody?

24     A.   No.

25     Q.   So that means that you've been permitted to reenter the

 1     country, and, in December of last year, in January, in

 2     February, in March, and April of this year, you have been able

 3     to stay in this country without being in custody; is that

 4     correct?

 5     A.    Yes.

 6     Q.    And, after you testify here today, you'll be returning to

 7     your homeland; is that correct?

 8     A.    For sure, I am.

 9     Q.    Yeah.  Now, do we also understand that you first entered

10     this country in 1992?

11           **THE COURT:**  Mr. Ruter, we will interrupt here and

12     pick up at 2:00.

13           **MR. RUTER:**  Thank you, Your Honor.

14           **THE COURT:**  Thank you.

15           Members of the jury, please remember:  Don't discuss

16     the case among yourselves or with anyone else.  Please be back

17     in the jury room at about five minutes before 2:00 so that we

18     can get started at 2:00 p.m.  Remember:  I can't get started

19     unless you are all here.  Thank you.

20           **THE CLERK:**  All rise.  This Honorable Court stands

21     in recess.

22           (Jury excused.)

23           (Luncheon recess -- 12:58 p.m.)

24           (Afternoon session -- 1:59 p.m.)

25           **THE CLERK:**  All rise.  This Honorable Court now

1     resumes in session.

2            THE COURT:  Please be seated.

3            Belinda, has the new interpreter been sworn?

4            THE CLERK:  No, sir.

5            THE COURT:  Would you please swear him in.

6            (Oath administered.)

7            INTERPRETER WESLEY:  I do.  Good afternoon, Your

8     Honor.  Carlos Wesley, court interpreter.

9            THE COURT:  Welcome.

10           (Whereupon, the Defendants enter the courtroom.)

11           MR. CUNNINGHAM:  Judge Quarles, while we're

12    assembling here, we just wanted to inform Your Honor that the

13    next witness we intend to call is in custody.

14           THE COURT:  Okay.  Yours, or the Marshal's?

15           MR. CUNNINGHAM:  He's in the Marshal's custody, Your

16    Honor, and I believe they've been notified that he's on deck.

17           THE COURT:  Okay.  Ready for the jury, counsel?

18           MR. MONTEMARANO:  Yes, Your Honor.

19           MR. RUTER:  Yes, sir.

20           DEFENDANT VENTURA:  She's talking with the witness.

21    We didn't hear we don't hear nothing.  We'd like to hear what

22    they're talking.

23           (Jury enters.)

24           THE COURT:  Please be seated.

25           Mr. Ruter?

1          **MR. RUTER:**  Your Honor, thank you again.

2          **THE CLERK:**  I'd like to remind you:  You're still

3     under oath.

4          **THE WITNESS:**  Yes.

5     BY MR. RUTER:

6     Q.   Mr. Campos, good afternoon.

7     A.   Good afternoon, sir.

8     Q.   Mr. Campos, you had told us earlier that you had entered

9     this country illegally in 1992; is that correct?

10    A.   Yes.

11    Q.   And could you tell us:  Where in the United States did

12    you actually enter?

13    A.   San Diego.

14    Q.   Okay.  And can you tell us how it was that you got

15    from -- by the way, what country did you come out of?  Was it

16    Mexico?

17    A.   No.  I'm Salvadorian.

18    Q.   Okay.  How did you actually make it into San Diego?

19    A.   I emigrated from my country, Guatemala, Mexico.

20    Q.   Did you have any papers of any kind in order to secure

21    entry into this country?

22    A.   No.

23    Q.   Okay.  Does that mean, then, that you came into this

24    country without any U.S. officials realizing you were here?

25    A.   Yes, but not for a long time.

1    Q.   Okay.  And what do you mean --

2    A.   Only for a month.

3    Q.   And what happened after a month?

4    A.   I'm a veteran of the war in El Salvador, and I was hurt

5    during the war, and I've also come to this country asking for

6    asylum.

7    Q.   And did you do that officially in 1992?

8    A.   Yes.

9    Q.   And did you receive asylum from the United States

10   Government?

11   A.   The U.S. did receive my application.  They gave me a work

12   permit, and then I waited for a court date in '97, but they

13   sent me a court date, but I missed it.

14   Q.   Does that mean, Mr. Campos, that you were in this country

15   under a work permit in 1992 and 1993 and 1994 and 1995 and

16   then finally in 1996?

17   A.   Yes.

18   Q.   Okay.  And then you said you had a court date in 1997?

19   A.   Yes, but I didn't realize when.

20   Q.   Okay.  Can you tell us today where that hearing was

21   supposed to be held -- in what city and state?

22   A.   In Arlington.  Arlington, Virginia.

23   Q.   All right.  Tell us, then:  When did you move from

24   San Diego to Vienna, Virginia?

25   A.   I never -- I never lived in San Diego.

1   Q.   Okay.

2   A.   I came in through San Diego.

3   Q.   And did you then immediately come to Vienna, Virginia?

4   A.   Yes, I did.  I bought a ticket and flew to Dallas, to the

5   airport.

6           **INTERPRETER GOLDSTEIN:**  The interpreter is going to

7   check.  The interpreter corrects.  The Dulles Airport, not to

8   Dallas.

9           **MR. RUTER:**  Thank you very much.

10  **BY MR. RUTER:**

11  Q.   In 1992, then, when you came to Virginia, did you become

12  employed anywhere?

13  A.   No.  I moved to New York, and I went to school.

14  Q.   Okay.  And what school did you attend, sir?

15  A.   School Number 18 in Jamaica Queens in New York City.

16  Q.   In New York City?

17  A.   Yes.

18  Q.   And then how long were you in New York before you moved

19  from New York?

20  A.   That was through -- through '96.  1996.

21  Q.   And where did you move after that?

22  A.   To Manassas.

23  Q.   And is that near Vienna, Virginia?

24  A.   Yes.

25  Q.   Did you work when you lived in Manassas?

```
 1    A.    Uh-huh.

 2    Q.    What kind of work did you do there?

 3    A.    Restaurant.

 4    Q.    And then you moved to Vienna?

 5    A.    No.  I lived -- well, my brother lived in Vienna.

 6    Q.    Okay.  And, when you moved to Vienna, did you live with

 7    your brother for a while in Vienna, Virginia?

 8    A.    Uh-huh.  And then I moved to Annapolis in 1997.

 9    Q.    And, when you arrived in Annapolis, let me ask you:  Why

10    was it that you chose to move to Annapolis in the first place?

11    A.    Because I met my wife -- my ex-wife, and I have three

12    children with her.

13    Q.    And was she from Annapolis, sir?

14    A.    She lived in Annapolis.  She was from El Salvador as

15    well.

16    Q.    Okay.  And is that the reason you moved to Annapolis, was

17    because your wife was from Annapolis?

18    A.    Uh-huh.  That's where we met, and we got married in

19    Annapolis.

20    Q.    And we understand from your direct examination that you

21    began working in the electronic business in Annapolis; is that

22    correct?

23    A.    Yes.

24    Q.    And you had a electronic business on ███ -- rather, on

25    ███████████████; is that correct?
```

```
 1    A.    Yes.

 2    Q.    Was that the first place you had a business?

 3    A.    Yes.  In Annapolis, yes.

 4    Q.    And did you ever move from that address to a different

 5    address to perform your electronic business?

 6    A.    No.  I was going to open another one, too.

 7    Q.    You were -- I'm sorry?

 8    A.    I was going to open another business.

 9    Q.    In what year were you going to do that?

10    A.    In 2008.

11    Q.    And you did not open that business?

12    A.    Never.

13    Q.    Why not?

14    A.    Because that's when I was deported.

15    Q.    Okay.  What, Mr. Campos, caused you to be deported --

16              MS. YASSER:  Objection, Your Honor.  May we

17    approach?

18              THE COURT:  Come up.

19              (Whereupon, the following discussion occurred at the

20    bench.)

21              THE COURT:  Can the interpreter hear the bench

22    conference?

23              INTERPRETER WESLEY:  Yes, Your Honor.

24              THE COURT:  Thank you.

25              MS. YASSER:  Your Honor, in an abundance of caution,
```

 1    I objected, because I'm not sure where Mr. Ruter is going,

 2    but, if he's going into the two prior convictions, one of

 3    which is 18 years old and the other one of which is 13 years

 4    old, which are prohibited under Rule 609, and I would seek the

 5    Court to advise him not to go into those areas.

 6            **MR. RUTER:**  Your Honor, I don't know why he was

 7    deported.  I simply want -- if he was deported because he was

 8    here -- this is my understanding so far.  He was here on a

 9    work permit, his testimony is, from 1992 through 19 --

10    whatever it was, and now we're into 2008.  I do not know why

11    he was deported.  I only know that he was deported.  I'm not

12    going to ask him about convictions --

13            **THE COURT:**  Why don't all you lawyers walk over to

14    him while the husher is on and see what the answer is.

15            **MS. YASSER:**  No.  I can tell you, Your Honor.  I'm

16    looking at it here --

17            **THE REPORTER:**  I need to hear you.

18            **MS. YASSER:**  I apologize.  I'm just looking for the

19    specific reason.  I believe it was because of his second-

20    degree assault, which was from 2000 -- 2000, and so, when he

21    was encountered, that was a deportable offense, is my

22    understanding.

23            **MR. RUTER:**  Well, Your Honor, if that's the case,

24    what I would suggest, with the Court's permission, is for me

25    to pointblank ask him whether or not he was deported because

1    he had been convicted of some crime in this country while he

2    was here, which caused him to then become deported.

3              **MS. YASSER:**  That conviction, Your Honor, is outside

4    the bounds of 609.  This is exactly what 609 is for.  It's 13

5    years old.  It's certainly not a moral crime.

6              **MR. RUTER:**  Your Honor, I'm not attempting to

7    impeach him on the offense.  I'm trying to understand why it

8    was that he was no longer welcome in this country, and I think

9    that's something that the jury has a right to know.

10             **THE COURT:**  Why?

11             **MR. RUTER:**  Well, because, Your Honor, maybe the

12   reason for his deportation was because his work permit had

13   expired, which seems to me that it goes a long way for a jury

14   to understand whether or not he had a technical reason for

15   having to leave, or whether it was something more -- such as

16   he had been convicted of a crime.  It's my view that rule

17   doesn't apply unless the actual crime itself has been

18   addressed.  I'm not going to address the crime.

19             **THE COURT:**  Well, again, what are you using it for?

20             **MR. RUTER:**  I'm using it, Your Honor, for our jury

21   to have a context about how he got here and then why he was no

22   longer invited to be here.  We know he came in illegally, and

23   now we know that he's about to be -- I think they have a

24   reason to know why he was deported, because there are so many

25   reasons why for someone to be asked to leave the country.

1         **THE COURT:**  Now, how do you plan on arguing it?

2    What does it establish?

3         **MR. RUTER:**  It establishes that evidently he wasn't

4    a law-abiding citizen while -- well, I shouldn't say he wasn't

5    law abiding while he was here, I guess would be the way it

6    would come out to a juror.

7         **THE COURT:**  Bad character?

8         **MR. RUTER:**  No.  It's the reason why he was

9    deported.

10        **THE COURT:**  Sustained.

11        (Whereupon, the bench conference was concluded.)

12        **THE COURT:**  Question.

13   **BY MR. RUTER:**

14   Q.   Mr. Campos, we learned from your direct examination that

15   then you were deported in 2009; is that right?

16   A.   Yes.

17   Q.   Now, while you were in Annapolis, we understand that you

18   ran this electronics business at ███████████████ in

19   Annapolis.  That's correct, isn't it?

20   A.   Yes.

21   Q.   Would it be fair to say that most of your clientele were

22   Hispanic?

23   A.   No.

24   Q.   What percentage of your clientele do you believe, in that

25   timeframe of 2007 and 2008 into 2009, were Hispanic?

```
 1      A.    Percentage of Hispanics?  Thirty-five percent.
 2      Q.    Okay.  One of those customers of yours was a man named
 3      Victor; is that correct?
 4      A.    Victor was never one of my customers.  He would just come
 5      and visit the area, and he was very friendly.  He'd say,
 6      "Hello," to everybody.  That's it.
 7      Q.    Okay.  Well, during the times when you would see Victor,
 8      it was my understanding that he would, from time to time, come
 9      to your shop at ███████████████; is that correct?
10      A.    Yes.
11      Q.    And you knew him for about eight years prior to his
12      death; is that correct?
13      A.    Yes.
14      Q.    So that would take us, if my math is right, back to
15      perhaps as early as the year 2000?
16      A.    Around there.
17      Q.    Okay.  And can you tell us:  How many times would you see
18      him on a monthly or a yearly basis starting in 2000 when you
19      first met him?
20      A.    Let's see.  Maybe once or twice a week.  Maybe three
21      times.  I really don't know.
22      Q.    Every week for eight years?
23      A.    No.  Sometimes -- sometimes it would be monthly.
24      Sometimes it would every two weeks.
25      Q.    Okay.  And, when you would see him, where would you
```

1    primarily see him at?  What location?

2    A.   Well, he always came to Forest Drive in the parking of

3    the Jennifer Shop.

4    Q.   Yes.  And, when you would actually see him and speak with

5    him, where would it be?  Would it be in the Jennifer Shop, or

6    would it be in your shop?

7    A.   At the liquor store, which is near there, in the parking

8    lot.  It has vertical parking lot.

9    Q.   Okay.  Well, does that mean that you would go out in the

10   parking lot and speak with him?

11   A.   Yes.  It was like two feet away from my door.

12   Q.   Okay.  Did you ever go to his house?

13   A.   No.

14   Q.   Did he ever come to your house?

15   A.   To my house?  No, never.

16   Q.   Did you ever socialize together?

17   A.   No.

18   Q.   Did you ever use his prostitution services?

19   A.   Sometimes maybe, yeah.

20   Q.   And he would bring these girls, oftentimes, if I

21   understand it, Mr. Campos, with him when he would visit the

22   Jennifer Shop area; is that correct?

23   A.   Uh-huh.

24           **THE REPORTER:**  If you would, say "yes" and "no,"

25   sir.

 1              **THE WITNESS:**  But I don't understand that.

 2    **BY MR. RUTER:**

 3    Q.    I'm sorry.  You don't understand what?

 4    A.    The last thing you said.

 5    Q.    I hate to say I forgot the last thing I said.

 6    Mr. Campos, if -- maybe it had to do with you yourself using

 7    the services of Mr. Pelon's women.  Is that what you don't

 8    understand?

 9    A.    No.  The services from Pelon was only after I was

10    separated from my wife.

11    Q.    And when was that?

12    A.    It's been since like 2006, 2007.

13    Q.    Okay.  Would it be fair to say, Mr. Campos, that,

14    sometime when Victor would visit you, he would do so after you

15    had called him requesting prostitution services from him?

16    A.    No.

17    Q.    Did you ever call him in order to secure the prostitution

18    services from him?

19    A.    Not to call him, because he was always around.

20    Q.    Does that mean he was always around with a girl with him?

21    A.    Yes.

22    Q.    Okay.  You were asked on direct examination, Mr. Campos,

23    how it was that you were so certain that he was engaged in the

24    prostitution business.  Do you recall that question from

25    Ms. Yasser?

1   A.   Yes.

2   Q.   Yes.  And you answered her question; did you not?

3   A.   Yes.

4   Q.   And you told the members of the jury here that you knew

5   that he engaged in prostitution services because of the

6   advertising done in the community; is that not correct?

7   A.   From Pancho.

8   Q.   Pardon?

9        **INTERPRETER GOLDSTEIN:**  From Pancho.

10  **BY MR. RUTER:**

11  Q.   So you're telling us that you learned that El Pelon was

12  engaged in the prostitution business from Pancho?

13  A.   No.  The question that she asked me was about Pancho; not

14  about Victor.  He gave out business cards.  Victor never gave

15  out business cards.

16  Q.   Okay.  So, if you wanted to use the services of Victor's

17  women, you would have to make contact with him in some manner

18  other than calling from a business card; is that correct?

19  A.   Well, with Victor, the relationship between Victor and

20  his business was not often.  He would come to -- not only the

21  services, but also to chat, to talk, and wait for a call.

22  Q.   A call for prostitution services?

23  A.   Yes.

24  Q.   Okay.  And when would that happen, Mr. Campos?  Typically

25  what part of the day would that happen?

1    A.    After 6:00.  Victor would always come after 6:00 in the

2    afternoon.

3    Q.    Okay.  Now, do we also understand that you knew Victor

4    long before you knew Pancho?

5    A.    Yes.

6    Q.    Okay.  Had you ever seen Victor and Pancho together?

7    A.    No.

8    Q.    Okay.  And you're saying Pancho would deliver, or he

9    would pass out business cards, you're saying; is that correct?

10   A.    Yes.

11   Q.    Did he ever pass out business cards at your business?

12   A.    Not -- not in my store; outside.

13   Q.    Okay.  Had he ever asked you to allow him to leave

14   business cards inside of your store?

15   A.    No.  Actually, he never came into my business.

16   Q.    So, in 2008, how well did you know Pancho?

17   A.    Because he'd come into the area, and he worked during the

18   day.  He worked from 1:00 p.m. on.

19   Q.    And, when you say "he worked," Mr. Campos, what do you

20   mean, "he worked from 1:00 p.m. on"?

21   A.    In his business, prostitution.

22   Q.    Okay.  Can you tell us how it is that you know that?

23   A.    Because it said so on the card.

24   Q.    Okay.  And, in 2008, before 2008, how many times had

25   Mr. Ventura come into your business?

1    A.    He never came to my business.

2    Q.    How many times prior to March of 2008 did you have

3    conversation with him about any topic at all?

4    A.    Well, starting in 2008, March, April 2008 was the first

5    conversation I had with him when I gave him some service --

6    repair service for a stereo, his car.

7    Q.    So the first time that you had conversation with

8    Mr. Ventura is in about March of 2008; is that correct?

9    A.    Yes.

10   Q.    Had you ever used any of his prostitution services prior

11   to March of 2008?

12   A.    Before March 2008?  I don't remember.

13   Q.    Yes.  Okay.  Did you ever go to his house?

14   A.    No.

15   Q.    Did he ever come to your house?

16   A.    No.

17   Q.    Did you ever have lunch together?

18   A.    Never.

19   Q.    Was he your friend?

20   A.    Acquaintance.

21   Q.    Was he your confidant?

22   A.    No.

23   Q.    Were you his?

24   A.    Neither.

25   Q.    Had you ever been inside of any of his vehicles?

1    A.    Yes.

2    Q.    When?

3    A.    Well, in March of -- March, April 2008 was when I had the

4    last conversation with him.  Then I left for Miami with a

5    contract with the Bank of Wachovia to install some security

6    systems.

7    Q.    Okay.

8    A.    In May.  And then I came back at the end of June.

9    Q.    From Miami?

10   A.    Yes.

11   Q.    Did you go to Miami to work?

12   A.    Yes.

13   Q.    Okay.  So, in March of 2008, do I understand that that

14   was when you were shown a handgun by El Flaco?

15   A.    Yes.  March or April.

16   Q.    Did you know that either Flaco or Pancho possessed a gun

17   before you saw the gun?

18   A.    No.

19   Q.    So is it your testimony, Mr. Campos, that Pancho

20   volunteered to you that he had a gun inside his vehicle?

21   A.    He didn't tell me he had it in the car.  He told me, "I

22   am going to show you this."

23   Q.    So he did that voluntarily?

24   A.    Yes.  He told the guy here to go and get it.

25   Q.    And do we understand that he told you that the reason

1    that he had the gun was because El Pelon had to be killed?

2    A.   The conversation started like this.  He -- he was

3    working, and he said, "Listen, have you seen Victor?"

4              And I said, "No, no.  I haven't seen him."

5              And he said, "I'm looking for that asshole, because

6    this territory -- this territory in Annapolis is mine, and

7    nobody has to come here and mess with it."  And then he said,

8    "Look what's going to happen to him," and then he brought out

9    the shoebox, and he took out the gun.

10   Q.   Where did all this take place?

11   A.   When he took out the gun, he was in the room that I was

12   renting.

13   Q.   And where was that room that you were renting,

14   Mr. Campos?

15   A.   It's on ████████████.  ████████████.

16   Q.   And how far away is ████████████ from your shop?

17   A.   It's like six blocks.

18   Q.   How did he get there, and how did you get there?

19   A.   Where?

20   Q.   To ████████████.

21   A.   How did I get there?

22   Q.   Yes.

23   A.   He -- he come to my room.  He come to my house.

24   Q.   He came to your house?

25   A.   Yes.

1    Q.   This is the first time you talked to him?

2    A.   No.   That was the last time I talked to him before I left

3    to Miami.

4    Q.   This is in March of 2008 --

5    A.   Yes.

6    Q.   -- when he showed you the gun?

7    A.   Yes, sir.   Yes.

8    Q.   And, Mr. Campos, isn't it also true that that was the

9    first time that you ever talked to Mr. Ventura?

10   A.   No.   We -- I knew him.   We would talk, like say, "Hello,

11   how are you," things like that, but we were not friends, not

12   like, "What are you doing?   How are you?"

13   Q.   Okay.   So, back to my question a minute ago:   How was it

14   that he was in your apartment on ████████████ if he was not

15   your friend in March of 2008?

16   A.   Well, when I was on a house call, and any customer would

17   call the shop, the call would get forwarded to ████████-6555.

18   It would get forwarded to my cell phone, so I could answer the

19   call anywhere.   Anybody -- any customer calling, call my shop,

20   and it would be forwarded to my cell phone.   I can answer the

21   phone and any customers anywhere.

22            And he told me I needed to repair the stereo in the

23   car, so -- so I told him, "I'm home now.   If you want, you can

24   come here, and I can check it."   I had my van and my tools

25   with me.   I had that with me all the time.

1    Q.   What kind of a car was it that the radio was in?

2    A.   Well, he had two vehicles.  He had a white Expedition,

3    and he had a small red car -- an old car.

4    Q.   And --

5    A.   I don't remember the make of the car.  It was a red car.

6    Q.   And which car was it that you looked into to attempt to

7    fix the radio?

8    A.   The car that he was driving, it was the red one.

9    Q.   That's the vehicle that you looked at in March of 2008?

10   A.   Yes.

11   Q.   Did you fix the radio?

12   A.   Yes.

13   Q.   Were you paid?

14   A.   About $15.  It was a fuse problem.

15   Q.   What time of the day or night was it, Mr. Campos, that

16   this conversation that we're now talking about took place on

17   ███████████?

18   A.   It was about 4:00 -- 3:30, 4:00, 4:30 in the afternoon.

19            **THE REPORTER:**  I'm sorry.  3:30?

20            **INTERPRETER KIRCHGESSNER:**  Or 4:00.

21   **BY MR. RUTER:**

22   Q.   In the afternoon?

23   A.   Yes.

24   Q.   Is that a residential area where you lived on ████

25   ████████?

1    A.    Yes.  It's a community.

2    Q.    And the conversation that we're talking about where you

3    saw the gun, that took place outside of your home, or inside

4    of your home?

5    A.    I was in the room where we started the conversation.

6    Q.    In your room?

7    A.    Uh-huh, and we finished outside.

8    Q.    And you saw the gun outside?

9    A.    No, inside.  Only inside.  Then he put it away.  He put

10   it in the box and took it.

11   Q.    All right.  You left for Miami, did I understand,

12   Mr. Campos, sometime in about May of 2008, and then you

13   returned in June of 2008?  Is that correct?

14   A.    Yes.

15   Q.    So, during the remainder of 2008, after this incident

16   occurred where you allege you saw a gun, from that time until

17   you went to Miami, did you see Mr. Ventura in the area again?

18   A.    Almost never, but, yes, I did see him one more time.

19   Q.    And, after you returned from Miami in June of 2008, until

20   you learned of the death of Victor in September of 2008, did

21   you see Mr. Ventura at all?

22   A.    Before Victor died?

23   Q.    Yes.  Between June of '08, when you returned from Miami,

24   until September of '08, when Victor died.

25   A.    Let me see.  Yes.  Yes.  One time, he gave me a ride.  I

1    was walking on Hilltop Lane.  I was going to see my children.

2    I had already separated from my wife, and so he was driving

3    the Ford Expedition, and he stopped, and he said, "Where are

4    you going?"

5              And I said, "To my wife's house to see the

6    children."

7              And he said, "Get on," and gave me a ride.

8    Q.    Okay.

9    A.    And, at that moment, he asked me, "Have you seen Victor?"

10             And I said, "No."  And then I said, "No."

11             And then he asked me, "Do you know what happened in

12   Marta Court?"

13             And I said, "Yes, I know what happened.  It looked

14   like they had a shot at a man and a woman inside the car.

15   What happened to that person, that's what's going to

16   happen --"

17             **INTERPRETER KIRCHGESSNER:**  I'm sorry.  Interpreter

18   correction.

19   A.    "-- that's what's going to happen to Victor also."

20   Q.    Okay, Mr. Campos.  Same question as to Victor:  From

21   March of 2008 until your leaving for Miami in about May of

22   2008, did you see Victor any longer?

23   A.    Yes, I saw him.

24   Q.    And did you see him after you saw the gun that supposedly

25   Pancho and Flaco had?

1    A.   Correct.

2    Q.   Okay.  When you returned from Miami in June of 2008,

3    until Victor's death in September of 2008, did you see Victor

4    anymore during that time frame?

5    A.   Yes.

6    Q.   Okay.  You indicated that, when Victor had come to your

7    shop before his death, he came, and you had asked him if he

8    would do some work -- some sheetrock work for him; is that

9    correct?

10   A.   Yes, in my new shop.

11   Q.   And you had also said he actually went inside and he

12   looked at the possible job?

13   A.   Yes.

14   Q.   And you also said that a price of $1,000 and a TV set was

15   quoted as the price for the job to be performed?

16   A.   Yes.

17   Q.   Okay.  Do you recall, when you gave your statement to

18   Detective Hartlove on September the 12th of 2008, that you

19   neglected to tell him about the fact that Victor had come to

20   you in order to find out whether or not he was going to do

21   some work at your shop?

22   A.   I told him he had been with me.

23   Q.   I'm sorry?

24          **INTERPRETER KIRCHGESSNER:**  "I told him he had been

25   with me."  Interpreter repeated.

1           **MR. RUTER:**   Okay.

2    **BY MR. RUTER:**

3    Q.   You did read the report that Detective Hartlove put

4    together.   You were shown that by Ms. Yasser a few moments

5    ago; were you not?

6    A.   Uh-huh, yes.

7    Q.   And you signed that statement?

8    A.   Yes.

9    Q.   Okay.  Would it be your testimony, Mr. Campos, then, that

10   the statement that you signed, which was actually written by

11   Detective Hartlove, is not a complete statement of yours?

12   There were things that were left out; is that your testimony?

13   A.   I read the literature -- the testimony that's there, and

14   nothing is missing.

15   Q.   Nothing is missing?

16   A.   No.  He was there with me.  He came to the shop.  I -- he

17   left.  I closed the shop, and I left.  It's all there.

18   Q.   Well, I'm -- you read the statement here.

19           **MR. RUTER:**   May I approach the witness, Your Honor?

20           **THE COURT:**   Yes.

21   **BY MR. RUTER:**

22   Q.   You read the statement a few minutes ago, didn't you?  If

23   you can't read the English version, you may wish to have it

24   translated.   You show me where there is discussion in there

25   about sheetrock and a thousand dollars and a TV set.

1   A.   No, that's not there.  No, that's not there.  When I had

2   this interview with Detective Hartlove, it was 2:00 in the

3   morning, and it was a lot for me.  All this, and with the

4   arrest from Immigration, I wasn't going to explain everything

5   in detail to Mr. Hartlove.  It was a lot.

6   Q.   Okay.  Excuse me.

7           Mr. Campos, did you kill El Pelon?

8   A.   Me?

9   Q.   Yes.

10  A.   Why?  Why?

11  Q.   You know his girlfriend, Sylvia, right?

12  A.   I didn't know her as Sylvia.  I knew her as Carla.

13  Q.   Well, you knew Carla?

14  A.   Yes.

15  Q.   And you told Carla that you killed him, didn't you?

16  A.   Me?  Never.

17  Q.   All right.  What was your phone number, Mr. Campos, back

18  in September of 2008?

19  A.   I can't remember.

20  Q.   Did you know Sylvia -- did you know her phone number back

21  in September of 2008?

22  A.   Yes.  I had both hers and his.

23  Q.   And why did you have hers?

24  A.   Because she also did services.  Because, when Victor was

25  sick, she did the deliveries.

1    Q.   She was a prostitute herself; was she not?

2    A.   No, I didn't know.

3    Q.   Okay.  But she delivered prostitutes for her husband; is

4    that what you're saying?

5    A.   Yes.  The business belonged to both, I think.

6    Q.   Okay.  Did you speak with her after her husband's death?

7    A.   Well, I did call her -- yes.  I called her once, because

8    I wanted to go to the funeral of El Pelon, because a lot of

9    people would come to my business and ask me, "What happened?

10   What happened," and -- and they want to go to the funeral,

11   too, and I said, "Well, no, that is a big problem."

12   Q.   What does that mean, Mr. Campos -- "that is a big

13   problem"?

14   A.   Well, yes, because, since he was a friend of eight years

15   and he was dead and we didn't know how or who, and I knew that

16   this man had shown me this weapon, so I imagine that's what

17   had happened.

18   Q.   Let me try it again.

19            INTERPRETER KIRCHGESSNER:  Interpreter would like to

20   place a correction on the record.

21            THE COURT:  Yes.

22            INTERPRETER KIRCHGESSNER:  When the interpreter said

23   "funeral," it should have been wake, to go to the wake.

24            THE COURT:  Thank you.

25            INTERPRETER KIRCHGESSNER:  Thank you.

1              **THE COURT:**  Question?

2              **MR. RUTER:**  Thank you.

3    **BY MR. RUTER:**

4    Q.  But, Mr. Campos, you knew Sylvia -- you called her Karma

5    before Victor's death, correct?

6    A.  Carla.  Carla.

7    Q.  Carla.  Carla.  I'm sorry.  You knew that Carla was

8    involved in the prostitution business with her husband?

9    A.  Yes.  I always saw them together.  From a long time, they

10   worked together in Annapolis.

11   Q.  Okay.  So is it fair to say that, most of the time when

12   you saw Victor delivering prostitutes, his wife was delivering

13   prostitutes with him?

14   A.  They almost never came together.  If Victor was sick,

15   then she would come, but most of the time Victor was the one

16   that did the job, but, when he was sick, she would -- Carla

17   would come.

18   Q.  Okay.  And would it be fair to say, Mr. Campos, that they

19   were a partnership in prostitution?

20   A.  I won't call it a partnership.  They were a couple.

21   Q.  Okay.  To your knowledge, they were equally involved in

22   the prostitution business; is that true?

23   A.  Yes.

24   Q.  Okay.  And, because you knew them well, you had her phone

25   number?

1    A.   That's correct.

2    Q.   And how did you get the number?

3    A.   They visited me.  They came to my business.  They would

4    come to my business.  "Hi, Carlos, how are you?"  I would

5    bring in bands from El Salvador, and we would play at parties,

6    and they would come sometimes to the parties we were having.

7    Q.   Where would the parties be held?

8    A.   Surfside 7 --

9    Q.   Okay.

10   A.   -- Edgewater.

11   Q.   And that is a restaurant/bar?

12   A.   Yes.

13   Q.   So, Mr. Campos, would you agree with me that that is

14   equivalent to you all socializing together; that is, you and

15   Karma and El Pelon?

16   A.   No.  We never socialized like that together.  We never,

17   never.

18   Q.   Okay.  Do you agree with me that you did not have the

19   same relationship with Pancho as you did with Victor and his

20   wife Karma?

21   A.   Yeah, it was much less with Pancho.

22   Q.   Okay.  So, after Victor's death, did you call Sylvia,

23   that you called Karma?

24   A.   Carla.

25   Q.   My apologies.  It's Carla.

1            And, when you called her, do I understand that you

2    asked her about funeral arrangements?  Was that the idea of

3    that call?

4    A.   Uh-huh, yes.

5    Q.   At any time, did you tell Carla that you felt guilty over

6    the death of her husband?

7    A.    It is possible that I told her I felt guilty, because

8    I -- knowing that this individual had a weapon, I should have

9    called the police.

10   Q.   So that part may have happened?

11   A.   More probably.

12   Q.   But -- probably did, but you did not say to her that you

13   felt guilty because you are the one who killed her husband?

14   A.   No, never.

15           **MR. RUTER:**   Thank you.  No further questions.

16           **THE COURT:**   Mr. Montemarano?

17           **MR. MONTEMARANO:**   Thank you, Your Honor.

18                    **CROSS-EXAMINATION**

19   **BY MR. MONTEMARANO:**

20   Q.   Good afternoon, Mr. Campos.

21   A.    Afternoon.

22   Q.   You had said you don't recall your telephone number back

23   in 2008; is that a fair statement?

24   A.    Yes, I don't remember it.

25   Q.    If I showed you a telephone number, would it possibly

1    refresh your recollection?

2    A.   It's possible.  Probably.

3         **MS. YASSER:**  Could you show it --

4         **MR. MONTEMARANO:**  Thought I'd save myself a walk.

5    **BY MR. MONTEMARANO:**

6    Q.   Does that number look familiar?

7    A.   Probably -- sure, yes.

8    Q.   Probably yes?

9    A.   Yes.

10   Q.   So you're answering in the affirmative?

11   A.   Yes, that was the number.

12   Q.   And the number is ██████-1222, correct?

13   A.   Yes.  That was the phone that I had at that time.

14   Q.   And that was the number you called Sylvia, who you called

15   Carla, on the 18th of September, five days after your friend,

16   Victor, was killed, correct, sir?

17   A.   Uh-huh.

18        **THE REPORTER:**  If you would, say "yes" and "no,"

19   sir.

20        **THE WITNESS:**  Yes, yes, yes.

21   **BY MR. MONTEMARANO:**

22   Q.   And that's the killing you told her you felt guilty

23   about, correct?

24   A.   Yes, because of what happened.

25   Q.   Yes, but you insist you didn't say, "I killed"?

 1    A.   That I killed him personally?  No, no, never.

 2    Q.   "I killed," just those two words?

 3    A.   No, I never said that.

 4    Q.   You never said it twice, correct, sir?

 5    A.   No.  I never -- I've never said that.

 6    Q.   And you've told, in response to some questions posed

 7    earlier today, that you were familiar with firearms from your

 8    service in the Army in El Salvador; is that correct, sir?

 9    A.   Yes.

10    Q.   And you fought for the Special Forces of El Salvador,

11    correct?

12    A.   Yes.  Yes.

13    Q.   And you carried a weapon, correct?

14    A.   In El Salvador?  Yes.

15    Q.   Yes.  And you carried a weapon, and you fought in the

16    civil war, correct?

17    A.   Yes, yes.

18    Q.   You carried a weapon to defend yourself against your

19    enemies?

20    A.   Yes.

21    Q.   And it was because of the actions of those enemies that

22    you were injured during the civil war; is that correct?

23    A.   Yes.

24    Q.   And, when you fought for the Army of El Salvador, that

25    was in the -- what we call the dirty war, correct?

```
1    A.    Yes, the civil war.

2    Q.    And, as a result of that war, you were certainly familiar

3    with violence, correct?

4    A.    Yes.

5    Q.    And you engaged in violence, correct?

6    A.    In the violence?  No.  In the war, yes.

7    Q.    You carried a weapon?

8    A.    That doesn't mean what -- that means policemen are also

9    violent.  They use weapons.

10   Q.    You used a weapon?

11   A.    When I was in the service.

12   Q.    Certainly, but that would be considered a violent act;

13   would it not?

14         MS. YASSER:  Objection, Your Honor, to this line of

15   questioning.

16         THE COURT:  Overruled.

17   BY MR. MONTEMARANO:

18   Q.    You would agree that using a weapon is a violent act; is

19   that a fair statement?

20   A.    Correct.

21   Q.    And, when you came to this country, you remained familiar

22   with violence; did you not?

23   A.    When I was here?  No.

24   Q.    You never engaged in violence in the United States?

25   A.    I have never fought with anyone, no.
```

1   Q.   Never fought with anybody?  You never inflicted harm on

2   anybody?

3   A.   I've never carried a weapon, never.

4            MS. YASSER:  Your Honor, objection.  Can we

5   approach?

6            THE WITNESS:  Never.

7            THE COURT:  What is the objection?

8            MS. YASSER:  Can we approach?  Relevance.

9            THE COURT:  Come up.

10           (Whereupon, the following discussion occurred at the

11   bench.)

12           THE COURT:  You think he did it?  That's the

13   relevance?  He's the shooter.  He did it.

14           MS. YASSER:  But I feel like he's trying to backdoor

15   the prior criminal convictions of this witness.

16           MR. MONTEMARANO:  Backdoor?  Not even close.  It's

17   not admissible as a fact of conviction to prove his bad

18   character under 609.  It is entirely admissible, not under

19   609, but to contravene a false statement he made under oath.

20           THE COURT:  Which is?

21           MR. MONTEMARANO:  "I am not involved in violence in

22   the United States."  He just stepped in it.  We have

23   convictions.  The fact of the conviction is it happened, and

24   the nature of the conviction for assault makes it violent, and

25   they're domestic violence convictions.  I am mindful of the

1    Court's ruling under 609.  I went and read *U.S. v. Gilmore*,

2    553 F.3d 669, Third Circuit case, 2009.  The fact of the

3    conviction and the nature of the conviction is admissible to

4    refute a false statement made from the stand.

5         **MS. YASSER:**  Your Honor, the conviction, first of

6    all, at least one of them, I know, is 18 years old, was for a

7    second-degree assault, which, as these Defense attorneys know

8    better than anyone, is often used -- under the modified

9    categorical approach, they're always arguing that it's not a

10   crime of violence.  Now he's flipping that on the head and

11   he's going to present to this jury that a second-degree

12   assault is -- not knowing any of the underlying facts, because

13   we couldn't pull the records, is a crime of violence?

14        **MR. MONTEMARANO:**  He denied it happened.  It doesn't

15   matter how long ago.  He can't deny the truth, and he denied

16   being involved in violence, and he volunteered it:  Not at

17   all, and never fought with anybody, never hurt anybody.

18        **MS. YASSER:**  What I'm suggesting is that those prior

19   crimes are not even an act of violence.  Now, I don't know --

20   I know one is a domestic, and one is a second-degree assault.

21   I don't have the records.

22        **THE COURT:**  Well, the domestic violence is probably

23   a crime of violence.

24        **MS. YASSER:**  I'm sorry.  Domestic assault, rather.

25   I don't have the underlying records.  I don't know anything

 1    about the underlying crimes.

 2              **THE COURT:**  He's going to be stuck with the answer.

 3              **MS. YASSER:**  Okay.

 4              **THE COURT:**  Overruled.  You're stuck with the

 5    answer, whatever it is.

 6              **MR. MONTEMARANO:**  That, I understand.

 7              **THE COURT:**  Okay.

 8              **MR. CUNNINGHAM:**  Judge, I think --

 9              **THE COURT:**  One lawyer per witness, per side from

10    the Government.

11              **MS. YASSER:**  Your Honor, I understand

12    Mr. Cunningham's concerns to be that this is just the fact of

13    the conviction; not the nature of the conviction that would be

14    allowed to go into.

15              **MR. MONTEMARANO:**  Well, I will ask:  Were you not

16    convicted of domestic violence in Virginia, I believe,

17    correct?

18              **THE COURT:**  And you'll be stuck with the answer.

19              **MR. MONTEMARANO:**  And were you not convicted of

20    assault in Virginia?

21              **THE COURT:**  Yeah.  Okay.  He's stuck with the

22    answer, whatever it is.

23              **MS. YASSER:**  Domestic assault.  I don't know if --

24    is that what it was?  Let's look back and make sure it's

25    right.

1        **MR. MONTEMARANO:**  I don't have the report.

2              (Whereupon, the bench conference was concluded.)

3              (Counsel conferring.)

4    **BY MR. MONTEMARANO:**

5    Q.   It was your testimony, Mr. Campos, you've not bene

6    involved yourself in violence since you've been in the United

7    States; is that correct, sir?

8    A.   Never.

9    Q.   Are you the same Carlos Campos who was convicted of

10   second-degree assault involving domestic violence in the state

11   of Virginia in 2000 for which you received a two-year period

12   of incarceration?

13   A.   They were only arguments with my former partner, and her

14   aunt -- her uncle called the police.

15   Q.   And, as a result of those arguments, you went to jail,

16   correct, sir?

17   A.   For about four hours.

18   Q.   Oh, so your sentence was suspended?

19   A.   I wasn't guilty.  I wasn't guilty.

20   Q.   It was a suspended sentence, correct, sir?

21   A.   Yes, because I wasn't sentenced.

22        **MR. MONTEMARANO:**  No further questions, Your Honor.

23   Thank you.

24        **THE COURT:**  Thank you.

25              Redirect?

| | |
|---|---|
| 1 | <u>**REDIRECT EXAMINATION**</u> |
| 2 | <u>**BY MS. YASSER:**</u> |
| 3 | Q.   Mr. Campos, you said that your former wife's uncle called |
| 4 | the police in 2000; is that correct? |
| 5 | A.   Yes. |
| 6 | Q.   And you didn't hit your wife, did you? |
| 7 | **MR. MONTEMARANO:**  Objection, Your Honor. |
| 8 | **THE COURT:**  Overruled. |
| 9 | **THE WITNESS:**  No. |
| 10 | <u>**BY MS. YASSER:**</u> |
| 11 | Q.   And the sentence -- |
| 12 | A.   We only had an argument. |
| 13 | Q.   And the sentence that you received was suspended? |
| 14 | A.   Yes. |
| 15 | Q.   I want to go back to our discussions earlier about |
| 16 | El Pancho and Flaco and the cars that they drove.  Do you |
| 17 | recall being asked on cross-examination about the different |
| 18 | cars that you had seen Pancho in? |
| 19 | A.   Uh-huh, yes. |
| 20 | Q.   And I think you testified that you had seen him in a |
| 21 | white Expedition as well as a red, smaller car on prior |
| 22 | occasions? |
| 23 | A.   Yes. |
| 24 | Q.   And the white car was a Ford Expedition? |
| 25 | A.   Yes. |

1    Q.   Now, in the time frame of March or April of 2008 when

2    Pancho and Flaco came to your room that you were renting near

3    your shop, were they driving the white Expedition, or the red

4    car that day?

5    A.   He arrived in the red car.  They called me first on the

6    phone, and they told me they wanted to get the stereo in the

7    red car repaired, and Flaco arrived first, and then, a while

8    after he arrived in the Expedition, the other appeared.

9    Q.   I see.  So both cars were present on that day?

10   A.   Yes, uh-huh.

11   Q.   I see.  Now, you also had a lot of questions about prior

12   conversations that you've had with Pancho over the period of

13   years that you knew him, which was about five years.  Do you

14   remember those questions?

15   A.   Who?  The questions from Pancho?

16   Q.   Questions about -- I have some questions about

17   conversations with Pancho in the years that you knew him.  You

18   testified on cross-examination that you did talk to Pancho

19   many times prior to the March-April time frame where you saw

20   the gun in the car; is that correct?

21   A.   With that, that was only that time that I saw him when he

22   told me that.

23   Q.   No, I understand.  I think -- and here is where the

24   confusion lies.  You mentioned that the last time that you

25   talked to Pancho before you went to Miami was in April or May

1    of 2008; is that correct?

2    A.   Yes.  Yes.

3    Q.   And then you talked to him one more time when you came

4    back and he gave you a ride to your wife's house to see your

5    kids when you came back from Miami?

6    A.   Yes.  Yes, correct.

7    Q.   And, before the time period in April and May of 2008,

8    when you saw Pancho and Flaco get the gun out of the car, you

9    had seen and talked to Pancho several times; is that correct?

10            **MR. RUTER:**  Objection, Your Honor.

11            **THE COURT:**  Basis?

12            **THE WITNESS:**  With who?

13            **MR. RUTER:**  That has been asked and answered, and

14    there is no misclarification on that issue.

15            **THE COURT:**  Okay.  Overruled.

16   **BY MS. YASSER:**

17   Q.   Let me back up.  I'll withdraw it.

18            You knew Pancho over a period of five years, is that

19   correct, approximately?

20   A.   Yeah.  One could say that.  About five years.

21   Q.   And you would see him in the area where your shop was?

22   A.   Yes.

23   Q.   And you'd have general conversation, casual with him; is

24   that correct?

25            **MR. RUTER:**  Your Honor, objection.  This is her

 1   witness; not mine.

 2                  THE COURT:  Overruled.

 3                  MS. YASSER:  Should I repeat the question?

 4                  THE WITNESS:  Yes.

 5   BY MS. YASSER:

 6   Q.   And you would have general conversation with Pancho when

 7   you'd see him over the five-year period of time?

 8   A.   No.  It was just casual, "How are you doing," "How do you

 9   do?"

10   Q.   I understand.

11   A.   "Business is bad," you know, so, when this thing happened

12   about Victor, between him and Victor, it was very brief.  It

13   wasn't like it was something that had been going on for a

14   while.

15   Q.   Understood.  And you knew El Pelon, or Victor, longer

16   than you knew Pancho; is that correct?

17   A.   Yes.

18   Q.   And, when Pancho came to you that day in March or April

19   of 2008, when he asked you to fix his stereo, he was also

20   looking for Victor; is that correct?

21   A.   Yes, he was.

22   Q.   And, when he gave you a ride to see your family, Pancho

23   also asked you about Victor then; is that correct?

24   A.   Yes.

25   Q.   And that was the time when he also told you about a

 1   shooting -- when Pancho told you about a shooting that he

 2   claimed responsibility for; is that correct?

 3   A.   Yes, he told me.

 4   Q.   And he told you to tell Victor about that as well?

 5   A.   He never told me.

 6   Q.   Okay.  Did you, Mr. Campos, tell Victor --

 7   A.   Yes, I did tell Victor.

 8            **MR. RUTER:**  Your Honor, objection.  Move to strike.

 9   Can we approach?

10            **THE COURT:**  Come up.

11            (Whereupon, the following discussion occurred at the

12   bench.)

13            **THE COURT:**  Can one of the interpreters hear me?

14            **INTERPRETER KIRCHGESSNER:**  Yes, Your Honor.

15            **THE COURT:**  Thank you.  Okay.  Yes?

16            **MR. RUTER:**  Your Honor, Ms. Yasser is far exceeding

17   cross-examination.  We never, myself nor Mr. Montemarano, got

18   involved in any of the shootings or any of the attempted

19   murders or anything of the such.  We talked about one thing,

20   which was brought out on direct, which was El Pelon, and she

21   now wants to get into an area which has never been examined at

22   all on cross, and, therefore, these questions clearly exceed

23   what she should be allowed to do on her redirect examination.

24            **THE COURT:**  Where are you going, Ms. Yasser?

25            **MS. YASSER:**  I -- actually, Your Honor, I wasn't

1    intending to elicit this on direct.  In fact, I didn't.  It

2    was on cross that this conversation in the car on the way to

3    his family came out, and that's what I'm seeking to clarify.

4              THE COURT:  What are you trying to get?

5              MS. YASSER:  That he, in fact, told that Pelon --

6    Pancho -- I'm sorry.  Pancho told him in the car on the way to

7    his family that he was responsible for shooting at -- and I

8    can't recall the name that he used, but it is, in fact, a

9    Forest Hill shooting from February of that same year -- March

10   of that same year, and that he was intending to relay this

11   message to Victor through this witness.  That's where I'm

12   going with it, but I think I've already gone there.  That

13   that --

14             MR. MONTEMARANO:  It wasn't brought out on cross.

15             MR. RUTER:  Your Honor, I'll say this.  The question

16   that I asked, I'm never going to be able to recall, but it had

17   absolutely nothing to do with any other shooting or attempted

18   shooting, but I find it difficult since we're going through

19   translators to be able to stop the action, but the question I

20   asked had nothing to do whatsoever with any other shootings or

21   murders, and I think Ms. Yasser is correct that colloquy dealt

22   with March of '08, which has never been brought up by the

23   Government or the Defense --

24             MR. MONTEMARANO:  Your Honor, I know it's

25   Mr. Ruter's objection, but I do have a dog in this fight as

1     well.

2          **THE COURT:**  Yes, you are permitted.

3          **MR. MONTEMARANO:**  No, I understand.  I just want to

4     be clear that, while I didn't go anywhere near this on cross,

5     this is now going to wash over onto me, and I, for that

6     reason, would object most strenuously, because I went nowhere

7     near any other conduct, any conduct in March, et cetera,

8     et cetera, et cetera.

9          **MS. YASSER:**  Your Honor, I distinctly remember him

10    testifying that he -- in a response to a question on cross

11    that he got into Pancho's car, and Pancho said, "What happened

12    to those people, the man and the woman, the shooting over

13    at --" and this is before the death of El Pelon.  This is a

14    different shooting, that he did that, that Pancho claimed

15    responsibility for that, and that was elicited on cross.

16         **THE COURT:**  Sustained.

17         **MR. MONTEMARANO:**  Thank you, Your Honor.

18         (Whereupon, the bench conference was concluded.)

19         **MR. MONTEMARANO:**  Move to strike the last question,

20    Your Honor.

21         **THE COURT:**  Motion to strike is granted.  The jury

22    will disregard the last question, as they will all unanswered

23    questions.

24         **MR. MONTEMARANO:**  Thank you, Your Honor.

25    **BY MS. YASSER:**

1    Q.   Mr. Campos, you mentioned on cross-examination that you

2    talked to Carla, the girlfriend of El Pelon, after his death?

3    Do you recall that?

4    A.   Yes.

5    Q.   And you testified that you expressed feelings of sadness

6    and regret for not calling the police after knowing that

7    Pancho and Flaco had a gun?

8              **MR. RUTER:**  Objection.  Leading.

9              **THE COURT:**  Overruled.

10             **THE WITNESS:**  I honestly felt bad because I had told

11   Victor -- the day that he showed me the weapon, I had told

12   Victor.

13   **BY MS. YASSER:**

14   Q.   But you felt guilty --

15             **MR. RUTER:**  Your Honor, objection.  Move to strike.

16   That's not responsive to the question.

17             **THE COURT:**  Are you satisfied with the answer?

18             **MS. YASSER:**  I am satisfied, Your Honor.

19             **THE COURT:**  It's the examiner's objection.

20   Overruled.

21             **MS. YASSER:**  I have no further questions, Your

22   Honor.

23             **THE COURT:**  Okay.

24             **MR. RUTER:**  None.

25             **THE COURT:**  Mr. Montemarano?

1        **MR. MONTEMARANO:**  Very briefly.

2                    **RECROSS-EXAMINATION**

3    **BY MR. MONTEMARANO:**

4    Q.   When you spoke to Carla after El Pelon's death, you would

5    agree it was a few days later, within a week?

6    A.   I don't believe so.  It was perhaps four or five days.

7    Q.   Five days.

8    A.   I was calling her -- I was calling her from the -- right

9    away, the next day, but the phone was cut off, or it was

10   turned off.

11   Q.   But, when you spoke to her, you say it was four to five

12   days later?

13   A.   Yeah.  She answered me about, oh, three days, five days.

14   Q.   Okay.  Is it not true that, when you spoke to Carla, that

15   was the first time you had spoken to her in eight months?

16   A.   No.  I had spoken to her before, because, before Victor

17   died, Victor had been drinking.  He had been drinking in my

18   room with a girl that was with him.  I called Carla, and I

19   told her, "Look, your husband is drunk, and he's going to be

20   driving drunk."

21           And she said, "I told him to stop drinking.  He

22   shouldn't be drinking."

23           I said, "Well, I'm going to send him home to you,"

24   and I told him -- I sent him home, but I told him to drive

25   very carefully.

 1    Q.   So you called your friend's wife to tell her that he --

 2    your friend had been drinking with another woman?

 3    A.   Yes.  That he had been drinking, and he was drinking a

 4    lot.

 5    Q.   Save me from such friends.

 6              **MR. MONTEMARANO:**  No further questions, Your Honor.

 7              **THE COURT:**  Thank you.

 8              Members of the jury, we've reached the afternoon

 9    break now.  Please remember:  Don't discuss the case among

10    yourselves or with anyone else.  I will call for you at ten

11    minutes before 4:00; that is, 3:50.  I will call for you at

12    3:50.

13              (Jury excused.)

14              **THE COURT:**  Thank you.  Good day, Mr. Campos.

15              (Witness excused.)

16              Government, your witness is back?

17              **MR. CUNNINGHAM:**  Yes, Your Honor.

18              **MS. YASSER:**  Yes, Your Honor.

19              **THE CLERK:**  All rise.  This Honorable Court now

20    stands in recess.

21              (Recess taken, 3:28 p.m. - 3:51 p.m.)

22              **THE CLERK:**  All rise.  This Honorable Court now

23    resumes in session.

24              **THE COURT:**  Ready for the jury, counsel?

25              **MR. CUNNINGHAM:**  Yes, Your Honor.

1        **THE COURT:**  Where is the next witness?

2        (Jury enters.)

3        **THE COURT:**  Please be seated.

4        Government, please call your next witness.

5        **MR. CUNNINGHAM:**  The United States calls

6    Maximilliano Zelaya Repalo.

7        Mr. Zelaya Repalo, please face the courtroom clerk

8    and raise your right hand.

9        **THE CLERK:**  Raise your right hand.

10                    **MAXIMILLIANO ZELAYA REPALO**

11         **WAS THEN DULY SWORN TO TELL THE TRUTH**

12        **THE WITNESS:**  I swear.

13        **THE CLERK:**  Okay.  You can be seated.

14        Will you state your name, and then spell it for the

15    record, please.

16        **THE WITNESS:**  Maximilliano Zelaya Repalo.  It's too

17    long.

18        **THE CLERK:**  Okay.  It's all right.

19                       **DIRECT EXAMINATION**

20    **BY MR. CUNNINGHAM:**

21    Q.   Good afternoon, Mr. Zelaya Repalo.

22    A.   Good afternoon.

23    Q.   Sir, how old are you?

24    A.   I'm 27, sir.

25    Q.   And what is your nationality?

Direct Examination of Maximilliano Zelaya Repalo

1    A.    I'm from Honduras.

2    Q.    You appear to be in some sort of a prison garb.  Are you

3    currently being detained by some governmental authority?

4    A.    That's right.

5    Q.    And what's that authority?

6    A.    Immigration.

7    Q.    And you're currently pending deportation; is that right?

8    A.    That's right.

9    Q.    Now, we'll come back to your history of coming to and

10   being deported from the United States, but, prior to being in

11   Immigration custody, were you in custody of the authorities in

12   Virginia?

13   A.    That's right.

14   Q.    Was that because you pled guilty to a property theft

15   crime in Virginia?

16   A.    Yes, sir.

17   Q.    And how long did you serve in prison?

18   A.    Well, altogether, it was 21 months.

19   Q.    And are you including the time that you served in federal

20   prison in Georgia with that "altogether"?

21   A.    That's right.

22   Q.    And you served time in federal prison because you pled

23   guilty to a property crime offense in the District of

24   Columbia, right?

25   A.    That's right.

1    Q.   Mr. Zelaya Repalo, did you commit these crimes to get

2    money to support a drug habit?

3    A.   That's right, sir.

4    Q.   And is it correct that, in 2010, you had a pretty serious

5    problem with cocaine and marijuana abuse?

6    A.   That's right, sir.

7    Q.   Now, regarding your deportation status, you said that

8    you're currently pending deportation.  Have you previously

9    been deported from the United States?

10   A.   Yes, I have deportation before.

11   Q.   Can you tell us how many times you have come into the

12   United States without authority?

13   A.   Four times, sir.

14   Q.   And what's your desire right now with regard to staying

15   in the United States or leaving?

16   A.   I don't have any wish to stay here.  I want to leave.

17   Q.   And do you still have family in Honduras?

18   A.   Yes, sir.

19   Q.   And is it your desire to return to your family?

20   A.   Of course, sir.

21   Q.   Mr. Zelaya Repalo, you admitted to crimes in the District

22   of Columbia and Virginia.  You were also charged with an

23   offense in Maryland that occurred on February 17th of 2010; is

24   that correct?

25   A.   That's right, sir.

1    Q.   Sir, do you remember being charged for essentially trying

2    to rob a location in Annapolis, Maryland?

3    A.   That's right.

4    Q.   And were you detained or were you put in jail for several

5    months before that case was resolved?

6    A.   That's right.

7    Q.   Do you remember the location where you went to commit

8    this robbery?

9    A.   Yes, I do remember.

10   Q.   And can you tell the jury, please, what that location

11   was.

12   A.   It was an apartment.  A brothel, sir.

13   Q.   Mr. Zelaya Repalo, did you know that it was a brothel?

14   A.   Yes, sir.

15   Q.   And how is it that you knew it was a brothel?

16   A.   I worked for the owner, sir.

17   Q.   And who was the owner, Mr. Zelaya Repalo?

18   A.   The man that's sitting over there.

19   Q.   And is this the man sitting -- the second man from the

20   right end of the table that you're referring to?

21   A.   That's right, sir.

22   Q.   Did you know that man by a name, Mr. Zelaya Repalo?

23   A.   Just by Chalo, sir.

24   Q.   Chalo.  Thank you.

25        Mr. Zelaya Repalo, I'm putting up on this screen, if

 1    you want to look there to your right -- do you see Government

 2    Exhibit 14h/1?

 3    A.    Yes.

 4    Q.    Do you recognize that as the location that you robbed on

 5    February 17th of 2010?

 6    A.    Yes, that's right.

 7    Q.    Now, Mr. Zelaya Repalo, you said that you had been

 8    employed by the guy that operated that brothel.  Chalo, you

 9    identified him.

10    A.    Yes.  I had worked for him before.

11    Q.    And, to be clear, do you see another gentleman seated at

12    the Defense table two people away from Chalo wearing a blue

13    striped shirt?

14    A.    Uh-huh, yes.

15    Q.    Do you know him, Mr. Zelaya Repalo?

16    A.    No, sir, I don't know him.

17    Q.    I want to talk to you about when you first met the man

18    you called Chalo.  Do you remember when that was?

19    A.    In December of 2009.

20    Q.    Where was it you met him?

21    A.    In Washington, sir.

22    Q.    Do you remember what day of the week it was?

23    A.    No, not at all.  I don't remember at all.

24    Q.    Do you remember the specific location you met him?

25    A.    It was a gas station.

Direct Examination of Maximilliano Zelaya Repalo

T-III-552

```
 1    Q.   And why were you at the gas station?

 2    A.   I was there looking for work, sir.

 3    Q.   Any particular kind of work?

 4    A.   Whatever.  It didn't matter.

 5    Q.   You did have a skill as a painter; did you not?

 6    A.   That's what I know how to do, yes.

 7    Q.   And did you approach Chalo, or did he approach you?

 8    A.   I went up to him.

 9    Q.   Is there any reason why you went up to him looking for a

10    job?

11    A.   He was in a van.  It looked like a working van.

12    Q.   Did you tell him you were looking for a job?

13    A.   That's right.

14    Q.   Did he offer you a job?

15    A.   That's right.

16    Q.   Did he tell you what kind of work you would do?

17    A.   Painting at that time.

18    Q.   Now, did you go with Chalo the day you met him in

19    Washington, D.C.?

20    A.   Yes, that's right.

21    Q.   And where did you go with him?

22    A.   To Annapolis.

23    Q.   Mr. Zelaya Repalo, had you ever been to Annapolis?

24    A.   No, I had never been there.

25    Q.   And were you going to go work just for that day?
```

1    A.   To do whatever.  I didn't know what was going to happen.

2    Q.   I'm sorry.  My question wasn't very good.

3              When you went with him, did you expect that you

4    would be going back to Washington, D.C. at the end of the day?

5    A.   No, I didn't know.

6    Q.   And did you have any personal property -- baggage, or

7    clothing, or anything that you got before you went with Chalo?

8    A.   I didn't have anything, sir.  I had just arrived from my

9    country, and I didn't have anything.

10   Q.   So you had only arrived in the United States, I guess for

11   maybe the fourth time, shortly before you met Chalo in

12   December 2009?

13   A.   That's right.

14   Q.   Did you talk with Chalo about living somewhere in

15   Annapolis?

16   A.   Yes.  He talked to me about staying at the apartment

17   there.

18   Q.   And was that while you were still in Washington, D.C.

19   that he talked to you about staying in his apartment?

20   A.   No.  We were already there, sir.

21   Q.   So did there come a time when you learned that he

22   expected you to do some kind of work other than painting?

23   A.   It was that very same night, sir.

24   Q.   Was it while you were still in Washington, or was it when

25   you got to Annapolis?

1    A.    No, we were already in Annapolis.

2    Q.    What was it that you learned that Chalo expected you to

3    do?

4    A.    Just to distribute cards, sir.

5    Q.    And did you know what kind of cards it was that he had

6    intended for you distribute?

7    A.    Something like that, sir.

8    Q.    What I'm looking -- what I'm asking you is:  When you say

9    "cards," were these business cards of some sort?

10   A.    Yes, they were business cards, sir.

11   Q.    And I'm going to show you now -- I'm going to put up on

12   the screen, if you'll look -- this is Government Exhibit 14k.

13   Do you see these cards?

14   A.    Yes, I see them, sir.

15   Q.    Are these the kinds of cards you were expected to

16   distribute, Mr. Zelaya Repalo?

17   A.    That's right.

18   Q.    Now, if you'll look at this card, there is no real

19   business identified on that card, right?

20   A.    Yes, of course.

21   Q.    Did Chalo tell you what these business cards were for?

22   A.    Yes, sir, that's right.

23   Q.    And what were they for?

24   A.    It was for prostitution.

25   Q.    And, when you gave the business -- well, first of all,

1    did he tell you to whom you were supposed to give those cards?

2    A.   That's only done between the Latin people, sir.

3    Q.   Where was it you would go to distribute business cards?

4    A.   To the Latin shops.

5    Q.   And was this in the Annapolis, Maryland area?

6    A.   That's right.

7    Q.   And, from your earlier statement, I assume you weren't

8    familiar with Annapolis at that time?

9    A.   No, I didn't know it.

10   Q.   How did you know where to go to pass out the cards?

11   A.   It was the stores that were nearby.  If not, somebody

12   would move me to some other place.

13   Q.   Did Chalo ever move you to a place he wanted you to

14   distribute cards?

15   A.   Yes.  Him or someone else.

16   Q.   Mr. Zelaya Repalo, do you know the name or did you know a

17   name used by one of the other people that worked for Chalo?

18   A.   I only knew him as Colmillo, sir.

19   Q.   Actually, Mr. Zelaya Repalo, before asking you about

20   Colmillo, do you know the man you're identifying as Chalo by

21   any other name?  In other words, do you know his proper name?

22   A.   No, sir, not at all.

23   Q.   Okay.  We'll refer to him as Chalo.

24        Did you know him by any other nicknames?

25   A.   Just by Chino.  That's all.

1    Q.   I'm putting up on the viewer now Government

2    Exhibit 16a/1.  Do you recognize that person?

3    A.   Yes, I do recognize him, sir.

4    Q.   And did he have a name?

5    A.   That's Colmillo, sir.

6    Q.   Mr. Zelaya Repalo, approximately how long did you work

7    for Chalo?

8    A.   For about a month, sir.

9    Q.   And did you ever discuss with him how much you would get

10   paid for the work you did for him?

11   A.   Yeah.  Depending on how things were, 300, $400.

12   Q.   And, other than passing out business cards, were you

13   expected to do any other kind of work for Chalo?

14   A.   No.  Sometimes just to bring food or things that really

15   didn't make a lot of sense, sir.

16   Q.   Now, to go back to the question about how much you got

17   paid, when you said 300 or $400, for what period of work would

18   that be?

19   A.   By the week, sir.

20   Q.   And did Chalo pay you for the four weeks of work you did

21   for him?

22   A.   He never paid me, sir.

23   Q.   Did he ever give you any money?

24   A.   Maybe some $50.

25   Q.   Is that why you went to rob the brothel on February 17th?

```
1    A.   That's right, sir.

2    Q.   Mr. Zelaya Repalo, did Chalo give you the business cards

3    you were supposed to distribute?

4    A.   Sometimes him, or sometimes Colmillo.

5    Q.   I'm going to show you some other business cards.  These

6    are Government Exhibit 3e.  I'm going to put them up.  They're

7    a little harder to see, but these have more writing on them.

8    A.   That's right.

9    Q.   Were you ever asked to distribute business cards that

10   looked more like these than the first ones I showed you?

11   A.   They make them in all different styles and types, sir.

12   Q.   When you were working for Mister, or for Chalo, where

13   were you living?

14   A.   In his apartment, sir.

15   Q.   Now, was this an apartment where he also lived?

16   A.   No, sir.

17   Q.   Is this like the apartment where you ultimately went to

18   rob, at ████████?

19   A.   That's right, sir.

20   Q.   And, while you were living there, was it being operated

21   as a brothel?

22   A.   That's right, sir.

23   Q.   During the day, is that when you would be out, handing

24   out these business cards?

25   A.   That's right.
```

1    Q.   Did you come back to the brothel at times when there were

2    men there to have sex with the women?

3    A.   That's right.

4    Q.   And were you able to see how the brothel operated?

5    A.   Very easily.  You just would pay, and then you would

6    choose who you were going to be with, and that's it.

7    Q.   When you were at the brothel, did you ever see Chalo come

8    to the brothel?

9    A.   That's right, sir.

10   Q.   Was there any particular time that he would come to the

11   brothel?  By that, I mean, a day of the week, or a particular

12   time of the day.

13   A.   He would come on Sundays.

14   Q.   Were there any other days that you recall having seen him

15   at the brothel?

16   A.   Also on Wednesdays.

17   Q.   Did you ever see Chalo take or give money to Colmillo or

18   any of the other men who were at the brothel?

19   A.   Yes, sir.

20   Q.   Do you remember where the money would be -- where it

21   would be in the brothel?

22   A.   No, sir, no.

23   Q.   Did you ever handle money yourself?

24   A.   No, sir, not at all.

25   Q.   You described the operation of the brothel as fairly

1    simple:  The men would come and pay money and have sex with

2    the women; is that right?

3    A.    Uh-huh, that's right.

4    Q.    Mr. Zelaya Repalo, did you see them keep track of how

5    many men would have sex with one -- with a woman?

6    A.    It's easy.  They just give them a ticket.  That's it.

7    Q.    And what would they use to -- as a ticket?

8    A.    Anything, sir.  Anything.

9    Q.    And would the women collect tickets from the men?

10   A.    That's right.

11   Q.    And then what would the women do with the ticket?

12   A.    They would turn them in at the end of the week, sir.

13   Q.    Did you ever see Colmillo or Chalo or any of the other

14   men making any kind of record, writing things down in any

15   books or notebook?

16   A.    I really didn't pay attention to that, sir.

17   Q.    Okay.  You weren't responsible, then, for --

18          **MR. CUNNINGHAM:**  I'll wait until the translators --

19   are you ready?

20          **INTERPRETER KIRCHGESSNER:**  Yes.

21   **BY MR. CUNNINGHAM:**

22   Q.    So, Mr. Zelaya Repalo, you weren't responsible, then, for

23   any of the money or the accounting?

24   A.    No, not at all, sir.

25   Q.    You said that sometimes you might be sent to get food.

1    Were you asked to purchase anything else for the brothel

2    operation?

3    A.    Perhaps condoms.

4    Q.    And were you given money so that you could purchase these

5    things?

6    A.    The women paid.

7    Q.    Would they give you the money, or would one of the men

8    give you money?

9    A.    They did.

10   Q.    Did you keep track of how much you spent when you

11   purchased condoms?

12   A.    No, sir, not at all.

13   Q.    Do you know how much the men had to pay for sex?

14   A.    Cheap, sir.

15   Q.    Do you know what the price was?

16   A.    30 pesos, sir.

17   Q.    Was it people were using pesos, or were they using

18   American currency?

19   A.    Dollars, sir.

20   Q.    So it was $30?

21   A.    $30, yes.

22   Q.    And was that for a particular period of time with one of

23   the women?

24              **INTERPRETER KIRCHGESSNER:**  Interpreter requesting --

25              **THE WITNESS:**  Whatever the guy could put out with.

1    **BY MR. CUNNINGHAM:**

2    Q.   Was there a maximum limit to the amount of time a man

3    could spend with one of the women?

4    A.   Perhaps 15 minutes.

5    Q.   Do you know if, while you worked for Chalo, he operated

6    any other brothels in Annapolis?

7    A.   Not in Annapolis, sir.

8    Q.   Did you learn that he operated a brothel in some other

9    location?

10   A.   That's right, sir.

11   Q.   Where was that?

12   A.   In New Hampshire, and also Easton.

13   Q.   And, New Hampshire, was that in the District of Columbia?

14   A.   It's -- it's on the border, sir.

15   Q.   And the border between D.C. and Maryland?

16   A.   Yes, that's right.

17   Q.   Now, the brothel in Easton, how did you know he operated

18   a brothel in Easton?

19   A.   I went there once or twice, sir.

20   Q.   And how did you get there?

21   A.   I was taken there.

22   Q.   Do you remember who took you there?

23   A.   The man that's sitting there, and once also Colmillo.

24   Q.   "The man" being the guy you call Chalo?

25   A.   That's right, sir.

1    Q.   And, when you went to Easton, did you work for him there?

2    A.   We were just visiting.

3    Q.   So you didn't hand out any business cards in Easton?

4    A.   We just were visiting.

5    Q.   Did you see any women when you went to this place in

6    Easton?

7    A.   Yes, sir.

8    Q.   So did he say it was a brothel, that he was working women

9    there?

10   A.   That was logical, sir.  I'm sorry, but --

11        **MR. RUTER:**  Your Honor, I have to object, then, to

12   the characterization that the brothel belonged to Mr. Ventura

13   given his testimony.

14        **THE COURT:**  Okay.  I understand the objection.

15   Overruled.

16   **BY MR. CUNNINGHAM:**

17   Q.   Mr. Zelaya Repalo, when you worked for Chalo, did you

18   ever drive a car?

19   A.   No, not at all, sir.

20   Q.   Did you ever get in a car with Colmillo or Chalo or

21   anyone else to pick up women?

22   A.   No, not to pick up women, sir.

23   Q.   And did you know that -- did you notice, during the four

24   weeks that you worked for him, that the women came in on

25   Monday and stayed through the following Sunday?

1          **MR. RUTER:**  Objection.

2          **THE COURT:**  Yes.  That -- don't testify.  Sustained.

3          **MR. CUNNINGHAM:**  Let me rephrase.

4    **BY MR. CUNNINGHAM:**

5    Q.   Mr. Zelaya Repalo, during your four weeks of working for

6    Chalo, were you able to observe when the women came to the

7    brothels?

8    A.   It was on Monday, sir.

9    Q.   And how long would they stay?

10   A.   They left on Sunday.

11   Q.   Do you know why they only stayed for one week?

12   A.   To tell you the truth, no, sir.

13   Q.   Do you know where the women came from?

14   A.   From different places.  I don't know exactly where from.

15   Q.   Did you ever see any of the women drive their own car to

16   get to the brothel?

17   A.   No, sir.

18   Q.   The places the women came from, were these other than in

19   Maryland?

20   A.   They could come from Virginia, D.C., or -- I don't

21   know -- New York.

22   Q.   And do you know how they got to the Annapolis, Maryland

23   location?

24   A.   No.  I don't know how, sir.

25   Q.   Mr. Zelaya Repalo, the night that you went to ████████ to

1    rob the place, you went there to get money, right?

2    A.    That's right, sir.

3    Q.    Do you remember if it looked like it looked when you

4    worked there?

5    A.    Yes.  It was the same.

6    Q.    Let me show you just a few pictures.  This is Government

7    Exhibit 14h/5.  This is one area of ████.  Does that look

8    similar to when you worked there?

9    A.    That's right, sir.

10   Q.    And do you know either of the two people who are in this

11   picture?

12   A.    Yes, sir.

13   Q.    Who are those people?

14   A.    I know only one of them.

15   Q.    Which one?

16   A.    The one on this side.

17   Q.    I'm sorry.  If you tap on the screen, sir, you may be

18   able to identify which one.  Is it this person?

19   A.    Yes.  That's the same one.

20   Q.    And did you know her by a particular name?

21   A.    No, not at all.

22   Q.    Okay.  And she worked there at the brothel during the

23   time you worked for Chalo?

24   A.    That is right, sir.

25   Q.    I'm just going to show you a few more pictures.  This is

1    Government 14h/6.  Is this the way one of the rooms looked

2    while you worked there?

3    A.   That's right, sir.

4    Q.   And this is another picture of a different room,

5    Government 14h/11.  Do you remember seeing things like a sheet

6    or some sort of covering over the window when you worked

7    there?

8    A.   Yes, that's right, sir.

9    Q.   Do you know why they would use a sheet like that to cover

10   up the window?

11   A.   No.  To tell you the truth, no.

12   Q.   This is Government Exhibit 14h/10.  Do you recognize

13   that, Mr. Zelaya Repalo?

14   A.   That's a lamp, right?

15   Q.   Well, I don't know if you -- if you know.  Did you ever

16   see them put eggs in a glass or in a dish in a corner of a

17   room while you were working in the brothel?

18            (Laughter.)

19            **MR. CUNNINGHAM:**  Apparently there is something

20   funny.

21            **THE WITNESS:**  My body was a witch.

22            **MR. CUNNINGHAM:**  I'm sorry?

23            **INTERPRETER KIRCHGESSNER:**  "My body was a witch."

24   **BY MR. CUNNINGHAM:**

25   Q.   What's that mean?

1    A.   Chino.

2    Q.   Why -- I don't understand why they would put the eggs

3    there.

4    A.   Neither do I, sir.

5    Q.   I'm going to show you Government 14h/7.  Did you ever see

6    anything like that while you worked at ██████?

7    A.   That is right, sir.

8    Q.   What is that?

9    A.   The death.

10   Q.   Do you know what that statue is about, Mr. Zelaya Repalo?

11   A.   No.  To tell you the truth, no, sir.

12   Q.   When you worked for Chalo, did you have a telephone?

13   A.   That's right, sir.

14   Q.   Was that your own telephone, or did he give you one?

15   A.   No, he gave it to me.

16   Q.   Now, you remember, the night that you robbed ████████,

17   there were a whole lot of telephones that were taken and

18   seized?  Do you remember that?

19   A.   Yes, sir.

20   Q.   And you were actually caught by the police that night?

21   A.   That's right.

22            **MR. CUNNINGHAM:**  Your Honor, may I approach?

23            **THE COURT:**  Yes.

24   **BY MR. CUNNINGHAM:**

25   Q.   Mr. Zelaya Repalo, I'm going to hand you a bag here that

 1    has four cell phones in it that are marked Government's

 2    Exhibits 14e/1, e/2, e/3, and e/4.  Do you recognize these

 3    phones as ones that were -- that you and the other guys you

 4    were with on February 17th took from the apartment?

 5    A.    I recognize mine.

 6    Q.    Which one is yours?

 7    A.    This one, the black one.

 8    Q.    Is it this one?

 9    A.    Yes, that's right.

10    Q.    Let me put it up on the screen so we can see.  You

11    pointed to this black one?

12    A.    That's right, sir.

13    Q.    Now, was that the phone that you had -- did you keep it

14    after you stopped working for Chalo?

15    A.    No, sir.  I bought that when I stopped working for him.

16    Q.    And, after you stopped working for him, did you try to

17    call him?

18    A.    No, not at all, sir.

19    Q.    Did you actually have a number where, if you had wanted

20    to, you could have tried to contact him?

21    A.    No, sir.

22    Q.    During the period that you worked for Chalo, did he have

23    a telephone number where he could contact you if he had

24    wanted?

25    A.    That's right, sir.

1    Q.   And was that on a telephone that he gave you while you

2    were working for him?

3    A.   That's right, sir.

4    Q.   And you left that phone behind when you stopped working

5    for him?

6    A.   That's right.

7    Q.   And, before you stopped working for him, did you ask him

8    for money that he owed you for the first several weeks you

9    worked for him?

10   A.   I had done it in between the weeks.

11   Q.   And what would he say to you when you asked him for your

12   pay?

13   A.   These guys like -- like a lady.

14   Q.   What do you mean by that?

15   A.   He talks more than a woman.

16        **MR. RUTER:**  Could you repeat?  I didn't hear, Your

17   Honor.

18        **INTERPRETER KIRCHGESSNER:**  Interpreter will repeat:

19   "He talks more than a woman."

20        **MR. RUTER:**  Okay.

21   **BY MR. CUNNINGHAM:**

22   Q.   But would he pay you?

23   A.   No, sir.

24   Q.   Why did you stop working for him?

25   A.   Because I was not going to work for free and then have to

 1      deal with the police too.

 2      Q.   Did something happen that made you feel like the police

 3      might get involved?

 4      A.   Of course, sir.  We were doing something illegal.  It's

 5      logical.

 6      Q.   Did you ever talk with Chalo about other people who were

 7      operating or working prostitution?

 8      A.   Well, it must have been him that talked, because I had

 9      nothing to say.

10      Q.   Well, did he ever say anything to you about other people

11      who were running prostitutes or operating brothels?

12      A.   Yes, sir.

13      Q.   And what was that?  What was it that you heard him say or

14      that he said to you?

15      A.   They were talking about a Dominican.

16      Q.   And, when you say "they," who are you referring to?

17      A.   Also Colmillo, sir.

18      Q.   So Colmillo and Chalo were talking about the Dominican.

19      From the conversation, could you tell what the Dominican did?

20      A.   That's right, sir.

21      Q.   And what was it that the Dominican did?

22      A.   He also worked with prostitution.

23      Q.   And did you hear Chalo say that he wanted to do anything

24      about or to the Dominican?

25               **MR. RUTER:**  Objection.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  That's right, sir.

 3    BY MR. CUNNINGHAM:

 4    Q.   And what was it that he said?

 5    A.   They wanted to kill him, sir.

 6    Q.   Was he saying this to Colmillo, or did he say it to you

 7    as well?

 8    A.   He said that several times, sir.

 9    Q.   Did you ever hear -- well, first of all, did you ever

10    meet a person who was identified as the Dominican?

11    A.   No.  I never met him, sir.

12    Q.   And were you ever with Chalo or Colmillo when they were

13    trying to find the Dominican?

14    A.   That's right, sir.

15    Q.   And I want you to tell us about that -- about -- about

16    when was it, in relation to when you started to work for

17    Chalo, that you went with him to look for the Dominican?

18    A.   It was soon from the first day.  They had a call or

19    something like that.

20    Q.   And I take it, because you never met him, that you guys

21    didn't find the Dominican that day?

22    A.   Of course we didn't find him.

23    Q.   Now, did you ever hear of any kind of conversation

24    between Chalo and the Dominican?

25    A.   It was the same day, sir.
```

Direct Examination of Maximilliano Zelaya Repalo

1    Q.    And how was it you were able to hear the conversation?

2    A.    They were talking in a loud voice.

3    Q.    Were they talking face to face?

4    A.    No, sir.  On the phone.

5    Q.    And, if they were talking on the telephone, were you able

6    to hear both parties?

7    A.    That's right, sir.

8    Q.    And how was that if it was on a telephone?

9    A.    Sir, they were speaking on the speaker.  You understand

10   speaker?

11   Q.    Okay.  And did you hear what Chalo said to the Dominican?

12   A.    I wasn't -- I was rarely paying attention, sir, but, yes,

13   I did hear some words.

14   Q.    And what were some of the words that you heard?

15   A.    They were threatening each other, sir.

16   Q.    What kind of threats did you hear them make to each

17   other?

18   A.    Insults and threats to -- death threats.

19   Q.    During the conversation you overheard or any conversation

20   you had with Chalo, did you ever hear him say he had done

21   anything to another man working in prostitution?

22                **MR. RUTER:**  Objection.

23                **THE COURT:**  Overruled.

24                **THE WITNESS:**  Well, I feel bad to say, but yes, sir.

25   **BY MR. CUNNINGHAM:**

1   Q.   And, Mr. Zelaya Repalo, what was it that you heard him

2   say?

3   A.   They spoke about that they killed another person before,

4   something along those lines.

5   Q.   Now, sir, when you were with Chalo, did you ever see him

6   have a gun?

7   A.   That's right, sir.

8   Q.   And when was it that you saw him have a gun?

9   A.   I saw it on him several times.

10          **INTERPRETER WESLEY:**  I'm sorry.  The interpreter

11   corrects himself:  I saw it several times.

12   **BY MR. CUNNINGHAM:**

13   Q.   And, specifically, was he in a vehicle, in a car, in the

14   brothel?  Where was it that you would see him with the gun?

15   A.   I saw it in the car.  I saw it in the brothel.  I saw it

16   several times, sir.

17   Q.   And, Mr. Zelaya Repalo, I'm going to show you -- when you

18   were driving around looking for the Dominican, did you see him

19   have a gun that night?

20   A.   That's right, sir.

21   Q.   Can you describe the gun you saw?

22   A.   It was a pistol, a semi-automatic, sir.

23   Q.   Do you remember the color of it?

24   A.   No, I do not remember the color.

25   Q.   I'm going to show you Government Exhibit 15c/5.  Sir, do

1    you see a gun in the top of that particular image?

2    A.   Yes, I see it, sir.

3    Q.   I'm going to show you another picture.  This one's not so

4    clear, but Government 15c/6.  Do you see that gun?

5    A.   That's right, sir.

6    Q.   Did the gun that you saw in Chalo's possession look

7    similar to that gun?

8    A.   Yes.  It was a semi-automatic.

9    Q.   Did it appear similar in color to the gun in that

10   picture?

11   A.   Yes, sir.

12   Q.   Now, I'm actually just holding up Government Exhibit 27s,

13   and do you recognize this, Mr. Zelaya Repalo?

14   A.   It's a muerta, sir.

15   Q.   It's another one of the Santa Muerte statues with the

16   wings broken off?

17   A.   Uh-huh.

18   Q.   Did you ever see this statue during the time that you

19   worked for Chalo?

20   A.   That's right, sir.

21            **THE COURT:**  Is that --

22   Q.   Did you see that one?

23            **MR. CUNNINGHAM:**  I'm sorry?

24            **THE COURT:**  What was the exhibit number for that

25   one?

 1              **MR. CUNNINGHAM:**  27s.

 2              **THE COURT:**  Not "t"?

 3              **MR. CUNNINGHAM:**  No, sir.

 4              **THE COURT:**  Okay.

 5              **MS. YASSER:**  It is "t."

 6              **MR. CUNNINGHAM:**  Oh, I apologize, Your Honor.  I've

 7    just been corrected.  Apparently I mismarked it on here, but

 8    we've identified it as 27t, and I'll correct it.

 9    **BY MR. CUNNINGHAM:**

10    Q.    Mr. Zelaya Repalo, after the robbery at ▆▆▆▆▆▆ in

11    February of 2010, did you have any other contact with Chalo?

12    A.    No.  No, sir.  From when I left, I had no contact.

13    Q.    And apparently you had had no contact with Mr. -- or with

14    the other individual that you pointed to in the blue shirt?

15    A.    No, sir.

16    Q.    Did you have any contact with them prior to your

17    testimony today?

18    A.    No, sir.

19    Q.    Okay.  How about did you have any while you were

20    waiting --

21    A.    You mean right now?

22    Q.    Yes, right now.

23    A.    Yes, sir.

24    Q.    Actually, let me ask you to go back to one particular

25    point.  I'm not sure if it was clear.  When you were with

1    Chalo driving around looking for the Dominican, did he have a

2    gun at that time?

3    A.   Yes, sir.

4    Q.   So I was asking you if you had any contact, particularly

5    today, with Chalo or the other man.

6              **MR. RUTER:**   Objection.  May we approach, Your Honor?

7              **THE COURT:**   Come up.

8              (Whereupon, the following discussion occurred at the

9    bench.)

10             **THE COURT:**   Is there an interpreter who can hear the

11   conference?  Is there an interpreter who can hear the

12   conference?  Can you hear the conference, Ms. Kirchgessner?

13             **INTERPRETER KIRCHGESSNER:**   Yes, Your Honor.  Now I

14   can.

15             **THE COURT:**   Thank you.

16             Yes?

17             **MR. RUTER:**   Your Honor, I ask the Court for an offer

18   of proof.  I have no idea what contact --

19             **MR. CUNNINGHAM:**   Your Honor, we were told by the

20   Marshals that, while they were doing their best to maintain

21   segregation between this witness and the two defendants, there

22   was a period of time immediately prior to his testimony when

23   they had removed the Defendants to the -- I don't know what

24   you call that area right off your courtroom.

25             **THE COURT:**   The holding cell?

1          **MR. CUNNINGHAM:**  The holding cell area, and

2    apparently they moved Mr. Zelaya Repalo into the -- I guess

3    the lobby area or the entrance area of the adjacent courtroom.

4    Notwithstanding that, it's their understanding that the

5    parties -- the three parties were close enough that -- it's my

6    understanding that Mr. Montemarano's client, Mr. Fuertes, had

7    said something in Spanish that the Marshals thought might have

8    been a threat of sorts, and, according to his attorney,

9    Mr. Zelaya Repalo's attorney, it was words to the effect of

10   "snitch," or what I would interpret as some kind of an attempt

11   to intimidate the witness.

12          **MR. RUTER:**  That was my --

13          **THE COURT:**  Not your dog, I understand.

14          **MR. RUTER:**  Well, Your Honor, if I could -- he is a

15   snitch.  That doesn't mean --

16          **MR. CUNNINGHAM:**  What a --

17          **THE COURT:**  We're in Baltimore apparently.

18          **MR. RUTER:**  That doesn't mean that anybody is being

19   intimidated, anybody is being threatened, anybody is being

20   harmed, but we all know that, when someone testifies or

21   cooperates, it is, in fact -- it is, in fact, a colloquialism

22   that that person is a snitch.

23          **THE COURT:**  The witness wants to speak to Mr. Nieto,

24   which I am permitting.

25          **MR. RUTER:**  But you may go farther --

1          **THE COURT:**  Anyway -- yes, Mr. Montemarano?

2          **MR. MONTEMARANO:**  Well, now, here at the bench, it's

3     revealed to me that my client's running his mouth.  I had no

4     understanding that it was my client, since he's been so well

5     behaved and benign.

6          **THE COURT:**  I can understand your automatically

7     assuming it was Mr. Ruter's client.

8          **MR. MONTEMARANO:**  Of course.

9          **MR. CUNNINGHAM:**  Your client is a murderer.  I don't

10    know why you would assume that.

11         **THE COURT:**  But a quiet one apparently.

12         **MR. MONTEMARANO:**  So I'm a little verklempt that I'm

13    not told of this before we were asking questions about this,

14    so, to that extent, I'm a little troubled.  I think, at very

15    least, there should be some sort of out of -- I was going to

16    say "*in camera*."  Not *in camera*, but some sort of hearing

17    outside the presence of the jury so we can establish what it

18    is that the Government is actually trying to get in.  I

19    mean --

20         **MR. CUNNINGHAM:**  Can I give you a little backdrop to

21    this, Your Honor?  Of course this is the witness who was

22    deposed two weeks ago today --

23         **THE COURT:**  Right.

24         **MR. CUNNINGHAM:**  -- and perhaps it's my editorial

25    observation, but I think it was pretty clear he was fairly

1    intimidated.  I can represent to the Court that the difference

2    between his accounts during the preparation of his testimony

3    and the deposition were remarkably in stark contrast, and he

4    acknowledged a great fear of -- particularly of Defendant

5    Ventura.  In cross-examination, there were a lot of questions

6    about his family back in Honduras, and he said he felt a great

7    deal of fear for his children -- not for himself, but for his

8    children.  So I think, to the extent that, you know, there had

9    been -- and of course it wasn't on the camera, but there was a

10   whole lot of gestures and facial -- by Mr. Ventura during the

11   deposition.

12        **THE COURT:**  I'll tell you what.  Why don't you all

13   amble over there, put the question to him, and see what his

14   answer will be.

15        **MR. CUNNINGHAM:**  Yes, Your Honor.

16        **THE COURT:**  Keep the husher going.

17        (Counsel conferring with the Witness.)

18        (Whereupon, the following conference was held at the

19   bench.)

20        **MR. CUNNINGHAM:**  Mr. Zelaya Repalo's account is

21   that, when they were back in the holding cell area,

22   Mr. Fuertes insulted him and accused -- words of the

23   translator, "made threats."  When we inquired of that, he said

24   that he told the Black men who were in the other -- Black men

25   who were in the holding cell that he was a snitch.

 1              **THE COURT:**  Okay.  Is that an objection?

 2              **MR. MONTEMARANO:**  Absolutely.

 3              **THE COURT:**  Sustained, mostly because it's not worth

 4      the effort to get it in.

 5              (Whereupon, the bench conference was concluded.)

 6  **BY MR. CUNNINGHAM:**

 7  Q.   Mr. Zelaya Repalo, during the break, the gentleman seated

 8      right back here approached you.  Is he your lawyer?

 9  A.   He's my attorney, yes.

10  Q.   And you asked to speak with him, and you were given an

11      opportunity to do so?

12  A.   That's right, sir.

13              **MR. CUNNINGHAM:**  Thank you.

14              No further questions, Your Honor.

15              **THE COURT:**  Cross?

16              **MR. RUTER:**  Thank you, Your Honor.

17                         **CROSS-EXAMINATION**

18  **BY MR. RUTER:**

19  Q.   Good afternoon, Mr. Repalo.

20  A.   Good afternoon, sir.

21  Q.   Mr. Repalo, we understand from your testimony that you

22      are back in this country for the fourth time illegally; is

23      that correct?

24  A.   That's right, sir.

25              **THE REPORTER:**  You might want to pull the mic down.

1    Q.   Can you recall today what year it was that you first

2    entered this country illegally?

3    A.   It was in 2003, sir.

4    Q.   And did you enter this country through Mexico?

5    A.   That's right, sir.

6    Q.   And did you bring any documents with you, or did you

7    sneak across the border?

8    A.   I just crossed the border, sir.

9    Q.   And how long were you in the country before you were

10   apprehended?

11   A.   No, sir.  I was caught coming in.

12   Q.   Okay.  And then they just turned you around, and you went

13   back immediately; is that correct?

14   A.   That's right, sir.

15   Q.   And what was the reason for your coming in 2003, sir?

16            **INTERPRETER KIRCHGESSNER:**  Your Honor?  Apologies,

17   Your Honor.  Interpreter needs to interrupt.  I am told by

18   Mr. Ventura that he can't hear the interpretation, but the

19   interpretation is being done from the stand of the questions

20   of the attorney, so he should be able to hear directly from

21   the stand, so I approached with another receiver, but that is

22   not the question.

23            **DEFENDANT VENTURA:**  No, this is working.  The point

24   is, when he talks into it, I want to hear what he's saying.  I

25   understand him, but maybe you don't understand.  I know what

1      she's saying, but we like to --

2              **DEFENDANT FUERTES:**  I hear what she's saying.  It's

3      no problem.

4              **THE COURT:**  Okay.

5              **INTERPRETER GOLDSTEIN:**  Your Honor, what I'm

6      hearing, Your Honor, is they are hearing the interpreters when

7      we speak in Spanish, and the interpretation of whatever

8      question is then in English.  The two Spanish-speaking

9      gentlemen can hear us speaking Spanish, so they hear the

10     question --

11             **THE COURT:**  That's all we need.

12             **INTERPRETER GOLDSTEIN:**  -- and then they hear the

13     answer.

14             **THE COURT:**  That's all we need.  Thank you.

15             **INTERPRETER GOLDSTEIN:**  Thank you, sir.

16             **THE COURT:**  Question?

17     **BY MR. RUTER:**

18     Q.   All right.  Mr. Repalo, the question, I think, proposed

19     is:  What was the reason for your coming into the country in

20     2003?

21     A.   I came to work, sir, and also I was fleeing from a gang.

22     Q.   When did you enter this country illegally for the second

23     time?  What year?

24     A.   I think it was between 2004 and 2005, sir.

25     Q.   In 2003, did you have a family which you had left behind,

1      or at least I should say that you attempted to leave behind?

2      A.   That's right, sir.

3      Q.   Did that include a wife and/or children?

4      A.   That's right, sir.

5      Q.   Okay.  And you're saying that you went back to your

6      country, and you were there for another year to a year and a

7      half before you made your second attempt; is that correct?

8      A.   That's right.

9      Q.   In the meantime, between your first attempt and your

10     second attempt, did you find any work in your country?

11     A.   Yes, sir.

12     Q.   So that would mean that you would have no need to reenter

13     the country since you had a job in your home country; is that

14     not true?

15     A.   Life was very difficult back there, sir, with the gangs.

16     They tried to kill me several times.

17     Q.   What gang -- you said gangs, plural?

18     A.   MS, sir.

19     Q.   Why were they trying to kill you, if you know?

20     A.   At that time, they would try to force young people to get

21     involved with them, and, if they didn't, they would kill you.

22     Q.   All right.  And was that the reason that you came in this

23     country illegally the second time?

24     A.   That's right, sir.

25     Q.   So it was not because of lack of work in your country; it

1    was because of the gangs threatening your life; is that

2    correct?

3    A.   That's right, sir.

4    Q.   Did the gangs threaten to kill your wife and children as

5    well?

6    A.   No, but my mom was raped and robbed.

7    Q.   Your mother was raped and robbed?

8    A.   That's right, sir.

9    Q.   And, Mr. Repalo, when you entered the country illegally

10   in 2005, how long were you in this country before you were

11   expelled a second time?

12   A.   Not at all, sir.  They grabbed me coming in.

13   Q.   Just like the first time?

14   A.   Yes, sir, that's right.

15   Q.   And, Mr. Repalo, did you then return back to the place

16   that you had just left; that is, your home where you were

17   living with your wife and your children?  Did you return back

18   to that same area?

19   A.   Not the second time, sir.  I had to go somewhere else.

20   Q.   So did you move yourself and your family?

21   A.   That's right, sir.

22   Q.   And is that still in your same country of Honduras?

23   A.   In Honduras.

24   Q.   Okay.  And when was it that you attempted to come in the

25   country illegally the third time?

1    A.   It was in 2006, sir.

2    Q.   Can you tell us, Mr. Repalo, approximately how many

3    months elapsed from the second attempt to enter this country

4    until the third attempt to enter the country?

5    A.   It was just a few months.  Just a few months.  That's

6    all.

7    Q.   Okay.  And can you tell us the reason for your leaving

8    your home town, your home country, and attempting to enter

9    illegally a third time?  What was the reason?

10   A.   The same reason: because they kept looking for me, and

11   there was a lot of problems there.

12   Q.   And do we understand, then, that you reentered the

13   country, the United States, a -- well, before I get there, how

14   long were you in this country when you entered in 2006 before

15   you were turned back?

16   A.   A year and a half, sir.

17   Q.   Okay.  And where did you spend -- so you were in this

18   country from 2006 until approximately when?

19   A.   Until about mid 2007.

20   Q.   And where did you live for that year and a half when you

21   were in this country?

22   A.   I lived in Newark, New Jersey, and also in North

23   Carolina.

24   Q.   And did you work while you were here -- let's take New

25   Jersey first.  Did you have a job while you were in New

Cross-Examination of Maximilliano Zelaya Repalo (Ruter)          T-III-585

```
 1      Jersey?

 2      A.   New Jersey was after North Carolina.  I actually lived in

 3      North Carolina first.

 4      Q.   Okay.  Let's talk about North Carolina.  Did you have a

 5      job while you lived in North Carolina?

 6      A.   Yes, that's right, sir.

 7      Q.   And was that a lawful job, sir?

 8      A.   It was legal, but it was business like on the street,

 9      selling different items.

10      Q.   Were you able to send money home while you were in North

11      Carolina?

12      A.   That's right, sir.

13      Q.   Did you send for your wife and children while you were in

14      North Carolina?

15      A.   No, sir.  I never had enough money.

16      Q.   And then you moved from North Carolina to New Jersey?

17      A.   Yes, because I had a problem in North Carolina.

18      Q.   And what problem was that?

19      A.   I was robbed, and I was shot at.

20      Q.   And did that cause you to move out of North Carolina?

21      A.   Yes, that's right, sir.

22      Q.   And did that lead you to New Jersey?

23      A.   That's right.

24      Q.   And did you have any gainful employment while you were in

25      New Jersey?
```

```
1    A.   I worked for approximately two months so I could gather

2    enough money to go back to my country.

3    Q.   And did that, in fact, happen?

4    A.   It did happen, yes, sir.

5    Q.   So did you return to your country the third time in mid

6    2007 voluntarily?

7    A.   That's right, sir.

8    Q.   Okay.  And then we understand that you reentered the

9    country a fourth time illegally; is that correct?

10   A.   That's right, sir.

11   Q.   And when, if you can recall, precisely did you reenter

12   the country a fourth time illegally?

13   A.   It was in 2009, but I don't know.  Maybe March 2009.

14   Q.   And, when you reentered in 2009, once again, did you come

15   across the border without papers?

16   A.   That's right, sir.

17   Q.   And, when you first entered in March of 2009, where did

18   you go to live?

19   A.   I came to Washington, sir.

20   Q.   And was that almost immediate?  If March 2009 is correct,

21   did you immediately move to Washington, D.C. in March of 2009?

22   A.   That's right, sir.

23   Q.   And did you obtain lawful employment when you came to

24   Washington, D.C. in March of 2009?

25   A.   There wasn't a lot of work, sir.
```

1    Q.   Now, we know, Mr. Repalo, that you had committed a

2    robbery on February 17th of 2010 at ▆▆▆▆▆▆, correct?

3    A.   That's right, sir.

4    Q.   Can you tell us:  How was it that you were able to live

5    without employment from March of 2009 -- and let's just go to

6    the end of the year.  From March of 2009 until December of

7    2009, how were you able to live?

8    A.   I was, for three months, in a drug treatment program.

9    Q.   Did you have to pay for that, sir?

10   A.   No, sir.

11   Q.   Were you ordered there by a Court, or did you just go to

12   some drug treatment program voluntarily?

13   A.   I went voluntarily.

14   Q.   Okay.  And what else did you do from March of 2009

15   through December of 2009?

16   A.   I work a few days in remodeling.  I shoveled snow.  I did

17   many things, sir.

18   Q.   Now, do we understand, Mr. Repalo, that you had spent

19   some time in custody in the Commonwealth of Virginia?

20   A.   That's right, sir.

21   Q.   And that's because, according to your testimony, you had

22   committed a -- you had stolen some property?

23   A.   That is right.

24   Q.   And do we understand the reason you stole the property

25   was to help support your drug habit?

1    A.    That's right, sir.

2    Q.    Can you tell us what property you stole, sir?

3    A.    I don't know, sir.  It was just a house.

4    Q.    Did you break into somebody's house?

5    A.    I went through the window.

6    Q.    You went through a window?  Did you see anybody at home

7    when you broke in the window?

8    A.    No, sir.  I made sure there was no one so as not to have

9    any problems.

10   Q.    Okay.  Did you remove anything from the home, Mr. Repalo,

11   when you left the home?

12   A.    Only a computer and a phone, sir.

13   Q.    A computer and a phone?

14   A.    That's right.

15   Q.    And did you sell those?

16   A.    I exchanged it for rocks, sir.

17   Q.    When you say "rocks," what kind of rocks are you talking

18   about?

19   A.    Crack.

20   Q.    Crack cocaine?

21   A.    Yeah.

22   Q.    Okay.  Do we also understand that you were convicted of a

23   property crime in Washington, D.C.?

24   A.    That's right, sir.

25   Q.    And what was it that you stole in Washington, D.C.?

1    A.   In Washington, I only went into the house, I took a

2    shower, I ate, and that was all.

3    Q.   You went into somebody's house?

4    A.   That's right, sir.

5    Q.   And you didn't -- you weren't invited?  Did you know who

6    lived there?

7    A.   No, sir, not at all.

8    Q.   All right.  You said on direct examination that you met

9    Chalo -- you've identified this gentleman here as Chalo,

10   correct, Mr. Repalo?  You've identified this man here as

11   Chalo, correct?

12   A.   That's right, sir.

13   Q.   And that was, you think, in very late 2009?

14   A.   That's right, sir.

15   Q.   And, if I understand it, you met him at a gas station,

16   and you walked up to him and asked if he had any work

17   available for you; is that correct?

18   A.   That is correct, sir.

19   Q.   Okay.  Had you done that prior to Chalo coming to the gas

20   station?  Had you been there before, Mr. Repalo, trying to

21   find work?

22   A.   Yes, sir, because they used to come by there.

23   Q.   Is it a fair statement to say that there are lots of

24   other people that come in that area in their cars or trucks

25   looking for what we might call a day laborer?

1    A.    Not there, sir, but, yes, I did look for work.

2    Q.    And, when you looked for work, did you go to like a gas

3    station or 7-Eleven, some store like that, where people might

4    congregate hoping to get a job by someone coming up to them?

5    A.    That's right, sir.

6    Q.    Okay.  And you approached Chaco, or Chalo, and you went

7    with him sometime in December of 2009; is that right?

8    A.    Chalo.  Chalo, yes.  That's right, sir.

9    Q.    Did you see in his van any kind of working material?

10   A.    You could see things related to painting, sir.

11   Q.    Okay.  Now, you told us that you then ended up going to

12   Annapolis on the same day.

13   A.    That is right, sir.

14   Q.    And that you were passing out business cards?

15   A.    That's right.

16   Q.    And when was it that you learned that these business

17   cards were associated with some kind of prostitution?

18   A.    That same evening.

19   Q.    The same day.  Okay.

20         Had you ever been involved in any capacity in the

21   prostitution business anywhere else?

22   A.    No, sir.

23   Q.    You spoke with investigators from time to time since

24   2010, haven't you, sir?

25   A.    Yes, sir.

1    Q.   And do you recall having a meeting with a Detective Lee,

2    Joe Hudson, and Detective Hartlove on February 18th of 2010?

3    A.   Yes, sir.

4    Q.   And do you recall that you gave a statement, and there is

5    a tape recording which was recording all of your words?

6    A.   That's right, sir.

7    Q.   Do you recall telling the investigators that you had

8    worked for Chalo for one week?

9    A.   That's right.  Correct.

10   Q.   And do you recall actually saying that to them at least

11   twice during your interview -- at least two times, that you'd

12   worked for Chalo for just one week?

13   A.   That is correct, sir.

14   Q.   Okay.  Now, today, we understand that you said you worked

15   for him for about four weeks.

16   A.   That is right, sir.

17   Q.   And so the question, Mr. Repalo, is:  Why is it that you

18   told investigators on February 18th of 2010 that you worked

19   there for one week, but now, today, you tell us it's four

20   weeks?

21   A.   The reason, sir, is they were unknown to me.  I did not

22   know what was going to happen -- what was happening.  I was

23   afraid.

24   Q.   When you say they were unknown to you, you're talking

25   about Detective Hartlove and Joe Hudson, the people that were

```
 1    speaking with you; is that your testimony?

 2    A.   That is true.

 3    Q.   Mr. Repalo, back in February of 2010, you were being

 4    questioned about prostitution; were you not?

 5    A.   Yes, sir.

 6    Q.   Okay.  Now, you were being held in custody on February

 7    the 18th of 2010, weren't you?

 8    A.   I was.

 9    Q.   Yes, sir.

10    A.   In custody.

11    Q.   And you were being held on four counts of armed robbery,

12    weren't you?

13    A.   That -- that's what the charge was, sir.

14    Q.   Yeah.  And you knew and believed that four counts of

15    armed robbery were a bigger problem for you than prostitution,

16    weren't you?

17    A.   I knew I had not used any weapons, and I had no reason

18    why I should be afraid of it.

19    Q.   Okay.  Well, you are aware, are you not, that there were

20    four victims in that apartment at ███████████, correct?

21    A.   I believe so, sir.

22    Q.   And you're aware, Mr. Repalo, that all four of them said

23    that either you or your two companions had a handgun when you

24    entered that apartment; isn't that right?

25    A.   That was a surprise to me, because that was not the case,
```

1    sir.

2    Q.   Okay.  And you're also aware that all four victims said

3    that either you or one of your companions had a long machete?

4    A.   That's what he had said, yes.

5    Q.   Yeah.  But you were more worried about handing out

6    business cards than you were robbing people at gunpoint and

7    with a machete?

8              **MR. CUNNINGHAM:**  Objection, Your Honor.

9              **THE COURT:**  Basis?

10             **MR. CUNNINGHAM:**  It's a mischaracterization.

11             **THE COURT:**  Okay.  Overruled.

12             **THE WITNESS:**  I was not distributing cards.  That

13   was something that had happened in the past, sir.

14   **BY MR. RUTER:**

15   Q.   Yeah.  Well, we know that there came a time when you

16   stopped distributing cards.  You've already told us that.

17   A.   That is right, sir.

18   Q.   And today, your testimony is, sir, that you did that for

19   about four weeks?

20   A.   That's right, sir.

21   Q.   All right.  So can you recall, Mr. Repalo, how much time

22   elapsed from the time that you stopped working and the day

23   that you decided to rob ███████████?

24   A.   A few weeks went by.

25   Q.   A few weeks.  And, during that few weeks of time, where

1    were you living?

2    A.   On the streets, sir.

3    Q.   On the streets.  Okay.

4         Do you know the two gentlemen that were with you who

5    helped rob ███████████████?

6    A.   I knew one of them, sir.

7    Q.   Okay.  And was it you who enlisted their help to come to

8    ██████████  and to rob these four people?

9    A.   I'm not going to lie, sir.  Yes, sir.

10   Q.   And what did you tell them you wanted them to do, sir?

11   A.   I told them that we should go visit the place.  I told

12   them the story of what had happened to me there and that I

13   wanted to go and get the money that was due to me.

14   Q.   Okay.  What was that story you told them, Mr. Repalo?

15   A.   That it was a brothel, that I had worked there, and I had

16   not gotten paid.

17   Q.   And?

18   A.   And we went there.

19   Q.   But you -- your theory was -- tell me if I've got it

20   wrong.  Your theory was you were owed money, and you were

21   going to go collect it?

22   A.   That is right.

23   Q.   Now, did you take any time, Mr. Repalo, to investigate

24   when you thought you should rob ██████████?  In other words,

25   day or night, Monday, Tuesday, Wednesday, things such as that,

1   before you actually did rob the place?

2   A.   Sir, I was there more or less a month, and I knew when I

3   could find some money there.

4   Q.   And when would that be?

5   A.   A Saturday, but I -- we went on a Wednesday, I believe --

6   Q.   Okay.

7   A.   -- sir.

8   Q.   Who did you believe -- Mr. Repalo, who did you believe

9   owned or was in charge of ███████████?

10  A.   Chino, sir.

11  Q.   Does that mean this man here?

12  A.   The same one, sir.

13  Q.   All right.  And this is the same man that you testified

14  to that you had seen with a gun before?

15  A.   That's right, sir.

16  Q.   This is a man that you had said to investigators on more

17  than one night had slept overnight at ███████████; is that

18  correct?

19  A.   That's correct, sir.

20  Q.   This is a man that you claim you overheard threatening

21  the Dominican with his life; is that not correct?

22  A.   That's correct, sir.

23  Q.   And, notwithstanding that, you decided to rob ███████

24  ██████?

25  A.   That's right, sir.

1   Q.   And it's your testimony that you robbed that place

2   without a single weapon?

3   A.   That's right, sir.

4   Q.   Would you agree with me, Mr. Repalo, that, based upon

5   what you've told us here today, that was a pretty bold thing

6   to do; was it not?

7   A.   Yes, sir, but we were three men, and I -- I was in my

8   right to do so.  I was getting what was mine, and they were

9   doing something illegal.

10  Q.   And, in fact, when you were intercepted by the police,

11  you were caught the same night, weren't you, sir?

12  A.   At the same -- at the same moment, sir.

13  Q.   Okay.  And, although you just told the jury one second

14  ago that you were within your right to go get your money, you

15  didn't tell the police that, did you?

16  A.   Sir, at that moment, it was dark, and I had to defend

17  myself.  They were pointing at me with a weapon.  I had to do

18  whatever in order to save my own skin.

19  Q.   And you would do whatever it takes to save your own skin,

20  wouldn't you, sir?

21  A.   Sir, whatever -- you have to do what you have to do.

22  Q.   Mr. Repalo, I also understand that you understood that

23  ██████████████ had actually been robbed not too long before

24  you entered upon the scene; is that correct?

25  A.   Yes, I knew that, sir.

1    Q.   And did you know who it was believed had robbed ███████

2    ██████ just prior to your robbing it?

3    A.   They were commenting that it had been the Dominican.

4    Q.   Did you understand the Dominican to be a dangerous

5    person?

6    A.   I only knew that he worked in prostitution, sir.  I don't

7    know if he was dangerous.

8    Q.   Part of what you did, Mr. Repalo, when you worked for a

9    short period of time in the prostitution business was you

10   would sometimes get the girls food, and I think you've

11   testified earlier you may also buy some condoms for them; is

12   that correct?

13   A.   That's right, sir.

14   Q.   Okay.  Did any of the girls ever go get any food for

15   themselves?

16   A.   They were not allowed, sir.

17   Q.   Were not allowed?

18   A.   No.

19   Q.   Did you ever have sex with any of the girls that you

20   worked with?

21   A.   Yes, sir.

22   Q.   And you had sex with one of the girls that was displayed

23   in that photograph, didn't you?

24   A.   No, sir.

25   Q.   No?  Which one did you have sex with?

```
 1    A.   With some previous to them, some that were -- they were

 2    changed prior to them.

 3    Q.   Did you pay them?

 4    A.   Sometimes some of them, and some of them, I won them

 5    over.

 6    Q.   So, when you won them over, that means they were your

 7    girlfriend temporarily, correct?

 8    A.   No, sir.  I just treated them with respect.  I treated

 9    them nicely, and they liked me, and they were with me.

10    Q.   And so they were happy to have sex with you without being

11    paid?

12              MR. CUNNINGHAM:  Objection, Your Honor.

13              THE COURT:  Sustained.  Sustained.  Sustained.

14              MR. RUTER:  I was looking for one photograph, Your

15    Honor.  Excuse me.

16              (Counsel conferring.)

17    BY MR. RUTER:

18    Q.   Mr. Repalo, let me show you what's been introduced as

19    Government 14h/5, and I think you were asked by Government

20    counsel if you recognized this picture; were you not?

21    A.   That's right, sir.

22    Q.   And do you know who this lady is here on the lower left

23    of 14h/5?

24    A.   The one I pointed at?

25    Q.   Yes, sir.
```

1    A.    Yes, sir.

2    Q.    And you don't know her name?

3    A.    No, sir.

4    Q.    Is this a woman, Mr. Repalo, that you had sexual

5    relations with without her consent?

6              **MR. CUNNINGHAM:**  Objection, Your Honor.

7              **THE COURT:**  Overruled.

8              **THE WITNESS:**  No, sir.

9    **BY MR. RUTER:**

10   Q.    Mr. Repalo, what precisely was the reason why you left

11   the working at ▌               ▌?

12   A.    As I said before, sir, I wasn't being paid, and I was

13   risking -- I was risking it with the police, sir.

14   Q.    Okay.  Does that mean, Mr. Repalo, that, had you been

15   paid, then you would have stayed?

16   A.    To tell you the truth, yes, sir.

17             **MR. RUTER:**  No further questions.  Thank you.

18             **THE COURT:**  Mr. Montemarano?

19             **MR. MONTEMARANO:**  No, thank you, Your Honor.

20             **THE COURT:**  Redirect?

21                   **REDIRECT EXAMINATION**

22   **BY MR. CUNNINGHAM:**

23   Q.    Mr. Zelaya Repalo, the night that you robbed ▌       ▌,

24   had you been drinking or had you been using any drugs that

25   day?

```
 1    A.    Just marijuana, sir.

 2    Q.    And do you remember the weather conditions at that time?

 3    A.    Very cold, sir.  Very cold.

 4    Q.    And where were you living at the time?

 5    A.    I was living in the streets, sir.

 6    Q.    Now, when you were taken into custody by the police, did

 7    they advise you of your rights?

 8    A.    Yes, sir.

 9    Q.    And did they ask you questions about the robbery?

10    A.    They asked me questions.

11    Q.    And did you say that you didn't want to talk to them

12    about that without a lawyer?

13    A.    That's right.

14    Q.    And did they ask you questions -- did you say that you

15    would be willing to talk to them about the prostitution

16    business?

17    A.    That's right, sir.

18    Q.    Now, Mr. Ruter asked you questions about the people or

19    your knowledge of whether the people who were at ███████ said

20    that you and the other men were armed.  Do you remember those

21    questions?

22    A.    Yes, sir.

23    Q.    And did those people show up at the proceeding when you

24    were being tried or supposed to be tried for the robbery at

25    ███████?
```

 1              **MR. RUTER:**  Objection.

 2              **THE COURT:**  Overruled.

 3              **THE WITNESS:**  Nobody showed up.  I was -- four

 4     months and a half, and nobody showed up.

 5     BY MR. CUNNINGHAM:

 6     Q.   Now, Mr. Zelaya Repalo, when you were looking for work

 7     with Chalo, did you tell him that you were able to do painting

 8     and other kinds of construction-related work?

 9     A.   Yes, in the beginning, when we met, yes.

10     Q.   And, during the four weeks that you were working for him,

11     did he ever take you in his van to a construction site?

12     A.   Oh, no.  Not at all, sir.

13     Q.   So you never painted for him?

14     A.   Not at all, sir.

15     Q.   Never did any drywall work for him?

16     A.   Never, sir.

17     Q.   Only worked in the prostitution business, right?

18     A.   That's right, sir.

19              **MR. CUNNINGHAM:**  Nothing further, Your Honor.

20              **THE COURT:**  Thank you.

21              Recross?

22              **MR. RUTER:**  Thank you.

23                      **RECROSS-EXAMINATION**

24     BY MR. RUTER:

25     Q.   So, Mr. Repalo, the day of the robbery, you just

```
 1   testified it was very cold.

 2   A.   That's right.

 3   Q.   And, earlier in the day, you spent much of the day

 4   shoveling snow; did you not?

 5   A.   We were shoveling snow, yes.

 6   Q.   And, after you robbed ██████████, you and your two

 7   companions ran away from ██████████; did you not?

 8   A.   My companions were running when the police came.

 9   Q.   Yes.  What were you doing?

10   A.   I -- I walked, sir.  I knew everything was messed up.

11   Q.   Well, the fact is you walked for several minutes before

12   the police came and arrested you; isn't that true?

13   A.   That's right, sir.

14   Q.   You indicated that, when you went to court, none of the

15   victims showed up; is that correct?

16   A.   That's right.

17   Q.   And is that when you got released from jail?

18   A.   That's right, sir.

19   Q.   Okay.  Notwithstanding, the fact is you robbed these four

20   people, didn't you?

21   A.   Of course, yes.

22             MR. RUTER:   Thank you.

23             THE COURT:   Thank you.

24             Good day, sir.  You may step down.

25             (Witness excused.)
```

1          **THE COURT:**  Members of the jury, we've reached the

2      end of another trial day.  Please remember:  Do not discuss

3      the case among yourselves or anyone else.  Don't talk to

4      anyone or let anyone talk to you about the case.  Don't

5      receive or send electronic communications about the case.

6      Avoid all outside information from the Internet or other

7      sources.  Please be in your room tomorrow morning at 9:25 so

8      that we can get started at 9:30, remembering that I can't

9      start until you're all here.

10          Good night.

11          **MR. CUNNINGHAM:**  Your Honor, may we approach?  May

12     counsel approach?

13          **THE COURT:**  Yes.

14          (Jury excused.)

15          (Whereupon, the following discussion occurred at the

16     bench.)

17          **MR. CUNNINGHAM:**  Your Honor, I just wanted to

18     inquire if it was acceptable for the Government to excuse

19     Mr. Zelaya Repalo.  As indicated, he's in ICE custody subject

20     to deportation.  That could take another week.  It could take

21     two, three, four.  The Department of Justice aren't trying to

22     effect his absence, but I just wanted to ask --

23          **THE COURT:**  Mr. Ruter, Mr. Montemarano, does either

24     of you wish to have him remain here?

25          **MR. RUTER:**  No, Your Honor.

1            **MR. MONTEMARANO:**  No dog in this fight.  It could

2    only get worse.

3            **THE COURT:**  Okay.

4            **MR. MONTEMARANO:**  I know how to fuss, Judge.  I

5    think I'm learning how not to.

6            **THE COURT:**  I'll see you tomorrow morning at 9:30.

7            **MR. MONTEMARANO:**  Thank you.  Have a nice evening,

8    Judge.

9            **THE COURT:**  How many witnesses do you have,

10   Mr. Cunningham?  Just give me a rough number.

11           **MS. YASSER:**  Twelve.

12           **MR. CUNNINGHAM:**  Twelve, but a fair number of them,

13   I think, are abbreviated.  I will preview for you tomorrow.

14   We have one more -- let's see.  Tomorrow, we have another

15   witness who is in custody currently, in State custody.  He's

16   here on a writ.

17           **MR. MONTEMARANO:**  That's Ascencio.

18           **MR. CUNNINGHAM:**  No.  No.  Mr. Ascencio is not in

19   custody.  This is Ferman Martinez Hernandez, who I suspect is

20   probably going to be a more protracted witness, who is also

21   speaking in Spanish.

22           **THE COURT:**  So about twelve left?

23           **MR. CUNNINGHAM:**  It is about twelve, yes.

24           **MS. YASSER:**  I'd have to refer to the witness list,

25   and I can do so if you like.

```
 1              THE COURT:  I'm trying to get some rough sense of --
 2              MR. CUNNINGHAM:  We still --
 3              THE COURT:  -- where we are.
 4              MR. CUNNINGHAM:  We're still optimistic, Judge,
 5      that, by next Wednesday -- barring some unforeseen
 6      development, we think we're going to get through them by next
 7      Wednesday.
 8              THE COURT:  Okay.  Defense should be ready to open,
 9      if they intend to open, then, on Wednesday, midday Wednesday.
10              MR. RUTER:  Yes, sir.
11              THE COURT:  Okay.  See you tomorrow morning.
12              MR. RUTER:  Thank you, sir.
13              MR. MONTEMARANO:  Thank you, Judge.
14              (Whereupon, the bench conference was concluded.)
15              THE CLERK:  All rise.  This Honorable Court stands
16      adjourned until tomorrow morning.
17              (Proceedings adjourned.)
18
19      I, Martin J. Giordano, Registered Merit Reporter and Certified
20      Realtime Reporter, certify that the foregoing is a correct
21      transcript from the record of proceedings in the
22      above-entitled matter.
23
24      _____          _____
25        Martin J. Giordano, RMR, CRR                   Date
```

INDEX

UNITED STATES v. GERMAN de JESUS VENTURA, et al.

TRIAL - VOL III - APRIL 10, 2013

                                                            PAGE

COMMENCEMENT OF PROCEEDINGS........................... 387

WITNESSES FOR
  THE GOVERNMENT:

JEFFREY SCOTT HARTLOVE
        Resumed the Stand............................. 389
        Cross-Examination (Cont.) by MR. RUTER.......... 389
        Redirect Examination by MR. CUNNINGHAM.......... 401
        Recross-Examination by MR. RUTER................ 409
        Recross-Examination by MR. MONTEMARANO.......... 411
        Witness Excused................................ 411

SANDRA MAME FLORES SAN MARON
        Sworn.......................................... 412
        Direct Examination by MS. YASSER................ 412
        Cross-Examination by MR. RUTER.................. 432
        Cross-Examination by MR. MONTEMARANO............ 439
        Redirect Examination by MS. YASSER.............. 440
        Recross-Examination by MR. RUTER................ 442
        Witness Excused................................ 443

SGT. JESSICA KIRCHNER
        Sworn.......................................... 443
        Direct Examination by MS. YASSER................ 443
        Cross-Examination by MR. RUTER.................. 465
        Cross-Examination by MR. MONTEMARANO............ 466
        Redirect Examination by MS. YASSER.............. 468
        Recross-Examination by MR. MONTEMARANO.......... 469
        Witness Excused................................ 470

CPL. MARK COCHRAN
        Sworn.......................................... 470
        Direct Examination by MR. CUNNINGHAM............ 470
        Cross-Examination by MR. MONTEMARANO............ 480
        Witness Excused................................ 482

PAGE
CARLOS ALBERTO HERNANDEZ CAMPOS
        Sworn.............................................. 483
        Direct Examination by MS. YASSER.................. 483
        Cross-Examination by MR. RUTER.................... 499
        Cross-Examination by MR. MONTEMARANO............. 529
        Redirect Examination by MS. YASSER............... 537
        Recross-Examination by MR. MONTEMARANO.......... 545
        Witness Excused.................................. 546

MAXIMILLIANO ZELAYA REPALO
        Sworn.............................................. 547
        Direct Examination by MR. CUNNINGHAM............. 547
        Cross-Examination by MR. RUTER................... 579
        Redirect Examination by MR. CUNNINGHAM.......... 599
        Recross-Examination by MR. RUTER................. 601
        Witness Excused.................................. 602

PROCEEDINGS ADJOURNED................................. 605

## $

**$1,000** [1] - 523:14
**$100** [1] - 431:3
**$15** [1] - 520:14
**$30** [2] - 560:20, 560:21
**$400** [2] - 556:11, 556:17
**$50** [1] - 556:24

## '

**'08** [3] - 521:23, 521:24, 542:22
**'09** [1] - 391:19
**'70s** [1] - 496:2
**'96** [1] - 505:20
**'97** [2] - 485:1, 504:12

## 1

**1** [4] - 419:24, 440:13, 441:8, 498:15
**1-5** [1] - 455:18
**10** [7] - 385:9, 387:1, 461:10, 462:17, 495:13, 606:3
**101** [1] - 386:24
**10:00** [8] - 421:24, 433:16, 434:6, 434:8, 434:19
**10:30** [1] - 495:14
**10a/11** [1] - 461:25
**10a/12** [1] - 462:5
**10a/13** [1] - 462:9
**10a/14** [1] - 462:11
**10a/15** [1] - 462:19
**10a/16** [2] - 414:3, 461:4
**10a/18** [3] - 414:9, 414:19, 461:1
**10a/4** [1] - 464:23
**10a/5** [1] - 462:23
**10b** [1] - 464:13
**10c** [1] - 464:11
**10d** [1] - 464:7
**10e/1** [1] - 463:22
**10f** [1] - 464:9
**10g** [1] - 464:16
**114** [1] - 456:15
**11:00** [4] - 434:6, 434:18, 434:21, 434:22
**11:28** [1] - 459:20
**11:48** [1] - 459:20
**11:50** [1] - 459:15
**1222** [1] - 530:12
**12:00** [2] - 436:16, 436:21
**12:30** [1] - 436:16
**12:58** [1] - 501:23
**12th** [1] - 523:18
**13** [2] - 508:3, 509:4
**1397** [1] - 498:25
**13th** [1] - 398:12
**14e/1** [1] - 567:2

**14h/1** [1] - 551:2
**14h/10** [1] - 565:12
**14h/11** [1] - 565:5
**14h/5** [3] - 564:7, 598:19, 598:23
**14h/6** [1] - 565:1
**14h/7** [1] - 566:5
**14k** [1] - 554:12
**15** [3] - 455:18, 471:1, 561:4
**15c/5** [1] - 572:25
**15c/6** [1] - 573:4
**15th** [4] - 402:16, 402:21, 402:23, 407:19
**1643** [1] - 457:24
**16a/1** [1] - 556:2
**17-year-old** [4] - 396:15, 396:25, 397:6, 397:8
**17b/7** [1] - 397:11
**17th** [5] - 549:23, 551:5, 556:25, 567:4, 587:2
**18** [3] - 505:15, 508:3, 534:6
**18th** [4] - 531:17, 591:2, 591:18, 592:7
**19** [1] - 508:9
**1992** [7] - 484:15, 501:10, 503:9, 504:7, 504:15, 505:11, 508:9
**1993** [1] - 504:15
**1994** [1] - 504:15
**1995** [1] - 504:15
**1996** [2] - 504:16, 505:20
**1997** [5] - 485:21, 485:24, 486:2, 504:18, 506:8
**1:00** [2] - 515:18, 515:20
**1:59** [1] - 501:24
**1b** [4] - 472:9, 472:13, 479:16
**1c** [1] - 474:3
**1d** [1] - 475:5
**1e** [1] - 477:4
**1f** [1] - 478:13
**1g** [1] - 479:5
**1st** [9] - 415:25, 416:16, 424:19, 432:2, 442:7, 442:9, 442:19, 449:15, 455:23

## 2

**2** [1] - 441:8
**2000** [6] - 508:20, 511:15, 511:18, 536:11, 537:4
**2003** [4] - 580:3, 580:15, 581:20, 581:25
**2004** [1] - 581:24
**2005** [2] - 581:24, 583:10
**2006** [4] - 513:12, 584:1, 584:14, 584:18
**2007** [4] - 510:25, 513:12, 584:19, 586:6
**2008** [46] - 389:15, 390:2, 409:11, 409:12, 445:22, 446:1, 446:12, 466:22, 471:5, 485:24, 485:25, 491:8, 507:10, 508:10, 510:25, 515:16, 515:24, 516:2, 516:4, 516:8, 516:11, 516:12, 517:3, 517:13, 519:4, 519:15, 520:9, 521:12, 521:13, 521:15, 521:19, 521:20, 522:21, 522:22,

523:2, 523:3, 523:18, 525:18, 525:21, 529:23, 538:1, 539:1, 539:7, 540:19
**2009** [38] - 391:10, 393:6, 413:7, 415:25, 416:16, 424:20, 432:2, 439:24, 442:7, 442:9, 442:19, 449:15, 455:23, 486:3, 497:11, 499:13, 499:16, 500:6, 500:13, 510:15, 510:25, 534:2, 551:19, 553:12, 586:13, 586:14, 586:17, 586:20, 586:21, 586:24, 587:5, 587:6, 587:7, 587:14, 587:15, 589:13, 590:7
**2010** [18] - 393:11, 396:8, 398:13, 402:15, 402:16, 407:19, 409:15, 445:22, 549:4, 549:23, 551:5, 574:11, 587:2, 590:24, 591:2, 591:18, 592:3, 592:7
**2011** [1] - 407:19
**2012** [3] - 500:14, 500:16, 500:22
**2013** [3] - 385:9, 387:1, 606:3
**21** [1] - 548:18
**21201** [1] - 386:24
**21401** [2] - 457:11, 457:20
**23rd** [1] - 471:5
**24** [1] - 411:15
**24-hour** [2] - 411:12, 411:14
**24th** [7] - 391:9, 391:18, 471:9, 471:12, 479:20, 480:14
**25** [1] - 493:1
**27** [1] - 547:24
**27s** [2] - 573:12, 574:1
**27t** [1] - 574:8
**28f/17** [1] - 398:15
**2:00** [4] - 501:12, 501:17, 501:18, 525:2

## 3

**3** [2] - 441:9, 456:4
**30** [1] - 560:16
**300** [2] - 556:11, 556:17
**30th** [2] - 389:15, 390:1
**387** [1] - 606:6
**389** [2] - 606:9, 606:10
**3:28** [1] - 546:21
**3:30** [2] - 520:18, 520:19
**3:50** [2] - 546:11, 546:12
**3:51** [1] - 546:21
**3a** [1] - 475:14
**3e** [1] - 557:6

## 4

**4** [1] - 441:6
**401** [1] - 606:10
**409** [1] - 606:11
**41** [1] - 404:11
**410-962-4504** [1] - 386:25
**411** [2] - 606:11, 606:12
**412** [2] - 606:13, 606:14

**432** [1] - 606:14
**439** [1] - 606:15
**440** [1] - 606:15
**442** [1] - 606:16
**443** [3] - 606:16, 606:18, 606:18
**465** [1] - 606:19
**466** [1] - 606:19
**468** [1] - 606:20
**469** [1] - 606:20
**470** [3] - 606:21, 606:22, 606:23
**4717** [1] - 405:6
**480** [1] - 606:23
**482** [1] - 606:24
**483** [2] - 607:2, 607:2
**499** [1] - 607:3
**4:00** [4] - 520:18, 520:20, 546:11
**4:30** [1] - 520:18
**4l** [2] - 404:16, 404:22

**5**

**50** [1] - 445:20
**5015** [1] - 498:22
**529** [1] - 607:3
**537** [1] - 607:4
**545** [1] - 607:4
**546** [1] - 607:5
**547** [2] - 607:6, 607:7
**5515** [1] - 386:23
**553** [1] - 534:2
**579** [1] - 607:7
**599** [1] - 607:8
**5:00** [1] - 414:1
**5:52** [1] - 385:9

**6**

**601** [1] - 607:8
**602** [1] - 607:9
**605** [1] - 607:10
**609** [6] - 508:4, 509:4, 533:18, 533:19, 534:1
**6177** [1] - 424:17
**6555** [1] - 519:17
**669** [1] - 534:2
**6:00** [2] - 515:1

**7**

**7** [1] - 528:8
**7-Eleven** [1] - 590:3
**7th** [1] - 396:8

**9**

**911** [1] - 393:15
**914** [1] - 405:11

**9:00** [4] - 414:1, 433:4, 433:5
**9:25** [1] - 603:7
**9:30** [2] - 603:8, 604:6
**9:32** [1] - 385:9
**9a/1** [1] - 452:11
**9a/10** [1] - 454:7
**9a/11** [1] - 454:9
**9a/12** [1] - 454:15
**9a/13** [1] - 454:19
**9a/14** [1] - 455:6
**9a/15** [1] - 455:14
**9a/16** [1] - 454:24
**9a/17** [1] - 452:4
**9a/18** [1] - 452:8
**9a/2** [1] - 452:14
**9a/3** [2] - 452:20, 452:21
**9a/4** [1] - 452:23
**9a/5** [1] - 453:14
**9a/6** [1] - 453:16
**9a/7** [1] - 453:18
**9a/8** [1] - 453:20
**9a/9** [1] - 453:25
**9b/1** [1] - 456:4
**9c** [1] - 457:4
**9d** [2] - 456:10, 456:14
**9e** [1] - 456:23
**9f** [4] - 457:16, 458:25, 460:4, 462:17
**9g** [1] - 457:1
**9h/1** [2] - 457:13, 458:1
**9h/2** [2] - 457:13, 458:1
**9mm** [2] - 492:24, 493:13

**A**

**A-L-I-C-A-R** [1] - 409:17
**a.m** [2] - 459:20
**a/1** [1] - 461:11
**a/10** [1] - 463:10
**a/15** [1] - 455:19
**a/17** [1] - 461:7
**a/2** [1] - 461:14
**a/3** [1] - 461:18
**a/6** [1] - 462:25
**a/7** [1] - 463:3
**a/8** [1] - 463:5
**a/9** [1] - 463:8
**abbreviated** [1] - 604:13
**abiding** [2] - 510:4, 510:5
**able** [22] - 388:5, 430:10, 467:15, 467:16, 472:10, 474:6, 474:7, 476:14, 498:1, 501:2, 542:16, 542:19, 558:4, 563:6, 564:18, 571:1, 571:5, 580:20, 585:10, 587:4, 587:7, 601:7
**ABOVE** [1] - 385:10
**above-entitled** [1] - 605:22
**ABOVE-ENTITLED** [1] - 385:10
**absence** [1] - 603:22
**absolutely** [4] - 399:11, 420:7, 542:17, 579:2

**abundance** [1] - 507:25
**abuse** [1] - 549:5
**acceptable** [1] - 603:18
**accidentally** [1] - 438:25
**according** [2] - 576:8, 587:21
**account** [1] - 578:20
**accounting** [1] - 559:23
**accounts** [1] - 578:2
**accurate** [2] - 391:25, 400:8
**accused** [1] - 578:22
**acknowledge** [1] - 475:21
**acknowledged** [1] - 578:4
**acquaintance** [1] - 516:20
**acquire** [1] - 403:16
**act** [4] - 419:22, 532:12, 532:18, 534:19
**action** [2] - 474:17, 542:19
**actions** [1] - 531:21
**activity** [1] - 437:7
**acts** [1] - 419:23
**actual** [2] - 475:15, 509:17
**additional** [1] - 474:16
**address** [18] - 387:12, 390:2, 396:16, 396:21, 413:9, 457:9, 457:17, 457:19, 457:21, 459:1, 459:2, 459:3, 462:8, 462:22, 464:15, 507:4, 507:5, 509:18
**addressed** [1] - 509:18
**adequately** [2] - 467:15, 467:16
**adjacent** [1] - 576:3
**adjourned** [2] - 605:16, 605:17
**ADJOURNED**................................. [1] - 607:10
**adjusting** [1] - 488:21
**administer** [1] - 447:10
**administered** [1] - 502:6
**admissible** [3] - 533:17, 533:18, 534:3
**admitted** [1] - 549:21
**advanced** [1] - 485:15
**advertising** [5] - 449:10, 462:13, 462:15, 487:23, 514:6
**advise** [4] - 392:11, 433:24, 508:5, 600:7
**advised** [1] - 399:12
**afraid** [2] - 591:23, 592:18
**Afternoon** [1] - 501:24
**afternoon** [16] - 491:12, 499:8, 499:9, 502:7, 503:6, 503:7, 515:2, 520:18, 520:22, 529:20, 529:21, 546:8, 547:21, 547:22, 579:19, 579:20
**afterwards** [1] - 399:10
**agency** [1] - 445:10
**Agent** [1] - 386:3
**agile** [1] - 419:19
**ago** [8] - 413:6, 414:7, 519:13, 524:5, 524:22, 534:15, 577:22, 596:14
**agree** [9] - 417:11, 417:14, 420:24, 491:25, 528:13, 528:18, 532:18, 545:5, 596:4
**agreed** [2] - 417:12, 420:21
**ahead** [1] - 449:14

**Aid** [1] - 456:22
**air** [1] - 414:16
**airport** [1] - 505:5
**Airport** [1] - 505:7
**al** [1] - 606:2
**Alba** [2] - 394:23, 394:25
**ALBERT** [1] - 483:13
**ALBERTO** [2] - 483:7, 607:1
**Alberto** [1] - 483:12
**alcohol** [8] - 451:9, 453:1, 457:2, 458:8, 458:9, 462:24, 463:6, 464:8
**alerted** [1] - 397:2
**Alicar** [1] - 409:17
**alive** [1] - 494:21
**allege** [1] - 521:16
**alleged** [1] - 419:6
**allegedly** [1] - 389:8
**allow** [3] - 393:1, 421:5, 515:13
**allowed** [4] - 535:14, 541:23, 597:16, 597:17
**allusions** [1] - 447:18
**almost** [4] - 403:2, 521:18, 527:14, 586:20
**alone** [2] - 479:1, 479:2
**altogether** [2] - 548:18, 548:20
**AM** [1] - 385:9
**amble** [1] - 578:13
**AMERICA** [1] - 385:4
**American** [1] - 560:18
**amount** [3] - 403:2, 453:12, 561:2
**Amparo** [2] - 457:8, 465:23
**analysis** [1] - 464:3
**Angalas** [1] - 455:8
**angle** [2] - 454:1, 461:6
**Annapolis** [56] - 389:14, 413:9, 443:19, 443:20, 446:18, 449:10, 450:9, 452:6, 456:7, 457:6, 457:10, 457:18, 457:20, 459:7, 460:10, 465:8, 467:3, 467:25, 470:23, 472:4, 485:3, 485:4, 485:8, 485:9, 485:18, 485:20, 485:23, 486:13, 488:5, 490:5, 506:8, 506:9, 506:10, 506:13, 506:14, 506:16, 506:17, 506:19, 506:21, 507:3, 510:17, 510:19, 518:6, 527:10, 550:2, 552:22, 552:23, 553:15, 553:25, 554:1, 555:5, 555:8, 561:6, 561:7, 563:22, 590:12
**Anne** [1] - 452:6
**annotation** [1] - 404:24
**answer** [16] - 389:11, 411:9, 418:12, 496:18, 499:23, 500:1, 508:14, 519:18, 519:20, 535:2, 535:5, 535:18, 535:22, 544:17, 578:14, 581:13
**answered** [9] - 396:20, 422:22, 422:23, 422:24, 473:15, 483:19, 514:2, 539:13, 545:13
**answering** [2] - 499:25, 530:10
**answers** [3] - 396:6, 484:3, 500:3
**anyway** [1] - 577:1
**apartment** [54] - 414:5, 414:6, 414:22,

414:24, 416:6, 416:8, 416:12, 416:14, 416:17, 417:15, 421:20, 427:3, 429:14, 435:5, 435:10, 435:16, 436:18, 436:20, 437:7, 437:20, 440:10, 441:4, 441:5, 441:10, 441:19, 442:18, 450:11, 450:22, 451:1, 451:4, 451:5, 452:5, 455:5, 455:11, 455:16, 456:8, 461:15, 461:16, 461:19, 461:20, 463:12, 463:14, 465:15, 519:14, 550:12, 553:16, 553:19, 557:14, 557:15, 557:17, 567:4, 592:20, 592:24
**Apartment** [2] - 440:13, 441:6
**apartments** [3] - 438:7, 438:9, 447:19
**Apartments** [1] - 441:8
**APD** [3] - 445:6, 445:14, 468:9
**apologies** [2] - 528:25, 580:16
**apologize** [4] - 455:9, 497:23, 508:18, 574:6
**appear** [10] - 395:15, 408:17, 437:19, 448:14, 448:20, 461:23, 468:23, 473:12, 548:2, 573:9
**appeared** [14] - 391:11, 395:21, 395:23, 397:12, 398:19, 402:10, 403:5, 424:9, 449:9, 451:17, 469:1, 469:7, 469:17, 538:8
**appearing** [1] - 395:12
**application** [1] - 504:11
**apply** [1] - 509:17
**appreciate** [1] - 387:14
**apprehended** [1] - 580:10
**approach** [20] - 406:5, 417:17, 424:25, 447:13, 455:25, 463:18, 470:9, 479:15, 507:17, 524:19, 533:5, 533:8, 534:9, 541:9, 552:7, 566:22, 575:6, 603:11, 603:12
**approached** [8] - 472:24, 473:9, 496:25, 497:3, 579:8, 580:21, 590:6
**appropriately** [1] - 388:6
**approximate** [2] - 445:18, 477:21
**appurtenances** [1] - 473:5
**APRIL** [2] - 387:1, 606:3
**April** [12] - 385:9, 402:23, 491:8, 501:2, 516:4, 517:3, 517:15, 538:1, 538:19, 538:25, 539:7, 540:18
**area** [34] - 390:24, 400:10, 403:3, 405:7, 405:9, 405:11, 440:12, 450:24, 450:25, 455:13, 456:20, 457:24, 459:9, 461:20, 461:21, 462:3, 465:13, 487:4, 511:5, 512:22, 515:17, 520:24, 521:17, 539:21, 541:21, 555:5, 564:7, 575:24, 576:1, 576:3, 578:21, 583:18, 589:24
**areas** [2] - 404:7, 508:5
**argue** [4] - 419:17, 425:6, 447:24, 448:8
**arguing** [2] - 510:1, 534:9
**argument** [1] - 537:12
**arguments** [2] - 536:13, 536:15
**Arlington** [2] - 504:22
**armed** [3] - 592:11, 592:15, 600:20

**Army** [2] - 531:8, 531:24
**arrange** [1] - 476:22
**arrangements** [1] - 529:2
**arrest** [4] - 449:25, 474:21, 474:22, 525:4
**arrested** [6] - 391:18, 450:2, 466:9, 474:24, 479:9, 602:12
**arrival** [1] - 407:12
**arrive** [1] - 479:3
**arrived** [12] - 403:7, 433:2, 450:20, 461:16, 495:13, 506:9, 538:5, 538:7, 538:8, 553:8, 553:10
**arriving** [1] - 449:16
**Arundel** [1] - 452:6
**Ascencio** [2] - 604:17, 604:18
**aside** [2] - 450:14, 450:17
**asleep** [1] - 423:3
**assailants** [2] - 394:20, 399:14
**assault** [9] - 508:20, 533:24, 534:7, 534:12, 534:20, 534:24, 535:20, 535:23, 536:10
**assembling** [1] - 502:12
**assertion** [1] - 393:23
**asshole** [2] - 492:11, 518:5
**assigned** [1] - 405:8
**assist** [4] - 390:1, 392:8, 399:10, 446:21
**assistance** [1] - 498:4
**Assistant** [2] - 385:14, 385:15
**assisted** [1] - 468:22
**assisting** [3] - 420:2, 446:13, 497:19
**associated** [9] - 398:1, 405:3, 418:24, 418:25, 426:22, 428:3, 457:21, 459:1, 590:17
**assume** [2] - 447:25, 555:7, 577:10
**assuming** [1] - 577:7
**Astrovan** [1] - 391:6
**asylum** [2] - 504:6, 504:9
**ate** [1] - 589:2
**attempt** [9] - 446:5, 481:22, 520:6, 576:10, 582:7, 582:9, 582:10, 584:3, 584:4
**attempted** [5] - 465:24, 541:18, 542:17, 582:1, 583:24
**attempting** [4] - 449:21, 449:22, 509:6, 584:8
**attend** [1] - 505:14
**attention** [6] - 415:24, 445:21, 458:25, 491:7, 559:16, 571:12
**attenuated** [1] - 428:17
**attorney** [5] - 388:7, 576:8, 576:9, 579:9, 580:20
**Attorney** [2] - 385:14, 385:15
**attorney-client** [1] - 388:7
**attorneys** [1] - 534:7
**aunt** [1] - 536:14
**authorities** [1] - 548:11
**authority** [3] - 548:3, 548:5, 549:12
**authorization** [1] - 413:22
**automatic** [2] - 572:22, 573:8

**automatically** [1] - 577:6
**available** [1] - 589:17
**Avenue** [1] - 402:18
**Avila** [1] - 408:15
**avoid** [1] - 603:6
**awake** [1] - 424:7
**awakened** [4] - 422:14, 434:3, 435:22, 435:24
**aware** [6] - 405:12, 448:3, 478:19, 592:19, 592:22, 593:2
**awoke** [1] - 434:3

## B

**baby** [5] - 421:23, 422:5, 434:4, 435:20, 435:23
**baby's** [1] - 434:24
**backdoor** [2] - 533:14, 533:16
**backdrop** [1] - 577:20
**background** [2] - 408:5, 408:17
**backpack** [1] - 454:3
**backup** [1] - 479:3
**bad** [6] - 431:13, 510:7, 533:17, 540:11, 544:10, 571:24
**bag** [7] - 396:1, 397:20, 400:11, 400:21, 463:24, 463:25, 566:25
**baggage** [1] - 553:6
**bail** [2] - 482:2, 482:4
**bald** [1] - 487:1
**Baltimore** [4] - 385:8, 386:24, 457:5, 576:17
**bands** [2] - 487:13, 528:5
**Bank** [1] - 517:5
**bar** [1] - 480:24
**barring** [1] - 605:5
**based** [4] - 435:15, 467:10, 469:5, 596:4
**basis** [16] - 399:17, 406:4, 406:25, 411:13, 411:14, 415:6, 423:24, 424:24, 451:14, 451:15, 458:13, 458:14, 486:10, 511:18, 539:11, 593:9
**bear** [1] - 404:15
**beat** [1] - 468:9
**become** [3] - 478:19, 505:11, 509:2
**bed** [16] - 422:6, 422:13, 423:2, 423:3, 433:9, 433:10, 433:11, 433:15, 433:17, 434:8, 435:20, 436:24, 451:1, 454:2, 463:9, 463:11
**bedroom** [9] - 436:7, 451:18, 451:21, 453:15, 453:19, 453:21, 454:1, 463:9, 463:12
**bedrooms** [10] - 451:1, 451:2, 451:8, 451:10, 452:22, 453:22, 454:21, 456:25, 457:2, 463:13
**bedside** [7] - 451:1, 451:10, 451:20, 452:24, 452:25, 454:2, 454:8
**Bee** [1] - 496:2
**beer** [1] - 495:16
**BEFORE** [1] - 385:11
**began** [1] - 506:21

**beginning** [4] - 391:1, 402:17, 402:23, 601:9
**behalf** [3] - 385:13, 385:16, 385:18
**behaved** [1] - 577:5
**behaviors** [3] - 428:15, 431:11, 432:4
**behind** [4] - 396:1, 568:4, 581:25, 582:1
**belief** [4] - 393:14, 396:14, 419:2, 419:3
**Belinda** [2] - 412:2, 502:3
**belonged** [3] - 400:7, 526:5, 562:12
**bench** [23] - 406:8, 406:19, 417:20, 417:21, 417:23, 420:16, 425:3, 429:3, 447:16, 448:17, 507:20, 507:21, 510:11, 533:11, 536:2, 541:12, 543:18, 575:9, 577:2, 578:19, 579:5, 603:16, 605:14
**bene** [1] - 536:5
**benign** [1] - 577:5
**Beretta** [2] - 492:25, 493:16
**best** [5] - 435:15, 477:17, 482:8, 483:23, 575:20
**better** [3] - 387:23, 395:16, 534:8
**between** [15] - 402:15, 402:22, 406:23, 475:24, 514:19, 521:23, 540:12, 555:2, 561:15, 568:10, 570:24, 575:21, 578:2, 581:24, 582:9
**big** [3] - 397:20, 526:11, 526:12
**bigger** [1] - 592:15
**bill** [4] - 457:5, 457:7, 457:8, 465:22
**bit** [4] - 444:18, 444:21, 481:16, 483:20
**black** [2] - 567:7, 567:11
**Black** [2] - 578:24
**blinds** [1] - 408:7
**blocks** [1] - 518:17
**blondish** [2] - 409:20, 409:21
**blue** [3] - 478:4, 551:12, 574:14
**body** [2] - 565:21, 565:23
**bold** [1] - 596:5
**book** [1] - 462:6
**booking** [2] - 448:1, 479:8
**books** [1] - 559:15
**border** [5] - 561:14, 561:15, 580:7, 580:8, 586:15
**borrow** [2] - 417:5, 417:8
**bottle** [6] - 421:23, 422:5, 434:4, 434:14, 434:20, 434:24
**bottom** [3] - 404:24, 478:16, 479:13
**bought** [4] - 397:16, 487:10, 505:4, 567:15
**bounds** [1] - 509:4
**bounty** [1] - 458:5
**box** [5] - 492:25, 494:11, 494:13, 494:14, 521:10
**brands** [1] - 397:24
**break** [6] - 430:18, 459:13, 460:3, 546:9, 579:7, 588:4
**Bridgett** [4] - 409:17, 409:19, 410:18, 410:19
**brief** [2] - 478:25, 540:12
**briefly** [7] - 401:6, 418:20, 446:11,

465:18, 468:19, 469:6, 545:1
**bring** [4] - 487:12, 487:13, 495:15, 495:16, 512:20, 528:5, 556:14, 580:6
**broke** [3] - 430:17, 439:9, 588:7
**broken** [6] - 430:21, 437:15, 442:13, 454:16, 480:1, 573:16
**broken-out** [1] - 442:13
**broken-up** [1] - 454:16
**brothel** [32] - 403:17, 403:20, 407:15, 449:23, 460:22, 550:12, 550:13, 550:15, 551:8, 556:25, 557:21, 558:1, 558:4, 558:7, 558:8, 558:11, 558:15, 558:18, 558:21, 558:25, 560:1, 561:8, 561:17, 561:18, 562:8, 562:12, 563:16, 564:22, 565:17, 572:14, 572:15, 594:15
**brothels** [10] - 406:22, 407:6, 407:8, 411:5, 411:6, 411:12, 456:20, 561:6, 563:7, 569:11
**brother** [2] - 506:5, 506:7
**brother's** [4] - 476:4, 476:5, 476:8, 476:9
**brothers** [1] - 410:12
**brought** [6] - 426:19, 465:8, 518:8, 541:20, 542:14, 542:22
**building** [10] - 414:6, 414:15, 416:9, 416:12, 416:17, 438:3, 438:7, 440:7, 441:20, 452:13
**buildings** [1] - 479:25
**bullets** [3] - 492:25, 494:8, 494:11
**burglary** [1] - 444:14
**business** [80] - 396:3, 420:6, 449:3, 449:5, 449:9, 457:17, 460:4, 462:7, 462:13, 462:14, 462:16, 462:21, 464:10, 464:14, 476:24, 485:5, 485:6, 486:20, 487:4, 487:9, 488:2, 488:15, 488:16, 489:14, 489:17, 489:20, 489:21, 490:16, 495:7, 495:8, 495:19, 506:21, 506:24, 507:2, 507:5, 507:8, 507:11, 510:18, 513:24, 514:12, 514:14, 514:15, 514:18, 514:20, 515:9, 515:11, 515:14, 515:15, 515:21, 515:25, 516:1, 526:5, 526:9, 527:8, 527:22, 528:3, 528:4, 540:11, 554:9, 554:10, 554:19, 554:21, 554:25, 555:3, 556:12, 557:2, 557:5, 557:9, 557:24, 562:3, 585:8, 590:14, 590:16, 590:21, 593:6, 597:9, 600:16, 601:17
**buy** [3] - 451:7, 495:25, 597:11
**BY** [98] - 389:4, 399:7, 399:24, 401:8, 404:18, 406:20, 407:7, 409:2, 411:3, 412:22, 415:15, 415:21, 417:10, 420:20, 424:4, 429:4, 430:2, 431:10, 432:10, 438:20, 439:19, 440:5, 442:2, 443:15, 445:2, 448:18, 451:22, 455:21, 456:2, 458:16, 460:2, 463:21, 465:20, 466:17, 468:17, 470:5, 470:21, 478:9, 479:18, 480:10, 481:18, 483:18, 486:9, 488:12,

488:22, 489:13, 491:6, 492:12, 493:2,
494:5, 495:4, 496:15, 497:25, 498:18,
499:7, 500:5, 503:5, 505:10, 510:13,
513:2, 514:10, 520:21, 524:2, 524:21,
527:3, 529:19, 530:5, 530:21, 532:17,
536:4, 537:2, 537:10, 539:16, 540:5,
543:25, 544:13, 545:3, 547:20,
559:21, 561:1, 562:16, 563:4, 565:24,
566:24, 568:21, 570:3, 571:25,
572:12, 574:9, 579:6, 579:18, 581:17,
593:14, 598:17, 599:9, 599:22, 601:5,
601:24

# C

**C-O-C-H-R-A-N** [1] - 470:18
**camera** [1] - 577:16, 578:9
**CAMPOS** [3] - 483:7, 483:14, 607:1
**Campos** [52] - 389:16, 482:24, 483:13,
483:19, 484:6, 486:4, 486:10, 487:3,
488:23, 489:6, 490:5, 490:12, 491:7,
496:16, 496:19, 499:8, 499:10,
499:24, 500:6, 500:23, 503:6, 503:8,
504:14, 507:15, 510:14, 512:21,
513:6, 513:13, 513:22, 514:24,
515:19, 517:19, 518:14, 519:8,
520:15, 521:12, 522:20, 524:9, 525:7,
525:17, 526:12, 527:4, 527:18,
528:13, 529:20, 536:5, 536:9, 537:3,
541:6, 544:1, 546:14
**canister** [1] - 462:1
**cannot** [1] - 419:13
**capacity** [2] - 445:3, 590:20
**capricious** [1] - 425:25
**car** [56] - 394:25, 395:18, 396:5, 409:4,
409:7, 409:16, 409:25, 410:3, 410:20,
430:14, 449:11, 457:17, 462:13,
462:15, 471:24, 472:11, 474:21,
476:12, 476:15, 478:22, 491:21,
491:23, 491:25, 492:24, 493:5, 493:7,
493:10, 493:24, 495:19, 516:6,
517:21, 519:23, 520:1, 520:3, 520:5,
520:6, 520:8, 522:14, 537:21, 537:24,
538:4, 538:5, 538:7, 538:20, 539:8,
542:2, 542:6, 543:11, 562:18, 562:20,
563:15, 572:13, 572:15
**card** [13] - 453:4, 454:21, 459:1, 459:6,
460:4, 462:7, 464:14, 464:18, 514:18,
515:23, 554:18, 554:19
**cards** [49] - 449:3, 449:5, 449:9, 451:6,
451:7, 453:8, 453:12, 454:17, 457:17,
460:5, 460:7, 462:10, 462:12, 462:13,
462:14, 462:16, 462:21, 464:10,
464:17, 489:21, 514:14, 514:15,
515:9, 515:11, 515:14, 554:4, 554:5,
554:9, 554:10, 554:13, 554:15,
554:21, 555:1, 555:3, 555:10, 555:14,
556:12, 557:2, 557:5, 557:9, 557:24,
562:3, 590:14, 590:17, 593:6, 593:12,
593:16

**care** [1] - 403:22
**career** [2] - 444:15, 444:24
**careful** [1] - 418:17
**carefully** [1] - 545:25
**Carla** [18] - 487:24, 525:12, 525:13,
525:15, 527:6, 527:7, 527:16, 528:24,
528:25, 529:5, 530:15, 544:2, 545:4,
545:14, 545:18
**Carlos** [8] - 386:4, 482:24, 483:12,
491:20, 495:22, 502:8, 528:4, 536:9
**CARLOS** [3] - 483:7, 483:13, 607:1
**Carolina** [10] - 584:23, 585:2, 585:3,
585:4, 585:5, 585:11, 585:14, 585:16,
585:17, 585:20
**carried** [5] - 531:13, 531:15, 531:18,
532:7, 533:3
**carrying** [1] - 399:15
**cars** [4] - 537:16, 537:18, 538:9, 589:24
**case** [18] - 392:14, 397:22, 402:3,
419:23, 449:15, 459:14, 482:11,
500:19, 501:16, 508:23, 534:2, 546:9,
550:5, 592:25, 603:3, 603:4, 603:5
**cases** [1] - 387:17
**Casey** [3] - 454:25, 455:1
**casual** [5] - 395:16, 395:21, 395:23,
539:23, 540:8
**categorical** [1] - 534:9
**caught** [3] - 566:20, 580:11, 596:11
**caused** [3] - 424:20, 507:15, 509:2
**caution** [1] - 507:25
**CD** [1] - 462:1
**cell** [14] - 432:22, 454:16, 456:6, 462:12,
463:24, 464:17, 519:18, 519:20,
567:1, 575:25, 576:1, 578:21, 578:25
**center** [1] - 477:10
**certain** [3] - 388:5, 491:7, 513:23
**certainly** [5] - 394:11, 425:6, 509:5,
532:2, 532:12
**Certified** [1] - 605:19
**certify** [1] - 605:20
**cessation** [1] - 387:12
**cetera** [7] - 444:16, 447:4, 449:11,
479:10, 543:7, 543:8
**Chaco** [1] - 590:6
**chair** [3] - 433:22, 443:10, 462:2
**Chalo** [56] - 550:23, 550:24, 551:8,
551:12, 551:18, 552:7, 552:18, 553:7,
553:11, 553:14, 554:2, 554:21,
555:13, 555:17, 555:20, 555:23,
556:7, 556:13, 556:20, 557:2, 557:12,
558:7, 558:17, 559:13, 561:5, 561:24,
562:17, 562:20, 563:6, 564:23,
566:12, 567:14, 567:22, 569:6,
569:18, 569:23, 570:12, 570:17,
570:24, 571:11, 571:20, 572:5,
573:19, 574:11, 575:1, 575:5, 589:9,
589:11, 589:19, 590:6, 590:8, 591:8,
591:12, 601:7
**Chalo's** [1] - 573:6
**change** [1] - 431:11

**changed** [1] - 598:2
**changing** [1] - 444:25
**character** [2] - 510:7, 533:18
**characterization** [2] - 395:20, 562:12
**charge** [3] - 494:7, 592:13, 595:9
**charged** [9] - 400:9, 401:17, 419:4,
419:23, 428:15, 446:3, 465:10,
549:22, 550:1
**charger** [3] - 463:24, 463:25, 494:7
**charges** [4] - 401:20, 419:10, 479:10,
480:3
**chat** [1] - 514:21
**cheap** [1] - 560:14
**cheaper** [2] - 456:21, 495:10
**check** [3] - 409:25, 505:7, 519:24
**child** [13] - 398:19, 398:19, 398:20,
398:22, 398:23, 398:24, 413:19,
418:9, 421:23, 434:4, 434:11, 434:13,
434:21
**children** [13] - 413:14, 413:15, 431:9,
440:16, 506:12, 522:1, 522:6, 578:7,
578:8, 582:3, 583:4, 583:17, 585:13
**Children's** [1] - 447:5
**Chino** [3] - 555:25, 566:1, 595:10
**choose** [1] - 558:6
**chose** [1] - 506:10
**Circuit** [1] - 534:2
**citations** [3] - 472:10, 472:14, 472:15
**cited** [2] - 477:14, 478:23
**citizen** [1] - 510:4
**city** [2] - 472:4, 504:21
**City** [2] - 505:15, 505:16
**civil** [3] - 531:16, 531:22, 532:1
**claim** [1] - 595:20
**claimed** [2] - 541:2, 543:14
**clarify** [1] - 542:3
**clean** [1] - 440:23
**cleaned** [1] - 430:9
**cleaning** [4] - 413:24, 416:2, 416:3,
449:11
**clear** [10] - 388:1, 441:3, 442:11,
447:21, 468:12, 543:4, 551:11, 573:4,
574:25, 577:25
**Clearance** [1] - 496:2
**clearly** [2] - 426:6, 541:22
**Clearwater** [1] - 496:2
**CLERK** [28] - 387:2, 387:7, 388:18,
412:4, 412:6, 412:10, 412:12, 412:16,
412:18, 443:6, 443:9, 459:17, 459:21,
470:14, 470:19, 483:6, 483:9, 483:15,
501:20, 501:25, 502:4, 503:2, 546:19,
546:22, 547:9, 547:13, 547:18, 605:15
**clerk** [1] - 547:7
**Clerk** [1] - 470:10
**client** [9] - 388:7, 447:18, 453:9, 467:9,
467:10, 576:6, 577:4, 577:7, 577:9
**client's** [2] - 447:22, 577:3
**clientele** [1] - 510:21, 510:24
**cloaked** [2] - 388:6

**close** [8] - 427:16, 435:13, 452:24, 454:8, 461:8, 463:4, 533:16, 576:5
**close-up** [4] - 452:24, 454:8, 461:8, 463:4
**closed** [1] - 524:17
**closer** [1] - 418:14
**closet** [6] - 451:19, 453:17, 453:19, 462:20, 462:24, 463:1
**closets** [2] - 453:15, 454:4
**clothes** [1] - 451:19
**clothing** [4] - 451:20, 454:5, 487:5, 553:7
**cocaine** [2] - 549:5, 588:20
**Cochran** [9] - 470:7, 470:9, 470:17, 470:22, 472:8, 477:17, 478:7, 479:19, 480:11
**COCHRAN** [2] - 470:12, 606:22
**code** [1] - 457:24
**codes** [2] - 405:8, 405:11
**cold** [4] - 495:25, 600:3, 602:1
**collaterally** [1] - 419:10
**collect** [2] - 559:9, 594:21
**college** [2] - 447:3, 484:10
**colloquialism** [1] - 576:21
**colloquy** [1] - 542:21
**Colmillo** [12] - 555:18, 555:20, 556:5, 557:4, 558:17, 559:13, 561:23, 562:20, 569:17, 569:18, 570:6, 570:12
**color** [4] - 491:15, 572:23, 572:24, 573:9
**Columbia** [3] - 548:24, 549:22, 561:13
**comfortable** [1] - 388:3
**coming** [11] - 395:18, 415:9, 425:7, 495:18, 548:9, 580:11, 580:15, 581:19, 583:12, 589:19, 590:4
**COMMENCEMENT** [1] - 606:6
**commenting** [1] - 597:3
**commit** [2] - 549:1, 550:7
**committed** [2] - 587:1, 587:22
**common** [1] - 455:13
**Commonwealth** [1] - 587:19
**communicate** [3] - 432:18, 467:15, 467:16
**communications** [1] - 603:5
**community** [10] - 449:10, 485:18, 487:5, 487:11, 487:22, 488:14, 489:22, 514:6, 521:1
**Community** [2] - 443:24, 444:4
**companies** [1] - 477:16
**companions** [4] - 592:23, 593:3, 602:7, 602:8
**company** [1] - 390:17
**Company** [1] - 390:18
**complete** [1] - 524:11
**complex** [2] - 437:8, 452:5
**computer** [3] - 477:11, 588:12, 588:13
**concerning** [1] - 466:21
**concerns** [2] - 467:19, 535:12
**conclude** [1] - 404:6

**concluded** [9] - 406:19, 420:16, 429:3, 448:17, 510:11, 536:2, 543:18, 579:5, 605:14
**conclusion** [1] - 469:4
**conditioning** [1] - 414:16
**conditions** [1] - 600:2
**condoms** [23] - 397:12, 397:13, 397:16, 397:18, 397:21, 400:12, 400:20, 454:10, 454:12, 456:11, 456:13, 456:17, 456:18, 456:19, 462:12, 463:1, 463:4, 463:7, 464:12, 560:3, 560:11, 597:11
**conduct** [4] - 428:16, 478:22, 543:7
**conducted** [1] - 402:24
**conference** [16] - 406:19, 417:22, 417:23, 420:16, 429:3, 448:17, 507:22, 510:11, 536:2, 543:18, 575:11, 575:12, 578:18, 579:5, 605:14
**conferring** [4] - 401:1, 536:3, 578:17, 598:16
**confidant** [1] - 516:21
**confidential** [1] - 392:1
**confusion** [1] - 538:24
**congregate** [1] - 590:4
**connected** [2] - 427:22, 427:23
**consent** [3] - 447:18, 468:13, 599:5
**considered** [1] - 532:12
**conspiracy** [3] - 419:23, 419:24, 428:16
**consternation** [1] - 387:16, 388:4
**Construction** [2] - 390:18, 390:21
**construction** [10] - 390:25, 391:2, 391:4, 391:11, 391:14, 402:11, 402:13, 402:18, 601:8, 601:11
**construction-related** [1] - 601:8
**CONT** [2] - 386:1, 389:3
**Cont** [1] - 606:10
**contact** [15] - 389:7, 390:5, 461:17, 465:25, 477:22, 479:21, 514:17, 567:20, 567:23, 574:11, 574:12, 574:13, 574:16, 575:4, 575:18
**contained** [6] - 451:3, 456:12, 456:13, 461:1, 463:23, 464:24
**containing** [1] - 464:17
**contemporaneous** [1] - 426:25
**context** [1] - 509:21
**continue** [1] - 444:23
**CONTINUED** [1] - 385:10
**continuing** [1] - 428:22
**contract** [1] - 517:5
**contrast** [1] - 578:3
**contravene** [1] - 533:19
**conversation** [19] - 416:25, 417:2, 493:3, 516:3, 516:5, 516:7, 517:4, 518:2, 520:16, 521:2, 521:5, 539:23, 540:6, 542:2, 569:19, 570:23, 571:1, 571:19
**conversations** [5] - 469:5, 494:23, 497:8, 538:12, 538:17
**convicted** [8] - 401:24, 401:25, 509:1, 509:16, 535:16, 535:19, 536:9, 588:22

**conviction** [10] - 402:1, 509:3, 533:17, 533:23, 533:24, 534:3, 534:5, 535:13
**convictions** [5] - 508:2, 508:12, 533:15, 533:23, 533:25
**cooperate** [1] - 497:8
**cooperates** [1] - 576:21
**copies** [2] - 472:10, 472:13
**copy** [1] - 475:11
**corner** [6] - 453:3, 478:17, 479:13, 490:3, 565:16
**Coronas** [1] - 495:16
**Corporal** [8] - 470:7, 470:9, 470:17, 470:22, 472:8, 477:17, 478:7, 480:11
**corporal** [1] - 479:19
**correct** [177] - 389:14, 389:21, 390:7, 390:18, 392:6, 392:16, 394:5, 394:24, 396:11, 396:17, 396:18, 396:22, 396:23, 402:13, 402:14, 411:6, 411:9, 411:10, 411:11, 413:4, 413:5, 413:10, 413:11, 421:3, 421:12, 424:10, 424:13, 429:17, 432:18, 434:8, 435:13, 436:10, 436:24, 437:4, 438:9, 439:24, 439:25, 441:4, 441:16, 441:17, 442:4, 442:5, 442:14, 450:13, 450:15, 459:3, 459:4, 462:18, 464:21, 466:5, 466:10, 466:11, 467:4, 467:5, 467:7, 467:11, 467:12, 467:17, 467:23, 467:25, 468:1, 468:2, 468:4, 468:6, 468:7, 468:10, 468:11, 468:14, 469:11, 469:19, 469:20, 470:23, 470:24, 471:21, 472:12, 473:25, 474:15, 474:23, 480:15, 480:19, 480:20, 480:21, 481:3, 481:4, 481:5, 481:6, 481:7, 481:12, 481:13, 481:25, 482:5, 484:1, 485:21, 489:15, 496:4, 497:11, 497:12, 500:7, 500:16, 500:20, 500:21, 501:4, 501:7, 503:9, 506:22, 506:25, 510:19, 511:3, 511:9, 511:12, 512:22, 514:6, 514:18, 515:9, 516:8, 521:13, 523:1, 523:9, 527:5, 528:1, 530:12, 530:16, 530:23, 531:4, 531:8, 531:11, 531:13, 531:16, 531:22, 531:25, 532:3, 532:5, 532:20, 535:17, 536:7, 536:16, 536:20, 537:4, 538:20, 539:1, 539:6, 539:9, 539:19, 539:24, 540:16, 540:20, 540:23, 541:2, 542:21, 549:4, 549:24, 574:8, 579:23, 580:13, 582:7, 583:2, 586:9, 586:20, 587:2, 589:10, 589:11, 589:17, 589:18, 591:9, 591:13, 592:20, 595:18, 595:19, 595:21, 595:22, 596:24, 597:12, 598:7, 602:15, 605:20
**corrected** [1] - 574:7
**correction** [2] - 522:18, 526:20
**correctly** [2] - 402:11, 439:23
**corrects** [4] - 490:8, 494:1, 505:7, 572:11
**costs** [1] - 418:4
**couch** [1] - 450:23

**Counsel** [1] - 401:1
**counsel** [10] - 388:9, 459:23, 498:12, 502:17, 536:3, 546:24, 578:17, 598:16, 598:20, 603:12
**Count** [1] - 419:24
**counted** [1] - 402:11
**country** [47] - 393:2, 499:11, 500:12, 500:15, 500:18, 501:1, 501:3, 501:10, 503:9, 503:15, 503:19, 503:21, 503:24, 504:5, 504:14, 509:1, 509:8, 509:25, 532:21, 553:9, 579:22, 580:2, 580:4, 580:9, 581:19, 581:22, 582:6, 582:10, 582:13, 582:23, 582:25, 583:9, 583:10, 583:22, 583:25, 584:3, 584:4, 584:8, 584:13, 584:14, 584:18, 584:21, 586:2, 586:5, 586:9, 586:12
**counts** [2] - 592:11, 592:14
**County** [3] - 389:25, 396:10, 452:6
**couple** [6] - 410:25, 447:3, 465:24, 479:25, 480:13, 527:20
**course** [17] - 389:6, 402:12, 403:11, 406:21, 425:13, 428:21, 445:14, 475:2, 489:9, 549:20, 554:20, 569:4, 570:22, 577:8, 577:21, 578:9, 602:21
**Court** [23] - 387:3, 387:14, 418:4, 418:15, 419:17, 427:13, 447:20, 459:17, 459:21, 461:9, 480:3, 480:4, 481:25, 501:20, 501:25, 508:5, 522:12, 546:19, 546:22, 575:17, 578:1, 587:11, 605:15
**COURT** [217] - 385:1, 387:5, 387:9, 387:22, 388:8, 388:12, 388:14, 388:23, 399:3, 399:5, 399:17, 399:19, 401:4, 406:4, 406:6, 406:18, 407:2, 408:22, 408:24, 411:18, 411:21, 411:24, 412:2, 412:5, 412:19, 415:6, 415:8, 415:14, 415:19, 417:7, 417:18, 417:21, 417:25, 418:5, 418:7, 418:17, 418:21, 419:12, 419:19, 420:5, 420:8, 420:10, 420:14, 423:24, 424:1, 424:24, 425:1, 425:4, 425:18, 425:21, 425:24, 426:5, 426:10, 426:13, 426:16, 427:23, 428:5, 428:8, 428:10, 428:17, 428:22, 428:24, 429:1, 430:1, 431:7, 432:7, 439:17, 440:3, 441:24, 442:24, 443:2, 443:5, 447:14, 447:25, 448:11, 448:13, 448:16, 451:14, 451:16, 456:1, 458:13, 458:15, 459:12, 459:23, 460:1, 463:20, 465:17, 466:14, 468:18, 469:13, 470:4, 470:8, 478:8, 479:17, 480:7, 482:16, 482:18, 482:20, 489:12, 491:5, 492:6, 492:22, 495:3, 496:11, 496:13, 497:24, 498:12, 499:3, 499:22, 499:24, 501:11, 501:14, 502:2, 502:5, 502:9, 502:14, 502:17, 502:24, 507:18, 507:21, 507:24, 508:13, 509:10, 509:19, 510:1, 510:7, 510:10, 510:12, 524:20, 526:21, 526:24, 527:1, 529:16, 532:16, 533:7,

533:9, 533:12, 533:20, 534:22, 535:2, 535:4, 535:7, 535:9, 535:18, 535:21, 536:24, 537:8, 539:11, 539:15, 540:2, 541:10, 541:13, 541:15, 541:24, 542:4, 543:2, 543:16, 543:21, 544:9, 544:17, 544:19, 544:23, 544:25, 546:7, 546:14, 546:24, 547:1, 547:3, 562:14, 563:2, 566:23, 570:1, 571:23, 573:21, 573:24, 574:2, 574:4, 575:7, 575:10, 575:15, 575:25, 576:13, 576:17, 576:23, 577:1, 577:6, 577:11, 577:23, 578:12, 578:16, 579:1, 579:3, 579:15, 581:4, 581:11, 581:14, 581:16, 593:9, 593:11, 598:13, 599:7, 599:18, 599:20, 601:2, 601:20, 602:23, 603:1, 603:13, 603:23, 604:3, 604:6, 604:9, 604:22, 605:1, 605:3, 605:8, 605:11
**court** [8] - 482:7, 482:11, 486:1, 502:8, 504:12, 504:13, 504:18, 602:14
**Court's** [8] - 387:11, 387:15, 447:21, 448:3, 488:17, 497:22, 508:24, 534:1
**Courthouse** [1] - 386:23
**Courtroom** [1] - 470:10
**courtroom** [9] - 478:2, 489:7, 490:25, 491:1, 502:10, 547:7, 575:24, 576:3
**cover** [1] - 565:9
**covering** [2] - 408:4, 565:6
**CPL** [2] - 470:12, 606:22
**crack** [2] - 588:19, 588:20
**Crime** [1] - 445:13
**crime** [15] - 401:12, 401:18, 444:15, 444:17, 509:1, 509:5, 509:16, 509:17, 509:18, 534:10, 534:13, 534:23, 548:15, 548:23, 588:23
**crimes** [6] - 444:12, 444:13, 534:19, 535:1, 549:1, 549:21
**Criminal** [4] - 385:5, 444:9, 445:12, 446:2
**criminal** [3] - 444:12, 444:25, 533:15
**criminally** [1] - 465:10
**criminals** [2] - 444:15, 444:16
**CROSS** [9] - 389:3, 432:9, 439:18, 465:19, 466:16, 480:9, 499:6, 529:18, 579:17
**Cross** [9] - 606:10, 606:14, 606:15, 606:19, 606:19, 606:23, 607:3, 607:3, 607:7
**cross** [20] - 389:5, 427:10, 432:7, 439:17, 465:17, 466:14, 480:7, 499:3, 537:17, 538:18, 541:17, 541:22, 542:2, 542:14, 543:4, 543:10, 543:15, 544:1, 578:5, 579:15
**Cross-Examination** [9] - 606:10, 606:14, 606:15, 606:19, 606:19, 606:23, 607:3, 607:3, 607:7
**CROSS-EXAMINATION** [9] - 389:3, 432:9, 439:18, 465:19, 466:16, 480:9, 499:6, 529:18, 579:17
**cross-examination** [6] - 389:5, 537:17,

538:18, 541:17, 544:1, 578:5
**cross-examine** [1] - 427:10
**crossed** [1] - 580:8
**Crown** [4] - 397:16, 397:18, 456:16, 456:19
**CRR** [2] - 386:23, 605:25
**cruel** [2] - 425:24
**cruiser** [2] - 481:15, 481:20
**cuffed** [2] - 481:14, 481:19
**cuffs** [1] - 468:6
**CUNNINGHAM** [76] - 387:10, 387:20, 387:23, 387:25, 399:16, 399:18, 401:6, 401:8, 404:17, 404:18, 406:13, 406:15, 406:20, 407:5, 407:7, 408:20, 470:6, 470:9, 470:21, 478:6, 478:9, 479:15, 479:18, 480:5, 482:19, 502:11, 502:15, 535:8, 546:17, 546:25, 547:5, 547:20, 559:18, 559:21, 561:1, 562:16, 563:3, 563:4, 565:19, 565:22, 565:24, 566:22, 566:24, 568:21, 570:3, 571:25, 572:12, 573:23, 574:1, 574:3, 574:6, 574:9, 575:19, 576:1, 576:16, 577:9, 577:20, 577:24, 578:15, 578:20, 579:6, 579:13, 593:8, 593:10, 598:12, 599:6, 599:22, 601:5, 601:19, 603:11, 603:17, 604:12, 604:18, 604:23, 605:2, 605:4
**Cunningham** [5] - 385:14, 387:9, 404:16, 411:4, 604:10
**Cunningham's** [1] - 535:12
**CUNNINGHAM..........** [2] - 606:10, 607:8
**CUNNINGHAM............** [2] - 606:23, 607:7
**cup** [2] - 462:1, 464:17
**currency** [1] - 560:18
**custody** [19] - 477:14, 478:24, 481:12, 481:14, 481:19, 500:23, 501:3, 502:13, 502:15, 548:11, 587:19, 592:6, 592:10, 600:6, 603:19, 604:15, 604:19
**customer** [2] - 519:16, 519:19
**customers** [3] - 511:2, 511:4, 519:21
**cut** [1] - 545:9
**CVS** [1] - 396:2, 400:10

**D**

**D.C** [11] - 390:24, 405:9, 552:19, 553:4, 553:18, 561:15, 563:20, 586:21, 586:24, 588:23, 588:25
**Dallas** [2] - 505:4, 505:8
**dangerous** [2] - 597:4, 597:7
**dark** [1] - 596:16
**date** [5] - 460:21, 471:8, 504:12, 504:13, 504:18
**Date** [1] - 605:25
**daughter** [2] - 413:18, 434:14

**days** [27] - 391:2, 391:4, 392:15, 402:20, 402:24, 426:25, 427:7, 428:13, 428:14, 428:17, 429:6, 431:15, 431:17, 437:21, 441:15, 458:17, 497:6, 530:15, 545:5, 545:6, 545:7, 545:12, 545:13, 558:14, 587:16
**de** [4] - 385:6, 385:16, 457:8, 606:2
**dead** [2] - 494:22, 526:15
**deal** [2] - 569:1, 578:7
**dealt** [1] - 542:21
**death** [13] - 511:12, 521:20, 523:3, 523:7, 526:6, 527:5, 528:22, 529:6, 543:13, 544:2, 545:4, 566:9, 571:18
**December** [12] - 445:22, 446:12, 466:22, 500:14, 500:16, 500:22, 501:1, 551:19, 553:12, 587:6, 587:15, 590:7
**decided** [2] - 593:23, 595:23
**decision** [1] - 388:9
**decisions** [2] - 387:15, 388:5
**deck** [1] - 502:16
**declined** [1] - 476:23
**defend** [1] - 531:18, 596:16
**DEFENDANT** [6] - 425:15, 426:9, 426:12, 502:20, 580:23, 581:2
**Defendant** [21] - 385:16, 385:18, 389:7, 401:1, 403:6, 405:15, 407:18, 446:13, 447:8, 448:20, 449:2, 466:22, 466:23, 468:23, 468:24, 478:7, 478:23, 479:21, 489:11, 491:4, 578:4
**defendants** [1] - 575:21
**Defendants** [3] - 385:7, 502:10, 575:23
**defense** [1] - 478:4
**Defense** [4] - 534:7, 542:23, 551:12, 605:8
**deficit** [1] - 406:11
**degree** [5] - 508:20, 534:7, 534:11, 534:20, 536:10
**deliver** [1] - 515:8
**delivered** [1] - 526:3
**deliveries** [3] - 488:3, 489:23, 525:25
**delivering** [2] - 527:12
**delivery** [1] - 488:4
**delving** [1] - 427:14
**denied** [2] - 534:14, 534:15
**deny** [1] - 534:15
**depart** [2] - 406:23, 407:4
**Department** [11] - 443:19, 443:21, 446:18, 450:10, 459:7, 460:10, 465:9, 467:4, 467:25, 470:23, 603:21
**department** [2] - 449:20, 450:14, 470:25, 478:20, 490:4
**departure** [1] - 407:13
**depicted** [4] - 414:4, 452:4, 452:21, 454:24
**deport** [1] - 393:1
**deportable** [1] - 508:21
**deportation** [7] - 486:1, 509:12, 548:7, 549:7, 549:8, 549:10, 603:20
**deported** [22] - 392:21, 486:3, 497:11,

497:13, 499:13, 499:16, 500:6, 500:9, 500:13, 507:14, 507:15, 508:7, 508:11, 508:25, 509:2, 509:24, 510:9, 510:15, 548:10, 549:9
**deposed** [1] - 577:22
**deposition** [2] - 578:3, 578:11
**describe** [4] - 423:12, 452:3, 476:14, 572:21
**described** [3] - 431:4, 479:20, 558:25
**describing** [1] - 467:21
**desire** [2] - 514:19, 549:19
**detail** [1] - 525:5
**detained** [3] - 401:20, 401:22, 548:3, 550:4
**detective** [2] - 397:25, 445:12
**Detective** [34] - 389:5, 392:13, 399:8, 400:19, 400:20, 401:9, 404:6, 404:20, 405:7, 405:21, 406:10, 406:21, 409:3, 446:17, 446:21, 447:7, 448:23, 449:1, 467:7, 467:10, 467:13, 467:18, 468:8, 468:22, 469:5, 469:9, 497:19, 523:18, 524:3, 524:11, 525:2, 591:1, 591:2, 591:25
**determine** [2] - 403:12, 430:10
**developing** [1] - 444:15
**development** [1] - 408:6
**died** [4] - 494:24, 521:22, 521:24, 545:17
**Diego** [5] - 503:13, 503:18, 504:24, 504:25, 505:2
**difference** [1] - 578:1
**different** [12] - 397:23, 420:10, 438:5, 454:1, 461:6, 507:4, 537:17, 543:14, 557:11, 563:14, 565:4, 585:9
**difficult** [2] - 542:18, 582:15
**difficulty** [1] - 418:8
**direct** [10] - 406:17, 415:24, 445:21, 491:7, 506:20, 510:14, 513:22, 541:20, 542:1, 589:8
**DIRECT** [5] - 412:21, 443:14, 470:20, 483:17, 547:19
**Direct** [5] - 606:14, 606:18, 606:23, 607:2, 607:7
**directed** [3] - 419:4, 419:15, 419:18
**direction** [1] - 418:13
**directly** [6] - 406:2, 424:11, 426:19, 443:10, 470:15, 580:20
**dirty** [1] - 531:25
**disagrees** [1] - 419:17
**discover** [1] - 475:2
**discovered** [5] - 407:18, 429:20, 440:20, 440:24, 441:14, 471:19
**discuss** [5] - 459:14, 501:15, 546:9, 556:9, 603:2
**discussion** [10] - 406:7, 417:19, 425:2, 447:15, 507:19, 524:24, 533:10, 541:11, 575:8, 603:15
**discussions** [1] - 537:15
**dish** [1] - 565:16
**dispatch** [1] - 477:10

**dispense** [1] - 418:3
**displayed** [1] - 597:22
**disposition** [1] - 401:20
**disregard** [1] - 543:22
**distinctly** [1] - 543:9
**distribute** [7] - 554:4, 554:6, 554:16, 555:3, 555:14, 557:3, 557:9
**distributing** [2] - 593:12, 593:16
**DISTRICT** [2] - 385:1, 385:1
**District** [8] - 387:2, 387:3, 480:2, 480:4, 481:24, 548:23, 549:21, 561:13
**Division** [3] - 444:10, 445:10
**DIVISION** [1] - 385:2
**divisions** [1] - 444:11
**Docket** [1] - 385:5
**document** [5] - 394:9, 394:12, 474:4, 474:6, 474:10, 475:6, 475:8, 477:5, 479:5, 498:8, 498:9, 498:12
**documents** [2] - 475:3, 580:6
**dog** [5] - 426:2, 426:5, 542:25, 576:13, 604:1
**dollars** [3] - 495:23, 524:25, 560:19
**domestic** [7] - 533:25, 534:20, 534:22, 534:24, 535:16, 535:23, 536:10
**domingo** [1] - 458:23
**Dominican** [16] - 569:15, 569:18, 569:19, 569:21, 569:24, 570:10, 570:13, 570:17, 570:21, 570:24, 571:11, 572:18, 575:1, 595:21, 597:3, 597:4
**done** [10] - 400:25, 416:5, 420:8, 498:9, 514:6, 555:2, 568:10, 571:20, 580:19, 589:19
**door** [25] - 406:16, 424:22, 429:18, 429:20, 429:22, 430:3, 430:11, 435:4, 435:9, 435:12, 438:8, 438:22, 439:3, 439:7, 440:20, 440:24, 441:1, 441:3, 441:5, 441:10, 452:12, 452:15, 455:5, 512:11
**doormen** [2] - 403:20, 404:4
**doorway** [1] - 396:4
**down** [17] - 389:25, 411:18, 433:22, 433:23, 435:3, 435:7, 441:11, 441:12, 442:24, 443:10, 444:21, 470:4, 470:15, 496:10, 559:14, 579:25, 602:24
**downstairs** [1] - 431:18
**draw** [1] - 427:21
**drawing** [1] - 458:24
**dressing** [1] - 408:4
**drew** [1] - 437:23
**drinking** [8] - 545:17, 545:21, 545:22, 546:2, 546:3, 599:24
**Drive** [1] - 512:2
**drive** [3] - 391:5, 545:24, 562:18, 563:15
**driver** [4] - 471:20, 472:24, 473:10, 481:7
**driver's** [2] - 409:24, 410:6
**driving** [6] - 520:8, 522:2, 538:3, 545:20, 572:18, 575:1

**drop** [1] - 404:2
**dropped** [1] - 403:25
**drove** [1] - 537:16
**drug** [5] - 445:11, 549:2, 587:8, 587:12, 587:25
**drugs** [1] - 599:24
**drunk** [2] - 545:19, 545:20
**drywall** [1] - 601:15
**duct** [1] - 463:7
**due** [1] - 594:13
**Dueñas** [3] - 389:16, 389:18, 405:13, 406:12
**Dulles** [1] - 505:7
**DULY** [6] - 389:2, 412:8, 443:8, 470:13, 483:8, 547:11
**duration** [1] - 477:21
**during** [35] - 389:6, 395:3, 395:10, 403:16, 404:12, 406:21, 406:23, 407:14, 409:14, 411:5, 446:19, 486:13, 487:17, 488:5, 488:24, 490:5, 504:5, 511:7, 515:17, 521:15, 523:4, 531:22, 557:23, 562:23, 563:5, 564:22, 567:22, 571:19, 573:18, 578:2, 578:10, 579:7, 591:11, 593:25, 601:10
**duties** [3] - 471:5, 471:7, 471:14

## E

**e/2** [2] - 463:22, 567:2
**e/3** [1] - 567:2
**e/4** [1] - 567:2
**early** [2] - 387:12, 511:15
**easily** [1] - 558:5
**Easton** [7] - 396:10, 561:12, 561:17, 561:18, 562:1, 562:3, 562:6
**easy** [1] - 559:6
**eat** [1] - 433:10
**Edgewater** [1] - 528:10
**editorial** [1] - 577:24
**Edward** [1] - 386:3
**effect** [2] - 576:9, 603:22
**effectively** [1] - 427:10
**effects** [1] - 403:16
**effort** [1] - 579:4
**eggs** [2] - 565:16, 566:2
**eight** [7] - 413:18, 487:15, 488:8, 511:11, 511:22, 526:14, 545:15
**either** [16] - 395:16, 400:7, 401:11, 403:25, 407:13, 416:25, 420:2, 432:1, 476:19, 494:15, 494:23, 517:16, 564:10, 592:23, 593:3, 603:23
**El** [46] - 389:8, 389:12, 389:23, 390:13, 390:14, 413:1, 484:7, 486:23, 486:24, 487:3, 487:7, 487:13, 487:14, 487:16, 487:20, 487:25, 489:15, 489:20, 493:3, 493:22, 494:16, 495:1, 496:3, 496:6, 496:23, 496:25, 497:5, 504:4, 506:14, 514:11, 517:14, 518:1, 525:7,

526:8, 528:5, 528:15, 531:8, 531:10, 531:14, 531:24, 537:16, 540:15, 541:20, 543:13, 544:2, 545:4
**el** [1] - 490:13
**elapsed** [3] - 425:9, 584:3, 593:22
**Electric** [1] - 457:5
**electric** [1] - 457:7
**electronic** [6] - 485:6, 485:15, 506:21, 506:24, 507:5, 603:5
**electronics** [4] - 485:5, 485:11, 485:16, 510:18
**elements** [1] - 419:8
**elicit** [1] - 542:1
**elicited** [2] - 448:4, 543:15
**emergency** [1] - 480:25
**emigrated** [1] - 503:19
**employed** [3] - 402:4, 505:12, 551:8
**employment** [3] - 585:24, 586:23, 587:5
**encounter** [7] - 446:13, 446:16, 446:19, 466:21, 471:18, 476:9, 477:18
**encountered** [11] - 446:17, 449:23, 450:8, 455:3, 455:4, 460:13, 460:14, 464:20, 465:1, 465:7, 508:21
**end** [9] - 391:2, 391:4, 402:23, 517:8, 550:20, 553:4, 559:12, 587:6, 603:2
**ended** [2] - 469:24, 590:11
**enemies** [2] - 531:19, 531:21
**enforcement** [7] - 474:17, 497:1, 497:4, 497:8, 498:3, 498:11, 498:24
**enforcers** [1] - 403:23
**enforcing** [1] - 471:16
**engage** [1] - 402:12
**engaged** [7] - 420:4, 481:7, 513:23, 514:5, 514:12, 532:5, 532:24
**engaging** [1] - 402:10
**English** [15] - 411:25, 423:16, 447:4, 467:14, 468:25, 469:1, 469:10, 473:10, 473:15, 476:6, 483:19, 483:20, 483:22, 524:23, 581:8
**enlisted** [1] - 594:7
**enter** [8] - 437:24, 502:10, 503:12, 580:4, 581:22, 584:3, 584:4, 584:8
**entered** [8] - 501:9, 503:8, 580:2, 583:9, 584:14, 586:17, 592:24, 596:24
**enterprises** [1] - 444:25
**enters** [4] - 388:11, 459:25, 502:23, 547:2
**entire** [1] - 446:19
**entirely** [1] - 533:18
**entirety** [1] - 471:2
**ENTITLED** [1] - 385:10
**entitled** [1] - 605:22
**entrance** [6] - 438:2, 452:9, 452:15, 461:15, 576:3
**entrances** [1] - 440:6
**entry** [1] - 503:21
**equally** [1] - 527:21
**equipment** [2] - 391:14, 480:25
**equivalent** [1] - 528:14

**Esau** [1] - 472:1
**Escobar** [10] - 413:21, 422:11, 422:12, 425:7, 426:19, 426:22, 427:7, 427:10, 427:19, 428:1
**Escobars** [2] - 425:12, 427:15
**Escobars'** [1] - 427:18
**Esquire** [2] - 385:17, 385:19
**Esquivel** [4] - 450:1, 454:25, 455:1, 472:1
**essentially** [1] - 550:1
**establish** [2] - 510:2, 577:17
**establishes** [1] - 510:3
**estimate** [4] - 477:21, 477:23, 495:12, 495:18
**et** [8] - 444:16, 447:4, 449:11, 479:10, 543:7, 543:8, 602:2
**evening** [16] - 415:25, 416:3, 416:11, 416:16, 416:18, 417:1, 420:22, 433:8, 434:17, 477:22, 480:14, 480:16, 487:18, 496:19, 590:18, 604:7
**event** [2] - 387:17, 387:25
**events** [8] - 427:5, 427:11, 427:14, 427:16, 427:21, 428:12, 428:14, 439:23
**eventually** [2] - 475:23, 475:24
**evidence** [9] - 395:10, 419:25, 420:3, 451:25, 454:13, 455:22, 460:15, 460:19, 463:16
**evidently** [3] - 425:6, 434:10, 510:3
**ex** [2] - 491:19, 506:11
**ex-wife** [2] - 491:19, 506:11
**exactly** [2] - 509:4, 563:14
**Examination** [25] - 606:10, 606:10, 606:11, 606:11, 606:14, 606:14, 606:15, 606:15, 606:16, 606:18, 606:19, 606:19, 606:20, 606:20, 606:23, 606:23, 607:2, 607:3, 607:3, 607:4, 607:4, 607:7, 607:7, 607:8, 607:8
**EXAMINATION** [25] - 389:3, 401:7, 409:1, 411:2, 412:21, 432:9, 439:18, 440:4, 442:1, 443:14, 465:19, 466:16, 468:20, 469:14, 470:20, 480:9, 483:17, 499:6, 529:18, 537:1, 545:2, 547:19, 579:17, 599:21, 601:23
**examination** [11] - 389:5, 506:20, 510:14, 513:22, 537:17, 538:18, 541:17, 541:23, 544:1, 578:5, 589:8
**examine** [1] - 427:10
**examined** [1] - 541:21
**examiner** [1] - 418:8
**examiner's** [1] - 544:19
**exceed** [1] - 541:22
**exceeding** [1] - 541:16
**except** [1] - 389:7
**exception** [3] - 403:10, 410:2, 410:15
**exchange** [2] - 392:4, 393:2
**exchanged** [1] - 588:16
**excuse** [9] - 387:20, 394:10, 438:17, 471:11, 482:25, 488:20, 525:6,

598:15, 603:18
**excused** [10] - 411:20, 443:1, 459:19, 470:5, 482:22, 501:22, 546:13, 546:15, 602:25, 603:14
**Excused**................................. [6] - 606:12, 606:16, 606:21, 606:24, 607:5, 607:9
**execute** [2] - 396:9, 397:3
**executed** [4] - 397:6, 397:9, 471:12, 479:2
**execution** [1] - 445:15
**exhibit** [4] - 404:13, 414:12, 461:10, 573:24
**Exhibit** [23] - 398:15, 404:11, 404:22, 414:3, 458:25, 461:10, 462:17, 472:9, 472:13, 474:3, 475:5, 475:14, 477:4, 478:13, 479:5, 551:2, 554:12, 556:2, 557:6, 564:7, 565:12, 572:25, 573:12
**Exhibits** [1] - 567:2
**exit** [1] - 474:20
**expect** [2] - 418:22, 553:3
**expected** [4] - 553:22, 554:2, 554:15, 556:13
**Expedition** [7] - 491:14, 520:2, 522:3, 537:21, 537:24, 538:3, 538:8
**expelled** [1] - 583:11
**experience** [4] - 419:22, 449:6, 453:6, 460:18
**experienced** [1] - 428:14
**expired** [1] - 509:13
**explain** [4] - 405:25, 429:19, 449:8, 525:4
**expressed** [2] - 483:24, 544:5
**expression** [1] - 427:24
**expressions** [1] - 395:22
**extent** [4] - 445:1, 446:10, 577:14, 578:8
**exterior** [2] - 452:12, 461:2
**extraordinarily** [1] - 419:9
**extreme** [1] - 403:1

## F

**F.3d** [1] - 534:2
**face** [4] - 470:10, 547:7, 571:3
**facial** [2] - 395:21, 578:10
**fact** [27] - 393:15, 399:14, 420:3, 420:4, 425:12, 427:10, 439:5, 446:23, 450:5, 467:10, 475:21, 481:11, 487:1, 523:19, 533:17, 533:23, 534:2, 535:12, 542:1, 542:5, 542:8, 576:21, 586:3, 596:10, 602:11, 602:19
**factories** [1] - 485:14
**facts** [2] - 418:13, 534:12
**failed** [1] - 394:4
**fair** [16] - 391:23, 395:6, 395:20, 397:25, 435:15, 436:17, 467:21, 469:24, 510:21, 513:13, 527:11, 527:18, 529:23, 532:19, 589:23, 604:12
**fairly** [3] - 428:17, 558:25, 577:25

**false** [2] - 533:19, 534:4
**familiar** [8] - 405:7, 449:5, 486:4, 530:6, 531:7, 532:2, 532:21, 555:8
**family** [22] - 417:13, 421:14, 421:17, 422:19, 423:7, 423:19, 424:20, 429:6, 431:5, 432:2, 432:14, 432:15, 432:18, 433:1, 540:22, 542:3, 542:7, 549:17, 549:19, 578:6, 581:25, 583:20
**far** [6] - 428:12, 453:3, 484:8, 508:8, 518:16, 541:16
**favors** [1] - 392:5
**fear** [2] - 578:4, 578:7
**February** [12] - 501:2, 542:9, 549:23, 551:5, 556:25, 567:4, 574:11, 587:2, 591:2, 591:18, 592:3, 592:6
**fed** [1] - 435:20
**federal** [2] - 548:19, 548:22
**feed** [1] - 435:23
**feelings** [1] - 544:5
**feet** [1] - 512:11
**felt** [8] - 424:2, 529:5, 529:7, 529:13, 530:22, 544:10, 544:14, 578:6
**female** [6] - 396:15, 446:5, 453:10, 457:3, 460:14, 476:16
**females** [3] - 396:2, 396:4, 455:7
**feminine** [3] - 451:9, 453:1, 456:24
**Ferman** [1] - 604:19
**few** [19] - 404:6, 427:1, 427:16, 431:16, 440:2, 449:3, 450:9, 451:19, 524:4, 524:22, 545:5, 564:6, 564:25, 584:5, 587:16, 593:24, 593:25
**fifteen** [1] - 443:22
**fight** [2] - 542:25, 604:1
**fill** [2] - 479:9, 479:11
**filled** [1] - 478:15
**finally** [6] - 410:14, 455:14, 464:16, 475:25, 479:4, 504:16
**financial** [2] - 392:9, 392:10
**financially** [1] - 392:4
**finger** [2] - 414:11, 414:23
**finished** [1] - 521:7
**firearms** [1] - 531:7
**first** [54] - 391:18, 393:6, 405:16, 419:21, 427:2, 427:4, 437:8, 437:13, 437:17, 446:12, 451:5, 452:2, 452:4, 452:10, 452:16, 456:3, 461:1, 463:22, 471:22, 472:2, 472:18, 473:16, 475:22, 476:1, 477:18, 482:9, 484:16, 484:19, 490:2, 498:19, 501:9, 506:10, 507:2, 511:19, 516:4, 516:7, 519:1, 519:9, 534:5, 538:5, 538:7, 545:15, 551:17, 554:25, 557:10, 568:8, 570:9, 570:18, 580:1, 582:9, 583:13, 584:25, 585:3, 586:17
**five** [12] - 426:25, 501:17, 511:1, 530:15, 538:13, 539:18, 539:20, 540:7, 545:6, 545:7, 545:11, 545:13
**five-year** [1] - 540:7
**fix** [5] - 430:24, 430:25, 520:7, 520:11, 540:19

**Flaco** [38] - 389:8, 389:12, 389:23, 390:13, 390:14, 390:16, 404:8, 404:25, 405:14, 405:15, 405:18, 405:23, 406:1, 490:6, 490:14, 490:18, 490:20, 490:22, 491:1, 491:9, 491:13, 493:3, 493:5, 493:7, 493:23, 494:15, 494:24, 497:14, 498:20, 517:14, 517:16, 522:25, 537:16, 538:2, 538:7, 539:8, 544:7
**Flaco's** [1] - 498:22
**flee** [2] - 481:5, 481:22
**fleeing** [1] - 581:21
**flew** [1] - 505:4
**flip** [1] - 481:2
**flipping** [1] - 534:10
**Floco** [1] - 404:25
**floor** [3] - 435:5, 437:8, 452:17, 452:18
**Flores** [36] - 411:23, 411:24, 412:14, 412:25, 414:10, 414:19, 415:1, 415:3, 415:16, 415:24, 416:15, 417:11, 420:21, 421:8, 422:17, 423:12, 423:21, 424:19, 429:5, 431:4, 431:14, 432:11, 432:13, 433:3, 434:20, 435:2, 437:23, 438:11, 438:21, 438:24, 439:5, 439:15, 439:20, 440:6, 440:19, 442:3
**FLORES** [2] - 412:7, 606:13
**Florida** [1] - 403:7
**flower** [1] - 449:11
**fluency** [1] - 446:25
**FOCR** [1] - 386:23
**folded** [2] - 451:6, 451:8
**follow** [1] - 399:11
**followed** [1] - 429:6
**following** [16] - 396:1, 397:7, 406:7, 406:13, 406:15, 407:13, 417:19, 425:2, 447:15, 507:19, 533:10, 541:11, 562:25, 575:8, 578:18, 603:15
**food** [7] - 403:15, 403:24, 433:9, 556:14, 559:25, 597:10, 597:14
**FOR** [3] - 385:1, 385:10, 606:7
**force** [1] - 582:20
**forced** [1] - 395:14
**Forces** [2] - 493:21, 531:10
**Ford** [3] - 491:13, 522:3, 537:24
**foregoing** [1] - 605:20
**Forest** [2] - 512:2, 542:9
**forgot** [1] - 513:5
**form** [3] - 392:13, 478:15, 478:25, 479:8, 479:11
**former** [2] - 536:13, 537:3
**forty** [1] - 484:13
**forty-three** [1] - 484:13
**forward** [1] - 388:2
**forwarded** [3] - 519:17, 519:18, 519:20
**fought** [6] - 531:10, 531:15, 531:24, 532:25, 533:1, 534:17
**four** [29] - 400:1, 400:7, 402:13, 413:15, 426:25, 438:6, 438:7, 536:17, 545:6, 545:11, 549:13, 556:20, 562:23,

563:5, 567:1, 591:15, 591:19, 592:11, 592:14, 592:20, 592:22, 593:2, 593:19, 594:8, 601:3, 601:10, 602:19, 603:21

**fourth** [4] - 553:11, 579:22, 586:9, 586:12
**frame** [4] - 445:21, 523:4, 538:1, 538:19
**Franco** [2] - 389:18, 405:13
**frankly** [1] - 427:9
**Freddy** [1] - 395:1
**free** [3] - 468:4, 476:24, 568:25
**freezer** [1] - 397:20
**frequently** [1] - 469:23
**freshening** [1] - 451:10
**Friday** [1] - 458:22
**friend** [5] - 516:19, 519:15, 526:14, 530:15, 546:2
**friend's** [4] - 476:1, 476:5, 476:8, 546:1
**friendly** [1] - 511:5
**friends** [3] - 495:15, 519:11, 546:5
**front** [8] - 387:13, 391:8, 396:1, 429:18, 429:20, 438:22, 439:7, 452:12
**Frye** [1] - 387:15
**Fuentes** [5] - 450:1, 454:25, 455:1, 469:7, 472:1
**FUERTES** [3] - 385:7, 426:12, 581:2
**Fuertes** [23] - 385:18, 389:8, 405:15, 405:23, 426:10, 446:13, 447:8, 448:20, 450:3, 466:22, 466:23, 467:3, 467:13, 467:24, 468:23, 468:24, 478:7, 478:23, 479:21, 480:19, 491:4, 576:6, 578:22
**Fuertes'** [1] - 449:2
**full** [4] - 455:1, 493:1, 494:10
**funeral** [4] - 526:8, 526:10, 526:23, 529:2
**funny** [1] - 565:20
**furtherance** [5] - 419:13, 419:14, 419:15, 419:18, 419:24
**fuse** [1] - 520:14
**fuss** [1] - 604:4

## G

**gainful** [1] - 585:24
**Gallagher** [1] - 387:13
**gang** [2] - 581:21, 582:17
**gangs** [4] - 582:15, 582:17, 583:1, 583:4
**garb** [1] - 548:2
**GARCIA** [1] - 385:7
**Garcia** [9] - 385:18, 394:23, 394:25, 395:3, 455:8, 455:10
**gas** [9] - 416:14, 424:22, 429:22, 430:6, 551:25, 552:1, 589:15, 589:19, 590:2
**Gas** [1] - 457:5
**gasoline** [21] - 427:3, 429:15, 429:20, 430:5, 430:6, 430:11, 437:14, 437:17, 437:19, 438:21, 438:25, 439:3, 439:4, 439:6, 440:20, 440:24, 440:25, 441:8,

441:10, 441:14, 442:12
**gather** [1] - 586:1
**Gees** [1] - 496:2
**general** [5] - 418:13, 450:24, 485:19, 539:23, 540:6
**generally** [3] - 420:5, 449:1, 450:21
**gentleman** [4] - 466:24, 551:11, 579:7, 589:9
**gentlemen** [5] - 388:12, 480:23, 498:21, 581:9, 594:4
**George's** [1] - 389:25
**Georgia** [1] - 548:20
**Gerald** [1] - 385:17
**GERMAN** [2] - 385:6, 606:2
**German** [3] - 385:16, 397:22, 489:11
**gestures** [1] - 578:10
**Gilmore** [1] - 534:1
**Giordano** [3] - 386:23, 605:19, 605:25
**girl** [13] - 396:25, 415:10, 416:17, 416:20, 416:25, 417:11, 434:12, 442:15, 442:17, 495:17, 495:19, 513:20, 545:18
**girlfriend** [4] - 487:24, 525:11, 544:2, 598:7
**girls** [9] - 403:25, 410:8, 410:11, 410:15, 512:20, 597:10, 597:14, 597:19, 597:22
**given** [10] - 408:9, 422:2, 422:4, 427:10, 453:9, 453:12, 477:13, 560:4, 562:13, 579:10
**glare** [1] - 455:9
**glass** [3] - 430:19, 565:16
**Goldstein** [1] - 386:4
**GOLDSTEIN** [15] - 420:19, 425:19, 426:4, 438:17, 482:25, 483:4, 490:8, 492:8, 494:1, 494:4, 505:6, 514:9, 581:5, 581:12, 581:15
**Gonzalez** [2] - 457:8, 465:23
**GOVERNMENT** [1] - 606:8
**Government** [42] - 385:13, 388:4, 393:3, 404:11, 404:22, 414:9, 420:10, 425:5, 425:10, 426:18, 462:17, 472:9, 472:13, 474:3, 475:5, 475:14, 477:4, 478:13, 479:4, 479:16, 500:19, 504:10, 535:10, 542:23, 546:16, 547:4, 551:1, 554:12, 556:1, 557:6, 564:6, 565:1, 565:5, 565:12, 566:5, 572:25, 573:4, 573:12, 577:18, 598:19, 603:18
**Government's** [28] - 387:15, 393:23, 414:3, 452:4, 452:8, 452:11, 452:20, 452:21, 453:14, 454:15, 456:4, 456:10, 456:14, 456:23, 457:1, 457:13, 457:16, 458:1, 458:25, 460:4, 461:4, 461:14, 461:18, 461:25, 463:22, 464:23, 498:15, 567:1
**governmental** [1] - 548:3
**grabbed** [2] - 395:13, 583:12
**grade** [1] - 447:2
**grant** [1] - 448:23

**granted** [1] - 543:21
**great** [4] - 466:12, 480:12, 578:4, 578:6
**ground** [1] - 437:19
**guard** [1] - 403:21
**Guatemala** [1] - 503:19
**guess** [4] - 422:5, 510:5, 553:10, 576:2
**guessing** [1] - 479:24
**guilty** [9] - 529:5, 529:7, 529:13, 530:22, 536:19, 544:14, 548:14, 548:23
**gun** [36] - 394:16, 394:17, 399:22, 400:4, 400:5, 493:12, 493:18, 493:23, 494:6, 494:11, 517:16, 517:17, 517:20, 518:1, 518:9, 518:11, 519:6, 521:3, 521:8, 521:16, 522:24, 538:20, 539:8, 544:7, 572:6, 572:8, 572:14, 572:19, 572:21, 573:1, 573:4, 573:6, 573:7, 573:9, 575:2, 595:14
**gunpoint** [1] - 593:6
**guns** [3] - 394:21, 493:17
**guy** [5] - 491:2, 517:24, 551:8, 560:25, 561:24
**guys** [4] - 404:4, 567:3, 568:13, 570:20

## H

**H-A-R-T-L-O-V-E** [1] - 388:22
**H-E-R-N-A-N-D-E-Z** [1] - 483:14
**habit** [2] - 549:2, 587:25
**hair** [2] - 409:20, 409:21, 486:25
**half** [8] - 413:6, 414:7, 477:23, 493:1, 582:7, 584:16, 584:20, 601:4
**Hampshire** [2] - 512:6, 561:13
**hand** [14] - 398:16, 400:11, 404:20, 412:6, 443:6, 470:11, 472:9, 475:14, 483:6, 489:22, 547:8, 547:9, 562:3, 566:25
**handed** [2] - 474:2, 474:4
**handgun** [2] - 399:15, 517:14, 592:23
**handing** [2] - 557:23, 593:5
**handle** [1] - 558:23
**handmade** [1] - 462:7
**happy** [1] - 598:10
**harder** [1] - 557:7
**harm** [1] - 533:1
**harmed** [1] - 576:20
**Hartlove** [31] - 388:21, 388:22, 392:13, 401:9, 404:6, 404:20, 405:7, 405:21, 406:10, 406:21, 446:17, 446:21, 447:7, 448:23, 449:1, 467:7, 467:10, 467:13, 467:18, 468:8, 468:22, 469:5, 469:9, 497:19, 523:18, 524:3, 524:11, 525:2, 525:5, 591:2, 591:25
**HARTLOVE** [2] - 389:1, 606:9
**hate** [1] - 513:5
**head** [4] - 452:19, 469:18, 487:2, 534:10
**headlight** [2] - 472:19, 473:1
**hear** [6] - 406:14, 421:11, 423:4, 425:15, 425:16, 425:17, 426:7, 426:10, 432:24, 435:12, 502:21,

507:21, 508:17, 541:13, 568:16, 569:23, 570:9, 570:23, 571:1, 571:6, 571:11, 571:13, 571:16, 571:20, 575:10, 575:11, 575:12, 580:18, 580:20, 580:24, 581:2, 581:9, 581:12

**heard** [9] - 395:19, 418:20, 421:13, 421:14, 423:6, 436:9, 569:13, 571:14, 572:1

**hearing** [6] - 388:8, 482:9, 504:20, 577:16, 581:6

**hearsay** [2] - 399:18, 415:13

**heater** [1] - 456:12

**Hector** [1] - 408:15

**held** [8] - 390:3, 395:12, 504:21, 528:7, 578:18, 592:6, 592:11

**Hello** [2] - 511:6, 519:10

**help** [9] - 390:2, 399:8, 417:11, 417:12, 420:3, 420:21, 420:24, 587:25, 594:7

**helped** [2] - 431:18, 594:5

**helping** [3] - 395:25, 417:14, 418:23

**Henry** [2] - 389:17, 389:20, 390:11

**HERNANDEZ** [2] - 483:7, 607:1

**Hernandez** [4] - 455:8, 483:13, 483:14, 604:19

**herself** [2] - 432:16, 526:1

**hi** [1] - 528:4

**high** [3] - 447:2, 473:8, 484:9

**highly** [1] - 427:8

**Hill** [1] - 542:9

**Hilltop** [2] - 472:5, 522:1

**himself** [3] - 474:1, 572:11, 578:7

**Hispanic** [10] - 396:24, 398:11, 450:10, 476:16, 476:17, 485:17, 487:5, 487:11, 510:22, 510:25

**Hispanics** [1] - 511:1

**history** [1] - 548:9

**hit** [1] - 537:6

**hold** [4] - 387:18, 402:2, 445:7, 445:23

**holding** [6] - 398:16, 573:12, 575:25, 576:1, 578:21, 578:25

**home** [18] - 398:23, 426:22, 431:11, 433:9, 442:14, 519:23, 521:3, 521:4, 545:23, 545:24, 582:13, 583:16, 584:8, 585:10, 588:6, 588:10, 588:11

**homeland** [1] - 501:7

**homemade** [1] - 464:14

**Honduran** [1] - 475:22

**Honduras** [5] - 548:1, 549:17, 578:6, 583:22, 583:23

**honest** [1] - 479:24

**honestly** [1] - 544:10

**Honor** [144] - 387:10, 388:24, 399:2, 399:4, 399:18, 400:25, 401:2, 401:6, 406:5, 406:16, 406:25, 408:21, 408:23, 410:24, 411:1, 411:16, 411:19, 411:22, 412:1, 412:20, 415:12, 417:16, 418:1, 418:6, 418:10, 418:18, 418:19, 419:1, 419:14, 420:15, 424:23, 425:5, 425:19, 426:4, 426:12, 426:15, 426:17, 427:4, 428:1,

428:19, 428:20, 428:21, 429:24, 432:8, 440:2, 441:23, 442:23, 447:12, 448:2, 448:12, 451:13, 455:25, 458:11, 459:9, 459:24, 463:19, 465:16, 466:15, 467:2, 468:17, 470:2, 470:7, 478:6, 479:15, 480:6, 480:8, 482:14, 482:17, 482:19, 482:23, 483:16, 492:21, 495:2, 497:23, 499:4, 501:13, 502:8, 502:12, 502:16, 502:18, 503:1, 507:16, 507:23, 507:25, 508:6, 508:15, 508:23, 509:3, 509:6, 509:11, 509:20, 524:19, 529:17, 532:14, 533:4, 534:5, 535:11, 536:22, 537:7, 539:10, 539:25, 541:8, 541:14, 541:16, 541:25, 542:15, 542:24, 543:9, 543:17, 543:20, 543:24, 544:15, 544:18, 544:22, 546:6, 546:17, 546:18, 546:25, 562:11, 566:22, 568:17, 574:6, 575:6, 575:13, 575:17, 575:19, 576:14, 577:21, 578:15, 579:14, 579:16, 580:16, 580:17, 581:5, 581:6, 593:8, 598:12, 598:15, 599:6, 599:19, 601:19, 603:11, 603:17, 603:25

**HONORABLE** [1] - 385:11

**Honorable** [8] - 387:4, 459:17, 459:21, 501:20, 501:25, 546:19, 546:22, 605:15

**hope** [1] - 387:14

**hoping** [1] - 590:4

**Hospital** [1] - 447:5

**hot** [1] - 456:12

**hour** [4] - 435:17, 436:18, 477:23

**hours** [14] - 411:15, 413:25, 415:25, 425:7, 425:9, 427:1, 427:6, 434:17, 435:17, 435:18, 436:20, 436:21, 466:8, 536:17

**house** [30] - 391:9, 395:17, 395:18, 399:13, 403:21, 404:4, 407:11, 425:12, 429:13, 429:16, 433:5, 435:5, 437:24, 442:4, 485:13, 512:12, 512:14, 512:15, 516:13, 516:15, 518:23, 518:24, 519:16, 522:5, 539:4, 588:3, 588:4, 589:1, 589:3

**household** [5] - 425:8, 426:20, 427:2, 427:7, 433:2

**houses** [5] - 398:7, 398:8, 487:18, 488:3, 489:23

**HSI** [1] - 386:3

**Hudson** [2] - 591:2, 591:25

**Humberto** [2] - 446:4, 486:14

**hurt** [3] - 421:7, 504:4, 534:17

**husband** [16] - 413:13, 416:10, 422:8, 422:9, 422:23, 424:5, 430:4, 433:18, 433:21, 436:6, 438:14, 526:3, 527:8, 529:6, 529:13, 545:19

**husband's** [6] - 413:20, 413:21, 430:13, 430:21, 441:18, 526:6

**husher** [2] - 508:14, 578:16

**hygiene** [2] - 453:1, 456:24

# I

**ICE** [1] - 603:19

**idea** [3] - 427:11, 529:2, 575:18

**identical** [1] - 476:2

**identification** [5] - 404:8, 405:14, 406:16, 473:24, 498:14

**identified** [14] - 401:14, 405:25, 472:1, 472:24, 473:13, 478:7, 489:11, 491:4, 551:9, 554:19, 570:10, 574:8, 589:9, 589:10

**identify** [9] - 405:15, 405:18, 405:21, 454:23, 456:4, 460:25, 464:24, 474:1, 564:18

**identifying** [1] - 555:20

**identity** [2] - 471:23, 475:19

**III** [2] - 385:6, 606:3

**illegal** [2] - 569:4, 596:9

**illegally** [16] - 392:16, 392:18, 410:15, 499:11, 500:10, 503:9, 509:22, 579:22, 580:2, 581:22, 582:23, 583:9, 583:25, 584:9, 586:9, 586:12

**illegals** [1] - 393:1

**illusion** [1] - 426:5

**image** [6] - 398:14, 407:23, 408:5, 408:9, 408:12, 573:1

**images** [3] - 408:8, 408:16

**imagine** [1] - 526:16

**immediate** [1] - 586:20

**immediately** [5] - 437:3, 505:3, 575:22, 580:13, 586:21

**immersion** [1] - 447:3

**Immigration** [7] - 402:7, 484:20, 486:2, 499:21, 525:4, 548:6, 548:11

**impeach** [1] - 509:7

**impediment** [1] - 388:2

**impermissible** [1] - 406:10

**IN** [1] - 385:1

**incarcerated** [1] - 401:23

**incarceration** [1] - 536:12

**incidences** [2] - 431:14, 437:13

**incident** [7] - 425:11, 427:2, 429:15, 430:13, 437:13, 471:22, 521:15

**incidents** [1] - 426:23

**include** [3] - 445:15, 452:5, 582:3

**included** [1] - 391:24

**including** [3] - 394:20, 417:17, 548:19

**inconsistent** [1] - 397:15

**indeed** [1] - 476:10

**INDEX** [1] - 606:1

**indicate** [2] - 399:25, 451:21

**indicated** [9] - 391:17, 391:19, 398:23, 414:14, 454:4, 469:16, 523:6, 602:14, 603:19

**indicating** [2] - 414:11, 461:12

**indicating)** [2] - 414:13, 414:25

**indicators** [1] - 451:11

**indicia** [2] - 451:11, 454:5

**Indictment** [1] - 428:16

**individual** [10] - 396:15, 401:14, 404:8, 405:14, 408:12, 455:2, 460:12, 471:19, 529:8, 574:14
**individuals** [10] - 393:19, 398:8, 450:8, 450:12, 450:16, 450:17, 454:23, 460:12, 476:20
**indulgence** [2] - 488:17, 497:22
**industry** [2] - 419:7, 460:23
**inference** [1] - 427:21
**inflicted** [1] - 533:1
**inform** [2] - 498:20, 502:12
**informant** [1] - 396:21
**informants** [1] - 392:1
**information** [10] - 391:19, 391:25, 392:4, 393:3, 448:1, 460:6, 477:11, 479:8, 479:10, 603:6
**initial** [1] - 405:19
**injured** [1] - 531:22
**inquire** [4] - 469:19, 475:18, 477:1, 603:18
**inquired** [1] - 578:23
**INS** [1] - 393:1
**inside** [21] - 391:5, 391:7, 391:12, 395:17, 396:3, 400:15, 400:17, 404:4, 417:15, 436:7, 455:16, 492:24, 494:9, 515:14, 516:25, 517:20, 521:3, 521:9, 522:14, 523:11
**insist** [1] - 530:25
**install** [1] - 517:5
**installing** [1] - 487:17
**insulted** [1] - 578:22
**insults** [1] - 571:18
**insurance** [2] - 430:23, 430:25
**Intelligence** [3] - 444:10, 444:14, 444:24
**intend** [3] - 448:4, 502:13, 605:9
**intended** [1] - 554:6
**intending** [2] - 542:1, 542:10
**interaction** [1] - 472:4
**intercepted** [1] - 596:10
**interest** [1] - 390:9
**interior** [3] - 453:17, 461:19, 462:20
**Internet** [1] - 603:6
**interpret** [3] - 496:18, 498:8, 576:10
**interpretation** [3] - 580:18, 580:19, 581:7
**interpreted** [1] - 483:1
**INTERPRETER** [32] - 420:19, 425:19, 426:4, 438:17, 482:25, 483:4, 488:17, 490:8, 492:8, 494:1, 494:4, 502:7, 505:6, 507:23, 514:9, 520:20, 522:17, 523:24, 526:19, 526:22, 526:25, 541:14, 559:20, 560:24, 565:23, 568:18, 572:10, 575:13, 580:16, 581:5, 581:12, 581:15
**Interpreter** [4] - 386:3, 386:4, 386:4, 482:25
**interpreter** [26] - 387:6, 412:3, 418:3, 426:8, 471:11, 483:25, 490:8, 492:8, 494:1, 496:17, 498:7, 502:3, 502:8,

505:6, 505:7, 507:21, 522:17, 523:25, 526:19, 526:22, 560:24, 568:18, 572:10, 575:10, 575:11, 580:17
**interpreters** [6] - 420:17, 438:17, 444:20, 488:21, 541:13, 581:6
**interrogating** [1] - 499:19
**interrupt** [2] - 501:11, 580:17
**intervened** [1] - 475:24
**intervention** [1] - 467:17
**interview** [4] - 401:11, 446:18, 525:2, 591:11
**interviewing** [1] - 389:16
**intimidate** [1] - 576:11
**intimidated** [2] - 576:19, 578:1
**introduced** [4] - 407:23, 408:9, 473:17, 598:18
**inventoried** [1] - 478:20
**inventory** [3] - 478:10, 478:14, 478:25
**investigate** [2] - 399:8, 594:23
**investigates** [1] - 444:12
**investigation** [10] - 389:6, 389:13, 392:21, 392:25, 403:11, 405:19, 409:14, 446:4, 446:9, 450:25
**Investigations** [4] - 444:9, 444:12, 445:12, 446:2
**investigations** [1] - 445:15
**investigators** [4] - 590:23, 591:7, 591:18, 595:16
**invited** [2] - 509:22, 589:5
**involved** [14] - 392:20, 396:16, 419:5, 419:16, 482:4, 527:8, 527:21, 533:21, 534:16, 536:6, 541:18, 569:3, 582:21, 590:20
**involvement** [1] - 449:15
**involving** [2] - 430:13, 536:10
**issue** [1] - 539:14
**issued** [2] - 472:11, 472:14
**item** [1] - 404:23
**items** [10] - 394:13, 404:5, 451:3, 451:19, 452:25, 454:4, 456:5, 462:3, 463:11, 585:9
**itself** [7] - 398:2, 398:5, 399:21, 428:16, 450:11, 451:4, 509:17

## J

**jail** [4] - 401:23, 536:15, 550:4, 602:17
**Jamaica** [1] - 505:15
**January** [3] - 486:3, 497:11, 501:1
**jeans** [1] - 475:9
**Jeffrey** [1] - 388:21
**JEFFREY** [2] - 389:1, 606:9
**Jelly** [1] - 453:1
**Jennifer** [3] - 512:3, 512:5, 512:22
**Jersey** [7] - 584:22, 584:25, 585:1, 585:2, 585:16, 585:22, 585:25
**JESSICA** [2] - 443:7, 606:17
**Jessica** [1] - 443:12
**JESUS** [2] - 385:6, 606:2

**Jesus** [2] - 385:16, 457:8
**job** [12] - 495:10, 523:12, 523:15, 527:16, 532:10, 552:12, 552:14, 582:13, 584:25, 585:5, 585:7, 590:4
**Joe** [2] - 591:2, 591:25
**JR** [1] - 385:11
**Jr** [1] - 387:4
**Juan** [4] - 413:21, 422:11, 422:12
**Judge** [9] - 387:13, 387:25, 420:13, 502:11, 535:8, 604:4, 604:8, 605:4, 605:13
**jueves** [1] - 458:22
**July** [1] - 396:8
**June** [5] - 517:8, 521:13, 521:19, 521:23, 523:2
**juror** [1] - 510:6
**JURORS** [1] - 388:13
**JURY** [1] - 385:11
**jury** [26] - 388:10, 388:15, 392:14, 427:21, 459:12, 459:23, 477:7, 479:7, 480:23, 498:21, 501:15, 501:17, 502:17, 509:9, 509:13, 509:20, 514:4, 534:11, 543:21, 546:8, 546:24, 550:10, 577:17, 596:13, 603:1
**Jury** [8] - 388:11, 459:19, 459:25, 501:22, 502:23, 546:13, 547:2, 603:14
**Justice** [1] - 603:21

## K

**K-I-R-C-H-N-E-R** [1] - 443:13
**Karma** [4] - 527:4, 528:15, 528:20, 528:23
**keep** [5] - 413:25, 559:4, 560:10, 567:13, 578:16
**Kelly** [1] - 386:3
**kept** [1] - 584:10
**Kerlin** [2] - 450:1, 472:1
**KEVIN** [1] - 385:7
**Kevin** [1] - 385:18
**kids** [1] - 539:5
**kill** [8] - 423:7, 423:19, 525:7, 570:5, 582:16, 582:19, 582:21, 583:4
**killed** [15] - 494:18, 495:1, 495:5, 495:6, 496:7, 496:23, 496:25, 518:1, 525:15, 529:13, 530:16, 530:25, 531:1, 531:2, 572:3
**killing** [1] - 530:22
**killings** [1] - 393:9
**kind** [22] - 400:11, 413:22, 413:25, 473:24, 478:22, 488:2, 493:18, 503:20, 506:2, 520:1, 552:3, 552:16, 553:22, 554:5, 556:13, 559:14, 570:23, 571:16, 576:10, 588:17, 590:9, 590:17
**kinds** [3] - 392:9, 554:15, 601:8
**Kirchgessner** [3] - 386:3, 417:23, 575:12
**KIRCHGESSNER** [14] - 488:17, 520:20,

522:17, 523:24, 526:19, 526:22, 526:25, 541:14, 559:20, 560:24, 565:23, 568:18, 575:13, 580:16
**Kirchner** [20] - 443:4, 443:12, 443:16, 444:20, 446:12, 448:19, 449:14, 451:12, 452:3, 453:7, 456:3, 456:16, 458:3, 458:17, 458:24, 460:3, 460:24, 463:13, 464:19, 466:18
**KIRCHNER** [2] - 443:7, 606:17
**kitchen** [7] - 433:13, 433:22, 450:23, 451:5, 454:13, 455:13, 456:12
**knowing** [1] - 529:8, 534:12, 544:6
**knowledge** [10] - 389:12, 390:17, 398:1, 407:1, 451:15, 451:17, 458:14, 466:3, 527:21, 600:19
**known** [2] - 397:25, 486:15
**knows** [1] - 439:11
**KY** [2] - 453:1, 456:24

## L

**Lab** [1] - 445:13
**laborer** [1] - 589:25
**lack** [2] - 395:15, 582:25
**ladies** [2] - 388:12, 410:5, 480:23, 498:20
**lady** [14] - 409:19, 418:23, 425:7, 425:8, 425:12, 426:19, 427:1, 427:6, 432:14, 433:20, 434:25, 436:17, 568:13, 598:22
**Laffer** [1] - 387:15
**lamp** [1] - 565:14
**Lane** [2] - 472:5, 522:1
**language** [2] - 418:8, 483:25
**large** [4] - 397:16, 397:18, 397:20, 485:18
**largely** [1] - 474:7
**last** [12] - 391:3, 400:10, 496:6, 496:22, 501:1, 513:4, 513:5, 517:4, 519:2, 538:24, 543:19, 543:22
**late** [1] - 589:13
**Latin** [2] - 555:2, 555:4
**Latinos** [2] - 398:10, 398:11
**Laughter** [1] - 565:18
**law** [9] - 474:16, 497:1, 497:4, 497:8, 498:3, 498:11, 498:24, 510:4, 510:5
**law-abiding** [1] - 510:4
**lawful** [2] - 585:7, 586:23
**laws** [1] - 471:17
**lawyer** [3] - 535:9, 579:8, 600:12
**lawyers** [1] - 508:13
**lead** [1] - 585:22
**leading** [3] - 415:18, 445:3, 544:8
**learn** [3] - 403:15, 416:8, 561:8
**learned** [7] - 409:5, 409:7, 432:13, 496:7, 496:23, 510:14, 514:11, 521:20, 553:21, 554:22, 590:16
**learning** [1] - 604:5
**least** [8] - 390:6, 473:12, 496:17, 534:6,

577:15, 582:1, 591:10, 591:11
**leave** [10] - 411:5, 435:10, 468:4, 485:25, 496:19, 509:15, 509:25, 515:13, 549:16, 582:1
**leaving** [5] - 407:8, 407:15, 522:21, 549:15, 584:7
**led** [1] - 469:3
**ledgers** [1] - 457:15
**Lee** [3] - 400:19, 400:20, 591:1
**leeway** [1] - 418:8
**left** [31] - 421:22, 421:24, 421:25, 422:3, 435:1, 435:12, 436:3, 436:18, 440:22, 459:8, 475:9, 478:17, 479:13, 495:19, 496:1, 496:3, 517:4, 519:2, 521:11, 524:12, 524:17, 563:10, 568:4, 574:12, 581:25, 583:16, 588:11, 598:22, 599:10, 604:22
**legal** [3] - 410:16, 499:12, 585:8
**legally** [5] - 410:19, 499:11, 499:12, 500:16, 500:18
**length** [1] - 421:4
**lengthy** [1] - 395:8
**lent** [1] - 417:8
**less** [4] - 434:13, 447:6, 528:21, 595:2
**level** [4] - 387:22, 437:19, 445:11, 446:25
**liaison** [1] - 450:10
**license** [12] - 409:24, 410:1, 410:6, 410:19, 471:20, 473:19, 473:21, 473:23, 474:13, 474:22
**lie** [2] - 433:23, 594:9
**lies** [1] - 538:24
**life** [3] - 582:15, 583:1, 595:21
**Lifestyle** [2] - 397:13, 397:20
**light** [5] - 387:14, 388:5, 447:21, 473:18, 480:24
**lights** [3] - 473:4, 473:6, 481:2
**likely** [1] - 434:20
**limit** [1] - 561:2
**limited** [1] - 476:7
**line** [1] - 532:14
**lines** [1] - 572:4
**liquor** [2] - 487:6, 512:7
**list** [1] - 604:24
**Listen** [1] - 518:3
**listening** [2] - 417:21, 496:1
**literature** [1] - 524:13
**live** [10] - 413:7, 413:12, 438:4, 438:5, 485:23, 506:6, 584:20, 586:18, 587:4, 587:7
**lived** [16] - 410:8, 410:12, 414:7, 414:10, 447:4, 504:25, 505:25, 506:5, 506:14, 520:24, 557:15, 584:22, 585:2, 585:5, 589:6
**lives** [2] - 438:3, 487:5
**living** [14] - 450:23, 451:18, 455:12, 461:21, 462:3, 480:2, 486:13, 553:14, 557:13, 557:20, 583:17, 594:1, 600:4, 600:5
**lobby** [2] - 446:18, 576:3

**local** [3] - 449:23, 465:13, 477:16
**locate** [3] - 390:2, 417:12, 465:24
**located** [7] - 414:12, 414:21, 452:16, 453:22, 455:10, 485:8, 498:5
**location** [20] - 396:10, 402:5, 449:18, 449:19, 450:5, 450:21, 451:23, 455:23, 460:13, 460:14, 460:15, 464:20, 512:1, 550:2, 550:7, 550:10, 551:4, 551:24, 561:9, 563:23
**locations** [1] - 445:16
**log** [1] - 454:14
**logical** [2] - 562:10, 569:5
**Lombard** [1] - 386:24
**look** [33] - 391:5, 391:6, 399:21, 400:2, 404:14, 408:16, 408:17, 430:4, 430:8, 447:8, 448:6, 448:23, 475:15, 478:2, 489:6, 490:25, 491:20, 491:22, 491:25, 492:1, 498:6, 518:8, 530:6, 535:24, 545:19, 551:1, 554:12, 554:18, 564:7, 570:17, 573:6, 590:1
**looked** [13] - 460:22, 476:2, 492:2, 520:6, 520:9, 522:13, 523:12, 552:11, 557:10, 564:3, 565:1, 590:2
**looking** [17] - 414:20, 455:5, 495:9, 508:16, 508:18, 518:5, 540:20, 552:2, 552:9, 552:12, 554:8, 572:18, 575:1, 584:10, 589:25, 598:14, 601:6
**lotions** [2] - 451:9, 453:2
**loud** [3] - 436:5, 436:6, 571:2
**loudly** [1] - 423:14
**lower** [2] - 453:3, 598:22
**luggage** [1] - 454:3
**lunch** [1] - 516:17
**Luncheon** [1] - 501:23
**lunes** [2] - 458:20, 458:21

## M

**ma'am** [5] - 388:21, 412:23, 413:7, 436:1, 465:21
**machete** [2] - 593:3, 593:7
**mailboxes** [1] - 461:13
**main** [2] - 461:20
**maintain** [1] - 575:20
**Maldonado** [5] - 461:17, 464:25, 465:6, 465:7, 466:8
**male** [6] - 395:25, 396:24, 403:21, 450:19, 453:9, 476:17
**males** [1] - 396:3
**MAME** [2] - 412:7, 606:13
**Mame** [1] - 412:14
**man** [34] - 389:20, 390:11, 423:8, 423:9, 423:18, 428:3, 431:24, 436:22, 437:4, 476:3, 477:13, 488:6, 489:9, 490:6, 511:2, 522:14, 526:16, 543:12, 550:18, 550:19, 550:22, 551:17, 555:20, 561:2, 561:23, 561:24, 571:21, 575:5, 589:10, 595:11, 595:13, 595:16, 595:20

**Manassas** [2] - 505:22, 505:25
**manner** [2] - 392:5, 514:17
**manufactured** [1] - 456:21
**manufacturer** [2] - 456:18, 493:15
**March** [33] - 402:15, 402:22, 402:23, 491:8, 491:13, 501:2, 516:2, 516:4, 516:8, 516:11, 516:12, 517:3, 517:13, 517:15, 519:4, 519:15, 520:9, 522:21, 538:1, 538:19, 540:18, 542:9, 542:22, 543:7, 586:13, 586:17, 586:20, 586:21, 586:24, 587:5, 587:6, 587:14
**March-April** [1] - 538:19
**marijuana** [2] - 549:5, 600:1
**Mark** [2] - 470:7, 470:17
**mark** [1] - 414:23
**MARK** [2] - 470:12, 606:22
**marked** [3] - 414:2, 480:21, 567:1
**marking** [1] - 414:11
**MARON** [2] - 412:7, 606:13
**Maron** [1] - 412:15
**married** [1] - 506:18
**Marshal's** [2] - 502:14, 502:15
**Marshals** [2] - 575:20, 576:7
**Marta** [2] - 386:4, 522:12
**martes** [1] - 458:21
**Marthza** [1] - 455:15
**Martin** [3] - 386:23, 605:19, 605:25
**Martinez** [2] - 455:15, 604:19
**MARYLAND** [1] - 385:1
**Maryland** [22] - 385:8, 386:24, 387:3, 405:9, 410:6, 410:9, 410:12, 413:9, 452:6, 457:6, 457:10, 457:20, 480:3, 481:24, 484:23, 485:2, 549:23, 550:2, 555:5, 561:15, 563:19, 563:22
**master** [2] - 425:24, 425:25
**matches** [1] - 453:12
**material** [2] - 397:19, 590:9
**materials** [1] - 391:12
**math** [1] - 511:14
**matter** [3] - 534:15, 552:4, 605:22
**MATTER** [1] - 385:10
**matters** [1] - 387:16
**Maximilliano** [4] - 393:18, 401:14, 547:6, 547:16
**MAXIMILLIANO** [2] - 547:10, 607:6
**maximum** [1] - 561:2
**McDonald's** [2] - 404:1, 404:3
**mean** [24] - 395:2, 409:9, 447:23, 486:24, 493:17, 494:20, 503:23, 504:1, 504:14, 512:9, 513:20, 515:20, 526:12, 532:8, 558:11, 565:25, 568:14, 574:21, 576:15, 576:18, 577:19, 582:12, 595:11, 599:14
**meaning** [1] - 398:10
**means** [4] - 403:13, 500:25, 532:8, 598:6
**meantime** [1] - 582:9
**meat** [2] - 418:14, 418:17
**meet** [6] - 467:6, 467:9, 488:13, 490:18,

490:20, 570:10
**meeting** [2] - 497:19, 591:1
**members** [7] - 388:15, 459:12, 485:17, 501:15, 514:4, 546:8, 603:1
**memory** [3] - 394:10, 400:3, 498:2
**men** [19] - 415:22, 415:23, 440:13, 440:15, 442:4, 442:13, 450:17, 558:2, 558:18, 559:1, 559:5, 559:9, 559:14, 560:7, 560:13, 578:24, 596:7, 600:20
**mentioned** [19] - 399:22, 399:23, 400:1, 413:22, 414:9, 421:2, 429:9, 429:15, 458:2, 459:1, 462:14, 463:16, 464:19, 474:13, 485:20, 489:14, 493:12, 538:24, 544:1
**mentioning** [1] - 422:11
**Merit** [1] - 605:19
**Merryman** [1] - 472:5
**mess** [1] - 518:7
**message** [2] - 494:16, 542:11
**messed** [1] - 602:10
**met** [18] - 391:17, 419:8, 467:3, 488:7, 490:2, 506:11, 506:18, 511:19, 551:17, 551:20, 551:24, 552:18, 553:11, 570:11, 570:20, 589:8, 589:15, 601:9
**Mexico** [3] - 503:16, 503:19, 580:4
**Miami** [13] - 491:12, 517:4, 517:9, 517:11, 519:3, 521:11, 521:17, 521:19, 521:23, 522:21, 523:2, 538:25, 539:5
**mic** [4] - 412:3, 443:10, 470:15, 579:25
**Michael** [2] - 385:14, 385:19
**mid** [2] - 459:11, 584:19, 586:5
**mid-morning** [1] - 459:11
**midday** [1] - 605:9
**middle** [2] - 447:2, 479:14
**midnight** [3] - 472:7, 480:16, 480:17
**might** [8] - 392:8, 444:21, 559:25, 569:3, 576:7, 579:25, 589:25, 590:3
**milk** [1] - 434:17
**mindful** [1] - 533:25
**mine** [4] - 518:6, 540:1, 567:5, 596:8
**minute** [4] - 394:10, 426:7, 466:20, 519:13
**minutes** [7] - 459:15, 464:18, 501:17, 524:22, 546:11, 561:4, 602:11
**Miranda** [4] - 447:10, 447:24, 448:10, 448:11
**Mirandize** [1] - 448:8
**Mirandized** [1] - 447:24
**miscellaneous** [1] - 463:2
**mischaracterization** [1] - 593:10
**misclarification** [1] - 539:14
**mismarked** [1] - 574:7
**missed** [3] - 481:3, 486:1, 504:13
**missing** [2] - 524:14, 524:15
**Mister** [1] - 557:12
**miércoles** [1] - 458:21
**modified** [1] - 534:8
**mom** [2] - 495:24, 583:6

**moment** [9] - 387:11, 399:1, 425:20, 458:25, 492:9, 497:22, 522:9, 596:12, 596:16
**moments** [2] - 425:7, 524:4
**Monday** [9] - 403:2, 406:23, 407:12, 407:14, 458:21, 562:25, 563:8, 594:25
**money** [22] - 394:1, 394:4, 487:16, 549:2, 556:23, 558:17, 558:20, 558:23, 559:1, 559:23, 560:4, 560:7, 560:8, 564:1, 568:8, 585:10, 585:15, 586:2, 594:13, 594:20, 595:3, 596:14
**monitoring** [1] - 417:23
**MONTEMARANO** [79] - 404:16, 406:3, 406:5, 406:9, 406:25, 410:25, 411:3, 411:16, 415:5, 415:7, 415:12, 415:18, 417:16, 417:24, 418:1, 418:6, 418:10, 425:22, 426:1, 431:6, 439:19, 440:1, 442:23, 447:12, 447:17, 448:7, 451:13, 451:15, 455:18, 455:20, 458:11, 458:14, 466:15, 466:17, 467:2, 468:17, 469:15, 470:2, 480:8, 480:10, 481:17, 481:18, 482:14, 502:18, 529:17, 529:19, 530:4, 530:5, 530:21, 532:17, 533:16, 533:21, 534:14, 535:6, 535:15, 535:19, 536:1, 536:4, 536:22, 537:7, 542:14, 542:24, 543:3, 543:17, 543:19, 543:24, 545:1, 545:3, 546:6, 577:2, 577:8, 577:12, 579:2, 599:19, 604:1, 604:4, 604:7, 604:17, 605:13
**Montemarano** [8] - 385:19, 389:9, 529:16, 541:17, 544:25, 577:1, 599:18, 603:23
**Montemarano's** [1] - 576:6
**MONTEMARANO..........** [3] - 606:11, 606:20, 607:4
**MONTEMARANO............** [4] - 606:15, 606:19, 606:23, 607:3
**month** [6] - 403:1, 403:4, 504:2, 504:3, 556:8, 595:2
**monthly** [2] - 511:18, 511:23
**months** [9] - 545:15, 548:18, 550:5, 584:3, 584:5, 586:1, 587:8, 601:4
**moral** [1] - 509:5
**Morales** [3] - 389:17, 389:20, 390:11
**morning** [28] - 387:5, 387:10, 387:11, 388:12, 388:13, 388:14, 390:9, 412:23, 412:24, 432:11, 432:12, 439:20, 439:21, 443:16, 443:17, 459:11, 459:13, 465:21, 466:18, 466:19, 466:25, 480:11, 480:14, 525:3, 603:7, 604:6, 605:11, 605:16
**most** [5] - 435:17, 510:21, 527:11, 527:15, 543:6
**mostly** [1] - 579:3
**mother** [1] - 583:7
**Motion** [1] - 543:21
**motion** [1] - 469:6
**motions** [2] - 469:16
**mouth** [1] - 577:3

**move** [17] - 406:3, 415:12, 429:24, 458:11, 484:22, 504:23, 505:21, 506:10, 507:4, 541:8, 543:19, 544:15, 555:12, 555:13, 583:20, 585:20, 586:21
**moved** [10] - 408:1, 445:11, 505:13, 505:18, 506:4, 506:6, 506:8, 506:16, 576:2, 585:16
**movements** [1] - 395:21
**moving** [1] - 459:9
**MR** [286] - 387:10, 387:20, 387:23, 387:25, 388:24, 389:4, 399:1, 399:4, 399:6, 399:7, 399:16, 399:18, 399:24, 400:24, 401:2, 401:6, 401:8, 404:16, 404:17, 404:18, 406:3, 406:5, 406:9, 406:13, 406:15, 406:20, 406:25, 407:5, 407:7, 408:20, 408:23, 409:2, 410:23, 410:25, 411:3, 411:16, 415:5, 415:7, 415:12, 415:18, 417:4, 417:6, 417:16, 417:24, 418:1, 418:6, 418:10, 418:19, 418:22, 419:14, 420:13, 423:23, 423:25, 424:23, 424:25, 425:5, 425:17, 425:22, 426:1, 426:15, 426:17, 428:20, 428:23, 428:25, 429:2, 429:24, 431:6, 432:8, 432:10, 438:19, 438:20, 439:14, 439:19, 440:1, 441:23, 441:25, 442:2, 442:21, 442:23, 447:12, 447:17, 448:7, 451:13, 451:15, 455:18, 455:20, 458:11, 458:14, 465:18, 465:20, 466:12, 466:15, 466:17, 467:2, 468:17, 469:15, 470:2, 470:6, 470:9, 470:21, 478:6, 478:9, 479:15, 479:18, 480:5, 480:8, 480:10, 481:17, 481:18, 482:14, 482:17, 482:19, 492:5, 492:21, 494:3, 495:2, 499:4, 499:7, 499:23, 500:5, 501:13, 502:11, 502:15, 502:18, 502:19, 503:1, 503:5, 505:9, 505:10, 508:6, 508:23, 509:6, 509:11, 509:20, 510:3, 510:8, 510:13, 513:2, 514:10, 520:21, 524:1, 524:2, 524:19, 524:21, 527:2, 527:3, 529:15, 529:17, 529:19, 530:4, 530:5, 530:21, 532:17, 533:16, 533:21, 534:14, 535:6, 535:8, 535:15, 535:19, 536:1, 536:4, 536:22, 537:7, 539:10, 539:13, 539:25, 541:8, 541:16, 542:14, 542:15, 542:24, 543:3, 543:17, 543:19, 543:24, 544:8, 544:15, 544:24, 545:1, 545:3, 546:6, 546:17, 546:25, 547:5, 547:20, 559:18, 559:21, 561:1, 562:11, 562:16, 563:1, 563:3, 563:4, 565:19, 565:22, 565:24, 566:22, 566:24, 568:16, 568:20, 568:21, 569:25, 570:3, 571:22, 571:25, 572:12, 573:23, 574:1, 574:3, 574:6, 574:9, 575:6, 575:17, 575:19, 576:1, 576:12, 576:14, 576:16, 576:18, 576:25, 577:2, 577:8, 577:9, 577:12, 577:20, 577:24, 578:15,

578:20, 579:2, 579:6, 579:13, 579:16, 579:18, 581:17, 593:8, 593:10, 593:14, 598:12, 598:14, 598:17, 599:6, 599:9, 599:17, 599:19, 599:22, 601:1, 601:5, 601:19, 601:22, 601:24, 602:22, 603:11, 603:17, 603:25, 604:1, 604:4, 604:7, 604:12, 604:17, 604:18, 604:23, 605:2, 605:4, 605:10, 605:12, 605:13, 606:10, 606:10, 606:11, 606:11, 606:14, 606:15, 606:16, 606:19, 606:19, 606:20, 606:23, 606:23, 607:3, 607:3, 607:4, 607:7, 607:7, 607:8, 607:8
**MS** [120] - 411:22, 412:1, 412:20, 412:22, 415:15, 415:21, 417:10, 418:18, 419:21, 420:7, 420:9, 420:15, 420:17, 420:20, 424:4, 425:16, 427:16, 427:25, 428:7, 428:9, 428:11, 428:19, 429:4, 430:2, 431:10, 432:6, 440:2, 440:5, 441:22, 443:3, 443:15, 444:20, 444:23, 445:2, 448:2, 448:12, 448:14, 448:18, 451:22, 455:19, 455:21, 455:25, 456:2, 458:16, 459:9, 459:24, 460:2, 461:9, 463:18, 463:21, 465:16, 468:19, 468:21, 469:12, 482:23, 483:3, 483:16, 483:18, 485:10, 486:9, 488:12, 488:20, 488:22, 489:10, 489:13, 491:3, 491:6, 492:12, 493:2, 494:5, 495:4, 496:12, 496:14, 496:15, 496:17, 497:22, 497:25, 498:7, 498:14, 498:18, 499:1, 507:16, 507:25, 508:15, 508:18, 509:3, 530:3, 532:14, 533:4, 533:8, 533:14, 534:5, 534:18, 534:24, 535:3, 535:11, 535:23, 537:2, 537:10, 539:16, 540:3, 540:5, 541:25, 542:5, 543:9, 543:25, 544:13, 544:18, 544:21, 546:18, 574:5, 582:18, 604:11, 604:24, 606:14, 606:15, 606:18, 606:20, 607:2, 607:4
**muerta** [1] - 573:14
**Muerte** [6] - 398:1, 398:8, 407:17, 408:2, 408:17, 573:15
**murder** [5] - 444:13, 446:4, 446:5, 497:1, 497:4
**murderer** [1] - 577:9
**murders** [2] - 541:19, 542:21
**music** [1] - 496:1
**must** [1] - 569:8

# N

**name** [38] - 388:19, 389:8, 389:22, 390:20, 405:3, 412:12, 412:14, 413:20, 413:21, 416:23, 416:24, 422:10, 422:12, 443:11, 455:1, 465:23, 470:15, 471:25, 474:1, 474:7, 474:9, 474:11, 475:21, 479:13, 483:10, 483:12, 486:18, 487:24, 542:8, 547:14, 550:22, 555:16,

555:17, 555:21, 556:4, 564:20, 599:2
**named** [6] - 389:20, 390:11, 404:8, 405:14, 486:14, 511:2
**names** [2] - 489:3, 490:22
**narrative** [2] - 496:11, 496:13
**nationality** [1] - 547:25
**nature** [3] - 533:24, 534:3, 535:13
**near** [8] - 396:3, 398:16, 439:6, 505:23, 512:7, 538:2, 543:4, 543:7
**nearby** [1] - 555:11
**necessary** [3] - 396:9, 404:19, 428:2
**need** [10] - 397:11, 418:11, 434:14, 447:23, 495:20, 495:25, 508:17, 581:11, 581:14, 582:12
**needed** [5] - 396:14, 403:15, 420:3, 432:25, 519:22
**needless** [1] - 419:9
**needs** [2] - 418:15, 580:17
**negative** [1] - 418:12
**neglected** [1] - 523:19
**neighbor** [2] - 429:21, 429:25
**neighborhoods** [1] - 471:16
**nervous** [1] - 424:2
**never** [51] - 392:11, 392:25, 426:5, 428:14, 431:20, 431:21, 465:25, 504:25, 507:12, 511:4, 512:15, 514:14, 515:15, 516:1, 516:18, 521:18, 525:16, 527:14, 528:16, 528:17, 529:14, 531:1, 531:3, 531:4, 531:5, 532:24, 532:25, 533:1, 533:3, 533:6, 534:17, 536:8, 541:5, 541:17, 541:21, 542:16, 542:22, 552:24, 556:22, 570:11, 570:20, 585:15, 601:13, 601:15, 601:16
**new** [7] - 444:16, 459:9, 495:7, 495:8, 495:11, 502:3, 523:10
**New** [15] - 505:13, 505:15, 505:16, 505:18, 505:19, 561:12, 561:13, 563:21, 584:22, 584:24, 584:25, 585:2, 585:16, 585:22, 585:25
**Newark** [1] - 584:22
**next** [18] - 392:15, 411:21, 421:15, 425:11, 437:16, 441:10, 443:2, 449:14, 454:22, 466:24, 494:11, 496:9, 502:13, 545:9, 547:1, 547:4, 605:5, 605:6
**nexus** [2] - 427:5, 427:8
**nice** [1] - 604:7
**nicely** [1] - 598:9
**nicknames** [3] - 486:21, 490:23, 555:24
**Nieto** [1] - 576:23
**night** [20] - 416:4, 416:21, 431:9, 478:22, 479:19, 479:20, 481:2, 482:4, 495:14, 520:15, 553:23, 563:25, 566:16, 566:20, 572:19, 594:25, 595:19, 596:11, 599:23, 603:10
**nine** [1] - 413:18
**nobody** [8] - 430:12, 439:2, 439:11, 442:15, 442:17, 518:7, 601:3, 601:4
**non** [1] - 392:10

**non-financial** [1] - 392:10
**none** [3] - 482:17, 544:24, 602:14
**noon** [1] - 459:15
**North** [10] - 584:22, 585:2, 585:3, 585:4, 585:5, 585:10, 585:14, 585:16, 585:17, 585:20
**NORTHERN** [1] - 385:2
**note** [3] - 451:3, 456:16, 493:15
**notebook** [2] - 404:13, 559:15
**notebooks** [1] - 457:14
**nothing** [16] - 387:17, 406:9, 408:20, 419:6, 425:10, 425:15, 431:22, 431:23, 451:21, 502:21, 524:14, 524:15, 542:17, 542:20, 569:15, 601:19
**notice** [3] - 415:3, 440:25, 562:23
**noticed** [4] - 395:24, 450:22, 451:1, 483:19
**notified** [1] - 502:16
**notwithstanding** [3] - 576:4, 595:23, 602:19
**November** [6] - 391:3, 402:16, 402:20, 402:21, 402:23, 407:19
**nowhere** [1] - 543:6
**number** [31] - 405:2, 405:5, 418:25, 424:8, 424:9, 424:12, 424:15, 424:16, 424:17, 428:2, 448:8, 449:12, 457:21, 498:19, 498:21, 498:23, 525:17, 525:20, 527:25, 528:2, 529:22, 529:25, 530:6, 530:11, 530:12, 530:14, 567:19, 567:23, 573:24, 604:10, 604:12
**Number** [4] - 441:6, 441:8, 461:10, 505:15
**numbers** [9] - 397:17, 397:18, 426:21, 449:4, 451:7, 497:14, 497:16, 498:3, 498:10

# O

**o'clock** [1] - 495:13
**Oath** [1] - 502:6
**oath** [3] - 388:19, 503:3, 533:19
**object** [5] - 419:1, 424:23, 429:24, 543:6, 562:11
**objected** [2] - 447:17, 508:1
**objection** [43] - 399:16, 406:3, 406:25, 415:5, 415:12, 415:18, 417:4, 417:6, 417:16, 420:12, 423:23, 428:22, 429:24, 431:6, 447:12, 451:13, 458:11, 492:5, 492:21, 495:2, 507:16, 532:14, 533:4, 533:7, 537:7, 539:10, 539:25, 541:8, 542:25, 544:8, 544:15, 544:19, 562:14, 563:1, 569:25, 571:22, 575:6, 579:1, 593:8, 598:12, 599:6, 601:1
**observation** [2] - 406:22, 577:25
**observe** [4] - 395:11, 450:20, 450:21, 563:6
**observed** [1] - 400:16

**obtain** [1] - 586:23
**obtained** [1] - 460:7
**obtaining** [1] - 459:6
**obviously** [5] - 397:21, 418:7, 419:25, 469:9
**occasion** [5] - 390:6, 391:6, 397:4, 403:5
**occasionally** [1] - 391:24
**occasioned** [1] - 427:14
**occasions** [4] - 392:3, 402:9, 403:24, 537:22
**occupancy** [1] - 451:11
**occur** [1] - 472:3
**occurred** [17] - 406:7, 417:19, 425:2, 425:6, 427:17, 437:13, 437:16, 447:15, 472:4, 472:6, 507:19, 521:16, 533:10, 541:11, 549:23, 575:8, 603:15
**OF** [4] - 385:1, 385:4, 387:1, 606:6
**offense** [7] - 401:17, 419:8, 474:16, 508:21, 509:7, 548:23, 549:23
**offer** [2] - 552:14, 575:17
**offered** [1] - 476:21
**office** [2] - 391:9, 391:24
**officer** [6] - 400:15, 400:17, 470:22, 471:3, 472:21, 479:3
**Officer** [1] - 482:20
**officers** [15] - 449:19, 449:20, 449:24, 450:2, 450:9, 450:17, 455:13, 459:5, 459:7, 460:6, 460:10, 461:15, 461:17, 465:24, 478:20
**officially** [1] - 504:7
**officials** [2] - 450:14, 503:24
**often** [3] - 453:9, 514:20, 534:8
**oftentimes** [1] - 512:20
**old** [12] - 413:16, 413:17, 413:18, 413:19, 427:24, 484:12, 508:3, 508:4, 509:5, 520:3, 534:6, 547:23
**oldest** [1] - 413:17
**Oldonado** [1] - 465:4
**Olivia** [1] - 464:25
**ON** [1] - 385:10
**once** [9] - 403:3, 474:10, 490:20, 511:20, 526:7, 561:19, 561:23, 586:14
**one** [115] - 387:18, 389:17, 390:2, 390:6, 390:10, 390:20, 391:22, 393:19, 393:25, 395:16, 396:2, 396:19, 397:10, 398:15, 399:1, 399:13, 399:14, 400:24, 403:5, 403:7, 404:7, 404:13, 405:11, 408:9, 409:5, 409:7, 409:10, 410:3, 410:16, 410:17, 413:17, 414:16, 430:19, 435:9, 437:15, 438:6, 438:14, 439:22, 446:17, 448:8, 448:16, 450:19, 451:18, 452:22, 453:15, 454:20, 455:7, 456:24, 460:14, 472:15, 477:16, 479:25, 480:1, 482:8, 488:19, 490:2, 490:7, 507:6, 508:2, 508:3, 511:2, 511:4, 520:8, 521:18, 521:25, 527:15, 529:13, 534:6, 534:20, 535:9, 539:3, 539:20, 541:13, 541:19,

555:17, 559:5, 560:7, 560:22, 561:3, 563:11, 564:7, 564:14, 564:15, 564:16, 564:18, 564:19, 565:1, 566:14, 567:6, 567:7, 567:8, 567:11, 573:15, 573:22, 573:25, 574:24, 577:11, 588:8, 591:8, 591:12, 591:19, 593:3, 594:6, 595:12, 595:17, 596:13, 597:22, 597:25, 598:14, 598:24, 604:14
**one's** [1] - 573:3
**ones** [2] - 557:10, 567:3
**open** [8] - 435:12, 449:25, 450:25, 507:6, 507:8, 507:11, 605:8, 605:9
**opened** [2] - 406:17, 435:9
**opening** [1] - 495:7
**operated** [7] - 480:18, 551:8, 557:20, 558:4, 561:5, 561:8, 561:17
**operating** [7] - 471:20, 471:24, 473:4, 474:22, 480:21, 569:7, 569:11
**operation** [3] - 419:25, 558:25, 560:2
**operative** [1] - 460:20
**operator** [2] - 472:11, 477:19
**opportunity** [3] - 401:11, 408:16, 579:11
**opposed** [1] - 475:22
**optimistic** [1] - 605:4
**order** [8] - 432:18, 435:10, 472:16, 472:17, 503:20, 513:17, 523:20, 596:18
**ordered** [1] - 587:11
**ordinarily** [2] - 397:15, 434:17
**originally** [2] - 479:3, 494:13
**otherwise** [1] - 440:18
**outside** [26] - 415:16, 421:10, 427:3, 427:18, 429:16, 429:20, 432:20, 435:7, 438:21, 440:13, 440:20, 440:24, 441:1, 441:8, 441:19, 442:4, 442:13, 455:4, 492:1, 509:3, 515:12, 521:3, 521:7, 521:8, 577:17, 603:6
**overheard** [2] - 571:19, 595:20
**overnight** [2] - 420:25, 595:17
**overruled** [31] - 399:19, 406:18, 407:2, 407:3, 415:8, 415:14, 415:19, 417:7, 420:14, 424:1, 430:1, 431:7, 448:13, 451:16, 458:15, 492:6, 492:22, 495:3, 532:16, 535:4, 537:8, 539:15, 540:2, 544:9, 544:20, 562:15, 570:1, 571:23, 593:11, 599:7, 601:2
**overseas** [2] - 456:20, 456:21
**overt** [2] - 419:22, 419:23
**owed** [3] - 394:1, 568:8, 594:20
**own** [9] - 403:7, 403:13, 409:7, 467:25, 485:5, 563:15, 566:14, 596:18, 596:19
**owned** [5] - 409:4, 409:16, 410:2, 426:6, 595:9
**owner** [3] - 428:4, 550:16, 550:17
**owns** [1] - 390:17

# P

**p.m** [11] - 414:1, 433:5, 434:21, 501:18, 501:23, 501:24, 515:18, 515:20, 546:21
**pack** [2] - 495:15, 495:16
**package** [3] - 397:19, 456:11, 456:15
**packages** [1] - 463:23
**PAGE** [2] - 606:6, 607:1
**page** [3] - 404:11, 404:13, 457:25
**paid** [13] - 391:20, 392:1, 394:4, 431:3, 520:13, 556:10, 556:17, 556:22, 560:6, 594:16, 598:11, 599:12, 599:15
**painted** [1] - 601:13
**painter** [1] - 552:5
**painting** [4] - 552:17, 553:22, 590:10, 601:7
**Pancho** [59] - 488:6, 488:13, 488:23, 489:1, 489:3, 489:4, 489:7, 489:14, 489:19, 489:23, 490:13, 490:14, 491:9, 491:13, 491:24, 492:3, 492:15, 492:19, 494:15, 494:23, 497:14, 498:23, 498:24, 514:7, 514:9, 514:12, 514:13, 515:4, 515:6, 515:8, 515:16, 517:16, 517:19, 522:25, 528:19, 528:21, 537:16, 537:18, 538:2, 538:12, 538:15, 538:17, 538:18, 538:25, 539:8, 539:9, 539:18, 540:6, 540:16, 540:18, 540:22, 541:1, 542:6, 543:11, 543:14, 544:7
**Pancho's** [1] - 543:11
**papal** [1] - 458:6
**paper** [4] - 451:8, 458:7, 474:2
**papers** [6] - 462:6, 463:2, 484:20, 484:21, 503:20, 586:15
**pardon** [2] - 409:6, 514:8
**parents** [1] - 410:8
**parking** [4] - 512:2, 512:7, 512:8, 512:10
**paroled** [1] - 500:17
**part** [10] - 417:14, 447:20, 481:14, 481:19, 484:16, 493:10, 493:21, 514:25, 529:10, 597:8
**participate** [2] - 445:15, 446:8
**participated** [1] - 445:19
**particular** [13] - 398:4, 399:20, 445:16, 463:14, 477:19, 479:11, 552:3, 558:10, 558:11, 560:22, 564:20, 573:1, 574:24
**particularly** [3] - 395:13, 575:4, 578:4
**parties** [7] - 487:11, 528:5, 528:6, 528:7, 571:6, 576:5
**partner** [1] - 536:13
**partnership** [2] - 527:19, 527:20
**parts** [1] - 485:13
**party** [2] - 419:6, 419:18
**pass** [5] - 440:12, 440:15, 515:9, 515:11, 555:10
**passenger** [2] - 472:19, 476:16

**passing** [2] - 556:12, 590:14
**passport** [5] - 475:11, 475:13, 475:15, 475:22, 476:1
**past** [1] - 593:13
**Patrol** [2] - 445:10, 471:15
**patrol** [1] - 474:21
**patrolling** [1] - 471:15
**pay** [12] - 391:24, 394:4, 431:2, 556:20, 558:5, 559:1, 559:16, 560:13, 568:12, 568:22, 587:9, 598:3
**paying** [1] - 571:12
**payment** [2] - 453:13, 454:18
**peace** [1] - 426:3
**Pelon** [32] - 486:23, 486:24, 487:3, 487:7, 487:14, 487:16, 487:20, 487:25, 489:15, 489:20, 494:16, 494:18, 494:21, 494:24, 495:1, 496:3, 496:6, 496:19, 496:23, 496:25, 497:5, 513:9, 514:11, 518:1, 525:7, 526:8, 528:15, 540:15, 541:20, 542:5, 543:13, 544:2
**Pelon's** [2] - 513:7, 545:4
**pending** [4] - 401:20, 419:11, 548:7, 549:8
**Pennsylvania** [1] - 402:18
**people** [32] - 391:25, 392:4, 392:8, 400:8, 402:4, 415:9, 415:16, 437:24, 438:5, 469:21, 469:23, 490:7, 526:9, 543:12, 551:12, 555:2, 555:17, 560:17, 564:10, 564:13, 569:6, 569:10, 582:20, 589:24, 590:3, 591:25, 593:6, 594:8, 600:18, 600:19, 600:23, 602:20
**per** [2] - 535:9
**perceived** [2] - 406:11, 420:1
**percent** [1] - 511:1
**percentage** [2] - 510:24, 511:1
**perfectly** [1] - 484:1
**perform** [2] - 472:20, 507:5
**performed** [2] - 398:12, 523:15
**performing** [1] - 471:5
**perhaps** [8] - 410:14, 435:17, 498:1, 511:15, 545:6, 560:3, 561:4, 577:24
**period** [17] - 393:2, 395:8, 402:15, 406:23, 407:14, 488:24, 491:8, 536:11, 538:12, 539:7, 539:18, 540:7, 556:17, 560:22, 567:22, 575:22, 597:9
**periods** [1] - 402:22
**permanent** [1] - 451:11
**permission** [4] - 447:8, 448:5, 448:23, 508:24
**permit** [7] - 413:4, 427:13, 428:18, 504:12, 504:15, 508:9, 509:12
**permitted** [3] - 418:8, 500:25, 543:2
**permitting** [1] - 576:24
**perpetrator** [1] - 401:13
**perpetrators** [1] - 401:12
**person** [19] - 399:22, 423:4, 465:23, 466:6, 466:21, 471:23, 474:25, 475:12, 476:14, 477:14, 478:3,

486:25, 522:15, 556:2, 564:18, 570:10, 572:3, 576:22, 597:5
**personal** [4] - 400:6, 403:16, 479:10, 553:6
**personally** [2] - 446:8, 531:1
**persons** [3] - 390:3, 396:19, 444:13
**pesos** [2] - 560:16, 560:17
**pharmacy** [1] - 495:25
**Philadelphia** [1] - 447:5
**phon)** [1] - 412:15
**phone** [65] - 396:21, 405:2, 417:8, 418:24, 421:3, 421:4, 421:7, 421:9, 421:11, 421:15, 422:2, 422:20, 422:22, 422:25, 423:4, 423:8, 423:22, 424:6, 424:10, 424:11, 425:6, 426:20, 426:21, 427:17, 427:22, 428:2, 428:13, 429:7, 431:15, 431:24, 432:17, 432:22, 432:25, 436:4, 436:7, 436:15, 436:19, 437:16, 437:19, 441:15, 442:11, 449:4, 451:6, 454:16, 457:21, 462:12, 463:24, 463:25, 464:18, 465:24, 495:19, 519:18, 519:20, 519:21, 525:17, 525:20, 527:24, 530:13, 538:6, 545:9, 567:13, 568:4, 571:4, 588:12, 588:13
**phones** [3] - 456:6, 567:1, 567:3
**photo** [3] - 452:7, 452:13, 462:21
**photograph** [30] - 389:16, 389:19, 390:6, 390:10, 397:10, 414:20, 437:24, 437:25, 452:24, 453:15, 453:17, 453:19, 453:21, 454:8, 454:10, 454:16, 454:20, 461:8, 461:19, 462:1, 462:6, 462:20, 462:24, 463:4, 463:6, 463:9, 464:24, 597:23, 598:14
**Photograph** [1] - 397:11
**photographs** [10] - 390:8, 397:10, 398:13, 451:23, 452:2, 454:22, 454:24, 460:19, 460:25, 463:1
**photos** [1] - 460:15
**physically** [1] - 402:24
**pick** [5] - 404:3, 433:25, 501:12, 562:21, 562:22
**picked** [1] - 389:19
**picking** [1] - 404:1
**picture** [14] - 398:16, 407:22, 407:24, 408:1, 408:6, 452:5, 452:10, 476:2, 564:11, 565:4, 573:3, 573:10, 598:20
**pictures** [4] - 400:15, 451:20, 564:6, 564:25
**piece** [1] - 474:2
**pieces** [1] - 451:19
**Pietro** [2] - 492:25, 493:16
**pills** [1] - 495:25
**pistol** [1] - 572:22
**place** [26] - 393:16, 394:7, 421:1, 427:12, 439:24, 446:16, 465:14, 466:9, 467:22, 472:18, 495:6, 495:7, 506:10, 507:2, 518:10, 520:16, 521:3, 526:20, 555:12, 555:13, 562:5, 564:1,

583:15, 594:11, 595:1, 596:1
**placed** [3] - 400:21, 419:25, 474:21
**places** [4] - 489:25, 490:1, 563:14, 563:18
**plan** [1] - 510:1
**play** [2] - 487:13, 528:5
**playing** [9] - 451:6, 453:4, 453:6, 453:8, 454:17, 454:21, 462:10, 462:12, 464:17
**pled** [2] - 548:14, 548:22
**plural** [1] - 582:17
**PM** [1] - 385:9
**pocket** [3] - 431:2, 475:9, 475:16
**point** [15] - 389:24, 422:14, 480:1, 480:13, 481:9, 482:8, 482:9, 484:22, 494:2, 494:4, 496:19, 496:22, 497:3, 574:25, 580:23
**pointblank** [1] - 508:25
**pointed** [3] - 567:11, 574:14, 598:24
**pointing** [1] - 596:17
**police** [46] - 416:8, 416:11, 416:17, 416:20, 417:1, 420:2, 424:7, 424:8, 424:12, 424:14, 424:15, 424:21, 429:9, 429:11, 429:12, 430:8, 430:10, 430:22, 436:12, 437:1, 437:3, 437:6, 440:22, 449:20, 450:14, 450:17, 470:25, 471:2, 472:21, 473:4, 478:20, 490:4, 497:14, 529:9, 536:14, 537:4, 544:6, 566:20, 569:1, 569:2, 596:10, 596:15, 599:13, 600:6, 602:8, 602:12
**Police** [10] - 443:19, 443:20, 446:18, 450:9, 459:7, 460:10, 465:8, 467:3, 467:25, 470:23
**policemen** [1] - 532:8
**Portillo** [1] - 474:11
**portion** [1] - 463:6
**posed** [2] - 406:12, 531:6
**position** [5] - 393:23, 443:23, 445:23, 445:25
**positions** [1] - 445:7
**possessed** [1] - 517:16
**possession** [1] - 573:6
**possible** [5] - 523:12, 529:7, 530:2
**possibly** [1] - 529:25
**post** [1] - 391:9
**pour** [3] - 439:2, 439:4, 439:8
**poured** [4] - 429:16, 430:11, 438:21, 441:8
**power** [1] - 467:25
**pray** [1] - 398:9
**prayer** [1] - 398:3
**prayer-to** [1] - 398:3
**precisely** [2] - 586:11, 599:10
**preference** [1] - 483:24
**prejudicial** [2] - 419:9, 427:8
**preparation** [1] - 578:2
**presence** [1] - 577:17
**present** [7] - 386:2, 446:19, 449:19, 449:20, 493:3, 534:11, 538:9
**presiding** [1] - 387:4

**presumably** [1] - 422:13
**pretty** [5] - 483:22, 490:21, 549:4, 577:25, 596:5
**prevailing** [1] - 420:12
**preview** [1] - 604:13
**previous** [3] - 452:13, 462:21, 598:1
**PREVIOUSLY** [1] - 389:2
**previously** [3] - 414:2, 447:17, 549:8
**price** [2] - 523:14, 523:15, 560:15
**primarily** [1] - 512:1
**Prince** [1] - 389:25
**print** [1] - 477:11
**printout** [1] - 477:9
**prison** [4] - 548:2, 548:17, 548:20, 548:22
**privilege** [1] - 388:7
**problem** [10] - 418:18, 492:20, 520:14, 526:11, 526:13, 549:5, 581:3, 585:17, 585:18, 592:15
**problems** [7] - 492:2, 492:4, 492:11, 492:13, 492:15, 584:11, 588:9
**proceed** [1] - 388:9
**proceeding** [3] - 387:13, 388:2, 600:23
**Proceedings** [1] - 605:17
**PROCEEDINGS** [2] - 387:1, 607:10
**proceedings** [2] - 387:12, 605:21
**PROCEEDINGS............................** [1] - 606:6
**processed** [1] - 465:9
**products** [3] - 451:9, 453:2, 456:24
**program** [2] - 587:8, 587:12
**programs** [1] - 447:3
**prohibited** [1] - 508:4
**projector** [1] - 457:25
**proof** [1] - 575:18
**proper** [1] - 555:21
**property** [9] - 400:6, 444:14, 548:14, 548:23, 553:6, 587:22, 587:24, 588:2, 588:23
**proposed** [1] - 581:18
**prostitute** [2] - 395:3, 526:1
**prostitutes** [7] - 409:3, 410:2, 411:5, 526:3, 527:12, 527:13, 569:11
**prostitution** [42] - 393:7, 393:8, 396:16, 398:2, 398:4, 398:7, 419:24, 425:14, 449:6, 449:13, 449:23, 487:19, 487:21, 488:2, 488:16, 489:18, 489:20, 490:16, 512:18, 513:15, 513:17, 513:24, 514:5, 514:12, 514:22, 515:21, 516:10, 527:8, 527:19, 527:22, 554:24, 569:7, 569:22, 571:21, 590:17, 590:21, 592:4, 592:15, 597:6, 597:9, 600:15, 601:17
**protecters** [1] - 403:23
**protracted** [1] - 604:20
**prove** [1] - 533:17
**provide** [7] - 418:11, 424:15, 473:21, 476:21, 477:11, 485:12, 497:13
**provided** [7] - 424:12, 447:18, 468:13,

498:3, 498:11, 498:20, 498:24
**provides** [1] - 449:12
**providing** [1] - 497:20
**proximity** [1] - 427:17
**prune** [1] - 418:16
**pull** [5] - 443:10, 470:14, 480:18, 534:13, 579:25
**pulled** [2] - 493:25, 494:2
**purchase** [6] - 397:23, 400:20, 451:7, 456:22, 560:1, 560:4
**purchased** [4] - 397:18, 400:12, 456:20, 560:11
**purpose** [3] - 439:6, 448:9, 460:20
**purposely** [1] - 439:1
**purposes** [1] - 461:9
**pursuit** [1] - 420:6
**put** [22] - 404:19, 414:19, 424:22, 439:6, 457:25, 481:11, 481:15, 481:20, 489:21, 495:10, 496:10, 521:9, 524:3, 550:4, 554:11, 557:6, 560:25, 565:16, 566:2, 567:10, 578:13
**putative** [1] - 401:11
**putting** [6] - 418:12, 437:25, 481:14, 481:19, 550:25, 556:1

### Q

**Quarles** [3] - 387:4, 420:13, 502:11
**QUARLES** [1] - 385:11
**Queens** [1] - 505:15
**questioned** [1] - 592:4
**questioning** [2] - 389:9, 532:15
**questions** [61] - 393:7, 399:4, 401:3, 401:4, 402:9, 404:7, 406:12, 406:16, 407:17, 407:20, 410:23, 410:25, 411:16, 418:11, 432:6, 439:14, 440:2, 440:6, 440:7, 440:19, 441:22, 442:22, 448:11, 465:16, 466:13, 469:12, 470:2, 473:14, 480:5, 480:13, 482:14, 497:1, 497:4, 499:2, 499:25, 500:1, 500:3, 529:15, 531:6, 536:22, 538:11, 538:14, 538:15, 538:16, 541:22, 543:23, 544:21, 546:6, 577:13, 578:5, 579:14, 580:19, 599:17, 600:9, 600:10, 600:14, 600:18, 600:21
**quickly** [1] - 463:17
**quiet** [1] - 577:11
**quietly** [1] - 498:8
**quite** [1] - 427:9
**quoted** [1] - 523:15

### R

**Rachel** [1] - 385:15
**rack** [2] - 480:24, 494:6
**radio** [3] - 520:1, 520:7, 520:11
**raise** [6] - 412:6, 443:6, 470:10, 483:6, 547:8, 547:9

**Ramirez** [3] - 446:4, 486:14, 486:18
**ran** [3] - 389:12, 510:18, 602:7
**rang** [2] - 436:4, 436:5
**Rapalo** [10] - 393:19, 393:23, 394:1, 394:3, 394:20, 394:24, 399:14, 400:7, 401:15, 401:17
**rape** [1] - 444:13
**raped** [2] - 583:6, 583:7
**rarely** [1] - 571:12
**rather** [2] - 506:24, 534:24
**reached** [2] - 546:8, 603:1
**read** [8] - 474:10, 498:16, 524:3, 524:13, 524:18, 524:22, 524:23, 534:1
**ready** [6] - 388:9, 459:23, 502:17, 546:24, 559:19, 605:8
**real** [3] - 466:6, 475:19, 554:18
**realize** [3] - 421:22, 429:19, 504:19
**realized** [3] - 422:6, 430:20, 476:2
**realizing** [1] - 503:24
**really** [6] - 431:13, 436:5, 469:24, 511:21, 556:14, 559:16
**Realtime** [1] - 605:20
**rear** [1] - 475:9
**reason** [24] - 394:3, 396:13, 472:25, 473:17, 484:3, 506:16, 508:19, 509:12, 509:14, 509:24, 510:8, 517:25, 543:6, 552:9, 580:15, 581:19, 582:22, 584:7, 584:9, 584:10, 587:24, 591:21, 592:17, 599:10
**reasonable** [1] - 427:21
**reasons** [1] - 509:25
**Rebeca** [3] - 389:16, 389:18, 389:25
**receipt** [3] - 453:9, 454:20, 462:2
**receipts** [1] - 454:18
**receive** [4] - 393:3, 504:9, 504:11, 603:5
**received** [9] - 418:23, 421:18, 421:19, 421:20, 424:19, 436:15, 453:13, 536:11, 537:13
**receiver** [1] - 580:21
**receiving** [5] - 423:21, 424:5, 428:13, 431:15, 441:15
**recently** [1] - 409:7
**recess** [4] - 459:18, 501:21, 501:23, 546:20
**Recess** [2] - 459:20, 546:21
**recipient** [1] - 427:20
**recipients** [1] - 432:3
**recognize** [17] - 414:3, 414:6, 423:10, 423:11, 457:13, 477:4, 477:25, 478:2, 478:16, 479:5, 551:4, 556:2, 556:3, 565:12, 567:2, 567:5, 573:13
**recognized** [1] - 598:20
**recollection** [5] - 398:15, 435:16, 477:17, 498:10, 530:1
**record** [18] - 388:1, 388:20, 412:13, 414:14, 443:11, 453:13, 467:2, 470:16, 478:6, 483:11, 488:21, 489:10, 491:3, 498:13, 526:20, 547:15, 559:14, 605:21
**recorded** [1] - 388:8

**recording** [2] - 591:5
**records** [3] - 534:13, 534:21, 534:25
**recover** [2] - 472:10, 479:16
**recovered** [3] - 394:13, 459:2, 475:18
**recross** [3] - 408:22, 441:24, 601:21
**Recross** [6] - 606:11, 606:11, 606:16, 606:20, 607:4, 607:8
**RECROSS** [6] - 409:1, 411:2, 442:1, 469:14, 545:2, 601:23
**Recross-Examination** [6] - 606:11, 606:11, 606:16, 606:20, 607:4, 607:8
**RECROSS-EXAMINATION** [6] - 409:1, 411:2, 442:1, 469:14, 545:2, 601:23
**red** [10] - 494:8, 494:2, 494:4, 520:3, 520:5, 520:8, 537:21, 538:3, 538:5, 538:7
**redirect** [8] - 401:5, 440:3, 468:18, 482:19, 498:2, 536:25, 541:23, 599:20
**Redirect** [5] - 606:10, 606:15, 606:20, 607:4, 607:8
**REDIRECT** [5] - 401:7, 440:4, 468:20, 537:1, 599:21
**reenter** [3] - 500:25, 582:12, 586:11
**reentered** [5] - 500:16, 500:18, 584:12, 586:8, 586:14
**refer** [2] - 555:23, 604:24
**referenced** [1] - 389:22
**references** [2] - 419:2, 458:6
**referred** [1] - 472:15
**referring** [5] - 462:15, 466:23, 490:11, 550:20, 569:16
**refers** [1] - 458:5
**reflect** [4] - 477:7, 478:6, 489:10, 491:3
**refresh** [4] - 394:10, 400:3, 498:2, 530:1
**refreshes** [1] - 498:10
**refute** [1] - 534:4
**regard** [2] - 405:13, 549:14
**regarding** [3] - 404:8, 499:19, 549:7
**registered** [2] - 390:20, 409:25
**Registered** [1] - 605:19
**registration** [3] - 473:20, 473:21, 477:1
**registry** [1] - 477:7
**regret** [1] - 544:6
**related** [3] - 425:11, 590:10, 601:8
**relates** [1] - 449:6
**relation** [2] - 422:24, 570:16
**relations** [1] - 599:5
**relationship** [2] - 514:19, 528:19
**relative** [2] - 447:22, 448:10
**relatives** [1] - 410:11
**relay** [3] - 467:19, 494:15, 542:10
**released** [4] - 465:10, 476:23, 477:13, 482:3, 482:5, 602:17
**relevance** [4] - 423:25, 448:9, 533:8, 533:13
**relevant** [4] - 419:2, 419:7, 419:10, 426:18
**religious** [1] - 398:3
**remain** [1] - 603:24

**remainder** [1] - 521:15
**remained** [1] - 532:21
**remarkably** [1] - 578:3
**remember** [49] - 388:15, 399:22, 399:23, 407:19, 407:20, 436:6, 434:7, 434:23, 437:9, 452:19, 459:13, 471:7, 471:18, 471:23, 472:6, 476:14, 476:18, 476:19, 479:25, 482:8, 491:15, 497:17, 501:15, 501:18, 516:12, 520:5, 525:19, 529:24, 538:14, 543:9, 546:9, 550:1, 550:7, 550:9, 551:18, 551:22, 551:23, 551:24, 558:20, 561:22, 564:3, 565:5, 566:16, 566:18, 572:23, 572:24, 600:2, 600:20, 603:2
**remembering** [1] - 603:8
**remind** [2] - 388:17, 388:18, 503:2
**remodeling** [2] - 495:8, 587:16
**remove** [1] - 588:10
**removed** [1] - 575:23
**renting** [4] - 491:19, 518:12, 518:13, 538:2
**repair** [4] - 472:16, 472:17, 516:6, 519:22
**repaired** [1] - 538:7
**Repalo** [61] - 547:6, 547:7, 547:16, 547:21, 549:1, 549:21, 550:13, 550:17, 550:22, 550:25, 551:7, 551:15, 552:23, 554:16, 555:16, 555:19, 556:6, 557:2, 559:4, 559:22, 562:17, 563:5, 563:25, 565:13, 566:10, 566:25, 572:1, 572:17, 573:13, 574:10, 576:2, 579:7, 579:19, 579:21, 581:18, 583:9, 583:15, 584:2, 587:1, 587:18, 588:10, 589:10, 589:20, 591:17, 592:3, 592:22, 593:21, 594:14, 594:23, 595:8, 596:4, 596:22, 597:8, 598:18, 599:4, 599:10, 599:14, 599:23, 601:6, 601:25, 603:19
**REPALO** [2] - 547:10, 607:6
**Repalo's** [2] - 576:9, 578:20
**repeat** [5] - 426:15, 444:15, 540:3, 568:16, 568:18
**repeated** [1] - 523:25
**rephrase** [2] - 488:25, 563:3
**report** [5] - 393:15, 399:21, 400:3, 524:3, 536:1
**Reported** [1] - 386:22
**REPORTER** [14] - 387:18, 387:21, 387:24, 406:14, 444:18, 481:16, 486:6, 488:10, 488:19, 508:17, 512:24, 520:19, 530:18, 579:25
**Reporter** [2] - 605:19, 605:20
**reports** [1] - 399:25
**represent** [1] - 578:1
**representation** [2] - 388:3
**requested** [2] - 392:25, 467:6
**requesting** [2] - 513:15, 560:24
**requests** [1] - 492:8
**residence** [5] - 407:18, 427:18, 455:7,

457:14
**residential** [1] - 520:24
**resolved** [1] - 550:5
**respect** [3] - 416:16, 441:18, 598:8
**respond** [2] - 429:12, 450:5
**responded** [3] - 450:7, 459:8, 460:11
**responding** [1] - 471:16
**response** [4] - 430:7, 459:6, 531:6, 543:10
**responsibility** [2] - 541:2, 543:15
**responsible** [3] - 542:7, 559:17, 559:22
**responsive** [1] - 544:16
**rest** [1] - 426:2
**restaurant** [2] - 487:12, 506:3
**restaurant/bar** [1] - 528:11
**restaurants** [1] - 487:5
**restrict** [1] - 447:25
**restrictions** [1] - 420:11
**result** [5] - 390:5, 401:18, 431:12, 532:2, 536:15
**resume** [1] - 459:16
**Resumed** [1] - 606:9
**resumes** [3] - 459:22, 502:1, 546:23
**retired** [1] - 433:7
**retrieve** [1] - 403:24
**retrieving** [1] - 404:5
**return** [6] - 416:5, 416:17, 549:19, 583:15, 583:17, 586:5
**returned** [6] - 466:8, 500:12, 521:13, 521:19, 521:23, 523:2
**returning** [1] - 501:6
**revealed** [1] - 577:3
**review** [1] - 460:19
**reviewing** [3] - 394:9, 394:12, 498:2
**reward** [1] - 392:3
**rewards** [2] - 392:9, 392:10
**rhetorical** [1] - 418:5
**Ricardo** [2] - 446:4, 486:14
**rid** [1] - 436:22
**ride** [5] - 476:22, 521:25, 522:7, 539:4, 540:22
**rights** [2] - 447:11, 600:7
**rise** [8] - 387:2, 459:17, 459:21, 501:20, 501:25, 546:19, 546:22, 605:15
**risking** [2] - 599:13
**Rite** [1] - 456:22
**Riva** [1] - 396:2
**Rivas** [3] - 446:4, 486:15, 486:18
**RMR** [2] - 386:23, 605:25
**Road** [2] - 396:2, 472:5
**rob** [10] - 550:2, 556:25, 557:18, 564:1, 593:23, 594:5, 594:8, 594:24, 595:1, 595:23
**robbed** [14] - 393:11, 393:19, 394:3, 551:4, 566:16, 583:6, 583:7, 585:19, 596:1, 596:23, 597:1, 599:23, 602:6, 602:19
**robbery** [13] - 393:15, 399:9, 401:10, 444:13, 550:8, 574:10, 587:2, 592:11,

592:15, 600:9, 600:24, 601:25
**robbing** [2] - 593:6, 597:2
**rocks** [5] - 429:8, 437:14, 588:16, 588:17
**roles** [1] - 445:7
**roof** [1] - 480:24
**Room** [1] - 386:23
**room** [18] - 444:21, 450:24, 455:12, 456:12, 461:24, 480:2, 491:19, 501:17, 518:11, 518:13, 518:23, 521:5, 521:6, 538:2, 545:18, 565:4, 565:17, 603:7
**rooms** [2] - 446:18, 565:1
**rough** [2] - 604:10, 605:1
**routine** [1] - 472:20
**rubbing** [7] - 451:9, 453:1, 457:2, 458:9, 462:24, 463:6, 464:8
**Rule** [1] - 508:4
**rule** [1] - 509:16
**ruling** [3] - 447:22, 448:3, 534:1
**run** [1] - 477:10
**running** [3] - 569:11, 577:3, 602:8
**RUTER** [112] - 388:24, 389:4, 399:1, 399:4, 399:6, 399:7, 399:24, 400:24, 401:2, 408:23, 409:2, 410:23, 417:4, 417:6, 418:19, 418:22, 419:14, 420:13, 423:23, 423:25, 424:23, 424:25, 425:5, 425:17, 426:15, 426:17, 428:20, 428:23, 428:25, 429:2, 429:24, 432:8, 432:10, 438:19, 438:20, 439:14, 441:23, 441:25, 442:2, 442:21, 465:18, 465:20, 466:12, 482:17, 492:5, 492:21, 494:3, 495:2, 499:4, 499:7, 499:23, 500:5, 501:13, 502:19, 503:1, 503:5, 505:9, 505:10, 508:6, 508:23, 509:6, 509:11, 509:20, 510:3, 510:8, 510:13, 513:2, 514:10, 520:21, 524:1, 524:2, 524:19, 524:21, 527:2, 527:3, 529:15, 539:10, 539:13, 539:25, 541:8, 541:16, 542:15, 544:8, 544:15, 544:24, 562:11, 563:1, 568:16, 568:20, 569:25, 571:22, 575:6, 575:17, 576:12, 576:14, 576:18, 576:25, 579:16, 579:18, 581:17, 593:14, 598:14, 598:17, 599:9, 599:17, 601:1, 601:22, 601:24, 602:22, 603:25, 605:10, 605:12
**Ruter** [10] - 385:17, 388:23, 420:11, 426:14, 498:4, 501:11, 502:25, 508:1, 600:18, 603:23
**Ruter's** [2] - 542:25, 577:7
**RUTER**.......... [1] - 606:10
**RUTER**................ [3] - 606:11, 606:16, 607:8
**RUTER**.................. [4] - 606:14, 606:19, 607:3, 607:7

# S

**sad** [1] - 431:8
**sadness** [1] - 544:5
**Safeway** [1] - 456:22
**Salvador** [11] - 413:1, 484:7, 487:13, 493:22, 504:4, 506:14, 528:5, 531:8, 531:10, 531:14, 531:24
**Salvadorian** [1] - 503:17
**SAN** [2] - 412:7, 606:13
**San** [6] - 412:14, 503:13, 503:18, 504:24, 504:25, 505:2
**Sandra** [2] - 411:23, 412:14
**SANDRA** [2] - 412:7, 606:13
**Santa** [6] - 398:1, 398:8, 407:17, 408:2, 408:17, 573:15
**sat** [5] - 400:16, 433:21, 433:22, 442:13, 496:10
**satisfaction** [1] - 473:12
**satisfied** [2] - 544:17, 544:18
**Saturday** [3] - 406:23, 458:23, 595:5
**save** [5] - 418:4, 530:4, 546:5, 596:18, 596:19
**saw** [43] - 391:1, 392:21, 397:12, 400:10, 400:20, 402:10, 402:12, 403:24, 403:25, 409:21, 415:9, 420:22, 432:20, 432:22, 477:25, 480:2, 481:24, 482:11, 488:15, 488:18, 488:23, 496:6, 496:23, 517:17, 521:3, 521:8, 521:16, 522:23, 522:24, 527:9, 527:12, 538:19, 538:21, 539:8, 572:8, 572:9, 572:11, 572:15, 572:21, 573:6
**scared** [3] - 422:15, 435:25, 436:1
**scene** [4] - 399:11, 461:16, 476:24, 596:24
**schedule** [1] - 434:14
**school** [9] - 447:1, 447:2, 473:8, 484:8, 484:9, 505:13, 505:14, 505:15
**scoot** [3] - 443:9, 470:14, 483:9
**scope** [1] - 403:11
**Scott** [1] - 388:21
**SCOTT** [2] - 389:1, 606:9
**screen** [6] - 404:19, 414:19, 550:25, 554:12, 564:17, 567:10
**search** [12] - 394:7, 396:9, 397:3, 404:12, 407:23, 445:16, 447:18, 468:13, 474:24, 475:2, 478:22, 478:25
**searches** [1] - 445:18
**seat** [2] - 476:17
**seated** [13] - 387:5, 388:14, 412:10, 443:9, 460:1, 470:14, 483:9, 502:2, 502:24, 547:3, 547:13, 551:11, 579:7
**second** [26] - 387:18, 400:24, 413:17, 422:13, 435:5, 435:23, 435:24, 452:17, 452:18, 453:21, 463:25, 496:21, 508:19, 534:7, 534:11, 534:20, 536:10, 550:19, 581:22, 582:7, 582:10, 582:23, 583:11,

583:19, 584:3, 596:13
**second-degree** [4] - 534:7, 534:11, 534:20, 536:10
**Section** [3] - 443:25, 444:5, 471:15
**section** [1] - 444:3
**secure** [2] - 503:20, 513:17
**security** [1] - 517:5
**see** [91] - 391:11, 391:14, 392:15, 395:10, 395:13, 397:11, 397:15, 399:21, 404:24, 405:2, 406:22, 407:2, 407:4, 407:8, 407:10, 407:15, 408:12, 415:16, 416:11, 416:13, 419:10, 419:16, 420:17, 421:8, 424:9, 429:14, 434:22, 434:23, 440:22, 448:9, 453:4, 473:19, 474:6, 474:7, 487:25, 489:7, 490:20, 491:1, 491:11, 508:14, 511:7, 511:17, 511:20, 511:25, 512:1, 512:4, 521:17, 521:18, 521:21, 521:25, 522:1, 522:5, 522:22, 522:24, 523:3, 538:9, 538:11, 539:4, 539:21, 540:7, 540:22, 551:1, 551:11, 554:13, 554:14, 557:7, 558:4, 558:7, 558:17, 559:4, 559:13, 562:5, 563:15, 565:16, 566:5, 567:10, 572:5, 572:14, 572:18, 573:1, 573:2, 573:4, 573:18, 573:22, 578:13, 588:6, 590:9, 590:10, 604:6, 604:14, 605:11
**seeing** [6] - 454:13, 459:10, 479:25, 491:9, 498:4, 565:5
**seek** [1] - 508:4
**seeking** [2] - 449:24, 542:3
**segregation** [1] - 575:21
**seized** [17] - 404:12, 449:1, 451:25, 454:10, 454:12, 455:23, 456:5, 456:6, 460:16, 462:3, 463:16, 464:1, 464:8, 464:10, 464:12, 464:15, 566:18
**sell** [1] - 588:15
**selling** [3] - 487:19, 487:20, 585:9
**semi** [2] - 572:22, 573:8
**semi-automatic** [2] - 572:22, 573:8
**send** [4] - 545:23, 585:10, 585:13, 603:5
**sense** [3] - 395:24, 556:15, 605:1
**sent** [4] - 493:5, 504:13, 545:24, 559:25
**sentence** [4] - 536:18, 536:20, 537:11, 537:13
**sentenced** [1] - 536:21
**separated** [3] - 491:18, 513:10, 522:2
**September** [30] - 389:15, 390:1, 391:9, 391:18, 398:12, 413:6, 415:25, 416:16, 424:19, 432:2, 439:24, 442:7, 442:9, 442:19, 445:22, 446:1, 449:15, 455:23, 471:5, 471:9, 471:12, 479:20, 480:15, 521:20, 521:24, 523:3, 523:18, 525:18, 525:21, 530:15
**Sergeant** [19] - 443:4, 443:16, 444:20, 446:12, 448:19, 449:14, 451:12, 452:3, 453:7, 456:3, 456:16, 458:3, 458:17, 458:24, 460:3, 460:24, 463:13, 464:19, 466:18
**sergeant** [5] - 443:12, 444:1, 445:3,

445:6, 446:1
**series** [4] - 398:13, 460:4, 460:24, 461:10
**serious** [1] - 549:4
**servant** [1] - 425:22
**serve** [2] - 449:21, 449:24, 548:17
**served** [3] - 470:25, 548:19, 548:22
**service** [15] - 449:10, 449:11, 449:22, 453:10, 453:11, 453:12, 454:18, 471:2, 471:16, 485:17, 516:5, 516:6, 531:8, 532:11
**serviced** [1] - 453:11
**Services** [2] - 443:24, 444:4
**services** [13] - 449:13, 485:11, 512:18, 513:7, 513:9, 513:15, 513:18, 514:5, 514:16, 514:21, 514:22, 516:10, 525:24
**session** [3] - 387:3, 459:22, 501:24, 502:1, 546:23
**set** [6] - 461:23, 461:24, 483:4, 495:23, 523:14, 524:25
**sets** [2] - 436:6, 487:10
**setting** [2] - 387:22, 448:5
**Seven** [1] - 487:12
**seventh** [1] - 447:2
**several** [13] - 392:15, 403:24, 539:9, 550:4, 568:8, 570:8, 572:9, 572:11, 572:16, 582:16, 602:11
**sex** [9] - 460:22, 558:2, 559:1, 559:5, 560:13, 597:19, 597:22, 597:25, 598:10
**sex-trafficking** [1] - 460:22
**sexual** [1] - 599:4
**SGT** [2] - 443:7, 606:17
**shampoo** [1] - 462:24
**shaved** [2] - 487:2
**sheet** [2] - 565:5, 565:9
**sheetrock** [4] - 487:18, 495:11, 523:8, 524:25
**shells** [1] - 493:1
**shirt** [4] - 466:24, 478:5, 551:13, 574:14
**shoebox** [5] - 492:24, 493:9, 493:23, 518:9
**shooter** [1] - 533:13
**shooting** [8] - 541:1, 542:7, 542:9, 542:17, 542:18, 543:12, 543:14
**shootings** [3] - 393:9, 541:18, 542:20
**Shop** [3] - 512:3, 512:5, 512:22
**shop** [21] - 485:11, 485:17, 487:4, 487:8, 488:14, 488:15, 490:3, 496:20, 497:2, 511:9, 512:6, 518:16, 519:17, 519:19, 523:7, 523:10, 523:21, 524:16, 524:17, 538:3, 539:21
**shops** [1] - 555:4
**short** [2] - 459:18, 597:9
**shorten** [2] - 496:11, 496:13
**shortly** [1] - 553:11
**shot** [2] - 522:14, 585:19
**shoveled** [1] - 587:16
**shoveling** [2] - 602:4, 602:5

**show** [27] - 390:6, 414:2, 414:9, 426:18, 426:21, 452:20, 454:22, 456:3, 460:24, 464:23, 472:8, 474:3, 475:5, 479:4, 517:22, 524:24, 530:3, 554:11, 557:5, 564:6, 564:25, 566:5, 572:17, 572:25, 573:3, 598:18, 600:23
**showed** [10] - 390:8, 390:10, 482:7, 519:6, 529:25, 544:11, 557:10, 601:3, 601:4, 602:15
**shower** [1] - 589:2
**showing** [2] - 477:4, 478:13
**shown** [8] - 389:17, 397:10, 398:13, 427:5, 462:21, 517:14, 524:4, 526:16
**sic** [1] - 409:17
**sick** [3] - 525:25, 527:14, 527:16
**side** [7] - 414:15, 423:1, 472:19, 476:18, 479:14, 535:9, 564:16
**sides** [1] - 429:1
**signature** [1] - 478:16
**signed** [3] - 497:20, 524:7, 524:10
**significance** [4] - 449:8, 451:3, 452:25, 456:17
**similar** [7] - 408:12, 408:18, 453:8, 564:8, 573:7, 573:9
**similarly** [1] - 462:5
**simple** [1] - 559:1
**simply** [5] - 387:25, 390:9, 398:6, 448:5, 508:7
**single** [1] - 596:2
**siren** [1] - 473:6
**sisters** [1] - 410:12
**site** [1] - 601:11
**sitting** [7] - 442:5, 466:24, 476:18, 478:4, 550:18, 550:19, 561:23
**six** [3] - 390:8, 495:15, 518:17
**skill** [1] - 552:5
**skills** [1] - 485:15
**skin** [2] - 596:18, 596:19
**skip** [1] - 449:14
**sleep** [2] - 431:9, 433:8
**slept** [3] - 433:20, 433:21, 595:17
**slow** [1] - 444:21
**slower** [2] - 444:18, 481:16
**small** [4] - 450:23, 494:13, 494:14, 520:3
**smaller** [1] - 537:21
**smashed** [1] - 441:19
**smell** [1] - 430:5
**smelled** [1] - 430:6
**sneak** [1] - 580:7
**snitch** [4] - 576:10, 576:15, 576:22, 578:25
**snow** [3] - 587:16, 602:4, 602:5
**so-called** [1] - 397:16
**socialize** [1] - 512:16
**socialized** [1] - 528:16
**socializing** [1] - 528:14
**sofa** [5] - 433:11, 433:12, 433:13, 433:21, 433:23

**softly** [1] - 423:14
**sold** [2] - 397:20, 485:13
**sole** [1] - 410:2
**someone** [16] - 417:21, 417:22, 419:4,
419:15, 433:24, 439:6, 449:12, 464:5,
467:17, 479:9, 490:9, 495:9, 509:25,
555:15, 576:20, 590:4
**sometime** [6] - 393:11, 491:13, 494:18,
513:14, 521:12, 590:7
**sometimes** [15] - 392:4, 403:22, 440:15,
487:23, 511:23, 511:24, 512:19,
528:6, 556:14, 557:4, 559:25, 597:10,
598:4
**somewhat** [1] - 453:9
**somewhere** [3] - 434:21, 553:14, 583:19
**son** [1] - 413:17
**son's** [1] - 422:12
**soon** [1] - 570:18
**Soriano** [3] - 395:1, 395:2, 408:10
**sorry** [34] - 387:8, 387:20, 387:24,
392:7, 398:11, 406:14, 416:19, 422:4,
428:7, 444:3, 444:19, 450:12, 458:1,
458:6, 462:17, 481:17, 488:20,
492:13, 494:3, 496:12, 507:7, 513:3,
520:19, 522:17, 523:23, 527:7,
534:24, 542:6, 553:2, 562:10, 564:17,
565:22, 572:10, 573:23
**sort** [9] - 462:1, 462:6, 469:6, 485:11,
548:2, 554:9, 565:6, 577:15, 577:16
**sorts** [1] - 576:8
**sound** [1] - 486:4
**sources** [1] - 603:7
**Spanish** [30] - 386:3, 386:4, 386:4,
411:25, 412:1, 423:16, 423:17,
446:23, 446:25, 447:1, 447:4, 458:2,
458:18, 467:11, 467:17, 467:19,
469:22, 473:7, 474:7, 476:7, 483:2,
483:25, 484:4, 498:8, 576:7, 581:7,
581:8, 581:9, 604:21
**Spanish-language** [1] - 483:25
**Spanish-speaking** [1] - 581:8
**spare** [1] - 485:13
**speaker** [2] - 571:9, 571:10
**speaking** [14] - 423:14, 423:16, 432:24,
450:21, 468:23, 469:8, 469:9, 472:2,
472:17, 571:9, 581:8, 581:9, 592:1,
604:21
**Special** [3] - 386:3, 493:21, 531:10
**specific** [6] - 454:13, 471:7, 471:14,
471:22, 508:19, 551:24
**specifically** [1] - 572:13
**speculation** [1] - 425:11
**spell** [7] - 412:12, 412:16, 412:17,
443:11, 470:16, 483:10, 547:14
**spend** [2] - 561:3, 584:17
**spending** [1] - 427:1
**spent** [4] - 427:6, 560:10, 587:18, 602:3
**spilled** [3] - 416:14, 438:25, 439:1
**spoken** [2] - 545:15, 545:16
**sprinkling** [1] - 427:2

**stairs** [1] - 440:7
**stand** [6] - 406:12, 418:3, 470:10, 534:4,
580:19, 580:21
**Stand**.............................. [1] - 606:9
**standard** [1] - 472:20
**standing** [2] - 428:21, 442:4
**stands** [5] - 419:3, 459:17, 501:20,
546:20, 605:15
**stark** [1] - 578:3
**start** [1] - 603:9
**started** [12] - 388:16, 445:10, 447:1,
487:9, 487:10, 501:18, 518:2, 521:5,
570:16, 603:8
**starters** [1] - 466:23
**starting** [8] - 446:12, 454:24, 458:19,
461:1, 463:22, 498:19, 511:18, 516:4
**state** [8] - 388:19, 412:12, 443:11,
465:14, 470:15, 483:10, 504:21,
536:10, 547:14
**State** [1] - 604:15
**statement** [20] - 395:6, 448:10, 469:25,
497:20, 498:1, 498:5, 499:5, 523:17,
524:7, 524:10, 524:11, 524:18,
524:22, 529:23, 532:19, 533:19,
534:4, 555:7, 589:23, 591:4
**statements** [3] - 391:22, 447:23, 448:3
**STATES** [3] - 385:1, 385:4, 606:2
**States** [23] - 387:2, 411:22, 413:2,
443:3, 470:6, 482:23, 484:14, 484:16,
484:19, 499:16, 500:19, 503:11,
504:9, 532:24, 533:22, 536:7, 547:5,
548:10, 549:9, 549:12, 549:15,
553:10, 584:13
**station** [6] - 482:3, 551:25, 552:1,
589:15, 589:20, 590:3
**statue** [6] - 397:25, 407:18, 408:2,
408:17, 566:10, 573:18
**statues** [2] - 398:9, 573:15
**status** [4] - 402:7, 410:1, 499:19, 549:7
**statute** [1] - 419:3
**stay** [7] - 393:1, 420:25, 433:12, 465:14,
501:3, 549:16, 563:9
**stayed** [6] - 396:3, 424:7, 433:20,
562:25, 563:11, 599:15
**staying** [3] - 549:14, 553:16, 553:19
**step** [4] - 411:18, 442:24, 470:4, 602:24
**stepped** [1] - 533:22
**steps** [4] - 435:3, 435:7, 441:13, 442:6
**stereo** [7] - 491:21, 491:22, 491:25,
516:6, 519:22, 538:6, 540:19
**still** [11] - 388:18, 421:19, 442:13, 466:4,
503:2, 549:17, 553:18, 553:24,
583:22, 605:2, 605:4
**stole** [3] - 587:24, 588:2, 588:25
**stolen** [1] - 587:22
**stones** [2] - 438:11, 442:12
**stop** [13] - 471:10, 471:11, 471:25,
472:2, 472:3, 472:21, 472:25, 473:18,
479:2, 496:3, 542:19, 545:21, 568:24
**stopped** [13] - 394:23, 394:25, 471:19,

472:18, 476:3, 522:3, 567:14, 567:15,
567:16, 568:4, 568:7, 593:16, 593:22
**stopping** [1] - 472:20
**store** [6] - 400:11, 400:18, 512:7,
515:12, 515:14, 590:3
**stores** [5] - 397:21, 397:23, 487:6,
555:11
**story** [2] - 594:12, 594:14
**strange** [2] - 415:3, 415:7
**street** [6] - 445:11, 452:7, 461:2, 461:5,
482:5, 585:8
**Street** [2] - 386:24, 495:8
**street-level** [1] - 445:11
**streets** [3] - 594:2, 594:3, 600:5
**strenuously** [1] - 543:6
**strike** [8] - 406:3, 415:13, 429:25,
458:12, 541:8, 543:19, 543:21, 544:15
**striped** [3] - 466:24, 478:5, 551:13
**strips** [1] - 397:20
**strong** [1] - 423:15
**stuck** [4] - 535:2, 535:4, 535:18, 535:21
**styles** [1] - 557:11
**subject** [6] - 387:12, 404:7, 449:22,
455:4, 455:5, 603:19
**subjected** [1] - 464:3
**subjects** [2] - 450:10, 450:24
**submit** [3] - 406:16, 418:15, 469:22
**subpoena** [1] - 486:11
**subscribed** [1] - 405:8
**subsequent** [3] - 407:13, 427:11,
479:23
**subsequently** [1] - 479:21
**substance** [2] - 469:2, 497:7
**successfully** [1] - 450:2
**suggest** [1] - 508:24
**suggested** [1] - 467:13
**suggesting** [1] - 534:18
**Suicide** [1] - 487:12
**Sunday** [7] - 403:2, 406:24, 407:13,
458:19, 458:23, 562:25, 563:10
**Sundays** [1] - 558:13
**supervise** [1] - 444:3
**supervising** [1] - 446:3
**supervisor** [6] - 443:24, 444:4, 444:6,
444:9, 445:13, 446:1
**supplies** [1] - 403:15
**support** [2] - 549:2, 587:25
**supported** [1] - 415:11
**supposed** [4] - 504:21, 555:1, 557:3,
600:24
**supposedly** [1] - 522:24
**suppressed** [2] - 447:20, 448:4
**suppression** [1] - 447:22
**Supreme** [1] - 387:14
**Surfside** [1] - 528:8
**surprise** [3] - 399:25, 400:2, 592:25
**surveillance** [16] - 391:1, 391:3, 395:5,
395:10, 396:2, 398:12, 402:17,
402:19, 402:25, 403:5, 403:11,

406:21, 409:14, 411:6, 411:12, 411:15
**suspect** [1] - 604:19
**suspended** [3] - 536:18, 536:20, 537:13
**sustained** [7] - 510:10, 543:16, 563:2, 579:3, 598:13
**swear** [4] - 387:6, 412:5, 502:5, 547:12
**switch** [1] - 438:18
**switched** [1] - 387:7
**switching** [1] - 420:17
**sworn** [1] - 502:3
**SWORN** [6] - 389:2, 412:8, 443:8, 470:13, 483:8, 547:11
**Sworn** ........................................... [5] - 606:13, 606:18, 606:22, 607:2, 607:6
**Sylvia** [6] - 525:11, 525:12, 525:20, 527:4, 528:22, 530:14
**systems** [1] - 517:6
**sábado** [1] - 458:22

## T

**table** [10] - 450:23, 451:2, 452:24, 452:25, 454:2, 454:8, 454:17, 478:4, 550:20, 551:12
**tables** [2] - 451:10, 451:20
**tags** [1] - 403:8
**takedown** [1] - 402:21
**Talbot** [1] - 396:10
**talks** [3] - 568:15, 568:19, 580:24
**tally** [2] - 453:11, 457:15
**tap** [1] - 564:17
**tape** [2] - 463:7, 591:5
**technical** [2] - 485:15, 509:14
**technician** [2] - 485:16
**technology** [1] - 425:22
**telephone** [18] - 396:20, 422:4, 424:8, 424:9, 424:15, 436:5, 451:7, 497:13, 498:19, 498:21, 529:22, 529:25, 566:12, 566:14, 567:23, 568:1, 571:5, 571:8
**telephones** [3] - 405:8, 498:16, 566:17
**television** [2] - 487:10, 495:23
**TELL** [6] - 389:2, 412:8, 443:8, 470:13, 483:8, 547:11
**temporal** [1] - 427:16
**temporarily** [1] - 598:7
**temporary** [1] - 486:10
**ten** [6] - 401:4, 428:13, 428:14, 428:17, 459:15, 546:10
**terms** [2] - 389:13, 449:5
**territory** [3] - 492:17, 518:6
**testified** [15] - 396:8, 432:17, 434:2, 436:10, 439:23, 440:12, 442:3, 497:10, 499:13, 537:20, 538:18, 544:5, 595:13, 597:11, 602:1
**testifies** [1] - 576:20
**testify** [8] - 411:24, 418:2, 418:23, 428:1, 486:11, 500:19, 501:6, 563:2
**testifying** [1] - 543:10

**testimony** [22] - 391:21, 395:19, 406:11, 418:15, 439:22, 466:21, 483:24, 508:9, 517:19, 524:9, 524:12, 524:13, 536:5, 562:13, 574:17, 575:22, 578:2, 579:21, 587:21, 592:1, 593:18, 596:1
**theft** [2] - 444:14, 548:14
**themselves** [3] - 419:5, 428:12, 597:15
**THEN** [5] - 412:8, 443:8, 470:13, 483:8, 547:11
**theory** [2] - 594:19, 594:20
**therefore** [1] - 541:22
**they've** [1] - 502:16
**Third** [1] - 534:2
**third** [6] - 419:6, 419:18, 583:25, 584:4, 584:9, 586:5
**thirty** [1] - 511:1
**thirty-five** [1] - 511:1
**thousand** [2] - 495:23, 524:25
**threat** [5] - 419:5, 419:12, 420:11, 422:18, 576:8
**threaten** [2] - 420:9, 583:4
**threatened** [5] - 423:18, 436:2, 436:3, 436:22, 576:19
**threatening** [18] - 418:24, 419:22, 420:1, 423:22, 424:6, 427:17, 427:22, 428:13, 428:15, 429:7, 431:15, 432:3, 437:16, 441:15, 571:15, 583:1, 595:20
**threats** [7] - 419:4, 427:20, 436:10, 571:16, 571:18, 578:23
**three** [25] - 413:6, 413:19, 414:7, 426:23, 426:24, 428:13, 436:20, 436:21, 437:21, 441:15, 450:10, 450:12, 450:16, 456:6, 472:13, 484:13, 488:7, 506:11, 511:20, 545:13, 576:5, 587:8, 596:7, 603:21
**threw** [1] - 438:17
**throughout** [1] - 456:8
**throw** [2] - 429:8, 437:17
**thrown** [1] - 429:21
**Thursday** [1] - 458:22
**ticket** [4] - 505:4, 559:6, 559:7, 559:11
**tickets** [1] - 559:9
**timeframe** [1] - 510:25
**tin** [1] - 464:17
**TO** [6] - 389:2, 412:8, 443:8, 470:13, 483:8, 547:11
**today** [16] - 486:11, 489:8, 491:1, 499:10, 500:20, 501:6, 504:20, 531:7, 574:17, 575:5, 577:22, 580:1, 591:14, 591:19, 593:18, 596:5
**together** [7] - 396:5, 490:19, 491:9, 512:16, 515:6, 516:17, 524:4, 527:9, 527:10, 527:14, 528:14, 528:16
**togetherness** [1] - 395:25
**tomorrow** [6] - 603:7, 604:6, 604:13, 604:14, 605:11, 605:16
**tone** [1] - 423:12
**took** [23] - 394:7, 400:15, 407:22, 427:12, 439:23, 442:15, 442:17, 447:2, 467:22, 474:16, 477:14,

478:23, 492:24, 493:25, 518:9, 518:11, 520:16, 521:3, 521:10, 561:22, 567:4, 589:1
**tools** [1] - 519:24
**top** [2] - 452:19, 573:1
**topic** [1] - 516:3
**touching** [1] - 429:18
**tow** [1] - 477:16
**toward** [2] - 443:10, 470:15
**towards** [3] - 391:2, 419:4, 423:1
**towed** [3] - 476:21, 477:16, 478:10
**towel** [1] - 463:6
**towels** [2] - 451:8, 458:7
**town** [1] - 584:8
**track** [2] - 559:4, 560:10
**trade** [5] - 419:5, 419:13, 419:16, 419:18, 420:4
**traffic** [4] - 471:10, 471:11, 471:17, 479:2
**trafficking** [1] - 460:22
**training** [3] - 449:6, 453:6, 460:18
**transcript** [1] - 605:21
**translated** [3] - 447:4, 448:19, 524:24
**translating** [1] - 469:21
**translation** [1] - 446:21
**translator** [1] - 578:23
**translators** [2] - 542:19, 559:18
**transportation** [2] - 403:13, 476:22
**transported** [3] - 389:24, 403:6, 465:11
**transporting** [1] - 446:6
**treated** [2] - 598:8
**treatment** [2] - 587:8, 587:12
**trends** [3] - 444:15, 444:16, 444:25
**trial** [1] - 603:2
**TRIAL** [2] - 385:11, 606:3
**trickle** [1] - 441:12
**tried** [5] - 476:22, 567:20, 582:16, 600:24
**troubled** [1] - 577:14
**trucks** [1] - 589:24
**true** [10] - 392:10, 392:20, 392:23, 438:24, 519:8, 527:22, 545:14, 582:14, 592:2, 602:12
**truth** [6] - 412:9, 534:15, 563:12, 565:11, 566:11, 599:16
**TRUTH** [6] - 389:2, 412:8, 443:8, 470:13, 483:8, 547:11
**try** [6] - 397:11, 439:5, 483:23, 526:18, 567:16, 582:20
**trying** [10] - 509:7, 533:14, 542:4, 550:1, 570:13, 577:18, 582:19, 589:20, 603:21, 605:1
**Tuesday** [2] - 458:21, 594:25
**turn** [2] - 498:9, 559:12
**turned** [4] - 413:18, 545:10, 580:12, 584:15
**TV** [2] - 523:14, 524:25
**twelve** [7] - 413:3, 413:17, 495:15, 604:11, 604:12, 604:22, 604:23

**twelve-pack** [1] - 495:15
**twice** [4] - 511:20, 531:4, 561:19, 591:11
**two** [38] - 391:1, 391:4, 399:4, 400:8, 402:20, 404:7, 413:19, 426:24, 435:17, 435:18, 445:4, 450:19, 453:22, 457:14, 463:13, 463:23, 472:15, 489:25, 497:6, 500:1, 508:2, 511:24, 512:11, 520:2, 531:2, 536:11, 551:12, 564:10, 575:21, 577:22, 581:8, 586:1, 591:11, 592:23, 594:4, 602:6, 603:21
**two-year** [1] - 536:11
**type** [7] - 391:12, 391:14, 394:14, 394:16, 394:18, 398:3, 493:12
**types** [1] - 557:11
**typically** [2] - 456:19, 514:24

## U

**U.S** [6] - 385:14, 385:15, 386:23, 503:24, 504:11, 534:1
**ugly** [1] - 431:13
**ultimate** [1] - 471:23
**ultimately** [2] - 497:10, 557:17
**unanswered** [1] - 543:22
**uncle** [2] - 536:14, 537:3
**under** [16] - 388:19, 390:20, 411:6, 419:3, 439:3, 467:25, 474:21, 486:11, 503:3, 504:15, 508:4, 533:18, 533:19, 534:1, 534:8
**underlying** [3] - 534:12, 534:25, 535:1
**understandable** [1] - 484:1
**understood** [8] - 439:22, 468:24, 469:1, 469:7, 469:23, 473:13, 540:15, 596:22
**undertaken** [1] - 411:12
**unforeseen** [1] - 605:5
**uniform** [1] - 473:2
**unit** [3] - 444:6, 444:8, 445:11
**Unit** [2] - 444:14, 444:24
**UNITED** [3] - 385:1, 385:4, 606:2
**United** [23] - 387:2, 411:22, 413:2, 443:3, 470:6, 482:23, 484:14, 484:16, 484:19, 499:16, 500:19, 503:11, 504:9, 532:24, 533:22, 536:6, 547:5, 548:10, 549:9, 549:12, 549:15, 553:10, 584:13
**units** [1] - 445:4
**unknown** [2] - 591:21, 591:24
**unless** [2] - 501:19, 509:17
**up** [69] - 399:11, 404:2, 404:3, 404:20, 406:6, 406:13, 406:15, 417:18, 421:18, 421:23, 422:5, 422:15, 422:17, 425:1, 427:23, 430:9, 433:25, 434:4, 434:14, 434:18, 435:9, 443:5, 443:10, 447:14, 448:5, 451:8, 451:10, 452:24, 454:8, 454:16, 457:25, 461:8, 461:23, 461:24, 463:4, 469:24, 470:14, 482:7, 483:5, 483:10, 484:22,

495:10, 501:12, 507:18, 533:9, 539:17, 541:10, 542:22, 550:25, 552:8, 552:9, 554:11, 556:1, 557:6, 562:21, 562:22, 565:10, 567:10, 573:12, 575:7, 589:16, 590:4, 590:11, 600:23, 601:3, 601:4, 602:10, 602:15
**upper** [1] - 414:15
**upstairs** [1] - 440:9
**utility** [1] - 465:22

## V

**van** [12] - 428:4, 430:17, 430:21, 437:15, 439:10, 441:21, 442:13, 519:24, 552:11, 590:9, 601:11
**vehicle** [35] - 391:5, 391:12, 391:15, 394:23, 395:17, 398:17, 403:7, 407:11, 441:18, 441:19, 471:19, 472:18, 472:21, 473:4, 473:9, 473:22, 474:20, 476:21, 477:2, 477:8, 477:10, 477:15, 477:19, 478:10, 478:19, 480:18, 480:21, 481:5, 481:9, 481:11, 517:20, 520:9, 572:13
**vehicle's** [1] - 473:19
**vehicles** [4] - 390:20, 427:19, 516:25, 520:2
**VENTURA** [6] - 385:6, 425:15, 426:9, 502:20, 580:23, 606:2
**Ventura** [37] - 385:16, 390:17, 393:14, 393:24, 394:1, 394:4, 395:5, 397:22, 398:14, 398:16, 400:10, 400:18, 400:20, 402:10, 403:6, 403:12, 404:1, 418:25, 419:3, 419:25, 420:4, 425:14, 426:7, 426:22, 427:9, 428:2, 428:3, 489:11, 515:25, 516:8, 519:9, 521:17, 521:21, 562:12, 578:5, 578:10, 580:18
**Ventura's** [3] - 388:2, 398:20, 407:18
**verklempt** [1] - 577:12
**version** [1] - 524:23
**vertical** [1] - 512:8
**veteran** [2] - 493:21, 504:4
**via** [1] - 465:24
**victim** [2] - 397:22, 428:8
**victims** [8] - 399:13, 400:7, 401:11, 402:2, 402:4, 592:20, 593:2, 602:15
**Victor** [60] - 486:15, 486:19, 486:21, 486:23, 487:1, 487:3, 487:7, 487:14, 487:20, 488:7, 488:8, 488:16, 492:2, 492:14, 492:16, 495:6, 495:8, 495:11, 511:3, 511:4, 511:7, 513:14, 514:14, 514:19, 515:1, 515:3, 515:6, 518:3, 521:20, 521:22, 521:24, 522:9, 522:19, 522:20, 522:22, 523:3, 523:6, 523:19, 525:24, 527:12, 527:14, 527:15, 528:19, 530:16, 540:12, 540:15, 540:20, 540:23, 541:4, 541:6, 541:7, 542:11, 544:11, 544:12, 545:16, 545:17
**Victor's** [4] - 514:16, 523:3, 527:5,

528:22
**Victoria** [1] - 386:3
**video** [1] - 496:10
**Vienna** [8] - 484:18, 504:24, 505:3, 505:23, 506:4, 506:5, 506:6, 506:7
**viernes** [1] - 458:22
**view** [8] - 418:15, 420:10, 420:12, 427:4, 452:7, 461:3, 461:5, 509:16
**viewer** [1] - 556:1
**violence** [16] - 532:3, 532:5, 532:6, 532:22, 532:24, 533:21, 533:25, 534:10, 534:13, 534:16, 534:19, 534:22, 534:23, 536:15, 536:6, 536:10
**violent** [4] - 532:9, 532:12, 532:18, 533:24
**Virginia** [18] - 405:9, 484:18, 484:22, 486:2, 504:22, 504:24, 505:3, 505:11, 505:23, 506:7, 535:16, 535:20, 536:11, 548:12, 548:15, 549:22, 563:20, 587:19
**visa** [1] - 500:17
**visit** [4] - 511:5, 512:21, 513:14, 594:11
**visited** [1] - 528:3
**visiting** [2] - 562:2, 562:4
**voice** [5] - 387:22, 423:10, 423:12, 423:15, 571:2
**VOL** [1] - 606:3
**Volume** [1] - 385:6
**voluntarily** [7] - 468:2, 468:13, 468:16, 517:23, 586:6, 587:12, 587:13
**voluntariness** [1] - 448:5
**volunteered** [2] - 517:20, 534:16
**vouching** [1] - 406:10
**VVV** [2] - 390:18, 390:21

## W

**Wachovia** [1] - 517:5
**wait** [3] - 426:7, 514:21, 559:18
**waited** [1] - 504:12
**waiting** [7] - 396:4, 401:23, 415:16, 433:24, 440:13, 461:24, 574:20
**wake** [2] - 526:23
**walk** [8] - 440:9, 440:17, 446:11, 452:2, 455:22, 456:21, 508:13, 530:4
**walked** [7] - 450:22, 450:25, 451:5, 474:20, 589:16, 602:10, 602:11
**walking** [4] - 396:1, 426:2, 452:9, 522:1
**wall** [1] - 451:20
**wallet** [7] - 447:8, 448:6, 448:24, 449:2, 449:4, 468:14
**wallets** [1] - 447:19
**walls** [1] - 487:18
**wants** [2] - 541:21, 576:23
**war** [9] - 493:21, 504:4, 504:5, 531:16, 531:22, 531:25, 532:1, 532:2, 532:6
**warrant** [6] - 396:9, 397:3, 397:7, 397:9, 449:21, 449:25
**warrants** [1] - 445:16

**WAS** [6] - 389:2, 412:8, 443:8, 470:13, 483:8, 547:11
**wash** [4] - 457:17, 462:13, 462:15, 543:5
**Washington** [12] - 390:24, 551:21, 552:19, 553:4, 553:18, 553:24, 586:19, 586:21, 586:24, 588:23, 588:25, 589:1
**watch** [1] - 403:3
**watched** [1] - 400:16
**water** [1] - 456:12
**WDQ-10-0770** [1] - 385:5
**weapon** [18] - 394:14, 394:18, 493:6, 493:7, 493:25, 494:9, 526:16, 529:8, 531:13, 531:15, 531:18, 532:7, 532:10, 532:18, 533:3, 544:11, 596:2, 596:17
**weapons** [4] - 394:8, 394:21, 532:9, 592:17
**wearing** [2] - 475:10, 551:12
**weather** [1] - 600:2
**Wednesday** [7] - 458:22, 594:25, 595:5, 605:5, 605:7, 605:9
**Wednesdays** [1] - 558:16
**week** [14] - 403:16, 458:18, 511:20, 511:22, 545:5, 551:22, 556:19, 558:11, 559:12, 563:11, 591:8, 591:12, 591:19, 603:20
**weeks** [14] - 511:24, 556:20, 562:24, 563:5, 568:8, 568:10, 577:22, 591:15, 591:20, 593:19, 593:24, 593:25, 601:10
**weird** [1] - 424:2
**welcome** [5] - 414:18, 415:2, 439:16, 502:9, 509:8
**Werder** [1] - 455:1
**Wesley** [2] - 386:4, 502:8
**WESLEY** [3] - 502:7, 507:23, 572:10
**West** [2] - 386:24, 495:8
**whatsoever** [1] - 542:20
**white** [6] - 478:5, 491:16, 520:2, 537:21, 537:24, 538:3
**whole** [8] - 421:17, 422:19, 423:7, 423:19, 430:19, 489:22, 566:17, 578:10
**wife** [14] - 491:19, 506:11, 506:17, 513:10, 522:2, 527:12, 528:20, 537:6, 546:1, 582:3, 583:4, 583:17, 585:13
**wife's** [3] - 522:5, 537:3, 539:4
**WILLIAM** [1] - 385:11
**William** [1] - 387:4
**willing** [2] - 420:25, 600:15
**Wilson** [1] - 474:11
**window** [15] - 408:4, 429:8, 430:24, 430:25, 437:14, 437:15, 438:12, 439:9, 442:12, 480:1, 565:6, 565:10, 588:5, 588:6, 588:7
**windows** [3] - 430:17, 430:18, 430:21
**wings** [1] - 573:16
**wish** [3] - 524:23, 549:16, 603:24

**wished** [1] - 391:20
**witch** [2] - 565:21, 565:23
**withdraw** [1] - 539:17
**witness** [32] - 388:17, 406:10, 408:20, 411:21, 412:3, 412:5, 414:14, 418:7, 418:22, 443:2, 463:18, 470:10, 480:6, 489:10, 491:4, 502:13, 502:20, 524:19, 533:15, 535:9, 540:1, 542:11, 546:16, 547:1, 547:4, 575:21, 576:11, 576:23, 577:21, 604:15, 604:20, 604:24
**Witness** [16] - 394:9, 394:12, 411:20, 443:1, 469:18, 470:5, 482:22, 546:15, 578:17, 602:25, 606:12, 606:16, 606:21, 606:24, 607:5, 607:9
**WITNESS** [49] - 388:21, 399:20, 407:4, 407:6, 411:19, 412:9, 412:11, 412:14, 412:17, 415:9, 415:20, 417:5, 417:8, 424:2, 431:8, 439:16, 442:25, 443:12, 444:19, 444:22, 444:24, 451:17, 470:17, 482:21, 483:12, 486:8, 488:11, 492:7, 492:10, 492:23, 498:16, 500:4, 503:4, 513:1, 530:20, 533:6, 537:9, 539:12, 540:4, 544:10, 547:12, 547:16, 560:25, 565:21, 570:2, 571:24, 593:12, 599:8, 601:3
**witness'** [1] - 406:11
**WITNESSES** [1] - 606:7
**witnesses** [3] - 392:14, 420:1, 604:9
**woke** [3] - 422:15, 422:17, 434:4
**woman** [26] - 403:6, 403:10, 403:12, 403:15, 420:22, 421:2, 421:8, 421:15, 421:19, 422:6, 423:8, 428:5, 428:8, 431:18, 431:20, 464:20, 464:24, 465:1, 477:13, 522:14, 543:12, 546:2, 559:5, 568:15, 568:19, 599:4
**women** [29] - 395:11, 395:13, 395:15, 406:22, 407:4, 415:22, 419:5, 420:2, 450:18, 450:19, 487:25, 513:7, 514:17, 558:2, 559:2, 559:9, 559:11, 560:6, 560:23, 561:3, 562:5, 562:8, 562:21, 562:22, 562:24, 563:6, 563:13, 563:15, 563:18
**won** [2] - 598:4, 598:6
**word** [1] - 395:16
**words** [9] - 432:24, 531:2, 555:21, 571:13, 571:14, 576:9, 578:22, 591:5, 594:24
**works** [1] - 499:24
**worried** [1] - 593:5
**worse** [1] - 604:2
**worth** [1] - 579:3
**writ** [1] - 604:16
**writing** [2] - 557:7, 559:14
**written** [2] - 497:20, 524:10
**wrote** [1] - 399:21

# Y

**Yasser** [11] - 385:15, 411:24, 418:2, 418:17, 455:18, 466:21, 513:25, 524:4, 541:16, 541:24, 542:21
**YASSER** [113] - 411:22, 412:1, 412:20, 412:22, 415:15, 415:21, 417:10, 418:18, 419:21, 420:7, 420:9, 420:15, 420:17, 420:20, 424:4, 425:16, 427:16, 427:25, 428:7, 428:9, 428:11, 428:19, 429:4, 430:2, 431:10, 432:6, 440:2, 440:5, 441:22, 443:3, 443:15, 444:20, 444:23, 445:2, 448:2, 448:12, 448:14, 448:18, 451:22, 455:19, 455:21, 455:25, 456:2, 458:16, 459:9, 459:24, 460:2, 461:9, 463:18, 463:21, 465:16, 468:19, 468:21, 469:12, 482:23, 483:3, 483:16, 483:18, 485:10, 486:9, 488:12, 488:20, 488:22, 489:10, 489:13, 491:3, 491:6, 492:12, 493:2, 494:5, 495:4, 496:12, 496:14, 496:15, 496:17, 497:22, 497:25, 498:7, 498:14, 498:18, 499:1, 507:16, 507:25, 508:15, 508:18, 509:3, 530:3, 532:14, 533:4, 533:8, 533:14, 534:5, 534:18, 534:24, 535:3, 535:11, 535:23, 537:12, 537:10, 539:16, 540:3, 540:5, 541:25, 542:5, 543:9, 543:25, 544:13, 544:18, 544:21, 546:18, 574:5, 604:11, 604:24
**YASSER.............** [3] - 606:15, 606:20, 607:4
**YASSER...............** [3] - 606:14, 606:18, 607:2
**year** [16] - 500:2, 501:1, 501:2, 507:9, 511:15, 536:11, 540:7, 542:9, 542:10, 580:1, 581:23, 582:6, 584:16, 584:20, 587:6
**yearly** [1] - 511:18
**years** [26] - 413:3, 413:6, 413:17, 413:18, 413:19, 414:7, 443:22, 445:14, 445:19, 471:1, 487:15, 488:7, 488:8, 489:1, 508:3, 509:5, 511:11, 511:22, 526:14, 534:6, 538:13, 538:17, 539:18, 539:20
**Yenis** [1] - 398:24
**yesterday** [6] - 387:13, 389:5, 391:21, 395:20, 396:8, 409:23
**York** [6] - 505:13, 505:15, 505:16, 505:18, 505:19, 563:21
**young** [10] - 396:24, 409:3, 418:23, 426:19, 427:1, 432:13, 434:10, 489:9, 491:2, 582:20
**younger** [1] - 476:16
**yourself** [9] - 391:24, 430:3, 446:9, 473:13, 513:6, 531:18, 536:6, 558:23, 583:20
**yourselves** [4] - 459:14, 501:16, 546:10, 603:3

## Z

**Zelaya** [40] - 393:19, 401:15, 401:17,
547:6, 547:7, 547:16, 547:21, 549:1,
549:21, 550:13, 550:17, 550:22,
550:25, 551:7, 551:15, 552:23,
554:16, 555:16, 555:19, 556:6, 557:2,
559:4, 559:22, 562:17, 563:5, 563:25,
565:13, 566:10, 566:25, 572:1,
572:17, 573:13, 574:10, 576:2, 576:9,
578:20, 579:7, 599:23, 601:6, 603:19
**ZELAYA** [2] - 547:10, 607:6