IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

_____
                                )
UNITED STATES OF AMERICA        )
                                )
                                )
     v.                         ) Criminal Docket No. WDQ-10-0770
                                ) Volume IV
GERMAN de JESUS VENTURA and     )
KEVIN GARCIA FUERTES,           )
          Defendants            )
_____ )

                                Baltimore, Maryland
                                April 11, 2013
                                9:28 AM to 6:31 PM

**THE ABOVE-ENTITLED MATTER CONTINUED ON FOR**
**JURY TRIAL**
**BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**

A P P E A R A N C E S

On behalf of the Government:

        Michael Cunningham, Assistant U.S. Attorney
        Rachel Yasser, Assistant U.S. Attorney

On behalf of Defendant German de Jesus Ventura:

        Gerald Ruter, Esquire

On behalf of Defendant Kevin Garcia Fuertes:

        Michael D. Montemarano, Esquire

```
 1                A P P E A R A N C E S  (CONT.)

 2    Also present:

 3            HSI Special Agent Edward Kelly
              Victoria Kirchgessner, Spanish Interpreter
 4            Marta Goldstein, Spanish Interpreter
              Shelley Blumberg-Lorenzana, Spanish Interpreter
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                    Reported by:

23            Martin J. Giordano, RMR, CRR, FOCR
              U.S. Courthouse, Room 5515
24            101 West Lombard Street
              Baltimore, Maryland 21201
25            410-962-4504
```

```
 1              PROCEEDINGS OF APRIL 11, 2013

 2          THE CLERK:  All rise.  The United States District

 3    Court for the District of Maryland is now in session, The

 4    Honorable William D. Quarles, Jr. presiding.

 5          THE COURT:  Good morning.

 6          MR. RUTER:  Your Honor, good morning.  Before we --

 7          INTERPRETER GOLDSTEIN:  Excuse me.  The Interpreter

 8    has not -- I was helping you, gentlemen.  Give me a moment,

 9    please.

10          MR. RUTER:  Excuse me.

11          INTERPRETER GOLDSTEIN:  Thank you, Your Honor.

12    We're ready now.

13          THE COURT:  Okay.

14          THE MARSHAL:  Your Honor, I'm not sure if

15    Mr. Martinez is here yet.  He's being brought in by agents

16    this morning.  He wasn't here when I came up, and that was

17    part of our confusion this morning.

18          THE COURT:  Martinez?

19          THE MARSHAL:  Let me check with counsel real quick.

20          THE COURT:  Ready for the jury, counsel?

21          MR. RUTER:  Your Honor, I'd like to bring a matter

22    to the Court's attention, either at the bench, or we perhaps

23    should excuse the witness.

24          THE COURT:  Come up.

25          MR. RUTER:  Thank you.
```

```
 1            (Whereupon, the following discussion occurred at the

 2    bench.)

 3            MR. RUTER:  Your Honor, I was advised by my

 4    assistant from my office that we had received some kind of a

 5    pleading by ECF.  It's Document 171.  It was filed yesterday.

 6    I just saw it this morning.  Your clerk was kind enough to

 7    bring me a copy, something filed by Mr. Ventura.  It is all in

 8    Spanish.

 9            Mr. Cunningham and myself asked one of the

10    interpreters if she could take a quick look at it, which she

11    did, and it indicates complaints about me, complaints about

12    the evidence, complaints about not seeing the evidence, not

13    understanding the charges against him.  Those are very vague

14    statements, Your Honor.  We did not have a word-for-word

15    interpretation --

16            THE COURT:  Well, let's try to get it translated,

17    and then we'll take it up then.

18            May I send for the jury, folks?

19            MR. RUTER:  Yes, Your Honor.

20            (Whereupon, the bench conference was concluded.)

21            THE COURT:  Continuing effort to thwart a 9:30

22    start.  Yes, please ask the jury to come in.

23            (Jury enters.)

24            THE COURT:  Good morning.

25            Thank you.  Please be seated.
```

1          Government, please call your next witness.

2          **MS. YASSER:**  Yes.  Good morning, everyone.  Good

3     morning, Your Honor.

4          The United States calls Detective Amy Miguez.

5               **DETECTIVE AMY MIGUEZ**

6          **WAS THEN DULY SWORN TO TELL THE TRUTH**

7          **THE CLERK:**  Be seated.  Scoot up and speak directly

8     toward the mic.  Will you state your name, and then spell it

9     for the record, please.

10          **THE WITNESS:**  Yes, ma'am.  It's Detective Amy

11    Miguez.  It's M-I-G-U-E-Z.

12               **DIRECT EXAMINATION**

13    **BY MS. YASSER:**

14    Q.   Detective Miguez, where do you work, ma'am?

15    A.   Annapolis Police Department.

16    Q.   And how long have you been with the Annapolis Police

17    Department?

18    A.   Thirteen years.

19    Q.   What unit or position do you currently hold?

20    A.   Currently, I'm in the Intelligence Unit, and I'm also the

21    press information officer for the department.

22    Q.   And what did you do before you were the press information

23    officer for the department?

24    A.   I worked solely for the Intelligence Unit.

25    Q.   Okay.  And were you working for the Intelligence Unit

1    back in 2009 to 2010?

2    A.   Yes, ma'am.

3    Q.   And what were some of your job responsibilities and

4    duties within the Intelligence Unit?

5    A.   We did Homeland Security duties, and we also did gang

6    investigation and prostitution investigations for the

7    department.

8    Q.   And was part of your job to gather intelligence, as best

9    you could, through office work as well as street work?

10   A.   Exactly.  Both, you know, open-source information from

11   officers coming in off the street, and then also doing some

12   work on the street to gather more information.

13   Q.   And I assume -- ma'am, were you a detective as well in

14   your role back in 2009 and 2010?

15   A.   Yes, ma'am.

16   Q.   And did you become aware of an investigation involving

17   the murder of a man called El Pelon back in September of 2008?

18   A.   Yes, ma'am.

19   Q.   As well as the attempted murder of a woman named

20   Nancy Ayala that he was transporting at the time?

21   A.   Yes, ma'am.

22   Q.   And were you also aware that that investigation included

23   and morphed into a sex-trafficking investigation as well?

24   A.   Yes, ma'am.

25   Q.   And, as a detective within CID at that time, were you

 1   involved in the attempted execution of an arrest warrant

 2   against Defendant Fuertes?

 3   A.   Yes, ma'am.

 4   Q.   And when was that?

 5   A.   In September of 2009, I went to an address that Fuertes

 6   had used to try and locate him.

 7   Q.   And was that September 24th, 2009, ma'am?

 8   A.   Correct.   September 24th.

 9   Q.   Now, why did you go to the address -- and I'm sorry.

10   Could you repeat where you went, please?

11   A.   Sure.   We went to ███████████████████████████████████

12   ███████.

13   Q.   And why did you go to that location?

14   A.   That's one of the addresses that the Defendant used in

15   the past.   I was aware that there had been previous occasions

16   to try and serve the warrant there unsuccessfully, you know,

17   and I wanted to make another attempt.

18   Q.   And, when you talk about being aware of previous attempts

19   to serve arrest warrants, are you referring to a specific date

20   and time?

21   A.   Yes.   On September 1st, 2009, other officers -- I was not

22   there at the time, but other officers attempted to serve the

23   same warrant at that address, ██████████████████.

24   Q.   And were you aware generally speaking what officers found

25   at that time?

1    A.    Yes.  They found a brothel.

2    Q.    Now, you mentioned you went back to attempt to serve this

3    open warrant on Mr. Fuertes on September 24th of 2009.  Did

4    you go alone, or did you have support?

5    A.    No.  I had our Hispanic liaison, Joseph Hudson, with me,

6    and I believe there were maybe some other uniformed officers

7    since, at that time, I was not uniformed.

8    Q.    And what was the purpose of bringing Spanish liaison

9    Joe Hudson with you?

10   A.    That neighborhood has a high Hispanic population, so odds

11   are, if somebody answered the door, they would probably speak

12   Spanish.

13   Q.    I take it, then, you don't speak Spanish?

14   A.    No, just very little.

15   Q.    Can you tell the ladies and gentlemen of the jury what

16   happened when you arrived at ██████████████ on

17   September 24th of 2009?

18   A.    Sure.  I went up to the door of the apartment, and I

19   knocked, and a man answered the door, who was later -- later

20   identified him as Carlos Ascencio.  I asked him if I could

21   come in and look for the Defendant Fuertes.  I had a flyer

22   with Fuertes' picture on it and information about him being

23   wanted that I, you know, showed to Carlos Ascencio, and then

24   I -- he said I could come in and look in the apartment to see

25   if Fuertes was there.

1    Q.   And is that protocol to bring such a wanted flyer with

2    you?

3    A.   Certainly, and that way, you know, if no one answered the

4    door, I could have checked with the other residents of the

5    apartment building, said, you know, "Have you seen this

6    person?"  You know, it's good to have a picture with you that

7    you can show so that maybe they don't know his name, but they

8    might know his face.

9    Q.   I want to show you what's been previously marked

10   Government's 12k and ask you to identify what's depicted in

11   12k.

12   A.   Sure.  That's the flyer that I had with me, a copy of it.

13   It's not the original one.

14   Q.   And you mentioned that, when you showed this flyer to

15   Mr. Ascencio, he granted you permission to come into the

16   apartment and look; is that correct?

17   A.   That's correct.

18   Q.   And did you go inside?

19   A.   Yes, I did.

20   Q.   What did you observe once you were inside the apartment?

21   A.   It's a pretty small apartment.  When you enter, you're in

22   like a living area that's also the kitchen, dining room area.

23   It's one big room.  There were two women in that area.  I

24   could see the -- there are two bedroom doors.  They were open.

25   I could see that there was not much furniture in the

1    apartment.  There was a couch.

2         In the bedrooms, there was not much furniture.

3    There was mattresses on the floor.  There didn't appear to be

4    a lot of things in the apartment where people were living --

5    things on the walls, you know, even, you know, chest of

6    drawers, or something like that.

7    Q.   Did you see any indicia of a sex-trafficking operation?

8    A.   Yes.  There were -- there was a big like Ziplock bag of

9    condoms kind of tucked by the stove.  There was rolls of paper

10   towels in the bedrooms, either on the bed or there was a small

11   nightstand in each room.  There is bottles of rubbing alcohol

12   as well, which a lot of times they'll have the rubbing alcohol

13   to clean off their private parts for the prostitution.

14   Q.   Now, on that occasion, did you take photographs and seize

15   evidence from ███████████████?

16   A.   Yes, I did.

17   Q.   I want to walk you through the photographs first, and

18   this is Government's 12a.

19          MS. YASSER:  The 12a series for the Court.

20          THE COURT:  Thank you.

21   BY MS. YASSER:

22   Q.   What's depicted there?

23   A.   That's the outside of the apartment building, ████

24   ████████████.

25   Q.   a/2?

1    A.   That's the front door of the ██████████.

2    Q.   Who is that depicted in 12a/10?

3    A.   That's Carlos Ascencio.

4    Q.   Is that the man who answered the door?

5    A.   Yes, it is.

6    Q.   12a/8?

7    A.   That's Helen Melendez Carbaja, one of the women in the

8    apartment.

9    Q.   Did you find out where this woman was from?

10   A.   Washington, D.C.

11   Q.   12a/9?

12   A.   Margarita Laona Santiago.

13            **THE REPORTER:**  I'm sorry.  Margarita?

14            **THE WITNESS:**  Laona, L-A-O-N-A, Santiago.

15   **BY MS. YASSER:**

16   Q.   Did you find out, Detective Miguez, where this woman was

17   from?

18   A.   West New York, New Jersey.

19   Q.   I want to show you now 12a/3.

20   A.   That's one of the bedrooms in the apartment.

21   Q.   And how many bedrooms were in this apartment?

22   A.   Two bedrooms.

23   Q.   12a/4?

24   A.   The paper towels.  And you can kind of see the bottle of

25   rubbing alcohol behind them on the nightstand.

1    Q.   12a/5?

2    A.   The paper -- this is the other bedroom, and there is the

3    paper towels on the bed and some lotion on the nightstand.

4    Q.   a/6?

5    A.   Closer up of the nightstand.

6    Q.   a/7?

7    A.   This is one of the women's purses.  I'm not sure -- let

8    me look at my notes.

9            (Witness reviewing document.)

10   A.   I believe that's Helen Melendez' purse, and a notebook

11   found in the purse that appears to be a ledger.

12   Q.   12a/11?

13   A.   That's the bag of condoms that was found by the stove.

14   There is also a hole punch in the picture, which a lot of

15   times will be used in the houses as a marker that the person

16   has paid.

17   Q.   Now, I notice that the -- it appears that the flyer that

18   was previously admitted as Government's --

19           **MR. MONTEMARANO:**  Objection.  Can we approach?

20           **THE COURT:**  Yes.  Come up.

21           (Whereupon, the following discussion occurred at the

22   bench.)

23           **MR. MONTEMARANO:**  Having missed my bus, Your Honor,

24   I wanted to wait and not impede Ms. Yasser's examination of

25   this witness with regard to the photographs.  I would object

 1    at this time generally to the admission of this flyer.  It's

 2    not in the exhibit book provided to the Defense.  I did not

 3    understand that the Government intended to admit it, and I'd

 4    like to have an opportunity to review it.

 5              **MS. YASSER:**  I apologize.

 6              **MR. MONTEMARANO:**  No.  I --

 7              **THE COURT:**  Okay.  I will, then, consider it

 8    withdrawn.  What's the number?

 9              **MR. MONTEMARANO:**  Marked 12k for kilo.

10              **MS. YASSER:**  Well, Your Honor, if I could --

11              **MR. MONTEMARANO:**  The Court's indulgence.

12              **MS. YASSER:**  -- I apologize.  It may not have been

13    in the copy of the exhibits --

14              **THE COURT:**  You've laid a foundation for it.  Let's

15    just move on.

16              **MS. YASSER:**  Okay.

17              **THE COURT:**  What we're arguing over, let's do it

18    on --

19              **MR. MONTEMARANO:**  I just want to make sure there is

20    no hearsay --

21              **THE COURT:**  -- down time.

22              **THE REPORTER:**  I'm sorry.  One more time.

23              **THE COURT:**  Well, the jury won't be seeing it for a

24    while.  It's not going to be published anymore, okay?

25              **MR. MONTEMARANO:**  Thank you.

1          **MS. YASSER:**  May I clear up the why it was evidence

2     that was seized?

3              **THE COURT:**  Okay.

4              (Whereupon, the bench conference was concluded.)

5     **BY MS. YASSER:**

6     Q.   Detective Miguez, I note that the -- looks like

7     Government's 12k is under the bag of condoms located in

8     Government's 12a/11.  Can you explain why that is?

9     A.   Yes.  Because it was set down on the table, and then the

10    condoms, which were found behind -- sticking out from the

11    stove weren't removed before the photograph was taken, and

12    they were moved on the table.

13    Q.   And, other than the movement of the condoms, were any

14    other items of evidence moved before photographs were taken?

15    A.   I believe Helen Melendez' purse was moved before

16    photographs were taken, and I think one of the drawers was

17    moved in a subsequent photo.  I don't know if you're going to

18    show that.

19    Q.   Detective Miguez, I want to show you Government's 12a/12.

20    It looks like a little bit of a closer-up shot of the previous

21    exhibit.  I'm just going to ask if you can identify by looking

22    at 12a/12 the name or address -- and I might need to hand it

23    up -- of the BG&E bill that's depicted in Government's 12a/12?

24    A.   ███████████████████████, and the name is Amparo de

25    Jesus, maybe Gonzalez.

1    Q.    Thank you.  Now, I want to go with you through very

2    briefly the evidence that was also seized at ████████████

3    on September 24th of 2009, starting with Government's 12b.

4    A.    That's the bag of condoms and then the other condoms that

5    were found loose in the apartment.

6    Q.    And now what else can you see contained in this bag?

7    A.    There is some sort of a lubricant -- sensual lubricant

8    besides the condoms.

9    Q.    Now, aside from the large number of Crown condoms in this

10   bag, are there a series of other varieties of condoms as well?

11   A.    Yeah.  There is Lifestyle condoms, and there is

12   strawberry, grape, vanilla, different -- banana.

13   Q.    I'm going to show you Government's 12c and ask that you

14   tell the ladies and gentlemen what's in 12c, please.

15   A.    These are handwritten little pieces of paper, numerous

16   cards.  They say Plaza Eastport, Yamar (phon), ████-1643.

17   They were found in the apartment.  It's a common way for these

18   brothels to get business, to hand out these cards to men at

19   different places around the city.  Plaza Eastport is Eastport

20   Plaza, so maybe they handed them out there, and then, when

21   they came to the apartment, they would know this man got the

22   card at Eastport Plaza, you know, so we get a lot of business

23   from there.

24   Q.    12d, if you could identify that.

25   A.    This is the BG&E bill from ████████████ that we

 1   found.

 2   Q.   12f?

 3   A.   These are little cards cut up into squares in a Dixie

 4   cup, and a lot of times what happens is there is some sort of

 5   marker that's given to the men who are paying for services.

 6   When they pay, they're given one to show that they've paid

 7   already, so they can give this to the woman, and the woman

 8   then will receive some sort of payment for every chip that she

 9   has.

10   Q.   Government's 12e?

11   A.   A set of keys.  These were from Carlos Ascencio.

12   Q.   12g?

13   A.   This is the hole punch in the picture taken from ▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮.

15   Q.   12h?

16   A.   The bottle of rubbing alcohol taken from ▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮.

18   Q.   And we have 12i and 12j.

19   A.   These are two cell phones taken from ▮▮▮▮▮▮▮▮.  One

20   was from Margarita Santiago, and the other one was from

21   Carlos Ascencio.

22   Q.   And then, finally, from the series 12l?

23   A.   This is the green notebook with the tally record in it.

24   Q.   And is there a phone number on the first page of that

25   notebook?

```
 1    A.    Yes.  It's ████-0903.

 2              MR. MONTEMARANO:  Your Honor?

 3              THE COURT:  Yes.

 4              MR. MONTEMARANO:  For the record, our objection is

 5    withdrawn.

 6              THE COURT:  Objection as to --

 7              MR. MONTEMARANO:  12k for --

 8              THE COURT:  12k?

 9              MR. MONTEMARANO:  Yes, sir.

10              THE COURT:  It is admitted.

11    BY MS. YASSER:

12    Q.    I'm just going to publish for the jury the notebook

13    seized in ████ and ask:  Detective Miguez, do you recall

14    where this notebook was seized, or from whom this notebook was

15    seized?

16    A.    This is Margarita Santiago.

17    Q.    Detective Miguez, did you later discover that

18    Defendant Ventura was arrested on the same day that you went

19    to ████, September 24th of 2009?

20    A.    Yes, I did, at a later date.

21    Q.    And was that arrest -- was that part of the operation

22    separate and independent from your activity on that day?

23    A.    Yes, ma'am.

24    Q.    I want to lastly direct your attention to approximately

25    five months later, February 17th of 2010.  Were you operating
```

```
 1    as a detective within CID on that date?

 2    A.    Yes, ma'am.

 3    Q.    And can you tell the ladies and gentlemen of the jury

 4    what you did on that day.

 5    A.    It was actually between February 17th and February 18th,

 6    and, right around midnight that night, I received a call from

 7    my supervisor, Sergeant Kirchner, that there was a robbery

 8    that occurred in Annapolis and that I should come in to get a

 9    search warrant for the house involved.

10    Q.    And did you do that?

11    A.    Yes, I did.

12    Q.    And what was the location of the suspected robbery?

13    A.    It was ███████████████████████.

14    Q.    And, after obtaining a search warrant for ████████████ --

15    I'm sorry -- ██████████████████████, did you go to that

16    location and serve that search warrant?

17    A.    Yes, I did.

18    Q.    And were photographs taken and evidence seized on that

19    occasion?

20    A.    Yes, ma'am.

21    Q.    I'm going to show you a series -- and this is, for the

22    Court, 14h, first starting with 14h/1?

23    A.    That's a photograph of the building, ████████████.

24    Q.    h/2?

25    A.    That's a closer shot of ████████████.
```

1    Q.   h/4?

2    A.   This is the front of ████████ actually taken that night,

3    with the snow.

4    Q.   h/5?

5    A.   This is inside the apartment, the two women that were

6    inside the apartment.

7    Q.   And, in addition to the two women inside the apartment,

8    were there any men?

9    A.   Yes, there were two men.

10   Q.   And were these the victims of the robbery?

11   A.   Yes, ma'am.

12   Q.   With respect to the two women depicted in 14h/5, did you

13   learn what these women's names were?

14   A.   Yes.  Luz Mary Diaz, and Liset Serrano.

15   Q.   And do you recall where those women were from?

16   A.   Luz Mary Diaz was from Colombia, the country Colombia,

17   and Liset Serrano -- I'm not certain.  I think she was from

18   New York.

19   Q.   Oh, and, to be clear, Detective Miguez, did either of

20   these two women make any allegations of rape?

21   A.   No --

22               **MR. RUTER:**  Objection, Your Honor.

23               **THE COURT:**  Overruled.

24               **THE WITNESS:**  No, ma'am.

25   **BY MS. YASSER:**

1    Q.    Detective Miguez, how many bedrooms, if you can recall,

2    were in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

3    A.    Two.

4    Q.    I'm going to show you Government's 14h/6.  What's

5    depicted there?

6    A.    A mattress on the floor.

7    Q.    And h/11?

8    A.    That's another bed and sheet over the window in the

9    apartment.

10   Q.    Government's 14h/7?

11   A.    This was in the living room directly in front of the door

12   as you entered the apartment.

13   Q.    And 14h/8?

14   A.    A closer-up picture.

15   Q.    14h/9?

16   A.    This was in the kitchen, rubbing alcohol we found.

17   Q.    14h/10?

18   A.    This was in the corner in the living room.  They're eggs

19   with yolks.

20   Q.    Have you ever seen that before?

21   A.    Yes.

22   Q.    And what do the eggs with the yolks signify to you in

23   your training and experience?

24   A.    It's just to help prevent pregnancy.

25   Q.    Government's h/12?

1    A.    This is the -- looking from the living room down the

2    hallway towards the bedroom in the apartment.

3    Q.    h/14?

4    A.    A used condom on the floor.

5    Q.    Do you recall where that was recovered?

6    A.    I don't recall.

7    Q.    I'm going to show you h/15?

8    A.    It's a closer-up picture of the used condom on the floor.

9    Q.    And h/16?

10   A.    This was the contents of the bathroom waste basket, used

11   condoms and condom wrappers.

12   Q.    Detective Miguez, did you observe any indicia of

13   permanent occupancy in ███████████████████?

14   A.    No.  There was very little -- very little furniture.  The

15   beds were on the floor.  There was very little clothing.

16   There is no pictures on the walls, you know, all the things

17   that people would move in when they moved in.  There is very

18   little in the kitchen cupboards, that kind of thing.

19   Q.    And, before I approach to move this evidence in, can you

20   tell me if you're aware whether the subjects, the persons

21   responsible for the robbery, were caught that evening?

22   A.    Yes, they were.

23   Q.    And do you know if any items of note were seized from

24   those individuals?

25   A.    Numerous belongings from the victims were seized from

1    them.

2    Q.    And I'm going to show you Government's h/17.  Are those

3    some of the belongings that were seized from the subjects?

4    A.    Yes.

5    Q.    And h/18?

6    A.    Those are the cell phones, again, from the previous

7    picture.

8    Q.    Were any guns -- any weapons recovered from those

9    individuals?

10   A.    No, ma'am.

11   Q.    Was there a canvas done of the area on that evening?

12   A.    Yes.

13   Q.    And, as I understand it, it was snowing; is that correct?

14   A.    Yes.  There was quite a bit of snow on the ground that

15   day, and the officers had seen the suspects that committed the

16   robbery in the road, and then they had run from the officer to

17   another location, so, when the officers caught them in that

18   second location, they backtracked to see if they could find

19   any -- anything in the snow, and they were able to find some

20   items.

21   Q.    And were some items still remaining on the individuals

22   themselves?

23   A.    Yes, that's correct.

24   Q.    And how does it work -- if there is snow on the ground,

25   how does an area canvas work?

1    A.   Well, it makes it a lot easier for us, because we can

2    kind of tell where the people were running because of the

3    marks in the snow, so the officers would look for where those

4    marks were and then search from there out to where an item

5    might be thrown.

6              **MS. YASSER:**  If I may approach the witness, Your

7    Honor?

8              **THE COURT:**  Yes.

9    **BY MS. YASSER:**

10   Q.   Turning back to the actual location at ███████, I want

11   to show you what's been marked as Government's -- and it's a

12   series of documents under 14.  First, actually, I'm going to

13   start with the subjects and show you Government's 14f/1

14   through f/5 and 14e/1 through e/4.  Can you identify those two

15   sets of phones for the ladies and gentlemen.

16   A.   Sure.  These are some of the phones recovered from the

17   suspects in the robbery.

18   Q.   And then I want to show you Government's 14m.  If you can

19   tell what that document is.

20   A.   Yes.  This, I found in the kitchen.  It's a letter in

21   Spanish, and the name on it is Carlos Antonio Ascencio.

22   Q.   Is that the same name of the individual you had

23   encountered at ████████████ back on September 24th of

24   '09?

25   A.   Yes, it is.

 1     Q.    Government's 14l, please.

 2     A.    It's a tow bill made out to a Luis Alberto Reyes, and we

 3     found that in the kitchen on ████.

 4     Q.    Government's 14d, please.

 5     A.    It's a cell phone recovered from one of the suspects in

 6     the robbery.

 7     Q.    14c/1 and c/2, please.

 8     A.    These two phones were seized from the actual apartment,

 9     ██████.

10     Q.    Now, I'm going to hand you what's been previously marked

11     as 14j and 14k.  Can you tell the jury what those are?

12     A.    Yes.  The little green cards, pieces of paper cut out

13     with a stamp on them that has lips and a heart, and then it

14     has a phone, and it says ████-8648, and then a cell phone,

15     and it says ████-5777, and these were in the kitchen of the

16     ██ -- of ██████.

17     Q.    And what is in 14 -- I believe it's j --

18     A.    "J" is the stamp used to create those notes -- those

19     cards.

20     Q.    It's a custom stamp?

21     A.    Exactly.

22     Q.    Thank you, Detective Miguez.

23           Now, in your experience and training, from your

24     review of the photographs and the evidence, as well as your

25     observations on February 17th of 2010, do you have a

 1    conclusion as to the operative purpose of ████████ on that

 2    day?

 3    A.   It appeared to be operating as a brothel.

 4              **MS. YASSER:**  Thank you.  No further questions, Your

 5    Honor.

 6              **THE COURT:**  Cross?

 7              **MR. MONTEMARANO:**  Your Honor, may we approach,

 8    please?

 9              **THE COURT:**  Sure.  Come up.

10              (Whereupon, the following discussion occurred at the

11    bench.)

12              **MR. MONTEMARANO:**  I would raise the same objection

13    to the letter from Mr. Ascencio.  It's not in the exhibit

14    book.  It's not even on the exhibit list, number one.  And,

15    secondly, and equally important, we are concerned about its

16    contents in terms of the fact that there are some Spanish

17    speakers, even to some small degree, on the jury, and it may

18    contain hearsay, et cetera, so we'd simply like to reserve an

19    objection regarding that or have it not yet admitted until we

20    can undertake the same review, and I think --

21              **THE COURT:**  You're referring to Government 14m?

22              **MR. MONTEMARANO:**  I believe that was it.

23              **THE COURT:**  Okay.  Foreign document receipt in name

24    of --

25              **MR. MONTEMARANO:**  Receipt, not letter?  The --

1              MS. YASSER:  A letter.

2              MR. MONTEMARANO:  -- Detective said it's a letter.

3    If it's a receipt with his name on it, with all due respect,

4    if it's a credit card receipt that's got your name on it, I

5    don't much care.  If it's a letter, it may contain narrative

6    things:  "I was abused," "I was hired," things like that.

7              THE COURT:  It says foreign document receipt, so I

8    will withdraw it.

9              MR. MONTEMARANO:  Thank you.

10             THE COURT:  I will defer ruling on it.  We

11   afterwards can --

12             MR. MONTEMARANO:  I'll get it cleaned up --

13             THE COURT:  -- get an evidentiary basis --

14             THE REPORTER:  I need to take one at a time if I

15   can.

16             THE COURT:  There is a foundation for admission, and

17   so I'll hear your arguments after you've had a chance to

18   review it.

19             MR. MONTEMARANO:  Thank you.

20             (Whereupon, the bench conference was concluded.)

21             MR. MONTEMARANO:  Thank you, Your Honor.

22             MR. RUTER:  Your Honor, thank you.

23             THE COURT:  Question?

24

25

<u>**CROSS-EXAMINATION**</u>

1

2   **BY MR. RUTER:**

3   Q.   Detective, when you visited ███████, was that on

4   actually February 17th, did you say, of 2010?

5   A.   It was into February 18th --

6   Q.   Okay.

7   A.   -- sometime overnight.

8   Q.   And did you have occasion to interview the four

9   individuals who were located inside of ███████?

10  A.   Let me check my notes.  I know they were interviewed.  I

11  just wasn't sure if I was present for all the interviews.

12  Q.   Okay.

13          (Witness reviewing document.)

14  A.   No.  I don't believe I was present for any of the

15  interviews.

16  Q.   Do you know whether or not they were interviewed

17  separately?

18  A.   I believe they were.

19  Q.   Would that be part of the protocol of your police

20  department, to interview possible defendants, suspects, or

21  victims individually?

22  A.   Usually, yes.

23  Q.   Okay.  And you said you found no guns.  Could you tell

24  the ladies and gentlemen of the jury why you were looking for

25  guns?

```
 1    A.   There was a call that reported the robbery, and the
 2    caller -- caller said his brother had been robbed, and I'm not
 3    sure -- one of the -- so, when the officers responded, they
 4    had -- didn't have a very good location.  They found the
 5    subjects in the area, and then they ran from the officers.
 6    When they caught up with those subjects, they first said that
 7    they had been robbed.  Though they were speaking in Spanish,
 8    it was hard for the officers to understand, and one of them
 9    said something about there was a Black guy with a gun.
10    Q.   Were the victims inside ████████████ also interviewed by
11    the police department?
12    A.   I -- like I said, yes.
13    Q.   Okay.  And did they also not report that they were
14    accosted with a gun?
15    A.   I -- I don't know.  I don't have it in my report.
16    Q.   Okay.  One of the people that was arrested was Mr. Zelaya
17    Repalo; is that correct?
18    A.   Yes.  Yes, sir.
19    Q.   And did he, in fact, admit that he was one of the
20    perpetrators of the armed robbery, or the robbery, I should
21    say?
22    A.   I'm -- I'm not sure.  I actually -- I didn't investigate
23    the robbery portion.  I only investigated the --
24    Q.   Okay.
25    A.   It was kind of split up between officers.
```

1   Q.   Understood.

2        **MR. RUTER:**  I have nothing further of this

3   detective.  Thank you very much.

4        **THE COURT:**  Cross?

5        **MR. MONTEMARANO:**  Thank you, Your Honor.

6                      **CROSS-EXAMINATION**

7   **BY MR. MONTEMARANO:**

8   Q.   Just a couple of questions, Detective.  How are you?

9   A.   Good, sir.

10  Q.   So I understand correctly, the items that you seized when

11  you were present on these two locations on the two specific

12  dates about which you've testified, generally speaking, come

13  into two categories: one, things that are of obvious

14  evidentiary value, correct?

15  A.   Correct.

16  Q.   And that's based upon your walking around the apartment.

17  There is no indicia of occupancy.  It looks like it's

18  operating as a brothel, and you've got a huge bag of condoms?

19  A.   Correct.

20  Q.   And that says, "Hmm, this could be a brothel.  This would

21  be evidence of that beyond my conclusions;" fair statement?

22  A.   Yes, sir.

23  Q.   In addition to that, you would be seizing things that are

24  of potential or likely or possible evidentiary value; for

25  example, the BGE receipt that we saw in one of the photographs

1    on the table?  Is that also a fair statement?

2    A.   Yes, sir.

3    Q.   And, when you came to the door of ██████ on the 24th

4    of September -- well, late September, okay -- you had a flyer

5    with you, correct?

6    A.   Yes, sir.

7    Q.   And that flyer would be the sort of thing issued to

8    members of your department when you're looking for someone who

9    is wanted on an arrest warrant; is that a fair statement?

10   A.   That -- well, it's different from the ones that would be

11   issued to us.  It was more for public consumption.  The ones

12   we do internally would usually be marked "Law Enforcement

13   Sensitive," you know, "Not for Distribution Outside the

14   Department."  This one, because it's not marked that way, it's

15   usually for someone to go around and show people or hand out.

16            **MR. MONTEMARANO:**  Thank you very much.

17            **THE WITNESS:**  You're welcome.

18            **THE COURT:**  Redirect?

19            **MS. YASSER:**  Just briefly.

20                    <u>**REDIRECT EXAMINATION**</u>

21   <u>**BY MS. YASSER:**</u>

22   Q.   You seized, for example, as the Defense attorney

23   indicated, evidence that could be of potential evidentiary

24   value, correct?

25   A.   Yes, ma'am.

```
1    Q.   And that includes the BGE bill in the name of Amparo de

2    Jesus Gonzalez at ██████████████?

3    A.   Yes, ma'am.

4    Q.   That's so that, later on in the investigation, you might

5    look at other pieces of evidence seized on other days -- for

6    example, like after a traffic stop, maybe an MVA

7    registration -- and match up those two items of evidence; is

8    that correct?

9    A.   Yes, ma'am.

10              MS. YASSER:  No further questions.

11              THE COURT:  Recross?

12              MR. MONTEMARANO:  No, Your Honor.

13              THE COURT:  Mr. Ruter, recross?

14              MR. RUTER:  No, sir.  Thank you.

15              THE COURT:  Thank you.  You are excused.  Good day.

16              THE WITNESS:  Thank you, Your Honor.

17              (Witness excused.)

18              THE COURT:  Call your next witness.

19              MR. CUNNINGHAM:  Your Honor, call Margarita

20    Santiago.

21              MS. YASSER:  Your Honor, if I may just clear this?

22              MR. CUNNINGHAM:  Your Honor, may we have just one

23    minute to reorganize some evidence that was used?

24              THE COURT:  Yes.

25              MR. CUNNINGHAM:  Ms. Santiago, if you'll please go
```

1    over there.

2              THE CLERK:  Please stand and raise your right hand.

3                   **MARGARITA SANTIAGO LAONA**

4         **WAS THEN DULY SWORN TO TELL THE TRUTH**

5              THE WITNESS:  I swear.

6              THE CLERK:  Be seated.  If you can scoot up and

7    speak -- state your name, and then spell it for the record,

8    please.

9              THE WITNESS:  My name is Margarita Santiago Laona.

10   Santiago, S-A-N-A -- Santiago -- N -- Santiago --

11             THE COURT:  Thank you.  Question.  Is --

12             MR. CUNNINGHAM:  I thought she -- I'm sorry, Your

13   Honor.  I thought we were still in the spelling of her name.

14             THE COURT:  There was some difficulty.  Let's go to

15   the examination.

16                     **DIRECT EXAMINATION**

17   BY MR. CUNNINGHAM:

18   Q.   Good morning, Ms. Santiago.

19   A.   Good morning.

20   Q.   Ms. Santiago, at the risk of asking an insensitive

21   question, we'll begin with:  How old are you?

22   A.   Twenty-seven.

23   Q.   And where are you from?

24   A.   Mexico.

25   Q.   When did you first come to the United States?

 1   A.   In 2002.

 2   Q.   When you came to the United States, did you have

 3   authority to do that?

 4   A.   No.

 5   Q.   How did you enter the United States?

 6   A.   Illegally.

 7   Q.   And where did you enter?

 8   A.   Through Nogales.

 9   Q.   And is that a city on the border of Mexico and Texas?

10   A.   Yes.

11   Q.   How old were you at the time?

12   A.   I don't remember well, because they falsified my papers.

13   Q.   When you came to the United States, were you alone,

14   Ms. Santiago?

15   A.   No.

16   Q.   Who were you traveling with?

17   A.   With a friend.

18   Q.   Was that another female, or a male friend?

19   A.   A female friend.

20   Q.   And what was the reason that you came to the United

21   States?

22   A.   To work.

23   Q.   Was it a particular kind of work you came to do?

24   A.   No.

25   Q.   Now, had you been working in Mexico?

1    A.    Yes.

2    Q.    What kind of work did you do?

3    A.    I was forced to prostitute myself.

4    Q.    Ms. Santiago, when you lived in Mexico, were you married?

5    A.    Not married, but together with somebody.

6    Q.    Did you have or do you have children with that person?

7    A.    Yes.

8    Q.    What was his name?

9    A.    The father, or the children?

10   Q.    I'm sorry.  The father.

11   A.    Raul Romero.

12   Q.    And who was it that forced you to work as a prostitute in

13   Mexico?

14   A.    Raul Romero.

15   Q.    And you have children with Raul Romero.  How many?

16   A.    Two.

17   Q.    Where are those children now?

18         **INTERPRETER KIRCHGESSNER:**  Interpreter requests

19   clarification.

20   A.    San Miguel de la Cinco de Descala (phon).

21   Q.    And is that a location in Mexico?

22   A.    Yes.

23   Q.    Who has custody of those children?

24   A.    Raul's mother.

25   Q.    And can you tell us, please, the age and the sex of your

```
 1   children?
 2   A.    ███████████████, and ████████████████.
 3   Q.    And how old is ██████?
 4   A.    Nine.
 5   Q.    And how old is ██████?
 6   A.    Five.
 7   Q.    And, Ms. Santiago, when was the last time you saw your
 8   children?
 9   A.    In 2008.
10   Q.    And have you been denied the ability to see your
11   children?
12   A.    Yes.
13   Q.    And how is that?
14   A.    If I did not send money or if I did not continue to work
15   for Raul, he would not let me see my children, and he said he
16   would take them away from me.
17   Q.    And, when you came to the United States, did Raul direct
18   you to find a particular kind of work?
19   A.    Yes.
20   Q.    And what was that, Ms. Santiago?
21   A.    The same.  Prostitution.
22   Q.    After you came into the United States in Texas, where did
23   you go?
24   A.    To New Jersey.
25   Q.    Did you have somebody there who you knew?
```

1    A.    Raul's cousins.

2    Q.    And, when you got to New Jersey, did you connect with or

3    did you become associated with Raul's cousins?

4    A.    Yes.

5    Q.    And did they make you work?

6    A.    Yes.

7    Q.    And was that in prostitution?

8    A.    Yes.

9    Q.    Now, Ms. Santiago, when you were in New Jersey, were you

10   ever caught by the police and charged with a prostitution

11   offense?

12   A.    Not in New Jersey.

13   Q.    Were you caught in Maryland?

14   A.    Yes.

15   Q.    Do you recall being arrested by the police in Annapolis,

16   Maryland on September 24th, 2009?

17   A.    Yes.

18   Q.    I want to talk to you about the circumstances that

19   brought you to Maryland.

20   A.    Okay.

21   Q.    So, using the date of September 24th, first, how long do

22   you recall having been in Maryland before you were arrested?

23   A.    First, one week, and the second week, I came back to

24   Maryland.

25   Q.    And were you arrested sometime during the second week,

```
 1    Ms. Santiago?

 2    A.   Not until the third.

 3    Q.   The third week.  Okay.

 4         Now, prior to those three weeks, had you ever worked

 5    in Maryland?

 6    A.   Yes.

 7    Q.   When was that?

 8    A.   I don't remember the date well.

 9    Q.   Okay.  Well, let's talk about the time you came right

10    around the arrest.  How did you come to be working at the

11    location you were arrested on September 24th, 2009?

12    A.   Through a friend.

13    Q.   And what did the friend give you?

14    A.   The number of a person called Chalo.

15    Q.   And what did you use the number for?

16    A.   To call Chalo to get work from him.

17    Q.   And do you know where the friend got this number for

18    Chalo?

19    A.   No.

20    Q.   Were you told that Chalo was somehow associated with any

21    of Raul's cousins?

22    A.   No.

23    Q.   Did you call the number that you were given for Chalo?

24    A.   Yes.

25    Q.   Now, Ms. Santiago, did you remember the number, or did
```

1    you write it down in some kind of notebook or piece of paper

2    somehow?

3    A.    I wrote on a piece of paper.

4    Q.    And did you call the number for Chalo?

5    A.    Yes.

6    Q.    And what did you talk about during the conversation?

7    A.    I asked him if he had work for me, and he told me he did.

8    Q.    And was it clear what kind of work you were talking

9    about?

10   A.    Yes.

11   Q.    And was this work for prostitution?

12   A.    Yes.

13   Q.    Now, when you talked to the person at the other end, was

14   this a man?

15   A.    Yes.

16   Q.    And did he identify himself as Chalo?

17   A.    Yes.

18   Q.    Do you remember if you spoke to him the very first time

19   you called him, or did you leave a message, and did he call

20   back?

21   A.    I talked to him at that moment.

22   Q.    And, when you talked to him, were you in New Jersey?

23   A.    Yes.

24   Q.    And did he know you were in New Jersey?

25   A.    No.

```
 1    Q.   Did you not talk to him about how you would get to
 2    Maryland?
 3    A.   Yes.
 4    Q.   What did you talk about, about how you would get to
 5    Maryland?
 6    A.   That I'd come by bus.
 7    Q.   And were you supposed to take the bus to a particular
 8    location?
 9    A.   I took the bus on 42 in New York to Washington, D.C.
10    Q.   And did he tell you to take the bus to D.C.?
11    A.   Yes.
12    Q.   How were you supposed to get from the bus station to
13    where you were going to work?
14    A.   I know the 42 well.
15    Q.   I'm sorry.  My question was:  When you got to the D.C.
16    bus station, when you arrived at the D.C. bus station, how
17    were you to get from there to where you were going to work?
18    A.   Chalo picked me up in Washington.
19    Q.   Did you discuss that during the telephone call?
20    A.   Yes.
21    Q.   Now, when you were talking with Chalo about coming to
22    work, did you talk about how much money you would get paid for
23    working for him?
24    A.   No.  I already knew.
25    Q.   How was it that you already knew?
```

1   A.   Because, as I told you, I was working before, because

2   Raul had me threatened to work, and so I knew how much it was

3   paid, and so then I asked Chalo how much he would pay me, and

4   he said the same, 30.

5   Q.   So was that $30 -- $30 per man?

6   A.   Yes.

7   Q.   And how much of that -- is that what the man would be

8   charged?

9   A.   Yes.

10   Q.   And I didn't make it clear, but was that in order to have

11   sex with you?

12   A.   Yes.

13   Q.   How much of that $30 would you receive?

14   A.   Fifteen.

15   Q.   Would you have any of that money -- was anything

16   subtracted from that $15?

17   A.   The food, what I spent on the -- on food during the week.

18   Q.   Would you be charged for anything else, like condoms or

19   paper towels or alcohol, those kinds of things?

20   A.   Yes.

21   Q.   Were you getting paid by Chalo and the other men for whom

22   you worked?

23   A.   Yes.

24   Q.   And what would you do with the money you received,

25   Ms. Santiago?

```
 1    A.   Early in the evening, Raul's cousin would come and wait

 2    for me to pick me up, and he would take all the money I had to

 3    send to Mexico to Raul.

 4    Q.   How were you able to live, then, Ms. Santiago?

 5    A.   I couldn't say anything.  They would take all the money,

 6    but Raul's cousin would give me $100 for the food and took

 7    care of the rent, so I -- they took care of everything.

 8    Q.   Now, Ms. Santiago, when you first talked to Chalo, did

 9    you talk about how long you would work for him in Maryland?

10    A.   First, we talked about one week.

11    Q.   Did you have a different or another conversation, or a

12    later talk about a different amount of time?

13    A.   Yes.

14    Q.   What did you talk about later?  How much time?

15    A.   One week.

16    Q.   Do you remember the sequence of what happened when you

17    worked for Chalo in Maryland?  In other words, when you came,

18    when you went back to New Jersey, and when you returned to

19    Maryland?

20    A.   It was on a bus.

21    Q.   The first time you came down to Maryland, you came by

22    bus?

23    A.   Yes.

24    Q.   And, when you got to the bus station in D.C., what did

25    you do?
```

```
 1    A.   I called Chalo to come pick me up.

 2    Q.   And did somebody come pick you up at the bus station?

 3    A.   Yes.

 4    Q.   And was that the person who identified himself as Chalo?

 5    A.   Yes.

 6    Q.   Ms. Santiago, during the course of the, I guess, two

 7    weeks -- was it two weeks that you worked for Chalo?

 8    A.   Three.

 9    Q.   Three weeks.  I'm sorry.  I misspoke.

10             During those three weeks, did you see Chalo on

11    several occasions?

12    A.   No.

13    Q.   So, the first time -- did Chalo ever take you to any

14    other locations where you worked for him other than the place

15    he took you in Maryland?

16    A.   He first took me to Maryland.

17    Q.   And then where did he take you?

18    A.   To the beach.

19    Q.   To the beach.  Was this another brothel?

20    A.   Yes.

21    Q.   And was that brothel in Portsmouth, Virginia?

22    A.   Yes.

23    Q.   And did it take you several hours to drive down there?

24    A.   I don't remember.  Maybe two or three hours.

25    Q.   And were you riding in the vehicle with Chalo during that
```

1    trip?

2    A.   Yes.

3    Q.   Now, Ms. Santiago, if you'll look, please, do you see

4    Chalo in the courtroom?

5    A.   Yes.

6    Q.   Is Chalo the man seated here, the second man from the

7    right at this table with the tan shirt on?

8    A.   Yes.

9         **MR. CUNNINGHAM:**  Your Honor, may the record reflect

10   that Ms. Santiago identified Defendant Ventura, Chalo.

11        **THE COURT:**  The record will reflect that

12   identification.

13   **BY MR. CUNNINGHAM:**

14   Q.   Now, after Chalo picked you up in D.C., did he bring you

15   to a brothel in Annapolis, Maryland?

16   A.   Yes.

17   Q.   And was this the same location where you were arrested on

18   September 24th, 2009?

19   A.   Yes.

20        **MR. CUNNINGHAM:**  Excuse me one minute, Your Honor,

21   if I may.

22   Q.   Ms. Santiago, the first place that Chalo brought you in

23   Maryland, did you actually work as a prostitute at that

24   location?

25   A.   Yes.

Direct Examination of Margarita Santiago Laona                    T-IV-678

```
 1    Q.   And can you tell us how many men you might see as clients
 2    on a given day?
 3    A.   Thirty, thirty-five.
 4    Q.   And would these men pay money to have sex with you?
 5    A.   Yes.
 6    Q.   Now, when you first came, did you stay in Maryland for a
 7    week?
 8    A.   Yes.
 9    Q.   And did you return to New Jersey?
10    A.   On Sunday.
11    Q.   And did you return back to Maryland the next day, or very
12    shortly thereafter?
13    A.   The following day.
14    Q.   Do you remember if you had another telephone conversation
15    with Chalo about coming back to work for him?
16    A.   Yes.
17    Q.   And, when you came back, is that when you were taken down
18    to the brothel in Portsmouth, Virginia?
19    A.   Yes.
20    Q.   Now, when you were down in Virginia, did you see any of
21    the men who operated the brothel there?
22    A.   Yes.
23    Q.   Do you think you would recognize if you saw the person
24    who operated the brothel down there if you saw that person
25    again?
```

1    A.    Yes.

2    Q.    Do you remember the name of the person who was operating

3    the brothel down there in Virginia?

4    A.    No.

5    Q.    Did you have much contact with that person?

6    A.    No.

7    Q.    Ms. Santiago, if you would look around the courtroom and

8    tell us if you see the person who was operating the brothel in

9    Portsmouth, Virginia.

10   A.    No.

11   Q.    Will you look at the Defense table and look around

12   throughout the courtroom if you think --

13          **MR. MONTEMARANO:**  Objection.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  No.

16          **MR. CUNNINGHAM:**  Okay.

17          **THE WITNESS:**  No.  No, I don't remember.

18          **MR. CUNNINGHAM:**  You don't remember.  All right.

19   **BY MR. CUNNINGHAM:**

20   Q.    Now, Ms. Santiago, after you worked in Portsmouth, did

21   you return to New Jersey?

22   A.    Yes.

23   Q.    And how long did you stay in New Jersey before returning

24   to Maryland?

25   A.    A week.

```
1    Q.   And, after staying in New Jersey for a week, did you

2    return to Maryland to the brothel where you were ultimately

3    arrested?

4    A.   Yes.

5    Q.   Do you recall if you had another conversation with Chalo

6    about coming back to work for him in Maryland?

7    A.   Yes.

8    Q.   And, again, did he tell you to come by bus and that you

9    would be picked up at the bus station?

10   A.   Yes.

11   Q.   Now, when you came back to Washington, D.C. to the bus

12   station, do you remember if it was Chalo or someone else who

13   picked you up on this -- I guess this would be the third week.

14   A.   It was Chalo.

15   Q.   And did you go to the same location where you had been

16   the first time you worked for him in Maryland?

17   A.   There, where I was arrested.

18   Q.   Okay.  And did you, again, work as a prostitute there

19   that week?

20   A.   Yes.

21   Q.   Do you remember any of the other people who were working

22   the week -- at that location the week you were arrested?

23   A.   Yes.

24   Q.   Before asking or showing you some pictures, Ms. Santiago,

25   when you were working at a brothel, where would you stay, like
```

Direct Examination of Margarita Santiago Laona

1      live during that week?

2      A.   Right there.

3      Q.   And did you have your own bedroom?

4      A.   In the same place where I worked, that's where I would

5      sleep at night.

6      Q.   And, from the pictures we've seen of the brothels, it

7      looks like you don't bring very much in the way of clothing

8      and any personal articles when you travel.

9      A.   No.

10     Q.   Are you allowed to go out when you're there for the week?

11     A.   No.

12     Q.   How do you get food?

13     A.   The ones who were taking care of the place would get the

14     food.

15     Q.   And would you get charged for that food, by the way?

16     A.   Yes.

17     Q.   I'm going to show you a photo of an individual.  This is

18     Government 12a/10.  Do you recognize that man, Ms. Santiago?

19     A.   Yes.

20     Q.   Was he one of the men who was working in the brothel when

21     you got arrested?

22     A.   He was there, but, before the police arrived, it was a

23     younger guy there.

24     Q.   Do you remember the name of the younger guy?

25     A.   No.

1    Q.   Did he have a nickname or anything?

2    A.   No.

3    Q.   Government Exhibit 12a/8, is this the woman that was

4    working with you when you got arrested?

5    A.   Yes.

6    Q.   Did you know her name, Ms. Santiago?

7    A.   No.

8    Q.   And this is Government's 12a/9.  That's a photograph of

9    you; is it not, Ms. Santiago?

10   A.   Yes.

11   Q.   I'm going to show you a photograph.  This is Government

12   Exhibit 16a/1.  You mentioned that there was a younger man who

13   was there before the police came.  Is this the man that was

14   there?

15   A.   Yes, he worked at another house.

16   Q.   Was this another house that Chalo operated in Annapolis?

17   A.   Yes.

18   Q.   And did you have any identity for the man that I just

19   showed you the picture, 16a/1?  Did you know him by any name?

20   A.   No.

21   Q.   And you said he left when the police came?

22   A.   But it's not the one that you just showed me on the

23   photograph.

24   Q.   I'm sorry.  Then I misunderstood.

25             There was a different person who was there when the

1   police came?

2   A.   Yes.  Even younger.

3   Q.   And how did he leave?

4   A.   He escaped, left us there alone, and sent the one in the

5   picture that you showed me before.

6   Q.   This man he sent, when you say he sent him, where did he

7   send him?

8   A.   This is the picture -- he was arrested earlier, and I

9   think he must have let Chalo know, and that's how they ended

10  up coming to the house, and we were arrested.

11              **MR. RUTER:**  Objection, Your Honor.

12              **THE COURT:**  Basis?

13              **MR. RUTER:**  Speculation.

14              **THE COURT:**  Sustained.

15  **BY MR. CUNNINGHAM:**

16  Q.   Ms. Santiago, the man you see in this picture, 16a/1, did

17  you see him during the three weeks that you worked for Chalo?

18  A.   Yes.

19  Q.   And did you see him talking ever with Chalo?

20  A.   No.

21  Q.   Did you ever see them together?

22  A.   Yes.

23  Q.   You said that this man worked at another brothel.  Had

24  you ever been to the other brothel?

25  A.   Yes.

 1    Q.   And is that how you know that this man worked at that

 2    other location?

 3    A.   Yes.

 4    Q.   Do you remember the name or the place where the other

 5    brothel was located?

 6    A.   I don't remember.

 7    Q.   Do you remember the name ████████████?

 8           **MR. RUTER:**  Objection.

 9           **THE COURT:**  Basis?

10           **MR. RUTER:**  It's a tad leading.

11           **THE COURT:**  Overruled.

12           **THE WITNESS:**  No.

13    **BY MR. CUNNINGHAM:**

14    Q.   If I showed you a picture, do you think you might

15    recognize the place of the other brothel?

16    A.   Okay.

17    Q.   I'm going to show you --

18           **MR. MONTEMARANO:**  Your Honor, we object.  May we

19    approach, please?

20           **THE COURT:**  Yes.  Come up.

21           (Whereupon, the following discussion occurred at the

22    bench.)

23           **THE COURT:**  Can the interpreter hear me?  Thank you.

24           **MR. MONTEMARANO:**  Unless the Government can

25    demonstrate through independent evidence the uniqueness of the

1    photograph that it's showing with regard to any other location

2    anywhere that this woman has been, this is remarkably

3    suggestive, "Is this the place," without being able to

4    demonstrate there aren't other places that look just like it.

5    This is not an especially unique building.  This is not like

6    showing us the U.S. Capitol or the Washington Monument where

7    that would be the only -- "Oh, yes, that's where I was," but

8    that's a reasonably ubiquitous and reasonably nondescript

9    building.

10            **MR. CUNNINGHAM:**  Well, Your Honor, frankly, I don't

11   need to spend a lot of time with this.  I'll move on, but I

12   was just asking her if she recognized it.  Candidly --

13            **THE COURT:**  Moving on is good.

14            **MR. CUNNINGHAM:**  Excuse me, Your Honor?

15            **THE COURT:**  Moving on is good.

16            (Whereupon, the bench conference was concluded.)

17   **BY MR. CUNNINGHAM:**

18   Q.   Ms. Santiago, very quickly, I'm going to just show you a

19   few pictures from the place where you were arrested.  This is

20   Government Exhibit 12a/3.  Do you see in that photograph there

21   is a -- appears to be a woman's purse on the table?

22   A.   Yes.

23   Q.   Is that your purse?

24   A.   No.

25   Q.   This is Government 12a/5.  Do you recognize that room,

 1    Ms. Santiago?

 2    A.    Yes.

 3    Q.    Is that the room that you were working in when you were

 4    arrested?

 5    A.    Yes.

 6    Q.    And, at the time you were arrested, Ms. Santiago, do you

 7    remember that you had a cell telephone?

 8    A.    Yes.

 9    Q.    I'm going to show you now Government Exhibit 12i,

10    Ms. Santiago.  Do you recognize this as your phone?

11    A.    Yes.

12    Q.    And, Ms. Santiago, do you remember that you kept the

13    telephone number for Chalo in your phone?

14    A.    Yes.

15              **MR. CUNNINGHAM:**  Your Honor, at this time, I would

16    like to show, for identification purposes only, to

17    Ms. Santiago and not publish to the jury what's marked

18    Government Exhibit 40a/1.

19    Q.    Ms. Santiago, I'm going to show you a page from

20    Government Exhibit 40a/1 for identification and ask if you

21    recognize the entry that is the second entry from the bottom

22    on that page?

23    A.    Yes.

24    Q.    Is that how you saved the entry for Chalo in your cell

25    telephone?

Direct Examination of Margarita Santiago Laona

1    A.   Yes.

2    Q.   And, Ms. Santiago, when you were arrested, the police

3    seized -- in addition to your cell phone, they seized a number

4    of items from the place you were staying, right -- the

5    brothel?

6    A.   Yes.

7    Q.   And one of those items is Government Exhibit 121.  I'm

8    going to approach you and hand this to you.  If you want to

9    take it out of the -- go ahead and take it out of the bag.  Do

10   you recognize that?

11   A.   Yes.

12   Q.   Is that your notebook?

13   A.   Yes.

14   Q.   And you see that there is a little loose piece of paper

15   there.

16   A.   Yes.

17   Q.   What is that loose piece of paper?

18   A.   It's where I would write down the tickets that I had.

19   Q.   And were the tickets the number of men that came to have

20   sex with you?

21   A.   Yes.

22   Q.   Is that how you kept track of how much money you were

23   owed?

24   A.   Yes.

25   Q.   Now, if you see on this page of the notebook, there

1    appears to be a number.  Do you see that number?

2    A.   Yes.

3    Q.   Did you write that number down?

4    A.   Yes.

5    Q.   And is that the number that you had gotten and through

6    which you contacted Chalo?

7    A.   Yes.

8    Q.   I'm going to show you again Government Exhibit 12l, and

9    this is the small piece of paper that was along with the

10   notebook, right?

11   A.   Yes.

12   Q.   Is the "d" -- is this for domingo?

13   A.   Yes.

14   Q.   And there is no number by that.  Is that because you

15   didn't have to work on Sunday?

16   A.   I left early, because the place that I was arrested at,

17   the same place -- the second time that I arrive there, the

18   police came on Friday.

19   Q.   Now, Ms. Santiago, after you were arrested, did you have

20   any telephone conversations with Chalo?

21   A.   Yes.  After -- after I was let out.  I was out.  He

22   called me.

23   Q.   And what did he say when he called you?

24   A.   He asked me if I was working.  I said I wasn't.  He

25   called me, but basically he was calling me to threaten to kill

1    me.

2    Q.   Why was he threatening you, Ms. Santiago?

3    A.   Because he thought I was the one that had called the cops

4    on him --

5    Q.   And had you -- I apologize.

6    A.   -- or the other girl that was there with me, he was also

7    blaming her.

8    Q.   Did he say what he would do if he found the person who

9    called the police?

10   A.   Yes.

11   Q.   And what was that?

12   A.   He said he was going to kill the girl that lived in

13   Washington.  He wanted me to help him find out who it was that

14   called the cops on him.

15   Q.   And you hadn't called the police, had you, Ms. Santiago?

16   A.   No.

17   Q.   And, to your knowledge, the other woman hadn't called the

18   police, had she?

19   A.   No.

20   Q.   Now, Ms. Santiago, when you were working for Chalo, how

21   were you treated by customers?

22            **MR. RUTER:**  Objection.

23            **THE COURT:**  Basis?

24            **MR. RUTER:**  Relevance, Your Honor.

25            **THE COURT:**  Overruled.

1           **THE WITNESS:**  Well, sometimes badly, and sometimes

2    not.  It all depended on the people that came there.

3    **BY MR. CUNNINGHAM:**

4    Q.   Were you ever assaulted?

5    A.   Yes.

6    Q.   Did you report that to anyone?

7    A.   No.

8    Q.   Why not?

9    A.   Because sometimes the clients would threaten to call the

10   police if we said anything.

11           **MR. CUNNINGHAM:**  I have no further questions of

12   Ms. Santiago, Your Honor.

13           **THE COURT:**  Okay.  Members of the jury, we're going

14   to take an earlier break than usual for the mid-morning break.

15   Please remember:  Do not discuss the case among yourselves or

16   with anyone else.  I will call for you at 11:30.

17           **THE CLERK:**  All rise.  This Honorable Court stands

18   in recess until 11:30.

19           (Jury excused.)

20           **MR. MONTEMARANO:**  Your Honor?

21           **THE COURT:**  Belinda?  Get your oath.  Yes.

22           **MR. MONTEMARANO:**  May counsel approach?

23           **THE COURT:**  Just a moment.  Please swear the new

24   interpreter.

25           (Oath administered.)

1          THE CLERK:  Will you state your name and the

2     language you are interpreting, please.

3          INTERPRETER BLUMBERG:  Shelley Blumberg, and I'm

4     federally certified to interpret in English and Spanish.

5          THE COURT:  Thank you, Ms. Blumberg.  Welcome.

6          Yes, counsel, come up.

7          MR. MONTEMARANO:  I can do it back here if you

8     prefer, but I thought because of the witness, we should

9     approach.

10         MR. CUNNINGHAM:  Or may the witness be --

11         THE COURT:  The witness may be excused, yes.

12         MR. CUNNINGHAM:  Thank you, Your Honor.

13         (Witness excused pending further examination.)

14         MR. MONTEMARANO:  For the record, Your Honor --

15         THE COURT:  Yes.

16         MR. MONTEMARANO:  -- this is 14m I've got on the

17    ELMO so Your Honor can see it.  Assuming this is the document

18    that was referenced during Detective Miguez' testimony as the

19    letter, I don't recall if she referred to it as a letter or

20    Ms. Yasser.  I would have no objection.  My problem is that

21    this is what I had in my book.  It doesn't look like it's a

22    letter under any way I understand that word, and I therefore

23    wanted to make sure we were talking about what I understood to

24    be the letter, but, if this is the "m," there is no objection.

25         THE COURT:  Thank you.  Government 14m is admitted.

1          **MR. MONTEMARANO:**  Thank you, Your Honor.

2          **THE COURT:**  See you at 11:30, you all.

3          **THE CLERK:**  All rise.  This Honorable Court stands

4     in recess until 11:30.

5          (Recess taken, 11:02 a.m. - 11:26 a.m.)

6          **THE CLERK:**  All rise.  This Honorable Court now

7     resumes in session.

8          **THE COURT:**  Ready for the jury, counsel?

9          **MR. RUTER:**  Yes, we are.

10          **THE COURT:**  Will the witness please take the stand.

11          (Jury enters.)

12          **THE COURT:**  Please be seated.

13          Please remind the witness.

14          **THE CLERK:**  I would like to remind you:  You are

15     still under oath.

16          **THE COURT:**  Cross?

17          **MR. RUTER:**  Your Honor, thank you.

18                    <u>**CROSS-EXAMINATION**</u>

19     <u>**BY MR. RUTER:**</u>

20     Q.   Good morning, Ms. Santiago.

21     A.   Good morning.

22     Q.   Ms. Santiago, we understand that you entered the United

23     States illegally in 2003; is that correct?

24     A.   Yes.

25     Q.   And so, when you entered this country, were you

1    approximately 18 years of age, or 19 years of age?

2    A.   Yes.

3    Q.   And, ma'am, when you entered, you did not enter with any

4    documentation; is that correct?  You didn't attempt to show

5    any U.S. officials some kind of documents in order to enter

6    the country, did you?

7    A.   No.

8    Q.   And you were asked on direct examination whether you were

9    working in your homeland of Mexico before you came to the

10   United States.  It's my understanding that you said you were,

11   and that work was prostitution; is that correct?

12   A.   Yes.

13   Q.   And, ma'am, can you tell us:  How long were you engaged

14   in prostitution in Mexico before you entered the United States

15   in 2003?

16   A.   I started to work from 2001.

17   Q.   Does that mean, Ms. Santiago, that you were approximately

18   16 years of age when you began prostitution in Mexico?

19   A.   Yes.

20   Q.   And, at that time, do we understand that you had a

21   boyfriend, Mr. Raul Ramirez?

22   A.   Yes.

23   Q.   And we also understand that it was Mr. Ramirez who had --

24   I think you had testified had forced you into prostitution; is

25   that also correct, ma'am?

 1    A.    Yes.

 2    Q.    And, Ms. Santiago, can you explain to the jurors what you

 3    mean by Mr. Ramirez forcing you into prostitution, please.

 4    A.    Well, he obligated me to work for him, and, if I didn't

 5    do so, he was going to kill my family and hurt me.

 6    Q.    Did he physically assault you, ma'am?

 7    A.    Yes.

 8    Q.    And you therefore were, rightfully so, afraid for your

 9    life; is that correct?

10    A.    Yes.

11    Q.    Ms. Santiago, when you were forced to -- let's move

12    forward a bit.

13          Do we further understand that he is the one who

14    forced you to come into the United States to prostitute

15    yourself?  Is that also correct?

16    A.    Yes.

17    Q.    And do we understand further that, before you entered the

18    United States through the state of Texas, that he had made

19    certain contacts with some of his relatives in the state of

20    New Jersey?

21    A.    Yes.

22    Q.    And were you privy to those communications between

23    Mr. Ramirez and his cousins in New Jersey?

24    A.    No.

25    Q.    Okay.  How was it that you learned that you were to go to

```
 1       New Jersey to see his cousins?

 2       A.   Well, when I first came here, they looked for and found a

 3       room for me to stay in where I was going to live.

 4       Q.   And we're talking about his cousins?

 5       A.   Yes.

 6       Q.   And, ma'am, were they male, or female, or both?

 7       A.   Both.

 8       Q.   Did you immediately go to work in New Jersey as a

 9       prostitute for Mr. Ramirez' cousins?

10       A.   Yes.

11       Q.   And for how long did you do that in New Jersey?

12       A.   From the point in time when I arrived.

13       Q.   I'm sorry?

14       A.   From the time I arrived.

15       Q.   Okay.  Can you tell us, Ms. Santiago:  What was the

16       financial arrangement between you and your boyfriend's cousins

17       concerning payment by your customers?

18       A.   Well, they sought work for me.  Raul's cousins sought

19       work for me, and they would look for a place and have me --

20       tell me to go there, and I would go there, and I simply had to

21       obey and not say anything else.

22       Q.   Okay.  While you're doing this, Ms. Santiago, are you in

23       communication with your boyfriend back in Mexico?

24       A.   Yes.

25       Q.   Are you sending him money?
```

1    A.    Yes.

2    Q.    Could you explain the financial arrangement between his

3    cousins and you as it relates to your payment for prostitution

4    services, please?

5    A.    Well, Raul's cousins didn't get anything for this.  I

6    would make 2,000, 3,000, and I had to send it all to him.

7    Q.    How much money was charged per customer when you would

8    have sexual relations with a man?

9    A.    Thirty.

10   Q.    $30 per man?

11   A.    Yes.

12   Q.    Okay.  And is it your testimony that, when you worked in

13   New Jersey, that the entire $30 per man ended up going back to

14   Mexico to your boyfriend, Mr. Ramirez?

15   A.    Yes.

16   Q.    Ms. Santiago, because you have been in the --

17   unfortunately in the prostitution business for some period of

18   time, can you tell us whether or not it is unusual that a

19   prostitute's boyfriend or husband may request their girlfriend

20   or wife to engage in prostitution services.

21   A.    Yes.

22   Q.    And can you tell us:  Would it be unusual that a

23   prostitute's boyfriend or husband may force their girlfriend

24   or wife into prostitution?

25   A.    Yes.

1    Q.   And, Ms. Santiago, you are telling us today, then, are

2    you not, that you are one of those persons that was forced

3    into prostitution by your boyfriend, Mr. Ramirez?

4    A.   Yes.

5    Q.   We understand there came a time when you had a friend

6    give you a phone number that you called, and that number was

7    associated with prostitution; is that right?

8    A.   Yes.

9    Q.   Now, that friend gave you that number while you were in

10   New Jersey working for your boyfriend's cousins; is that

11   right?

12   A.   Yes.

13   Q.   Was she also engaged in the prostitution business?

14   A.   Yes.

15   Q.   And she gave you the number, which you then called; is

16   that right?

17   A.   Yes.

18   Q.   And we understand that you spoke to a Hispanic male who

19   identified himself as Chalo; is that also correct?

20   A.   Yes.

21   Q.   The reason that you called Chalo, Ms. Santiago, if I

22   understand it, is so that you could work further in the

23   prostitution industry; is that correct?

24   A.   Yes.

25   Q.   Did Raul's cousins know that you were making that phone

 1    call?

 2    A.    Yes.

 3    Q.    So does that mean that you actually advised the cousins

 4    that you were seeking to go elsewhere to engage in

 5    prostitution services?

 6    A.    They also called looking for work for me.

 7    Q.    So the cousins that you were working for in New Jersey,

 8    are you saying they would also make telephone calls to

 9    whomever in order to find more clients for you?

10    A.    Yes.

11    Q.    Now, why was it, Ms. Santiago, that your cousins then did

12    not call the phone number that your friend had given you?

13    A.    Because I didn't tell them anything, and, when I was

14    given the number, I called Chalo.

15    Q.    Okay.  After you made the phone call to Chalo, we

16    understand that you asked him if he had work for you; is that

17    right?

18    A.    Yes.

19    Q.    Would it be fair to say, Ms. Santiago, then, that Chalo

20    did not force you to commit prostitution while you were

21    working for him?

22    A.    No.

23    Q.    And would it be fair to say, Ms. Santiago, that Chalo did

24    not induce you --

25              **MR. CUNNINGHAM:**  Objection.

1      THE COURT:  Basis?

2      MR. CUNNINGHAM:  Your Honor, may we approach?

3      THE COURT:  Come up.

4      (Whereupon, the following discussion occurred at the

5   bench.)

6      MR. CUNNINGHAM:  Your Honor, I think that the term

7   "induce" is one that's subject to different interpretations

8   from the standpoint of the elements of the offense that are

9   relevant actually specifically to --

10      THE COURT:  Can you use a different word, Mr. Ruter,

11   other than "induce"?

12      MR. RUTER:  I shall work at it, Your Honor.

13      THE COURT:  Thank you.

14      (Whereupon, the bench conference was concluded.)

15      (Realtime transcript feed interrupted.)

16      INTERPRETER GOLDSTEIN:  Excuse us, Your Honor.

17      THE COURT:  Marta, do you still have your

18   connections?

19      INTERPRETER GOLDSTEIN:  No.

20      THE COURT:  Martin, can you check the connections?

21   Martin --

22      THE REPORTER:  Yes, sir?

23      THE COURT:  -- can you get mine over there --

24      THE REPORTER:  I think --

25      THE COURT:  -- or are you up?

 1              **THE REPORTER:**  I think we're up.

 2              **THE COURT:**  A technical difficulty.

 3              (Laughter.)

 4              **THE COURT:**  Thanks, Martin.

 5              **THE REPORTER:**  Yes, sir.

 6              **THE COURT:**  Question?

 7              **MR. RUTER:**  Your Honor, thank you.

 8   **BY MR. RUTER:**

 9   Q.   Ms. Santiago, you requested Chalo to allow you to work

10   for him; is that correct?

11   A.   Yes.

12   Q.   And you did so so that you could make money and send it

13   back to your boyfriend in Mexico; is that right?

14   A.   Yes.

15   Q.   Now, Ms. Santiago, when you were questioned earlier, you

16   were asked if you and Chalo spoke about money; that is, what

17   you would receive when you first called him.  Do you recall

18   that question?

19   A.   No.  No.

20   Q.   You do not recall that question?

21   A.   No.

22   Q.   Okay.  Ms. Santiago, then, when you and Chalo first spoke

23   on the phone, did you speak about how you'd be paid?

24   A.   No, because I already knew how much would be charged.

25   Q.   Okay.  And, Ms. Santiago, if you -- you had never met

```
 1    Chalo prior to this phone call, had you?

 2    A.   No.

 3    Q.   And you'd only worked in prostitution services in the

 4    state of New Jersey, and that is here in the United States; is

 5    that right?

 6    A.   Yes.

 7    Q.   So how is it that you would know in advance what kind of

 8    payment you were going to receive?

 9    A.   Well, as I told you, I had already worked in New Jersey,

10    and I depended on the people that I would be attending to.

11    Q.   Did you ever receive more than $30 per customer while you

12    were in New Jersey?

13    A.   No.

14    Q.   So what you're telling us, I believe, is that you just

15    assumed that was the payment; is that right?

16    A.   Yes.

17    Q.   Okay.  How long after you spoke to Chalo did you come to

18    Maryland?

19    A.   I talked with him one week, and then later, Monday, I

20    came.

21    Q.   Okay.  And, at that time, did your cousins know that you

22    were going to Maryland?

23    A.   No.

24    Q.   I'm just wondering, though, Ms. Santiago:  Wouldn't your

25    cousins wonder where you are if you weren't in New Jersey
```

1    working for them?

2    A.   Yes.

3    Q.   So, notwithstanding, you took a bus from New Jersey to

4    Washington, D.C.; is that right?

5    A.   Yes.

6    Q.   Okay.  We understand that Chalo picked you up?

7    A.   Yes.

8    Q.   And we understand that Chalo is the man sitting right

9    here that I'm pointing at right now; is that right?

10   A.   Yes.

11   Q.   And, in effect, Ms. Santiago, what you said to Chalo was

12   that you're here ready to work; is that correct?

13   A.   Yes.

14   Q.   Okay.  And that led you to ██████████████; is that

15   your recollection?

16   A.   Yes.

17   Q.   You stayed there for one week; is that right?

18   A.   Yes.

19   Q.   You had sexual contact with approximately 30 men per day;

20   is that correct?

21   A.   Yes.

22   Q.   And you did that for five days?

23   A.   Yes.

24   Q.   And, at the conclusion of that five days, you were paid?

25   A.   Yes.

1    Q.   And how much, if you can recall, were you paid during

2    that -- at the conclusion of the first week?

3    A.   I don't remember the amount exactly.

4    Q.   Was it in cash, or was it a check?

5    A.   Cash.

6    Q.   And who gave you the cash?

7    A.   Chalo.

8    Q.   And did he give that cash to you on a Friday, or

9    Saturday?

10   A.   On Sundays, when I arrived.

11   Q.   Well, the first time -- the first time you got paid, what

12   day of the week were you paid on?

13           **INTERPRETER BLUMBERG:**  The interpreter hears when he

14   arrived.  Could you repeat the question -- oh, I have it here.

15   I'm happy -- excuse me.

16           **THE WITNESS:**  Saturday.

17           **MR. RUTER:**  Okay.

18   **BY MR. RUTER:**

19   Q.   And where did you receive that money?

20   A.   On --

21           **INTERPRETER BLUMBERG:**  The interpreter corrects.

22           **THE WITNESS:**  In his house where we were working.

23   **BY MR. RUTER:**

24   Q.   At ███████████████?

25   A.   I don't remember very well.

1    Q.   Okay.

2    A.   Maybe it was where I was the first time.

3    Q.   Well, all right.  Where you were the first time was the

4    same place that you were arrested at later on; isn't that

5    right?

6    A.   Yes.

7    Q.   Okay.  And, Ms. Santiago, you took the money, and you put

8    it in your purse, didn't you?

9    A.   Yes.

10   Q.   And, after you received your money, you got in a vehicle,

11   and you went back to Washington, D.C.; did you not?

12   A.   Yes.

13   Q.   Okay.  Who took you there?

14   A.   Chalo.

15   Q.   Did you tell him where you were going?

16   A.   No.

17   Q.   Was there any difficulty in him taking you to the -- he

18   took you to the bus station, did he not, in Washington, D.C.?

19   A.   Yes.

20   Q.   And he took you there because you asked him to take you

21   there?

22   A.   Yes.

23   Q.   And, ma'am, when he dropped you off, did you tell him

24   where it was that you were going?

25   A.   No.

1   Q.   Okay.  Did he ask you where you were going?

2   A.   No.

3   Q.   Did he seem to care where you were going?

4   A.   No.

5   Q.   Okay.  Did he know that you'd be returning?

6   A.   Yes.

7   Q.   And how is that?

8   A.   Well, he had already told me to come back and work at the

9   other house.

10  Q.   Okay.  And did you want to come back and work at the

11  other house?

12  A.   I didn't want to, but I had to do it because Raul forced

13  me to.

14  Q.   Okay.  And that's the point, Ms. Santiago.  You did it

15  because Raul forced you to do it?

16  A.   Yes.

17  Q.   Chalo, however, did not force you to do it?

18  A.   No.

19  Q.   Yeah.  So you went back to New Jersey?

20  A.   Yes.

21  Q.   You went back to your cousins?

22  A.   Yes.

23  Q.   They saw a purse full of cash?

24  A.   Yes.

25  Q.   And they took it from you?

1  A.   Yes.

2  Q.   So you then stayed in New Jersey for about another week

3  and worked for the cousins again, didn't you?

4  A.   No.  I came back to Maryland.

5  Q.   And did you come back the Sunday?

6  A.   Monday.

7  Q.   Okay.  So you stayed overnight in New Jersey Saturday

8  night; is that correct?

9  A.   Yes.

10  Q.   And then did you stay overnight with your cousins Sunday

11  night as well?

12  A.   Yes.

13  Q.   And then did you catch a bus early Monday morning back to

14  Washington, D.C.?

15  A.   Yes.

16  Q.   And you called Chalo before you got on the bus to return

17  to Washington, D.C. on Monday morning; is that what happened?

18  A.   Yes.

19  Q.   And he said that you'd be picked up Monday morning?

20  A.   Yes.

21  Q.   And, ma'am, you were, in fact, picked up on Monday

22  morning; is that correct?

23  A.   Yes.

24  Q.   And was it Chalo who picked you up?

25  A.   Yes.

1    Q.    And then, from there, do we understand that you went to a

2    different place?

3    A.    Yes.

4    Q.    And did you stay there for five days to work?

5    A.    Then, just through Wednesday, Wednesday night, I was

6    taken to the beach.

7    Q.    Okay.  And, when you were at the one place for three

8    days, did you see men every day?

9    A.    Yes.

10   Q.    And did you keep track of how many men it was?

11   A.    I kept track, and then I would make -- figure it out by

12   the end of the day, at night --

13   Q.    Okay.

14   A.    -- how much I had done.

15   Q.    And, before you went to the beach, were you paid for

16   those three days?

17   A.    No.

18   Q.    Okay.  Then you went to the beach?

19   A.    Yes.

20   Q.    For two days?

21   A.    Yes.

22   Q.    And were you with men during those two days?

23   A.    Yes.

24   Q.    And, after those two days, what did you do?

25   A.    I went back Sunday to my house.

```
 1    Q.   And how did you get back to your house?

 2    A.   The one that was bringing me took me to Washington, and

 3    then I took a bus, and I went to New York.

 4    Q.   Before you went to Washington, were you paid?

 5    A.   Yes.

 6    Q.   Do you recall how much?

 7    A.   No.

 8    Q.   And then you went back to New Jersey?

 9    A.   Yes.

10    Q.   And how long did you stay in New Jersey at this time

11    before you returned to Maryland?

12    A.   Just overnight.

13    Q.   Just like the week before?

14    A.   Yes.

15    Q.   And did you then call anyone in Maryland telling them you

16    were coming back Monday morning again?

17    A.   No.

18    Q.   Did you just come back to Maryland without making any

19    phone calls at all?

20    A.   I didn't come back to Maryland at that point.

21    Q.   You were arrested at ████████████ on September 24th,

22    correct?

23    A.   Yes.

24    Q.   So you must have returned back to Maryland before you got

25    arrested?
```

1   A.   But I already told you about the three days.

2   Q.   All right.  When you came back to Maryland to work at

3   ███████████  a second time, Chalo didn't force you to come,

4   did he?

5   A.   No, because I asked him for work, and so he put me back

6   to the same house where I was arrested.

7   Q.   Okay.

8   A.   Then I told him I didn't want to go there because I had

9   already been with the police.  So he told me nothing was going

10  to happen, don't worry, to do him a favor, and to work again

11  at this house.

12  Q.   When had you been arrested, ma'am?

13  A.   The third time.

14  Q.   Were you arrested two times while you were working for --

15  working with Chalo here -- were you arrested twice when you

16  were working with him?

17  A.   The first day, on Friday, the police arrived.  I wasn't

18  arrested, because the police came, and they weren't looking

19  for that.  They were looking for drugs.  They asked me where I

20  was from, and they told me to go back to Mexico, and they

21  said, "Why don't you go back there."  They asked me where I

22  was living.  I told them, "New Jersey."  So they asked why was

23  I here since there was so much work, wasn't I afraid of being

24  arrested?  They asked me if I had any children.  I told them I

25  did.  Then they told me that they could take my children away

1    from me because I was doing illegal things.  So I told them

2    that I was afraid, and so the police let me go back home.

3    Q.   Back home to New Jersey?

4    A.   Yes.

5    Q.   Okay.  And, Ms. Santiago, notwithstanding that contact

6    with the police, you decided to come back to Maryland again

7    and continue in prostitution; is that right?

8    A.   Yes.

9    Q.   Okay.  When you went back to New Jersey that second time,

10   you also had a purse full of cash, and did the cousins take

11   all that money from you as well?

12   A.   Yes.

13   Q.   And then we understand that you, in fact, were arrested

14   on September 24th?

15   A.   Yes.

16   Q.   And were you at this time charged with prostitution,

17   Ms. Santiago?

18   A.   Yes.

19   Q.   And did you go to court on those charges?

20   A.   Yes.

21   Q.   And what happened as a result?  Do you know?

22   A.   No -- well, no.  They offered me a bail, but I didn't

23   have any money, so I stayed there until Immigration came for

24   me.

25   Q.   And Immigration came for you.

1          Now, you've had different meetings with Immigration,

2     haven't you?

3     A.   Yes.

4     Q.   And we all agree that you were here illegally at that

5     time; were you not?

6     A.   Yes.

7     Q.   But is it your understanding that today you are in this

8     country legally?

9     A.   Yes.

10    Q.   And is the reason due in large measure, Ms. Santiago,

11    because of the force of threats (sic) made against you by your

12    boyfriend, Mr. Ramirez, back in Mexico?

13    A.   Yes.

14    Q.   And it's also the reason you're here in a legal status

15    today is because you have agreed to assist Immigration

16    officials and other federal officials in the investigation of

17    your boyfriend for being involved in illegal prostitution

18    activities?

19    A.   Yes.

20    Q.   And it's also part of the reason you're now here legally

21    is because you have agreed to help federal officials

22    investigate the prostitution activities of your cousins in New

23    Jersey; is that right?

24    A.   Yes.

25    Q.   And then is it also true, Ms. Santiago, that part of the

 1   reason that you're in this country legally now is because

 2   you've agreed to testify against Mr. Ventura here?

 3   A.   Yes.

 4   Q.   Is it your desire, Ms. Santiago, to stay in the United

 5   States as long as you can?

 6   A.   Yes.

 7   Q.   You do not wish to return to Mexico, do you?

 8   A.   No.  I'm afraid that, if I do, Raul will do something to

 9   me.

10   Q.   Yes.  Understood.

11         So you told the jury about a phone call or two that

12   you had with Chalo after you were released from jail following

13   your arrest on September 24th of 2009.  Do you recall that?

14   A.   Yes.

15   Q.   And when did those calls take place?

16   A.   I don't remember the date exactly, but in November.

17   Q.   Of what year?

18   A.   2009.

19   Q.   And you've been in this country for all of 2009, correct?

20   A.   Yes.

21   Q.   And all of 2010 up to today's date?

22   A.   Yes.

23   Q.   And, with the exception of the brief time you were

24   incarcerated, you've been free to go where you please since

25   your release from the Anne Arundel County Detention Center; is

1   that right?

2   A.   Yes.

3           **MR. RUTER:**  If I could have a moment, Your Honor.

4           **THE COURT:**  Yes.

5           (Counsel conferring with the Defendant.)

6           **MR. RUTER:**  Your Honor, no further questions at this

7   time.   Thank you.

8           **THE COURT:**  Mr. Montemarano?

9           **MR. MONTEMARANO:**  No questions, Your Honor.   Thank

10  you.

11          **THE COURT:**  Redirect?

12          **MR. CUNNINGHAM:**  Yes.   Very briefly, Your Honor.

13                  **REDIRECT EXAMINATION**

14  **BY MR. CUNNINGHAM:**

15  Q.   Ms. Santiago, when you first spoke with Chalo on the

16  telephone and talked to him about work, would you have

17  traveled to Maryland if he hadn't offered you a job?

18  A.   No.

19  Q.   And would you have come here if he hadn't confirmed or

20  told you that he would pay you to work for him?

21  A.   No.

22  Q.   And, at least the first time or maybe between the second

23  week and the third time that you came down, he took you back

24  to the bus station in Washington, D.C., right?

25  A.   Yes.

1    Q.   And I think you said that that was on a Saturday, and you

2    went to New Jersey for Saturday and Sunday night?

3    A.   Yes.

4    Q.   And would you have come back to Maryland had he not told

5    you that you could work again for him in Maryland?

6    A.   No.

7    Q.   And Chalo knew that you weren't staying in Washington,

8    D.C., didn't he?

9    A.   Yes.

10   Q.   Who paid for your tickets between Washington, D.C. and

11   where you were living in New Jersey?

12   A.   I did.

13   Q.   And did you have to pay for that ticket from the money

14   you made sleeping with men?

15   A.   Yes.

16           MR. CUNNINGHAM:  Nothing further, Your Honor.  Thank

17   you.

18           THE COURT:  Recross?

19           MR. RUTER:  No, sir.  Thank you.

20           THE COURT:  May I excuse the witness?

21           MR. CUNNINGHAM:  Yes, Your Honor.

22           THE COURT:  Thank you.  You are excused, ma'am.

23   Good day.

24           (Witness excused.)

25           MR. CUNNINGHAM:  Your Honor, may I have a moment to

 1    gather the witness before the next witness?  The next witness

 2    we call, Your Honor, is Carlos Ascencio.

 3              **INTERPRETER GOLDSTEIN:**  Interpreter requests to know

 4    whether this next witness needs interpreting at the bench

 5    also?

 6              **MR. CUNNINGHAM:**  Yes, he does, Your Honor.

 7              **INTERPRETER GOLDSTEIN:**  Thank you.

 8              **MR. CUNNINGHAM:**  Mr. Ascencio, please go over to the

 9    witness box.

10              **THE CLERK:**  Raise your right hand.

11                    **CARLOS ANTONIO ASCENCIO**

12          **WAS THEN DULY SWORN TO TELL THE TRUTH**

13              **THE CLERK:**  Be seated.  And ask him to state his

14    name, then maybe spell it for the record.

15              **THE WITNESS:**  Okay.  My name is Carlos Antonio

16    Ascencio.

17                    **DIRECT EXAMINATION**

18    **BY MR. CUNNINGHAM:**

19    Q.   Good morning, Mr. Ascencio, or good afternoon,

20    Mr. Ascencio.

21    A.   Good afternoon.

22    Q.   Sir, how old are you?

23    A.   Fifty-three years old.

24    Q.   And where are you from?

25    A.   From El Salvador.

Direct Examination of Carlos Antonio Ascencio

T-IV-716

1   Q.   How long have you been in the United States?

2   A.   I've been here for eleven years.

3   Q.   And did you come here with authority?  In other words,

4   did you legally enter the United States?

5   A.   Illegal.

6   Q.   How was it you entered the United States?

7   A.   Well, you go to the border, and you get a coyote to bring

8   you over.

9   Q.   And did you do that on the United States-Mexican border,

10  or somewhere else?

11  A.   On the Mexican border.

12  Q.   Do you remember where you entered the United States?

13  A.   Yes.

14  Q.   And where was that, Mr. Ascencio?

15  A.   It's called Agua Prieta.

16  Q.   Is that in California, or one of the other border states?

17  A.   I really don't know, because, when you come here, you

18  don't know where you are, but that's where I came in.

19  Q.   Okay.  And, once you came in to the United States, what

20  did you do?

21  A.   Well, I looked for my family.  I had some relatives in

22  California.

23  Q.   Were you successful at finding them?

24  A.   Yes.

25  Q.   And what did you do when you found your family in

1    California?

2    A.   I started to look for work, which is what we do when we

3    come here.

4    Q.   Were you able to find work?

5    A.   Yes.

6    Q.   And what kind of work did you do, Mr. Ascencio?

7    A.   I started working with grass, landscaping.  Then I worked

8    at a car wash.

9    Q.   Did there come a time, Mr. Ascencio, when you traveled or

10   moved to Washington, D.C.?

11   A.   Yes.

12   Q.   Do you remember about when that was?

13   A.   In 2006.

14   Q.   And, when you came to Washington, did you find work?

15   A.   It was really complicated, but it -- it was really hard

16   to get work.

17   Q.   I mean, why was it hard to find work in Washington,

18   Mr. Ascencio?

19   A.   Because one doesn't have any documents, and many

20   companies ask you for those documents.

21   Q.   I see.  And were you ultimately able to get a job in

22   Washington, D.C.?

23   A.   I did.  I worked with a man who did some remodeling.

24   Q.   And do you remember the name of that individual?

25   A.   Yes.  His name was Enrique.

1    Q.   Did you ever work for an individual named Angel Villa.

2    A.   Angel Villa?  I think it's Angel Villa.

3    Q.   Villa, yes.  Did you work for a man named Angel Villa in

4    Washington, D.C.?

5    A.   No.  Well, we were actually co-workers.  It was a man

6    named Alex who actually gave me work.  He was the owner of one

7    of those places -- those prostitution places.

8    Q.   So Alex was the owner of a brothel in Washington, D.C.?

9    A.   Yes.

10   Q.   And did you work for Alex?

11   A.   Yes.

12   Q.   And what kind of work did you do for Alex?

13   A.   Well, what I had to do was to be outside calling the

14   clients or looking for clients, passing out cards, doing

15   errands for the women if they needed food or anything else.

16   Q.   Mr. Ascencio, did you know that what Alex was doing was

17   essentially running a brothel or a place of prostitution?

18   A.   Yes.

19   Q.   When you were working for Alex, did there come a time

20   when you met a person known to you as Chino?

21   A.   Yes.

22   Q.   And how was it that you met Chino?

23   A.   Well, he would come there as a customer.

24   Q.   If you see Chino in the courtroom, would you point to

25   him, please.

1    A.    Yes.  He's there.

2    Q.    Is he the man seated second from the right at this table

3    in a tan shirt?

4    A.    Yes.

5          **MR. CUNNINGHAM:**  Your Honor, may the record reflect

6    that Mr. Ascencio has identified Defendant Ventura as Chino?

7          **THE COURT:**  Second from your right?

8          **MR. CUNNINGHAM:**  I apologize.  What, Your Honor?

9          **THE COURT:**  Second from your right, yes.

10         **MR. CUNNINGHAM:**  I'm sorry.  Second from the end of

11   the table.

12         **THE COURT:**  Okay.  The record will reflect the

13   identification.

14         **MR. CUNNINGHAM:**  Thank you, Your Honor.

15   **BY MR. CUNNINGHAM:**

16   Q.    Mr. Ascencio, when you met Chino, did he ever talk to you

17   about coming to work for him?

18   A.    Well, in the beginning, he did tell me he had businesses

19   here in Annapolis.

20   Q.    Did he tell you what kind of businesses he had?

21   A.    Yes, prostitution.

22   Q.    Did he tell you whether he had businesses in any

23   locations other than Annapolis?

24   A.    In Virginia.

25   Q.    Did he mention a specific location within Virginia?

1    A.    Norfolk.

2    Q.    Did he discuss in any particular way why you might want

3    to work for him instead of Alex in the same kind of business?

4    A.    Well, yes.  He had asked me if I wanted to work for him,

5    and then I was arrested, and then I asked him if I could still

6    work with him, and he said, "Yes."

7    Q.    You mentioned you were arrested.  For what crime were you

8    arrested?

9    A.    For the same thing -- prostitution.

10   Q.    And was that while you were working for Alex?

11   A.    Yes.

12   Q.    Do you remember -- well, let me establish a date here,

13   and then we'll use that.  Do you remember you were arrested by

14   police in Annapolis on September 24th of 2009?

15   A.    Yes.

16   Q.    And, at the time, who were you working for?

17   A.    For Chino.

18   Q.    About how long had you been working for Chino when you

19   were arrested?

20   A.    For about four months.

21   Q.    And, prior to that, had you gone to jail or served any

22   time for the arrest in Washington, D.C.?

23   A.    Yes, but I had probation.

24   Q.    And was there something in particular that caused you to

25   decide to go to work for Chino?

1    A.   Well, yes, because I did not feel comfortable there

2    because I had already been arrested, so I wanted to go work

3    for him instead.

4    Q.   Do you recall how you were able to get in touch with

5    Chino to talk about working for him?

6    A.   He had given me his phone number.

7    Q.   And did you call him?

8    A.   Yes.

9    Q.   Now, did you tell him that you were on probation in

10   Washington?

11   A.   Yes, correct.

12   Q.   And, as a result of being on probation, were you required

13   to do anything in Washington?

14   A.   Yes.

15   Q.   And what was that, Mr. Ascencio?

16   A.   Well, I had to do urine tests and go to classes -- drug

17   classes.

18   Q.   And was that because you were caught using drugs at the

19   time you were arrested, Mr. Ascencio?

20   A.   Yes.  They found me dirty.

21   Q.   Did you talk with Chino about making arrangements so you

22   could still do the things you had to do while on probation and

23   work for him?

24   A.   Yes.  I told him, and he agreed to facilitate things,

25   even to give me an automobile so I could go and -- go to the

1    probation.

2    Q.   By the way, did you have a driver's license?

3    A.   No.

4    Q.   And did you actually operate a car that Mr. -- or that

5    Chino gave you?

6    A.   Yes.

7    Q.   Now, Mr. Ascencio, did you learn that other people were

8    also employed by Chino in the brothel?

9    A.   Yes.

10   Q.   And did you learn that most of them were, like you, in

11   the United States illegally?

12   A.   Yes, correct.

13   Q.   And was that both the men, as well as the women?

14   A.   Yes.

15   Q.   Now, when you first went to work for Chino, what kind of

16   job or jobs did you do?

17   A.   Well, I told him I was afraid to be inside, so he told me

18   not to worry, that he would have me work outside giving out

19   cards to people, and also running errands for the women, and

20   also to help him with the other guy that was inside, to take

21   turns so he wouldn't get bored.

22   Q.   Now, the cards that you mentioned, were these cards that

23   advertised the business that was being operated in the

24   brothel?

25   A.   Yes.

1    Q.    And where would you distribute the cards?

2    A.    Well, I would go to the Hispanic stores where a lot of

3    Hispanics come, and I would distribute to them.

4    Q.    And did you ever give these cards to anyone who wasn't

5    Hispanic?

6    A.    No.

7    Q.    Did there come a time -- well, you mentioned that, in

8    addition to doing the outside work, you actually worked in the

9    brothels; is that right?

10   A.    Yes.

11   Q.    And, while working inside the brothel for Chino, did you

12   learn essentially how the business was conducted?

13   A.    That's right.

14   Q.    And, when a man came to the brothel and wanted to have

15   sex, what would he do first?

16   A.    Well, he would come, look at them, and choose one.

17   Q.    Was there any exchange of money?

18   A.    That's right.  $30.

19   Q.    And, when a man gave $30, what was he going to get in

20   return?

21   A.    Sometimes he would get a chip, or sometimes he would get

22   a card punched so -- so that we could keep a tally.

23   Q.    Mr. Ascencio, first I'm going to show you -- if you'll

24   look at the screen right there to your right, this is

25   Government Exhibit 12f.  I'm just going to put it up here, and

1    I'm going to bring it to you and let you look at it.  This is

2    a plastic cup that was seized when you were arrested.  It was

3    seized from the location.  Do you see that there are a lot of

4    little pieces of a card in that cup?

5    A.   Yes.

6    Q.   And are those the tickets that would be given to the men

7    after they paid for sex?

8    A.   Yes, correct.

9    Q.   Now, you also mentioned that sometimes there were playing

10   cards.  Did you use playing cards as tickets as well?

11   A.   Also sometimes.

12   Q.   And were there occasions when there were holes punched in

13   a card?

14   A.   Yes.

15   Q.   I'm going to just put on the screen Government

16   Exhibit 12g, and this was also seized at the location where

17   you were arrested.  Was that used to punch cards to keep track

18   of how many customers a woman serviced?

19   A.   Yes, correct.

20   Q.   And, when you were working in the brothel --

21              **MR. CUNNINGHAM:**  Strike that, Your Honor.  I'll move

22   on.

23   Q.   Now, Mr. Ascencio, do you know how the women came to

24   arrive at or be transported to the brothel?

25   A.   Yes.  Some came from New York or different parts up

```
 1    there, like Boston, and they were picked up at the Greyhound

 2    in Washington, D.C.

 3    Q.   Did you ever pick up any women for Chino?

 4    A.   Yes, once.

 5    Q.   Where did you pick the person up?

 6    A.   To the Greyhound in Washington.

 7    Q.   And do you know where that person had come from?

 8    A.   She came from New York.

 9    Q.   And did Chino tell you to go to the bus station to pick

10    her up?

11    A.   Yes.

12    Q.   I'm going to show you Government Exhibit 12a/9.  Do you

13    recognize this person?

14    A.   Yes.  That's the one I went to pick up.

15    Q.   And did you -- this is a woman you were arrested with on

16    September 24th, right?

17    A.   Yes, correct.

18    Q.   And do you recognize the person in Exhibit 12a/8?

19    A.   Yes.

20    Q.   And who is that?

21    A.   Her name is --

22         INTERPRETER KIRCHGESSNER:   Interpreter asked for

23    interpretation of the name.

24    A.   She lives in Washington.  Helen.

25    Q.   And she was also arrested with you on the 24th of
```

1    September?

2    A.   Yes.

3    Q.   And Government Exhibit 12a/10, is that a photo of you the

4    day you were arrested, Mr. Ascencio?

5    A.   That's right.

6    Q.   Now, when the women -- was there a particular day of the

7    week that the women would come to the brothel?

8    A.   Yes.  They were exchanged every Monday, so they would

9    come every Monday and leave on Sunday.

10   Q.   Do you know why the women were rotated on a weekly basis?

11   A.   Well, yes.  In part, because the clients did not like to

12   have the same -- to repeat the same every time.

13   Q.   And, the time that you drove to pick up a woman in

14   Washington, D.C., do you remember what vehicle you used?

15   A.   Yes.

16   Q.   What car was that?

17   A.   A white Astrovan.

18   Q.   Mr. Ascencio, were you paid for the work you did?

19   A.   Yes.

20   Q.   How much did you earn?

21   A.   $50 a day.

22   Q.   And were you paid?  Were you paid?

23   A.   Yes.

24   Q.   When were you paid?

25   A.   On Sunday.

1    Q.   And were you paid in cash?

2    A.   Yes, cash.

3    Q.   Was there ever a time during the four months that you

4    worked for Chino that you weren't paid?

5    A.   No.  I was always paid.

6    Q.   And, to your knowledge, were the women always paid?

7    A.   Yes, always.

8    Q.   Were all of the women paid the same amount?

9    A.   No.  It was different depending on how much each of them

10   did in tickets.

11   Q.   Were there any of them who got paid less than -- strike

12   that.  Let me rephrase that question.

13         During the time you worked for Chino, Mr. Ascencio,

14   did he treat any of the women differently than he treated

15   other women?

16              **MR. RUTER:**  Objection.

17              **THE COURT:**  Basis?

18              **MR. RUTER:**  Relevance, Your Honor.

19              **THE COURT:**  Overruled.

20              **THE WITNESS:**  No.  The same.

21   **BY MR. CUNNINGHAM:**

22   Q.   Mr. Ascencio, I'm going to show you Government

23   Exhibit 16a/1.  When you worked for Chino, did you ever see

24   this person?

25   A.   Yes.

1    Q.   And did you know this person by any name?

2    A.   Well, in the beginning, I only knew him as Colmillo, and

3    then, at the end, I learned that his name was Antonio Reyes.

4    Q.   And what kind of things did Colmillo do for Chino?

5    A.   Well, what he did was to collect the money and to do

6    deliveries, and to also take care of the other house that he

7    had.

8    Q.   Did he work in the brothel where you were arrested,

9    Mr. Ascencio?

10   A.   No.  He was in the other house.

11   Q.   Do you know what the location was of the other house?

12   A.   Well, I don't know the exact address, because I did not

13   know Annapolis very well, but I do know that it was three

14   houses away from the post office.

15   Q.   Did you ever work at that other brothel?

16   A.   No.  He just took me there once to -- to know the -- to

17   show me the place.

18   Q.   And, from what you saw, can you describe Colmillo's

19   relationship to Chino?

20   A.   Well, I know that he was like his right hand.

21   Q.   Now, you mentioned that Chino had given you his telephone

22   number.  Do you remember what his telephone number was?

23   A.   Yes, correct.

24   Q.   What was his number?

25   A.   ████████-0903.

1    Q.    Mr. Ascencio, did you call that number so many times that

2    you committed it to memory?

3    A.    No, I do not call him.  He called me.

4    Q.    Ah.  Now, the day you were arrested, the police seized a

5    telephone from you, right?

6    A.    Yes.

7    Q.    I'm showing you Government Exhibit 12j.  Was this the

8    phone that was taken from you when you were arrested?

9    A.    Yes.

10   Q.    And did you have a telephone number, the number that you

11   just identified, in that phone that was associated with Chino?

12   A.    Yes.

13   Q.    You mentioned that Chino had another brothel in Annapolis

14   near the post office, and earlier talked about that he said he

15   had a brothel in Norfolk.  Did you ever go with him to the

16   brothel in or near Norfolk?

17   A.    Yes.  He took me there once to see it, because he wanted

18   me to stay there, working there.

19   Q.    Why was it that he wanted you to work there instead of

20   Annapolis?

21           MR. RUTER:  Objection.

22           THE COURT:  Basis?

23           MR. RUTER:  He's asking for state of mind of

24   Mr. Ventura, Your Honor.

25           THE COURT:  I will sustain the objection as to form.

1    You may rephrase the question.

2    **BY MR. CUNNINGHAM:**

3    Q.   Mr. Ascencio, did Chino tell you why he wanted you to

4    work in Norfolk?

5    A.   Well, I don't know why he wanted that, but he wanted me

6    to go there.

7    Q.   And you did go to the Norfolk brothel with him?

8    A.   Yes.

9    Q.   Do you remember how you got to Norfolk?

10   A.   To tell you the truth, no, I'm not good for that.  I get

11   lost.

12   Q.   Were you driving?

13           **MR. MONTEMARANO:**  Objection, Your Honor.

14           **THE COURT:**  Basis?

15           **MR. MONTEMARANO:**  Assumes facts not in evidence.

16           **THE COURT:**  Overruled.

17           **THE WITNESS:**  No.  Chino was driving.

18   **BY MR. CUNNINGHAM:**

19   Q.   And do you remember what kind of a car or vehicle you

20   were in?

21   A.   Yes.

22   Q.   What was that?

23   A.   It was a gray Ford Expedition.

24           **THE COURT:**  May we stop here, Mr. Cunningham?

25           **MR. CUNNINGHAM:**  Yes, Your Honor.

 1          THE COURT:  Members of the jury, we've reached the

 2   lunch hour.  Please remember:  Do not discuss the case among

 3   yourselves or with anyone else.  Please be back in your jury

 4   room at about five minutes before 2:00 so that we can get

 5   started at 2:00 p.m.  Thank you.

 6          THE CLERK:  All rise.  This Honorable Court stands

 7   in recess until 2:00 p.m.

 8          (Jury excused.)

 9          (Luncheon recess -- 12:53 p.m.)

10          (Afternoon session -- 1:59 p.m.)

11          THE CLERK:  All rise.  This Honorable Court now

12   resumes in session.

13          THE COURT:  Ready for the jury, folks?

14          MR. CUNNINGHAM:  Yes, Your Honor.  If we could,

15   before they come in, if we could just broach and then perhaps

16   schedule when we can address the subject of the letter that

17   was submitted?

18          THE COURT:  I'm referring you to my complaints

19   department, Judge Gallagher.  We have tomorrow off.  You folks

20   can take care of that tomorrow.

21          Bring the jury in, please.

22          Get your witness.

23          (Jury enters.)

24          THE COURT:  You may be seated.

25          Please remind the witness.

```
 1              THE CLERK:  I'd like to remind you:  You're still

 2   under oath.

 3              THE WITNESS:  Yes.

 4              THE COURT:  Mr. Cunningham?

 5   BY MR. CUNNINGHAM:

 6   Q.   Mr. Ascencio, when we broke for lunch, I had asked you a

 7   question about going to Norfolk.  I want to continue with

 8   that.  When you went to Norfolk, did you go to a brothel that

 9   some people called the beach?

10   A.   Yes.

11   Q.   And do you remember meeting someone who essentially ran

12   that brothel?

13   A.   Yes.

14   Q.   And did that person have a name, or was the person

15   introduced to you by a name?

16   A.   Not a name; rather, a nickname, El Pancha (phon).

17   Q.   Okay.  Did you ever hear anybody refer to El Pacha (phon)

18   by some other name?

19   A.   Well, yes.

20   Q.   And what was that?

21   A.   Guanano.

22   Q.   And did El Pacha (phon) work for Chino at that brothel?

23              MR. RUTER:  Objection, Your Honor.

24              THE WITNESS:  Yes.

25              MR. RUTER:  Basis of knowledge.
```

1       **THE COURT:**  Overruled.  You'll get cross-

2  examination.

3  **BY MR. CUNNINGHAM:**

4  Q.  Mr. Ascencio, if you saw El Pacha again, do you think

5  you'd recognize him?

6  A.  Yes.

7  Q.  Would you please look around the courtroom and tell me if

8  you see El Pacha.

9  A.  Yes.  It's the guy in the blue shirt.

10      **MR. CUNNINGHAM:**  Your Honor, may the record reflect

11  that Mr. Ascencio has identified Defendant Fuertes?

12      **THE COURT:**  The record will reflect that

13  identification.

14  **BY MR. CUNNINGHAM:**

15  Q.  Do you remember, Mr. Ascencio, approximately how much

16  time before your arrest you had taken this trip to Norfolk?

17  A.  Before my arrest, you said?

18  Q.  Yes.

19  A.  That was in July, more or less.

20  Q.  And did you agree to work for Chino at that brothel?

21  A.  No.  To be honest, I didn't want to work there.

22  Q.  Why not?

23  A.  Because I was on probation, and I didn't want things to

24  turn out badly.

25  Q.  And was that location farther away from Washington, D.C.

1    than Annapolis?

2    A.   That's right.

3    Q.   Mr. Ascencio, do you remember if, on the occasion when

4    you drove to Norfolk, whether or not there was also a woman in

5    the car with you?

6    A.   Yes.

7    Q.   And was that a woman who was going to work in the brothel

8    down there?

9           MR. MONTEMARANO:   Objection.  Basis for knowledge.

10          THE COURT:   Overruled.  You'll get cross.

11          THE WITNESS:   Yes.

12   BY MR. CUNNINGHAM:

13   Q.   Had she been working in the brothel in Annapolis before

14   going to Norfolk?

15   A.   Yes, Annapolis, and she was taken from there to that one.

16   Q.   Now, you mentioned that you knew El Pacha by the --

17   another name of Guanano; is that correct?

18   A.   Yes.

19   Q.   And, Mr. Ascencio, when you had the cell phone that you

20   previously identified as Government Exhibit 12j, was this your

21   own cell phone, or had you been given this cell phone?

22   A.   No.  That was my cell.

23   Q.   And was it your practice to save telephone numbers,

24   associate them with individuals who you contacted?

25   A.   Yes.

1    Q.   Do you remember saving a telephone number for Chino?

2    A.   No.   Just the one I mentioned to you before.

3    Q.   And do you recall -- I'm going to show you what is marked

4    for identification purposes as Government Exhibit 40a/2.   I

5    want to show you some pages from this exhibit.

6              Mr. Ascencio, I'd like you to look at the second

7    entry on Page 6 of 11 for Government Exhibit for

8    identification 40a/2.   Do you see the second entry?

9    A.   Yes.

10   Q.   Okay.   May I have the exhibit, please?   Do you recognize

11   that as an entry you saved in your phone for El Pacha?

12   A.   Yes.

13   Q.   Now, I'd like you to also look on Page 7 of 11 at this

14   particular page, particularly right in the middle.   Do you see

15   that there appears to be an entry on there for a name similar

16   to Juan or Juano?

17   A.   Yes.

18   Q.   And do you know for whom that entry was made?

19   A.   For the man who worked there in Norfolk.

20   Q.   Mr. Ascencio, do you recall ever seeing El Pacha in

21   Annapolis, Maryland?

22   A.   Yes.

23   Q.   And were there any particular occasions when he was in

24   Annapolis?

25   A.   Yes.   On Sundays, in the afternoon.

1    Q.   Did you learn why it was that he would be in Annapolis on

2    Sunday afternoon?

3    A.   Yes.  Because he had finished his work already, and he

4    had gone to drop the girl off to the Greyhound and stayed

5    there.

6              **INTERPRETER BLUMBERG:**  The interpreter requests

7    permission to inquire what "por la tarde" is.  It could be

8    afternoon or evening.

9              **THE WITNESS:**  From 5:00 on.

10             **INTERPRETER BLUMBERG:**  So it would be the evening.

11   Interpreter corrects.

12   **BY MR. CUNNINGHAM:**

13   Q.   Mr. Ascencio, while you were working in the brothel, were

14   you able to observe whether the women who were working there

15   were allowed to leave at their own will?

16   A.   No.

17   Q.   Were the women left alone?

18   A.   No, of course not.

19   Q.   Why weren't they left alone?

20   A.   Well, because he said that they couldn't go out.  If they

21   needed something, one would have to go and bring something for

22   them.

23   Q.   Were the women allowed to have friends visit them during

24   the week?

25             **MR. RUTER:**  Objection.

```
 1              THE WITNESS:  No.

 2              THE COURT:  Basis?

 3              MR. RUTER:  It's the form of the question, Your

 4      Honor.  It's really leading.  It's very leading.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  No, they couldn't.

 7      BY MR. CUNNINGHAM:

 8      Q.   If the women needed food or supplies, such as condoms or

 9      cleaning supplies or alcohol, how would they get that?

10      A.   Well, I took responsibility for going to get it for them.

11      Q.   And where would you get the money?

12      A.   Well, the same from what was being sold.

13      Q.   Now, Mr. Ascencio, did you ever meet one of the women

14      that worked in the brothel who was called Periquita?

15      A.   Yes.

16      Q.   And how was it that you met her?

17      A.   She went to work there in Annapolis.

18      Q.   And about how long did she work in the same brothel where

19      you were working?

20      A.   A week.

21      Q.   And do you know if she had any relations -- any kind of a

22      relationship with Chino?

23      A.   Yes.  He said that she was his old lady.

24      Q.   And do you remember what she looked like?

25      A.   Yes.
```

1    Q.   Can you describe her, please.

2    A.   She is white, and she has a lot of acne on her face.

3    She's about 160, 155 in height.

4    Q.   Was she thin, or heavyset?

5    A.   She was thin.

6    Q.   I'm going to show you a photograph of Government Exhibit,

7    or Government Exhibit 6c/15.  Does that appear like the woman

8    you identified as Periquita?

9    A.   Yes.

10   Q.   Did you ever learn from either her or, more

11   significantly, from Chino that he -- in terms of the money,

12   that he treated her differently than the other women?

13   A.   Yes, of course.

14   Q.   When you say "of course," why would he have treated her

15   differently?

16   A.    In other words, what she earned, he kept.  It wasn't

17   turned over.

18   Q.   Now, speaking of money, Mr. Ascencio, did Chino ever talk

19   to you about committing robberies of other brothels run by

20   competitors?

21             **MR. RUTER:**  Objection, Your Honor.

22             **THE COURT:**  Basis?

23             **MR. RUTER:**  Relevance, and leading again.

24             **THE COURT:**  Okay.  Overruled.

25             **THE WITNESS:**  Yes.

1    **BY MR. CUNNINGHAM:**

2    Q.   What was it that he talked to you about?

3    A.   Well, in Annapolis, he had competition, and a person by

4    the name of Juan in Annapolis, who was a Dominican.

5    Q.   Did he ever talk to you about doing something about Juan?

6    A.   Yes.

7    Q.   What was that?

8    A.   Well, he said that he was invading his territory.  He was

9    going to try to find a way to get him out of there, that he

10   wanted to scare him so he would leave.

11   Q.   Did he ever -- in talking about the Dominican, did he

12   ever talk to you about something that had happened to another

13   competitor?

14   A.   Yes.  A guy who was called Pelon.

15   Q.   Did he tell you what happened to him?

16   A.   Well, yes.  He had mentioned to me that he had deliveries

17   there in Annapolis, too, and an address had been asked -- an

18   address had asked for a girl to be delivered from, and, when

19   they went, he was ambushed.

20   Q.   Did he tell you what happened to Pelon?

21   A.   Yes.  That he was killed, and also they shot the girl he

22   had with her -- with him.

23          **INTERPRETER BLUMBERG:**  Interpreter corrects.

24   Q.   Did he ever talk about doing the same thing to Juan, the

25   Dominican?

1    A.    Yes.  He said that, if he didn't leave there, the same

2    thing would happen to him as what happened to Pelon.

3    Q.    Mr. Ascencio, did Chino ever threaten you?

4    A.    Well, he never threatened me, no, but he says -- what he

5    says all the time is what you -- the person who owes, pays.

6    Q.    When you were with him, did you ever see him have any

7    kind of weapons?

8    A.    Yes.

9    Q.    What kind of weapons?

10   A.    Once, I saw him with a 9mm, and then, on another

11   occasion, I saw him with a .38, a revolver.

12   Q.    Where was it that you saw him have these guns?

13   A.    He always had it hidden in the car where he was going

14   around.

15   Q.    Would he ever show you that he had the guns?

16   A.    Yes.

17   Q.    Did he tell you why he had guns?

18   A.    Well, yes.  He also robbed other whorehouses.

19              **MR. CUNNINGHAM:**  I have nothing further of

20   Mr. Ascencio, Your Honor.

21              **THE COURT:**  Cross?

22              **MR. RUTER:**  Yes.  Thank you, Your Honor.

23                        <u>**CROSS-EXAMINATION**</u>

24   <u>BY MR. RUTER:</u>

25   Q.    Good afternoon, Mr. Ascencio.

1   A.   Good afternoon.

2   Q.   Mr. Ascencio, you entered this country illegally from

3   El Salvador some eleven years ago; is that right?

4   A.   Yes.

5   Q.   And what was the reason that you entered this country

6   illegally?

7   A.   Well, to seek a better future for the family, you know

8   what I mean.

9   Q.   For your family back in El Salvador?

10  A.   Yes.

11  Q.   You were in California initially, correct?

12  A.   Yes, that's right.

13  Q.   And, if I understand it, you were there for some time

14  working, or looking for work?

15  A.   That's right.

16  Q.   And you were in California with some relatives?

17  A.   Yes.

18  Q.   And, while you were there, were you able to find some

19  work?

20  A.   That's right.

21  Q.   And did you send money back to your family in

22  El Salvador?

23  A.   Yes, that's correct.

24  Q.   In terms of your family, Mr. Ascencio, were you married

25  when you left El Salvador in about eleven years ago?

1    A.   Not exactly married, but living together, that's all.

2    Q.   And did you have children with this lady?

3    A.   Yes.

4    Q.   And how many?

5    A.   In all, I have five children.

6    Q.   And was it your intention to send money back to all five

7    children?

8    A.   Yes, of course.

9    Q.   And you said you moved to Washington, D.C. in 2006; is

10   that right?

11   A.   Yes, that's right.

12   Q.   And what was the reason for moving to Washington, D.C.?

13   A.   Well, yes.  I have a cousin here, and I talked to him and

14   told him I wanted to come here to see if I could find some

15   work or I could make some more money, because, in California,

16   I was only earning the minimum wage, which is about 7.25,

17   7.75.  He said, "Oh, sure.  Here, you can find a job in

18   construction and make about $15 an hour."

19   Q.   Okay.  And was it based upon what your relative here in

20   Washington, D.C. said that caused you to come to Washington,

21   D.C.?

22   A.   Yes.

23   Q.   And did you live with your relative in Washington, D.C.?

24   A.   No.  He actually lives here in Maryland.

25   Q.   Okay.  And you lived with him here in Maryland?

1    A.   Yes.

2    Q.   And did he help you find work in Maryland?

3    A.   Yes.

4    Q.   When you came here in 2006, how long did it take you

5    before you became gainfully employed?

6    A.   About a month, more or less.

7    Q.   And did you work regularly then throughout 2006?

8    A.   Yes.

9    Q.   And then how about 2007?

10   A.   In 2007, up until the time when snow fell, I was able to

11   work, and then I couldn't.

12   Q.   And did you continue to work in lawful employment

13   throughout 2007?

14   A.   Before the snow came, yes.  I worked with a fellow who

15   did remodeling.

16   Q.   Okay.  And do we understand, then, that you began to work

17   in the prostitution business?

18   A.   Yes, that's correct.

19   Q.   And we also understand that that was with a person not

20   Chalo -- not Chino?

21   A.   Right.

22   Q.   That was a man named Alex?

23   A.   Alex, yes, that's correct.

24   Q.   And Alex was a man; is that correct?

25   A.   Yes.

1   Q.   Did Alex have anything to do with Chino?

2   A.   No.

3   Q.   And how many houses of prostitution did he have?

4   A.   Oh, he had several.

5   Q.   And were they all in Washington, D.C., or were they

6   elsewhere besides Washington, D.C.?

7   A.   Just in Washington, D.C.

8   Q.   And you said several.  Can you recall today how many

9   locations he actually had in Washington?

10  A.   One on ███████████.  He had another one on ███.  He

11  had another one on ███, and another one on █████████, as it's

12  called.

13  Q.   That's at least five locations?

14  A.   Yes.

15  Q.   And did he have those in 2007?

16  A.   That's right.

17  Q.   And 2008?

18  A.   Yes.

19  Q.   How about 2009?

20  A.   Yes, he still had it.

21  Q.   And do you know about 2010?

22  A.   No, because I think that, by that date, all the houses

23  had been closed by the police.

24  Q.   Okay.  Did Alex work with anybody else?

25  A.   Yes.  Yes.  There were three more.  It was him and his

1    sister, Denora, and then there was another guy called Jose

2    Flores, the Dominican, and then a woman called Sofia, so the

3    four of them were associated.

4    Q.   And was Sofia related to him?

5    A.   No.

6    Q.   And were they all partners, all four of them?

7    A.   The four of them.

8    Q.   And how about Susanna Gonzalez?

9    A.   Susanna Gonzalez?  I don't remember that name.

10   Q.   Okay.  Did you ever know of a man named Gonzale,

11   G-O-N-Z-A-L-E?

12   A.   No.

13   Q.   You gave a statement -- you spoke to police immediately

14   on September 24th of 2009, after you were arrested; did you

15   not, sir?

16   A.   That's right.

17   Q.   And do you recall speaking with a person named

18   Joseph Hudson?

19   A.   No.  I don't know who he is.  Maybe he's the one that was

20   there with the people that arrested me?

21   Q.   Yes.  He's a translator.  He was a person on

22   September 24th of 2009 when you were arrested, and there were

23   police officers present.  He was a man translating between you

24   and the investigators.  Does that refresh your recollection?

25   A.   Yes, because they spoke Spanish.

1   Q.   Yes.  Yes.

2        Do you recall telling the investigators that a

3   friend of yours told you that a man needed a worker?

4   A.   No.  I don't remember having said that.

5   Q.   Okay.  Did you know, on September 24th, 2009, a man named

6   Colmillo?

7   A.   Yes.

8   Q.   And how long had you known him?

9   A.   About three months, I believe.

10  Q.   Did you come to know him after you began to work for

11  El Chino?

12  A.   Yes.

13  Q.   Do you recall telling investigators that you were aware

14  of an owner, and that people called that owner Gonzale?

15  A.   No.

16  Q.   Okay.  And you don't recall telling investigators that

17  you knew of a man they called Gonzale, but you never had the

18  opportunity to know him?

19  A.   I don't remember that last name.

20  Q.   Okay.  Based upon your questioning this morning or

21  earlier today, we understand that Chino was a customer of a --

22  one of the brothels that you worked at in Washington, D.C.; is

23  that correct?

24  A.   Yes, that's correct.

25  Q.   And that was a brothel owned by Alex?

1    A.    That's right.

2    Q.    Do you know whether Chino ever met Alex?

3              **INTERPRETER GOLDSTEIN:**   Interpreter requests

4    clarification.

5              **THE WITNESS:**   Yes.   He must have known him, because

6    he was going from one house to the other, so he must have

7    known.

8    **BY MR. RUTER:**

9    Q.    Now, when you say he was going from one house to another,

10   are you talking about Chino here?

11   A.    Yes, correct.

12   Q.    And are you saying that he would go from one house to

13   another of houses of prostitution owned by Alex?

14   A.    That's right.

15   Q.    And how do you know that he went from house to house of

16   these five houses owned by Alex?

17   A.    Because he liked to see who were the more -- the most

18   beautiful women to give them work as well.

19   Q.    Okay.   So is it your testimony, then, Mr. Ascencio, that

20   Chino would go to one of the five houses of prostitution owned

21   by Alex, and he would have sex with the women, and he'd also

22   try to see if any of them wanted to work with him?   Was that

23   your testimony?

24   A.    That's correct.

25   Q.    And how do you know that?

1    A.   Because he told me -- he told me that himself.

2    Q.   Okay.  How often did you know him to visit the brothels

3    in Washington, D.C. owned by Alex?

4    A.   Every eight days.

5    Q.   Every eight days?

6         **INTERPRETER GOLDSTEIN:**   Interpreter corrects.

7    A.   Weekly.

8    Q.   Weekly?  Every seven days?

9    A.   Yes, once a week.

10   Q.   Okay.  Once a week.

11        And was there a particular day of the week that he

12   would go visit these brothels in Washington, D.C.?

13   A.   The day, no, but I know it was once a week.

14   Q.   Did you know it to be on different days of the week, or

15   was it always the same day of each week?

16   A.   Different.

17   Q.   Different.  Okay.

18        And, to your knowledge, did he pay whatever the fee

19   was that was charged?

20   A.   Yes.

21   Q.   Okay.  And these were the same houses that were also

22   owned by Sofia, is that right, and Lenore?  Is that right?

23   A.   Well --

24   Q.   His sister?

25   A.   Yes.  His sister, Denora.

1  Q.   Denora.  My apologies for the pronunciation.

2         Mr. Ascencio, did you know -- did Sofia or Denora

3  work in the houses of prostitution as prostitutes themselves?

4  A.   They did not work.

5  Q.   Okay.  Do you know where it was that the women came from

6  that were in these five houses of prostitution?

7  A.   Yes, of course.  Most of them came from here, from New

8  York, from Boston, New Jersey, different places.

9  Q.   And were they all illegals?

10 A.   All illegal, yes.

11 Q.   Now, do we understand that there came a time when you

12 were arrested and charged with, I believe, prostitution in

13 Washington, D.C., while working for Alex?

14 A.   Yes.

15 Q.   And you went to court, and you were placed on probation;

16 is that right?

17 A.   Yes.

18 Q.   You were told by the Judge, "Don't commit any more

19 crimes," weren't you?

20 A.   Yes.

21 Q.   But you did?

22 A.   I did, correct.

23 Q.   And, because you were on probation to a judge in

24 Washington, D.C., you did not want to continue working

25 illegally in Washington, D.C., did you?

1    A.   That's right.

2    Q.   So you sought out Chino for a job; isn't that right?

3    A.   Yes, that's right.  When he told me he would give me a

4    job here in Annapolis, I said that, if he would give me a job,

5    I would come with him, yes.

6    Q.   Yeah.  And the fact is, though, Mr. Ascencio, is that,

7    after you were arrested and convicted, you asked Chino for a

8    job, didn't you?

9    A.   Yes, correct.

10   Q.   And then he accepted?

11   A.   Yes.

12   Q.   He didn't force you to work for him, did he?

13   A.   No, of course not.

14   Q.   You actually asked Chino if you could work on the outside

15   of the houses of prostitution, because you did not want to

16   work on the inside of the houses of prostitution.  Did I hear

17   that right?

18   A.   Yes, that's right.

19   Q.   And, Mr. Ascencio, your thought was, if the police showed

20   up, you didn't want to be caught inside of the house of

21   prostitution?  Was that what you were thinking?

22   A.   That's what I was thinking, yes.

23   Q.   And do we understand that Chino accommodated you?

24   A.   Yes.

25   Q.   He didn't say to you, "Well, you're going to have to do

1    it my way"?  He allowed you to be on the outside because you

2    asked; isn't that right?

3    A.    Yes.  He gave me the possibility of working that way.

4    Q.    And you did; is that right?  And you did?

5    A.    Yes.

6    Q.    You passed out business cards?

7    A.    Yes.

8    Q.    You helped the women who were working on the inside?

9    A.    Correct.

10   Q.    You were asked by Government counsel if any of the girls

11   were forced to do prostitution.  Do you recall that?

12   A.    Yes.

13   Q.    What was your answer?

14   A.    No.  They were all there on their own will.  They would

15   call and ask for weeks.  They would call the owner and ask for

16   weeks.

17   Q.    Okay.  So, to your knowledge, Mr. Ascencio, the ladies

18   that you saw during your employment with Chino were there

19   because they wanted to make money; is that right?

20              **MR. CUNNINGHAM:**  Objection, Your Honor.

21              **THE COURT:**  Basis?

22              **MR. CUNNINGHAM:**  Calls for speculation.

23              **THE COURT:**  Overruled.

24   **BY MR. RUTER:**

25   Q.    Mr. Ascencio, you saw each week various women receive a

1    large hunk of cash, didn't you?

2    A.   That's right.

3    Q.   And you knew, did you not, Mr. Ascencio, that there was

4    no way and no place that any of these women could make the

5    kind of cash that you saw them make at any legitimate

6    employment; isn't that also true?

7              **MR. CUNNINGHAM:**   Objection, Your Honor.

8              **THE COURT:**   Sustained.

9    **BY MR. RUTER:**

10   Q.   Could the girls leave the house if they wanted to?

11   A.   Only if they got sick.  Otherwise, no.

12   Q.   Okay.  What would happen, if anything, Mr. Ascencio, if

13   the girls were to leave the house during the day while they

14   were working?

15   A.   Well, the one that would get angry would be the owner of

16   the house.  That's what would happen.

17   Q.   The owner of the house would get angry?

18   A.   That's right.

19   Q.   Okay.  Would the owner of the house go look for another

20   replacement if a girl simply left in the middle of the week?

21   A.   That's right, correct, that he would have to look for

22   one.

23   Q.   Do you recall, Mr. Ascencio, being interviewed by one

24   Detective Hartlove?

25   A.   I don't know who he is.  The one that was in Annapolis?

1    Q.   Do you recall being interviewed by a Detective Hartlove

2    on May 21st of 2010 with several other people, including the

3    translator, in Annapolis, Maryland?

4    A.   The only time I was interviewed was when I was arrested.

5    Q.   Well, isn't it true you were interviewed on May 21st,

6    2010, Detective Hartlove was present, Detective Kelly was

7    present, Kimberly DiPietro was present?

8    A.   Only when I was in the jail.

9    Q.   And Elizabeth Palin was present?

10   A.   I don't remember very well.

11   Q.   Okay.  Now, on this particular day, Mr. Ascencio, it's my

12   belief that there was a tape recording of your conversation

13   that you had with these individuals?

14   A.   Like I told you before, the only time I was interviewed

15   was when I was arrested and I was in jail.

16          **MR. RUTER:**  If I could approach the witness, Your

17   Honor?

18          **THE COURT:**  Yes.

19          (Counsel conferring.)

20          **MR. RUTER:**  If I could have this marked for

21   identification as Defense Number 1.

22   **BY MR. RUTER:**

23   Q.   And, Mr. Ascencio, I'm going to ask the translator to

24   translate to you silently the contents of Page 3 of this

25   document, as well as Page 20 of this document.



1          **THE CLERK:**  What is it?

2          **THE COURT:**  Husher, Madam Clerk.  Husher.

3          (Interpreter translating document to the witness.)

4          **INTERPRETER GOLDSTEIN:**  The interpreter has finished

5     translating the document for the witness.

6     **BY MR. RUTER:**

7     Q.   So, Mr. Ascencio, having had this document read to you,

8     is your recollection refreshed as to what you told

9     Detective Hartlove concerning whether the girls could leave

10    the house at ███████████?

11    A.   I do remember that I did say that only if they got sick.

12    Q.   That's not what the document says, is it?

13         **MS. YASSER:**  Objection.

14    Q.   That's not what you read, is it?

15    A.   No.

16    Q.   Okay.  Do you have a recollection today as to what you

17    told Detective Hartlove on May 21st, 2010, concerning whether

18    or not the girls were being held against their force at

19    ███████████, or against their wishes at ███████████?

20    A.   No.  It wasn't against their will.  They did it

21    voluntarily.

22    Q.   Okay.  Mr. Ascencio, did you yourself ever take any of

23    the girls from a house of prostitution and drive them to

24    Washington, D.C.?

25    A.   No.

Cross-Examination of Carlos Antonio Ascencio (Ruter)            T-IV-755

1    Q.   Did you ever pick any women up from Washington, D.C. and

2    take them to a brothel?

3    A.   Just once.  I went to pick up one of them at the

4    Greyhound in Washington.

5    Q.   Okay.  Just one time?

6    A.   Just once.

7    Q.   All right.  And I understand from your direct examination

8    that you were always paid by Chino; is that right?

9    A.   Yes.

10   Q.   And do I understand that you know that the women were

11   always paid as well?  Is that correct?

12   A.   Yes, they were paid, too.

13   Q.   Okay.  And, Mr. Ascencio, you testified earlier that you

14   were asked on one occasion by Chino as to whether or not you

15   would work in Norfolk, Virginia.  Do you recall that?

16   A.   That's right.

17   Q.   And he did so because he wanted you to work there; is

18   that correct?

19   A.   Yes, that's right.

20   Q.   And you said, "No"?

21   A.   I said, "No."

22   Q.   And Chino said, "Okay"?

23   A.   Yes.

24              **MR. RUTER:**  Nothing further.  Thank you.

25              **THE COURT:**  Mr. Montemarano?

```
1              MR. MONTEMARANO:  No questions, Your Honor.

2              THE COURT:  Redirect?

3              MR. CUNNINGHAM:  Just a few, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. CUNNINGHAM:

6    Q.   Mr. Ascencio, with regard to the question about

7    transporting women, you said one time you went to the

8    Greyhound station to pick up a woman; is that right?

9    A.   Yes, that's right.

10   Q.   And whose car did you use?

11   A.   White Chevy Astrovan.

12   Q.   Whose car was that?

13   A.   It belonged to Chino.

14   Q.   And did he give you the keys?

15   A.   That's right.

16   Q.   Did he tell you to go pick the woman up?

17   A.   That's right.

18   Q.   And there was some question as to what happened if a

19   woman got sick when she was working.  Do you remember that?

20   A.   Well, if they got sick, then -- well, then, yeah, she

21   would just get the money that she was owed, and then he would

22   look for somebody else, and she'd leave.

23   Q.   Mr. Ascencio, did you ever, in the time you worked in the

24   brothels, learn what would happen to a woman if it -- if she

25   had her time of the month, if she had her period?
```

1    A.    She wouldn't work.   She would just get paid.

2    Q.    And would she have to leave?

3    A.    Yeah.   She would leave, because she didn't want to work

4    that way.

5    Q.    And --

6              **INTERPRETER GOLDSTEIN:**  Excuse me.   Interpreter

7    corrects.   "She didn't like to work that way."

8              **MR. CUNNINGHAM:**   Okay.

9    **BY MR. CUNNINGHAM:**

10   Q.    And you were working for Alex before you went to work for

11   Chino; is that right?

12   A.    Yes.

13   Q.    And I think your answer to some of Mr. Ruter's questions

14   were that Chino came there looking for women to work in his

15   own business?

16   A.    That's right.

17   Q.    Did you know of any of the women that Chino took from any

18   of Alex' brothels to work for him?

19             **INTERPRETER GOLDSTEIN:**   Interpreter would like

20   clarification.   Did he know of, or did he know them?

21             **MR. CUNNINGHAM:**   Strike that.   I'll move on.

22   **BY MR. CUNNINGHAM:**

23   Q.    Do you know if Alex had any particular identifying

24   features?

25   A.    Yes.

```
 1    Q.   And what was that?

 2    A.   Well, he had an eye that -- well, it was like -- well, it

 3    wasn't his eye.

 4             MR. CUNNINGHAM:  No further questions, Your Honor.

 5             THE COURT:  Recross?

 6             MR. RUTER:  No, thank you.

 7             THE COURT:  May I excuse the witness?

 8             MR. CUNNINGHAM:  Yes, Your Honor.  Thank you.

 9             THE COURT:  Thank you.  You are excused, sir.  Good

10    day.

11             THE WITNESS:  Okay.

12             (Witness excused.)

13             MS. YASSER:  The United States calls Detective Ricky

14    Truitt.

15             INTERPRETER GOLDSTEIN:  Excuse me, Your Honor.  The

16    interpreter would like to know if we're going to have any

17    other Spanish-speaking witnesses today?

18             MR. CUNNINGHAM:  Yes, Your Honor.

19             INTERPRETER GOLDSTEIN:  Thank you.

20             THE COURT:  But this is not one; is that correct?

21             MR. CUNNINGHAM:  No, it is not, Your Honor.

22                  DETECTIVE RICHARD TRUITT

23             WAS THEN DULY SWORN TO TELL THE TRUTH

24             THE CLERK:  Be seated.  You can scoot up and pull

25    the mic down, speak directly toward it, state your name, and
```

 1    then spell it for the record, please.

 2              **THE WITNESS:**  Detective Richard Truitt, T-R-U-I-T-T.

 3              **THE CLERK:**  Thank you.

 4                        **DIRECT EXAMINATION**

 5    **BY MS. YASSER:**

 6    Q.    Detective Truitt, good afternoon.

 7    A.    Good afternoon.

 8    Q.    Where do you work, sir?

 9    A.    Annapolis Police Department.

10    Q.    And how long have you been with the Annapolis Police

11    Department?

12    A.    Since March of 2001.

13    Q.    And what position do you currently hold there?

14    A.    I'm the acting corporal in the Intelligence Section for

15    the Office of the Chief.

16    Q.    And, before you were a corporal in that position, what

17    position did you hold?

18    A.    Detective.

19    Q.    And how long were you a detective?

20    A.    Since early 2002.

21    Q.    So, back in the 2008-2010 time frame, were you a

22    detective with the Annapolis Police Department?

23    A.    I was.

24    Q.    And what unit were you a part of?

25    A.    I was a part of the Investigative Support Unit under the

 1    Intelligence Section.

 2    Q.   And what does the Investigative Support Unit under the

 3    Intelligence Section do?

 4    A.   They're responsible for cross-unit collaboration within

 5    the police department.  We provide support services for all

 6    the investigative units within the police department.  We also

 7    provide logistic supports, phone, any technical support, phone

 8    orders, GPS orders.  We also provide support for manpower for

 9    arrests.  We serve high-profile arrest warrants, and just any

10    general fill-in that the unit may need.

11    Q.   So, in that capacity, did you assist in the investigation

12    that followed from the murder and attempted murder of

13    Mr. Rivas Ramirez as well as Nancy Ayala back in September of

14    2008?

15    A.   I did.

16    Q.   And did you also assist in the sex trafficking

17    investigation that arose from that homicide investigation?

18    A.   I did.

19    Q.   And was part of your involvement executing arrests on

20    persons of interest in those investigations?

21    A.   Yes, it was.

22    Q.   Specifically directing your attention to September 24th

23    of 2009, did you assist in the arrest of Defendant German

24    Ventura?

25    A.   I did.

1    Q.   Can you tell the ladies and gentlemen of the jury how you

2    came in contact with Defendant Ventura on that day.

3    A.   We received information that Mr. Ventura had an open

4    arrest warrant through the District of Columbia.  We had

5    further received information that he was in the area of Billy

6    Jon Alley in the city of Annapolis, which is in the rear of

7    the Chesapeake Avenue Postal Office.

8    Q.   Is that location -- well, let me ask you:  Did you go to

9    that location, then?

10   A.   I did.

11   Q.   And did you encounter Mr. Ventura at that location?

12   A.   I did.  He was seated inside a vehicle on the alley.

13   Q.   And is that location close to an address, ███████████████

14   ███████?

15   A.   It's within a block or so.

16   Q.   And, when you saw Mr. Ventura, what did you do?

17   A.   We placed him under arrest.

18   Q.   And did you search him incident to arrest?

19   A.   We did.

20   Q.   And what did you seize, if anything?

21   A.   We went through his person for anything, any contraband

22   or weapons that may be on him.  Knowing that he was a person

23   of interest for Detective Hartlove, we went through -- he had

24   several cards, business cards, sheets, which I recognized

25   through my training, knowledge, and experience as tally sheets

1    or record sheets.  He also had a large sum of currency in his

2    wallet.

3    Q.   Did he have any phones on him, if you can remember?

4    A.   He had two.

5    Q.   I want to show you, Corporal Truitt, what's been marked

6    as Government's 13b/1 through b/3.  Do you recognize --

7              **MS. YASSER:**  Madam Clerk, if I could get the screen

8    on the podium as well.  Thank you.

9    Q.   Do you recognize what's depicted in Government's 13b/1?

10   A.   That appears to be a photocopy of one of the tally

11   sheets.

12   Q.   Similarly with 13b/2?

13   A.   Yes.

14   Q.   And b/3?

15   A.   Yes.

16   Q.   And I'd like to direct your attention now to

17   Government's 13d/2 and d/1.  Do you recognize, first, 13d/1?

18   A.   It appears to be the cell phone that was seized that day.

19   Q.   And do you recall what phone number was associated with

20   that phone?

21   A.   I'd have to review -- I'd have to confirm with the report

22   which -- which phone had which phone number.

23   Q.   And then, with respect to 13d/2, do you recognize this

24   phone?

25   A.   It also appears to be marked with the case number for

1    that day.

2    Q.    You said you saw a large amount of currency in

3    Mr. Ventura's wallet as well?

4    A.    Yes.

5    Q.    And was that currency seized by you, or by

6    Detective Hartlove?

7    A.    Detective Hartlove.  All the evidence was seized by him.

8    Q.    Now, around that same time that Mr. Ventura was arrested

9    on September 24th of 2009, did you also support the

10   investigation through one of the many tools you've cited,

11   which was the obtaining of court orders for phones?

12   A.    Yes.

13   Q.    And did you obtain orders for realtime GPS trackers on

14   phones?

15   A.    Yes.

16   Q.    And what is a GPS realtime tracker as it relates to a

17   telephone?

18   A.    Each carrier is different.  They -- it uses the assisted

19   GPS that's mandated on the phone to provide approximate

20   location of the hand set, of its current location at the time

21   that the request for location is made.

22   Q.    And is it more accurate than what's commonly known as

23   cell tower information?

24        **MR. MONTEMARANO:**  Objection.  Basis for knowledge.

25        **THE COURT:**  Overruled.

1          **THE WITNESS:**  It is typically more accurate;

2    however, they can be as large as the site of a tower.

3    **BY MS. YASSER:**

4    Q.   Now, with respect to your participation in this

5    investigation, did you obtain realtime GPS tracking orders on

6    phones associated with Defendant Ventura?

7    A.   I did.

8    Q.   Including the phones that were seized from him on

9    September 24th of 2009?

10   A.   Yes.

11   Q.   And did you also obtain court orders for other cell

12   phones that were determined to be relevant over the course of

13   the investigation?

14   A.   Yes.

15   Q.   And, if you can, if you can recall, approximately how

16   many applications for court orders did you do?  How many

17   different phones, if you can recall?  Was it at least eight?

18   A.   At least eight.

19   Q.   And, when you obtained these court orders, were they

20   authorized for a 60-day period of tracking?

21   A.   Yes.

22   Q.   And did you sometimes seek extensions of those orders as

23   well?

24   A.   Yes.

25   Q.   And, in response to your court order, did you obtain

1    phone record or data or records from the phone companies in

2    response?

3    A.   Could you repeat the question?

4    Q.   Sure.  Maybe you can just explain to the ladies and

5    gentlemen of the jury how it works, how you get the

6    information from the phone company in response to your court

7    order.

8    A.   The information -- the dialed number is provided through

9    a secure connection to the police department in response to

10   the court order.  The information includes dial digits, time,

11   location, duration of the call, inbound/outbound status,

12   whether the call is a text message or call, whether it is a

13   request -- outbound request for voicemail, the inbound call is

14   rerouted to voicemail, and the location -- the originating

15   location and the terminating location of the hand set upon

16   receiving it.

17   Q.   And do you recall approximately how frequently the

18   location information would be updated and what time intervals?

19   A.   That information as to the pen request would only be upon

20   receipt or making of a telephone call.  In addition to the pen

21   data received, several carriers offer additional GPS location,

22   which is timed, and typically a 15-minute interval.

23   Q.   Now, if you were to print out all of the records that you

24   got from the phone company in response to your court orders,

25   approximately how many pages would you say it would be?

1    A.    Several thousand.

2    Q.    Fair to say it would be voluminous?

3    A.    Yes.

4    Q.    Now, the phone data that was acquired as a result of

5    these court orders, did it assist in the physical surveillance

6    of Defendant Ventura and others that were suspected to be

7    participating in his operation?

8    A.    It did.

9    Q.    And did you, in fact, participate in that physical

10   surveillance at times?

11   A.    I did.

12   Q.    And over what period of time did you or your colleagues

13   participate in physical surveillance of Defendant Ventura and

14   his suspected co-conspirators?

15   A.    I believe it was middle or it was March through November,

16   early November.

17   Q.    And what year was that?

18   A.    2010.

19   Q.    Now, what were you doing?  When you and your colleagues

20   initially started surveilling Mr. Ventura, what was it that

21   you were trying to accomplish?

22   A.    We were trying to determine a pattern of what

23   Mr. Ventura's days consisted of.

24   Q.    And were you able to determine a pattern with respect

25   to -- let me ask you this:  With respect to the sex

1    trafficking investigation, were you able to determine a

2    pattern of relevant activity?

3    A.   Yes.

4    Q.   And what was that?

5         **MR. RUTER:**  Your Honor, may we approach briefly?

6         **THE COURT:**  Sure.

7         (Whereupon, the following discussion occurred at the

8    bench.)

9         **MR. RUTER:**  Your Honor, I have no objection to the

10   line of questioning, but I want to make the record clear that

11   Government counsel could represent that what this detective is

12   going to testify concerning eliminates any references which

13   could be in violation of the Court's Order of last week

14   concerning the exclusion of any GPS tracking devices placed on

15   the vehicles.

16        **MS. YASSER:**  I've informed the witness, and we've

17   scrubbed it of any GPS tracking information.

18        **THE COURT:**  You know, I really thought a brothel

19   case would move a little quicker.

20        **MR. RUTER:**  I think, Your Honor, everybody knows

21   that there are a bunch of brothels.

22        **THE COURT:**  Thank you.

23        (Whereupon, the bench conference was concluded.)

24   **BY MS. YASSER:**

25   Q.   What was that pattern, Corporal Truitt?



1   A.   We determined that, typically on Mondays, we would see

2   Mr. Ventura interact with females that were believed to be

3   involved in the illegal activity, and, on Sunday afternoons to

4   evenings, we would also see interaction with females again.

5   Q.   Now, did your surveillance of Mr. Ventura include

6   surveillance at a location of ███████████?

7   A.   Yes.

8   Q.   And what was that location?

9   A.   Mr. Ventura's residence.

10   Q.   Directing your attention to March 5th of 2010, did you

11   conduct surveillance at ████████ on that day?

12   A.   Yes.

13   Q.   And did you note any vehicles of interest outside of that

14   house?

15   A.   The -- there was a green Ford Expedition and a white

16   Chevy Astrovan.

17   Q.   I want to move ahead and direct your attention to Monday,

18   August 30th of 2010.  Did you conduct surveillance on that day

19   as well?

20   A.   Yes.

21   Q.   And were you focussed on Mondays because of the pattern

22   that you had earlier established?

23   A.   Yes.

24   Q.   Now, what did you observe on that Monday, August 30th of

25   2010?

1    A.   Just confirm with my notes what -- that day.

2         **MS. YASSER:**  If I can direct the witness, Your

3    Honor?

4         **THE COURT:**  Yes, please.

5    **BY MS. YASSER:**

6    Q.   Did you go to a hospital on that day?

7    A.   Yes.

8    Q.   And what led you to that hospital?

9    A.   We had looked at the phone information to see where

10   Mr. Ventura was.  Upon receiving visual of him operating a

11   vehicle, we noticed there was a female in the van with him,

12   and we followed them to a hospital in Takoma Park.

13   Q.   And did you go inside that hospital?

14   A.   I did.

15   Q.   And did you take photographs?

16   A.   I did.

17   Q.   And what did you take those photographs with?

18   A.   My cell phone.

19   Q.   I want to show you what's been marked Government's h/4

20   and h/5, first starting with h/4 --

21        **THE COURT:**  No number?  Just an h/4?

22        **MS. YASSER:**  Oh, I'm sorry.  28h/4.  I apologize.

23   Twenty-eight.

24   **BY MS. YASSER:**

25   Q.   Is that one of the photographs you took?

1    A.    It is.

2    Q.    And 28h/5?

3    A.    It is.

4    Q.    And, finally, 28h/6, are all those photographs you took

5    inside the hospital?

6    A.    Yes, ma'am.

7    Q.    And where was Mr. Ventura at the time these photographs

8    were taken?

9    A.    He was inside the hospital.

10   Q.    And what was he doing?

11   A.    He was on his telephone.

12   Q.    Was he on his telephone the whole time you saw him?

13   A.    He was.

14   Q.    Did you observe any interactions between him and this

15   woman?

16   A.    They appeared to be almost -- if I didn't see them get

17   out of the car, I would assume they were independently there.

18   Q.    And what did she look like?

19   A.    She looked upset.

20        **MR. RUTER:**  Objection, Your Honor.  We have the

21   photographs we've just seen.

22        **MS. YASSER:**  I'm sorry.

23        **THE COURT:**  The objection was?

24        **MR. RUTER:**  As to how she appeared, we have the

25   photograph.  We saw how she appeared.

 1          **THE COURT:**  Okay.  Overruled.

 2   **BY MS. YASSER:**

 3   Q.   You saw her for a period of time that extended beyond the

 4   picture -- the three pictures that I showed the jury?

 5   A.   Yes.  I was in the hospital for approximately ten

 6   minutes.

 7   Q.   And what did you observe?  How did she appear to you

 8   during that period of time?

 9   A.   She appeared upset.  She was -- her -- you could tell

10   that her spirits were down.  She was slumped in her chair.

11   Her face was down.  She held her hand against her face.  She

12   seemed -- she didn't seem comfortable.

13   Q.   Now, I want to move you forward to Monday -- another

14   Monday, September 13th of 2010, and I want to ask you what you

15   observed in general -- first of all, did you conduct

16   surveillance on that day?

17   A.   Yes.

18   Q.   And did you conduct that surveillance together with

19   Detective Hartlove?

20   A.   I did.

21   Q.   Okay.  Now, Detective Hartlove has previously testified

22   about this surveillance.  I just want a general summary from

23   your end of what you saw on that day.

24   A.   I saw Mr. Ventura leave the residence on ███████.  He

25   went a short distance down the street to a McDonald's.  At the

1    McDonald's, he had an interaction where a female exited

2    another vehicle on the lot and entered his, and then they left

3    and headed towards Annapolis.

4    Q.   Very good.  And do you know where they headed in

5    Annapolis?

6    A.   Final destination was ██████████ in Annapolis,

7    Maryland.

8    Q.   And I want to show you, Corporal Truitt, first, this

9    photograph in 28f/6 and ask if you recognize that photograph?

10   A.   Yes, I do.

11   Q.   Did you take that photograph?

12   A.   Yes.

13   Q.   Is this the location where you saw the female get out of

14   a car and get into the car Mr. Ventura was driving?

15   A.   Yes.

16   Q.   And from what car -- if you could, using your finger,

17   draw a circle around the car from which this female exited.

18            (Witness complying.)

19   Q.   And, if you could, using your finger as well, please draw

20   an "X" over the car that she entered.

21            (Witness complying.)

22   Q.   And was that Mr. Ventura's vehicle?

23   A.   Yes.

24   Q.   Now, I want to show you 28f/11 and ask if that's the same

25   female that you saw exit out of Mr. Ventura's or exit out of

 1    the green car you circled and enter into Mr. Ventura's car at

 2    the McDonald's?

 3    A.    Yes.  That's the picture from later in the day.

 4    Q.    Corporal Truitt, were you also involved in the

 5    November 15th, 2010 takedown of this sex trafficking

 6    investigation in response to an assault?

 7    A.    Yes.

 8    Q.    And what did you do on that day?

 9    A.    We began surveillance of Mr. Ventura in the morning time,

10    and we followed him until we received notification that the

11    arrest should be made.

12    Q.    And, during that period of time that you surveilled him

13    the morning of November 15th, what did you see?

14    A.    In the morning, he left his house, and then he -- he

15    traveled to -- he traveled to D.C., and then -- then he left

16    D.C., and he came back towards Annapolis during periods of

17    time which we lost physical surveillance on him, and then it

18    was picked back up, and then it resulted in his arrest just

19    after the Rowe Boulevard exit in Annapolis on Route 50.

20    Q.    And is that area still in the D.C. area, or -- I'm

21    sorry -- that was in Annapolis?

22    A.    That was in Annapolis, Maryland.

23    Q.    Okay.  Now, when you mentioned that surveillance was lost

24    on Defendant Ventura for some period of time and then

25    regained, was there anyone with him in the car?

1    A.    There was a female.

2    Q.    And had that female been present before surveillance was

3    lost?

4    A.    She was present when -- when we saw -- when we picked the

5    vehicle up in D.C.

6    Q.    I see.  So you didn't see Mr. Ventura actually physically

7    pick her up?

8    A.    I did not.

9    Q.    Okay.  But, when you picked up surveillance and you

10   noticed that this woman was now in the car, was that in D.C.,

11   or in Maryland?

12   A.    It was in the District of Columbia.

13   Q.    I want to back you up a bit with my concluding questions

14   and direct your attention back to March of 2010, so earlier in

15   the year.  Did you also respond to a traffic stop involving an

16   individual known as Freddy Soriano and a woman he was with,

17   Alba Garcia Garcia?

18   A.    I did.

19   Q.    And why did you respond to that traffic stop?

20   A.    I overheard a radio transmission from Annapolis police

21   communications concerning a possible abduction that had taken

22   place.

23   Q.    And why is it that you responded?  Is there something

24   about the abduction that you thought might be relevant to your

25   investigation?

1    A.   It sounded similar to other calls that police

2    communications had received concerning rival pimps that had

3    been placing calls against one another in an attempt to have

4    the competitor arrested or action by the police taken against

5    them.

6    Q.   And did you say you heard the radio dispatch for the

7    call?

8    A.   I did.

9    Q.   And were you close-by?

10   A.   I was.  I wasn't -- I was less than a mile or two away.

11   Q.   So did you respond to the location of the traffic stop?

12   A.   I did.  The traffic stop had just been made when I

13   arrived.

14   Q.   And what did you observe with respect to -- well, let me

15   ask you this:  You said the call was for a possible abduction;

16   is that correct?

17   A.   I believe a person being kept against their will.

18   Q.   And did you observe the female in the vehicle at that

19   time that you responded?

20   A.   I did.

21   Q.   And I want to show you what's been marked as

22   Government's 15c/2.  Do you recognize that woman?

23   A.   I don't.

24   Q.   Well, let me ask you more generally, then:  When you

25   responded to the scene, did you observe the female that was

1    located in the car at the time?

2    A.   I did observe her, yes.

3    Q.   And do you recall observing her general demeanor?

4    A.   She was slightly nervous, but it appeared to be more

5    nervous about the police being present.  She didn't -- she

6    wasn't visibly shaking or crying or anything that would more

7    commonly indicate that somebody was in distress or, you know,

8    her rescuers had just arrived.

9    Q.   Did it appear to you to be an abduction situation?

10   A.   It did not.

11   Q.   And, with respect to the gentleman driving the car, for

12   lack of a better word, the man driving the car, do you know

13   the identity of that man?

14   A.   I do.

15   Q.   And who was that?

16   A.   Freddy Leguismano Soriano.

17   Q.   And what happened to Mr. Soriano on that day?  Was he

18   arrested?

19   A.   He was.  He was taken back to the police station for

20   further investigation.

21   Q.   Do you recall what the basis of the arrest was?

22   A.   I believe initially he was taken back so that we could

23   get a Spanish interpreter to completely wade through the case

24   and make sure that there was nothing underlying.  I believe

25   later in the case with the investigation, it was determined

1    that he didn't have a driver's license, or his license was

2    suspended.

3    Q.   And, over the course of that time with Mr. Soriano back

4    at the station, did you learn where he was from originally,

5    which country he was from?

6    A.   The Dominican Republic.

7            MS. YASSER:  No further questions, Your Honor.

8            THE COURT:  Thank you.

9            Members of the jury, we're going to take the

10   afternoon recess now.  Please remember:  Don't discuss the

11   case among yourselves or with anyone else.  Don't let anyone

12   discuss the case with you.  I will call for you at ten minutes

13   before 4:00.  3:50, we will resume.

14           THE CLERK:  All rise.  This Honorable Court stands

15   in recess until 3:50.

16           (Jury excused.)

17           (Recess taken, 3:27 p.m. - 3:51 p.m.)

18           THE CLERK:  All rise.  This Honorable Court now

19   resumes in session.

20           THE COURT:  Ready for the jury?

21           MR. CUNNINGHAM:  Yes, Your Honor.  I had one

22   request, if I may, before the jury comes in --

23           THE COURT:  Yes?

24           MR. CUNNINGHAM:  -- regarding -- I know you had

25   referred this to Magistrate Judge Gallagher.  The concern the

1    Government has is, as we evaluated the letter that was

2    submitted to the Court yesterday, it does seem to blend two

3    things.  One is the sort of the discovery request issue, and

4    the other matter has to do with counsel and satisfaction, and,

5    regarding the latter, it's our appreciation that, in front of

6    the Magistrate Judge, as occurred on Tuesday afternoon, this

7    is largely an *ex parte* proceeding.

8              Candidly, Your Honor, neither Ms. Yasser nor I have

9    encountered a situation, while in a trial, a matter was

10   referred to a magistrate judge in which the Government is not

11   a participant, and all I'm asking for is maybe a few minutes'

12   time at the end of the day, not to further delay the jury,

13   when we might address this here before it goes to

14   Judge Gallagher.

15             (Jury enters.)

16        **THE COURT:**  You may be seated.

17             Please remind the witness.

18        **THE CLERK:**  I would like to remind you:  You are

19   still under oath.

20        **THE WITNESS:**  Yes, ma'am.

21        **THE CLERK:**  Thank you, sir.

22        **MR. RUTER:**  Your Honor, I have no questions of

23   Detective Truitt.  Thank you.

24        **MR. MONTEMARANO:**  Nor I, Your Honor.  Thank you.

25        **THE COURT:**  Good day, Detective.

1            **THE WITNESS:**  Thank you, Your Honor.

2            (Witness excused.)

3            **MR. CUNNINGHAM:**  Your Honor, the United States next

4    calls Ferman Martinez Hernandez.  Mr. Martinez, please go to

5    the witness box.

6            **INTERPRETER GOLDSTEIN:**  Excuse me, sir.  If you

7    would give us a moment to set up.

8            **MR. CUNNINGHAM:**  Excuse me.  I'll wait.

9            **INTERPRETER GOLDSTEIN:**  The Interpreter is ready,

10   Your Honor.

11           **THE COURT:**  Thank you.

12           **THE CLERK:**  Will you please stand and raise your

13   right hand.

14             **FERMAN HERNANDEZ MARTINEZ**

15        **WAS THEN DULY SWORN TO TELL THE TRUTH**

16           **THE CLERK:**  Be seated.  You can state your name for

17   the record, and spell it, please.

18           **THE WITNESS:**  Ferman Hernandez Martinez.

19           **THE CLERK:**  Thank you.

20                **DIRECT EXAMINATION**

21   BY MR. CUNNINGHAM:

22   Q.   Good afternoon, Mr. Martinez.  I will ask you questions

23   from over here, and can you see me?

24   A.   Yes.

25   Q.   Mr. Martinez, I know that you speak -- actually, you

1   speak English reasonably well, but, as you've asked for an

2   interpreter, I'm going to ask you to wait until the

3   interpreter translates my questions into Spanish, make sure

4   you understand, and then communicate to the interpreter in

5   Spanish, and wait for the next question.  Do you understand?

6   A.   Okay.

7   Q.   Mr. Martinez, I note that you appear today in what

8   appears to be prison garb.  Are you currently in custody?

9   A.   Yes.

10  Q.   And are you a prisoner in the Maryland Department of

11  Corrections?

12  A.   That's right.

13  Q.   Okay.  We'll come back and talk about that in detail in a

14  few minutes.  I want to begin with some background questions.

15           How old are you, Mr. Martinez?

16  A.   Twenty-eight.

17  Q.   And where are you from?

18  A.   From Tijuana.

19  Q.   And that's in Mexico?

20  A.   Yes.

21  Q.   And when did you first come to the United States?

22  A.   It's been a long time.

23  Q.   Have you come, or I should say have you gone back and

24  forth between Mexico and the United States several times?

25  A.   Yes.

1    Q.    And do you still have family members that live in Mexico?

2    A.    No.

3    Q.    Do you remember the last time that you came into the

4    United States?

5    A.    It was when I was, I think, about 17 years old.

6    Q.    So about -- I guess that would make it approximately,

7    what, eleven years ago or so?

8    A.    Uh-huh.

9    Q.    And, on any of the occasions when you came into the

10   United States, did you have lawful authority to do that?

11   A.    No.

12   Q.    When you first came into the United States, was it at the

13   border in the vicinity of Tijuana and California?

14   A.    Yes.  My parents brought me here.

15   Q.    And did you live in California for a period of time?

16   A.    Yes.

17   Q.    When you lived there, were you able to go to school or

18   get a job?

19   A.    I was working.

20   Q.    And where was it that you were living at that time,

21   Mr. Martinez?

22   A.    With my mom and dad.

23   Q.    I'm just -- I'm asking:  What was the location, general

24   location?  Was that near Los Angeles, or San Diego?

25   A.    It was in Los Angeles -- South Los Angeles.

1    Q.   And what kind of a job were you able to get at that time?

2    A.   It was a company that made food.

3    Q.   And what did you do for the company?

4    A.   Well, as an example, I had to pick up things.  They made

5    like quesadillas and tacos, and what I did was package them.

6    Q.   Now, when you were still living in that Los Angeles area,

7    did there come a time when you got in trouble with the law?

8    A.   Yes.

9    Q.   What happened?

10   A.   A long time ago, I used drugs.  Well, once the detectives

11   caught me and I had -- on me, I had crystal, and I had -- what

12   do you call it -- marijuana.  And then I just wanted to run.

13   I tried to run, but they grabbed me, and I got -- what's it

14   called?  What's it called?  A six-month class so I would stop

15   using drugs.

16   Q.   Were you able, as a result of that class, to stop using

17   drugs?

18   A.   I didn't finish the class.  I had about one week to go.

19   I had about one week to go to finish the class, but I didn't

20   have money, and my parents couldn't help me.

21   Q.   During that time, Mr. Martinez, did you become associated

22   with any kind of gang?

23   A.   Yes.  I followed the gangs, because they were supporting

24   me much more than my parents were.

25   Q.   And did you get into any trouble with the law as a result

 1    of your gang affiliation?

 2    A.    In California, no, not really, because, in California, I

 3    didn't really get in trouble with the law, but it wasn't --

 4    didn't have anything to do with the gangs.  It was just drugs.

 5    Q.    And you were charged with a drug distribution offense?

 6    A.    Exactly.

 7    Q.    And were you on probation as a result of that,

 8    Mr. Martinez?

 9    A.    Exactly.

10    Q.    And did there come a time when you left California

11    without the authority of your probation officer?

12    A.    No.  What do you call it?  No.  I didn't have a probation

13    officer.  I just went to do the class once a week, and I just

14    had to go and call every week and take a test -- urine test.

15    Q.    When you left California, though, you were still on

16    probation, right?

17    A.    Exactly.

18    Q.    And you didn't have authority to leave, right?

19    A.    Exactly.

20    Q.    And where did you go after leaving California?

21    A.    I went to Las Vegas.  I had a friend -- a male friend

22    there.  He was going to help me.

23    Q.    And how long did you stay in Las Vegas?

24    A.    About two to three months.

25    Q.    Did you work while you were there?

```
1    A.   Yes, I was working.

2    Q.   What kind of work did you do?

3    A.   It's -- what do you call it?  7-Eleven, as a cashier.

4    Q.   And, after -- you said you stayed in Las Vegas for a

5    couple of months.  Where did you go after that?

6    A.   I went to Tennessee.

7    Q.   Where -- do you remember where in Tennessee?

8    A.   Yes.  In Clarksville, Tennessee.

9    Q.   What was it that took you to that location?

10   A.   Because I hadn't found any work in Las Vegas, so I found

11   another male friend that was going to help me go there.

12   Q.   And what kind of work did you expect to be able to do in

13   Clarksville?

14   A.   A cook.

15   Q.   Were you successful in finding work there?

16   A.   Yes.

17   Q.   How long did you stay in Clarksville?

18   A.   About six months.

19   Q.   Did you eventually come to Maryland?

20   A.   No.  From there, I went to Indiana.

21   Q.   And how long were you in Indiana?

22   A.   I was there for only about two weeks, because I couldn't

23   find any work.

24   Q.   Where did you go from Indiana?

25   A.   To Maryland.
```

1    Q.   Okay.  And what was it that brought you to Maryland,

2    Mr. Martinez?

3    A.   Well, I don't know, but I was dealing with the Internet

4    and getting in touch with people on the Internet, and I was

5    told that there was work here, so I came here.

6    Q.   Did you have an acquaintance in Maryland?

7    A.   No one.

8    Q.   When you came here, where were you staying?

9    A.   I was sleeping out on the street.

10   Q.   Did you ever meet someone who gave you a place to live?

11   A.   No.  Actually, I would go into empty houses to sleep, and

12   sometimes I even went under the houses.

13   Q.   Now, to put this in a time frame, Mr. Martinez, earlier I

14   referenced the fact that you're currently in custody in

15   Maryland jail, right?

16   A.   Yes.

17   Q.   And you were arrested on November 15th of 2010; is that

18   right?

19   A.   Exactly.

20   Q.   And ultimately you were convicted of a crime -- an

21   assault kind of crime that occurred on November 3rd of that

22   same year -- November 3rd of 2010; is that right?

23   A.   Correct.

24   Q.   And you received a jail sentence for that.  What was your

25   sentence?

1    A.    It was first and second degree.

2    Q.    First- and second-degree assault?

3    A.    First, second, uh-huh.

4    Q.    And what I asked you was:  How much time did you get?

5          **INTERPRETER GOLDSTEIN:**  The interpreter would like

6    to, I guess, make a correction, Your Honor.  The word

7    "assault" in English is a false cognate when said into

8    Spanish, and it comes out assault, asalto, but assault in

9    Spanish is not a -- to assault someone is different in

10   Spanish.  The word is "agredir," which means a different thing

11   than asalto, which is a robbery.

12         **MR. CUNNINGHAM:**  I see.

13         **INTERPRETER GOLDSTEIN:**  So it's kind of a confusing

14   false cognate that the gentleman is using.  I would be glad to

15   interpret it exactly as he says it.  That might be the best

16   way to handle it, or perhaps we might --

17         **THE COURT:**  Or perhaps you can get him to tell what

18   the conduct was that he's talking about.

19         **MR. CUNNINGHAM:**  Your Honor, I'll ask.

20   **BY MR. CUNNINGHAM:**

21   Q.    Mr. Martinez, we'll come back to it in some detail later

22   on in the examination, but what was it that you did for which

23   you got convicted?

24   A.    I had to go kill someone.

25   Q.    Now, Mr. Martinez, your meeting today, you have

 1    previously -- excuse me.  You're testifying today.  You had

 2    previously met with representatives of the Government to talk

 3    about your testimony; is that correct?

 4    A.   Yes.

 5    Q.   And is it your hope today that, if you testify, that that

 6    may be communicated to a judge in Maryland and have some

 7    effect on the amount of time that you have to serve your

 8    sentence?

 9    A.   Yes.

10    Q.   And, in turn -- in that respect, you haven't been

11    promised anything as far as any results or any outcome from

12    the Government, have you?

13    A.   No.

14    Q.   And you are represented by an attorney at this time; is

15    that correct?

16    A.   Exactly.

17    Q.   Now, how much time before you were arrested in Maryland

18    had it been -- strike that.  Let me try to ask this question

19    better.

20         When did you come to Maryland relative to when you

21    were arrested?

22    A.   I don't understand the question very well.

23    Q.   How many months had you been in Maryland before you were

24    arrested?

25    A.   I think about four.

```
1    Q.   And you were arrested at a location in Annapolis,
2    Maryland; is that correct?
3    A.   Yes.
4    Q.   And what were you doing at the time you were arrested?
5    A.   Well, I was working in a brothel.
6    Q.   I'm going to show you Government Exhibit 25a/1, and do
7    you recognize this as the entrance to the building where you
8    were working?
9    A.   Yes.
10   Q.   I'm just going to go through a few interior pictures.
11   You said this was a brothel.  Is this familiar to you as --
12   this is Government Exhibit 25a/2.  Is that familiar to you as
13   the interior of the brothel?
14   A.   Yes.  Actually, this right here is where I was arrested.
15   Q.   In this room?
16   A.   Yes.  I was thrown down on the floor there, and that
17   window is the one that they broke and came in through it.
18   Q.   Okay.  We'll see in the next photograph.  This is
19   Government Exhibit 25a/3.  You're referring to the window here
20   that does appear to have a broken pane of glass?
21   A.   Exactly.
22   Q.   Now, on the table that's in this picture, do you see --
23   I'm going to point to it with my pen.  This is the phone
24   closest to the right side of the table?
25   A.   Yes.
```

```
1    Q.   Was that a phone that you were using at the time,
2    Mr. Martinez?
3    A.   Yes.
4    Q.   I'm going to put up -- this is Government Exhibit 25b/1.
5    Is this that phone?
6    A.   Yes.
7    Q.   Mr. Martinez, you said you were working at the brothel at
8    that time.  Very generally, how did it come to be that you
9    were working in a brothel?
10   A.   I started -- well, through a male friend -- through a
11   male friend, I got relations and was able to start working at
12   a brothel.
13   Q.   Well, was the male friend someone you knew from the
14   Prince George's County area of Maryland?
15   A.   Yes.
16   Q.   And did that person introduce you to someone else?
17   A.   No.  He just said -- well, he gave me a telephone number
18   so I could communicate with that person.
19   Q.   Do you remember the telephone number that he gave you?
20   A.   No.  I never remember anything about phones.
21   Q.   Did he give you a name to associate with the telephone
22   number?
23   A.   Yes, but let me think about what was it he said to me.
24   Oh, okay.  He said they called him El Chino.
25   Q.   Now, did you contact the telephone number that you had
```

1    been given?

2    A.   Yes.  He wrote it down on the telephone, and I called.

3    Q.   Let me show you a second here, Government Exhibit 25a/6.

4    Do you recognize the man in this picture?

5    A.   Yes.

6    Q.   Who is that?

7    A.   Quique, Enrique.

8    Q.   And was he the person who gave you the telephone number

9    to call?

10   A.   Yes.  He gave it to me.

11   Q.   Now, was he with you the day you were arrested at the

12   brothel?

13   A.   Yes.

14   Q.   And there is a woman seated beside him.  Was she also at

15   the brothel?

16   A.   Yes.

17   Q.   Do you remember that the 15th of November, the day you

18   were arrested, was a Monday?

19   A.   Yes.

20   Q.   And, if you recall, how long had the woman that's in this

21   picture been at the brothel before this arrest occurred?

22   A.   About two or three hours, I think.  Two hours, I think.

23   Q.   Okay.  So she had just arrived at the brothel that day?

24   A.   Yes.  Yes, because -- because it must have been one hour

25   or an hour and a half when we got arrested.

1    Q.   When you called the number that Enrique had given you,

2    what did you say to the person who -- well, let me ask you

3    this:  Did someone answer the phone?

4    A.   Yes.

5    Q.   And what did you say to the person?

6    A.   That I wanted to work.

7    Q.   And was this a man or a woman that answered the phone?

8    A.   A man.

9    Q.   And what did he say to you?

10   A.   That he wanted to see me first to see if I could work and

11   that -- and also if I had enough balls to work in that.

12   Q.   And did you know what he was referring to with that?

13   A.   Yes.  I knew what he was referring to, because Enrique

14   had told me what the job was about.

15   Q.   Now, did the individual that you spoke to on the phone

16   tell you to call him Chino, or something else?

17   A.   He only told me he was called Chino, that people called

18   him Chino.

19   Q.   Did you ever use any other name in talking to him or

20   addressing him?

21   A.   No.  That happened a long -- a long time later when I met

22   another guy that knew everything about him and told me they

23   called him Ventura.

24   Q.   Did you ever call him Oscar?

25   A.   I remember I did.

1  Q.   And did you call him both Oscar and Chino?

2  A.   Yes.

3  Q.   Mr. Martinez, about how long did you work for Chino

4  before you were arrested?

5  A.   I don't remember.  To be honest, I don't remember.  It

6  was some time.

7  Q.   Do you remember that the assault or that the crime for

8  which you were convicted that occurred on November 3rd was

9  about twelve days before you were arrested at the brothel?

10  A.   Uh-huh, yes.

11  Q.   And you said that crime occurred because you had been

12  asked to kill someone.  Who was it that asked you to kill

13  someone?

14  A.   (Witness pointing.)  Chino.

15  Q.   Chino.  And are you pointing to the man in the tan shirt?

16  A.   Yes.

17        **MR. CUNNINGHAM:**  Your Honor, may the record reflect

18  that Mr. Martinez has identified Defendant Ventura as the man

19  he's calling Chino.

20        **THE COURT:**  The record will reflect that

21  identification.

22  **BY MR. CUNNINGHAM:**

23  Q.   Now, if you can remember, how long before the crime on

24  November 3rd had it been that you were working for Chino?

25  A.   Could you repeat the question?

1    Q.    Yeah.   Were you working for Chino for a few weeks or a

2    few months before this crime that -- when he asked you to kill

3    someone?

4    A.    It was some weeks before.

5    Q.    You said that, before giving you a job, Chino wanted to

6    meet you.   Did you meet him?

7    A.    Yes.

8    Q.    And where did that occur?

9    A.    That was in PG County.

10   Q.    And do you remember if it was at like a business

11   establishment, or something like that?

12   A.    It was a business establishment.   It was a CVS pharmacy.

13   Q.    And, at the time, did you talk to him about the kind of

14   work that he wanted you to do?

15   A.    Yes.

16   Q.    Did you know he wanted you to work in a brothel?

17   A.    Yes.   I knew I was going to work in that.

18   Q.    And did you know what kind of things he would have you

19   doing in the brothel?

20   A.    Just to take care of some girls.

21   Q.    Did you talk with him at the time about how much money

22   you would get paid?

23   A.    Well, allegedly, when some other guy had told me they

24   were going to pay me $400.

25   Q.    And for what period of time would you get paid $400?

1    A.    For a whole week.

2    Q.    And did Chino pay you the amount -- that amount of money

3    when you worked for him?

4    A.    I never received money from him.  He gave me some money

5    one day, and then he took it back, and he never give me any

6    more money.

7    Q.    Now, when you were working with him, did he provide you a

8    place to live?

9    A.    I had to be at -- sleeping there -- living there with the

10   girls as well.

11   Q.    And did you have a room of your own in that apartment?

12   A.    No.  I slept on the sofa.

13   Q.    And how did you pay for things like food and, you know,

14   other things you would need for your living expenses?

15   A.    Well, about the food, I had to eat from what the girls

16   had.  The girls had to buy the food, and I had to eat from

17   what they bought.

18   Q.    Now, did you meet any of the other people -- besides

19   Enrique, did you meet any of the other people that worked for

20   Chino in the brothel?

21   A.    Yes.  There was another person -- another guy that -- he

22   treated him badly, too.

23   Q.    And do you remember the name of that other person?

24   A.    I don't remember his name, but he was called Colmillo.

25   Q.    I'm showing you Government Exhibit 16a/1.  Is this the

1   person you're referring to who was called Colmillo?

2   A.   Yes.  He was Colmillo.

3   Q.   Did this man work in the brothel at ███████ where

4   you were arrested?

5   A.   Exactly.

6   Q.   Do you know if he worked at any other brothels at that

7   time?

8   A.   No, because he had other problems with him, with Chino,

9   because he drank a lot, and he would put him out in the

10  street.

11  Q.   I'm sorry.  Who would -- who would put whom out in the

12  street?

13  A.   Chino did.

14  Q.   Chino put Colmillo out in the street?

15  A.   Yes.

16  Q.   Now, when you were working for Chino, were you always in

17  the same brothel?

18  A.   Yes.

19  Q.   Did he ever tell you that he operated a brothel in any

20  other location?

21  A.   Yes.  Behind the subway.

22  Q.   Was this also in Annapolis, Maryland?

23  A.   Yes, I think so.

24  Q.   You're saying -- is this the Safeway grocery store?

25  A.   No.  It's a supermarket, Safeway.  It's a big one.

 1    Q.   Mr. Martinez, do you recall:  Did you ever go to that

 2    other brothel yourself?

 3    A.   I went there once.

 4    Q.   I'm going to show you Government Exhibit 28g.  Do you

 5    recognize this as the entranceway of the other brothel?

 6    A.   Yes.

 7    Q.   This is the one behind the Safeway?

 8    A.   Exactly.

 9    Q.   Did you just go there to visit, or did you actually work

10    at that brothel?

11    A.   No.  I went there because Colmillo once asked me to go

12    there, but there were no women.

13    Q.   Now, what kind of work did you do when you were working

14    for Chino in the brothel?

15    A.   I had to be taking care of the women, or sometimes I had

16    to collect the money.

17    Q.   And, when you collected the money, were you required to

18    keep track of how much money you collected?

19    A.   No, because he would come and collect it in the middle of

20    the week.

21    Q.   And was there any system that was used to keep track of

22    how many men had sex with one of the women?

23    A.   They had like -- what would you call it -- playing cards,

24    like poker cards.

25    Q.   And what would they do with the cards?

1    A.   They would punch a hole for every person that would go by

2    there.

3    Q.   I'm going to show you Government Exhibit 25f.  Do you

4    recognize this as one of the cards they would use or the way

5    they would keep track of how many men saw a particular woman?

6    A.   Yes.

7    Q.   Now, Mr. Martinez, when you were working in the brothel,

8    did you see Chino come to the brothel?

9    A.   Yes.

10   Q.   And I think earlier you said he came or the money was

11   collected sometime in the middle of the week.  Who was it that

12   collected the money?

13   A.   Chino came to collect it, because he had been robbed

14   before, and he didn't want that to happen again.

15   Q.   How did you learn that he had been robbed?

16   A.   Because one day I went to a grocery stop to get some

17   cigarettes with Colmillo, and I was smoking a cigarette out

18   there with Colmillo when I saw -- we saw a car, a Mitsubishi

19   Spyder that was out there.  They said, "Hey, come here,"

20   because that's one of the guys that robbed us.

21   Q.   This is Colmillo that said that to you?

22   A.   Exactly.

23   Q.   And did Chino ever talk to you about that one of his

24   brothels or the brothel had gotten robbed?

25   A.   Yes.

1    Q.   Did he tell you who robbed him?

2    A.   He said that he more or less knew who had robbed him, but

3    he wasn't very sure who it was.  The one that had told me that

4    he more or less knew who it had been that -- because he pretty

5    much knew everything about everything, because he spent a lot

6    of time in the street.

7    Q.   Was that Colmillo, or Chino?

8    A.   Yes.  It was Colmillo, because Colmillo had also told me

9    that, since Chino treated him badly, that he wanted to take

10   revenge on him, but he didn't know how.

11   Q.   You mentioned that one day you were in a shop, or, while

12   we're on that subject, I'm going to show you Government

13   Exhibit 19c.  Do you recognize the person who is in this

14   picture that I've just put my finger on?

15   A.   It's me.

16   Q.   And, at the time -- this is back in 2010 -- you had

17   fairly distinctive sideburns; did you not?

18   A.   Yes.

19   Q.   And had you been sent to the -- is this at the Shoppers?

20   A.   Yes.

21   Q.   And have you been sent there to purchase things for the

22   brothel?

23   A.   Yes.

24   Q.   Who gave you the money to buy whatever it was you were

25   purchasing?

1    A.   The girls gave me the money.  They had to buy their own

2    materials.

3    Q.   And were you buying things like condoms and cleaning

4    supplies?

5    A.   Yes.  That was the first time I bought condoms.  It was

6    like a box of condoms and paper.

7    Q.   Now, you mentioned that Colmillo talked to you about

8    Chino.  Did you ever see El Chino -- you earlier said he threw

9    him out on the street.  Did you see any other incidences of

10   how Chino treated Colmillo?

11   A.   He treated him badly.  Well, he treated him badly, but,

12   you know, sometimes he would get angry.  Sometimes he would

13   laugh, but he couldn't do anything, because Chino -- I don't

14   know -- I think he had him threatened, but I don't know.  He

15   couldn't do anything.

16   Q.   Did you ever hear Chino threaten Colmillo?

17   A.   No, but I did see -- I heard once he -- he scolded him,

18   and he said -- he said bad things to him.  I remember that.

19   Q.   What kind of bad things did he say?

20   A.   Like -- like -- like, "You -- you asshole, you don't do

21   anything.  You only drink all day.  That's all you do all day.

22   Go out in the street."

23        And he would say, "Okay, I'm going to leave."

24        And then he would say -- and then he would say, "I'm

25   not going to pay you your money.  Let's see what you do.

 1    Let's see how -- let's see how you can manage.  I don't want

 2    you here anymore."

 3    Q.   To be clear about something, Mr. Martinez, if you look to

 4    your right at the man at the Defense table in the light blue

 5    shirt --

 6    A.   Uh-huh.

 7    Q.   -- do you know him?

 8    A.   No.  I'm looking at him.  No, I've never seen him.  I

 9    don't know him.

10    Q.   Okay.  Now, did Chino ever say anything to you about

11    other men who were operating brothels or running prostitutes

12    in Annapolis, Maryland?

13    A.   He had trouble with some people.

14    Q.   Did he tell you who they were?

15    A.   Not specifically, or not exactly, but that's sort of the

16    thing you see all the time.  When you have a brothel, you have

17    to be taking care of yourself, because you never know who is

18    going to come at you.  So he had problems with everybody that

19    had brothels anywhere in the area?

20    Q.   And, besides the fact that they were competing for

21    business, did he have any other kind of problems?

22    A.   Not that I remember.  Just -- just about the girls.  He

23    wanted to earn all of the money.  They fought over their

24    territory.

25    Q.   And did he ever talk to you about doing anything

 1    the other men who were in the sex-trafficking business?

 2    A.    Just once when he asked me to do him a favor and to go

 3    execute somebody who -- they called him Hector.  He was -- he

 4    was the other delivery of -- the enemy of him.

 5    Q.    Did you ever meet this guy, Hector?

 6    A.    No, I never saw him.  I just saw him on the day of the

 7    incident.

 8    Q.    And did you know of him other than when Chino talked

 9    about it?

10    A.    I didn't know that guy.

11    Q.    And I understand.  What I'm asking about:  Did you know

12    about him or hear about him other than through Chino?

13    A.    I don't understand your question.

14    Q.    Let me ask this:  Did Chino talk to you about any other

15    men who did a delivery service like Hector?

16          MR. RUTER:  Objection, Your Honor.  I think he's

17    already asked that very question.

18          MR. CUNNINGHAM:  Wait.

19          THE WITNESS:  I remember, but I don't remember very

20    well.  He had a taxi driver --

21          MR. RUTER:  Withdraw -- withdraw my objection.

22          THE COURT:  Okay.

23          MR. RUTER:  I withdraw my objection.  Thank you,

24    sir.

25          THE WITNESS:  He had a taxi driver, and sometimes he

1    would use him to bring the women, and sometimes he didn't use

2    him to bring the women.

3    **BY MR. CUNNINGHAM:**

4    Q.   And did Chino complain about the taxi driver?

5    A.   Sometimes.

6    Q.   Now, did Chino ever talk to you about having done

7    anything to people before you came to work for him, other

8    people who were in the sex-trafficking business with whom he

9    had trouble?

10                **MR. RUTER:**  Objection.

11                **THE COURT:**  Basis?

12                **MR. RUTER:**  Relevance, Your Honor, as to what

13   happened before.

14                **THE COURT:**  Overruled.

15                **THE WITNESS:**  He had had problems with other people

16   like me, like the ones that took care of the girls, because

17   supposedly he had been robbed, and they had taken the money

18   away.

19   **BY MR. CUNNINGHAM:**

20   Q.   Did the subject of trying to kill Hector come up out of

21   the blue, or how did that come up?

22   A.   Well, he had problems with a so-called Puerto Rican, and

23   he -- he had really gotten right up to here with him, and he

24   wanted to get rid of him, but he just didn't know how.

25   Q.   And was Hector the Puerto Rican?

1    A.    No.  He was the delivery man for the Puerto Rican.

2    Q.    And so continue with how the subject came up of doing

3    something to Hector.

4    A.    He had sent two guys named Frank and Memo to give me a

5    weapon so I -- so I would take care of it.  I was going to

6    take care of it.  I was going to do the whole job, and I think

7    he was playing that day, because he sent me with those two

8    guys with a shotgun, and the shotgun didn't have any bullets.

9    So, when it came to the time for me to execute the guy, I

10    didn't have any bullets.  I actually pulled the trigger to

11    bust his head up, but I didn't have bullets.

12    Q.    I'm going to show you Government Exhibit 19a/10.  Let me

13    turn it over this way.  Is that the shotgun that you got?

14    A.    Exactly.  I actually pulled the trigger three times, and

15    nothing happened.  Nothing came out.

16    Q.    Did Chino tell you that he was going to get a shotgun?

17    A.    He was going to get a weapon, but he wasn't very sure

18    where he was going to get it until later when he did get one,

19    and he got it through this Memo and Franklin.

20    Q.    Did you tell him that you wanted something other than a

21    shotgun?

22    A.    I had asked him for -- I had asked him for a smaller

23    weapon, but the only thing he was able to get was a shotgun.

24    Q.    Now, Mr. Martinez, speaking of weapons, had you ever

25    talked with Chino about having a weapon?

1    A.   Not specifically, but he said that I had to do that job.

2    Q.   Well, what I'm asking you is:  Had you, prior to that

3    time, seen Chino with a weapon?

4    A.   I don't remember.  I know that he had one in the car.  He

5    had several cars.  I don't know if he had still several cars.

6    I know that he had a revolver.  I just don't know, but he had

7    one in his car.

8    Q.   Okay.  Was this a gun that he showed you?

9    A.   No.

10   Q.   Did he tell you that he had a revolver?

11   A.   He had weapons.  He had told me before that he had

12   weapons.

13   Q.   Did he tell you what kind of weapons that he had?

14   A.   Just small calibre.

15   Q.   And did he tell you why he had the weapons?

16   A.   Well, it's just as a precaution, because, in that

17   business, you have to always be ready, and you have to have a

18   way to respond as a precaution.

19   Q.   And, going back now to Hector, you mentioned that Memo

20   and the other guy showed up.  Did they bring a weapon with

21   them?

22   A.   They brought the weapon.  They had it in -- I don't know

23   what you call it.  They had it in a case.

24   Q.   And you actually did have an encounter with Hector on

25   November 3rd, right?

1    A.    Yes.

2    Q.    And how was it that you were able to meet up with Hector?

3    A.    He gave me his telephone number, and I got in touch with

4    him.

5    Q.    I'm sorry.  Who was it that gave you Hector's telephone

6    number?

7    A.    Chino.

8    Q.    Chino gave you his number, and did he tell you what you

9    were supposed to do?

10   A.    He just told me, "I'm going to give you the telephone

11   number for this person, because he already knows me.  He knows

12   my voice.  He doesn't know you.  He's never seen you."

13   Q.    And what were you supposed to do with the telephone

14   number?

15   A.    Just to get in touch with him to meet up with me

16   somewhere in a dark place so I could do what I had to do.

17   Q.    And did you end up calling Hector?

18   A.    Yes.

19   Q.    And how was it that you tried to meet up with him?  Did

20   you ask him to deliver a woman to a place?

21   A.    Yes.  I talked to him, and I said, "I want you to bring a

22   woman to me to someplace."  We were looking for a telephone

23   number for him so we could find him, because I noticed, when I

24   talked to the guy on the phone, that he was nervous.  It's

25   like he perceived something was going on.

1    Q.    Were you with Frank and Memo at the time that you called

2    Hector?

3    A.    Yes.

4    Q.    And you had the gun already, right?

5    A.    Yes.

6    Q.    And was the place that you wanted to meet him close to

7    the brothel where you worked?

8    A.    No.  It couldn't be anywhere close.  It had to be far

9    away, because, if it was close, the guy knew where his brothel

10   was.

11   Q.    And how did you get to the place where you were supposed

12   to meet up with Hector?

13   A.    It was in some house, and we walked for about ten

14   minutes.  We got to a cemetery.  Behind it, there was some

15   very big houses there, and it was quite dark, and that's where

16   we were going to do it.

17   Q.    And did Hector come to that location?

18   A.    Yes, he came.  He came once, and he parked a way down,

19   because, actually, I felt that he -- he kind of knew what was

20   going on.  He was thinking that something was going to happen

21   to him that night.  So he parked down in the car, and he

22   turned off the lights, and he called me back on the phone and

23   said, "Where are you?"

24         I told him, "I'm here.  I'm further up.  Come on up

25   here."

1          But he didn't want to come up.  He said, "Come down

2     here.  No.  I've got the girl.  You come down here."

3          I said, "No, no.  Come on up here."

4          Well, actually, Frank and Memo were hiding behind

5     some trees where it was dark there.  The guy didn't want to

6     come up, but he did come up afterward.  When he came up, I

7     just remembered that he came up, Memo came up the other side

8     of the car.  There were three people inside the car.  The girl

9     was on this side, the guy was on this side, driving the car,

10    and I think the Puerto Rican was in the back seat.  It's a

11    little guy.  I think he was back there.  He was a bit on the

12    old side.

13    Q.   Was the driver Hector, or was Hector in the back seat?

14    A.   No.  Hector was driving the car.

15    Q.   Okay.  And, at the time he came up, did you approach him

16    and try to do what Chino asked you to do?

17    A.   Yes.  When I saw a guy, I got the shotgun, put it to his

18    head, and I just said, "Look, get out of the car."  The girl

19    started screaming.  I told her to shut up, or I was going to

20    get her, too.  Then Memo --

21          **THE WITNESS:**  (In English) hold on.  Sorry.

22          **INTERPRETER GOLDSTEIN:**  That's okay.

23          **THE WITNESS:**  Memo took the weapon away from me.  I

24    had first loaded it.  I loaded it three different times, and I

25    actually shot, and nothing came out.

1    **BY MR. CUNNINGHAM:**

2    Q.   So did you know that the gun was not loaded?

3    A.   No.  He had said, "Well, the guys had told me that it had

4    five shots inside."

5    Q.   And, after the gun did not discharge, what happened?

6    A.   That's when Memo took it from me.  That's when I heard

7    the guy start the car, Hector, and I saw when Memo hit him

8    with the shotgun.  I saw -- I know I saw him hit him with the

9    shotgun, and then he swore at him, and I don't know how it

10   happened, but, at that moment, he started the car, and he

11   pressed the gas pedal, and he almost hit a house.

12   Q.   And do you remember that Hector drove away, and then

13   later came back and actually found you guys?

14   A.   So, when he left, I -- I run, because I said, "Oh, man,

15   this thing is not loaded.  Why do they send me to do something

16   with something that's not -- that has no bullets?"  So I ran,

17   and I left them behind me.

18   Q.   Do you remember --

19   A.   And the moment --

20   Q.   I'm sorry.

21   A.   And, the moment we hit the road, five or six cars from

22   the competition came, and one stopped in the middle of the

23   road, and they showed us a big knife this size, and they put

24   it on Franklin's neck, and Memo took it from him.  But then we

25   run again, and I went into a dealer -- a Ford dealer that's

1    right there, and then they left, but, since we run, we tried

2    to hide.  So we tried to hide so that -- they tried -- so we

3    run because they tried to harm us, and each of us went a

4    different way.

5    Q.   And did you get away that night?

6    A.   For that night, I had run away.

7    Q.   And you tossed the gun as you were running away, right?

8    A.   When we were running, the three of us were running

9    together, and I said, "I'm not going to carry this, because,

10   if I keep this, the police finds me with this, I'm going to go

11   to jail."  So we were running, and there were some houses

12   there, and we saw a recycling bin there, so I put the shotgun

13   inside the recycling bin.

14   Q.   And did you talk to Chino after that about this attack on

15   Hector?

16   A.   Yes.  I -- yes.  I called him.  I talked to him on the

17   phone, and I even asked him to come and pick me up, but he

18   didn't want to pick me up.  First, he said he would, but then

19   he said he would not, and I think he was afraid to come pick

20   me up there because it was hot there.

21   Q.   Okay.  Let me just ask you questions, okay, Mr. Martinez?

22   After talking to him, did you go back to the brothel

23   eventually that night?

24   A.   Yes.

25   Q.   And it was about another -- you worked for about another

```
 1    two weeks or so before you were arrested, right?

 2    A.   Exactly.

 3    Q.   And, during that time, did you see Chino and how he

 4    treated the women who were working there?

 5              MR. RUTER:   Objection, Your Honor.

 6              THE WITNESS:   Not very well.

 7              THE COURT:   Basis?

 8              MR. RUTER:   That had been asked and answered

 9    earlier.

10              THE COURT:   Sustained.

11              MR. RUTER:   Move to strike the answer, please.

12              THE COURT:   The jury will disregard the question and

13    answer --

14              MR. RUTER:   Thank you.

15              THE COURT:   -- basically because you've heard it

16    before.

17    BY MR. CUNNINGHAM:

18    Q.   Mr. Martinez, after you were arrested, have you had any

19    contact with Chino since that time?

20    A.   No.  Not until now that I see him again after so much

21    time in jail.

22              MR. CUNNINGHAM:   I have nothing further of this

23    witness, Your Honor.

24              THE COURT:   Cross?

25              MR. RUTER:   Thank you, Your Honor.
```

 1                      <u>CROSS-EXAMINATION</u>

 2     <b>BY MR. RUTER:</b>

 3     Q.   Good afternoon, Mr. Hernandez.

 4     A.   Good afternoon.

 5     Q.   You said that you had some trouble or you hung with a

 6     gang of some type when you were in California; is that

 7     correct?

 8     A.   Yes.

 9     Q.   And what was the name of that gang?

10     A.   Brown Pride Locos.

11     Q.   And was that unique to the city of Los Angeles?

12     A.   Yes.  That gang comes from San Diego.

13     Q.   Was it -- part of what the gang did, you included, was to

14     sell drugs from time to time?

15     A.   Well, yes.  Well, yes.  More or less selling drugs.

16     That's how we survive.

17     Q.   Was it part of the gang's purpose to commit robberies

18     from time to time?

19     A.   Well, in my gang, I don't remember.  I never committed

20     any robberies.  It was just selling drugs.  That was the way

21     we would make most of the money.

22     Q.   You were not required as part of your initiation to

23     commit any particular crime?

24     A.   No.  In my gang, when you -- when you start, are

25     initiated, you get even -- you have to put up with 13 seconds

1    of blows.

2    Q.   What do they call that?  What's the name for that?

3    A.   On Mexicano locos -- well -- or mucho cafe locos (phon).

4    Q.   That's where all the members get together and they beat

5    you for 13 seconds?

6    A.   No, not all the members.  It's only three persons from a

7    click that's going to jump me.

8    Q.   Okay.  And that happened to you?

9    A.   Yes.  That's what happens all the time.  When you're

10   going to jump into a gang, they jump you all -- so that you're

11   part of the gang.

12   Q.   You worked at a 7-Eleven in Las Vegas for a couple of

13   months after you left California; is that right, sir?

14   A.   Yes.

15   Q.   Now, did you lose that job, or did you leave the job

16   voluntarily?

17   A.   No.  I left voluntarily because I was given a better job

18   option in Tennessee.

19   Q.   And that was as a cook?

20   A.   Exactly.

21   Q.   And you took that job?

22   A.   Yes.

23   Q.   And you had that job around six months?

24   A.   Yes.

25   Q.   Did you lose that job, or did you leave it voluntarily?

1    A.   No.  The problem I had there was that I was referred to

2    that restaurant by a friend of my brother.  The friend was the

3    owner of the restaurant, and then what happened is there were

4    some --

5              **INTERPRETER KIRCHGESSNER:**  Interpreter requests --

6              **THE WITNESS:**  There were some problems there, and so

7    they -- they got rid of a lot of people there, and I was one

8    of them.

9    **BY MR. RUTER:**

10   Q.   The loss of your job, though, Mr. Hernandez, had nothing

11   to do with you.  It had to do with the ownership; is that

12   correct?

13   A.   Exactly.  With the owner, because -- yes, because I was

14   just a cook.

15   Q.   And then, from there, you did come to Maryland?

16   A.   No.  From there, I went to Indiana.

17   Q.   Indiana.  Sorry.

18          And then, from there, Indiana, you came to Maryland?

19   A.   Exactly.

20   Q.   You had no relatives here at all?

21   A.   Nobody.  As I told you, I just came here, and I didn't

22   know anybody, and that day, it was snowing heavily.  I didn't

23   know that it snowed heavily in this state, and I don't know

24   how it happened, but God helped me that day, and I found a

25   blanket, and I got under the blanket under a house, and I even

1    had a cat sleeping with me.

2              (Laughter.)

3    Q.   Mr. Hernandez, how long before November 3rd of 2010 were

4    you sleeping with that cat under somebody's house?

5    A.   That was like two or three months.  It was a long time,

6    because I did not find a job in Maryland.  I did not have

7    papers, so how can you find a job?  The only option of finding

8    a job was to stand on a corner and wait for a person to come

9    and pick you up and say, if you wanted to earn, say, $10 for a

10   little bit -- a little while --

11   Q.   Mr. --

12   A.   That's how I survived.

13   Q.   Thank you, Mr. Martinez.

14             Again, trying to get back to when you first came to

15   Maryland.  When you were under that house with that cat, you

16   had just come to Maryland; is that correct?

17   A.   Yes.

18   Q.   Okay.  And so the answer to my last question was, then,

19   about two or three months elapsed from the time that you first

20   arrived in Maryland until the robbery that occurred on

21   November 3rd of 2010?

22   A.   No.  It had been longer.  No, because, when I met

23   Enrique, I met him -- let me try to remember.  I met Enrique

24   close to the end of the year.  And I told you a while ago when

25   you asked me another question, when I lived there with that

Case 1:10-cr-00770-WDQ   Document 302   Filed 03/19/14   Page 181 of 249
Cross-Examination of Ferman Hernandez Martinez (Ruter)

T-IV-815

1    cat under that house, then I went to live in the -- to sleep

2    in apartments.  I went inside apartments to sleep.

3    Q.   At that time, you had not yet met Chino; is that correct?

4    A.   No.  I didn't know anybody.  I met Quique long time

5    later, and -- I met Quique long time later.  I met Quique

6    through the drugs, because the friends that you make when you

7    live in the streets is all about drugs and beer.

8            **MR. RUTER:**  Is he saying Enrique?  Is that the name

9    he's using?  Enrique?

10            **THE WITNESS:**  Quique.  Quique.  They call him

11   Quique.  Enrique.

12            **MR. RUTER:**  Okay.  Thank you.

13   **BY MR. RUTER:**

14   Q.   Last question on times, I think, Mr. Martinez:  How much

15   time before the incident that occurred on November 3rd, 2010,

16   the robbery -- how long before that was it when you met Chino

17   here?

18   A.   I met him not long ago.  I don't remember the month, but

19   I met him a few months before I started working with him, but

20   it was the same year.

21   Q.   So are you testifying that, before you started working

22   with Chino, before you actually started working with him, that

23   you had met him before that?

24   A.   As I told you, I did not know him, but Quique gave me his

25   telephone number, and that's when I met him.  And, when I met

1    him, I met him behind a pharmacy.  Walgreen's, I think it's

2    called, or CVS.  I don't remember.

3    Q.   And was that in Annapolis, or was that in Washington,

4    D.C.?

5    A.   In PG County.

6    Q.   You don't know where in PG County?

7    A.   Yes.  The street name is Kenilworth Avenue, and the other

8    one -- yes.  Kenilworth -- Kenilworth and 56th Street.

9    Q.   All right.  So you met him, and, after you met him, how

10   much time elapsed before you started working with him?

11   A.   About four or five days.

12   Q.   Okay.  And then we understand that you worked for him in

13   Annapolis, correct?

14   A.   Exactly.

15   Q.   We understand that you're able to understand how the

16   business operated because of your observations; is that

17   correct?

18   A.   Exactly.

19   Q.   And the number of weeks -- if you can, sir, can you give

20   the jury your best estimate as to the number of weeks that you

21   worked for Chino?

22   A.   I don't remember, but it was several weeks.

23   Q.   So, when you use the word "several," you believed it was

24   more than two weeks?

25   A.   More than two weeks.

1    Q.    You believe it was more than three weeks?

2    A.    Yes.

3    Q.    And you believe it was more than four weeks?

4    A.    Like I said, I -- I just remember it was more than three

5    weeks.  I can't tell you if it was more than four, five, or

6    six, because I'd be lying.

7    Q.    Okay.  Nonetheless, when you went to work for him, it was

8    your understanding that you were going to earn approximately

9    $400 per week; is that not correct?

10   A.    Correct.

11   Q.    So, if you -- and we understand that you never got paid?

12   A.    Paid me once, but he took it away from me again.

13   Q.    Yes.  How much did he pay you the once?

14            **INTERPRETER GOLDSTEIN:**  Your Honor, may I ask the

15   witness to please wait until we finish with the

16   interpretation?

17            **THE COURT:**  Yes, please.

18            **INTERPRETER GOLDSTEIN:**  We're starting to talk on

19   top of each other.

20            **THE WITNESS:**  Okay.  Okay.

21            **INTERPRETER GOLDSTEIN:**  Okay.  Thank you, Your

22   Honor.

23            **THE COURT:**  Thank you.

24   **BY MR. RUTER:**

25   Q.    Mr. Hernandez, just try to answer -- just try to answer

1    the very question that I'm asking.

2            So the question is:  How much money did he give you?

3    A.   $400.

4    Q.   Which would be pay for one week?

5    A.   Correct.

6    Q.   Did he give it to you in cash?

7    A.   Correct.

8    Q.   Did it make you happy when you got the $400?

9    A.   Of course I was.

10   Q.   And was this after the first week that you worked for him

11   that you got the $400?

12   A.   Yes.

13   Q.   And then how long was this $400 in your hands before he

14   removed it from your hands?

15   A.   I think for maybe about two, three hours.

16   Q.   Okay.  And then you were not happy anymore?

17   A.   Well, no.

18   Q.   So what happened in the space of two or three hours that

19   he took your $400 away from you?

20   A.   We went to a casino that night.

21   Q.   Okay.  And what happened at the casino?

22   A.   He was playing and playing.  He made a lot of money.  He

23   had a lot of money in his hand.  But then he spent it, and he

24   spent it, and he ended up without having any money.  So, since

25   he knew that I had money, he said, "Well, mochilas, and

1    I'll -- give it to me, and I'll give it back to you tomorrow.

2         **INTERPRETER GOLDSTEIN:**  Interpreter would like to

3    say that mochilas actually stands for like a bag or something,

4    but it could have many other meanings.

5         **THE WITNESS:**  Okay.

6         **INTERPRETER GOLDSTEIN:**  I'm not sure what it is.

7         **THE WITNESS:**  It's like saying, "Lend it to me.

8    I'll give it back to you tomorrow."  And he never gave it to

9    me.

10        (Laughter.)

11   **BY MR. RUTER:**

12   Q.   All right.  And, in the space of the next several weeks,

13   did you ask this man to repay you for the money that he had

14   lost?

15   A.   I asked him when he was going to pay me.  He said he

16   wasn't going to pay me, because he wanted to know, what, was I

17   scheming?  Was I trying to take off with his money?  Or what

18   was I going to do, work for somebody else?  I said, "No.  I

19   was going to work with him," okay.  But he said, "No, I'm

20   not -- I'm not going to pay you your money, but I'll pay it to

21   you some other week," and that week never arrived.

22   Q.   So then the second week came and went, and you didn't get

23   paid any money the second week?

24   A.   No.  No, I never got any money from him.  Just the day

25   that he gave me some money and took it away that very same

1   day.

2   Q.   You could have left, couldn't you?  After the second week

3   that you didn't get paid or repaid, you just could have left,

4   couldn't you?

5   A.   I was going to leave, because I had a job at a factory

6   place.  I even told them about it.

7   Q.   And what factory place was that?

8   A.   It was in Columbia.

9   Q.   In Columbia, Maryland?

10  A.   Yes.

11  Q.   How much money were you going to get?  Do you know?

12  A.   There?  I was going to get paid $16 an hour.

13  Q.   An hour.  And then the third week came, and you didn't go

14  to Columbia?

15  A.   I didn't go to Columbia.

16  Q.   You stayed with this man and didn't get paid?

17  A.   He told me --

18  Q.   Question, sir:  You stayed with this man and didn't get

19  paid?

20  A.   No.

21  Q.   And then came the fourth week, and you worked for this

22  man, and you didn't go to Columbia, and you didn't get paid?

23  A.   And I was arrested.

24  Q.   Yeah.  And you were arrested on November 3rd with this

25  robbery you talked about?

1              **MR. CUNNINGHAM:**  Objection, Your Honor.

2              **MR. RUTER:**  Mr. --

3              **THE COURT:**  Basis?

4              **MR. CUNNINGHAM:**  Mischaracterization.  He wasn't

5     arrested on November 3rd.

6              **MR. RUTER:**  I'm sorry.  He was arrested on

7     November 15th.

8              **THE WITNESS:**  Exactly.

9     **BY MR. RUTER:**

10    Q.   All right.  On November 3rd, you committed this assault,

11    correct?

12    A.   Like I told you, I don't remember what day it was --

13    Q.   Okay.  I understand.

14    A.   -- because I wasn't checking days.

15    Q.   Yes, sir.

16    A.   I just had to do what I had to do, and that was it.

17    Q.   Okay.  And you did this at the behest of Chino here?

18    A.   Yes.  He wanted me to do -- do a favor for him.

19    Q.   Yes.  And what were you going to get, if anything, for

20    that favor?

21    A.   Nothing.

22    Q.   So you were going to do a favor for a man who took away

23    your first $400, didn't give you your next $400, didn't give

24    you your next $400, didn't give you your next $400, treated

25    you poorly, and made you lose a job in Columbia; is that your

 1   testimony?

 2   A.   Yes.

 3   Q.   Sir, didn't you even ask for some money in exchange for

 4   going to kill a man?

 5   A.   He -- no, because he had told me that not to worry about

 6   it, that I was going to get some money afterwards.  He told me

 7   he was going to give me a car, and he was going to put me in a

 8   good place, but I didn't -- I didn't get to see a car or

 9   anything.

10   Q.   Right.

11   A.   And Colmillo used to tell me that all he ever did was

12   tell lies to people to try to keep them close to him, that

13   people worked for him for nothing.

14   Q.   So, Mr. Hernandez, you were told by Colmillo before you

15   ever began working or when you first started working for this

16   man, you were told by him that he would lie to people all the

17   time; isn't that right?

18   A.   He lied to people, exactly.

19   Q.   And, notwithstanding the warning from Colmillo, and

20   notwithstanding the fact that you never got paid, you chose to

21   believe that he was going to give you a car, lots of money,

22   and a place to live after you killed a man; is that your

23   testimony?

24   A.   No.  The problem is Colmillo had told me he had given a

25   car to Colmillo.  I saw that he had given a car to Colmillo,

1   and also he had given him money.  But, when Colmillo started

2   sucking on beer, he took everything away from him.

3   Q.   Yes.

4   A.   So that's kind of what I was trusting.

5   Q.   You told us that Chino treated Colmillo poorly; is that

6   right?

7   A.   Yes.

8   Q.   And do we understand that it appears as if part of the

9   reason that he was treated poorly was because Colmillo was a

10  drunk?

11  A.   Exactly.

12  Q.   And did that seem to be the case to you?  Did Colmillo

13  seem to be a drunk?

14  A.   Colmillo drank, but he drank when he had a day off.

15  That's when he drank.  But he didn't drink during a workday.

16  Q.   Okay.  But you told the jury earlier that what Chino did

17  was he told Colmillo, if he didn't stop drinking, he would --

18  he would kick him out of the house.  Isn't that what Chino

19  said to him?

20  A.   Exactly.

21  Q.   So, Mr. Hernandez, how long before the attempt to assault

22  Hector was it that you saw the shotgun?

23  A.   It was that very same night.

24  Q.   Same day?

25  A.   Same day, yes.

```
1    Q.   Where were you when you received that shotgun?

2    A.   Outside the door.

3    Q.   What door?

4    A.   Where the brothel is.

5    Q.   Which brothel?

6    A.   His -- his --

7    Q.   Did you see where the shotgun --

8              INTERPRETER GOLDSTEIN:  Hold on.  Interpreter hasn't

9    finished.

10             THE WITNESS:  His brothel.  The one he has.

11   BY MR. RUTER:

12   Q.   Yes.  Which address?  On ███████████?

13   A.   Exactly.

14             INTERPRETER GOLDSTEIN:  One --

15             THE WITNESS:  Sorry.  Yes.  The one that was on

16   ██████████████.

17   BY MR. RUTER:

18   Q.   Where did the gun come from?

19   A.   I don't know.

20   Q.   Well, you've told these folks here that he, Chino, gave

21   you the gun, right?

22   A.   He -- I think he gave the weapon to them, because they

23   gave it to me.  And he said -- well, the reference was that he

24   had -- well, I don't know how to say this.  It's like he

25   didn't want to get his hands dirty.  He didn't want to get his
```

1    hands dirty.  They had a weapon, so they were supposed to give

2    it to me, like he sent them to do it.

3    Q.   All right.  So -- but let me get this straight, sir.  I

4    thought that I heard you say earlier that Chino gave you the

5    gun; yes or no?

6    A.   (In English) Yes.

7              **THE WITNESS:**  Oh, sorry.

8              Yes.  No.  He had given it to them.

9         **MR. RUTER:**  Ah.

10             **THE WITNESS:**  He never gave me a weapon.  I never

11   saw him that night.

12   **BY MR. RUTER:**

13   Q.   All right.  You never saw him that night?

14   A.   Just on the phone.

15   Q.   Right.  So your testimony presently is that either Frank

16   or Niño gave you the gun?

17   A.   It's like I told you at the beginning.  He said to those

18   guys to give me the weapon so I would do him that favor.  It's

19   what I told you before.  It's like you're trying to confuse

20   me.

21   Q.   I'm not trying to confuse you.  Your testimony is that

22   Chino here did not give you the gun; is that right?

23   A.   No.  I never saw him that night, as I told you again.

24   Q.   Okay.  Your testimony is that either Frank or Niño gave

25   you the gun?

 1    A.    Yes.  Sent by him.

 2    Q.    Pardon?

 3    A.    Sent by him.

 4    Q.    Sent by him.

 5          Where were you located when Frank or Niño gave you

 6    the gun?

 7    A.    In front of the house of ███████████.

 8    Q.    Okay.  And, when the gun was given you, do you remember

 9    right now whether it was Frank or whether it was Niño who gave

10    it to you?

11    A.    No.  It's been a long time, and that was at night.

12    Q.    When they gave the weapon to you, was it inside of any

13    kind of a case, a blanket, anything at all, where you actually

14    couldn't see the weapon, but it simply looked to be the shape

15    of a weapon or felt like a weapon?

16    A.    Yes.  It was a case this big, black.

17    Q.    Was it a soft case, sir, or was it a hard case?

18    A.    And I didn't touch it.

19    Q.    Okay.  Well, you did touch it, because you took it with

20    you?

21    A.    No.  I touched the weapon when I was going to shoot the

22    guy.

23    Q.    Did you have to take the weapon out of the case so you

24    could shoot the weapon?

25    A.    No.  I didn't take it out.  Memo did.

1    Q.   Okay.  And, when Memo took it out, where were you

2    located?

3    A.   I was in the exact position where I was when the girl

4    came with the car and with the other girl.

5    Q.   And I'm not too sure I understand.  Let me try it again.

6         Did you first handle the gun near ███████████, or

7    did you first handle the gun somewhere else other than near

8    ███████████?

9    A.   When I loaded the weapon, it was when I was going to

10   shoot the guy.

11   Q.   This may be a communication problem.

12        You didn't load the gun?

13        **INTERPRETER KIRCHGESSNER:**  Interpreter correction.

14   Interpreter correction.  Counsel, you're right.  Interpreter

15   misinterpreted.  "When I carried the weapon --" Interpreter

16   stands corrected.  "When I carried the weapon was when I was

17   going to shoot the guy."

18        **MR. RUTER:**  Okay.

19   **BY MR. RUTER:**

20   Q.   And the first time that you held the weapon, sir, was

21   that when you were in a vehicle that -- were you inside of a

22   car when you actually handled the weapon for the first time?

23   A.   Inside of what vehicle are you talking about?

24   Q.   Well --

25   A.   Because I never talked about being inside any vehicle.

1    You want to confuse me.

2    Q.   Well, my apologies if you had not gone into a vehicle.

3    How far away from ████████████, which is where you've told us

4    you first saw the weapon -- how far away was that from the

5    place where you actually assaulted Hector?

6    A.   As I told you before, when I first saw -- I saw the case

7    where the weapon was, but, when I first saw the weapon and

8    used the weapon and carried the weapon was when I was behind

9    the cemetery where the houses were when I was going to shoot

10   the guy.

11   Q.   And the question is this:  How far away from

12   ████████████, where you first saw the weapon, is that from

13   the cemetery, when you first handled the weapon?

14   A.   It was like -- about ten minutes away.

15   Q.   Was it ten minutes walking, or ten minutes by car?

16   A.   Walking.  Where were we going to get a car from?  We did

17   not have a car.

18   Q.   So you walked.  You walked with the gun --

19   A.   No.

20   Q.   -- for ten minutes to the cemetery?

21   A.   No.  I did not walk with the gun.  I had the weapon when

22   I was there, when I was going to shoot the guy.  That's when I

23   had the weapon.

24   Q.   Well, who had the weapon for the ten-minute walk from

25   ████████████ to the cemetery?

1    A.    Memo.

2    Q.    And you all walked together, didn't you?

3    A.    The three together.

4    Q.    All three of you?

5    A.    The three together.

6    Q.    Right.  With Niño holding the gun in his hand?

7    A.    Not in his hand.  He had it inside here.

8    Q.    All right.  The first time that you handled the gun was

9    when Hector pulled up; is that correct?

10   A.    Exactly.  When he came to park there is when I was going

11   to shoot at him.

12   Q.    Now, you demonstrated for the jury how you racked that

13   gun.  You went like this (indicating), didn't you?

14   A.    Yes.

15   Q.    Right.

16   A.    Yes.  When I had it in my hand, I racked it three times.

17   Q.    Well, you racked it once.  Then you pulled the trigger.

18   Then you racked it again, and you pulled the trigger.  Then

19   you racked it again, and you pulled the trigger.  Isn't that

20   more accurate?

21   A.    Of course.  It was a shotgun.  It was not an automatic

22   pistol.

23   Q.    Am I to assume that November 3rd of 2010 was not the

24   first time that you've pulled a trigger of a gun?

25   A.    Well, what are you referring to?  I don't understand that

 1  question.

 2  Q.   Prior to November 3rd, 2010, have you ever pulled the

 3  trigger of any gun?

 4  A.   Never.

 5  Q.   Wow.  You told Chino here -- earlier, you told these

 6  folks that you told him you wanted a short gun.  You didn't

 7  want a long gun.  Remember that?

 8  A.   I did not say any --

 9  Q.   You didn't say that?

10  A.   Well, yes, you're right.  I remember now.  Yes.  I -- I

11  did ask for a short gun, but he did not have a short weapon,

12  so he sent these guys with a shotgun.  It was a shotgun.

13  Q.   Now, you testified earlier, if I recall, that you've seen

14  this man with a revolver in his car on more than one occasion;

15  is that right?

16  A.   I saw him, yes, you're right.  You're right.

17  Q.   And I heard you testify earlier that Chino told you he

18  was trying to find a weapon for you; is that correct?

19  A.   Yes, but he didn't find it.

20  Q.   Didn't find it.  And your testimony is that Niño, if I'm

21  pronouncing that right -- I apologize if I'm not.  Memo?

22  Thank you.  But your testimony is that Memo gave you an empty

23  shotgun?

24  A.   No.  I didn't know.  Supposedly the shotgun had five

25  bullets -- five, but, when I -- when I racked it and I pulled

1    the trigger, it didn't have any -- nothing.

2    Q.   Who told you it had five bullets in it?

3    A.   Memo.

4    Q.   Did Memo tell you that he had checked the shotgun

5    himself?

6    A.   No.  He didn't say any of that.  He just gave me the

7    weapon, and the job was over.

8    Q.   Are you familiar with how many bullets the shotgun will

9    hold?

10   A.   One cartridge can contain several bullets.  It depends

11   what kind of cartridge.

12   Q.   Okay.  So you're saying that some shotguns may shoot more

13   bullets than other shotguns?

14   A.   No, they're all the same.

15   Q.   All right.  You had said that Chino had also treated you

16   badly.

17   A.   Yes.

18   Q.   Could you explain to us what that meant when you said he

19   treated you badly.

20   A.   That, if I worked for another person, it was going to be

21   bad for me.  Same thing that happened to the other guy that he

22   had.

23   Q.   I see.  You collected the money for the women?

24   A.   Sometimes.

25   Q.   Okay.  How much money would you be holding, Mr. Martinez,

1    at any given time at the end of the day?

2    A.   Sometimes -- sometimes you'd collect a lot, sometimes a

3    little.  Sometimes you would get, per day, like a thousand

4    dollars per day.

5    Q.   And would you be responsible to hang onto that money for

6    the day at the end of the night?

7    A.   Yes.

8    Q.   And, if no one came to collect it, then you would have to

9    keep it overnight as well?  You would have to keep that

10   personally overnight?

11   A.   Yes.

12   Q.   And, if no one came the next day to collect the money,

13   you'd have to collect all that money, and, once again, you

14   personally would have to keep it; is that correct?

15   A.   No.  Sometimes not, because sometimes Colmillo would

16   come, and Chino would tell him he had to pick up -- to collect

17   the money, so I had to give the money to Colmillo.  They both

18   played many games with each other.  Sometimes they would

19   give -- I would give the money to him, and then he would say,

20   "No, I give it back to him -- to you."

21   Q.   Who had said that?

22   A.   Colmillo.

23   Q.   All right.

24          THE COURT:  Mr. Ruter, you have two minutes until

25   Monday.

1          **MR. RUTER:**  Thank you very much, Your Honor.

2  **BY MR. RUTER:**

3  Q.   I want to make sure I understand this.  Did you tell the

4  jurors that you had seen a gun that Chino had in the past, or

5  that he had told you that he had a gun in the past?

6  A.   I had seen that he had a weapon under his car.

7  Q.   You actually saw the weapon in his car?

8  A.   Yes.

9  Q.   And it was a revolver?

10  A.   As I told you a while ago, I don't know if it was a

11  revolver or something different.  Or it was a pistol, yeah,

12  inside.

13          **THE COURT:**  Mr. Ruter, we'll pick up on Monday

14  morning.

15          **MR. RUTER:**  Thank you, sir.

16          **THE COURT:**  Members of the jury, please remember:

17  Don't discuss the case among yourselves or with anyone else.

18  Don't let anyone talk to you about the case.  Don't receive or

19  send electronic communications about the case.  Avoid all

20  outside information from the Internet or other sources.

21          Please be in your jury room on Monday at about 9:25

22  so that we can get started at 9:30.  Good night.  Have good

23  weekends to all of you.

24          **JUROR:**  You, too.

25          (Jury excused.)

1              **THE COURT:**  Mr. Montemarano, Mr. Fuertes, have good

2     weekends.  Good-by.

3              **DEFENDANT FUERTES:**  You, too.

4              **THE MARSHAL:**  Hold on a second.

5              (Witness excused pending further examination.)

6              **THE COURT:**  Translators, please don't pack up yet.

7              **INTERPRETER KIRCHGESSNER:**  Don't pack up yet?

8              **THE COURT:**  Don't pack up yet.

9              **INTERPRETER KIRCHGESSNER:**  Okay.  Thank you, Your

10    Honor.

11             **THE COURT:**  Member of the audience, thank you.

12    Good-by.

13             **UNIDENTIFIED SPEAKER:**  Thank you.  Have a nice

14    weekend.

15             **THE COURT:**  We need him for a bit.

16             You all may be seated.

17             Mr. Cunningham, you were saying?

18             **MR. CUNNINGHAM:**  Yes.  Your Honor, as I recall, that

19    the Defendant had submitted a letter, and I -- I apologize.  I

20    don't have the full docket entries with me, but I think I

21    recall correspondence directed to Your Honor from the

22    Defendant that addressed --

23             **MR. RUTER:**  171.

24             **MR. CUNNINGHAM:**  Yes.  Mr. Ruter advises me that it

25    was 171, that --

 1          THE COURT:  And of course it will be, if it has not

 2    already been, docketed --

 3          MR. CUNNINGHAM:  Thank you.

 4          THE COURT:  -- along with the translation.

 5          MR. CUNNINGHAM:  What I'm referring to, Your Honor,

 6    is I recall there had been a previous correspondence of the

 7    Defendant regarding this request for translation, and it was

 8    my --

 9          THE COURT:  There was a motion.

10          MR. CUNNINGHAM:  It was my recollection you were

11    going to rule on that.

12          THE COURT:  There was a motion earlier --

13          MR. CUNNINGHAM:  Yes, Your Honor.

14          THE COURT:  -- requesting that essentially all of

15    the documents be translated in Spanish.

16          MR. CUNNINGHAM:  And my recollection is that that

17    was denied, Your Honor.

18          THE COURT:  That's correct.

19          MR. CUNNINGHAM:  And, to the extent that that's

20    reabsorbed in this, or, by inference, it sounds like it's

21    absorbed in this, then I'm -- I, one, would like some, you

22    know, reassertion of that so that this isn't -- that's not the

23    subject of what we're going presumably to Judge Gallagher --

24          THE COURT:  No.  First, I decided to handle this

25    myself rather than Judge Gallagher, so --

1          **MR. CUNNINGHAM:**  May I be seated, Your Honor?

2          **THE COURT:**  No.  Actually, I need several things

3     from you.  First of all, Mr. Cunningham, what is your office's

4     discovery policy in terms of having defendants receive

5     documents?

6          **MR. CUNNINGHAM:**  Your Honor, in fact, our discovery

7     policy is fairly explicit that we hold the Defense attorneys

8     to not releasing documents to the defendants.  Obviously that

9     doesn't preclude them from sharing the information, sharing

10    the actual documents, but certainly not providing the copies

11    of the documents.  I think Your Honor is well aware we've had

12    some circumstances in the past that have led to some rather

13    tragic results.  Earlier, I -- does that suffice, Your Honor?

14         **THE COURT:**  I had one question.  In the case of *pro*

15    *se* representation, how would you handle the issue of the

16    Defendant's review of discovery?

17         **MR. CUNNINGHAM:**  I'm not 100% sure, Your Honor.  I

18    haven't dealt with it.  I could speculate that we would make

19    arrangements for some way for a defendant to review, in

20    whatever capacity -- particularly -- and I'm thinking if the

21    Defendant is in custody in particular.  We'd have to make some

22    arrangements for a defendant in custody to have access to the

23    documents, but then they would not be allowed to, say, go with

24    him or her back into a custodial context.

25         **THE COURT:**  So the arrangement would be similar to

1    2255s or appeals where there is an arrangement made with the

2    custodian of the facility and that the documents would be

3    reviewed in the presence of custodial staff?

4              **MR. CUNNINGHAM:**  That's correct, Your Honor.

5              **THE COURT:**  Okay.  Mr. Cunningham, what would be the

6    effects on the Government of having to retry this case for

7    Mr. Ventura alone?

8              **MR. CUNNINGHAM:**  Your Honor, I think we're talking

9    about --

10             **THE COURT:**  Tell me about the resources that would

11   be required.

12             **MR. CUNNINGHAM:**  It would require a tremendous

13   amount of resources, Your Honor.  For one thing, we've spent

14   an awful lot of money at this point in time.  I think it's not

15   an exaggeration to say thousands and thousands, perhaps close

16   to a hundred thousand dollars, and the amount of time and

17   effort of officers, obviously the services of translators.

18   We, the Government alone, in preparation for the trial, have

19   had to use translators with many or virtually all of the

20   Spanish language-speaking witnesses.  I could probably ask

21   Mr. Schenning, but I suspect he's not happy with how much

22   money we have spent of our budget, but it's certainly been

23   thousands of dollars.

24             In addition, Your Honor, some of these witnesses

25   are -- in particular, Zelaya Repalo, for example, is in

 1     deportation proceedings, and is pending deportation.  If he's

 2     deported, the effort to return him to make sure he's

 3     considered to be available would be expensive.  Carlos Campos

 4     was brought back under circumstances you've heard testimony

 5     about for his availability.  Finding a number of these

 6     witnesses, many of whom are transient, are out of state, the

 7     women that we've alluded to -- Ms. Santiago is in New York.  I

 8     know the officers expended substantial time and effort just in

 9     locating witnesses like Ms. Santiago and some of the other

10     people.

11             The trial is now two and a half years subsequent to

12     when Mr. Ventura was arrested, and, while some of the time is

13     attributable to what I would regard as good-faith negotiations

14     on the part of both parties as to whether or not a negotiated

15     disposition was possible, Mr. Ventura has caused the

16     termination of his representation by three of the attorneys

17     who have represented him -- first, Mr. Bittner; second,

18     Mr. Retureta -- and, actually, I may have misspoken.  I don't

19     think that he caused the termination of Mr. Balarezo's

20     representation.

21             **THE COURT:**  Right.  Actually, Mr. Ruter is the fifth

22     attorney for the Defendant.

23             **MR. CUNNINGHAM:**  He is, Your Honor, but I don't

24     believe --

25             **THE COURT:**  Two were conflicted out --

1              **MR. CUNNINGHAM:**  Correct, Your Honor.

2              **THE COURT:**  -- and two were removed at the request

3      of Mr. Ventura.

4              **MR. CUNNINGHAM:**  But the effect of this, Your Honor,

5      is essentially the victim in this case has been on the hook

6      for that period of time, not an insubstantial amount of

7      stresses.  She's dealt with the uncertainty of the case.  I

8      can represent to the Court that some of the anxiety that she

9      felt when he was -- when she knew, or believed, I should say,

10     that he was going to be released from custody, that certainly

11     had a bearing on the information that she provided to the

12     authorities.  I think that, actually, Detective Hartlove

13     testified to that information as far as the explanation for an

14     account that she may have given at one time versus an account

15     of the same subject at a later time.

16             **THE COURT:**  I assume you're referring to the person

17     referred to in the Indictment as RDF?

18             **MR. CUNNINGHAM:**  That's correct, Your Honor.  And

19     she's been identified as Rebeca Dueñas Franco.

20             **THE COURT:**  Thank you.  And now, before I wish you a

21     happy, good weekend, how long would it take to try this case

22     if you were trying it only as to Mr. Ventura?

23             **MR. CUNNINGHAM:**  I think about the same amount of

24     time, Your Honor.

25             **THE COURT:**  Mr. Ruter, do you wish to say anything

1    on discovery matters or contradict anything that

2    Mr. Cunningham said with respect to discovery matters?

3              **MR. RUTER:**  No.  I think it's all accurate, Your

4    Honor.

5              **THE COURT:**  Okay.  Thank you.

6              Mr. Cunningham, since the remainder of this will

7    deal with the relationship between Mr. Ruter and Mr. Ventura,

8    I bid you both a good weekend.

9              **MS. YASSER:**  Thank you, Your Honor.

10             **MR. CUNNINGHAM:**  Your Honor, so you can continue,

11   can we step out and then come back after you're done and

12   recover our things?

13             **THE COURT:**  Yes.

14             (Whereupon, Government counsel are excused.)

15             **THE COURT:**  Mr. Ventura, I understand that you're

16   unhappy with Mr. Ruter.  Please tell me why.

17             **DEFENDANT VENTURA:**  I'd like to know what letter

18   we're talking about, because basically I've sent you about ten

19   different letters.

20             **THE COURT:**  Well, this is the one that I received

21   today.

22             **DEFENDANT VENTURA:**  That's what I'm referring to,

23   sir.

24             **THE COURT:**  Very good.

25             **DEFENDANT VENTURA:**  On behalf of the Government, I'm

 1    not accusing the attorney, Gerry, but there is something that

 2    they're hiding.  As you can see, all of the witnesses they've

 3    had have been bought.  So that's what I want to know, because,

 4    before I came to this trial, I actually sent you letters

 5    complaining to the fact that I had not seen the discovery for

 6    my case, and nothing in Spanish.  I'm not saying that I don't

 7    know how to read English.  I do read a little bit, but I don't

 8    read it fluently.

 9         So my problem is that I'm here, and I don't care how

10    many witnesses they have.  I know who I am, but I'm seeing

11    that I'm not being defended, because every prisoner has a

12    right to see the evidence against them and what he's being

13    accused of, or for a fair negotiation.  We're now talking

14    about 25 years, and sign here, and that's why I didn't do it.

15         I don't know the problem that you know that I had

16    with Mr. Cunningham.  I was seven months locked up at Super

17    Max.  He never gave the letters to Mr. Benson Legg.  Until an

18    officer -- and I'm not going to say his name just to be

19    careful -- and thank God there are people that feel sorry for

20    us and want to help other people.  The reason was that you

21    even got that letter, the fact that you were able to get that

22    letter, if that letter had not been brought to you by someone

23    else, you would never have gotten it.

24         So what I want you to do is ask the Government:

25    What is it they've done with all the letters and all the

```
 1    packages that I've sent here?  Mr. Williams -- Judge Williams,

 2    sir, I sent one like this.

 3                 THE COURT:  Close enough.

 4                 DEFENDANT VENTURA:  Okay.  And you didn't receive

 5    it.  That's where I prove to you that all of the documents was

 6    something that he sent to me, and I don't even remember very

 7    well in English where I'm at a place where everybody works

 8    this way.  You want me to wash your shirt?  Two soups.  Okay?

 9    You want me to clean out your cell?  Two dollars.  If I want

10    somebody to translate for me or write a letter, ten dollars.

11    A professional letter for you, I didn't have a lot of money in

12    the commissary, so I did it in Spanish, and I begged the

13    person to please either bring it or send it, and the person

14    who actually dealt with this says that it's the prosecutors

15    that have to handle this, who have been attacking me with no

16    end.

17                 I don't know if you have the reports, because

18    Cunningham grabs them so nobody else can see them.  I was, in

19    the lockup, asked if I wanted to cooperate to deliver drugs.

20                 INTERPRETER GOLDSTEIN:  I'm sorry.  Drugs?

21                 INTERPRETER KIRCHGESSNER:  And cell phones.

22                 THE WITNESS:  Just drugs.  And cell phones.

23                 INTERPRETER GOLDSTEIN:  Your Honor, I correct.  Cell

24    phones.

25                 THE COURT:  Thank you.
```

1          **DEFENDANT VENTURA:**  I have had so many attempts

2    against me by the officers, the Mafia that lives at Super Max.

3    That's why I refuse to go to Super Max.  None of the lawyers

4    want to deal with this subject.  I ask my lawyer here, and he

5    said, yes, I think I -- I realize about.  I remember that

6    Mr. Repalo placed a complaint against this person that was

7    here, this lawyer, and imagine what they did to me.  They

8    stabbed me here in the back -- four men did.  An officer hit

9    me in the eye.  Retureta saw that.  That's why I asked him to

10   withdraw.

11         **THE COURT:**  Okay.  I'm asking you now about your

12   problems with Mr. Ruter.

13         **DEFENDANT VENTURA:**  Okay.  I'm sorry, sir.  I'm

14   going to answer that, but I wanted to have the opportunity to

15   talk to a judge about everything that has happened to me,

16   because nobody has helped me so far.

17         **THE COURT:**  Yes, I understand that.  Tell me about

18   your difficulty --

19         **DEFENDANT VENTURA:**  The problem with Mr. Gerry --

20   I'm not going to say he's not a good lawyer, because I'm not a

21   lawyer, but I have what's called a filibuster, where they have

22   the federal laws, and it says that every prisoner, before

23   being brought to trial, has to see the evidence, and they have

24   to be explained -- it has to be explained to them that they

25   can pick the -- what you say in Spanish -- the jury.  And,

1    three or four months before coming to trial, I have not seen

2    that gentleman.  But I had the hope that he would use at least

3    five minutes to show me -- at least see this is what's left.

4    And I think he's not the problem, but Mr. Cunningham is with

5    his gang of corrupt people.  I'm sorry to say that way, but I

6    need to say the truth.  I think that he does what he tells

7    them -- what they tell him.

8         THE COURT:  Mr. Ventura, are you asking to defend

9    yourself in this trial?

10        DEFENDANT VENTURA:  Well, American people, if that's

11   the only option that you have -- because I'm asking to see the

12   discovery in order to have the chance to defend myself, if

13   that's the only option that you have for me, then yes, I

14   defend myself.

15        THE COURT:  You would be defending yourself in this

16   trial.  Do you understand?

17        DEFENDANT VENTURA:  Okay.  To answer your question,

18   I don't know anything about the laws, but, if you think that

19   is the correct way, it's okay.  I will sit here and defend

20   myself.  Anyway, nobody is defending me.  I know I am going to

21   be sentenced anyway.

22        THE COURT:  It's not my decision to make; it's your

23   decision to make, sir.

24        DEFENDANT VENTURA:  I'm only asking to be defended

25   and to be allowed to see the discovery and the evidence they

1     have against me, and --

2              **THE COURT:**  Okay.

3              **DEFENDANT VENTURA:**  There are a lot of secrets that

4     aren't revealed to me.  For example, I didn't know that

5     Mr. Campos was going to be a witness against me.  I don't even

6     have the list of witnesses that are supposed to be here

7     against me.  I'm sitting here like a little boy and just

8     having to listen to the adults speak.

9              **THE COURT:**  Okay.  Mr. Ruter?

10             **MR. RUTER:**  Yes, Your Honor?

11             **THE COURT:**  Have you shared any of the discovery

12    content with Mr. Ventura?

13             **MR. RUTER:**  Yes, Your Honor, I have.

14             **THE COURT:**  What have you shared?

15             **MR. RUTER:**  Your Honor, I wished I had brought a

16    pleading.  Some kind of a motion was filed a long time ago,

17    and I outline in my pleading every date that I had gone to see

18    Mr. Ventura, along with the amount of hours spent at each

19    meeting.

20             **THE COURT:**  That's a matter of record, yes.

21             **MR. RUTER:**  Yeah.  And the reason I went, Your

22    Honor, was to do nothing more than to give him every single

23    page of discovery I could.  Obviously I went with an

24    interpreter, because I do not speak Spanish, and I find that,

25    in English, Mr. Ventura and I do not relate that well.  We can

1    understand a little bit, but Spanish is clearly his preferred

2    language.

3            And what had happened, Your Honor, I spent more time

4    with Mr. Ventura going over discovery, I have to confess --

5    and unfortunately my bill will probably reflect it -- than

6    with most clients, because he had made the same comments about

7    all prior counsel; that is to say, he wanted to see his

8    discovery.  So I thought to myself, well, we're not going to

9    have this complaint under my watch, and what the Government

10   did, they delivered to Mr. Montemarano and myself a large box,

11   and it was divided into eleven separate binders.  It's the way

12   that they organize their file, and I began by taking Binders 1

13   and then Binders 2 and et cetera.

14           So, over the course, Your Honor, of a couple of

15   months, I had gotten to Binder 6, I believe, maybe 7 --

16   perhaps 7 -- and Mr. Ventura complained repeatedly that he

17   wanted to see it in English.  He wasn't satisfied with

18   Mr. Benningfield -- Johnnie Benningfield reading to him what I

19   believed to be, Your Honor, the important discovery.

20           And what I mean by that, Your Honor, is that a lot

21   of documents, I felt, were not of such importance that

22   Mr. Ventura had to see every single page, but I showed him the

23   discovery anyways.  An example, Your Honor, might be 200 pages

24   of subpoenaed material from the phone company, and he would

25   look at it, and I would explain what it is, and he'd say,

1    "Well, I don't need to see that," and he was correct; he

2    didn't need to see that.  He couldn't possibly digest it.

3    But, in terms of Grand Jury testimony, in terms of statements

4    made by co-conspirators, by victims, in terms of every single

5    transaction that the Government has laid out here in terms of

6    the raids, the surveillances and so on, he saw all of it.

7         Now, when he complained to me again last week about

8    it, he reminded me -- he said, "You know, I didn't see all the

9    discovery," and he was right; he did not.  So I went to the

10   last few binders he hadn't seen, and I already knew it, but I

11   went through it again.

12        Those binders, Your Honor, were nothing more than a

13   regurgitation of the other binders that he had already seen,

14   and I think that's because there is different investigations

15   going on; that is to say, a murder investigation, an attempted

16   murder investigation, and a prostitution case.  And I think

17   what happened, Your Honor, is that, as the -- this is not

18   uncommon.  As the Government begins to organize their files,

19   they duplicate the same materials, but they put them in

20   different places, and that's all that remained, was stuff that

21   he had already seen anyway.

22        I don't know what else I could do, Your Honor, and

23   it came to the point where I said, "Well --" I said to myself,

24   "I'll go ahead and I'll file a motion before Judge Quarles,"

25   believing that probably I'd get the response that I got, Your

 1    Honor, but I told him I would do it, and I did it.

 2              Your Honor --

 3              **THE COURT:**  This was the motion to have all of

 4    discovery translated --

 5              **MR. RUTER:**  Yes, sir.

 6              **THE COURT:**  -- into Spanish?

 7              **MR. RUTER:**  Yes.  And so I did it, and Your Honor

 8    considered it.

 9              **THE COURT:**  That would be roughly how many pages,

10    Mr. Ruter?

11              **MR. RUTER:**  I'm going to say, Your Honor, about

12    10,000 pages.

13              **THE COURT:**  Okay.

14              **MR. RUTER:**  And so, Your Honor, in that regard, we

15    have had a rocky relationship.

16              **THE COURT:**  I noticed this week, though, it appears

17    that you have been interacting with each other.

18              **MR. RUTER:**  We do --

19              **THE COURT:**  No, no.  I mean --

20              **MR. RUTER:**  -- and we have before.

21              **THE COURT:**  -- with respect to the defense.

22              **MR. RUTER:**  Yes.

23              **THE COURT:**  He seems to give you ideas --

24              **MR. RUTER:**  He does.

25              **THE COURT:**  -- and I note that some of them work

1   their way into your examinations.

2          MR. RUTER:   True.  I cannot say, Your Honor -- I

3   can't make any comment about Mr. Ventura's assertion that the

4   Government is either lying or cheating or withholding

5   evidence.  I could only say I am well aware of Mr. Cunningham

6   and Ms. Yasser as prosecutors, and I will say it in front of

7   Mr. Ventura:  I have never been the recipient of any

8   dishonesty or any purposely-withheld evidence, any lying or

9   cheating by federal prosecutors, and so I don't -- I don't

10  have anything to -- when he goes into those things, quite

11  frankly, I just -- they go in one ear, and they go out the

12  other, because I've seen none of that in my representation of

13  him.

14         THE COURT:   I understand that, but you have to also

15  understand that this is all new to Mr. Ventura.

16         MR. RUTER:   Yes, sir.

17         THE COURT:   Mr. Ventura is an amateur in these

18  matters, of course, and you can understand that, if he does

19  not trust the Government, that is a pretty basic American

20  position, actually, not to trust the Government.

21         MR. RUTER:   I do.  Your Honor, I do, and I've

22  attempted to discuss that with him over the period of my

23  representation, but, quite frankly, I have made no progress.

24  That's evidenced by the fact that we have this letter, which I

25  have now read it, and he makes the same kinds of remarks

1    today, and I don't in any way, shape, or form, Your Honor, say

2    it in a negative sense towards Mr. Ventura.  I'm only saying

3    it -- here we are today.  He's making the same comments that

4    he believes that there is things being withheld and the story

5    is not being told properly because of Mr. Cunningham's alleged

6    misconduct, and I've simply told him, "I have not been able to

7    see such a thing, and I do not see such a thing," and I'm,

8    quite frankly, Your Honor, pretty frank with my clients.

9    Whether they're foreign speakers or not, I try to be very

10   direct in my answering questions without trying to sugarcoat

11   anything that might be being said between me and my client.

12            **THE COURT:**  Thank you.

13            Mr. Ventura, has Mr. Ruter been truthful in his

14   discussions with me about your working relationship?

15            **DEFENDANT VENTURA:**  Well, to tell you the truth, I

16   have not seen the discovery.  As you can see from the

17   testimony of the person that was here, they -- he had to be

18   shown that, because -- he had not showed me -- showed that to

19   me.  Well, there are many things, Your Honor, but it's you who

20   decides.  I know you are a judge with many years of experience

21   from what I've heard from other people at CDF.

22            So what I need you, please, is to check everything

23   that's against me or in favor, everything that exists,

24   whatever has been denied to me, what's illegal in the case, to

25   be used in the case.  For example, I have talked about this

1    with him, for example.  Maybe that book is making me crazy,

2    because I read it all the time.  But, if I'm being indicted

3    for prostitution, if the evidence, as you can see, says

4    homicide, it means that it's included in the evidence of the

5    homicide.  My lawyer knows that, and you know that, too.  They

6    talk about death and death, and they're not talking about

7    prostitution.

8            So you have seen what -- he said that Mr. Cunningham

9    is not involved in corruption, but you have seen what they

10   said, how much money they have spent to bring people to come

11   here as witnesses.  Who is not going to want to come here to

12   the United States?  Who is not going to want to come here as a

13   witness to stay in the United States?

14           The point I want to make is that my life is on the

15   line, and that is a question of the faith I lost.  The law is

16   in your hands.  So, as you have said, if somebody in the

17   public and the jury has relatives that are police officers,

18   they have to tell you.  One said -- one said that he didn't

19   like lying people, and most of the people the prosecution

20   chose were people that had been victims, and they -- and they

21   either have relatives that are police officers, or they are

22   police officers.

23           **THE COURT:**  Well, Mr. Ventura, unfortunately I don't

24   have the time or patience to hear a detailed review of the

25   jury selection process.  I made a determination that the jury

1    was fully capable of rendering a fair and impartial decision.

2    I understand that they might not be entirely to your taste,

3    but I do have every faith in them to give you a fair trial,

4    sir.  I have every faith in their ability to follow the oath,

5    and they've all taken an oath.  They've all sworn to God to

6    give you a fair trial, sir.

7         **MR. RUTER:**  Your Honor, could I just have a brief

8    response also?

9         **THE COURT:**  Yes.

10        **MR. RUTER:**  Mr. Ventura has, many, many times

11   throughout the proceedings, complained to me about the

12   introduction of evidence concerning murder.  I told him,

13   Judge Quarles --

14        **THE COURT:**  That you lost that battle?

15        **MR. RUTER:**  I blamed it on you, sir.

16        **THE COURT:**  You should have.  It's my fault.

17        **MR. RUTER:**  Your Honor, I told him -- I said, "Well,

18   Judge Quarles is the one -- he's the only one that counts who

19   said that that evidence can come in."  I said -- I advised him

20   that we objected to it procedurally.  You have to file a

21   paper.  We argued about it.  He was here.  I said, "and

22   Judge Quarles denied our motion, and he ruled that evidence

23   concerning -- some evidence concerning the death of El Pelon

24   was going to be admissible," and, every time he hears it, he

25   then pokes me and he complains, and I don't blame him.

1          **THE COURT:**  I hope you've also explained to him,

2    however, that you have protected his rights to this extent:

3    If it turns out that you're convicted -- and there is no

4    guarantee that you will be, but, if it turns out that you are

5    convicted and I was wrong about letting that evidence in, then

6    your lawyer has done a very good job of preserving that so

7    that another Court will look at that decision, and, if that

8    Court decides that I was wrong, then your conviction goes

9    away.

10          So, just because you're hearing this evidence at

11   trial, that doesn't mean that your attorney hasn't put you in

12   the best possible position for the next stage if, through some

13   misfortune, you are convicted, and that's one of the things

14   that you might not understand because you're not an attorney

15   and because you're not experienced in these proceedings, but

16   your attorney, Mr. Ruter, has put you in the best position

17   that you can be in having lost the argument about whether the

18   evidence comes in or not.

19          You know, these decisions that happen here in my

20   court at this level are not the last word.  In this system of

21   justice, I don't get the last word.  As a matter of fact, the

22   jury itself may not get the last word.  There are two courts

23   above me, and, if you're convicted here, there is the Court of

24   Appeals, and there is the United States Supreme Court looking

25   over my shoulders to make sure that I, in fact, protected your

```
 1    interests and I, in fact, made sure that you had a fair trial.
 2           So I understand that this is a horrible position to
 3    be in.  No one wants to be prosecuted.  No one wants to face
 4    the strength of the United States Government.  I -- believe
 5    me, I've seen this enough to understand how bad this feels for
 6    you, but you must understand that I believe, in this
 7    situation, your attorney has done the best possible job under
 8    the circumstances, and, from what I see, you're at least
 9    still, the two of you, able to communicate with each other.
10           In any event, I will -- I'm not going to make a
11    decision today.  I will see you all Monday morning.
12           MR. RUTER:  Yes, Your Honor.
13           THE COURT:  Have good weekends -- as good a weekend
14    as you can over at the facility, but I'm going to spend the
15    weekend and think about your request, sir.  Thank you.
16           MR. RUTER:  Thank you, Your Honor.
17           THE COURT:  We're in recess.
18           THE CLERK:  All rise.  This Honorable Court now
19    stands in recess.
20           DEFENDANT VENTURA:  Thank you, Your Honor.
21           THE COURT:  Thank you, ladies.
22           INTERPRETER GOLDSTEIN:  Thank you, sir.
23           (Proceedings adjourned.)
24
25
```

1      I, Martin J. Giordano, Registered Merit Reporter and Certified

2    Realtime Reporter, certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6    _____      _____

7      Martin J. Giordano, RMR, CRR                Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2       UNITED STATES v. GERMAN de JESUS VENTURA, et al.

3                TRIAL - VOL IV - APRIL 11, 2013

4

5

6                                                              PAGE
        COMMENCEMENT OF PROCEEDINGS............................ 637
7
        WITNESSES FOR
8         THE GOVERNMENT:

9       DETECTIVE AMY MIGUEZ
                Sworn......................................... 639
10              Direct Examination by MS. YASSER.............. 639
                Cross-Examination by MR. RUTER................ 661
11              Cross-Examination by MR. MONTEMARANO.......... 663
                Redirect Examination by MS. YASSER............ 664
12              Witness Excused............................... 665

13      MARGARITA SANTIAGO LAONA
                Sworn......................................... 666
14              Direct Examination by MR. CUNNINGHAM.......... 666
                Cross-Examination by MR. RUTER................ 692
15              Redirect Examination by MR. CUNNINGHAM........ 713
                Witness Excused............................... 714
16
        CARLOS ANTONIO ASCENCIO
17              Sworn......................................... 715
                Direct Examination by MR. CUNNINGHAM.......... 715
18              Cross-Examination by MR. RUTER................ 740
                Redirect Examination by MR. CUNNINGHAM........ 756
19              Witness Excused............................... 758

20      DETECTIVE RICHARD TRUITT
                Sworn......................................... 758
21              Direct Examination by MS. YASSER.............. 759
                Witness Excused............................... 779
22

23

24

25

1

                                                              PAGE
FERMAN HERNANDEZ MARTINEZ
2        Sworn........................................... 779
         Direct Examination by MR. CUNNINGHAM............ 779
3        Cross-Examination by MR. RUTER.................. 811
         Witness Excused Pending Further Examination...... 834
4
MOTIONS HEARING....................................... 834
5
PROCEEDINGS ADJOURNED................................. 854
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 814:9
**$100** [1] - 675:6
**$15** [2] - 674:16, 742:18
**$16** [1] - 820:12
**$30** [8] - 674:5, 674:13, 696:10, 696:13, 701:11, 723:18, 723:19
**$400** [12] - 793:24, 793:25, 817:9, 818:3, 818:8, 818:11, 818:13, 818:19, 821:23, 821:24
**$50** [1] - 726:21

## '

**'09** [1] - 657:24

## 0

**0903** [2] - 651:1, 728:25

## 1

**1** [2] - 753:21, 846:12
**10,000** [1] - 848:12
**100%** [1] - 836:17
**101** [1] - 636:24
**11** [5] - 635:9, 637:1, 735:7, 735:13, 856:3
**11:02** [1] - 692:5
**11:26** [1] - 692:5
**11:30** [4] - 690:16, 690:18, 692:2, 692:4
**12:53** [1] - 731:9
**12a** [2] - 644:18, 644:19
**12a/10** [3] - 645:2, 681:18, 726:3
**12a/11** [2] - 646:12, 648:8
**12a/12** [3] - 648:19, 648:22, 648:23
**12a/3** [2] - 645:19, 685:20
**12a/4** [1] - 645:23
**12a/5** [2] - 646:1, 685:25
**12a/8** [3] - 645:6, 682:3, 725:18
**12a/9** [3] - 645:11, 682:8, 725:12
**12b** [1] - 649:3
**12c** [2] - 649:13, 649:14
**12d** [1] - 649:24
**12e** [1] - 650:10
**12f** [2] - 650:2, 723:25
**12g** [2] - 650:12, 724:16
**12h** [1] - 650:15
**12i** [2] - 650:18, 686:9
**12j** [3] - 650:18, 729:7, 734:20
**12k** [6] - 643:10, 643:11, 647:9, 648:7, 651:7, 651:8
**12l** [3] - 650:22, 687:7, 688:8
**13** [2] - 811:25, 812:5
**13b/1** [2] - 762:6, 762:9
**13b/2** [1] - 762:12

**13d/1** [1] - 762:17
**13d/2** [2] - 762:17, 762:23
**13th** [1] - 771:14
**14** [2] - 657:12, 658:17
**14c/1** [1] - 658:7
**14d** [1] - 658:4
**14e/1** [1] - 657:14
**14f/1** [1] - 657:13
**14h** [1] - 652:22
**14h/1** [1] - 652:22
**14h/10** [1] - 654:17
**14h/5** [1] - 653:12
**14h/6** [1] - 654:4
**14h/7** [1] - 654:10
**14h/8** [1] - 654:13
**14h/9** [1] - 654:15
**14j** [1] - 658:11
**14k** [1] - 658:11
**14l** [1] - 658:1
**14m** [4] - 657:18, 659:21, 691:16, 691:25
**15-minute** [1] - 765:22
**155** [1] - 738:3
**15c/2** [1] - 775:22
**15th** [5] - 773:5, 773:13, 785:17, 790:17, 821:7
**16** [1] - 693:18
**160** [1] - 738:3
**1643** [1] - 649:16
**16a/1** [5] - 682:12, 682:19, 683:16, 727:23, 794:25
**17** [1] - 781:5
**171** [3] - 638:5, 834:23, 834:25
**17th** [4] - 651:25, 652:5, 658:25, 661:4
**18** [1] - 693:1
**18th** [2] - 652:5, 661:5
**19** [1] - 693:1
**19a/10** [1] - 803:12
**19c** [1] - 798:13
**1:59** [1] - 731:10
**1st** [1] - 641:21

## 2

**2** [1] - 846:13
**2,000** [1] - 696:6
**20** [1] - 753:25
**200** [1] - 846:23
**2001** [2] - 693:16, 759:12
**2002** [2] - 667:1, 759:20
**2003** [2] - 692:23, 693:15
**2006** [4] - 717:13, 742:9, 743:4, 743:7
**2007** [4] - 743:9, 743:10, 743:13, 744:15
**2008** [4] - 640:17, 669:9, 744:17, 760:14
**2008-2010** [1] - 759:21
**2009** [25] - 640:1, 640:14, 641:5, 641:7, 641:21, 642:3, 642:17, 649:3, 651:19, 670:16, 671:11, 677:18, 712:13, 712:18, 712:19, 720:14, 744:19,

745:14, 745:22, 746:5, 760:23, 763:9, 764:9
**2010** [25] - 640:1, 640:14, 651:25, 658:25, 661:4, 712:21, 744:21, 753:2, 753:6, 754:17, 766:18, 768:10, 768:18, 768:25, 771:14, 773:5, 774:14, 785:17, 785:22, 798:16, 814:3, 814:21, 815:15, 829:23, 830:2
**2013** [1] - 635:9, 637:1, 856:3
**21201** [1] - 636:24
**21st** [3] - 753:2, 753:5, 754:17
**2255s** [1] - 837:1
**24th** [24] - 641:7, 641:8, 642:3, 642:17, 649:3, 651:19, 657:23, 664:3, 670:16, 670:21, 671:11, 677:18, 708:21, 710:14, 712:13, 720:14, 725:16, 725:25, 745:14, 745:22, 746:5, 760:22, 763:9, 764:9
**25** [1] - 841:14
**25a/1** [1] - 788:6
**25a/2** [1] - 788:12
**25a/3** [1] - 788:19
**25a/6** [1] - 790:3
**25b/1** [1] - 789:4
**25f** [1] - 797:3
**28f/11** [1] - 772:24
**28f/6** [1] - 772:9
**28g** [1] - 796:4
**28h/4** [1] - 769:22
**28h/5** [1] - 770:2
**28h/6** [1] - 770:4
**2:00** [3] - 731:4, 731:5, 731:7

## 3

**3** [1] - 753:24
**3,000** [1] - 696:6
**30** [2] - 674:4, 702:19
**30th** [2] - 768:18, 768:24
**38** [1] - 740:11
**3:27** [1] - 777:17
**3:50** [2] - 777:13, 777:15
**3:51** [1] - 777:17
**3rd** [13] - 785:21, 785:22, 792:8, 792:24, 804:25, 814:3, 814:21, 815:15, 820:24, 821:5, 821:10, 829:23, 830:2

## 4

**40a/1** [2] - 686:18, 686:20
**40a/2** [2] - 735:4, 735:8
**410-962-4504** [1] - 636:25
**42** [2] - 673:9, 673:14
**4:00** [1] - 777:13

## 5

**50** [1] - 773:19

**5515** [1] - 636:23
**56th** [1] - 816:8
**5777** [1] - 658:15
**5:00** [1] - 736:9
**5th** [1] - 768:10

## 6

**6** [2] - 735:7, 846:15
**60-day** [1] - 764:20
**637** [1] - 856:6
**639** [2] - 856:9, 856:10
**661** [1] - 856:10
**663** [1] - 856:11
**664** [1] - 856:11
**665** [1] - 856:12
**666** [2] - 856:13, 856:14
**692** [1] - 856:14
**6:31** [1] - 635:9
**6c/15** [1] - 738:7

## 7

**7** [3] - 735:13, 846:15, 846:16
**7-Eleven** [2] - 784:3, 812:12
**7.25** [1] - 742:16
**7.75** [1] - 742:17
**713** [1] - 856:15
**714** [1] - 856:15
**715** [2] - 856:17, 856:17
**740** [1] - 856:18
**756** [1] - 856:18
**758** [2] - 856:19, 856:20
**759** [1] - 856:21
**779** [3] - 856:21, 857:2, 857:2

## 8

**811** [1] - 857:3
**834** [2] - 857:3, 857:4
**854** [1] - 857:5
**8648** [1] - 658:14

## 9

**9:25** [1] - 833:21
**9:28** [1] - 635:9
**9:30** [2] - 638:21, 833:22
**9mm** [1] - 740:10

## A

**a.m** [2] - 692:5
**a/2** [1] - 644:25
**a/6** [1] - 646:4
**a/7** [1] - 646:6

**abduction** [4] - 774:21, 774:24, 775:15, 776:9
**ability** [2] - 669:10, 852:4
**able** [22] - 656:19, 675:4, 685:3, 717:4, 717:21, 721:4, 736:14, 741:18, 743:10, 766:24, 767:1, 781:17, 782:1, 782:16, 784:12, 789:11, 803:23, 805:2, 816:15, 841:21, 850:6, 854:9
**ABOVE** [1] - 635:10
**above-entitled** [1] - 855:4
**ABOVE-ENTITLED** [1] - 635:10
**absorbed** [1] - 835:21
**abused** [1] - 660:6
**accepted** [1] - 750:10
**access** [1] - 836:22
**accommodated** [1] - 750:23
**accomplish** [1] - 766:21
**accosted** [1] - 662:14
**account** [2] - 839:14
**accurate** [4] - 763:22, 764:1, 829:20, 840:3
**accused** [1] - 841:13
**accusing** [1] - 841:1
**acne** [1] - 738:2
**acquaintance** [1] - 785:6
**acquired** [1] - 766:4
**acting** [1] - 759:14
**action** [1] - 775:4
**activities** [2] - 711:18, 711:22
**activity** [3] - 651:22, 767:2, 768:3
**actual** [3] - 657:10, 658:8, 836:10
**addition** [6] - 653:7, 663:23, 687:3, 723:8, 765:20, 837:24
**additional** [1] - 765:21
**address** [11] - 641:5, 641:9, 641:23, 648:22, 728:12, 731:16, 739:17, 739:18, 761:13, 778:13, 824:12
**addressed** [1] - 834:22
**addresses** [1] - 641:14
**addressing** [1] - 791:20
**adjourned** [1] - 854:23
**ADJOURNED**.................................. [1] - 857:5
**administered** [1] - 690:25
**admissible** [1] - 852:24
**admission** [2] - 647:1, 660:16
**admit** [2] - 647:3, 662:19
**admitted** [4] - 646:18, 651:10, 659:19, 691:25
**adults** [1] - 845:8
**advance** [1] - 701:7
**advertised** [1] - 722:23
**advised** [3] - 638:3, 698:3, 852:19
**advises** [1] - 834:24
**affiliation** [1] - 783:1
**afraid** [6] - 694:8, 709:23, 710:2, 712:8, 722:17, 809:19
**Afternoon** [1] - 731:10
**afternoon** [14] - 715:19, 715:21, 735:25,

736:2, 736:8, 740:25, 741:1, 759:6, 759:7, 777:10, 778:6, 779:22, 811:3, 811:4
**afternoons** [1] - 768:3
**afterwards** [2] - 660:11, 822:6
**age** [4] - 668:25, 693:1, 693:18
**Agent** [1] - 636:3
**agents** [1] - 637:15
**ago** [8] - 741:3, 741:25, 781:7, 782:10, 814:24, 815:18, 833:10, 845:16
**agredir** [1] - 786:10
**agree** [2] - 711:4, 733:20
**agreed** [4] - 711:15, 711:21, 712:2, 721:24
**Agua** [1] - 716:15
**ahead** [3] - 687:9, 768:17, 847:24
**al** [1] - 856:2
**Alba** [1] - 774:17
**Alberto** [1] - 658:2
**alcohol** [7] - 644:11, 644:12, 645:25, 650:16, 654:16, 674:19, 737:9
**Alex** [22] - 718:6, 718:8, 718:10, 718:12, 718:16, 718:19, 720:3, 720:10, 743:22, 743:23, 743:24, 744:1, 744:24, 746:25, 747:2, 747:13, 747:16, 747:21, 748:3, 749:13, 757:10, 757:23
**Alex'** [1] - 757:18
**allegations** [1] - 653:20
**alleged** [1] - 850:5
**allegedly** [1] - 793:23
**Alley** [1] - 761:6
**alley** [1] - 761:12
**allow** [1] - 700:9
**allowed** [6] - 681:10, 736:15, 736:23, 751:1, 836:23, 844:25
**alluded** [1] - 838:7
**almost** [2] - 770:16, 808:11
**alone** [7] - 642:4, 667:13, 683:4, 736:17, 736:19, 837:7, 837:18
**AM** [1] - 635:9
**amateur** [1] - 849:17
**ambushed** [1] - 739:19
**AMERICA** [1] - 635:4
**American** [2] - 844:10, 849:19
**amount** [12] - 675:12, 703:3, 727:8, 763:2, 787:7, 794:2, 837:13, 837:16, 839:6, 839:23, 845:18
**Amparo** [2] - 648:24, 665:1
**Amy** [2] - 639:4, 639:10
**AMY** [2] - 639:5, 856:9
**Angel** [4] - 718:1, 718:2, 718:3
**Angeles** [5] - 781:24, 781:25, 782:6, 811:11
**angry** [3] - 752:15, 752:17, 799:12
**Annapolis** [42] - 639:15, 639:16, 652:8, 670:15, 677:15, 682:16, 719:19, 719:23, 720:14, 728:13, 729:13, 729:20, 734:1, 734:13, 734:15, 735:21, 735:24, 736:1, 737:17, 739:3,

739:4, 739:17, 750:4, 752:25, 753:3, 759:9, 759:10, 759:22, 761:6, 772:3, 772:5, 772:6, 773:16, 773:19, 773:21, 773:22, 774:20, 788:1, 795:22, 800:12, 816:3, 816:13

**Anne** [1] - 712:25

**answer** [10] - 751:13, 757:13, 791:3, 810:11, 810:13, 814:18, 817:25, 843:14, 844:17

**answered** [6] - 642:11, 642:19, 643:3, 645:4, 791:7, 810:8

**answering** [1] - 850:10

**ANTONIO** [2] - 715:11, 856:16

**Antonio** [3] - 657:21, 715:15, 728:3

**anxiety** [1] - 839:8

**anyway** [3] - 844:20, 844:21, 847:21

**anyways** [1] - 846:23

**apartment** [24] - 642:18, 642:24, 643:5, 643:16, 643:20, 643:21, 644:1, 644:4, 644:23, 645:8, 645:20, 645:21, 649:5, 649:17, 649:21, 653:5, 653:6, 653:7, 654:9, 654:12, 655:2, 658:8, 663:16, 794:11

**apartments** [2] - 815:2

**apologies** [2] - 749:1, 828:2

**apologize** [7] - 647:5, 647:12, 689:5, 719:8, 769:22, 830:21, 834:19

**Appeals** [1] - 853:24

**appeals** [1] - 837:1

**appear** [6] - 644:3, 738:7, 771:7, 776:9, 780:7, 788:20

**appeared** [6] - 659:3, 770:16, 770:24, 770:25, 771:9, 776:4

**applications** [1] - 764:16

**appreciation** [1] - 778:5

**approach** [12] - 646:19, 655:19, 657:6, 659:7, 684:19, 687:8, 690:22, 691:9, 699:2, 753:16, 767:5, 807:15

**approximate** [1] - 763:19

**APRIL** [2] - 637:1, 856:3

**April** [1] - 635:9

**area** [12] - 643:22, 643:23, 656:11, 656:25, 662:5, 761:5, 773:20, 782:6, 789:14, 800:19

**argued** [1] - 852:21

**arguing** [1] - 647:17

**argument** [1] - 853:17

**arguments** [1] - 660:17

**armed** [1] - 662:20

**arose** [1] - 760:17

**arrangement** [4] - 695:16, 696:2, 836:25, 837:1

**arrangements** [3] - 721:21, 836:19, 836:22

**arrest** [18] - 641:1, 641:19, 651:21, 664:9, 671:10, 712:13, 720:22, 733:16, 733:17, 760:9, 760:23, 761:4, 761:17, 761:18, 773:11, 773:18, 776:21, 790:21

**arrested** [75] - 651:18, 662:16, 670:15,

670:22, 670:25, 671:11, 677:17, 680:3, 680:17, 680:22, 681:21, 682:4, 683:8, 683:10, 685:19, 686:4, 686:6, 687:2, 688:16, 688:19, 704:4, 708:21, 708:25, 709:6, 709:12, 709:14, 709:15, 709:18, 709:24, 710:13, 720:5, 720:7, 720:8, 720:13, 720:19, 721:2, 721:19, 724:2, 724:17, 725:15, 725:25, 726:4, 728:8, 729:4, 729:8, 745:14, 745:20, 745:22, 749:12, 750:7, 753:4, 753:15, 763:8, 775:4, 776:18, 785:17, 787:17, 787:21, 787:24, 788:1, 788:4, 788:14, 790:11, 790:18, 790:25, 792:4, 792:9, 795:4, 810:1, 810:18, 820:23, 820:24, 821:5, 821:6, 838:12

**arrests** [2] - 760:9, 760:19

**arrive** [2] - 688:17, 724:24

**arrived** [13] - 642:16, 673:16, 681:22, 695:12, 695:14, 703:10, 703:14, 709:17, 775:13, 776:8, 790:23, 814:20, 819:21

**articles** [1] - 681:8

**Arundel** [1] - 712:25

**asalto** [2] - 786:8, 786:11

**Ascencio** [64] - 642:20, 642:23, 643:15, 645:3, 650:11, 650:21, 657:21, 659:13, 715:2, 715:8, 715:16, 715:19, 715:20, 716:14, 717:6, 717:9, 717:18, 718:16, 719:6, 719:16, 721:15, 721:19, 722:7, 723:23, 724:23, 726:4, 726:18, 727:13, 727:22, 728:9, 729:1, 730:3, 732:6, 733:4, 733:11, 733:15, 734:3, 734:19, 735:6, 735:20, 736:13, 737:13, 738:18, 740:3, 740:20, 740:25, 741:2, 741:24, 747:19, 749:2, 750:6, 750:19, 751:17, 751:25, 752:3, 752:12, 752:23, 753:11, 753:23, 754:7, 754:22, 755:13, 756:6, 756:23

**ASCENCIO** [2] - 715:11, 856:16

**aside** [1] - 649:9

**assault** [11] - 694:6, 773:6, 785:21, 786:2, 786:7, 786:8, 786:9, 792:7, 821:10, 823:21

**assaulted** [2] - 690:4, 828:5

**assertion** [1] - 849:3

**asshole** [1] - 799:20

**assist** [5] - 711:15, 760:11, 760:16, 760:23, 766:5

**Assistant** [2] - 635:14, 635:15

**assistant** [1] - 638:4

**assisted** [1] - 763:18

**associate** [2] - 734:24, 789:21

**associated** [8] - 670:3, 671:20, 697:7, 729:11, 745:3, 762:19, 764:6, 782:21

**assume** [4] - 640:13, 770:17, 829:23, 839:16

**assumed** [1] - 701:15

**assumes** [1] - 730:15

**assuming** [1] - 691:17

**Astrovan** [3] - 726:17, 756:11, 768:16

**attack** [1] - 809:14

**attacking** [1] - 842:15

**attempt** [5] - 641:17, 642:2, 693:4, 775:3, 823:21

**attempted** [6] - 640:19, 641:1, 641:22, 760:12, 847:15, 849:22

**attempts** [2] - 641:18, 843:1

**attending** [1] - 701:10

**attention** [7] - 637:22, 651:24, 760:22, 762:16, 768:10, 768:17, 774:14

**Attorney** [2] - 635:14, 635:15

**attorney** [8] - 664:22, 787:14, 838:22, 841:1, 853:11, 853:14, 853:16, 854:7

**attorneys** [2] - 836:7, 838:16

**attributable** [1] - 838:13

**audience** [1] - 834:11

**August** [2] - 768:18, 768:24

**authorities** [1] - 839:12

**authority** [5] - 667:3, 716:3, 781:10, 783:11, 783:18

**authorized** [1] - 764:20

**automatic** [1] - 829:21

**automobile** [1] - 721:25

**availability** [1] - 838:5

**available** [1] - 838:3

**Avenue** [2] - 761:7, 816:7

**avoid** [1] - 833:19

**aware** [9] - 640:16, 640:22, 641:15, 641:18, 641:24, 655:20, 746:13, 836:11, 849:5

**awful** [1] - 837:14

**Ayala** [2] - 640:20, 760:13

**B**

**b/3** [2] - 762:6, 762:14

**background** [1] - 780:14

**backtracked** [1] - 656:18

**bad** [4] - 799:18, 799:19, 831:21, 854:5

**badly** [4] - 690:1, 733:24, 794:22, 798:9, 799:11, 831:16, 831:19

**bag** [9] - 644:8, 646:13, 648:7, 649:4, 649:6, 649:10, 663:18, 687:9, 819:3

**bail** [1] - 710:22

**Balarezo's** [1] - 838:19

**balls** [1] - 791:11

**Baltimore** [2] - 635:8, 636:24

**banana** [1] - 649:12

**based** [4] - 663:16, 742:19, 746:20

**basic** [1] - 849:19

**basis** [16] - 660:13, 683:12, 684:9, 689:23, 699:1, 726:10, 727:17, 729:22, 730:14, 732:25, 734:9, 737:2, 738:22, 751:21, 763:24, 776:21, 802:11, 810:7, 821:3

**basket** [1] - 655:10

**bathroom** [1] - 655:10

**battle** [1] - 852:14

beach [6] - 676:18, 676:19, 707:6, 707:15, 707:18, 732:9
bearing [1] - 839:11
beat [1] - 812:4
beautiful [1] - 747:18
became [1] - 743:5
become [3] - 640:16, 670:3, 782:21
bed [3] - 644:10, 646:3, 654:8
bedroom [4] - 643:24, 646:2, 655:2, 681:3
bedrooms [6] - 644:2, 644:10, 645:20, 645:21, 645:22, 654:1
beds [1] - 655:15
beer [2] - 815:7, 823:2
BEFORE [1] - 635:11
began [6] - 693:18, 743:16, 746:10, 773:9, 822:15, 846:12
begged [1] - 842:12
begin [2] - 666:21, 780:14
beginning [3] - 719:18, 728:2, 825:17
begins [1] - 847:18
behalf [5] - 635:13, 635:16, 635:18, 840:25
behest [1] - 821:17
behind [9] - 645:25, 648:10, 795:21, 796:7, 806:14, 807:4, 808:17, 816:1, 828:8
belief [1] - 753:12
believes [1] - 850:4
Belinda [1] - 690:21
belonged [1] - 756:13
belongings [2] - 655:25, 656:3
bench [14] - 637:22, 638:2, 638:20, 646:22, 648:4, 659:11, 660:20, 684:22, 685:16, 699:5, 699:14, 715:4, 767:8, 767:23
Benningfield [2] - 846:18
Benson [1] - 841:17
beside [1] - 790:14
best [6] - 640:8, 786:15, 816:20, 853:12, 853:16, 854:7
better [4] - 741:7, 776:12, 787:19, 812:17
between [12] - 652:5, 662:25, 694:22, 695:16, 696:2, 713:22, 714:10, 745:23, 770:14, 780:24, 840:7, 850:11
beyond [2] - 663:21, 771:3
BG&E [2] - 648:23, 649:25
BGE [2] - 663:25, 665:1
bid [1] - 840:8
big [6] - 643:23, 644:8, 795:25, 806:15, 808:23, 826:16
bill [5] - 648:23, 649:25, 658:2, 665:1, 846:5
Billy [1] - 761:5
bin [2] - 809:12, 809:13
Binder [1] - 846:15
binders [4] - 846:11, 847:10, 847:12, 847:13

Binders [2] - 846:12, 846:13
bit [9] - 648:20, 656:14, 694:12, 774:13, 807:11, 814:10, 834:15, 841:7, 846:1
Bittner [1] - 838:17
black [1] - 826:16
Black [1] - 662:9
blame [1] - 852:25
blamed [1] - 852:15
blaming [1] - 689:7
blanket [3] - 813:25, 826:13
blend [1] - 778:2
block [1] - 761:15
blows [1] - 812:1
blue [3] - 733:9, 800:4, 802:21
Blumberg [3] - 636:4, 691:3, 691:5
BLUMBERG [6] - 691:3, 703:13, 703:21, 736:6, 736:10, 739:23
Blumberg-Lorenzana [1] - 636:4
book [4] - 647:2, 659:14, 691:21, 851:1
border [6] - 667:9, 716:7, 716:9, 716:11, 716:16, 781:13
bored [1] - 722:21
Boston [2] - 725:1, 749:8
bottle [2] - 645:24, 650:16
bottles [1] - 644:11
bottom [1] - 686:21
bought [3] - 794:17, 799:5, 841:3
Boulevard [1] - 773:19
box [4] - 715:9, 779:5, 799:6, 846:10
boy [1] - 845:7
boyfriend [9] - 693:21, 695:23, 696:14, 696:19, 696:23, 697:3, 700:13, 711:12, 711:17
boyfriend's [2] - 695:16, 697:10
break [2] - 690:14
brief [2] - 712:23, 852:7
briefly [4] - 649:2, 664:19, 713:12, 767:5
bring [15] - 637:21, 638:7, 643:1, 677:14, 681:7, 716:7, 724:1, 731:21, 736:21, 802:1, 802:2, 804:20, 805:21, 842:13, 851:10
bringing [2] - 642:8, 708:2
broach [1] - 731:15
broke [2] - 732:6, 788:17
broken [1] - 788:20
brothel [79] - 642:1, 659:3, 663:18, 663:20, 676:19, 676:21, 677:15, 678:18, 678:21, 678:24, 679:3, 679:8, 680:2, 680:25, 681:20, 683:23, 683:24, 684:5, 684:15, 687:5, 718:8, 718:17, 722:8, 722:24, 723:11, 723:14, 724:20, 724:24, 726:7, 728:8, 728:15, 729:13, 729:15, 729:16, 730:7, 732:8, 732:12, 732:22, 733:20, 734:7, 734:13, 736:13, 737:14, 737:18, 746:25, 755:2, 767:18, 788:5, 788:11, 788:13, 789:7, 789:9, 789:12, 790:12, 790:15, 790:21, 790:23, 792:9, 793:16, 793:19, 794:20, 795:3, 795:17, 795:19, 796:2, 796:5, 796:10,

796:14, 797:7, 797:8, 797:24, 798:22, 800:16, 806:7, 806:9, 809:22, 824:4, 824:5, 824:10
brothels [14] - 649:18, 681:6, 723:9, 738:19, 746:22, 748:2, 748:12, 756:24, 757:18, 767:21, 795:6, 797:24, 800:11, 800:19
brother [2] - 662:2, 813:2
brought [10] - 637:15, 670:19, 677:22, 781:14, 785:1, 804:22, 838:4, 841:22, 843:23, 845:15
brown [1] - 811:10
budget [1] - 837:22
building [6] - 643:5, 644:23, 652:23, 685:5, 685:9, 788:7
bullets [9] - 803:8, 803:10, 803:11, 808:16, 830:25, 831:2, 831:8, 831:10, 831:13
bunch [1] - 767:21
bus [22] - 646:23, 673:6, 673:7, 673:9, 673:10, 673:12, 673:16, 675:20, 675:22, 675:24, 676:2, 680:8, 680:9, 680:11, 702:3, 704:18, 706:13, 706:16, 708:3, 713:24, 725:9
business [18] - 649:18, 649:22, 696:17, 697:13, 720:3, 722:23, 723:12, 743:17, 751:6, 757:15, 761:24, 793:10, 793:12, 800:21, 801:1, 802:8, 804:17, 816:16
businesses [3] - 719:18, 719:20, 719:22
bust [1] - 803:11
buy [3] - 794:16, 798:24, 799:1
buying [1] - 799:3
BY [67] - 639:13, 644:21, 645:15, 648:5, 651:11, 653:25, 657:9, 661:2, 663:7, 664:21, 666:17, 677:13, 679:19, 683:15, 684:13, 685:17, 690:3, 692:19, 700:8, 703:18, 703:23, 713:14, 715:18, 719:15, 727:21, 730:2, 730:18, 732:5, 733:3, 733:14, 734:12, 736:12, 737:7, 739:1, 740:24, 747:8, 751:24, 752:9, 753:22, 754:6, 756:5, 757:9, 757:22, 759:5, 764:3, 767:24, 769:5, 769:24, 771:2, 779:21, 786:20, 792:22, 802:3, 802:19, 808:1, 810:17, 811:2, 813:9, 815:13, 817:24, 819:11, 821:9, 824:11, 824:17, 825:12, 827:19, 833:2

---

**C**

---

c/2 [1] - 658:7
cafe [1] - 812:3
calibre [1] - 804:14
California [15] - 716:16, 716:22, 717:1, 741:11, 741:16, 742:15, 781:13, 781:15, 783:2, 783:10, 783:15, 783:20, 811:6, 812:13
caller [2] - 662:2

**Campos** [2] - 838:3, 845:5
**candidly** [2] - 685:12, 778:8
**cannot** [1] - 849:2
**canvas** [2] - 656:11, 656:25
**capable** [1] - 852:1
**capacity** [2] - 760:11, 836:20
**Capitol** [1] - 685:6
**car** [45] - 717:8, 722:4, 726:16, 730:19, 734:5, 740:13, 756:10, 756:12, 770:17, 772:14, 772:16, 772:17, 772:20, 773:1, 773:25, 774:10, 776:1, 776:11, 776:12, 797:18, 804:4, 804:7, 806:21, 807:8, 807:9, 807:14, 807:18, 808:7, 808:10, 822:7, 822:8, 822:21, 822:25, 827:4, 827:22, 828:15, 828:16, 828:17, 830:14, 833:6, 833:7
**Carbaja** [1] - 645:7
**card** [5] - 649:22, 660:4, 723:22, 724:4, 724:13
**cards** [21] - 649:16, 649:18, 650:3, 658:12, 658:19, 718:14, 722:19, 722:22, 723:1, 723:4, 724:10, 724:17, 751:6, 761:24, 796:23, 796:24, 796:25, 797:4
**care** [14] - 660:5, 675:7, 681:13, 705:3, 728:6, 731:20, 793:20, 796:15, 800:17, 802:16, 803:5, 803:6, 841:9
**careful** [1] - 841:19
**CARLOS** [2] - 715:11, 856:16
**Carlos** [9] - 642:20, 642:23, 645:3, 650:11, 650:21, 657:21, 715:2, 715:15, 838:3
**carried** [3] - 827:15, 827:16, 828:8
**carrier** [1] - 763:18
**carriers** [1] - 765:21
**carry** [1] - 809:9
**cars** [3] - 804:5, 808:21
**cartridge** [2] - 831:10, 831:11
**case** [28] - 690:15, 731:2, 762:25, 767:19, 776:23, 776:25, 777:11, 777:12, 804:23, 823:12, 826:13, 826:16, 826:17, 826:23, 828:6, 833:17, 833:18, 833:19, 836:14, 837:6, 839:5, 839:7, 839:21, 841:6, 847:16, 850:24, 850:25
**cash** [11] - 703:4, 703:5, 703:6, 703:8, 705:23, 710:10, 727:1, 727:2, 752:1, 752:5, 818:6
**cashier** [1] - 784:3
**casino** [2] - 818:20, 818:21
**cat** [4] - 814:1, 814:4, 814:15, 815:1
**catch** [1] - 706:13
**categories** [1] - 663:13
**caught** [8] - 655:21, 656:17, 662:6, 670:10, 670:13, 721:18, 750:20, 782:11
**caused** [4] - 720:24, 742:20, 838:15, 838:19
**CDF** [1] - 850:21
**cell** [19] - 650:19, 656:6, 658:5, 658:14,

686:7, 686:24, 687:3, 734:19, 734:21, 734:22, 762:18, 763:23, 764:11, 769:18, 842:9, 842:21, 842:22, 842:23
**cemetery** [5] - 806:14, 828:9, 828:13, 828:20, 828:25
**Center** [1] - 712:25
**certain** [2] - 653:17, 694:19
**certainly** [4] - 643:3, 836:10, 837:22, 839:10
**Certified** [1] - 855:1
**certified** [1] - 691:4
**certify** [1] - 855:2
**cetera** [2] - 659:18, 846:13
**chair** [1] - 771:10
**Chalo** [62] - 671:14, 671:16, 671:18, 671:20, 671:23, 672:4, 672:16, 673:18, 673:21, 674:3, 674:21, 675:8, 675:17, 676:1, 676:4, 676:7, 676:10, 676:13, 676:25, 677:4, 677:6, 677:10, 677:14, 677:22, 678:15, 680:5, 680:12, 680:14, 682:16, 683:9, 683:17, 683:19, 686:13, 686:24, 688:6, 688:20, 689:20, 697:19, 697:21, 698:14, 698:15, 698:19, 698:23, 700:9, 700:16, 700:22, 701:1, 701:17, 702:6, 702:8, 702:11, 703:7, 704:14, 705:17, 706:16, 706:24, 709:3, 709:15, 712:12, 713:15, 714:7, 743:20
**chance** [2] - 660:17, 844:12
**charged** [10] - 670:10, 674:8, 674:18, 681:15, 696:7, 700:24, 710:16, 748:19, 749:12, 783:5
**charges** [2] - 638:13, 710:19
**cheating** [2] - 849:4, 849:9
**check** [5] - 671:9, 661:10, 699:20, 703:4, 850:22
**checked** [2] - 643:4, 831:4
**checking** [1] - 821:14
**Chesapeake** [1] - 761:7
**chest** [1] - 644:5
**Chevy** [2] - 756:11, 768:16
**Chief** [1] - 759:15
**children** [14] - 668:6, 668:9, 668:15, 668:17, 668:23, 669:1, 669:8, 669:11, 669:15, 709:24, 709:25, 742:2, 742:5, 742:7
**Chino** [112] - 718:20, 718:22, 718:24, 719:6, 719:16, 720:17, 720:18, 720:25, 721:5, 721:21, 722:5, 722:8, 722:15, 723:11, 725:3, 725:9, 727:4, 727:13, 727:23, 728:4, 728:19, 728:21, 729:11, 729:13, 730:3, 730:17, 732:22, 733:20, 735:1, 737:22, 738:11, 738:18, 740:3, 743:20, 744:1, 746:11, 746:21, 747:2, 747:10, 747:20, 750:2, 750:7, 750:14, 750:23, 751:18, 755:8, 755:14, 755:22, 756:13, 757:11, 757:14, 757:17, 789:24, 791:16, 791:17,

791:18, 792:1, 792:3, 792:14, 792:15, 792:19, 792:24, 793:1, 793:5, 794:2, 794:20, 795:8, 795:13, 795:14, 795:16, 796:14, 797:8, 797:13, 797:23, 798:7, 798:9, 799:8, 799:10, 799:13, 799:16, 800:10, 801:8, 801:12, 801:14, 802:4, 802:6, 803:16, 803:25, 804:3, 805:7, 805:8, 807:16, 809:14, 810:3, 810:19, 815:3, 815:16, 815:22, 816:21, 821:17, 823:5, 823:16, 823:18, 824:20, 825:4, 825:22, 830:5, 830:17, 831:15, 832:16, 833:4
**chip** [2] - 650:8, 723:21
**choose** [1] - 723:16
**chose** [2] - 822:20, 851:20
**CID** [2] - 640:25, 652:1
**cigarette** [1] - 797:17
**cigarettes** [1] - 797:17
**Cinco** [1] - 668:20
**circle** [1] - 772:17
**circled** [1] - 773:1
**circumstances** [4] - 670:18, 836:12, 838:4, 854:8
**cited** [1] - 763:10
**city** [4] - 649:19, 667:9, 761:6, 811:11
**clarification** [3] - 668:19, 747:4, 757:20
**Clarksville** [3] - 784:8, 784:13, 784:17
**class** [5] - 782:14, 782:16, 782:18, 782:19, 783:13
**classes** [2] - 721:16, 721:17
**clean** [2] - 644:13, 842:9
**cleaned** [1] - 660:12
**cleaning** [2] - 737:9, 799:3
**clear** [7] - 648:1, 653:19, 665:21, 672:8, 674:10, 767:10, 800:3
**clearly** [1] - 846:1
**CLERK** [25] - 637:2, 639:7, 666:2, 666:6, 690:17, 691:1, 692:3, 692:6, 692:14, 715:10, 715:13, 731:6, 731:11, 732:1, 754:1, 758:24, 759:3, 777:14, 777:18, 778:18, 778:21, 779:12, 779:16, 779:19, 854:18
**Clerk** [2] - 754:2, 762:7
**clerk** [1] - 638:6
**click** [1] - 812:7
**client** [1] - 850:11
**clients** [8] - 678:1, 690:9, 698:9, 718:14, 726:11, 846:6, 850:8
**close** [9] - 761:13, 775:9, 806:6, 806:8, 806:9, 814:24, 822:12, 837:15, 842:3
**close-by** [1] - 775:9
**closed** [1] - 744:23
**closer** [5] - 646:5, 648:20, 652:25, 654:14, 655:8
**closer-up** [3] - 648:20, 654:14, 655:8
**closest** [1] - 788:24
**clothing** [2] - 655:15, 681:7
**co** [3] - 718:5, 766:14, 847:4
**co-conspirators** [2] - 766:14, 847:4

co-workers [1] - 718:5
cognate [2] - 786:7, 786:14
collaboration [1] - 760:4
colleagues [2] - 766:12, 766:19
collect [9] - 728:5, 796:16, 796:19, 797:13, 832:2, 832:8, 832:12, 832:13, 832:16
collected [5] - 796:17, 796:18, 797:11, 797:12, 831:23
Colmillo [32] - 728:2, 728:4, 746:6, 794:24, 795:1, 795:2, 795:14, 796:11, 797:17, 797:18, 797:21, 798:7, 798:8, 799:7, 799:10, 799:16, 822:11, 822:14, 822:19, 822:24, 822:25, 823:1, 823:5, 823:9, 823:12, 823:14, 823:17, 832:15, 832:17, 832:22
Colmillo's [1] - 728:18
Colombia [2] - 653:16
Columbia [8] - 761:4, 774:12, 820:8, 820:9, 820:14, 820:15, 820:22, 821:25
comfortable [2] - 721:1, 771:12
coming [8] - 640:11, 673:21, 678:15, 680:6, 683:10, 708:16, 719:17, 844:1
COMMENCEMENT [1] - 856:6
comment [1] - 849:3
comments [2] - 846:6, 850:3
commissary [1] - 842:12
commit [4] - 698:20, 749:18, 811:17, 811:23
committed [4] - 656:15, 729:2, 811:19, 821:10
committing [1] - 738:19
common [1] - 649:17
commonly [2] - 763:22, 776:7
communicate [3] - 780:4, 789:18, 854:9
communicated [1] - 787:6
communication [2] - 695:23, 827:11
communications [4] - 694:22, 774:21, 775:2, 833:19
companies [2] - 717:20, 765:1
company [5] - 765:6, 765:24, 782:2, 782:3, 846:24
competing [1] - 800:20
competition [2] - 739:3, 808:22
competitor [2] - 739:13, 775:4
competitors [1] - 738:20
complain [1] - 802:4
complained [3] - 846:16, 847:7, 852:11
complaining [1] - 841:5
complains [1] - 852:25
complaint [2] - 843:6, 846:9
complaints [4] - 638:11, 638:12, 731:18
completely [1] - 776:23
complicated [1] - 717:15
complying [2] - 772:18, 772:21
concern [1] - 777:25
concerned [1] - 659:15
concerning [10] - 695:17, 754:9, 754:17, 767:12, 767:14, 774:21,

775:2, 852:12, 852:23
concluded [6] - 638:20, 648:4, 660:20, 685:16, 699:14, 767:23
concluding [1] - 774:13
conclusion [3] - 659:1, 702:24, 703:2
conclusions [1] - 663:21
condom [3] - 655:4, 655:8, 655:11
condoms [18] - 644:9, 646:13, 648:7, 648:10, 648:13, 649:4, 649:8, 649:9, 649:10, 649:11, 655:11, 663:18, 674:18, 737:8, 799:3, 799:5, 799:6
conduct [5] - 768:11, 768:18, 771:15, 771:18, 786:18
conducted [1] - 723:12
conference [6] - 638:20, 648:4, 660:20, 685:16, 699:14, 767:23
conferring [2] - 713:5, 753:19
confess [1] - 846:4
confirm [2] - 762:21, 769:1
confirmed [1] - 713:19
conflicted [1] - 838:25
confuse [3] - 825:19, 825:21, 828:1
confusing [1] - 786:13
confusion [1] - 637:17
connect [1] - 670:2
connection [1] - 765:9
connections [2] - 699:18, 699:20
consider [1] - 647:7
considered [2] - 838:3, 848:8
consisted [1] - 766:23
conspirators [2] - 766:14, 847:4
construction [1] - 742:18
consumption [1] - 664:11
CONT [1] - 636:1
contact [6] - 679:5, 702:19, 710:5, 761:2, 789:25, 810:19
contacted [2] - 688:6, 734:24
contacts [1] - 694:19
contain [3] - 659:18, 660:5, 831:10
contained [1] - 649:6
content [1] - 845:12
contents [1] - 655:10, 659:16, 753:24
context [1] - 836:24
continue [7] - 669:14, 710:7, 732:7, 743:12, 749:24, 803:2, 840:10
CONTINUED [1] - 635:10
continuing [1] - 638:21
contraband [1] - 761:21
contradict [1] - 840:1
conversation [5] - 672:6, 675:11, 678:14, 680:5, 753:12
conversations [1] - 688:20
convicted [8] - 750:7, 785:20, 786:23, 792:8, 853:3, 853:5, 853:13, 853:23
conviction [1] - 853:8
cook [2] - 784:14, 812:19, 813:14
cooperate [1] - 842:19
copies [1] - 836:10
cops [2] - 689:3, 689:14

copy [3] - 638:7, 643:12, 647:13
corner [2] - 654:18, 814:8
corporal [2] - 759:14, 759:16
Corporal [4] - 762:5, 767:25, 772:8, 773:4
correct [77] - 641:8, 643:16, 643:17, 656:13, 656:23, 662:17, 663:14, 663:15, 663:19, 664:5, 664:24, 665:8, 692:23, 693:4, 693:11, 693:25, 694:9, 694:15, 697:19, 697:23, 700:10, 702:12, 702:20, 706:8, 706:22, 708:22, 712:19, 721:11, 722:12, 724:8, 724:19, 725:17, 728:23, 734:17, 741:11, 741:23, 743:18, 743:23, 743:24, 746:23, 746:24, 747:11, 747:24, 749:22, 750:9, 751:9, 752:21, 755:11, 755:18, 758:20, 775:16, 785:23, 787:3, 787:15, 788:2, 811:7, 813:12, 814:16, 815:3, 816:13, 816:17, 817:9, 817:10, 818:5, 818:7, 821:11, 829:9, 830:18, 832:14, 835:18, 837:4, 839:1, 839:18, 842:23, 844:19, 847:1, 855:2
corrected [1] - 827:16
correction [3] - 786:6, 827:13, 827:14
Corrections [1] - 780:11
correctly [1] - 663:10
corrects [5] - 703:21, 736:11, 739:23, 748:6, 757:7
correspondence [2] - 834:21, 835:6
corrupt [1] - 844:5
corruption [1] - 851:9
couch [1] - 644:1
Counsel [1] - 713:5
counsel [12] - 637:19, 637:20, 690:22, 691:6, 692:8, 751:10, 753:19, 767:11, 778:4, 827:14, 840:14, 846:7
country [9] - 653:16, 692:25, 693:6, 711:8, 712:1, 712:19, 741:2, 741:5, 777:5
counts [1] - 852:18
County [5] - 712:25, 789:14, 793:9, 816:5, 816:6
couple [4] - 663:8, 784:5, 812:12, 846:14
course [14] - 676:6, 736:18, 738:13, 738:14, 742:8, 749:7, 750:13, 764:12, 777:3, 818:9, 829:21, 835:1, 846:14, 849:18
Court [17] - 637:3, 644:19, 652:22, 690:17, 692:3, 692:6, 731:6, 731:11, 777:14, 777:18, 778:2, 839:8, 853:7, 853:8, 853:23, 853:24, 854:18
COURT [206] - 635:1, 637:5, 637:13, 637:18, 637:20, 637:24, 638:16, 638:21, 638:24, 644:20, 646:20, 647:7, 647:14, 647:17, 647:21, 647:23, 648:3, 651:3, 651:6, 651:8, 651:10, 653:23, 657:8, 659:6, 659:9, 659:21, 659:23, 660:7, 660:10,

660:13, 660:16, 660:23, 663:4, 664:18, 665:11, 665:13, 665:15, 665:18, 665:24, 666:11, 666:14, 677:11, 679:14, 683:12, 683:14, 684:9, 684:11, 684:20, 684:23, 685:13, 685:15, 689:23, 689:25, 690:13, 690:21, 690:23, 691:5, 691:11, 691:15, 691:25, 692:2, 692:8, 692:10, 692:12, 692:16, 699:1, 699:3, 699:10, 699:13, 699:17, 699:20, 699:23, 699:25, 700:2, 700:4, 700:6, 713:4, 713:8, 713:11, 714:18, 714:20, 714:22, 719:7, 719:9, 719:12, 727:17, 727:19, 729:22, 729:25, 730:14, 730:16, 730:24, 731:1, 731:13, 731:18, 731:24, 732:4, 733:1, 733:12, 734:10, 737:2, 737:5, 738:22, 738:24, 740:21, 751:21, 751:23, 752:8, 753:18, 754:2, 755:25, 756:2, 758:5, 758:7, 758:9, 758:20, 763:25, 767:6, 767:18, 767:22, 769:4, 769:21, 770:23, 771:1, 777:8, 777:20, 777:23, 778:16, 778:25, 779:11, 786:17, 792:20, 801:22, 802:11, 802:14, 810:7, 810:10, 810:12, 810:15, 810:24, 817:17, 817:23, 821:3, 832:24, 833:13, 833:16, 834:1, 834:6, 834:8, 834:11, 834:15, 835:1, 835:4, 835:9, 835:12, 835:14, 835:18, 835:24, 836:2, 836:14, 836:25, 837:5, 837:10, 838:21, 838:25, 839:2, 839:16, 839:20, 839:25, 840:5, 840:13, 840:15, 840:20, 840:24, 842:3, 842:25, 843:11, 843:17, 844:8, 844:15, 844:22, 845:2, 845:9, 845:11, 845:14, 845:20, 848:3, 848:6, 848:9, 848:13, 848:16, 848:19, 848:21, 848:23, 848:25, 849:14, 849:17, 850:12, 851:23, 852:9, 852:14, 852:16, 853:1, 854:13, 854:17, 854:21
**court** [12] - 710:19, 749:15, 763:11, 764:11, 764:16, 764:19, 764:25, 765:6, 765:10, 765:24, 766:5, 853:20
**Court's** [3] - 637:22, 647:11, 767:13
**Courthouse** [1] - 636:23
**courtroom** [5] - 677:4, 679:7, 679:12, 718:24, 733:7
**courts** [1] - 853:22
**cousin** [3] - 675:1, 675:6, 742:13
**cousins** [23] - 670:1, 670:3, 671:21, 694:23, 695:1, 695:4, 695:9, 695:16, 695:18, 696:3, 696:5, 697:10, 697:25, 698:3, 698:7, 698:11, 701:21, 701:25, 705:21, 706:3, 706:10, 710:10, 711:22
**coyote** [1] - 716:7
**crazy** [1] - 851:1
**create** [1] - 658:18
**credit** [1] - 660:4
**crime** [8] - 720:7, 785:20, 785:21, 792:7, 792:11, 792:23, 793:2, 811:23

**crimes** [1] - 749:19
**Criminal** [1] - 635:5
**Cross** [5] - 856:10, 856:11, 856:14, 856:18, 857:3
**CROSS** [5] - 661:1, 663:6, 692:18, 740:23, 811:1
**cross** [8] - 659:6, 663:4, 692:16, 733:1, 734:10, 740:21, 760:4, 810:24
**Cross-Examination** [5] - 856:10, 856:11, 856:14, 856:18, 857:3
**CROSS-EXAMINATION** [5] - 661:1, 663:6, 692:18, 740:23, 811:1
**cross-unit** [1] - 760:4
**Crown** [1] - 649:9
**CRR** [2] - 636:23, 855:7
**crying** [1] - 776:6
**crystal** [1] - 782:11
**Cunningham** [14] - 635:14, 638:9, 730:24, 732:4, 834:17, 836:3, 837:5, 840:2, 840:6, 841:16, 842:18, 844:4, 849:5, 851:8
**CUNNINGHAM** [103] - 665:19, 665:22, 665:25, 666:12, 666:17, 677:9, 677:13, 677:20, 679:16, 679:18, 679:19, 683:15, 684:13, 685:10, 685:14, 685:17, 686:15, 690:3, 690:11, 691:10, 691:12, 698:25, 699:2, 699:6, 713:12, 713:14, 714:16, 714:21, 714:25, 715:6, 715:8, 715:18, 719:5, 719:8, 719:10, 719:14, 719:15, 724:21, 727:21, 730:2, 730:18, 730:25, 731:14, 732:5, 733:3, 733:10, 733:14, 734:12, 736:12, 737:7, 739:1, 740:19, 751:20, 751:22, 752:7, 756:3, 756:5, 757:8, 757:9, 757:21, 757:22, 758:4, 758:8, 758:18, 758:21, 777:21, 777:24, 779:3, 779:8, 779:21, 786:12, 786:19, 786:20, 792:17, 792:22, 801:18, 802:3, 802:19, 808:1, 810:17, 810:22, 821:1, 821:4, 834:18, 834:24, 835:3, 835:5, 835:10, 835:13, 835:16, 835:19, 836:1, 836:6, 836:17, 837:4, 837:8, 837:12, 838:23, 839:1, 839:4, 839:18, 839:23, 840:10
**Cunningham's** [1] - 850:5
**CUNNINGHAM..........** [2] - 856:15, 856:18
**CUNNINGHAM............** [3] - 856:14, 856:17, 857:2
**cup** [3] - 650:4, 724:2, 724:4
**cupboards** [1] - 655:18
**currency** [3] - 762:1, 763:2, 763:5
**current** [1] - 763:20
**custodial** [2] - 836:24, 837:3
**custodian** [1] - 837:2
**custody** [6] - 668:23, 780:8, 785:14, 836:21, 836:22, 839:10
**custom** [1] - 658:20
**customer** [4] - 696:7, 701:11, 718:23, 746:21

**customers** [3] - 689:21, 695:17, 724:18
**cut** [2] - 650:3, 658:12
**CVS** [2] - 793:12, 816:2

# D

**D.C** [46] - 645:10, 673:9, 673:10, 673:15, 673:16, 675:24, 677:14, 680:11, 702:4, 704:11, 704:18, 706:14, 706:17, 713:24, 714:8, 714:10, 717:10, 717:22, 718:4, 718:8, 720:22, 725:2, 726:14, 733:25, 742:9, 742:12, 742:20, 742:21, 742:23, 744:5, 744:6, 744:7, 746:22, 748:3, 748:12, 749:13, 749:24, 749:25, 754:24, 755:1, 773:15, 773:16, 773:20, 774:5, 774:10, 816:4
**d/1** [1] - 762:17
**dad** [1] - 781:22
**dark** [3] - 805:16, 806:15, 807:5
**data** [3] - 765:1, 765:21, 766:4
**Date** [1] - 855:7
**date** [10] - 641:19, 651:20, 652:1, 670:21, 671:8, 712:16, 712:21, 720:12, 744:22, 845:17
**dates** [1] - 663:12
**days** [18] - 665:5, 702:22, 702:24, 707:4, 707:8, 707:16, 707:20, 707:22, 707:24, 709:1, 748:4, 748:5, 748:8, 748:14, 766:23, 792:9, 816:11, 821:14
**de** [7] - 635:6, 635:16, 648:24, 665:1, 668:20, 856:2
**deal** [2] - 840:7, 843:4
**dealer** [2] - 808:25
**dealing** [1] - 785:3
**dealt** [3] - 836:18, 839:7, 842:14
**death** [2] - 851:6, 852:23
**decide** [1] - 720:25
**decided** [2] - 710:6, 835:24
**decides** [2] - 850:20, 853:8
**decision** [5] - 844:22, 844:23, 852:1, 853:7, 854:11
**decisions** [1] - 853:19
**defend** [4] - 844:8, 844:12, 844:14, 844:19
**Defendant** [22] - 635:16, 635:18, 641:2, 641:14, 642:21, 651:18, 677:10, 713:5, 719:6, 733:11, 760:23, 761:2, 764:6, 766:6, 766:13, 773:24, 792:18, 834:19, 834:22, 835:7, 836:21, 838:22
**defendant** [2] - 836:19, 836:22
**DEFENDANT** [14] - 834:3, 840:17, 840:22, 840:25, 842:4, 843:1, 843:13, 843:19, 844:10, 844:17, 844:24, 845:3, 850:15, 854:20
**Defendant's** [1] - 836:16
**Defendants** [1] - 635:7
**defendants** [3] - 661:20, 836:4, 836:8
**defended** [2] - 841:11, 844:24

**defending** [2] - 844:15, 844:20
**Defense** [6] - 647:2, 664:22, 679:11, 753:21, 800:4, 836:7
**defense** [1] - 848:21
**defer** [1] - 660:10
**degree** [3] - 659:17, 786:1, 786:2
**delay** [1] - 778:12
**deliver** [2] - 805:20, 842:19
**delivered** [2] - 739:18, 846:10
**deliveries** [2] - 728:6, 739:16
**delivery** [3] - 801:4, 801:15, 803:1
**demeanor** [1] - 776:3
**demonstrate** [2] - 684:25, 685:4
**demonstrated** [1] - 829:12
**denied** [4] - 669:10, 835:17, 850:24, 852:22
**Denora** [4] - 745:1, 748:25, 749:1, 749:2
**Department** [7] - 639:15, 639:17, 664:14, 759:9, 759:11, 759:22, 780:10
**department** [10] - 639:21, 639:23, 640:7, 661:20, 662:11, 664:8, 731:19, 760:5, 760:6, 765:9
**depended** [2] - 690:2, 701:10
**depicted** [7] - 643:10, 644:22, 645:2, 648:23, 653:12, 654:5, 762:9
**deportation** [2] - 838:1
**deported** [1] - 838:2
**Descala** [1] - 668:20
**describe** [2] - 728:18, 738:1
**desire** [1] - 712:4
**destination** [1] - 772:6
**detail** [2] - 780:13, 786:21
**detailed** [1] - 851:24
**Detective** [34] - 639:4, 639:10, 639:14, 645:16, 648:6, 648:19, 651:13, 651:17, 653:19, 654:1, 655:12, 658:22, 660:2, 661:3, 663:8, 691:18, 752:24, 753:1, 753:6, 754:9, 754:17, 758:13, 759:2, 759:6, 759:18, 761:23, 763:6, 763:7, 771:19, 771:21, 778:23, 778:25, 839:12
**DETECTIVE** [4] - 639:5, 758:22, 856:9, 856:20
**detective** [7] - 640:13, 640:25, 652:1, 663:3, 759:19, 759:22, 767:11
**detectives** [1] - 782:10
**Detention** [1] - 712:25
**determination** [1] - 851:25
**determine** [3] - 766:22, 766:24, 767:1
**determined** [3] - 764:12, 768:1, 776:25
**devices** [1] - 767:14
**dial** [1] - 765:10
**dialed** [1] - 765:8
**Diaz** [2] - 653:14, 653:16
**Diego** [2] - 781:24, 811:12
**different** [26] - 649:12, 649:19, 664:10, 675:11, 675:12, 682:25, 699:7, 699:10, 707:2, 711:1, 724:25, 727:9, 748:14, 748:16, 748:17, 749:8,

763:18, 764:17, 786:9, 786:10, 807:24, 809:4, 833:11, 840:19, 847:14, 847:20
**differently** [3] - 727:14, 738:12, 738:15
**difficulty** [4] - 666:14, 700:2, 704:17, 843:18
**digest** [1] - 847:2
**digits** [1] - 765:10
**dining** [1] - 643:22
**DiPietro** [1] - 753:7
**DIRECT** [5] - 639:12, 666:16, 715:17, 759:4, 779:20
**direct** [9] - 651:24, 669:17, 693:8, 755:7, 762:16, 768:17, 769:2, 774:14, 850:10
**Direct** [5] - 856:10, 856:14, 856:17, 856:21, 857:2
**directed** [1] - 834:21
**directing** [2] - 760:22, 768:10
**directly** [3] - 639:7, 654:11, 758:25
**dirty** [3] - 721:20, 824:25, 825:1
**discharge** [1] - 808:5
**discover** [1] - 651:17
**discovery** [18] - 778:3, 836:4, 836:6, 836:16, 840:1, 840:2, 841:5, 844:12, 844:25, 845:11, 845:23, 846:4, 846:8, 846:19, 846:23, 847:9, 848:4, 850:16
**discuss** [8] - 673:19, 690:15, 720:2, 731:2, 777:10, 777:12, 833:17, 849:22
**discussion** [6] - 638:1, 646:21, 659:10, 684:21, 699:4, 767:7
**discussions** [1] - 850:14
**dishonesty** [1] - 849:8
**dispatch** [1] - 775:6
**disposition** [1] - 838:15
**disregard** [1] - 810:12
**distance** [1] - 771:25
**distinctive** [1] - 798:17
**distress** [1] - 776:7
**distribute** [2] - 723:1, 723:3
**distribution** [1] - 783:5
**Distribution** [1] - 664:13
**District** [4] - 637:2, 637:3, 761:4, 774:12
**DISTRICT** [2] - 635:1, 635:1
**divided** [1] - 846:11
**DIVISION** [1] - 635:2
**Dixie** [1] - 650:3
**docket** [1] - 834:20
**Docket** [1] - 635:5
**docketed** [1] - 835:2
**Document** [1] - 638:5
**document** [12] - 646:9, 657:19, 659:23, 660:7, 661:13, 691:17, 753:25, 754:3, 754:5, 754:7, 754:12
**documentation** [1] - 693:4
**documents** [13] - 657:12, 693:5, 717:19, 717:20, 835:15, 836:5, 836:8, 836:10, 836:11, 836:23, 837:2, 842:5, 846:21
**dollars** [5] - 832:4, 837:16, 837:23,

842:9, 842:10
**domingo** [1] - 688:12
**Dominican** [5] - 739:4, 739:11, 739:25, 745:2, 777:6
**done** [2] - 656:11, 707:14, 802:6, 840:11, 841:25, 853:6, 854:7
**door** [10] - 642:11, 642:18, 642:19, 643:4, 645:1, 645:4, 654:11, 664:3, 824:2, 824:3
**doors** [1] - 643:24
**down** [24] - 647:21, 648:9, 655:1, 672:1, 675:21, 676:23, 678:17, 678:20, 678:24, 679:3, 687:18, 688:3, 713:23, 734:8, 758:25, 771:10, 771:11, 771:25, 788:16, 790:2, 806:18, 806:21, 807:1, 807:2
**drank** [4] - 795:9, 823:14, 823:15
**draw** [2] - 772:17, 772:19
**drawers** [2] - 644:6, 648:16
**drink** [2] - 799:21, 823:15
**drinking** [1] - 823:17
**drive** [2] - 676:23, 754:23
**driver** [4] - 801:20, 801:25, 802:4, 807:13
**driver's** [2] - 722:2, 777:1
**driving** [7] - 730:12, 730:17, 772:14, 776:11, 776:12, 807:9, 807:14
**drop** [1] - 736:4
**dropped** [1] - 704:23
**drove** [3] - 726:13, 734:4, 808:12
**drug** [2] - 721:16, 783:5
**drugs** [14] - 709:19, 721:18, 782:10, 782:15, 782:17, 783:4, 811:14, 811:15, 811:20, 815:6, 815:7, 842:19, 842:20, 842:22
**drunk** [2] - 823:10, 823:13
**due** [2] - 660:3, 711:10
**Dueñas** [1] - 839:19
**DULY** [5] - 639:6, 666:4, 715:12, 758:23, 779:15
**duplicate** [1] - 847:19
**duration** [1] - 765:11
**during** [23] - 670:25, 672:6, 673:19, 674:17, 676:6, 676:10, 676:25, 681:1, 683:17, 691:18, 703:1, 707:22, 727:3, 727:13, 736:23, 751:18, 752:13, 771:8, 773:12, 773:16, 782:21, 810:3, 823:15
**duties** [2] - 640:4, 640:5

# E

**e/4** [1] - 657:14
**ear** [1] - 849:11
**early** [5] - 675:1, 688:16, 706:13, 759:20, 766:16
**earn** [4] - 726:20, 800:23, 814:9, 817:8
**earned** [1] - 738:16
**earning** [1] - 742:16

**easier** [1] - 657:1
**Eastport** [4] - 649:16, 649:19, 649:22
**eat** [2] - 794:15, 794:16
**ECF** [1] - 638:5
**Edward** [1] - 636:3
**effect** [3] - 702:11, 787:7, 839:4
**effects** [1] - 837:6
**effort** [4] - 638:21, 837:17, 838:2, 838:8
**eggs** [2] - 654:18, 654:22
**eight** [6] - 748:4, 748:5, 764:17, 764:18, 769:23, 780:16
**either** [9] - 637:22, 644:10, 653:19, 738:10, 825:15, 825:24, 842:13, 849:4, 851:21
**El** [18] - 640:17, 715:25, 732:16, 732:17, 732:22, 733:4, 733:8, 734:16, 735:11, 735:20, 741:3, 741:9, 741:22, 741:25, 746:11, 789:24, 799:8, 852:23
**elapsed** [2] - 814:19, 816:10
**electronic** [1] - 833:19
**elements** [1] - 699:8
**eleven** [5] - 716:2, 741:3, 741:25, 781:7, 846:11
**eliminates** [1] - 767:12
**Elizabeth** [1] - 753:9
**ELMO** [1] - 691:17
**elsewhere** [2] - 698:4, 744:6
**employed** [2] - 722:8, 743:5
**employment** [3] - 743:12, 751:18, 752:6
**empty** [2] - 785:11, 830:22
**encounter** [2] - 761:11, 804:24
**encountered** [2] - 657:23, 778:9
**end** [11] - 672:13, 707:12, 719:10, 728:3, 771:23, 778:12, 805:17, 814:24, 832:1, 832:6, 842:16
**ended** [2] - 683:9, 696:13, 818:24
**enemy** [1] - 801:4
**Enforcement** [1] - 664:12
**engage** [2] - 696:20, 698:4
**engaged** [2] - 693:13, 697:13
**English** [9] - 691:4, 780:1, 786:7, 807:21, 825:6, 841:7, 842:7, 845:25, 846:17
**Enrique** [10] - 717:25, 790:7, 791:1, 791:13, 794:19, 814:23, 815:8, 815:9, 815:11
**enter** [7] - 643:21, 667:5, 667:7, 693:3, 693:5, 716:4, 773:1
**entered** [12] - 654:12, 692:22, 692:25, 693:3, 693:14, 694:17, 716:6, 716:12, 741:2, 741:5, 772:2, 772:20
**enters** [4] - 638:23, 692:11, 731:23, 778:15
**entire** [1] - 696:13
**entirely** [1] - 852:2
**ENTITLED** [1] - 635:10
**entitled** [1] - 855:4
**entrance** [1] - 788:7
**entranceway** [1] - 796:5

**entries** [1] - 834:20
**entry** [8] - 686:21, 686:24, 735:7, 735:8, 735:11, 735:15, 735:18
**equally** [1] - 659:15
**errands** [2] - 718:15, 722:19
**escaped** [1] - 683:4
**especially** [1] - 685:5
**Esquire** [2] - 635:17, 635:19
**essentially** [5] - 718:17, 723:12, 732:11, 835:14, 839:5
**establish** [1] - 720:12
**established** [1] - 768:22
**establishment** [2] - 793:11, 793:12
**estimate** [1] - 816:20
**et** [3] - 659:18, 846:13, 856:2
**evaluated** [1] - 778:1
**evening** [5] - 655:21, 656:11, 675:1, 736:8, 736:10
**evenings** [1] - 768:4
**event** [1] - 854:10
**eventually** [2] - 784:19, 809:23
**evidence** [31] - 638:12, 644:15, 648:1, 648:14, 649:2, 652:18, 655:19, 658:24, 663:21, 664:23, 665:5, 665:7, 665:23, 684:25, 730:15, 763:7, 841:12, 843:23, 844:25, 849:5, 849:8, 851:3, 851:4, 852:12, 852:19, 852:22, 852:23, 853:5, 853:10, 853:18
**evidenced** [1] - 849:24
**evidentiary** [4] - 660:13, 663:14, 663:24, 664:23
**ex** [1] - 778:7
**exact** [2] - 728:12, 827:3
**exactly** [30] - 640:10, 658:21, 703:3, 712:16, 742:1, 783:6, 783:9, 783:17, 783:19, 785:19, 786:15, 787:16, 788:21, 795:5, 796:8, 797:22, 800:15, 803:14, 812:2, 812:20, 813:13, 813:19, 816:14, 816:18, 821:8, 822:18, 823:11, 823:20, 824:13, 829:10
**exaggeration** [1] - 837:15
**examination** [8] - 646:24, 666:15, 691:13, 693:8, 733:2, 755:7, 786:22, 834:5
**Examination** [13] - 856:10, 856:10, 856:11, 856:11, 856:14, 856:14, 856:15, 856:17, 856:18, 856:18, 856:21, 857:2, 857:3
**EXAMINATION** [13] - 639:12, 661:1, 663:6, 664:20, 666:16, 692:18, 713:13, 715:17, 740:23, 756:4, 759:4, 779:20, 811:1
**Examination.....** [1] - 857:3
**examinations** [1] - 849:1
**example** [9] - 663:25, 664:22, 665:6, 782:4, 837:25, 845:4, 846:23, 850:25, 851:1
**exception** [1] - 712:23
**exchange** [2] - 723:17, 822:3

**exchanged** [1] - 726:8
**exclusion** [1] - 767:14
**excuse** [14] - 637:7, 637:10, 637:23, 677:20, 685:14, 699:16, 703:15, 714:20, 757:6, 758:7, 758:15, 779:6, 779:8, 787:1
**Excused** [1] - 857:3
**excused** [15] - 665:15, 665:17, 690:19, 691:11, 691:13, 714:22, 714:24, 731:8, 758:9, 758:12, 777:16, 779:2, 833:25, 834:5, 840:14
**Excused................................** [4] - 856:12, 856:15, 856:19, 856:21
**execute** [2] - 801:3, 803:9
**executing** [1] - 760:19
**execution** [1] - 641:1
**exhibit** [6] - 647:2, 648:21, 659:13, 659:14, 735:5, 735:10
**Exhibit** [30] - 682:3, 682:12, 685:20, 686:9, 686:18, 686:20, 687:7, 688:8, 723:25, 724:16, 725:12, 725:18, 726:3, 727:23, 729:7, 734:20, 735:4, 735:7, 738:6, 738:7, 788:6, 788:12, 788:19, 789:4, 790:3, 794:25, 796:4, 797:3, 798:13, 803:12
**exhibits** [1] - 647:13
**exists** [1] - 850:23
**exit** [3] - 772:25, 773:19
**exited** [2] - 772:1, 772:17
**expect** [1] - 784:12
**Expedition** [2] - 730:23, 768:15
**expended** [1] - 838:8
**expenses** [1] - 794:14
**expensive** [1] - 838:3
**experience** [4] - 654:23, 658:23, 761:25, 850:20
**experienced** [1] - 853:15
**explain** [6] - 648:8, 694:2, 696:2, 765:4, 831:18, 846:25
**explained** [3] - 843:24, 853:1
**explanation** [1] - 839:13
**explicit** [1] - 836:7
**extended** [1] - 771:3
**extensions** [1] - 764:22
**extent** [2] - 835:19, 853:2
**eye** [3] - 758:2, 758:3, 843:9

# F

**f/5** [1] - 657:14
**face** [5] - 643:8, 738:2, 771:11, 854:3
**facilitate** [1] - 721:24
**facility** [2] - 837:2, 854:14
**fact** [14] - 659:16, 662:19, 706:21, 710:13, 750:6, 766:9, 785:14, 800:20, 822:20, 836:6, 841:5, 841:21, 849:24, 853:21, 853:25, 854:1
**factory** [2] - 820:5, 820:7
**facts** [1] - 730:15

**fair** [11] - 663:21, 664:1, 664:9, 698:19, 698:23, 766:2, 841:13, 852:1, 852:3, 852:6, 854:1
**fairly** [2] - 798:17, 836:7
**faith** [4] - 838:13, 851:15, 852:3, 852:4
**false** [2] - 786:7, 786:14
**falsified** [1] - 667:12
**familiar** [3] - 788:11, 788:12, 831:8
**family** [8] - 694:5, 716:21, 716:25, 741:7, 741:9, 741:21, 741:24, 781:1
**far** [7] - 787:11, 806:8, 828:3, 828:4, 828:11, 839:13, 843:16
**father** [2] - 668:9, 668:10
**fault** [1] - 852:16
**favor** [7] - 709:10, 801:2, 821:18, 821:20, 821:22, 825:18, 850:23
**features** [1] - 757:24
**February** [6] - 651:25, 652:5, 658:25, 661:4, 661:5
**federal** [4] - 711:16, 711:21, 843:22, 849:9
**federally** [1] - 691:4
**fee** [1] - 748:18
**feed** [1] - 699:15
**fell** [1] - 743:10
**fellow** [1] - 743:14
**felt** [4] - 806:19, 826:15, 839:9, 846:21
**female** [12] - 667:18, 667:19, 695:6, 769:11, 772:1, 772:13, 772:17, 772:25, 774:1, 774:2, 775:18, 775:25
**females** [2] - 768:2, 768:4
**Ferman** [2] - 779:4, 779:18
**FERMAN** [2] - 779:14, 857:1
**few** [9] - 685:19, 756:3, 778:11, 780:14, 788:10, 793:1, 793:2, 815:19, 847:10
**fifteen** [1] - 674:14
**fifth** [1] - 838:21
**fifty** [1] - 715:23
**fifty-three** [1] - 715:23
**figure** [1] - 707:11
**file** [3] - 846:12, 847:24, 852:20
**filed** [3] - 638:5, 638:7, 845:16
**files** [1] - 847:18
**filibuster** [1] - 843:21
**fill** [1] - 760:10
**fill-in** [1] - 760:10
**final** [1] - 772:6
**finally** [2] - 650:22, 770:4
**financial** [2] - 695:16, 696:2
**finger** [3] - 772:16, 772:19, 798:14
**finish** [2] - 782:18, 782:19, 817:15
**finished** [2] - 736:3, 754:4, 824:9
**first** [63] - 644:17, 650:24, 652:22, 657:12, 662:6, 666:25, 670:21, 670:23, 672:18, 675:8, 675:10, 675:21, 676:13, 676:16, 677:22, 678:6, 680:16, 695:2, 700:17, 700:22, 703:2, 703:11, 704:2, 704:3, 709:17, 713:15, 713:22, 722:15, 723:15,

723:23, 762:17, 769:20, 771:15, 772:8, 780:21, 781:12, 786:1, 786:2, 786:3, 791:10, 799:5, 807:24, 809:18, 814:14, 814:19, 818:10, 821:23, 822:15, 827:6, 827:7, 827:20, 827:22, 828:4, 828:6, 828:7, 828:12, 828:13, 829:8, 829:24, 835:24, 836:3, 838:17
**five** [21] - 651:25, 669:6, 678:3, 702:22, 702:24, 707:4, 731:4, 742:5, 742:6, 744:13, 747:16, 747:20, 749:6, 808:4, 808:21, 816:11, 817:5, 830:24, 830:25, 831:2, 844:3
**floor** [6] - 644:3, 654:6, 655:4, 655:8, 655:15, 788:16
**Flores** [1] - 745:2
**fluently** [1] - 841:8
**flyer** [8] - 642:21, 643:1, 643:12, 643:14, 646:17, 647:1, 664:4, 664:7
**FOCR** [1] - 636:23
**focussed** [1] - 768:21
**folks** [5] - 638:18, 731:13, 731:19, 824:20, 830:6
**follow** [1] - 852:4
**followed** [4] - 760:12, 769:12, 773:10, 782:23
**following** [8] - 638:1, 646:21, 659:10, 678:13, 684:21, 699:4, 712:12, 767:7
**food** [12] - 674:17, 675:6, 681:12, 681:14, 681:15, 718:15, 737:8, 782:2, 794:13, 794:15, 794:16
**FOR** [5] - 635:1, 635:10, 856:7
**force** [7] - 696:23, 698:20, 705:17, 709:3, 711:11, 750:12, 754:18
**forced** [9] - 668:3, 668:12, 693:24, 694:11, 694:14, 697:2, 705:12, 705:15, 751:11
**forcing** [1] - 694:3
**Ford** [3] - 730:23, 768:15, 808:25
**foregoing** [1] - 855:2
**foreign** [3] - 659:23, 660:7, 850:9
**form** [3] - 729:25, 737:3, 850:1
**forth** [1] - 780:24
**forward** [2] - 694:12, 771:13
**fought** [1] - 800:23
**foundation** [2] - 647:14, 660:16
**four** [12] - 661:8, 720:20, 727:3, 745:3, 745:6, 745:7, 787:25, 816:11, 817:3, 817:5, 843:8, 844:1
**fourth** [1] - 820:21
**frame** [2] - 759:21, 785:13
**Franco** [1] - 839:19
**frank** [1] - 850:8
**Frank** [7] - 803:4, 806:1, 807:4, 825:15, 825:24, 826:5, 826:9
**Franklin** [1] - 803:19
**Franklin's** [1] - 808:24
**frankly** [4] - 685:10, 849:11, 849:23, 850:8
**Freddy** [2] - 774:16, 776:16
**free** [1] - 712:24

**frequently** [1] - 765:17
**Friday** [3] - 688:18, 703:8, 709:17
**friend** [18] - 667:17, 667:18, 667:19, 671:12, 671:13, 671:17, 697:5, 697:9, 698:12, 746:3, 783:21, 784:11, 789:10, 789:11, 789:13, 813:2
**friends** [2] - 736:23, 815:6
**front** [6] - 645:1, 653:2, 654:11, 778:5, 826:7, 849:6
**Fuertes** [8] - 635:18, 641:2, 641:5, 642:3, 642:21, 642:25, 733:11, 834:1
**FUERTES** [2] - 635:7, 834:3
**Fuertes'** [1] - 642:22
**full** [3] - 705:23, 710:10, 834:20
**fully** [1] - 852:1
**furniture** [3] - 643:25, 644:2, 655:14
**future** [1] - 741:7

# G

**gainfully** [1] - 743:5
**Gallagher** [5] - 731:19, 777:25, 778:14, 835:23, 835:25
**games** [1] - 832:18
**gang** [12] - 640:5, 782:22, 783:1, 811:6, 811:9, 811:12, 811:13, 811:19, 811:24, 812:10, 812:11, 844:5
**gang's** [1] - 811:17
**gangs** [2] - 782:23, 783:4
**garb** [1] - 780:8
**GARCIA** [1] - 635:7
**Garcia** [3] - 635:18, 774:17
**gas** [1] - 808:11
**gather** [3] - 640:8, 640:12, 715:1
**general** [5] - 760:10, 771:15, 771:22, 776:3, 781:23
**generally** [5] - 641:24, 647:1, 663:12, 775:24, 789:8
**gentleman** [3] - 776:11, 786:14, 844:2
**gentlemen** [8] - 637:8, 642:15, 649:14, 652:3, 657:15, 661:24, 761:1, 765:5
**George's** [1] - 789:14
**Gerald** [1] - 635:17
**GERMAN** [2] - 635:6, 856:2
**German** [2] - 635:16, 760:23
**Gerry** [2] - 841:1, 843:19
**Giordano** [3] - 636:23, 855:1, 855:7
**girl** [11] - 689:6, 689:12, 736:4, 739:18, 739:21, 752:20, 807:2, 807:8, 807:18, 827:3, 827:4
**girlfriend** [2] - 696:19, 696:23
**girls** [13] - 751:10, 752:10, 752:13, 754:9, 754:18, 754:23, 793:20, 794:10, 794:15, 794:16, 799:1, 800:22, 802:16
**given** [20] - 650:5, 650:6, 671:23, 678:2, 698:12, 698:14, 721:6, 724:6, 728:21, 734:21, 790:1, 791:1, 812:17, 822:24, 822:25, 823:1, 825:8, 826:8, 832:1,

839:14
**glad** [1] - 786:14
**glass** [1] - 788:20
**God** [3] - 813:24, 841:19, 852:5
**Goldstein** [1] - 636:4
**GOLDSTEIN** [28] - 637:7, 637:11,
  699:16, 699:19, 715:3, 715:7, 747:3,
  748:6, 754:4, 757:6, 757:19, 758:15,
  758:19, 779:6, 779:9, 786:5, 786:13,
  807:22, 817:14, 817:18, 817:21,
  819:2, 819:6, 824:8, 824:14, 842:20,
  842:23, 854:22
**Gonzale** [3] - 745:10, 746:14, 746:17
**GONZALE** [1] - 745:11
**Gonzalez** [4] - 648:25, 665:2, 745:8,
  745:9
**good-by** [2] - 834:2, 834:12
**good-faith** [1] - 838:13
**Government** [55] - 635:13, 639:1, 647:3,
  659:21, 681:18, 682:3, 682:11,
  684:24, 685:20, 685:25, 686:9,
  686:18, 686:20, 687:7, 688:8, 691:25,
  723:25, 724:15, 725:12, 726:3,
  727:22, 729:7, 734:20, 735:4, 735:7,
  738:6, 738:7, 751:10, 767:11, 778:1,
  778:10, 787:2, 787:12, 788:6, 788:12,
  788:19, 789:4, 790:3, 794:25, 796:4,
  797:3, 798:12, 803:12, 837:6, 837:18,
  840:14, 840:25, 841:24, 846:9, 847:5,
  847:18, 849:4, 849:19, 849:20, 854:4
**GOVERNMENT** [1] - 856:8
**Government's** [25] - 643:10, 644:18,
  646:18, 648:7, 648:8, 648:19, 648:23,
  649:3, 649:13, 650:10, 654:4, 654:10,
  654:25, 656:2, 657:11, 657:13,
  657:18, 658:1, 664:6, 682:8, 762:6,
  762:9, 762:17, 769:19, 775:22
**GPS** [8] - 760:8, 763:13, 763:16, 763:19,
  764:5, 765:21, 767:14, 767:17
**grabbed** [1] - 782:13
**grabs** [1] - 842:18
**Grand** [1] - 847:3
**granted** [1] - 643:15
**grape** [1] - 649:12
**grass** [1] - 717:7
**gray** [1] - 730:23
**green** [4] - 650:23, 658:12, 768:15,
  773:1
**Greyhound** [5] - 725:1, 725:6, 736:4,
  755:4, 756:8
**grocery** [2] - 795:24, 797:16
**ground** [2] - 656:14, 656:24
**Guanano** [2] - 732:21, 734:17
**guarantee** [1] - 853:4
**guess** [4] - 676:6, 680:13, 781:6, 786:6
**gun** [30] - 662:9, 662:14, 804:8, 806:4,
  808:2, 808:5, 809:7, 824:18, 824:21,
  825:5, 825:16, 825:23, 826:5, 826:6,
  826:8, 827:6, 827:7, 827:12, 828:18,
  828:21, 829:6, 829:8, 829:13, 829:24,

830:3, 830:6, 830:7, 830:11, 833:4,
  833:5
**guns** [6] - 656:8, 661:23, 661:25,
  740:12, 740:15, 740:17
**guy** [27] - 662:9, 681:23, 681:24,
  722:20, 733:9, 739:14, 745:1, 791:22,
  793:23, 794:21, 801:5, 801:10, 803:9,
  804:20, 805:24, 806:9, 807:5, 807:9,
  807:11, 807:17, 808:7, 826:22,
  827:10, 827:17, 828:10, 828:22,
  831:21
**guys** [7] - 797:20, 803:4, 803:8, 808:3,
  808:13, 825:18, 830:12

## H

**h/11** [1] - 654:7
**h/12** [1] - 654:25
**h/14** [1] - 655:3
**h/15** [1] - 655:7
**h/16** [1] - 655:9
**h/17** [1] - 656:2
**h/18** [1] - 656:5
**h/2** [1] - 652:24
**h/4** [4] - 653:1, 769:19, 769:20, 769:21
**h/5** [2] - 653:4, 769:20
**half** [2] - 790:25, 838:11
**hallway** [1] - 655:2
**hand** [16] - 648:22, 649:18, 658:10,
  664:15, 666:2, 687:8, 715:10, 728:20,
  763:20, 765:15, 771:11, 779:13,
  818:23, 829:6, 829:7, 829:16
**handed** [1] - 649:20
**handle** [6] - 786:16, 827:6, 827:7,
  835:24, 836:15, 842:15
**handled** [3] - 827:22, 828:13, 829:8
**hands** [5] - 818:13, 818:14, 824:25,
  825:1, 851:16
**handwritten** [1] - 649:15
**hang** [1] - 832:5
**happy** [5] - 703:15, 818:8, 818:16,
  837:21, 839:21
**hard** [4] - 662:8, 717:15, 717:17, 826:17
**harm** [1] - 809:3
**Hartlove** [11] - 752:24, 753:1, 753:6,
  754:9, 754:17, 761:23, 763:6, 763:7,
  771:19, 771:21, 839:12
**head** [2] - 803:11, 807:18
**headed** [2] - 772:3, 772:4
**hear** [7] - 660:17, 684:23, 732:17,
  750:16, 799:16, 801:12, 851:24
**heard** [8] - 775:6, 799:17, 808:6,
  810:15, 825:4, 830:17, 838:4, 850:21
**hearing** [1] - 853:10
**HEARING** ........................................... [1] -
  857:4
**hears** [2] - 703:13, 852:24
**hearsay** [2] - 647:20, 659:18
**heart** [1] - 658:13

**heavily** [2] - 813:22, 813:23
**heavyset** [1] - 738:4
**Hector** [22] - 801:3, 801:5, 801:15,
  802:20, 802:25, 803:3, 804:19,
  804:24, 805:2, 805:17, 806:2, 806:12,
  806:17, 807:13, 807:14, 808:7,
  808:12, 809:15, 823:22, 828:5, 829:9
**Hector's** [1] - 805:5
**height** [1] - 738:3
**held** [3] - 754:18, 771:11, 827:20
**Helen** [4] - 645:7, 646:10, 648:15,
  725:24
**help** [9] - 654:24, 689:13, 711:21,
  722:20, 743:2, 782:20, 783:22,
  784:11, 841:20
**helped** [3] - 751:8, 813:24, 843:16
**helping** [1] - 637:8
**Hernandez** [8] - 779:4, 779:18, 811:3,
  813:10, 814:3, 817:25, 822:14, 823:21
**HERNANDEZ** [2] - 779:14, 857:1
**hidden** [1] - 740:13
**hide** [2] - 809:2
**hiding** [2] - 807:4, 841:2
**high** [2] - 642:10, 760:9
**high-profile** [1] - 760:9
**himself** [5] - 672:16, 676:4, 697:19,
  748:1, 831:5
**hired** [1] - 660:6
**Hispanic** [5] - 642:5, 642:10, 697:18,
  723:2, 723:5
**Hispanics** [1] - 723:3
**hit** [5] - 808:7, 808:8, 808:11, 808:21,
  843:8
**Hmm** [1] - 663:20
**hold** [8] - 639:19, 759:13, 759:17,
  807:21, 824:8, 831:9, 834:4, 836:7
**holding** [2] - 829:6, 831:25
**hole** [3] - 646:14, 650:13, 797:1
**holes** [1] - 724:12
**home** [2] - 710:2, 710:3
**homeland** [1] - 693:9
**Homeland** [1] - 640:5
**homicide** [3] - 760:17, 851:4, 851:5
**honest** [2] - 733:21, 792:5
**Honor** [154] - 637:6, 637:11, 637:14,
  637:21, 638:3, 638:14, 638:19, 639:3,
  646:23, 647:10, 651:2, 653:22, 657:7,
  659:5, 659:7, 660:21, 660:22, 663:5,
  665:12, 665:16, 665:19, 665:21,
  665:22, 666:13, 677:9, 677:20,
  683:11, 684:18, 685:10, 685:14,
  686:15, 689:24, 690:12, 690:20,
  691:12, 691:14, 691:17, 692:1,
  692:17, 699:2, 699:6, 699:12, 699:16,
  700:7, 713:3, 713:6, 713:9, 713:12,
  714:16, 714:21, 714:25, 715:2, 715:6,
  719:5, 719:8, 719:14, 724:21, 727:18,
  729:24, 730:13, 730:25, 731:14,
  732:23, 733:10, 737:4, 738:21,
  740:20, 740:22, 751:20, 752:7,

753:17, 756:1, 756:3, 758:4, 758:8,
758:15, 758:18, 758:21, 767:5, 767:9,
767:20, 769:3, 770:20, 777:7, 777:21,
778:8, 778:22, 778:24, 779:1, 779:3,
779:10, 786:6, 786:19, 792:17,
801:16, 802:12, 810:5, 810:23,
810:25, 817:14, 817:22, 821:1, 833:1,
834:10, 834:18, 834:21, 835:5,
835:13, 835:17, 836:1, 836:6, 836:11,
836:13, 836:17, 837:4, 837:8, 837:13,
837:24, 838:23, 839:1, 839:4, 839:18,
839:24, 840:4, 840:9, 840:10, 842:23,
845:10, 845:13, 845:15, 845:22,
846:3, 846:14, 846:19, 846:20,
846:23, 847:12, 847:17, 847:22,
848:1, 848:2, 848:7, 848:11, 848:14,
849:2, 849:21, 850:1, 850:8, 850:19,
852:7, 852:17, 854:12, 854:16, 854:20
**HONORABLE** [1] - 635:11
**Honorable** [9] - 637:4, 690:17, 692:3,
692:6, 731:6, 731:11, 777:14, 777:18,
854:18
**hook** [1] - 839:5
**hope** [3] - 787:5, 844:2, 853:1
**horrible** [1] - 854:2
**hospital** [7] - 769:6, 769:8, 769:12,
769:13, 770:5, 770:9, 771:5
**hot** [1] - 809:20
**hour** [6] - 731:2, 742:18, 790:24,
790:25, 820:12, 820:13
**hours** [7] - 676:23, 676:24, 790:22,
818:15, 818:18, 845:18
**house** [37] - 652:9, 682:15, 682:16,
683:10, 703:22, 705:9, 705:11,
707:25, 708:1, 709:6, 709:11, 728:6,
728:10, 728:11, 747:6, 747:9, 747:12,
747:15, 750:20, 752:10, 752:13,
752:16, 752:17, 752:19, 754:10,
754:23, 768:14, 773:14, 806:13,
808:11, 813:25, 814:4, 814:15, 815:1,
823:18, 826:7
**houses** [17] - 646:15, 728:14, 744:3,
744:22, 747:13, 747:16, 747:20,
748:21, 749:3, 749:6, 750:15, 750:16,
785:11, 785:12, 806:15, 809:11, 828:9
**HSI** [1] - 636:3
**Hudson** [3] - 642:5, 642:9, 745:18
**huge** [1] - 663:18
**hundred** [1] - 837:16
**hung** [1] - 811:5
**hunk** [1] - 752:1
**hurt** [1] - 694:5
**husband** [2] - 696:19, 696:23
**husher** [2] - 754:2

## I

**ideas** [1] - 848:23
**identification** [9] - 677:12, 686:16,

686:20, 719:13, 733:13, 735:4, 735:8,
753:21, 792:21
**identified** [11] - 642:20, 676:4, 677:10,
697:19, 719:6, 729:11, 733:11,
734:20, 738:8, 792:18, 839:19
**identify** [5] - 643:10, 648:21, 649:24,
657:14, 672:16
**identifying** [1] - 757:23
**identity** [2] - 682:18, 776:13
**illegal** [6] - 710:1, 711:17, 716:5,
749:10, 768:3, 850:24
**illegally** [7] - 667:6, 692:23, 711:4,
722:11, 741:2, 741:6, 749:25
**illegals** [1] - 749:9
**imagine** [1] - 843:7
**immediately** [2] - 695:8, 745:13
**Immigration** [4] - 710:23, 710:25, 711:1,
711:15
**impartial** [1] - 852:1
**impede** [1] - 646:24
**importance** [1] - 846:21
**important** [2] - 659:15, 846:19
**IN** [1] - 635:1
**inbound** [1] - 765:13
**inbound/outbound** [1] - 765:11
**incarcerated** [1] - 712:24
**incidences** [1] - 799:9
**incident** [3] - 761:18, 801:7, 815:15
**include** [1] - 768:5
**included** [3] - 640:22, 811:13, 851:4
**includes** [1] - 665:1, 765:10
**including** [2] - 753:2, 764:8
**independent** [2] - 651:22, 684:25
**independently** [1] - 770:17
**INDEX** [1] - 856:1
**Indiana** [6] - 784:20, 784:21, 784:24,
813:16, 813:17, 813:18
**indicate** [1] - 776:7
**indicated** [1] - 664:23
**indicates** [1] - 638:11
**indicating** [1] - 829:13
**indicia** [3] - 644:7, 655:12, 663:17
**indicted** [1] - 851:2
**Indictment** [1] - 839:17
**individual** [6] - 657:22, 681:17, 717:24,
718:1, 774:16, 791:15
**individually** [1] - 661:21
**individuals** [6] - 655:24, 656:9, 656:21,
661:9, 734:24, 753:13
**induce** [3] - 698:24, 699:7, 699:11
**indulgence** [1] - 647:11
**industry** [1] - 697:23
**inference** [1] - 835:20
**information** [19] - 639:21, 639:22,
640:10, 640:12, 642:22, 761:3, 761:5,
763:23, 765:6, 765:8, 765:10, 765:18,
765:19, 767:17, 769:9, 833:20, 836:9,
839:11, 839:13
**informed** [1] - 767:16

**initiated** [1] - 811:25
**initiation** [1] - 811:22
**inquire** [1] - 736:7
**insensitive** [1] - 666:20
**inside** [27] - 643:18, 643:20, 653:5,
653:6, 653:7, 661:9, 662:10, 722:17,
722:20, 723:11, 750:16, 750:20,
751:8, 761:12, 769:13, 770:5, 770:9,
807:8, 808:4, 809:13, 815:2, 826:12,
827:21, 827:23, 827:25, 829:7, 833:12
**instead** [3] - 720:3, 721:3, 729:19
**insubstantial** [1] - 839:6
**Intelligence** [7] - 639:20, 639:24,
639:25, 640:4, 759:14, 760:1, 760:3
**intelligence** [1] - 640:8
**intended** [1] - 647:3
**intention** [1] - 742:6
**interact** [1] - 768:2
**interacting** [1] - 848:17
**interaction** [2] - 768:4, 772:1
**interactions** [1] - 770:14
**interest** [3] - 760:20, 761:23, 768:13
**interests** [1] - 854:1
**interior** [2] - 788:10, 788:13
**internally** [1] - 664:12
**Internet** [3] - 785:3, 785:4, 833:20
**interpret** [2] - 691:4, 786:15
**interpretation** [3] - 638:15, 725:23,
817:16
**interpretations** [1] - 699:7
**Interpreter** [7] - 636:3, 636:4, 636:4,
637:7, 725:22, 779:9, 827:15
**interpreter** [28] - 668:18, 684:23,
690:24, 703:13, 703:21, 715:3, 736:6,
736:11, 739:23, 747:3, 748:6, 754:3,
754:4, 757:6, 757:19, 758:16, 776:23,
780:2, 780:3, 780:4, 786:5, 813:5,
819:2, 824:8, 827:13, 827:14, 845:24
**INTERPRETER** [41] - 637:7, 637:11,
668:18, 691:3, 699:16, 699:19,
703:13, 703:21, 715:3, 715:7, 725:22,
736:6, 736:10, 739:23, 747:3, 748:6,
754:4, 757:6, 757:19, 758:15, 758:19,
779:6, 779:9, 786:5, 786:13, 807:22,
813:5, 817:14, 817:18, 817:21, 819:2,
819:6, 824:8, 824:14, 827:13, 834:7,
834:9, 842:20, 842:21, 842:23, 854:22
**interpreters** [1] - 638:10
**interpreting** [2] - 691:2, 715:4
**interrupted** [1] - 699:15
**interval** [1] - 765:22
**intervals** [1] - 765:18
**interview** [2] - 661:8, 661:20
**interviewed** [8] - 661:10, 661:16,
662:10, 752:23, 753:1, 753:4, 753:5,
753:14
**interviews** [2] - 661:11, 661:15
**introduce** [1] - 789:16
**introduced** [1] - 732:15
**introduction** [1] - 852:12

**invading** [1] - 739:8
**investigate** [2] - 662:22, 711:22
**investigated** [1] - 662:23
**investigation** [19] - 640:6, 640:16, 640:22, 640:23, 665:4, 711:16, 760:11, 760:17, 763:10, 764:5, 764:13, 767:1, 773:6, 774:25, 776:20, 776:25, 847:15, 847:16
**investigations** [3] - 640:6, 760:20, 847:14
**Investigative** [1] - 759:25, 760:2
**investigative** [1] - 760:6
**investigators** [4] - 745:24, 746:2, 746:13, 746:16
**involved** [6] - 641:1, 652:9, 711:17, 768:3, 773:4, 851:9
**involvement** [1] - 760:19
**involving** [2] - 640:16, 774:15
**issue** [2] - 778:3, 836:15
**issued** [2] - 664:7, 664:11
**item** [1] - 657:4
**items** [8] - 648:14, 655:23, 656:20, 656:21, 663:10, 665:7, 687:4, 687:7
**itself** [1] - 853:22
**IV** [2] - 635:6, 856:3

## J

**jail** [8] - 712:12, 720:21, 753:8, 753:15, 785:15, 785:24, 809:11, 810:21
**Jersey** [37] - 645:18, 669:24, 670:2, 670:9, 670:12, 672:22, 672:24, 675:18, 678:9, 679:21, 679:23, 680:1, 694:20, 694:23, 695:1, 695:8, 695:11, 696:13, 697:10, 698:7, 701:4, 701:9, 701:12, 701:25, 702:3, 705:19, 706:2, 706:7, 708:8, 708:10, 709:22, 710:3, 710:9, 711:23, 714:2, 714:11, 749:8
**JESUS** [2] - 635:6, 856:2
**Jesus** [2] - 635:16, 648:25, 665:2
**job** [31] - 640:3, 640:8, 713:17, 717:21, 722:16, 742:17, 750:2, 750:4, 750:8, 781:18, 782:1, 791:14, 793:5, 803:6, 804:1, 812:15, 812:17, 812:21, 812:23, 812:25, 813:10, 814:6, 814:7, 814:8, 820:5, 821:25, 831:7, 853:6, 854:7
**jobs** [1] - 722:16
**Joe** [1] - 642:9
**Johnnie** [1] - 846:18
**Jon** [1] - 761:6
**Jose** [1] - 745:1
**Joseph** [2] - 642:5, 745:18
**Jr** [1] - 637:4
**JR** [1] - 635:11
**Juan** [4] - 735:16, 739:4, 739:5, 739:24
**Juano** [1] - 735:16
**Judge** [12] - 731:19, 749:18, 777:25, 778:6, 778:14, 835:23, 835:25, 842:1,

847:24, 852:13, 852:18, 852:22
**judge** [5] - 749:23, 778:10, 787:6, 843:15, 850:20
**July** [1] - 733:19
**jump** [3] - 812:7, 812:10
**JUROR** [1] - 833:24
**jurors** [2] - 694:2, 833:4
**JURY** [1] - 635:11
**jury** [36] - 637:20, 638:18, 638:22, 642:15, 647:23, 651:12, 652:3, 658:11, 659:17, 661:24, 686:17, 690:13, 692:8, 712:11, 731:1, 731:3, 731:13, 731:21, 761:1, 765:5, 771:4, 777:9, 777:20, 777:22, 778:12, 810:12, 816:20, 823:16, 829:12, 833:16, 833:21, 843:25, 851:17, 851:25, 853:22
**Jury** [9] - 638:23, 690:19, 692:11, 731:8, 731:23, 777:16, 778:15, 833:25, 847:3
**justice** [1] - 853:21

## K

**keep** [11] - 707:10, 723:22, 724:17, 796:18, 796:21, 797:5, 809:10, 822:12, 832:9, 832:14
**Kelly** [2] - 636:3, 753:6
**Kenilworth** [3] - 816:7, 816:8
**kept** [5] - 686:12, 687:22, 707:11, 738:16, 775:17
**KEVIN** [1] - 635:7
**Kevin** [1] - 635:18
**keys** [2] - 650:11, 756:14
**kick** [1] - 823:18
**Kimberly** [1] - 753:7
**kind** [42] - 638:4, 638:6, 644:9, 645:24, 655:18, 657:2, 662:25, 667:23, 668:2, 669:18, 672:1, 672:8, 693:5, 701:7, 717:6, 718:12, 719:20, 720:3, 722:15, 728:4, 730:19, 737:21, 740:7, 740:9, 752:5, 782:1, 782:22, 784:2, 784:12, 785:21, 786:13, 793:13, 793:18, 796:13, 799:19, 800:21, 804:13, 806:19, 823:4, 826:13, 831:11, 845:16
**kinds** [2] - 674:19, 849:25
**KIRCHGESSNER** [7] - 668:18, 725:22, 813:5, 827:13, 834:7, 834:9, 842:21
**Kirchgessner** [1] - 636:3
**Kirchner** [1] - 652:7
**kitchen** [6] - 643:22, 654:16, 655:18, 657:20, 658:3, 658:15
**knife** [1] - 808:23
**knocked** [1] - 642:19
**knowing** [1] - 761:22
**knowledge** [8] - 689:17, 727:6, 732:25,

734:9, 748:18, 751:17, 761:25, 763:24
**known** [6] - 718:20, 746:8, 747:5, 747:7, 763:22, 774:16
**knows** [4] - 767:20, 805:11, 851:5

## L

**lack** [1] - 776:12
**ladies** [6] - 642:15, 649:14, 652:3, 657:15, 661:24, 751:17, 761:1, 765:4, 854:21
**lady** [2] - 737:23, 742:2
**laid** [2] - 647:14, 847:5
**landscaping** [1] - 717:7
**language** [3] - 691:2, 837:20, 846:2
**language-speaking** [1] - 837:20
**Laona** [3] - 645:12, 645:14, 666:9
**LAONA** [3] - 645:14, 666:3, 856:13
**large** [7] - 649:9, 711:10, 752:1, 762:1, 763:2, 764:2, 846:10
**largely** [1] - 778:7
**Las** [11] - 783:21, 783:23, 784:4, 784:10, 812:12
**last** [11] - 669:7, 746:19, 767:13, 781:3, 814:18, 815:14, 847:7, 847:10, 853:20, 853:21, 853:22
**lastly** [1] - 651:24
**late** [1] - 664:4
**latter** [1] - 778:5
**laugh** [1] - 799:13
**Laughter** [3] - 700:3, 814:2, 819:10
**Law** [1] - 664:12
**law** [4] - 782:7, 782:25, 783:3, 851:15
**lawful** [2] - 743:12, 781:10
**laws** [2] - 843:22, 844:18
**lawyer** [6] - 843:4, 843:7, 843:20, 843:21, 851:5, 853:6
**lawyers** [1] - 843:3
**leading** [4] - 684:10, 737:4, 738:23
**learn** [6] - 653:13, 722:7, 722:10, 723:12, 736:1, 738:10, 756:24, 777:4, 797:15
**learned** [2] - 694:25, 728:3
**least** [7] - 713:22, 744:13, 764:17, 764:18, 844:2, 844:3, 854:8
**leave** [18] - 672:19, 683:3, 726:9, 736:15, 739:10, 740:1, 752:10, 752:13, 754:9, 756:22, 757:2, 757:3, 771:24, 783:18, 799:23, 812:15, 812:25, 820:5
**leaving** [1] - 783:20
**led** [3] - 702:14, 769:8, 836:12
**ledger** [1] - 646:11
**left** [20] - 682:21, 683:4, 688:16, 736:17, 736:19, 741:25, 752:20, 772:2, 773:14, 773:15, 783:10, 783:15, 808:14, 808:17, 809:1, 812:13, 812:17, 820:2, 820:3, 844:3
**legal** [1] - 711:14

**legally** - 711:8, 711:20, 712:1, 716:4

**Legg** [1] - 841:17

**legitimate** [1] - 752:5

**Leguismano** [1] - 776:16

**Lend** [1] - 819:7

**Lenore** [1] - 748:22

**less** [7] - 727:11, 733:19, 743:6, 775:10, 798:2, 798:4, 811:15

**letter** [20] - 657:20, 659:13, 659:25, 660:1, 660:2, 660:5, 691:19, 691:22, 691:24, 731:16, 778:1, 834:19, 840:17, 841:21, 841:22, 842:10, 842:11, 849:24

**letters** [4] - 840:19, 841:4, 841:17, 841:25

**letting** [1] - 853:5

**level** [1] - 853:20

**liaison** [2] - 642:5, 642:8

**license** [3] - 722:2, 777:1

**lie** [1] - 822:16

**lied** [1] - 822:18

**lies** [1] - 822:12

**life** [2] - 694:9, 851:14

**Lifestyle** [1] - 649:11

**light** [1] - 800:4

**lights** [1] - 806:22

**likely** [1] - 663:24

**line** [2] - 767:10, 851:15

**lips** [1] - 658:13

**Liset** [2] - 653:14, 653:17

**list** [2] - 659:14, 845:6

**listen** [1] - 845:8

**live** [11] - 675:4, 681:1, 695:3, 742:23, 781:1, 781:15, 785:10, 794:8, 815:1, 815:7, 822:22

**lived** [5] - 668:4, 689:12, 742:25, 781:17, 814:25

**lives** [3] - 725:24, 742:24, 843:2

**living** [12] - 643:22, 644:4, 654:11, 654:18, 655:1, 709:22, 714:11, 742:1, 781:20, 782:6, 794:9, 794:14

**load** [1] - 827:12

**loaded** [5] - 807:24, 808:2, 808:15, 827:9

**locate** [1] - 641:6

**located** [6] - 648:7, 661:9, 684:5, 776:1, 826:5, 827:2

**locating** [1] - 838:9

**location** [44] - 641:13, 652:12, 652:16, 656:17, 656:18, 657:10, 662:4, 668:21, 671:11, 673:8, 677:17, 677:24, 680:15, 680:22, 684:2, 685:1, 719:25, 724:3, 724:16, 728:11, 733:25, 761:8, 761:9, 761:11, 761:13, 763:20, 763:21, 765:11, 765:14, 765:15, 765:18, 765:21, 768:6, 768:8, 772:13, 775:11, 781:23, 781:24, 784:9, 788:1, 795:20, 806:17

**locations** [5] - 663:11, 676:14, 719:23, 744:9, 744:13

**locked** [1] - 841:16

**lockup** [1] - 842:19

**Locos** [1] - 811:10

**locos** [2] - 812:3

**logistic** [1] - 760:7

**Lombard** [1] - 636:24

**look** [29] - 638:10, 642:21, 642:24, 643:16, 646:8, 657:3, 665:5, 677:3, 679:7, 679:11, 685:4, 691:21, 695:19, 717:2, 723:16, 723:24, 724:1, 733:7, 735:6, 735:13, 752:19, 752:21, 756:22, 770:18, 800:3, 807:18, 846:25, 853:7

**looked** [6] - 695:2, 716:21, 737:24, 769:9, 770:19, 826:14

**looking** [13] - 648:21, 655:1, 661:24, 664:8, 698:6, 709:18, 709:19, 718:14, 741:14, 757:14, 800:8, 805:22, 853:24

**looks** [4] - 648:6, 648:20, 663:17, 681:7

**loose** [3] - 649:5, 687:14, 687:17

**Lorenzana** [1] - 636:4

**Los** [5] - 781:24, 781:25, 782:6, 811:11

**lose** [3] - 812:15, 812:25, 821:25

**loss** [1] - 813:10

**lost** [8] - 730:11, 773:17, 773:23, 774:3, 819:14, 851:15, 852:14, 853:17

**lotion** [1] - 646:3

**lubricant** [2] - 649:7

**Luis** [1] - 658:2

**lunch** [2] - 731:2, 732:6

**Luncheon** [1] - 731:9

**Luz** [2] - 653:14, 653:16

**lying** [4] - 817:6, 849:4, 849:8, 851:19

**M**

**M-I-G-U-E-Z** [1] - 639:11

**ma'am** [30] - 639:10, 639:14, 640:2, 640:13, 640:15, 640:18, 640:21, 640:24, 641:3, 641:7, 651:23, 652:2, 652:20, 653:11, 653:24, 656:10, 664:25, 665:3, 665:9, 693:3, 693:13, 693:25, 694:6, 695:6, 704:23, 706:21, 709:12, 714:22, 770:6, 778:20

**Madam** [2] - 754:2, 762:7

**Mafia** [1] - 843:2

**Magistrate** [2] - 777:25, 778:6

**magistrate** [1] - 778:10

**male** [6] - 667:18, 695:6, 697:18, 783:21, 784:11, 789:10, 789:11, 789:13

**man** [55] - 640:17, 642:19, 645:4, 649:21, 672:14, 674:5, 674:7, 677:6, 681:18, 682:12, 682:13, 682:18, 683:6, 683:16, 683:23, 684:1, 696:8, 696:10, 696:13, 702:8, 717:23, 718:3, 718:5, 719:2, 723:14, 723:19, 735:19, 743:22, 743:24, 745:10, 745:23, 746:3, 746:5, 746:17, 776:12, 776:13,

**790:4, 791:7, 791:8, 792:15, 792:18, 795:3, 800:4, 803:1, 808:14, 819:13, 820:16, 820:18, 820:22, 821:22, 822:4, 822:16, 822:22, 830:14**

**manage** [1] - 800:1

**mandated** [1] - 763:19

**manpower** [1] - 760:8

**March** [4] - 759:12, 766:15, 768:10, 774:14

**Margarita** [2] - 645:12, 645:13, 650:20, 651:16, 665:19, 666:9

**MARGARITA** [2] - 666:3, 856:13

**marijuana** [1] - 782:12

**marked** [13] - 643:9, 647:9, 657:11, 658:10, 664:12, 664:14, 686:17, 735:3, 753:20, 762:5, 762:25, 769:19, 775:21

**marker** [2] - 646:15, 650:5

**marks** [2] - 657:3, 657:4

**married** [4] - 668:4, 686:5, 741:24, 742:1

**MARSHAL** [3] - 637:14, 637:19, 834:4

**Marta** [2] - 639:4, 699:17

**Martin** [6] - 636:23, 699:20, 699:21, 700:4, 855:1, 855:7

**MARTINEZ** [2] - 779:14, 857:1

**Martinez** [29] - 637:15, 637:18, 779:4, 779:18, 779:22, 779:25, 780:7, 780:15, 781:21, 782:21, 783:8, 785:2, 785:13, 786:21, 786:25, 789:2, 789:7, 792:3, 792:18, 796:1, 797:7, 800:3, 803:24, 809:21, 810:18, 814:13, 815:14, 831:25

**Mary** [2] - 653:14, 653:16

**MARYLAND** [1] - 635:1

**Maryland** [67] - 635:8, 636:24, 637:3, 670:13, 670:16, 670:19, 670:22, 670:24, 671:5, 673:2, 673:5, 675:9, 675:17, 675:19, 675:21, 676:15, 676:16, 677:15, 677:23, 678:6, 678:11, 679:24, 680:2, 680:6, 680:16, 701:18, 701:22, 706:4, 708:11, 708:15, 708:18, 708:20, 708:24, 709:2, 710:6, 713:17, 714:4, 714:5, 735:21, 742:24, 742:25, 743:2, 753:3, 772:7, 773:22, 774:11, 780:10, 784:19, 784:25, 785:1, 785:6, 785:15, 787:6, 787:17, 787:20, 787:23, 788:2, 789:14, 795:22, 800:12, 813:15, 813:18, 814:6, 814:15, 814:16, 814:20, 820:9

**match** [1] - 665:7

**material** [1] - 846:24

**materials** [2] - 799:2, 847:19

**matter** [6] - 637:21, 778:4, 778:9, 845:20, 853:21, 855:4

**MATTER** [1] - 635:10

**matters** [3] - 840:1, 840:2, 849:18

**mattress** [1] - 654:6

**mattresses** [1] - 644:3

**Max** [3] - 841:17, 843:2, 843:3
**McDonald's** [3] - 771:25, 772:1, 773:2
**mean** [8] - 693:17, 694:3, 698:3, 717:17, 741:8, 846:20, 848:19, 853:11
**meanings** [1] - 819:4
**means** [2] - 786:10, 851:4
**meant** [1] - 831:18
**measure** [1] - 711:10
**meet** [12] - 737:13, 785:10, 793:6, 794:18, 794:19, 801:5, 805:2, 805:15, 805:19, 806:6, 806:12
**meeting** [2] - 732:11, 786:25, 845:19
**meetings** [1] - 711:1
**Melendez** [1] - 645:7
**Melendez'** [2] - 646:10, 648:15
**member** [1] - 834:11
**members** [8] - 664:8, 690:13, 731:1, 777:9, 781:1, 812:4, 812:6, 833:16
**Memo** [13] - 803:4, 803:19, 804:19, 806:1, 807:4, 807:7, 807:20, 808:6, 808:7, 808:24, 827:1, 830:22, 831:4
**memo** [5] - 807:23, 826:25, 829:1, 830:21, 831:3
**memory** [1] - 729:2
**men** [23] - 649:18, 650:5, 653:8, 653:9, 674:21, 678:1, 678:4, 678:21, 681:20, 687:19, 702:19, 707:8, 707:10, 707:22, 714:14, 722:13, 724:6, 796:22, 797:5, 800:11, 801:1, 801:15, 843:8
**mention** [1] - 719:25
**mentioned** [16] - 642:2, 643:14, 682:12, 720:7, 722:22, 723:7, 724:9, 728:21, 729:13, 734:16, 735:2, 739:16, 773:23, 798:11, 799:7, 804:19
**Merit** [1] - 855:1
**message** [2] - 672:19, 765:12
**met** [24] - 700:25, 718:20, 718:22, 719:16, 737:16, 747:2, 787:2, 791:21, 814:22, 814:23, 815:3, 815:4, 815:5, 815:16, 815:18, 815:19, 815:23, 815:25, 816:1, 816:9
**Mexican** [2] - 716:9, 716:11
**Mexicano** [1] - 812:3
**Mexico** [19] - 666:24, 667:9, 667:25, 668:4, 668:13, 668:21, 675:3, 693:9, 693:14, 693:18, 695:23, 696:14, 700:13, 709:20, 711:12, 712:7, 780:19, 780:24, 781:1
**mic** [2] - 639:8, 758:25
**Michael** [2] - 635:14, 635:19
**mid** [1] - 690:14
**mid-morning** [1] - 690:14
**middle** [6] - 735:14, 752:20, 766:15, 796:19, 797:11, 808:22
**midnight** [1] - 652:6
**might** [15] - 643:8, 648:22, 657:5, 665:4, 678:1, 684:14, 720:2, 774:24, 778:13, 786:15, 786:16, 846:23, 850:11, 852:2, 853:14

**Miguel** [1] - 668:20
**Miguez** [12] - 639:4, 639:11, 639:14, 645:16, 648:6, 648:19, 651:13, 651:17, 653:19, 654:1, 655:12, 658:22
**MIGUEZ** [2] - 639:5, 856:9
**Miguez'** [1] - 691:18
**mile** [1] - 775:10
**mind** [1] - 729:23
**mine** [1] - 699:23
**minimum** [1] - 742:16
**minute** [3] - 665:23, 677:20, 828:24
**minutes** [11] - 731:4, 771:6, 777:12, 780:14, 806:14, 828:14, 828:15, 828:20, 832:24, 844:3
**minutes'** [1] - 778:11
**mischaracterization** [1] - 821:4
**misconduct** [1] - 850:6
**misfortune** [1] - 853:13
**misinterpreted** [1] - 827:15
**missed** [1] - 646:23
**misspoke** [1] - 676:9
**misspoken** [1] - 838:18
**misunderstood** [1] - 682:24
**Mitsubishi** [1] - 797:18
**mochilas** [2] - 818:25, 819:3
**mom** [1] - 781:22
**moment** [9] - 637:8, 672:21, 690:23, 713:3, 714:25, 779:7, 808:10, 808:19, 808:21
**Monday** [18] - 701:19, 706:6, 706:13, 706:17, 706:19, 706:21, 708:16, 726:8, 726:9, 768:17, 768:24, 771:13, 771:14, 790:18, 832:25, 833:13, 833:21, 854:11
**Mondays** [2] - 768:1, 768:21
**money** [73] - 669:14, 673:22, 674:15, 674:24, 675:2, 675:5, 678:4, 687:22, 695:25, 696:7, 700:12, 700:16, 703:19, 704:7, 704:10, 710:11, 710:23, 714:13, 723:17, 728:5, 737:11, 738:11, 738:18, 741:21, 742:6, 742:15, 751:19, 756:21, 782:20, 793:21, 794:2, 794:4, 794:6, 796:16, 796:17, 796:18, 797:10, 797:12, 798:24, 799:1, 799:25, 800:23, 802:17, 811:21, 818:2, 818:22, 818:23, 818:24, 818:25, 819:13, 819:17, 819:20, 819:23, 819:24, 819:25, 820:11, 822:3, 822:6, 822:21, 823:1, 831:23, 831:25, 832:5, 832:12, 832:13, 832:17, 832:19, 837:14, 837:22, 842:11, 851:10
**Montemarano** [5] - 635:19, 713:8, 755:25, 834:1, 846:10
**MONTEMARANO** [40] - 646:19, 646:23, 647:6, 647:9, 647:11, 647:19, 647:25, 651:2, 651:4, 651:7, 651:9, 659:7, 659:12, 659:22, 659:25, 660:2, 660:9, 660:12, 660:19, 660:21, 663:5, 663:7, 664:16, 665:12, 679:13, 684:18,

684:24, 690:20, 690:22, 691:7, 691:14, 691:16, 692:1, 713:9, 730:13, 730:15, 734:9, 756:1, 763:24, 778:24
**MONTEMARANO............** [1] - 856:11
**month** [4] - 743:6, 756:25, 782:14, 815:18
**months** [17] - 651:25, 720:20, 727:3, 746:9, 783:24, 784:5, 784:18, 787:23, 793:2, 812:13, 812:23, 814:5, 814:19, 815:19, 841:16, 844:1, 846:15
**Monument** [1] - 685:6
**morning** [25] - 637:5, 637:6, 637:16, 637:17, 638:6, 638:24, 639:2, 639:3, 666:18, 666:19, 690:14, 692:20, 692:21, 706:13, 706:17, 706:19, 706:22, 708:16, 715:19, 746:20, 773:9, 773:13, 773:14, 833:14, 854:11
**morphed** [1] - 640:23
**most** [6] - 722:10, 747:17, 749:7, 811:21, 846:6, 851:19
**mother** [1] - 668:24
**motion** [6] - 835:9, 835:12, 845:16, 847:24, 848:3, 852:22
**MOTIONS** [1] - 857:4
**move** [11] - 647:15, 655:17, 655:19, 685:11, 694:11, 724:21, 757:21, 767:19, 768:17, 771:13, 810:11
**moved** [7] - 648:12, 648:14, 648:15, 648:17, 655:17, 717:10, 742:9
**movement** [1] - 648:13
**moving** [3] - 685:13, 685:15, 742:12
**MR** [261] - 637:6, 637:10, 637:21, 637:25, 638:3, 638:19, 646:19, 646:23, 647:6, 647:9, 647:11, 647:19, 647:25, 651:2, 651:4, 651:7, 651:9, 653:22, 659:7, 659:12, 659:22, 659:25, 660:2, 660:9, 660:12, 660:19, 660:21, 661:2, 663:2, 663:5, 663:7, 664:16, 665:12, 665:14, 665:19, 665:22, 665:25, 666:12, 667:7, 677:9, 677:13, 677:20, 679:13, 679:16, 679:18, 679:19, 683:11, 683:13, 683:15, 684:8, 684:10, 684:13, 684:18, 684:24, 685:10, 685:14, 685:17, 686:15, 689:22, 689:24, 690:3, 690:11, 690:20, 690:22, 691:7, 691:10, 691:12, 691:14, 691:16, 692:1, 692:9, 692:17, 692:19, 698:25, 699:2, 699:6, 699:12, 700:7, 700:8, 703:17, 703:18, 703:23, 713:3, 713:6, 713:9, 713:12, 713:14, 714:16, 714:19, 714:21, 714:25, 715:6, 715:8, 715:18, 719:5, 719:8, 719:10, 719:14, 719:15, 724:21, 727:16, 727:18, 727:21, 729:21, 729:23, 730:2, 730:13, 730:15, 730:18, 730:25, 731:14, 732:5, 732:23, 732:25, 733:3, 733:10, 733:14, 734:9, 734:12, 736:12, 736:25, 737:3, 737:7, 738:21, 738:23,

739:1, 740:19, 740:22, 740:24, 747:8, 751:20, 751:22, 751:24, 752:7, 752:9, 753:16, 753:20, 753:22, 754:6, 755:24, 756:1, 756:3, 756:5, 757:8, 757:9, 757:21, 757:22, 758:4, 758:6, 758:8, 758:18, 758:21, 763:24, 767:5, 767:9, 767:20, 770:20, 770:24, 777:21, 777:24, 778:22, 778:24, 779:3, 779:8, 779:21, 786:12, 786:19, 786:20, 792:17, 792:22, 801:16, 801:18, 801:21, 801:23, 802:3, 802:10, 802:12, 802:19, 808:1, 810:5, 810:8, 810:11, 810:14, 810:17, 810:22, 810:25, 811:2, 813:9, 815:8, 815:12, 815:13, 817:24, 819:11, 821:1, 821:2, 821:4, 821:6, 821:9, 824:11, 824:17, 825:9, 825:12, 827:18, 827:19, 833:1, 833:2, 833:15, 834:18, 834:23, 834:24, 835:3, 835:5, 835:10, 835:13, 835:16, 835:19, 836:1, 836:6, 836:17, 837:4, 837:8, 837:12, 838:23, 839:1, 839:4, 839:18, 839:23, 840:3, 840:10, 845:10, 845:13, 845:15, 845:21, 848:5, 848:7, 848:11, 848:14, 848:18, 848:20, 848:22, 848:24, 849:2, 849:16, 849:21, 852:7, 852:10, 852:15, 852:17, 854:12, 854:16, 856:10, 856:11, 856:14, 856:14, 856:15, 856:17, 856:18, 856:18, 857:2, 857:3
**MS** [39] - 639:2, 639:13, 644:19, 644:21, 645:15, 647:5, 647:10, 647:12, 647:16, 648:1, 648:5, 651:11, 653:25, 657:6, 657:9, 659:4, 660:1, 664:19, 664:21, 665:10, 665:21, 754:13, 758:13, 759:5, 762:7, 764:3, 767:16, 767:24, 769:2, 769:5, 769:22, 769:24, 770:22, 771:2, 777:7, 840:9, 856:10, 856:11, 856:21
**murder** [7] - 640:17, 640:19, 760:12, 847:15, 847:16, 852:12
**must** [6] - 683:9, 708:24, 747:5, 747:6, 790:24, 854:6
**MVA** [1] - 665:6

# N

**name** [49] - 639:8, 643:7, 648:22, 648:24, 657:21, 657:22, 659:23, 660:3, 660:4, 665:1, 666:7, 666:9, 666:13, 668:8, 679:2, 681:24, 682:6, 682:19, 684:4, 684:7, 691:1, 715:14, 715:15, 717:24, 717:25, 725:21, 725:23, 728:1, 728:3, 732:14, 732:15, 732:16, 732:18, 734:17, 735:15, 739:4, 745:9, 746:19, 758:25, 779:16, 789:21, 791:19, 794:23, 794:24, 811:9, 812:2, 815:8, 816:7, 841:18
**named** [9] - 640:19, 718:1, 718:3, 718:6, 743:22, 745:10, 745:17, 746:5, 803:4

**names** [1] - 653:13
**Nancy** [2] - 640:20, 760:13
**narrative** [1] - 660:5
**near** [5] - 729:14, 729:16, 781:24, 827:6, 827:7
**neck** [1] - 808:24
**need** [11] - 648:22, 660:14, 685:11, 760:10, 794:14, 834:15, 836:2, 844:6, 847:1, 847:2, 850:22
**needed** [4] - 718:15, 736:21, 737:8, 746:3
**needs** [1] - 715:4
**negative** [1] - 850:2
**negotiated** [1] - 838:14
**negotiation** [1] - 841:13
**negotiations** [1] - 838:13
**neighborhood** [1] - 642:10
**nervous** [3] - 776:4, 776:5, 805:24
**never** [25] - 700:25, 740:4, 746:17, 789:20, 794:4, 794:5, 800:8, 800:17, 801:6, 805:12, 811:19, 817:11, 819:8, 819:21, 819:24, 822:20, 825:10, 825:13, 825:23, 827:25, 830:4, 841:17, 841:23, 849:7
**new** [2] - 690:23, 849:15
**New** [45] - 645:18, 653:18, 669:24, 670:2, 670:9, 670:12, 672:22, 672:24, 673:9, 675:18, 678:9, 679:21, 679:23, 680:1, 694:20, 694:23, 695:1, 695:8, 695:11, 696:13, 697:10, 698:7, 701:4, 701:9, 701:12, 701:25, 702:3, 705:19, 706:2, 706:7, 708:3, 708:8, 708:10, 709:22, 710:3, 710:9, 711:22, 714:2, 714:11, 724:25, 725:8, 749:7, 749:8, 838:7
**next** [15] - 639:1, 665:18, 678:11, 715:1, 715:4, 779:3, 780:5, 788:18, 819:12, 821:23, 821:24, 832:12, 853:12
**nice** [1] - 834:13
**nickname** [2] - 682:1, 732:16
**night** [20] - 652:6, 653:2, 681:5, 706:8, 706:11, 707:5, 707:12, 714:2, 806:21, 809:5, 809:6, 809:23, 818:20, 823:23, 825:11, 825:13, 825:23, 826:11, 832:6, 833:22
**nightstand** [4] - 644:11, 645:25, 646:3, 646:5
**nine** [1] - 669:4
**Niño** [6] - 825:16, 825:24, 826:5, 826:9, 829:6, 830:20
**nobody** [4] - 813:21, 842:18, 843:16, 844:20
**Nogales** [1] - 667:8
**nondescript** [1] - 685:8
**none** [2] - 843:3, 849:12
**nonetheless** [1] - 817:7
**Norfolk** [13] - 720:1, 729:15, 729:16, 730:4, 730:7, 730:9, 732:7, 732:8, 733:16, 734:4, 734:14, 735:19, 755:15
**NORTHERN** [1] - 635:2

**note** [5] - 648:6, 655:23, 768:13, 780:7, 848:25
**notebook** [10] - 646:10, 650:23, 650:25, 651:12, 651:14, 672:1, 687:12, 687:25, 688:10
**notes** [4] - 646:8, 658:18, 661:10, 769:1
**nothing** [17] - 663:2, 709:9, 714:16, 740:19, 755:24, 776:24, 803:15, 807:25, 810:22, 813:10, 821:21, 822:13, 831:1, 841:6, 845:22, 847:12
**notice** [1] - 646:17
**noticed** [4] - 769:11, 774:10, 805:23, 848:16
**notification** [1] - 773:10
**notwithstanding** [4] - 702:3, 710:5, 822:19, 822:20
**November** [21] - 712:16, 766:15, 766:16, 773:5, 773:13, 785:17, 785:21, 785:22, 790:17, 792:8, 792:24, 804:25, 814:3, 814:21, 815:15, 820:24, 821:5, 821:7, 821:10, 829:23, 830:2
**number** [53] - 647:8, 649:9, 650:24, 659:14, 671:14, 671:15, 671:17, 671:23, 671:25, 672:4, 686:13, 687:3, 687:19, 688:1, 688:3, 688:5, 688:14, 697:6, 697:9, 697:15, 698:12, 698:14, 721:6, 728:22, 728:24, 729:1, 729:10, 735:1, 762:19, 762:22, 762:25, 765:8, 769:21, 789:17, 789:19, 789:22, 789:25, 790:8, 791:1, 805:3, 805:6, 805:8, 805:11, 805:14, 805:23, 815:25, 816:19, 816:20, 838:5
**Number** [1] - 753:21
**numbers** [1] - 734:23
**numerous** [2] - 649:15, 655:25

# O

**oath** [6] - 690:21, 692:15, 732:2, 778:19, 852:4, 852:5
**Oath** [1] - 690:25
**obey** [1] - 695:21
**object** [2] - 646:25, 684:18
**objected** [1] - 852:20
**objection** [34] - 646:19, 651:4, 651:6, 653:22, 659:12, 659:19, 679:13, 683:11, 684:8, 689:22, 691:20, 691:24, 698:25, 727:16, 729:21, 729:25, 730:13, 732:23, 734:9, 736:25, 738:21, 751:20, 752:7, 754:13, 763:24, 767:9, 770:20, 770:23, 801:16, 801:21, 801:23, 802:10, 810:5, 821:1
**obligated** [1] - 694:4
**observations** [2] - 658:25, 816:16
**observe** [10] - 643:20, 655:12, 736:14, 768:24, 770:14, 771:7, 775:14, 775:18, 775:25, 776:2

**observed** [1] - 771:15
**observing** [1] - 776:3
**obtain** [4] - 763:13, 764:5, 764:11, 764:25
**obtained** [1] - 764:19
**obtaining** [2] - 652:14, 763:11
**obvious** [1] - 663:13
**obviously** [3] - 836:8, 837:17, 845:23
**occasion** [7] - 644:14, 652:19, 661:8, 734:3, 740:11, 755:14, 830:14
**occasions** [5] - 641:15, 676:11, 724:12, 735:23, 781:9
**occupancy** [2] - 655:13, 663:17
**occur** [1] - 793:8
**occurred** [14] - 638:1, 646:21, 652:8, 659:10, 684:21, 699:4, 767:7, 778:6, 785:21, 790:21, 792:8, 792:11, 814:20, 815:15
**odds** [1] - 642:10
**OF** [4] - 635:1, 635:4, 637:1, 856:6
**offense** [3] - 670:11, 699:8, 783:5
**offer** [1] - 765:21
**offered** [2] - 710:22, 713:17
**Office** [2] - 759:15, 761:7
**office** [4] - 638:4, 640:9, 728:14, 729:14
**office's** [1] - 836:3
**officer** [7] - 639:21, 639:23, 656:16, 783:11, 783:13, 841:18, 843:8
**officers** [19] - 640:11, 641:21, 641:22, 641:24, 642:6, 656:15, 656:17, 657:3, 662:3, 662:5, 662:8, 662:25, 745:23, 837:17, 838:8, 843:2, 851:17, 851:21, 851:22
**officials** [4] - 693:5, 711:16, 711:21
**often** [1] - 748:2
**old** [10] - 666:21, 667:11, 669:3, 669:5, 715:22, 715:23, 737:23, 780:15, 781:5, 807:12
**ON** [1] - 635:10
**once** [22] - 643:20, 716:19, 725:4, 728:16, 729:17, 740:10, 748:9, 748:10, 748:13, 755:3, 755:6, 782:10, 783:13, 796:3, 796:11, 799:17, 801:2, 806:18, 817:12, 817:13, 829:17, 832:13
**one** [117] - 638:9, 641:14, 643:3, 643:13, 643:23, 645:7, 645:20, 646:7, 647:22, 648:16, 650:6, 650:19, 650:20, 658:5, 659:14, 660:14, 662:3, 662:8, 662:16, 662:19, 663:13, 663:25, 664:14, 665:22, 670:23, 675:10, 675:15, 677:20, 681:20, 682:22, 683:4, 687:7, 689:3, 694:13, 697:2, 699:7, 701:19, 702:17, 707:7, 708:2, 716:16, 717:19, 718:6, 723:16, 725:14, 734:15, 735:2, 736:21, 737:13, 744:10, 744:11, 745:19, 746:22, 747:6, 747:9, 747:12, 747:20, 752:15, 752:22, 752:23, 752:25, 755:3, 755:5, 755:14, 756:7, 758:20, 762:10, 763:10, 769:25,

775:3, 777:21, 778:3, 782:18, 782:19, 785:7, 788:17, 790:24, 794:5, 795:25, 796:7, 796:22, 797:4, 797:16, 797:20, 797:23, 798:3, 798:11, 803:18, 804:4, 804:7, 808:22, 813:7, 816:8, 818:4, 824:10, 824:14, 824:15, 830:14, 831:10, 832:8, 832:12, 835:21, 836:14, 837:13, 839:14, 840:20, 842:2, 849:11, 851:18, 852:18, 853:13, 854:3
**ones** [4] - 664:10, 664:11, 681:13, 802:16
**open** [4] - 640:10, 642:3, 643:24, 761:3
**open-source** [1] - 640:10
**operate** [1] - 722:4
**operated** [6] - 678:21, 678:24, 682:16, 722:23, 795:19, 816:16
**operating** [7] - 651:25, 659:3, 663:18, 679:2, 679:8, 769:10, 800:11
**operation** [3] - 644:7, 651:21, 766:7
**operative** [1] - 659:1
**opportunity** [3] - 647:4, 746:18, 843:14
**option** [4] - 812:18, 814:7, 844:11, 844:13
**order** [7] - 674:10, 693:5, 698:9, 764:25, 765:7, 765:10, 844:12
**Order** [1] - 767:13
**orders** [11] - 760:8, 763:11, 763:13, 764:5, 764:11, 764:16, 764:19, 764:22, 765:24, 766:5
**organize** [2] - 846:12, 847:18
**original** [1] - 643:13
**originally** [1] - 777:4
**originating** [1] - 765:14
**Oscar** [2] - 791:24, 792:1
**otherwise** [1] - 752:11
**outbound** [1] - 765:13
**outcome** [1] - 787:11
**outline** [1] - 845:17
**Outside** [1] - 664:13
**outside** [9] - 644:23, 718:13, 722:18, 723:8, 750:14, 751:1, 768:13, 824:2, 833:20
**overheard** [1] - 774:20
**overnight** [6] - 661:7, 706:7, 706:10, 708:12, 832:9, 832:10
**overruled** [14] - 653:23, 679:14, 684:11, 689:25, 727:19, 730:16, 733:1, 734:10, 737:5, 738:24, 751:23, 763:25, 771:1, 802:14
**owed** [2] - 687:23, 756:21
**owes** [1] - 740:5
**own** [7] - 681:3, 734:21, 736:15, 751:14, 757:15, 794:11, 799:1
**owned** [6] - 746:25, 747:13, 747:16, 747:20, 748:3, 748:22
**owner** [10] - 718:6, 718:8, 746:14, 751:15, 752:15, 752:17, 752:19, 813:3, 813:13
**ownership** [1] - 813:11

**P**

**p.m** [6] - 731:5, 731:7, 731:9, 731:10, 777:17
**Pacha** [7] - 732:17, 732:22, 733:4, 733:8, 734:16, 735:11, 735:20
**pack** [3] - 834:6, 834:7, 834:8
**package** [1] - 782:5
**packages** [1] - 842:1
**page** [6] - 650:24, 686:19, 686:22, 687:25, 735:14, 845:23, 846:22
**Page** [4] - 735:7, 735:13, 753:24, 753:25
**PAGE** [2] - 856:6, 857:1
**pages** [5] - 735:5, 765:25, 846:23, 848:9, 848:12
**paid** [39] - 646:16, 650:6, 673:22, 674:3, 674:21, 700:23, 702:24, 703:1, 703:11, 703:12, 707:15, 708:4, 714:10, 724:7, 726:18, 726:22, 726:24, 727:1, 727:4, 727:5, 727:6, 727:8, 727:11, 755:8, 755:11, 755:12, 757:1, 793:22, 793:25, 817:11, 817:12, 819:23, 820:3, 820:12, 820:16, 820:19, 820:22, 822:20
**Palin** [1] - 753:9
**Pancha** [1] - 732:16
**pane** [1] - 788:20
**paper** [14] - 644:9, 645:24, 646:2, 646:3, 649:15, 658:12, 672:1, 672:3, 674:19, 687:14, 687:17, 688:9, 799:6, 852:21
**papers** [2] - 667:12, 814:7
**pardon** [1] - 826:2
**parents** [3] - 781:14, 782:20, 782:24
**Park** [1] - 769:12
**park** [1] - 829:10
**parked** [2] - 806:18, 806:21
**part** [16] - 637:17, 640:8, 651:21, 661:19, 711:20, 711:25, 726:11, 759:24, 759:25, 760:19, 811:13, 811:17, 811:22, 812:11, 823:8, 838:14
**parte** [1] - 778:7
**participant** [1] - 778:11
**participate** [2] - 766:9, 766:13
**participating** [1] - 766:7
**participation** [1] - 764:4
**particular** [15] - 667:23, 669:18, 673:7, 720:2, 720:24, 726:6, 735:14, 735:23, 748:11, 753:11, 757:23, 797:5, 811:23, 836:21, 837:25
**particularly** [2] - 735:14, 836:20
**parties** [1] - 838:14
**partners** [1] - 745:6
**parts** [2] - 644:13, 724:25
**passed** [1] - 751:6
**passing** [1] - 718:14
**past** [4] - 641:15, 833:4, 833:5, 836:12
**patience** [1] - 851:24
**pattern** [5] - 766:22, 766:24, 767:2, 767:25, 768:21

**pay** [16] - 650:6, 674:3, 678:4, 713:20, 714:13, 748:18, 793:24, 794:2, 794:13, 799:25, 817:13, 818:4, 819:15, 819:16, 819:20
**paying** [1] - 650:5
**payment** [5] - 650:8, 695:17, 696:3, 701:8, 701:15
**pays** [1] - 740:5
**pedal** [1] - 808:11
**Pelon** [5] - 640:17, 739:14, 739:20, 740:2, 852:23
**pen** [3] - 765:19, 765:20, 788:23
**Pending** [1] - 857:3
**pending** [3] - 691:13, 834:5, 838:1
**people** [38] - 644:4, 655:17, 657:2, 662:16, 664:15, 680:21, 690:2, 701:10, 722:7, 722:19, 732:9, 745:20, 746:14, 753:2, 785:4, 791:17, 794:18, 794:19, 800:13, 802:7, 802:8, 802:15, 807:8, 813:7, 822:12, 822:13, 822:16, 822:18, 838:10, 841:19, 841:20, 844:5, 844:10, 850:21, 851:10, 851:19, 851:20
**per** [9] - 674:5, 696:7, 696:10, 696:13, 701:11, 702:19, 817:9, 832:3, 832:4
**perceived** [1] - 805:25
**perhaps** [6] - 637:22, 731:15, 786:16, 786:17, 837:15, 846:16
**period** [12] - 696:17, 756:25, 764:20, 766:12, 771:3, 771:8, 773:12, 773:24, 781:15, 793:25, 839:6, 849:22
**periods** [1] - 773:16
**Periquita** [2] - 737:14, 738:8
**permanent** [1] - 655:13
**permission** [2] - 643:15, 736:7
**perpetrators** [1] - 662:20
**person** [48] - 643:6, 646:15, 668:6, 671:14, 672:13, 676:4, 678:23, 678:24, 679:2, 679:5, 679:8, 682:25, 689:8, 718:20, 725:5, 725:7, 725:13, 725:18, 727:24, 728:1, 732:14, 739:3, 740:5, 743:19, 745:17, 745:21, 761:21, 761:22, 775:17, 789:16, 789:18, 790:8, 791:2, 791:5, 794:21, 794:23, 795:1, 797:1, 798:13, 805:11, 814:8, 831:20, 839:16, 842:13, 843:6, 850:17
**personal** [1] - 681:8
**personally** [2] - 832:10, 832:14
**persons** [4] - 655:20, 697:2, 760:20, 812:6
**PG** [3] - 793:9, 816:5, 816:6
**pharmacy** [2] - 793:12, 816:1
**phon** [3] - 649:16, 732:17, 732:22
**phon)** [3] - 668:20, 732:16, 812:3
**phone** [49] - 650:24, 658:5, 658:14, 686:10, 686:13, 687:3, 697:6, 697:25, 698:12, 698:15, 700:23, 701:1, 708:19, 712:11, 721:6, 729:8, 729:11, 734:19, 734:21, 735:11, 760:7,
762:18, 762:19, 762:20, 762:22, 762:24, 763:19, 765:1, 765:6, 765:24, 766:4, 769:9, 769:18, 788:23, 789:1, 789:5, 791:3, 791:7, 791:15, 805:24, 806:22, 809:17, 825:14, 846:24
**phones** [16] - 650:19, 656:6, 657:15, 657:16, 658:8, 762:3, 763:11, 763:14, 764:6, 764:8, 764:12, 764:17, 789:20, 842:21, 842:22, 842:24
**photo** [3] - 648:17, 681:17, 726:3
**photocopy** [1] - 762:10
**photograph** [13] - 648:11, 652:23, 682:8, 682:11, 682:23, 685:1, 685:20, 738:6, 770:25, 772:9, 772:11, 788:18
**photographs** [14] - 644:14, 644:17, 646:25, 648:14, 648:16, 652:18, 658:24, 663:25, 769:15, 769:17, 769:25, 770:4, 770:7, 770:21
**physical** [4] - 766:5, 766:9, 766:13, 773:17
**physically** [2] - 694:6, 774:6
**pick** [21] - 675:2, 676:1, 676:2, 725:3, 725:5, 725:9, 725:14, 726:13, 755:1, 755:3, 756:8, 756:16, 774:7, 782:4, 809:17, 809:18, 809:19, 814:9, 832:16, 833:13, 843:25
**picked** [12] - 673:18, 677:14, 680:9, 680:13, 702:6, 706:19, 706:21, 706:24, 725:1, 773:18, 774:4, 774:9
**picture** [18] - 642:22, 643:6, 646:14, 650:13, 654:14, 655:8, 656:7, 682:19, 683:5, 683:8, 683:16, 684:14, 771:4, 773:3, 788:22, 790:4, 790:21, 798:14
**pictures** [6] - 655:16, 680:24, 681:6, 685:19, 771:4, 788:10
**piece** [5] - 672:1, 672:3, 687:14, 687:17, 688:9
**pieces** [4] - 649:15, 658:12, 665:5, 724:4
**pimps** [1] - 775:2
**pistol** [2] - 829:22, 833:11
**place** [32] - 676:14, 677:22, 681:4, 681:13, 684:4, 684:15, 685:3, 685:19, 687:4, 688:16, 688:17, 695:19, 704:4, 707:2, 707:7, 712:15, 718:17, 728:17, 752:4, 774:22, 785:10, 794:8, 805:16, 805:20, 806:6, 806:11, 820:6, 820:7, 822:8, 822:22, 828:5, 842:7
**placed** [4] - 749:15, 761:17, 767:14, 843:6
**places** [6] - 649:19, 685:4, 718:7, 749:8, 847:20
**placing** [1] - 775:3
**plastic** [1] - 724:2
**played** [1] - 832:18
**playing** [6] - 724:9, 724:10, 796:23, 803:7, 818:22
**Plaza** [2] - 649:16, 649:20, 649:22
**plaza** [1] - 649:19
**pleading** [3] - 638:5, 845:16, 845:17
**PM** [1] - 635:9
**podium** [1] - 762:8
**point** [8] - 695:12, 705:14, 708:20, 718:24, 788:23, 837:14, 847:23, 851:14
**pointing** [3] - 702:9, 792:14, 792:15
**poker** [1] - 796:24
**pokes** [1] - 852:25
**police** [37] - 661:19, 662:11, 670:10, 670:15, 681:22, 682:13, 682:21, 683:1, 687:2, 688:18, 689:9, 689:15, 689:18, 690:10, 709:9, 709:17, 709:18, 710:2, 710:6, 720:14, 729:4, 744:23, 745:13, 745:23, 750:19, 760:5, 760:6, 765:9, 774:20, 775:1, 775:4, 776:5, 776:19, 809:10, 851:17, 851:21, 851:22
**Police** [5] - 639:15, 639:16, 759:9, 759:10, 759:22
**policy** [2] - 836:4, 836:7
**poorly** [3] - 821:25, 823:5, 823:9
**population** [1] - 642:10
**por** [1] - 736:7
**portion** [1] - 662:23
**Portsmouth** [4] - 676:21, 678:18, 679:9, 679:20
**position** [9] - 639:19, 759:13, 759:16, 759:17, 827:3, 849:20, 853:12, 853:16, 854:2
**possibility** [1] - 751:3
**possible** [7] - 661:20, 663:24, 774:21, 775:15, 838:15, 853:12, 854:7
**possibly** [1] - 847:2
**post** [2] - 728:14, 729:14
**Postal** [1] - 761:7
**potential** [2] - 663:24, 664:23
**practice** [1] - 734:23
**precaution** [2] - 804:16, 804:18
**preclude** [1] - 836:9
**prefer** [1] - 691:8
**preferred** [1] - 846:1
**pregnancy** [1] - 654:24
**preparation** [1] - 837:18
**presence** [1] - 837:3
**present** [12] - 636:2, 661:11, 661:14, 663:11, 745:23, 753:6, 753:7, 753:9, 774:2, 774:4, 776:5
**presently** [1] - 825:15
**preserving** [1] - 853:6
**presiding** [1] - 637:4
**press** [2] - 639:21, 639:22
**pressed** [1] - 808:11
**presumably** [1] - 835:23
**pretty** [4] - 643:21, 798:4, 849:19, 850:8
**prevent** [1] - 654:24
**previous** [5] - 641:15, 641:18, 648:20, 656:6, 835:6
**previously** [7] - 643:9, 646:18, 658:10, 734:20, 771:21, 787:1, 787:2

**Pride** [1] - 811:10
**Prieta** [1] - 716:15
**Prince** [1] - 789:14
**print** [1] - 765:23
**prison** [1] - 780:8
**prisoner** [3] - 780:10, 841:11, 843:22
**private** [1] - 644:13
**privy** [1] - 694:22
**pro** [1] - 836:14
**probation** [12] - 720:23, 721:9, 721:12, 721:22, 722:1, 733:23, 749:15, 749:23, 783:7, 783:11, 783:12, 783:16
**problem** [8] - 691:20, 813:1, 822:24, 827:11, 841:9, 841:15, 843:19, 844:4
**problems** [7] - 795:8, 800:18, 800:21, 802:15, 802:22, 813:6, 843:12
**procedurally** [1] - 852:20
**proceeding** [1] - 778:7
**PROCEEDINGS** [2] - 637:1, 857:5
**proceedings** [4] - 838:1, 852:11, 853:15, 855:3
**Proceedings** [1] - 854:23
**PROCEEDINGS...........................** [1] - 856:6
**process** [1] - 851:25
**professional** [1] - 842:11
**profile** [1] - 760:9
**progress** [1] - 849:23
**promised** [1] - 787:11
**pronouncing** [1] - 830:21
**pronunciation** [1] - 749:1
**properly** [1] - 850:5
**prosecuted** [1] - 854:3
**prosecution** [1] - 851:19
**prosecutors** [3] - 842:14, 849:6, 849:9
**prostitute** [6] - 668:3, 668:12, 677:23, 680:18, 694:14, 695:9
**prostitute's** [2] - 696:19, 696:23
**prostitutes** [2] - 749:3, 800:11
**prostitution** [45] - 640:6, 644:13, 669:21, 670:7, 670:10, 672:11, 693:11, 693:14, 693:18, 693:24, 694:3, 696:3, 696:17, 696:20, 696:24, 697:3, 697:7, 697:13, 697:23, 698:5, 698:20, 701:3, 710:7, 710:16, 711:17, 711:22, 718:7, 718:17, 719:21, 720:9, 743:17, 744:3, 747:13, 747:20, 749:3, 749:6, 749:12, 750:15, 750:16, 750:21, 751:11, 754:23, 847:16, 851:3, 851:7
**protected** [2] - 853:2, 853:25
**protocol** [2] - 643:1, 661:19
**prove** [1] - 842:5
**provide** [5] - 760:5, 760:7, 760:8, 763:19, 794:7
**provided** [3] - 647:2, 765:8, 839:11
**providing** [1] - 836:10
**public** [2] - 664:11, 851:17
**publish** [2] - 651:12, 686:17

**published** [1] - 647:24
**Puerto** [4] - 802:22, 802:25, 803:1, 807:10
**pull** [1] - 758:24
**pulled** [9] - 803:10, 803:14, 829:9, 829:17, 829:18, 829:19, 829:24, 830:2, 830:25
**punch** [4] - 646:14, 650:13, 724:17, 797:1
**punched** [2] - 723:22, 724:12
**purchase** [1] - 798:21
**purchasing** [1] - 798:25
**purpose** [3] - 642:8, 659:1, 811:17
**purposely** [1] - 849:8
**purposely-withheld** [1] - 849:8
**purposes** [2] - 686:16, 735:4
**purse** [8] - 646:10, 646:11, 648:15, 685:21, 685:23, 704:8, 705:23, 710:10
**purses** [1] - 646:7
**put** [18] - 704:7, 709:5, 723:25, 724:15, 785:13, 789:4, 795:9, 795:11, 795:14, 798:14, 807:17, 808:23, 809:12, 811:25, 822:7, 847:19, 853:11, 853:16

## Q

**Quarles** [5] - 637:4, 847:24, 852:13, 852:18, 852:22
**QUARLES** [1] - 635:11
**quesadillas** [1] - 782:5
**questioned** [1] - 700:15
**questioning** [2] - 746:20, 767:10
**questions** [17] - 659:4, 663:8, 665:10, 690:11, 713:6, 713:9, 756:1, 757:13, 758:4, 774:13, 777:7, 778:22, 779:22, 780:3, 780:14, 809:21, 850:10
**quick** [2] - 637:19, 638:10
**quicker** [1] - 767:19
**quickly** [1] - 685:18
**Quique** [5] - 790:7, 815:4, 815:5, 815:10, 815:11, 815:24
**quite** [5] - 656:14, 806:15, 849:10, 849:23, 850:8

## R

**Rachel** [1] - 635:15
**racked** [6] - 829:12, 829:16, 829:17, 829:18, 829:19, 830:25
**radio** [2] - 774:20, 775:6
**raids** [1] - 847:6
**raise** [4] - 659:12, 666:2, 715:10, 779:12
**Ramirez** [8] - 693:21, 693:23, 694:3, 694:23, 696:14, 697:3, 711:12, 760:13
**Ramirez'** [1] - 695:9
**ran** [3] - 662:5, 732:11, 808:16
**rape** [1] - 653:20
**rather** [3] - 732:16, 835:25, 836:12

**Raul** [11] - 668:11, 668:14, 668:15, 669:15, 669:17, 674:2, 675:3, 693:21, 705:12, 705:15, 712:8
**Raul's** [9] - 668:24, 670:1, 670:3, 671:21, 675:1, 675:6, 695:18, 696:5, 697:25
**RDF** [1] - 839:17
**reabsorbed** [1] - 835:20
**reached** [1] - 731:1
**read** [7] - 754:7, 754:14, 841:7, 841:8, 849:25, 851:2
**reading** [1] - 846:18
**ready** [8] - 637:12, 637:20, 692:8, 702:12, 731:13, 777:20, 779:9, 804:17
**real** [1] - 637:19
**realize** [1] - 843:5
**really** [8] - 716:17, 717:15, 737:4, 767:18, 783:2, 783:3, 802:23
**Realtime** [1] - 699:15, 855:2
**realtime** [3] - 763:13, 763:16, 764:5
**rear** [1] - 761:6
**reason** [11] - 667:20, 697:21, 711:10, 711:14, 711:20, 712:1, 741:5, 742:12, 823:9, 841:20, 845:21
**reasonably** [3] - 685:8, 780:1
**reassertion** [1] - 835:22
**Rebeca** [1] - 839:19
**receipt** [7] - 659:23, 659:25, 660:3, 660:4, 660:7, 663:25, 765:20
**receive** [7] - 650:8, 674:13, 700:17, 701:8, 701:11, 703:19, 751:25, 833:18, 836:4, 842:4
**received** [12] - 638:4, 652:6, 674:24, 704:10, 761:3, 761:5, 765:21, 773:10, 775:2, 785:24, 794:4, 824:1, 840:20
**receiving** [2] - 765:16, 769:10
**Recess** [2] - 692:5, 777:17
**recess** [8] - 690:18, 692:4, 731:7, 731:9, 777:10, 777:15, 854:17, 854:19
**recipient** [1] - 849:7
**recognize** [22] - 678:23, 681:18, 684:15, 685:25, 686:10, 686:21, 687:10, 725:13, 725:18, 733:5, 735:10, 762:6, 762:9, 762:17, 762:23, 772:9, 775:22, 788:7, 790:4, 796:5, 797:4, 798:13
**recognized** [2] - 685:12, 761:24
**recollection** [6] - 702:15, 745:24, 754:8, 754:16, 835:10, 835:16
**record** [21] - 639:9, 650:23, 651:4, 666:7, 677:9, 677:11, 691:14, 715:14, 719:5, 719:12, 733:10, 733:12, 759:1, 762:1, 765:1, 767:10, 779:17, 792:17, 792:20, 845:20, 855:3
**recording** [1] - 753:12
**records** [2] - 765:1, 765:23
**recover** [1] - 840:12
**recovered** [4] - 655:5, 656:8, 657:16, 658:5
**recross** [4] - 665:11, 665:13, 714:18, 758:5

**recycling** [2] - 809:12, 809:13
**Redirect** [3] - 856:11, 856:15, 856:18
**redirect** [1] - 664:18, 713:11, 756:2
**REDIRECT** [3] - 664:20, 713:13, 756:4
**refer** [1] - 732:17
**reference** [1] - 824:23
**referenced** [2] - 691:18, 785:14
**references** [1] - 767:12
**referred** [5] - 691:19, 777:25, 778:10, 813:1, 839:17
**referring** [11] - 641:19, 659:21, 731:18, 788:19, 791:12, 791:13, 795:1, 829:25, 835:5, 839:16, 840:22
**reflect** [9] - 677:9, 677:11, 719:5, 719:12, 733:10, 733:12, 792:17, 792:20, 846:5
**refresh** [1] - 745:24
**refreshed** [1] - 754:8
**refuse** [1] - 843:3
**regained** [1] - 773:25
**regard** [5] - 646:25, 685:1, 756:6, 838:13, 848:14
**regarding** [4] - 659:19, 777:24, 778:5, 835:7
**Registered** [1] - 855:1
**registration** [1] - 665:7
**regularly** [1] - 743:7
**regurgitation** [1] - 847:13
**relate** [1] - 845:25
**related** [1] - 745:4
**relates** [2] - 696:3, 763:16
**relations** [3] - 696:8, 737:21, 789:11
**relationship** [5] - 728:19, 737:22, 840:7, 848:15, 850:14
**relative** [3] - 742:19, 742:23, 787:20
**relatives** [6] - 694:19, 716:21, 741:16, 813:20, 851:17, 851:21
**release** [1] - 712:25
**released** [2] - 712:12, 839:10
**releasing** [1] - 836:8
**relevance** [4] - 689:24, 727:18, 738:23, 802:12
**relevant** [4] - 699:9, 764:12, 767:2, 774:24
**remainder** [1] - 840:6
**remained** [1] - 847:20
**remaining** [1] - 656:21
**remarkably** [1] - 685:2
**remarks** [1] - 849:25
**remember** [78] - 667:12, 671:8, 671:25, 672:18, 675:16, 676:24, 678:14, 679:2, 679:17, 679:18, 680:12, 680:21, 681:24, 684:4, 684:6, 684:7, 686:7, 686:12, 690:15, 703:3, 703:25, 712:16, 716:12, 717:12, 717:24, 720:12, 720:13, 726:14, 728:22, 730:9, 730:19, 731:2, 732:11, 733:15, 734:3, 735:1, 737:24, 745:9, 746:4, 746:19, 753:10, 754:11, 756:19, 762:3, 777:10, 781:3, 784:7, 789:19,

789:20, 790:17, 791:25, 792:5, 792:7, 792:23, 793:10, 794:23, 794:24, 799:18, 800:22, 801:19, 804:4, 808:12, 808:18, 811:19, 814:23, 815:18, 816:2, 816:22, 817:4, 821:12, 826:8, 830:7, 830:10, 833:16, 842:6, 843:5
**remembered** [1] - 807:7
**remind** [6] - 692:13, 692:14, 731:25, 732:1, 778:17, 778:18
**reminded** [1] - 847:8
**remodeling** [2] - 717:23, 743:15
**removed** [3] - 648:11, 818:14, 839:2
**rendering** [1] - 852:1
**rent** [1] - 675:7
**reorganize** [1] - 665:23
**repaid** [1] - 820:3
**Repalo** [3] - 662:17, 837:25, 843:6
**repay** [1] - 819:13
**repeat** [5] - 641:10, 703:14, 726:12, 765:3, 792:25
**repeatedly** [1] - 846:16
**rephrase** [2] - 727:12, 730:1
**replacement** [1] - 752:20
**report** [4] - 662:13, 662:15, 690:6, 762:21
**Reported** [1] - 636:22
**reported** [1] - 662:1
**REPORTER** [7] - 645:13, 647:22, 660:14, 699:22, 699:24, 700:1, 700:5
**Reporter** [2] - 855:1, 855:2
**reports** [1] - 842:17
**represent** [2] - 767:11, 839:8
**representation** [5] - 836:15, 838:16, 838:20, 849:12, 849:23
**representatives** [1] - 787:2
**represented** [2] - 787:14, 838:17
**Republic** [1] - 777:6
**request** [7] - 696:19, 763:21, 765:13, 765:19, 777:22, 778:3, 835:7, 839:2, 854:15
**requested** [1] - 700:9
**requesting** [1] - 835:14
**requests** [5] - 668:18, 715:3, 736:6, 747:3, 813:5
**require** [1] - 837:12
**required** [4] - 721:12, 796:17, 811:22, 837:11
**rerouted** [1] - 765:14
**rescuers** [1] - 776:8
**reserve** [1] - 659:18
**residence** [2] - 768:9, 771:24
**residents** [1] - 643:4
**resources** [2] - 837:10, 837:13
**respect** [11] - 653:12, 660:3, 762:23, 764:4, 766:24, 766:25, 775:14, 776:11, 787:10, 840:2, 848:21
**respond** [4] - 774:15, 774:19, 775:11, 804:18

**responded** [4] - 662:3, 774:23, 775:19, 775:25
**response** [8] - 764:25, 765:2, 765:6, 765:9, 765:24, 773:6, 847:25, 852:8
**responsibilities** [1] - 640:3
**responsibility** [1] - 737:10
**responsible** [3] - 655:21, 760:4, 832:5
**restaurant** [2] - 813:2, 813:3
**result** [6] - 710:21, 721:12, 766:4, 782:16, 782:25, 783:7
**resulted** [1] - 773:18
**results** [2] - 787:11, 836:13
**resume** [1] - 777:13
**resumes** [3] - 692:7, 731:12, 777:19
**retry** [1] - 837:6
**Retureta** [2] - 838:18, 843:9
**return** [8] - 678:9, 678:11, 679:21, 680:2, 706:16, 712:7, 723:20, 838:2
**returned** [2] - 675:18, 708:11, 708:24
**returning** [2] - 679:23, 705:5
**revealed** [1] - 845:4
**revenge** [1] - 798:10
**review** [8] - 647:4, 658:24, 659:20, 660:18, 762:21, 836:16, 836:19, 851:24
**reviewed** [1] - 837:3
**reviewing** [2] - 646:9, 661:13
**revolver** [6] - 740:11, 804:6, 804:10, 830:14, 833:9, 833:11
**Reyes** [2] - 658:2, 728:3
**Rican** [5] - 802:22, 802:25, 803:1, 807:10
**RICHARD** [2] - 758:22, 856:20
**Richard** [1] - 759:2
**Ricky** [1] - 758:13
**rid** [2] - 802:24, 813:7
**riding** [1] - 676:25
**rightfully** [1] - 694:8
**rights** [1] - 853:2
**rise** [9] - 637:2, 690:17, 692:3, 692:6, 731:6, 731:11, 777:14, 777:18, 854:18
**risk** [1] - 666:20
**rival** [1] - 775:2
**Rivas** [1] - 760:13
**RMR** [2] - 636:23, 855:7
**road** [3] - 656:16, 808:21, 808:23
**robbed** [10] - 662:2, 662:7, 740:18, 797:13, 797:15, 797:20, 797:24, 798:1, 798:2, 802:17
**robberies** [3] - 738:19, 811:17, 811:20
**robbery** [15] - 652:7, 652:12, 653:10, 655:21, 656:16, 657:17, 658:6, 662:1, 662:20, 662:23, 786:11, 814:20, 815:16, 820:25
**rocky** [1] - 848:15
**role** [1] - 640:14
**rolls** [1] - 644:9
**Romero** [3] - 668:11, 668:14, 668:15
**room** [13] - 643:22, 643:23, 644:11,

654:11, 654:18, 655:1, 685:25, 686:3,
695:3, 731:4, 788:15, 794:11, 833:21
**Room** [1] - 636:23
**rotated** [1] - 726:10
**roughly** [1] - 848:9
**Route** [1] - 773:19
**Rowe** [1] - 773:19
**rubbing** [5] - 644:11, 644:12, 645:25,
650:16, 654:16
**rule** [1] - 835:11
**ruled** [1] - 852:22
**ruling** [1] - 660:10
**run** [9] - 656:16, 738:19, 782:12,
782:13, 808:14, 808:25, 809:1, 809:3,
809:6
**running** [8] - 657:2, 718:17, 722:19,
800:11, 809:7, 809:8, 809:11
**Ruter** [15] - 635:17, 665:13, 699:10,
832:24, 833:13, 834:24, 838:21,
839:25, 840:7, 840:16, 843:12, 845:9,
848:10, 850:13, 853:16
**RUTER** [108] - 637:6, 637:10, 637:21,
637:25, 638:3, 638:19, 653:22,
660:22, 661:2, 663:2, 665:14, 683:11,
683:13, 684:8, 684:10, 689:22,
689:24, 692:9, 692:17, 692:19,
699:12, 700:7, 700:8, 703:17, 703:18,
703:23, 713:3, 713:6, 714:19, 727:16,
727:18, 729:21, 729:23, 732:23,
732:25, 736:25, 737:3, 738:21,
738:23, 740:22, 740:24, 747:8,
751:24, 752:9, 753:16, 753:20,
753:22, 754:6, 755:24, 758:6, 767:5,
767:9, 767:20, 770:20, 770:24,
778:22, 801:16, 801:21, 801:23,
802:10, 802:12, 810:5, 810:8, 810:11,
810:14, 810:25, 811:2, 813:9, 815:8,
815:12, 815:13, 817:24, 819:11,
821:2, 821:6, 821:9, 824:11, 824:17,
825:9, 825:12, 827:18, 827:19, 833:1,
833:2, 833:15, 834:23, 840:3, 845:10,
845:13, 845:15, 845:21, 848:5, 848:7,
848:11, 848:14, 848:18, 848:20,
848:22, 848:24, 849:2, 849:16,
849:21, 852:7, 852:10, 852:15,
852:17, 854:12, 854:16
**Ruter's** [1] - 757:13
**RUTER**.................. [4] - 856:10, 856:14,
856:18, 857:3

## S

**Safeway** [3] - 795:24, 795:25, 796:7
**Salvador** [5] - 715:25, 741:3, 741:9,
741:22, 741:25
**San** [3] - 668:20, 781:24, 811:12
**SANA** [1] - 666:10
**Santiago** [75] - 645:12, 645:14, 650:20,
651:16, 665:20, 665:25, 666:9,

666:10, 666:18, 666:20, 667:14,
668:4, 669:7, 669:20, 670:9, 671:1,
671:25, 674:25, 675:4, 675:8, 676:6,
677:3, 677:10, 677:22, 679:7, 679:20,
680:24, 681:18, 682:6, 682:9, 683:16,
685:18, 686:1, 686:6, 686:10, 686:12,
686:17, 686:19, 687:2, 688:19, 689:2,
689:15, 689:20, 690:12, 692:20,
692:22, 693:17, 694:2, 694:11,
695:15, 695:22, 696:16, 697:1,
697:21, 698:11, 698:19, 698:23,
700:9, 700:15, 700:22, 700:25,
701:24, 702:11, 704:7, 705:14, 710:5,
710:17, 711:10, 711:25, 712:4,
713:15, 838:7, 838:9
**SANTIAGO** [2] - 666:3, 856:13
**satisfaction** [1] - 778:4
**satisfied** [1] - 846:17
**Saturday** [5] - 703:9, 703:16, 706:7,
714:1, 714:2
**save** [1] - 734:23
**saved** [2] - 686:24, 735:11
**saving** [1] - 735:1
**saw** [48] - 638:6, 663:25, 669:7, 678:23,
678:24, 705:23, 728:18, 733:4,
740:10, 740:11, 740:12, 751:18,
751:25, 752:5, 761:16, 763:2, 770:12,
770:25, 771:3, 771:23, 771:24,
772:13, 772:25, 774:4, 797:5, 797:18,
801:6, 807:17, 808:7, 808:8, 809:12,
822:25, 823:22, 825:11, 825:13,
825:23, 828:4, 828:6, 828:7, 828:12,
830:16, 833:7, 843:9, 847:6
**scare** [1] - 739:10
**scene** [1] - 775:25
**schedule** [1] - 731:16
**scheming** [1] - 819:17
**Schenning** [1] - 837:21
**school** [1] - 781:17
**scolded** [1] - 799:17
**scoot** [3] - 639:7, 666:6, 758:24
**screaming** [1] - 807:19
**screen** [3] - 723:24, 724:15, 762:7
**scrubbed** [1] - 767:17
**se** [1] - 836:15
**search** [5] - 652:9, 652:14, 652:16,
657:4, 761:18
**seat** [2] - 807:10, 807:13
**seated** [15] - 638:25, 639:7, 666:6,
677:6, 692:12, 715:13, 719:2, 731:24,
758:24, 761:12, 778:16, 779:16,
790:14, 834:16, 836:1
**second** [24] - 656:18, 670:23, 670:25,
677:6, 686:21, 688:17, 709:3, 710:9,
713:22, 719:2, 719:7, 719:9, 719:10,
735:6, 735:8, 786:1, 786:2, 786:3,
790:3, 819:22, 819:23, 820:2, 834:4,
838:17
**second-degree** [1] - 786:2
**secondly** [1] - 659:15

**seconds** [2] - 811:25, 812:5
**secrets** [1] - 845:3
**Section** [3] - 759:14, 760:1, 760:3
**secure** [1] - 765:9
**Security** [1] - 640:5
**see** [85] - 642:24, 643:24, 643:25, 644:7,
645:24, 649:6, 656:18, 669:10,
669:15, 676:10, 677:3, 678:1, 678:20,
679:8, 683:16, 683:17, 683:19,
683:21, 685:20, 687:14, 687:25,
688:1, 691:17, 692:2, 695:1, 707:8,
717:21, 718:24, 724:3, 727:23,
729:17, 733:8, 735:8, 735:14, 740:6,
742:14, 747:17, 747:22, 768:1, 768:4,
769:9, 770:16, 773:13, 774:6, 779:23,
786:12, 788:18, 788:22, 791:10,
797:8, 799:8, 799:9, 799:17, 799:25,
800:1, 800:16, 810:3, 810:20, 822:8,
824:7, 826:14, 831:23, 841:2, 841:12,
842:18, 843:23, 844:3, 844:11,
844:25, 845:17, 846:7, 846:17,
846:22, 847:1, 847:2, 847:8, 850:7,
850:16, 851:3, 854:8, 854:11
**seeing** [4] - 638:12, 647:23, 735:20,
841:10
**seek** [2] - 741:7, 764:22
**seeking** [1] - 698:4
**seem** [5] - 705:3, 771:12, 778:2, 823:12,
823:13
**seize** [2] - 644:14, 761:20
**seized** [23] - 648:2, 649:2, 651:13,
651:14, 651:15, 652:18, 655:23,
655:25, 656:3, 658:8, 663:10, 664:22,
665:5, 687:3, 724:2, 724:3, 724:16,
729:4, 762:18, 763:5, 763:7, 764:8
**seizing** [1] - 663:23
**selection** [1] - 851:25
**sell** [1] - 811:14
**selling** [2] - 811:15, 811:20
**send** [11] - 638:18, 669:14, 675:3,
683:7, 696:6, 700:12, 741:21, 742:6,
808:15, 833:19, 842:13
**sending** [1] - 695:25
**sense** [1] - 850:2
**Sensitive** [1] - 664:13
**sensual** [1] - 649:7
**sent** [17] - 683:4, 683:6, 798:19, 798:21,
803:4, 803:7, 825:2, 826:1, 826:3,
826:4, 830:12, 840:18, 841:4, 842:1,
842:2, 842:6
**sentence** [3] - 785:24, 785:25, 787:8
**sentenced** [1] - 844:21
**separate** [2] - 651:22, 846:11
**separately** [1] - 661:17
**September** [30] - 640:17, 641:5, 641:7,
641:8, 641:21, 642:3, 642:17, 649:3,
651:19, 657:23, 664:4, 670:16,
670:21, 671:11, 677:18, 708:21,
710:14, 712:13, 720:14, 725:16,
726:1, 745:14, 745:22, 746:5, 760:13,

760:22, 763:9, 764:9, 771:14
**sequence** [1] - 675:16
**Sergeant** [1] - 652:7
**series** [5] - 644:19, 649:10, 650:22, 652:21, 657:12
**Serrano** [2] - 653:14, 653:17
**serve** [7] - 641:16, 641:19, 641:22, 642:2, 652:16, 760:9, 787:7
**served** [1] - 720:21
**service** [1] - 801:15
**serviced** [1] - 724:18
**services** [7] - 650:5, 696:4, 696:20, 698:5, 701:3, 760:5, 837:17
**session** [5] - 637:3, 692:7, 731:10, 731:12, 777:19
**set** [5] - 648:9, 650:11, 763:20, 765:15, 779:7
**sets** [1] - 657:15
**seven** [3] - 666:22, 748:8, 841:16
**several** [16] - 676:11, 676:23, 744:4, 744:8, 753:2, 761:24, 765:21, 766:1, 780:24, 804:5, 816:22, 816:23, 819:12, 831:10, 836:2
**sex** [15] - 640:23, 644:7, 668:25, 674:11, 678:4, 687:20, 723:15, 724:7, 747:21, 760:16, 766:25, 773:5, 796:22, 801:1, 802:8
**sex-trafficking** [4] - 640:23, 644:7, 801:1, 802:8
**sexual** [2] - 696:8, 702:19
**shaking** [1] - 776:6
**shall** [1] - 699:12
**shape** [2] - 826:14, 850:1
**shared** [2] - 845:11, 845:14
**sharing** [2] - 836:9
**sheet** [1] - 654:8
**sheets** [4] - 761:24, 761:25, 762:1, 762:11
**Shelley** [2] - 636:4, 691:3
**shirt** [6] - 677:7, 719:3, 733:9, 792:15, 800:5, 842:8
**shoot** [8] - 826:21, 826:24, 827:10, 827:17, 828:9, 828:22, 829:11, 831:12
**shop** [1] - 798:11
**Shoppers** [1] - 798:19
**short** [4] - 771:25, 830:6, 830:11
**shortly** [1] - 678:12
**shot** [4] - 648:20, 652:25, 739:21, 807:25
**shotgun** [20] - 803:8, 803:13, 803:16, 803:21, 803:23, 807:17, 808:8, 808:9, 809:12, 823:22, 824:1, 824:7, 829:21, 830:12, 830:23, 830:24, 831:4, 831:8
**shotguns** [2] - 831:12, 831:13
**shots** [1] - 808:4
**shoulders** [1] - 853:25
**show** [44] - 643:7, 643:9, 645:19, 648:18, 648:19, 649:13, 650:6, 652:21, 654:4, 655:7, 656:2, 657:11, 657:13, 657:18, 664:15, 681:17,

682:11, 684:17, 685:18, 686:9, 686:16, 686:19, 688:8, 693:4, 723:23, 725:12, 727:22, 728:17, 735:3, 735:5, 738:6, 740:15, 762:5, 769:19, 772:8, 772:24, 775:21, 788:6, 790:3, 796:4, 797:3, 798:12, 803:12, 844:3
**showed** [14] - 642:23, 643:14, 682:19, 682:22, 683:5, 684:14, 750:19, 771:4, 804:8, 804:20, 808:23, 846:22, 850:18
**showing** [5] - 680:24, 685:1, 685:6, 729:7, 794:25
**shown** [1] - 850:18
**shut** [1] - 807:19
**sic** [1] - 711:11
**sick** [4] - 752:11, 754:11, 756:19, 756:20
**side** [5] - 788:24, 807:7, 807:9, 807:12
**sideburns** [1] - 798:17
**sign** [1] - 841:14
**significantly** [1] - 738:11
**signify** [1] - 654:22
**silently** [1] - 753:24
**similar** [3] - 735:15, 775:1, 836:25
**similarly** [1] - 762:12
**simply** [5] - 659:18, 695:20, 752:20, 826:14, 850:6
**single** [3] - 845:22, 846:22, 847:4
**sister** [3] - 745:1, 748:24, 748:25
**sit** [1] - 844:19
**site** [1] - 764:2
**sitting** [2] - 702:8, 845:7
**situation** [3] - 776:9, 778:9, 854:7
**six** [5] - 782:14, 784:18, 808:21, 812:23, 817:6
**six-month** [1] - 782:14
**size** [1] - 808:23
**sleep** [4] - 681:5, 785:11, 815:1, 815:2
**sleeping** [5] - 714:14, 785:9, 794:9, 814:1, 814:4
**slept** [1] - 794:12
**slightly** [1] - 776:4
**slumped** [1] - 771:10
**small** [5] - 643:21, 644:10, 659:17, 688:9, 804:14
**smaller** [1] - 803:22
**smoking** [1] - 797:17
**snow** [7] - 653:3, 656:14, 656:19, 656:24, 657:3, 743:10, 743:14
**snowed** [1] - 813:23
**snowing** [2] - 656:13, 813:22
**so-called** [1] - 802:22
**sofa** [1] - 794:12
**Sofia** [4] - 745:2, 745:4, 748:22, 749:2
**soft** [1] - 826:17
**sold** [1] - 737:12
**solely** [1] - 639:24
**someone** [14] - 664:8, 664:15, 680:12, 732:11, 785:10, 786:9, 786:24, 789:13, 789:16, 791:3, 792:12,

792:13, 793:3, 841:22
**someplace** [1] - 805:22
**sometime** [3] - 661:7, 670:25, 797:11
**sometimes** [23] - 690:1, 690:9, 723:21, 724:9, 724:11, 764:22, 785:12, 796:15, 799:12, 801:25, 802:1, 802:5, 831:24, 832:2, 832:3, 832:15, 832:18
**somewhere** [3] - 716:10, 805:16, 827:7
**Soriano** [4] - 774:16, 776:16, 776:17, 777:3
**sorry** [26] - 641:9, 645:13, 647:22, 652:15, 666:12, 668:10, 673:15, 676:9, 682:24, 695:13, 719:10, 769:22, 770:22, 773:21, 795:11, 805:5, 807:21, 808:20, 813:17, 821:6, 824:15, 825:7, 841:19, 842:20, 843:13, 844:5
**sort** [6] - 649:7, 650:4, 650:8, 664:7, 778:3, 800:15
**sought** [3] - 695:18, 750:2
**sounded** [1] - 775:1
**sounds** [1] - 835:20
**soups** [1] - 842:8
**source** [1] - 640:10
**sources** [1] - 833:20
**South** [1] - 781:25
**space** [2] - 818:18, 819:12
**Spanish** [27] - 636:3, 636:4, 636:4, 638:8, 642:8, 642:12, 642:13, 657:21, 659:16, 662:7, 691:4, 745:25, 758:17, 776:23, 780:3, 780:5, 786:8, 786:9, 786:10, 835:15, 837:20, 841:6, 842:12, 843:25, 845:24, 846:1, 848:6
**Spanish-speaking** [1] - 758:17
**SPEAKER** [1] - 834:13
**speakers** [2] - 659:17, 850:9
**speaking** [8] - 641:24, 662:7, 663:12, 738:18, 745:17, 758:17, 803:24, 837:20
**Special** [1] - 636:3
**specific** [3] - 641:19, 663:11, 719:25
**specifically** [4] - 699:9, 760:22, 800:15, 804:1
**speculate** [1] - 836:18
**speculation** [2] - 683:13, 751:22
**spell** [5] - 639:8, 666:7, 715:14, 759:1, 779:17
**spelling** [1] - 666:13
**spend** [2] - 685:11, 854:14
**spent** [9] - 674:17, 798:5, 818:23, 818:24, 837:13, 837:22, 845:18, 846:3, 851:10
**spirits** [1] - 771:10
**split** [1] - 662:25
**Spyder** [1] - 797:19
**squares** [1] - 650:3
**stabbed** [1] - 843:8
**staff** [1] - 837:3
**stage** [1] - 853:12
**stamp** [3] - 658:13, 658:18, 658:20

**stand** [4] - 666:2, 692:10, 779:12, 814:8
**standpoint** [1] - 699:8
**stands** [7] - 690:17, 692:3, 731:6, 777:14, 819:3, 827:16, 854:19
**start** [5] - 638:22, 657:13, 789:11, 808:7, 811:24
**started** [15] - 693:16, 717:2, 717:7, 731:5, 766:20, 789:10, 807:19, 808:10, 815:19, 815:21, 815:22, 816:10, 822:15, 823:1, 833:22
**starting** [4] - 649:3, 652:22, 769:20, 817:18
**state** [12] - 639:8, 666:7, 691:1, 694:18, 694:19, 701:4, 715:13, 729:23, 758:25, 779:16, 813:23, 838:6
**statement** [4] - 663:21, 664:1, 664:9, 745:13
**statements** [2] - 638:14, 847:3
**states** [1] - 716:16
**States** [34] - 637:2, 639:4, 666:25, 667:2, 667:5, 667:13, 667:21, 669:17, 669:22, 692:23, 693:10, 693:14, 694:14, 694:18, 701:4, 712:5, 716:1, 716:4, 716:6, 716:9, 716:12, 716:19, 722:11, 758:13, 779:3, 780:21, 780:24, 781:4, 781:10, 781:12, 851:12, 851:13, 853:24, 854:4
**STATES** [3] - 635:1, 635:4, 856:2
**States-Mexican** [1] - 716:9
**station** [13] - 673:12, 673:16, 675:24, 676:2, 680:9, 680:12, 704:18, 713:24, 725:9, 756:8, 776:19, 777:4
**status** [2] - 711:14, 765:11
**stay** [12] - 678:6, 679:23, 680:25, 695:3, 706:10, 707:4, 708:10, 712:4, 729:18, 783:23, 784:17, 851:13
**stayed** [8] - 702:17, 706:2, 706:7, 710:23, 736:4, 784:4, 820:16, 820:18
**staying** [4] - 680:1, 687:4, 714:7, 785:8
**step** [1] - 840:11
**sticking** [1] - 648:10
**still** [15] - 656:21, 666:13, 692:15, 699:17, 720:5, 721:22, 732:1, 744:20, 773:20, 778:19, 781:1, 782:6, 783:15, 804:5, 854:9
**stop** [10] - 665:6, 730:24, 774:15, 774:19, 775:11, 775:12, 782:14, 782:16, 797:16, 823:17
**stopped** [1] - 808:22
**store** [1] - 795:24
**stores** [1] - 723:2
**story** [1] - 850:4
**stove** [3] - 644:9, 646:13, 648:11
**straight** [1] - 825:3
**strawberry** [1] - 649:12
**street** [12] - 640:9, 640:11, 640:12, 771:25, 785:9, 795:10, 795:12, 795:14, 798:6, 799:9, 799:22, 816:7
**Street** [2] - 636:24, 816:8
**streets** [1] - 815:7

**strength** [1] - 854:4
**stresses** [1] - 839:7
**strike** [5] - 724:21, 727:11, 757:21, 787:18, 810:11
**stuff** [1] - 847:20
**subject** [8] - 699:7, 731:16, 798:12, 802:20, 803:2, 835:23, 839:15, 843:4
**subjects** [5] - 655:20, 656:3, 657:13, 662:5, 662:6
**submitted** [3] - 731:17, 778:2, 834:19
**subpoenaed** [1] - 846:24
**subsequent** [2] - 648:17, 838:11
**substantial** [1] - 838:8
**subtracted** [1] - 674:16
**subway** [1] - 795:21
**successful** [2] - 716:23, 784:15
**sucking** [1] - 823:2
**suffice** [1] - 836:13
**sugarcoat** [1] - 850:10
**suggestive** [1] - 685:3
**sum** [1] - 762:1
**summary** [1] - 771:22
**Sunday** [10] - 678:10, 688:15, 706:5, 706:10, 707:25, 714:2, 726:9, 726:25, 736:2, 768:3
**Sundays** [2] - 703:10, 735:25
**Super** [3] - 841:16, 843:2, 843:3
**supermarket** [1] - 795:25
**supervisor** [1] - 652:7
**supplies** [2] - 737:8, 737:9, 799:4
**Support** [2] - 759:25, 760:7
**support** [5] - 642:4, 760:5, 760:7, 760:8, 763:9
**supporting** [1] - 782:23
**supports** [1] - 760:7
**supposed** [7] - 673:7, 673:12, 805:9, 805:13, 806:11, 825:1, 845:6
**supposedly** [2] - 802:17, 830:24
**Supreme** [1] - 853:24
**surveillance** [15] - 766:5, 766:10, 766:13, 768:5, 768:6, 768:11, 768:18, 771:16, 771:18, 771:22, 773:9, 773:17, 773:23, 774:2, 774:9
**surveillances** [1] - 847:6
**surveilled** [1] - 773:12
**surveilling** [1] - 766:20
**survive** [1] - 811:16
**survived** [1] - 814:12
**Susanna** [2] - 745:8, 745:9
**suspect** [1] - 837:21
**suspected** [3] - 652:12, 766:6, 766:14
**suspects** [4] - 656:15, 657:17, 658:5, 661:20
**suspended** [1] - 777:2
**sustain** [1] - 729:25
**sustained** [3] - 683:14, 752:8, 810:10
**swear** [2] - 666:5, 690:23
**swore** [1] - 808:9
**sworn** [1] - 852:5

**SWORN** [5] - 639:6, 666:4, 715:12, 758:23, 779:15
**Sworn..........................................** [5] - 856:9, 856:13, 856:17, 856:20, 857:2
**system** [2] - 796:21, 853:20

# T

**T-R-U-I-T-T** [1] - 759:2
**table** [11] - 648:9, 648:12, 664:1, 677:7, 679:11, 685:21, 719:2, 719:11, 788:22, 788:24, 800:4
**tacos** [1] - 782:5
**tad** [1] - 684:10
**takedown** [1] - 773:5
**Takoma** [1] - 769:12
**tally** [4] - 650:23, 723:22, 761:25, 762:10
**tan** [3] - 677:7, 719:3, 792:15
**tape** [1] - 753:12
**tarde** [1] - 736:7
**taste** [1] - 852:2
**taxi** [3] - 801:20, 801:25, 802:4
**technical** [2] - 700:2, 760:7
**telephone** [30] - 673:19, 678:14, 686:7, 686:13, 686:25, 688:20, 698:8, 713:16, 728:21, 728:22, 729:5, 729:10, 734:23, 735:1, 763:17, 765:20, 770:11, 770:12, 789:17, 789:19, 789:21, 789:25, 790:2, 790:8, 805:3, 805:5, 805:10, 805:13, 805:22, 815:25
**TELL** [5] - 639:6, 666:4, 715:12, 758:23, 779:15
**ten** [10] - 771:5, 777:12, 806:13, 828:14, 828:15, 828:20, 828:24, 840:18, 842:10
**ten-minute** [1] - 828:24
**Tennessee** [4] - 784:6, 784:7, 784:8, 812:18
**term** [1] - 699:6
**terminating** [1] - 765:15
**termination** [2] - 838:16, 838:19
**terms** [4] - 659:16, 738:11, 741:24, 836:4, 847:3, 847:4, 847:5
**territory** [2] - 739:8, 800:24
**test** [2] - 783:14
**testified** [6] - 663:12, 693:24, 755:13, 771:21, 830:13, 839:13
**testify** [4] - 712:2, 767:12, 787:5, 830:17
**testifying** [2] - 787:1, 815:21
**testimony** [15] - 691:18, 696:12, 747:19, 747:23, 787:3, 822:1, 822:23, 825:15, 825:21, 825:24, 830:20, 830:22, 838:4, 847:3, 850:17
**tests** [1] - 721:16
**Texas** [3] - 667:9, 669:22, 694:18
**text** [1] - 765:12
**themselves** [2] - 656:22, 749:3

**THEN** [9] - 639:6, 666:4, 715:12, 758:23, 779:15

**thereafter** [1] - 678:12

**therefore** [2] - 691:22, 694:8

**they've** [5] - 650:6, 841:2, 841:25, 852:5

**thin** [2] - 738:4, 738:5

**thinking** [4] - 750:21, 750:22, 806:20, 836:20

**third** [6] - 671:2, 671:3, 680:13, 709:13, 713:23, 820:13

**thirteen** [1] - 639:18

**thirty** [3] - 678:3, 696:9

**thirty-five** [1] - 678:3

**thousand** [3] - 766:1, 832:3, 837:16

**thousands** [3] - 837:15, 837:23

**threaten** [4] - 688:25, 690:9, 740:3, 799:16

**threatened** [3] - 674:2, 740:4, 799:14

**threatening** [1] - 689:2

**threats** [1] - 711:11

**three** [33] - 671:4, 676:8, 676:9, 676:10, 676:24, 683:17, 707:7, 707:16, 709:1, 715:23, 728:13, 744:25, 746:9, 771:4, 783:24, 790:22, 803:14, 807:8, 807:24, 809:8, 812:6, 814:5, 814:19, 817:1, 817:4, 818:15, 818:18, 829:3, 829:4, 829:5, 829:16, 838:16, 844:1

**threw** [1] - 799:8

**throughout** [4] - 679:12, 743:7, 743:13, 852:11

**thrown** [2] - 657:5, 788:16

**thwart** [1] - 638:21

**ticket** [1] - 714:13

**tickets** [6] - 687:18, 687:19, 714:10, 724:6, 724:10, 727:10

**Tijuana** [2] - 780:18, 781:13

**timed** [1] - 765:22

**TO** [5] - 639:6, 666:4, 715:12, 758:23, 779:15

**today** [15] - 697:1, 711:7, 711:15, 744:8, 746:21, 754:16, 758:17, 780:7, 786:25, 787:1, 787:5, 840:21, 850:1, 850:3, 854:11

**today's** [1] - 712:21

**together** [9] - 668:5, 683:21, 742:1, 771:18, 809:9, 812:4, 829:2, 829:3, 829:5

**tomorrow** [4] - 731:19, 731:20, 819:1, 819:8

**took** [34] - 673:9, 675:6, 675:7, 676:15, 676:16, 702:3, 704:7, 704:13, 704:18, 704:20, 705:25, 708:2, 708:3, 713:23, 728:16, 729:17, 737:10, 757:17, 769:25, 770:4, 784:9, 794:5, 802:16, 807:23, 808:6, 808:24, 812:21, 817:12, 818:19, 819:25, 821:22, 823:2, 826:19, 827:1

**tools** [1] - 763:10

**top** [1] - 817:19

**tossed** [1] - 809:7

**touch** [6] - 721:4, 785:4, 805:3, 805:15, 826:18, 826:19

**touched** [1] - 826:21

**tow** [1] - 658:2

**toward** [2] - 639:8, 758:25

**towards** [4] - 655:2, 772:3, 773:16, 850:2

**towels** [4] - 644:10, 645:24, 646:3, 674:19

**tower** [2] - 763:23, 764:2

**track** [7] - 687:22, 707:10, 707:11, 724:17, 796:18, 796:21, 797:5

**tracker** [1] - 763:16

**trackers** [1] - 763:13

**tracking** [4] - 764:5, 764:20, 767:14, 767:17

**traffic** [5] - 665:6, 774:15, 774:19, 775:11, 775:12

**trafficking** [7] - 640:23, 644:7, 760:16, 767:1, 773:5, 801:1, 802:8

**tragic** [1] - 836:13

**training** [3] - 654:23, 658:23, 761:25

**transaction** [1] - 847:5

**transcript** [2] - 699:15, 855:3

**transient** [1] - 838:6

**translate** [2] - 753:24, 842:10

**translated** [3] - 638:16, 835:15, 848:4

**translates** [1] - 780:3

**translating** [3] - 745:23, 754:3, 754:5

**translation** [2] - 835:4, 835:7

**translator** [3] - 745:21, 753:3, 753:23

**translators** [3] - 834:6, 837:17, 837:19

**transmission** [1] - 774:20

**transported** [1] - 724:24

**transporting** [2] - 640:20, 756:7

**travel** [1] - 681:8

**traveled** [4] - 713:17, 717:9, 773:15

**traveling** [1] - 667:16

**treat** [1] - 727:14

**treated** [15] - 689:21, 727:14, 738:12, 738:14, 794:22, 798:9, 799:10, 799:11, 810:4, 821:24, 823:5, 823:9, 831:15, 831:19

**trees** [1] - 807:5

**tremendous** [1] - 837:12

**trial** [12] - 778:9, 837:18, 838:11, 841:4, 843:23, 844:1, 844:9, 844:16, 852:3, 852:6, 853:11, 854:1

**TRIAL** [2] - 635:11, 856:3

**tried** [6] - 782:13, 805:19, 809:1, 809:2, 809:3

**trigger** [8] - 803:10, 803:14, 829:17, 829:18, 829:19, 829:24, 830:3, 831:1

**trip** [2] - 677:1, 733:16

**trouble** [6] - 782:7, 782:25, 783:3, 800:13, 802:9, 811:5

**true** [4] - 711:25, 752:6, 753:5, 849:2

**Truitt** [8] - 758:14, 759:2, 759:6, 762:5, 767:25, 772:8, 773:4, 778:23

**TRUITT** [2] - 758:22, 856:20

**trust** [2] - 849:19, 849:20

**trusting** [1] - 823:4

**TRUTH** [5] - 639:6, 666:4, 715:12, 758:23, 779:15

**truth** [3] - 730:10, 844:6, 850:15

**truthful** [1] - 850:13

**try** [14] - 638:16, 641:6, 641:16, 739:9, 747:22, 787:18, 807:16, 814:23, 817:25, 822:12, 827:5, 839:21, 850:9

**trying** [12] - 766:21, 766:22, 802:20, 814:14, 819:17, 825:19, 825:21, 830:18, 839:22, 850:10

**tucked** [1] - 644:9

**Tuesday** [1] - 778:6

**turn** [4] - 733:24, 787:10, 803:13

**turned** [2] - 738:17, 806:22

**turning** [1] - 657:10

**turns** [3] - 722:21, 853:3, 853:4

**twelve** [1] - 792:9

**twenty** [3] - 666:22, 769:23, 780:16

**twenty-eight** [2] - 769:23, 780:16

**twenty-seven** [1] - 666:22

**twice** [1] - 709:15

**two** [49] - 643:23, 643:24, 645:22, 650:19, 653:5, 653:7, 653:9, 653:12, 653:20, 654:3, 657:14, 658:8, 663:11, 663:13, 665:7, 668:16, 676:6, 676:7, 676:24, 707:20, 707:22, 707:24, 709:14, 712:11, 762:4, 775:10, 778:2, 783:24, 784:22, 790:22, 803:4, 803:7, 810:1, 814:5, 814:19, 816:24, 816:25, 818:15, 818:18, 832:24, 838:11, 838:25, 839:2, 842:8, 842:9, 853:22, 854:9

**type** [1] - 811:6

**typically** [3] - 764:1, 765:22, 768:1


## U


**U.S** [5] - 635:14, 635:15, 636:23, 685:6, 693:5

**ubiquitous** [1] - 685:8

**ultimately** [3] - 680:2, 717:21, 785:20

**uncertainty** [1] - 839:7

**uncommon** [1] - 847:18

**under** [19] - 648:7, 657:12, 691:22, 692:15, 732:2, 759:25, 760:2, 761:17, 778:19, 785:12, 813:23, 814:4, 814:15, 815:1, 833:6, 838:4, 846:9, 854:7

**underlying** [1] - 776:24

**understood** [3] - 663:1, 691:23, 712:10

**undertake** [1] - 659:20

**unfortunately** [3] - 696:17, 846:5, 851:23

**unhappy** [1] - 840:16

**UNIDENTIFIED** [1] - 834:13

**uniformed** [2] - 642:6, 642:7

**unique** [2] - 685:5, 811:11
**uniqueness** [1] - 684:25
**unit** [4] - 639:19, 759:24, 760:4, 760:10
**Unit** [6] - 639:20, 639:24, 639:25, 640:4, 759:25, 760:2
**United** [34] - 637:2, 639:4, 666:25, 667:2, 667:5, 667:13, 667:20, 669:17, 669:22, 692:22, 693:10, 693:14, 694:14, 694:18, 701:4, 712:4, 716:1, 716:4, 716:6, 716:9, 716:12, 716:19, 722:11, 758:13, 779:3, 780:21, 780:24, 781:4, 781:10, 781:12, 851:12, 851:13, 853:24, 854:4
**UNITED** [1] - 635:1, 635:4, 856:2
**units** [1] - 760:6
**unless** [1] - 684:24
**unsuccessfully** [1] - 641:16
**unusual** [2] - 696:18, 696:22
**up** [96] - 637:16, 637:24, 638:17, 639:7, 642:18, 646:5, 646:20, 648:1, 648:20, 648:23, 650:3, 654:14, 655:8, 659:9, 660:12, 662:6, 662:25, 665:7, 666:6, 673:18, 675:2, 676:1, 676:2, 677:14, 680:9, 680:13, 683:10, 684:20, 691:6, 696:13, 699:3, 699:25, 700:1, 702:6, 706:19, 706:21, 706:24, 712:21, 723:25, 724:25, 725:1, 725:3, 725:5, 725:10, 725:14, 726:13, 743:10, 750:20, 755:1, 755:3, 756:8, 756:16, 758:24, 773:18, 774:5, 774:7, 774:9, 774:13, 779:7, 782:4, 789:4, 802:20, 802:21, 802:23, 803:2, 803:11, 804:20, 805:2, 805:15, 805:17, 805:19, 806:12, 806:24, 807:1, 807:3, 807:6, 807:7, 807:15, 807:19, 809:17, 809:18, 809:20, 811:25, 814:9, 818:24, 829:9, 832:16, 833:13, 834:6, 834:7, 834:8, 841:16
**updated** [1] - 765:18
**upset** [2] - 770:19, 771:9
**urine** [2] - 721:16, 783:14
**uses** [1] - 763:18
**usual** [1] - 690:14

# V

**vague** [1] - 638:13
**value** [3] - 663:14, 663:24, 664:24
**van** [1] - 769:11
**vanilla** [1] - 649:12
**varieties** [1] - 649:10
**various** [1] - 751:25
**Vegas** [5] - 783:21, 783:23, 784:4, 784:10, 812:12
**vehicle** [14] - 676:25, 704:10, 726:14, 730:19, 761:12, 769:11, 772:2, 772:22, 774:5, 775:18, 827:21, 827:23, 827:25, 828:2
**vehicles** [2] - 767:15, 768:13

**VENTURA** [15] - 635:6, 840:17, 840:22, 840:25, 842:4, 843:1, 843:13, 843:19, 844:10, 844:17, 844:24, 845:3, 850:15, 854:20, 856:2
**Ventura** [49] - 635:16, 638:7, 651:18, 677:10, 712:2, 719:6, 729:24, 760:24, 761:2, 761:3, 761:11, 761:16, 763:8, 764:6, 766:6, 766:13, 766:20, 768:2, 768:5, 769:10, 770:7, 771:24, 772:14, 773:9, 773:24, 774:6, 791:23, 792:18, 837:7, 838:12, 838:15, 839:3, 839:22, 840:7, 840:15, 844:8, 845:12, 845:18, 845:25, 846:4, 846:16, 846:22, 849:7, 849:15, 849:17, 850:2, 850:13, 851:23, 852:10
**Ventura's** [7] - 763:3, 766:23, 768:9, 772:22, 772:25, 773:1, 849:3
**versus** [1] - 839:14
**vicinity** [1] - 781:13
**victim** [1] - 839:5
**victims** [6] - 653:10, 655:25, 661:21, 662:10, 847:4, 851:20
**Victoria** [1] - 636:3
**Villa** [5] - 718:1, 718:2, 718:3
**violation** [1] - 767:13
**Virginia** [8] - 676:21, 678:18, 678:20, 679:3, 679:9, 719:24, 719:25, 755:15
**virtually** [1] - 837:19
**visibly** [1] - 776:6
**visit** [4] - 736:23, 748:2, 748:12, 796:9
**visited** [1] - 661:3
**visual** [1] - 769:10
**voice** [1] - 805:12
**voicemail** [2] - 765:13, 765:14
**VOL** [1] - 856:3
**Volume** [1] - 635:6
**voluminous** [1] - 766:2
**voluntarily** [4] - 754:21, 812:16, 812:17, 812:25

# W

**wade** [1] - 776:23
**wage** [1] - 742:16
**wait** [8] - 646:24, 675:1, 779:8, 780:2, 780:5, 801:18, 814:8, 817:15
**Walgreen's** [1] - 816:1
**walk** [3] - 644:17, 828:21, 828:24
**walked** [4] - 806:13, 828:18, 829:2
**walking** [3] - 663:16, 828:15, 828:16
**wallet** [2] - 762:2, 763:3
**walls** [2] - 644:5, 655:16
**wants** [2] - 854:3
**warning** [1] - 822:19
**warrant** [9] - 641:1, 641:16, 641:23, 642:3, 652:9, 652:14, 652:16, 664:9, 761:4
**warrants** [2] - 641:19, 760:9
**WAS** [5] - 639:6, 666:4, 715:12, 758:23,

779:15
**wash** [2] - 717:8, 842:8
**Washington** [49] - 645:10, 673:9, 673:18, 680:11, 685:6, 689:13, 702:4, 704:11, 704:18, 706:14, 706:17, 708:2, 708:4, 713:24, 714:7, 714:10, 717:10, 717:14, 717:17, 717:22, 718:4, 718:8, 720:22, 721:10, 721:13, 725:2, 725:6, 725:24, 726:14, 733:25, 742:9, 742:12, 742:20, 742:23, 744:5, 744:6, 744:7, 744:9, 746:22, 748:3, 748:12, 749:13, 749:24, 749:25, 754:24, 755:1, 755:4, 816:3
**waste** [1] - 655:10
**watch** [1] - 846:9
**WDQ-10-0770** [1] - 635:5
**weapon** [39] - 803:5, 803:17, 803:23, 803:25, 804:3, 804:20, 804:22, 807:23, 824:22, 825:1, 825:10, 825:18, 826:12, 826:14, 826:15, 826:21, 826:23, 826:24, 827:9, 827:15, 827:16, 827:20, 827:22, 828:4, 828:7, 828:8, 828:12, 828:13, 828:21, 828:23, 828:24, 830:11, 830:18, 831:7, 833:6, 833:7
**weapons** [9] - 656:8, 740:7, 740:9, 761:22, 803:24, 804:11, 804:12, 804:13, 804:15
**Wednesday** [2] - 707:5
**week** [54] - 670:23, 670:25, 671:3, 674:17, 675:10, 675:15, 678:7, 679:25, 680:1, 680:13, 680:19, 680:22, 681:1, 681:10, 701:19, 702:17, 703:2, 703:12, 706:2, 708:13, 713:23, 726:7, 736:24, 737:20, 748:9, 748:10, 748:11, 748:13, 748:14, 748:15, 751:25, 752:20, 767:13, 782:18, 782:19, 783:13, 783:14, 794:1, 796:20, 797:11, 817:9, 818:4, 818:10, 819:21, 819:22, 819:23, 820:2, 820:13, 820:21, 847:7, 848:16
**weekend** [5] - 834:14, 839:21, 840:8, 854:13, 854:15
**weekends** [3] - 833:23, 834:2, 854:13
**weekly** [3] - 726:10, 748:7, 748:8
**weeks** [21] - 671:4, 676:7, 676:9, 676:10, 683:17, 751:15, 751:16, 784:22, 793:1, 793:4, 810:1, 816:19, 816:20, 816:22, 816:24, 816:25, 817:1, 817:3, 817:5, 819:12
**welcome** [2] - 664:17, 691:5
**West** [1] - 636:24
**west** [1] - 645:18
**white** [4] - 726:17, 738:2, 756:11, 768:15
**whole** [3] - 770:12, 794:1, 803:6
**whorehouses** [1] - 740:18
**wife** [2] - 696:20, 696:24
**William** [1] - 637:4
**WILLIAM** [1] - 635:11

**Williams** [2] - 842:1
**window** [3] - 654:8, 788:17, 788:19
**wish** [3] - 712:7, 839:20, 839:25
**wished** [1] - 845:15
**wishes** [1] - 754:19
**withdraw** [5] - 660:8, 801:21, 801:23, 843:10
**withdrawn** [2] - 647:8, 651:5
**withheld** [2] - 849:8, 850:4
**withholding** [1] - 849:4
**witness** [30] - 637:23, 639:1, 646:25, 657:6, 665:18, 691:8, 691:10, 691:11, 692:10, 692:13, 714:20, 715:1, 715:4, 715:9, 731:22, 731:25, 753:16, 754:3, 754:5, 758:7, 767:16, 769:2, 778:17, 779:5, 810:23, 817:15, 845:5, 851:13
**WITNESS** [47] - 639:10, 645:14, 653:24, 664:17, 665:16, 666:5, 666:9, 679:15, 679:17, 684:12, 690:1, 703:16, 703:22, 715:15, 727:20, 730:17, 732:3, 732:24, 734:11, 736:9, 737:1, 737:6, 738:25, 747:5, 758:11, 759:2, 764:1, 778:20, 779:1, 779:18, 801:19, 801:25, 802:15, 807:21, 807:23, 810:6, 813:6, 815:10, 817:20, 819:5, 819:7, 821:8, 824:10, 824:15, 825:7, 825:10, 842:22
**Witness** [16] - 646:9, 661:13, 665:17, 691:13, 714:24, 758:12, 772:18, 772:21, 779:2, 792:14, 834:5, 856:12, 856:15, 856:19, 856:21, 857:3
**witnesses** [9] - 758:17, 837:20, 837:24, 838:6, 838:9, 841:2, 841:10, 845:6, 851:11
**WITNESSES** [1] - 856:7
**woman** [29] - 640:19, 645:9, 645:16, 650:7, 682:3, 685:2, 689:17, 724:18, 725:15, 726:13, 734:4, 734:7, 738:7, 745:2, 756:8, 756:16, 756:19, 756:24, 770:15, 774:10, 774:16, 775:22, 790:14, 790:20, 791:7, 797:5, 805:20, 805:22
**woman's** [1] - 685:21
**women** [44] - 643:23, 645:7, 653:5, 653:7, 653:12, 653:15, 653:20, 718:15, 722:13, 722:19, 724:23, 725:3, 726:6, 726:7, 726:10, 727:6, 727:8, 727:14, 727:15, 736:14, 736:17, 736:23, 737:8, 737:13, 738:12, 747:18, 747:21, 749:5, 751:8, 751:25, 752:4, 755:1, 755:10, 756:7, 757:14, 757:17, 796:12, 796:15, 796:22, 802:1, 802:2, 810:4, 831:23, 838:7
**women's** [2] - 646:7, 653:13
**wonder** [1] - 701:25
**wondering** [1] - 701:24
**word** [11] - 638:14, 691:22, 699:10, 776:12, 786:6, 786:10, 816:23, 853:20, 853:21, 853:22

**word-for-word** [1] - 638:14
**words** [3] - 675:17, 716:3, 738:16
**workday** [1] - 823:15
**worker** [1] - 746:3
**workers** [1] - 718:5
**works** [2] - 765:5, 842:7
**worry** [3] - 709:10, 722:18, 822:5
**wow** [1] - 830:5
**wrappers** [1] - 655:11
**write** [4] - 672:1, 687:18, 688:3, 842:10
**wrote** [2] - 672:3, 790:2

## Y

**Yamar** [1] - 649:16
**YASSER** [36] - 639:2, 639:13, 644:19, 644:21, 645:15, 647:5, 647:10, 647:12, 647:16, 648:1, 648:5, 651:11, 653:25, 657:6, 657:9, 659:4, 660:1, 664:19, 664:21, 665:10, 665:21, 754:13, 758:13, 759:5, 762:7, 764:3, 767:16, 767:24, 769:2, 769:5, 769:22, 769:24, 770:22, 771:2, 777:7, 840:9
**Yasser** [4] - 635:15, 691:20, 778:8, 849:6
**Yasser's** [1] - 646:24
**YASSER..............** [1] - 856:11
**YASSER................** [2] - 856:10, 856:21
**year** [6] - 712:17, 766:17, 774:15, 785:22, 814:24, 815:20
**years** [13] - 639:18, 693:1, 693:18, 715:23, 716:2, 741:3, 741:25, 781:5, 781:7, 838:11, 841:14, 850:20
**yesterday** [2] - 638:5, 778:2
**yolks** [2] - 654:19, 654:22
**York** [8] - 645:18, 653:18, 673:9, 708:3, 724:25, 725:8, 749:8, 838:7
**younger** [4] - 681:23, 681:24, 682:12, 683:2
**yourself** [6] - 694:15, 754:22, 796:2, 800:17, 844:9, 844:15
**yourselves** [4] - 690:15, 731:3, 777:11, 833:17

## Z

**Zelaya** [2] - 662:16, 837:25
**Ziplock** [1] - 644:8