1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2                 NORTHERN DIVISION

3    _____
                                   )
4    UNITED STATES OF AMERICA       )
                                   )
5                                   )
         v.                        ) Criminal Docket No. WDQ-10-0770
6                                   ) Volume VI
     GERMAN de JESUS VENTURA and   )
7    KEVIN GARCIA FUERTES,          )
            Defendants             )
8    _____)
                                        Baltimore, Maryland
9                                       April 16, 2013
                                        9:27 AM to 5:54 PM
10
         **THE ABOVE-ENTITLED MATTER CONTINUED ON FOR**
11                      **JURY TRIAL**
       **BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**
12
                    A P P E A R A N C E S
13
     On behalf of the Government:
14
             Michael Cunningham, Assistant U.S. Attorney
15           Rachel Yasser, Assistant U.S. Attorney

16   On behalf of Defendant German de Jesus Ventura:

17           Gerald Ruter, Esquire

18   On behalf of Defendant Kevin Garcia Fuertes:

19           Michael D. Montemarano, Esquire

20

21

22

23

24

25

```
 1              A P P E A R A N C E S (CONT.)

 2     Also present:

 3            HSI Special Agent Edward Kelly
              Victoria Kirchgessner, Spanish Interpreter
 4            Marta Goldstein, Spanish Interpreter

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                    Reported by:

23            Martin J. Giordano, RMR, CRR, FOCR
              U.S. Courthouse, Room 5515
24            101 West Lombard Street
              Baltimore, Maryland 21201
25            410-962-4504
```

1          **PROCEEDINGS OF APRIL 16, 2013**

2          **THE CLERK:**  All rise.  The United States District

3     Court for the District of Maryland is now in session, The

4     Honorable William D. Quarles, Jr. presiding.

5          **THE COURT:**  Good morning.

6          Ready for the jury, folks?

7          **MR. RUTER:**  Your Honor, not quite yet.  There is

8     just one matter if I could, Your Honor.

9          **THE COURT:**  Yes.

10          **MR. RUTER:**  Mr. Ventura has requested that I ask the

11     Court if His Honor had made any ruling on the paper that he

12     had filed last Thursday.

13          **THE COURT:**  Yes.

14          **MR. RUTER:**  And he wants me to advise the Court that

15     he believes the trial should be stopped until a time at which

16     the Court -- you, Your Honor -- can make decisions concerning

17     requests that he made last week.

18          **THE COURT:**  The request was denied.  Trial will

19     continue until verdict.

20          Ready for the jury, counsel?

21          **MR. RUTER:**  Yes, Your Honor.

22          **MS. YASSER:**  Your Honor, can we bring the witness

23     in?

24          **THE COURT:**  Yes, please.

25          (Jury enters.)

1      **THE COURT:**  Please be seated.

2      **THE CLERK:**  I'd like to remind you, you are still

3   under oath --

4      **THE WITNESS:**  Okay.

5      **THE CLERK:**  -- and will you state your name again

6   for the record, please.

7      **THE WITNESS:**  Esmirna Dueñas.

8      **THE CLERK:**  Thank you.

9      **MR. RUTER:**  Your Honor, thank you.

10      May I approach the witness, Your Honor?

11      **THE COURT:**  Yes, you may.

12                **ESMIRNA REBECA DUEÑAS FRANCO**

13        **WAS PREVIOUSLY DULY SWORN TO TELL THE TRUTH**

14                **CROSS-EXAMINATION (CONT.)**

15   **BY MR. RUTER:**

16   Q.   Ms. Franco, allow me to show you what's been introduced

17   as Defense Exhibit Number 3, and I'm going to ask you whether

18   or not you can identify this document?

19   A.   I don't remember this document.

20   Q.   Ms. Franco, can I ask you whether or not you can identify

21   a signature, which appears to be your signature, at the bottom

22   of the document?

23   A.   Yes.

24   Q.   Okay.  Did you sign the document?

25   A.   Correct.

1    Q.    And did you date the document?

2    A.    Yes.

3    Q.    And what date did you place on the document?

4    A.    March 22nd.

5    Q.    Of what year?

6    A.    I don't know.

7    Q.    You're the one who signed the document, though?

8    A.    Yes.

9    Q.    Okay.  I'm going to ask the interpreter, Ms. Franco,

10   because you do not read English -- am I right?

11   A.    No.

12         **MR. RUTER:**  So I'm going to ask the interpreter to

13   read aloud, since it's in evidence, the paragraph marked

14   Number 2 to Ms. Franco, and then, after you read that, I will

15   ask you a question.

16         **INTERPRETER GOLDSTEIN:**  The interpreter would

17   clarify.  You want me to read that to her?

18         **MR. RUTER:**  Yes.

19         **INTERPRETER GOLDSTEIN:**  Translate it?

20         **MR. RUTER:**  Yes.  She doesn't read English.

21         (Interpreter Goldstein translating the document to

22   the witness.)

23   **BY MR. RUTER:**

24   Q.    And, Ms. Franco, do you understand what the interpreter

25   just read to you?

1    A.   Yes.

2    Q.   Did you put an "X" mark next to one of the items that you

3    were just read.

4    A.   No.   I didn't put that "X" down.

5    Q.   You did not?

6    A.   No.

7         **MR. RUTER:**   If I could show the jury, Your Honor,

8    please?

9    Q.   Ms. Franco, this was the document you were just shown; is

10   that correct?

11   A.   Yes.

12   Q.   And you recall that you signed your name where it says

13   "Rebeca Dueñas;" is that correct?

14   A.   Correct.

15   Q.   And you also see the date which you indicated was your

16   writing; is that also correct?

17   A.   Yes.

18   Q.   Okay.   And you see that there are three check marks on

19   the document; is that right?

20   A.   Yes.

21   Q.   The "X" that I'm pointing to, which says "Married Filing

22   Jointly," do you see that?

23   A.   Yes, I'm looking at it.

24   Q.   Okay.   The question is:   When you signed this document,

25   were you or were you not married?

 1    A.    I'm not married.

 2    Q.    Okay.  But you did not put this check mark down?

 3    A.    I haven't put any Xs down there.

 4    Q.    Okay.  Do you know who did, ma'am?

 5    A.    No.

 6    Q.    Okay.

 7          **MR. RUTER:**  If I could approach the witness again,

 8    Your Honor?

 9          **THE COURT:**  Yes.

10    **BY MR. RUTER:**

11    Q.    Ms. Franco, this is in English.  I know you're not going

12    to understand it.  I'm going to ask the translator to show

13    this to you and to see whether or not you've ever seen this

14    particular document, which is Defense Number 4.  It's already

15    been moved into evidence, and it purports to be a statement of

16    the wages you earned while working for the recycling company.

17          Do you recall yesterday I'd asked you if you

18    recalled exactly when it was that you worked for the recycling

19    company?

20    A.    Yes.

21    Q.    And would it be fair to say that, yesterday, it was not

22    clear to you exactly when it was that you worked for that

23    company?

24          **MS. YASSER:**  Your Honor, may I -- I'm sorry.

25          **THE WITNESS:**  I don't remember.

 1              **MS. YASSER:**  May I see the Defense exhibit?

 2              **THE COURT:**  Yes.  Please show it to Government

 3      counsel.

 4              **MR. RUTER:**  I did show it to Mr. Cunningham earlier,

 5      Your Honor.

 6              **THE COURT:**  It's Ms. Yasser's witness.

 7              **MS. YASSER:**  Your Honor, this document is in

 8      English, and I think the witness has testified that she can't

 9      read or write in English.

10              **MR. RUTER:**  I think that's right.

11              **THE COURT:**  Okay.  Make your presentation.

12              **MR. RUTER:**  Thank you.

13              **THE COURT:**  Overruled.

14      **BY MR. RUTER:**

15      Q.  Ms. Franco, I'm going to ask the interpreter to read to

16      you these -- there is three dates on here, and I want the

17      interpreter to read these three dates to you.  It's here,

18      here, and here.

19              **MR. RUTER:**  Do you see them?

20              **INTERPRETER GOLDSTEIN:**  Is that --

21              **MR. RUTER:**  Right here, right here, and right here.

22              (Interpreter Goldstein translating a portion of the

23      document to the witness.)

24      **BY MR. RUTER:**

25      Q.  Do you see -- you had the dates read to you, ma'am, by

1    the interpreter?

2    A.   Yes, I do remember this.  It was a time that I wanted to

3    get my daughter back, so I went to the recycle company.  At

4    that date, I was still with Chino, but, when he found out that

5    I had gone back to work, he took me out of work.

6    Q.   Okay.  Ms. Franco, looking at Defense Exhibit Number 4,

7    do we see that you were working for the recycling company

8    during the week of October 24th, 2008?  Is that accurate?

9    A.   Yes.

10   Q.   And you worked an entire 40-hour week; did you not?

11   A.   Yes.

12   Q.   And you also worked an additional four hours of overtime;

13   did you not?

14   A.   Yes.

15   Q.   And what hours do you recall were you working?  Were you

16   working what you'd call the dayshift, or were you working what

17   we'd call the nightshift?

18   A.   During the day.

19   Q.   Okay.  And do you recall the starting time and the ending

20   time while you were working?

21   A.   I don't remember.

22   Q.   Can you recall where you were living in late October of

23   2008?

24   A.   No.

25   Q.   Can you recall how you got to work?

1    A.    A female co-worker would give me a ride.

2    Q.    And, when you say "a female co-worker," was that a

3    co-worker from the recycling plant, or a co-worker who was

4    involved in prostitution?

5    A.    She worked at the plant.

6    Q.    And do you recall her name?

7    A.    No.

8    Q.    And she would come and pick you up?

9    A.    Yes.

10   Q.    And do we understand she'd pick you up sometime in the

11   morning?

12   A.    Yes.

13   Q.    And she would drop you back off at the end of your shift?

14   A.    Yes.

15   Q.    With whom were you living in late October of 2008?

16   A.    I don't remember.

17   Q.    Do we see by this document that you worked the week of

18   October 29th of 2008?

19   A.    Yes.

20   Q.    And we also understand that, on that same week, you

21   worked over seven and one half hours of overtime?

22   A.    Yes.

23   Q.    And did your friend work at the same plant with you, pick

24   you up in the morning, then drop you off in the afternoon?

25   A.    Yes.

```
 1    Q.   And did you have a child at that time?

 2    A.   No.

 3    Q.   Okay.  And then we also see, do we not, that you worked

 4    the week of November 4th of 2008?

 5    A.   Yes.

 6    Q.   And you worked the entire 40-hour week; is that also

 7    correct, ma'am?

 8    A.   Yes.

 9    Q.   And same question:  Your friend picked you up in the

10    morning, and then she dropped you off at the end of your

11    shift; is that right?

12    A.   Yes.

13    Q.   And, once again, do you happen to recall where you were

14    living in November of 2008?

15    A.   No.

16    Q.   Now, Ms. Franco, we understand, I believe, that you

17    received a visit from the police on September the 26th of

18    2008; is that right?

19    A.   Yes.

20    Q.   And do you recall where the address was that you were

21    located at when the police came?

22    A.   No.

23    Q.   Was it ▮▮▮▮▮▮▮▮▮▮?

24    A.   Yes.

25    Q.   Okay.  And do you recall:  Were you living at that
```

1    address when the police had come on September 26th of 2008?

2    A.   Yes.

3    Q.   Okay.  So you can recall where you were living in

4    September of 2008, but are you also testifying that you cannot

5    remember where you were living in October of 2008?

6    A.   When I lived at ████████, I wasn't working on that

7    date.

8    Q.   On what date?  The date the police came?

9    A.   September.

10   Q.   Okay.  You were not working as a prostitute; is that what

11   you're saying?

12   A.   No.  I'm not referring to that.  I'm referring to work.

13   Q.   Yes.  Were you working as a prostitute on September 26th

14   of 2008?

15   A.   Yes.

16   Q.   Okay.  And with whom were you working on September 26th

17   of 2008?

18   A.   With another girl.

19   Q.   Okay.  And what was her name?

20   A.   I don't know.  I don't remember.

21   Q.   And you were working in the prostitution business with

22   this other girl on September 26th of 2008; isn't that right?

23   A.   Yes.

24   Q.   Okay.  Now, my question is:  How is it that you went from

25   working prostitution on September 26th of 2008, but you went

1    back to work at the recycling plant in October and early

2    November of 2008?

3    A.    Because I already told you:  I wanted to get my daughter

4    back, and I wanted a decent job.

5    Q.    Okay.  And what you're referring to is, on September 26th

6    of 2008, when the police visited ████████████, when they

7    arrived, evidently your child was there -- you had a child who

8    was there unattended; is that right?

9    A.    Yes.

10   Q.    So that would mean, Ms. Franco, that, when I asked you

11   about five minutes ago whether or not you had a child in

12   October of 2008, and you answered, "No," that means you were

13   wrong; is that correct?

14   A.    No.  I am not mistaken.

15   Q.    All right.  Am I mistaken in saying that, about five

16   minutes ago, you testified that, in October of 2008, you did

17   not have a child?

18   A.    The date the police came to the house, that's when they

19   took my little girl.

20   Q.    Okay.  So you had a little girl in September of 2008,

21   correct?

22   A.    Yes.

23   Q.    And that means you also had a little girl in October of

24   2008; is that also not correct?

25          **INTERPRETER GOLDSTEIN:**  Interpreter would like a

1   correction, or not a correction, or a clarification.  When you

2   say, "is that also not correct," that is something I cannot do

3   in Spanish.

4           **MR. RUTER:**  I'll rephrase the question.

5   **BY MR. RUTER:**

6   Q.   In October of 2008, did you have a little girl?

7   A.   Yes.

8   Q.   Okay.  When you were working with this other girl in

9   prostitution on September 26th of 2008, were you also working

10  with Chino on the same date?

11  A.   Yes.

12  Q.   And would it be fair to say that you were working with

13  him on Monday, Tuesday, Wednesday, Thursday, Friday, and

14  Saturday?

15  A.   Monday to Sunday.

16  Q.   Okay.  And that you had done that for some period of time

17  prior to September 26th of 2008 with Chino?

18  A.   Yes.

19  Q.   And then you decided to go back to work for the recycling

20  plant; is that not right?

21  A.   Yes.

22  Q.   And Chino knew that, didn't he?

23  A.   Yes.

24  Q.   And you worked there for an entire three weeks, correct?

25  A.   Yes.

1     Q.   And this is after you'd been visited by the police on

2     September 26th of 2008?

3     A.   Yes.

4     Q.   You were gone from Chino all day long, Monday through

5     Friday, for at least a period of three weeks following

6     September 26th of 2008?

7     A.   Yes.

8     Q.   While you were working at the recycling plant from

9     October into November of 2008, did you see Chino here?

10    A.   Yes.

11    Q.   How many times?

12    A.   I don't know how many times, but quite often.

13    Q.   Yes, but, Ms. Franco, during that timeframe, you were

14    having sex with him regularly; were you not?

15    A.   Yes.

16    Q.   And he knew where you were every day, didn't he?

17    A.   Yes.

18    Q.   Ms. Franco, yesterday you told us about an unfortunate

19    incident when you had been raped; is that correct?

20    A.   Yes.

21    Q.   And can you tell us whether or not the individual who

22    raped you forced -- physically forced you to submit to his

23    physical advances?

24    A.   Yes.

25    Q.   And can you tell us where the rape actually took place?

1    As an example, was it in a building?  Was it in a car?  Was it

2    outside?

3    A.    When we were going to Houston on a mountain.

4    Q.    By car?

5    A.    No.  Walking.

6    Q.    While walking.  And did this physical attack occur to you

7    while you were outside?

8              **MS. YASSER:**  Your Honor, may we approach on this

9    subject?

10             **THE COURT:**  Come up.

11             (Whereupon, the following discussion occurred at the

12   bench.)

13             **MS. YASSER:**  Your Honor, I should have objected

14   sooner.  I thought it was going to be one or two questions,

15   but it's clear to me now that Mr. Ruter is trying to elicit

16   explicit details about a prior physical assault on this victim

17   prior to a time that she even knew these two defendants, and

18   I'm not -- the relevance is questionable with respect to this

19   particular case at issue.

20             **MR. RUTER:**  Your Honor, I'm going to attempt to

21   prove that the injuries that were pointed out by Ms. Yasser

22   may not have occurred at all at the hands of Mr. Ventura.

23   They very well could have happened at the hands of this rape

24   that she's told us already was forceful, and it was outside.

25             **THE COURT:**  The rules do permit more extensive

1    questioning in that area proving an alternative source for

2    injuries --

3            **MS. YASSER:**  Well --

4            **THE COURT:**  -- or the presence of other physical

5    evidence.

6            **MS. YASSER:**  My understanding is, if that's the

7    attempt that they're trying to make, under Rule, I believe,

8    412, they're required to provide written notice of an intent

9    on prior sexual contact in order to prove prior or other

10   source of injury, and they've not done so.  There is supposed

11   to be a hearing outside the jury in front of the Court.

12           **MR. RUTER:**  It doesn't apply to the Government, Your

13   Honor; it applies to the Defense.  It was the Government who

14   brought the injuries to the forefront, and I think they have

15   an expert, allegedly, who is going to attempt to confirm that

16   what Ms. Franco says about those injuries is accurate.

17           **THE COURT:**  Well, I will keep the witness available.

18   We'll hear the Government's evidence, and then I may permit

19   you, depending upon what the Government's evidence is, to

20   recall her to go into a specific fact.

21           **MR. RUTER:**  Then I'll move on, Your Honor.  Thank

22   you.

23           **THE COURT:**  Yes.

24           (Whereupon, the bench conference was concluded.)

25   **BY MR. RUTER:**

1    Q.   Ms. Franco, we understand that the first person that you

2    worked with in the prostitution business was a man named Alex;

3    is that right?

4    A.   Yes.

5    Q.   And do we also understand that the reason that you gave

6    the jury for working in prostitution with Alex was because he

7    had threatened your child?  Is that accurate?

8    A.   Yes.

9    Q.   What I was unclear about -- and I'd ask you to attempt to

10   clarify -- was:  How was it that Alex threatened your child

11   which caused you to engage in prostitution with him?

12   A.   He threatened with harming her.

13   Q.   And do I understand that, from your earlier testimony, he

14   didn't know exactly where your child was?  Is that true?

15   A.   He knew where she was.

16   Q.   Okay.  Had he met your child before?

17   A.   Yes.

18   Q.   Okay.  And, when he threatened you and then you decided

19   to engage in prostitution, do I understand that about one week

20   went past from the time that he threatened you until the time

21   that you began to be involved in prostitution?

22   A.   Yes.

23   Q.   And where was it precisely that Alex took you to engage

24   in prostitution?

25   A.   At a house of his.

1   Q.   And where was that house located?

2   A.   In Maryland.

3   Q.   And where in Maryland?

4   A.   I don't remember the address.

5   Q.   Do you recall whether or not it was in -- do you recall

6   what town it was in?

7   A.   No.

8   Q.   And how long had you worked for him in that particular

9   house?

10  A.   One week.

11  Q.   And then did you move to another house and work for Alex?

12  A.   Yes.

13  Q.   Now, before you started working for him, did you and Alex

14  discuss payment?

15  A.   No.

16  Q.   Did you believe that you were going to receive money in

17  exchange for having sex with other men?

18  A.   Yes.

19  Q.   But your testimony is you did not know how much money you

20  were going to receive; is that correct?

21  A.   Yes.

22  Q.   Did there come a time when Alex ever paid you any money?

23  A.   No.

24  Q.   So, after the first week of working with Alex, you

25  received no money; is that correct?

1    A.    Yes.

2    Q.    And then you said you went to a second house on the

3    second week that you worked with him; is that true?

4    A.    Yes.

5    Q.    Do you recall where that house was?

6    A.    The same place in Maryland.

7    Q.    Was it in the same house?

8    A.    Different house.

9    Q.    Was it the same town?

10   A.    Yes.

11   Q.    You just don't recall what the town was?

12   A.    No.

13   Q.    Okay.  And, after that second week, did you receive any

14   money from Alex?

15   A.    Never.

16   Q.    How many weeks approximately, Ms. Franco, did you work

17   for Alex?

18   A.    Four weeks.

19   Q.    Okay.  And did you work at four different houses?

20   A.    Yes.

21   Q.    And Alex did not pay you at the end of any of those four

22   weeks?

23   A.    No.

24   Q.    Did you ask him for payment?

25   A.    Yes.

1    Q.   And what did he say?

2    A.   "No."

3    Q.   Did you advise him that, if you were not paid, you would

4    not work for him any longer?

5    A.   Yes.

6    Q.   And what did he say?

7    A.   That I -- I couldn't tell that to him because he had my

8    daughter.

9    Q.   Were you living with your daughter during that timeframe

10   when you worked with Alex?

11   A.   No.

12   Q.   Alex knew where you lived?

13   A.   Yes.

14   Q.   Had he ever visited your home?

15   A.   I lived in a house of his.

16   Q.   Okay.  For the entire month?

17   A.   During the time I was with him.

18   Q.   I guess my question, Ms. Franco, is:  Did you live in the

19   houses where you were working each day, or did you live with

20   Alex while you were working with Alex?

21   A.   No, I didn't live with him.

22   Q.   Okay.  And, Ms. Franco, what was it that caused your

23   relationship -- that is, your working with Alex -- to come to

24   an end after approximately four weeks?

25   A.   I did not say I worked only four weeks.  I said I worked

1    the four weeks of the month always.

2    Q.   Does that mean that you worked for Alex longer than four

3    weeks?

4    A.   Yes.

5    Q.   Okay.  So then let me try again.  How long do you think

6    you worked for Alex altogether?

7    A.   I don't remember the time, but it was during the time I

8    was with him.

9    Q.   But you worked for him longer than four weeks; is that

10   what our understanding is, ma'am?

11   A.   Yes.

12   Q.   Okay.  How was it that you were moved from house to

13   house?  Did Alex himself move you from house to house, or did

14   someone else move you from house to house?

15   A.   Workers of his.

16   Q.   Okay.  During the entire timeframe you worked for Alex,

17   did you ever receive any money from Alex?

18   A.   No.

19   Q.   Okay.  And, once again, Ms. Franco, was the reason you

20   were not paid any money was because he was holding your child?

21   A.   Yes.

22   Q.   Okay.  How was it that you were able to provide any food

23   at all for your child or for yourself?

24   A.   He took care of that.

25   Q.   Okay.  Did Alex ever strike you?

Cross-Examination of Esmirna Rebeca Dueñas Franco (Ruter)          T-VI-1165

```
 1    A.   Yes.

 2    Q.   How many times?

 3    A.   I don't remember.

 4    Q.   Was it more than once?

 5    A.   Yes.

 6    Q.   And would he use his hand to strike you?

 7    A.   Yes.

 8    Q.   Would he use his fist -- a clenched fist to strike you?

 9    A.   Yes.

10    Q.   And, when he would use his open hand and hit you, where

11    on your body would he hit you?

12    A.   In the body.

13    Q.   And can you recall today, Ms. Franco, exactly where on

14    your body might he hit you with an open hand?

15    A.   In places where it would not show that I had been hit.

16    Q.   Okay.  And, when he would strike you with a closed hand,

17    can you recall where on your body he would strike you?

18    A.   My stomach.

19    Q.   Okay.  Besides his hand, did he ever strike you with

20    anything else?

21    A.   No.

22    Q.   And you did not recall how many times he actually did

23    this?  In other words, was it on one occasion, or two

24    occasions, or three occasions, et cetera?

25    A.   Several times.  I lost count.
```

Cross-Examination of Esmirna Rebeca Dueñas Franco (Ruter)        T-VI-1166

```
1    Q.   Okay.  As a result of any of those blows to you,

2    Ms. Franco, did he ever cut you, as an example, with his

3    fingernails, or something else?

4    A.   No.

5    Q.   Now, after you worked for Alex, do we understand that you

6    continued to work in the prostitution business?

7    A.   Yes.

8    Q.   Did you ever work with a man called Pelon?

9    A.   No.

10   Q.   Did you know of a man named Pelon who was involved in the

11   prostitution business?

12   A.   No.

13   Q.   Did you ever work for El Pollo?

14   A.   No.

15   Q.   Did you ever hear of a man involved in the prostitution

16   business by the name of El Pollo?

17   A.   No.

18   Q.   Did you ever work for Omar?

19   A.   No.

20   Q.   Pollo, P-O-L-L-O?

21            THE REPORTER:  Counsel --

22            MR. RUTER:  Yes?

23            THE REPORTER:  -- the last name you mentioned --

24            MR. RUTER:  Yes?

25            THE REPORTER:  -- is that Pollo?
```

1              **MR. RUTER:**  That's my pronunciation.  P-O-L-L-O.

2    One might pronounce that Pollo.

3              **THE REPORTER:**  Thank you.

4              **MR. RUTER:**  The question was -- and if I could ask

5    it again, Your Honor?

6              **THE COURT:**  Yes.

7    BY MR. RUTER:

8    Q.   Did you ever work for a man named El Pollo?

9    A.   No.

10   Q.   And I had asked whether or not you ever worked for a man

11   named Omar?

12   A.   No.

13   Q.   Have you ever heard of a man named Omar who was involved

14   in the prostitution business?

15   A.   No.

16   Q.   I'm referring to a man I believe was also known as Omar

17   el Flaco.

18   A.   No.

19   Q.   So, after you worked for Alex, the question is:  What was

20   it that caused you to no longer be working for Alex?

21   A.   I didn't want to work.

22   Q.   And you advised Alex of that fact?

23   A.   Yes.

24   Q.   And you didn't want to work because you weren't being

25   paid; is that accurate?

1   A.   It wasn't because of that.  I just didn't want to be with

2   men.

3   Q.   And did you advise Alex of that?

4   A.   Yes.

5   Q.   And what did he say?

6   A.   That I had to continue.

7   Q.   And did you?

8   A.   Yes.

9   Q.   Now, during this entire timeframe, Ms. Franco, did it

10  ever occur to you to call the police on Alex?

11  A.   Yes, but I wasn't able to.

12  Q.   Okay.  And did you have a cell phone?

13  A.   No.

14  Q.   And you were not able to for what reason or reasons?

15  A.   Because he had my daughter.

16  Q.   Okay.  And --

17              **INTERPRETER KIRCHGESSNER:**  Interpreter requests a

18  conference with the --

19              (Interpreters conferring.)

20              **INTERPRETER KIRCHGESSNER:**  The interpreter stands by

21  her interpretation.

22              **MR. RUTER:**  Okay.

23  **BY MR. RUTER:**

24  Q.   When you advised Alex that you did not wish to work for

25  him, is that when he would physically beat you?

1    A.   Yes.

2    Q.   Okay.  Now, again, Ms. Franco, there did come a time when

3    you stopped working for Alex, correct?

4    A.   Yes.

5    Q.   So the question, again, is:  How was it that you stopped

6    working for Alex?

7    A.   When I met Chino.

8    Q.   And how and where did you meet Chino?

9    A.   They were friends.

10   Q.   Who was friends?

11   A.   Chino and Alex.

12   Q.   And how do you know that?

13   A.   They had the same business.

14   Q.   The prostitution business?

15   A.   Yes.

16   Q.   And did you know whether or not Alex and Chino would,

17   from time to time, have the same women working with them?

18   A.   Yes.

19   Q.   And did you know that before you actually met Chino?

20   A.   No.

21   Q.   Where was it, then, ma'am, that you actually met Chino?

22   A.   At one of Alex's houses.

23   Q.   And was Chino there as a customer?

24   A.   Yes.

25   Q.   And, the first time that you saw him at Alex's house as a

1    customer, did it turn out that he had sexual relations with

2    you?

3    A.   Yes.

4    Q.   And do you know whether or not Chino paid for your

5    services?

6    A.   I don't know.

7    Q.   Were you given any kind of a ticket, a playing card, a

8    stone, or some other indicia of evidence that you had had sex

9    with Chino?

10   A.   No.

11   Q.   Okay.  When you worked for Alex, Ms. Franco, were you

12   required to keep some kind of document or some kind of

13   evidence as to how many men you had had sex with on a

14   particular day?

15   A.   Yes.

16   Q.   Okay.  And the reason, if the jurors understand it, was

17   because that was the way that the owner would know how many

18   men had come in and had sex with the ladies at a particular

19   house; is that correct, ma'am?

20   A.   Yes.

21   Q.   And, to your knowledge, isn't it also true that that

22   method was used so that the women would know how much money

23   they were to receive at the end of a week's work?

24   A.   Yes.

25   Q.   And, to your knowledge of the business, all the ladies

1   who worked would keep some kind, if they could, of a ledger so

2   they could know and remember by the week's end how much money

3   they should receive; is that right?

4   A.   Yes.

5   Q.   Now, Ms. Franco, these ladies do that because they need

6   the money; isn't that right?

7           **MS. YASSER:**  Objection.  Calls for speculation.

8           **THE COURT:**  Sustained.  You may rephrase.

9           **MR. RUTER:**  Thank you, Your Honor.

10  **BY MR. RUTER:**

11  Q.   The ledgers are kept by the ladies so they know how much

12  money they should receive at the end of the week; is that

13  correct?

14  A.   Yes.

15  Q.   And, in your experience in the business, you've actually

16  seen the women receive cash at the end of the week for their

17  week's labor; is that correct?

18  A.   I never saw when they gave money to them.

19  Q.   Okay.  So, Ms. Franco, you met Chino when he came to

20  Alex's -- one of Alex's houses, and you had sex with Chino,

21  correct?

22  A.   Yes.

23  Q.   And, as a result of that encounter, how long was it

24  before you left Alex and began to work with Chino?

25  A.   I don't remember.

1    Q.   Can you recall whether or not you'd ever had sex with
2    Chino again while you were working with Alex?
3    A.   I don't remember.
4    Q.   Before you left to work with Chino, did Alex know that
5    you were going to leave him and work with Chino?
6    A.   No.
7    Q.   What exactly did you do, Ms. Franco, to leave Alex?
8    Physically, what did you do?
9    A.   I left with Chino.
10   Q.   Okay.  And, prior to your leaving for Chino, you had been
11   beaten several times by Alex; is that right?
12   A.   Yes.
13   Q.   And, prior to your leaving Alex, he had threatened you
14   innumerable times, correct?
15   A.   Yes.
16   Q.   And, throughout the entire course of your working with
17   Alex, he was holding your child, correct?
18   A.   Yes.
19   Q.   Were you therefore concerned that Alex would harm you
20   should you leave him?
21   A.   Yes.
22   Q.   Would it be fair to say, Ms. Franco, that, while you
23   worked with Alex, that you would have had sexual contact with
24   hundreds of men?
25   A.   Yes.

1    Q.   And would it also be fair to say that, by your leaving

2    Alex, you would be costing Alex thousands of dollars in

3    income?  Would that be correct?

4    A.   Yes.

5    Q.   Okay.  And, notwithstanding, you decided to leave?

6    A.   Yes.

7    Q.   Did you recall, Ms. Franco, how long you were working

8    with Chino before the police visited ███████████████ on

9    September 26th of 2008?

10   A.   No.

11   Q.   Okay.  As best you can, Ms. Franco, can you tell the

12   ladies and gentlemen of the jury:  Was it a week before the

13   police came on September 26th of 2008 that you first started

14   working with Chino?

15   A.   It wasn't one week.  It was several.

16   Q.   And that's what I'm trying to get at.  So it was -- it

17   was more than one week, correct?

18   A.   Yes.

19   Q.   And you believe it was more than two weeks?

20   A.   I don't remember.

21   Q.   Okay.  Could you say, Ms. Franco, with confidence that it

22   was less than a month that you were working with Chino before

23   the police came to ███████████████ on September 26th?

24   A.   Yes.

25   Q.   Okay.  So would this be accurate, ma'am, to say that you

1    had been working with Chino for a shorter period of time

2    before the police came in on September 26th of 2008 than the

3    entire time that you'd worked with Alex?

4    A.   Yes.

5    Q.   Okay.  After you left Alex, did you ever hear from him

6    again?

7    A.   No.

8    Q.   Did he have your phone number?

9    A.   No.

10   Q.   While you worked for him, then, Ms. Franco, how would he

11   be able to get a hold of you, or how would you be able to get

12   a hold of him if you did not have a cell phone?

13   A.   Because I worked in his houses, and his workers got in

14   touch with him.

15   Q.   Okay.  All right.  On September 26th, 2008, you met with

16   various police officers, law enforcement; is that right?

17   A.   Yes.

18   Q.   Okay.  And do you recall the names of any of those police

19   officers that you'd met with, Ms. Franco?

20   A.   I don't remember.

21   Q.   Okay.  Do you recall whether or not your conversation

22   with the law enforcement officers was recorded?

23   A.   No.

24   Q.   Okay.  You don't remember?

25   A.   No.

1    Q.   Do you know the name Detective Jeff Hartlove?

2    A.   Yes.

3    Q.   Yeah.  And you know him because you've met with him

4    several times; is that true?

5    A.   Yes.

6    Q.   Yes.  And you also met with him on September 29th of

7    2008, just a couple of days after the police raided ███████

8    ████████████████; is that right?

9    A.   I don't remember.

10   Q.   Okay.  Do you know a man named Detective Ed Carraballo --

11   Carraballo?

12   A.   Yes.  I only saw him once.

13   Q.   Okay.  And you saw him on September 29th of 2008; did you

14   not?

15   A.   I don't remember the date.

16   Q.   Okay.  When you met with law enforcement on

17   September 29th of 2008, where was your child on that date?

18   A.   I don't remember.

19   Q.   Is it possible, ma'am, that your child was taken by the

20   Department of Social Services and that your child was in the

21   custody of the Department of Social Services on September 29th

22   of 2008?

23   A.   Yes.

24   Q.   Okay.  Can you recall today, Ms. Franco, whether or not

25   you told the detectives that you'd met with on September 29th

1    of 2008 that you were working in prostitution with Chino?

2    A.   No.

3    Q.   You'd told them that you were working in prostitution

4    with Alex; is that right?

5    A.   Yes.

6    Q.   Yes.  And did you tell the law enforcement officers,

7    Ms. Franco, that Alex had threatened you?

8    A.   Yes.

9    Q.   And did you tell them that Alex had beaten you?

10   A.   Yes.

11   Q.   Okay.  And those things were true; is that right?

12   A.   Yes.

13   Q.   Okay.  Were you not concerned, Ms. Franco, that word may

14   get back to Alex that you were telling the police that you'd

15   worked for him in prostitution?

16   A.   Yes.

17   Q.   Now, after your conversation with the detectives on

18   September 29th, 2008 -- that took place at a police station;

19   did it not?

20   A.   Yes.

21   Q.   And you told the police, did you not, that you were

22   afraid of Alex?

23   A.   Yes.

24   Q.   You told the police that you did not want to be involved

25   in prostitution; is that correct?

1    A.    Yes.

2    Q.    The police officers told you, did they not, that they

3    would help you get your child back?

4    A.    No.

5    Q.    They did not?

6    A.    No.

7    Q.    Why was it, Ms. Franco, that you went back to

8    prostitution after September 29th of 2008?

9    A.    By then, I was working with Chino.

10   Q.    All right.  Did you ask the police if they would help

11   you, ma'am, so that you would not have to return to

12   prostitution?

13   A.    Yes.

14   Q.    And what did the police say?

15   A.    That they would help me.

16   Q.    And what did they say they would do, though, to help you?

17   A.    Take me to a -- that they would take me to a shelter.

18   Q.    Okay.  And, at that time, you realized that your daughter

19   was safe; am I correct in saying that?

20         (Interpreters conferring.)

21   A.    Yes.

22   Q.    And the police advised you that they would find a shelter

23   for you where you could live; is that correct?

24   A.    Yes.

25   Q.    And you did not want to be in the prostitution business,

1    did you?

2    A.   No.

3    Q.   So you rejected the police officers' offer to help you be

4    removed from prostitution; is that right?

5    A.   No.

6    Q.   No?  Then what -- what is right?

7    A.   That very same night, I went back to ███████████.

8    Q.   You could have gone to a shelter the same night, couldn't

9    you?

10   A.   Not at that time.

11   Q.   The police offered you to stay in a shelter; did they

12   not?

13   A.   Right.

14   Q.   And they offered you shelter that night, didn't they?

15   A.   Yes.

16   Q.   You, however, chose to go back to ██████████████?

17   A.   I had to pick up some papers there.

18   Q.   And what papers were they?

19   A.   Papers from my country.

20   Q.   And that's the reason why you went back to ████████

21   ████████?

22   A.   Yes.

23   Q.   And, when you returned that evening, Ms. Franco, was

24   Chino present?

25   A.   No.

1    Q.   And isn't it true that you could have gotten your papers

2    and then gone to the shelter as the police had advised you

3    they would do for you?

4    A.   I couldn't leave after that.

5    Q.   How did you get to ████████████ after you had your

6    interview with the police?

7    A.   I don't remember.

8    Q.   Did you walk?

9    A.   I don't know.  I don't remember.

10   Q.   Okay.  Is it possible that the police themselves took you

11   to ████████████?

12   A.   Yes.  I don't remember.

13   Q.   When you left Alex and went to work with Chino, you did

14   so voluntarily; is that correct?

15   A.   Yes.

16   Q.   You indicated that, after being with Chino, there came a

17   time when he -- he urged you to become involved in

18   prostitution; is that right?

19   A.   Yes.

20   Q.   And we also understand that you resisted his request?

21   A.   Yes.

22   Q.   And you resumed prostitution; is that right?

23   A.   Yes.

24   Q.   And, Ms. Franco, did you continue that, the prostitution,

25   uninterrupted after you were -- after the raid at ████████

1      ████████ on September 26th of '08, did you then continue doing

2      prostitution right on through 2008 into 2009?

3      A.    Yes.  I kept working for Chino.

4      Q.    And, when you first started working for Chino, which we

5      think -- tell me if I'm right -- is about a month before

6      September 26th of 2008, did you live in one place, or did you

7      live in different places?

8      A.    Different places.

9      Q.    Okay.  So, if, Ms. Franco, you lived in different

10     places -- and we're talking about approximately one month that

11     you were with Chino before the raid on September 26th -- how

12     many different places did you live in during those

13     approximately four weeks?

14     A.    ███████████.

15     Q.    Did you live just at one place in ██████████, or did

16     you live in more than one place before September 26th of '08?

17     A.    Yes, other places.

18     Q.    And where else besides ██████████ before

19     September 26th of '08 did you live?

20     A.    I don't remember.

21     Q.    You were working; were you not?

22     A.    Yes.

23     Q.    For the entire four weeks before September 26th of '08?

24     A.    Yes.

25     Q.    And you were earning income?

1    A.   I only worked for three weeks during that time.

2    Q.   Before September 26th of '08?

3    A.   Yes.

4    Q.   And you were earning income?

5    A.   Yes.

6    Q.   And you were collecting the tickets from men?

7    A.   Yes.

8    Q.   And they were paying?

9    A.   I only picked up the tickets.  They paid the workers.

10   Q.   And did you then get paid money after that?

11   A.   No.

12   Q.   Okay.  So your testimony is you worked with Chino for

13   about three weeks before the raid on September 26th of '08,

14   and he never gave you a dime?

15   A.   Yes.

16   Q.   And your testimony is that, on September 29th of 2008,

17   the police told you they would help you get your daughter back

18   and would provide a place for you to live; is that correct?

19   A.   They didn't tell me they were going to get my daughter

20   back.  They just said they would find a place -- a shelter for

21   me to be in.

22   Q.   Okay.  Well, didn't the police show up at a hearing just

23   a couple days later to help you get your daughter back?

24   A.   No.

25   Q.   Do you recall having a hearing before some kind of a

1    person in authority concerning what should happen to your

2    daughter?

3    A.   Yes.

4    Q.   And are you telling these folks that you don't recall

5    whether Detective Hartlove or some other law enforcement

6    officer was there with you to assist you in getting your

7    daughter returned?

8    A.   Yes.  They were there, but they never told me that they

9    were going to try to help me recover my daughter.

10   Q.   Why do you think they were there?

11   A.   I don't know.

12   Q.   They were there, Ms. Franco, were they not, to help you

13   get your child returned to you?

14   A.   I repeat:  Once again, they never told me that at no

15   time.

16   Q.   Okay.  Notwithstanding this, Ms. Franco, on

17   September 29th, the police did offer you shelter, and, instead

18   of taking the shelter, you returned to ███████████████ to

19   continue with prostitution; is that correct?

20   A.   I did not come back for that, but to get some papers.

21   Q.   Okay.  You continued in prostitution from September 29th

22   of 2008 until November the 15th of 2010; is that correct?

23   A.   Yes.

24   Q.   Yeah.  With the exception of a few weeks when you worked

25   for the recycling company?

1    A.    Yes, but I worked at recycling during the day, and, at

2    night, I worked.

3    Q.    So you worked at the recycling company during the day,

4    and then you did prostitution at night?

5    A.    Yes.

6    Q.    Ms. Franco, you were visited by the police on

7    November 15th of 2010; is that right?

8    A.    Yes.  Yes.

9    Q.    And do you recall that you were interviewed by the police

10   again?

11   A.    Yes.

12   Q.    And, at this time, when you were interviewed, you were

13   pregnant; is that right, ma'am?

14   A.    Yes.

15   Q.    And you were pregnant with Chino's child; is that also

16   correct?

17   A.    Yes.

18   Q.    Now, on the September 29th, 2008 statement you gave,

19   you'd never told the police that you worked for Chino; is that

20   correct?

21   A.    No.

22   Q.    On November 15, 2010, you did tell them that you worked

23   with Chino; is that correct?

24   A.    Yes.

25   Q.    Now, you told the police that you knew of a man named

1  Freddy Soriano?

2  A.   No.  I don't remember.

3  Q.   Okay.  Did you know a person named Freddy Soriano on

4  November 15th of 2010?

5  A.   Yes.

6  Q.   And what did you know him to be, or in what business did

7  you know him to be in?

8  A.   I knew he was a worker of Chino's.

9  Q.   So he and Soriano worked together; is that your

10  understanding?

11  A.   Yes.

12  Q.   Okay.  Ms. Franco, did you have -- do you know who a man

13  named Raudel is?

14  A.   What I knew is that he was another person that had a

15  business.

16  Q.   A prostitution business?

17  A.   Yes.

18  Q.   And did you understand that Raudel would give women to

19  Alex so they also could work for Alex?

20  A.   No.

21  Q.   Okay.  Did you ever know Alex to, if you will, take women

22  from other owners, and then those other owners give girls --

23  women to Alex?

24  A.   Yes.

25  Q.   Did you know whether or not Alex ever gave any women to

1   Chino?

2   A.   No.

3   Q.   Did you ever know Chino to give women to Alex?

4   A.   No.

5   Q.   Okay.  Did you ever know any of the women to be passed

6   between friends?

7   A.   Yes.

8   Q.   And what does that mean, ma'am?

9   A.   That the woman that worked in one house had to go work in

10  another house.

11  Q.   And what does it mean, though, to be passed between

12  friends?

13  A.   That they shared the women.

14  Q.   Okay.  Was Chino a friend of Freddy?

15  A.   He was a worker of his.

16  Q.   Okay.  Did you tell the police on November 15th, 2010,

17  that you had seen Chino with a gun?

18  A.   Yes.

19  Q.   Do you recall telling them when the last time was prior

20  to November 15th, 2010, that you had seen a gun?

21  A.   No.

22          **MR. RUTER:**  She said, "No"?  I'm sorry.  Did I hear

23  an answer?

24          **INTERPRETER KIRCHGESSNER:**  Yes, she said no.

25          **MR. RUTER:**  Okay.

1    **INTERPRETER KIRCHGESSNER:**   The interpreter repeats.

2    **BY MR. RUTER:**

3    Q.   Do you recall where it was that you saw this gun?

4    A.   ███████████.

5    Q.   Okay.  And did you have any discussions with Chino about

6    that gun?

7    A.   Yes.  The last time I saw it.

8    Q.   And what was that conversation?

9    A.   To remove that from there because I did not want to have

10   problems with the owner of the house.

11   Q.   Okay.  Did you tell him that you would not allow it?

12   A.   Yes.

13   Q.   And you're saying that he never moved it?

14   A.   Yes, he took it.

15   Q.   Did he hit you or strike you when you told him to remove

16   it?

17   A.   No.

18   Q.   He just removed it, you're saying?

19   A.   Yes.

20   Q.   When you were working with Chino, Ms. Franco, did he ever

21   ask you to call any of the girls that were supposed to be

22   working to see if they were going to come to work?

23   A.   Yes.

24   Q.   And did you do that?

25   A.   Yes.

 1   Q.   Could you tell us exactly what happened, please.

 2   A.   He would give me the telephone number for the girl to

 3   call and see if she was going to come and work, because

 4   sometimes he was busy and he couldn't do it himself.

 5   Q.   And so you'd make the call for him?

 6   A.   Yes.  Twice.

 7   Q.   And, when you made the call, were there some times when

 8   the girl could not make it and then other times when the girl

 9   could make it?

10   A.   No.

11   Q.   And the two instances that you actually did that, to your

12   knowledge, did the girls come to work, or don't you know?

13   A.   I don't know if they came.

14   Q.   Okay.  Did you ever tell the police that Raudel was the

15   head of Chino?

16   A.   Yes.

17   Q.   And what does that mean, that Raudel is the head of

18   Chino?

19   A.   It means that Chino told me to say that.

20   Q.   So was he, or was he not the head of Chino?

21   A.   No.

22   Q.   Okay.  Now, you told the police that on November 15th of

23   2010, correct?

24   A.   Yes.

25   Q.   Okay.  And Chino here was locked up on November 15th,

1   2010, wasn't he?

2   A.   Yes.

3   Q.   When was it, then, that he told you to tell the police

4   that Raudel was his head or his boss?

5   A.   He always told me that -- to say that in case the police

6   arrested him.

7   Q.   Did you know:  Was there a person named Raudel?

8   A.   I never met him.

9   Q.   Well, the question is:  To your knowledge, was there a

10  business owner named Raudel?

11  A.   Yes.

12  Q.   Okay.  Do we understand, Ms. Franco, that there are a lot

13  of owners of prostitution businesses of which you are aware?

14  A.   Yes, I know that, but I don't know them.

15  Q.   Okay.  And you know that many are female owners; is that

16  right?

17  A.   No.

18  Q.   Did you tell the police that one Carlita was a business

19  owner?

20          **INTERPRETER KIRCHGESSNER:**  Interpreter requests

21  clarification on the name.  Juan Carlita?

22          **MR. RUTER:**  No.  Just one, Carlita.

23          **THE WITNESS:**  Yes.

24  **BY MR. RUTER:**

25  Q.   And Carlita, is that a female, or is that a male?

1    A.   A man.

2    Q.   Did you ever work for Carlita?

3    A.   No.

4    Q.   Did you ever hear of an owner named Brenda?

5    A.   No.

6    Q.   Did you ever hear of an owner named Vivian?

7    A.   Yes.

8    Q.   And is she -- is that a woman, or is that a man?

9    A.   A woman.

10   Q.   And did you ever work for Vivian?

11   A.   No.

12   Q.   Okay.  Didn't Alex have you work for at least one woman?

13   A.   No.

14   Q.   Okay.  And you know of an owner named Carlos?

15   A.   Yes.

16   Q.   And you know of a owner named Jose?

17   A.   Yes.

18   Q.   Did you tell the police that you sent money home to your

19   mother?

20   A.   Yes.

21   Q.   And did you send money home to your mother?

22   A.   No.

23   Q.   Did you, however, tell the police that you did send money

24   home to your mother?

25          MS. YASSER:  Asked and answered, Your Honor.

| 1 | **THE COURT:**  Overruled. |
| 2 | **THE WITNESS:**  Yes. |
| 3 | **BY MR. RUTER:** |

Q.   And you told the police that you wanted to leave Chino,
but you couldn't because you had to send money home to your
mother; is that correct?

A.   I don't -- I don't remember that conversation.  I don't
remember.

Q.   Can you recall telling the police that you need to
work -- "I need to send money to my house.  My mother is
sick"?

A.   Yes.

Q.   Does that mean that you did not tell the police the truth
on November 15th, 2010, when you told them that you needed to
work so you could send money home to your mother?

A.   Yes.

Q.   Do you recall the police asking you when the last time
was you ever sent money home when you talked to them on
November 10th of 2010?

A.   I don't remember.

Q.   Do you recall telling them that you had sent money home
about one week before you were interviewed on November 15th of
2010?

A.   No.

Q.   No, what?

1   A.   I don't remember.

2            MR. RUTER:   May I approach, Your Honor?

3            THE COURT:   Yes.

4            MR. RUTER:   Madam Clerk, may we have this marked for

5   identification as Defense Number 5?

6            THE COURT:   Have you shown it to the Government?

7            (Document tendered to Ms. Yasser.)

8            (Counsel conferring.)

9            MR. RUTER:   Just for identification only.

10  **BY MR. RUTER:**

11  Q.   Ms. Franco, I'm going to ask the interpreter to read to

12  you silently Page 99 and 100.

13           **INTERPRETER KIRCHGESSNER:**   The interpreter will

14  sight translate these two pages.

15           (Interpreter translating document to the witness.)

16           **INTERPRETER KIRCHGESSNER:**   Interpreter concluded the

17  sight interpretation.

18  **BY MR. RUTER:**

19  Q.   Ms. Franco, the interpreter has had a chance to read you

20  Page 99 and 100 of the exhibit; is that correct?

21  A.   Yes.

22  Q.   Does the reading of the document help you to refresh your

23  recollection concerning what you told the police about the

24  last time that you'd sent money home to your mother?

25  A.   Yes.

1    Q.   And when was that?

2    A.   I don't remember the date, but, yes, on occasions, I sent

3    her money.  I begged him to give me money to send to my mother

4    because she was sick.

5    Q.   So, then, is your answer you did send money home, or you

6    didn't send money home?

7    A.   About three times.

8    Q.   Okay.  Was that money that you received as a result of

9    your prostitution activities?

10   A.   I did not deposit the money; it was him who deposited it,

11   and it wasn't much.  It was just a hundred -- just bare

12   hundred dollars.

13   Q.   On November the 15th of 2010, did you tell police that

14   the reason that women worked in prostitution is because of the

15   money which they received as a result of working in the

16   business?

17   A.   Some, they do.  Some don't.  Some, they are threatened to

18   work, I believe.

19   Q.   Did you tell the -- did the police ask you whether or not

20   Chino threatened the girls to work for him?

21   A.   Yes.

22   Q.   And what did you tell the police when they asked you

23   that?

24   A.   That he would threaten them on the phone.

25   Q.   That's what you told the police on November 15th, 2010?

1    A.    That's what I remember.

2    Q.    And what you told them on that date was the truth; was it

3    not?

4    A.    Yes.

5    Q.    Okay.

6              **MR. RUTER:**  Rachel?

7              (Document tendered to Ms. Yasser.)

8              (Counsel conferring.)

9    **BY MR. RUTER:**

10   Q.    Now, on September 15th, 2010 -- I'll make sure I have

11   this right, Ms. Franco --

12             **MR. CUNNINGHAM:**  November.

13   Q.    November 15th, 2010.  I'll make sure I get this right.

14   The police specifically asked you whether or not Chino ever

15   threatened any of the girls; is that right?

16   A.    Yes.

17   Q.    And you gave them a response; is that correct?

18   A.    Yes.

19             **MR. RUTER:**  Now, Your Honor, I wonder if this is a

20   good time to take the morning break?

21             **THE COURT:**  Okay.  Members of the jury, we're going

22   to take the morning break now.  Please remember, don't discuss

23   the case among yourselves or with anyone else.  I will call

24   for you at noon.  We will resume at noon.

25             (Jury excused.)

 1          THE COURT:  How much more do you have, Mr. Ruter?

 2          MR. RUTER:  Maybe 45 minutes with the Court's

 3   permission?

 4          THE COURT:  No, you don't have my permission for 45

 5   minutes more.

 6          MR. RUTER:  Half hour?

 7          THE COURT:  Twenty minutes.  You've been at it for

 8   two hours and 43 minutes.  You have 20 more minutes.

 9          MR. RUTER:  So, come 12 o'clock, Your Honor, I'll

10   have until 12:20.

11          THE COURT:  Yes.

12          MR. RUTER:  Thank you.

13          THE COURT:  We're in recess.

14          THE CLERK:  This Honorable Court now stands in

15   recess.

16          (Recess taken, 11:34 a.m. - 12:00 p.m.)

17          THE CLERK:  All rise.  This Honorable Court now

18   resumes in session.

19          THE COURT:  Counsel, approach.

20          (Whereupon, the following discussion occurred at the

21   bench.)

22          MR. MONTEMARANO:  Good morning, Your Honor.

23          THE COURT:  I understand the witness has a health

24   problem -- she's being attended by a physician now -- one of

25   the things I noticed during the course of your examination,

1    Mr. Ruter.  In any event, I'm told by the physician that she

2    needs at least another half hour, so I'm going to send the

3    jury out for lunch, and we'll resume at 2 o'clock and see

4    where everyone is physically at that point.  Juror Number 11

5    has a baptist convention that he wants to go to, which would

6    require him to leave tomorrow morning, be gone Wednesday and

7    Thursday.  We have four alternates.  I will hear from you if

8    you wish to try to keep him on, but I'm inclined --

9         **MR. MONTEMARANO:**  No objection --

10        **THE COURT:**  I'm inclined to grant --

11        **MR. MONTEMARANO:**  No objection from Mr. Fuertes.

12        **THE COURT:**  I'm inclined to excuse him.

13        **MS. YASSER:**  No objection.

14        **THE COURT:**  Now, Mr. Ruter, you were saying?

15        **MR. MONTEMARANO:**  No.  Actually, I was the one who

16   asked for the bench conference.

17        **THE COURT:**  Yes?

18        **MR. MONTEMARANO:**  Your Honor had indicated a desire

19   to shorten Mr. Ruter's cross.

20        **THE COURT:**  Yes.

21        **MR. MONTEMARANO:**  If I could advise the Court as

22   follows:  Mr. Ruter and I spent a good 45 minutes consulting

23   yesterday afternoon after the close of business about where we

24   intended to go today with regard to cross so as not to extend

25   it too long on my part with what Mr. Ruter has done.  I had

1    reserved earlier yesterday 45 minutes for cross of this

2    witness.

3              **THE COURT:**  Yes.

4              **MR. MONTEMARANO:**  I'm prepared to alert the Court

5    that, if Mr. Ruter is granted 45 minutes to finish what he

6    believes he needs to do and we had talked about doing, I'll

7    cut mine back.  I probably wouldn't need more than 20.  So

8    it's the same amount of time.  Mr. Ruter, in essence, having

9    prepared it --

10             **THE COURT:**  But then I still have to listen to it.

11   I'm teasing, of course, Mr. Ruter.  You've been a joy.

12             **MR. MONTEMARANO:**  Well, the alternative is to listen

13   to me, Your Honor, and I'm not teasing.

14             **THE COURT:**  That's okay.  Maybe the jurors will come

15   out of the box and cut it short, so no problem there.  Tell

16   you what?  I'll think about it, and we'll resume at 2 o'clock.

17             **MR. RUTER:**  Yes, sir.

18             **THE COURT:**  And, at that point, I'll have some more

19   information about the witness -- first of all, whether the

20   witness herself will be able to continue.  If she's not able

21   to continue today, then I'm inclined to grant you the

22   additional time.  If, however, she wants to get it done today,

23   then I'm not going to let you kill the witness.

24             **MR. MONTEMARANO:**  Oh, sure, Your Honor, but I'm

25   saying the two of us together shouldn't take more than an

1    hour.

2              **THE COURT:**  Well, of which 20 minutes will be him.

3              **MR. MONTEMARANO:**  Well, but we could do it the other

4    way as Your Honor was suggesting.

5              **MR. RUTER:**  Your Honor, I would submit that she's

6    apt to survive me better than him.  That's the way I see it.

7              **MR. MONTEMARANO:**  There is that.

8              **THE COURT:**  There is that, yeah.

9              **MS. YASSER:**  Three hours in, and she needs medical

10   care.  I'm not so sure, Gerry.

11             **MR. RUTER:**  Well, okay.

12             **MR. MONTEMARANO:**  If she'd give a straight answer --

13             **THE COURT:**  I had -- well, I have no sense that

14   she's being evasive in any way.

15             **MR. MONTEMARANO:**  I don't think it's much evasive --

16             **THE COURT:**  I could not imagine, frankly, the stress

17   she must be under.  Think of the embarrassment of having to do

18   this --

19             **MR. MONTEMARANO:**  Oh, not a question.

20             **THE COURT:**  -- in front of a courtroom full of

21   strangers.  This is not a pleasant experience for her.  That's

22   the century's understatement.  This is not a --

23             **MR. MONTEMARANO:**  And I'm not suggesting that I'm

24   insensitive, Your Honor, but it seems --

25             **THE COURT:**  No.  I'm not suggesting that you should

 1    be any less vigorous in your advocacy, but sometimes vigor

 2    requires also some caution and common sense.

 3             **MR. MONTEMARANO:**  Absolutely.  My point is that it's

 4    taking so long, and it seems to me that perhaps the

 5    appropriate way to analogize this for the witness' benefit

 6    would be like, when you yank a band-aid off, it hurts a lot,

 7    but it's over with.  She is doing this so slowly, and I think

 8    it's prolonging the agony.

 9             **THE COURT:**  Well, again, she's not a particularly

10    well-educated woman.

11             **MR. MONTEMARANO:**  True.

12             **THE COURT:**  She's doing this slowly because the

13    examination is being conducted in a foreign language and she's

14    not familiar with it, and it's not something that she's done

15    just to Mr. Ruter.  She took a long time, as I recall, in

16    responding to the Government's questions as well.  So it's not

17    as if she was quick on the response to --

18             **MR. MONTEMARANO:**  Not at all.

19             **THE COURT:**  -- the direct and is dragging her feet

20    in response to the Defense.  I mean, she is -- this is a

21    genuinely unpleasant experience, and she hasn't been

22    volunteering information for either side frankly.

23             In any event, as I said, at 2 o'clock, we'll all

24    have some more information.  I'll know from her physician what

25    the situation is and whether it is, in fact, possible for her

1    to continue today.  If her doctor thinks, as I said, it's

2    possible for her to continue tomorrow and she's fresh, then I

3    might very well give you your total 65 minutes any way you

4    want to spend it, if she's fresh and available to go tomorrow,

5    but, in my opinion, she was in observable distress during the

6    last half hour or so of Mr. Ruter's examination.

7         **MR. MONTEMARANO:**  For the record, I note that, with

8    the monitor in the way, I see nothing but the top of her head,

9    notwithstanding my height.

10        **THE COURT:**  Yes.  Well, that was just my opinion,

11   but I think she was in observable distress.

12        Okay.  2 o'clock, folks.

13        **MS. YASSER:**  Thank you, Your Honor.

14        **MR. MONTEMARANO:**  Thank you, sir.

15        **THE COURT:**  Belinda, would you tell the jury we're

16   going to take an early lunch break and that we will resume at

17   2:00, and get Number 11 to himself and tell him that we will

18   let him go, but he should not discuss that with anyone.  He

19   should just not come in tomorrow.

20        **THE CLERK:**  Yes.

21        **THE COURT:**  Okay.

22        (Whereupon, the bench conference was concluded.)

23        **THE COURT:**  Okay.  We are in recess until 2:00 --

24   2:00 p.m.

25        **THE CLERK:**  All rise.  This Honorable Court is now

1    in recess until 2:00 p.m.

2                    (Luncheon recess -- 12:09 p.m.)

3                    (Afternoon session -- 2:00 p.m.)

4            **THE CLERK:**  All rise.  This Honorable Court now

5    resumes in session.

6            **THE COURT:**  Please be seated.

7            Is Dr. Baker here?

8            **MS. YASSER:**  She is.

9            **THE COURT:**  May I speak to her, please?

10           **MS. YASSER:**  Sure.

11           **THE COURT:**  Counsel, approach.

12                   (Whereupon, the following discussion occurred at the

13   bench.)

14           **THE COURT:**  Good afternoon.

15           **DR. BAKER:**  Good afternoon.

16           **THE COURT:**  Dr. Mesa Baker?

17           **DR. BAKER:**  Yes.

18           **THE COURT:**  My understanding is that you are a

19   medical doctor; is that correct?

20           **DR. BAKER:**  Yes.

21           **THE COURT:**  I think I've seen you in another trial,

22   haven't I?

23           **DR. BAKER:**  Yes.

24           **THE COURT:**  Okay.  Dr. Baker, you've had a chance to

25   examine the witness who is on the stand?

 1          **DR. BAKER:**  Correct.

 2          **THE COURT:**  What was her state when you examined

 3     her?  How would --

 4          **DR. BAKER:**  For today?

 5          **THE COURT:**  Yes.

 6          **DR. BAKER:**  Seemed to be having a severe anxiety

 7     attack, very distraught, seems to have pulled herself

 8     together.  My only concern is this persistent pain in her arm,

 9     which is a little odd.  I'm used to tingling and numbness and

10     maybe other things.

11          **THE COURT:**  If that were male, we'd be thinking

12     heart attack?

13          **DR. BAKER:**  Yeah.  We'd be worried about heart

14     attacks.  I've queried her about her background, family's

15     background.  It's not significant, so I don't think she's

16     having a heart attack in front of us, but I would recommend

17     she follow up with her physician later, particularly if this

18     pain doesn't settle down.

19          **THE COURT:**  Do you have any opinion about her

20     ability to continue the examination this afternoon?

21          **DR. BAKER:**  As far as I can tell, I think she's able

22     to go forward.

23          **THE COURT:**  Okay.  Thank you.

24          **DR. BAKER:**  Certainly.

25          **THE COURT:**  May we have the witness, please?  Don't

1    go yet, guys.

2            **MR. RUTER:**  Do you want the Government, Your Honor?

3    Mike?

4            **THE REPORTER:**  Counsel?

5            **MS. YASSER:**  Excuse us, Your Honor.

6            **THE COURT:**  That's okay.  Waiting for the witness.

7    I want to ask her a few questions while she's --

8            **MS. YASSER:**  Oh, probably doesn't know to bring her.

9            **THE COURT:**  Okay.  And I will need an interpreter at

10   the bench, please.

11           **MR. CUNNINGHAM:**  You want her at the bench, Your

12   Honor?

13           **THE COURT:**  Yes.

14           **INTERPRETER KIRCHGESSNER:**  Yes, Your Honor.  I was

15   interpreting.

16           **THE COURT:**  Thank you.

17           **INTERPRETER KIRCHGESSNER:**  Of course speaking with

18   you.

19           **THE COURT:**  Good afternoon, Ms. Dueñas Franco.  How

20   do you feel?

21           **THE WITNESS:**  A little better.

22           **THE COURT:**  Okay.  Do you feel well enough to

23   continue examination today?

24           **THE WITNESS:**  I would like to finish right now with

25   this.

1              THE COURT:  Okay.  So you would rather complete this

2     today than come back at another time?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  Thank you very much.

5              Will you step back, please.

6         MS. YASSER:  Can she take the witness stand?

7              THE COURT:  Yes, she can take the witness stand.

8     Counsel, don't go away yet.

9              Mr. Montemarano, what was your proposal?

10        MR. MONTEMARANO:  On time?

11        MR. RUTER:  Shifting of time.

12        MR. MONTEMARANO:  Oh, we would take an hour, and

13    Mr. Ruter would irrigate to himself about 40, and I would

14    irrigate to myself about 20.  If he gets his 40, I can

15    probably keep mine at 20.  I'm going to have to do it.

16             THE COURT:  Okay.  Let's do it.

17        MR. MONTEMARANO:  Thank you, Your Honor.

18             (Whereupon, the bench conference was concluded.)

19             THE COURT:  Does she have water?

20             THE CLERK:  She has water?

21             THE WITNESS:  Yes.

22             THE COURT:  Counsel, are you ready for the jury?

23        MS. YASSER:  Yes, Your Honor.

24        MR. MONTEMARANO:  Yes, Your Honor.  Thank you.

25             (Jury enters.)

1            THE COURT:  Thank you.  Please be seated.

2            THE CLERK:  I would like to remind you, you are

3    still under oath.

4            THE WITNESS:  Thank you.

5            THE COURT:  Mr. Ruter.

6            MR. RUTER:  May it please the Court.

7    BY MR. RUTER:

8    Q.   Good afternoon, Ms. Dueñas Franco.

9            Ma'am, we were discussing your meeting that you had

10   with various police officers on November 15th of 2010.  Do you

11   recall that?

12   A.   Yes.

13   Q.   Were you asked by the police whether or not Chino had

14   ever forced you to work in prostitution with him?

15   A.   Yes.

16   Q.   And do you recall what your response was at that time?

17   A.   No.

18   Q.   Do you recall whether or not you told the police that you

19   were not forced to do prostitution by Chino?

20   A.   No.

21   Q.   Does that mean, no, you do not recall, or, no, you were

22   not forced?

23   A.   I don't remember.

24   Q.   Okay.  And, before I approach with the Court's

25   permission, do you recall whether or not you told the police

1    whether or not other girls were threatened by Chino?

2    A.   Yes.

3    Q.   And, yes, you recall, or, yes, he forced the girls to do

4    prostitution?

5    A.   Yes, he forced them.

6          **MR. RUTER:**  Your Honor, if I could have this marked

7    as Defense Exhibit Number 7 for identification only, please.

8          **THE COURT:**  Defense 7 for identification.

9          **MR. RUTER:**  Thank you, ma'am.

10         **THE CLERK:**  You're welcome, sir.

11         **MR. RUTER:**  May I approach the witness, Your Honor?

12         **THE COURT:**  Yes.

13   **BY MR. RUTER:**

14   Q.   Ms. Franco, I'm going to ask the interpreter to read for

15   you Page 102 and Page 103, down to Line 6 on Page 103.

16         **MR. RUTER:**  Thank you.

17         **INTERPRETER KIRCHGESSNER:**  Interpreter will sight

18   translate this page.

19         (Interpreter translating document to the witness.)

20         **MR. RUTER:**  Thank you, madam.

21         **INTERPRETER KIRCHGESSNER:**  Interpreter has finished

22   the interpretation.

23   **BY MR. RUTER:**

24   Q.   Ms. Franco, as a result of the interpreter reading these

25   two pages to you, do you have a recollection today as to

 1    whether or not you were asked by the police if you were forced

 2    to work for Chino in prostitution by force?

 3    A.   It's true I never said that.

 4    Q.   And, when you say you never said that, what you're saying

 5    is you told the police that you were never threatened by Chino

 6    to do prostitution; is that correct?

 7    A.   Yes, I said that, because I was afraid.

 8    Q.   And you also told the police on the same day that Chino

 9    never threatened any of the other girls; is that also true?

10    You told the police that?

11    A.   Yes.

12    Q.   Okay.  Then why did you tell them that?

13    A.   I say it again.  Because I was afraid.

14    Q.   You were so afraid that you turned right around and went

15    back to ████████████████████ the same night, didn't you?

16    A.   Yes, but I repeated already that it was to get some

17    papers.

18    Q.   What papers were they you were going to get, Ms. Franco?

19    A.   Papers that were sent from my country -- birth

20    certificate.

21    Q.   And are you telling us that you did not have the ability

22    to have the police officers go with you and to retrieve those

23    documents that you thought you had to have?

24    A.   Yes.

25    Q.   Did you ever do anything with those papers that you had

1      to go get?

2      A.   Yes.

3      Q.   What did you do with them?

4      A.   I needed to get my passport.

5      Q.   And was that so you could return home?

6      A.   Yes.

7      Q.   To go home to your homeland with your child?

8      A.   Yes.

9      Q.   But you never did that, did you?

10     A.   No.

11     Q.   Do you recall, during this interview you had with the

12     police, whether or not the police asked you about whether

13     Chino ever talked about the death of El Pelon?

14     A.   Yes.

15     Q.   What did they ask you?

16     A.   If Chino had threatened Pelon.

17     Q.   And what did you tell them?

18     A.   That he placed some telephone calls to him.

19     Q.   Are you sure that's what you told the police?

20     A.   Yes.

21            **MR. RUTER:**  Page 108 and 109.

22            (Counsel conferring.)

23            **MR. RUTER:**  If I could have this marked as Defense

24     Number 8 for identification.

25            **MR. CUNNINGHAM:**  Mr. Ruter, can you repeat the page,

 1    please, of that document?

 2              **MR. RUTER:**  This is 108 and 109.

 3              Madam Interpreter, can you read Lines 17 and 18,

 4    please.

 5              **INTERPRETER KIRCHGESSNER:**  Yes, of course.

 6              **MR. RUTER:**  I'm not so sure if it's 17 and 18 or 18

 7    and 19.  Here and here, just these two lines on Page 108.

 8              (Interpreter translating document to the witness.)

 9              **MR. RUTER:**  I think that's it.

10    **BY MR. RUTER:**

11    Q.   Ms. Franco, you just had the interpreter read Lines 18

12    and 19 of Page 108.  Having read this, do you have a

13    recollection today as to whether or not you told the police

14    that Chino never discussed the death of El Pelon after

15    El Pelon was killed?

16    A.   Yes.  I remember, it's true, at that moment, I lied

17    again.

18    Q.   Okay.  Thank you.

19              Ma'am, at the time that you had this conversation,

20    do you recall whether or not you lived on ███████████, or

21    on November 15th of 2010?

22    A.   Yes.

23    Q.   And had you lived there for approximately a year before

24    the interview which took place on November 15, 2010?

25    A.   Yes.

```
1    Q.   And were you involved in prostitution throughout the

2    entire year of 2010?

3    A.   Yes.

4    Q.   Was ███████████████ ever used as a place for

5    prostitution?

6    A.   Never.

7    Q.   Do you recall being asked during this interview on

8    November 15th, 2010, when the last time was that you had ever

9    seen Chino with a gun?

10        And withdraw that question.  That's not the question

11   I wanted to ask.

12        How long before November 15th, 2010 had you worked

13   in the prostitution business?

14   A.   I don't remember.

15   Q.   You were pregnant at the time, correct?

16   A.   Yes.

17   Q.   You worked at the ███████████████ address on occasion for

18   the purpose of prostitution; is that correct?

19   A.   Yes.

20   Q.   Whose house of prostitution was that?

21   A.   Chino's.

22   Q.   Did you tell the police that that was Chino and Alex's

23   house of prostitution?

24   A.   Yes.

25   Q.   Why did you do that?
```

```
 1    A.   I was afraid.

 2    Q.   And it was your fear that caused you to tell the police

 3    that Alex and Chino owned this house for prostitution?

 4    A.   Yes.

 5    Q.   At the time, did you understand that Alex and Chino were

 6    friends or associates in the prostitution business while you

 7    were working at ███████████?

 8    A.   No.

 9    Q.   Now, do you recall, on November 15th of 2010, having a

10    second interview with the police on the same evening, but

11    later -- later that evening?

12    A.   I did not understand clearly.

13    Q.   There appears to have been two separate interviews that

14    took place on November 15th of 2010.  The first interview

15    started approximately 8:44 p.m.  Do you recall that?

16    A.   Yes.

17    Q.   And that interview lasted for over two hours.  Do you

18    recall that?

19    A.   Yes.

20    Q.   And then you kind of almost immediately started a second

21    interview, which started at 10:56 p.m., and that went on for

22    just about 26 minutes.  Do you recall that?

23    A.   Yes.

24    Q.   Do you recall being asked when the last time was that

25    you'd seen Chino with a gun?
```

1    A.    I don't remember.

2    Q.    Okay.  Let me ask you today, Ms. Franco:  Do you recall

3    today, prior to November 15th of 2010, when did you last see

4    Chino with a gun?

5    A.    I don't know.  I don't remember very well.  Around eight

6    months prior.

7    Q.    Do you recall telling the police that you had seen a

8    cream-colored gun about a month to a month and a half before

9    your November 15th, 2010 interview?

10   A.    Before 2010?

11   Q.    Do you recall telling the police that you had seen Chino

12   with a gun approximately in October of 2010?

13   A.    Yes.

14   Q.    Do you also recall telling the police that you saw Chino

15   and Alex at the same time with this gun we're talking about?

16   A.    Yes.

17   Q.    Was that true?

18   A.    Yes.

19   Q.    And you saw, then -- you're telling the ladies and

20   gentlemen of the jury today you saw both Alex and Chino at the

21   same time with a gun; is that right?

22   A.    Yes.

23   Q.    And this is the same Alex that you had been a prostitute

24   for; is that right?

25   A.    Yes.

1   Q.   This is the same Alex that beat you up so many times you

2   can't remember; is that right?

3   A.   Yes, the same one.

4   Q.   And this is the same Alex that had never paid you a dime;

5   isn't that right?

6   A.   Yes.

7   Q.   And, Ms. Franco, isn't it true that Alex and Chino were

8   competitors?

9   A.   No.

10   Q.   Were they friends?

11   A.   Friends, and, at the same time, enemies.

12   Q.   So you saw two friends and two enemies at the same time

13   with one gun; is that your testimony?

14   A.   Yes.

15   Q.   Where did the gun come from?

16   A.   I don't know.

17   Q.   Where did the gun go?

18   A.   I don't know.

19   Q.   You told the police that Alex took the gun, didn't you?

20   A.   I don't remember.

21   Q.   All right.

22        **MR. RUTER:**  Rachel, this is Page 14 of the second

23   interview.

24        **MR. CUNNINGHAM:**  Defense 9?

25        **MR. RUTER:**  It will be 9, yeah.  Thank you very

1    much.

2              Madam Interpreter, if you could read from Page 14 --

3              **MS. YASSER:**  Can you have -- Gerry, can you have her

4    read --

5              **MR. RUTER:**  I'm sorry?

6              **MS. YASSER:**  The translator on here --

7              (Counsel conferring.)

8              **MR. RUTER:**  It's actually incorrect?  It's your

9    translation.

10             (Counsel conferring.)

11             **MR. RUTER:**  If you could read Line 2 through

12   Line 9 -- to Line 10.

13             **INTERPRETER BLUMBERG:**  Interpreter sight

14   translating.

15             (Interpreter translating portion of the document to

16   the witness.)

17   **BY MR. RUTER:**

18   Q.   Ma'am, having listened to that, do you now recall that

19   you told the police that Alex kept the gun?

20   A.   Yes.

21   Q.   And whose gun was it?

22   A.   Chino's.

23   Q.   Chino.  So Chino gave that gun to his enemy; is that

24   right?

25   A.   Yes.

1   Q.   During the second interview on the same date, Ms. Franco,

2   do you recall the detectives asking you once again whether or

3   not Chino had ever held you against your will?

4   A.   I don't remember.

5   Q.   Do you recall telling the police that he did not hold you

6   against your will?

7   A.   Yes.

8   Q.   And did you tell the police that he did not hold you

9   against your will?

10  A.   Yes.

11  Q.   Do you recall telling the police that you worked because

12  you needed the money?

13  A.   Yes.

14  Q.   Do you recall, ma'am, telling the police that Chino told

15  you he did not want you to work in prostitution?

16  A.   Yes.

17  Q.   And you told the police that Chino told you he did not

18  want you to work in prostitution; is that right?

19  A.   Yes.

20  Q.   Ms. Franco, when was it that you found out that Chino was

21  married and that he had a child with his wife?

22  A.   I don't remember.

23  Q.   You did find out, though, didn't you?

24  A.   Yes.

25  Q.   And that changed your relationship with Chino; did it

1   not?

2   A.   No.

3   Q.   You had a romantic relationship with Chino; did you not?

4   A.   No.

5   Q.   You did not love him or care for him affectionately; is

6   that your testimony?

7   A.   No.

8   Q.   And is it your testimony also that Chino did not have

9   love or affection for you?

10  A.   No.

11      **MR. RUTER:**  Your Honor, if I could display at this

12  time Defense Exhibit Number 6, Government counsel has already

13  seen it.  It's been introduced without objection.  If I could

14  figure out how to --

15  Q.   Ms. Franco, can you identify that picture?  Is it on your

16  screen to your right?

17  A.   Yes.

18      **MR. RUTER:**  If I could inquire of the jurors -- if I

19  could inquire, Your Honor, if the jurors' screens are on?

20  Mine is not, so --

21      **JURORS:**  Yes.

22      **THE COURT:**  They are.

23  BY MR. RUTER:

24  Q.   And, Ms. Franco, that is you, and that's Chino; is that

25  right?

1    A.   Yes.

2    Q.   And that's -- you're in Virginia Beach; is that correct?

3    A.   Yes.

4    Q.   This is a picture of you as well; is that right, ma'am?

5    A.   Yes.

6    Q.   And you're directing your expression here to whom?

7    A.   Chino.

8    Q.   Okay.  Were you mad at him?

9    A.   Yes.

10   Q.   At that time, you were?

11   A.   Yes.

12   Q.   Okay.  And were you mad at him when this picture here was

13   taken?

14   A.   No.

15   Q.   No?  Well, when was this picture taken in relation to

16   that picture?

17   A.   I don't remember the date.

18            **THE COURT:**  Do they have exhibit numbers?

19            **MR. RUTER:**  Your Honor, this is collectively 6.

20            **THE COURT:**  Okay.

21   **BY MR. RUTER:**

22   Q.   They're all taken -- these pictures are all taken within

23   moments of each other, weren't they, Ms. Franco?

24   A.   Yes.

25   Q.   Okay.  This picture, you were mad at him; is that right?

1    A.    Yes, but that day, I was drunk.

2    Q.    All right.  And, when this picture was taken, were you

3    mad at him?

4    A.    I told you:  I was drunk.

5    Q.    In this picture, were you also drunk?

6    A.    Yes.

7    Q.    And then, finally, this picture, were you also drunk?

8    A.    Yes, in all of them.

9    Q.    So you're telling the ladies and gentlemen on the jury

10   that these are not pictures of two individuals who are

11   expressing affection, one for another; is that correct?

12   A.    What I know is that I was very drunk that day.  I don't

13   remember what I did that day.

14   Q.    Did you and Chino have discussions about the fact that

15   you have a child together and the fact that you needed child

16   support from him?

17   A.    No.

18   Q.    Let me ask if I could back up, Ms. Franco.  When you

19   discovered that Mr. Ventura here was, in fact, married and had

20   a child with his wife, did that surprise you?

21   A.    Yes.

22   Q.    And can you tell the folks here how it was that it did

23   surprise you?

24   A.    Because I thought he was on his own.

25   Q.    And you thought that you two were going to become a

1   couple, didn't you?

2   A.   No.

3   Q.   Okay.  So back to the child support.  Are you saying that

4   you -- did the police ever -- did you ever tell the police on

5   November 15th of 2010 that you and Chino had come to an

6   agreement on the issue of child support?

7   A.   No.

8   Q.   Okay.  Do you recall telling the police that you told him

9   that he had to help you?

10  A.   I don't remember.

11  Q.   Do you recall telling the police that he said, "Okay,"

12  and, "Let's come to an agreement"?

13  A.   No.

14          **MR. RUTER:**  Page 22 and 23, if I could have this

15  marked for identification, please.  Thank you.

16          Madam Interpreter, if you could read Page 22 and

17  Page 23, please.

18          **INTERPRETER BLUMBERG:**  Page -- last -- the entire

19  pages?

20          **MR. RUTER:**  The entire, yes.

21          (Interpreter translating Defense Exhibit 10 to the

22  witness.)

23  **BY MR. RUTER:**

24  Q.   Having listened to that, Ms. Franco, do you now recall

25  having told the police that you and Chino had discussed your

1    need for child support?

2    A.   I don't remember that conversation.  I don't --

3    Q.   At all?

4    A.   No.

5    Q.   Okay.  Do you recall, the same day, the police asking you

6    another time, once again, whether or not Chino had ever hit

7    you?

8    A.   Yes.

9    Q.   And do you recall telling the police, "No, never"?

10   A.   Yes.

11   Q.   Do you recall, ma'am, being in the Grand Jury on

12   December 7th of 2010?

13   A.   Yes.

14   Q.   And you were placed under oath, just like you were in

15   this courtroom yesterday; isn't that right?

16   A.   Yes.

17   Q.   And you were asked whether or not you had ever heard

18   anything about the murder of El Pelon; were you not?

19   A.   Yes.

20   Q.   And you told the Grand Jury under oath that the answer to

21   that question was no; is that right?

22   A.   Yes.

23          **MR. RUTER:**  The last series of questions, if I

24   could, Your Honor.

25   Q.   Ms. Franco, you told the authorities that there was about

1  a period of seven to eight months when you were locked up by

2  Chino here; is that right?

3  A.   Yes.

4  Q.   And do you recall where you were locked up by Chino?

5  A.   Yes.

6  Q.   Where was that?

7  A.   ██████████████.

8  Q.   And, when you said that you were locked up, does that

9  mean that you were not allowed to leave the house for a period

10 of seven to eight months?

11 A.   Yes.

12 Q.   And, therefore, you're telling us that, for a period of

13 seven to eight months, you never left that ████████████

14 address; is that correct?

15 A.   Yes, I did leave there, because sometimes I went out with

16 him.

17 Q.   When he was not there, who was with you, if anyone?

18 A.   His workers.

19 Q.   Was that house being used as a house of prostitution?

20 A.   Yes.

21 Q.   And were you working as a prostitute at that time?

22 A.   Yes.

23 Q.   And was that six days a week?

24 A.   Monday to Sunday.

25 Q.   Okay.  And, for that seven to eight months, do we

1    understand, then, that you never went to another house to work

2    with Chino; you stayed in that house for seven to eight

3    months?  Is that correct?

4    A.   No.  Sometimes I went out with him.

5    Q.   And, when you say you went out with him, that means you

6    went out to -- to a restaurant or something?  Is that what

7    that means?

8    A.   It was to do deliveries.

9    Q.   Okay.  So the only time you left the house was to do

10   other prostitution work; is that correct?

11   A.   Or to go shopping.

12   Q.   And during this entire time that you were doing

13   prostitution; is that right?

14   A.   Yes.

15   Q.   And there were other girls in the house?

16   A.   Yes.  They would come to work there.

17   Q.   And, during that entire time, did you receive any money

18   from Chino?

19   A.   Just to go buy food.

20   Q.   Where was your older child during this timeframe?

21   A.   Social Services.

22   Q.   And did you have your second child yet?

23   A.   No.

24   Q.   Were you pregnant with your second child yet?

25   A.   No.

1       **MR. RUTER:**   Your Honor, I have no further questions.

2   Thank you very much.

3           **THE COURT:**   Thank you.

4       **MR. RUTER:**   Thank you.

5       **THE COURT:**   Mr. Montemarano?

6       **MR. MONTEMARANO:**   Thank you, Your Honor.

7           Ms. Goldstein, are you ready?

8                   **CROSS-EXAMINATION**

9   **BY MR. MONTEMARANO:**

10  Q.   Good afternoon, Ms. Franco.

11  A.   Good afternoon.

12  Q.   We have never met before, have we?

13  A.   No.

14  Q.   Nor have we spoken before?

15  A.   No.

16  Q.   My name is Michael Montemarano.  I represent

17  Kerlin Fuertes.  You know who Kerlin is, right?

18  A.   Yes.

19  Q.   That's him sitting over here; is it not?

20  A.   Yes.

21  Q.   I'd like to ask you just a few questions about Kerlin, if

22  I could.  Can you help me understand some of the answers

23  you've given before?

24  A.   Yes.

25  Q.   Do you remember, at the end of the questions asked to you

1   by Ms. Yasser, you were asked if you feared Kerlin?  Do you

2   remember that question?

3   A.   Yes.

4   Q.   And you remember your answer was:  No, you do not fear

5   him; is that a fair statement?

6   A.   Yes.

7   Q.   And that was the truth; was it not?

8   A.   Yes.

9   Q.   And that's because you had no reason to fear Kerlin, did

10  you?

11  A.   No.

12  Q.   In fact, you had a good relationship with Kerlin, didn't

13  you?

14  A.   It wasn't that great.

15  Q.   Well, he was nice to you; was he not?

16  A.   Yes.

17  Q.   He never hit you?

18  A.   No.

19  Q.   He never beat you?

20  A.   No.

21  Q.   He was kind to you?

22  A.   Yes.

23  Q.   He didn't take advantage of you?

24  A.   No.

25  Q.   He never restrained you?

```
1    A.   No.

2    Q.   And, during the entire time you knew Kerlin, you had a

3    relationship with Mr. Ventura; did you not?

4    A.   Yes.

5    Q.   That's Mr. Ventura meaning Chino, correct?

6    A.   Yes.

7    Q.   Now, if I understand correctly, you have spoken to the

8    police many times about what you knew about Mr. Ventura; is

9    that a fair statement?

10   A.   Yes.

11   Q.   And the first time was on the night of the 28th to the

12   29th of September of 2008, correct?

13   A.   Yes.

14   Q.   And the second date was approximately 16 months later in

15   November of 2010, correct?

16   A.   Yes.

17   Q.   And you were spoken to twice on that evening, correct?

18   A.   Yes.

19   Q.   And then you spoke before the Grand Jury about a month

20   later on the 7th of December?

21   A.   Yes.

22   Q.   And then you spoke to them again in May of 2011; is that

23   a fair statement?

24   A.   Yes.

25   Q.   And it was only in May of 2011 that you finally
```

1   remembered that there was blood on Kerlin's shoes; is that a

2   fair statement?

3   A.   Yes.

4   Q.   And that was the first time you had mentioned that,

5   correct?

6   A.   Yes.

7   Q.   And it was only in May of 2011 you had mentioned there

8   was blood on Kerlin's shirt; is that correct?

9   A.   Yes.

10  Q.   And that was approximately, by my count, five months

11  after you answered the questions before the Grand Jury,

12  correct?

13  A.   Yes.

14  Q.   And, Mr. Cunningham, this gentleman right here, was the

15  one asking you the questions in front of the Grand Jury; was

16  he not?

17  A.   Yes.

18  Q.   And that was when you said you knew nothing about

19  anything relating to the murder of El Pelon, correct?

20  A.   Yes.

21  Q.   And that was the first time you mentioned that you had

22  seen Kerlin with a gun; isn't that correct -- May of 2011?

23  A.   Yes.

24  Q.   And you had no reason to be scared of Kerlin; is that

25  correct?

1              (Interpreter conferring with the witness.)

2              **INTERPRETER GOLDSTEIN:**  Interpreter would like to

3    advise the Judge that she wants to keep going, but she's not

4    feeling very well.

5              **THE COURT:**  Okay.

6              **MR. MONTEMARANO:**  I'll be quick, Your Honor.

7              **THE COURT:**  Thank you.

8              **MR. MONTEMARANO:**  Sure.

9              **INTERPRETER GOLDSTEIN:**  The interpreter would like

10   to go back to the last question.

11             **THE WITNESS:**  No.

12   **BY MR. MONTEMARANO:**

13   Q.   And you still really have no reason to fear Kerlin,

14   correct?

15   A.   No.

16   Q.   He's not like Mr. Ventura, is he?

17   A.   No.

18   Q.   Because you know he had nothing to do with the murder of

19   El Pelon, correct?

20   A.   Yes, I heard.

21             **MR. MONTEMARANO:**  Nothing further, Your Honor.

22             **THE COURT:**  Thank you.

23             Redirect?

24             **MS. YASSER:**  Thank you, Your Honor.

25

1          **REDIRECT EXAMINATION**

2     **BY MS. YASSER:**

3     Q.   Ms. Dueñas, you've been cross-examined now for almost

4     four hours, so I want to try to be quick, but I want to make

5     sure I give you an opportunity to explain a few things as well

6     where you may not have had that chance, and I want to start

7     with the pictures that Mr. Ruter showed you from Virginia

8     Beach.  Ms. Dueñas, do you recall having worked in Virginia

9     Beach earlier that day in prostitution?

10    A.   Yes.

11    Q.   And I think you testified on direct that, after you left

12    the beach where those photos were taken, you had to go back to

13    work?

14    A.   Yes.

15    Q.   So my question for you is:  Were you happy when those

16    photos were taken to have a break from working in

17    prostitution?

18    A.   No.

19    Q.   You weren't happier to be on the beach than you were to

20    be working in a brothel?

21    A.   Yes.

22    Q.   Now, with respect to how you first started in

23    prostitution, I just want to reverse and talk to you a little

24    bit about your time with Alex very briefly.

25              Alex's brothels were in a different part of Maryland

```
1    than Chino's; is that correct?  Did I understand your

2    testimony correctly?

3    A.   Yes.

4    Q.   And did I also understand that, when you worked for Alex,

5    your daughter was living, being cared for by someone else?

6    A.   Yes.

7    Q.   And who was that person?

8    A.   One of Alex's aunts.

9    Q.   And you testified that you eventually met Chino at one of

10   Alex's houses where Alex was -- where Chino was a customer; is

11   that correct?

12   A.   Yes.

13   Q.   And was Chino nice to you then?

14   A.   Yes.

15   Q.   And did you tell Chino you wanted to leave Alex's?

16   A.   Not at that time.

17   Q.   Did you eventually ask Chino to help you leave Alex's?

18   A.   Yes.

19   Q.   And did he agree to help you?

20   A.   Yes.

21   Q.   Did you feel that Chino could protect you from Alex?

22   A.   Yes.

23   Q.   And what about your daughter?  What happened with your

24   daughter?

25   A.   I went to get her from where she was.
```

Redirect Examination of Esmirna Rebeca Dueñas Franco

1   Q.   And was Chino with you then?

2   A.   Yes.

3   Q.   Now, there was a period of time, if I understand your

4   direct testimony, where you were with Chino, and you did not

5   have to work in prostitution.  Did I understand that

6   correctly?

7   A.   At the beginning.

8   Q.   And that changed sometime later?

9   A.   Yes.

10  Q.   And then there was a period of time that you worked for

11  Chino before you were encountered by the police in September

12  of 2008?

13  A.   Yes.

14  Q.   And, just so it's clear, because I think it seemed like

15  you were a little bit confused, are you unclear about how long

16  it was that you worked for Chino before you were encountered

17  by the police in September of 2008?

18  A.   It had been months.

19  Q.   It had been some time?

20  A.   Yes.

21  Q.   And, when you talked to the police in 2008, your daughter

22  had been taken from you; is that correct?

23  A.   Yes.

24  Q.   And you were trying to get her back?

25  A.   Yes.

Redirect Examination of Esmirna Rebeca Dueñas Franco                T-VI-1230

```
 1    Q.   And where was Chino, Ms. Dueñas?  Had Chino been arrested

 2    that day?

 3    A.   No.

 4    Q.   He was on the street?

 5    A.   Yes.

 6    Q.   What about Flaco?  Was he also on the street?

 7    A.   At that time, he was in the house.

 8    Q.   And, a couple days earlier, Flaco had gone with you to

 9    the police station; is that correct?

10    A.   Yes.

11    Q.   Ms. Dueñas, were you illegally in the country at the time

12    that you talked to the police in September of 2008?

13    A.   Yes.

14    Q.   At that time, Ms. Dueñas, why didn't you tell the police

15    about Chino when you talked to them?

16    A.   I was scared.

17    Q.   What were you scared of?

18    A.   Chino.

19    Q.   When you were encountered approximately two years later

20    in November of 2011, you did -- Chino was arrested that day;

21    is that correct?

22    A.   Yes.

23    Q.   And you did tell the police you were working for Chino at

24    that time?

25    A.   Yes.
```

1   Q.   And you were asked, Ms. Dueñas --

2        **MS. YASSER:**  And I'd like to refer Defense counsel

3   to Page 102 of that statement.

4   Q.   You were asked about the reason --

5        **MR. MONTEMARANO:**  What?  Which statement?

6        **MS. YASSER:**  102.  November 15th, 2010, Page 102.

7   **BY MS. YASSER:**

8   Q.   You were asked about the reason women work in

9   prostitution, and you told the police that many do it for the

10  necessity or because our pimps have threatened us.  They want

11  us to work, so we work, but no one does it out of pleasure.

12       Do you recall telling the police that?

13  A.   Yes.

14  Q.   And you had told the police that Chino was, in fact, your

15  pimp at the time?

16  A.   That's right.

17  Q.   And you also told the police that -- you were asked did

18  you feel safe to go back to your house.  Do you remember being

19  asked that by the police?

20  A.   Yes.

21  Q.   And you told the police that, if I don't go to my house,

22  he will suspect something.  I don't know if he has people

23  outside.  Do you recall that answer?

24  A.   Yes.

25  Q.   But you didn't tell the police everything about Chino

1    that day.  I think that much is clear; is that correct,

2    Ms. Dueñas?

3    A.    Yes.

4    Q.    Now, Chino had been arrested that day; is that correct?

5    A.    Yes.

6    Q.    Were there other occasions that you're aware of when

7    Chino had been arrested?

8    A.    Yes.

9    Q.    And what happened on those other occasions -- those prior

10   occasions when Chino was arrested?

11   A.    He would only be in for a day or two, and then he'd get

12   out again.

13   Q.    Ms. Dueñas, you were also asked about El Pelon in

14   November of 2011.  Do you recall that?

15   A.    Yes.

16   Q.    And you were asked if you thought that Chino had anything

17   to do with the killing of that man, and your answer was,

18   "Well, everything that I have heard --"

19          **MR. MONTEMARANO:**  Objection.

20          **THE COURT:**  Sustained.

21   **BY MS. YASSER:**

22   Q.    Ms. Dueñas, do you recall being asked about the killing

23   of El Pelon?

24   A.    Yes.

25   Q.    Do you recall whether you gave the police any indication

1    that you might have had information about that murder?

2    A.   No.

3    Q.   You were also asked at that time if you were scared of

4    Chino.  Do you recall being asked that?

5    A.   Yes.

6    Q.   Do you recall answering in the affirmative?

7    A.   Yes.

8              **MR. MONTEMARANO:**  Objection.

9              **THE COURT:**  Overruled, but only because it's late.

10   **BY MS. YASSER:**

11   Q.   Ms. Dueñas, following your statement on November 15th of

12   2010 when Chino was arrested, you did testify in front of the

13   Federal Grand Jury on December 7th of 2010.  Do you recall

14   that?

15   A.   Yes.

16   Q.   And this was now after Chino had been locked up for

17   nearly a month; is that correct?

18   A.   Yes.

19   Q.   And did you provide additional information about Chino at

20   that time?

21   A.   Yes.

22   Q.   You did not provide information about El Pelon at that

23   time; is that correct?

24   A.   No.

25   Q.   Do you recall Mr. Cunningham telling you before he

Redirect Examination of Esmirna Rebeca Dueñas Franco

```
 1    excused you that, if you needed to change something you said
 2    or add to it, that you may be given the opportunity to do so
 3    so long as the Grand Jury has not already acted on your
 4    testimony?
 5              MR. MONTEMARANO:  Objection.
 6              THE COURT:  Overruled.  That's foundational.
 7              THE WITNESS:  Yes.
 8    BY MS. YASSER:
 9    Q.   And do you recall also being informed that, if that
10    should come about, you could let one of the agents or you can
11    let one of the agents or the victim assistant coordinator
12    know, and they'll get in touch with us.  Do you recall that?
13    A.   Yes.
14    Q.   And do you recall whether, if some months later, you got
15    in touch --
16              MR. MONTEMARANO:  Objection.
17              THE COURT:  Sustained.  Sustained.  Sustained.
18              MS. YASSER:  Your Honor, may we --
19              THE COURT:  Sustained.
20    BY MS. YASSER:
21    Q.   Ms. Dueñas, back on November 15th of 2010, you did give
22    information about Kerlin Fuertes.  Do you remember that?
23              MR. MONTEMARANO:  Objection.  Leading.
24              THE COURT:  Overruled.
25              THE WITNESS:  Yes.
```

 1    **BY MS. YASSER:**

 2    Q.   Do you recall being asked questions about whether

 3    Mr. Fuertes had a gun?

 4    A.   Yes.

 5    Q.   And do you recall giving affirmative answers to those

 6    questions?

 7              **MR. MONTEMARANO:**  Objection.

 8              **THE COURT:**  Sustained.

 9              **MS. YASSER:**  Your Honor, may we approach?

10              **THE COURT:**  What was the answer?

11    **BY MS. YASSER:**

12    Q.   What was the answer, Ms. Dueñas?

13    A.   Yes.

14    Q.   Yes, you -- yes, what, Ms. Dueñas?

15    A.   That I had seen them.

16    Q.   And you also gave information --

17              **MR. MONTEMARANO:**  Objection.

18              **THE COURT:**  Overruled.

19    **BY MS. YASSER:**

20    Q.   You were asked on cross-examination about a prior

21    statement involving a yellow gun.  Do you recall those

22    questions on cross-examination?

23              Cream-colored.  Excuse me.  Cream-colored.

24    A.   Yes.

25    Q.   Do you recall also describing that that gun had other

Redirect Examination of Esmirna Rebeca Dueñas Franco        T-VI-1236

```
1    colors on it?

2    A.   Yes.

3    Q.   And what was that color?

4    A.   Black.

5    Q.   Now, Ms. Dueñas, you were asked questions about Kerlin

6    Fuertes, and you testified that Kerlin, compared to Chino, was

7    nice to you.  Do you recall that?

8              MR. MONTEMARANO:  Objection.  Misstating the

9    question.

10             THE COURT:  Overruled.  The jury will rely on their

11   recollection of the questions and testimony.

12             THE WITNESS:  Yes.

13   BY MS. YASSER:

14   Q.   And, over a period of time, you actually lived with

15   Mr. Fuertes; is that correct?

16   A.   Yes.

17   Q.   And was that during a time where you were working for

18   Chino?

19   A.   Yes.

20   Q.   And was Kerlin working for Chino at the same time?

21   A.   Yes.

22   Q.   And did Kerlin see how Chino would treat you?

23   A.   On one occasion.

24   Q.   And what was that occasion?

25   A.   When he hit me.
```

1    Q.   And was that an occasion that you previously testified

2    about?

3    A.   Yes.

4    Q.   Was that the occasion with the belt?

5    A.   Yes.

6              **MS. YASSER:**  No further questions, Your Honor.

7              **MR. RUTER:**  Just very briefly.

8              **THE COURT:**  Mr. Ruter?

9                        **RECROSS-EXAMINATION**

10   **BY MR. RUTER:**

11   Q.   Ms. Franco, you'd indicated that there were other

12   occasions before November 15th, 2010, when Chino had been

13   arrested; is that right?

14   A.   Yes.

15   Q.   He was never arrested for prostitution, though, was he?

16   A.   No.

17   Q.   Now, when you first started seeing Chino while you were

18   working for Alex, would it be fair to say, Ms. Franco, that

19   you two were, for lack of a better word, dating?

20   A.   Yes.

21   Q.   And you were dating for the purpose of getting to know

22   one another as a couple; would that be a fair statement?

23   A.   Yes.

24   Q.   Yes.  Okay.  And then last question, Ms. Franco:  On

25   November 15th, 2010, Ms. Yasser had asked you whether or not

1    you were asked by the police if you were scared of Mr. -- of

2    Chino.  Do you recall her asking that question?

3    A.   Yes.

4    Q.   And you told the police that you were scared; is that

5    right?

6    A.   Yes.

7    Q.   And you also told them you were scared because Chino

8    would get mad; is that right?

9    A.   Yes.

10   Q.   You told the police that he would get excited; is that

11   right?

12   A.   Yes.

13   Q.   And you told the police that he never hit you?

14   A.   Yes.

15             **MR. RUTER:**  Thank you, ma'am.

16             **THE COURT:**  Thank you.  Only five one last

17   questions.

18             Mr. Montemarano?

19             **MR. MONTEMARANO:**  Thank you, Your Honor.

20             **MR. RUTER:**  I'm doing better, Your Honor.

21                      **RECROSS-EXAMINATION**

22   **BY MR. MONTEMARANO:**

23   Q.   Ms. Franco, you have testified that you were scared when

24   you first talked to the police in September of 2008; is that a

25   fair statement?

 1    A.   Yes.

 2    Q.   And you were nervous?

 3    A.   Yes.

 4    Q.   But you talked to the police for quite a long while on

 5    the night of the 28th, 29th of September; did you not?

 6    A.   Yes.

 7    Q.   I'd like to talk to you about the very beginning of your

 8    conversation with the two detectives.  One was a Spanish

 9    speaker, Detective Carraballo, correct?

10    A.   Yes.

11    Q.   And the other was Detective Hartlove, correct?

12    A.   Yes.

13    Q.   The buzz cut, flat top?

14    A.   Yes.

15    Q.   Okay.  Do you remember being asked the following

16    question?  Now, you were spoken to by Detective Carraballo in

17    Spanish; is that correct?

18    A.   Yes.

19    Q.   Do you remember being asked the following question?

20         **MS. YASSER:**  Objection, Your Honor.

21         **THE COURT:**  Basis?

22         **MS. YASSER:**  Is this going to call for a hearsay

23    response now?

24         **THE COURT:**  Overruled.

25    **BY MR. MONTEMARANO:**

 1    Q.    "And we have several -- we have already talked to many

 2    witnesses.  We have a lot of our information, and part of our

 3    investigation led us to your house, █████ of ████████████, and

 4    that's why we found you there, and we'd like to talk to you."

 5          Do you remember that question?

 6    A.    Yes.

 7    Q.    Do you recall your response?

 8    A.    No.

 9    Q.    If I showed you a document, might it refresh your

10    recollection of what your response was to the police?

11    A.    Yes.

12          **MR. MONTEMARANO:**  Page 2 of the transcript of 29

13    September.

14          (Counsel conferring.)

15          **MR. MONTEMARANO:**  Can we just mark this as another

16    Defense exhibit?  I don't need it marked separately for

17    Mr. Fuertes.

18          **THE CLERK:**  Number 11.

19          **MR. MONTEMARANO:**  Eleven.  Gracias.

20    **BY MR. MONTEMARANO:**

21    Q.    I'm going to show you what's been marked for

22    identification as Defense 11.  I'm going to show you here the

23    part that I read.  Do you see your answer?  Does that refresh

24    your recollection?

25    A.    Yes.

1    Q.   Okay.  You answered yes?  You had said, "Uh-huh."  You

2    answered in the affirmative; is that correct?

3    A.   Yes.

4    Q.   And then Detective Carraballo said, "Okay."  Do you

5    remember that?

6    A.   Yes.

7    Q.   And do you remember your response?

8    A.   No.

9    Q.   I'd like to show it to you, see if this refreshes your

10   recollection.

11          **MR. MONTEMARANO:**  Can you read from Line 16 to

12   Line 19.

13          **THE REPORTER:**  Page?

14          **MR. MONTEMARANO:**  Lines 15 through 19.

15          **THE REPORTER:**  Page?

16          **MR. MONTEMARANO:**  Page 2.  It's Page 2 of the

17   transcript.

18          **INTERPRETER KIRCHGESSNER:**  The interpreter will

19   translate the lines requested by the attorney, Page 2.

20          (Interpreter translating portions of the document to

21   the witness.)

22   **BY MR. MONTEMARANO:**

23   Q.   Do you recall that?

24   A.   I don't even understand the question.

25   Q.   This suggests that your response to Detective

1    Carraballo --

2              **MS. YASSER:**  Objection.

3              **THE COURT:**  Sustained.

4              **MR. MONTEMARANO:**  Would you --

5              **THE REPORTER:**  Would you tell me for the record what

6    is being translated.

7              **MR. MONTEMARANO:**  Line 9, beginning with the

8    question -- beginning with "and" by Detective Carraballo, can

9    you translate all the way through the section that I asked you

10   to translate, Ms. Kirchgessner?

11             **INTERPRETER KIRCHGESSNER:**  Interpreter will

12   translate from Line 9 to the end of the page, Page 2.

13             (Interpreter translating portions of the document to

14   the witness.)

15             **INTERPRETER KIRCHGESSNER:**  The interpreter finished

16   the sight interpretation.

17             **MR. MONTEMARANO:**  Thank you.

18   BY MR. MONTEMARANO:

19   Q.   Does having that translated to you a second time refresh

20   your recollection?

21   A.   Yes.

22   Q.   Your response to the question was:  "Fire away.  Shoot.

23   Ask your questions," correct?

24             **THE COURT:**  Please get out of the jury box,

25   Mr. Montemarano.  Thank you.

1          **THE WITNESS:**  Yes.

2    **BY MR. MONTEMARANO:**

3    Q.   And then you laughed, correct?

4    A.   Yes.

5          **MR. MONTEMARANO:**  No further questions, Your Honor.

6    Thank you.

7          **THE COURT:**  Thank you.  You may step down.

8          (Witness excused.)

9          **THE COURT:**  Call your next witness.

10          **MS. YASSER:**  The United States calls Mary Mesa

11   Baker.

12          **THE CLERK:**  Raise your right hand.

13                **MARY-THERESA BAKER**

14       **WAS THEN DULY SWORN TO TELL THE TRUTH**

15          **THE CLERK:**  Be seated.  You can scoot up and pull

16   the chair up.  Speak directly toward that microphone.  You can

17   pull it down if you like.

18          State your name, and then spell it for the record,

19   please.

20          **THE WITNESS:**  Mary-Theresa Baker, M-A-R-Y, dash,

21   T-H-E-R-E-S-A.

22                **DIRECT EXAMINATION**

23   **BY MS. YASSER:**

24   Q.   Good afternoon, Dr. Baker.

25   A.   Hi.

1    Q.   Are you a medical doctor, ma'am?

2    A.   Yes, I am.

3    Q.   And how long have you been a doctor?

4    A.   Twenty-five years.

5    Q.   And where do you currently work?

6    A.   I am the Medical Director of the Baltimore Child Abuse

7    Center.

8    Q.   What are some of your job responsibilities and duties as

9    the Director of the Baltimore Child Abuse Center?

10   A.   I perform the complete medical exam and forensic evidence

11   and photo collection for alleged cases of child abuse that

12   occur typically in Baltimore City.

13   Q.   And is that for acute care, or non-acute care?

14   A.   Those are non-acute cases.

15   Q.   And what does that mean exactly, to be a non-acute versus

16   an acute case?

17   A.   Particularly for sexual abuse evaluations, after 72 hours

18   for prepubertal children, and after five days or 120 hours --

19        THE REPORTER:  I'm sorry.  One more time, a little

20   bit slower if you would.

21        THE WITNESS:  I'm sorry.  72 hours is the cutoff for

22   prepubertal children.  Five days, 120 hours is the cutoff for

23   postpubertal patients for acute evidence collection with the

24   rape kits, the DNA, and those sorts of things.

25   BY MS. YASSER:

1    Q.    And do your examinations also include full physical

2    examinations -- forensics, physical examinations?

3    A.    Yes.  Every patient is examined from head to toe.

4    Q.    And you used the word "child," and we've heard

5    "adolescent" before as well.  Can you just put a general age

6    range on those terms.

7    A.    Pediatricians typically see children and adolescents and

8    young adults up to about 21 to 24 at most places.

9    Occasionally some of the clinics -- adolescent clinics

10   specialize all the way up to 26.

11   Q.    And does the Baltimore Child Abuse Center see patients

12   within those age ranges?

13   A.    Yes, we do.

14   Q.    And do you also from time to time see older adults?

15   A.    Yes, we do.

16   Q.    Why would either young adults or older adults be seen at

17   the Baltimore Child Abuse Center?

18   A.    Older adults, particularly those who are mentally

19   disabled, are sent to the Child Abuse Center for non-acute

20   exams because it's a calmer, more friendly, and supportive

21   environment.

22   Q.    Dr. Baker, where did you receive your education?

23   A.    I had my undergraduate degree from the Pennsylvania State

24   University in 1984.  My medical degree is from the Medical

25   College of Pennsylvania in 1988.  I trained in pediatric

1    adolescent medicine in El Paso, Texas, graduated in '91, and

2    passed my Boards that November.

3    Q.   I'm sorry.  Where did you do your residency?

4    A.   In William Beaumont Army Medical Center in El Paso,

5    Texas.

6    Q.   Now, as part of your education and training, did you

7    receive training on how to perform forensic medical

8    examinations?

9    A.   I did.  When I first finished residency and was

10   transferred to Hawaii, Tripler Army Medical Center sent me to

11   the San Diego Children's Hospital for a week-long forensic

12   colposcopy course.  I then had cases in Hawaii of various

13   types.

14        Four years later, where -- the Army sent me to Fort

15   Bragg, North Carolina, and then, two years after that, then

16   came to Baltimore, and, in the interim, I would get continuous

17   CME and training, attend conferences on the subject;

18   particularly, a San Diego conference on child maltreatment and

19   the American Professional Society on the abuse of children.

20   Q.   And does all that training and education you just

21   described include the examination of skin for injury?

22   A.   Yes.

23   Q.   And do you also train others on how to perform these

24   forensic exams that you just described?

25   A.   Yes, I do.  Medical students mostly, family practice and

```
 1    pediatric residents, but also nurse examiners, staff doctors
 2    come to rotate with me and learn about how to do abuse exams.
 3    Q.   And have you received any awards for your work throughout
 4    the years, Dr. Baker?
 5    A.   I have received best senior resident award in my training
 6    program, a teaching award for family practice while in Hawaii,
 7    and a community service award through my alma mater in
 8    Philadelphia.
 9    Q.   Are you currently licensed to practice medicine in the
10    state of Maryland?
11    A.   Yes, I am.
12    Q.   And you mentioned you are Director of the Baltimore Child
13    Abuse Center.  How long have you held that position?
14    A.   I had been there for 16 years.  It will be this summer.
15    Q.   And what did you do before that?
16    A.   That -- then I was two years in Fort Bragg, North
17    Carolina, general pediatrics as well as the forensic exams.
18    Q.   Do you hold any Board certifications?
19    A.   Yes.  I am Board certified in pediatric and adolescent
20    medicine from the American Board of Pediatrics since 1991, and
21    I am sub-Boarded in the area of child abuse pediatrics since
22    that was first given in 2005.
23    Q.   And, over the course of your approximate 25-year career
24    as a medical doctor, have you examined individuals where there
25    is a concern of possible past injury?
```

1    A.   Yes.

2    Q.   Approximately how many individuals would you say you've

3    examined?

4    A.   It has to be more than 3,000.  Just for the Baltimore-

5    area cases, I've done more than 3,000, and I did a number

6    of -- before I came to Baltimore.

7    Q.   And that's for both physical and sexual injury?

8    A.   It's a complete physical exam for all patients.

9    Q.   And would you say it's been mostly children and

10   adolescents that you've examined?

11   A.   Yes.  The bulk of our work is through like 18.

12   Q.   Have you been qualified to testify as an expert before?

13   A.   Yes, I have.

14   Q.   And is that in cases involving either physical or sexual

15   abuse?

16   A.   There have been both.

17   Q.   How many times have you been qualified to testify as an

18   expert?

19   A.   In Baltimore City, it is fourteen times.  Outside of the

20   city and other jurisdictions, a dozen times.

21   Q.   Have you been qualified in this Court?

22   A.   Yes, I have.

23   Q.   I want to just focus real quick on the physical -- the

24   non-genital portion of forensic examinations.  Is there

25   another medical term to describe the physical -- the external

1    part of a forensic exam?

2    A.   Well, you're particularly focussing on cutaneous findings

3    in the head-to-toe general exam.

4    Q.   And what does that mean?  What does "cutaneous" mean?

5    A.   "Cutaneous" means skin.

6    Q.   And the training that you described earlier, did that

7    include training with respect to skin findings?

8    A.   Cutaneous skin findings are the most common type of child

9    abuse findings that are documented.  It's a very large area in

10   all child maltreatment.

11   Q.   And what is the protocol or the approach relative to

12   cutaneous or skin injury when you're examining a patient?

13   A.   Typically is to incorporate as part of the whole exam, so

14   I do head, eyes, ears, nose, throat exam, look at eyes, look

15   at teeth, look at ears, and -- but palpate, touch and feel for

16   sore places, lumps, bumps, masses, anything that hurts; the

17   scalp, neck, throat, listen to the heart, listen to the lungs,

18   listen to the abdomen, look at --

19            **INTERPRETER GOLDSTEIN:**  Your Honor, the interpreters

20   request that the witness please slow down.

21            **THE COURT:**  Yes.  Please, Doctor.

22            **MS. YASSER:**  I failed to warn you, Doctor, that we

23   have interpreters here today.

24            **THE WITNESS:**  I am sorry.  I speak very fast.

25            **INTERPRETER KIRCHGESSNER:**  Interpreter would request

1    two minutes to catch up with the last sentences.

2              (Pause.)

3              **INTERPRETER KIRCHGESSNER:**  Thank you.

4              **THE WITNESS:**  So heart, lungs, abdomen, palpate

5    those areas, look at the back from top to bottom under a good

6    light, look at the front abdomen under a good light.  It --

7    usually the skin and the body is done in sections for modesty.

8    Littler kids don't care as much.  The older the patient, the

9    more you'll do just one section at a time.  Front of the legs,

10   the bottom, and the feet, top of the legs, sometimes rolling

11   the patient over to see all of the back of the legs, sometimes

12   having them stand up, or sometimes just lifting them up,

13   checking the feet and all the way to the bottom of the feet,

14   and the toes.

15   **BY MS. YASSER:**

16   Q.   And, when you discover an injury to the skin, what do you

17   do?

18   A.   I -- I'm looking or palpating for any lesions, any mark

19   or finding at all on the skin, and that anything I notice, I

20   would ask, then, the patient, "How did you get this?"

21   Q.   And can you draw any conclusions about the possible

22   source or cause of a skin injury that you find?

23   A.   Findings on the skin are all about pattern recognition.

24   There are birthmarks can look a certain way.  Rashes will

25   appear a certain way.  Injuries tend to appear like the -- an

 1    object that may have been used against someone.  So it's

 2    looking for the type of pattern, how it looks, how it's

 3    healed, and also where it is on the body.

 4    Q.   Can you also -- can you date findings of skin injury?

 5    A.   Regular skin that has hair on it, stratified squamous

 6    skin, heals in fairly standard fashion, so superficial

 7    injuries and petechiae will be gone in about 72 hours, and

 8    then deeper tissue takes at least six weeks, but final scars

 9    do not set on regular skin until about six months.

10    Q.   And how do you know if a scar is final?

11    A.   It's well knit.  It's very firm.  The color doesn't

12    change anymore.  It tends to have returned to a color more or

13    less like the rest of the skin.

14    Q.   And so, if an injury is healed or well set, the most you

15    can tell is that it's greater than six months?

16    A.   That is correct.

17    Q.   Now, is there any distinction between adults and children

18    when it comes to cutaneous findings?

19    A.   Other than the extreme.  The very old people have fragile

20    skin that probably injures more easily, and very young

21    children are particularly prone for infectious processes or

22    birthmarks and things that can be mistaken for abuse, so there

23    are more mimics in children probably than in adults and

24    adolescents.

25         **MS. YASSER:**  Your Honor, I'd like to offer Dr. Baker

```
 1    as an expert in the area of forensic medical examinations,

 2    particularly with respect to cutaneous findings.

 3                  THE COURT:  Voir dire on qualifications?

 4                  MR. RUTER:  Voir dire?

 5                  THE COURT:  Yes.

 6                  MR. RUTER:  Thank you.

 7                    VOIR DIRE EXAMINATION

 8    BY MR. RUTER:

 9    Q.   Dr. Baker, good afternoon.

10    A.   Good afternoon.

11    Q.   Dr. Baker, first of all, are you a member of any child

12    advocacy groups?

13    A.   I'm a member of American Professional Society on the

14    Abuse of Children, the American Academy of Pediatrics.  I'm a

15    fellow of the American Academy of Pediatrics.  I'm a member of

16    American Academy of Pediatrics' Maryland section, and a member

17    of the -- the Child Maltreatment Committee in the American

18    Academy of Pediatrics.

19    Q.   And do all of those organizations have essentially the

20    same mission?

21    A.   Advocacy for the health and well-being of adolescents and

22    children, yes.

23    Q.   Okay.  I have been given sometime ago your curriculum

24    vitae by the Government, and I had noted that you have

25    attended many conferences for continuing educational purposes;
```

 1       is that right?

 2       A.   Correct.

 3       Q.   It appears like there could be about 20 of those

 4       throughout the United States; is that also correct?

 5       A.   Yes, sir.

 6       Q.   Would it be fair to say that all of those presentations

 7       that you attended dealt with a child abuse of some type?

 8       A.   Yes, by and large.

 9       Q.   As an example, the Shaken Baby Symposium?

10       A.   Correct.

11       Q.   There are several on child abuse and neglect?

12       A.   Correct.

13       Q.   There is ones on child memory and suggestibility?

14       A.   Yes.

15       Q.   And we also see from your curriculum vitae that you have

16       given numerous presentations, to your credit, and it looks

17       like maybe 30 or 40?

18       A.   Yes.

19       Q.   And, as I review those, they're all identified by a title

20       of some type; is that accurate?

21       A.   Yes.

22       Q.   Your presentation?

23               And, once again, those appear to be child sexual

24       abuse related.  Would that be a fair statement?

25       A.   By and large, yes.

1    Q.    Okay.  And, as I am looking through those, I'm not sure

2    if you have your CV with you, Doctor?

3    A.    Not in front of me.

4    Q.    But I'm sure you have a good memory?

5    A.    Reasonably.

6    Q.    And I'm looking for some that are not related to sexual

7    child abuse in your CV.

8    A.    The most recent Governor's conference in Annapolis, I did

9    a presentation on physical abuse findings.

10   Q.    And is that shown here on your CV?

11   A.    I don't know if it made it on that one.  That would have

12   been this past fall, for example.

13   Q.    Okay.  All right.  So we understand that, when you do a

14   physical exam, that one thing you're looking for is some kind

15   of injury to the skin?

16   A.    Yes.

17   Q.    And we also understand that the best that you can do as

18   far as dating an injury would be to the certainty of six

19   months, because that's when scarring comes to a final -- I'll

20   call it a resting place, which I'm sure is not a very medical

21   term, but is that a fair statement?

22   A.    Correct.

23   Q.    Would it also be a fair statement to say that, if you

24   were to see any kind of a skin injury that has, in your

25   opinion, come to its final resting place -- it's done

1    changing -- that that injury may be as young as six months, or

2    it could be as old as three years, five years?

3    A.    True to almost a patient's entire life.

4    Q.    Okay.  And would it also be true, then, in order for you

5    to make a diagnosis as to what the cause of that injury would

6    be, that the person reporting the injury would play a role in

7    you making your diagnosis; is that correct?

8    A.    Traditionally, 90% of all medical diagnosis is made by

9    the history.

10   Q.    Okay.  And, in the case of a very, very young child, as

11   an example -- let's take a hypothetical of a three-year-old as

12   an example.  Would it be fair to say that that child may not

13   be a very good historian to help you figure out how that child

14   received some kind of a cutaneous mark on his or her skin?

15   A.    Correct.

16   Q.    And, on the other hand, if you were examining a 25-year-

17   old, that person, presumably of reasonable intelligence, could

18   be able to historically advise you where they thought the mark

19   had come from; is that also accurate?

20   A.    Yes.

21   Q.    And can you tell the jury, if you're able to quantify it,

22   what percentage of your findings would come as a result of an

23   adult's historical analysis or indication to you where a mark

24   came from versus your simple -- I don't want to call it

25   simple -- your evaluation of the skin itself without any input

1    whatsoever from that person?

2    A.   I would estimate it runs about 50-50 in that there is a

3    number of marks that speak for themselves or rashes or skin

4    conditions and findings that I will be the one who tells the

5    parent what the child has based on how it looks.

6    Q.   And, taking that to the adult, though -- in this case,

7    we're talking about an adult, right?

8    A.   Correct.

9    Q.   That's the subject?

10         In terms of adults, can you quantify what percentage

11   of your findings are found by you as a result of the

12   examination alone versus an examination and a discussion with

13   the subject of your examination?

14   A.   So it's those marks that are not diagnostic in and of

15   themselves that I need a history for, for me to tell and make

16   a diagnosis, to put it together.  So, for the more vague or

17   irregular marks, then it's the majority of them I need a

18   history for, but some marks are fairly distinct and I can tell

19   what's happened, and they'll just tell me -- they'll fill in

20   the details for me what I already know really.

21   Q.   Okay.  And, without going into any detail, in this

22   particular examination, how do you quantify what you're able

23   to see?  Did you figure it out by looking, or do you have to

24   figure it out by looking and speaking with the person that you

25   examine?

1    A.    For this specific exam?

2    Q.    Yes.

3    A.    For this patient, there were four marks.  One was clearly

4    diagnostic in and of itself, and the other three, I needed

5    some level of history to figure out what they were.

6    Q.    Okay.  And, of this type, you've made approximately 3,000

7    type examinations, you're telling us?

8    A.    For forensic --

9    Q.    Of the type that you made in this case?

10   A.    Specify the type for me.

11   Q.    Well, you're the one that did the evaluation in this

12   case.

13   A.    Correct.

14   Q.    And my question is:  How many of the 3,000 physical exams

15   that you made were similar to the cutaneous type that you

16   looked at in this case?

17   A.    Well, they would all be -- every patient --

18   Q.    Every one?

19   A.    -- look at them and ask for what marks are.  Some people

20   have no marks, and some kids have lots of vague marks, and

21   some people -- some children are sent specifically for me to

22   look at their skin only, and some are part of a child sexual

23   abuse evaluation as well.

24   Q.    Okay.

25            **MR. RUTER:**  No further questions, Your Honor.

| 1 | **THE COURT:**  Do you wish to be heard? |

1    **THE COURT:**  Do you wish to be heard?

2    **MR. RUTER:**  If I could, if we could approach.

3    **THE COURT:**  Let me ask first:  Mr. Montemarano, do

4  you have questions on *voir dire*?

5    **MR. MONTEMARANO:**  The Court's indulgence.

6    **MR. RUTER:**  One other question, Your Honor, if I

7  could.

8  **BY MR. RUTER:**

9  Q.  Of the 3,000 examinations that you've estimated, how many

10  of those are of children versus adults?

11  A.  The large majority are children.  I would probably have,

12  adults over 18, maybe about 20.

13  Q.  Okay.  So, of the 3,000, you've had 20 adults, and you've

14  had 2,980 children?

15  A.  Yeah.  Well more than that probably.

16  Q.  Yes, ma'am.  Thank you.

17    **MR. RUTER:**  If I could be heard, Your Honor.  If I

18  could approach.

19    **MR. MONTEMARANO:**  No questions on behalf of

20  Mr. Fuertes.

21    **THE COURT:**  Okay.  Come up.

22    (Whereupon, the following discussion occurred at the

23  bench.)

24    **THE COURT:**  Yes, sir?

25    **MR. RUTER:**  Your Honor, I would suggest that this

1   witness would not be qualified to give an opinion about the

2   origin of the injuries as she looked at in this case, given

3   the fact that she's only examined, out of over 3,000, perhaps

4   20 adults.  Obviously we don't know the real circumstances of

5   the other 19 or so.  That's number one.

6           Number two, Your Honor, although the Court hasn't

7   seen it, I have seen the report of Dr. Baker, and it appears

8   as if she did not make a diagnosis at all.  That's the way

9   that I read the report.  She indicated that she examined four

10  marks on the -- the person we're talking about, of course,

11  Your Honor, happens to be Rebeca Dueñas Franco, and it's my

12  recollection that the report indicated that the marks were

13  consistent with what Ms. Franco told her was the origin of the

14  injuries, and I don't -- if I'm correct in saying it, I don't

15  believe that's a diagnosis.  It's simply a regurgitation of

16  what the person who she examined told her.

17          **MS. YASSER:**  And that's what we would actually be

18  asking her to testify to, Your Honor.  With respect to the

19  second objection, it's just were they -- was what you were

20  told about the source of the injury consistent with what you

21  saw?  That's essentially the final question we're asking

22  about.

23          **THE COURT:**  You get the last word.

24          **MS. YASSER:**  Your Honor, can I just address the

25  first objection?

1          **THE COURT:**   Sure.

2          **MS. YASSER:**   I think Dr. Baker testified that there

3    is -- in all her patients, children or adults, she does a full

4    cutaneous examination, and that there is no distinction

5    between somebody of, you know, in Ms. Dueñas' age range and

6    the adolescents that she examines, of which the large majority

7    of her examinations are.  It's only the old, the very old, and

8    the very young that have distinguishing factors when it comes

9    to cutaneous findings.

10          **MR. MONTEMARANO:**   I would submit, Your Honor, what

11    this witness therefore ends up needing to do, if the

12    Government's desire to put her on in the way that Ms. Yasser

13    agrees she's going to, she ends up saying this other witness

14    has told you the truth.  It's impermissible vouching for

15    another witness' testimony by saying, "She told me this, and

16    it's true."

17          **MR. RUTER:**   And, Your Honor, in that regard, I would

18    cite *U.S. versus Benally* -- it's 541 F.3d at Page 990 -- and

19    also *U.S. versus Whitted*, W-H-I-T-T-E-D, 11 F.3d at Page 782,

20    and I believe those two cases stand for the very proposition

21    that Mr. Montemarano just indicated, Your Honor, which is an

22    expert should not be permitted to simply give an opinion as to

23    the truthfulness or the untruthfulness of what a third party

24    has told them.  That's confusing to a jury and not helpful at

25    all to them in the ultimate issues.

1        **MS. YASSER:**  And, again, maybe I was unclear, but my

2   question would be:  Is what you observed, Dr. Baker,

3   consistent with the whip of a belt, or is it consistent with a

4   knife?  It's not what she -- and I may have misspoke, and I

5   apologize.  Not is it consistent with what she told you

6   happened, but is it consistent with what we know that the

7   injury was testified to occurring.

8        **MR. RUTER:**  That's the same thing, Your Honor.

9        **MR. MONTEMARANO:**  That's exactly it:  "She said,

10  'it's belt.'  Does it look like a belt to you?"

11       **MR. RUTER:**  Is it a knife?  Does it appear to be a

12  knife to you.

13       **MR. MONTEMARANO:**  Was she telling the truth when she

14  told us it was a belt.

15       **THE COURT:**  It seems like, in this case, there will

16  be testimony relating to a doctor's medical findings.  The

17  objections, I think, go more to weight than admissibility, so

18  I will permit her to testify as an expert.

19       **MR. RUTER:**  Your Honor?

20       **THE COURT:**  Yes?

21       **MR. RUTER:**  This may be premature, but would the

22  Court entertain my having Ms. Franco recalled given the fact

23  that she had testified, Your Honor, that she had been

24  forcefully raped and that where we left it was she was on

25  her -- she was hiking up a road with this man who raped her,

1    and where I was going, Your Honor, I would hope everybody

2    would realize, is I wanted to know whether or not she had been

3    pushed to the ground.  I wanted to know whether or not she had

4    been struck with an object, which would also be perhaps very

5    important to whether or not this jury is going to believe this

6    doctor and Ms. Franco, or whether they're going to believe a

7    third-party agent may have been the cause of those injuries.

8                **THE COURT:**  I'll permit you to recall her.

9            **MR. RUTER:**  Thank you, sir.

10               **THE COURT:**  You'll have her availability.

11           **MR. RUTER:**  Thank you, Judge.

12           **MR. MONTEMARANO:**  Your Honor, since it's 4 o'clock,

13   can we take the afternoon break now?

14               **THE COURT:**  They had a two-and-a-half-hour lunch.

15   No.  We go forward.

16               (Whereupon, the bench conference was concluded.)

17               **THE COURT:**  Members of the jury, Dr. Baker is

18   qualified as an expert in forensic medical exams, particularly

19   with respect to cutaneous skin findings, and may so testify.

20               Now, generally we don't permit a witness to talk

21   about the witness' opinions or to testify about opinions.  We

22   make an exception for witnesses who are experts, people who,

23   by virtue of education, training, or skills in a particular

24   area have opinions that may be of value to you.  You consider

25   an expert's opinion together with all of the other evidence in

1     the case.  You give those opinions the weight and value you

2     believe it should have.  She is an expert and may testify as

3     such.

4              **MS. YASSER:**  Thank you, Your Honor.

5              **DIRECT EXAMINATION (CONT.)**

6     **BY MS. YASSER:**

7     Q.   Dr. Baker, I want to direct your attention to

8     November 17th of 2011.  Did you examine a patient named

9     Esmirna Rebeca Dueñas Franco on that day?

10    A.   Yes, I did.

11    Q.   Did you perform a forensic medical evaluation of that

12    patient?

13    A.   Yes, I did.

14    Q.   Do you remember why she was brought to you?

15    A.   She was brought because she was definitely outside the

16    five-day time limit to go to the emergency room or a typical

17    rape crisis center, and because there were some findings that

18    they had wanted documented, and also, because she had not been

19    feeling well and does not have regular medical care, other

20    places to go.

21    Q.   And did you conduct a full forensic medical examination

22    that included both the sexual and a physical examination?

23    A.   Yes, I did.

24    Q.   And did you issue a report of that examination?

25    A.   Yes, I did.

1    Q.    Is it protocol to do so?

2    A.    Yes, it is.

3    Q.    Okay.  Can you walk the ladies and gentlemen of the jury

4    through the examination that you performed, just broadly

5    speaking, that day?

6    A.    Typically, when my patient first comes, I will go over a

7    medical history, background, medical information, particularly

8    focussed on skin issues or skin problems and GI and GU --

9    gastrointestinal or gastro-anal issues because of the

10   confounding overlap with potential abuse.  I go through the

11   medical history.  Then I go through that head-to-toe physical

12   exam.  Anything that looks significant, I will take photos.

13   The last thing is the genital exam, which is documented with

14   photos if it's going to be forensically important, and then

15   lastly are any cultures that might be indicated, or other

16   tests.

17   Q.   And, in the patient history section of your examination,

18   did the patient report anything with respect to genital

19   injury?

20   A.    It would help to have a copy of my report.

21             MS. YASSER:  May I approach the witness, Your Honor?

22             THE COURT:  Yes.

23             MS. YASSER:  This is 39a, Your Honor.

24             THE WITNESS:  Historically, she did not report for

25   me discharge, constipation, or diarrhea.  It was explained to

1   me she had been removed from a place of prostitution and had

2   already been pregnant with a second child and had a normal

3   delivery, and that currently she was having a lot of cramping,

4   both during her menstruation and afterwards ever since the

5   delivery.  She was unsure if it was related to trauma, being

6   hit at the time, and that mainly it was suprapubic, just above

7   the pubic bone, low in the abdomen, was so bad at times it

8   would make her suddenly sit down, and she couldn't really

9   characterize it well.  It would start.  It would stop.  It

10  lasted one to three days at a time, and sometimes Motrin did

11  help it.

12  **BY MS. YASSER:**

13  Q.   And did the patient report anything with respect to

14  genital injury, infection, or pain?

15  A.   Oh, yes, and she had reported a history of having small

16  blisters off and on that would be so bad that at times she was

17  told not to see clients.

18  Q.   And did that sound like anything to you, or were you able

19  to diagnose that based on the history or any STD testing that

20  may have been performed that day?

21  A.   It sounds very suspicious of herpes, genital infection,

22  but you need to really be able to see it at the time and get a

23  culture to be certain.

24  Q.   And was it not active at the time?

25  A.   It was not active at that time.

Direct Examination of Mary-Theresa Baker

1    Q.    Was STD testing performed on that day?

2    A.    Yes, it was, through blood tests and urine, DNA testing,

3    and checked a wet print as well.

4    Q.    And what were the results?

5    A.    And all of those were negative.

6    Q.    With respect to the examination of this individual, did

7    you note any injury to her body or to her skin?

8    A.    Yes.  On the cutaneous exam, I noted four different areas

9    that I took photos.  She also had a birthmark, a café-au-lait

10   birthmark on her abdomen.

11   Q.    And I want to -- well, let me ask you this:  Did you

12   observe each of these injuries -- these four injuries with

13   your own eyes?

14   A.    Yes.  I could see each of them.

15   Q.    And you said -- mentioned that you also would feel --

16   feel for injury.  Could you feel some of these injuries as

17   well?

18   A.    Yes.  Three of them, I could definitely feel, raise up

19   from the skin.  They were distinctly palpable.

20   Q.    And you mentioned, Dr. Baker, that you took photographs

21   of the injuries; is that correct?

22   A.    Correct.

23   Q.    And have you reviewed those photographs?

24   A.    Yes, I have.

25   Q.    Before -- prior to your testimony?

1      A.    Yes.

2      Q.    The injury depicted in the photographs, was it more or

3      less clear to you with the naked eye than it is in the

4      photographs?

5      A.    Frequently photos don't do justice, particularly to a

6      well-healed injury or if you have very dark skin, but they

7      were easily noticeable, and that's why I would have

8      photographed them.

9      Q.    And is your testimony today based on your physical, your

10     own observation of those injuries?

11     A.    Correct.

12     Q.    I want to talk to you about the injuries you observed,

13     and I want to go through them, starting with an injury that

14     you noted -- and, actually, let me have you do this,

15     Dr. Baker.  I apologize.  Can you just explain to the ladies

16     and gentlemen of the jury where you noted injury on the body.

17     A.    There was a small, thin linear, line-like mark just below

18     the ankle on the left foot; a small scar on the upper left

19     thigh; a bigger scar by the left hip; and a distinct scar on

20     the left elbow.

21     Q.    Let's go ahead and start with the elbow.  Can you

22     describe more particularly the injury that you noted.

23     A.    I have it described as a classic stellate mark to the --

24     sorry -- right elbow.  So the "stellate" means star-shaped.

25     It sort of starts at a central point and goes outward over a

 1    boney prominence where your elbow sticks out like that.  When

 2    you land on hard surfaces, that is often what you see.

 3    Q.   And was that injury palpable?

 4    A.   Yes, it was.

 5    Q.   Could you tell anything about the age of injury?

 6    A.   It's more than six months old.

 7    Q.   So does that mean it was set, or healed?

 8    A.   It seemed to be completely healed.

 9    Q.   Now, can you tell anything from your observations about

10    whether this injury could be accidental or whether the -- a

11    patient could have been pushed down?

12    A.   I did specifically ask that.  Well, no.  I have the

13    history.  So I would have asked -- I'm sorry -- what happened,

14    and the history I got was that patient was pushed onto the

15    ground with rocks.

16    Q.   And was that patient history or description consistent

17    with what you observed?

18    A.   Yes, it is.

19    Q.   And was it also consistent with the reported timing of

20    the event?

21    A.   Yes.  I believe all of these -- I don't speak of them

22    each separately.  As I recall, all of them were considered to

23    be well past six months of age, and, after that, I didn't ask

24    details about when they had happened.

25    Q.   Now, moving to the thigh -- actually, before I do,

```
1    Dr. Baker, let me show you what's been previously marked as
2    Government's 39a/2b.  And I apologize.  I'm not sure how well
3    this is going to translate on the ELMO.  Let's see.
4           In looking at this photograph, can you see the
5    photographs that you took of the injury to Ms. Dueñas' elbow?
6    A.   Yes, I do.
7    Q.   Which photographs are those?
8    A.   They are Number 7 and Number 8.
9    Q.   Those are the bottom two photographs?
10   A.   Correct.
11   Q.   Can you just point -- and you can actually circle using
12   your finger -- where this stellate injury or stellate mark
13   that you described is?
14   A.   Yes.  The picture is slightly further away shows that --
15   ah.  Around here, and actually went up and took a slightly
16   closer one.  You kind of get the view of how it has arms or is
17   star-shaped for that stellate lesion.
18   Q.   Thank you, Dr. Baker.  That's actually printed on photo
19   paper.  I don't know if that -- is that a better or worse
20   image for you, Doctor?
21   A.   That seems about the same for the bottom.  I think it's a
22   little better for the upper two, 5 and 6.
23   Q.   And what do the photographs in 5 and 6 refer to?  Which
24   injury is that?
25   A.   That would be the scar on the left hip.
```

1    Q.    And was that injury palpable to you?

2    A.    Yes, it was.  It was raised and thickened in the center.

3    Q.    And could you tell how old that injury was?

4    A.    It's definitely older than six months.

5    Q.    And what did you do after observing that injury?

6    A.    When I saw it and could feel it, I asked the patient how

7    she got it, and the answer was from the car door.

8    Q.    And was that consistent with what you observed by your

9    own eyes?

10   A.    Yes.  It's a pretty good implement to give me this

11   somewhat linear, so sort of line-shaped, but not sharp and

12   thin and smooth.  With a closer view, you see it sort of

13   thickened in the middle.  So something line-shaped, but not

14   real sharp like a piece of glass, say.

15   Q.    I want to direct your attention to the next injury that

16   you noted, which I believe was to the patient's thigh.  Can

17   you describe what you observed on the patient's thigh.

18   A.    Yes.  There is a small, rather irregular mark to the

19   front part -- the anterior left thigh.  When I asked the

20   patient what that was, she said it was the tip of a belt.

21   Q.    And was that injury palpable?  In other words, could you

22   feel it?  Was it raised?

23   A.    That one was not raised.

24   Q.    And how old did that injury appear to you?

25   A.    It would be older than six months.

1    Q.    And, as noted above, did you -- did you, as protocol, ask

2    the patient what happened when you observed that injury?

3    A.    Yes, and she said it was from the tip of a belt.

4    Q.    And was the patient's reported history consistent with

5    what you observed?

6    A.    Yes, it could be.

7    Q.    And why is that?

8    A.    It's a -- it's a small injury on an outer aspect, but up

9    along your thigh, where you don't tend to bump into things --

10   your shins, the elbows, the wrists, we kind of -- shins down

11   to your ankles, we kind of call those no-man's land.  Kids, in

12   particular, bang them up; active people, all the time.  But,

13   closer to your trunk, the less accidental injuries we tend to

14   get.  So it was a little more suspicious, higher up on a more

15   covered part of the body, and it's just a small edge, a small

16   noticeable scar there, so I -- it would be consistent with the

17   edge of something -- the tip of something, something small.

18   Q.    And I want to show you what's been previously marked as

19   Government Exhibit 39a/2A, and referring to the bottom two

20   pictures, and, again, I'm not -- I'm not sure how well this is

21   translating on the screen, but can you please circle the

22   injury that you noted to the patient's upper, inner thigh

23   area.

24   A.    It's the line right through here.  That's probably the

25   best on that photo, pick it up.

1    Q.    And, Dr. Baker, did you observe another injury -- a

2    fourth injury to this particular patient on that day?

3    A.    Yes.  And there was a clear, sharp, linear, well-healed

4    line just below the left inner ankle.

5    Q.    And could you feel that injury?

6    A.    Yes.  That one was palpable and raised.

7    Q.    Was that a well-set or a healed injury as well?

8    A.    Yes.  It was completely healed.

9    Q.    And, from your own observations, could you tell anything

10   about the source of the injury?

11   A.    Well, this one is such a nice, thin, healed-up line.

12   It's not quite surgical.  Surgeons usually leave their little

13   suture lines behind in dots, so it's something very thin and

14   very sharp would cut that.  If you had said glass, I wouldn't

15   be surprised.  A very thin, jagged, smooth edge of a piece of

16   metal, something like that.

17   Q.    Like a knife?

18   A.    Like a knife.

19   Q.    And, when you observed this injury, did you ask the

20   patient what had happened?

21   A.    Yes.

22   Q.    And do you recall what she said the source of that injury

23   was?

24   A.    Yeah.  And she said it was from a knife cut.

25   Q.    And was that consistent with your own observations?

1    A.   Yes, it is.

2              **MS. YASSER:**  No further questions, Your Honor.

3              **THE COURT:**  Mr. Ruter, will you cross?

4              **MR. RUTER:**  Yes.  Could I?

5              **THE COURT:**  About how long?

6              **MR. RUTER:**  No more than ten minutes.

7              **THE COURT:**  Okay.

8                        **CROSS-EXAMINATION**

9    **BY MR. RUTER:**

10   Q.   Dr. Baker, when the person that you evaluated came to

11   your office, was she in the company of anyone?

12   A.   Yes.  They brought two potential translators for me.

13   Q.   Were there any police officers with the translator?

14   A.   One was an Immigration & Customs Enforcement agent.

15   Q.   Okay.  Do you know why that person was there?

16   A.   Because the -- Ms. Dueñas is in the custody or working

17   with Immigration.

18   Q.   Okay.  The first injury, at least the point that my notes

19   indicate, is this injury below the ankle, which you just

20   testified to.  And you saw it -- did you see it before you

21   were told by Ms. Franco that it existed?

22   A.   Yeah.  Typically I look at the patient's body, find

23   things, and then ask how they got it.

24   Q.   Okay.  Before the examination came in, what was your

25   understanding as to why it was that she was being presented to

 1    you?

 2    A.    That we were concerned that there were some bodily

 3    injuries that could be documented potentially.

 4    Q.    Okay.  And bodily injuries that were not self-sustained?

 5    A.    Presumably.

 6    Q.    Okay.  Well, when you say "presumably," what were you

 7    told?

 8    A.    That she had been removed from a human-trafficking

 9    condition, and had some injuries that needed to be

10    documented --

11    Q.    All right.  And --

12    A.    -- and --

13    Q.    -- you were told that it was the belief of whoever it was

14    that presented her that these injuries resulted from her being

15    involved in the sex-trafficking industry; is that not correct?

16    A.    I'm not actually quite sure about that, in that I wasn't

17    anticipating finding petechiae or bleeding or a break in the

18    hymen that would be from sexual contact.  These were supposed

19    to be more physical abuse trauma.

20    Q.    Yes.  As a result of her being involved in sex

21    trafficking?

22    A.    Possibly connected to that, yes.

23    Q.    All right.  So, when you saw the ankle injury, you saw

24    that it, in fact, was not normal, and it was indeed some kind

25    of an injury.

1    A.   Yes.

2    Q.   And, when you saw the injury, without anybody telling you

3    what they believed the source of the injury was, did you have

4    a professional opinion about what the source of the injury

5    was?

6    A.   Yes.  It's a classic cut -- linear cut from something

7    sharp.

8    Q.   Okay.  And would you agree that's something that probably

9    most of us here would look at and say, "It looks like a scar

10   to me --"

11   A.   Yes.

12   Q.   "-- from a cut"?  Okay.

13          As to that cut, did you form a professional opinion

14   before speaking with her as to what the source of the cut was?

15   A.   It's in an odd location under the ankle bone there, and I

16   wasn't sure if there was a fall or an old -- a fall onto

17   something sharp perhaps, or how she had gotten it until I

18   asked.

19   Q.   Okay.  And, therefore, it's fair to say that, prior to

20   you having a conversation with the person you examined, you

21   had no professional opinion as to the source of the cut?

22   A.   Well, I'd have some.  It was some -- clearly some sharp

23   object.

24   Q.   Yeah.  Did you have a professional opinion on whether or

25   not the cut was caused by her or caused by a third party?

1   A.   It's not a typical spot for a self cutter.  It would be

2   unusual.

3   Q.   Okay.  Would you agree with me that it's the kind of a

4   cut, from what the pictures show, that a person could be

5   walking and literally come across a sharp piece of metal, as

6   an example, low to the ground, and, in their normal gait, in

7   their normal gait, that sharp object protruding from the

8   ground or from the sidewalk, from a tree, from anything, may

9   have caused such an injury?

10  A.   It's possible, although, when you catch something as

11  you're walking or moving past it, you tend to get thickening

12  as it pulls the skin as you go by, so it tends to have more of

13  an arrow shape to it.  This was really straight across, so I

14  would buy more a fall onto a sharp object.

15  Q.   So, after you were told by Ms. Franco that it was a

16  knife, did you then form an opinion -- a professional medical

17  opinion about the source of the cut?

18  A.   Yes.  So --

19  Q.   And what was that?

20  A.   -- appearance of the lesion along with the history led me

21  to the opinion that it was an inflicted wound from a knife.

22  Q.   Okay.  And, therefore, what caused you to reach the

23  conclusion was what you were told by Ms. Franco?

24  A.   In addition to the finding, yes.

25  Q.   If Ms. Franco had not told you that it was a knife, would

1    you have had a professional opinion that it was a knife; yes
2    or no?
3    A.   Not necessarily.
4    Q.   So the answer is, "No;" is that right?  The answer is,
5    "No"?
6    A.   It -- well, I wouldn't exclude a knife, so it's not
7    completely "yes" or "no."
8    Q.   Okay.  And we then move to the scar on the left -- on the
9    hip area.  Were there photographs taken of that?
10   A.   Yes.
11   Q.   Okay.  Would it be fair to say that, if you were a
12   layperson like me, you may not -- with the photographs we saw,
13   that you may not even know what part of the body you'd be
14   looking at?
15   A.   True.
16   Q.   Because I couldn't tell.  Does that sound reasonable?
17   A.   True.
18   Q.   Okay.  And, as to the left scar, when you saw it, before
19   having any conversations with Ms. Franco, had you formed a
20   professional medical opinion as to what caused the scar?
21   A.   You're talking about the one on the hip, or the thigh?
22   Q.   Well, let's -- we'll go with the hip, since I'm looking
23   at my notes here.
24   A.   Okay.  No, I did not know what object that was.  I was
25   actually rather curious.

1  Q.   Okay.  And, before speaking with Ms. Franco, did you have

2  any opinion at all about how that injury may have occurred, or

3  what may have come in contact with the hip to have caused the

4  injury?

5  A.   Its appearance means it's something that was sort of

6  straight-edged, but not real thin, possibly a fall onto the

7  edge of a bedstead, edge of a piece of furniture, something

8  like that, but where it hits your hip.

9  Q.   Okay.  And you asked her about that --

10  A.   Yes.

11  Q.   -- particular injury?

12       And what did she say?

13  A.   And she said it was the car door.

14  Q.   A car door.

15       Did she indicate how it was that the car door came

16  into contact with her hip?

17  A.   No, she did not.

18  Q.   And, as to the injury to her thigh, you had a

19  professional opinion before speaking with her that it was some

20  kind of injury?

21  A.   Yes.

22  Q.   Okay.  And it was some kind of injury where you thought

23  that an object which had some kind of a point but not a -- not

24  like a knife point; is that accurate?

25  A.   Yeah, not super sharp.  It's the most vague of all of the

 1    findings.  It's not --

 2    Q.   Yes.

 3    A.   -- raised and palpable, so I definitely needed history to

 4    decide what it was.

 5    Q.   But you saw that before she pointed it out to you?

 6    A.   But, yes, I could see it.

 7    Q.   Okay.  And then she indicated to you that was as a result

 8    of a belt?

 9    A.   The tip of a belt.

10    Q.   And she said the tip of a belt?

11    A.   Yes.

12    Q.   And what do you understand that to mean?  There is two

13    tips.  We agree with that, right?

14    A.   Right, so I'm not sure if just the -- the tongue -- no.

15    The very tip of one metal edge just would have lightly got

16    that area, or if we're talking about the other ends where the

17    holes are, the tip of the leather -- the leather side of it.

18    I'm not sure.

19    Q.   And, Doctor, if you can tell us:  In your professional

20    opinion, at what angle or how the belt would have hit her to

21    have caused that kind of an injury?

22    A.   Flipped out where just the tip of it caught her.

23    Q.   And just the tip of it.  You mean going laterally across

24    her leg, or actually striking her into her leg?

25    A.   No.  Kind of just flicked across, as a belt being flung

1    about.

2    Q.   Just across it?

3    A.   Yes.

4    Q.   All right.  And then the last injury was the elbow?

5    A.   Correct.

6    Q.   And you noted, without her indicating, that you saw it

7    yourself?

8    A.   Oh, yes.

9    Q.   And you could not form a professional opinion as to what

10   had happened; you just knew it was an injury; is that right?

11   A.   Correct.

12   Q.   And you then told us that she told you that she had been

13   pushed down, and she landed on her elbow; is that right?

14   A.   Correct.

15   Q.   Okay.  Do we also understand that, had she not told you

16   that, that, in your professional view, it's just as likely

17   that she could have slipped and fallen down rather than being

18   pushed and fallen down; is that accurate?

19   A.   It's possible.

20   Q.   You'd get the same injury; is that right?

21   A.   Yes.  You need the history, too.

22   Q.   And then, lastly, you don't know whether or not these

23   injuries occurred -- this exam was November of 2011, right?

24   A.   Correct.

25   Q.   So do we understand that the injuries could have occurred

1    as early perhaps as the beginning part of 2011?

2    A.   Yes.

3    Q.   And -- or they could have occurred as early as --

4    A.   Years before.

5    Q.   -- 2000, 2001 --

6    A.   Yes.

7    Q.   -- 2002?  Okay.  Good.

8            **MR. RUTER:**  All right.  Thank you very much.

9            **THE COURT:**  Mr. Montemarano?

10           **MR. MONTEMARANO:**  No questions, Your Honor.  Thank

11    you.

12           **THE COURT:**  Redirect?

13           **MS. YASSER:**  Just very briefly, Your Honor.

14                **REDIRECT EXAMINATION**

15    **BY MS. YASSER:**

16    Q.   Dr. Baker, in referring to your report, do you recall a

17    reference about who came in with this patient in November of

18    2011?  And can you just, in reference to your report, on

19    Page 1, tell me the names of those two women that came in.  I

20    guess --

21    A.   I had Susan Ritter, who is the victim coordinator, I

22    know, and Cindy -- I pronounce Cindy translator.  I don't even

23    recall her last name, but I know she was an ICE agent.

24    Q.   She was a translator for ICE?

25    A.   There we go?

```
 1    Q.   All right.  Now, with respect to your findings,
 2    Dr. Baker, obviously you can't tell this jury anything about
 3    who caused the injuries to this particular patient; is that
 4    correct?
 5    A.   Correct.
 6    Q.   But, in your professional opinion, from what you
 7    observed, were the injuries consistent -- were the injuries
 8    you observed consistent with the patient's reported history?
 9    A.   Yes, they were.
10            MS. YASSER:  No questions, Your Honor.
11            MR. RUTER:  No questions.  Thank you.
12            THE COURT:  Thank you.  You are excused, Doctor.
13            THE WITNESS:  Thank you.
14            (Witness excused.)
15            THE COURT:  Members of the jury, we're going to take
16    the late-afternoon break now.  Please remember:  Don't discuss
17    the case among yourselves or with anyone else.  I will call
18    for you at five minutes before 5:00, 4:55.
19            THE CLERK:  All rise.  This Honorable Court stands
20    in recess.
21            (Jury excused.)
22            THE COURT:  One more?
23            MS. YASSER:  Yes, Your Honor.  We are on our final
24    witness, Special Agent Ed Kelly.
25            THE COURT:  How long?
```

1          **MS. YASSER:**  Your Honor, I would have to estimate

2     it's going to be more than an hour.

3          **THE COURT:**  Okay.

4          **MR. RUTER:**  Your Honor, when might we hear from

5     Ms. Franco?  I was not planning on calling her back in my

6     case.  I thought we would just call her back in the

7     Government's case.

8          **THE COURT:**  We have her available tomorrow?

9          **MS. YASSER:**  Your Honor, I haven't had a chance to

10    look at the rule since we last discussed it.  My recollection

11    is that there is a required hearing outside the presence of

12    the jury before we can get into a victim's prior sexual

13    history, specific instances of her prior sexual history --

14         **THE COURT:**  Is this prior sexual history, or just

15    prior injuries?  I didn't hear them say they were going into

16    prior sexual history.

17         **MS. YASSER:**  Well, I wasn't sure how far along that

18    line of questioning.  They are eliciting questions about a

19    rape, a sexual assault, and, you know, if Mr. Ruter's

20    questions are simply, "Were you ever pushed down upon the

21    ground during a sexual assault," then, you know, I would

22    almost be willing to just give the victim a call and have a

23    stipulation as to a certain question or two as regards to the

24    specific questions that he has.

25         **THE COURT:**  Well, talk to each other.  I'll see you.

```
1              MS. YASSER:  Okay.  Thank you, Your Honor.

2              MR. RUTER:  Thank you.

3              THE CLERK:  This Honorable Court stands in recess.

4              (Recess taken, 4:31 p.m. - 4:54 p.m.)

5              THE CLERK:  All rise.  This Honorable Court now

6      resumes in session.

7              THE COURT:  Ready for the jury, counsel?

8              MR. RUTER:  Yes, Your Honor.

9              MS. YASSER:  Yes, Your Honor.

10             MR. MONTEMARANO:  Yes, Your Honor.

11             MR. RUTER:  Your Honor, 11:00 a.m. tomorrow morning?

12             THE COURT:  Thank you.

13             MR. RUTER:  If I didn't, Belinda was going to do it

14     for me.  If I didn't, Belinda was going to do it.

15             THE CLERK:  I said, "12 o'clock."

16             MR. RUTER:  She actually said, "12 o'clock."

17             I said, "I don't think so."

18             THE COURT:  Marshals, we'll still need people here

19     at 9:30.

20             (Jury enters.)

21             THE COURT:  Please be seated.

22             MS. YASSER:  May I call the witness, Your Honor?

23             THE COURT:  Yes, please.

24             MS. YASSER:  The United States calls Special

25     Agent Ed Kelly.
```

1      **THE CLERK:**  Raise your right hand.

2                    **EDWARD J. KELLY**

3      **WAS THEN DULY SWORN TO TELL THE TRUTH**

4      **THE CLERK:**  Be seated.  You can scoot up and speak

5      directly toward the mic.  State your name, and then spell it

6      for the record, please.

7      **THE WITNESS:**  Edward J. Kelly, E-D-W-A-R-D,

8      K-E-L-L-Y.

9                    **DIRECT EXAMINATION**

10     **BY MS. YASSER:**

11     Q.   Special Agent Kelly, where do you work, sir?

12     A.   Homeland Security Investigations, Baltimore, Maryland.

13     Q.   Is that commonly known as HSI?

14     A.   Yes, ma'am.

15     Q.   How long have you been with HSI?

16     A.   Since 2003, when it was created.

17     Q.   And where did you work before 2003?

18     A.   I was an INS special agent.

19     Q.   How long have you been with Immigration?

20     A.   Since 1997, when I came on as a Border Patrol agent.

21     Q.   And where were you a Border Patrol agent?

22     A.   South Texas, ma'am.

23     Q.   And what did you do in South Texas as a Border Patrol

24     agent?

25     A.   Patrolled the border between the points of entry, north

1    of the ports of entry, the highways south of the checkpoints.

2              **THE REPORTER:**  I'm sorry.  At points of entry?

3              **THE WITNESS:**  Points of entry, yes.  And we

4    patrolled the interior between the ports of entry and the

5    checkpoint north of us, the Harlingen Station.

6              **THE REPORTER:**  I'm sorry.  The what station?

7              **THE WITNESS:**  Harlingen, H-A-R-L-I-N-G-E-N.

8    **BY MS. YASSER:**

9    Q.   How long were you a Border Patrol agent in South Texas?

10   A.   Approximately three and a half years.

11   Q.   And then you joined -- where did you go after that, I

12   should ask?

13   A.   I transferred to the Philadelphia District Investigations

14   for INS as an Immigration Enforcement Agent, Allenwood,

15   Pennsylvania, an institutional hearing program.

16   Q.   And what did you do as an enforcement agent?

17   A.   We processed federal prisoners that were in the custody

18   of the Bureau of Prisons for Immigration proceedings so, when

19   they finished doing their criminal time, they would be

20   processed more quickly to be removed from the United States at

21   the appropriate -- if appropriate.

22   Q.   When did you become a special agent with HSI?

23   A.   2002.

24   Q.   Okay.  And what unit are you currently a part of?

25   A.   I'm with human trafficking, human smuggling, and worksite

 1    enforcement.

 2    Q.   How long have you been doing human trafficking, human

 3    smuggling, and worksite enforcement cases?

 4    A.   I started investigating human trafficking approximately

 5    2005.

 6    Q.   And what are your job responsibilities and duties with

 7    respect to those types of cases?

 8    A.   We develop informants, we follow leads from non-

 9    government organizations, State and local law enforcement,

10    other federal agencies, labor trafficking, sex trafficking.

11    Q.   You mentioned labor and sex trafficking.  Are those your

12    areas of expertise?

13    A.   I mainly focus on sex trafficking.

14    Q.   And, with respect to sex trafficking, have you focussed

15    on any certain type of sex-trafficking operations during your

16    time with HSI?

17    A.   We work a lot of Asian massage parlors, and also outcall

18    from Backpage previously, and Hispanic delivery services, and

19    brothels.

20    Q.   You mentioned outcalls from Backpage.  What does that

21    mean?

22    A.   On Backpage, there is a section where you can go and

23    browse for prosecution, and outcall means that you call the

24    girl to you.  In-call means you go to the girl.

25    Q.   And you investigate cases involving Backpage?

1    A.    We have previously when it's involved foreign nationals.

2    Q.    Now, how many sex-trafficking cases would you say you've

3    worked specifically in the Latino community?

4    A.    Over 50, and that's a low number.  As far as -- it's been

5    a lot more than 50.

6    Q.    And do you speak some Spanish, Special Agent Kelly?

7    A.    Yes.  I had to to acquire my job with the Border Patrol,

8    and keep it.

9    Q.    Aside from language barriers, are there any other

10   obstacles to investigating cases in the Latino community sex-

11   trafficking operations?

12   A.    Undercover agents are limited that speak Spanish that are

13   allowed into that community that will be serviced by those

14   houses, distrust of law enforcement in general, cultural

15   barriers.

16   Q.    With respect to the victims and witnesses in these cases,

17   what is their typical -- what do you see in terms of typically

18   their Immigration status?

19   A.    The majority of them are undocumented.

20   Q.    I want to talk to you about your involvement in the

21   particular case before the Court.  Can you tell the ladies and

22   gentlemen of the jury how and when you got involved with this

23   case.

24   A.    Detective Hartlove contacted me after he went out with

25   the Prince George's County Police Department, because I had

1    worked a lot of Hispanic brothels with that department, so,

2    when Detective Hartlove met Sergeant Norris of the Prince

3    George's County Police Department, he gave him my contact

4    information because I was familiar with the Latino brothels.

5    Q.   Do you recall approximately when that was?

6    A.   I would say probably about 2008.  In the fall, winter of

7    2008.

8    Q.   And did you assist Detective Hartlove in his

9    investigation?

10   A.   Yes.  Anything he asked that we could help with, we would

11   do.

12   Q.   And what did you do over the course of the investigation,

13   if I can get a brief summary of your participation?

14   A.   Some of our agents responded out to Annapolis to assist

15   with interviews on occasion.  When he would be at a brothel,

16   he might contact me to ask me what types of questions to ask

17   the girls to try and elicit a response, because many times you

18   have a very brief opportunity with the females, and it's very

19   difficult to have them self identify and bring complaints.  So

20   he would ask me how I should form the questions to identify

21   indicators.

22        If we see indicators in the females, a lot of times

23   we'll try and place them with non-governmental operations to

24   give them a chance to feel safe and be able to better

25   articulate what's happened to them.

1    Q.   Did you also, in the course of your investigation,

2    participate in the policing of consensual calls to known or

3    suspected brothel numbers?

4    A.   Yes.

5    Q.   And did you also follow up and conduct and participate in

6    searches of those brothels?

7    A.   Yes.

8    Q.   What is a consensual call?

9    A.   Maryland's a two-party-consent state.  As a federal

10   agent, we can conduct one-party consensual phone calls.  We

11   get permission of our supervisors and also the U.S. Attorney's

12   Office.  We'll call for -- so we don't do it willy-nilly.  It

13   is controlled, and there is reports that are done, but we're

14   able to do one-party consent as a federal agency, and that is

15   to gather evidence of a crime, possibly provide protection for

16   an undercover agent.

17   Q.   I'd like to play a selection of some of the calls that

18   you assisted in recording in this particular case.

19          MS. YASSER:  And if I can ask the jury to please

20   pass down the binders at the end of the jury box.

21          MR. CUNNINGHAM:  Your Honor, do you want me to

22   approach and assist, or --

23          THE COURT:  Yes.

24          MS. YASSER:  Your Honor, there is a copy of the

25   binder on your bench as well.

1          **THE COURT:**  Thank you.

2          **MS. YASSER:**  And a copy has been provided to the

3      interpreters as well.  Oh, actually, you know what?  It's in

4      Spanish, so it's -- it's in Spanish.

5      **BY MS. YASSER:**

6      Q.    Now, do you recall making, you know, quite a lot of

7      consensual calls in this particular case, Special Agent Kelly?

8      A.    Yes.

9      Q.    And have you culled out, with the help of the Government,

10     just a few of the calls that you made over the course of the

11     investigation?

12     A.    Yes.

13     Q.    I want to start with some of the calls that were made in

14     May of 2010 to a number ending in 9346.  Do you recall why you

15     called that particular number in May of 2010?

16     A.    That was a number associated with a Latino brothel in

17     Annapolis, Maryland.

18     Q.    And do you recall the source of that -- was it a source

19     information that gave that you lead?

20     A.    Yeah.  We were -- we would have received the number

21     through our investigation, yes, ma'am.

22          **MS. YASSER:**  I want to play -- and, for the ladies

23     and gentlemen, this is Tab 1 in your binders.  I'd like to

24     play for the jury -- I believe, Mr. Cunningham, it's Track 1

25     on the CD.

 1                  (Whereupon, an audio recording was played.)

 2             **THE COURT:**  What exhibit number was that, counsel?

 3             **MS. YASSER:**  Your Honor, this is --

 4             **MR. CUNNINGHAM:**  Should be right inside.

 5             **MS. YASSER:**  This is Government 40b/1A, Your Honor.

 6             **THE COURT:**  Thank you.

 7             **MS. YASSER:**  I'd like to play for the jury now

 8    40b/1B, which is at Tab 2 in the binder.

 9             **MR. RUTER:**  May we approach, Your Honor, before

10    that's played?

11             **THE COURT:**  Come up.

12                  (Whereupon, the following discussion occurred at the

13    bench.)

14             **MR. RUTER:**  Your Honor, we just received the folder

15    with these calls, and the difficulty that I see is, after the

16    call is ended, Special Agent Kelly may provide what would

17    appear to me to be kind of his opinion.  As an example, it

18    talks about, on Line 4 -- he speaks into the -- his recorder,

19    says target number for the Chino brothel.  There is lots of

20    evidence, Judge Quarles, about the brothels.  We certainly

21    know that.  The problem is that I think the officer is

22    editorializing.  I do not know if he does it again, but I

23    would have to object to any characterization as to what the

24    number represents.

25             **THE COURT:**  What page?

1             **MR. RUTER:**  Well, this would be Page 2, Your Honor,

2      of --

3             **MR. MONTEMARANO:**  Tab 1.

4             **MR. RUTER:**  Of Tab 1.

5             **THE COURT:**  Line 18?

6             **MR. RUTER:**  Line 18, yes, sir.

7             **THE COURT:**  Okay.

8             **MS. YASSER:**  Special Agent Kelly will testify later

9      on more in detail as to the connections between the numbers

10     that are involved in these consensuals so as to, I guess,

11     close the loop on that.  It's going to obviously be his

12     opinion that, in the course of his investigation, that certain

13     brothels were associated with certain people, and we have a

14     whole chart all about that.

15            **THE COURT:**  Okay.  My understanding is that you'll

16     connect it up later, so overruled.

17            **MR. RUTER:**  Okay.  Thank you, Your Honor.

18            (Whereupon, the bench conference was concluded.)

19            **MS. YASSER:**  If we could, Mr. Cunningham, play

20     Track 2 on the CD, please.

21            (Whereupon, an audio recording was played.)

22            **MS. YASSER:**  And, for the record, Your Honor, that

23     was Government Exhibit 40a/1B.

24            **THE COURT:**  Thank you.

25     <u>BY MS. YASSER:</u>

1    Q.    Special Agent, there was some discussion of direction on

2    that call.  Do you have the transcript in front of you there?

3    A.    No, I do not.

4    Q.    Well, then let me read for you what the discussion was.

5    There was some discussion about, "... from Jennifer's, to

6    Oakland."  Do you know what that refers to?

7    A.    Jennifer Shop is one of the locations we did a lot of

8    surveillance on during this investigation, and that was down

9    the street from the ███████████ brothel, and Oaklawn I

10   believe is the pronunciation of the avenue that parallels

11   Forest Drive, and that's the intersection that was one of the

12   photographs taken by Detective Hartlove and previously entered

13   in as an exhibit.

14   Q.    And interaction outside of which suspected brothel?

15   A.    ██████████.

16   Q.    Special Agent Kelly, did you know or recognize the

17   voice --

18              THE COURT:  Hold on for a moment.  Translator?

19              INTERPRETER BLUMBERG:  Hold on for a moment.  We

20   seem to have a technical difficulty.

21              INTERPRETER GOLDSTEIN:  The equipment is working

22   now, Your Honor.

23              THE COURT:  Thank you.

24              MS. YASSER:  Could I approach the witness with a

25   copy of the binder?

1          **THE COURT:**  Yes.

2     **BY MS. YASSER:**

3     Q.   Now, Special Agent Kelly, did you know or recognize a

4     voice of the person who picked up the phone at the 9346

5     number?

6     A.   No, I did not.

7     Q.   Was anyone of interest in the investigation arrested with

8     that phone number in the following month after these calls

9     were made?

10    A.   Two people were arrested with that phone number.

11    Q.   And who were those people?

12    A.   In June, it was Reyes, also known as Colmillo, and, on

13    November 15th, 2010, that phone was recovered at ███████.

14    Q.   Now, with respect to Reyes, who you've referred to as

15    Colmillo, did you recover another number that was associated

16    with him sometime later on?

17    A.   On the June incident?

18    Q.   Later on in October -- on October 18th of 2010, do you

19    recall retrieving a piece of trash or receipt from Luis Reyes?

20    A.   Oh, yes.  Another place we routinely did surveillance on

21    the investigation was the McDonald's in Riverdale, Maryland,

22    and we observed Reyes there in one of the vehicles.  He took

23    trash from the vehicle and placed it in the receptacle, left

24    the area, and I was able to go over and retrieve that trash

25    without anyone else disturbing it, and there was a phone

1    receipt in there for -- I know the last four of the phone.

2    Q.   What's the last four of the phone?

3    A.   5211.

4    Q.   And I believe that that receipt has been previously

5    admitted into evidence, but what did you do upon retrieving

6    that number -- the 5211 number?

7    A.   We placed consensual calls to it, ma'am.

8    Q.   I want to play some of those consensual calls now.  The

9    first is the October 20th of 2010 call, and that looks like

10   it's Tab Number --

11         MS. YASSER:  Oh, I'm sorry.  We have to have a disk

12   change, but, for the ladies and gentlemen of the jury, that's

13   Tab Number 6.  And, Mr. Cunningham, it's W6400022, and this is

14   Government's 40b/1E.

15         MR. CUNNINGHAM:  I'm sorry.  Can you repeat the

16   track?  WS --

17         (Counsel conferring.)

18         (Whereupon, an audio recording was played.)

19   **BY MS. YASSER:**

20   Q.   I want to place or play another call, Your Honor, and

21   this is Government's 40b/2A.  It's Tab Number 7 for the ladies

22   and gentlemen of the jury, and, for Mr. Cunningham, it's

23   WS400029.

24         (Whereupon, an audio recording was played.)

25         MS. YASSER:  I apologize, Your Honor.  I gave the

 1   wrong track to Mr. Cunningham.  It's -- and tab number.  It's

 2   Tab Number 9.  This is a call from November 5th, 2010, and

 3   it's 40b/1F from the Government, and, for Mr. Cunningham, it's

 4   the track that ends in 39.

 5            (Whereupon, an audio recording was played.)

 6   **BY MS. YASSER:**

 7   Q.   Special Agent Kelly, there was a reference in that call

 8   to a ██████████.  Do you know to which street that refers?

 9   A.   Our investigation showed that routinely █████ was

10   pronounced █████.

11   Q.   Is that a replacement of the █ with an █?

12   A.   That's what it appears, yes.

13   Q.   Is that common in speaking -- translation from Spanish to

14   English?

15   A.   Not that I'm aware of.  It's just in this instance.

16   Q.   Okay.

17            **MS. YASSER:**  Now, I want to play one more call to

18   this number, 5211, and that's a November 15th, 2010 call, and

19   that's Government's 40b/1G, and the track ending in 535.

20            **THE COURT:**  Exhibit number?

21            **MS. YASSER:**  40b/1G, and it's Tab Number 10.

22            **THE COURT:**  Thank you.

23            (Whereupon, an audio recording was played.)

24            **MS. YASSER:**  And that's the end of that call.

25   **BY MS. YASSER:**

1    Q.   Now, with respect to November 15th, 2010, was a search

2    performed at ████████████████ on that date and time?  On that

3    date?  I'm sorry.

4    A.   Yes.  On November 15th, 2010, we executed a search

5    warrant.

6    Q.   And we're going to go through a few of those items in a

7    moment, but was that 5211 number that was used in the first

8    call -- October 20th call, was that recovered?

9    A.   No.  That phone dropped off, and a new phone number

10   became the number we were placing consensual phone calls to.

11   Q.   Now, with respect to the November 5th call, which is Tab

12   Number 9, the number that was called then was the 5211 number

13   as well, and did that number come up --

14              (Whereupon, an audio recording was played.)

15         **MR. CUNNINGHAM:**  Sorry.

16   **BY MS. YASSER:**

17   Q.   -- that number come up over the course of your

18   investigation in a different capacity?

19              (Whereupon, an audio recording was played.)

20         **MR. CUNNINGHAM:**  Apologize, Your Honor.

21         **THE WITNESS:**  That was the number that was

22   associated with luring Hector Avila into the armed robbery.

23   **BY MS. YASSER:**

24   Q.   And is that from your review of the toll records as well

25   as testimony in this case?

1    A.   Yes, and our investigation that evening with Mr. Avila.

2    Q.   You mentioned that ███████████████ was searched on

3    November 15th, 2010.  I want to go through with you some of

4    the photographs that were taken on that day.

5         MS. YASSER:   And this is Government's series 25,

6    Your Honor.

7    Q.   Do you recognize that picture --

8    A.   Yes.

9    Q.   -- in 25a/1?

10   A.   That's the front door for █████████████.

11   Q.   This is 25a/3.  What's that?

12   A.   That's the television on the table that's by the window

13   where the SWAT Team deployed the distraction device.

14   Q.   Why was there a distraction device deployed?

15   A.   Because the investigation showed there was violence and

16   weapons involved.

17   Q.   This is Government's 25a/4.

18   A.   That's Mr. Martinez.

19   Q.   25a/5.

20   A.   That's one of the bedrooms.

21   Q.   25a/6?

22   A.   That is Ms. Vargas to the left, and I don't remember his

23   last name.  I apologize.  We called him Enrique, the guy on

24   the right.

25   Q.   25a/7?

1    A.    I think that's the same bedroom, just from another angle.

2    Q.    And what did that location appear to you as, Special

3    Agent Kelly?

4    A.    A brothel.

5    Q.    25a/12?

6    A.    I believe his last name is Reyes.  He was driving the

7    Toyota Corolla that day.

8    Q.    25a/3?

9    A.    Omar Reyes Flores' identity documents and phone.

10   Q.    Now, before the search of brothels and other locations on

11   November 15th of 2010, this jury has previously heard about a

12   search that was done at a location in Easton, Maryland.  I

13   want to review with you why that brothel was searched, and if

14   you could please just explain to the ladies and gentlemen of

15   the jury when and why that brothel was searched.

16   A.    So, as part of the investigations, we were placing

17   consensual phone calls.  One of the things that's unique with

18   the Latino or Hispanic brothels and delivery services as

19   opposed to the Asian massage parlors we normally investigate

20   is, on occasion, they'll receive and prostitute juveniles, so

21   we use a wide range of resources to try and identify that.

22           One of those is consensual phone calls.  Another

23   thing, a source of information in the community, undercover

24   agents, you know, and working with State and local.  The thing

25   that happened on July 6th that caused us to execute a search

 1    warrant on July 7th was that, when we placed the consensually-

 2    monitored phone call, the individual advertised that the

 3    female was 17 years of age.

 4    Q.   I want to play for you some of those calls that led to

 5    that search warrant, starting with -- this is going to be

 6    Tab 3 of the binder, Government's 40b/1C, and Track 3 on that

 7    CD.

 8              **MS. YASSER:**  Actually, the first of those calls,

 9    Your Honor, because of the way they were recorded, was a call

10    to ███████████.

11              (Whereupon, an audio recording was played.)

12              **MR. RUTER:**  Same objection, Your Honor.

13              **THE COURT:**  Overruled.  Same ruling.

14              **MS. YASSER:**  Your Honor --

15              **THE COURT:**  You have a continuing objection.

16              **MR. RUTER:**  Thank you, sir.

17              **MS. YASSER:**  -- I'd now like to play Track 4, which

18    is Tab 4 -- I'm sorry -- Track 5, which is now Tab 4 in the

19    binder.  It's the call from -- the follow-up call from

20    July 6th, 2010.

21              **MR. CUNNINGHAM:**  Track 4?

22              **MS. YASSER:**  Track 5.

23              **MR. CUNNINGHAM:**  Did you identify the exhibit?

24              **MS. YASSER:**  Yes.  It's 40b/1D.

25              (Whereupon, an audio recording was played.)

1    **BY MS. YASSER:**

2    Q.   And these calls were placed to a number, Special

3    Agent Kelly, that ends in 9186.  How did you associate that

4    number with the Easton brothel at the time?

5    A.   That's my number that was placing the --

6    Q.   Oh, I apologize.  I'm sorry.  4630.

7    A.   And we identified it through the investigation.  I

8    believe that was through the Easton Police Department.  They

9    were able to develop that from one of their sources of

10   identification.

11   Q.   And what was the address associated with that brothel?

12   A.   ████████████████████████.

13   Q.   Were you present for the search of that location on July

14   7th of 2010?

15   A.   Yes, I was.

16   Q.   I'd like to review some of those photographs with you

17   now.  This is Government's 17b/1, I believe.  What is that?

18   A.   That appears -- sorry.  That appears to be the front door

19   of ████████████.

20   Q.   17b/3?

21   A.   Corner bedroom.

22   Q.   17b/4?

23   A.   Another bedroom.

24   Q.   17b/5?

25   A.   Mattresses.  I'm not sure if they're in the same bedroom

1    or not.

2    Q.    What was ███████████████, Special Agent Kelly?

3    A.    A second-floor apartment, ma'am, and it was being

4    occupied as a Hispanic brothel.

5    Q.    17b/8?

6    A.    Wallet with a business card.

7    Q.    And was that the number that you called on the

8    consensuals?

9    A.    It's cut off, but, I mean, if you pulled it out, yeah, it

10   would be 4630, yes, ma'am.

11   Q.    17b/9?

12   A.    Playing cards.

13   Q.    17b/12?

14   A.    There is tampons, loose currency, and playing cards.  In

15   my investigations, we've seen where not all the women, but

16   some of the women worked through their menstrual cycle, and

17   they'll use the tampons to allow them to work if they're

18   available or if they're forced to use it.

19   Q.    17b/14?

20   A.    Tally sheet.  It's a -- in English, so the days of the

21   week.

22   Q.    Do you know the name of the woman that was recovered at

23   ██████?

24   A.    One of the names she provided us was Wendy.

25   Q.    Government's 7 -- oh, I'm sorry.  17b/3 -- b/13?

1    A.    A machete.  It's fancier than normal because of the

2    holder and the cut.

3    Q.    Now, you mentioned this was a second-floor apartment; was

4    that right?

5    A.    Yes, ma'am.

6    Q.    And was there an attic or a crawl space associated with

7    that apartment?

8    A.    Yes.  You could access it through the bathroom.

9    Q.    And did you access that -- was it a crawl space, or an

10   attic, by the way?

11   A.    You could stand and walk in it.  It was not conditioned

12   space, but there were floorboards, so you could use it for

13   storage, but it was not conditioned space as part of the

14   interior.

15   Q.    And did you search it?

16   A.    I did.

17   Q.    This is 17b/16.  What is that?

18   A.    That's the space that I searched.

19   Q.    And did you lift up those floorboards?

20   A.    I did.

21   Q.    And this is 17b/17.  Special Agent Kelly, what did you

22   find when you lifted up those floorboards?

23   A.    We found a variety of objects hidden in the rafters.

24   There were business cards.  There was a small Santa Muerte.

25   There was an empty box of condoms.  There were condoms.  There

1    was lubricant, K-Y Jelly for sexual purposes.  There were

2    dirty towels.  It was unusual in the fact that normally in

3    the -- like Langley Park, where there is a lot of brothels,

4    they'll use the dumpsters so you can't do a traditional trash

5    rip to see what's going on in the house as an investigative

6    technique, but, here, a lot of their trash was in there, so we

7    could see -- we could get a better picture of what was

8    actually happening.

9    Q.   I believe most of that evidence has already been put in,

10   so I'm going to continue with just the pictures, and this is

11   17b/8.  What is that?

12   A.   That's what I take to be a Santa Muerte --

13   Q.   b/18.

14   A.   Pardon.

15   Q.   Sorry.  17b --

16   A.   It appears to be a Santa --

17            **MS. YASSER:**  Excuse me.  17b/18 for the record.

18   Q.   What is that?

19   A.   That's what I take to be a Santa Muerte statue.

20   Q.   And where was that recovered?

21   A.   In that space.

22   Q.   17b/19?

23   A.   Box of Lifestyle condoms.  Some were full.  Some were

24   empty.

25   Q.   17b/21?

 1   A.   The trash.

 2   Q.   And 17b/22?

 3   A.   The rubbing alcohol and more condoms, looks like wipes,

 4   and the K-Y Jelly.

 5   Q.   Finally, 17b/23?

 6   A.   More trash, and it just shows you the filth.

 7   Q.   The same day that the ████████████ location was

 8   searched back in November of 2010, were other locations and

 9   vehicles also searched?

10   A.   Yes, there were.

11   Q.   I think the jury has already heard from

12   Detective Hartlove on most of those locations.  We just need

13   to go through with you very briefly the vehicles that were

14   also searched on that day.  Starting with the Ford Explorer --

15   and this is Government's series 21.  Do you recall where that

16   Ford Explorer was when it was searched?

17   A.   The Explorer would have been at ████████████.

18   Q.   And whose residence is that?

19   A.   Mr. Ventura's.

20   Q.   21a?

21   A.   Maryland license plate displaying 57157, Mike, 5.

22   Q.   Is that a license plate relevant to the surveillance

23   conducted in this case?

24   A.   Yes, it is.

25   Q.   21b?

1    A.    Tally sheets.

2    Q.    21e?

3    A.    Cellular phone.

4    Q.    21c?

5    A.    It looks like a receipt for Ashland, Virginia.

6    Q.    And 21d?

7    A.    It looks like a money remitter receipt from Jose Antonio

8    Reyes to Lucia Reyes Escobar in El Salvador.

9    Q.    I want to move on to the next vehicle that was searched

10   on November 15th of 2010, and that was a Ford Expedition.  Do

11   you recall where that vehicle was on November 15th?

12   A.    As I recall, that vehicle had left the residence with

13   Yenis Ruiz operating it to pick up a child, and then

14   subsequently came back when the -- once again, we had our

15   Special Response Team execute the warrant at ███████████,

16   and they found an unaccompanied minor in the house.

17   Q.    Now, there is only one item of evidentiary value that was

18   seized from the Ford Expedition.  I'm going to place it on the

19   screen for you.  It's Government's 22a.  What is that?

20   A.    A tally sheet.

21   Q.    There was also a Nissan Sentra that was searched on

22   November 15th, 2010, or, actually, it was searched sometime

23   thereafter.  Can you explain why that was?

24   A.    It was -- so we had a number of search warrants to

25   execute, and we had ten days to execute them, and we couldn't

 1    find the vehicle, so we found it on November 22nd.  Through

 2    Detective Hartlove, it had been impounded in Annapolis.

 3    Q.   And was that vehicle searched at the time --

 4    A.   Once we --

 5    Q.   -- it was found?

 6    A.   Once we found the location, we found the vehicle.  We

 7    went and we searched the vehicle pursuant to the search

 8    warrant, yes.

 9    Q.   Do you recall when that was?

10    A.   Should have been November 22nd.

11    Q.   And were items of evidentiary value seized from that

12    Nissan Sentra?

13    A.   Yes, they were.

14    Q.   This is 23a.

15    A.   It's a playing card with a hole punch.

16    Q.   23b?

17    A.   Boxes of business cards.

18            **MS. YASSER:**  I'm removing and publishing to the

19    jury, Your Honor, one of the business cards seized from that

20    box.

21    Q.   23c?

22    A.   We know those to be homemade business cards for

23    advertising prostitution.  They were identified through the

24    investigation.

25    Q.   And then, finally, 23d?



```
 1    A.   Maryland registration for Jose Antoni Lopez, ███████

 2    ██████, Silver Spring.

 3    Q.   Is there also a Toyota Corolla that was searched on that

 4    same day?

 5    A.   Yes.  That would have been closer to ████████████.

 6    Q.   And do you know who was operating that Toyota Corolla on

 7    that day?

 8    A.   The individual identified previously as Omar Reyes.

 9    Q.   And 24a, is that a document that was seized from the

10    vehicle?

11    A.   Yes, it was.

12    Q.   24b?

13    A.   Business cards that we identified through the

14    investigation as being involved in advertising Hispanic

15    prostitution.

16    Q.   What appears to be another business card.  Is that number

17    recognizable to you?

18    A.   I'd have to check my chart, if I can real quick?

19    Q.   Yeah, if could you.  It ends in 8938.

20         (Witness reviewing document.)

21    A.   I've listed that number as associated ████████████,

22    and we recovered that number previously on September 26th,

23    2008.

24    Q.   Was Defendant Ventura arrested on November 15th, 2010 as

25    well?
```

1    A.   Yes, he was.

2    Q.   I think some of the items previously seized from him have

3    been admitted, and I want to show you Government's 20b/1.  Do

4    you recognize that?

5    A.   Yes, I do.

6    Q.   What is that?

7    A.   That's a -- what we've identified as a Santa Muerte

8    prayer that was on his person.

9    Q.   And did you obtain a translation of the Santa Muerte

10   prayer?

11   A.   I did.

12   Q.   This is Government's 20b/2, and that will be admitted

13   into evidence.

14          Now, when Mr. Ventura was arrested on November 15th

15   of 2010, he was transporting someone; is that correct?

16   A.   Yes, he was.

17   Q.   I'm going to show you what's been marked as

18   Government's 20q.  Who is that?

19   A.   Bonita Torres Moran, I believe is the correct

20   pronunciation of her name.

21   Q.   And this was a item seized from Ms. Moran; is that

22   correct?

23   A.   Yes, ma'am.

24   Q.   And what does that show?

25   A.   It's a Greyhound ticket showing she traveled from New

1    York, New York to Washington, D.C.

2    Q.   And was that the same day that she was arrested with

3    Mr. Ventura?

4    A.   Yes, ma'am.  It shows an arrival time of November 15th,

5    2010, at 11:20 a.m.

6    Q.   This is Government's 20g.  Was that also seized from

7    Mr. Ventura?

8    A.   It was, ma'am.

9    Q.   And there is a name Joong Kim at the bottom.  Do you know

10   that person?

11   A.   Yes, ma'am.

12   Q.   Who is it?

13   A.   He's the same Mr. Kim that testified here for this trial.

14   Q.   The owner of ██████████?

15   A.   Yes, ma'am.

16   Q.   Have you had occasion to review Mr. Ventura's prior

17   arrest history in the two years leading up to his arrest in

18   this case from 2008 to 2010?

19   A.   Yes, ma'am.

20   Q.   Without going into why he was arrested, has Mr. Ventura

21   been arrested before?

22   A.   Yes, ma'am.

23   Q.   And how many times?

24   A.   I can safely say, the one time, he was taken into full-

25   custody arrest.  The other time, I'm not sure if it was full

1    custody or not, so I would say one full-custody arrest.

2    Q.   And how long was Mr. Ventura approximately detained on

3    that arrest date?

4    A.   A brief period of time.  The exact -- the amount of

5    hours, I'm not certain.

6    Q.   I want to go back quickly to Ms. Bonita Moran, I think

7    you called her?  Moran?

8    A.   Bonita Torres Moran.

9    Q.   That was the woman who was arrested with Mr. Ventura on

10   November 15th.  Did you have occasion -- was she also -- was a

11   cell phone seized from her person on that day?

12   A.   I'm not sure if it was her person or her bag, but it was

13   identified to be associated with her, yes, ma'am.

14   Q.   And I'm going to put on the screen for you what's been

15   marked as 40d/3.  What is this?

16   A.   That appears to be a toll report that we ran pursuant to

17   the evidence gathered for this investigation that shows

18   contact between her phone number, ▓▓▓ -- Ms. Moran's phone

19   number, ▓▓▓▓▓-8075, and the phone number ▓▓▓▓▓-3124 that

20   we associated with Mr. Ventura.

21   Q.   And was that number -- that 3124 number actually seized

22   from Mr. Ventura on that day?

23   A.   A phone with that number was seized in the Astrovan that

24   day, yes, ma'am.

25   Q.   And does this toll record show contacts between

1   Mr. Ventura's 3124 number and Ms. Moran's 8075 number on that

2   day?

3   A.   Yes, ma'am, incoming and outgoing.

4   Q.   You also heard testimony in the course of this trial

5   about surveillance that was conducted on August 2nd of 2010.

6   Do you recall that testimony?

7   A.   Yes, ma'am.

8   Q.   And can you review for the ladies -- and did you

9   participate in that surveillance on that day, Special

10  Agent Kelly?

11  A.   Yes, I did, ma'am.

12  Q.   What did you do?

13  A.   I ended up doing surveillance at ▮▮▮▮▮▮▮▮▮▮ in the

14  afternoon, ma'am.

15  Q.   And could you just briefly summarize what the

16  surveillance on that day revealed.

17  A.   Mr. Ventura moving a female from ▮▮▮▮▮▮▮▮▮ to

18  another location in Prince George's County, returning back to

19  the residence at ▮▮▮▮▮▮▮, meeting another female there

20  that had driven a vehicle there with Florida tags on it.  She

21  entered into his silver Expedition with him as the operator.

22  They returned to ▮▮▮▮▮▮▮▮▮ for a short time, and then

23  drove down to Portsmouth, Virginia.

24  Q.   And did you coordinate with people in Portsmouth,

25  Virginia, to pick up surveillance at that time?

1    A.   I did.   I coordinated with a local HSI office in

2    Portsmouth, Virginia.

3    Q.   And what did they observe?

4    A.   They observed Mr. Ventura's vehicle arrive at ███████,

5    Portsmouth, Virginia.   They observed a Hispanic male and a

6    Hispanic female in the same manner of dress and physical

7    description exit the vehicle at the rear of the house.

8    Q.   And, when you say the same manner and physical dress, did

9    you provide the manner and physical dress to them over the

10   phone?

11   A.   Yes, ma'am.

12   Q.   Okay.   I want to show you what's been previously admitted

13   as Government's 28e/2.   Is that a surveillance image from

14   earlier that morning?

15   A.   Yes, ma'am.

16   Q.   Do you know approximately what time?

17   A.   Approximately 10:00 a.m.

18   Q.   And Government's 28e/6?

19   A.   And that would be later on where -- that's the female

20   that arrived in the Toyota with the Florida tags.

21   Q.   And, by the way, what day of the week is August 2nd?

22   A.   Monday, ma'am.

23   Q.   28e/7?

24   A.   ████████████, same vehicles, same participants.

25   Q.   Now, at the time that this surveillance was conducted,

1    was there also realtime GPS tracking up on Mr. Ventura's

2    phone?

3    A.    Yes.

4    Q.    And what phone number was that?

5    A.    The ████████-3124.

6    Q.    And did you review the information that was acquired from

7    that phone in preparation for your testimony today?

8    A.    I did.

9    Q.    And did you create a map of that activity on the phone in

10   the hours preceding and following the activities on the --

11   during the surveillance?

12   A.    Yes, with the help of our analyst.

13   Q.    And what did it show generally?  What does your analysis

14   show?

15   A.    On August 1st, 2010 -- on August 1st -- I'm sorry.  I

16   hear double language.  I'm sorry.

17             So, on August 1st, 2010, 3124 was in Maryland, and

18   it traveled from Maryland to Portsmouth, Virginia in the early

19   hours of August 2nd, 2010, and then it returned from

20   Virginia -- from Portsmouth, Virginia, back to Maryland, and

21   subsequently it returned from Maryland to Portsmouth,

22   Virginia.

23             **THE COURT:**  Thank you, Ms. Yasser.

24             Members of the jury, we've reached the end of the

25   trial day.  Tomorrow, we're going to get a little later start.

 1    The Court has other business, so we will be starting at

 2    11:00 a.m.  Please be in your jury room at about five minutes

 3    before 11:00 so that we can get started at 11:00.  Please

 4    remember:  Don't discuss the case among yourselves or with

 5    anyone else.  We'll see you tomorrow morning at 11:00 a.m.

 6              (Jury excused.)

 7              (Witness excused pending further examination.)

 8              **THE COURT:**  Counsel, we'll have drafts of the

 9    instructions and verdict sheets for you for your review, and

10    see you tomorrow at 11:00.  Good night.

11              **MR. RUTER:**  Thank you, Your Honor.

12              **THE CLERK:**  All rise.  This Honorable Court stands

13    adjourned until tomorrow morning.

14              (Proceedings adjourned.)

15

16

17    I, Martin J. Giordano, Registered Merit Reporter and Certified

18    Realtime Reporter, certify that the foregoing is a correct

19    transcript from the record of proceedings in the

20    above-entitled matter.

21

22    _____        _____

23      Martin J. Giordano, RMR, CRR                Date

24

25

1

INDEX

2

UNITED STATES v. GERMAN de JESUS VENTURA, et al.

3

TRIAL - VOL VI - APRIL 16, 2013

4

5

6

PAGE

COMMENCEMENT OF PROCEEDINGS........................... 1145

7

WITNESSES FOR
  THE GOVERNMENT:

8

9

ESMIRNA REBECA DUEÑAS FRANCO
        Resumed the Stand.............................. 1146
10      Cross-Examination (Cont.) by MR. RUTER......... 1146
        Cross-Examination by MR. MONTEMARANO........... 1222
11      Redirect Examination by MS. YASSER............. 1227
        Recross-Examination by MR. RUTER............... 1237
12      Recross-Examination by MR. MONTEMARANO......... 1238
        Witness Excused................................ 1243
13

MARY-THERESA BAKER
14      Sworn.......................................... 1243
        Direct Examination by MS. YASSER............... 1243
15      *Voir Dire* Examination by MR. RUTER............. 1252
        Direct Examination (Cont.) by MS. YASSER....... 1263
16      Cross-Examination by MR. RUTER................. 1273
        Redirect Examination by MS. YASSER............. 1281
17      Witness Excused................................ 1282

18 EDWARD J. KELLY
        Sworn.......................................... 1285
19      Direct Examination by MS. YASSER............... 1285
        Witness Excused Pending Further Examination..... 1316
20

PROCEEDINGS ADJOURNED................................. 1316

21

22

23

24

25

'

**'08** [6] - 1180:1, 1180:16, 1180:19, 1180:23, 1181:2, 1181:13
**'91** [1] - 1246:1

## 1

**1** [5] - 1281:19, 1291:23, 1291:24, 1293:3, 1293:4
**10** [3] - 1213:12, 1218:21, 1297:21
**100** [2] - 1191:12, 1191:20
**101** [1] - 1144:24
**102** [4] - 1205:15, 1231:3, 1231:6
**103** [1] - 1205:15
**108** [4] - 1207:21, 1208:2, 1208:7, 1208:12
**109** [2] - 1207:21, 1208:2
**10:00** [1] - 1314:17
**10:56** [1] - 1210:21
**10th** [1] - 1190:19
**11** [5] - 1195:4, 1199:17, 1240:18, 1240:22, 1260:19
**1145** [1] - 1317:6
**1146** [2] - 1317:9, 1317:10
**11:00** [6] - 1284:11, 1316:2, 1316:3, 1316:5, 1316:10
**11:20** [1] - 1311:5
**11:34** [1] - 1194:16
**12** [3] - 1194:9, 1284:15, 1284:16
**120** [2] - 1244:18, 1244:22
**1222** [1] - 1317:10
**1227** [1] - 1317:11
**1237** [1] - 1317:11
**1238** [1] - 1317:12
**1243** [3] - 1317:12, 1317:14, 1317:14
**1252** [1] - 1317:15
**1263** [1] - 1317:15
**1273** [1] - 1317:16
**1281** [1] - 1317:16
**1282** [1] - 1317:17
**1285** [2] - 1317:18, 1317:19
**12:00** [1] - 1194:16
**12:09** [1] - 1200:2
**12:20** [1] - 1194:10
**1316** [2] - 1317:19, 1317:20
**14** [2] - 1212:22, 1213:2
**15** [3] - 1183:22, 1208:24, 1241:14
**15th** [40] - 1182:22, 1183:7, 1184:4, 1185:16, 1185:20, 1187:22, 1187:25, 1190:14, 1190:22, 1192:13, 1192:25, 1193:10, 1193:13, 1204:10, 1208:21, 1209:8, 1209:12, 1210:9, 1210:14, 1211:3, 1211:9, 1218:5, 1231:6, 1233:11, 1234:21, 1237:12, 1237:25, 1295:13, 1297:18, 1298:1, 1298:4, 1299:3, 1300:11, 1307:10, 1307:11, 1307:22, 1309:24, 1310:14, 1311:4,

1312:10
**16** [6] - 1143:9, 1145:1, 1224:14, 1241:11, 1247:14, 1317:3
**17** [3] - 1208:3, 1208:6, 1301:3
**17b** [1] - 1305:15
**17b/1** [1] - 1302:17
**17b/12** [1] - 1303:13
**17b/14** [1] - 1303:19
**17b/16** [1] - 1304:17
**17b/17** [1] - 1304:21
**17b/18** [1] - 1305:17
**17b/19** [1] - 1305:22
**17b/21** [1] - 1305:25
**17b/22** [1] - 1306:2
**17b/23** [1] - 1306:5
**17b/3** [2] - 1302:20, 1303:25
**17b/4** [1] - 1302:22
**17b/5** [1] - 1302:24
**17b/8** [2] - 1303:5, 1305:11
**17b/9** [1] - 1303:11
**17th** [1] - 1263:8
**18** [8] - 1208:3, 1208:6, 1208:11, 1248:11, 1258:12, 1293:5, 1293:6
**18th** [1] - 1295:18
**19** [5] - 1208:7, 1208:12, 1241:12, 1241:14, 1259:5
**1984** [1] - 1245:24
**1988** [1] - 1245:25
**1991** [1] - 1247:20
**1997** [1] - 1285:20
**1st** [3] - 1315:15, 1315:17

## 2

**2** [14] - 1147:14, 1195:3, 1196:16, 1198:23, 1199:12, 1213:11, 1240:12, 1241:16, 1241:19, 1242:12, 1292:8, 1293:1, 1293:20
**2,980** [1] - 1258:14
**20** [9] - 1194:8, 1196:7, 1197:2, 1203:14, 1203:15, 1253:3, 1258:12, 1258:13, 1259:4
**2000** [1] - 1281:5
**2001** [1] - 1281:5
**2002** [2] - 1281:7, 1286:23
**2003** [2] - 1285:16, 1285:17
**2005** [2] - 1247:22, 1287:5
**2008** [52] - 1151:8, 1151:23, 1152:15, 1152:18, 1153:4, 1153:14, 1153:18, 1154:1, 1154:4, 1154:5, 1154:14, 1154:17, 1154:22, 1154:25, 1155:2, 1155:6, 1155:12, 1155:16, 1155:20, 1155:24, 1156:6, 1156:9, 1156:17, 1157:2, 1157:6, 1157:9, 1173:9, 1173:13, 1174:2, 1174:15, 1175:7, 1175:13, 1175:17, 1175:22, 1176:1, 1176:18, 1177:8, 1180:2, 1180:6, 1181:16, 1182:22, 1183:18, 1224:12, 1229:12, 1229:17, 1229:21, 1230:12,

1238:24, 1289:6, 1289:7, 1309:23, 1311:18
**2009** [1] - 1180:2
**2010** [60] - 1182:22, 1183:7, 1183:22, 1184:4, 1185:16, 1185:20, 1187:23, 1188:1, 1190:14, 1190:19, 1190:23, 1192:13, 1192:25, 1193:10, 1193:13, 1204:10, 1208:21, 1208:24, 1209:2, 1209:8, 1209:12, 1210:9, 1210:14, 1211:3, 1211:9, 1211:10, 1211:12, 1218:5, 1219:12, 1224:15, 1231:6, 1233:12, 1233:13, 1234:21, 1237:12, 1237:25, 1291:14, 1291:15, 1295:13, 1295:18, 1296:9, 1297:2, 1297:18, 1298:1, 1298:4, 1299:3, 1300:11, 1301:20, 1302:14, 1306:8, 1307:10, 1307:22, 1309:24, 1310:15, 1311:5, 1311:18, 1313:5, 1315:15, 1315:17, 1315:19
**2011** [10] - 1224:22, 1224:25, 1225:7, 1225:22, 1230:20, 1232:14, 1263:8, 1280:23, 1281:1, 1281:18
**2013** [3] - 1143:9, 1145:1, 1317:3
**20b/1** [1] - 1310:3
**20b/2** [1] - 1310:12
**20g** [1] - 1311:6
**20q** [1] - 1310:18
**20th** [2] - 1296:9, 1298:8
**21** [2] - 1245:8, 1306:15
**21201** [1] - 1144:24
**21a** [1] - 1306:20
**21b** [1] - 1306:25
**21c** [1] - 1307:4
**21d** [1] - 1307:6
**21e** [1] - 1307:2
**22** [2] - 1218:14, 1218:16
**22a** [1] - 1307:19
**22nd** [3] - 1147:4, 1308:1, 1308:10
**23** [2] - 1218:14, 1218:17
**23a** [1] - 1308:14
**23b** [1] - 1308:16
**23c** [1] - 1308:21
**23d** [1] - 1308:25
**24** [1] - 1245:8
**24a** [1] - 1309:9
**24b** [1] - 1309:12
**24th** [1] - 1151:8
**25** [1] - 1299:5
**25-year** [2] - 1247:23, 1255:16
**25a/1** [1] - 1299:9
**25a/12** [1] - 1300:5
**25a/3** [2] - 1299:11, 1300:8
**25a/4** [1] - 1299:17
**25a/5** [1] - 1299:19
**25a/6** [1] - 1299:21
**25a/7** [1] - 1299:25
**26** [2] - 1210:22, 1245:10
**26th** [25] - 1153:17, 1154:1, 1154:13, 1154:16, 1154:22, 1154:25, 1155:5, 1156:9, 1156:17, 1157:2, 1157:6,

1173:9, 1173:13, 1173:23, 1174:2, 1174:15, 1180:1, 1180:6, 1180:11, 1180:16, 1180:19, 1180:23, 1181:2, 1181:13, 1309:22
**28e/2** [1] - 1314:13
**28e/6** [1] - 1314:18
**28e/7** [1] - 1314:23
**28th** [2] - 1224:11, 1239:5
**29** [1] - 1240:12
**29th** [14] - 1152:18, 1175:6, 1175:13, 1175:17, 1175:21, 1175:25, 1176:18, 1177:8, 1181:16, 1182:17, 1182:21, 1183:18, 1224:12, 1239:5
**2:00** [5] - 1199:17, 1199:23, 1199:24, 1200:1, 1200:3
**2nd** [3] - 1313:5, 1314:21, 1315:19

## 3

**3** [3] - 1146:17, 1301:6
**3,000** [7] - 1248:4, 1248:5, 1257:6, 1257:14, 1258:9, 1258:13, 1259:3
**30** [1] - 1253:17
**3124** [5] - 1312:19, 1312:21, 1313:1, 1315:5, 1315:17
**39** [1] - 1297:4
**39a** [1] - 1264:23
**39a/2A** [1] - 1271:19
**39a/2b** [1] - 1269:2

## 4

**4** [8] - 1149:14, 1151:6, 1262:12, 1292:18, 1301:17, 1301:18, 1301:21
**40** [3] - 1203:13, 1203:14, 1253:17
**40-hour** [2] - 1151:10, 1153:6
**40a/1B** [1] - 1293:23
**40b/1A** [1] - 1292:5
**40b/1B** [1] - 1292:8
**40b/1C** [1] - 1301:6
**40b/1D** [1] - 1301:24
**40b/1E** [1] - 1296:14
**40b/1F** [1] - 1297:3
**40b/1G** [2] - 1297:19, 1297:21
**40b/2A** [1] - 1296:21
**40d/3** [1] - 1312:15
**410-962-4504** [1] - 1144:25
**412** [1] - 1159:8
**43** [1] - 1194:8
**45** [5] - 1194:2, 1194:4, 1195:22, 1196:1, 1196:5
**4630** [2] - 1302:6, 1303:10
**4:31** [1] - 1284:4
**4:54** [1] - 1284:4
**4:55** [1] - 1282:18
**4th** [1] - 1153:4

## 5

**5** [6] - 1191:5, 1269:22, 1269:23, 1301:18, 1301:22, 1306:21
**50** [2] - 1288:4, 1288:5
**50-50** [1] - 1256:2
**5211** [5] - 1296:3, 1296:6, 1297:18, 1298:7, 1298:12
**535** [1] - 1297:19
**541** [1] - 1260:18
**5515** [1] - 1144:23
**57157** [1] - 1306:21
**5:00** [1] - 1282:18
**5:54** [1] - 1143:9
**5th** [1] - 1297:2, 1298:11

## 6

**6** [6] - 1205:15, 1215:12, 1216:19, 1269:22, 1269:23, 1296:13
**65** [1] - 1199:3
**6th** [2] - 1300:25, 1301:20

## 7

**7** [5] - 1205:7, 1205:8, 1269:8, 1296:21, 1303:25
**72** [3] - 1244:17, 1244:21, 1251:7
**782** [1] - 1260:19
**7th** [5] - 1219:12, 1224:20, 1233:13, 1301:1, 1302:14

## 8

**8** [2] - 1207:24, 1269:8
**8075** [2] - 1312:19, 1313:1
**8938** [1] - 1309:19
**8:44** [1] - 1210:15

## 9

**9** [7] - 1212:24, 1212:25, 1213:12, 1242:7, 1242:12, 1297:2, 1298:12
**90%** [1] - 1255:8
**9186** [1] - 1302:3
**9346** [2] - 1291:14, 1295:4
**99** [2] - 1191:12, 1191:20
**990** [1] - 1260:18
**9:27** [1] - 1143:9
**9:30** [1] - 1284:19

## A

**a.m** [6] - 1194:16, 1284:11, 1311:5, 1314:17, 1316:2, 1316:5
**abdomen** [5] - 1249:18, 1250:4, 1250:6,

1265:7, 1266:10
**ability** [2] - 1201:20, 1206:21
**able** [17] - 1164:22, 1168:11, 1168:14, 1174:11, 1196:20, 1201:21, 1255:18, 1255:21, 1256:22, 1265:18, 1265:22, 1289:24, 1290:14, 1295:24, 1302:9
**ABOVE** [1] - 1143:10
**above-entitled** [1] - 1316:20
**ABOVE-ENTITLED** [1] - 1143:10
**absolutely** [1] - 1198:3
**Abuse** [7] - 1244:6, 1244:9, 1245:11, 1245:17, 1245:19, 1247:13, 1252:14
**abuse** [16] - 1244:11, 1244:17, 1246:19, 1247:2, 1247:21, 1248:15, 1249:9, 1251:22, 1253:7, 1253:11, 1253:24, 1254:7, 1254:9, 1257:23, 1264:10, 1274:19
**Academy** [4] - 1252:14, 1252:15, 1252:16, 1252:18
**access** [2] - 1304:8, 1304:9
**accidental** [2] - 1268:10, 1271:13
**accurate** [9] - 1151:8, 1159:16, 1160:7, 1167:25, 1173:25, 1253:20, 1255:19, 1278:24, 1280:18
**acquire** [1] - 1288:7
**acquired** [1] - 1315:6
**acted** [1] - 1234:3
**active** [3] - 1265:24, 1265:25, 1271:12
**activities** [1] - 1192:9, 1315:10
**activity** [1] - 1315:9
**acute** [7] - 1244:13, 1244:14, 1244:15, 1244:16, 1244:23, 1245:19
**add** [1] - 1234:2
**addition** [1] - 1276:24
**additional** [3] - 1151:12, 1196:22, 1233:19
**address** [7] - 1153:20, 1154:1, 1161:4, 1209:17, 1220:14, 1259:24, 1302:11
**adjourned** [2] - 1316:13, 1316:14
**ADJOURNED**................................ [1] - 1317:20
**admissibility** [1] - 1261:17
**admitted** [4] - 1296:5, 1310:3, 1310:12, 1314:12
**adolescent** [4] - 1245:5, 1245:9, 1246:1, 1247:19
**adolescents** [5] - 1245:7, 1248:10, 1251:24, 1252:21, 1260:6
**adult** [2] - 1256:6, 1256:7
**adult's** [1] - 1255:23
**adults** [13] - 1245:8, 1245:14, 1245:16, 1245:18, 1251:17, 1251:23, 1256:10, 1258:10, 1258:12, 1258:13, 1259:4, 1260:3
**advances** [1] - 1157:23
**advantage** [1] - 1223:23
**advertised** [1] - 1301:2
**advertising** [2] - 1308:23, 1309:14
**advise** [6] - 1145:14, 1163:3, 1168:3, 1195:21, 1226:3, 1255:18

**advised** [4] - 1167:22, 1168:24, 1177:22, 1179:2
**advocacy** [3] - 1198:1, 1252:12, 1252:21
**affection** [2] - 1215:9, 1217:11
**affectionately** [1] - 1215:5
**afraid** [5] - 1176:22, 1206:7, 1206:13, 1206:14, 1210:1
**Afternoon** [1] - 1200:3
**afternoon** [15] - 1152:24, 1195:23, 1200:14, 1200:15, 1201:20, 1202:19, 1204:8, 1222:10, 1222:11, 1243:24, 1252:9, 1252:10, 1262:13, 1282:16, 1313:14
**afterwards** [1] - 1265:4
**age** [6] - 1245:5, 1245:12, 1260:5, 1268:5, 1268:23, 1301:3
**agencies** [1] - 1287:10
**agency** [1] - 1290:14
**Agent** [18] - 1144:3, 1282:24, 1284:25, 1285:11, 1286:14, 1288:6, 1291:7, 1292:16, 1293:8, 1294:1, 1294:16, 1295:3, 1297:7, 1300:3, 1302:9, 1303:2, 1304:21, 1313:10
**agent** [12] - 1262:7, 1273:14, 1281:23, 1285:18, 1285:20, 1285:21, 1285:24, 1286:9, 1286:16, 1286:22, 1290:10, 1290:16
**agents** [5] - 1234:10, 1234:11, 1288:12, 1289:14, 1300:24
**ago** [3] - 1155:11, 1155:16, 1252:23
**agony** [1] - 1198:8
**agree** [4] - 1228:19, 1275:8, 1276:3, 1279:13
**agreement** [2] - 1218:6, 1218:12
**agrees** [1] - 1260:13
**ahead** [1] - 1267:21
**aid** [1] - 1198:6
**al** [1] - 1317:2
**alcohol** [1] - 1306:3
**alert** [1] - 1196:4
**Alex** [75] - 1160:2, 1160:6, 1160:10, 1160:23, 1161:11, 1161:13, 1161:22, 1161:24, 1162:14, 1162:17, 1162:21, 1163:10, 1163:12, 1163:20, 1163:23, 1164:2, 1164:6, 1164:13, 1164:16, 1164:17, 1164:25, 1166:5, 1167:19, 1167:20, 1167:22, 1168:3, 1168:10, 1168:24, 1169:3, 1169:6, 1169:11, 1169:16, 1170:11, 1171:24, 1172:2, 1172:4, 1172:7, 1172:11, 1172:13, 1172:17, 1172:19, 1172:23, 1173:2, 1174:3, 1174:5, 1176:4, 1176:7, 1176:9, 1176:14, 1176:22, 1179:13, 1184:19, 1184:21, 1184:23, 1184:25, 1185:3, 1189:12, 1210:3, 1210:5, 1211:15, 1211:20, 1211:23, 1212:1, 1212:4, 1212:7, 1212:19, 1213:19, 1227:24, 1228:4, 1228:10, 1228:21, 1237:18

**Alex's** [10] - 1169:22, 1169:25, 1171:20, 1209:22, 1227:25, 1228:8, 1228:10, 1228:15, 1228:17
**alleged** [1] - 1244:11
**allegedly** [1] - 1159:15
**Allenwood** [1] - 1286:14
**allow** [3] - 1146:16, 1186:11, 1303:17
**allowed** [2] - 1220:9, 1288:13
**alma** [1] - 1247:7
**almost** [4] - 1210:20, 1227:3, 1255:3, 1283:22
**alone** [1] - 1256:12
**aloud** [1] - 1147:13
**alternates** [1] - 1195:7
**alternative** [2] - 1159:1, 1196:12
**altogether** [1] - 1164:6
**AM** [1] - 1143:9
**AMERICA** [1] - 1143:4
**American** [7] - 1246:19, 1247:20, 1252:13, 1252:14, 1252:15, 1252:16, 1252:17
**amount** [2] - 1196:8, 1312:4
**anal** [1] - 1264:9
**analogize** [1] - 1198:5
**analysis** [2] - 1255:23, 1315:13
**analyst** [1] - 1315:12
**angle** [2] - 1279:20, 1300:1
**ankle** [5] - 1267:18, 1272:4, 1273:19, 1274:23, 1275:15
**ankles** [1] - 1271:11
**Annapolis** [4] - 1254:8, 1289:14, 1291:17, 1308:2
**answer** [13] - 1185:23, 1192:5, 1197:12, 1219:20, 1223:4, 1231:23, 1232:17, 1235:10, 1235:12, 1240:23, 1270:7, 1277:4
**answered** [5] - 1155:12, 1189:25, 1225:11, 1241:1, 1241:2
**answering** [1] - 1233:6
**answers** [2] - 1222:22, 1235:5
**anterior** [1] - 1270:19
**anticipating** [1] - 1274:17
**Antoni** [1] - 1309:1
**Antonio** [1] - 1307:7
**anxiety** [1] - 1201:6
**apartment** [3] - 1303:3, 1304:3, 1304:7
**apologize** [7] - 1261:5, 1267:15, 1269:2, 1296:25, 1298:20, 1299:23, 1302:6
**appear** [7] - 1250:25, 1253:23, 1261:11, 1270:24, 1292:17, 1300:2
**appearance** [2] - 1276:20, 1278:5
**applies** [1] - 1159:13
**apply** [1] - 1159:12
**approach** [16] - 1146:10, 1149:7, 1158:8, 1191:2, 1194:19, 1200:11, 1204:24, 1205:11, 1235:9, 1249:11, 1258:2, 1258:18, 1264:21, 1290:22, 1292:9, 1294:24
**appropriate** [3] - 1198:5, 1286:21

**approximate** [1] - 1247:23
**April** [1] - 1143:9
**APRIL** [2] - 1145:1, 1317:3
**apt** [1] - 1197:6
**area** [10] - 1159:1, 1247:21, 1248:5, 1249:9, 1252:1, 1262:24, 1271:23, 1277:9, 1279:16, 1295:24
**areas** [3] - 1250:5, 1266:8, 1287:12
**arm** [1] - 1201:8
**armed** [1] - 1298:22
**arms** [1] - 1269:16
**Army** [3] - 1246:4, 1246:10, 1246:14
**arrest** [5] - 1311:17, 1311:25, 1312:1, 1312:3
**arrested** [17] - 1188:6, 1230:1, 1230:20, 1232:4, 1232:7, 1232:10, 1233:12, 1237:13, 1237:15, 1295:7, 1295:10, 1309:24, 1310:14, 1311:2, 1311:20, 1311:21, 1312:9
**arrival** [1] - 1311:4
**arrive** [1] - 1314:4
**arrived** [2] - 1155:7, 1314:20
**arrow** [1] - 1276:13
**articulate** [1] - 1289:25
**Ashland** [1] - 1307:5
**Asian** [2] - 1287:17, 1300:19
**aside** [1] - 1288:9
**aspect** [1] - 1271:8
**assault** [3] - 1158:16, 1283:19, 1283:21
**assist** [4] - 1182:6, 1289:8, 1289:14, 1290:22
**assistant** [1] - 1234:11
**Assistant** [2] - 1143:14, 1143:15
**assisted** [1] - 1290:18
**associate** [1] - 1302:3
**associated** [9] - 1291:16, 1293:13, 1295:15, 1298:22, 1302:11, 1304:6, 1309:21, 1312:13, 1312:20
**associates** [1] - 1210:6
**Astrovan** [1] - 1312:23
**attack** [4] - 1158:6, 1201:7, 1201:12, 1201:16
**attacks** [1] - 1201:14
**attempt** [4] - 1158:20, 1159:7, 1159:15, 1160:9
**attend** [1] - 1246:17
**attended** [3] - 1194:24, 1252:25, 1253:7
**attention** [2] - 1263:7, 1270:15
**attic** [2] - 1304:6, 1304:10
**Attorney** [2] - 1143:14, 1143:15
**attorney** [1] - 1241:19
**Attorney's** [1] - 1290:11
**audio** [10] - 1292:1, 1293:21, 1296:18, 1296:24, 1297:5, 1297:23, 1298:14, 1298:19, 1301:11, 1301:25
**August** [6] - 1313:5, 1314:21, 1315:15, 1315:17, 1315:19
**aunts** [1] - 1228:8
**authorities** [1] - 1219:25

**authority** [1] - 1182:1
**availability** [1] - 1262:10
**available** [4] - 1159:17, 1199:4, 1283:8, 1303:18
**avenue** [1] - 1294:10
**Avila** [2] - 1298:22, 1299:1
**award** [3] - 1247:5, 1247:6, 1247:7
**awards** [1] - 1247:3
**aware** [3] - 1188:13, 1232:6, 1297:15

## B

**b/13** [1] - 1303:25
**b/18** [1] - 1305:13
**Baby** [1] - 1253:9
**background** [3] - 1201:14, 1201:15, 1264:7
**Backpage** [4] - 1287:18, 1287:20, 1287:22, 1288:15
**bad** [2] - 1265:7, 1265:16
**bag** [1] - 1312:12
**Baker** [24] - 1200:7, 1200:16, 1200:24, 1243:11, 1243:20, 1243:24, 1245:22, 1247:4, 1251:25, 1252:9, 1252:11, 1259:7, 1260:2, 1261:2, 1262:17, 1263:7, 1266:20, 1267:15, 1269:1, 1269:18, 1272:1, 1273:10, 1281:16, 1282:2
**BAKER** [12] - 1200:15, 1200:17, 1200:20, 1200:23, 1201:1, 1201:4, 1201:6, 1201:13, 1201:21, 1201:24, 1243:13, 1317:13
**Baltimore** [13] - 1143:8, 1144:24, 1244:6, 1244:9, 1244:12, 1245:11, 1245:17, 1246:16, 1247:12, 1248:4, 1248:6, 1248:19, 1285:12
**band** [1] - 1198:6
**band-aid** [1] - 1198:6
**bang** [1] - 1271:12
**baptist** [1] - 1195:5
**bare** [1] - 1192:11
**barriers** [2] - 1288:9, 1288:15
**based** [3] - 1256:5, 1265:19, 1267:9
**basis** [1] - 1239:21
**bathroom** [1] - 1304:8
**beach** [2] - 1227:12, 1227:19
**Beach** [3] - 1216:2, 1227:8, 1227:9
**beat** [3] - 1168:25, 1212:1, 1223:19
**beaten** [2] - 1172:11, 1176:9
**Beaumont** [1] - 1246:4
**became** [1] - 1298:10
**become** [3] - 1179:17, 1217:25, 1286:22
**bedroom** [4] - 1300:1, 1302:21, 1302:23, 1302:25
**bedrooms** [1] - 1299:20
**bedstead** [1] - 1278:7
**BEFORE** [1] - 1143:11
**began** [2] - 1160:21, 1171:24
**begged** [1] - 1192:3

**beginning** [5] - 1229:7, 1239:7, 1242:7, 1242:8, 1281:1
**behalf** [4] - 1143:13, 1143:16, 1143:18, 1258:19
**behind** [1] - 1272:13
**belief** [1] - 1274:13
**believes** [2] - 1145:15, 1196:6
**Belinda** [3] - 1199:15, 1284:13, 1284:14
**below** [3] - 1267:17, 1272:4, 1273:19
**belt** [12] - 1237:4, 1261:3, 1261:10, 1261:14, 1270:20, 1271:3, 1279:8, 1279:9, 1279:10, 1279:20, 1279:25
**Benally** [1] - 1260:18
**bench** [14] - 1158:12, 1159:24, 1194:21, 1195:16, 1199:22, 1200:13, 1202:10, 1202:11, 1203:18, 1258:23, 1262:16, 1290:25, 1292:13, 1293:18
**benefit** [1] - 1198:5
**best** [4] - 1173:11, 1247:5, 1254:17, 1271:25
**better** [8] - 1197:6, 1202:21, 1237:19, 1238:20, 1269:19, 1269:22, 1289:24, 1305:7
**between** [9] - 1185:6, 1185:11, 1251:17, 1260:5, 1285:25, 1286:4, 1293:9, 1312:18, 1312:25
**bigger** [1] - 1267:19
**binder** [5] - 1290:25, 1292:8, 1294:25, 1301:6, 1301:19
**binders** [2] - 1290:20, 1291:23
**birth** [1] - 1206:19
**birthmark** [2] - 1266:9, 1266:10
**birthmarks** [2] - 1250:24, 1251:22
**bit** [3] - 1227:24, 1229:15, 1244:20
**black** [1] - 1236:4
**bleeding** [1] - 1274:17
**blisters** [1] - 1265:16
**blood** [3] - 1225:1, 1225:8, 1266:2
**blows** [1] - 1166:1
**BLUMBERG** [3] - 1213:13, 1218:18, 1294:19
**Board** [3] - 1247:18, 1247:19, 1247:20
**Boarded** [1] - 1247:21
**Boards** [1] - 1246:2
**bodily** [2] - 1274:2, 1274:4
**body** [11] - 1165:11, 1165:12, 1165:14, 1165:17, 1250:7, 1251:3, 1266:7, 1267:16, 1271:15, 1273:22, 1277:13
**bone** [2] - 1265:7, 1275:15
**boney** [1] - 1268:1
**Bonita** [3] - 1310:19, 1312:6, 1312:8
**Border** [5] - 1285:20, 1285:21, 1285:23, 1286:9, 1288:7
**border** [1] - 1285:25
**boss** [1] - 1188:4
**bottom** [8] - 1146:21, 1250:5, 1250:10, 1250:13, 1269:9, 1269:21, 1271:19, 1311:9
**box** [6] - 1196:15, 1242:24, 1290:20, 1304:25, 1305:23, 1308:20

**boxes** [1] - 1308:17
**Bragg** [2] - 1246:15, 1247:16
**break** [7] - 1193:20, 1193:22, 1199:16, 1227:16, 1262:13, 1274:17, 1282:16
**Brenda** [1] - 1189:4
**brief** [3] - 1289:13, 1289:18, 1312:4
**briefly** [5] - 1227:24, 1237:7, 1281:13, 1306:13, 1313:15
**bring** [3] - 1145:22, 1202:8, 1289:19
**broadly** [1] - 1264:4
**brothel** [13] - 1227:20, 1289:15, 1290:3, 1291:16, 1292:19, 1294:9, 1294:14, 1300:4, 1300:13, 1300:15, 1302:4, 1302:11, 1303:4
**brothels** [10] - 1227:25, 1287:19, 1289:1, 1289:4, 1290:6, 1292:20, 1293:13, 1300:10, 1300:18, 1305:3
**brought** [5] - 1159:14, 1263:14, 1263:15, 1273:12
**browse** [1] - 1287:23
**building** [1] - 1158:1
**bulk** [1] - 1248:11
**bump** [1] - 1271:9
**bumps** [1] - 1249:16
**Bureau** [1] - 1286:18
**business** [28] - 1154:21, 1160:2, 1166:6, 1166:11, 1166:16, 1167:14, 1169:13, 1169:14, 1170:25, 1171:15, 1177:25, 1184:6, 1184:15, 1184:16, 1188:10, 1188:18, 1192:16, 1195:23, 1209:13, 1210:6, 1303:6, 1304:24, 1308:17, 1308:19, 1308:22, 1309:13, 1309:16, 1316:1
**businesses** [1] - 1188:13
**busy** [1] - 1187:4
**buy** [2] - 1221:19, 1276:14
**buzz** [1] - 1239:13
**BY** [63] - 1146:15, 1147:23, 1149:10, 1150:14, 1150:24, 1156:5, 1159:25, 1167:7, 1168:23, 1171:10, 1186:2, 1188:24, 1190:3, 1191:10, 1191:18, 1193:9, 1204:7, 1205:13, 1205:23, 1208:10, 1213:17, 1215:23, 1216:21, 1218:23, 1222:9, 1226:12, 1227:2, 1231:7, 1232:21, 1233:10, 1234:8, 1234:20, 1235:1, 1235:11, 1235:19, 1236:13, 1237:10, 1238:22, 1239:25, 1240:20, 1241:22, 1242:18, 1243:2, 1243:23, 1244:25, 1250:15, 1252:8, 1258:8, 1263:6, 1265:12, 1273:9, 1281:15, 1285:10, 1286:8, 1291:5, 1293:25, 1295:2, 1296:19, 1297:6, 1297:25, 1298:16, 1298:23, 1302:1

## C

**café-au-lait** [1] - 1266:9
**calmer** [1] - 1245:20
**cannot** [2] - 1154:4, 1156:2

**capacity** [1] - 1298:18
**car** [6] - 1158:1, 1158:4, 1270:7, 1278:13, 1278:14, 1278:15
**card** [4] - 1170:7, 1303:6, 1308:15, 1309:16
**cards** [7] - 1303:12, 1303:14, 1304:24, 1308:17, 1308:19, 1308:22, 1309:13
**care** [7] - 1164:24, 1197:10, 1215:5, 1244:13, 1250:8, 1263:19
**cared** [1] - 1228:5
**career** [1] - 1247:23
**Carlita** [4] - 1188:18, 1188:21, 1188:22, 1188:25, 1189:2
**Carlos** [1] - 1189:14
**Carolina** [2] - 1246:15, 1247:17
**Carraballo** [7] - 1175:10, 1175:11, 1239:9, 1239:16, 1241:4, 1242:1, 1242:8
**case** [23] - 1158:19, 1188:5, 1193:23, 1244:16, 1255:10, 1256:6, 1257:9, 1257:12, 1257:16, 1259:2, 1261:15, 1263:1, 1282:17, 1283:6, 1283:7, 1288:21, 1288:23, 1290:18, 1291:7, 1298:25, 1306:23, 1311:18, 1316:4
**cases** [12] - 1244:11, 1244:14, 1246:12, 1248:5, 1248:14, 1260:20, 1287:3, 1287:7, 1287:25, 1288:2, 1288:10, 1288:16
**cash** [1] - 1171:16
**catch** [2] - 1250:1, 1276:10
**caught** [1] - 1279:22
**caused** [13] - 1160:11, 1163:22, 1167:20, 1210:2, 1275:25, 1276:9, 1276:22, 1277:20, 1278:3, 1279:21, 1282:3, 1300:25
**caution** [1] - 1198:2
**CD** [3] - 1291:25, 1293:20, 1301:7
**cell** [3] - 1168:12, 1174:12, 1312:11
**cellular** [1] - 1307:3
**Center** [8] - 1244:7, 1244:9, 1245:11, 1245:17, 1245:19, 1246:4, 1246:10, 1247:13
**center** [2] - 1263:17, 1270:2
**central** [1] - 1267:25
**century's** [1] - 1197:22
**certain** [8] - 1250:24, 1250:25, 1265:23, 1283:23, 1287:15, 1293:12, 1293:13, 1312:5
**certainly** [2] - 1201:24, 1292:20
**certainty** [1] - 1254:18
**certificate** [1] - 1206:20
**certifications** [1] - 1247:18
**Certified** [1] - 1316:17
**certified** [1] - 1247:19
**certify** [1] - 1316:18
**cetera** [1] - 1165:24
**chair** [1] - 1243:16
**chance** [5] - 1191:19, 1200:24, 1227:6, 1283:9, 1289:24
**change** [3] - 1234:1, 1251:12, 1296:12

**changed** [2] - 1214:25, 1229:8
**changing** [1] - 1255:1
**characterization** [1] - 1292:23
**characterize** [1] - 1265:9
**chart** [2] - 1293:14, 1309:18
**check** [3] - 1148:18, 1149:2, 1309:18
**checked** [1] - 1266:3
**checking** [1] - 1250:13
**checkpoint** [1] - 1286:5
**checkpoints** [1] - 1286:1
**child** [48] - 1153:1, 1155:7, 1155:11, 1155:17, 1160:7, 1160:10, 1160:14, 1160:16, 1164:20, 1164:23, 1172:17, 1175:17, 1175:19, 1175:20, 1177:3, 1182:13, 1183:15, 1207:7, 1214:21, 1217:15, 1217:20, 1218:3, 1218:6, 1219:1, 1221:20, 1221:22, 1221:24, 1244:11, 1245:4, 1246:18, 1247:21, 1249:8, 1249:10, 1252:11, 1253:7, 1253:11, 1253:13, 1253:23, 1254:7, 1255:10, 1255:12, 1255:13, 1256:5, 1257:22, 1265:2, 1307:13
**Child** [7] - 1244:6, 1244:9, 1245:11, 1245:17, 1245:19, 1247:12, 1252:17
**Children** [1] - 1252:14
**children** [14] - 1244:18, 1244:22, 1245:7, 1246:19, 1248:9, 1251:17, 1251:21, 1251:23, 1252:22, 1257:21, 1258:10, 1258:11, 1258:14, 1260:3
**Children's** [1] - 1246:11
**Chino** [126] - 1151:4, 1156:10, 1156:17, 1156:22, 1157:4, 1157:9, 1169:7, 1169:8, 1169:11, 1169:16, 1169:19, 1169:21, 1169:23, 1170:4, 1170:9, 1171:19, 1171:20, 1171:24, 1172:2, 1172:4, 1172:5, 1172:9, 1172:10, 1173:8, 1173:14, 1173:22, 1174:1, 1176:1, 1177:9, 1178:24, 1179:13, 1179:16, 1180:3, 1180:4, 1180:11, 1181:12, 1183:19, 1183:23, 1185:1, 1185:3, 1185:14, 1185:17, 1186:5, 1186:20, 1187:15, 1187:18, 1187:19, 1187:20, 1187:25, 1190:4, 1192:20, 1193:14, 1204:13, 1204:19, 1205:1, 1206:2, 1206:5, 1206:8, 1207:13, 1207:16, 1208:14, 1209:9, 1209:22, 1210:3, 1210:5, 1210:25, 1211:4, 1211:11, 1211:14, 1211:20, 1212:7, 1213:23, 1214:3, 1214:14, 1214:17, 1214:20, 1214:25, 1215:3, 1215:8, 1215:24, 1216:7, 1217:14, 1218:5, 1218:25, 1219:6, 1220:2, 1220:4, 1221:2, 1221:18, 1224:5, 1228:9, 1228:10, 1228:13, 1228:15, 1228:17, 1228:21, 1229:1, 1229:4, 1229:11, 1229:16, 1230:1, 1230:15, 1230:18, 1230:20, 1230:23, 1231:14, 1231:25, 1232:4, 1232:7, 1232:10, 1232:16, 1233:4, 1233:12, 1233:16, 1233:19, 1236:6, 1236:18, 1236:20, 1236:22,

1237:12, 1237:17, 1238:2, 1238:7, 1292:19
**Chino's** [5] - 1183:15, 1184:8, 1209:21, 1213:22, 1228:1
**chose** [1] - 1178:16
**Cindy** [2] - 1281:22
**circle** [2] - 1269:11, 1271:21
**circumstances** [1] - 1259:4
**cite** [1] - 1260:18
**City** [2] - 1244:12, 1248:19
**city** [1] - 1248:20
**clarification** [1] - 1156:1, 1188:21
**clarify** [2] - 1147:17, 1160:10
**classic** [2] - 1267:23, 1275:6
**clear** [6] - 1149:22, 1158:15, 1229:14, 1232:1, 1267:3, 1272:3
**clearly** [3] - 1210:12, 1257:3, 1275:22
**clenched** [1] - 1165:8
**CLERK** [22] - 1145:2, 1146:2, 1146:5, 1146:8, 1194:14, 1194:17, 1199:20, 1199:25, 1200:4, 1203:20, 1204:2, 1205:10, 1240:18, 1243:12, 1243:15, 1282:19, 1284:3, 1284:5, 1284:15, 1285:1, 1285:4, 1316:12
**Clerk** [1] - 1191:4
**clients** [1] - 1265:17
**clinics** [2] - 1245:9
**close** [2] - 1195:23, 1293:11
**closed** [1] - 1165:16
**closer** [4] - 1269:16, 1270:12, 1271:13, 1309:5
**CME** [1] - 1246:17
**co** [4] - 1152:1, 1152:2, 1152:3
**co-worker** [4] - 1152:1, 1152:2, 1152:3
**collecting** [1] - 1181:6
**collection** [2] - 1244:11, 1244:23
**collectively** [1] - 1216:19
**College** [1] - 1245:25
**Colmillo** [2] - 1295:12, 1295:15
**color** [3] - 1236:3, 1251:11, 1251:12
**colored** [3] - 1211:8, 1235:23
**colors** [1] - 1236:1
**colposcopy** [1] - 1246:12
**COMMENCEMENT** [1] - 1317:6
**Committee** [1] - 1252:17
**common** [3] - 1198:2, 1249:8, 1297:13
**commonly** [1] - 1285:13
**community** [5] - 1247:7, 1288:3, 1288:10, 1288:13, 1300:23
**company** [8] - 1149:16, 1149:19, 1149:23, 1151:3, 1157:7, 1182:25, 1183:3, 1273:11
**compared** [1] - 1236:6
**competitors** [1] - 1212:8
**complaints** [1] - 1289:19
**complete** [3] - 1203:1, 1244:10, 1248:8
**completely** [3] - 1268:8, 1272:8, 1277:7
**concern** [2] - 1201:8, 1247:25
**concerned** [3] - 1172:19, 1176:13,

1274:2
**concerning** [3] - 1145:16, 1182:1, 1191:23
**concluded** [6] - 1159:24, 1191:16, 1199:22, 1203:18, 1262:16, 1293:18
**conclusion** [1] - 1276:23
**conclusions** [1] - 1250:21
**condition** [1] - 1274:9
**conditioned** [2] - 1304:11, 1304:13
**conditions** [1] - 1256:4
**condoms** [4] - 1304:25, 1305:23, 1306:3
**conduct** [3] - 1263:21, 1290:5, 1290:10
**conducted** [4] - 1198:13, 1306:23, 1313:5, 1314:25
**conference** [9] - 1159:24, 1168:18, 1195:16, 1199:22, 1203:18, 1246:18, 1254:8, 1262:16, 1293:18
**conferences** [2] - 1246:17, 1252:25
**conferring** [10] - 1168:19, 1177:20, 1191:8, 1193:8, 1207:22, 1213:7, 1213:10, 1226:1, 1240:14, 1296:17
**confidence** [1] - 1173:21
**confirm** [1] - 1159:15
**confounding** [1] - 1264:10
**confused** [1] - 1229:15
**confusing** [1] - 1260:24
**connect** [1] - 1293:16
**connected** [1] - 1274:22
**connections** [1] - 1293:9
**consensual** [9] - 1290:2, 1290:8, 1290:10, 1291:7, 1296:7, 1296:8, 1298:10, 1300:17, 1300:22
**consensually** [1] - 1301:1
**consensuals** [2] - 1293:10, 1303:8
**consent** [2] - 1290:9, 1290:14
**consider** [1] - 1262:24
**considered** [1] - 1268:22
**consistent** [14] - 1259:13, 1259:20, 1261:3, 1261:5, 1261:6, 1268:16, 1268:19, 1270:8, 1271:4, 1271:16, 1272:25, 1282:7, 1282:8
**constipation** [1] - 1264:25
**consulting** [1] - 1195:22
**Cont** [2] - 1317:10, 1317:15
**CONT** [3] - 1144:1, 1146:14, 1263:5
**contact** [8] - 1159:9, 1172:23, 1274:18, 1278:3, 1278:16, 1289:3, 1289:16, 1312:18
**contacted** [1] - 1288:24
**contacts** [1] - 1312:25
**continue** [12] - 1145:19, 1168:6, 1179:24, 1180:1, 1182:19, 1196:20, 1196:21, 1199:1, 1199:2, 1201:20, 1202:23, 1305:10
**CONTINUED** [1] - 1143:10
**continued** [2] - 1166:6, 1182:21
**continuing** [2] - 1252:25, 1301:15
**continuous** [1] - 1246:16

**controlled** [1] - 1290:13
**convention** [1] - 1195:5
**conversation** [8] - 1174:21, 1176:17, 1186:8, 1190:7, 1208:19, 1219:2, 1239:8, 1275:20
**conversations** [1] - 1277:19
**coordinate** [1] - 1313:24
**coordinated** [1] - 1314:1
**coordinator** [2] - 1234:11, 1281:21
**copy** [4] - 1264:20, 1290:24, 1291:2, 1294:25
**corner** [1] - 1302:21
**Corolla** [3] - 1300:7, 1309:3, 1309:6
**correct** [101] - 1146:25, 1148:10, 1148:13, 1148:14, 1148:16, 1153:7, 1155:13, 1155:21, 1155:24, 1156:2, 1156:24, 1157:19, 1161:20, 1161:25, 1169:3, 1170:19, 1171:13, 1171:17, 1171:21, 1172:14, 1172:17, 1173:3, 1173:17, 1176:25, 1177:19, 1177:23, 1179:14, 1181:18, 1182:19, 1182:22, 1183:16, 1183:20, 1183:23, 1187:23, 1190:6, 1191:20, 1193:17, 1200:19, 1201:1, 1206:6, 1209:15, 1209:18, 1216:2, 1217:11, 1220:14, 1221:3, 1221:10, 1224:5, 1224:12, 1224:15, 1224:17, 1225:5, 1225:8, 1225:12, 1225:19, 1225:22, 1225:25, 1226:14, 1226:19, 1228:1, 1228:11, 1229:22, 1230:9, 1230:21, 1232:1, 1232:4, 1233:17, 1233:23, 1236:15, 1239:9, 1239:11, 1239:17, 1241:2, 1242:23, 1243:3, 1251:16, 1253:2, 1253:4, 1253:10, 1253:12, 1254:22, 1255:7, 1255:15, 1256:8, 1257:13, 1259:14, 1266:21, 1266:22, 1267:11, 1269:10, 1274:15, 1280:5, 1280:11, 1280:14, 1280:24, 1282:4, 1282:5, 1310:15, 1310:19, 1310:22, 1316:18
**correction** [2] - 1156:1
**correctly** [3] - 1224:7, 1228:2, 1229:6
**costing** [1] - 1173:2
**counsel** [20] - 1145:20, 1150:3, 1166:21, 1191:8, 1193:8, 1194:19, 1200:11, 1202:4, 1203:8, 1203:22, 1207:22, 1213:7, 1213:10, 1215:12, 1231:2, 1240:14, 1284:7, 1292:2, 1296:17, 1316:8
**count** [2] - 1165:25, 1225:10
**country** [3] - 1178:19, 1206:19, 1230:11
**County** [3] - 1288:25, 1289:3, 1313:18
**couple** [5] - 1175:7, 1181:23, 1218:1, 1230:8, 1237:22
**course** [14] - 1172:16, 1194:25, 1196:11, 1202:17, 1208:5, 1246:12, 1247:23, 1259:10, 1289:12, 1290:1, 1291:10, 1293:12, 1298:17, 1313:4
**COURT** [162] - 1143:1, 1145:5, 1145:9, 1145:13, 1145:18, 1145:24, 1146:1, 1146:11, 1149:9, 1150:2, 1150:6,

1150:11, 1150:13, 1158:10, 1158:25, 1159:4, 1159:17, 1159:23, 1167:6, 1171:8, 1190:1, 1191:3, 1191:6, 1193:21, 1194:1, 1194:4, 1194:7, 1194:11, 1194:13, 1194:19, 1194:23, 1195:10, 1195:12, 1195:14, 1195:17, 1195:20, 1196:3, 1196:10, 1196:14, 1196:18, 1197:2, 1197:8, 1197:13, 1197:16, 1197:20, 1197:25, 1198:9, 1198:12, 1198:19, 1199:10, 1199:15, 1199:21, 1199:23, 1200:6, 1200:9, 1200:11, 1200:14, 1200:16, 1200:18, 1200:21, 1200:24, 1201:2, 1201:5, 1201:11, 1201:19, 1201:23, 1201:25, 1202:6, 1202:9, 1202:13, 1202:16, 1202:19, 1202:22, 1203:1, 1203:4, 1203:7, 1203:16, 1203:19, 1203:22, 1204:1, 1204:5, 1205:8, 1205:12, 1215:22, 1216:18, 1216:20, 1222:3, 1222:5, 1226:5, 1226:7, 1226:22, 1232:20, 1233:9, 1234:6, 1234:17, 1234:19, 1234:24, 1235:8, 1235:10, 1235:18, 1236:10, 1237:8, 1238:16, 1239:21, 1239:24, 1242:3, 1242:24, 1243:7, 1243:9, 1249:21, 1252:3, 1252:5, 1258:1, 1258:3, 1258:21, 1258:24, 1259:23, 1260:1, 1261:15, 1261:20, 1262:8, 1262:10, 1262:14, 1262:17, 1264:22, 1273:3, 1273:5, 1273:7, 1281:9, 1281:12, 1282:12, 1282:15, 1282:22, 1282:25, 1283:3, 1283:8, 1283:14, 1283:25, 1284:7, 1284:12, 1284:18, 1284:21, 1284:23, 1290:23, 1291:1, 1292:2, 1292:6, 1292:11, 1292:25, 1293:5, 1293:7, 1293:15, 1293:24, 1294:18, 1294:23, 1295:1, 1297:20, 1297:22, 1301:13, 1301:15, 1315:23, 1316:8
**Court** [21] - 1145:3, 1145:11, 1145:14, 1145:16, 1159:11, 1194:14, 1194:17, 1195:21, 1196:4, 1199:25, 1200:4, 1204:6, 1248:21, 1259:6, 1261:22, 1282:19, 1284:3, 1284:5, 1288:21, 1316:1, 1316:12
**Court's** [5] - 1194:2, 1204:24, 1258:5
**Courthouse** [1] - 1144:23
**courtroom** [2] - 1197:20, 1219:15
**covered** [1] - 1271:15
**cramping** [1] - 1265:3
**crawl** [2] - 1304:6, 1304:9
**cream** [3] - 1211:8, 1235:23
**cream-colored** [3] - 1211:8, 1235:23
**create** [1] - 1315:9
**created** [1] - 1285:16
**credit** [1] - 1253:16
**crime** [1] - 1290:15
**Criminal** [1] - 1143:5
**criminal** [1] - 1286:19
**crisis** [1] - 1263:17
**CROSS** [3] - 1146:14, 1222:8, 1273:8

**cross** [7] - 1195:19, 1195:24, 1196:1, 1227:3, 1235:20, 1235:22, 1273:3
**Cross** [3] - 1317:10, 1317:10, 1317:16
**cross-examination** [2] - 1235:20, 1235:22
**Cross-Examination** - 1317:10, 1317:10, 1317:16
**CROSS-EXAMINATION** [3] - 1146:14, 1222:8, 1273:8
**cross-examined** [1] - 1227:3
**CRR** [2] - 1144:23, 1316:23
**culled** [1] - 1291:9
**cultural** [1] - 1288:14
**culture** [1] - 1265:23
**cultures** [1] - 1264:15
**CUNNINGHAM** [11] - 1193:12, 1202:11, 1207:25, 1212:24, 1290:21, 1292:4, 1296:15, 1298:15, 1298:20, 1301:21, 1301:23
**Cunningham** [10] - 1143:14, 1150:4, 1225:14, 1233:25, 1291:24, 1293:19, 1296:13, 1296:22, 1297:1, 1297:3
**curious** [1] - 1277:25
**currency** [1] - 1303:14
**curriculum** [2] - 1252:23, 1253:15
**custody** [6] - 1175:21, 1273:16, 1286:17, 1311:25, 1312:1
**customer** [3] - 1169:23, 1170:1, 1228:10
**Customs** [1] - 1273:14
**cut** [17] - 1166:2, 1196:7, 1196:15, 1239:13, 1272:14, 1272:24, 1275:6, 1275:12, 1275:13, 1275:14, 1275:21, 1275:25, 1276:4, 1276:17, 1303:9, 1304:2
**cutaneous** [13] - 1249:2, 1249:4, 1249:5, 1249:8, 1249:12, 1251:18, 1252:2, 1255:14, 1257:15, 1260:4, 1260:9, 1262:19, 1266:8
**cutoff** [2] - 1244:21, 1244:22
**cutter** [1] - 1276:1
**CV** [3] - 1254:2, 1254:7, 1254:10
**cycle** [1] - 1303:16

# D

**D.C** [1] - 1311:1
**dark** [1] - 1267:6
**dash** [1] - 1243:20
**Date** [1] - 1316:23
**date** [20] - 1147:1, 1147:3, 1148:15, 1151:4, 1154:7, 1154:8, 1155:18, 1156:10, 1175:15, 1175:17, 1192:2, 1193:2, 1214:1, 1216:17, 1224:14, 1251:4, 1298:2, 1298:3, 1312:3
**dates** [3] - 1150:16, 1150:17, 1150:25
**dating** [3] - 1237:19, 1237:21, 1254:18
**daughter** [16] - 1151:3, 1155:3, 1163:8, 1163:9, 1168:15, 1177:18, 1181:17,

1181:19, 1181:23, 1182:2, 1182:7, 1182:9, 1228:5, 1228:23, 1228:24, 1229:21
**days** [9] - 1175:7, 1181:23, 1220:23, 1230:8, 1244:18, 1244:22, 1265:10, 1303:20, 1307:25
**dayshift** [1] - 1151:16
**de** [3] - 1143:6, 1143:16, 1317:2
**dealt** [1] - 1253:7
**death** [2] - 1207:13, 1208:14
**December** [3] - 1219:12, 1224:20, 1233:13
**decent** [1] - 1155:4
**decide** [1] - 1279:4
**decided** [3] - 1156:19, 1160:18, 1173:5
**decisions** [1] - 1145:16
**deeper** [1] - 1251:8
**Defendant** [3] - 1143:16, 1143:18, 1309:24
**defendants** [1] - 1158:17
**Defendants** [1] - 1143:7
**Defense** [16] - 1146:17, 1149:14, 1150:1, 1151:6, 1159:13, 1191:5, 1198:20, 1205:7, 1205:8, 1207:23, 1212:24, 1215:12, 1218:21, 1231:2, 1240:16, 1240:22
**definitely** [4] - 1263:15, 1266:18, 1270:4, 1279:3
**degree** [2] - 1245:23, 1245:24
**deliveries** [1] - 1221:8
**delivery** [4] - 1265:3, 1265:5, 1287:18, 1300:18
**denied** [1] - 1145:18
**department** [1] - 1289:1
**Department** [5] - 1175:20, 1175:21, 1288:25, 1289:3, 1302:8
**depicted** [1] - 1267:2
**deployed** [2] - 1299:13, 1299:14
**deposit** [1] - 1192:10
**deposited** [1] - 1192:10
**describe** [3] - 1248:25, 1267:22, 1270:17
**described** [5] - 1246:21, 1246:24, 1249:6, 1267:23, 1269:13
**describing** [1] - 1235:25
**description** [2] - 1268:16, 1314:7
**desire** [2] - 1195:18, 1260:12
**detail** [2] - 1256:21, 1293:9
**details** [3] - 1158:16, 1256:20, 1268:24
**detained** [1] - 1312:2
**Detective** [15] - 1175:1, 1175:10, 1182:5, 1239:9, 1239:11, 1239:16, 1241:4, 1241:25, 1242:8, 1288:24, 1289:2, 1289:8, 1294:12, 1306:12, 1308:2
**detectives** [4] - 1175:25, 1176:17, 1214:2, 1239:8
**develop** [2] - 1287:8, 1302:9
**device** [2] - 1299:13, 1299:14
**diagnose** [1] - 1265:19

**diagnosis** [6] - 1255:5, 1255:7, 1255:8, 1256:16, 1259:8, 1259:15
**diagnostic** [2] - 1256:14, 1257:4
**diarrhea** [1] - 1264:25
**Diego** [2] - 1246:11, 1246:18
**different** [9] - 1162:8, 1162:19, 1180:7, 1180:8, 1180:9, 1180:12, 1227:25, 1266:8, 1298:18
**difficult** [1] - 1289:19
**difficulty** [2] - 1292:15, 1294:20
**dime** [2] - 1181:14, 1212:4
**dire** [3] - 1252:3, 1252:4, 1258:4
**Dire** [1] - 1317:15
**DIRE** [1] - 1252:7
**direct** [5] - 1198:19, 1227:11, 1229:4, 1263:7, 1270:15
**DIRECT** [3] - 1243:22, 1263:5, 1285:9
**Direct** [3] - 1317:14, 1317:15, 1317:19
**directing** [1] - 1216:6
**direction** [1] - 1294:1
**directly** [2] - 1243:16, 1285:5
**Director** [3] - 1244:6, 1244:9, 1247:12
**dirty** [1] - 1305:2
**disabled** [1] - 1245:19
**discharge** [1] - 1264:25
**discover** [1] - 1250:16
**discovered** [1] - 1217:19
**discuss** [5] - 1161:14, 1193:22, 1199:18, 1282:16, 1316:4
**discussed** [3] - 1208:14, 1218:25, 1283:10
**discussing** [1] - 1204:9
**discussion** [9] - 1158:11, 1194:20, 1200:12, 1256:12, 1258:22, 1292:12, 1294:1, 1294:4, 1294:5
**discussions** [2] - 1186:5, 1217:14
**disk** [1] - 1296:11
**display** [1] - 1215:11
**displaying** [1] - 1306:21
**distinct** [2] - 1256:18, 1267:19
**distinction** [2] - 1251:17, 1260:4
**distinctly** [1] - 1266:19
**distinguishing** [1] - 1260:8
**distraction** [2] - 1299:13, 1299:14
**distraught** [1] - 1201:7
**distress** [2] - 1199:5, 1199:11
**District** [3] - 1145:2, 1145:3, 1286:13
**DISTRICT** [2] - 1143:1, 1143:1
**distrust** [1] - 1288:14
**disturbing** [1] - 1295:25
**DIVISION** [1] - 1143:2
**DNA** [2] - 1244:24, 1266:2
**Docket** [1] - 1143:5
**Doctor** [6] - 1249:21, 1249:22, 1254:2, 1269:20, 1279:19, 1282:12
**doctor** [6] - 1199:1, 1200:19, 1244:1, 1244:3, 1247:24, 1262:6
**doctor's** [1] - 1261:16
**doctors** [1] - 1247:1

**document** [27] - 1146:18, 1146:19,
  1146:22, 1146:24, 1147:1, 1147:3,
  1147:7, 1147:21, 1148:9, 1148:19,
  1148:24, 1149:14, 1150:7, 1150:23,
  1152:17, 1170:12, 1191:15, 1191:22,
  1205:19, 1208:1, 1208:8, 1213:15,
  1240:9, 1241:20, 1242:13, 1309:9,
  1309:20
**Document** [2] - 1191:7, 1193:7
**documented** [5] - 1249:9, 1263:18,
  1264:13, 1274:3, 1274:10
**documents** [2] - 1206:23, 1300:9
**dollars** [2] - 1173:2, 1192:12
**done** [10] - 1156:16, 1159:10, 1195:25,
  1196:22, 1198:14, 1248:5, 1250:7,
  1254:25, 1290:13, 1300:12
**door** [6] - 1270:7, 1278:13, 1278:14,
  1278:15, 1299:10, 1302:18
**dots** [1] - 1272:13
**double** [1] - 1315:16
**down** [18] - 1148:4, 1149:2, 1149:3,
  1201:18, 1205:15, 1243:7, 1243:17,
  1249:20, 1265:8, 1268:11, 1271:10,
  1280:13, 1280:17, 1280:18, 1283:20,
  1290:20, 1294:8, 1313:23
**dozen** [1] - 1248:20
**Dr** [22] - 1200:7, 1200:16, 1200:24,
  1243:24, 1245:22, 1247:4, 1251:25,
  1252:9, 1252:11, 1259:7, 1260:2,
  1261:2, 1262:17, 1263:7, 1266:20,
  1267:15, 1269:1, 1269:18, 1272:1,
  1273:10, 1281:16, 1282:2
**DR** [10] - 1200:15, 1200:17, 1200:20,
  1200:23, 1201:1, 1201:4, 1201:6,
  1201:13, 1201:21, 1201:24
**drafts** [1] - 1316:8
**dragging** [1] - 1198:19
**draw** [1] - 1250:21
**dress** [3] - 1314:6, 1314:8, 1314:9
**Drive** [1] - 1294:11
**driven** [1] - 1313:20
**driving** [1] - 1300:6
**drop** [2] - 1152:13, 1152:24
**dropped** [2] - 1153:10, 1298:9
**drove** [1] - 1313:23
**drunk** [5] - 1217:1, 1217:4, 1217:5,
  1217:7, 1217:12
**DUEÑAS** [2] - 1146:12, 1317:9
**Dueñas** [21] - 1146:7, 1148:13, 1202:19,
  1204:8, 1227:3, 1227:8, 1230:1,
  1230:11, 1230:14, 1231:1, 1232:2,
  1232:13, 1232:22, 1233:11, 1234:21,
  1235:12, 1235:14, 1236:5, 1259:11,
  1263:9, 1273:16
**Dueñas'** [2] - 1260:5, 1269:5
**DULY** [3] - 1146:13, 1243:14, 1285:3
**dumpsters** [1] - 1305:4
**during** [27] - 1151:8, 1151:18, 1157:13,
  1163:9, 1163:17, 1164:7, 1164:16,
  1168:9, 1180:12, 1181:1, 1183:1,

  1183:3, 1194:25, 1199:5, 1207:11,
  1209:7, 1214:1, 1221:12, 1221:17,
  1221:20, 1224:2, 1236:17, 1265:4,
  1283:21, 1287:15, 1294:8, 1315:11
**duties** [2] - 1244:8, 1287:6

# E

**early** [5] - 1155:1, 1199:16, 1281:1,
  1281:3, 1315:18
**earned** [1] - 1149:16
**earning** [2] - 1180:25, 1181:4
**ears** [2] - 1249:14, 1249:15
**easily** [2] - 1251:20, 1267:7
**Easton** [3] - 1300:12, 1302:4, 1302:8
**Ed** [3] - 1175:10, 1282:24, 1284:25
**edge** [6] - 1271:15, 1271:17, 1272:15,
  1278:7, 1279:15
**edged** [1] - 1278:6
**editorializing** [1] - 1292:22
**educated** [1] - 1198:10
**education** [4] - 1245:22, 1246:6,
  1246:20, 1262:23
**educational** [1] - 1252:25
**EDWARD** [3] - 1285:2, 1285:7, 1317:18
**Edward** [2] - 1144:3, 1285:7
**eight** [6] - 1211:5, 1220:1, 1220:10,
  1220:13, 1220:25, 1221:2
**either** [3] - 1198:22, 1245:16, 1248:14
**el** [1] - 1167:17
**El** [15] - 1166:13, 1166:16, 1167:8,
  1207:13, 1208:14, 1208:15, 1219:18,
  1225:19, 1226:19, 1232:13, 1232:23,
  1233:22, 1246:1, 1246:4, 1307:8
**elbow** [7] - 1267:20, 1267:21, 1267:24,
  1268:1, 1269:5, 1280:4, 1280:13
**elbows** [1] - 1271:10
**eleven** [1] - 1240:19
**elicit** [2] - 1158:15, 1289:17
**eliciting** [1] - 1283:18
**ELMO** [1] - 1269:3
**embarrassment** [1] - 1197:17
**emergency** [1] - 1263:16
**empty** [2] - 1304:25, 1305:24
**encounter** [1] - 1171:23
**encountered** [3] - 1229:11, 1229:16,
  1230:19
**end** [13] - 1152:13, 1153:10, 1162:21,
  1163:24, 1170:23, 1171:2, 1171:12,
  1171:16, 1222:25, 1242:12, 1290:20,
  1297:24, 1315:24
**ended** [2] - 1292:16, 1313:13
**ending** [3] - 1151:19, 1291:14, 1297:19
**ends** [6] - 1260:11, 1260:13, 1279:16,
  1297:4, 1302:3, 1309:19
**enemies** [2] - 1212:11, 1212:12
**enemy** [1] - 1213:23
**Enforcement** [2] - 1273:14, 1286:14
**enforcement** [10] - 1174:16, 1174:22,

  1175:16, 1176:6, 1182:5, 1286:16,
  1287:1, 1287:3, 1287:9, 1288:14
**engage** [3] - 1160:11, 1160:19, 1160:23
**English** [7] - 1147:10, 1147:20,
  1149:11, 1150:8, 1150:9, 1297:14,
  1303:20
**Enrique** [1] - 1299:23
**entered** [2] - 1294:12, 1313:21
**enters** [3] - 1145:25, 1203:25, 1284:20
**entertain** [1] - 1261:22
**entire** [16] - 1151:10, 1153:6, 1156:24,
  1163:16, 1164:16, 1168:9, 1172:16,
  1174:3, 1180:23, 1209:2, 1218:18,
  1218:20, 1221:12, 1221:17, 1224:2,
  1255:3
**entitled** [1] - 1316:20
**ENTITLED** [1] - 1143:10
**entry** [5] - 1285:25, 1286:1, 1286:2,
  1286:3, 1286:4
**environment** [1] - 1245:21
**equipment** [1] - 1294:21
**Escobar** [1] - 1307:8
**Esmirna** [2] - 1146:7, 1263:9
**ESMIRNA** [2] - 1146:12, 1317:9
**Esquire** [2] - 1143:17, 1143:19
**essence** [1] - 1196:8
**essentially** [2] - 1252:19, 1259:21
**estimate** [2] - 1256:2, 1283:1
**estimated** [1] - 1258:9
**et** [2] - 1165:24, 1317:2
**evaluated** [1] - 1273:10
**evaluation** [4] - 1255:25, 1257:11,
  1257:23, 1263:11
**evaluations** [1] - 1244:17
**evasive** [2] - 1197:14, 1197:15
**evening** [5] - 1178:23, 1210:10,
  1210:11, 1224:17, 1299:1
**event** [3] - 1195:1, 1198:23, 1268:20
**eventually** [2] - 1228:9, 1228:17
**evidence** [16] - 1147:13, 1149:15,
  1159:5, 1159:18, 1159:19, 1170:8,
  1170:13, 1244:10, 1244:23, 1262:25,
  1290:15, 1292:20, 1296:5, 1305:9,
  1310:13, 1312:17
**evidentiary** [2] - 1307:17, 1308:11
**evidently** [1] - 1155:7
**exact** [1] - 1312:4
**exactly** [8] - 1149:18, 1149:22, 1160:14,
  1165:13, 1172:7, 1187:1, 1244:15,
  1261:9
**exam** [12] - 1244:10, 1248:8, 1249:1,
  1249:3, 1249:13, 1249:14, 1254:14,
  1257:1, 1264:12, 1264:13, 1266:8,
  1280:23
**EXAMINATION** [11] - 1146:14, 1222:8,
  1227:1, 1237:9, 1238:21, 1243:22,
  1252:7, 1263:5, 1273:8, 1281:14,
  1285:9
**Examination** [11] - 1317:10, 1317:10,
  1317:11, 1317:11, 1317:12, 1317:14,

1317:15, 1317:15, 1317:16, 1317:16, 1317:19

**examination** [21] - 1194:25, 1198:13, 1199:6, 1201:20, 1202:23, 1235:20, 1235:22, 1246:21, 1256:12, 1256:13, 1256:22, 1260:4, 1263:21, 1263:22, 1263:24, 1264:4, 1264:17, 1266:6, 1273:24, 1316:7

**Examination....** [1] - 1317:19

**examinations** [9] - 1245:1, 1245:2, 1246:8, 1248:24, 1252:1, 1257:7, 1258:9, 1260:7

**examine** [3] - 1200:25, 1256:25, 1263:8

**examined** [10] - 1201:2, 1227:3, 1245:3, 1247:24, 1248:3, 1248:10, 1259:3, 1259:9, 1259:16, 1275:20

**examiners** [1] - 1247:1

**examines** [1] - 1260:6

**examining** [2] - 1249:12, 1255:16

**example** [8] - 1158:1, 1166:2, 1253:9, 1254:12, 1255:11, 1255:12, 1276:6, 1292:17

**exams** [4] - 1245:20, 1246:24, 1247:2, 1247:17, 1257:14, 1262:18

**exception** [2] - 1182:24, 1262:22

**exchange** [1] - 1161:17

**excited** [1] - 1238:10

**exclude** [1] - 1277:6

**excuse** [4] - 1195:12, 1202:5, 1235:23, 1305:17

**Excused** [1] - 1317:19

**excused** [8] - 1193:25, 1234:1, 1243:8, 1282:12, 1282:14, 1282:21, 1316:6, 1316:7

**Excused.............................** [2] - 1317:12, 1317:17

**execute** [4] - 1300:25, 1307:15, 1307:25

**executed** [1] - 1298:4

**Exhibit** [7] - 1146:17, 1151:6, 1205:7, 1215:12, 1218:21, 1271:19, 1293:23

**exhibit** [8] - 1150:1, 1191:20, 1216:18, 1240:16, 1292:2, 1294:13, 1297:20, 1301:23

**existed** [1] - 1273:21

**exit** [1] - 1314:7

**Expedition** [3] - 1307:10, 1307:18, 1313:21

**experience** [3] - 1171:15, 1197:21, 1198:21

**expert** [8] - 1159:15, 1248:12, 1248:18, 1252:1, 1260:22, 1261:18, 1262:18, 1263:2

**expert's** [1] - 1262:25

**expertise** [1] - 1287:12

**experts** [1] - 1262:22

**explain** [4] - 1227:5, 1267:15, 1300:14, 1307:23

**explained** [1] - 1264:25

**explicit** [1] - 1158:16

**Explorer** [3] - 1306:14, 1306:16,

1306:17

**expressing** [1] - 1217:11

**expression** [1] - 1216:6

**extend** [1] - 1195:24

**extensive** [1] - 1158:25

**external** [1] - 1248:25

**extreme** [1] - 1251:19

**eye** [1] - 1267:3

**eyes** [4] - 1249:14, 1266:13, 1270:9

## F

**F.3d** [2] - 1260:18, 1260:19

**fact** [12] - 1159:20, 1167:22, 1198:25, 1217:14, 1217:15, 1217:19, 1223:12, 1231:14, 1259:3, 1261:22, 1274:24, 1305:2

**factors** [1] - 1260:8

**failed** [1] - 1249:22

**fair** [18] - 1149:21, 1156:12, 1172:22, 1173:1, 1223:5, 1224:9, 1224:23, 1225:2, 1237:18, 1237:22, 1238:25, 1253:6, 1253:24, 1254:21, 1254:23, 1255:12, 1275:19, 1277:11

**fairly** [2] - 1251:6, 1256:18

**fall** [6] - 1254:12, 1275:16, 1276:14, 1278:6, 1289:6

**fallen** [2] - 1280:17, 1280:18

**familiar** [2] - 1198:14, 1289:4

**family** [2] - 1246:25, 1247:6

**family's** [1] - 1201:14

**fancier** [1] - 1304:1

**far** [4] - 1201:21, 1254:18, 1283:17, 1288:4

**fashion** [1] - 1251:6

**fast** [1] - 1249:24

**fear** [4] - 1210:2, 1223:4, 1223:9, 1226:13

**feared** [1] - 1223:1

**federal** [4] - 1286:17, 1287:10, 1290:9, 1290:14

**Federal** [1] - 1233:13

**feet** [4] - 1198:19, 1250:10, 1250:13

**fellow** [1] - 1252:15

**female** [9] - 1152:1, 1152:2, 1188:15, 1188:25, 1301:3, 1313:17, 1313:19, 1314:6, 1314:19

**females** [2] - 1289:18, 1289:22

**few** [6] - 1182:24, 1202:7, 1222:21, 1227:5, 1291:10, 1298:6

**figure** [5] - 1215:14, 1255:13, 1256:23, 1256:24, 1257:5

**filed** [1] - 1145:12

**Filing** [1] - 1148:21

**fill** [1] - 1256:19

**filth** [1] - 1306:6

**final** [6] - 1251:8, 1251:10, 1254:19, 1254:25, 1259:21, 1282:23

**finally** [4] - 1217:7, 1224:25, 1306:5,

1308:25

**findings** [18] - 1249:2, 1249:7, 1249:8, 1249:9, 1250:23, 1251:4, 1251:18, 1252:2, 1254:9, 1255:22, 1256:4, 1256:11, 1260:9, 1261:16, 1262:19, 1263:17, 1279:1, 1282:1

**finger** [1] - 1269:12

**fingernails** [1] - 1166:3

**finish** [2] - 1196:5, 1202:24

**finished** [4] - 1205:21, 1242:15, 1246:9, 1286:19

**fire** [1] - 1242:22

**firm** [1] - 1251:11

**first** [23] - 1160:1, 1161:24, 1169:25, 1173:13, 1180:4, 1196:19, 1210:14, 1224:11, 1225:4, 1225:21, 1227:22, 1237:17, 1238:24, 1246:9, 1247:22, 1252:11, 1258:3, 1259:25, 1264:6, 1273:18, 1296:9, 1298:7, 1301:8

**fist** [2] - 1165:8

**five** [11] - 1155:11, 1155:15, 1225:10, 1238:16, 1244:4, 1244:18, 1244:22, 1255:2, 1263:16, 1282:18, 1316:2

**five-day** [1] - 1263:16

**Flaco** [3] - 1167:17, 1230:6, 1230:8

**flat** [1] - 1239:13

**flicked** [1] - 1279:25

**flipped** [1] - 1279:22

**floor** [2] - 1303:3, 1304:3

**floorboards** [3] - 1304:12, 1304:19, 1304:22

**Flores'** [1] - 1300:9

**Florida** [2] - 1313:20, 1314:20

**flung** [1] - 1279:25

**FOCR** [1] - 1144:23

**focus** [2] - 1248:23, 1287:13

**focussed** [2] - 1264:8, 1287:14

**focussing** [1] - 1249:2

**folder** [1] - 1292:14

**folks** [4] - 1145:6, 1182:4, 1199:12, 1217:22

**follow** [4] - 1201:17, 1287:8, 1290:5, 1301:19

**follow-up** [1] - 1301:19

**following** [11] - 1157:5, 1158:11, 1194:20, 1200:12, 1233:11, 1239:15, 1239:19, 1258:22, 1292:12, 1295:8, 1315:10

**follows** [1] - 1195:22

**food** [2] - 1164:22, 1221:19

**foot** [1] - 1267:18

**FOR** [3] - 1143:1, 1143:10, 1317:7

**force** [1] - 1206:2

**forced** [9] - 1157:22, 1204:14, 1204:19, 1204:22, 1205:3, 1205:5, 1206:1, 1303:18

**forceful** [1] - 1158:24

**forcefully** [1] - 1261:24

**Ford** [4] - 1306:14, 1306:16, 1307:10, 1307:18

**forefront** [1] - 1159:14
**foregoing** [1] - 1316:18
**foreign** [2] - 1198:13, 1288:1
**forensic** [12] - 1244:10, 1246:7, 1246:11, 1246:24, 1247:17, 1248:24, 1249:1, 1252:1, 1257:8, 1262:18, 1263:11, 1263:21
**forensically** [1] - 1264:14
**forensics** [1] - 1245:2
**Forest** [1] - 1294:11
**form** [4] - 1275:13, 1276:16, 1280:9, 1289:20
**formed** [1] - 1277:19
**Fort** [2] - 1246:14, 1247:16
**forward** [2] - 1201:22, 1262:15
**foundational** [1] - 1234:6
**four** [20] - 1151:12, 1162:18, 1162:19, 1162:21, 1163:24, 1163:25, 1164:1, 1164:2, 1164:9, 1180:13, 1180:23, 1195:7, 1227:4, 1246:14, 1257:3, 1259:9, 1266:8, 1266:12, 1296:1, 1296:2
**fourteen** [1] - 1248:19
**fourth** [1] - 1272:2
**fragile** [1] - 1251:19
**FRANCO** [2] - 1146:12, 1317:9
**Franco** [82] - 1146:16, 1146:20, 1147:9, 1147:14, 1147:24, 1148:9, 1149:11, 1150:15, 1151:6, 1153:16, 1155:10, 1157:13, 1157:18, 1159:16, 1160:1, 1162:16, 1163:18, 1163:22, 1164:19, 1165:13, 1166:2, 1168:9, 1169:2, 1170:11, 1171:5, 1171:19, 1172:7, 1172:22, 1173:7, 1173:11, 1173:21, 1174:10, 1174:19, 1175:24, 1176:7, 1176:13, 1177:7, 1178:23, 1179:24, 1180:9, 1182:12, 1182:16, 1183:6, 1184:12, 1186:20, 1188:12, 1191:11, 1191:19, 1193:11, 1202:19, 1204:8, 1205:14, 1205:24, 1206:18, 1208:11, 1211:2, 1212:7, 1214:1, 1214:20, 1215:15, 1215:24, 1216:23, 1217:18, 1218:24, 1219:25, 1222:10, 1237:11, 1237:18, 1237:24, 1238:23, 1259:11, 1259:13, 1261:22, 1262:6, 1263:9, 1273:21, 1276:15, 1276:23, 1276:25, 1277:19, 1278:1, 1283:5
**frankly** [2] - 1197:16, 1198:22
**Freddy** [3] - 1184:1, 1184:3, 1185:14
**frequently** [1] - 1267:5
**fresh** [2] - 1199:2, 1199:4
**Friday** [2] - 1156:13, 1157:5
**friend** [3] - 1152:23, 1153:9, 1185:14
**friendly** [1] - 1245:20
**friends** [8] - 1169:9, 1169:10, 1185:6, 1185:12, 1210:6, 1212:10, 1212:11, 1212:12
**front** [12] - 1159:11, 1197:20, 1201:16, 1225:15, 1233:12, 1250:6, 1250:9, 1254:3, 1270:19, 1294:2, 1299:10,

1302:18
**Fuertes** [9] - 1143:18, 1195:11, 1222:17, 1234:22, 1235:3, 1236:6, 1236:15, 1240:17, 1258:20
**FUERTES** [1] - 1143:7
**full** [8] - 1197:20, 1245:1, 1260:3, 1263:21, 1305:23, 1311:24, 1311:25, 1312:1
**full-custody** [1] - 1312:1
**furniture** [1] - 1278:7

## G

**gait** [2] - 1276:6, 1276:7
**GARCIA** [1] - 1143:7
**Garcia** [1] - 1143:18
**gastro** [1] - 1264:9
**gastro-anal** [1] - 1264:9
**gastrointestinal** [1] - 1264:9
**gather** [1] - 1290:15
**gathered** [1] - 1312:17
**general** [4] - 1245:5, 1247:17, 1249:3, 1288:14
**generally** [2] - 1262:20, 1315:13
**genital** [5] - 1248:24, 1264:13, 1264:18, 1265:14, 1265:21
**gentleman** [1] - 1225:14
**gentlemen** [10] - 1173:12, 1211:20, 1217:9, 1264:3, 1267:16, 1288:22, 1291:23, 1296:12, 1296:22, 1300:14
**genuinely** [1] - 1198:21
**George's** [3] - 1288:25, 1289:3, 1313:18
**Gerald** [1] - 1143:17
**GERMAN** [2] - 1143:6, 1317:2
**German** [1] - 1143:16
**Gerry** [2] - 1197:10, 1213:3
**GI** [1] - 1264:8
**Giordano** [3] - 1144:23, 1316:17, 1316:23
**girl** [12] - 1154:18, 1154:22, 1155:19, 1155:20, 1155:23, 1156:6, 1156:8, 1187:2, 1187:8, 1287:24
**girls** [10] - 1184:22, 1186:21, 1187:12, 1192:20, 1193:15, 1205:1, 1205:3, 1206:9, 1221:15, 1289:17
**given** [8] - 1170:7, 1222:23, 1234:2, 1247:22, 1252:23, 1253:16, 1259:2, 1261:22
**glass** [2] - 1270:14, 1272:14
**GOLDSTEIN** [8] - 1147:16, 1147:19, 1150:20, 1155:25, 1226:2, 1226:9, 1249:19, 1294:21
**Goldstein** [4] - 1144:4, 1147:21, 1150:22, 1222:7
**GOVERNMENT** [1] - 1317:8
**government** [1] - 1287:9
**Government** [9] - 1143:13, 1150:2, 1159:12, 1159:13, 1191:6, 1202:2, 1215:12, 1252:24, 1271:19, 1291:9,

1292:5, 1293:23, 1297:3
**Government's** [22] - 1159:18, 1159:19, 1198:16, 1260:12, 1269:2, 1283:7, 1296:14, 1296:21, 1297:19, 1299:5, 1299:17, 1301:6, 1302:17, 1303:25, 1306:15, 1307:19, 1310:3, 1310:12, 1310:18, 1311:6, 1314:13, 1314:18
**governmental** [1] - 1289:23
**Governor's** [1] - 1254:8
**GPS** [1] - 1315:1
**Gracias** [1] - 1240:19
**graduated** [1] - 1246:1
**Grand** [7] - 1219:11, 1219:20, 1224:19, 1225:11, 1225:15, 1233:13, 1234:3
**grant** [2] - 1195:10, 1196:21
**granted** [1] - 1196:5
**great** [1] - 1223:14
**greater** [1] - 1251:15
**Greyhound** [1] - 1310:25
**ground** [5] - 1262:3, 1268:15, 1276:6, 1276:8, 1283:21
**groups** [1] - 1252:12
**GU** [1] - 1264:8
**guess** [3] - 1163:18, 1281:20, 1293:10
**gun** [22] - 1185:17, 1185:20, 1186:3, 1186:6, 1209:9, 1210:25, 1211:4, 1211:8, 1211:12, 1211:15, 1211:21, 1212:13, 1212:15, 1212:17, 1212:19, 1213:19, 1213:21, 1213:23, 1225:22, 1235:3, 1235:21, 1235:25
**guy** [1] - 1299:23
**guys** [1] - 1202:1

## H

**H-A-R-L-I-N-G-E-N** [1] - 1286:7
**hair** [1] - 1251:5
**half** [7] - 1152:21, 1194:6, 1195:2, 1199:6, 1211:8, 1262:14, 1286:10
**hand** [8] - 1165:6, 1165:10, 1165:14, 1165:16, 1165:19, 1243:12, 1255:16, 1285:1
**hands** [2] - 1158:22, 1158:23
**happier** [1] - 1227:19
**happy** [1] - 1227:15
**hard** [1] - 1268:2
**Harlingen** [2] - 1286:5, 1286:7
**harm** [1] - 1172:19
**harming** [1] - 1160:12
**Hartlove** [9] - 1175:1, 1182:5, 1239:11, 1288:24, 1289:2, 1289:8, 1294:12, 1306:12, 1308:2
**Hawaii** [3] - 1246:10, 1246:12, 1247:6
**head** [9] - 1187:15, 1187:17, 1187:20, 1188:4, 1199:8, 1245:3, 1249:3, 1249:14, 1264:11
**head-to-toe** [2] - 1249:3, 1264:11
**healed** [5] - 1251:3, 1251:14, 1267:6, 1268:7, 1268:8, 1272:3, 1272:7,

1272:8, 1272:11
**healed-up** [1] - 1272:11
**heals** [1] - 1251:6
**health** [2] - 1194:23, 1252:21
**hear** [10] - 1159:18, 1166:15, 1174:5, 1185:22, 1189:4, 1189:6, 1195:7, 1283:4, 1283:15, 1315:16
**heard** [10] - 1167:13, 1219:17, 1226:20, 1232:18, 1245:4, 1258:1, 1258:17, 1300:11, 1306:11, 1313:4
**hearing** [5] - 1159:11, 1181:22, 1181:25, 1283:11, 1286:15
**hearsay** [1] - 1239:22
**heart** [5] - 1201:12, 1201:13, 1201:16, 1249:17, 1250:4
**Hector** [1] - 1298:22
**height** [1] - 1199:9
**held** [2] - 1214:3, 1247:13
**help** [20] - 1177:3, 1177:10, 1177:15, 1177:16, 1178:3, 1181:17, 1181:23, 1182:9, 1182:12, 1191:22, 1218:9, 1222:22, 1228:17, 1228:19, 1255:13, 1264:20, 1265:11, 1289:10, 1291:9, 1315:12
**helpful** [1] - 1260:24
**herpes** [1] - 1265:21
**herself** [2] - 1196:20, 1201:7
**hi** [1] - 1243:25
**hidden** [1] - 1304:23
**higher** [1] - 1271:14
**highways** [1] - 1286:1
**hiking** [1] - 1261:25
**himself** [4] - 1164:13, 1187:4, 1199:17, 1203:13
**hip** [8] - 1267:19, 1269:25, 1277:9, 1277:21, 1277:22, 1278:3, 1278:8, 1278:16
**Hispanic** [1] - 1287:18, 1289:1, 1300:18, 1303:4, 1309:14, 1314:5, 1314:6
**historian** [1] - 1255:13
**historical** [1] - 1255:23
**historically** [1] - 1258:18, 1264:24
**history** [22] - 1255:9, 1256:15, 1256:18, 1257:5, 1264:7, 1264:11, 1264:17, 1265:15, 1265:19, 1268:13, 1268:14, 1268:16, 1271:4, 1276:20, 1279:3, 1280:21, 1282:8, 1283:13, 1283:14, 1283:16, 1311:17
**hit** [11] - 1165:10, 1165:11, 1165:14, 1165:15, 1186:15, 1219:6, 1223:17, 1236:25, 1238:13, 1265:6, 1279:20
**hits** [1] - 1278:8
**hold** [7] - 1174:11, 1174:12, 1214:5, 1214:8, 1247:18, 1294:18, 1294:19
**holder** [1] - 1304:2
**holding** [2] - 1164:20, 1172:17
**hole** [1] - 1308:15
**holes** [1] - 1279:17
**home** [13] - 1163:14, 1189:18, 1189:21,

1189:24, 1190:5, 1190:15, 1190:18, 1190:21, 1191:24, 1192:5, 1192:6, 1207:5, 1207:7
**Homeland** [1] - 1285:12
**homeland** [1] - 1207:7
**homemade** [1] - 1308:22
**Honor** [111] - 1145:7, 1145:8, 1145:11, 1145:16, 1145:21, 1145:22, 1146:9, 1146:10, 1148:7, 1149:8, 1149:24, 1150:5, 1150:7, 1158:8, 1158:13, 1158:20, 1159:13, 1159:21, 1167:5, 1171:9, 1189:25, 1191:2, 1193:19, 1194:9, 1194:22, 1195:18, 1196:13, 1196:24, 1197:4, 1197:5, 1197:24, 1199:13, 1202:2, 1202:5, 1202:12, 1202:14, 1203:17, 1203:23, 1203:24, 1205:6, 1205:11, 1215:11, 1215:19, 1216:19, 1219:24, 1222:1, 1222:6, 1226:6, 1226:21, 1226:24, 1234:18, 1235:9, 1237:6, 1238:19, 1238:20, 1239:20, 1243:5, 1249:19, 1251:25, 1257:25, 1258:6, 1258:17, 1258:25, 1259:6, 1259:11, 1259:18, 1259:24, 1260:10, 1260:17, 1260:21, 1261:8, 1261:19, 1261:23, 1262:1, 1262:12, 1263:4, 1264:21, 1264:23, 1273:2, 1281:10, 1281:13, 1282:10, 1282:23, 1283:1, 1283:4, 1283:9, 1284:1, 1284:8, 1284:9, 1284:10, 1284:11, 1284:22, 1290:21, 1290:24, 1292:3, 1292:5, 1292:9, 1292:14, 1293:1, 1293:17, 1293:22, 1294:22, 1296:20, 1296:25, 1298:20, 1299:6, 1301:9, 1301:12, 1301:14, 1308:19, 1316:11
**HONORABLE** [1] - 1143:11
**Honorable** [9] - 1145:4, 1194:14, 1194:17, 1199:25, 1200:4, 1282:19, 1284:3, 1284:5, 1316:12
**hope** [1] - 1262:1
**Hospital** [1] - 1246:11
**hour** [7] - 1194:6, 1195:2, 1197:1, 1199:6, 1203:12, 1262:14, 1283:2
**hours** [15] - 1151:12, 1151:15, 1152:21, 1194:8, 1197:9, 1210:17, 1227:4, 1244:17, 1244:18, 1244:21, 1244:22, 1251:7, 1312:5, 1315:10, 1315:19
**house** [39] - 1155:18, 1160:25, 1161:1, 1161:9, 1161:11, 1162:2, 1162:5, 1162:7, 1162:8, 1163:15, 1164:12, 1164:13, 1164:14, 1169:25, 1170:19, 1185:9, 1185:10, 1186:10, 1190:10, 1209:20, 1209:23, 1210:3, 1220:9, 1220:19, 1221:1, 1221:2, 1221:9, 1221:15, 1230:7, 1231:18, 1231:21, 1240:3, 1305:5, 1307:16, 1314:7
**houses** [7] - 1162:19, 1163:19, 1169:22, 1171:20, 1174:13, 1228:10, 1288:14
**Houston** [1] - 1158:3
**HSI** [6] - 1144:3, 1285:13, 1285:15, 1286:22, 1287:16, 1314:1

**human** [6] - 1274:8, 1286:25, 1287:2, 1287:4
**human-trafficking** [1] - 1274:8
**hundred** [2] - 1192:11, 1192:12
**hundreds** [1] - 1172:24
**hurts** [2] - 1198:6, 1249:16
**hymen** [1] - 1274:18
**hypothetical** [1] - 1255:11

**I**

**ICE** [2] - 1281:23, 1281:24
**identification** [8] - 1191:5, 1191:9, 1205:7, 1205:8, 1207:24, 1218:15, 1240:22, 1302:10
**identified** [7] - 1253:19, 1302:7, 1308:23, 1309:8, 1309:13, 1310:7, 1312:13
**identify** [7] - 1146:18, 1146:20, 1215:15, 1289:19, 1289:20, 1300:21, 1301:23
**identity** [1] - 1300:9
**illegally** [1] - 1230:11
**image** [2] - 1269:20, 1314:13
**imagine** [1] - 1197:16
**immediately** [1] - 1210:20
**Immigration** [6] - 1273:14, 1273:17, 1285:19, 1286:14, 1286:18, 1288:18
**impermissible** [1] - 1260:14
**implement** [1] - 1270:10
**important** [2] - 1262:5, 1264:14
**impounded** [1] - 1308:2
**IN** [1] - 1143:1
**in-call** [1] - 1287:24
**incident** [2] - 1157:19, 1295:17
**inclined** [4] - 1195:8, 1195:10, 1195:12, 1196:21
**include** [3] - 1245:1, 1246:21, 1249:7
**included** [1] - 1263:22
**income** [3] - 1173:3, 1180:25, 1181:4
**incoming** [1] - 1313:3
**incorporate** [1] - 1249:13
**incorrect** [1] - 1213:8
**indeed** [1] - 1274:24
**INDEX** [1] - 1317:1
**indicate** [2] - 1273:19, 1278:15
**indicated** [9] - 1148:15, 1179:16, 1195:18, 1237:11, 1259:9, 1259:12, 1260:21, 1264:15, 1279:7
**indicating** [1] - 1280:6
**indication** [2] - 1232:25, 1255:23
**indicators** [1] - 1289:21, 1289:22
**indicia** [1] - 1170:8
**individual** [4] - 1157:21, 1266:6, 1301:2, 1309:8
**individuals** [3] - 1217:10, 1247:24, 1248:2
**indulgence** [1] - 1258:5
**industry** [1] - 1274:15
**infection** [2] - 1265:14, 1265:21

**infectious** [1] - 1251:21
**inflicted** [1] - 1276:21
**informants** [1] - 1287:8
**information** [14] - 1196:19, 1198:22, 1198:24, 1233:1, 1233:19, 1233:22, 1234:22, 1235:16, 1240:2, 1264:7, 1289:4, 1291:19, 1300:23, 1315:6
**informed** [1] - 1234:9
**injures** [1] - 1251:20
**injuries** [26] - 1158:21, 1159:2, 1159:14, 1159:16, 1250:25, 1251:7, 1259:2, 1259:14, 1262:7, 1266:12, 1266:16, 1266:21, 1267:10, 1267:12, 1271:13, 1274:3, 1274:4, 1274:9, 1274:14, 1280:23, 1280:25, 1282:3, 1282:7, 1283:15
**injury** [66] - 1159:10, 1246:21, 1247:25, 1248:7, 1249:12, 1250:16, 1250:22, 1251:4, 1251:14, 1254:15, 1254:18, 1254:24, 1255:1, 1255:5, 1255:6, 1259:20, 1261:7, 1264:19, 1265:14, 1266:7, 1266:16, 1267:2, 1267:6, 1267:13, 1267:16, 1267:22, 1268:3, 1268:5, 1268:10, 1269:5, 1269:12, 1269:24, 1270:1, 1270:3, 1270:5, 1270:15, 1270:21, 1270:24, 1271:2, 1271:8, 1271:22, 1272:1, 1272:2, 1272:5, 1272:7, 1272:10, 1272:19, 1272:22, 1273:18, 1273:19, 1274:23, 1274:25, 1275:2, 1275:3, 1275:4, 1276:9, 1278:2, 1278:4, 1278:11, 1278:18, 1278:20, 1278:22, 1279:21, 1280:4, 1280:10, 1280:20
**inner** [2] - 1271:22, 1272:4
**innumerable** [1] - 1172:14
**input** [1] - 1255:25
**inquire** [2] - 1215:18, 1215:19
**INS** [2] - 1285:18, 1286:14
**insensitive** [1] - 1197:24
**inside** [1] - 1292:4
**instance** [1] - 1297:15
**instances** [2] - 1187:11, 1283:13
**instead** [1] - 1182:17
**institutional** [1] - 1286:15
**instructions** [1] - 1316:9
**intelligence** [1] - 1255:17
**intended** [1] - 1195:24
**intent** [1] - 1159:8
**interaction** [1] - 1294:14
**interest** [1] - 1295:7
**interim** [1] - 1246:16
**interior** [2] - 1286:4, 1304:14
**interpretation** [4] - 1168:21, 1191:17, 1205:22, 1242:16
**Interpreter** [8] - 1144:3, 1144:4, 1147:21, 1150:22, 1208:3, 1213:2, 1218:16, 1226:1
**interpreter** [36] - 1147:9, 1147:12, 1147:16, 1147:24, 1150:15, 1150:17, 1151:1, 1155:25, 1168:17, 1168:20,

1186:1, 1188:20, 1191:11, 1191:13, 1191:15, 1191:16, 1191:19, 1202:9, 1205:14, 1205:17, 1205:19, 1205:21, 1205:24, 1208:8, 1208:11, 1213:13, 1213:15, 1218:21, 1226:2, 1226:9, 1241:18, 1241:20, 1242:11, 1242:13, 1242:15, 1249:25
**INTERPRETER** [28] - 1147:16, 1147:19, 1150:20, 1155:25, 1168:17, 1168:20, 1185:24, 1186:1, 1188:20, 1191:13, 1191:16, 1202:14, 1202:17, 1205:17, 1205:21, 1208:5, 1213:13, 1218:18, 1226:2, 1226:9, 1241:18, 1242:11, 1242:15, 1249:19, 1249:25, 1250:3, 1294:19, 1294:21
**interpreters** [3] - 1249:19, 1249:23, 1291:3
**Interpreters** [2] - 1168:19, 1177:20
**interpreting** [1] - 1202:15
**intersection** [1] - 1294:11
**interview** [7] - 1179:6, 1207:11, 1208:24, 1209:7, 1210:10, 1210:14, 1210:17, 1210:21, 1211:9, 1212:23, 1214:1
**interviewed** [3] - 1183:9, 1183:12, 1190:22
**interviews** [2] - 1210:13, 1289:15
**introduced** [2] - 1146:16, 1215:13
**investigate** [2] - 1287:25, 1300:19
**investigating** [2] - 1287:4, 1288:10
**investigation** [14] - 1240:3, 1289:9, 1289:12, 1290:1, 1291:11, 1291:21, 1293:12, 1294:8, 1295:7, 1295:21, 1297:9, 1298:18, 1299:1, 1299:15, 1302:7, 1308:24, 1309:14, 1312:17
**investigations** [2] - 1300:16, 1303:15
**Investigations** [2] - 1285:12, 1286:13
**investigative** [1] - 1305:5
**involved** [15] - 1152:4, 1160:21, 1166:10, 1166:15, 1167:13, 1176:24, 1179:17, 1209:1, 1274:15, 1274:20, 1288:1, 1288:22, 1293:10, 1299:16, 1309:14
**involvement** [1] - 1288:20
**involving** [3] - 1235:21, 1248:14, 1287:25
**irregular** [2] - 1256:17, 1270:18
**irrigate** [2] - 1203:13, 1203:14
**issue** [3] - 1158:19, 1218:6, 1263:24
**issues** [3] - 1260:25, 1264:8, 1264:9
**item** [2] - 1307:17, 1310:21
**items** [4] - 1148:2, 1298:6, 1308:11, 1310:2
**itself** [2] - 1255:25, 1257:4

## J

**jagged** [1] - 1272:15
**Jeff** [1] - 1175:1

**Jelly** [2] - 1305:1, 1306:4
**Jennifer** [1] - 1294:7
**Jennifer's** [1] - 1294:5
**JESUS** [2] - 1143:6, 1317:2
**Jesus** [1] - 1143:16
**job** [4] - 1155:4, 1244:8, 1287:6, 1288:7
**joined** [1] - 1286:11
**Jointly** [1] - 1148:22
**Joong** [1] - 1311:9
**Jose** [3] - 1189:16, 1307:7, 1309:1
**joy** [1] - 1196:11
**JR** [1] - 1143:11
**Jr** [1] - 1145:4
**Juan** [1] - 1188:21
**Judge** [3] - 1226:3, 1262:11, 1292:20
**July** [4] - 1300:25, 1301:1, 1301:20, 1302:13
**June** [2] - 1295:12, 1295:17
**jurisdictions** [1] - 1248:20
**Juror** [1] - 1195:4
**JURORS** [1] - 1215:21
**jurors** [3] - 1170:16, 1196:14, 1215:18
**jurors'** [1] - 1215:19
**jury** [37] - 1145:6, 1145:20, 1148:7, 1159:11, 1160:6, 1173:12, 1193:21, 1195:3, 1195:15, 1203:22, 1211:20, 1217:9, 1236:10, 1242:24, 1255:21, 1260:24, 1262:5, 1262:17, 1264:3, 1267:16, 1282:2, 1282:15, 1283:12, 1284:7, 1288:22, 1290:19, 1290:20, 1291:24, 1292:7, 1296:12, 1296:22, 1300:11, 1300:15, 1306:11, 1308:19, 1315:24, 1316:2
**Jury** [13] - 1145:25, 1193:25, 1203:25, 1219:11, 1219:20, 1224:19, 1225:11, 1225:15, 1233:13, 1234:3, 1282:21, 1284:20, 1316:6
**JURY** [1] - 1143:11
**justice** [1] - 1267:5
**juveniles** [1] - 1300:20

## K

**K-E-L-L-Y** [1] - 1285:8
**keep** [7] - 1159:17, 1170:12, 1171:1, 1195:8, 1203:15, 1226:3, 1288:8
**KELLY** [2] - 1285:2, 1317:18
**Kelly** [17] - 1144:3, 1282:24, 1284:25, 1285:7, 1285:11, 1288:6, 1291:7, 1292:16, 1293:8, 1294:16, 1295:3, 1297:7, 1300:3, 1302:3, 1303:2, 1304:21, 1313:10
**kept** [3] - 1171:11, 1180:3, 1213:19
**Kerlin** [15] - 1222:17, 1222:21, 1223:1, 1223:9, 1223:12, 1224:2, 1225:22, 1225:24, 1226:13, 1234:22, 1236:5, 1236:6, 1236:20, 1236:22
**Kerlin's** [2] - 1225:1, 1225:8
**KEVIN** [1] - 1143:7

**Kevin** [1] - 1143:18
**kids** [3] - 1250:8, 1257:20, 1271:11
**kill** [1] - 1196:23
**killed** [1] - 1208:15
**killing** [2] - 1232:17, 1232:22
**Kim** [2] - 1311:9, 1311:13
**kind** [21] - 1170:7, 1170:12, 1171:1, 1181:25, 1210:20, 1223:21, 1254:14, 1254:24, 1255:14, 1269:16, 1271:10, 1271:11, 1274:24, 1276:3, 1278:20, 1278:22, 1278:23, 1279:21, 1279:25, 1292:17
**Kirchgessner** [2] - 1144:3, 1242:10
**KIRCHGESSNER** [17] - 1168:17, 1168:20, 1185:24, 1186:1, 1188:20, 1191:13, 1191:16, 1202:14, 1202:17, 1205:17, 1205:21, 1208:5, 1241:18, 1242:11, 1242:15, 1249:25, 1250:3
**kits** [1] - 1244:24
**knife** [12] - 1261:4, 1261:11, 1261:12, 1272:17, 1272:18, 1272:24, 1276:16, 1276:21, 1276:25, 1277:1, 1277:6, 1278:24
**knit** [1] - 1251:11
**knowledge** [4] - 1170:21, 1170:25, 1187:12, 1188:9
**known** [4] - 1167:16, 1285:13, 1290:2, 1295:12
**KY** [2] - 1305:1, 1306:4

## L

**labor** [3] - 1171:17, 1287:10, 1287:11
**lack** [1] - 1237:19
**ladies** [15] - 1170:18, 1170:25, 1171:5, 1171:11, 1173:12, 1211:19, 1217:9, 1264:3, 1267:15, 1288:21, 1291:22, 1296:12, 1296:21, 1300:14, 1313:8
**land** [2] - 1268:2, 1271:11
**landed** [1] - 1280:13
**Langley** [1] - 1305:3
**language** [3] - 1198:13, 1288:9, 1315:16
**large** [5] - 1249:9, 1253:8, 1253:25, 1258:11, 1260:6
**last** [26] - 1145:12, 1145:17, 1166:23, 1185:19, 1186:7, 1190:17, 1191:24, 1199:6, 1209:8, 1210:24, 1211:3, 1218:18, 1219:23, 1226:10, 1237:24, 1238:16, 1250:1, 1259:23, 1264:13, 1280:4, 1281:23, 1283:10, 1296:1, 1296:2, 1299:23, 1300:6
**lasted** [2] - 1210:17, 1265:10
**lastly** [2] - 1264:15, 1282:16
**late** [4] - 1151:22, 1152:15, 1233:9, 1282:16
**late-afternoon** [1] - 1282:16
**laterally** [1] - 1279:23
**Latino** [5] - 1288:3, 1288:10, 1289:4,

1291:16, 1300:18
**laughed** [1] - 1243:3
**law** [7] - 1174:16, 1174:22, 1175:16, 1176:6, 1182:5, 1287:9, 1288:14
**layperson** [1] - 1277:12
**lead** [1] - 1291:19
**leading** [2] - 1234:23, 1311:17
**leads** [1] - 1287:8
**learn** [1] - 1247:2
**least** [5] - 1157:5, 1189:12, 1195:2, 1251:8, 1273:18
**leather** [2] - 1279:17
**leave** [12] - 1172:5, 1172:7, 1172:20, 1173:5, 1179:4, 1190:4, 1195:6, 1220:9, 1220:15, 1228:15, 1228:17, 1272:12
**leaving** [3] - 1172:10, 1172:13, 1173:1
**led** [3] - 1240:3, 1276:20, 1301:4
**ledger** [1] - 1171:1
**ledgers** [1] - 1171:11
**left** [21] - 1171:24, 1172:4, 1172:9, 1174:5, 1179:13, 1220:13, 1221:9, 1227:11, 1261:24, 1267:18, 1267:19, 1267:20, 1269:25, 1270:19, 1272:4, 1277:8, 1277:18, 1295:23, 1299:22, 1307:12
**leg** [2] - 1279:24
**legs** [3] - 1250:9, 1250:10, 1250:11
**lesion** [2] - 1269:17, 1276:20
**lesions** [1] - 1250:18
**less** [5] - 1173:22, 1198:1, 1251:13, 1267:3, 1271:13
**level** [1] - 1257:5
**license** [2] - 1306:21, 1306:22
**licensed** [1] - 1247:9
**lied** [1] - 1208:16
**life** [1] - 1255:3
**Lifestyle** [1] - 1305:23
**lift** [1] - 1304:19
**lifted** [1] - 1304:22
**lifting** [1] - 1250:12
**light** [2] - 1250:6
**lightly** [1] - 1279:15
**likely** [1] - 1280:16
**limit** [1] - 1263:16
**limited** [1] - 1288:12
**Line** [11] - 1205:15, 1213:11, 1213:12, 1241:11, 1241:12, 1242:7, 1242:12, 1292:18, 1293:13, 1293:6
**line** [7] - 1267:17, 1270:11, 1270:13, 1271:24, 1272:4, 1272:11, 1283:18
**line-like** [1] - 1267:17
**line-shaped** [2] - 1270:11, 1270:13
**linear** [4] - 1267:17, 1270:11, 1272:3, 1275:6
**Lines** [3] - 1208:3, 1208:11, 1241:14
**lines** [3] - 1208:7, 1241:19, 1272:13
**listed** [1] - 1309:21
**listen** [5] - 1196:10, 1196:12, 1249:17,

1249:18
**listened** [2] - 1213:18, 1218:24
**literally** [1] - 1276:5
**littler** [1] - 1250:8
**live** [11] - 1163:18, 1163:19, 1163:21, 1177:23, 1180:6, 1180:7, 1180:12, 1180:15, 1180:16, 1180:19, 1181:18
**lived** [7] - 1154:6, 1163:12, 1163:15, 1180:9, 1208:20, 1208:23, 1236:14
**living** [8] - 1151:22, 1152:15, 1153:14, 1153:25, 1154:3, 1154:5, 1163:9, 1228:5
**local** [3] - 1287:9, 1300:24, 1314:1
**located** [2] - 1153:21, 1161:1
**location** [7] - 1275:15, 1300:2, 1300:12, 1302:13, 1306:7, 1308:6, 1313:19
**locations** [4] - 1294:7, 1300:10, 1306:8, 1306:12
**locked** [5] - 1187:25, 1220:1, 1220:4, 1220:8, 1233:16
**Lombard** [1] - 1144:24
**look** [13] - 1249:14, 1249:15, 1249:18, 1250:5, 1250:6, 1253:24, 1257:19, 1257:22, 1261:10, 1273:22, 1275:9, 1283:10
**looked** [2] - 1257:16, 1259:2
**looking** [12] - 1148:23, 1151:6, 1250:18, 1251:2, 1254:1, 1254:6, 1254:14, 1256:23, 1256:24, 1269:4, 1277:14, 1277:22
**looks** [9] - 1251:2, 1253:16, 1256:5, 1264:12, 1275:9, 1296:9, 1306:3, 1307:5, 1307:7
**loop** [1] - 1293:11
**loose** [1] - 1303:14
**Lopez** [1] - 1309:1
**lost** [1] - 1165:25
**love** [2] - 1215:5, 1215:9
**low** [3] - 1265:7, 1276:6, 1288:4
**lubricant** [1] - 1305:1
**Lucia** [1] - 1307:8
**Luis** [1] - 1295:19
**lumps** [1] - 1249:16
**lunch** [3] - 1195:3, 1199:16, 1262:14
**Luncheon** [1] - 1200:2
**lungs** [2] - 1249:17, 1250:4
**luring** [1] - 1298:22

## M

**ma'am** [44] - 1149:4, 1150:25, 1153:7, 1164:10, 1169:21, 1170:19, 1173:25, 1175:19, 1177:11, 1183:13, 1185:8, 1204:9, 1205:9, 1208:19, 1213:18, 1214:14, 1216:4, 1219:11, 1238:15, 1244:1, 1258:16, 1285:14, 1285:22, 1291:21, 1296:7, 1303:3, 1303:10, 1304:5, 1310:23, 1311:4, 1311:8, 1311:11, 1311:15, 1311:19, 1311:22,

1312:13, 1312:24, 1313:3, 1313:7,
1313:11, 1313:14, 1314:11, 1314:15,
1314:22

**machete** [1] - 1304:1

**mad** [5] - 1216:8, 1216:12, 1216:25,
1217:3, 1238:8

**madam** [4] - 1205:20, 1208:3, 1213:2,
1218:16

**Madam** [1] - 1191:4

**majority** [4] - 1256:17, 1258:11, 1260:6,
1288:19

**male** [3] - 1188:25, 1201:11, 1314:5

**maltreatment** [2] - 1246:18, 1249:10

**Maltreatment** [1] - 1252:17

**man** [15] - 1160:2, 1166:8, 1166:10,
1166:15, 1167:8, 1167:10, 1167:13,
1167:16, 1175:10, 1183:25, 1184:12,
1189:1, 1189:8, 1232:17, 1261:25

**man's** [1] - 1271:11

**manner** [3] - 1314:6, 1314:8, 1314:9

**map** [1] - 1315:9

**March** [1] - 1147:4

**mark** [11] - 1148:2, 1149:2, 1240:15,
1250:18, 1255:14, 1255:18, 1255:23,
1267:17, 1267:23, 1269:12, 1270:18

**marked** [11] - 1147:13, 1191:4, 1205:6,
1207:23, 1218:15, 1240:16, 1240:21,
1269:1, 1271:18, 1310:17, 1312:15

**marks** [11] - 1148:18, 1256:3, 1256:14,
1256:17, 1256:18, 1257:3, 1257:19,
1257:20, 1259:10, 1259:12

**Married** [1] - 1148:21

**married** [4] - 1148:25, 1149:1, 1214:21,
1217:19

**Marshals** [1] - 1284:18

**Marta** [1] - 1144:4

**Martin** [3] - 1144:23, 1316:17, 1316:23

**Martinez** [1] - 1299:18

**Mary** [2] - 1243:10, 1243:20

**MARY** [3] - 1243:13, 1243:20, 1317:13

**Mary-Theresa** [1] - 1243:20

**MARY-THERESA** [2] - 1243:13, 1317:13

**MARYLAND** [1] - 1143:1

**Maryland** [19] - 1143:8, 1144:24,
1145:3, 1161:2, 1161:3, 1162:6,
1227:25, 1247:10, 1252:16, 1285:12,
1291:17, 1295:21, 1300:12, 1306:21,
1309:1, 1315:17, 1315:18, 1315:20,
1315:21

**Maryland's** [1] - 1290:9

**massage** [2] - 1287:17, 1300:19

**masses** [1] - 1249:16

**mater** [1] - 1247:7

**matter** [2] - 1145:8, 1316:20

**MATTER** [1] - 1143:10

**mattresses** [1] - 1302:25

**McDonald's** [1] - 1295:21

**mean** [17] - 1155:10, 1164:2, 1185:8,
1185:11, 1187:17, 1190:13, 1198:20,
1204:21, 1220:9, 1244:15, 1249:4,

1268:7, 1279:12, 1279:23, 1287:21,
1303:9

**meaning** [1] - 1224:5

**means** [10] - 1155:12, 1155:23,
1187:19, 1221:5, 1221:7, 1249:5,
1267:24, 1278:5, 1287:23, 1287:24

**Medical** [4] - 1244:6, 1245:24, 1246:4,
1246:10

**medical** [22] - 1197:9, 1200:19, 1244:1,
1244:10, 1245:24, 1246:7, 1246:25,
1247:24, 1248:25, 1252:1, 1254:20,
1255:8, 1261:16, 1262:18, 1263:11,
1263:19, 1263:21, 1264:7, 1264:11,
1276:16, 1277:20

**medicine** [3] - 1246:1, 1247:9, 1247:20

**meet** [1] - 1169:8

**meeting** [2] - 1204:9, 1313:19

**member** [4] - 1252:11, 1252:13,
1252:15, 1252:16

**members** [4] - 1193:21, 1262:17,
1282:15, 1315:24

**memory** [2] - 1253:13, 1254:4

**men** [6] - 1161:17, 1168:2, 1170:13,
1170:18, 1172:24, 1181:6

**menstrual** [1] - 1303:16

**menstruation** [1] - 1265:4

**mentally** [1] - 1245:18

**mentioned** [11] - 1166:23, 1225:4,
1225:7, 1225:21, 1247:12, 1266:15,
1266:20, 1287:11, 1287:20, 1299:2,
1304:3

**Merit** [1] - 1316:17

**Mesa** [2] - 1200:16, 1243:10

**met** [15] - 1160:16, 1169:7, 1169:19,
1169:21, 1171:19, 1174:15, 1174:19,
1175:3, 1175:6, 1175:16, 1175:25,
1188:8, 1222:12, 1228:9, 1289:2

**metal** [3] - 1272:16, 1276:5, 1279:15

**method** [1] - 1170:22

**mic** [1] - 1285:5

**Michael** [3] - 1143:14, 1143:19, 1222:16

**microphone** [1] - 1243:16

**middle** [1] - 1270:13

**might** [8] - 1165:14, 1167:2, 1199:3,
1233:1, 1240:9, 1264:15, 1283:4,
1289:16

**Mike** [2] - 1202:3, 1306:21

**mimics** [1] - 1251:23

**mine** [3] - 1196:7, 1203:15, 1215:20

**minor** [1] - 1307:16

**minutes** [17] - 1155:11, 1155:16,
1194:2, 1194:5, 1194:7, 1194:8,
1195:22, 1196:1, 1196:5, 1197:2,
1199:3, 1210:22, 1250:1, 1273:6,
1282:18, 1316:2

**mission** [1] - 1252:20

**misspoke** [1] - 1261:4

**misstating** [1] - 1236:8

**mistaken** [3] - 1155:14, 1155:15,
1251:22

**modesty** [1] - 1250:7

**moment** [4] - 1208:16, 1294:18,
1294:19, 1298:7

**moments** [1] - 1216:23

**Monday** [5] - 1156:13, 1156:15, 1157:4,
1220:24, 1314:22

**money** [32] - 1161:16, 1161:19,
1161:22, 1161:25, 1162:14, 1164:17,
1164:20, 1170:22, 1171:2, 1171:6,
1171:12, 1171:18, 1181:10, 1189:18,
1189:21, 1189:23, 1190:5, 1190:10,
1190:15, 1190:18, 1190:21, 1191:24,
1192:3, 1192:5, 1192:6, 1192:8,
1192:10, 1192:15, 1214:12, 1221:17,
1307:7

**monitor** [1] - 1199:8

**monitored** [1] - 1301:2

**MONTEMARANO** [65] - 1194:22,
1195:9, 1195:11, 1195:15, 1195:18,
1195:21, 1196:4, 1196:12, 1196:24,
1197:3, 1197:7, 1197:12, 1197:15,
1197:19, 1197:23, 1198:3, 1198:11,
1198:18, 1199:7, 1199:14, 1203:10,
1203:12, 1203:17, 1203:24, 1222:6,
1222:9, 1226:6, 1226:8, 1226:12,
1226:21, 1231:5, 1232:19, 1233:8,
1234:5, 1234:16, 1234:23, 1235:7,
1235:17, 1236:8, 1238:19, 1238:22,
1239:25, 1240:12, 1240:15, 1240:19,
1240:20, 1241:11, 1241:14, 1241:16,
1241:22, 1242:4, 1242:7, 1242:17,
1242:18, 1243:2, 1243:5, 1258:5,
1258:19, 1260:10, 1261:9, 1261:13,
1262:12, 1281:10, 1284:10, 1293:3

**Montemarano** [9] - 1143:19, 1203:9,
1222:5, 1222:16, 1238:18, 1242:25,
1258:3, 1260:21, 1281:9

**MONTEMARANO.........** [1] - 1317:12

**MONTEMARANO..........** [1] - 1317:10

**month** [10] - 1163:16, 1164:1, 1173:22,
1180:5, 1180:10, 1211:8, 1224:19,
1233:17, 1295:8

**months** [18] - 1211:6, 1220:1, 1220:10,
1220:13, 1220:25, 1221:3, 1224:14,
1225:10, 1229:18, 1234:14, 1251:9,
1251:15, 1254:19, 1255:1, 1261:9,
1268:23, 1270:4, 1270:25

**Moran** [5] - 1310:19, 1310:21, 1312:6,
1312:7, 1312:8

**Moran's** [2] - 1312:18, 1313:1

**morning** [12] - 1145:5, 1152:11,
1152:24, 1153:10, 1193:20, 1193:22,
1194:22, 1195:6, 1284:11, 1314:14,
1316:5, 1316:13

**most** [8] - 1245:8, 1249:8, 1251:14,
1254:8, 1275:9, 1278:25, 1305:9,
1306:12

**mostly** [2] - 1246:25, 1248:9

**mother** [8] - 1189:19, 1189:21, 1189:24,
1190:6, 1190:10, 1190:15, 1191:24,

1192:3
**Motrin** [1] - 1265:10
**mountain** [1] - 1158:3
**move** [6] - 1159:21, 1161:11, 1164:13, 1164:14, 1277:8, 1307:9
**moved** [3] - 1149:15, 1164:12, 1186:13
**moving** [3] - 1268:25, 1276:11, 1313:17
**MR** [212] - 1145:7, 1145:10, 1145:14, 1145:21, 1146:9, 1146:15, 1147:12, 1147:18, 1147:20, 1147:23, 1148:7, 1149:7, 1149:10, 1150:4, 1150:10, 1150:12, 1150:14, 1150:19, 1150:21, 1150:24, 1156:4, 1156:5, 1158:20, 1159:12, 1159:21, 1159:25, 1166:22, 1166:24, 1167:1, 1167:4, 1167:7, 1168:22, 1168:23, 1171:9, 1171:10, 1185:22, 1185:25, 1186:2, 1188:22, 1188:24, 1190:3, 1191:2, 1191:4, 1191:9, 1191:10, 1191:18, 1193:6, 1193:9, 1193:12, 1193:19, 1194:2, 1194:6, 1194:9, 1194:12, 1194:22, 1195:9, 1195:11, 1195:15, 1195:18, 1195:21, 1196:4, 1196:12, 1196:17, 1196:24, 1197:3, 1197:5, 1197:7, 1197:11, 1197:12, 1197:15, 1197:19, 1197:23, 1198:3, 1198:11, 1198:18, 1199:7, 1199:14, 1202:2, 1202:11, 1203:10, 1203:11, 1203:12, 1203:17, 1203:24, 1204:6, 1204:7, 1205:6, 1205:9, 1205:11, 1205:13, 1205:16, 1205:20, 1205:23, 1207:21, 1207:23, 1207:25, 1208:2, 1208:6, 1208:9, 1208:10, 1212:22, 1212:24, 1212:25, 1213:5, 1213:8, 1213:11, 1213:17, 1215:11, 1215:18, 1215:23, 1216:19, 1216:21, 1218:14, 1218:20, 1218:23, 1219:23, 1222:1, 1222:4, 1222:6, 1222:9, 1226:6, 1226:8, 1226:12, 1226:21, 1231:5, 1232:19, 1233:8, 1234:5, 1234:16, 1234:23, 1235:7, 1235:17, 1236:8, 1237:7, 1237:10, 1238:15, 1238:19, 1238:20, 1238:22, 1239:25, 1240:12, 1240:15, 1240:19, 1240:20, 1241:11, 1241:14, 1241:16, 1241:22, 1242:4, 1242:7, 1242:17, 1242:18, 1243:2, 1243:5, 1252:4, 1252:6, 1252:8, 1257:25, 1258:2, 1258:5, 1258:6, 1258:8, 1258:17, 1258:19, 1258:25, 1260:10, 1260:17, 1261:8, 1261:9, 1261:11, 1261:13, 1261:19, 1261:21, 1262:9, 1262:11, 1262:12, 1273:4, 1273:6, 1273:9, 1281:8, 1281:10, 1282:11, 1283:4, 1284:2, 1284:8, 1284:10, 1284:11, 1284:13, 1284:16, 1290:21, 1292:4, 1292:9, 1292:14, 1293:1, 1293:3, 1293:4, 1293:6, 1293:17, 1296:15, 1298:15, 1298:20, 1301:12, 1301:16, 1301:21, 1301:23, 1316:11, 1317:10, 1317:10, 1317:11, 1317:12, 1317:15,

1317:16
**MS** [107] - 1145:22, 1149:24, 1150:1, 1150:7, 1158:8, 1158:13, 1159:3, 1159:6, 1171:7, 1189:25, 1195:13, 1197:9, 1199:13, 1200:8, 1200:10, 1202:5, 1202:8, 1203:6, 1203:23, 1213:3, 1213:6, 1226:24, 1227:2, 1231:2, 1231:6, 1231:7, 1232:21, 1233:10, 1234:8, 1234:18, 1234:20, 1235:1, 1235:9, 1235:11, 1235:19, 1236:13, 1237:6, 1239:20, 1239:22, 1242:2, 1243:10, 1243:23, 1244:25, 1249:22, 1250:15, 1251:25, 1259:17, 1259:24, 1260:2, 1261:1, 1263:4, 1263:6, 1264:21, 1264:23, 1265:12, 1273:2, 1281:13, 1281:15, 1282:10, 1282:23, 1283:1, 1283:9, 1283:17, 1284:1, 1284:9, 1284:22, 1284:24, 1285:10, 1286:8, 1290:19, 1290:24, 1291:2, 1291:5, 1291:22, 1292:3, 1292:5, 1292:7, 1293:8, 1293:19, 1293:22, 1293:25, 1294:24, 1295:2, 1296:11, 1296:19, 1296:25, 1297:6, 1297:17, 1297:21, 1297:24, 1297:25, 1298:16, 1298:23, 1299:5, 1301:8, 1301:14, 1301:17, 1301:22, 1301:24, 1302:1, 1305:17, 1308:18, 1317:11, 1317:14, 1317:15, 1317:16, 1317:19
**Muerte** [5] - 1304:24, 1305:12, 1305:19, 1310:7, 1310:9
**murder** [4] - 1219:18, 1225:19, 1226:18, 1233:1
**must** [1] - 1197:17


# N


**naked** [1] - 1267:3
**name** [17] - 1146:5, 1148:12, 1152:6, 1154:19, 1166:16, 1166:23, 1175:1, 1188:21, 1222:16, 1243:18, 1281:23, 1285:5, 1299:23, 1300:6, 1303:22, 1310:20, 1311:9
**named** [16] - 1160:2, 1166:10, 1167:8, 1167:11, 1167:13, 1175:10, 1183:25, 1184:3, 1184:13, 1188:7, 1188:10, 1189:4, 1189:6, 1189:14, 1189:16, 1263:8
**names** [3] - 1174:18, 1281:19, 1303:24
**nationals** [1] - 1288:1
**nearly** [1] - 1233:17
**necessarily** [1] - 1277:3
**necessity** [1] - 1231:10
**neck** [1] - 1249:17
**need** [13] - 1171:5, 1190:9, 1190:10, 1196:7, 1202:9, 1219:1, 1240:16, 1256:15, 1256:17, 1265:22, 1280:21, 1284:18, 1306:12
**needed** [8] - 1190:14, 1207:4, 1214:12, 1217:15, 1234:1, 1257:4, 1274:9, 1279:3

**needing** [1] - 1260:11
**needs** [3] - 1195:2, 1196:6, 1197:9
**negative** [1] - 1266:5
**neglect** [1] - 1253:11
**nervous** [1] - 1239:2
**never** [25] - 1162:15, 1171:18, 1181:14, 1182:8, 1182:14, 1183:19, 1186:13, 1188:8, 1206:3, 1206:4, 1206:5, 1206:9, 1207:9, 1208:14, 1209:6, 1212:4, 1219:9, 1220:13, 1221:1, 1222:12, 1223:17, 1223:19, 1223:25, 1237:15, 1238:13
**New** [2] - 1310:25, 1311:1
**new** [1] - 1298:9
**next** [4] - 1148:2, 1243:9, 1270:15, 1307:9
**nice** [4] - 1223:15, 1228:13, 1236:7, 1272:11
**night** [9] - 1178:7, 1178:8, 1178:14, 1183:2, 1183:4, 1206:15, 1224:11, 1239:5, 1316:10
**nightshift** [1] - 1151:17
**nilly** [1] - 1290:12
**Nissan** [2] - 1307:21, 1308:12
**no-man's** [1] - 1271:11
**non** [7] - 1244:13, 1244:14, 1244:15, 1245:19, 1248:24, 1287:8, 1289:23
**non-acute** [4] - 1244:13, 1244:14, 1244:15, 1245:19
**non-genital** [1] - 1248:24
**non-governmental** [1] - 1289:23
**noon** [2] - 1193:24
**normal** [5] - 1265:2, 1274:24, 1276:6, 1276:7, 1304:1
**normally** [2] - 1300:19, 1305:2
**Norris** [1] - 1289:2
**north** [2] - 1285:25, 1286:5
**North** [2] - 1246:15, 1247:16
**NORTHERN** [1] - 1143:2
**nose** [1] - 1249:14
**note** [2] - 1199:7, 1266:7
**noted** [9] - 1252:24, 1266:8, 1267:14, 1267:16, 1267:22, 1270:16, 1271:1, 1271:22, 1280:6
**notes** [2] - 1273:18, 1277:23
**nothing** [4] - 1199:8, 1225:18, 1226:18, 1226:21
**notice** [2] - 1159:8, 1250:19
**noticeable** [2] - 1267:7, 1271:16
**noticed** [1] - 1194:25
**notwithstanding** [3] - 1173:5, 1182:16, 1199:9
**November** [59] - 1153:4, 1153:14, 1155:2, 1157:9, 1182:22, 1183:7, 1183:22, 1184:4, 1185:16, 1185:20, 1187:22, 1187:25, 1190:14, 1190:19, 1190:22, 1192:13, 1192:25, 1193:12, 1193:13, 1204:10, 1208:21, 1208:24, 1209:8, 1209:12, 1210:9, 1210:14, 1211:3, 1211:9, 1218:5, 1224:15,

1230:20, 1231:6, 1232:14, 1233:11, 1234:21, 1237:12, 1237:25, 1246:2, 1263:8, 1280:23, 1281:17, 1295:13, 1297:2, 1297:18, 1298:1, 1298:4, 1298:11, 1299:3, 1300:11, 1306:8, 1307:10, 1307:11, 1307:22, 1308:1, 1308:10, 1309:24, 1310:14, 1311:4, 1312:10

**Number** [19] – 1146:17, 1147:14, 1149:14, 1151:6, 1191:5, 1195:4, 1199:17, 1205:7, 1207:24, 1215:12, 1240:18, 1269:8, 1296:10, 1296:13, 1296:21, 1297:2, 1297:21, 1298:12

**number** [48] – 1174:8, 1187:2, 1248:5, 1256:3, 1259:5, 1259:6, 1288:4, 1291:14, 1291:15, 1291:16, 1291:20, 1292:2, 1292:19, 1292:24, 1295:5, 1295:8, 1295:10, 1295:15, 1296:6, 1297:1, 1297:18, 1297:20, 1298:7, 1298:9, 1298:10, 1298:12, 1298:13, 1298:17, 1298:21, 1302:2, 1302:4, 1302:5, 1303:7, 1307:24, 1309:16, 1309:21, 1309:22, 1312:18, 1312:19, 1312:21, 1312:23, 1313:1, 1315:4

**numbers** [3] – 1216:18, 1290:3, 1293:9

**numbness** [1] – 1201:9

**numerous** [1] – 1253:16

**nurse** [1] – 1247:1

## O

**o'clock** [8] – 1194:9, 1195:3, 1196:16, 1198:23, 1199:12, 1262:12, 1284:15, 1284:16

**Oakland** [1] – 1294:6

**Oaklawn** [1] – 1294:9

**oath** [4] – 1146:3, 1204:3, 1219:14, 1219:20

**object** [8] – 1251:1, 1262:4, 1275:23, 1276:7, 1276:14, 1277:24, 1278:23, 1292:23

**objected** [1] – 1158:13

**objection** [19] – 1171:7, 1195:9, 1195:11, 1195:13, 1215:13, 1232:19, 1233:8, 1234:5, 1234:16, 1234:23, 1235:7, 1235:17, 1236:8, 1239:20, 1242:2, 1259:19, 1259:25, 1301:2, 1301:15

**objections** [1] – 1261:17

**objects** [1] – 1304:23

**observable** [2] – 1199:5, 1199:11

**observation** [1] – 1267:10

**observations** [3] – 1268:9, 1272:9, 1272:25

**observe** [3] – 1266:12, 1272:1, 1314:3

**observed** [13] – 1261:2, 1267:12, 1268:17, 1270:8, 1270:17, 1271:2, 1271:5, 1272:19, 1282:7, 1282:8, 1295:22, 1314:4, 1314:5

**observing** [1] – 1270:5

**obstacles** [1] – 1288:10

**obtain** [1] – 1310:9

**obviously** [3] – 1259:4, 1282:2, 1293:11

**occasion** [10] – 1165:23, 1209:17, 1236:23, 1236:24, 1237:1, 1237:4, 1289:15, 1300:20, 1311:16, 1312:10

**occasionally** [1] – 1245:9

**occasions** [7] – 1165:24, 1192:2, 1232:6, 1232:9, 1232:10, 1237:12

**occupied** [1] – 1303:4

**occur** [3] – 1158:6, 1168:10, 1244:12

**occurred** [10] – 1158:11, 1158:22, 1194:20, 1200:12, 1258:22, 1278:2, 1280:23, 1280:25, 1281:3, 1292:12

**occurring** [1] – 1261:7

**October** [16] – 1151:8, 1151:22, 1152:15, 1152:18, 1154:5, 1155:1, 1155:12, 1155:16, 1155:23, 1156:6, 1157:9, 1211:12, 1295:18, 1296:9, 1298:8

**odd** [2] – 1201:9, 1275:15

**OF** [4] – 1143:1, 1143:4, 1145:1, 1317:6

**offer** [3] – 1178:3, 1182:17, 1251:25

**offered** [2] – 1178:11, 1178:14

**office** [2] – 1273:11, 1314:1

**Office** [1] – 1290:12

**officer** [2] – 1182:6, 1292:21

**officers** [8] – 1174:16, 1174:19, 1174:22, 1176:6, 1177:2, 1204:10, 1204:22, 1273:13

**officers'** [1] – 1178:3

**often** [2] – 1157:12, 1268:2

**old** [10] – 1251:19, 1255:2, 1255:11, 1255:17, 1260:7, 1268:6, 1270:3, 1270:24, 1275:16

**older** [7] – 1221:20, 1245:14, 1245:16, 1245:18, 1250:8, 1270:4, 1270:25

**Omar** [6] – 1166:18, 1167:11, 1167:13, 1167:16, 1300:9, 1309:8

**ON** [1] – 1143:10

**once** [11] – 1153:13, 1164:19, 1165:4, 1175:12, 1182:14, 1214:2, 1219:6, 1253:23, 1307:14, 1308:4, 1308:6

**one** [71] – 1145:8, 1147:7, 1148:2, 1152:21, 1158:14, 1160:19, 1161:10, 1165:23, 1167:2, 1169:22, 1171:20, 1173:15, 1173:17, 1180:6, 1180:10, 1180:15, 1180:16, 1185:9, 1188:18, 1188:22, 1189:12, 1190:22, 1194:24, 1195:15, 1212:3, 1212:13, 1217:11, 1225:15, 1228:8, 1228:9, 1231:11, 1234:10, 1234:11, 1236:23, 1237:22, 1238:16, 1239:8, 1244:19, 1250:9, 1254:11, 1254:14, 1256:4, 1257:3, 1257:11, 1257:18, 1258:6, 1259:5, 1265:10, 1269:16, 1270:23, 1272:6, 1272:11, 1273:14, 1277:21, 1279:15, 1282:22, 1290:10, 1290:14, 1294:7, 1294:11, 1295:22, 1297:17, 1299:20,

**observing** [1] – 1270:5

1300:17, 1300:22, 1302:9, 1303:24, 1307:17, 1308:19, 1311:24, 1312:1

**one-party** [2] – 1290:10, 1290:14

**ones** [1] – 1253:13

**open** [2] – 1165:10, 1165:14

**operating** [2] – 1307:13, 1309:6

**operations** [3] – 1287:15, 1288:11, 1289:23

**operator** [1] – 1313:21

**opinion** [23] – 1199:5, 1199:10, 1201:19, 1254:25, 1259:1, 1260:22, 1262:25, 1275:4, 1275:13, 1275:21, 1275:24, 1276:16, 1276:17, 1276:21, 1277:1, 1277:20, 1278:2, 1278:19, 1279:20, 1280:9, 1282:6, 1292:17, 1293:12

**opinions** [4] – 1262:21, 1262:24, 1263:1

**opportunity** [3] – 1227:5, 1234:2, 1289:18

**opposed** [1] – 1300:19

**order** [2] – 1159:9, 1255:4

**organizations** [2] – 1252:19, 1287:9

**origin** [2] – 1259:2, 1259:13

**outcall** [2] – 1287:17, 1287:23

**outcalls** [1] – 1287:20

**outer** [1] – 1271:8

**outgoing** [1] – 1313:3

**outside** [9] – 1158:2, 1158:7, 1158:24, 1159:11, 1231:23, 1248:19, 1263:15, 1283:11, 1294:14

**outward** [1] – 1267:25

**overlap** [1] – 1264:10

**overruled** [10] – 1150:13, 1190:1, 1233:9, 1234:6, 1234:24, 1235:18, 1236:10, 1239:24, 1293:16, 1301:13

**overtime** [2] – 1151:12, 1152:21

**own** [6] – 1217:24, 1266:13, 1267:10, 1270:9, 1272:9, 1272:25

**owned** [1] – 1210:3

**owner** [9] – 1170:17, 1186:10, 1188:10, 1188:19, 1189:4, 1189:6, 1189:14, 1189:16, 1311:14

**owners** [4] – 1184:22, 1188:13, 1188:15

## P

**P-O-L-L-O** [1] – 1167:1

**p.m** [9] – 1194:16, 1199:24, 1200:1, 1200:2, 1200:3, 1210:15, 1210:21, 1284:4

**PAGE** [1] – 1317:6

**page** [5] – 1205:18, 1207:25, 1241:15, 1242:12, 1292:25

**Page** [26] – 1191:12, 1191:20, 1205:15, 1207:21, 1208:7, 1208:12, 1212:22, 1213:2, 1218:14, 1218:16, 1218:17, 1218:18, 1231:3, 1231:6, 1240:12, 1241:13, 1241:16, 1241:19, 1242:12, 1260:18, 1260:19, 1281:19, 1293:1

**pages** [3] – 1191:14, 1205:25, 1218:19

**paid** [8] - 1161:22, 1163:3, 1164:20, 1167:25, 1170:4, 1181:9, 1181:10, 1212:4
**pain** [3] - 1201:8, 1201:18, 1265:14
**palpable** [6] - 1266:19, 1268:3, 1270:1, 1270:21, 1272:6, 1279:3
**palpate** [2] - 1249:15, 1250:4
**palpating** [1] - 1250:18
**paper** [2] - 1145:11, 1269:19
**papers** [9] - 1178:17, 1178:18, 1178:19, 1179:1, 1182:20, 1206:17, 1206:18, 1206:19, 1206:25
**paragraph** [1] - 1147:13
**parallels** [1] - 1294:10
**pardon** [1] - 1305:14
**parent** [1] - 1256:5
**Park** [1] - 1305:3
**parlors** [2] - 1287:17, 1300:19
**part** [15] - 1195:25, 1227:25, 1240:2, 1240:23, 1246:6, 1249:1, 1249:13, 1257:22, 1270:19, 1271:5, 1277:13, 1281:1, 1286:24, 1300:16, 1304:13
**participants** [1] - 1314:24
**participate** [3] - 1290:2, 1290:5, 1313:9
**participation** [1] - 1289:13
**particular** [15] - 1149:14, 1158:19, 1161:8, 1170:14, 1170:18, 1256:22, 1262:23, 1271:12, 1272:2, 1278:11, 1282:3, 1288:21, 1290:18, 1291:7, 1291:15
**particularly** [12] - 1198:9, 1201:17, 1244:17, 1245:18, 1246:18, 1249:2, 1251:21, 1252:2, 1262:18, 1264:7, 1267:5, 1267:22
**party** [6] - 1260:23, 1262:7, 1275:25, 1290:9, 1290:10, 1290:14
**Paso** [2] - 1246:1, 1246:4
**pass** [1] - 1290:20
**passed** [3] - 1185:5, 1185:11, 1246:2
**passport** [1] - 1207:4
**past** [5] - 1160:20, 1247:25, 1254:12, 1268:23, 1276:11
**patient** [23] - 1245:3, 1249:12, 1250:8, 1250:11, 1250:20, 1257:3, 1257:17, 1263:8, 1263:12, 1264:6, 1264:17, 1264:18, 1265:13, 1268:11, 1268:14, 1268:16, 1270:6, 1270:20, 1271:2, 1272:2, 1272:20, 1281:17, 1282:3
**patient's** [7] - 1255:3, 1270:16, 1270:17, 1271:4, 1271:22, 1273:22, 1282:8
**patients** [4] - 1244:23, 1245:11, 1248:8, 1260:3
**Patrol** [5] - 1285:20, 1285:21, 1285:23, 1286:9, 1288:7
**patrolled** [2] - 1285:25, 1286:4
**pattern** [2] - 1250:23, 1251:2
**Pause** [1] - 1250:2
**pay** [1] - 1162:21
**paying** [1] - 1181:8
**payment** [2] - 1161:14, 1162:24

**pediatric** [3] - 1245:25, 1247:1, 1247:19
**pediatricians** [1] - 1245:7
**pediatrics** [2] - 1247:17, 1247:21
**Pediatrics** [4] - 1247:20, 1252:14, 1252:15, 1252:18
**Pediatrics'** [1] - 1252:16
**Pelon** [12] - 1166:8, 1166:10, 1207:13, 1207:16, 1208:14, 1208:15, 1219:18, 1225:19, 1226:19, 1232:13, 1232:23, 1233:22
**pending** [1] - 1316:7
**Pending** [1] - 1317:19
**Pennsylvania** [3] - 1245:23, 1245:25, 1286:15
**people** [11] - 1231:22, 1251:19, 1257:19, 1257:21, 1262:22, 1271:12, 1284:18, 1293:13, 1295:10, 1295:11, 1313:24
**percentage** [2] - 1255:22, 1256:10
**perform** [4] - 1244:10, 1246:7, 1246:23, 1263:11
**performed** [4] - 1264:4, 1265:20, 1266:1, 1298:2
**perhaps** [5] - 1198:4, 1259:3, 1262:4, 1275:17, 1281:1
**period** [10] - 1156:16, 1157:5, 1174:1, 1220:1, 1220:9, 1220:12, 1229:3, 1229:10, 1236:14, 1312:4
**permission** [4] - 1194:3, 1194:4, 1204:25, 1290:11
**permit** [5] - 1158:25, 1159:18, 1261:18, 1262:8, 1262:20
**permitted** [1] - 1260:22
**persistent** [1] - 1201:8
**person** [21] - 1160:1, 1182:1, 1184:3, 1184:14, 1188:7, 1228:7, 1255:6, 1255:17, 1256:1, 1256:24, 1259:10, 1259:16, 1273:10, 1273:15, 1275:20, 1276:4, 1295:4, 1310:8, 1311:10, 1312:11, 1312:12
**petechiae** [2] - 1251:7, 1274:17
**Philadelphia** [2] - 1247:8, 1286:13
**phone** [30] - 1168:12, 1174:8, 1174:12, 1192:24, 1290:10, 1295:4, 1295:8, 1295:10, 1295:13, 1295:25, 1296:1, 1296:2, 1298:9, 1298:10, 1300:9, 1300:17, 1300:22, 1301:2, 1307:3, 1312:11, 1312:18, 1312:19, 1312:23, 1314:10, 1315:2, 1315:4, 1315:7, 1315:9
**photo** [3] - 1244:11, 1269:18, 1271:25
**photograph** [1] - 1269:4
**photographed** [1] - 1267:8
**photographs** [13] - 1266:20, 1266:23, 1267:2, 1267:4, 1269:5, 1269:7, 1269:9, 1269:23, 1277:9, 1277:12, 1294:12, 1299:4, 1302:16
**photos** [6] - 1227:12, 1227:16, 1264:12, 1264:14, 1266:9, 1267:5
**physical** [21] - 1157:23, 1158:6,

1158:16, 1159:4, 1245:1, 1245:2, 1248:7, 1248:8, 1248:14, 1248:23, 1248:25, 1254:9, 1254:14, 1257:14, 1263:22, 1264:11, 1267:9, 1274:19, 1314:6, 1314:8, 1314:9
**physically** [4] - 1157:22, 1168:25, 1172:8, 1195:4
**physician** [4] - 1194:24, 1195:1, 1198:24, 1201:17
**pick** [7] - 1152:8, 1152:10, 1152:23, 1178:17, 1271:25, 1307:13, 1313:25
**picked** [3] - 1153:9, 1181:9, 1295:4
**picture** [12] - 1215:15, 1216:4, 1216:12, 1216:15, 1216:16, 1216:25, 1217:2, 1217:5, 1217:7, 1269:14, 1299:7, 1305:7
**pictures** [6] - 1216:22, 1217:10, 1227:7, 1271:20, 1276:4, 1305:10
**piece** [5] - 1270:14, 1272:15, 1276:5, 1278:7, 1295:19
**pimp** [1] - 1231:15
**pimps** [1] - 1231:10
**place** [19] - 1147:3, 1157:25, 1162:6, 1176:18, 1180:6, 1180:15, 1180:16, 1181:18, 1181:20, 1208:24, 1209:4, 1210:14, 1254:20, 1254:25, 1265:1, 1289:23, 1295:20, 1296:20, 1307:18
**placed** [6] - 1207:18, 1219:14, 1295:23, 1296:7, 1301:1, 1302:2
**places** [9] - 1165:15, 1180:7, 1180:8, 1180:10, 1180:12, 1180:17, 1245:8, 1249:16, 1263:20
**placing** [3] - 1298:10, 1300:16, 1302:5
**planning** [1] - 1283:5
**plant** [6] - 1152:3, 1152:5, 1152:23, 1155:1, 1156:20, 1157:8
**plate** [2] - 1306:21, 1306:22
**play** [11] - 1255:6, 1290:17, 1291:22, 1291:24, 1292:7, 1293:19, 1296:8, 1296:20, 1297:17, 1301:4, 1301:17
**played** [11] - 1292:1, 1292:10, 1293:21, 1296:18, 1296:24, 1297:5, 1297:23, 1298:14, 1298:19, 1301:11, 1301:25
**playing** [4] - 1170:7, 1303:12, 1303:14, 1308:15
**pleasant** [1] - 1197:21
**pleasure** [1] - 1231:11
**PM** [1] - 1143:9
**point** [8] - 1195:4, 1196:18, 1198:3, 1267:25, 1269:11, 1273:18, 1278:23, 1278:24
**pointed** [2] - 1158:21, 1279:5
**pointing** [1] - 1148:21
**points** [3] - 1285:25, 1286:2, 1286:3
**police** [110] - 1153:17, 1153:21, 1154:1, 1154:8, 1155:6, 1155:18, 1157:1, 1168:10, 1173:8, 1173:13, 1173:23, 1174:2, 1174:16, 1174:18, 1175:7, 1176:14, 1176:18, 1176:21, 1176:24, 1177:2, 1177:10, 1177:14, 1177:22,

1178:3, 1178:11, 1179:2, 1179:6, 1179:10, 1181:17, 1181:22, 1182:17, 1183:6, 1183:9, 1183:19, 1183:25, 1185:16, 1187:14, 1187:22, 1188:3, 1188:5, 1188:18, 1189:18, 1189:23, 1190:4, 1190:9, 1190:13, 1190:17, 1191:23, 1192:13, 1192:19, 1192:22, 1192:25, 1193:14, 1204:10, 1204:13, 1204:18, 1204:25, 1206:1, 1206:5, 1206:8, 1206:10, 1206:22, 1207:12, 1207:19, 1208:13, 1209:22, 1210:2, 1210:10, 1211:7, 1211:11, 1211:14, 1212:19, 1213:19, 1214:5, 1214:8, 1214:11, 1214:14, 1214:17, 1218:4, 1218:8, 1218:11, 1218:25, 1219:5, 1219:9, 1224:8, 1229:11, 1229:17, 1229:21, 1230:9, 1230:12, 1230:14, 1230:23, 1231:9, 1231:12, 1231:14, 1231:17, 1231:19, 1231:21, 1231:25, 1232:25, 1238:1, 1238:4, 1238:10, 1238:13, 1238:24, 1239:4, 1240:10, 1273:13
**Police** [3] - 1288:25, 1289:3, 1302:8
**policing** [1] - 1290:2
**Pollo** [6] - 1166:13, 1166:16, 1166:20, 1166:25, 1167:2, 1167:8
**POLLO** [1] - 1166:20
**portion** [3] - 1150:22, 1213:15, 1248:24
**portions** [2] - 1241:20, 1242:13
**ports** [2] - 1281:1, 1286:4
**Portsmouth** [7] - 1313:23, 1313:24, 1314:2, 1314:5, 1315:18, 1315:20, 1315:21
**position** [1] - 1247:13
**possible** [8] - 1175:19, 1179:10, 1198:25, 1199:2, 1247:25, 1250:21, 1276:10, 1280:19
**possibly** [2] - 1274:22, 1278:6, 1290:15
**postpubertal** [1] - 1244:23
**potential** [2] - 1264:10, 1273:12
**potentially** [1] - 1274:3
**practice** [3] - 1246:25, 1247:6, 1247:9
**prayer** [2] - 1310:8, 1310:10
**preceding** [1] - 1315:10
**precisely** [1] - 1160:23
**pregnant** [5] - 1183:13, 1183:15, 1209:15, 1221:24, 1265:2
**premature** [1] - 1261:21
**preparation** [1] - 1315:7
**prepared** [2] - 1196:4, 1196:9
**prepubertal** [2] - 1244:18, 1244:22
**presence** [2] - 1159:4, 1283:11
**present** [3] - 1144:2, 1178:24, 1302:13
**presentation** [3] - 1150:11, 1253:22, 1254:9
**presentations** [2] - 1253:6, 1253:16
**presented** [2] - 1273:25, 1274:14
**presiding** [1] - 1145:4
**presumably** [3] - 1255:17, 1274:5, 1274:6

**pretty** [1] - 1270:10
**previously** [12] - 1237:1, 1269:1, 1271:18, 1287:18, 1288:1, 1294:12, 1296:4, 1300:11, 1309:8, 1309:22, 1310:2, 1314:12
**PREVIOUSLY** [1] - 1146:13
**Prince** [3] - 1288:25, 1289:2, 1313:18
**print** [1] - 1266:3
**printed** [1] - 1269:18
**prisoners** [1] - 1286:17
**Prisons** [1] - 1286:18
**problem** [3] - 1194:24, 1196:15, 1292:21
**problems** [2] - 1186:10, 1264:8
**Proceedings** [1] - 1316:14
**PROCEEDINGS** [2] - 1145:1, 1317:20
**proceedings** [2] - 1286:18, 1316:19
**PROCEEDINGS...........................** [1] - 1317:6
**processed** [2] - 1286:17, 1286:20
**processes** [1] - 1251:21
**Professional** [2] - 1246:19, 1252:13
**professional** [12] - 1275:4, 1275:13, 1275:21, 1275:24, 1276:16, 1277:1, 1277:20, 1278:19, 1279:19, 1280:9, 1280:16, 1282:6
**program** [2] - 1247:6, 1286:15
**prolonging** [1] - 1198:8
**prominence** [1] - 1268:1
**prone** [1] - 1251:21
**pronounce** [2] - 1167:2, 1281:22
**pronounced** [1] - 1297:10
**pronunciation** [3] - 1167:1, 1294:10, 1310:20
**proposal** [1] - 1203:9
**proposition** [1] - 1260:20
**prosecution** [1] - 1287:23
**prostitute** [5] - 1154:10, 1154:13, 1211:23, 1220:21, 1300:20
**prostitution** [61] - 1152:4, 1154:21, 1154:25, 1156:9, 1160:2, 1160:6, 1160:11, 1160:19, 1160:21, 1160:24, 1166:6, 1166:11, 1166:15, 1167:14, 1169:14, 1176:1, 1176:3, 1176:15, 1176:25, 1177:8, 1177:12, 1177:25, 1178:4, 1179:18, 1179:22, 1179:24, 1180:2, 1182:19, 1182:21, 1183:4, 1184:16, 1188:13, 1192:9, 1192:14, 1204:14, 1204:19, 1205:4, 1206:2, 1206:6, 1209:1, 1209:5, 1209:13, 1209:18, 1209:20, 1209:23, 1210:3, 1210:6, 1214:15, 1214:18, 1220:19, 1221:10, 1221:13, 1227:9, 1227:17, 1227:23, 1229:5, 1231:9, 1237:15, 1265:1, 1308:23, 1309:15
**protect** [1] - 1228:21
**protection** [1] - 1290:15
**protocol** [3] - 1249:11, 1264:1, 1271:1
**protruding** [1] - 1276:7
**prove** [2] - 1158:21, 1159:9

**provide** [8] - 1159:8, 1164:22, 1181:18, 1233:19, 1233:22, 1290:15, 1292:16, 1314:9
**provided** [2] - 1291:2, 1303:24
**proving** [1] - 1159:1
**pubic** [1] - 1265:7
**publishing** [1] - 1308:18
**pull** [2] - 1243:15, 1243:17
**pulled** [2] - 1201:7, 1303:9
**pulls** [1] - 1276:12
**punch** [1] - 1308:15
**purports** [1] - 1149:15
**purpose** [2] - 1209:18, 1237:21
**purposes** [2] - 1252:25, 1305:1
**pursuant** [1] - 1308:7, 1312:16
**pushed** [3] - 1262:3, 1268:11, 1268:14, 1280:13, 1280:18, 1283:20
**put** [9] - 1148:2, 1148:4, 1149:2, 1149:3, 1245:5, 1256:16, 1260:12, 1305:9, 1312:14

## Q

**qualifications** [1] - 1252:3
**qualified** [5] - 1248:12, 1248:17, 1248:21, 1259:1, 1262:18
**quantify** [3] - 1255:21, 1256:10, 1256:22
**QUARLES** [1] - 1143:11
**Quarles** [2] - 1145:4, 1292:20
**queried** [1] - 1201:14
**questionable** [1] - 1158:18
**questioning** [2] - 1159:1, 1283:18
**questions** [30] - 1158:14, 1198:16, 1202:7, 1219:23, 1222:1, 1222:21, 1222:25, 1225:11, 1225:15, 1235:2, 1235:6, 1235:22, 1236:5, 1236:11, 1237:6, 1238:17, 1242:23, 1243:5, 1257:25, 1258:4, 1258:19, 1273:2, 1281:10, 1282:10, 1282:11, 1283:18, 1283:20, 1283:24, 1289:16, 1289:20
**quick** [5] - 1198:17, 1226:6, 1227:4, 1248:23, 1309:18
**quickly** [2] - 1286:20, 1312:6
**quite** [6] - 1145:7, 1157:12, 1239:4, 1272:12, 1274:16, 1291:6

## R

**Rachel** [3] - 1143:15, 1193:6, 1212:22
**rafters** [1] - 1304:23
**raid** [3] - 1179:25, 1180:11, 1181:13
**raided** [1] - 1175:7
**raise** [3] - 1243:12, 1266:18, 1285:1
**raised** [5] - 1270:2, 1270:22, 1270:23, 1272:6, 1279:3
**ran** [1] - 1312:16
**range** [3] - 1245:6, 1260:5, 1300:21

**ranges** [1] - 1245:12
**rape** [5] - 1157:25, 1158:23, 1244:24, 1263:17, 1283:19
**raped** [4] - 1157:19, 1157:22, 1261:24, 1261:25
**rashes** [2] - 1250:24, 1256:3
**rather** [4] - 1203:1, 1270:18, 1277:25, 1280:17
**Raudel** [7] - 1184:13, 1184:18, 1187:14, 1187:17, 1188:4, 1188:7, 1188:10
**reach** [1] - 1276:22
**reached** [1] - 1315:24
**read** [25] - 1147:10, 1147:13, 1147:14, 1147:17, 1147:20, 1147:25, 1148:3, 1150:9, 1150:15, 1150:17, 1150:25, 1191:11, 1191:19, 1205:14, 1208:3, 1208:11, 1208:12, 1213:2, 1213:4, 1213:11, 1218:16, 1240:23, 1241:11, 1259:9, 1294:4
**reading** [2] - 1191:22, 1205:24
**ready** [5] - 1145:6, 1145:20, 1203:22, 1222:7, 1284:7
**real** [4] - 1248:23, 1259:4, 1270:14, 1278:6, 1309:18
**realize** [1] - 1262:2
**realized** [1] - 1177:18
**really** [5] - 1226:13, 1256:20, 1265:8, 1265:22, 1276:13
**realtime** [1] - 1315:1
**Realtime** [1] - 1316:18
**rear** [1] - 1314:7
**reason** [11] - 1160:5, 1164:19, 1168:14, 1170:16, 1178:20, 1192:14, 1223:9, 1225:24, 1226:13, 1231:4, 1231:8
**reasonable** [2] - 1255:17, 1277:16
**reasonably** [1] - 1254:5
**reasons** [1] - 1168:14
**Rebeca** [3] - 1148:13, 1259:11, 1263:9
**REBECA** [2] - 1146:12, 1317:9
**recalled** [2] - 1149:18, 1261:22
**receipt** [5] - 1295:19, 1296:1, 1296:4, 1307:5, 1307:7
**receive** [12] - 1161:16, 1161:20, 1162:13, 1164:17, 1170:23, 1171:3, 1171:12, 1171:16, 1221:17, 1245:22, 1246:7, 1300:20
**received** [9] - 1153:17, 1161:25, 1192:8, 1192:15, 1247:3, 1247:5, 1255:14, 1291:20, 1292:14
**recent** [1] - 1254:8
**receptacle** [1] - 1295:23
**recess** [7] - 1194:13, 1194:15, 1199:23, 1200:1, 1200:2, 1282:20, 1284:3
**Recess** [2] - 1194:16, 1284:4
**recognition** [1] - 1250:23
**recognizable** [1] - 1309:17
**recognize** [4] - 1294:16, 1295:3, 1299:7, 1310:4
**recollection** [10] - 1191:23, 1205:25, 1208:13, 1236:11, 1240:10, 1240:24,

1241:10, 1242:20, 1259:12, 1283:10
**recommend** [1] - 1201:16
**record** [9] - 1146:6, 1199:7, 1242:5, 1243:18, 1285:6, 1293:22, 1305:17, 1312:25, 1316:19
**recorded** [2] - 1174:22, 1301:9
**recorder** [1] - 1292:18
**recording** [11] - 1290:18, 1292:1, 1293:21, 1296:18, 1296:24, 1297:5, 1297:23, 1298:14, 1298:19, 1301:11, 1301:25
**records** [1] - 1298:24
**recover** [2] - 1182:9, 1295:15
**recovered** [5] - 1295:13, 1298:8, 1303:22, 1305:20, 1309:22
**RECROSS** [2] - 1237:9, 1238:21
**Recross** [2] - 1317:11, 1317:12
**RECROSS-EXAMINATION** [2] - 1237:9, 1238:21
**Recross-Examination** [2] - 1317:11, 1317:12
**recycle** [1] - 1151:3
**recycling** [10] - 1149:16, 1149:18, 1151:7, 1152:3, 1155:1, 1156:19, 1157:8, 1182:25, 1183:1, 1183:3
**redirect** [2] - 1226:23, 1281:12
**Redirect** [2] - 1317:11, 1317:16
**REDIRECT** [2] - 1227:1, 1281:14
**refer** [2] - 1231:2, 1269:23
**reference** [3] - 1281:17, 1281:18, 1297:7
**referred** [1] - 1295:14
**referring** [4] - 1154:12, 1155:5, 1167:16, 1271:19, 1281:16
**refers** [2] - 1294:6, 1297:8
**refresh** [4] - 1191:22, 1240:9, 1240:23, 1242:19
**refreshes** [1] - 1241:9
**regard** [2] - 1195:24, 1260:17
**regards** [1] - 1283:23
**Registered** [1] - 1316:17
**registration** [1] - 1309:1
**regular** [3] - 1251:5, 1251:9, 1263:19
**regularly** [1] - 1157:14
**regurgitation** [1] - 1259:15
**rejected** [1] - 1178:3
**related** [3] - 1253:24, 1254:6, 1265:5
**relating** [2] - 1225:19, 1261:16
**relation** [1] - 1216:15
**relations** [1] - 1170:1
**relationship** [5] - 1163:23, 1214:25, 1215:3, 1223:12, 1224:3
**relative** [1] - 1249:11
**relevance** [1] - 1158:18
**relevant** [1] - 1306:22
**rely** [1] - 1236:10
**remember** [58] - 1146:19, 1149:25, 1151:2, 1151:21, 1152:16, 1154:5, 1154:20, 1161:4, 1164:7, 1165:3,

1171:2, 1171:25, 1172:3, 1173:20, 1174:20, 1174:24, 1175:9, 1175:15, 1175:18, 1179:7, 1179:9, 1179:12, 1180:20, 1184:2, 1190:7, 1190:8, 1190:20, 1191:1, 1192:2, 1193:1, 1193:22, 1204:23, 1208:16, 1209:14, 1211:1, 1211:5, 1212:2, 1212:20, 1214:4, 1214:22, 1216:17, 1217:13, 1218:10, 1219:2, 1222:25, 1223:2, 1223:4, 1231:18, 1234:22, 1239:15, 1239:19, 1240:5, 1241:5, 1241:7, 1263:14, 1282:16, 1299:22, 1316:4
**remembered** [1] - 1225:1
**remind** [2] - 1146:2, 1204:2
**remitter** [1] - 1307:7
**remove** [2] - 1186:9, 1186:15
**removed** [5] - 1178:4, 1186:18, 1265:1, 1274:8, 1286:20
**removing** [1] - 1308:18
**repeat** [3] - 1182:14, 1207:25, 1296:15
**repeated** [1] - 1206:16
**repeats** [1] - 1186:1
**rephrase** [2] - 1156:4, 1171:8
**replacement** [1] - 1297:11
**report** [11] - 1259:7, 1259:9, 1259:12, 1263:24, 1264:18, 1264:20, 1264:24, 1265:13, 1281:16, 1281:18, 1312:16
**reported** [4] - 1265:15, 1268:19, 1271:4, 1282:8
**Reported** [1] - 1144:22
**Reporter** [2] - 1316:17, 1316:18
**REPORTER** [11] - 1166:21, 1166:23, 1166:25, 1167:3, 1202:4, 1241:13, 1241:15, 1242:5, 1244:19, 1286:2, 1286:6
**reporting** [1] - 1255:6
**reports** [1] - 1290:13
**represent** [1] - 1222:16
**represents** [1] - 1292:24
**request** [4] - 1145:18, 1179:20, 1249:20, 1249:25
**requested** [2] - 1145:10, 1241:19
**requests** [3] - 1145:17, 1168:17, 1188:20
**require** [1] - 1195:6
**required** [3] - 1159:8, 1170:12, 1283:11
**requires** [1] - 1198:2
**reserved** [1] - 1196:1
**residence** [3] - 1306:18, 1307:12, 1313:19
**residency** [2] - 1246:3, 1246:9
**resident** [1] - 1247:5
**residents** [1] - 1247:1
**resisted** [1] - 1179:20
**resources** [1] - 1300:21
**respect** [16] - 1158:18, 1227:22, 1249:7, 1252:2, 1259:18, 1262:19, 1264:18, 1265:13, 1266:6, 1282:1, 1287:7, 1287:14, 1288:16, 1295:14, 1298:1, 1298:11

**responded** [1] - 1289:14
**responding** [1] - 1198:16
**Response** [1] - 1307:15
**response** [11] - 1193:17, 1198:17, 1198:20, 1204:16, 1239:23, 1240:7, 1240:10, 1241:7, 1241:25, 1242:22, 1289:17
**responsibilities** [2] - 1244:8, 1287:6
**rest** [1] - 1251:13
**restaurant** [1] - 1221:6
**resting** [2] - 1254:20, 1254:25
**restrained** [1] - 1223:25
**result** [9] - 1166:1, 1171:23, 1192:8, 1192:15, 1205:24, 1255:22, 1256:11, 1274:20, 1279:7
**resulted** [1] - 1274:14
**results** [1] - 1266:4
**resume** [4] - 1193:24, 1195:3, 1196:16, 1199:16
**Resumed** [1] - 1317:9
**resumed** [1] - 1179:22
**resumes** [3] - 1194:18, 1200:5, 1284:6
**retrieve** [2] - 1206:22, 1295:24
**retrieving** [2] - 1295:19, 1296:5
**return** [2] - 1177:11, 1207:5
**returned** [8] - 1178:23, 1182:7, 1182:13, 1182:18, 1251:12, 1313:22, 1315:19, 1315:21
**returning** [1] - 1313:18
**revealed** [1] - 1313:16
**reverse** [1] - 1227:23
**review** [8] - 1253:19, 1298:24, 1300:13, 1302:16, 1311:16, 1313:8, 1315:6, 1316:9
**reviewed** [1] - 1266:23
**reviewing** [1] - 1309:20
**Reyes** [9] - 1295:12, 1295:14, 1295:19, 1295:22, 1300:6, 1300:9, 1307:8, 1309:8
**ride** [1] - 1152:1
**rip** [1] - 1305:5
**rise** [7] - 1145:2, 1194:17, 1199:25, 1200:4, 1282:19, 1284:5, 1316:12
**Ritter** [1] - 1281:21
**Riverdale** [1] - 1295:21
**RMR** [2] - 1144:23, 1316:23
**road** [1] - 1261:25
**robbery** [1] - 1298:22
**rocks** [1] - 1268:15
**role** [1] - 1255:6
**rolling** [1] - 1250:10
**romantic** [1] - 1215:3
**Room** [1] - 1144:23
**room** [2] - 1263:16, 1316:2
**rotate** [1] - 1247:2
**routinely** [2] - 1295:20, 1297:9
**rubbing** [1] - 1306:3
**Ruiz** [1] - 1307:13
**rule** [1] - 1283:10

**Rule** [1] - 1159:7
**rules** [1] - 1158:25
**ruling** [2] - 1145:11, 1301:13
**runs** [1] - 1256:2
**Ruter** [17] - 1143:17, 1158:15, 1194:1, 1195:1, 1195:14, 1195:22, 1195:25, 1196:5, 1196:8, 1196:11, 1198:15, 1203:13, 1204:5, 1207:25, 1227:7, 1237:8, 1273:3
**RUTER** [130] - 1145:7, 1145:10, 1145:14, 1145:21, 1146:9, 1146:15, 1147:12, 1147:18, 1147:20, 1147:23, 1148:7, 1149:7, 1149:10, 1150:4, 1150:10, 1150:12, 1150:14, 1150:19, 1150:21, 1150:24, 1156:4, 1156:5, 1158:20, 1159:12, 1159:21, 1159:25, 1166:22, 1166:24, 1167:1, 1167:4, 1167:7, 1168:22, 1168:23, 1171:9, 1171:10, 1185:22, 1185:25, 1186:2, 1188:22, 1188:24, 1190:3, 1191:2, 1191:4, 1191:9, 1191:10, 1191:18, 1193:6, 1193:9, 1193:19, 1194:2, 1194:6, 1194:9, 1194:12, 1196:17, 1197:5, 1197:11, 1202:2, 1203:11, 1204:6, 1204:7, 1205:6, 1205:9, 1205:11, 1205:13, 1205:16, 1205:20, 1205:23, 1207:21, 1207:23, 1208:2, 1208:6, 1208:9, 1208:10, 1212:22, 1212:25, 1213:5, 1213:8, 1213:11, 1213:17, 1215:11, 1215:18, 1215:23, 1216:19, 1216:21, 1218:14, 1218:20, 1218:23, 1219:23, 1222:1, 1222:4, 1237:7, 1237:10, 1238:15, 1238:20, 1252:4, 1252:6, 1252:8, 1257:25, 1258:2, 1258:6, 1258:8, 1258:17, 1258:25, 1260:17, 1261:8, 1261:11, 1261:19, 1261:21, 1262:9, 1262:11, 1273:4, 1273:6, 1273:9, 1281:8, 1282:11, 1283:4, 1284:2, 1284:8, 1284:11, 1284:13, 1284:16, 1292:9, 1292:14, 1293:1, 1293:4, 1293:6, 1293:17, 1301:12, 1301:16, 1316:11
**Ruter's** [3] - 1195:19, 1199:6, 1283:19
**RUTER.........** [1] - 1317:10
**RUTER.............** [1] - 1317:15
**RUTER...............** [1] - 1317:11
**RUTER.................** [1] - 1317:16

## S

**safe** [3] - 1177:19, 1231:18, 1289:24
**safely** [1] - 1311:24
**Salvador** [1] - 1307:8
**San** [2] - 1246:11, 1246:18
**Santa** [6] - 1304:24, 1305:12, 1305:16, 1305:19, 1310:7, 1310:9
**Saturday** [1] - 1156:14
**saw** [20] - 1169:25, 1171:18, 1175:12, 1175:13, 1186:3, 1186:7, 1211:14,

1211:19, 1211:20, 1212:12, 1259:21, 1270:6, 1273:20, 1274:23, 1275:2, 1277:12, 1277:18, 1279:5, 1280:6
**scalp** [1] - 1249:17
**scar** [10] - 1251:10, 1267:18, 1267:19, 1269:25, 1271:16, 1275:9, 1277:8, 1277:18, 1277:20
**scared** [8] - 1225:24, 1230:16, 1230:17, 1233:3, 1238:1, 1238:4, 1238:7, 1238:23
**scarring** [1] - 1254:19
**scars** [1] - 1251:8
**scoot** [2] - 1243:15, 1285:4
**screen** [4] - 1215:16, 1271:21, 1307:19, 1312:14
**screens** [1] - 1215:19
**search** [10] - 1298:1, 1298:4, 1300:10, 1300:12, 1300:25, 1301:5, 1302:13, 1304:15, 1307:24, 1308:7
**searched** [14] - 1299:2, 1300:13, 1300:15, 1304:18, 1306:8, 1306:9, 1306:14, 1306:16, 1307:9, 1307:21, 1307:22, 1308:3, 1308:7, 1309:3
**searches** [1] - 1290:6
**seated** [6] - 1146:1, 1200:6, 1204:1, 1243:15, 1284:21, 1285:4
**second** [15] - 1162:2, 1162:3, 1162:13, 1210:10, 1210:20, 1212:22, 1214:1, 1221:22, 1221:24, 1224:14, 1242:19, 1259:19, 1265:2, 1303:3, 1304:3
**second-floor** [2] - 1303:3, 1304:3
**section** [7] - 1242:9, 1250:9, 1252:16, 1264:17, 1287:22
**sections** [1] - 1250:7
**Security** [1] - 1285:12
**see** [44] - 1148:15, 1148:18, 1148:22, 1149:13, 1150:1, 1150:19, 1150:25, 1151:7, 1152:17, 1153:3, 1157:9, 1186:22, 1187:3, 1195:3, 1197:6, 1199:8, 1211:3, 1236:22, 1240:23, 1241:9, 1245:7, 1245:11, 1245:14, 1250:11, 1253:15, 1254:24, 1256:23, 1265:17, 1265:22, 1266:14, 1268:2, 1269:3, 1269:4, 1270:12, 1273:20, 1279:6, 1283:25, 1288:17, 1289:22, 1292:15, 1305:5, 1305:7, 1316:5, 1316:10
**seeing** [1] - 1237:17
**seem** [1] - 1294:20
**seized** [10] - 1307:18, 1308:11, 1308:19, 1309:9, 1310:2, 1310:21, 1311:6, 1312:11, 1312:21, 1312:23
**selection** [1] - 1290:17
**self** [3] - 1274:4, 1276:1, 1289:19
**self-sustained** [1] - 1274:4
**send** [7] - 1189:21, 1189:23, 1190:5, 1190:10, 1190:15, 1192:3, 1192:5, 1192:6, 1195:2
**senior** [1] - 1247:5
**sense** [2] - 1197:13, 1198:2

**sent** [10] - 1189:18, 1190:18, 1190:21, 1191:24, 1192:2, 1206:19, 1245:19, 1246:10, 1246:14, 1257:21
**sentences** [1] - 1250:1
**Sentra** [2] - 1307:21, 1308:12
**separate** [1] - 1210:13
**separately** [2] - 1240:16, 1268:22
**September** [47] - 1153:17, 1154:1, 1154:4, 1154:9, 1154:13, 1154:16, 1154:22, 1154:25, 1155:5, 1155:20, 1156:9, 1156:17, 1157:2, 1157:6, 1173:9, 1173:13, 1173:23, 1174:2, 1174:15, 1175:6, 1175:13, 1175:17, 1175:21, 1175:25, 1176:18, 1177:8, 1180:1, 1180:6, 1180:11, 1180:16, 1180:19, 1180:23, 1181:2, 1181:13, 1181:16, 1182:17, 1182:21, 1183:18, 1193:10, 1224:12, 1229:11, 1229:17, 1230:12, 1238:24, 1239:5, 1240:13, 1309:22
**Sergeant** [1] - 1289:2
**series** [3] - 1219:23, 1299:5, 1306:15
**service** [1] - 1247:7
**serviced** [1] - 1288:13
**Services** [3] - 1175:20, 1175:21, 1221:21
**services** [3] - 1170:5, 1287:18, 1300:18
**session** [5] - 1145:3, 1194:18, 1200:3, 1200:5, 1284:6
**set** [4] - 1251:9, 1251:14, 1268:7, 1272:7
**settle** [1] - 1201:18
**seven** [6] - 1152:21, 1220:1, 1220:10, 1220:13, 1220:25, 1221:2
**several** [6] - 1165:25, 1172:11, 1173:15, 1175:4, 1240:1, 1253:11
**severe** [1] - 1201:6
**sex** [16] - 1157:14, 1161:17, 1170:8, 1170:13, 1170:18, 1171:20, 1172:1, 1274:15, 1274:20, 1287:10, 1287:11, 1287:13, 1287:14, 1287:15, 1288:2, 1288:10
**sex-trafficking** [3] - 1274:15, 1287:15, 1288:2
**sexual** [18] - 1159:9, 1170:1, 1172:23, 1244:17, 1248:7, 1248:14, 1253:23, 1254:6, 1257:22, 1263:22, 1274:18, 1283:12, 1283:13, 1283:14, 1283:16, 1283:19, 1283:21, 1305:1
**Shaken** [1] - 1253:9
**shape** [1] - 1276:13
**shaped** [4] - 1267:24, 1269:17, 1270:11, 1270:13
**shared** [1] - 1185:13
**sharp** [11] - 1270:11, 1270:14, 1272:3, 1272:14, 1275:7, 1275:17, 1275:22, 1276:5, 1276:7, 1276:14, 1278:25
**sheet** [2] - 1303:20, 1307:20
**sheets** [2] - 1307:1, 1316:9
**shelter** [9] - 1177:17, 1177:22, 1178:8,

1178:11, 1178:14, 1179:2, 1181:20, 1182:17, 1182:18
**shift** [2] - 1152:13, 1153:11
**shifting** [1] - 1203:11
**shins** [2] - 1271:10
**shirt** [1] - 1225:8
**shoes** [1] - 1225:1
**shoot** [1] - 1242:22
**Shop** [1] - 1294:7
**shopping** [1] - 1221:11
**short** [2] - 1196:15, 1313:22
**shorten** [1] - 1195:19
**shorter** [1] - 1174:1
**show** [20] - 1146:16, 1148:7, 1149:12, 1150:2, 1150:4, 1165:15, 1181:22, 1240:21, 1240:22, 1241:9, 1269:1, 1271:18, 1276:4, 1310:3, 1310:17, 1310:24, 1312:25, 1314:12, 1315:13, 1315:14
**showed** [4] - 1227:7, 1240:9, 1297:9, 1299:15
**showing** [1] - 1310:25
**shown** [3] - 1148:9, 1191:6, 1254:10
**shows** [4] - 1269:14, 1306:6, 1311:4, 1312:17
**sick** [2] - 1190:11, 1192:4
**side** [2] - 1198:22, 1279:17
**sidewalk** [1] - 1276:8
**sight** [5] - 1191:14, 1191:17, 1205:17, 1213:13, 1242:16
**sign** [1] - 1146:24
**signature** [2] - 1146:21
**signed** [3] - 1147:7, 1148:12, 1148:24
**significant** [2] - 1201:15, 1264:12
**silently** [1] - 1191:12
**silver** [1] - 1313:21
**Silver** [1] - 1309:2
**similar** [1] - 1257:15
**simple** [2] - 1255:24, 1255:25
**simply** [3] - 1259:15, 1260:22, 1283:20
**sit** [1] - 1265:8
**sitting** [1] - 1222:19
**situation** [1] - 1198:25
**six** [10] - 1220:23, 1251:8, 1251:9, 1251:15, 1254:18, 1255:1, 1268:6, 1268:23, 1270:4, 1270:25
**skills** [1] - 1262:23
**skin** [29] - 1246:21, 1249:5, 1249:7, 1249:8, 1249:12, 1250:7, 1250:16, 1250:19, 1250:22, 1250:23, 1251:4, 1251:5, 1251:6, 1251:9, 1251:13, 1251:20, 1254:15, 1254:24, 1255:14, 1255:25, 1256:3, 1257:22, 1262:19, 1264:8, 1266:7, 1266:19, 1267:6, 1276:12
**slightly** [2] - 1269:14, 1269:15
**slipped** [1] - 1280:17
**slow** [1] - 1249:20
**slower** [1] - 1244:20

**slowly** [2] - 1198:7, 1198:12
**small** [9] - 1265:15, 1267:17, 1267:18, 1270:18, 1271:8, 1271:15, 1271:17, 1304:24
**smooth** [1] - 1270:12, 1272:15
**smuggling** [2] - 1286:25, 1287:3
**Social** [3] - 1175:20, 1175:21, 1221:21
**Society** [2] - 1246:19, 1252:13
**someone** [4] - 1164:14, 1228:5, 1251:1, 1310:15
**sometime** [5] - 1152:10, 1229:8, 1252:23, 1295:16, 1307:22
**sometimes** [8] - 1187:4, 1198:1, 1220:15, 1221:4, 1250:10, 1250:11, 1250:12, 1265:10
**somewhat** [1] - 1270:11
**sooner** [1] - 1158:14
**sore** [1] - 1249:16
**Soriano** [3] - 1184:1, 1184:3, 1184:9
**sorry** [22] - 1149:24, 1185:22, 1213:5, 1244:19, 1244:21, 1246:3, 1249:24, 1267:24, 1268:13, 1286:2, 1286:6, 1296:11, 1296:15, 1298:3, 1298:15, 1301:18, 1302:6, 1302:18, 1303:25, 1305:15, 1315:15, 1315:16
**sort** [4] - 1267:25, 1270:11, 1270:12, 1278:5
**sorts** [1] - 1244:24
**sound** [2] - 1265:18, 1277:16
**sounds** [1] - 1265:21
**source** [14] - 1159:1, 1159:10, 1250:22, 1259:20, 1272:10, 1272:22, 1275:3, 1275:4, 1275:14, 1275:21, 1276:17, 1291:18, 1300:23
**sources** [1] - 1302:9
**South** [3] - 1285:22, 1285:23, 1286:9
**south** [1] - 1286:1
**space** [6] - 1304:6, 1304:9, 1304:12, 1304:13, 1304:18, 1305:21
**Spanish** [10] - 1144:3, 1144:4, 1156:3, 1239:8, 1239:17, 1288:6, 1288:12, 1291:4, 1297:13
**speaker** [1] - 1239:9
**speaking** [7] - 1202:17, 1256:24, 1264:5, 1275:14, 1278:1, 1278:19, 1297:13
**speaks** [1] - 1292:18
**special** [2] - 1285:18, 1286:22
**Special** [18] - 1144:3, 1282:24, 1284:24, 1285:11, 1288:6, 1291:7, 1292:16, 1293:8, 1294:1, 1294:16, 1295:3, 1297:7, 1300:2, 1302:2, 1303:2, 1304:21, 1307:15, 1313:9
**specialize** [1] - 1245:10
**specific** [4] - 1159:20, 1257:1, 1283:13, 1283:24
**specifically** [4] - 1193:14, 1257:21, 1268:12, 1288:3
**specify** [1] - 1257:10
**speculation** [1] - 1171:7

**spell** [4] - 1243:18, 1285:5
**spend** [1] - 1199:4
**spent** [1] - 1195:22
**spoken** [4] - 1222:14, 1224:7, 1224:17, 1239:16
**spot** [1] - 1276:1
**Spring** [1] - 1309:2
**squamous** [1] - 1251:5
**staff** [1] - 1247:1
**stand** [6] - 1200:25, 1203:6, 1203:7, 1250:12, 1260:20, 1304:11
**Stand**............................. [1] - 1317:9
**standard** [1] - 1251:6
**stands** [5] - 1168:20, 1194:14, 1282:19, 1284:3, 1316:12
**star** [2] - 1267:24, 1269:17
**star-shaped** [2] - 1267:24, 1269:17
**start** [5] - 1227:6, 1265:9, 1267:21, 1291:13, 1315:25
**started** [10] - 1161:13, 1173:13, 1180:4, 1210:15, 1210:20, 1210:21, 1227:22, 1237:17, 1287:4, 1316:3
**starting** [7] - 1151:19, 1267:13, 1301:5, 1306:14, 1316:1
**starts** [1] - 1267:25
**state** [6] - 1146:5, 1201:2, 1243:18, 1247:10, 1285:5, 1290:9
**State** [3] - 1245:23, 1287:9, 1300:24
**statement** [15] - 1149:15, 1183:18, 1223:5, 1224:9, 1224:23, 1225:2, 1231:3, 1231:5, 1233:11, 1235:21, 1237:22, 1238:25, 1253:24, 1254:21, 1254:23
**States** [5] - 1145:2, 1243:10, 1253:4, 1284:24, 1286:20
**STATES** [3] - 1143:1, 1143:4, 1317:2
**Station** [1] - 1286:5
**station** [3] - 1176:18, 1230:9, 1286:6
**statue** [1] - 1305:19
**status** [1] - 1288:18
**stay** [1] - 1178:11
**stayed** [1] - 1221:2
**STD** [2] - 1265:19, 1266:1
**stellate** [5] - 1267:23, 1267:24, 1269:12, 1269:17
**step** [2] - 1203:5, 1243:7
**sticks** [1] - 1268:1
**still** [6] - 1146:2, 1151:4, 1196:10, 1204:3, 1226:13, 1284:18
**stipulation** [1] - 1283:23
**stomach** [1] - 1165:18
**stone** [1] - 1170:8
**stop** [1] - 1265:9
**stopped** [3] - 1145:15, 1169:3, 1169:5
**storage** [1] - 1304:13
**straight** [3] - 1197:12, 1276:13, 1278:6
**straight-edged** [1] - 1278:6
**strangers** [1] - 1197:21
**stratified** [1] - 1251:5

**street** [4] - 1230:4, 1230:6, 1294:9, 1297:8
**Street** [1] - 1144:24
**stress** [1] - 1197:16
**strike** [7] - 1164:25, 1165:6, 1165:8, 1165:16, 1165:17, 1165:19, 1186:15
**striking** [1] - 1279:24
**struck** [1] - 1262:4
**students** [1] - 1246:25
**sub** [1] - 1247:21
**sub-Boarded** [1] - 1247:21
**subject** [4] - 1158:9, 1246:17, 1256:9, 1256:13
**submit** [3] - 1157:22, 1197:5, 1260:10
**subsequently** [2] - 1307:14, 1315:21
**suddenly** [1] - 1265:8
**suggest** [1] - 1258:25
**suggestibility** [1] - 1253:13
**suggesting** [3] - 1197:4, 1197:23, 1197:25
**suggests** [1] - 1241:25
**summarize** [1] - 1313:15
**summary** [1] - 1289:13
**summer** [1] - 1247:14
**Sunday** [2] - 1156:15, 1220:24
**super** [1] - 1278:25
**superficial** [1] - 1251:6
**supervisors** [1] - 1290:11
**support** [4] - 1217:16, 1218:3, 1218:6, 1219:1
**supportive** [1] - 1245:20
**supposed** [3] - 1159:10, 1186:21, 1274:18
**suprapubic** [1] - 1265:6
**surfaces** [1] - 1268:2
**surgeons** [1] - 1272:12
**surgical** [1] - 1272:12
**surprise** [2] - 1217:20, 1217:23
**surprised** [1] - 1272:15
**surveillance** [9] - 1294:8, 1295:20, 1306:22, 1313:5, 1313:9, 1313:13, 1313:16, 1313:25, 1314:13, 1314:25, 1315:11
**survive** [1] - 1197:6
**Susan** [1] - 1281:21
**suspect** [1] - 1231:22
**suspected** [2] - 1290:3, 1294:14
**suspicious** [2] - 1265:21, 1271:14
**sustained** [9] - 1171:8, 1232:20, 1234:17, 1234:19, 1235:8, 1242:3, 1274:4
**suture** [1] - 1272:13
**SWAT** [1] - 1299:13
**SWORN** [3] - 1146:13, 1243:14, 1285:3
**Sworn**......................................... [2] - 1317:14, 1317:18
**Symposium** [1] - 1253:9

# T

**T-H-E-R-E-S-A** [1] - 1243:21
**Tab** [13] - 1291:23, 1292:8, 1293:3, 1293:4, 1296:10, 1296:13, 1296:21, 1297:2, 1297:21, 1298:11, 1301:6, 1301:18
**tab** [1] - 1297:1
**table** [1] - 1299:12
**tags** [2] - 1313:20, 1314:20
**talks** [1] - 1292:18
**tally** [3] - 1303:20, 1307:1, 1307:20
**tampons** [2] - 1303:14, 1303:17
**target** [1] - 1292:19
**teaching** [1] - 1247:6
**Team** [2] - 1299:13, 1307:15
**teasing** [2] - 1196:11, 1196:13
**technical** [1] - 1294:20
**technique** [1] - 1305:6
**teeth** [1] - 1249:15
**telephone** [2] - 1187:2, 1207:18
**television** [1] - 1299:12
**TELL** [3] - 1146:13, 1243:14, 1285:3
**ten** [2] - 1273:6, 1307:25
**tend** [4] - 1250:25, 1271:9, 1271:13, 1276:11
**tendered** [2] - 1191:7, 1193:7
**tends** [2] - 1251:12, 1276:12
**term** [2] - 1248:25, 1254:21
**terms** [3] - 1245:6, 1256:10, 1288:17
**testified** [12] - 1150:8, 1155:16, 1227:11, 1228:9, 1236:6, 1237:1, 1238:23, 1260:2, 1261:7, 1261:23, 1273:20, 1311:13
**testify** [9] - 1233:12, 1248:12, 1248:17, 1259:18, 1261:18, 1262:19, 1262:21, 1263:2, 1293:8
**testifying** [1] - 1154:4
**testimony** [19] - 1160:13, 1161:19, 1181:12, 1181:16, 1212:13, 1215:6, 1215:8, 1228:2, 1229:4, 1234:4, 1236:11, 1260:15, 1261:16, 1266:25, 1267:9, 1298:25, 1313:4, 1313:6, 1315:7
**testing** [3] - 1265:19, 1266:1, 1266:2
**tests** [2] - 1264:16, 1266:2
**Texas** [5] - 1246:1, 1246:5, 1285:22, 1285:23, 1286:9
**themselves** [3] - 1179:10, 1256:3, 1256:15
**THEN** [2] - 1243:14, 1285:3
**thereafter** [1] - 1307:23
**therefore** [5] - 1172:19, 1220:12, 1260:11, 1275:19, 1276:22
**THERESA** [2] - 1243:13, 1317:13
**Theresa** [1] - 1243:20
**they've** [1] - 1159:10
**thickened** [2] - 1270:2, 1270:13
**thickening** [1] - 1276:11

**thigh** [9] - 1267:19, 1268:25, 1270:16, 1270:17, 1270:19, 1271:9, 1271:22, 1277:21, 1278:18
**thin** [6] - 1267:17, 1270:12, 1272:11, 1272:13, 1272:15, 1278:6
**thinking** [1] - 1201:11
**thinks** [1] - 1199:1
**third** [3] - 1260:23, 1262:7, 1275:25
**third-party** [1] - 1262:7
**thousands** [1] - 1173:2
**threaten** [1] - 1192:24
**threatened** [15] - 1160:7, 1160:10, 1160:12, 1160:18, 1160:20, 1172:13, 1176:7, 1192:17, 1192:20, 1193:15, 1205:1, 1206:5, 1206:9, 1207:16, 1231:10
**three** [16] - 1148:18, 1150:16, 1150:17, 1156:24, 1157:5, 1165:24, 1181:1, 1181:13, 1192:7, 1197:9, 1255:2, 1255:11, 1257:4, 1265:10, 1266:18, 1286:10
**three-year-old** [1] - 1255:11
**throat** [2] - 1249:14, 1249:17
**throughout** [4] - 1172:16, 1209:1, 1247:3, 1253:4
**Thursday** [3] - 1145:12, 1156:13, 1195:7
**ticket** [2] - 1170:7, 1310:25
**tickets** [2] - 1181:6, 1181:9
**timeframe** [5] - 1157:13, 1163:9, 1164:16, 1168:9, 1221:20
**timing** [1] - 1268:19
**tingling** [1] - 1201:9
**tip** [9] - 1270:20, 1271:3, 1271:17, 1279:9, 1279:10, 1279:15, 1279:17, 1279:22, 1279:23
**tips** [1] - 1279:13
**tissue** [1] - 1251:8
**title** [1] - 1253:19
**TO** [3] - 1146:13, 1243:14, 1285:3
**today** [17] - 1165:13, 1175:24, 1195:24, 1196:21, 1196:22, 1199:1, 1201:4, 1202:23, 1203:2, 1205:25, 1208:13, 1211:2, 1211:3, 1211:20, 1249:23, 1267:9, 1315:7
**toe** [3] - 1245:3, 1249:3, 1264:11
**toes** [1] - 1250:14
**together** [6] - 1184:9, 1196:25, 1201:8, 1217:15, 1256:16, 1262:25
**toll** [3] - 1298:24, 1312:16, 1312:25
**tomorrow** [10] - 1195:6, 1199:2, 1199:4, 1199:19, 1283:8, 1284:11, 1315:25, 1316:5, 1316:10, 1316:13
**tongue** [1] - 1279:14
**took** [17] - 1151:5, 1155:19, 1157:25, 1160:23, 1164:24, 1176:18, 1179:10, 1186:14, 1198:15, 1208:24, 1210:14, 1212:19, 1266:9, 1266:20, 1269:5, 1269:15, 1295:22
**top** [4] - 1199:8, 1239:13, 1250:5,

1250:10
**Torres** [2] - 1310:19, 1312:8
**total** [1] - 1199:3
**touch** [4] - 1174:14, 1234:12, 1234:16, 1249:15
**toward** [2] - 1243:16, 1285:5
**towels** [1] - 1305:2
**town** [3] - 1161:6, 1162:9, 1162:11
**Toyota** [4] - 1300:7, 1309:3, 1309:6, 1314:20
**track** [5] - 1296:16, 1297:1, 1297:4, 1297:19, 1301:21
**Track** [6] - 1291:24, 1293:20, 1301:6, 1301:17, 1301:18, 1301:22
**tracking** [1] - 1315:1
**traditional** [1] - 1305:4
**traditionally** [1] - 1255:8
**trafficking** [14] - 1274:8, 1274:15, 1274:21, 1286:25, 1287:2, 1287:4, 1287:10, 1287:11, 1287:13, 1287:14, 1287:15, 1288:2, 1288:11
**train** [1] - 1246:23
**trained** [1] - 1245:25
**training** [8] - 1246:6, 1246:7, 1246:17, 1246:20, 1247:5, 1249:6, 1249:7, 1262:23
**transcript** [4] - 1240:12, 1241:17, 1294:2, 1316:19
**transferred** [2] - 1246:10, 1286:13
**translate** [8] - 1147:19, 1191:14, 1205:18, 1241:19, 1242:9, 1242:10, 1242:12, 1269:3
**translated** [2] - 1242:6, 1242:19
**translating** [11] - 1147:21, 1150:22, 1191:15, 1205:19, 1208:8, 1213:14, 1213:15, 1218:21, 1241:20, 1242:13, 1271:21
**translation** [3] - 1213:9, 1297:13, 1310:9
**translator** [6] - 1149:12, 1213:6, 1273:13, 1281:22, 1281:24, 1294:18
**translators** [1] - 1273:12
**transporting** [1] - 1310:15
**trash** [7] - 1295:19, 1295:23, 1295:24, 1305:4, 1305:6, 1306:1, 1306:6
**trauma** [2] - 1265:5, 1274:19
**traveled** [2] - 1310:25, 1315:18
**treat** [1] - 1236:22
**tree** [1] - 1276:8
**trial** [6] - 1145:15, 1145:18, 1200:21, 1311:13, 1313:4, 1315:25
**TRIAL** [2] - 1143:11, 1317:3
**Tripler** [1] - 1246:10
**true** [17] - 1160:14, 1162:3, 1170:21, 1175:4, 1176:11, 1179:1, 1198:11, 1206:3, 1206:9, 1208:16, 1211:17, 1212:7, 1255:3, 1255:4, 1260:16, 1277:15, 1277:17
**trunk** [1] - 1271:13
**truth** [5] - 1190:13, 1193:2, 1223:7,

1260:14, 1261:13
**TRUTH** [3] - 1146:13, 1243:14, 1285:3
**truthfulness** [1] - 1260:23
**try** [7] - 1164:5, 1182:9, 1195:8, 1227:4, 1289:17, 1289:23, 1300:21
**trying** [4] - 1158:15, 1159:7, 1173:16, 1229:24
**Tuesday** [1] - 1156:13
**turn** [1] - 1170:1
**turned** [1] - 1206:14
**twenty** [2] - 1194:7, 1244:4
**twenty-five** [1] - 1244:4
**twice** [2] - 1187:6, 1224:17
**two** [36] - 1158:14, 1158:17, 1165:23, 1173:19, 1187:11, 1191:14, 1194:8, 1196:25, 1205:25, 1208:7, 1210:13, 1210:17, 1212:12, 1217:10, 1217:25, 1230:19, 1232:11, 1237:19, 1239:8, 1246:15, 1247:16, 1250:1, 1259:6, 1260:20, 1262:14, 1269:9, 1269:22, 1271:19, 1273:12, 1279:12, 1281:19, 1283:23, 1290:9, 1295:10, 1311:17
**two-and-a-half-hour** [1] - 1262:14
**two-party-consent** [1] - 1290:9
**type** [10] - 1249:8, 1251:2, 1253:7, 1253:20, 1257:6, 1257:7, 1257:9, 1257:10, 1257:15, 1287:15
**types** [3] - 1246:13, 1287:7, 1289:16
**typical** [3] - 1263:16, 1276:1, 1288:17
**typically** [6] - 1244:12, 1245:7, 1249:13, 1264:6, 1273:22, 1288:17

## U

**U.S** [6] - 1143:14, 1143:15, 1144:23, 1260:18, 1260:19, 1290:11
**ultimate** [1] - 1260:25
**unaccompanied** [1] - 1307:16
**unattended** [1] - 1155:8
**unclear** [3] - 1160:9, 1229:15, 1261:1
**under** [9] - 1146:3, 1159:7, 1197:17, 1204:3, 1219:14, 1219:20, 1250:5, 1250:6, 1275:15
**undercover** [3] - 1288:12, 1290:16, 1300:23
**undergraduate** [1] - 1245:23
**understatement** [1] - 1197:22
**undocumented** [1] - 1288:19
**unfortunate** [1] - 1157:18
**uninterrupted** [1] - 1179:25
**unique** [1] - 1300:17
**unit** [1] - 1286:24
**UNITED** [3] - 1143:1, 1143:4, 1317:2
**United** [5] - 1145:2, 1243:10, 1253:4, 1284:24, 1286:20
**University** [1] - 1245:24
**unpleasant** [1] - 1198:21
**unsure** [1] - 1265:5
**untruthfulness** [1] - 1260:23

**unusual** [2] - 1276:2, 1305:2
**up** [49] - 1152:8, 1152:10, 1152:24,
1153:9, 1158:10, 1178:17, 1181:9,
1181:22, 1187:25, 1201:17, 1212:1,
1217:18, 1220:1, 1220:4, 1220:8,
1233:16, 1243:15, 1243:16, 1245:8,
1245:10, 1250:1, 1250:12, 1258:21,
1260:11, 1260:13, 1261:25, 1266:18,
1269:15, 1271:8, 1271:12, 1271:14,
1271:25, 1272:11, 1285:4, 1290:5,
1292:11, 1293:16, 1295:4, 1298:13,
1298:17, 1301:19, 1304:19, 1304:22,
1307:13, 1311:17, 1313:13, 1313:25,
1315:1
**upper** [3] - 1267:18, 1269:22, 1271:22
**urged** [1] - 1179:17
**urine** [1] - 1266:2

## V

**vague** [3] - 1256:16, 1257:20, 1278:25
**value** [4] - 1262:24, 1263:1, 1307:17,
1308:11
**Vargas** [1] - 1299:22
**variety** [1] - 1304:23
**various** [3] - 1174:16, 1204:10, 1246:12
**vehicle** [12] - 1295:23, 1307:9, 1307:11,
1307:12, 1308:1, 1308:3, 1308:6,
1308:7, 1309:10, 1313:20, 1314:4,
1314:7
**vehicles** [4] - 1295:22, 1306:9, 1306:13,
1314:24
**VENTURA** [2] - 1143:6, 1317:2
**Ventura** [18] - 1143:16, 1145:10,
1158:22, 1217:19, 1224:3, 1224:5,
1224:8, 1226:16, 1309:24, 1310:14,
1311:3, 1311:7, 1311:20, 1312:2,
1312:9, 1312:20, 1312:22, 1313:17
**Ventura's** [5] - 1306:19, 1311:16,
1313:1, 1314:4, 1315:1
**verdict** [2] - 1145:19, 1316:9
**versus** [6] - 1244:15, 1255:24, 1256:12,
1258:10, 1260:18, 1260:19
**VI** [2] - 1143:6, 1317:3
**victim** [4] - 1158:16, 1234:11, 1281:21,
1283:22
**victim's** [1] - 1283:12
**victims** [1] - 1288:16
**Victoria** [1] - 1144:3
**view** [3] - 1269:16, 1270:12, 1280:16
**vigor** [1] - 1198:1
**vigorous** [1] - 1198:1
**violence** [1] - 1299:15
**Virginia** [12] - 1216:2, 1227:7, 1227:8,
1307:5, 1313:23, 1313:25, 1314:2,
1314:5, 1315:18, 1315:20, 1315:22
**virtue** [1] - 1262:23
**visit** [1] - 1153:17
**visited** [5] - 1155:6, 1157:1, 1163:14,

1173:8, 1183:6
**vitae** [2] - 1252:24, 1253:15
**Vivian** [2] - 1189:6, 1189:10
**voice** [2] - 1294:17, 1295:4
**Voir** [1] - 1317:15
**voir** [3] - 1252:3, 1252:4, 1258:4
**VOIR** [1] - 1252:7
**VOL** [1] - 1317:3
**Volume** [1] - 1143:6
**voluntarily** [1] - 1179:14
**volunteering** [1] - 1198:22
**vouching** [1] - 1260:14

## W

**W6400022** [1] - 1296:13
**wages** [1] - 1149:16
**waiting** [1] - 1202:6
**walk** [3] - 1179:8, 1264:3, 1304:11
**walking** [4] - 1158:5, 1158:6, 1276:5,
1276:11
**wallet** [1] - 1303:6
**wants** [4] - 1145:14, 1195:5, 1196:22,
1226:3
**warn** [1] - 1249:22
**warrant** [5] - 1298:5, 1301:1, 1301:5,
1307:15, 1308:8
**warrants** [1] - 1307:24
**WAS** [3] - 1146:13, 1243:14, 1285:3
**Washington** [1] - 1311:1
**water** [2] - 1203:19, 1203:20
**WDQ-10-0770** [1] - 1143:5
**weapons** [1] - 1299:16
**Wednesday** [2] - 1156:13, 1195:6
**week** [22] - 1145:17, 1151:8, 1151:10,
1152:17, 1152:20, 1153:4, 1153:6,
1160:19, 1161:10, 1161:24, 1162:3,
1162:13, 1171:12, 1171:16, 1173:12,
1173:15, 1173:17, 1190:22, 1220:23,
1246:11, 1303:21, 1314:21
**week's** [3] - 1170:23, 1171:2, 1171:17
**week-long** [1] - 1246:11
**weeks** [17] - 1156:24, 1157:5, 1162:16,
1162:18, 1162:22, 1163:24, 1163:25,
1164:1, 1164:3, 1164:9, 1173:19,
1180:13, 1180:23, 1181:1, 1181:13,
1182:24, 1251:8
**weight** [2] - 1261:17, 1263:1
**welcome** [1] - 1205:10
**well-being** [1] - 1252:21
**well-educated** [1] - 1198:10
**well-healed** [2] - 1267:6, 1272:3
**well-set** [1] - 1272:7
**Wendy** [1] - 1303:24
**West** [1] - 1144:24
**wet** [1] - 1266:3
**whatsoever** [1] - 1256:1
**whip** [1] - 1261:3
**Whitted** [1] - 1260:19

**WHITTED** [1] - 1260:19
**whole** [2] - 1249:13, 1293:14
**wide** [1] - 1300:21
**wife** [2] - 1214:21, 1217:20
**WILLIAM** [1] - 1143:11
**William** [2] - 1145:4, 1246:4
**willing** [1] - 1283:22
**willy** [1] - 1290:12
**willy-nilly** [1] - 1290:12
**window** [1] - 1299:12
**winter** [1] - 1289:6
**wipes** [1] - 1306:3
**wish** [3] - 1168:24, 1195:8, 1258:1
**withdraw** [1] - 1209:10
**Witness** [7] - 1243:8, 1282:14, 1309:20,
1316:7, 1317:12, 1317:17, 1317:19
**witness** [37] - 1145:22, 1146:10,
1147:22, 1149:7, 1150:6, 1150:8,
1150:23, 1159:17, 1191:15, 1194:23,
1196:2, 1196:19, 1196:20, 1196:23,
1200:25, 1201:25, 1202:6, 1203:6,
1203:7, 1205:11, 1205:19, 1208:8,
1213:16, 1218:22, 1226:1, 1241:21,
1242:14, 1243:9, 1249:20, 1259:1,
1260:11, 1260:13, 1262:20, 1264:21,
1282:24, 1284:22, 1294:24
**WITNESS** [25] - 1146:4, 1146:7,
1149:25, 1188:23, 1190:2, 1202:21,
1202:24, 1203:3, 1203:21, 1204:4,
1226:11, 1234:7, 1234:25, 1236:12,
1243:1, 1243:20, 1244:21, 1249:24,
1250:4, 1264:24, 1282:13, 1285:7,
1286:3, 1286:7, 1298:21
**witness'** [3] - 1198:5, 1260:15, 1262:21
**WITNESSES** [1] - 1317:7
**witnesses** [3] - 1240:2, 1262:22,
1288:16
**woman** [7] - 1185:9, 1189:8, 1189:9,
1189:12, 1198:10, 1303:22, 1312:9
**women** [15] - 1169:17, 1170:22,
1171:16, 1184:18, 1184:21, 1184:23,
1184:25, 1185:3, 1185:5, 1185:13,
1192:14, 1231:8, 1281:19, 1303:15,
1303:16
**wonder** [1] - 1193:19
**word** [4] - 1176:13, 1237:19, 1245:4,
1259:23
**words** [2] - 1165:23, 1270:21
**worker** [6] - 1152:1, 1152:2, 1152:3,
1184:8, 1185:15
**workers** [4] - 1164:15, 1174:13, 1181:9,
1220:18
**worksite** [2] - 1286:25, 1287:3
**worried** [1] - 1201:13
**worse** [1] - 1269:19
**wound** [1] - 1276:21
**wrists** [1] - 1271:10
**write** [1] - 1150:9
**writing** [1] - 1148:16
**written** [1] - 1159:8

**WS** [1] - 1296:16
**WS400029** [1] - 1296:23

## X

**Xs** [1] - 1149:3

## Y

**yank** [1] - 1198:6
**YASSER** [102] - 1145:22, 1149:24,
    1150:1, 1150:7, 1158:8, 1158:13,
    1159:3, 1159:6, 1171:7, 1189:25,
    1195:13, 1197:9, 1199:13, 1200:8,
    1200:10, 1202:5, 1202:8, 1203:6,
    1203:23, 1213:3, 1213:6, 1226:24,
    1227:2, 1231:2, 1231:6, 1231:7,
    1232:21, 1233:10, 1234:8, 1234:18,
    1234:20, 1235:1, 1235:9, 1235:11,
    1235:19, 1236:13, 1237:6, 1239:20,
    1239:22, 1242:2, 1243:10, 1243:23,
    1244:25, 1249:22, 1250:15, 1251:25,
    1259:17, 1259:24, 1260:2, 1261:1,
    1263:4, 1263:6, 1264:21, 1264:23,
    1265:12, 1273:2, 1281:13, 1281:15,
    1282:10, 1282:23, 1283:1, 1283:9,
    1283:17, 1284:1, 1284:9, 1284:22,
    1284:24, 1285:10, 1286:8, 1290:19,
    1290:24, 1291:2, 1291:5, 1291:22,
    1292:3, 1292:5, 1292:7, 1293:8,
    1293:19, 1293:22, 1293:25, 1294:24,
    1295:2, 1296:11, 1296:19, 1296:25,
    1297:6, 1297:17, 1297:21, 1297:24,
    1297:25, 1298:16, 1298:23, 1299:5,
    1301:8, 1301:14, 1301:17, 1301:22,
    1301:24, 1302:1, 1305:17, 1308:18
**Yasser** [8] - 1143:15, 1158:21, 1191:7,
    1193:7, 1223:1, 1237:25, 1260:12,
    1315:23
**Yasser's** [1] - 1150:6
**YASSER.......** [1] - 1317:15
**YASSER.............** [2] - 1317:11, 1317:16
**YASSER...............** [2] - 1317:14,
    1317:19
**year** [4] - 1147:5, 1208:23, 1209:2,
    1255:11
**years** [13] - 1230:19, 1244:4, 1246:14,
    1246:15, 1247:4, 1247:14, 1247:16,
    1255:2, 1281:4, 1286:10, 1301:3,
    1311:17
**yellow** [1] - 1235:21
**Yenis** [1] - 1307:13
**yesterday** [6] - 1149:17, 1149:21,
    1157:18, 1195:23, 1196:1, 1219:15
**York** [2] - 1311:1
**young** [6] - 1245:8, 1245:16, 1251:20,
    1255:1, 1255:10, 1260:8
**yourself** [2] - 1164:23, 1280:7
**yourselves** [3] - 1193:23, 1282:17,

1316:4