```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                       NORTHERN DIVISION

 3    _____
                                     )
 4    UNITED STATES OF AMERICA       )
                                     )
 5                                   )
          v.                         ) Criminal Docket No. WDQ-10-0770
 6                                   ) Volume VII
      GERMAN de JESUS VENTURA and    )
 7    KEVIN GARCIA FUERTES,          )
              Defendants             )
 8    _____)
                                          Baltimore, Maryland
 9                                        April 17, 2013
                                          11:00 AM to 3:25 PM
10
            THE ABOVE-ENTITLED MATTER CONTINUED ON FOR
11                          JURY TRIAL
         BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.
12
                      A P P E A R A N C E S
13
      On behalf of the Government:
14
              Michael Cunningham, Assistant U.S. Attorney
15            Rachel Yasser, Assistant U.S. Attorney

16    On behalf of Defendant German de Jesus Ventura:

17            Gerald Ruter, Esquire

18    On behalf of Defendant Kevin Garcia Fuertes:

19            Michael D. Montemarano, Esquire

20

21

22

23

24

25
```

```
 1                   A P P E A R A N C E S (CONT.)

 2     Also present:

 3            HSI Special Agent Edward Kelly
              Victoria Kirchgessner, Spanish Interpreter
 4            Marta Goldstein, Spanish Interpreter

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                         Reported by:

23            Martin J. Giordano, RMR, CRR, FOCR
              U.S. Courthouse, Room 5515
24            101 West Lombard Street
              Baltimore, Maryland 21201
25            410-962-4504
```

1          **PROCEEDINGS OF APRIL 17, 2013**

2          **THE CLERK:**  All rise.  The United States District

3     Court for the District of Maryland is now in session, The

4     Honorable William D. Quarles, Jr. presiding.

5          **THE COURT:**  Ready for the jury, counsel?

6          **MS. YASSER:**  Yes, Your Honor.

7          **MR. MONTEMARANO:**  Yes, Your Honor.

8          **MR. RUTER:**  Your Honor, one thing before we begin.

9     I think the record should show that I had spent some period of

10    time this morning with Mr. Ventura concerning his right to

11    testify, and he has requested that the Court continue this

12    trial for at least a week or two so that he has an opportunity

13    to become more prepared for his testimony.

14         His -- he wants it also part of the record, Your

15    Honor, that he believes I have not spent enough time with him

16    in the past prior to the motions hearing on March the -- I

17    think 13th or March 27th of this year, we had a motions

18    hearing.  And I had not seen him prior to that enough time for

19    him to be able to prepare his defense or his right to testify

20    or not to testify, and he feels he still has not had enough

21    time even after meeting again this morning.

22         **THE COURT:**  Okay.  Ready for the jury?

23         **MS. YASSER:**  Yes, Your Honor.

24         **THE COURT:**  Send for the jury.

25         (Jury enters.)

1          **THE COURT:**  Good morning.  Please be seated.

2          Alternate Juror Number 1, please take Seat

3     Number 11.  You are now Juror Number 11.

4          All the other alternates, move down.  Alternate

5     Number 2, you become Alternate Number 1.

6          Alternate Number 3, you become Alternate Number 2.

7          Alternate Number 4, you become Alternate Number 3.

8          Thank you.

9          **MS. YASSER:**  Thank you, Your Honor.

10          Good morning.  Good morning, Special Agent Kelly.

11          **THE CLERK:**  I'd like to remind you:  You're still

12     under oath, and would you repeat your name again for the

13     record.  Thank you.

14          **THE WITNESS:**  Edward J. Kelly.

15          **THE CLERK:**  Thank you, sir.

16                    **EDWARD J. KELLY**

17      **WAS PREVIOUSLY DULY SWORN TO TELL THE TRUTH**

18            **DIRECT EXAMINATION (CONT.)**

19     **BY MS. YASSER:**

20     Q.  Special Agent Kelly, when we left off yesterday, we had

21     played some consensual calls for the ladies and gentlemen of

22     the jury, and a series of those calls were to a number ending

23     in 5211.  Do you recall that?

24     A.  Yes, ma'am.

25     Q.  And do you recall testifying how you obtained the number

1    ending in 5211 from the trash outside of McDonald's?

2    A.   Yes, I do.

3    Q.   I want to introduce what's been marked as Government

4    Exhibit Number 18 and ask you to please identify that exhibit

5    for the jury.

6    A.   That's the receipt that I pulled out of the trash that

7    was deposited at the McDonald's.

8    Q.   Now, after those consensual calls were placed to the 5211

9    number -- and, by the way, what location was that number

10   associated with?

11   A.   ████████████████, ma'am.

12   Q.   There was a search at that location; is that correct?

13   A.   Yes, there was.

14   Q.   I want to show you what's been previously marked

15   Government's 25b/1 through b/5.

16              **MS. YASSER:**  May I approach the witness, Your Honor?

17              **THE COURT:**  Yes, you may.

18   **BY MS. YASSER:**

19   Q.   Can you identify these for the ladies and gentlemen of

20   the jury.

21   A.   They appear to be the phones that were recovered at ████

22   ████████████.

23   Q.   Did you conduct an analysis on these phones as well as

24   other phones recovered during the course of the investigation?

25   A.   Yes.  The phones were searched.

1   Q.   I want to show you 25c.  What is that?

2   A.   That's a large box of Trojan condoms and rubbing alcohol.

3   Q.   25d?

4   A.   Playing cards.

5   Q.   And then finally 25e?

6           **THE REPORTER:**  25e.

7           **MS. YASSER:**  "e."

8           **THE WITNESS:**  Rubbing alcohol, and what appears to

9   be K-Y Jelly.

10  **BY MS. YASSER:**

11  Q.   Jumping forward, we also talked about surveillance

12  yesterday that was conducted on August 2nd of 2010.  Do you

13  recall that?

14  A.   Yes.

15  Q.   And you previously testified about what

16  Detective Hartlove, yourself, and agents in Norfolk, Virginia

17  observed, and that relates to Government's Exhibit 28e.  Do

18  you recall that?

19  A.   Yes.

20  Q.   Now, at the time, were you and other officers involved in

21  the investigation up on any phones that were specifically

22  relevant to that surveillance?

23  A.   Throughout the investigation, we ran multiple pen

24  registers with also precision locate, and they would also

25  obtain cell tower information.

1    Q.    And what phone number were you up on at the time as it

2    relates to Defendant Ventura?

3    A.    I know on that day, we had data for the phone number

4    ending 3124, ████████-3124, and we also had data on

5    ██████████-4168.

6    Q.    And, starting with the 3124 number, can you just explain

7    to the ladies and gentlemen of the jury how you associated

8    that number with Mr. Ventura?

9    A.    That was the number that we directly associated with

10   Mr. Ventura as his personal line.

11   Q.    And was he arrested with that phone on November 15th,

12   2010?

13   A.    Yes, he was.

14   Q.    With respect to the 4168 number, how did you associate

15   that phone with your investigation?

16   A.    I believe, initially in the investigation, it was

17   identified because it had a high frequency; there was a lot of

18   phone calls to that number.  So I believe that was the initial

19   reason we went up on that number, but subsequent, it was

20   identified as a number was used by Mr. Fuertes.

21   Q.    And how so?

22   A.    That was a number identified in two witness' phones as

23   the phone he used when he was in Virginia working for

24   Mr. Ventura in the prostitution.

25   Q.    And we'll review those phone associations in a little

1   bit, but, with respect to those two phones, did you conduct an

2   analysis of the precision locate or cell tower information as

3   it relates first to 3124?

4   A.   Yes.  We were able to map the cell towers on those -- on

5   August 1st and August 2nd.

6   Q.   And can you tell the ladies and gentlemen of the jury

7   generally what that analysis revealed.

8   A.   That that phone was in Maryland on August 1st.  It

9   traveled to Portsmouth, Virginia on August 2nd.  Then it

10  returned from Portsmouth, Virginia to Maryland on August 2nd.

11  Then it traveled in and around Prince George's County on

12  August 2nd before returning to Portsmouth, Virginia at

13  approximately -- I think it was 7:30 p.m. that evening.

14  Q.   And was that over the course of a Sunday and a Monday?

15  A.   Yes.  August 2nd was a Monday.

16  Q.   I want to show you Government's 40e/1 and ask you to

17  please describe what this exhibit depicts.

18  A.   That's a map of the cell towers that we were able to

19  identify that showed the phone moving through different areas.

20  The towers -- you get tower hits when the phone received or

21  placed a phone call, so the green tack at the top indicates

22  the initial tower we used to track the movement, which is

23  August 1st, 2010, at 9:10 p.m.

24  Q.   And where did that phone end up that -- I guess the next

25  day, the next morning?

```
 1    A.    The last tower hit on this map is August 2nd at

 2    1:23 a.m., and that's in the vicinity of Portsmouth, Virginia.

 3    Q.    Would that phone have had to have crossed any state lines

 4    in order to end up in Portsmouth, Virginia?

 5    A.    Yes.  At a minimum, it crossed the state line between

 6    Maryland and Virginia.

 7    Q.    Government's 40e/2, what does that reveal?

 8    A.    That's the return trip that we mapped out on August 2nd

 9    from Portsmouth, Virginia to Maryland.

10    Q.    And at what time did it arrive back -- the phone first

11    hit back in Maryland?

12    A.    So the initial hit, the green thumbtack, is, once again,

13    1:23 a.m., and then the next activity -- tower activity we

14    have was at 5:18 a.m. in Virginia, and then we have it

15    stopping at 7:11 a.m. in Maryland.

16    Q.    And, that morning of August 2nd, was that when

17    Detective Hartlove surveilled Defendant Ventura outside of

18    ██████████?

19    A.    Yes.

20    Q.    Government's 40e/3, what does that show, Detective, or

21    Special Agent Kelly?

22    A.    Once again, we start the movement at 7:11 a.m., and then

23    we have the towers -- there are several hits around Prince

24    George's County, at 2:55 p.m. around the Washington, D.C.

25    Beltway area, and then returning to Portsmouth, Virginia at
```

1    7:28 p.m. on August 2nd.

2    Q.    And can you remind the ladies and gentlemen of the jury

3    when it was that Detective Hartlove observed this woman in the

4    pink shirt get into Defendant Ventura's vehicle on that day?

5    A.    I believe it was 1:30 p.m.

6    Q.    And is that location where he observed the woman in the

7    pink shirt getting into the vehicle -- is that consistent with

8    what was happening on the phones?

9    A.    There is no tower hit from 1:30 p.m., but there is a

10   tower hit for 2:55 p.m. in the vicinity where I would have

11   seen Mr. Ventura return to ███████████████ for the

12   surveillance.

13   Q.    And did that surveillance include observing Ventura

14   heading southbound at that time?

15   A.    We left ████████████, and then the phone shows

16   southern movement.

17   Q.    And was this woman in the pink shirt -- was she

18   subsequently identified?

19   A.    Yes, she was.

20   Q.    And how so?  How did you identify her?

21   A.    We ran the tags on the plate, and the tags came back to

22   her true name.  We were able to run database checks, identify

23   her, obtain photographs, name, date of birth, other

24   identifiers.

25   Q.    What is her name?

1   A.   Bridgett Alcivar.

2   Q.   Does she have a history of prostitution?

3   A.   Yes.  She was arrested for prostitution in Virginia.

4   Q.   And I think you previously testified that there were

5   agents in Norfolk that observed -- that picked up Ventura as

6   well as this woman in the Virginia area later that night?

7   A.   Yes.  Agent Joseph was running a collateral case for us

8   out of Norfolk, Virginia, and she and her group intercepted

9   the vehicle and maintained physical surveillance of it to █

10  ████████████.

11  Q.   I want to show you what's been marked as Government's

12  28e/12.  Do you recognize that?

13  A.   That's a photograph that was provided to me for █

14  ████████████  in Portsmouth, Virginia.

15  Q.   And was that a suspected brothel, Special Agent Kelly?

16  A.   Yes.

17  Q.   And was there a consensual call made with respect to that

18  brothel?

19  A.   Yes, there was.

20  Q.   Now, you mentioned also analyzing a number ending in 4168

21  that was associated with Defendant Fuertes.  Can you tell the

22  ladies and gentlemen of the jury where Defendant Fuertes'

23  phone was subsequent to this transport of Ms. Alcivar down to

24  Virginia.

25  A.   That phone moved from Virginia to Maryland and back on

 1   August 2nd, and then, on August 3rd at 12:30 in the -- 30

 2   minutes after midnight, it would have been in -- at ███████

 3   ███████ with a -- I think a radius of 50 to 70 meters.

 4   Q.   And did you analyze that phone for information relating

 5   to its whereabouts for the remainder of that week?

 6   A.   Yes.  We conducted an analysis of the realtime data that

 7   we had that showed that phone remained in Virginia that week.

 8   Q.   And what about the 3124 number associated with

 9   Defendant Ventura?  Where was that phone for the remainder of

10   that particular week?

11   A.   That phone would eventually return to Maryland.

12   Q.   Where it remained the rest of the week?

13   A.   Yes.  To the best of my knowledge, yes.

14   Q.   With regards to contacts between these two numbers around

15   the same time on August 2nd of 2010, did you look at the tolls

16   to see if there were any communications between these two

17   phones on August 2nd of 2010?

18   A.   There was communication that day.

19   Q.   Do you recall how many contacts there were that day?

20   A.   I believe it was around eight.

21   Q.   Special Agent Kelly, did you conduct an overall analysis

22   of all the many telephones that this jury has heard about

23   during the course of this trial?

24   A.   Yes, with the help of the analyst that we have in our

25   group.  It's a lot of data.

1    Q.   How many phones would you say you analyzed over the

2    course of this investigation?

3    A.   Cellebrite data, as far as physical examinations of

4    phones that were recovered, was 57.  Two of those, we couldn't

5    recover data from.  The toll analysis encompassed over 200,000

6    records.

7    Q.   And there was also an extensive amount of data received

8    from pen registers as well as cell site and realtime GPS

9    information on phones?

10   A.   Correct.

11   Q.   And is it safe to say that those records combined were

12   voluminous?

13   A.   Yes, they were.

14   Q.   I want to go through with you some of the ways that you

15   were able to connect up the phones that were recovered in this

16   case with the persons of interest in this case, specifically

17   with respect to the Defendants, and I want to show you what's

18   been previously marked as Government's 40f/1, and this is

19   Page 1 of that exhibit.

20        **MR. MONTEMARANO:**  Objection, Your Honor.  We've

21   already brought this to the Court's attention.

22        **THE COURT:**  Come up.  Bring the document.

23        (Whereupon, the following discussion occurred at the

24   bench.)

25        **MS. YASSER:**  Your Honor, this is the summary exhibit

 1    that we're seeking to admit as a summary chart as well as the

 2    frequency chart, and I apologize.  I thought that we resolved

 3    the objection.  It's actually not the page that I just put

 4    up --

 5              THE COURT:  Don't cover the microphone.

 6              THE REPORTER:  Please don't cover the mics.

 7              MS. YASSER:  That relates to Defendant Fuertes.

 8    It's actually Page 2.  And Mr. Montemarano took issue with the

 9    addition of two phones, one of which -- and I can show Your

10    Honor.  It's 4 and 5 here.  The first one is connected to

11    Mr. Fuertes through testimony through Carlos Ascencio, who

12    testified that it was saved in his phone as "Flaco," I

13    believe, and then Fuertes Number 5 was associated with him

14    through booking information that was obtained on January 3rd

15    of 2009 as well as March 25th of 2009, and I have the booking

16    sheets here for Your Honor if you require.

17              THE COURT:  The objection?

18              MR. MONTEMARANO:  Yes, Your Honor.  With regard to

19    Fuertes Number 4, I observe that the initial provision of the

20    information to us a week and a half before trial contained no

21    reference to that.  I'm presuming they had spoken to

22    Mr. Ascencio at some point before when he took the stand, and,

23    therefore, they knew this phone would have related to my

24    client, and, therefore, would have disclosed it to me, but

25    they did not do so as of the 27th.  That's as to 4.

1          As to 5, in addition to that, the Government claims

2     to have been able to extract this from booking information.

3     These are the exhibits that Mr. Cunningham came running up

4     with and that were given to us, I believe, yesterday by the

5     Government.  They are marked 44a and b.  And, on each one, the

6     Government observes that there is a home phone listed, the one

7     in question, ███████-0076.

8          There has been no showing that this information was

9     extracted from my client.  I say that because, as much as

10    anything else, we also can see that his eyes are listed as

11    being blue, as you can see next to my finger there, and I

12    think the Court can take as an article of faith sitting up

13    here that my client's eyes are not blue, and I think the

14    Government will stipulate to that.

15         But, furthermore, although I am aware that there is

16    case law suggesting that mere index information for purposes

17    of booking is not protected by *Miranda* and would not have been

18    part of what the Government -- the Court suppressed with

19    regard to my client's statements, there has to be a limit to

20    how much information the Government is permitted to extract

21    from a defendant or a suspect under that rubric.  Simply put,

22    the Government could create a 50-page booking form with

23    information out to the nth degree and nth generation and

24    claim, "Oh, this is only booking information."

25         **THE COURT:**  But that's not the case here, is it?

 1          **MR. MONTEMARANO:**  But I don't believe --

 2          **THE COURT:**  Let's argue the case here.

 3          **MR. MONTEMARANO:**  I'm saying -- well, it's *reductio*

 4     *ad absurdum*, of course, Your Honor.  My point is I don't

 5     consider a phone to be part of the information you need to

 6     identify a person, which is name, date of birth, physical

 7     characteristics which are observed by the police officer,

 8     perhaps an address, although that's pretty fungible and -- as

 9     we've seen in this case with people living at different

10     addresses at different times, but a phone number now becomes

11     an investigative tool, and that's exactly what it's being used

12     as here, and, for that reason, we respectfully submit that

13     they should not be allowed to go into either of these on the

14     disclosure basis, and, certainly Number 5, based upon this as

15     being a source.

16          **MS. YASSER:**  Your Honor, as I've already indicated,

17     this is a summary chart.  It consists of information extracted

18     from phones by Special Agent Kelly as well as other

19     information received in the course of the investigation.  The

20     basis has been submitted to the Court, and I think it's

21     supported by both the records, as well as the testimony that

22     you heard.

23          **THE COURT:**  When did you provide Fuentes 4?

24          **MS. YASSER:**  Fuentes 4 was provided in the last

25     summary chart that we sent.  Was that on Sunday?

 1          **MR. MONTEMARANO:**  It might have been Sunday.  Ah,

 2    here.  Sunday, 4/14, Your Honor.  I dated it so the Court

 3    could be clear.  This is the original.  I dated in highlighter

 4    3/27, and this is the 4/14, which would have been Sunday.

 5          **THE COURT:**  Why did it come so late?

 6          **MS. YASSER:**  Again, it was discovered through

 7    testimony of Carlos Ascencio.  When preparing for his

 8    testimony at trial, he was shown Cellebrite information, I

 9    believe, from his -- extracted from his phone, and he

10    identified a specific phone number as being related to the

11    Defendant.

12          **THE COURT:**  Sustained as to Fuertes 4.

13          Fuertes 5, the booking information, when was it

14    provided?

15          **MS. YASSER:**  When was the booking information

16    provided to the Government?

17          **THE COURT:**  To the Defense.

18          **MS. YASSER:**  When did you --

19          **THE REPORTER:**  I can't hear you.

20          **MS. YASSER:**  I think, with respect to the

21    January 9th arrest, that was yesterday.  The remainder of the

22    information, both that provided in December of 2008 as well as

23    March 2009, was previously provided in discovery.

24          **MR. MONTEMARANO:**  No, no.  It comes from December of

25    2008, Ms. Yasser.  I think the Court's question was:  When was

1    it provided to me?

2         MS. YASSER:  It -- in discovery -- I mean, those two

3    times would have been provided in discovery with the booking

4    sheets --

5         THE COURT:  Which would have been when?

6         MS. YASSER:  I mean, in February.

7         MR. MONTEMARANO:  No later than February.  I think

8    that's probably a fair statement, Your Honor.

9         THE COURT:  Okay.

10         MR. MONTEMARANO:  If it was part of it, I have no --

11    I'm not, in any way, shape, or form, quarrelling with

12    Ms. Yasser's description.  I'd only observe to the Court that,

13    if it was in there, I have no independent recollection of

14    seeing this form.  It may or may not have been provided

15    related to those particular arrests in December of '08 and

16    January of '09.

17         THE COURT:  Overruled as to Fuertes 5.

18         MR. MONTEMARANO:  Thank you, Your Honor.

19         MS. YASSER:  Your Honor, I'll need to redact.  I

20    have a frequency chart that contains Fuertes Number 4, and I

21    also need to redact --

22         THE COURT:  Can you work around it until after the

23    break?  I'm going to break at 1:00.

24         MS. YASSER:  I was hoping to be done with this

25    witness before that time.  Maybe what I'll do is I'll hand it

1    to Mr. Cunningham and ask somebody to step outside and redact

2    the particular exhibit.

3              THE COURT:  Okay.

4              MS. YASSER:  Thank you, Your Honor.

5              (Whereupon, the bench conference was concluded.)

6              MR. CUNNINGHAM:  Can we have one moment to consult,

7    Your Honor?

8              THE COURT:  Yes.

9              (Pause.)

10   **BY MS. YASSER:**

11   Q.   We're going to come back to the phone association chart

12   after an amendment is made, and, if I could ask you just to

13   turn your attention to specific instances of criminal conduct

14   as it relates to this investigation, Special Agent Kelly.

15             Did you analyze toll records in connection with

16   particular instances of conduct in this investigation --

17   particular occurrences?

18   A.   Yes, we did.

19   Q.   And why do you do that?

20   A.   To show contact between individuals, assign the phone

21   numbers, to show -- if two people are doing things in

22   different locations, it shows they're communicating and

23   possibly someone is directing someone else or participating

24   with someone else.

25   Q.   And, with respect to witness testimony, did you hear and

Direct Examination of Edward J. Kelly                    T-VII-1362

1   were you present for the testimony of Ms. Sandra Flores, the

2   woman who lived at ████████████ back on September 1st of

3   2009?

4   A.   Yes, I was.

5   Q.   And, after hearing that testimony and learning of what

6   she had to say, did you observe toll records as they relate to

7   a phone number ending in 0903?

8   A.   Yes, we did.

9   Q.   And that number, 0903, who in this investigation is that

10  number associated with?

11  A.   We associate that number with Mr. Ventura.

12  Q.   And how do you associate that number with Mr. Ventura?

13  A.   I can -- the main thing was he was arrested with it on

14  September 24th, 2009, and it was previously registered to him

15  as a subscriber up to -- I think it was like September -- it

16  was around the time of the homicide of Pelon.  It was also

17  saved on some phones we did examinations of as different

18  names -- Chalo, Chalo Maryland, Chino, Trabajo.  "Trabajo"

19  means "work" in Spanish.

20  Q.   And you said that the Defendant was actually arrested

21  with that phone on September 24th of 2009?

22  A.   Yes.

23  Q.   I want to show you what's been previously marked as

24  40d/4.  Is this the toll analyses that you conducted on

25  Ventura's phone ending in 0903?

1   A.   Yes.

2   Q.   And it looks like this reflects two calls.  Can you

3   please tell the ladies and gentlemen of the jury -- these two

4   calls are to a specific number.  Can you see what that number

5   is?

6   A.   Well, it shows, on September -- it's a little blurry.

7   I'm sorry.

8   Q.   Let me take it out of the covering for you.

9   A.   It's September 1st, 2009, 23:25 hours, ████-6177

10  called 0903.  The direction shows who is calling who, who

11  initiates contact.

12  Q.   And so who is that number ending in 6177?  Who is that

13  associated with?

14  A.   We associate that with Ms. Flores.

15  Q.   Is that based on her testimony?

16  A.   Yes, and she provided it to us.

17  Q.   And then what's the next contact between 0903 and 6177?

18  A.   On September 2nd, 2009 at 00:38 hours, there is an

19  outgoing call from 0903 to ████-6177.  There is also

20  duration.  The call -- the initial call was 13 minutes and 46

21  seconds, and then the subsequent phone call was 3 minutes and

22  34 seconds.

23  Q.   Directing your attention to approximately three weeks

24  later in September of 2009, did you learn of an arrest at ████

25  ████████████ on that date?

1    A.   September 24th, ma'am?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And who was arrested there?

5    A.   That was a male and two females:  Mr. Ascencio and

6    Ms. Santiago, and I believe the other female's last name was

7    Melendez.

8    Q.   And did Ms. Santiago provide her phone number to law

9    enforcement?

10   A.   She did.

11   Q.   Was it also recovered from the location at the time of

12   her arrest?

13   A.   It was.

14   Q.   Do you recall that phone number?

15   A.   No, I do not.  I can -- I have it.  I can look for it.  I

16   have it.

17   Q.   I'm going to show you what's been previously marked as

18   40d/1.  Before I do, let me ask you:  Did you look at toll

19   records from Ventura's phone ending in 0903 as it relates to

20   the phone number associated with Margarita Santiago?

21   A.   Yes, we did.

22        **MS. YASSER:**  This is 40d/1 for the record, Your

23   Honor.

24   Q.   Did your analysis reveal contacts between Ms. Santiago

25   and Mr. Ventura?

1    A.    Yes.  It appears, once again, the contact -- this would

2    have been run through our toll database that we maintained, so

3    it looks like this record encompassed September 5th, 2009

4    forward.

5    Q.    And who made the first contact?  Who was the caller?

6    A.    Looks like Ms. Santiago called in to Mr. Ventura, or that

7    phone.

8    Q.    And then are there contacts through and including

9    September 23rd of 2009?

10   A.    Yes.  This record ends September 23rd, 2009.

11   Q.    Did you also look to see whether there was contact

12   between Ms. Santiago and Mr. Ventura following her arrest on

13   September 24th of 2009?

14   A.    There was contact after that date.

15   Q.    Do you recall Ms. Santiago's testimony that, prior to her

16   arrest on September 24th, 2009, she had an encounter with

17   police -- a prior encounter with police at ██████████████████?

18   A.    I do.

19   Q.    And was her testimony the first time you had learned of

20   that prior contact?

21   A.    Yes.

22   Q.    After hearing her testimony, did you follow up to see if

23   you could corroborate whether, in fact, there had been prior

24   contact with Ms. Santiago at that address?

25   A.    Yes, we did.

1    Q.    What did you find?

2    A.    There was contact at that address, and she was listed on

3    the report.

4          **MS. YASSER:**  I'm going to show what's been

5    previously marked as Government's 12m, Your Honor.

6    Q.    What is that?

7    A.    That's an Annapolis Police Department Calls for Service

8    sheet.

9    Q.    And what does that reflect?

10   A.    It shows, on September 11th, 2009 -- it looks like

11   Detective Carraballo responded to ████████████, and it

12   looks like -- it's a little blurry.  It looks like it's 15:39

13   hours, and they cleared at 16:29 hours.

14   Q.    I think you heard Ms. Santiago testify that the police

15   officer who came that day threatened to take her children away

16   from her.  Do you recall that testimony?

17   A.    Something to that effect, ma'am.

18   Q.    In your years investigating sex-trafficking cases,

19   particularly in the context of illegal immigrants, is that

20   something that --

21         **MR. MONTEMARANO:**  Objection.

22         **THE COURT:**  Basis?

23         **MR. RUTER:**  Your Honor, could we approach on that

24   question, please?

25         **THE COURT:**  Sure.

 1          (Whereupon, the following discussion occurred at the

 2   bench.)

 3          **THE COURT:**  A walk always provides a chance to

 4   organize one's thoughts, doesn't it?

 5          **MR. MONTEMARANO:**  Well, Your Honor, I was slow at

 6   least once yesterday, which is an awfully embarrassing thing

 7   for someone whose business is supposed to be being quick on

 8   the draw.  I believe the answer calls for an opinion or

 9   conclusion by the witness drawing on past experience, and

10   therefore is of marginal relevance to what we are talking

11   about here today.

12          **THE COURT:**  Okay.  Overruled.

13          **MR. RUTER:**  Your Honor, I have a different problem.

14          **THE COURT:**  You made good use of the walk to the

15   bench also.

16          (Laughter.)

17          **MR. RUTER:**  I did.  I thank you, sir.

18          I understand this is a summary witness, but I find

19   it objectionable that Government counsel repeats what she

20   believes the testimony was of this witness, and then this

21   witness, and then this witness, and then she's then directing

22   the witness to answer the question.  I understand there has to

23   be a direction, Judge Quarles.  You just can't say, "Do you

24   remember?"  But I do find it objectionable that the entire

25   body of a prior witness' testimony is regurgitated by the

 1    question before there is an actual question on what some other

 2    witness said.

 3            **MS. YASSER:**  Your Honor, I'm simply trying to put

 4    some context around analysis that was conducted and why it was

 5    done.  Otherwise --

 6            **THE COURT:**  Of course, that's one of the purposes of

 7    closing argument, Ms. Yasser.  Take it back a notch or two,

 8    would you, in terms of summarizing?

 9            **MS. YASSER:**  Sure.

10            **THE COURT:**  Thank you.

11            **MR. RUTER:**  Your Honor, the last thing, and then I

12    promise I'll leave.

13            **THE COURT:**  No, no.  No, no.  You have full rights

14    to be here as long as the trial is going on.

15            **MR. RUTER:**  Thank you.  I heard that counsel twice

16    indicated that, "As a result of hearing the testimony of...

17    did you," and this could be fodder for cross-examination, but

18    I was wondering whether or not counsel meant to say, "After

19    speaking with," or, "After having the Grand Jury testimony

20    of... months and months and months ago, did they do an

21    analysis," but I think the questions have been, as a result of

22    hearing their testimony, did you then do certain things, and I

23    wanted to know if that was accurate.

24            **MS. YASSER:**  Well, one --

25            **THE COURT:**  Well, one of the things that -- I'm

1    sorry.

2              **MS. YASSER:**  -- of the things was new.  I'm sorry,

3    Your Honor.  That what Margarita Santiago revealed, and I

4    think I established in questioning that was something he

5    hadn't heard before.  The remainder of the questioning, if I

6    did suggest that it was only after hearing testimony on the

7    stand, then I misspoke.

8              **MR. RUTER:**  Okay.  I mean, if it was, Your Honor, of

9    course we'd object, because, if they just discovered it, we

10   haven't had a chance to --

11             **THE COURT:**  I was going to point out to Ms. Yasser

12   that that was one of the reasons why an objection was

13   sustained the last time you were here --

14             **MR. RUTER:**  Yes, sir.

15             **THE COURT:**  -- basically because of the lateness of

16   the disclosure, and I'm sure she doesn't want to take unfair

17   advantage of anyone.

18             **MS. YASSER:**  No, sir.

19             **MR. RUTER:**  Thank you, Your Honor.

20             **MS. YASSER:**  Thank you, Your Honor.

21             (Whereupon, the bench conference was concluded.)

22   **BY MS. YASSER:**

23   Q.   Special Agent Kelly, do you recall the question that I

24   had asked before the break?

25             Let me restate it.  In your experience investigating

1    sex-trafficking cases, particularly as they relate to illegal

2    immigration, have you ever encountered a situation where a law

3    enforcement officer has threatened a prostitute to take away

4    her children?

5    A.   I wouldn't say "threatened."  I would say you're advising

6    them that their criminal activity is going to cause the loss

7    of the child like that, especially if you have people that are

8    investigating other things other than sex trafficking,

9    because, when we go in to do sex trafficking, we're asking

10   questions to see if there is indications of trafficking.

11        If there is a drug agent there or a drug officer,

12   their intent is to, you know, conduct their investigation,

13   and, at that point, they'll advise the ramifications to

14   someone who is found in a situation like that, and that could

15   be the loss of the child.

16   Q.   And do you have any basis of knowledge for why

17   Detective Carraballo was at ███████████ on that day?

18   A.   I believe it was a drug investigation.

19   Q.   Special Agent Kelly, were you also involved in the

20   investigation of the November 3rd, 2010 assault on an

21   individual named Hector Avila?

22   A.   Yes.  I responded.

23   Q.   And, in addition to the phone recordings which the jury

24   has already heard, did you also conduct a toll analysis with

25   respect to that particular assault?

1    A.   Yes, we did.

2    Q.   And can you tell them what you did and what you were

3    looking for.

4    A.   We had the victim's phone number.  We had identified the

5    phone number that was used to lure the victim into the area.

6    That phone number was also --

7              MR. RUTER:  Objection to the characterization, Your

8    Honor.

9              THE COURT:  Overruled.

10             THE WITNESS:  That -- so that phone number was used

11   to lure the victim, and that phone number was identified on

12   our investigation as the house number for ██████████████, so

13   we had tolls and contacts with it.  So we looked at the time

14   frame before the assault, during the assault, robbery, and

15   then afterwards to see how -- what type of contact that number

16   had with other numbers that were part of the investigation.

17   **BY MS. YASSER:**

18   Q.   I want to show you what's been previously marked as

19   Government's 40d/2.  What is that?

20   A.   That's November 3rd, 2010, starting at 9:58 in the

21   morning, the contact between ██████-3124 and ██████-5306,

22   and -- well, pardon me.  And then it also associates the

23   dialed number as ██████-5211.

24   Q.   And, with respect to the 3124 number, who was that number

25   associated with?

1    A.    Mr. Ventura.

2    Q.    And how so?

3    A.    He was arrested with it on November 15th.  We had

4    numerous consensual phone calls with it.  We were getting

5    precision locate on it.

6    Q.    And, with respect to the 5211 number, who or where was

7    that number associated with?

8    A.    That was a number recovered from the trash at the

9    McDonald's, and then subsequent consensual phone calls were

10   made to it, and then that was a number identified by Mr. Avila

11   as the number used to bring him into the area.

12   Q.    And so do these initial contacts in the day show outgoing

13   and incoming calls between the 5211 number and the 3124 number

14   associated with Ventura?

15   A.    It does, as well as the duration of the phone call.

16   Q.    And then did you also see on here -- look for contacts

17   with the victim, Hector Avila's phone?

18   A.    That's not on this toll analysis.  It is on another toll

19   analysis.

20   Q.    Well, let me ask you:  What's the -- I see a 5306 number

21   on this analysis.  Whose number is that?

22   A.    I'm -- I apologize.  I was looking at the right column

23   for the number dialed.  Yeah.  In the left, about halfway

24   down, at approximately 21:14 hours, it starts receiving phone

25   calls from 5211, and then incoming and outgoing back and

1       forth.

2       Q.    And so who was the recipient of the first contact at

3       21:14 on November 3rd, 2010?

4       A.    5211 called 5306.

5       Q.    And what was the duration of that call?

6       A.    Forty-two seconds.

7       Q.    Do you recall approximately what time Hector Avila was

8       assaulted on November 3rd, 2010?

9       A.    No.  I know it was in the evening hours.  I'm not sure of

10      the exact time.  I responded later that evening, and I

11      understand it to be around that time.

12      Q.    Okay.  Now, with respect to, in general, the contacts

13      between Hector Avila's phone and the phone number ending in

14      09 -- 3124, associated with Ventura, did you look back to see

15      when it was that these two phones had contact at all?

16      A.    That year, or that day?

17      Q.    That year, ever.

18      A.    Yes.  We ran a toll analysis for 5306, and I'm sorry.

19      I'm just getting to the numbers, trying to keep it straight.

20      To the best of my recollection, unless you put a toll analysis

21      up, it would have been, I think, July of that year is when

22      they -- the initial contact with those two phone numbers.

23                  MR. RUTER:  What year was that again?  I'm sorry.

24                  THE WITNESS:  2010.

25                  MR. RUTER:  Thank you.

1    **BY MS. YASSER:**

2    Q.   Now, as I mentioned, did you participate in the recording

3    of phone calls between Hector Avila and Defendant Ventura

4    following the November 3rd, 2010 assault?

5    A.   I did.

6    Q.   And, prior to that, were you also involved in the

7    recording of a threatening call to another individual of

8    interest in the investigation?

9    A.   Another person that was receiving threats?

10   Q.   Yes.

11   A.   Yes.  We placed numerous --

12   Q.   Who was that?

13   A.   Freddy Soriano.

14   Q.   And do you recall on what date you recorded a threatening

15   phone call from Ventura to Freddy Soriano?

16           **MS. YASSER:**  And this is going to be Tab 5, if I can

17   refer the ladies and gentlemen of the jury back to their

18   binder of consensual calls, and if I could pass up for Special

19   Agent Kelly the same binder.  Do you have one?  Tab 5.  I

20   don't know if yours has tabs.

21           **THE WITNESS:**  Oh, no.  August 4th, 2010.

22           **MS. YASSER:**  And, if I could ask Mr. Cunningham to

23   please play that phone call for the ladies and gentlemen of

24   the jury, and it's Government Exhibit 40b/3A, and this is

25   Tab 5.

```
 1              (Whereupon, an audio recording was played.)

 2   BY MS. YASSER:

 3   Q.   Special Agent Kelly, did you review along with the jury

 4   that transcript in English?

 5   A.   I did.

 6   Q.   There is a reference on Page 2 to the sending of a small

 7   picture, "... the one landing on your chest."

 8              Now, did you or any of the other investigators

 9   involved with this case receive anything from Freddy Soriano

10   on that date or around that time?

11   A.   As I recall, August 3rd, Detective Hartlove received the

12   text messages from Soriano.

13   Q.   I want to show you -- and have you reviewed that text

14   message?

15   A.   Yeah.  It was presented as an exhibit.

16   Q.   I want to show you Government's 15c/7.  Do you recognize

17   that?

18   A.   Yes.  I've seen it several times.

19   Q.   And what is that?

20   A.   That's what I take to be the Santa Muerte statue with a

21   pistol between -- a semi-automatic pistol between its wings,

22   and what appears to be a magazine that would fit inside of the

23   semi-automatic pistol on top of whatever the book is that that

24   religion would have.

25   Q.   And what is this?  What is this physically?
```

1    A.    That is the image that was forwarded that -- from

2    Mr. Soriano.

3    Q.    Now, I want to direct your attention back to our earlier

4    conversation about phone records and analysis that you

5    conducted.  You mentioned that you had analyzed, I think,

6    nearly 60 phones in this particular case; is that correct?

7    A.    Fifty-seven.

8    Q.    And did you compose, with the help of an analyst, a

9    summary chart from the voluminous records that you reviewed in

10   connection with this case?

11   A.    Yes, we did.

12   Q.    And did those records include -- in addition to the

13   physical phones, did they include subscriber records?

14   A.    At some times.

15   Q.    And did it also include information that you obtained in

16   general over the course of the investigation?

17   A.    Yes.  Things that we'd receive from sources of

18   information, from cooperating witnesses, from victims.

19   Q.    And, after you associated certain phones with certain

20   people, did you make connection between the phones through

21   toll record analysis?

22   A.    Yes, that's one way we did.

23   Q.    And why do you do a toll record analysis to see the

24   connections between, for example, phones associated with one

25   defendant to another defendant?

1    A.    Frequency of communication.

2    Q.    What does that tell you, Special Agent Kelly?

3    A.    The more often someone talks, the longer they talk, the

4    more involved they may be in the criminal conspiracy.

5    Q.    I want to show you what's been previously marked as the

6    first page of Government's 40f/1.  You've already discussed

7    through your testimony some of the associations you made with

8    these phones, in particular with respect to the first entry,

9    0903, and the second entry, 3124, but I'd like to cover the

10   third and fourth entries on this page, starting with 7742.

11         Who did you associate that number with, Special

12   Agent Kelly?

13   A.    Mr. Ventura.

14   Q.    And how did you associate that number with Mr. Ventura?

15   A.    He was arrested with it on September 24th, '09, as well

16   as the Ventura Number 1 number.  The phone we recovered from

17   ███████████████   had that phone number saved as "Oscar

18   Annapolis" in its contacts.  On Ms. Fuertes' (sic) phone, it

19   was saved as "Mi Niño."  There was an incoming text on one of

20   the phones addressing the -- that number as -- there was --

21   pardon me.  There is a text message on that phone where the

22   person sending that text message addressed the person who had

23   that phone as "Chale," and it was saved as "Oskar Annapo"

24   on -- it says "Helen" here, but that's Ms. Melendez.  She's

25   the other female that was arrested on September 24th, 2009 at

1     ████████████    with Ms. Santiago and Mr. Ascencio.

2     Q.   And, for this particular phone, were you able to obtain

3     toll records for a certain period of time?

4     A.   We did not obtain toll records.  We have Cellebrite call

5     logs only.  Using the Cellebrite, we -- depending on the make

6     and model of the phone, we can pull the call that's incoming

7     and outgoing and missed and generate a small project of what

8     phone history is on that phone.

9     Q.   With respect to many of the phones in this investigation,

10    did you or other officers obtain toll records?

11    A.   Yes.

12    Q.   And were those for the entire length of the investigation

13    from 2008 to 2010, or are they short periods throughout the

14    investigation?

15    A.   It's on a phone-by-phone basis.  Not all -- not all the

16    phones were available the length of the investigation.

17    Q.   Now, with respect to the final entry here, we see a 9263

18    number.  You've attributed that to Ventura as well.  Can you

19    explain to the ladies and gentlemen of the jury how.

20    A.   The 911 call that I believe is an exhibit on March 13th,

21    2010 was the 911 call, a reporting on Freddy Soriano, alleged

22    that a woman -- I won't get into it, but it caused police

23    action or sought to cause police action against

24    Freddy Soriano, and then also a receipt for the phone was

25    recovered at ████████████ at Mr. Ventura's residence on

1    November 15th, 2010.

2    Q.   And, since we've been through Ventura Number 1 and

3    Number 2 and the jury has heard extensive testimony on the

4    connections between those phones, I'm going to turn your

5    attention now instead to Page 2 of Government's 40f/1.

6              **MS. YASSER:**  If I could have a moment, Your Honor.

7              **THE COURT:**  Yes.

8    **BY MS. YASSER:**

9    Q.   I want to direct your attention to the first three

10   entries.  What do the first three entries on this chart

11   reveal?

12   A.   They're associated with -- we're calling them Fuertes 1,

13   2, and 3 for Defendant Mr. Fuertes.  Phone Number for

14   Fuertes 1 is ▌▌▌▌▌-5015.

15   Q.   And how primarily and why do you associate that number

16   with Defendant Fuertes?

17   A.   He was arrested with it.  He gave and had the number on

18   the September 25th, 2008 incident and the December 10th, 2008

19   incident with Mr. -- with Detective Hartlove.

20   Q.   And was that phone number also saved on any of the phones

21   that you recovered and analyzed over the course of the

22   investigation?

23   A.   Yeah.  The phone that was recovered at ▌▌▌▌▌▌▌▌ had

24   that number saved as "Flaco."

25   Q.   And do you recall when that phone was recovered at

1    ███████████?

2    A.   It would have been September 26th, 2008.

3    Q.   Now, with respect to the next number on this chart,

4    Fuertes Number 2, can you tell the ladies and gentlemen why

5    you associated that number with Mr. Fuertes?

6    A.   That was the phone in his possession when he was arrested

7    on March 25th, 2009.

8    Q.   By the way, speaking of Mr. Fuertes' arrest on March 25th

9    of 2009, do you know if Mr. Fuertes was -- or that there were

10   any Immigration consequences following that arrest?

11             **MR. MONTEMARANO:**  Objection.

12             **THE COURT:**  Basis?

13             **MR. MONTEMARANO:**  Relevance.

14             **MS. YASSER:**  It has to do with timing and location

15   of this particular defendant.

16             **THE COURT:**  Thank you.  Overruled.

17             **THE WITNESS:**  Yeah.  An ICE detainer was lodged

18   against him, and he -- which resulted in him coming into

19   Immigration custody.

20   **BY MS. YASSER:**

21   Q.   And was he detained in Immigration custody for any

22   lengthy period of time?

23   A.   He was detained, but he was placed in proceedings and

24   eventually was released because he failed to appear for his

25   Immigration proceedings and became an ICE fugitive.

1          **MR. MONTEMARANO:**  Objection.

2          **MS. YASSER:**  Again, for timing and location, Your

3     Honor.

4          **MR. MONTEMARANO:**  May we approach?

5          **THE COURT:**  Come up.

6          (Whereupon, the following discussion occurred at the

7     bench.)

8          **MR. MONTEMARANO:**  Timing and location, well, let's

9     cleverly get into the fact that my client failed to appear and

10    blacken his name before the jury, as if the evidence wasn't

11    doing a good enough job.  Most respectfully, it didn't have to

12    go there, and I request that the jury be instructed to

13    disregard the response.

14         **MS. YASSER:**  If I can, Your Honor, the Government's

15    theory is that, after Mr. Fuertes was placed in deportation

16    proceedings and failed to appear, that's when approximately he

17    went to Virginia, and that's the reason that he went to

18    Virginia is the Government's theory of the case.

19         **MR. MONTEMARANO:**  It's a lovely theory which the

20    Government is certainly entitled to argue on closing.  In as

21    much as there is no evidence -- there is not a single sighting

22    of him there, there is not a single instance where they can

23    link him to -- with these phones that are allegedly his a year

24    after they last were in his possession, or ascribed to him,

25    the only evidence we have he was even in Virginia was the

1    testimony of Ms. Franco yesterday.

2              **MS. YASSER:**  Carlos Ascencio also testified that

3    he'd seen Pacha, who is Fuertes, in Virginia.

4              **THE COURT:**  Overruled.

5              (Whereupon, the bench conference was concluded.)

6    **BY MS. YASSER:**

7    Q.   Special Agent Kelly, my last question had to do with

8    Immigration consequences for Mr. Fuertes in the earlier part

9    of 2009.  Now, when Mr. Fuertes was released from ICE custody,

10   was there some sort of tracking device on him?

11   A.   Yeah.  As I recall, he had a brace -- we have an

12   alternatives to detention policy where, if possible, there is

13   no violent crimes in their history, people that are subject to

14   removal proceedings, we place on a bracelet with intensive

15   monitoring.  Because he came from a facility, that might have

16   been one of the reasons to place that on him as opposed to

17   just a straight removal, a release on recognizance, because he

18   came through the criminal alien program.  So, as I recall -- I

19   reviewed the records a long time ago -- he was on a bracelet.

20   Q.   And you mentioned that he didn't appear for court

21   following this March 25th, 2009 arrest?

22   A.   Correct.  I believe that was April or May of 2009.

23   Q.   Now, with respect to Fuertes Number 3, can you tell the

24   ladies and gentlemen of the jury how you associate that phone

25   with Mr. Fuertes.

1    A.    Well, we had toll data on it, August and September of

2    2010.  I believe the reason we obtained that toll data was

3    because we saw a frequency with other target numbers in the

4    investigation.  Subsequently, he was identified by Ms. Fuertes

5    as the number --

6    Q.    Ms. Fuertes?

7    A.    Pardon me.  Ms. Dueñas for the -- for Mr. Fuertes when he

8    was working in Virginia for Mr. Ventura, and then we also

9    reviewed the phones.  It was saved the same as Mr. Ascencio's.

10   It was saved as "Juano" on Mr. Ascencio's phone with the

11   similar testimony, and it was saved as "Flaco" on the phone

12   that was recovered from ████████████ September 1st, 2009.

13   In Mr. Ventura's Phones 1, 2, and 3, it was saved as "Pacha,"

14   "Norfo," and "Pinto."  It was saved as "Flaco" on a phone

15   recovered at ████████████ on November 15th, 2010.  It was

16   saved as "Chin" on the phone ██████████████, which that

17   phone was recovered November 15th, 2010, and Mr. Reyes was

18   arrested with that phone on June 28, 2010.

19          It was saved on -- so the phone number for that is

20   ██████-9346, and, between Mr. Reyes' arrest and what -- in

21   June 28th of 2010 and when that phone was recovered on

22   November 15th, 2010, that number had been erased.

23   Q.    I want to show you finally what's been indicated as a

24   number for Fuertes, Fuertes Number 5, and can you just tell

25   the ladies and gentlemen of the jury how you associated that

```
 1    number with Mr. Fuertes.

 2    A.        ████-0076, Mr. Fuertes provided that himself on

 3    January 3rd, 2009 and March 25th, 2009 on the booking sheets.

 4    Q.    Now, there were a lot of phones seized over the course of

 5    this investigation.  Were some of those phones associated with

 6    brothel locations --

 7    A.    Yes.

 8    Q.    -- that you identified?

 9         I want to walk through now with you how you formed

10    those connections between particular locations and brothels

11    and phone numbers.

12         MS. YASSER:  And this is -- for the record, this is

13    Government's 40f/1, still Page 3.

14    Q.    Mr. Kelly, or Special Agent Kelly, directing you to the

15    first number, 8938, with what or where did you associate that

16    number?

17    A.    We associate that number with the brothel at ████████

18    ████.

19    Q.    And how so?

20    A.    There were business cards recovered in the Toyota Corolla

21    that was searched on November 15th, 2010, and they were on

22    Mr. Fuertes' person December 10th, 2008.  The phone was

23    recovered September 26th, 2008 at ████████, and, at that

24    time, law enforcement answered the phone of people who were

25    calling in and asking for girls on the phone.
```



1   Q.   Let's go to the next line, the number you associated with

2   ███████.   Can you tell us how you associate that number

3   with that location?

4   A.   ███████-1397, the subscriber for that is Amparo de Jesus

5   Gonzalez, █████████████, Annapolis, Maryland.   It was also

6   a part of the subscriber records that another address was

7   associated with that number, a █████████████, Capitol

8   Heights, Maryland.

9   Q.   What do you know that address to be?   Whose residence?

10  A.   Mr. Ventura.

11  Q.   And then finally?

12  A.   Then there were also business cards recovered from the

13  Nissan Altima operated by Mr. Fuertes.

14  Q.   The next location is █████████████.   Did you associate

15  a phone number with that location?

16  A.   ███████-1643.

17  Q.   And how did you associate that?

18  A.   Business cards for █████████████ were recovered from ███

19  ███████ on September 1st, 2009.

20  Q.   And did that actually contain the address █████████████?

21  A.   I believe so.

22  Q.   The next line is █████████████.   Can you tell me

23  how you associated the number with that location?

24  A.   That would be ███████-4630.   Business cards were

25  recovered pursuant to a search warrant at █████████████ on

1   July 7th, 2010.  We also had done consensual calls to that

2   number, and the phone itself was recovered at ███████████

3   on July 7th, 2010.

4   Q.   And is that the same location that the jury heard the

5   consensuals regarding the juvenile?

6   A.   Correct.

7   Q.   Is that in Easton?

8   A.   Yes.

9   Q.   The next line is ██████████████, and there is four

10  numbers that you associated with ██████████.  Can you walk the

11  ladies and gentlemen of the jury through your associations.

12  A.   First one is ████████-9346.  The phone was recovered

13  November 15th, 2010 at ██████████████.  We had consensual

14  phone calls, and Mr. Reyes was arrested with the phone on

15  June 28th, 2010.  There is other contact with that number

16  associated with the investigation that's not in this chart.

17  Q.   What's the next number that you associate with ██████

18  ██████████████?

19  A.   ████████-2387, and that was recovered from Mr. Ventura's

20  van on November 15th, 2010, and we had a consensual call to

21  that number.

22  Q.   ██████████████████ Number 3?

23  A.   ████████-5211.  There were consensual calls to that

24  number.  The bill from the Wireless shop dated 10/18/10, that

25  says tossed by Reyes.  That was the receipt recovered from the

 1   trash.

 2   Q.   And then what about the fourth number associated with ▮▮▮▮

 3   ▮▮▮▮▮▮▮▮▮?

 4   A.   ▮▮▮▮▮-8346.  Two boxes of business cards were recovered

 5   from the Nissan Sentra on November 22nd, 2010 pursuant to the

 6   search warrant.  Two receipts for phone recovered at

 7   Mr. Ventura's residence, which is ▮▮▮▮▮▮▮▮▮▮▮▮ on

 8   November 15th, 2010, and a receipt for the phone and phone

 9   recovered November 15th, 2010 in the Astrovan operated by

10   Mr. Ventura.

11   Q.   The next line is the address of ▮▮▮▮▮▮▮▮▮▮▮▮.   Where

12   is that located?

13   A.   That's in Portsmouth, Virginia.

14   Q.   And what's the number you associated with that location?

15   A.   ▮▮▮▮▮▮-1815.

16   Q.   Why did you make that association?

17   A.   We received the phone through the investigation that

18   Agent Joseph was conducting in Norfolk.  We received that

19   phone number.  We eventually placed a consensual phone call,

20   and that number was located through -- in other ways in the

21   investigation.

22   Q.   And how was --

23   A.   And as well as what's on the chart.  In the consensual

24   call in Norfolk, it was saved as "Chin" and "Chi Kitiguao" --

25   I don't know if I pronounced that correctly -- on the phones

 1    recovered at ▮▮▮▮▮▮▮▮ on July 7th, 2010, and was also

 2    saved as "Chim" -- it's "Chin" in Block 2, and "Chim" on

 3    Line 3 -- on the phone recovered November 15th, 2010 in the

 4    Astrovan operated by Mr. Ventura.

 5    Q.   Now, we've seen that name Chin before.  Where did we see

 6    that?

 7    A.   That's a 4168, Fuertes 3.

 8    Q.   Now, continuing on with the two phone numbers associated

 9    with ▮▮▮▮▮▮, can you explain why you made those

10    associations?

11    A.   The business cards, stamps, phones.  So the business

12    cards, the stamp to make the business card, and the phone for

13    both those numbers were recovered from ▮▮▮▮▮▮ or on the

14    people that had stolen it from ▮▮▮▮▮▮ on 2/17/10.  So part

15    of that whole incident on February 17th, 2010, those two

16    phones were recovered at the address.  They were on the

17    business cards for the address, and they were that stamp to

18    make the business cards.

19    Q.   Now, after making these associations with the locations,

20    did you check for frequency of contact between the Defendants

21    and these particular locations?

22    A.   Yes, we did.

23    Q.   And did you also check for frequency of contact between

24    the two defendants themselves, the various phones that were

25    associated with them?

1    A.    Yes, we did.

2    Q.    I want to review that with you now?

3              **MS. YASSER:**  If I could approach, Your Honor?

4              **THE COURT:**  Yes.

5              **MS. YASSER:**  Special Agent Kelly, I'm going to ask

6    you to step down and bring your documents that you need with

7    you.

8              **THE REPORTER:**  Just make sure you keep your voice

9    loud and clear.

10             **THE WITNESS:**  Okay.

11   **BY MS. YASSER:**

12   Q.    I'm going to start, without blocking the Judge, with

13   respect -- sure.  With respect to first the frequency of

14   contact between the phone numbers associated with Mr. Ventura

15   and the phone numbers associated with Mr. Fuertes, can you

16   describe how many contacts you saw over the period of time in

17   your investigation?

18   A.    We modified it.  There has been a change that I see.  So

19   the total amount of calls between Mr. Ventura in the left

20   column and Mr. Fuertes along the top would represent 3,236

21   contacts between August 1st, 2008 and September 17th, 2010.

22   Q.    And, just to be clear, Special Agent Kelly, did you have

23   toll records for that entire length of time?  In other words,

24   was that consistent from the start of that period to the end,

25   or were there brief periods throughout for which you had toll

1    records?

2    A.    There is periods listed for the individual phones that

3    demonstrate what periods we actually had the tolls for, so,

4    no, we didn't have tolls for all the numbers for the whole

5    time frame.  This is the sum of several smaller blocks of

6    time.

7    Q.    Okay.  So taking as an example that first entry between

8    Ventura Number 1 and Fuertes Number 1 in the upper left-hand

9    column of Government's Exhibit --

10            **MS. YASSER:**  For the record, this is Government's

11   Exhibit 31c.

12   Q.    How many contacts were made during that period of time?

13   A.    Between Ventura 1 and Fuertes 1, there were 919 contacts

14   between August 1st, 2008 and December 10th, 2008.

15   Q.    And does the rest of the chart reflect contacts for just

16   brief periods or month periods at a time?

17   A.    It reflects the period that we had the data.

18   Q.    Now, with respect to Ventura's phones and Fuertes'

19   phones, did you also analyze those phones for contacts with

20   the brothel locations that you identified?

21   A.    Yes, we did.

22   Q.    And, starting first with Ventura Number -- well,

23   actually, in sum total, how many contacts were there between

24   Ventura's phones and Fuertes' phones with the brothel

25   locations?

 1    A.    8,576 between August 2nd, 2008 and November 15th, 2010.

 2    Q.    And did Defendant Ventura have contacts with all the

 3    brothels --

 4              MR. MONTEMARANO:   Objection, Your Honor.  Can we

 5    please approach?

 6              THE COURT:   Come up.

 7              (Whereupon, the following discussion occurred at the

 8    bench.)

 9              THE COURT:   Yes, sir?

10              MR. MONTEMARANO:   I had hoped not to need to bring

11    this up, but, while I am unhappy about, I am resigned to the

12    fact that the Government can have the witness testify about

13    these phones being associated with one or both of the

14    Defendants.  The testimony is coming out as calls between

15    Ventura and Fuertes, which is --

16              THE COURT:   Sustained.  Sustained.

17              MR. MONTEMARANO:   -- entirely inappropriate.

18              THE COURT:   Sustained.

19              Also, while you're here, Mr. Ruter, please ask

20    Mr. Ventura not to have contact with any of the witnesses

21    while they're on the stand, including calling Special

22    Agent Kelly a liar.

23              MR. RUTER:   Yes, sir.

24              THE COURT:   Thank you.

25              (Whereupon, the bench conference was concluded.)

1          **MS. YASSER:**  Actually, Special Agent Kelly, you can

2    go ahead and take a seat.  I think we've covered that.

3    **BY MS. YASSER:**

4    Q.   Now, you mentioned you conducted an analysis of -- I'm

5    going to get it wrong, but I think 57 phones?

6    A.   Correct.

7    Q.   Okay.  Now, did you look through those phones to see how

8    many of the phones had contacts saved in or phone contacts

9    with the numbers that you associated with Mr. Ventura or

10   Mr. Fuertes?

11   A.   Out of the 57 phones, two we couldn't recover data from,

12   so the analysis was actually 55 -- the data recovered from 55,

13   and the total analysis that I did for the whole project also

14   involved the brothel numbers, or numbers that we associated

15   through the investigation.

16   Q.   And how many of the phones had connections with any of

17   those numbers?

18   A.   It would have been 49 of the 55 phones that we were able

19   to obtain data from had relevant contact with numbers that I

20   identified in the investigation.

21   Q.   Special Agent Kelly, as part of your investigation, did

22   you research Ms. Dueñas' employment history?

23   A.   Yes.

24   Q.   And, in doing so, did you go to the facility where

25   Ms. Dueñas had testified that she was employed?

1    A.    We did.

2    Q.    Do you recall approximately when that was that you went

3    there?

4    A.    Within the last three to four months.

5    Q.    And did you observe anything noteworthy when you went to

6    that location?

7    A.    Yes.  There was a picture on the wall.

8    Q.    And, by the way, where was that, that you went?

9    A.    Waste Management down in Laurel, Maryland, in Prince -- I

10   believe it's the Prince George's County side of it.  Laurel is

11   a couple of counties coming together.

12   Q.    I want to show you Government's 39d and ask if you

13   recognize that photograph?

14   A.    Yes.

15   Q.    Where was that observed?

16   A.    In the Office of Human Resources where we went to serve a

17   subpoena.

18   Q.    And do you recognize anyone in that exhibit?

19   A.    Ms. Dueñas in the bottom right.

20   Q.    As part of the investigation, was Ms. Dueñas encountered

21   at a ███████████ location on November 15th, 2010?

22   A.    She was.

23   Q.    And were you present on that day?

24   A.    No.

25   Q.    Have you reviewed photographs taken from that location on

 1      that day?

 2      A.   I have.

 3      Q.   And do you have knowledge of what type of residence it

 4      was that Ms. Dueñas was residing in?

 5      A.   She had a room in the basement of a single-family

 6      residence.

 7      Q.   I want to show you Government's 26a/1.  Do you recognize

 8      that?

 9      A.   That would be the exterior door to the basement.

10      Q.   26a/2?

11      A.   There is a glare -- I'm sorry -- but I can see it now.

12      That's the bedroom.  That's the bed.

13      Q.   A little better?

14      A.   Yeah.

15      Q.   26a/4?

16      A.   Appears to be lotions and some currency, some vitamins,

17      DVD player.

18      Q.   Do you know approximately how much cash was recovered

19      from the entirety of ███████████?

20      A.   No.  I believe it was less than a hundred dollars.

21      Q.   Was there any other evidence obtained from ███████████

22      with respect to cash deposits or receipts or anything

23      evidencing money of any kind?

24      A.   No.

25      Q.   Do you know if there was any food recovered from the room

1    where Ms. Dueñas was staying?

2    A.   Not that was made note of.

3    Q.   I want to show you 26j, ask you to identify that.

4    A.   That is a hospital -- I'd call it a bill from Washington

5    Adventist Hospital for a patient Esmirna Franco.

6    Q.   From what date?  Or I guess let me actually direct you to

7    Page 2 and ask if you can tell from looking at this what this

8    record reflects the date of service to be.

9    A.   August 30th, 2010.

10   Q.   And what's the description of the service provided?

11   A.   I'm not a doctor, but it looks like a pregnancy less than

12   14 weeks.

13   Q.   And then what's the entry below that reflect?

14   A.   "Pregnant uterus."

15   Q.   I'm sorry.  You may have mentioned it, but the name of

16   the person on that bill?

17   A.   Esmirna Franco.

18   Q.   Was there a phone recovered from Ms. Dueñas on that day?

19   A.   There were two phones recovered at that address.

20   Q.   And did you look for contact information for Mr. Fuertes

21   or a Mr. Ventura?

22   A.   I know I -- we researched tolls for Mr. Ventura, contact

23   with his number -- all numbers associated with him.

24   Q.   And do you recall seeing contact between Mr. Ventura's

25   phone and Ms. Dueñas' phone?

1   A.   Yes.  There was substantial contact between the two.

2   Q.   And, on that same date, was the number ending in 3124 --

3   was that the number recovered from Mr. Ventura's possession?

4   A.   Yes.  It was in the van that he was arrested.

5   Q.   And did you analyze that phone?

6   A.   We did.

7   Q.   Were there any text messages of note contained within

8   that phone --

9   A.   There were.

10  Q.   -- as it relates to Witness Dueñas?

11  A.   There were.

12  Q.   And how, if you know, did Mr. Ventura have Ms. Dueñas'

13  phone saved in his phone?

14  A.   "Diabla."

15  Q.   Do you know what that means?

16  A.   Female devil.

17  Q.   I want to show you what's been marked as Government's

18  29b/1A, and this is a -- there is two pages of this exhibit.

19  First, I'm going to show you the front side.  Is that a text

20  message that -- what is that?

21  A.   There is a bad glare on the name.  I know what the name

22  there --

23        **MS. YASSER:**  I apologize, but I think I misquoted.

24  It's 39b/1A for the record, Your Honor.

25        **THE COURT:**  Yes.

1    **BY MS. YASSER:**

2    Q.   What is this a picture of?

3    A.   That's a picture of the Number 11 text.

4    Q.   And whose phone is this a picture of?

5    A.   That is the 3124 phone number associated with

6    Mr. Ventura.

7    Q.   And is this an incoming, or an outgoing text from the

8    "Diabla" number?

9    A.   From the text, it's from Diabla to ████-3124.

10   Q.   I'm going to show you -- is there two parts to this

11   particular text exchange?

12   A.   Yes.  The text rolls onto another screen.

13         **MS. YASSER:**  And this is going to be 39b/1B, Your

14   Honor.

15   Q.   Is that the remainder of that particular text message?

16   A.   Yes.

17   Q.   And did you obtain a Court-certified translation of that

18   text message?

19   A.   Yes.

20   Q.   I want to show you the backs of 39b/1A and b/1B and ask

21   you to read that for the ladies and gentlemen of the jury,

22   starting with the left side.

23   A.   So, from Diabla, she devil, "Pardon me if I bother you,

24   but it was only to tell you that Marian does not work on

25   Sunday.  I won't bother you anymore, but it was only to tell

1    you --" "but it was only to tell you that Marian does not work

2    on --" I'm sorry.  "I won't bother you anymore," and that's

3    it.  It's -- I think it rolled over from the bottom part.

4    Q.   Was that just because of the way the photograph was taken

5    of the phone?

6    A.   Yes.  Well, no.  There is more data, so that photograph

7    was taken by our computer forensic agent, so they're trying to

8    be as -- they try and get all the data possible to make sure

9    they have a complete record.

10   Q.   What's the date on that particular text message?

11   A.   October 29th.

12        **MR. RUTER:**  Of what year?

13   Q.   Do you know what year?

14   A.   I do not.

15        **MS. YASSER:**  You'll have cross.

16   Q.   Now, were there also a series of text messages that

17   have -- scratch that.

18        Let me show you Government's 39b/3 and b/4.  Do you

19   recognize that?

20   A.   That's another text message from that phone.

21   Q.   And who is that text message from, and who is it to?

22   A.   From Diabla to ██████-3124.

23   Q.   And when was that text message received?

24   A.   It appears to be 10/26.

25   Q.   And what time?

```
 1    A.    3:30 a.m.

 2    Q.    39b/4, what does that reflect?

 3    A.    Another text from Diabla to ██████-3124.

 4    Q.    And when was that received?

 5    A.    On November 2nd.

 6    Q.    And, other than the address listed here, was there

 7    anything else to that text message?

 8    A.    No, not that I observed.

 9    Q.    Same question for 39b/4:  Anything other than the

10    address?

11    A.    No, not that I observed.

12    Q.    39b/5, do you recognize that?

13    A.    Another text from Diabla to ██████-3124.

14    Q.    And when was that received?

15    A.    November 6th.

16    Q.    And what time?

17    A.    7:43 p.m.

18    Q.    Are any of these addresses familiar to you?

19    A.    ████████████████ is familiar to me.

20    Q.    How is that familiar to you?

21    A.    I participated in a search warrant that was executed at

22    that location on or about that -- I think it was a week later.

23    Q.    And what was observed at that particular location?

24    A.    It was a Latino brothel suspected of drug activity.

25    Q.    And you said it was about a week later; is that correct?
```

```
 1    A.    Yes.

 2    Q.    And what year was that?

 3    A.    2010.

 4    Q.    I want to show you 39b/2.  What is that?

 5    A.    That's another text from Diabla to ████-3124.

 6    Q.    And what time is that?

 7    A.    It's 1:35 a.m. on the November 6th.

 8    Q.    Is that the same date on which Government's 39b/5 was

 9    sent --

10    A.    Yes.

11    Q.    -- or received, rather?

12          Did you obtain a Court-certified translation of that

13    text message?

14    A.    I did.

15    Q.    This is the back of that exhibit.  If you could read that

16    translation for the ladies and gentlemen of the jury.

17    A.    2:25, Diabla:  "Daddy, you know that the baby is moving a

18    lot."  Message size, from, to, and if you want the -- do you

19    want all of it, or --

20    Q.    Special Agent Kelly, were you present in the courtroom

21    following the testimony of Rebeca Dueñas Franco on Monday of

22    this week?

23    A.    Yes, I was.

24    Q.    And, after the jury was dismissed, did you remain at

25    counsel's table?
```

1    A.    I did.

2              MR. RUTER:   Objection.  May we approach, Your Honor?

3              THE COURT:   Come up.

4              (Whereupon, the following discussion occurred at the

5    bench.)

6              MR. RUTER:   Your Honor, I never like hearing the

7    phrase, "after the jury was dismissed."  So, if I could have a

8    proffer as to what it is that was --

9              MR. MONTEMARANO:   I'll join.

10             MS. YASSER:   I've previously talked to you about

11   this, but, after the jury was dismissed, the Defendant was

12   being escorted out by the Marshals, and he turned to Special

13   Agent Kelly and said, "Have fun with my woman, Kelly."

14             THE COURT:   Okay.  And you want that for what

15   reason?

16             MS. YASSER:   Well, to show that he had a possessive

17   attitude towards Rebeca Dueñas Franco just immediately

18   following her testimony.  It acknowledges even that he had an

19   association with her.

20             MR. RUTER:   Well, Your Honor, if I could be heard.

21   Mr. Ventura has proffered to me that he has proof of Special

22   Agent Kelly had a sexual relationship with Ms. Franco, for

23   whatever that's worth.  If Government counsel were to state

24   that, then it would seem to me I might -- it may be necessary

25   for me to ask how many times did he see her, under what

1    situations, under what circumstances, and the like, which I

2    don't think is a good idea, and his comment is not meaningful

3    in any context whatsoever.  Assuming that he said it, it

4    doesn't mean anything.

5           **THE COURT:**  Well, the Government is on notice that,

6    if they elicit it, you get to examine on it.

7           **MR. RUTER:**  Yes, and I would hope that that would

8    not be necessary, but that's where we are.

9           **MR. MONTEMARANO:**  I respectfully submit that the

10   401/403 problem, as it applies to my client in terms of this

11   being a joint trial argues in favor of the Government not

12   being permitted to elicit it.

13          **MR. RUTER:**  And the last thing I would say, Your

14   Honor, is that Ms. Yasser proffered the relevance that it

15   shows that there is an association between the two.  Isn't it

16   apparent?  They have a child together.  Now, I don't see where

17   it gets anybody at all.

18          **MR. MONTEMARANO:**  And that's not been denied by the

19   Defense or controverted, and won't be in the Defense cases.

20          **THE COURT:**  Actually, that is true.  Okay.

21   Sustained.

22          **MR. MONTEMARANO:**  Thank you.

23          **MR. RUTER:**  Thank you, Your Honor.

24          (Whereupon, the bench conference was concluded.)

25   **BY MS. YASSER:**

1    Q.    Special Agent Kelly, we've heard the name Raudel during

2    the course of this trial.  Do you know somebody named Raudel?

3    A.    Raudel.

4    Q.    Raudel?

5              THE REPORTER:  Could you spell it, please?

6              THE WITNESS:  R-A-U-D-E-L.

7    BY MS. YASSER:

8    Q.    Who is Raudel?

9    A.    He's a Mexican national.  He's currently under indictment

10   in the Eastern District of Virginia for human trafficking.

11   Q.    Is that sex trafficking?

12   A.    Yes, ma'am.

13   Q.    Have you ever heard of a man named Alex?

14   A.    Yes.  Yes, I have, ma'am.

15   Q.    And how have you identified Alex?

16   A.    Choco.  He's a Hispanic male.  He has a bad eye.  He's

17   been identified by several sources of information.

18   Q.    And has a location associated with Alex ever been

19   searched in the course of your investigation or other

20   investigations that you're aware of?

21   A.    Personally, I've done surveillance on a location that I

22   associate with Alex and -- to little or no success, and I'm

23   not certain about one search that was conducted earlier on in

24   this investigation by the Prince George's County Police

25   Department, whether or not --

1          **MR. MONTEMARANO:**  Objection, Your Honor.  Non-

2     responsive.

3          **THE COURT:**  Well, as I tried to explain, non-

4     responsiveness is the examiner's objection; however, you

5     probably have several other bases, which I will sustain on.

6          **MR. MONTEMARANO:**  We'll start with relevance.  Thank

7     you, Your Honor.

8     **BY MS. YASSER:**

9     Q.   Can I direct you, Special Agent Kelly, to Washington,

10    D.C. area.  Was there a brothel ever associated with Alex that

11    was searched there in Washington, D.C.?

12    A.   Oh, yes, ma'am.

13    Q.   And when was that?

14    A.   I don't have the date.  If you'd show me the report, I

15    can refresh my memory.

16    Q.   If you give me a moment.

17    A.   Yes, ma'am.

18    Q.   While I'm looking for that, do you recall why that

19    particular location was searched?

20         **MR. MONTEMARANO:**  Objection.  Relevance.

21         **THE COURT:**  Haven't heard the question.  Overruled.

22    **BY MS. YASSER:**

23    Q.   Do you recall why -- do you know or are you aware of why

24    that location was searched?

25         **MR. MONTEMARANO:**  Objection.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  There was a 911 call alleging -- I

3    believe it was gunshots.

4    **BY MS. YASSER:**

5    Q.   And do you know from what number that 911 call was

6    placed?

7    A.   It was the ████████ 1, I believe.  It's ████-9346.

8    Q.   And how or why was that particular location identified

9    with this individual named Alex?

10   A.   So the call initiated a law enforcement response which

11   had caused a barricade situation, which then, once it was a

12   crime scene, entry was made.  It was identified as a Latino

13   brothel.  Interviews were conducted, and a photograph of who

14   I've subsequently been able to show other people identified

15   Alex was shown to people there that day, and identified as

16   Alex.

17   Q.   And how was he identified in relation to the location

18   that was searched?

19   A.   Owner/operator, ma'am.

20   Q.   You mentioned that 911 call was placed with a number of

21   relevance in your investigation in this case, and that was ████

22   ████; is that correct?

23   A.   Yes, ma'am.

24   Q.   Did you search for the numbers -- associated with this

25   investigation, did you search in general for contact with the

1  police, contact with 911 emergency calls?

2  A.   911 calls from numbers we associated as targets, yes, I

3  did, ma'am.

4  Q.   And what did that investigation reveal?

5  A.   It was over 200 contacts.

6           **MS. YASSER:**  No further questions.

7           **THE COURT:**  Cross?

8           **MR. RUTER:**  Thank you, Your Honor.

9                    **CROSS-EXAMINATION**

10  **BY MR. RUTER:**

11  Q.   Good afternoon, Special Agent Kelly.

12  A.   Good afternoon, sir.

13  Q.   You've been involved in human trafficking, if we

14  understand, since 2005; is that right?

15  A.   Yes, sir.

16  Q.   And, in addition to that, you were at the Border Patrol

17  of Texas for eight years before that?

18  A.   Yes, sir.

19  Q.   Also correct?

20       And, as a result, you've seen hundreds or thousands

21  or tens of thousands of people attempt to illegally cross into

22  the United States from Mexico?

23  A.   I'd go with thousands, sir.

24  Q.   With thousands?

25  A.   Or over thousands.  I'm not saying 10,000, but we had a

1    lot of people come through our area, sir.

2    Q.    Okay.  And a lot of those folks would just come by foot?

3    A.    Where we worked, there was the river, so they had to come

4    across the river, and then they'd run by foot, get picked up

5    by cars, get transported to the next spot, then walk around

6    the checkpoint, and then move on through various forms of

7    transportation.

8    Q.    Okay.  During your time with the Border Patrol as well as

9    being involved for the last seven or more years in human

10   trafficking, a lot of these human-trafficking cases and patrol

11   cases dealt with Hispanic people; is that right?

12   A.    The ones --

13   Q.    A lot of your investigations have dealt with Hispanic

14   individuals?

15   A.    Yeah.  We didn't investigate -- we weren't -- in the

16   Border Patrol, we weren't allowed to investigate crimes as

17   part of our unit.  We patrolled, interdicted, and placed in

18   proceedings, so I wouldn't --

19             **THE REPORTER:**  We patrolled?

20             **THE WITNESS:**  Pardon?  We would patrol, interdict,

21   and place in proceedings.  So, as Border Patrol agents, you're

22   not an agent or an investigator, so it's -- it's the uniform

23   branch.  Just there is a distinction there.  When I performed

24   in that capacity, I didn't perform as an investigator.

25   **BY MR. RUTER:**

 1    Q.   Okay.  Nonetheless, you'd have had lots and lots of

 2    contact with people who had entered the United States who were

 3    from Mexico, as an example?

 4    A.   We had a lot of Central Americans in our area, sir.

 5    Q.   All right.  Guatemala, El Salvador, Honduras, et cetera?

 6    A.   Yes, sir.

 7    Q.   Okay.  And you also would have come into contact with

 8    both males and females; is that correct?

 9    A.   Yes, sir.

10    Q.   Adults?  Adult males, and adult females?

11    A.   With children too, sir.

12    Q.   And children.  And you've also had now about seven years

13    of investigation on human trafficking, and you've conducted

14    dozens of separate investigations; is that correct?

15    A.   Yes, sir.

16    Q.   And a lot of those have dealt with Hispanic people as

17    well; is that correct?

18    A.   Yes, sir.

19    Q.   I want to ask you:  As a result of the extraordinary

20    amount of contact you have had with Central American people,

21    have you noted as a general rule the relationship that exists

22    between a man and a woman, between a male and a female?

23         **MS. YASSER:**  Objection, Your Honor, as to relevance.

24         **THE COURT:**  Sustained as to form.

25    **BY MR. RUTER:**

1    Q.   I'll probably dance around it later, Your Honor.

2         **THE COURT:**  Okay, but no Percy Sledge imitation, for

3    those my age or older.

4         (Laughter.)

5    **BY MR. RUTER:**

6    Q.   You had indicated on direct examination that there was a

7    search made in Easton on July the 7th of 2010.

8    A.   Yes, sir.

9    Q.   And it was made because you all were afraid that there

10   could have been a juvenile individual involved in prostitution

11   at that location; is that right?

12   A.   Yes, sir.

13   Q.   And that's because, if we recall, someone at the brothel

14   said that there was a juvenile at that location; is that

15   correct?

16   A.   Yes, sir.

17   Q.   And is it a fair statement, based upon your experience

18   and investigation, that the men who frequented these places

19   prefer younger women as compared to older women?

20   A.   Yes, sir.

21   Q.   Is it also your experience that the people who answer the

22   phones may often times lie about exactly who it is and what it

23   is that they are selling at that time?

24   A.   We've had it happen on several occasions, sir.

25   Q.   And this is one where, when you, in fact, did a warrant

1    on this location, there was, in fact, no juvenile present at

2    that time; is that right?

3    A.   Correct.

4    Q.   And it would be fair to say that didn't surprise you, did

5    it?

6    A.   No, sir.

7    Q.   That didn't surprise you because you've learned, with all

8    your experience, that many people involved in this line of

9    trade lie?

10   A.   Yes, sir.

11   Q.   And they lie about any number of things; true?

12   A.   Yes, sir.

13   Q.   When you did that search, did you find any guns or any

14   weapons at all?

15   A.   No.  Just a bullet, sir.

16   Q.   Okay.

17            **THE REPORTER:**  "A bullet"?

18   **BY MR. RUTER:**

19   Q.   A bullet, do we understand?

20   A.   A bullet, yes, sir.

21   Q.   A bullet.

22   A.   A 9mm.

23   Q.   Okay.  And then you also did, if we understand it, a

24   bunch of searches from time to time?  As an example, on the

25   Ford Expedition driven by Mr. Ventura, you all searched that

1   vehicle?

2   A.   November 15th, there was a number of searches done that

3   day, sir.

4   Q.   Were there any weapons found in that vehicle?

5   A.   No, sir.

6   Q.   And you searched the Nissan associated with Mr. Ventura;

7   is that right?

8   A.   Yes, sir.

9   Q.   Did you find any weapons in that vehicle?

10  A.   No, sir.

11  Q.   You searched a Toyota Corolla associated with

12  Mr. Ventura, didn't you?

13  A.   Yes, sir.

14  Q.   Did you find any weapons in there?

15  A.   No, sir.

16  Q.   You searched ▮▮▮▮ on November 15th, 2010, didn't you?

17  A.   Yes, sir.

18  Q.   Find any weapons in there?

19  A.   No, sir.

20  Q.   You searched his home at ▮▮▮▮▮▮ on November 15th,

21  2010, didn't you?

22  A.   I didn't participate in that search, but it was searched,

23  sir.

24  Q.   All right.  And you've seen all the paperwork in this

25  case.  You're the case agent.  You've reviewed all this stuff,

1   haven't you?

2   A.   Yes, I have, sir.

3   Q.   And there was no weapons found then, was there?

4   A.   No, sir.

5   Q.   Okay.  But you were told by many of your sources, Special

6   Agent Kelly, were you not, that Mr. Ventura here always

7   carried a sidearm?

8   A.   I was -- I don't know if we were told "always," but I

9   know, on a number of occasions, people told us they saw him

10  with weapons.

11  Q.   Yeah.

12  A.   I wouldn't say "always," because, on September 24th, when

13  he was arrested, he didn't have any weapons either, sir.

14  Q.   Oh, I was going to bring that up.

15  A.   Oh.

16  Q.   So he didn't have any weapons on that date either?

17  A.   Not on his person.  No, they didn't search the vehicle

18  that day, sir.

19  Q.   Had you done any analysis on the amount of money that you

20  believe, based upon your investigation, would have been made

21  at any of the particular houses over any particular period of

22  time as an example?

23  A.   The general analysis that we use for the business is 100

24  clients per girl per week.  That's the normal amount, or

25  that's, from what I understand through my investigative

1    experiences, what an owner's goal is, to hit a hundred,

2    because they only have a couple of busy days.  So, if you have

3    two girls and they stay the whole week, they don't get sick,

4    then -- so you're going to make 3,000 per house gross per

5    week.

6    Q.   For both women, you'd earn $3,000?

7    A.   If you hit your numbers.  If you get girls that clients

8    want to come to and there is not other businesses that's

9    competing with you.

10   Q.   Right, but it would be a total of $3,000, 1,500 for one

11   girl, and then $1,500 for the other girl?

12   A.   Right.  And then you subtract the cost of food, the

13   condoms, the towels, the jelly, and all that stuff out.

14   Q.   Okay.  And then you'd expect, then, to see thousands of

15   dollars per month per location; is that accurate?

16   A.   Well, that's the gross, so then you have to pay your

17   doormen, you have to pay your advertisers, your -- generally

18   that's -- the doormen are paid anywhere from 3 to $500.  The

19   advertiser, normally called the portero, would be paid 300,

20   because they have less work to do, and then -- so you're

21   losing 800 there to your employees, so then you're taking it

22   down to 2,200.  You have to pay your lease.  You have your

23   vehicle; you have to pay your gas.  If you're in an area where

24   there is a strong gang activity, you have to pay the rent, so

25   on and so forth.

1       So, yes, they're -- generally if you're running a

2   house, you should be -- 1,500 or 2,000 a week would be

3   reasonable if you get good girls, the girls do come and they

4   work the full week, and you're in an area with not a lot of

5   competition.

6   Q.   How much would you expect, then, for an operator of a

7   location to net after you factored out what the ladies are

8   paid and the supplies and the rent and any other expenses that

9   you've just named?  How much then would be left over for the

10  owner or operator of a particular facility?

11  A.   I'd say 1,500 to 2,000 would be a reasonable expectation.

12  Q.   Okay.  And so, if it's 1,500, then there is four weeks in

13  a month more or less, we're talking about, say, 4,000-plus

14  dollars per month per location?

15  A.   Yes.  6,000 per month, sir.

16  Q.   Okay.  And, if a person had four locations, as an

17  example, then would you continue to multiply it out times four

18  locations?

19  A.   If you're doing well, sir.

20  Q.   Okay.  And that would give you a figure of 16 to $18,000

21  or more per month if you had four locations; is that right?

22  A.   Four locations, and you're working two girls at every

23  location.  That's the other thing.  If you have a location

24  with two girls, you're making that.  If you have a location

25  with one girl, now you're starting at 1,500.

1    Q.   Okay.

2    A.   So it depends on how many girls you're running.  If

3    you're running a girl on delivery -- because generally you

4    don't run two girls on delivery.  You run a driver, and the

5    driver, and the driver is paying for that --

6              **THE REPORTER:**  A little slower.

7              **THE WITNESS:**  Sorry.

8              **THE REPORTER:**  Generally?

9              **THE WITNESS:**  So it's not as simple as saying you

10   have four locations.  You have to look at the location and how

11   many girls you have at the location and what your competition

12   is.  Not a lot -- my investigation is that the majority of

13   Latino brothels and Hispanic brothels, they're not cash cases.

14   We're not seizing assets, we're not identifying assets, and

15   we're not finding large sums of money.

16   **BY MR. RUTER:**

17   Q.   You're not finding -- you're not finding large sums of

18   money, period?

19   A.   Not with the Hispanic brothels, no, sir.  That Raudel

20   individual, as I mentioned before, he was -- he was the only

21   one that we think would might have been successful, and there

22   was no large currency seized -- seizure there.

23   Q.   Okay.  This man Raudel, by the way, was he the same

24   Raudel that I -- we heard testimony from concerning

25   Ms. Franco?

1    A.    I believe she said she knew him, or she had heard of him.

2    I'm not sure what her exact testimony was as far as her

3    relationship.

4    Q.    Well, she told you all -- one or more of your many

5    interviews before you all came here that she said that Raudel

6    was Chino's boss; did she not?

7    A.    I believe, in one interview, she did say that.

8    Q.    Okay.  And she said that he was Alex's boss as well,

9    didn't she?

10   A.    I don't recall her saying that, but I -- it's definitely

11   possible.

12   Q.    She may have said it in the same breath.  My recollection

13   is, in the same breath, she said, "Raudel was the boss of

14   Chino and Alex and Freddy."  That's my recollection, which is

15   pretty good.

16   A.    I can believe that, and he was the biggest pimp around.

17   Q.    Okay.  Do you know what she meant, since you were at the

18   interview, when she said that Raudel was the boss of Chino?

19   Did you understand that Chino worked for Raudel?

20   A.    My investigation did not show that he was an employee of

21   Raudel, because then he would have been wrapped up in that

22   investigation out of the Eastern District of Virginia, but

23   what I understand a lot of the girls understand the owners,

24   the pimps, the operators to be is one giant Mafia.  They don't

25   look at them as individuals.  They look at them as a whole

1  criminal organization.  They can't understand they're separate

2  as far as how we investigate and prosecute crimes.  A lot of

3  the girls are here illegally.  A lot of the girls have a low

4  level of education.  To them, it's -- it's them, it's the

5  Mafia, it's -- they're all -- and they think all the owners

6  are together.

7  Q.   And, having said that, would it not be fair to say that

8  that's precisely how Ms. Franco saw it?

9  A.   In that -- I -- if you show me the context of how it was

10  put in, it might have been how she referenced at that time,

11  but the one thing with the -- and I don't know which statement

12  you're talking about, Ms. Franco, because she was interviewed

13  on several times --

14  Q.   Yeah.

15  A.   -- and it's my -- I try and interview people as few times

16  as possible and allow them to go with a non-government

17  organization to feel comfortable to come forward with whatever

18  their true story is.  So I'm not sure at which interview

19  you're mentioning, because there was the initial one when --

20  after the child was taken and subsequent interview.  So if you

21  can reference in a time frame, that might help me understand

22  it.

23  Q.   Okay.  And I may have to step aside to take a look at

24  that, Special Agent Kelly.  You do recall that her

25  statement -- her first statement, I think, was 158 pages long.

1    Do you remember that?

2    A.   The one in Annapolis?

3    Q.   The one on September the -- September 29th, I believe.

4    A.   With the Annapolis, Detective Hartlove and such?

5    Q.   Uh-huh.

6    A.   I don't know the number of pages.  I know it's a large

7    statement.

8    Q.   But you've read it?

9    A.   I've reviewed it.

10   Q.   Right.  More than once?

11   A.   No.

12   Q.   No?  I stand corrected.  It's only 146 pages long.

13          But that's followed by a second interview on the

14   same day, which is 34 pages long, right?

15   A.   If you're telling me the page count.

16   Q.   Yeah.  But, notwithstanding, if you can't recall her

17   specifically, your testimony is that it was not uncommon in

18   this trade that the women really are not familiar with exactly

19   who is running what?

20   A.   The man who owns the house, because that's who they have

21   to call to get the week, or that's who like -- the other thing

22   is it's not always the girl calling for the week.  I've done

23   several investigations assisting with our New York and New

24   Jersey offices where the girls that are in New York and New

25   Jersey are victims of trafficking, and then their brokers are

1    calling down here to get weeks for them here.  So they know

2    who is associated with the house they're working in that week,

3    so -- but then they look at all those owners as being one

4    Mafia, one criminal organization.

5    Q.    Okay.  You would agree with me, Special Agent, when

6    you're investigating any crime -- and we're talking here about

7    sex trafficking -- and you're interviewing, in this case, a

8    prostitute -- and we'll talk about specifically Ms. Franco --

9    that the better questioning technique would not be to make

10   that witness any promises if you can avoid it?  Would that be

11   a fair statement?

12   A.    Always.

13   Q.    Okay.  And that's because you want to have a witness that

14   would have no bias for you or no bias against you; would that

15   be a fair statement?

16   A.    Right, but I -- if you think they're victims, you also

17   want to assure them -- because one of the things with us with

18   Immigration is like, when we're interviewing someone to see if

19   there is indication of human trafficking, you know, the -- we

20   try and let them know we're not there to do any wrong to them,

21   make them feel at ease, because they have a distrust of law

22   enforcement.  They have the fear of Immigration problems.  So

23   it's not that we're going to promise that they're going to

24   receive a benefit, but we try and let them know that we're not

25   going to do any harm, if that makes sense.  So I don't know if

1   you consider that a promise or not.  It's just trying to gain

2   rapport with a potential victim.

3   Q.   So would it be fair to say, put another way, that you may

4   attempt to treat a victim with kids' gloves, we might say?

5   A.   Yes.

6            THE COURT:  Mr. Ruter, can we pick it up at 2:00?

7            MR. RUTER:  Of course we can, Your Honor.

8            THE COURT:  Thank you.

9            Members of the jury, please remember:  Don't discuss

10   the case among yourselves or with anyone else.  Please be back

11   in the jury room at about five minutes before 2:00.  We'll get

12   started at 2:00.

13            (Jury excused.)

14            THE CLERK:  All rise.  This Honorable Court stands

15   in short recess.

16            (Luncheon recess -- 12:52 p.m.)

17            (Afternoon session -- 1:59 p.m.)

18            THE CLERK:  All rise.  This Honorable Court now

19   resumes in session.

20            THE COURT:  Ready for the jury?

21            MS. YASSER:  Yes, Your Honor.

22            Oh, Your Honor, I'm sorry.  We're trying to revise

23   the chart so it doesn't reflect the changes that were covered

24   up, so, to the extent Mr. Ruter needs to use it --

25            MR. RUTER:  No.

1      **MS. YASSER:**  -- during cross -- okay.

2           (Jury enters.)

3           **THE COURT:**  Please be seated.

4           **MR. RUTER:**  Your Honor?

5           **THE COURT:**  Yes, sir.

6  **BY MR. RUTER:**

7  Q.   Special Agent Kelly, you had told us on my earlier cross-

8  examination that, as an investigator, you would do everything

9  that you could never to make any promise to a potential

10  witness, and then you gave us the reasons why you would not do

11  that; is that correct?

12  A.   Yes, that's what I said.

13  Q.   Okay.  Do you recall whether or not I had asked

14  Ms. Franco whether or not she had made any promises by the

15  authorities concerning trying to help her with her child after

16  her child had been taken away from her?

17  A.   Yeah, I recall that question.

18  Q.   And do you recall that Ms. Franco said no promises had

19  been made to help her with her child --

20  A.   Yes.

21  Q.   -- to get her child returned?

22  A.   Yeah, I recall that testimony.

23  Q.   Do you recall whether or not there was any other time

24  when she had given a different response to that question?

25  A.   No, I do not recall.  That was back in 2008, I think it

1    was, or --

2    Q.    It was September -- do you recall she gave a lengthy

3    statement on September 29th of 2008?

4    A.    Yes.

5    Q.    And do you recall having read that statement?

6    A.    I reviewed it.

7    Q.    Okay.  And can you recall that Detective Carraballo was

8    the lead person who did the questioning on that particular day

9    along with Detective Hartlove?

10   A.    Well, I believe Detective Carraballo, when the two of

11   them worked together, was acting -- he was the interpreter for

12   Detective Hartlove.

13   Q.    Okay.  Can you recall the detective indicating to

14   Ms. Franco that they're investigating a murder case, and that,

15   if he has to write a letter to the Department of Social

16   Services to help her with the girl, then he'll write it, that

17   he'll give it to them?

18   A.    No.  I wasn't there, so I don't recall it.

19   Q.    Okay.  Do you recall the detective saying to her that --

20             MS. YASSER:  Objection, Your Honor.

21             THE COURT:  Sustained.  He said he wasn't there.

22             MR. RUTER:  Yeah.  All right.  So have

23   Detective Carraballo ready for me.

24             MS. YASSER:  If you want to show it to him --

25             MR. RUTER:  No, no.

1        **MS. YASSER:**  -- you can show it --

2        **MR. RUTER:**  No.

3    **BY MR. RUTER:**

4    Q.   Special Agent Kelly, we heard these phone calls between

5    Freddy and Chino, is that right, that were played earlier

6    today?

7    A.   There was, I believe, one phone call with Freddy Soriano

8    and Chino, yes, sir.

9    Q.   Yeah.  And do you recall that, with the second phone

10   call, they both kind of went back and forth, if you will, kind

11   of making negative comments about each other, threatening each

12   other?

13   A.   I'm thinking the second phone call was the, "I'm busy.

14   I'm busy."  In the short one, or you mean the one after that

15   one?

16   Q.   The one after that one.

17   A.   I don't remember any direct -- if you see me -- if you

18   give me the transcript, I'll review it again.  I don't

19   remember any direct threats Soriano said to Chino.

20   Q.   Do you recall threats the other way?

21   A.   There was the mention of the message that he sent.

22   Q.   Right.  And, after that, do you recall them then laughing

23   back and forth talking about whether or not one of them had an

24   old woman?

25   A.   Yes.

1    Q.   And what did you understand that to mean?

2    A.   I believe that was an insult from one pimp to another

3    pimp about the quality of women they would have had.

4    Q.   Right.  And that went on for a bit of time, and they both

5    laughed back and forth; did they not?

6    A.   Yes.

7    Q.   Okay.  And, if I understand it, did you know where Chino

8    was located -- physically located when that phone call --

9    those two phone calls occurred?  He was at the casinos, wasn't

10   he?

11   A.   I'm trying to recall.  I apologize.  I don't -- I know I

12   corroborated the toll that the phone was made, but I didn't

13   check the cell tower information, so I'm not certain.

14   Q.   Okay.  But is it possible that he was at the casinos?

15   A.   He spent a lot of times at the casinos, yes, sir.

16   Q.   Yeah.  And he did say initially when that -- when he

17   called, he said, "I'm busy"?

18   A.   Yes, sir.

19   Q.   Yeah.  Did you analyze the number of phone calls between

20   Ms. Franco and Mr. Ventura?

21   A.   We did.

22   Q.   And did you know whether or not there were more calls

23   between Mr. Ventura and Ms. Franco as compared with phone

24   calls between Mr. Ventura and any other females, numerically?

25   A.   When -- when I did review -- I didn't review all of the

1    female records, but I reviewed the records of the tolls of the

2    prostitutes.  There would be a low frequency on the

3    prostitutes.  Ms. Santiago was one of the higher ones that I

4    noted.  With Ms. Dueñas, it was in excess of a thousand phone

5    calls, and the majority of the -- the direction of those phone

6    calls was mainly from Mr. Ventura in to Ms. Dueñas' number,

7    but -- so hers would have -- was way out of line from the

8    other females that I analyzed that I recall.

9    Q.   Yes, sir.  And you learned in your investigation, did you

10   not, that Ms. Franco and Mr. Ventura had a different

11   relationship than Mr. Ventura and the other females that you

12   investigated?  Is that true?

13   A.   Yes.

14   Q.   And part of that difference in the relationship is the

15   fact that they, from time to time, lived with one another; is

16   that true?

17   A.   I wouldn't -- I don't believe we ever found any of his

18   property at the places where she was living, so I don't know

19   if -- they were -- they would spend time at different

20   locations together.

21   Q.   Okay.  Maybe that's a better way to phrase it.  They

22   spent more time together than perhaps Mr. Ventura would have

23   with the other women that you investigated throughout the

24   course of this lengthy investigation?

25   A.   Correct.

1    Q.    Okay.  And of course they had a child together?

2    A.    Currently, yes.

3    Q.    Okay.  Not so, to your knowledge, with any of the other

4    women that you investigated in this investigation; is that

5    true?

6    A.    Just Yenis Ruiz, the woman he lived with at ██████████

7    ████.

8    Q.    Was that his wife?

9    A.    No.

10   Q.    Did they have a child together?

11   A.    Two male children.

12   Q.    Okay.  And do you know whether or not Mr. Ventura called

13   her his wife?

14   A.    I don't know if he called her his wife or his woman.

15   Q.    Okay.  You showed the jurors Exhibit 39b/1D dated

16   October 29th, 2010, and, if we understand it, Ms. Franco texts

17   Mr. Ventura about the fact that Marian does not work on

18   Sundays.  Do you recall that text?

19   A.    Yeah.  I believe she -- I don't know if she didn't work

20   Sunday or she had to leave Sunday.  I don't -- if you put it

21   up --

22   Q.    I was going to ask:  Did you understand what it meant?

23   A.    If you put it up, I can read it, and I can have a better

24   understanding.

25   Q.    Okay.  Well, I'm not going to do that if it's okay.  You

1    don't remember, do you?

2    A.   No.  I don't remember if she had to leave on Sunday or if

3    she couldn't work Sunday.

4    Q.   Okay.  It was Ms. Franco who advised Mr. Ventura of that

5    fact; is that what happened?  Her phone contacted his phone?

6    A.   Yes.  I took that in the manner of someone who is

7    answering to a higher-up as far as how that -- how the whole

8    text was read.  "Excuse me," like you're talking to someone

9    above you.

10   Q.   Okay.  You don't find that at all cultural?

11   A.   When you mention "cultural," in -- when I speak in

12   Spanish, if there is a man and a woman, I use the masculine

13   intended to speak, so, if you're saying the male takes

14   dominance over the female as far as in the language, I

15   don't --

16   Q.   Well, then, with that, maybe we better look at the

17   message and you can further enlighten us.

18           **MR. RUTER:**  Is it 39?

19           **MS. YASSER:**  It is 39.

20           **MR. RUTER:**  Thank you.

21   **BY MR. RUTER:**

22   Q.   I'm going to take this out of the sleeve so you can read

23   it better.  This is Government Exhibit 39b/1A.  The question

24   is -- and do you read Spanish, sir?

25   A.   No, and especially not the way they send it in the text

1      format.

2      Q.   Okay.  So, when you told us what this meant before, did

3      Ms. Yasser show you an English version?

4               **MS. YASSER:**  It's on the back.

5               **THE WITNESS:**  Oh, yes.

6      **BY MR. RUTER:**

7      Q.   Okay.  And she says to him, "Pardon me if I bother you,

8      but it was only to tell you that Marian does not work on

9      Sunday.  I won't bother you anymore;" is that right?

10     A.   Yes, sir.

11     Q.   Okay.  And my question was:  What did you understand that

12     message to mean?

13     A.   That Marian does not work on Sunday, so either she's not

14     going to work on Sunday, or -- like, if they're scheduling

15     another week in the future, she's only going to work until

16     Saturday.  Something about Marian's schedule, that she's not

17     going to work, or she -- her schedule, she's a Monday to

18     Saturday girl.

19     Q.   Okay.  Did you know whether or not Marian and Rebeca

20     worked -- both of them worked as prostitutes -- are you aware

21     of that -- on October 29th of 2010?

22     A.   No.  I don't have any particular information about that.

23     Q.   Okay.  Do you know where Ms. Franco was located when she

24     texted this message -- where she was physically located?

25     A.   I think the other text was on 10/29 as well for ████████

1  ████████████████, if I recall, and if you --

2  Q.   Yes.

3  A.   -- want to refresh my memory, so I would assume she -- do

4  you want me to explain why we think -- what ████████████████

5  means?

6  Q.   No.  You already did.

7  A.   But as far as why she texted it and why I think she would

8  be somewhere.

9  Q.   It sounds like you used the word "assume," so we'll leave

10 that.

11 A.   Okay.

12 Q.   There was another text that you showed the jury.  It was

13 39b/2.  It was the same date, I believe.  No.  Maybe it

14 wasn't.  It was November the 6th of 2010, and it said

15 something about, "Daddy, the baby is moving."  Do you recall

16 that one?

17 A.   Yes, sir.

18 Q.   Okay.  And what did you understand that to mean as a

19 result of your investigation?

20 A.   That Ms. Dueñas was pregnant, and that she was telling

21 Mr. Ventura that the baby was moving.

22 Q.   Okay.  And, among Hispanic-speaking people, do you see

23 the word "daddy" used a lot?

24 A.   I see "papi" a lot with the prostitutes.

25 Q.   But you don't see "daddy"?

1    A.    Well, "papi" means "daddy," so a lot of the girls will

2    say "papi," so --

3    Q.    Okay.  And the question is:  This doesn't say, "papi,"

4    does it?

5    A.    Well, that's the English.  I don't know what it said in

6    Spanish.

7    Q.    You don't know?

8    A.    If you show me the Spanish, I can --

9    Q.    Okay.  Well, I was assuming that, when it's the

10   translation, it's done accurately?

11   A.    But -- so you're asking me if the English is used a lot,

12   and I'm just telling you, when I get it, I get it in Spanish,

13   so, when you say the English form of "daddy," I'd say "papi,"

14   if I'm going to say what I normally hear when I'm talking to

15   Latino prostitutes.

16   Q.    Okay.  Outside of the prostitution business, because

17   you've been involved with Hispanic people for a lot of years,

18   true?

19   A.    Yes.

20   Q.    Have you heard males being referred to as "daddy"?

21   A.    From their wives?

22   Q.    Or girlfriends.

23   A.    When I associate it with this prostitution business,

24   that's where I get it the most.  I get called "papi," because

25   I'm in a position of authority, so just, when I come in, I

1   hear it a lot.

2   Q.   All right.  I had asked you earlier, I think, about this

3   Raudel, and, if I understand it, Raudel, you've now told us,

4   is under Indictment in Virginia?

5   A.   He was on *America's Most Wanted*, yes, sir.

6   Q.   Okay.  And I had asked whether you were aware if Raudel

7   was Chino's boss.  Do you recall that?

8   A.   Yes, I do, sir.

9   Q.   And your answer was?

10   A.   Not that my investigation showed, because then he would

11   have been part of the investigation -- sorry -- in the Eastern

12   District of Virginia.

13   Q.   Okay.  Ms. Franco had advised you that she knew of

14   Raudel; did she not?

15   A.   Yes, sir.

16   Q.   Okay.  Did she play any role in the investigation of

17   Raudel in Virginia?

18   A.   No, sir.

19   Q.   All right.  Special Agent Kelly, when some -- when any

20   investigator is speaking with a potential witness,

21   procedurally and as a protocol, would it be best for the

22   questioner, law enforcement officer, not to characterize the

23   suspect, not to use any euphemisms, not to suggest whether

24   that person is guilty or not guilty, good or bad, evil or

25   angelic, et cetera?

1   A.   Yes, that's -- that's a good go-by.

2   Q.   Okay.  And the reason you would choose not to do that

3   would be for what purpose, for what reason?

4   A.   To color their testimony.

5   Q.   Right.  You don't -- the idea is you don't want to place

6   your personal thoughts into the thoughts of your potential

7   witness; would that be what you're saying?

8   A.   Yes.

9   Q.   Okay.  Now, you'd reviewed, did you not, the interview on

10  September 29th of 2009?  That's when Ms. Franco was speaking

11  at length with Detective Carraballo and Detective Hartlove.

12  A.   Yes.

13  Q.   Do you recall Detective Carraballo on a couple of

14  occasions referring to Mr. Ventura as a bad man?

15  A.   I do not recall that.  Like I said, it was a lengthy

16  statement, I believe.

17  Q.   Okay.  Well, you did review the statement; did you not?

18  A.   I did.

19  Q.   All right.  Special Agent Kelly, did you review the

20  statement made by Ms. Franco on November 15th of 2010?

21  A.   The statement and the report prepared by Detective Lee,

22  yes.

23  Q.   And do you recall on that day Detective Carraballo

24  advising Ms. Franco that Mr. Ventura was a bad man?

25  A.   I didn't think he was there that day, because we had a --

1    another interpreter.

2    Q.   And unfortunately you're right, and I'm wrong.  How about

3    Detective Lee?

4    A.   Yes.  Detective Lee, but he's English speaking.

5    Q.   All right.  Did you recall him calling Mr. Ventura a bad

6    man?

7    A.   I do -- I don't know if he said "bad people" or "bad

8    man."  I don't recall.

9    Q.   Okay.  If I showed you this document, may it refresh your

10   recollection?

11   A.   Yes.  I wasn't present to the interview.

12          **MR. RUTER:**  If you would mark this as Defense

13   Number 12 for identification.  This is Page 14 and 15 of a

14   statement given on November 15th of 2010.

15          (Witness reviewing exhibit.)

16          **THE WITNESS:**  Do you want me to read all of it, or

17   just the part that you're asking about?

18          **MR. RUTER:**  Just -- I've done some highlighting.

19          **THE WITNESS:**  Right.  I didn't know if you wanted me

20   to read all the highlights.

21          **MR. RUTER:**  Yeah, but I'm asking you just to read it

22   to yourself, and then, after you're finished, I'll ask you a

23   question.

24          **THE WITNESS:**  About the rest of it as well, or --

25          **MR. RUTER:**  Well, I'll direct you.

 1              THE WITNESS:  I see there.

 2              MR. RUTER:  There, that, and then there.

 3              THE WITNESS:  Okay.

 4              (Witness reviewing exhibit.)

 5    BY MR. RUTER:

 6    Q.   Okay.  So you've had a chance to review this exhibit;

 7    have you not?

 8    A.   Yes.

 9    Q.   And this was the early part of the interview; is that

10    right?

11    A.   Yes.

12    Q.   Okay.  And, having read that document now, has your

13    recollection been refreshed as to what Detective Lee said to

14    Ms. Franco about Mr. Ventura?

15    A.   Yes.

16    Q.   And what is that?

17    A.   The transcript reflects he called him a bad man and a bad

18    person.

19    Q.   Right.  A couple times?

20    A.   Yes.

21    Q.   And you would agree with me that that probably is not a

22    good technique when you're trying to decide whether a person

23    is a potential witness in a criminal case, agreed?

24    A.   Different people have different techniques.  I wouldn't

25    use that one, yes.

 1    Q.   Yeah.  And you wouldn't use it because, when you tell a

 2    potential witness that the suspect is a bad man, then you may

 3    plant thoughts in their brain; true or false?

 4    A.   True.

 5    Q.   Okay.  And you never want to plant a thought in the

 6    witness' brain, do you?

 7    A.   Correct.

 8    Q.   Okay.  Ms. Franco, to your knowledge, was treated

 9    differently than the other women; is that right?

10    A.   By whom, sir?

11    Q.   Mr. Ventura.

12    A.   Yes, sir.

13    Q.   And how so?

14    A.   From our investigation, she didn't receive any of the

15    proceeds of her work -- her labor.  He would control where she

16    lived, how she moved.

17    Q.   And did you believe that that was a result of the fact

18    that Mr. Ventura felt that he was in a boyfriend-girlfriend

19    relationship with Ms. Franco?

20    A.   That's not my belief, sir.

21    Q.   Okay.  Well, didn't Ms. Franco tell you that that was

22    what her belief was as to Mr. Ventura?

23    A.   Ultimately, it is -- not in the end certainly.

24    Q.   How about when she appeared in the Grand Jury in this

25    courthouse on December 7th of 2010?

1    A.    I don't have the Grand Jury transcript, and I wasn't in

2    the Grand Jury.

3    Q.    All right.

4              (Counsel conferring.)

5    **BY MR. RUTER:**

6    Q.    Did you ever have any conversations with Ms. Franco

7    about -- well, let me rephrase it.

8              **MR. RUTER:**  Excuse me one second, Your Honor.

9              **THE COURT:**  Yes.

10   **BY MR. RUTER:**

11   Q.    You had indicated that you had read the September 29th,

12   2008 interview of Ms. Franco, correct?

13   A.    Yeah.  Once again, I said I reviewed it.

14   Q.    Yeah.  Do you recall whether or not Detective Carraballo

15   had indicated that he would write a letter on behalf of

16   Ms. Franco in order to have her daughter returned to her after

17   she had been detained on September 26th of 2008?

18   A.    I didn't know if -- I don't think she was detained on

19   September 26th, was she, sir?

20   Q.    Well, there was a bust, was there not, at ████████████

21   ██████?

22   A.    I don't think anyone was arrested on 9/26.

23   Q.    She may not have been arrested.  She was there present.

24   She was a prostitute on that day, wasn't she?

25   A.    Yes, as part --

1   Q.   And she ended up, on September 29th, 2008, in an

2   interview, didn't she?

3   A.   Yeah, but I thought she came in for that, sir.

4   Q.   Well, how she got there, I didn't ask you.  She was in an

5   interview, wasn't she?

6   A.   Yes, sir.

7   Q.   And Detective Carraballo was interviewing, wasn't he?

8   A.   Detective Carraballo -- and I'm trying to pronounce his

9   name right -- and Detective Hartlove, yes.

10  Q.   The question is, again, whether or not you remember that,

11  on that date, Detective Carraballo told her that he would

12  assist her in attempting to have her daughter returned to her?

13  A.   No.

14  Q.   You do not recall that?

15  A.   I do not.

16  Q.   All right.

17          **MR. RUTER:**  If I could have this marked as Defense

18  Number 12.

19          **THE REPORTER:**  Thirteen, I believe.

20          **MR. RUTER:**  Or 13.  Thanks.

21  **BY MR. RUTER:**

22  Q.   And you did review this report; did you not, sir?

23  A.   Yes.

24  Q.   If you would read --

25  A.   That's not a report; it's a transcript.

1    Q.   You read the transcript, didn't you, Agent?

2    A.   I reviewed it off of what I read from the -- I read the

3    report more thoroughly.

4    Q.   Read Page 32 and 33 for me.

5            **MS. YASSER:**  Your Honor, the Government doesn't have

6    any objection even though the witness has testified that he

7    wasn't present.

8            **THE COURT:**  And you rose to tell me that?

9            **MS. YASSER:**  Because -- to advise that, while this

10   is objectionable, we are not -- we're not offering our

11   objection at this point.

12           **THE COURT:**  And that was important for me to know?

13           **MS. YASSER:**  Sorry, Your Honor.

14           **MR. RUTER:**  I'd be happy to call the Detective in

15   here, Judge.

16           (Witness reviewing exhibit.)

17           **THE REPORTER:**  I need to hear you.

18           **THE WITNESS:**  Oh, I'm sorry.  I was just reading

19   more of the transcript.

20   **BY MR. RUTER:**

21   Q.   The question is, Special Agent:  Having reviewed this

22   document, is your recollection refreshed as to whether or not

23   there is a conversation between Detective Carraballo and

24   Ms. Franco as to whether he would or would not help her

25   attempt to get her daughter back?

1        **THE COURT:**  Please don't block the jury, Mr. Ruter.

2        **THE WITNESS:**  There was a statement by

3   Detective Carraballo to Ms. Dueñas, but, just to clarify, the

4   translation -- that was in Spanish, and there is a subsequent

5   translation that Detective Carraballo gave back to

6   Detective Hartlove, so -- so -- but that's what

7   Detective Carraballo said to Ms. Dueñas.

8   **BY MR. RUTER:**

9   Q.   Yeah.  And did he not also say that getting some kind of

10  support from a Homicide detective is, quite frankly, something

11  of great weight or consideration; is that a fair statement?

12  A.   That is -- that is what Detective Carraballo said in

13  Spanish.

14  Q.   Yes.  Presumably to the ears of Ms. Franco, who speaks

15  Spanish?

16  A.   Correct.

17  Q.   All right.  And the question is:  Would you agree with me

18  that that statement was made in order to obtain from

19  Ms. Franco the belief that the detectives would do all they

20  could to help her obtain her child back from the Department of

21  Social Services?

22       **MS. YASSER:**  Objection, Your Honor.  Calls for

23  speculation.

24       **THE COURT:**  Overruled.

25       **THE WITNESS:**  It sounds like a statement that would

 1  try and elicit her cooperation in their investigation, yes.

 2          **MR. RUTER:**  Okay.  Good.  All right.  With that, I

 3  have no further questions.  Thank you.

 4          **THE COURT:**  Cross, Mr. Montemarano?

 5          **MR. MONTEMARANO:**  Thank you, Your Honor.

 6                    **CROSS-EXAMINATION**

 7  **BY MR. MONTEMARANO:**

 8  Q.  Good afternoon, Special Agent Kelly.  How are you doing?

 9  A.  Well, and you, sir?

10  Q.  Just ducky.

11          Let's stay on the 29th of September and the

12  interview of Ms. Dueñas by Detective Hartlove and Carraballo

13  and the report -- I mean, the transcript you read.

14          **MR. MONTEMARANO:**  Defense 11, please?  Thank you.

15  Q.  And you've just testified that you had reviewed the

16  transcript, correct?

17  A.  That page, yes, sir.  I reviewed the whole transcript,

18  yeah, but I just reviewed that --

19  Q.  Yeah.  Just now --

20  A.  Yeah.

21  Q.  You testified that you previously had reviewed the entire

22  transcript?

23  A.  Yes, sir.

24  Q.  And you would agree, as Mr. Ruter referenced earlier, it

25  runs 158 pages.  Does that sound right?

1    A.    Yes, sir.

2    Q.    And you recall the introductory statements by

3    Detective Carraballo and Detective Hartlove to Ms. Dueñas to

4    explain why they want to talk to her?

5    A.    No, sir.

6    Q.    Okay.  Well, that would be, in your experience as a

7    trained investigator, one of the first things you do.  You

8    tell somebody why you're there to talk to them; is that a fair

9    statement?

10   A.    Yes, sir.

11   Q.    You recall from your review of the transcript -- oh, by

12   the way, did you ever listen to the actual tape --

13   A.    No, sir.

14   Q.    -- or the CD or however it's recorded?

15   A.    That one, I believe, is a digital one.  No, I did not,

16   sir.

17   Q.    Okay.  Do you recall Ms. Dueñas laughing in response to

18   the initial introduction by Detective Carraballo and

19   Detective Hartlove?

20   A.    Is this the exhibit you had the other day, sir?  I recall

21   seeing what you presented at trial.

22   Q.    If I might show it to refresh your recollection.

23   Defense 11.

24   A.    Shoot away.

25   Q.    Yes.

1          **MR. CUNNINGHAM:**  What exhibit number?

2          **MR. MONTEMARANO:**  Defense 11.  Page 2 of the 9/29/08

3     transcript.

4          **THE WITNESS:**  Yeah.  That was just the other day, so

5     I recall that.

6     **BY MR. MONTEMARANO:**

7     Q.   And you recall her testimony?

8     A.   Yes.

9     Q.   Would this be consistent with your understanding that she

10    was laughing in response to their questions; is that a fair

11    statement?

12    A.   If it's on the transcript, then that's what's on the

13    audio.

14    Q.   And you have no reason to think the transcript is

15    incorrect, correct?

16    A.   No.  I -- I obtained the transcript, sir.

17    Q.   Okay.  Oh, so you had it transcribed?

18    A.   Yeah, I submitted the request.

19    Q.   Oh, okay.  So, as far as you're concerned, it's an

20    accurate recitation of what's on the tape?

21    A.   Yes, sir.

22    Q.   Okay.  And that would roll back to your testimony -- I

23    think it was right before lunch -- where you suggested that,

24    when you meet with someone, especially someone from another

25    culture, that you're going to try to make them feel at ease?

1   Do you remember stating that under oath?

2   A.   Build rapport, yes, sir.

3   Q.   Yes.  Build rapport.  Build rapport or establish or gain

4   rapport.  I don't recall what the verb was, but the idea is to

5   establish a relationship, to establish your bona fides, to get

6   the person to want to talk to you and talk to you candidly,

7   truthfully, fully, honestly; is that a fair statement?

8   A.   Well, it depends if -- it depends on how you mean it,

9   like -- so the majority of the work that I do when we go to

10  these places, we're meeting potential victims of human

11  trafficking, so we're trying to gain their rapport as far as

12  that.  I don't necessarily want to -- so, as far as when I say

13  that, I mean, when we're trying to develop rapport with a

14  potential victim that may have distrust of law enforcement.

15  Q.   Okay.  And certainly Ms. Dueñas would come within that

16  category?

17  A.   Yes.

18  Q.   Okay.  And you'd have no reason to think that that would

19  be -- the approach being taken by Detectives Hartlove and

20  Carraballo would be any different?  They'd be wanting to do

21  the same thing with someone who they believe is a victim of a

22  crime, correct?

23  A.   Detective Hartlove, back in 2008, was calling me to ask

24  me which questions to ask regarding human trafficking, because

25  he had no background or basis in it at that point in time.

```
1    Q.   That's perfectly fine.
2         Now, I'd like to ask you a few more questions about
3    the testimony you gave earlier today regarding phones.  You
4    were responsible for assembling the toll records and coming up
5    with statistical -- that word and I never get along --
6    statistical data that were on the charts that Ms. Yasser was
7    asking about earlier today?
8    A.   Yeah.  That chart was specifically for frequency.
9    Q.   And, in particular, you were identifying certain phones
10   based upon those people that your investigation has associated
11   with those particular phone lines; is that a fair statement?
12   A.   Yes.
13   Q.   But I'd like to invite your attention --
14        MR. MONTEMARANO:  Ms. Yasser, do we have the chart?
15        MS. YASSER:  Yes.
16        MR. MONTEMARANO:  The one with the location
17   information.
18        MS. YASSER:  Which one?
19        (Counsel conferring.)
20        MR. MONTEMARANO:  Mr. Cunningham kindly provided me
21   the original.  This is 40 -- is that an "h," Mr. Cunningham?
22        MR. CUNNINGHAM:  No.
23        MR. MONTEMARANO:  40h/1?
24        MR. CUNNINGHAM:  No.  Bear with me.  Let me get
25   this --
```

1        **MR. MONTEMARANO:**  That's an "f"?  Okay.  40f/1.  I

2   thought my handwriting was bad.

3   **BY MR. MONTEMARANO:**

4   Q.   That look familiar?

5   A.   Yes, it does.

6   Q.   Okay.  And these are the phone numbers relating to

7   Mr. Ventura; is that correct?

8   A.   Correct.

9   Q.   And there is in here, I believe, one relating -- with the

10  same information on the phone numbers relating to Mr. Fuertes,

11  correct?

12  A.   Yes.

13  Q.   And we have 5015 number -- let's make this a little

14  bigger -- correct?

15  A.   Correct.

16  Q.   And that's the one that was seized from -- when he was

17  arrested, my client gave you that number or gave law

18  enforcement that number as his number, correct?

19  A.   I believe that number was actually seized from him that

20  day.

21  Q.   That was my understanding.  It doesn't say it here, but,

22  actually, I think it was the phone -- that phone was taken

23  from his person, correct?

24  A.   Well, it says arrested and gave, had on 9/25 --

25  Q.   Ah.  English is a little loose of the tongue.

1   A.   Yeah.  9/25/08, he was arrested with that phone number.

2   Q.   That's my understanding.  And, on the 1672 number, that

3   was also taken from him, correct?

4   A.   Correct.

5   Q.   So we have no question these are associated with him,

6   correct?

7   A.   Correct.

8   Q.   Let's look at Fuertes Number 3.  It's listed, as I

9   understand this, as "CLLO" on Ms. Dueñas' phone, correct?

10  A.   Yes.

11  Q.   It's listed as "Juano" on Mr. Ascencio's phone, correct?

12  A.   Correct.

13  Q.   It's listed as "Flaco" on a phone recovered from ████?

14  A.   Correct.

15  Q.   It's listed on different phones associated with

16  Mr. Ventura as "Pacha" or "Norfo" or "Pinto," correct?

17  A.   Yes.

18  Q.   And then it's listed as "Chin" on two different phones;

19  is that correct?

20  A.   Yes.

21  Q.   And also was "Flaco" on another phone recovered from

22  Mr. Ventura's home --

23  A.   Correct.

24  Q.   -- correct?

25       And this is a phone for which you have toll records,

1    so I understand, from August and September of 2010?

2            **MR. MONTEMARANO:**  Oh, my apologies.

3    Q.   October and November of 2010, correct?

4    A.   Yes.

5    Q.   We don't have records from the other dates; is that a

6    fair statement?

7    A.   Yes.

8    Q.   And so, in '09, you have no way of knowing who was using

9    that telephone, correct?

10   A.   I do have associating with that number through another

11   investigation that we were running out of Virginia through '09

12   into 2010.

13   Q.   I'm not sure I follow.

14            (Counsel conferring.)

15   **BY MR. MONTEMARANO:**

16   Q.   You never seized this phone, the 0076; is that a fair

17   statement?

18   A.   Yes, sir.

19   Q.   And you never seized 4168?

20   A.   Correct.

21   Q.   You don't know where it is today?

22   A.   No reason to need to know, no, sir.

23   Q.   You would agree, without belaboring the point, a phone is

24   an easily-transferred item?  One person can give it to

25   another, can give it to another, correct?

1   A.    Correct.  The tolls and the frequency and who it contacts

2   is what's important.

3   Q.    Correct, but there were other people calling Mr. Ventura

4   for the sake of discussion, correct?

5   A.    Yes, sir.

6   Q.    Other people involved in this enterprise, correct?

7   A.    Correct, sir.

8   Q.    And other people who were involved in operating the

9   various brothels at times after March of 2009; is that a fair

10  statement?

11  A.    Yes, sir.

12  Q.    In fact, those brothels continued in almost continuous

13  operation through and including taking down the organization

14  in November of 2010, correct?

15  A.    Well, the Easton one, we took down, and then the

16  Portsmouth one was taken down for one reason or another.  The

17  ████████████ was the one that was the -- there was a ████

18  ██ address that was operational and suspected of illegal

19  activity for a time, and then that was taken down before we

20  can, you know, conduct illegal activity, so not all of his

21  brothels remained functioning throughout that time frame.

22  Q.    But at least one brothel of Mr. Ventura's was in

23  operation continuously through the 10th -- the 15th of

24  November of 2010?

25  A.    Yes.

1      **MR. MONTEMARANO:**  No further questions, Your Honor.

2  Thank you.

3               **THE COURT:**  Redirect?

4               **MS. YASSER:**  Thank you, Your Honor.

5                    <u>**REDIRECT EXAMINATION**</u>

6  **BY MS. YASSER:**

7  Q.   Special Agent Kelly, you were asked questions on cross-

8  examination about your search of Easton and what compelled it.

9  Do you recall those questions?

10  A.   Yes.

11  Q.   And you were asked particularly about juveniles.  Do you

12  recall testifying that, in your experience and training, the

13  men who frequented these brothels would prefer younger to

14  older women; is that correct?

15  A.   Yes.

16  Q.   So is it true that the younger woman is the better, or,

17  in terms of from the trafficker's perspective, the more

18  lucrative, a younger woman would be?

19  A.   Yes.

20  Q.   And is it also true that, the more lucrative as perhaps a

21  more attractive woman might be?

22  A.   Yes.

23  Q.   Now, you mentioned that what initiated your search of

24  Easton was this belief that there might be a juvenile there;

25  is that correct?

1    A.   Correct.

2    Q.   And, in your experience and training and past

3    investigations, have you ever recovered a juvenile inside a

4    Hispanic brothel?

5    A.   Yes, I have.

6    Q.   And what's the youngest age either you or your colleagues

7    have recovered from inside a Spanish brothel?

8              **MR. MONTEMARANO:**  Objection.  Relevance.

9              **THE COURT:**  Sustained.

10   **BY MS. YASSER:**

11   Q.   You were also asked questions with respect to weapons or

12   guns that were recovered over the course of the investigation.

13   Do you recall those questions?

14   A.   Yes.

15   Q.   I want to show you a few pictures, Special Agent Kelly.

16   Do you recognize Government 2a?  Do you recognize that?

17   A.   That's a machete, camera, condoms, and business cards.

18   Q.   And do you know where that machete was recovered?

19   A.   I believe that was the Nissan that was operated by

20   Mr. Fuertes.

21   Q.   I also want to pass up to you --

22             **MS. YASSER:**  If I may approach, Your Honor, this is

23   Government's 17i and 17m.

24             **THE COURT:**  Yes.

25   **BY MS. YASSER:**

1    Q.    Special Agent Kelly, do you recognize these exhibits?

2    A.    Yes.   They were the machetes that were recovered at █████

3    ████████   in Easton, Maryland.

4    Q.    Do you also recall in the course of your investigation

5    seeing picture text messages with photos of firearms?

6    A.    Yes.

7    Q.    And was that seen in this case on one occasion, or more

8    than one occasion?

9    A.    More than one occasion.

10   Q.    This is 19a/6.  Do you recognize that?

11   A.    Yes.   That's Mr. Avila's phone.

12   Q.    Do you recognize 15c/b?

13   A.    That's the text message from Mr. Soriano.

14               **THE REPORTER:**  I'm sorry.  c/b?

15               **MR. CUNNINGHAM:**  c/6.

16               **MS. YASSER:**  I'm sorry.  15c/6.  My apologies.

17   **BY MS. YASSER:**

18   Q.    Special Agent Kelly, was a firearm used to assault anyone

19   over the course of this investigation?

20   A.    Yes, it was.

21   Q.    And was that firearm recovered?

22   A.    Yes, it was.

23   Q.    Special Agent Kelly, do you recognize this exhibit?

24   A.    That's the shotgun that was recovered after the assault

25   on Mr. Avila.

1    Q.   You were also asked a lot of questions about proceeds

2    relating to sex trafficking.   Do you recall that?

3    A.   Yes, ma'am.

4    Q.   And, just to be clear, were your answers that you gave

5    gross proceeds, or net?   In other words, had you subtracted

6    for the payment of employees?

7    A.   I believe I started with gross, and then went to net with

8    what my best guesstimate was of what their expenses would be.

9    Q.   Special Agent Kelly, I want to show you again two

10   exhibits that were shown to you during cross, starting with

11   39b/2.   Can you tell by looking at this exhibit what date and

12   time this message was sent?

13   A.   November 6th, 1:35 a.m.

14   Q.   That would have been just early that morning; is that

15   correct?

16   A.   Yes.

17   Q.   And then, this message, when was that received, I should

18   say?

19   A.   November 6th, 7:43 p.m.

20   Q.   So that would be later in that evening?

21   A.   Yes.

22   Q.   And, this message, it appears to be just an address; is

23   that correct?

24   A.   Yes.

25   Q.   Have you seen that before in the context of sex

1    trafficking?

2    A.   Just an address?

3    Q.   Yes.  Have you come across that in the course of your

4    investigation?

5    A.   Yes, as it relates to different things.

6    Q.   What does it mean to you?

7    A.   In this investigation, it meant that was where that

8    particular -- Diabla would be working on that day.

9              **MS. YASSER:**  Thank you.  No further questions.

10             **THE COURT:**  Recross?

11             **MR. RUTER:**  No recross, Your Honor.

12             **THE COURT:**  Recross?

13             **MR. MONTEMARANO:**  A couple, Your Honor.

14                       **RECROSS-EXAMINATION**

15   **BY MR. MONTEMARANO:**

16   Q.   Ms. Yasser was asking you about guns, so I'd like to get

17   something amply clear.  During the course of this

18   investigation, beginning in September of '08 through March of

19   '09, my client, Mr. Fuertes, had numerous encounters with law

20   enforcement; fair statement?

21   A.   Fair statement.

22   Q.   Several of them were voluntary.  You heard, for example,

23   Detective Hartlove's discussion how he asked my client to come

24   to the Annapolis Police Department, and that was December of

25   '08, correct?

1    A.    Yes.

2    Q.    But, for the most part, they were what we would call

3    unanticipated encounters with law enforcement; arrests for

4    traffic offenses, for example?

5    A.    Yes.

6    Q.    And those were not voluntary?  He didn't roll up to the

7    police and say, "I'm driving without a license"?  They pulled

8    him over for some traffic offense and found out he didn't have

9    a license, he was revoked, whatever, correct, sir?

10   A.    Correct.

11   Q.    And, likewise, when they raided the -- did the raid in

12   3/25/09, that wasn't announced, correct, because that's not

13   how you do raids?

14   A.    I don't think that was a raid.  I think that was a

15   warrant service.  When you say "raid," I --

16   Q.    Fair enough.

17   A.    -- take it as a --

18   Q.    Fair statement.

19         When they served the warrant, you don't tend to

20   announce, "We're coming over to arrest you"?  That's not the

21   usual practice; fair statement?

22   A.    Correct.  When you do a warrant service, it's --

23   generally you want to surprise them.

24   Q.    You want to surprise them.  Okay.

25         And, in the course of all these surprises of Mr. --

1    and, just so we're clear, after these surprise encounters,

2    Mr. Fuertes was searched, correct, taken into custody?  That's

3    actually standard and routine, correct?

4    A.   Yes.

5    Q.   And, if he was driving a vehicle, it ended up getting

6    searched at one time or another, correct?

7    A.   Inventoried or searched.

8    Q.   Or both?

9    A.   Right.  It just -- if you're doing an inventory search,

10   you're looking for valuables and, of that nature, you're not

11   going into places where things may be hidden, contraband,

12   stuff like that.

13   Q.   Certainly.  But there was, for example, the car he was

14   arrested in, in September that was ultimately searched in

15   October pursuant to a warrant, correct?

16   A.   I don't think it was pursuant to a warrant.

17   Q.   After the car was impounded?

18   A.   Oh, are you talking in 2010, or 2008?

19   Q.   2008.  I'm sorry.

20   A.   2008 wasn't a warrant.

21   Q.   Okay.  Again, then I'm confusing it.  And, likewise, the

22   locations where Mr. Fuertes was found were searched as well?

23   A.   Once again, I don't -- some locations were searched, yes.

24   Q.   And, with regard to all these searches of all these

25   locations, no firearms were ever located, correct?

```
 1    A.    Correct.

 2    Q.    No ammunition was ever located, correct?

 3    A.    Correct.

 4            MR. MONTEMARANO:  No further questions, Your Honor.

 5    Thank you.

 6            THE COURT:  Thank you.  Counsel, approach.

 7            (Whereupon, the following discussion occurred at the

 8    bench.)

 9            THE COURT:  Is that it?

10            MS. YASSER:  Yes, Your Honor.

11            THE COURT:  Okay.

12            MR. CUNNINGHAM:  Subject to the --

13            THE COURT:  Right.  Checking documents, that sort of

14    thing.  Here is what I'd like to do.  What I'd like to do is

15    send the jury home, break, and then give Mr. Ruter the rest of

16    the day to prep his witness, who has complained that he didn't

17    get enough prep time.  So you get to spend some more time with

18    him, Mr. Ruter.

19            MR. RUTER:  Your Honor, I do want the record to show

20    this.  It is to build a record.  I had seen Mr. Ventura for

21    four hours on Saturday in D.C.  I spent another hour and a

22    half this morning, and I'll have a couple more hours, thanks

23    to the Court.  I'm no farther along right now than I was

24    before.  I'm going to give it every effort --

25            THE COURT:  Two weekends ago, you mean?
```

1          **MR. RUTER:**  Yes, sir.

2          **THE COURT:**  Okay.

3          **MR. MONTEMARANO:**  May it please the Court.  If

4     Mr. Ruter needs a reference, I stand ready, willing, and able.

5     I've seen more of him than my wife in the last month.

6          **MR. CUNNINGHAM:**  You mean --

7          **MR. RUTER:**  Your Honor, the last thing we should put

8     on the record is the Court will recall that I had begun to

9     cross-examine Ms. Franco concerning a very unfortunate rape

10    that she experienced when she entered the country.  There was

11    an objection, and the Court stopped me, and what happened was

12    the Government and myself agreed to speak with Ms. Franco by

13    phone this morning, and we did, and I was the only person who

14    asked her questions, as it turned out.

15          I was satisfied after listening to her answers that

16    she would testify in here that, when she was raped en route to

17    Maryland from Houston, Texas, that she was not in any way,

18    shape, or form physically harmed; rather, she was advised by

19    her -- the smuggler who helped her in the country that, should

20    she not submit to sex, the result would be he would leave her

21    out in the middle of nowhere, and she had no idea where she

22    was, and I think that does happen, of course, at least I've

23    read, Your Honor, from time to time.  And that was when she

24    then submitted to his advances.

25          Our conversation was clear that she did not fall

1     down, she wasn't pushed down.  Although I questioned her about

2     the terrain, whether there were trees and thickets and rocks

3     and so on, whether or not she could have in any way been

4     injured physically in any way, the answer was, "No," "No,"

5     and, "No."

6           Based upon that, I made the determination that I

7     would not ask the Government to bring her back into the

8     courtroom, continue my examination, only to have her repeat

9     the same question again, and that was done strictly as my

10    decision as a trial tactic, that it would not be helpful to

11    Mr. Ventura for the jury to hear that she was -- the rape did

12    not result in any kind of physical damage to her.

13          **THE COURT:**  Thank you.

14          Okay.  Here is my plan.  As I said, I want to send

15    them home.  I'd like to have us meet tomorrow at 9:30 a.m. for

16    the instructions conference, begin the presentation of

17    evidence at 10:00.  After they're home, we can do the drill of

18    a closing, of your advising your respective clients on the

19    rights, of your telling them whether you've got impeachables

20    or not so we can get some administerial things out of the way

21    this afternoon.

22          **MR. RUTER:**  Wonderful.

23          **MR. MONTEMARANO:**  I'm happy to advise my client

24    today regarding his right to testify if the Court prefers.

25          **THE COURT:**  No.  As I said, I'd like to do that when

1     the jury is home now.

2              MR. MONTEMARANO:  Oh, I'm sorry.  Now.

3              THE COURT:  Now.  So tomorrow morning our two things

4     will be basically the instructions conference, followed by

5     Mr. Ruter's case, followed by argument.

6              MR. RUTER:  Your Honor, I had not alerted the Court

7     that I have a sentencing hearing before Judge Bredar tomorrow

8     at 2:00 p.m., and I didn't do so prior because I wasn't too

9     sure we were going to be in the proceedings.  I have not

10    talked to Judge Bredar about that problem, but I could tell

11    the Court my client is like 73 years old, and I'm hoping --

12             THE COURT:  To get it done?

13             MR. RUTER:  Hoping I can get fortunate, and so I'd

14    really hate to have to postpone that, and so --

15             THE COURT:  I'll try to work around it, Mr. Ruter.

16             MR. RUTER:  Thank you, Judge.

17             THE COURT:  Try to get everything done tomorrow that

18    you need to get done.

19             MR. RUTER:  Thank you.

20             MR. CUNNINGHAM:  I have a 9 o'clock sentencing with

21    Judge Bennett.  Will you call him and ask him to make it a

22    25-minute sentencing proceeding, Judge, like yours?

23             (Laughter.)

24             THE COURT:  Well, I'm sure he's much more detailed

25    than I am.  Okay.

1          **MR. MONTEMARANO:**  Your Honor, I would only suggest

2     the following.  There is not going to be a lot of -- there is

3     not going to be much of a free-for-all over the jury

4     instructions, and Ms. Yasser may be able to handle them on her

5     own as much as Mr. Cunningham has put the Government's views

6     in excruciating detail --

7          **THE COURT:**  His objections?  Yes.  Okay.  Well, go

8     to your sentencing.

9          **MR. CUNNINGHAM:**  Judge, that's covered.  I'll either

10    get somebody to cover it for me.  That's not a problem.  I was

11    just adding some weak attempt at levity.

12         **THE COURT:**  You were poking.  I understand.

13         Thank you.  Please step back, counsel.

14         (Whereupon, the bench conference was concluded.)

15         **THE COURT:**  Members of the jury, just to give you

16    some sense of scheduling, we, the lawyers and I, and the

17    Defendants have some work to do which will not require your

18    presence, so I'm going to send you home and ask you, again,

19    not to talk about the case among yourselves or with anyone

20    else.

21         It is anticipated tomorrow that there will be

22    perhaps some evidence from the Defense.  Again, remember:  No

23    defendant has an obligation to produce anything.  So, over the

24    evening, the counsel will think, and the Defendants will make

25    decisions with respect to presenting evidence, but, even if

 1    evidence is presented, I still anticipate that we will then

 2    get to closing arguments tomorrow, to jury instructions, and

 3    that the case, I hope, will be given to you to begin your

 4    deliberations tomorrow.

 5         If you begin your deliberations tomorrow, instead of

 6    taking Friday off as I had planned, I'll bring you back in on

 7    Friday, and you can continue your deliberations on Friday.  So

 8    just to have a sense of what you're going to be doing for the

 9    next few.

10         Again, please remember:  Don't discuss the case

11    among yourselves or with anyone else.  Don't let anyone

12    discuss the case with you.  I will see you tomorrow morning.

13    Please be in place at five minutes before 10:00 so that we can

14    get started at 10:00 a.m.  Again, the lawyers and I have some

15    work to do at 9:30, so you benefit somewhat by having a half-

16    hour later start, but let me assure you we will be using that

17    time.  So we'll see you tomorrow morning at 10:00 -- 10:00

18    tomorrow.  Please be in place at five of 10:00 for a

19    10:00 a.m. start.  10:00 tomorrow.  Good night.

20         **JUROR:**  Thank you.

21         **JUROR:**  Yes, thank you.

22         (Laughter.)

23         **THE COURT:**  Okay.  Your second early day home from

24    school, isn't it?

25         **JUROR:**  It is.  It's a snow day.

1              (Jury excused.)

2              **THE COURT:**  Thank you.  You may be seated.  You may

3     step down.

4              **THE WITNESS:**  Thank you, sir.

5              (Witness excused.)

6              **THE COURT:**  Subject to review of documents and

7     hands-on with the evidence, I understand the Government has

8     rested?

9              **MR. CUNNINGHAM:**  That is correct, Your Honor.

10             **THE COURT:**  Counsel, motions?

11             **MR. RUTER:**  Your Honor, we would move for judgment

12    of acquittal as to all seven counts as to Mr. Ventura;

13    however, Your Honor, given the record, I will submit without

14    argument.

15             I would say this, Your Honor.  This came in the form

16    of one of our motions *in limine*.  It is our position that, as

17    to Count 6, the only thing that is relevant is whether or not

18    Mr. Ventura had enticed or forced or coerced Ms. Franco to

19    engage in prostitution.

20             In that regard, I realize, reviewing the evidence in

21    the light most favorable to the Government, there is most

22    likely enough evidence to have that go forward, but it's our

23    position that, if she was involved in prostitution, it was not

24    as a result of any force or enticement or coercion of

25    Mr. Ventura, and, with that, Your Honor, I would submit.

 1          **THE COURT:**  I anticipate hearing more about that

 2     during the instructions conference as well.

 3          **MR. RUTER:**  I think so.

 4          **THE COURT:**  Mr. Montemarano, motions on behalf of

 5     Mr. Fuertes?

 6          **MR. MONTEMARANO:**  Thank you, Your Honor.  With

 7     regard to the three counts, I'm going to talk about them in

 8     reverse order.  As to Count 6, there is no evidence of force,

 9     fraud, and coercion undertaken by Mr. Fuertes or aided and

10     abetted by Mr. Fuertes.  The most we see was his presence when

11     there was physical violence directed towards Ms. Dueñas

12     Franco -- Rebeca -- who testified yesterday and the day

13     before, that he was aware of this having happened on one

14     occasion.  I respectfully submit it's simply not enough to

15     establish that in the very terms of the instruction.

16          As to the transport count --

17          **THE COURT:**  Let me ask the Government about Count 6

18     first of all.

19          **MR. MONTEMARANO:**  Sure.  That would be fine.

20          **THE COURT:**  Count 6, evidence as to Mr. Fuertes?

21          **MR. CUNNINGHAM:**  Your Honor, I think that there was

22     evidence that he received pay from Ventura, and certainly

23     financial benefit is a predicate or one of the components of

24     that violation.

25          **THE COURT:**  Did she, Ms. Franco, not testify that

1     she had no fear of Mr. Fuertes?

2          **MR. CUNNINGHAM:**   She did testify to that effect,

3     Your Honor.  One of the things that we were going to ask the

4     Court during the charge conference -- and I suspect we'll

5     speak more to it during that session, but, to the extent that

6     a reckless disregard instruction would be given to the jury in

7     light of the testimony that he was present when she, you know,

8     was beaten, that it was in the context of her performing as a

9     prostitute, and this was an enterprise from which Mr. Fuertes

10    did derive a financial benefit, that, in fact, his complicity

11    is, in fact, shown by that testimony and that evidence.

12          **THE COURT:**   Okay.  So benefit with knowledge, you

13    say, is sufficient on Count 6?

14          **MR. CUNNINGHAM:**   Yes, Your Honor.

15          **THE COURT:**   Okay.  Thank you.

16          **MR. MONTEMARANO:**   I respectfully submit that it is

17    simply not where the knowledge is so abbreviated, so

18    attenuated, so focussed, one instance.  There has to be some

19    sort of course of conduct.  The Government simply cannot

20    bootstrap overarching knowledge out of one incident when

21    Ms. Dueñas, Ms. Franco, doesn't suggest that.  She suggested

22    that he treated her well, he did not mistreat her, he did not

23    abuse her, he did not restrain her.  He did none of the things

24    which the elements set out in the instruction call for, which

25    is the reason I cross-examined her in that very vein.

1    I respectfully submit the Government simply has not

2  made force or fraud or coercion from Mr. Fuertes directed

3  toward Ms. Franco, and we would respectfully request that the

4  Court grant the motion.

5    For the record, my client will not be putting on a

6  defense, so we would ask that the Court's ruling be, in

7  essence, as we will be making it in a renewed fashion after we

8  rest.

9    **THE COURT:**  Okay.  Your next argument?

10    **MR. MONTEMARANO:**  As to the transport count, once

11  again, from the terms of the instruction, there is no

12  suggestion that he aided and abetted transport.  He did not

13  transport the girls in interstate commerce.  He was not

14  involved in picking them up at the bus station, for example,

15  buying tickets, nothing of that sort.

16    The perfect example of the rather clear bifurcation

17  is the photograph we were shown in evidence earlier today -- I

18  believe it's in the 40s -- of the silver Expedition, the woman

19  in the pink shirt getting out down in Portsmouth.  Mr. Fuertes

20  never did any anything of that sort, and he's not observed at

21  any time doing anything of that sort.

22    I respectfully submit that the Government has not

23  made the transportation count, the Mann Act count.

24    **THE COURT:**  Anything further?

25    **MR. MONTEMARANO:**  We would submit as to Count 1 of

 1    the § 371 conspiracy.

 2          **THE COURT:**  Okay.  I think there is sufficient

 3    evidence to get to the jury, so the motions will be denied,

 4    although I do understand the arguments you will be making,

 5    Mr. Montemarano.

 6          Mr. Ruter, please advise your client.

 7          **MR. RUTER:**  Yes, Your Honor.

 8          Mr. Ventura, do you want to stand up, please.

 9          Mr. Ventura, you have a right in this case to

10    testify if you choose, or not to testify if you choose.  If

11    you were to decide not to testify, Judge Quarles would advise

12    the jury that they could not think anything badly about you,

13    that they couldn't draw any what they call an inference -- any

14    negative inference or belief that, as a result of your not

15    testifying, that you're trying to hide something from them.

16          In the event that you were to decide to testify,

17    what would happen is I will question you.  You'll be sitting

18    right over there on the witness stand.  I will direct your

19    examination, and, after I am completed with my examination,

20    the prosecutors, either Mr. Cunningham or Ms. Yasser, would

21    have an opportunity to cross-examine you as to all matters

22    that I have questioned you about and any other matters that

23    Judge Quarles believes to be relevant and proper under the

24    laws of this country and given the facts of this case.

25          **THE COURT:**  Mr. Ruter, let me interrupt you now to

```
 1      inquire of the Government whether it has convictions with

 2      which it intends to impeach Mr. Ventura?

 3              MR. CUNNINGHAM:  No, Your Honor.

 4              THE COURT:  Thank you.

 5              MR. RUTER:  Okay.  And, Mr. Ventura, His Honor just

 6      asked the Government if you had any convictions -- any

 7      criminal convictions which they might wish to bring to the

 8      jury's attention so as to impeach you.  They have answered

 9      that there are no such convictions.  Therefore, if you had

10      been convicted of any other crime -- if you had been, it will

11      not be brought up in this courtroom.

12              Do you understand that so far?

13              DEFENDANT VENTURA:  Uh --

14              MR. RUTER:  I'm not quite done yet.  Do you

15      understand what I've just said so far?

16              DEFENDANT VENTURA:  If you don't let me talk, how am

17      I going to talk?

18              MR. RUTER:  All right.  That's a fair -- that's a

19      fair comment.

20              The last thing I do want to say, Mr. Ventura, is, a

21      couple of Saturdays ago, did you and I have occasion to meet

22      and to discuss this very topic, as to whether or not you

23      wished to testify or not to testify?

24              DEFENDANT VENTURA:  Sir, I have to question, back in

25      March -- March 27th, how many months it had been since you had
```

1      even seen me or seen my face?  You said you didn't know.  I am

2      going to testify in front of the Grand Jury --

3              **INTERPRETER GOLDSTEIN:**  The Interpreter was

4      questioning as to the use of "Grand Jury," Your Honor.

5              **DEFENDANT VENTURA:**  I have never had the opportunity

6      to be prepared for this case, and never has Mr. Cunningham or

7      the prosecutors ordered for the evidence to be given to me so

8      that I could prepare for this case.  I never heard the CDs.  I

9      never heard the testimony of Ms. Franco either.  Photos of

10     supposedly something with Ms. Franco -- it looked like an

11     infection of some kind, but I actually see that those pictures

12     must have been pictures of men.

13              **THE REPORTER:**  I'm sorry.  Must have been?

14              **INTERPRETER GOLDSTEIN:**  "Must have been pictures of

15     men."

16              **DEFENDANT VENTURA:**  Those are false pictures.

17              I sent 20, 25, to 50 letters throughout the 28

18     months since I've been arrested, and no defense attorney has

19     ever sat down with me to go over the evidence.  Only thing

20     I've been told is, "Just remain silent.  When it's your turn,

21     you can talk."  When I'm dead, how can I talk?  I was never

22     given the chance.  Not just necessarily the attorney who is

23     here and is representing me in this case, but before him.  I

24     want to say that, before any of them -- I would certainly hope

25     that all this is being recorded.  And I think that they have

1   not wanted to show me -- the gentleman over there -- not

2   wanted to show me the evidence because they wanted to convince

3   the witness that they -- the witnesses were being paid.

4          All this time, I've maintained silence, and I have

5   not been able to talk to any judge.  I would love to yell or

6   scream, but I can't, because I don't have any help.  But I

7   have written letters asking for help regarding my situation.

8   It's illegal for -- according to a book that I've been

9   reading, it's illegal for any prisoner to be brought up

10  against a wall or whatever and shot, because at least that one

11  gets told that he's going to be shot because he's set a bomb

12  somewhere.

13         On the 27th of March, I was woken up at CDF and told

14  only that I had a court date, and I said, "Court?  I've never

15  received any letters to say that I'm going to be taken up for

16  a trial."  I think soldiers are prepared before they go to

17  war, don't they?  They're told when the bomb is going to fall

18  on them so they can protect themselves or learn to use a

19  weapon, right, or how to at least salute their bosses?  That's

20  what I think.  I'm not sure.  In my country, I lived near

21  soldiers, and I saw that at least they were prepared to go to

22  war.

23         In my case, I've seen that I've never had the

24  opportunity to see the evidence, to prepare myself for the

25  case, and I don't know if you know it, but there has been some

1    corruption as far as my case is concerned.  Eduardo Balarezo

2    said he came here -- Eduardo Balarezo -- to prepare my case.

3    The prosecutors are playing.  They're playing a game, but I'm

4    not playing, because this is my life.  The attorneys between

5    them -- all of them have been playing games, and I know the

6    Judge isn't going to hear me, but the attorney's not going to

7    listen to me.  I'm not paying a penny out of my pocket to him.

8    It's obvious that he'll listen to the Government much better.

9          Even -- if any -- if any attorney had listened to

10   me, I wouldn't be here.  I would be outside working in my

11   regular job.  I'm a plumber -- a professional plumber.  That's

12   what I would be doing.  I think nobody showed those pictures,

13   I don't think.  He didn't either.  You've seen --

14        **INTERPRETER GOLDSTEIN:**  The interpreter is

15   requesting that the gentleman please talk slower and in

16   shorter gaps for me to be accurate.

17        **THE COURT:**  Thank you.

18        **INTERPRETER GOLDSTEIN:**  Thank you, sir.

19        **DEFENDANT VENTURA:**  And Mr. Kelly and Hartlove, I

20   don't think they've seen me out on Pennsylvania Avenue when I

21   started working from Route 5 to Route 95.  I was the assistant

22   to the foreman.  I was the one driving the truck and machines

23   in the back on the trailer.  Am I going to have time to answer

24   a phone when I'm answering an emergency to cut a pipe because

25   there is something wrong?  Those pictures haven't been shown

1   by Mr. Kelly, and I saw him on the corner with a camera.  Many

2   prostitutes told me that he was looking for me, and I'll tell

3   you why.

4            His friend, Hartlove's, whose name is Lee -- I have

5   a friend, Walter Franco.  The agents met with this Walter

6   Franco, and they told him I was a bad person, a person -- a

7   bad person, somebody that is involved in prostitution, and I

8   agree that that was bad.  I like women, but the point here is,

9   if I have a girlfriend and I ask her out to dinner and ask her

10  to the casino --

11           **INTERPRETER GOLDSTEIN:**  Sir, I'm telling the

12  gentleman he needs to let me finish.  Otherwise, you're not

13  going to hear what he wants you to hear.

14           **DEFENDANT VENTURA:**  I'm sorry.

15           I don't think it's a crime to have a girlfriend.  It

16  would be ungentlemanly of me to ask, "Are you a prostitute?

17  If you're a prostitute, I won't go out with you."  The point

18  is that, that day that I had a fight with Mr. Walter Franco,

19  that's not the only thing Mr. Kelly found on my criminal

20  record, and I want to say here in front of everybody that this

21  gentleman kept me from getting renewal on my residency.  They

22  kept away the receipt from Anumpo Chapa (phon), who is an

23  attorney.  They already had a plan.  They offered him less

24  than three years.

25           I don't care what they've been doing, but I know

 1    that they've been violating the rights of a prisoner,

 2    destroyed my life, and I guess I don't care about that either.

 3    In their conscience, they know I'm not a bad person or that

 4    I've been involved in bad things.  I've worked all my life in

 5    Washington, D.C., and I've never moved from this area, and,

 6    all the time, they've been following me.

 7         **THE COURT:**  Mr. Ventura, we are beyond the point

 8    where this is helpful to me.

 9         Finish your advice, Mr. Ruter, if you would.

10         **MR. RUTER:**  Thank you, Your Honor.

11         Mr. Ventura, I think where I was last:  Two

12    Saturdays ago, when I visited you at the jail, did we have

13    occasion then to discuss the rights that you had either to

14    testify or not to testify?

15         **DEFENDANT VENTURA:**  Can I talk?

16         **MR. RUTER:**  Well, I think it's a "yes" or a "no."

17    You can --

18         **DEFENDANT VENTURA:**  The question is that you want --

19         **INTERPRETER GOLDSTEIN:**  One moment, sir, please.  We

20    can't do it, sir.

21         **THE COURT:**  Okay.  Please be quiet.

22         I'm going to interrupt this advice of rights and go

23    to the advice of rights, Mr. Montemarano.  Mr. Ventura, listen

24    to Mr. Montemarano.

25         **MR. MONTEMARANO:**  Good afternoon, Kerlin.  How are

1     you?  Did you hear Mr. Ruter's explanation of the right to

2     testify as given to Mr. Ventura?

3                **DEFENDANT FUERTES:**  Yes, sir.

4                **MR. MONTEMARANO:**  And we've discussed this before?

5                **DEFENDANT FUERTES:**  Yes.

6                **MR. MONTEMARANO:**  We've discussed this for many

7     weeks before this trial?  And I've explained to you as

8     follows --

9                **DEFENDANT FUERTES:**  Yes.

10                **THE REPORTER:**  I need to have the answer first

11    before you start the next question.

12                **MR. MONTEMARANO:**  And I've explained to you as

13    follows:  You have the absolute right to testify.  Only you

14    can assert or give up that right.  If you choose not to

15    testify, it will not be held against you, and the Judge will

16    instruct the jury they cannot hold it against you.  You will

17    not be thought to be guilty simply because of your silence.

18                In addition, you have no obligation to put on any

19    form of defense, call any other witnesses.  If you choose,

20    however, to put on a defense, call witnesses, or take the

21    stand and testify, you could be cross-examined by the

22    Government attorneys and asked questions about what you say

23    and about other relevant and appropriate matters.

24                **THE COURT:**  Mr. Montemarano, let me interrupt you

25    here to inquire of the Government whether it has convictions

1   with which it intends to impeach Mr. Fuertes should he take

2   the stand?

3          **MR. CUNNINGHAM:**  There are, Your Honor, yes.

4          **THE COURT:**  They are?

5          **MR. CUNNINGHAM:**  From Virginia, Your Honor.

6          **THE COURT:**  The offenses?

7          **MR. CUNNINGHAM:**  Actually, excuse me one second.  If

8   I can grab the file, Your Honor, I'll tell you.

9          **MR. MONTEMARANO:**  Mike, is one of them the

10  Immigration fraud?

11         **MR. CUNNINGHAM:**  Well, there is Immigration fraud.

12  I can --

13         **MR. MONTEMARANO:**  We're aware --

14         **MR. CUNNINGHAM:**  There is an aggravated identity

15  fraud conviction out of Virginia as well.

16         **MR. MONTEMARANO:**  The 27 months?

17         **MR. CUNNINGHAM:**  Yes.

18         **MR. MONTEMARANO:**  I'm aware of a conviction in the

19  Eastern District of Virginia, Your Honor, out of Richmond.  My

20  client, represented by counsel, took a plea to an Immigration

21  fraud offense, received a 27-month sentence, which ended this

22  past November, so he was awaiting trial here in Baltimore on

23  this case, but was actually serving time out of Virginia, if

24  the Court follows, still in BOP, slash, Marshals' custody, but

25  I'm not aware of any others than that.

 1          **MR. CUNNINGHAM:**  That's correct, Your Honor.

 2          **THE COURT:**  Okay.  So it's not aggravated identity

 3     fraud; it is Immigration document fraud?

 4          **MR. CUNNINGHAM:**  Your Honor, I thought the -- I

 5     actually thought the charged offense was a RICO count, but

 6     that it captured the -- essentially the document fraud kind of

 7     conspiracy.

 8          **THE COURT:**  Okay.  And I would, of course,

 9     Mr. Montemarano, permit impeachment with that conviction.

10          **MR. MONTEMARANO:**  Thank you, Your Honor.

11          So you understand, your convictions in Virginia for

12     Immigration fraud would -- could be used to discredit you.

13     You understand that?

14          **DEFENDANT FUERTES:**  Yes.

15          **MR. MONTEMARANO:**  In addition, and more important,

16     that I explained to you when the trial began that statements

17     that you made to the police were kept out of evidence by a

18     ruling of the Court.  If you take the stand, the Court could

19     revisit that decision and could let the Government use those

20     statements by you to impeach you, but only if you take the

21     stand.  Based upon that, we discussed what your options were;

22     did we not?  And I told you my advice was not to testify.  Do

23     you understand all that?

24          **DEFENDANT VENTURA:**  Yes, sir.

25          **MR. MONTEMARANO:**  What is your decision?

1          **DEFENDANT FUERTES:**  Not to testify.

2          **THE COURT:**  Thank you.

3          **MR. MONTEMARANO:**  Thank you, Your Honor.

4          **THE COURT:**  Mr. Ruter?

5          **MR. RUTER:**  May I again?

6              So, Mr. Ventura, when you and I met two Saturdays

7     ago, I gave you a written letter which outlined your rights.

8     We also discussed on that day that, if you were to decide to

9     testify, you'd be cross-examined by the prosecution.  They

10    also, if they wanted to, could then introduce this evidence,

11    the statements that you made, which one of them was recorded,

12    reduced to writing on a transcript, and I advised you at that

13    time, and I advise you again today that it's my opinion that

14    you should elect not to testify.

15             If you do testify, you need to know that, if the

16    jury were to find you guilty and if Judge Quarles found at the

17    time of sentencing that you had perjured yourself while

18    testifying, the Court could increase your sentence as a result

19    of the testimony that you gave which he found to be

20    untruthful.  It doesn't mean that he would, but he could, and

21    that could add additional time to your sentence.

22             Do you understand all that?  Mr. Ventura, I'm going

23    to ask you this.

24         **DEFENDANT VENTURA:**  And how do you know they're

25    going to find me guilty?

1           **MR. RUTER:**  I said, "if you are found guilty."

2    "If."

3           **DEFENDANT VENTURA:**  If you know they're going to

4    find me guilty because you already negotiated together.  I'm

5    going to testify, sir, and I'm going to say the truth.

6           **MR. RUTER:**  Mr. Ventura --

7           **DEFENDANT VENTURA:**  If you --

8           **THE COURT:**  Thank you, Mr. Ruter.  Thank you.  We

9    have your client's decision.

10           **MR. RUTER:**  Thank you, sir.

11           **THE COURT:**  Thank you.  We are in recess.

12           **THE CLERK:**  All rise.  This Honorable Court stands

13    in recess until tomorrow morning at 9:30.

14           **THE COURT:**  Marshals, will you keep Mr. Ventura here

15    until Mr. Ruter releases you?  Thank you.

16           **MR. RUTER:**  Your Honor, we'll probably do that at

17    the lockup.

18           **THE MARSHAL:**  Okay.  I got you, Judge.

19           **DEFENDANT VENTURA:**  I don't want to talk to him in

20    this -- I want to have a camera, because I want the

21    opportunity to be prepared.

22           **THE MARSHAL:**  Sir, there is no one left to talk to.

23    Let's go.

24           (Proceedings adjourned.)

25

1     I, Martin J. Giordano, Registered Merit Reporter and Certified

2    Realtime Reporter, certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6    _____    _____

7     Martin J. Giordano, RMR, CRR       Date

1                          INDEX

2      UNITED STATES v. GERMAN de JESUS VENTURA, et al.

3              TRIAL - VOL VII - APRIL 17, 2013

4

5

6                                                    PAGE
       COMMENCEMENT OF PROCEEDINGS......................... 1345
7
       WITNESSES FOR
8        THE GOVERNMENT:

9      EDWARD J. KELLY
               Resumed the Stand............................. 1346
10             Direct Examination (Cont.) by MS. YASSER........ 1346
               Cross-Examination by MR. RUTER................. 1406
11             Cross-Examination by MR. MONTEMARANO........... 1440
               Redirect Examination by MS. YASSER............. 1449
12             Recross-Examination by MR. MONTEMARANO......... 1453
               Witness Excused............................... 1462
13
       MOTIONS HEARING...................................... 1462
14
       ADVISEMENT OF RIGHTS................................. 1466
15
       PROCEEDINGS ADJOURNED................................ 1477
16

17

18

19

20

21

22

23

24

25

## $

**$1,500** [1] - 1413:11
**$18,000** [1] - 1414:20
**$3,000** [2] - 1413:6, 1413:10
**$500** [1] - 1413:18

**'**

**'08** [3] - 1360:15, 1453:18, 1453:25
**'09** [5] - 1360:16, 1377:15, 1447:8, 1447:11, 1453:19

## 0

**0076** [3] - 1357:7, 1384:2, 1447:16
**00:38** [1] - 1363:18
**09** [1] - 1373:14
**0903** [8] - 1362:7, 1362:9, 1362:25, 1363:10, 1363:17, 1363:19, 1364:19, 1377:9

## 1

**1** [14] - 1346:2, 1346:5, 1355:19, 1377:16, 1379:2, 1379:12, 1379:14, 1383:13, 1390:8, 1390:13, 1405:7, 1465:25
**1,500** [5] - 1413:10, 1414:2, 1414:11, 1414:12, 1414:25
**10,000** [1] - 1406:25
**10/18/10** [1] - 1386:24
**10/26** [1] - 1398:24
**10/29** [1] - 1428:25
**100** [1] - 1412:23
**101** [1] - 1344:24
**10:00** [8] - 1458:17, 1461:13, 1461:14, 1461:17, 1461:18, 1461:19
**10th** [4] - 1379:18, 1384:22, 1390:14, 1448:23
**11** [6] - 1346:3, 1397:3, 1440:14, 1441:23, 1442:2
**11:00** [1] - 1343:9
**11th** [1] - 1366:10
**12** [2] - 1433:13, 1437:18
**12:30** [1] - 1354:1
**12:52** [1] - 1420:16
**12m** [1] - 1366:5
**13** [2] - 1363:20, 1437:20
**1345** [1] - 1479:6
**1346** [2] - 1479:9, 1479:10
**1397** [1] - 1385:4
**13th** [2] - 1345:17, 1378:20
**14** [2] - 1395:12, 1433:13
**1406** [1] - 1479:10
**1440** [1] - 1479:11
**1449** [1] - 1479:11

**1453** [1] - 1479:12
**146** [1] - 1418:12
**1462** [2] - 1479:12, 1479:13
**1466** [1] - 1479:14
**1477** [1] - 1479:15
**15** [1] - 1433:13
**158** [2] - 1417:25, 1440:25
**15:39** [1] - 1366:12
**15c/6** [1] - 1451:16
**15c/7** [1] - 1375:16
**15c/b** [1] - 1451:12
**15th** [20] - 1349:11, 1372:3, 1379:1, 1383:15, 1383:17, 1383:22, 1384:21, 1386:13, 1386:20, 1387:8, 1387:9, 1388:3, 1391:1, 1393:21, 1411:2, 1411:16, 1411:20, 1432:20, 1433:14, 1448:23
**16** [1] - 1414:20
**1643** [1] - 1385:16
**1672** [1] - 1446:2
**16:29** [1] - 1366:13
**17** [3] - 1343:9, 1345:1, 1479:3
**17i** [1] - 1450:23
**17m** [1] - 1450:23
**17th** [2] - 1388:15, 1389:21
**18** [1] - 1347:4
**1815** [1] - 1387:15
**19a/6** [1] - 1451:10
**1:00** [1] - 1360:23
**1:23** [2] - 1351:2, 1351:13
**1:30** [2] - 1352:5, 1352:9
**1:35** [2] - 1400:7, 1452:13
**1:59** [1] - 1420:17
**1st** [9] - 1350:5, 1350:8, 1350:23, 1362:2, 1363:9, 1383:12, 1385:19, 1389:21, 1390:14

## 2

**2** [12] - 1346:5, 1346:6, 1356:8, 1375:6, 1379:3, 1379:5, 1379:13, 1380:4, 1383:13, 1388:2, 1395:7, 1442:2
**2,000** [2] - 1414:2, 1414:11
**2,200** [1] - 1413:22
**2/17/10** [1] - 1388:14
**20** [1] - 1468:17
**200** [1] - 1406:5
**200,000** [1] - 1355:5
**2005** [1] - 1406:14
**2008** [21] - 1359:22, 1359:25, 1378:13, 1379:18, 1380:2, 1384:22, 1384:23, 1389:21, 1390:14, 1391:1, 1421:25, 1422:3, 1436:12, 1436:17, 1437:1, 1443:23, 1455:18, 1455:19, 1455:20
**2009** [27] - 1356:15, 1359:23, 1362:3, 1362:14, 1362:21, 1363:9, 1363:18, 1363:24, 1365:3, 1365:9, 1365:10, 1365:13, 1365:16, 1366:10, 1377:25, 1380:7, 1380:9, 1382:9, 1382:21,

**1382:22, 1383:12, 1384:3, 1385:19, 1432:10, 1448:9
**2010** [53] - 1348:12, 1349:12, 1350:23, 1354:15, 1354:17, 1370:20, 1371:20, 1373:3, 1373:8, 1373:24, 1374:4, 1374:21, 1378:13, 1378:21, 1379:1, 1383:2, 1383:15, 1383:17, 1383:18, 1383:21, 1383:22, 1384:21, 1386:1, 1386:3, 1386:13, 1386:15, 1386:20, 1387:5, 1387:8, 1387:9, 1388:1, 1388:3, 1388:15, 1389:21, 1391:1, 1393:21, 1395:9, 1400:3, 1409:7, 1411:16, 1411:21, 1426:16, 1428:21, 1429:14, 1432:20, 1433:14, 1435:25, 1447:1, 1447:3, 1447:12, 1448:14, 1448:24, 1455:18
**2013** [3] - 1343:9, 1345:1, 1479:3
**21201** [1] - 1344:24
**21:14** [2] - 1372:24, 1373:3
**22nd** [1] - 1387:5
**2387** [1] - 1386:19
**23:25** [1] - 1363:9
**23rd** [2] - 1365:9, 1365:10
**24th** [6] - 1362:14, 1362:21, 1364:1, 1365:13, 1365:16, 1377:15, 1377:25, 1412:12
**25** [1] - 1468:17
**25-minute** [1] - 1459:22
**25b/1** [1] - 1347:15
**25c** [1] - 1348:1
**25d** [1] - 1348:3
**25e** [2] - 1348:5, 1348:6
**25th** [6] - 1356:15, 1379:18, 1380:7, 1380:8, 1382:21, 1384:3
**26a/1** [1] - 1394:7
**26a/2** [1] - 1394:10
**26a/4** [1] - 1394:15
**26j** [1] - 1395:3
**26th** [4] - 1380:2, 1384:23, 1436:17, 1436:19
**27** [1] - 1474:16
**27-month** [1] - 1474:21
**27th** [4] - 1345:17, 1356:25, 1467:25, 1469:13
**28** [2] - 1383:18, 1468:17
**28e** [1] - 1348:17
**28e/12** [1] - 1353:12
**28th** [2] - 1383:21, 1386:15
**29b/1A** [1] - 1396:18
**29th** [9] - 1398:11, 1418:3, 1422:3, 1426:16, 1428:21, 1432:10, 1436:11, 1437:1, 1440:11
**2:00** [4] - 1420:6, 1420:11, 1420:12, 1459:8
**2:25** [1] - 1400:17
**2:55** [2] - 1351:24, 1352:10
**2a** [1] - 1450:16
**2nd** [16] - 1348:12, 1350:5, 1350:9, 1350:10, 1350:12, 1350:15, 1351:1, 1351:8, 1351:16, 1352:1, 1354:1,

1354:15, 1354:17, 1363:18, 1391:1, 1399:5

## 3

**3** [12] - 1346:6, 1346:7, 1363:21, 1379:13, 1382:23, 1383:13, 1384:13, 1386:22, 1388:3, 1388:7, 1413:18, 1446:8
**3,000** [1] - 1413:4
**3,236** [1] - 1389:20
**3/25/09** [1] - 1454:12
**3/27** [1] - 1359:4
**30** [1] - 1354:1
**300** [1] - 1413:19
**30th** [1] - 1395:9
**3124** [17] - 1349:4, 1349:6, 1350:3, 1354:8, 1371:21, 1371:24, 1372:13, 1373:14, 1377:9, 1396:2, 1397:5, 1397:9, 1398:22, 1399:3, 1399:13, 1400:5
**31c** [1] - 1390:11
**32** [1] - 1438:4
**33** [1] - 1438:4
**34** [2] - 1363:22, 1418:14
**371** [1] - 1466:1
**39** [2] - 1427:18, 1427:19
**39b/1A** [3] - 1396:24, 1397:20, 1427:23
**39b/1B** [1] - 1397:13
**39b/1D** [1] - 1426:15
**39b/2** [3] - 1400:4, 1429:13, 1452:11
**39b/3** [1] - 1398:18
**39b/4** [2] - 1399:2, 1399:9
**39b/5** [2] - 1399:12, 1400:8
**39d** [1] - 1393:12
**3:25** [1] - 1343:9
**3:30** [1] - 1399:1
**3rd** [9] - 1354:1, 1356:14, 1370:20, 1371:20, 1373:3, 1373:8, 1374:4, 1375:11, 1384:3

## 4

**4** [8] - 1346:7, 1356:10, 1356:19, 1356:25, 1358:23, 1358:24, 1359:12, 1360:20
**4,000-plus** [1] - 1414:13
**4/14** [2] - 1359:2, 1359:4
**40** [1] - 1444:21
**401/403** [1] - 1402:10
**40b/3A** [1] - 1374:24
**40d/1** [2] - 1364:18, 1364:22
**40d/2** [1] - 1371:19
**40d/4** [1] - 1362:24
**40e/1** [1] - 1350:16
**40e/2** [1] - 1351:7
**40e/3** [1] - 1351:20
**40f/1** [5] - 1355:18, 1377:6, 1379:5,

1384:13, 1445:1
**40h/1** [1] - 1444:23
**40s** [1] - 1465:18
**410-962-4504** [1] - 1344:25
**4168** [5] - 1349:5, 1349:14, 1353:20, 1388:7, 1447:19
**44a** [1] - 1357:5
**46** [1] - 1363:20
**4630** [1] - 1385:24
**49** [1] - 1392:18
**4th** [1] - 1374:21

## 5

**5** [11] - 1356:10, 1356:13, 1357:1, 1358:14, 1359:13, 1360:17, 1374:16, 1374:19, 1374:25, 1383:24, 1470:21
**50** [2] - 1354:3, 1468:17
**50-page** [1] - 1357:22
**5015** [2] - 1379:14, 1445:13
**5211** [9] - 1346:23, 1347:1, 1347:8, 1371:23, 1372:6, 1372:13, 1372:25, 1373:4, 1386:23
**5306** [4] - 1371:21, 1372:20, 1373:4, 1373:18
**55** [3] - 1392:12, 1392:18
**5515** [1] - 1344:23
**57** [3] - 1355:4, 1392:5, 1392:11
**5:18** [1] - 1351:14
**5th** [1] - 1365:3

## 6

**6** [5] - 1462:17, 1463:8, 1463:17, 1463:20, 1464:13
**6,000** [1] - 1414:15
**60** [1] - 1376:6
**6177** [4] - 1363:9, 1363:12, 1363:17, 1363:19
**6th** [5] - 1399:15, 1400:7, 1429:14, 1452:13, 1452:19

## 7

**70** [1] - 1354:3
**73** [1] - 1459:11
**7742** [1] - 1377:10
**7:11** [2] - 1351:15, 1351:22
**7:28** [1] - 1352:1
**7:30** [1] - 1350:13
**7:43** [2] - 1399:17, 1452:19
**7th** [5] - 1386:1, 1386:3, 1388:1, 1409:7, 1435:25

## 8

**8,576** [1] - 1391:1

**800** [1] - 1413:21
**8346** [1] - 1387:4
**8938** [1] - 1384:15

## 9

**9** [1] - 1459:20
**9/25** [1] - 1445:24
**9/25/08** [1] - 1446:1
**9/26** [1] - 1436:22
**9/29/08** [1] - 1442:2
**911** [7] - 1378:20, 1378:21, 1405:2, 1405:5, 1405:20, 1406:1, 1406:2
**919** [1] - 1390:13
**9263** [1] - 1378:17
**9346** [3] - 1383:20, 1386:12, 1405:7
**95** [1] - 1470:21
**9:10** [1] - 1350:23
**9:30** [3] - 1458:15, 1461:15, 1477:13
**9:58** [1] - 1371:20
**9mm** [1] - 1410:22
**9th** [1] - 1359:21

## A

**a.m** [11] - 1351:2, 1351:13, 1351:14, 1351:15, 1351:22, 1399:1, 1400:7, 1452:13, 1458:15, 1461:14, 1461:19
**abbreviated** [1] - 1464:17
**abetted** [2] - 1463:10, 1465:12
**able** [12] - 1345:19, 1350:4, 1350:18, 1352:22, 1355:15, 1357:2, 1378:2, 1392:18, 1405:14, 1457:4, 1460:4, 1469:5
**ABOVE** [1] - 1343:10
**above-entitled** [1] - 1478:4
**ABOVE-ENTITLED** [1] - 1343:10
**absolute** [1] - 1473:13
**absurdum** [1] - 1358:4
**abuse** [1] - 1464:23
**according** [1] - 1469:8
**accurate** [4] - 1368:23, 1413:15, 1442:20, 1470:16
**accurately** [1] - 1430:10
**acknowledges** [1] - 1401:18
**acquittal** [1] - 1462:12
**Act** [1] - 1465:23
**acting** [1] - 1422:11
**action** [2] - 1378:23
**activity** [7] - 1351:13, 1370:6, 1399:24, 1413:24, 1448:19, 1448:20
**actual** [2] - 1368:1, 1441:12
**ad** [1] - 1358:4
**add** [1] - 1476:21
**adding** [1] - 1460:11
**addition** [7] - 1356:9, 1357:1, 1370:23, 1376:12, 1406:16, 1473:18, 1475:15
**additional** [1] - 1476:21

**address** [15] - 1358:8, 1365:24, 1366:2, 1385:6, 1385:9, 1385:20, 1387:11, 1388:16, 1388:17, 1395:19, 1399:6, 1399:10, 1448:18, 1452:22, 1453:2
**addressed** [1] - 1377:22
**addresses** [2] - 1358:10, 1399:18
**addressing** [1] - 1377:20
**adjourned** [1] - 1477:24
**ADJOURNED**................................. [1] - 1479:15
**administerial** [1] - 1458:20
**admit** [1] - 1356:1
**adult** [2] - 1408:10
**adults** [1] - 1408:10
**advances** [1] - 1457:24
**advantage** [1] - 1369:17
**Adventist** [1] - 1395:5
**advertiser** [1] - 1413:19
**advertisers** [1] - 1413:17
**advice** [4] - 1472:9, 1472:22, 1472:23, 1475:22
**advise** [5] - 1370:13, 1438:9, 1458:23, 1466:6, 1466:11, 1476:13
**advised** [4] - 1427:4, 1431:13, 1457:18, 1476:12
**ADVISEMENT** [1] - 1479:14
**advising** [3] - 1370:5, 1432:24, 1458:18
**afraid** [1] - 1409:9
**afternoon** [5] - 1406:11, 1406:12, 1440:8, 1458:21, 1472:25
**Afternoon** [1] - 1420:17
**afterwards** [1] - 1371:15
**age** [2] - 1409:3, 1450:6
**agent** [4] - 1370:11, 1398:7, 1407:22, 1411:25
**Agent** [45] - 1344:3, 1346:10, 1346:20, 1351:21, 1353:7, 1353:15, 1354:21, 1358:18, 1361:14, 1369:23, 1370:19, 1374:19, 1375:3, 1377:2, 1377:12, 1382:7, 1384:14, 1387:18, 1389:5, 1389:22, 1391:22, 1392:1, 1392:21, 1400:20, 1401:13, 1401:22, 1403:1, 1404:9, 1406:11, 1412:6, 1417:24, 1419:5, 1421:7, 1423:4, 1431:19, 1432:19, 1438:1, 1438:21, 1440:8, 1449:7, 1450:15, 1451:1, 1451:18, 1451:23, 1452:9
**agents** [4] - 1348:16, 1353:5, 1407:21, 1471:5
**aggravated** [2] - 1474:14, 1475:2
**ago** [6] - 1368:20, 1382:19, 1456:25, 1467:21, 1472:12, 1476:7
**agree** [6] - 1419:5, 1434:21, 1439:17, 1440:24, 1447:23, 1471:8
**agreed** [2] - 1434:23, 1457:12
**ahead** [1] - 1392:2
**aided** [2] - 1463:9, 1465:12
**al** [1] - 1479:2
**Alcivar** [2] - 1353:1, 1353:23
**alcohol** [2] - 1348:2, 1348:8

**alerted** [1] - 1459:6
**Alex** [9] - 1403:13, 1403:15, 1403:18, 1403:22, 1404:10, 1405:9, 1405:15, 1405:16, 1416:14
**Alex's** [1] - 1416:8
**alien** [1] - 1382:18
**alleged** [1] - 1378:21
**allegedly** [1] - 1381:23
**alleging** [1] - 1405:2
**allow** [1] - 1417:16
**allowed** [2] - 1358:13, 1407:16
**almost** [1] - 1448:12
**Alternate** [7] - 1346:2, 1346:4, 1346:5, 1346:6, 1346:7
**alternates** [1] - 1346:4
**alternatives** [1] - 1382:12
**Altima** [1] - 1385:13
**AM** [1] - 1343:9
**amendment** [1] - 1361:12
**AMERICA** [1] - 1343:4
**America's** [1] - 1431:5
**American** [1] - 1408:20
**Americans** [1] - 1408:4
**ammunition** [1] - 1456:2
**amount** [5] - 1355:7, 1389:19, 1408:20, 1412:19, 1412:24
**Amparo** [1] - 1385:4
**amply** [1] - 1453:17
**analyses** [1] - 1362:24
**analysis** [23] - 1347:23, 1350:2, 1350:7, 1354:6, 1354:21, 1355:5, 1364:24, 1368:4, 1368:21, 1370:24, 1372:18, 1372:19, 1372:21, 1373:18, 1373:20, 1376:4, 1376:21, 1376:23, 1392:4, 1392:12, 1392:13, 1412:19, 1412:23
**analyst** [2] - 1354:24, 1376:8
**analyze** [5] - 1354:4, 1361:15, 1390:19, 1396:5, 1424:19
**analyzed** [4] - 1355:1, 1376:5, 1379:21, 1425:8
**analyzing** [1] - 1353:20
**angelic** [1] - 1431:25
**Annapo** [1] - 1377:23
**Annapolis** [6] - 1366:7, 1377:18, 1385:5, 1418:2, 1418:4, 1453:24
**announce** [1] - 1454:20
**announced** [1] - 1454:12
**answer** [7] - 1367:8, 1367:22, 1409:21, 1431:9, 1458:4, 1470:23, 1473:10
**answered** [2] - 1384:24, 1467:8
**answering** [1] - 1427:7, 1470:24
**answers** [2] - 1452:4, 1457:15
**anticipate** [2] - 1461:1, 1463:1
**anticipated** [1] - 1460:21
**Anumpo** [1] - 1471:22
**apologies** [2] - 1447:2, 1451:16
**apologize** [4] - 1356:2, 1372:22, 1396:23, 1424:11
**apparent** [1] - 1402:16

**appear** [5] - 1347:21, 1380:24, 1381:9, 1381:16, 1382:20
**appeared** [1] - 1435:24
**applies** [1] - 1402:10
**approach** [9] - 1347:16, 1366:23, 1381:4, 1389:3, 1391:5, 1401:2, 1443:19, 1450:22, 1456:6
**appropriate** [1] - 1473:23
**April** [2] - 1343:9, 1382:22
**APRIL** [2] - 1345:1, 1479:3
**area** [10] - 1351:25, 1353:6, 1371:5, 1372:11, 1404:10, 1407:1, 1408:4, 1413:23, 1414:4, 1472:5
**areas** [1] - 1350:19
**argue** [2] - 1358:2, 1381:20
**argues** [1] - 1402:11
**argument** [4] - 1368:7, 1459:5, 1462:14, 1465:9
**arguments** [2] - 1461:2, 1466:4
**arrest** [10] - 1359:21, 1363:24, 1364:12, 1365:12, 1365:16, 1380:8, 1380:10, 1382:21, 1383:20, 1454:20
**arrested** [21] - 1349:11, 1353:3, 1362:13, 1362:20, 1364:4, 1372:3, 1377:15, 1377:25, 1379:17, 1380:6, 1383:18, 1386:14, 1396:4, 1412:13, 1436:22, 1436:23, 1445:17, 1445:24, 1446:1, 1455:14, 1468:18
**arrests** [2] - 1360:15, 1454:3
**arrive** [1] - 1351:10
**article** [1] - 1357:12
**Ascencio** [6] - 1356:11, 1356:22, 1359:7, 1364:5, 1378:1, 1382:2
**Ascencio's** [3] - 1383:9, 1383:10, 1446:11
**ascribed** [1] - 1381:24
**aside** [1] - 1417:23
**assault** [7] - 1370:20, 1370:25, 1371:14, 1374:4, 1451:18, 1451:24
**assaulted** [1] - 1373:8
**assembling** [1] - 1444:4
**assert** [1] - 1473:14
**assets** [1] - 1415:14
**assign** [1] - 1361:20
**assist** [1] - 1437:12
**Assistant** [2] - 1343:14, 1343:15
**assistant** [1] - 1470:21
**assisting** [1] - 1418:23
**associate** [16] - 1349:14, 1362:11, 1362:12, 1363:14, 1377:11, 1377:14, 1379:15, 1382:24, 1384:15, 1384:17, 1385:2, 1385:14, 1385:17, 1386:17, 1403:22, 1430:23
**associated** [45] - 1347:10, 1349:7, 1349:9, 1353:21, 1354:8, 1356:13, 1362:10, 1363:13, 1364:20, 1371:25, 1372:7, 1372:14, 1373:14, 1376:19, 1376:24, 1379:12, 1380:5, 1383:25, 1384:5, 1385:1, 1385:7, 1385:23, 1386:10, 1386:16, 1387:2, 1387:14,

1388:8, 1388:25, 1389:14, 1389:15, 1391:13, 1392:9, 1392:14, 1395:23, 1397:5, 1403:18, 1404:10, 1405:24, 1406:2, 1411:6, 1411:11, 1419:2, 1444:10, 1446:5, 1446:15
**associates** [1] - 1371:22
**associating** [1] - 1447:10
**association** [4] - 1361:11, 1387:16, 1401:19, 1402:15
**associations** [5] - 1349:25, 1377:7, 1386:11, 1388:10, 1388:19
**assume** [1] - 1429:3, 1429:9
**assuming** [2] - 1402:3, 1430:9
**assure** [2] - 1419:17, 1461:16
**Astrovan** [2] - 1387:9, 1388:4
**attempt** [4] - 1406:21, 1420:4, 1438:25, 1460:11
**attempting** [1] - 1437:12
**attention** [8] - 1355:21, 1361:13, 1363:23, 1376:3, 1379:5, 1379:9, 1444:13, 1467:8
**attenuated** [1] - 1464:18
**attitude** [1] - 1401:17
**Attorney** [2] - 1343:14, 1343:15
**attorney** [4] - 1468:18, 1468:22, 1470:9, 1471:23
**attorney's** [1] - 1470:6
**attorneys** [2] - 1470:4, 1473:22
**attractive** [1] - 1449:21
**attributed** [1] - 1378:18
**audio** [2] - 1375:1, 1442:13
**August** [25] - 1348:12, 1350:5, 1350:8, 1350:9, 1350:10, 1350:12, 1350:15, 1350:23, 1351:1, 1351:8, 1351:16, 1352:1, 1354:1, 1354:15, 1354:17, 1374:21, 1375:11, 1383:1, 1389:21, 1390:14, 1391:1, 1395:9, 1447:1
**authorities** [1] - 1421:15
**authority** [1] - 1430:25
**automatic** [2] - 1375:21, 1375:23
**available** [1] - 1378:16
**Avenue** [1] - 1470:20
**Avila** [5] - 1370:21, 1372:10, 1373:7, 1374:3, 1451:25
**Avila's** [3] - 1372:17, 1373:13, 1451:11
**avoid** [1] - 1419:10
**awaiting** [1] - 1474:22
**aware** [9] - 1357:15, 1403:20, 1404:23, 1428:20, 1431:6, 1463:13, 1474:13, 1474:18, 1474:25
**awfully** [1] - 1367:6

## B

**b/1B** [1] - 1397:20
**b/4** [1] - 1398:18
**b/5** [1] - 1347:15
**baby** [3] - 1400:17, 1429:15, 1429:21
**background** [1] - 1443:25

**backs** [1] - 1397:20
**bad** [17] - 1396:21, 1403:16, 1431:24, 1432:14, 1432:24, 1433:5, 1433:7, 1434:17, 1435:2, 1445:2, 1471:6, 1471:7, 1471:8, 1472:3, 1472:4
**badly** [1] - 1466:12
**Balarezo** [2] - 1470:1, 1470:2
**Baltimore** [3] - 1343:8, 1344:24, 1474:22
**barricade** [1] - 1405:11
**based** [7] - 1358:14, 1363:15, 1409:17, 1412:20, 1444:10, 1458:6, 1475:21
**basement** [1] - 1394:5, 1394:9
**bases** [1] - 1404:5
**basis** [7] - 1358:14, 1358:20, 1366:22, 1370:16, 1378:15, 1380:12, 1443:25
**bear** [1] - 1444:24
**beaten** [1] - 1464:8
**became** [1] - 1380:25
**become** [4] - 1345:13, 1346:5, 1346:6, 1346:7
**becomes** [1] - 1358:10
**bed** [1] - 1394:12
**bedroom** [1] - 1394:12
**BEFORE** [1] - 1343:11
**began** [1] - 1475:16
**begin** [4] - 1345:8, 1458:16, 1461:3, 1461:5
**beginning** [1] - 1453:18
**begun** [1] - 1457:8
**behalf** [5] - 1343:13, 1343:16, 1343:18, 1436:15, 1463:4
**belaboring** [1] - 1447:23
**belief** [5] - 1435:20, 1435:22, 1439:19, 1449:24, 1466:14
**believes** [3] - 1345:15, 1367:20, 1466:23
**below** [1] - 1395:13
**Beltway** [1] - 1351:25
**bench** [13] - 1355:24, 1361:5, 1367:2, 1367:15, 1369:21, 1381:7, 1382:5, 1391:8, 1391:25, 1401:5, 1402:24, 1456:8, 1460:14
**benefit** [5] - 1419:24, 1461:15, 1463:23, 1464:10, 1464:12
**Bennett** [1] - 1459:21
**best** [4] - 1354:13, 1373:20, 1431:21, 1452:8
**better** [8] - 1394:13, 1419:9, 1425:21, 1426:23, 1427:16, 1427:23, 1449:16, 1470:8
**between** [40] - 1351:5, 1354:14, 1354:16, 1361:20, 1363:17, 1364:24, 1365:12, 1371:21, 1372:13, 1373:13, 1374:3, 1375:21, 1376:20, 1376:24, 1379:4, 1383:20, 1384:10, 1388:20, 1388:23, 1389:14, 1389:19, 1389:21, 1390:7, 1390:13, 1390:14, 1390:23, 1391:1, 1391:14, 1395:24, 1396:1, 1402:15, 1408:22, 1423:4, 1424:19,

1424:23, 1424:24, 1438:23, 1470:4
**beyond** [1] - 1472:7
**bias** [2] - 1419:14
**bifurcation** [1] - 1465:16
**bigger** [1] - 1445:14
**biggest** [1] - 1416:16
**bill** [3] - 1386:24, 1395:4, 1395:16
**binder** [2] - 1374:18, 1374:19
**birth** [2] - 1352:23, 1358:6
**bit** [2] - 1350:1, 1424:4
**blacken** [1] - 1381:10
**block** [1] - 1439:1
**Block** [1] - 1388:2
**blocking** [1] - 1389:12
**blocks** [1] - 1390:5
**blue** [2] - 1357:1, 1357:13
**blurry** [2] - 1363:6, 1366:12
**body** [1] - 1367:25
**bomb** [2] - 1469:11, 1469:17
**bona** [1] - 1443:5
**book** [2] - 1375:23, 1469:8
**booking** [10] - 1356:14, 1356:15, 1357:2, 1357:17, 1357:22, 1357:24, 1359:13, 1359:15, 1360:3, 1384:3
**bootstrap** [1] - 1464:20
**BOP** [1] - 1474:24
**Border** [4] - 1406:16, 1407:8, 1407:16, 1407:21
**boss** [5] - 1416:6, 1416:8, 1416:13, 1416:18, 1431:7
**bosses** [1] - 1469:19
**bother** [5] - 1397:23, 1397:25, 1398:2, 1428:7, 1428:9
**bottom** [2] - 1393:19, 1398:3
**box** [1] - 1348:2
**boxes** [1] - 1387:4
**boyfriend** [1] - 1435:18
**boyfriend-girlfriend** [1] - 1435:18
**brace** [1] - 1382:11
**bracelet** [2] - 1382:14, 1382:19
**brain** [2] - 1435:3, 1435:6
**branch** [1] - 1407:23
**break** [4] - 1360:23, 1369:24, 1456:15
**breath** [2] - 1416:12, 1416:13
**Bredar** [2] - 1459:7, 1459:10
**Bridgett** [1] - 1353:1
**brief** [2] - 1389:25, 1390:16
**bring** [8] - 1355:22, 1372:11, 1389:6, 1391:10, 1412:14, 1458:7, 1461:6, 1467:7
**brokers** [1] - 1418:25
**brothel** [14] - 1353:15, 1353:18, 1384:6, 1384:17, 1390:20, 1390:24, 1392:14, 1399:24, 1404:10, 1405:13, 1409:13, 1448:22, 1450:4, 1450:7
**brothels** [9] - 1384:10, 1391:3, 1415:13, 1415:19, 1448:9, 1448:12, 1448:21, 1449:13
**brought** [3] - 1355:21, 1467:11, 1469:9

**build** [4] - 1443:2, 1443:3, 1456:20
**bullet** [5] - 1410:15, 1410:17, 1410:19, 1410:20, 1410:21
**bunch** [1] - 1410:24
**bus** [1] - 1465:14
**business** [15] - 1367:7, 1384:20, 1385:12, 1385:18, 1385:24, 1387:4, 1388:11, 1388:12, 1388:17, 1388:18, 1412:23, 1430:16, 1430:23, 1450:17
**businesses** [1] - 1413:8
**bust** [1] - 1436:20
**busy** [4] - 1413:2, 1423:13, 1423:14, 1424:17
**buying** [1] - 1465:15
**BY** [44] - 1346:19, 1347:18, 1348:10, 1361:10, 1369:22, 1371:17, 1374:1, 1375:2, 1379:8, 1380:20, 1382:6, 1389:11, 1392:3, 1397:1, 1402:25, 1403:7, 1404:8, 1404:22, 1405:4, 1406:10, 1407:25, 1408:25, 1409:5, 1410:18, 1415:16, 1421:6, 1423:3, 1427:21, 1428:6, 1434:5, 1436:5, 1436:10, 1437:21, 1438:20, 1439:8, 1440:7, 1442:6, 1445:3, 1447:15, 1449:6, 1450:10, 1450:25, 1451:17, 1453:15

### C

**c/6** [1] - 1451:15
**c/b** [1] - 1451:14
**caller** [1] - 1365:5
**camera** [3] - 1450:17, 1471:1, 1477:20
**candidly** [1] - 1443:6
**cannot** [2] - 1464:19, 1473:16
**capacity** [1] - 1407:24
**Capitol** [1] - 1385:7
**captured** [1] - 1475:6
**car** [2] - 1455:13, 1455:17
**card** [1] - 1388:12
**cards** [11] - 1348:4, 1384:20, 1385:12, 1385:18, 1385:24, 1387:4, 1388:11, 1388:12, 1388:17, 1388:18, 1450:17
**care** [2] - 1471:25, 1472:2
**Carlos** [3] - 1356:11, 1359:7, 1382:2
**Carraballo** [21] - 1366:11, 1370:17, 1422:7, 1422:10, 1422:23, 1432:11, 1432:13, 1432:23, 1436:14, 1437:7, 1437:8, 1437:11, 1438:23, 1439:3, 1439:5, 1439:7, 1439:12, 1440:12, 1441:3, 1441:18, 1443:20
**carried** [1] - 1412:7
**cars** [1] - 1407:5
**case** [34] - 1353:7, 1355:16, 1357:16, 1357:25, 1358:2, 1358:9, 1375:9, 1376:6, 1376:10, 1381:18, 1405:21, 1411:25, 1419:7, 1420:10, 1422:14, 1434:23, 1451:7, 1459:5, 1460:19, 1461:3, 1461:10, 1461:12, 1466:9,

1466:24, 1468:6, 1468:8, 1468:23, 1469:23, 1469:25, 1470:1, 1470:2, 1474:23
**cases** [6] - 1366:18, 1370:1, 1402:19, 1407:10, 1407:11, 1415:13
**cash** [3] - 1394:18, 1394:22, 1415:13
**casino** [1] - 1471:10
**casinos** [3] - 1424:9, 1424:14, 1424:15
**category** [1] - 1443:16
**caused** [2] - 1378:22, 1405:11
**CD** [1] - 1441:14
**CDF** [1] - 1469:13
**CDs** [1] - 1468:8
**cell** [6] - 1348:25, 1350:2, 1350:4, 1350:18, 1355:8, 1424:13
**Cellebrite** [4] - 1355:3, 1359:8, 1378:4, 1378:5
**Central** [2] - 1408:4, 1408:20
**certain** [7] - 1368:22, 1376:19, 1378:3, 1403:23, 1424:13, 1444:9
**certainly** [7] - 1358:14, 1381:20, 1435:23, 1443:15, 1455:13, 1463:22, 1468:24
**certified** [2] - 1397:17, 1400:12
**Certified** [1] - 1478:1
**certify** [1] - 1478:2
**cetera** [2] - 1408:5, 1431:25
**Chale** [1] - 1377:23
**Chalo** [2] - 1362:18
**chance** [4] - 1367:3, 1369:10, 1434:6, 1468:22
**change** [1] - 1389:18
**changes** [1] - 1420:23
**Chapa** [1] - 1471:22
**characteristics** [1] - 1358:7
**characterization** [1] - 1371:7
**characterize** [1] - 1431:22
**charge** [1] - 1464:4
**charged** [1] - 1475:5
**chart** [15] - 1356:1, 1356:2, 1358:17, 1358:25, 1360:20, 1361:11, 1376:9, 1379:10, 1380:3, 1386:16, 1387:23, 1390:15, 1420:23, 1444:8, 1444:14
**charts** [1] - 1444:6
**check** [3] - 1388:20, 1388:23, 1424:13
**checking** [1] - 1456:13
**checkpoint** [1] - 1407:6
**checks** [1] - 1352:22
**chest** [1] - 1375:7
**Chi** [1] - 1387:24
**child** [11] - 1370:7, 1370:15, 1402:16, 1417:20, 1421:15, 1421:16, 1421:19, 1421:21, 1426:1, 1426:10, 1439:20
**children** [5] - 1366:15, 1370:4, 1408:11, 1408:12, 1426:11
**Chim** [2] - 1388:2
**Chin** [5] - 1383:16, 1387:24, 1388:2, 1388:5, 1446:18
**Chino** [8] - 1362:18, 1416:14, 1416:18,

1416:19, 1423:5, 1423:8, 1423:19, 1424:7
**Chino's** [2] - 1416:6, 1431:7
**Choco** [1] - 1403:16
**choose** [5] - 1432:2, 1466:10, 1473:14, 1473:19
**circumstances** [1] - 1402:1
**claim** [1] - 1357:24
**claims** [1] - 1357:1
**clarify** [1] - 1439:3
**clear** [8] - 1359:3, 1389:9, 1389:22, 1452:4, 1453:17, 1455:1, 1457:25, 1465:16
**cleared** [1] - 1366:13
**CLERK** [6] - 1345:2, 1346:11, 1346:15, 1420:14, 1420:18, 1477:12
**cleverly** [1] - 1381:9
**client** [12] - 1356:24, 1357:9, 1381:9, 1402:10, 1445:17, 1453:19, 1453:23, 1458:23, 1459:11, 1465:5, 1466:6, 1474:20
**client's** [3] - 1357:13, 1357:19, 1477:9
**clients** [3] - 1412:24, 1413:7, 1458:18
**CLLO** [1] - 1446:9
**closing** [4] - 1368:7, 1381:20, 1458:18, 1461:2
**coerced** [1] - 1462:18
**coercion** [3] - 1462:24, 1463:9, 1465:2
**collateral** [1] - 1353:7
**colleagues** [1] - 1450:6
**color** [1] - 1432:4
**column** [3] - 1372:22, 1389:20, 1390:9
**combined** [1] - 1355:11
**comfortable** [1] - 1417:17
**coming** [5] - 1380:18, 1391:14, 1393:11, 1444:4, 1454:20
**COMMENCEMENT** [1] - 1479:6
**comment** [2] - 1402:2, 1467:19
**comments** [1] - 1423:11
**commerce** [1] - 1465:13
**communicating** [1] - 1361:22
**communication** [2] - 1354:18, 1377:1
**communications** [1] - 1354:16
**compared** [2] - 1409:19, 1424:23
**compelled** [1] - 1449:8
**competing** [1] - 1413:9
**competition** [2] - 1414:5, 1415:11
**complained** [1] - 1456:16
**complete** [1] - 1398:9
**completed** [1] - 1466:19
**complicity** [1] - 1464:10
**components** [1] - 1463:23
**compose** [1] - 1376:8
**computer** [1] - 1398:7
**concerned** [2] - 1442:19, 1470:1
**concerning** [4] - 1345:10, 1415:24, 1421:15, 1457:9
**concluded** [6] - 1361:5, 1369:21, 1382:5, 1391:25, 1402:24, 1460:14

**conclusion** [1] - 1367:9
**condoms** [3] - 1348:2, 1413:13, 1450:17
**conduct** [9] - 1347:23, 1350:1, 1354:21, 1361:13, 1361:16, 1370:12, 1370:24, 1448:20, 1464:19
**conducted** [9] - 1348:12, 1354:6, 1362:24, 1368:4, 1376:5, 1392:4, 1403:23, 1405:13, 1408:13
**conducting** [1] - 1387:18
**conference** [10] - 1361:5, 1369:21, 1382:5, 1391:25, 1402:24, 1458:16, 1459:4, 1460:14, 1463:2, 1464:4
**conferring** [1] - 1436:4, 1444:19, 1447:14
**confusing** [1] - 1455:21
**connect** [1] - 1355:15
**connected** [1] - 1356:10
**connection** [3] - 1361:15, 1376:10, 1376:20
**connections** [4] - 1376:24, 1379:4, 1384:10, 1392:16
**conscience** [1] - 1472:3
**consensual** [12] - 1346:21, 1347:8, 1353:17, 1372:4, 1372:9, 1374:18, 1386:1, 1386:13, 1386:20, 1386:23, 1387:19, 1387:23
**consensuals** [1] - 1386:5
**consequences** [2] - 1380:10, 1382:8
**consider** [2] - 1358:5, 1420:1
**consideration** [1] - 1439:11
**consistent** [3] - 1352:7, 1389:24, 1442:9
**consists** [1] - 1358:17
**conspiracy** [3] - 1377:4, 1466:1, 1475:7
**consult** [1] - 1361:6
**CONT** [2] - 1344:1, 1346:18
**Cont** [1] - 1479:10
**contact** [30] - 1361:20, 1363:11, 1363:17, 1365:1, 1365:5, 1365:11, 1365:14, 1365:20, 1365:24, 1366:2, 1371:15, 1371:21, 1373:2, 1373:15, 1373:22, 1386:15, 1388:20, 1388:23, 1389:14, 1391:20, 1392:19, 1395:20, 1395:22, 1395:24, 1396:1, 1405:25, 1406:1, 1408:2, 1408:7, 1408:20
**contacted** [1] - 1427:5
**contacts** [21] - 1354:14, 1354:19, 1364:24, 1365:8, 1371:13, 1372:12, 1372:16, 1373:12, 1377:18, 1389:16, 1389:21, 1390:12, 1390:13, 1390:15, 1390:19, 1390:23, 1391:2, 1392:8, 1406:5, 1448:1
**contain** [1] - 1385:20
**contained** [2] - 1356:20, 1396:7
**contains** [1] - 1360:20
**context** [6] - 1366:19, 1368:4, 1402:3, 1417:9, 1452:25, 1464:8
**continue** [4] - 1345:11, 1414:17, 1458:8, 1461:7

**continued** [1] - 1448:12
**CONTINUED** [1] - 1343:10
**continuing** [1] - 1388:8
**continuous** [1] - 1448:12
**continuously** [1] - 1448:23
**contraband** [1] - 1455:11
**control** [1] - 1435:15
**controverted** [1] - 1402:19
**conversation** [3] - 1376:4, 1438:23, 1457:25
**conversations** [1] - 1436:6
**convicted** [1] - 1467:10
**conviction** [3] - 1474:15, 1474:18, 1475:9
**convictions** [6] - 1467:1, 1467:6, 1467:7, 1467:9, 1473:25, 1475:11
**convince** [1] - 1469:2
**cooperating** [1] - 1376:18
**cooperation** [1] - 1440:1
**corner** [1] - 1471:1
**Corolla** [2] - 1384:20, 1411:11
**correct** [72] - 1347:12, 1355:10, 1376:6, 1382:22, 1386:6, 1392:6, 1399:25, 1405:22, 1406:19, 1408:8, 1408:14, 1408:17, 1409:15, 1410:3, 1421:11, 1425:25, 1435:7, 1436:12, 1439:16, 1440:16, 1442:15, 1443:22, 1445:7, 1445:8, 1445:11, 1445:14, 1445:15, 1445:18, 1445:23, 1446:3, 1446:4, 1446:6, 1446:7, 1446:9, 1446:11, 1446:12, 1446:14, 1446:16, 1446:19, 1446:23, 1446:24, 1447:3, 1447:9, 1447:20, 1447:25, 1448:1, 1448:3, 1448:4, 1448:6, 1448:7, 1448:14, 1449:14, 1449:25, 1450:1, 1452:15, 1452:23, 1453:25, 1454:9, 1454:10, 1454:12, 1454:22, 1455:2, 1455:3, 1455:6, 1455:15, 1455:25, 1456:1, 1456:2, 1456:3, 1462:9, 1475:1, 1478:2
**corrected** [1] - 1418:12
**correctly** [1] - 1387:25
**corroborate** [1] - 1365:23
**corroborated** [1] - 1424:12
**corruption** [1] - 1470:1
**cost** [1] - 1413:12
**counsel** [13] - 1345:5, 1367:19, 1368:15, 1368:18, 1401:23, 1436:4, 1444:19, 1447:14, 1456:6, 1460:13, 1460:24, 1462:10, 1474:20
**counsel's** [1] - 1400:25
**count** [6] - 1418:15, 1463:16, 1465:10, 1465:23, 1475:5
**Count** [8] - 1462:17, 1463:8, 1463:17, 1463:20, 1464:13, 1465:25
**counties** [1] - 1393:11
**country** [4] - 1457:10, 1457:19, 1466:24, 1469:20
**counts** [2] - 1462:12, 1463:7
**County** [4] - 1350:11, 1351:24, 1393:10,

1403:24
**couple** [7] - 1393:11, 1413:2, 1432:13, 1434:19, 1453:13, 1456:22, 1467:21
**course** [25] - 1347:24, 1350:14, 1354:23, 1355:2, 1358:4, 1358:19, 1368:6, 1369:9, 1376:16, 1379:21, 1384:4, 1403:2, 1403:19, 1420:7, 1425:24, 1426:1, 1450:12, 1451:4, 1451:19, 1453:3, 1453:17, 1454:25, 1457:22, 1464:19, 1475:8
**court** [2] - 1382:20, 1469:14
**Court** [26] - 1345:3, 1345:11, 1357:12, 1357:18, 1358:20, 1359:2, 1360:12, 1397:17, 1400:12, 1420:14, 1420:18, 1456:23, 1457:3, 1457:8, 1457:11, 1458:24, 1459:6, 1459:11, 1464:4, 1465:4, 1469:14, 1474:24, 1475:18, 1476:18, 1477:12
**COURT** [117] - 1343:1, 1345:5, 1345:22, 1345:24, 1346:1, 1347:17, 1355:22, 1356:5, 1356:17, 1357:25, 1358:2, 1358:23, 1359:5, 1359:12, 1359:17, 1360:5, 1360:9, 1360:17, 1360:22, 1361:3, 1361:8, 1366:22, 1366:25, 1367:3, 1367:12, 1367:14, 1368:6, 1368:10, 1368:13, 1368:25, 1369:11, 1369:15, 1371:9, 1379:7, 1380:12, 1380:16, 1381:5, 1382:4, 1389:4, 1391:6, 1391:9, 1391:16, 1391:18, 1391:24, 1396:25, 1401:3, 1401:14, 1402:5, 1402:20, 1404:3, 1404:21, 1405:1, 1406:7, 1408:24, 1409:2, 1420:6, 1420:8, 1420:20, 1421:3, 1421:5, 1422:21, 1436:9, 1438:8, 1438:12, 1439:1, 1439:24, 1440:4, 1449:3, 1450:9, 1450:24, 1453:10, 1453:12, 1456:6, 1456:9, 1456:11, 1456:13, 1456:25, 1457:2, 1458:13, 1458:25, 1459:3, 1459:12, 1459:15, 1459:17, 1459:24, 1460:7, 1460:12, 1460:15, 1461:23, 1462:2, 1462:6, 1462:10, 1463:1, 1463:4, 1463:17, 1463:20, 1463:25, 1464:12, 1464:15, 1465:9, 1465:24, 1466:2, 1466:25, 1467:4, 1470:17, 1472:7, 1472:21, 1473:24, 1474:4, 1474:6, 1475:2, 1475:8, 1476:2, 1476:4, 1477:8, 1477:11, 1477:14
**Court's** [3] - 1355:21, 1359:25, 1465:6
**Court-certified** [2] - 1397:17, 1400:12
**courthouse** [1] - 1435:25
**Courthouse** [1] - 1344:23
**courtroom** [3] - 1400:20, 1458:8, 1467:11
**cover** [4] - 1356:5, 1356:6, 1377:9, 1460:10
**covered** [3] - 1392:2, 1420:23, 1460:9
**covering** [1] - 1363:8
**create** [1] - 1357:22
**crime** [5] - 1405:12, 1419:6, 1443:22,

1467:10, 1471:15
**crimes** [3] - 1382:13, 1407:16, 1417:2
**criminal** [9] - 1361:13, 1370:6, 1377:4,
1382:18, 1417:1, 1419:4, 1434:23,
1467:7, 1471:19
**Criminal** [1] - 1343:5
**cross** [14] - 1368:17, 1398:15, 1406:7,
1406:21, 1421:1, 1421:7, 1440:4,
1449:7, 1452:10, 1457:9, 1464:25,
1466:21, 1473:21, 1476:9
**CROSS** [2] - 1406:9, 1440:6
**Cross** [2] - 1479:10, 1479:11
**cross-examination** [1] - 1368:17
**CROSS-EXAMINATION** [2] - 1406:9,
1440:6
**Cross-Examination** [2] - 1479:10,
1479:11
**cross-examine** [2] - 1457:9, 1466:21
**cross-examined** [3] - 1464:25, 1473:21,
1476:9
**crossed** [2] - 1351:3, 1351:5
**CRR** [2] - 1344:23, 1478:7
**cultural** [2] - 1427:10, 1427:11
**culture** [1] - 1442:25
**Cunningham** [9] - 1343:14, 1357:3,
1361:1, 1374:22, 1444:20, 1444:21,
1460:5, 1466:20, 1468:6
**CUNNINGHAM** [22] - 1361:6, 1442:1,
1444:22, 1444:24, 1451:15, 1456:12,
1457:6, 1459:20, 1460:9, 1462:9,
1463:21, 1464:2, 1464:14, 1467:3,
1474:3, 1474:5, 1474:7, 1474:11,
1474:14, 1474:17, 1475:1, 1475:4
**currency** [1] - 1394:16, 1415:22
**custody** [5] - 1380:19, 1380:21, 1382:9,
1455:2, 1474:24
**cut** [1] - 1470:24

# D

**D.C** [5] - 1351:24, 1404:10, 1404:11,
1456:21, 1472:5
**daddy** [6] - 1400:17, 1429:23, 1429:25,
1430:1, 1430:13, 1430:20
**Daddy** [1] - 1429:15
**damage** [1] - 1458:12
**dance** [1] - 1409:1
**data** [16] - 1349:3, 1349:4, 1354:6,
1354:25, 1355:3, 1355:5, 1355:7,
1383:1, 1383:2, 1390:17, 1392:11,
1392:12, 1392:19, 1398:6, 1398:8,
1444:6
**database** [1] - 1352:22, 1365:2
**Date** [1] - 1478:7
**date** [17] - 1352:23, 1358:6, 1363:25,
1365:14, 1374:14, 1375:10, 1395:6,
1395:8, 1396:2, 1398:10, 1400:8,
1404:14, 1412:16, 1429:13, 1437:11,
1452:11, 1469:14

**dated** [4] - 1359:2, 1359:3, 1386:24,
1426:15
**dates** [1] - 1447:5
**daughter** [3] - 1436:16, 1437:12,
1438:25
**days** [1] - 1413:2
**de** [4] - 1343:6, 1343:16, 1385:4, 1479:2
**dead** [1] - 1468:21
**dealt** [3] - 1407:11, 1407:13, 1408:16
**December** [8] - 1359:22, 1359:24,
1360:15, 1379:18, 1384:22, 1390:14,
1435:25, 1453:24
**decide** [4] - 1434:22, 1466:11, 1466:16,
1476:8
**decision** [4] - 1458:10, 1475:19,
1475:25, 1477:9
**decisions** [1] - 1460:25
**Defendant** [16] - 1343:16, 1343:18,
1349:2, 1351:17, 1352:4, 1353:21,
1353:22, 1354:9, 1356:7, 1359:11,
1362:20, 1374:3, 1379:13, 1379:16,
1391:2, 1401:11
**defendant** [5] - 1357:21, 1376:25,
1380:15, 1460:23
**DEFENDANT** [19] - 1467:13, 1467:16,
1467:24, 1468:5, 1468:16, 1470:19,
1471:14, 1472:15, 1472:18, 1473:3,
1473:5, 1473:9, 1475:14, 1475:24,
1476:1, 1476:24, 1477:3, 1477:7,
1477:19
**defendants** [1] - 1388:24
**Defendants** [6] - 1343:7, 1355:17,
1388:20, 1391:14, 1460:17, 1460:24
**defense** [5] - 1345:19, 1465:6, 1468:18,
1473:19, 1473:20
**Defense** [5] - 1359:17, 1402:19,
1433:12, 1437:17, 1440:14, 1441:23,
1442:2, 1460:22
**definitely** [1] - 1416:10
**degree** [1] - 1357:23
**deliberations** [3] - 1461:4, 1461:5,
1461:7
**delivery** [2] - 1415:3, 1415:4
**demonstrate** [1] - 1390:3
**denied** [2] - 1402:18, 1466:3
**Department** [5] - 1366:7, 1403:25,
1422:15, 1439:20, 1453:24
**depicts** [1] - 1350:17
**deportation** [1] - 1381:15
**deposited** [1] - 1347:7
**deposits** [1] - 1394:22
**derive** [1] - 1464:10
**describe** [2] - 1350:17, 1389:16
**description** [2] - 1360:12, 1395:10
**destroyed** [1] - 1472:2
**detail** [1] - 1460:6
**detailed** [1] - 1459:24
**detained** [4] - 1380:21, 1380:23,
1436:17, 1436:18
**detainer** [1] - 1380:17

**Detective** [41] - 1348:16, 1351:17,
1351:20, 1352:3, 1366:11, 1370:17,
1375:11, 1379:19, 1418:4, 1422:7,
1422:9, 1422:10, 1422:12, 1422:23,
1432:11, 1432:13, 1432:21, 1432:23,
1433:3, 1433:4, 1434:13, 1436:14,
1437:7, 1437:8, 1437:9, 1437:11,
1438:14, 1438:23, 1439:3, 1439:5,
1439:6, 1439:7, 1439:12, 1440:12,
1441:3, 1441:18, 1441:19, 1443:23,
1453:23
**detective** [3] - 1422:13, 1422:19,
1439:10
**detectives** [1] - 1439:19
**Detectives** [1] - 1443:19
**detention** [1] - 1382:12
**determination** [1] - 1458:6
**develop** [1] - 1443:13
**device** [1] - 1382:10
**devil** [2] - 1396:16, 1397:23
**Diabla** [10] - 1396:14, 1397:8, 1397:9,
1397:23, 1398:22, 1399:3, 1399:13,
1400:5, 1400:17, 1453:8
**dialed** [2] - 1371:23, 1372:23
**difference** [1] - 1425:14
**different** [15] - 1350:19, 1358:9,
1358:10, 1361:22, 1362:17, 1367:13,
1421:24, 1425:10, 1425:19, 1434:24,
1443:20, 1446:15, 1446:18, 1453:5
**differently** [1] - 1435:9
**digital** [1] - 1441:15
**dinner** [1] - 1471:9
**DIRECT** [1] - 1346:18
**Direct** [1] - 1479:10
**direct** [9] - 1376:3, 1379:9, 1395:6,
1404:9, 1409:6, 1423:17, 1423:19,
1433:25, 1466:18
**directed** [2] - 1463:11, 1465:2
**directing** [4] - 1361:23, 1363:23,
1367:21, 1384:14
**direction** [3] - 1363:10, 1367:23, 1425:5
**directly** [1] - 1349:9
**disclosed** [1] - 1356:24
**disclosure** [2] - 1358:14, 1369:16
**discovered** [2] - 1359:6, 1369:9
**discovery** [3] - 1359:23, 1360:2, 1360:3
**discredit** [1] - 1475:12
**discuss** [5] - 1420:9, 1461:10, 1461:12,
1467:22, 1472:13
**discussed** [5] - 1377:6, 1473:4, 1473:6,
1475:21, 1476:8
**discussion** [8] - 1355:23, 1367:1,
1381:6, 1391:7, 1401:4, 1448:4,
1453:23, 1456:7
**dismissed** [3] - 1400:24, 1401:7,
1401:11
**disregard** [2] - 1381:13, 1464:6
**distinction** [1] - 1407:23
**DISTRICT** [2] - 1343:1, 1343:1
**District** [6] - 1345:2, 1345:3, 1403:10,

1416:22, 1431:12, 1474:19
**distrust** [2] - 1419:21, 1443:14
**DIVISION** [1] - 1343:2
**Docket** [1] - 1343:5
**doctor** [1] - 1395:11
**document** [6] - 1355:22, 1433:9, 1434:12, 1438:22, 1475:3, 1475:6
**documents** [3] - 1389:6, 1456:13, 1462:6
**dollars** [3] - 1394:20, 1413:15, 1414:14
**dominance** [1] - 1427:14
**done** [14] - 1360:24, 1368:5, 1386:1, 1403:21, 1411:2, 1412:19, 1418:22, 1430:10, 1433:18, 1458:9, 1459:12, 1459:17, 1459:18, 1467:14
**door** [1] - 1394:9
**doormen** [2] - 1413:17, 1413:18
**down** [16] - 1346:4, 1353:23, 1372:24, 1389:6, 1393:9, 1413:22, 1419:1, 1448:13, 1448:15, 1448:16, 1448:19, 1458:1, 1462:3, 1465:19, 1468:19
**dozens** [1] - 1408:14
**draw** [2] - 1367:8, 1466:13
**drawing** [1] - 1367:9
**drill** [1] - 1458:17
**driven** [1] - 1410:25
**driver** [3] - 1415:4, 1415:5
**driving** [3] - 1454:7, 1455:5, 1470:22
**drug** [4] - 1370:11, 1370:18, 1399:24
**ducky** [1] - 1440:10
**Dueñas** [20] - 1383:7, 1392:25, 1393:19, 1393:20, 1394:4, 1395:1, 1395:18, 1396:10, 1400:21, 1401:17, 1425:4, 1429:20, 1439:3, 1439:7, 1440:12, 1441:3, 1441:17, 1443:15, 1463:11, 1464:21
**Dueñas'** [5] - 1392:22, 1395:25, 1396:12, 1425:6, 1446:9
**DULY** [1] - 1346:17
**duration** [3] - 1363:20, 1372:15, 1373:5
**during** [12] - 1347:24, 1354:23, 1371:14, 1390:12, 1403:1, 1407:8, 1421:1, 1452:10, 1453:17, 1463:2, 1464:4, 1464:5
**DVD** [1] - 1394:17

# E

**early** [3] - 1434:9, 1452:14, 1461:23
**earn** [1] - 1413:6
**ears** [1] - 1439:14
**ease** [2] - 1419:21, 1442:25
**easily** [1] - 1447:24
**easily-transferred** [1] - 1447:24
**Eastern** [4] - 1403:10, 1416:22, 1431:11, 1474:19
**Easton** [6] - 1386:7, 1409:7, 1448:15, 1449:8, 1449:24, 1451:3
**Eduardo** [2] - 1470:1, 1470:2

**education** [1] - 1417:4
**EDWARD** [2] - 1346:16, 1479:9
**Edward** [2] - 1344:3, 1346:14
**effect** [2] - 1366:17, 1464:2
**effort** [1] - 1456:24
**eight** [2] - 1354:20, 1406:17
**either** [11] - 1358:13, 1412:13, 1412:16, 1428:13, 1450:6, 1460:9, 1466:20, 1468:9, 1470:13, 1472:2, 1472:13
**El** [1] - 1408:5
**elect** [1] - 1476:14
**elements** [1] - 1464:24
**elicit** [3] - 1402:6, 1402:12, 1440:1
**embarrassing** [1] - 1367:6
**emergency** [2] - 1406:1, 1470:24
**employed** [1] - 1392:25
**employee** [1] - 1416:20
**employees** [2] - 1413:21, 1452:6
**employment** [1] - 1392:22
**en** [1] - 1457:16
**encompassed** [2] - 1355:5, 1365:3
**encounter** [2] - 1365:16, 1365:17
**encountered** [2] - 1370:2, 1393:20
**encounters** [3] - 1453:19, 1454:3, 1455:1
**end** [4] - 1350:24, 1351:4, 1389:24, 1435:23
**ended** [3] - 1437:1, 1455:5, 1474:21
**ending** [10] - 1346:22, 1347:1, 1349:4, 1353:20, 1362:7, 1362:25, 1363:12, 1364:19, 1373:13, 1396:2
**ends** [1] - 1365:10
**enforcement** [10] - 1364:9, 1370:3, 1384:24, 1405:10, 1419:22, 1431:22, 1443:14, 1445:18, 1453:20, 1454:3
**engage** [1] - 1462:19
**English** [7] - 1375:4, 1428:3, 1430:5, 1430:11, 1430:13, 1433:4, 1445:25
**enlighten** [1] - 1427:17
**entered** [2] - 1408:2, 1457:10
**enterprise** [2] - 1448:6, 1464:9
**enters** [2] - 1345:25, 1421:2
**enticed** [1] - 1462:18
**enticement** [1] - 1462:24
**entire** [4] - 1367:24, 1378:12, 1389:23, 1440:21
**entirely** [1] - 1391:17
**entirety** [1] - 1394:19
**ENTITLED** [1] - 1343:10
**entitled** [2] - 1381:20, 1478:4
**entries** [3] - 1377:10, 1379:10
**entry** [6] - 1377:8, 1377:9, 1378:17, 1390:7, 1395:13, 1405:12
**erased** [1] - 1383:22
**escorted** [1] - 1401:12
**Esmirna** [2] - 1395:5, 1395:17
**especially** [3] - 1370:7, 1427:25, 1442:24
**Esquire** [2] - 1343:17, 1343:19

**essence** [1] - 1465:7
**essentially** [1] - 1475:6
**establish** [4] - 1443:3, 1443:5, 1463:15
**established** [1] - 1369:4
**et** [3] - 1408:5, 1431:25, 1479:2
**euphemisms** [1] - 1431:23
**evening** [5] - 1350:13, 1373:9, 1373:10, 1452:20, 1460:24
**event** [1] - 1466:16
**eventually** [3] - 1354:11, 1380:24, 1387:19
**evidence** [23] - 1381:10, 1381:21, 1381:25, 1394:21, 1458:17, 1460:22, 1460:25, 1461:1, 1462:7, 1462:20, 1462:22, 1463:8, 1463:20, 1463:22, 1464:11, 1465:17, 1466:3, 1468:7, 1468:19, 1469:2, 1469:24, 1475:17, 1476:10
**evidencing** [1] - 1394:23
**evil** [1] - 1431:24
**exact** [2] - 1373:10, 1416:2
**exactly** [3] - 1358:11, 1409:22, 1418:18
**Examination** [5] - 1479:10, 1479:10, 1479:11, 1479:11, 1479:12
**examination** [7] - 1368:17, 1409:6, 1421:8, 1449:8, 1458:8, 1466:19
**EXAMINATION** [5] - 1346:18, 1406:9, 1440:6, 1449:5, 1453:14
**examinations** [2] - 1355:3, 1362:17
**examine** [3] - 1402:6, 1457:9, 1466:21
**examined** [3] - 1464:25, 1473:21, 1476:9
**examiner's** [1] - 1404:4
**example** [11] - 1376:24, 1390:7, 1408:3, 1410:24, 1412:22, 1414:17, 1453:22, 1454:4, 1455:13, 1465:14, 1465:16
**excess** [1] - 1425:4
**exchange** [1] - 1397:11
**excruciating** [1] - 1460:6
**excuse** [3] - 1427:8, 1436:8, 1474:7
**excused** [3] - 1420:13, 1462:1, 1462:5
**Excused...............................** [1] - 1479:12
**executed** [1] - 1399:21
**Exhibit** [7] - 1347:4, 1348:17, 1374:24, 1390:9, 1390:11, 1426:15, 1427:23
**exhibit** [18] - 1347:4, 1350:17, 1355:19, 1355:25, 1361:2, 1375:15, 1378:20, 1393:18, 1396:18, 1400:15, 1433:15, 1434:4, 1434:6, 1438:16, 1441:20, 1442:1, 1451:23, 1452:11
**exhibits** [3] - 1357:3, 1451:1, 1452:10
**exists** [1] - 1408:21
**expect** [2] - 1413:14, 1414:6
**expectation** [1] - 1414:11
**Expedition** [2] - 1410:25, 1465:18
**expenses** [2] - 1414:8, 1452:8
**experience** [8] - 1367:9, 1369:25, 1409:17, 1409:21, 1410:8, 1441:6, 1449:12, 1450:2

**experienced** [1] - 1457:10
**experiences** [1] - 1413:1
**explain** [6] - 1349:6, 1378:19, 1388:9, 1404:3, 1429:4, 1441:4
**explained** [3] - 1473:7, 1473:12, 1475:16
**explanation** [1] - 1473:1
**extensive** [2] - 1355:7, 1379:3
**extent** [2] - 1420:24, 1464:5
**exterior** [1] - 1394:9
**extract** [2] - 1357:2, 1357:20
**extracted** [3] - 1357:9, 1358:17, 1359:9
**extraordinary** [1] - 1408:19
**eye** [1] - 1403:16
**eyes** [2] - 1357:10, 1357:13

## F

**face** [1] - 1468:1
**facility** [3] - 1382:15, 1392:24, 1414:10
**fact** [12] - 1365:23, 1381:9, 1391:12, 1409:25, 1410:1, 1425:15, 1426:17, 1427:5, 1435:17, 1448:12, 1464:10, 1464:11
**factored** [1] - 1414:7
**facts** [1] - 1466:24
**failed** [3] - 1380:24, 1381:9, 1381:16
**fair** [22] - 1360:8, 1409:17, 1410:4, 1417:7, 1419:11, 1419:15, 1420:3, 1439:11, 1441:8, 1442:10, 1443:7, 1444:11, 1447:6, 1447:16, 1448:9, 1453:20, 1453:21, 1454:16, 1454:18, 1454:21, 1467:18, 1467:19
**faith** [1] - 1357:12
**fall** [2] - 1457:25, 1469:17
**false** [2] - 1435:3, 1468:16
**familiar** [5] - 1399:18, 1399:19, 1399:20, 1418:18, 1445:4
**family** [1] - 1394:5
**far** [12] - 1355:3, 1416:2, 1417:2, 1427:7, 1427:14, 1429:7, 1442:19, 1443:11, 1443:12, 1467:12, 1467:15, 1470:1
**fashion** [1] - 1465:7
**favor** [1] - 1402:11
**favorable** [1] - 1462:21
**fear** [2] - 1419:22, 1464:1
**February** [3] - 1360:6, 1360:7, 1388:15
**felt** [1] - 1435:18
**female** [4] - 1377:25, 1396:16, 1408:22, 1425:1, 1427:14
**female's** [1] - 1364:6
**females** [6] - 1364:5, 1408:8, 1408:10, 1424:24, 1425:8, 1425:11
**few** [4] - 1417:15, 1444:2, 1450:15, 1461:9
**fides** [1] - 1443:5
**fifty** [1] - 1376:7
**fifty-seven** [1] - 1376:7

**fight** [1] - 1471:18
**figure** [1] - 1414:20
**file** [1] - 1474:8
**final** [1] - 1378:17
**finally** [3] - 1348:5, 1383:23, 1385:11
**financial** [2] - 1463:23, 1464:10
**fine** [2] - 1444:1, 1463:19
**finger** [1] - 1357:11
**finish** [2] - 1471:12, 1472:9
**finished** [1] - 1433:22
**firearm** [2] - 1451:18, 1451:21
**firearms** [2] - 1451:5, 1455:25
**first** [20] - 1350:3, 1351:10, 1356:10, 1365:5, 1365:19, 1373:2, 1377:6, 1377:8, 1379:9, 1379:10, 1384:15, 1386:12, 1389:13, 1390:7, 1390:22, 1396:19, 1417:25, 1441:7, 1463:18, 1473:10
**fit** [1] - 1375:22
**five** [3] - 1420:11, 1461:13, 1461:18
**Flaco** [5] - 1356:12, 1379:24, 1383:11, 1383:14, 1446:13, 1446:21
**Flores** [2] - 1362:1, 1363:14
**FOCR** [1] - 1344:23
**focussed** [1] - 1464:18
**fodder** [1] - 1368:17
**folks** [1] - 1407:2
**follow** [2] - 1365:22, 1447:13
**followed** [3] - 1418:13, 1459:4, 1459:5
**following** [14] - 1355:23, 1365:12, 1367:1, 1374:4, 1380:10, 1381:6, 1382:21, 1391:7, 1400:21, 1401:4, 1401:18, 1456:7, 1460:2, 1472:6
**follows** [3] - 1473:8, 1473:13, 1474:24
**food** [2] - 1394:25, 1413:12
**foot** [2] - 1407:2, 1407:4
**FOR** [3] - 1343:1, 1343:10, 1479:7
**force** [3] - 1462:24, 1463:8, 1465:2
**forced** [1] - 1462:18
**Ford** [1] - 1410:25
**foregoing** [1] - 1478:2
**foreman** [1] - 1470:22
**forensic** [1] - 1398:7
**form** [8] - 1357:22, 1360:11, 1360:14, 1408:24, 1430:13, 1457:18, 1462:15, 1473:19
**format** [1] - 1428:1
**formed** [1] - 1384:9
**forms** [1] - 1407:6
**forth** [5] - 1373:1, 1413:25, 1423:10, 1423:23, 1424:5
**fortunate** [1] - 1459:13
**forty** [1] - 1373:6
**forty-two** [1] - 1373:6
**forward** [4] - 1348:1, 1365:4, 1417:17, 1462:22
**forwarded** [1] - 1376:1
**four** [9] - 1386:9, 1393:4, 1414:12, 1414:16, 1414:17, 1414:21, 1414:22,

**fourth** [2] - 1377:10, 1387:2
**frame** [4] - 1371:14, 1390:5, 1417:21, 1448:21
**Franco** [45] - 1382:1, 1395:5, 1395:17, 1400:21, 1401:17, 1401:22, 1415:25, 1417:8, 1417:12, 1419:8, 1421:14, 1421:18, 1422:14, 1424:20, 1424:23, 1425:10, 1426:16, 1427:4, 1428:23, 1431:13, 1432:10, 1432:20, 1432:24, 1434:14, 1435:8, 1435:19, 1435:21, 1436:6, 1436:12, 1436:16, 1438:24, 1439:14, 1439:19, 1457:9, 1457:12, 1462:18, 1463:12, 1463:25, 1464:21, 1465:3, 1468:9, 1468:10, 1471:5, 1471:6, 1471:18
**frankly** [1] - 1439:10
**fraud** [10] - 1463:9, 1465:2, 1474:10, 1474:11, 1474:15, 1474:21, 1475:3, 1475:6, 1475:12
**Freddy** [6] - 1374:13, 1374:15, 1375:9, 1378:21, 1378:24, 1416:14, 1423:5, 1423:7
**free** [1] - 1460:3
**free-for-all** [1] - 1460:3
**frequency** [11] - 1349:17, 1356:2, 1360:20, 1377:1, 1383:3, 1388:20, 1388:23, 1389:13, 1425:2, 1444:8, 1448:1
**frequented** [2] - 1409:18, 1449:13
**Friday** [3] - 1461:6, 1461:7
**friend** [2] - 1471:4, 1471:5
**front** [3] - 1396:19, 1468:2, 1471:20
**Fuentes** [2] - 1358:23, 1358:24
**FUERTES** [6] - 1343:7, 1473:3, 1473:5, 1473:9, 1475:14, 1476:1
**Fuertes** [55] - 1343:18, 1349:20, 1353:21, 1356:7, 1356:11, 1356:13, 1356:19, 1359:12, 1359:13, 1360:17, 1360:20, 1379:12, 1379:13, 1379:14, 1379:16, 1380:4, 1380:5, 1380:9, 1381:15, 1382:3, 1382:8, 1382:9, 1382:23, 1382:25, 1383:4, 1383:6, 1383:7, 1383:24, 1384:1, 1384:2, 1385:13, 1388:7, 1389:15, 1389:20, 1390:8, 1390:13, 1391:15, 1392:10, 1395:20, 1445:10, 1446:8, 1450:20, 1453:19, 1455:2, 1455:22, 1463:5, 1463:9, 1463:10, 1463:20, 1464:1, 1464:9, 1465:2, 1465:19, 1474:1
**Fuertes'** [5] - 1353:22, 1377:18, 1380:8, 1384:22, 1390:18, 1390:24
**fugitive** [1] - 1380:25
**full** [2] - 1368:13, 1414:4
**fully** [1] - 1443:7
**fun** [1] - 1401:13
**functioning** [1] - 1448:21
**fungible** [1] - 1358:8
**furthermore** [1] - 1357:15
**future** [1] - 1428:15

# G

**gain** [3] - 1420:1, 1443:3, 1443:11
**game** [1] - 1470:3
**games** [1] - 1470:5
**gang** [1] - 1413:24
**gaps** [1] - 1470:16
**GARCIA** [1] - 1343:7
**Garcia** [1] - 1343:18
**gas** [1] - 1413:23
**general** [5] - 1373:12, 1376:16, 1405:25, 1408:21, 1412:23
**generally** [6] - 1350:7, 1413:17, 1414:1, 1415:3, 1415:8, 1454:23
**generate** [1] - 1378:7
**generation** [1] - 1357:23
**gentleman** [4] - 1469:1, 1470:15, 1471:12, 1471:21
**gentlemen** [16] - 1346:21, 1347:19, 1349:7, 1350:6, 1352:2, 1353:22, 1363:3, 1374:17, 1374:23, 1378:19, 1380:4, 1382:24, 1383:25, 1386:11, 1397:21, 1400:16
**George's** [4] - 1350:11, 1351:24, 1393:10, 1403:24
**Gerald** [1] - 1343:17
**GERMAN** [2] - 1343:6, 1479:2
**German** [1] - 1343:16
**giant** [1] - 1416:24
**Giordano** [3] - 1344:23, 1478:1, 1478:7
**girl** [8] - 1412:24, 1413:11, 1414:25, 1415:3, 1418:22, 1422:16, 1428:18
**girlfriend** [3] - 1435:18, 1471:9, 1471:15
**girlfriends** [1] - 1430:22
**girls** [16] - 1384:25, 1413:3, 1413:7, 1414:3, 1414:22, 1414:24, 1415:2, 1415:4, 1415:11, 1416:23, 1417:3, 1418:24, 1430:1, 1465:13
**given** [10] - 1357:4, 1421:24, 1433:14, 1461:3, 1462:13, 1464:6, 1466:24, 1468:7, 1468:22, 1473:2
**glare** [2] - 1394:11, 1396:21
**gloves** [1] - 1420:4
**go-by** [1] - 1432:1
**goal** [1] - 1413:1
**Goldstein** [1] - 1344:4
**GOLDSTEIN** [6] - 1468:3, 1468:14, 1470:14, 1470:18, 1471:11, 1472:19
**Gonzalez** [1] - 1385:5
**government** [1] - 1417:16
**GOVERNMENT** [1] - 1479:8
**Government** [34] - 1343:13, 1347:3, 1357:1, 1357:5, 1357:6, 1357:14, 1357:18, 1357:20, 1357:22, 1359:16, 1367:19, 1374:24, 1381:20, 1391:12, 1401:23, 1402:5, 1402:11, 1427:23, 1438:5, 1450:16, 1457:12, 1458:7, 1462:7, 1462:21, 1463:17, 1464:19, 1465:1, 1465:22, 1467:1, 1467:6,

1470:8, 1473:22, 1473:25, 1475:19
**Government's** [24] - 1347:15, 1348:17, 1350:16, 1351:7, 1351:20, 1353:11, 1355:18, 1366:5, 1371:19, 1375:16, 1377:6, 1379:5, 1381:14, 1381:18, 1384:13, 1390:9, 1390:10, 1393:12, 1394:7, 1396:17, 1398:18, 1400:8, 1450:23, 1460:5
**GPS** [1] - 1355:8
**grab** [1] - 1474:8
**Grand** [2] - 1368:19, 1435:24, 1436:1, 1436:2, 1468:2, 1468:4
**grant** [1] - 1465:4
**great** [1] - 1439:11
**green** [2] - 1350:21, 1351:12
**gross** [4] - 1413:4, 1413:16, 1452:5, 1452:7
**group** [2] - 1353:8, 1354:25
**Guatemala** [1] - 1408:5
**guess** [3] - 1350:24, 1395:6, 1472:2
**guesstimate** [1] - 1452:8
**guilty** [4] - 1431:24, 1473:17, 1476:16, 1476:25, 1477:1, 1477:4
**guns** [3] - 1410:13, 1450:12, 1453:16
**gunshots** [1] - 1405:3

# H

**half** [3] - 1356:20, 1456:22, 1461:15
**halfway** [1] - 1372:23
**hand** [2] - 1360:25, 1390:8
**handle** [1] - 1460:4
**hands** [1] - 1462:7
**hands-on** [1] - 1462:7
**handwriting** [1] - 1445:2
**happy** [2] - 1438:14, 1458:23
**harm** [1] - 1419:25
**harmed** [1] - 1457:18
**Hartlove** [17] - 1348:16, 1351:17, 1352:3, 1375:11, 1379:19, 1418:4, 1422:9, 1422:12, 1432:11, 1437:9, 1439:6, 1440:12, 1441:3, 1441:19, 1443:19, 1443:23, 1470:19
**Hartlove's** [2] - 1453:23, 1471:4
**hate** [1] - 1459:14
**heading** [1] - 1352:14
**hear** [10] - 1359:19, 1361:25, 1430:14, 1431:1, 1438:17, 1458:11, 1470:6, 1471:13, 1473:1
**heard** [19] - 1354:22, 1358:22, 1366:14, 1368:15, 1369:5, 1370:24, 1379:3, 1386:4, 1401:20, 1403:1, 1403:13, 1404:21, 1415:24, 1416:1, 1423:4, 1430:20, 1453:22, 1468:8, 1468:9
**hearing** [10] - 1345:16, 1345:18, 1362:5, 1365:22, 1368:16, 1368:22, 1369:6, 1401:6, 1459:7, 1463:1
**HEARING**.................................. [1] - 1479:13

**Hector** [5] - 1370:21, 1372:17, 1373:7, 1373:13, 1374:3
**Heights** [1] - 1385:8
**held** [1] - 1473:15
**Helen** [1] - 1377:24
**help** [10] - 1354:24, 1376:8, 1417:21, 1421:15, 1421:19, 1422:16, 1438:24, 1439:20, 1469:6, 1469:7
**helped** [1] - 1457:19
**helpful** [2] - 1458:10, 1472:8
**hidden** [1] - 1455:11
**hide** [1] - 1466:15
**high** [1] - 1349:17
**higher** [2] - 1425:3, 1427:7
**higher-up** [1] - 1427:7
**highlighter** [1] - 1359:3
**highlighting** [1] - 1433:18
**highlights** [1] - 1433:20
**himself** [1] - 1384:2
**Hispanic** [9] - 1403:16, 1407:11, 1407:13, 1408:16, 1415:13, 1415:19, 1429:22, 1430:17, 1450:4
**Hispanic-speaking** [1] - 1429:22
**history** [4] - 1353:2, 1378:8, 1382:13, 1392:22
**hit** [7] - 1351:1, 1351:11, 1351:12, 1352:9, 1352:10, 1413:1, 1413:7
**hits** [2] - 1350:20, 1351:23
**hold** [1] - 1473:16
**home** [9] - 1357:6, 1411:20, 1446:22, 1456:15, 1458:15, 1458:17, 1459:1, 1460:18, 1461:23
**homicide** [1] - 1362:16
**Homicide** [1] - 1439:10
**Honduras** [1] - 1408:5
**honestly** [1] - 1443:7
**Honor** [94] - 1345:6, 1345:7, 1345:8, 1345:15, 1345:23, 1346:9, 1347:16, 1355:20, 1355:25, 1356:10, 1356:16, 1356:18, 1358:4, 1358:16, 1359:2, 1360:8, 1360:18, 1360:19, 1361:4, 1361:7, 1364:23, 1366:5, 1366:23, 1367:5, 1367:13, 1368:3, 1368:11, 1369:3, 1369:8, 1369:19, 1369:20, 1371:8, 1379:6, 1381:3, 1381:14, 1389:3, 1391:4, 1396:24, 1397:14, 1401:2, 1401:6, 1401:20, 1402:14, 1402:23, 1404:1, 1404:7, 1406:8, 1408:23, 1409:1, 1420:7, 1420:21, 1420:22, 1421:4, 1422:20, 1436:8, 1438:5, 1438:13, 1439:22, 1440:5, 1449:1, 1449:4, 1450:22, 1453:11, 1453:13, 1456:4, 1456:10, 1456:19, 1457:7, 1457:23, 1459:6, 1460:1, 1462:9, 1462:11, 1462:13, 1462:15, 1462:25, 1463:6, 1463:21, 1464:3, 1464:14, 1466:7, 1467:3, 1467:5, 1468:4, 1472:10, 1474:3, 1474:5, 1474:8, 1474:19, 1475:1, 1475:4, 1475:10, 1476:3, 1477:16

**HONORABLE** [1] - 1343:11
**Honorable** [4] - 1345:4, 1420:14, 1420:18, 1477:12
**hope** [3] - 1402:7, 1461:3, 1468:24
**hoped** [1] - 1391:10
**hoping** [3] - 1360:24, 1459:11, 1459:13
**hospital** [1] - 1395:4
**Hospital** [1] - 1395:5
**hour** [2] - 1456:21, 1461:16
**hours** [8] - 1363:9, 1363:18, 1366:13, 1372:24, 1373:9, 1456:21, 1456:22
**house** [5] - 1371:12, 1413:4, 1414:2, 1418:20, 1419:2
**houses** [1] - 1412:21
**Houston** [1] - 1457:17
**HSI** [1] - 1344:3
**human** [8] - 1403:10, 1406:13, 1407:9, 1407:10, 1408:13, 1419:19, 1443:10, 1443:24
**Human** [1] - 1393:16
**human-trafficking** [1] - 1407:10
**hundred** [2] - 1394:20, 1413:1
**hundreds** [1] - 1406:20

---

# I

**ICE** [3] - 1380:17, 1380:25, 1382:9
**idea** [4] - 1402:2, 1432:5, 1443:4, 1457:21
**identification** [1] - 1433:13
**identified** [19] - 1349:17, 1349:20, 1349:22, 1352:18, 1359:10, 1371:4, 1371:11, 1372:10, 1383:4, 1384:8, 1390:20, 1392:20, 1403:15, 1403:17, 1405:8, 1405:12, 1405:14, 1405:15, 1405:17
**identifiers** [1] - 1352:24
**identify** [7] - 1347:4, 1347:19, 1350:19, 1352:20, 1352:22, 1358:6, 1395:3
**identifying** [2] - 1415:14, 1444:9
**identity** [2] - 1474:14, 1475:2
**illegal** [6] - 1366:19, 1370:1, 1448:18, 1448:20, 1469:8, 1469:9
**illegally** [2] - 1406:21, 1417:3
**image** [1] - 1376:1
**imitation** [1] - 1409:2
**immediately** [1] - 1401:17
**immigrants** [1] - 1366:19
**immigration** [1] - 1370:2
**Immigration** [7] - 1380:10, 1380:19, 1380:21, 1380:25, 1382:8, 1419:18, 1419:22, 1474:10, 1474:11, 1474:20, 1475:3, 1475:12
**impeach** [4] - 1467:2, 1467:8, 1474:1, 1475:20
**impeachables** [1] - 1458:19
**impeachment** [1] - 1475:9
**important** [3] - 1438:12, 1448:2, 1475:15

**impounded** [1] - 1455:17
**IN** [1] - 1343:1
**inappropriate** [1] - 1391:17
**incident** [4] - 1379:18, 1379:19, 1388:15, 1464:20
**include** [4] - 1352:13, 1376:12, 1376:13, 1376:15
**including** [3] - 1365:8, 1391:21, 1448:13
**incoming** [5] - 1372:13, 1372:25, 1377:19, 1378:6, 1397:7
**incorrect** [1] - 1442:15
**increase** [1] - 1476:18
**independent** [1] - 1360:13
**index** [1] - 1357:16
**INDEX** [1] - 1479:1
**indicated** [6] - 1358:16, 1368:16, 1383:23, 1409:6, 1436:11, 1436:15
**indicates** [1] - 1350:21
**indicating** [1] - 1422:13
**indication** [1] - 1419:19
**indications** [1] - 1370:10
**Indictment** [1] - 1431:4
**indictment** [1] - 1403:9
**individual** [6] - 1370:21, 1374:7, 1390:2, 1405:9, 1409:10, 1415:20
**individuals** [3] - 1361:20, 1407:14, 1416:25
**infection** [1] - 1468:11
**inference** [2] - 1466:13, 1466:14
**information** [27] - 1348:25, 1350:2, 1354:4, 1355:9, 1356:14, 1356:20, 1357:2, 1357:8, 1357:16, 1357:20, 1357:23, 1357:24, 1358:5, 1358:17, 1358:19, 1359:8, 1359:13, 1359:15, 1359:22, 1376:15, 1376:18, 1395:20, 1403:17, 1424:13, 1428:22, 1444:17, 1445:10
**initial** [9] - 1349:18, 1350:22, 1351:12, 1356:19, 1363:20, 1372:12, 1373:22, 1377:19, 1441:18
**initiated** [2] - 1405:10, 1449:23
**initiates** [1] - 1363:11
**injured** [1] - 1458:4
**inquire** [2] - 1467:1, 1473:25
**inside** [3] - 1375:22, 1450:3, 1450:7
**instance** [2] - 1381:22, 1464:18
**instances** [2] - 1361:13, 1361:16
**instead** [2] - 1379:5, 1461:5
**instruct** [1] - 1473:16
**instructed** [1] - 1381:12
**instruction** [4] - 1463:15, 1464:6, 1464:24, 1465:11
**instructions** [5] - 1458:16, 1459:4, 1460:4, 1461:2, 1463:2
**insult** [1] - 1424:2
**intended** [1] - 1427:13
**intends** [2] - 1467:2, 1474:1
**intensive** [1] - 1382:14

**intent** [1] - 1370:12
**intercepted** [1] - 1353:8
**interdict** [1] - 1407:20
**interdicted** [1] - 1407:17
**interest** [2] - 1355:16, 1374:8
**INTERPRETER** [6] - 1468:3, 1468:14, 1470:14, 1470:18, 1471:11, 1472:19
**interpreter** [3] - 1422:11, 1433:1, 1470:14
**Interpreter** [3] - 1344:3, 1344:4, 1468:3
**interrupt** [3] - 1466:25, 1472:22, 1473:24
**interstate** [1] - 1465:13
**interview** [13] - 1416:7, 1416:18, 1417:15, 1417:18, 1417:20, 1418:13, 1432:9, 1433:11, 1434:9, 1436:12, 1437:2, 1437:5, 1440:12
**interviewed** [1] - 1417:12
**interviewing** [3] - 1419:7, 1419:18, 1437:7
**interviews** [2] - 1405:13, 1416:5
**introduce** [2] - 1347:3, 1476:10
**introduction** [1] - 1441:18
**introductory** [1] - 1441:2
**inventoried** [1] - 1455:7
**inventory** [1] - 1455:9
**investigate** [3] - 1407:15, 1407:16, 1417:2
**investigated** [3] - 1425:12, 1425:23, 1426:4
**investigating** [5] - 1366:18, 1369:25, 1370:8, 1419:6, 1422:14
**investigation** [60] - 1347:24, 1348:21, 1348:23, 1349:15, 1349:16, 1355:2, 1358:19, 1361:14, 1361:16, 1362:9, 1370:12, 1370:18, 1370:20, 1371:12, 1371:16, 1374:8, 1376:16, 1378:9, 1378:12, 1378:14, 1378:16, 1379:22, 1383:4, 1384:5, 1386:16, 1387:17, 1387:21, 1389:17, 1392:15, 1392:20, 1392:21, 1393:20, 1403:19, 1403:24, 1405:21, 1405:25, 1406:4, 1408:13, 1409:18, 1412:20, 1415:12, 1416:20, 1416:22, 1425:9, 1425:24, 1426:4, 1429:19, 1431:10, 1431:11, 1431:16, 1435:14, 1440:1, 1444:10, 1447:11, 1450:12, 1451:4, 1451:19, 1453:4, 1453:7, 1453:16
**investigations** [5] - 1403:20, 1407:13, 1408:14, 1418:23, 1450:3
**investigative** [2] - 1358:11, 1412:25
**investigator** [5] - 1407:22, 1407:24, 1421:8, 1431:20, 1441:7
**investigators** [1] - 1375:8
**invite** [1] - 1444:13
**involved** [17] - 1348:20, 1370:19, 1374:6, 1375:9, 1377:4, 1392:14, 1406:13, 1407:9, 1409:10, 1410:8, 1430:17, 1448:6, 1448:8, 1462:23, 1465:14, 1471:7, 1472:4

**issue** [1] - 1356:8
**item** [1] - 1447:24
**itself** [1] - 1386:2

## J

**jail** [1] - 1472:12
**January** [4] - 1356:14, 1359:21, 1360:16, 1384:3
**jelly** [1] - 1413:13
**Jelly** [1] - 1348:9
**Jersey** [2] - 1418:24, 1418:25
**JESUS** [1] - 1343:6, 1479:2
**Jesus** [2] - 1343:16, 1385:4
**job** [2] - 1381:11, 1470:11
**join** [1] - 1401:9
**joint** [1] - 1402:11
**Joseph** [2] - 1353:7, 1387:18
**JR** [1] - 1343:11
**Jr** [1] - 1343:4
**Juano** [2] - 1383:10, 1446:11
**judge** [1] - 1469:5
**Judge** [15] - 1367:23, 1389:12, 1438:15, 1459:7, 1459:10, 1459:16, 1459:21, 1459:22, 1460:9, 1466:11, 1466:23, 1470:6, 1473:15, 1476:16, 1477:18
**judgment** [1] - 1462:11
**July** [5] - 1373:21, 1386:1, 1386:3, 1388:1, 1409:7
**jumping** [1] - 1348:11
**June** [3] - 1383:18, 1383:21, 1386:15
**JUROR** [3] - 1461:20, 1461:21, 1461:25
**Juror** [2] - 1346:2, 1346:3
**jurors** [1] - 1426:15
**jury** [45] - 1345:5, 1345:22, 1345:24, 1346:22, 1347:5, 1347:20, 1349:7, 1350:6, 1352:2, 1353:22, 1354:22, 1363:3, 1370:23, 1374:17, 1374:24, 1375:3, 1378:19, 1379:3, 1381:10, 1381:12, 1382:24, 1383:25, 1386:4, 1386:11, 1397:21, 1400:16, 1400:24, 1401:7, 1401:11, 1420:9, 1420:11, 1420:20, 1429:12, 1439:1, 1456:15, 1458:11, 1459:1, 1460:3, 1460:15, 1461:2, 1464:6, 1466:3, 1466:12, 1473:16, 1476:16
**JURY** [1] - 1343:11
**Jury** [10] - 1345:25, 1368:19, 1420:13, 1421:2, 1435:24, 1436:1, 1436:2, 1462:1, 1468:2, 1468:4
**jury's** [1] - 1467:8
**juvenile** [6] - 1386:5, 1409:10, 1409:14, 1410:1, 1449:24, 1450:3
**juveniles** [1] - 1449:11

## K

**keep** [3] - 1373:19, 1389:8, 1477:14

**Kelly** [46] - 1344:3, 1346:10, 1346:14, 1346:20, 1351:21, 1353:15, 1354:21, 1358:18, 1361:14, 1369:23, 1370:19, 1374:19, 1375:3, 1377:2, 1377:12, 1382:7, 1384:14, 1389:5, 1389:22, 1391:22, 1392:1, 1392:21, 1400:20, 1401:13, 1401:22, 1403:1, 1404:9, 1406:11, 1412:6, 1417:24, 1421:7, 1423:4, 1431:19, 1432:19, 1440:8, 1449:7, 1450:15, 1451:1, 1451:18, 1451:23, 1452:9, 1470:19, 1471:1, 1471:19
**KELLY** [2] - 1346:16, 1479:19
**kept** [3] - 1471:21, 1471:22, 1475:17
**Kerlin** [1] - 1472:25
**KEVIN** [1] - 1343:7
**Kevin** [1] - 1343:18
**kids'** [1] - 1420:4
**kind** [7] - 1394:23, 1423:10, 1439:9, 1458:12, 1468:11, 1475:6
**kindly** [1] - 1444:20
**Kirchgessner** [1] - 1344:3
**Kitiguao** [1] - 1387:24
**knowing** [1] - 1447:8
**knowledge** [8] - 1354:13, 1370:16, 1394:3, 1426:3, 1435:8, 1464:12, 1464:17, 1464:20
**KY** [1] - 1348:9

## L

**labor** [1] - 1435:15
**ladies** [17] - 1346:21, 1347:19, 1349:7, 1350:6, 1352:2, 1353:22, 1363:3, 1374:17, 1374:23, 1378:19, 1380:4, 1382:24, 1383:25, 1386:11, 1397:21, 1400:16, 1414:7
**landing** [1] - 1375:7
**language** [1] - 1427:14
**large** [5] - 1348:2, 1415:15, 1415:17, 1415:22, 1418:6
**last** [14] - 1351:1, 1358:24, 1364:6, 1368:11, 1369:13, 1381:24, 1382:7, 1393:4, 1402:13, 1407:9, 1457:5, 1457:7, 1467:20, 1472:11
**late** [1] - 1359:5
**lateness** [1] - 1369:15
**Latino** [4] - 1399:24, 1405:12, 1415:13, 1430:15
**laughed** [1] - 1424:5
**laughing** [3] - 1423:22, 1441:17, 1442:10
**laughter** [2] - 1409:4, 1461:22
**Laughter** [2] - 1367:16, 1459:23
**Laurel** [2] - 1393:9, 1393:10
**law** [11] - 1357:16, 1364:8, 1370:2, 1384:24, 1405:10, 1419:21, 1431:22, 1443:14, 1445:17, 1453:19, 1454:3
**laws** [1] - 1466:24

**lawyers** [2] - 1460:16, 1461:14
**lead** [1] - 1422:8
**learn** [2] - 1363:24, 1469:18
**learned** [3] - 1365:19, 1410:7, 1425:9
**learning** [1] - 1362:5
**lease** [1] - 1413:22
**least** [7] - 1345:12, 1367:6, 1448:22, 1457:22, 1469:10, 1469:19, 1469:21
**leave** [5] - 1368:12, 1426:20, 1427:2, 1429:9, 1457:20
**Lee** [5] - 1432:21, 1433:3, 1433:4, 1434:13, 1471:4
**left** [8] - 1346:20, 1352:15, 1372:23, 1389:19, 1390:8, 1397:22, 1414:9, 1477:22
**left-hand** [1] - 1390:8
**length** [4] - 1378:12, 1378:16, 1389:23, 1432:11
**lengthy** [4] - 1380:22, 1422:2, 1425:24, 1432:15
**less** [5] - 1394:20, 1395:11, 1413:20, 1414:13, 1471:23
**letter** [3] - 1422:15, 1436:15, 1476:7
**letters** [3] - 1468:17, 1469:7, 1469:15
**level** [1] - 1417:4
**levity** [1] - 1460:11
**liar** [1] - 1391:22
**license** [2] - 1454:7, 1454:9
**lie** [3] - 1409:22, 1410:9, 1410:11
**life** [3] - 1470:4, 1472:2, 1472:4
**light** [2] - 1462:21, 1464:7
**likely** [1] - 1462:22
**likewise** [2] - 1454:11, 1455:21
**limine** [1] - 1462:16
**limit** [1] - 1357:19
**line** [8] - 1349:10, 1351:5, 1385:1, 1385:22, 1386:9, 1387:11, 1410:8, 1425:7
**Line** [1] - 1388:3
**lines** [2] - 1351:3, 1444:11
**link** [1] - 1381:23
**listed** [10] - 1357:6, 1357:10, 1366:2, 1390:2, 1399:6, 1446:8, 1446:11, 1446:13, 1446:15, 1446:18
**listen** [4] - 1441:12, 1470:7, 1470:8, 1472:23
**listened** [1] - 1470:9
**listening** [1] - 1457:15
**lived** [5] - 1362:2, 1425:15, 1426:6, 1435:16, 1469:20
**living** [2] - 1358:9, 1425:18
**locate** [3] - 1348:24, 1350:2, 1372:5
**located** [8] - 1387:12, 1387:20, 1424:8, 1428:23, 1428:24, 1455:25, 1456:2
**location** [36] - 1347:9, 1347:12, 1352:6, 1364:11, 1380:14, 1381:2, 1381:8, 1385:3, 1385:14, 1385:15, 1385:23, 1386:4, 1387:14, 1393:6, 1393:21, 1393:25, 1399:22, 1399:23, 1403:18, 1403:21, 1404:19, 1404:24, 1405:8,

1405:17, 1409:11, 1409:14, 1410:1,
1413:15, 1414:7, 1414:14, 1414:23,
1414:24, 1415:10, 1415:11, 1444:16
**locations** [16] - 1361:22, 1384:6,
1384:10, 1388:19, 1388:21, 1390:20,
1390:25, 1414:16, 1414:18, 1414:21,
1414:22, 1415:10, 1425:20, 1455:22,
1455:23, 1455:25
**lockup** [1] - 1477:17
**lodged** [1] - 1380:17
**logs** [1] - 1378:5
**Lombard** [1] - 1344:24
**look** [16] - 1354:15, 1364:15, 1364:18,
1365:11, 1372:16, 1373:14, 1392:7,
1395:20, 1415:10, 1416:25, 1417:23,
1419:3, 1427:16, 1445:4, 1446:8
**looked** [2] - 1371:13, 1468:10
**looking** [7] - 1371:3, 1372:22, 1395:7,
1404:18, 1452:11, 1455:10, 1471:2
**looks** [7] - 1363:2, 1365:3, 1365:6,
1366:10, 1366:12, 1395:11
**loose** [1] - 1445:25
**losing** [1] - 1413:21
**loss** [2] - 1370:6, 1370:15
**lotions** [1] - 1394:16
**loud** [1] - 1389:9
**love** [1] - 1469:5
**lovely** [1] - 1381:19
**low** [2] - 1417:3, 1425:2
**lucrative** [2] - 1449:18, 1449:20
**lunch** [1] - 1442:23
**Luncheon** [1] - 1420:16
**lure** [2] - 1371:5, 1371:11

## M

**ma'am** [12] - 1346:24, 1347:11, 1364:1,
1366:17, 1403:12, 1403:14, 1404:12,
1404:17, 1405:19, 1405:23, 1406:3,
1452:3
**machete** [2] - 1450:17, 1450:18
**machetes** [1] - 1451:2
**machines** [1] - 1470:22
**Mafia** [3] - 1416:24, 1417:5, 1419:4
**magazine** [1] - 1375:22
**main** [1] - 1362:13
**maintained** [3] - 1353:9, 1365:2, 1469:4
**majority** [3] - 1415:12, 1425:5, 1443:9
**male** [5] - 1364:5, 1403:16, 1408:22,
1426:11, 1427:13
**males** [3] - 1408:8, 1408:10, 1430:20
**man** [11] - 1403:13, 1408:22, 1415:23,
1418:20, 1427:12, 1432:14, 1432:24,
1433:6, 1433:8, 1434:17, 1435:2
**Management** [1] - 1393:9
**Mann** [1] - 1465:23
**manner** [1] - 1427:6
**map** [3] - 1350:4, 1350:18, 1351:1
**mapped** [1] - 1351:8

**March** [14] - 1345:16, 1345:17, 1356:15,
1359:23, 1378:20, 1380:7, 1380:8,
1382:21, 1384:3, 1448:9, 1453:18,
1467:25, 1469:13
**Margarita** [2] - 1364:20, 1369:3
**marginal** [1] - 1367:10
**Marian** [6] - 1397:24, 1398:1, 1426:17,
1428:8, 1428:13, 1428:19
**Marian's** [1] - 1428:16
**mark** [1] - 1433:12
**marked** [7] - 1347:3, 1347:14, 1353:11,
1355:18, 1357:5, 1362:23, 1364:17,
1366:5, 1371:18, 1377:5, 1396:17,
1437:17
**MARSHAL** [2] - 1477:18, 1477:22
**Marshals** [2] - 1401:12, 1477:14
**Marshals'** [1] - 1474:24
**Marta** [1] - 1344:4
**Martin** [3] - 1344:23, 1478:1, 1478:7
**MARYLAND** [1] - 1343:1
**Maryland** [17] - 1343:8, 1344:24,
1345:3, 1350:8, 1350:10, 1351:6,
1351:9, 1351:11, 1351:15, 1353:25,
1354:11, 1362:18, 1385:5, 1385:8,
1393:9, 1451:3, 1457:17
**masculine** [1] - 1427:12
**matter** [1] - 1478:4
**MATTER** [1] - 1343:10
**matters** [3] - 1466:21, 1466:22, 1473:23
**McDonald's** [3] - 1347:1, 1347:7,
1372:9
**mean** [15] - 1360:2, 1360:6, 1369:8,
1402:4, 1423:14, 1424:1, 1428:12,
1429:18, 1440:13, 1443:8, 1443:13,
1453:6, 1456:25, 1457:6, 1476:20
**meaningful** [1] - 1402:2
**means** [4] - 1362:19, 1396:15, 1429:5,
1430:1
**meant** [5] - 1368:18, 1416:17, 1426:22,
1428:2, 1453:7
**meet** [3] - 1442:24, 1458:15, 1467:21
**meeting** [2] - 1345:21, 1443:10
**Melendez** [2] - 1364:7, 1377:24
**members** [2] - 1420:9, 1460:15
**memory** [2] - 1404:15, 1429:3
**men** [4] - 1409:18, 1449:13, 1468:12,
1468:15
**mention** [2] - 1423:21, 1427:11
**mentioned** [9] - 1353:20, 1374:2,
1376:5, 1382:20, 1392:4, 1395:15,
1405:20, 1415:20, 1449:23
**mentioning** [1] - 1417:19
**mere** [1] - 1357:16
**Merit** [1] - 1478:1
**message** [21] - 1375:14, 1377:21,
1377:22, 1396:20, 1397:15, 1397:18,
1398:10, 1398:20, 1398:21, 1398:23,
1399:7, 1400:13, 1400:18, 1423:21,
1427:17, 1428:12, 1428:24, 1451:13,
1452:12, 1452:17, 1452:22

**messages** [4] - 1375:12, 1396:7,
1398:16, 1451:5
**met** [2] - 1471:5, 1476:6
**meters** [1] - 1354:3
**Mexican** [1] - 1403:9
**Mexico** [2] - 1406:22, 1408:3
**Mi** [1] - 1377:19
**Michael** [2] - 1343:14, 1343:19
**microphone** [1] - 1356:5
**mics** [1] - 1356:6
**middle** [1] - 1457:21
**midnight** [1] - 1354:2
**might** [11] - 1359:1, 1382:15, 1401:24,
1415:21, 1417:10, 1417:21, 1420:4,
1441:22, 1449:21, 1449:24, 1467:7
**Mike** [1] - 1474:9
**minimum** [1] - 1351:5
**minutes** [5] - 1354:2, 1363:20, 1363:21,
1420:11, 1461:13
**Miranda** [1] - 1357:17
**misquoted** [1] - 1396:23
**missed** [1] - 1378:7
**misspoke** [1] - 1369:7
**mistreat** [1] - 1464:22
**model** [1] - 1378:6
**modified** [1] - 1389:18
**moment** [4] - 1361:6, 1379:6, 1404:16,
1472:19
**Monday** [4] - 1350:14, 1350:15,
1400:21, 1428:17
**money** [4] - 1394:23, 1412:19, 1415:15,
1415:18
**monitoring** [1] - 1382:15
**Montemarano** [9] - 1343:19, 1356:8,
1440:4, 1463:4, 1466:5, 1472:23,
1472:24, 1473:24, 1475:9
**MONTEMARANO** [68] - 1345:7,
1355:20, 1356:18, 1358:1, 1358:3,
1359:1, 1359:24, 1360:7, 1360:10,
1360:18, 1366:21, 1367:5, 1380:11,
1380:13, 1381:1, 1381:4, 1381:8,
1381:19, 1391:4, 1391:10, 1391:17,
1401:9, 1402:9, 1402:18, 1402:22,
1404:1, 1404:6, 1404:20, 1404:25,
1440:5, 1440:7, 1440:14, 1442:2,
1442:6, 1444:14, 1444:16, 1444:20,
1444:23, 1445:1, 1445:3, 1447:2,
1447:15, 1449:1, 1450:8, 1453:13,
1453:15, 1456:4, 1457:3, 1458:23,
1459:2, 1460:1, 1463:6, 1463:19,
1464:16, 1465:10, 1465:25, 1472:25,
1473:4, 1473:6, 1473:12, 1474:9,
1474:13, 1474:16, 1474:18, 1475:10,
1475:15, 1475:25, 1476:3
**MONTEMARANO.........** [1] - 1479:12
**MONTEMARANO............** [1] - 1479:11
**month** [7] - 1390:16, 1413:15, 1414:13,
1414:14, 1414:15, 1414:21, 1457:5
**months** [7] - 1368:20, 1393:4, 1467:25,
1468:18, 1474:16

**morning** [15] - 1345:10, 1345:21, 1346:1, 1346:10, 1350:25, 1351:16, 1371:21, 1452:14, 1456:22, 1457:13, 1459:3, 1461:12, 1461:17, 1477:13
**Most** [1] - 1431:5
**most** [6] - 1381:11, 1430:24, 1454:2, 1462:21, 1463:10
**motion** [1] - 1465:4
**MOTIONS** [1] - 1479:13
**motions** [6] - 1345:16, 1345:17, 1462:10, 1462:16, 1463:4, 1466:3
**move** [3] - 1346:4, 1407:6, 1462:11
**moved** [3] - 1353:25, 1435:16, 1472:5
**movement** [3] - 1350:22, 1351:22, 1352:16
**moving** [4] - 1350:19, 1400:17, 1429:15, 1429:21
**MR** [170] - 1345:7, 1345:8, 1355:20, 1356:18, 1358:1, 1358:3, 1359:1, 1359:24, 1360:7, 1360:10, 1360:18, 1361:6, 1366:21, 1366:23, 1367:5, 1367:13, 1367:17, 1368:11, 1368:15, 1369:8, 1369:14, 1369:19, 1371:7, 1373:23, 1373:25, 1380:11, 1380:13, 1381:1, 1381:4, 1381:8, 1381:19, 1391:4, 1391:10, 1391:17, 1391:23, 1398:12, 1401:2, 1401:6, 1401:9, 1401:20, 1402:7, 1402:9, 1402:13, 1402:18, 1402:22, 1402:23, 1404:1, 1404:6, 1404:20, 1404:25, 1406:8, 1406:10, 1407:25, 1408:25, 1409:5, 1410:18, 1415:16, 1420:7, 1420:25, 1421:4, 1421:6, 1422:22, 1422:25, 1423:2, 1423:3, 1427:18, 1427:20, 1427:21, 1428:6, 1433:12, 1433:18, 1433:21, 1433:25, 1434:2, 1434:5, 1436:5, 1436:8, 1436:10, 1437:17, 1437:20, 1437:21, 1438:14, 1438:20, 1439:8, 1440:2, 1440:5, 1440:7, 1440:14, 1442:1, 1442:2, 1442:6, 1444:14, 1444:16, 1444:20, 1444:22, 1444:23, 1444:24, 1445:1, 1445:3, 1447:2, 1447:15, 1449:1, 1450:8, 1451:15, 1453:11, 1453:13, 1453:15, 1456:4, 1456:12, 1456:19, 1457:1, 1457:3, 1457:6, 1457:7, 1458:22, 1458:23, 1459:2, 1459:6, 1459:13, 1459:16, 1459:19, 1459:20, 1460:1, 1460:9, 1462:9, 1462:11, 1463:3, 1463:6, 1463:19, 1463:21, 1464:2, 1464:14, 1464:16, 1465:10, 1465:25, 1466:7, 1467:3, 1467:5, 1467:14, 1467:18, 1472:10, 1472:16, 1472:25, 1473:4, 1473:6, 1473:12, 1474:3, 1474:5, 1474:7, 1474:9, 1474:11, 1474:13, 1474:14, 1474:16, 1474:17, 1474:18, 1475:1, 1475:4, 1475:10, 1475:15, 1475:25, 1476:3, 1476:5, 1477:1, 1477:6, 1477:10, 1477:16, 1479:10, 1479:11, 1479:12

**MS** [88] - 1345:6, 1345:23, 1346:9, 1346:19, 1347:16, 1347:18, 1348:7, 1348:10, 1355:25, 1356:7, 1358:16, 1358:24, 1359:6, 1359:15, 1359:18, 1359:20, 1360:2, 1360:6, 1360:19, 1360:24, 1361:4, 1361:10, 1364:22, 1366:4, 1368:3, 1368:9, 1368:24, 1369:2, 1369:18, 1369:20, 1369:22, 1371:17, 1374:1, 1374:16, 1374:22, 1375:2, 1379:6, 1379:8, 1380:14, 1380:20, 1381:2, 1381:14, 1382:2, 1382:6, 1384:12, 1389:3, 1389:5, 1389:11, 1390:10, 1392:1, 1392:3, 1396:23, 1397:1, 1397:13, 1398:15, 1401:10, 1401:16, 1402:25, 1403:7, 1404:8, 1404:22, 1405:4, 1406:6, 1408:23, 1420:21, 1421:1, 1422:20, 1422:24, 1423:1, 1427:19, 1428:4, 1438:5, 1438:9, 1438:13, 1439:22, 1444:15, 1444:18, 1449:4, 1449:6, 1450:10, 1450:22, 1450:25, 1451:16, 1451:17, 1453:9, 1456:10, 1479:10, 1479:11
**Muerte** [1] - 1375:20
**multiple** [1] - 1348:23
**multiply** [1] - 1414:17
**murder** [1] - 1422:14
**must** [3] - 1468:12, 1468:13, 1468:14

# N

**name** [14] - 1346:12, 1352:22, 1352:23, 1352:25, 1358:6, 1364:6, 1381:10, 1388:5, 1395:15, 1396:21, 1403:1, 1437:9, 1471:4
**named** [5] - 1370:21, 1403:2, 1403:13, 1405:9, 1414:9
**names** [1] - 1362:18
**national** [1] - 1403:9
**nature** [1] - 1455:10
**near** [1] - 1469:20
**nearly** [1] - 1376:6
**necessarily** [2] - 1443:12, 1468:22
**necessary** [2] - 1401:24, 1402:8
**need** [10] - 1358:5, 1360:19, 1360:21, 1389:6, 1391:10, 1438:17, 1447:22, 1459:18, 1473:10, 1476:15
**needs** [3] - 1420:24, 1457:4, 1471:12
**negative** [2] - 1423:11, 1466:14
**negotiated** [1] - 1477:4
**net** [3] - 1414:7, 1452:5, 1452:7
**never** [15] - 1401:6, 1421:9, 1435:5, 1444:5, 1447:16, 1447:19, 1465:20, 1468:5, 1468:6, 1468:8, 1468:9, 1468:21, 1469:14, 1469:23, 1472:5
**New** [4] - 1418:23, 1418:24
**new** [1] - 1369:2
**next** [16] - 1350:24, 1350:25, 1351:13, 1357:11, 1363:17, 1380:3, 1385:1,

1385:14, 1385:22, 1386:9, 1386:17, 1387:11, 1407:5, 1461:9, 1465:9, 1473:11
**night** [2] - 1353:6, 1461:19
**Nissan** [4] - 1385:13, 1387:5, 1411:6, 1450:19
**Niño** [1] - 1377:19
**nobody** [1] - 1470:12
**non** [3] - 1404:1, 1404:3, 1417:16
**non-government** [1] - 1417:16
**none** [1] - 1464:23
**nonetheless** [1] - 1408:1
**Norfo** [2] - 1383:14, 1446:16
**Norfolk** [5] - 1348:16, 1353:5, 1353:8, 1387:18, 1387:24
**normal** [1] - 1412:24
**normally** [2] - 1413:19, 1430:14
**NORTHERN** [1] - 1343:2
**notch** [1] - 1368:7
**note** [2] - 1395:2, 1396:7
**noted** [2] - 1408:21, 1425:4
**noteworthy** [1] - 1393:5
**nothing** [1] - 1465:15
**notice** [1] - 1402:5
**notwithstanding** [1] - 1418:16
**November** [35] - 1349:11, 1370:20, 1371:20, 1372:3, 1373:3, 1373:8, 1374:4, 1379:1, 1383:15, 1383:17, 1383:22, 1384:21, 1386:13, 1386:20, 1387:5, 1387:8, 1387:9, 1388:3, 1391:1, 1393:21, 1399:5, 1399:15, 1400:7, 1411:2, 1411:16, 1411:20, 1429:14, 1432:20, 1433:14, 1447:3, 1448:14, 1448:24, 1452:13, 1452:19, 1474:22
**nowhere** [1] - 1457:21
**nth** [2] - 1357:23
**number** [106] - 1346:22, 1346:25, 1347:9, 1349:1, 1349:3, 1349:6, 1349:8, 1349:9, 1349:14, 1349:18, 1349:19, 1349:20, 1349:22, 1353:20, 1354:8, 1358:10, 1359:10, 1362:7, 1362:9, 1362:10, 1362:11, 1362:12, 1363:4, 1363:12, 1364:8, 1364:14, 1364:20, 1371:4, 1371:5, 1371:6, 1371:10, 1371:11, 1371:12, 1371:15, 1371:23, 1371:24, 1372:6, 1372:7, 1372:8, 1372:10, 1372:11, 1372:13, 1372:20, 1372:21, 1372:23, 1373:13, 1377:11, 1377:14, 1377:16, 1377:17, 1377:20, 1378:18, 1379:15, 1379:17, 1379:20, 1379:24, 1380:3, 1380:5, 1383:5, 1383:19, 1383:22, 1383:24, 1384:1, 1384:15, 1384:16, 1384:17, 1385:1, 1385:2, 1385:7, 1385:15, 1385:23, 1386:2, 1386:15, 1386:17, 1386:21, 1386:24, 1387:2, 1387:14, 1387:19, 1387:20, 1395:23, 1396:2, 1396:3, 1397:5, 1397:8, 1405:5, 1405:20, 1410:11, 1411:2, 1412:9,

1418:6, 1424:19, 1425:6, 1442:1, 1445:13, 1445:17, 1445:18, 1445:19, 1446:1, 1446:2, 1447:10
**Number** [29] - 1346:2, 1346:3, 1346:5, 1346:6, 1346:7, 1347:4, 1356:13, 1356:19, 1358:14, 1360:20, 1377:16, 1379:2, 1379:3, 1379:13, 1380:4, 1382:23, 1383:24, 1386:22, 1390:8, 1390:22, 1397:3, 1433:13, 1437:18, 1446:8
**numbers** [24] - 1354:14, 1361:21, 1371:16, 1373:19, 1373:22, 1383:3, 1384:11, 1386:10, 1388:8, 1388:13, 1389:14, 1389:15, 1390:4, 1392:9, 1392:14, 1392:17, 1392:19, 1395:23, 1405:24, 1406:2, 1413:7, 1445:6, 1445:10
**numerically** [1] - 1424:24
**numerous** [3] - 1372:4, 1374:11, 1453:19

# O

**o'clock** [1] - 1459:20
**oath** [2] - 1346:12, 1443:1
**object** [1] - 1369:9
**objection** [21] - 1355:20, 1356:3, 1356:17, 1366:21, 1369:12, 1371:7, 1380:11, 1381:1, 1391:4, 1401:2, 1404:1, 1404:4, 1404:20, 1404:25, 1408:23, 1422:20, 1438:6, 1438:11, 1439:22, 1450:8, 1457:11
**objectionable** [3] - 1367:19, 1367:24, 1438:10
**objections** [1] - 1460:7
**obligation** [2] - 1460:23, 1473:18
**observe** [4] - 1356:19, 1360:12, 1362:6, 1393:5
**observed** [10] - 1348:17, 1352:3, 1352:6, 1353:5, 1358:7, 1393:15, 1399:8, 1399:11, 1399:23, 1465:20
**observes** [1] - 1357:6
**observing** [1] - 1352:13
**obtain** [10] - 1348:25, 1352:23, 1378:2, 1378:4, 1378:10, 1392:19, 1397:17, 1400:12, 1439:18, 1439:20
**obtained** [6] - 1346:25, 1356:14, 1376:15, 1383:2, 1394:21, 1442:16
**obvious** [1] - 1470:8
**occasion** [6] - 1451:7, 1451:8, 1451:9, 1463:14, 1467:21, 1472:13
**occasions** [3] - 1409:24, 1412:9, 1432:14
**occurred** [7] - 1355:23, 1367:1, 1381:6, 1391:7, 1401:4, 1424:9, 1456:7
**occurrences** [1] - 1361:17
**October** [5] - 1398:11, 1426:16, 1428:21, 1447:3, 1455:15
**OF** [5] - 1343:1, 1343:4, 1345:1, 1479:6,

1479:14
**of..** [2] - 1368:16, 1368:20
**offense** [3] - 1454:8, 1474:21, 1475:5
**offenses** [2] - 1454:4, 1474:6
**offered** [1] - 1471:23
**offering** [1] - 1438:10
**Office** [1] - 1393:16
**officer** [5] - 1358:7, 1366:15, 1370:3, 1370:11, 1431:22
**officers** [2] - 1348:20, 1378:10
**offices** [1] - 1418:24
**often** [2] - 1377:3, 1409:22
**old** [2] - 1423:24, 1459:11
**older** [3] - 1409:3, 1409:19, 1449:14
**ON** [1] - 1343:10
**once** [9] - 1351:12, 1351:22, 1365:1, 1367:6, 1405:11, 1418:10, 1436:13, 1455:23, 1465:10
**one** [76] - 1345:8, 1356:9, 1356:10, 1357:5, 1357:6, 1361:6, 1368:6, 1368:24, 1368:25, 1369:12, 1374:19, 1375:7, 1376:22, 1376:24, 1377:19, 1382:16, 1386:12, 1391:13, 1403:23, 1409:25, 1413:10, 1414:25, 1415:21, 1416:4, 1416:7, 1416:24, 1417:11, 1417:19, 1418:2, 1418:3, 1419:3, 1419:4, 1419:17, 1423:7, 1423:14, 1423:15, 1423:16, 1423:23, 1424:2, 1425:3, 1425:15, 1429:16, 1434:25, 1436:8, 1441:7, 1441:15, 1444:16, 1444:18, 1445:9, 1445:16, 1447:24, 1448:15, 1448:16, 1448:17, 1448:22, 1451:7, 1451:8, 1451:9, 1455:6, 1462:16, 1463:13, 1463:23, 1464:3, 1464:18, 1464:20, 1469:10, 1470:22, 1472:19, 1474:7, 1474:9, 1476:11, 1477:22
**one's** [1] - 1367:4
**ones** [2] - 1407:12, 1425:3
**operated** [4] - 1385:13, 1387:9, 1388:4, 1450:19
**operating** [1] - 1448:8
**operation** [2] - 1448:13, 1448:23
**operational** [1] - 1448:18
**operator** [2] - 1414:6, 1414:10
**operators** [1] - 1416:24
**opinion** [2] - 1367:8, 1476:13
**opportunity** [5] - 1345:12, 1466:21, 1468:5, 1469:24, 1477:21
**opposed** [1] - 1382:16
**options** [1] - 1475:21
**order** [4] - 1351:4, 1436:16, 1439:18, 1463:8
**ordered** [1] - 1468:7
**organization** [4] - 1417:1, 1417:17, 1419:4, 1448:13
**organize** [1] - 1367:4
**original** [2] - 1359:3, 1444:21
**Oscar** [1] - 1377:17
**Oskar** [1] - 1377:23

**otherwise** [2] - 1368:5, 1471:12
**outgoing** [5] - 1363:19, 1372:12, 1372:25, 1378:7, 1397:7
**outlined** [1] - 1476:7
**outside** [5] - 1347:1, 1351:17, 1361:1, 1430:16, 1470:10
**overall** [1] - 1354:21
**overarching** [1] - 1464:20
**overruled** [8] - 1360:17, 1367:12, 1371:9, 1380:16, 1382:4, 1404:21, 1405:1, 1439:24
**own** [1] - 1460:5
**owner** [1] - 1414:10
**owner's** [1] - 1413:1
**owner/operator** [1] - 1405:19
**owners** [3] - 1416:23, 1417:5, 1419:3
**owns** [1] - 1418:20

# P

**p.m** [12] - 1350:13, 1350:23, 1351:24, 1352:1, 1352:5, 1352:9, 1352:10, 1399:17, 1420:16, 1420:17, 1452:19, 1459:8
**Pacha** [3] - 1382:3, 1383:13, 1446:16
**PAGE** [1] - 1479:6
**Page** [9] - 1355:19, 1356:8, 1375:6, 1379:5, 1384:13, 1395:7, 1433:13, 1438:4, 1442:2
**page** [6] - 1356:3, 1377:6, 1377:10, 1418:15, 1440:17
**pages** [6] - 1396:18, 1417:25, 1418:6, 1418:12, 1418:14, 1440:25
**paid** [4] - 1413:18, 1413:19, 1414:8, 1469:3
**paperwork** [1] - 1411:24
**papi** [6] - 1429:24, 1430:1, 1430:2, 1430:3, 1430:13, 1430:24
**Pardon** [2] - 1397:23, 1428:7
**pardon** [4] - 1371:22, 1377:21, 1383:7, 1407:20
**part** [18] - 1345:14, 1357:18, 1358:5, 1360:10, 1371:16, 1382:8, 1385:6, 1388:14, 1392:21, 1393:20, 1398:3, 1407:17, 1425:14, 1431:11, 1433:17, 1434:9, 1436:25, 1454:2
**participate** [2] - 1374:2, 1411:22
**participated** [1] - 1399:21
**participating** [1] - 1361:23
**particular** [26] - 1354:10, 1360:15, 1361:2, 1361:16, 1361:17, 1370:25, 1376:6, 1377:8, 1378:2, 1380:15, 1384:10, 1388:21, 1397:11, 1397:15, 1398:10, 1399:23, 1404:19, 1405:8, 1412:21, 1414:10, 1422:8, 1428:22, 1444:9, 1444:11, 1453:8
**particularly** [3] - 1366:19, 1370:1, 1449:11
**parts** [1] - 1397:10

**pass** [2] - 1374:18, 1450:21
**past** [4] - 1345:16, 1367:9, 1450:2, 1474:22
**patient** [1] - 1395:5
**Patrol** [4] - 1406:16, 1407:8, 1407:16, 1407:21
**patrol** [2] - 1407:10, 1407:20
**patrolled** [2] - 1407:17, 1407:19
**Pause** [1] - 1361:9
**pay** [6] - 1413:16, 1413:17, 1413:22, 1413:23, 1413:24, 1463:22
**paying** [2] - 1415:5, 1470:7
**payment** [1] - 1452:6
**Pelon** [1] - 1362:16
**pen** [2] - 1348:23, 1355:8
**Pennsylvania** [1] - 1470:20
**penny** [1] - 1470:7
**people** [27] - 1358:9, 1361:21, 1370:7, 1376:20, 1382:13, 1384:24, 1388:14, 1405:14, 1405:15, 1406:21, 1407:1, 1407:11, 1408:2, 1408:16, 1408:20, 1409:21, 1410:8, 1412:9, 1417:15, 1429:22, 1430:17, 1433:7, 1434:24, 1444:10, 1448:3, 1448:6, 1448:8
**per** [10] - 1412:24, 1413:4, 1413:15, 1414:14, 1414:15, 1414:21
**Percy** [1] - 1409:2
**perfect** [1] - 1465:16
**perfectly** [1] - 1444:1
**perform** [1] - 1407:24
**performed** [1] - 1407:23
**performing** [1] - 1464:8
**perhaps** [4] - 1358:8, 1425:22, 1449:20, 1460:22
**period** [9] - 1345:9, 1378:3, 1380:22, 1389:16, 1389:24, 1390:12, 1390:17, 1412:21, 1415:18
**periods** [6] - 1378:13, 1389:25, 1390:2, 1390:3, 1390:16
**perjured** [1] - 1476:17
**permit** [1] - 1475:9
**permitted** [2] - 1357:20, 1402:12
**person** [20] - 1358:6, 1374:9, 1377:22, 1384:22, 1395:16, 1412:17, 1414:16, 1422:8, 1431:24, 1434:18, 1434:22, 1443:6, 1445:23, 1447:24, 1457:13, 1471:6, 1471:7, 1472:3
**personal** [2] - 1349:10, 1432:6
**personally** [1] - 1403:21
**persons** [1] - 1355:16
**perspective** [1] - 1449:17
**phon** [1] - 1471:22
**phone** [144] - 1349:1, 1349:3, 1349:11, 1349:15, 1349:18, 1349:23, 1349:25, 1350:8, 1350:19, 1350:20, 1350:21, 1350:24, 1351:3, 1351:10, 1352:15, 1353:23, 1353:25, 1354:4, 1354:7, 1354:9, 1354:11, 1356:12, 1356:23, 1357:6, 1358:5, 1358:10, 1359:9, 1359:10, 1361:11, 1361:20, 1362:7,

1362:21, 1362:25, 1363:21, 1364:8, 1364:14, 1364:19, 1364:20, 1365:7, 1370:23, 1371:4, 1371:5, 1371:6, 1371:10, 1371:11, 1372:4, 1372:9, 1372:15, 1372:17, 1372:24, 1373:13, 1373:22, 1374:3, 1374:15, 1374:23, 1376:4, 1377:16, 1377:17, 1377:18, 1377:21, 1377:23, 1378:2, 1378:6, 1378:8, 1378:15, 1378:24, 1379:13, 1379:20, 1379:23, 1379:25, 1380:6, 1382:24, 1383:10, 1383:11, 1383:14, 1383:16, 1383:17, 1383:18, 1383:19, 1383:21, 1384:11, 1384:22, 1384:24, 1384:25, 1385:15, 1386:2, 1386:12, 1386:14, 1387:6, 1387:8, 1387:17, 1387:19, 1388:3, 1388:8, 1388:12, 1389:14, 1389:15, 1392:8, 1395:18, 1395:25, 1396:5, 1396:8, 1396:13, 1397:4, 1397:5, 1398:5, 1398:20, 1423:4, 1423:7, 1423:9, 1423:13, 1424:8, 1424:9, 1424:12, 1424:19, 1424:23, 1425:4, 1425:5, 1427:5, 1444:11, 1445:6, 1445:10, 1445:22, 1446:1, 1446:9, 1446:11, 1446:13, 1446:21, 1446:25, 1447:16, 1447:23, 1451:11, 1457:13, 1470:24
**phone-by-phone** [1] - 1378:15
**Phones** [1] - 1383:13
**phones** [55] - 1347:21, 1347:23, 1347:24, 1347:25, 1348:21, 1349:22, 1350:1, 1352:8, 1354:17, 1355:1, 1355:4, 1355:9, 1355:15, 1356:9, 1358:18, 1362:17, 1373:15, 1376:6, 1376:13, 1376:19, 1376:20, 1376:24, 1377:8, 1377:20, 1378:9, 1378:16, 1379:4, 1379:20, 1381:23, 1383:9, 1384:4, 1384:5, 1387:25, 1388:11, 1388:16, 1388:24, 1390:2, 1390:18, 1390:19, 1390:24, 1391:13, 1392:5, 1392:7, 1392:8, 1392:11, 1392:16, 1392:18, 1395:19, 1409:22, 1444:3, 1444:9, 1446:15, 1446:18
**photograph** [6] - 1353:13, 1393:13, 1398:4, 1398:6, 1405:13, 1465:17
**photographs** [2] - 1352:23, 1393:25
**photos** [2] - 1451:5, 1468:9
**phrase** [2] - 1401:7, 1425:21
**physical** [5] - 1353:9, 1355:3, 1358:6, 1376:13, 1458:12, 1463:11
**physically** [5] - 1375:25, 1424:8, 1428:24, 1457:18, 1458:4
**pick** [1] - 1420:6
**picked** [2] - 1353:5, 1407:4
**picking** [1] - 1465:14
**picture** [6] - 1375:7, 1393:7, 1397:2, 1397:3, 1397:4, 1451:5
**pictures** [7] - 1450:15, 1468:11, 1468:12, 1468:14, 1468:16, 1470:12, 1470:25
**pimp** [3] - 1416:16, 1424:2, 1424:3

**pimps** [1] - 1416:24
**pink** [4] - 1352:4, 1352:7, 1352:17, 1465:19
**Pinto** [2] - 1383:14, 1446:16
**pipe** [1] - 1470:24
**pistol** [3] - 1375:21, 1375:23
**place** [6] - 1382:14, 1382:16, 1407:21, 1432:5, 1461:13, 1461:18
**placed** [9] - 1347:8, 1350:21, 1374:11, 1380:23, 1381:15, 1387:19, 1405:6, 1405:20, 1407:17
**places** [4] - 1409:18, 1425:18, 1443:10, 1455:11
**plan** [2] - 1458:14, 1471:23
**planned** [1] - 1461:6
**plant** [2] - 1435:3, 1435:5
**plate** [1] - 1352:21
**play** [2] - 1374:23, 1431:16
**played** [3] - 1346:21, 1375:1, 1423:5
**player** [1] - 1394:17
**playing** [5] - 1348:4, 1470:3, 1470:4, 1470:5
**plea** [1] - 1474:20
**plumber** [2] - 1470:11
**PM** [1] - 1343:9
**pocket** [1] - 1470:7
**point** [10] - 1356:22, 1358:4, 1369:11, 1370:13, 1438:11, 1443:25, 1447:23, 1471:8, 1471:17, 1472:7
**poking** [1] - 1460:12
**police** [9] - 1358:7, 1365:17, 1366:14, 1378:22, 1378:23, 1406:1, 1454:7, 1475:17
**Police** [3] - 1366:7, 1403:24, 1453:24
**policy** [1] - 1382:12
**portero** [1] - 1413:19
**Portsmouth** [11] - 1350:9, 1350:10, 1350:12, 1351:2, 1351:4, 1351:9, 1351:25, 1353:14, 1387:13, 1448:16, 1465:19
**position** [3] - 1430:25, 1462:16, 1462:23
**possession** [3] - 1380:6, 1381:24, 1396:3
**possessive** [1] - 1401:16
**possible** [5] - 1382:12, 1398:8, 1416:11, 1417:16, 1424:14
**possibly** [1] - 1361:23
**postpone** [1] - 1459:14
**potential** [8] - 1420:2, 1421:9, 1431:20, 1432:6, 1434:23, 1435:2, 1443:10, 1443:14
**practice** [1] - 1454:21
**precisely** [1] - 1417:8
**precision** [3] - 1348:24, 1350:2, 1372:5
**predicate** [1] - 1463:23
**prefer** [2] - 1409:19, 1449:13
**prefers** [1] - 1458:24
**pregnancy** [1] - 1395:11

**pregnant** [2] - 1395:14, 1429:20
**prep** [2] - 1456:16, 1456:17
**prepare** [4] - 1345:19, 1468:8, 1469:24, 1470:2
**prepared** [6] - 1345:13, 1432:21, 1468:6, 1469:16, 1469:21, 1477:21
**preparing** [1] - 1359:7
**presence** [2] - 1460:18, 1463:10
**present** [9] - 1344:2, 1362:1, 1393:23, 1400:20, 1410:1, 1433:11, 1436:23, 1438:7, 1464:7
**presentation** [1] - 1458:16
**presented** [3] - 1375:15, 1441:21, 1461:1
**presenting** [1] - 1460:25
**presiding** [1] - 1345:4
**presumably** [1] - 1439:14
**presuming** [1] - 1356:21
**pretty** [2] - 1358:8, 1416:15
**previously** [13] - 1347:14, 1348:15, 1353:4, 1355:18, 1359:23, 1362:14, 1362:23, 1364:17, 1366:5, 1371:18, 1377:5, 1401:10, 1440:21
**PREVIOUSLY** [1] - 1346:17
**primarily** [1] - 1379:15
**Prince** [5] - 1350:11, 1351:23, 1393:9, 1393:10, 1403:24
**prisoner** [2] - 1469:9, 1472:1
**problem** [4] - 1367:13, 1402:10, 1459:10, 1460:10
**problems** [1] - 1419:22
**procedurally** [1] - 1431:21
**proceeding** [1] - 1459:22
**PROCEEDINGS** [2] - 1345:1, 1479:15
**proceedings** [8] - 1380:23, 1380:25, 1381:16, 1382:14, 1407:18, 1407:21, 1459:9, 1478:3
**Proceedings** [1] - 1477:24
**PROCEEDINGS........................** [1] - 1479:6
**proceeds** [3] - 1435:15, 1452:1, 1452:5
**produce** [1] - 1460:23
**professional** [1] - 1470:11
**proffer** [1] - 1401:8
**proffered** [2] - 1401:21, 1402:14
**program** [1] - 1382:18
**project** [2] - 1378:7, 1392:13
**promise** [4] - 1368:12, 1419:23, 1420:1, 1421:9
**promises** [3] - 1419:10, 1421:14, 1421:18
**pronounce** [1] - 1437:8
**pronounced** [1] - 1387:25
**proof** [1] - 1401:21
**proper** [1] - 1466:23
**property** [1] - 1425:18
**prosecute** [1] - 1417:2
**prosecution** [1] - 1476:9
**prosecutors** [3] - 1466:20, 1468:7,

1470:3
**prostitute** [6] - 1370:3, 1419:8, 1436:24, 1464:9, 1471:16, 1471:17
**prostitutes** [6] - 1425:2, 1425:3, 1428:20, 1429:24, 1430:15, 1471:2
**prostitution** [9] - 1349:24, 1353:2, 1353:3, 1409:10, 1430:16, 1430:23, 1462:19, 1462:23, 1471:7
**protect** [1] - 1469:18
**protected** [1] - 1357:17
**protocol** [1] - 1431:21
**provide** [2] - 1358:23, 1364:8
**provided** [13] - 1353:13, 1358:24, 1359:14, 1359:16, 1359:22, 1359:23, 1360:1, 1360:3, 1360:14, 1363:16, 1384:2, 1395:10, 1444:20
**provides** [1] - 1367:3
**provision** [1] - 1356:19
**pull** [1] - 1378:6
**pulled** [2] - 1347:6, 1454:7
**purpose** [1] - 1432:3
**purposes** [2] - 1357:16, 1368:6
**pursuant** [4] - 1385:25, 1387:5, 1455:15, 1455:16
**pushed** [1] - 1458:1
**put** [12] - 1356:3, 1357:21, 1368:3, 1373:20, 1417:10, 1420:3, 1426:20, 1426:23, 1457:7, 1460:5, 1473:18, 1473:20
**putting** [1] - 1465:5

**Q**

**quality** [1] - 1424:3
**Quarles** [5] - 1345:4, 1367:23, 1466:11, 1466:23, 1476:16
**QUARLES** [1] - 1343:11
**quarrelling** [1] - 1360:11
**questioned** [2] - 1458:1, 1466:22
**questioner** [1] - 1431:22
**questioning** [5] - 1369:4, 1369:5, 1419:9, 1422:8, 1468:4
**questions** [17] - 1368:21, 1370:10, 1406:6, 1440:3, 1442:10, 1443:24, 1444:2, 1449:1, 1449:7, 1449:9, 1450:11, 1450:13, 1452:1, 1453:9, 1456:4, 1457:14, 1473:22
**quick** [1] - 1367:7
**quiet** [1] - 1472:21
**quite** [2] - 1439:10, 1467:14

**R**

**R-A-U-D-E-L** [1] - 1403:6
**Rachel** [1] - 1343:15
**radius** [1] - 1354:3
**raid** [3] - 1454:11, 1454:14, 1454:15
**raided** [1] - 1454:11

**raids** [1] - 1454:13
**ramifications** [1] - 1370:13
**ran** [3] - 1348:23, 1352:21, 1373:18
**rape** [2] - 1457:9, 1458:11
**raped** [1] - 1457:16
**rapport** [7] - 1420:2, 1443:2, 1443:3, 1443:4, 1443:11, 1443:13
**rather** [3] - 1400:11, 1457:18, 1465:16
**Raudel** [18] - 1403:1, 1403:2, 1403:3, 1403:4, 1403:8, 1415:19, 1415:23, 1415:24, 1416:5, 1416:13, 1416:18, 1416:19, 1416:21, 1431:3, 1431:6, 1431:14, 1431:17
**read** [20] - 1397:21, 1400:15, 1418:8, 1422:5, 1426:23, 1427:8, 1427:22, 1427:24, 1433:16, 1433:20, 1433:21, 1434:12, 1436:11, 1437:24, 1438:1, 1438:2, 1438:4, 1440:13, 1457:23
**reading** [2] - 1438:18, 1469:9
**ready** [5] - 1345:5, 1345:22, 1420:20, 1422:23, 1457:4
**realize** [1] - 1462:20
**really** [2] - 1418:18, 1459:14
**realtime** [2] - 1354:6, 1355:8
**Realtime** [1] - 1478:2
**reason** [12] - 1349:19, 1358:12, 1381:17, 1383:2, 1401:15, 1432:2, 1432:3, 1442:14, 1443:18, 1447:22, 1448:16, 1464:25
**reasonable** [2] - 1414:3, 1414:11
**reasons** [3] - 1369:12, 1382:16, 1421:10
**Rebeca** [4] - 1400:21, 1401:17, 1428:19, 1463:12
**receipt** [5] - 1347:6, 1378:24, 1386:25, 1387:8, 1471:22
**receipts** [2] - 1387:6, 1394:22
**receive** [4] - 1375:9, 1376:17, 1419:24, 1435:14
**received** [10] - 1350:20, 1355:7, 1358:19, 1375:11, 1387:17, 1387:18, 1398:23, 1399:4, 1399:14, 1400:11, 1452:17, 1463:22, 1469:15, 1474:21
**receiving** [2] - 1372:24, 1374:9
**recess** [4] - 1420:15, 1420:16, 1477:11, 1477:13
**recipient** [1] - 1373:2
**recitation** [1] - 1442:20
**reckless** [1] - 1464:6
**recognizance** [1] - 1382:17
**recognize** [13] - 1353:12, 1375:16, 1393:13, 1393:18, 1394:7, 1398:19, 1399:12, 1450:16, 1451:1, 1451:10, 1451:12, 1451:23
**recollection** [8] - 1360:13, 1373:20, 1416:12, 1416:14, 1433:10, 1434:13, 1438:22, 1441:22
**record** [20] - 1345:9, 1345:14, 1346:13, 1364:22, 1365:3, 1365:10, 1376:21, 1376:23, 1384:12, 1390:10, 1395:8, 1396:24, 1398:9, 1456:19, 1456:20,

1457:8, 1462:13, 1465:5, 1471:20, 1478:3
**recorded** [4] - 1374:14, 1441:14, 1468:25, 1476:11
**recording** [3] - 1374:2, 1374:7, 1375:1
**recordings** [1] - 1370:23
**records** [22] - 1355:6, 1355:11, 1358:21, 1361:15, 1362:6, 1364:19, 1376:4, 1376:9, 1376:12, 1376:13, 1378:3, 1378:4, 1378:10, 1382:19, 1385:6, 1389:23, 1390:1, 1425:1, 1444:4, 1446:25, 1447:5
**recover** [2] - 1355:5, 1392:11
**recovered** [46] - 1347:21, 1347:24, 1355:4, 1355:15, 1364:11, 1372:8, 1377:16, 1378:25, 1379:21, 1379:23, 1379:25, 1383:12, 1383:15, 1383:17, 1383:21, 1384:20, 1384:23, 1385:12, 1385:18, 1385:25, 1386:2, 1386:12, 1386:19, 1386:25, 1387:4, 1387:6, 1387:9, 1388:1, 1388:3, 1388:13, 1388:16, 1392:12, 1394:18, 1394:25, 1395:18, 1395:19, 1396:3, 1446:13, 1446:21, 1450:3, 1450:7, 1450:12, 1450:18, 1451:2, 1451:21, 1451:24
**recross** [3] - 1453:10, 1453:11, 1453:12
**Recross** [1] - 1479:12
**RECROSS** [1] - 1453:14
**Recross-Examination** [1] - 1479:12
**RECROSS-EXAMINATION** [1] - 1453:14
**redact** [3] - 1360:19, 1360:21, 1361:1
**redirect** [1] - 1449:3
**Redirect** [1] - 1479:11
**REDIRECT** [1] - 1449:5
**reduced** [1] - 1476:12
**reductio** [1] - 1358:3
**refer** [1] - 1374:17
**reference** [4] - 1356:21, 1375:6, 1417:21, 1457:4
**referenced** [2] - 1417:10, 1440:24
**referred** [1] - 1430:20
**referring** [1] - 1432:14
**reflect** [5] - 1366:9, 1390:15, 1395:13, 1399:2, 1420:23
**reflects** [4] - 1363:2, 1390:17, 1395:8, 1434:17
**refresh** [4] - 1404:15, 1429:3, 1433:9, 1441:22
**refreshed** [2] - 1434:13, 1438:22
**regard** [5] - 1356:18, 1357:19, 1455:24, 1462:20, 1463:7
**regarding** [5] - 1386:5, 1443:24, 1444:3, 1458:24, 1469:7
**regards** [1] - 1354:14
**registered** [1] - 1362:14
**Registered** [1] - 1478:1
**registers** [2] - 1348:24, 1355:8
**regular** [1] - 1470:11
**regurgitated** [1] - 1367:25

**relate** [2] - 1362:6, 1370:1
**related** [3] - 1356:23, 1359:10, 1360:15
**relates** [8] - 1348:17, 1349:2, 1350:3, 1356:7, 1361:14, 1364:19, 1396:10, 1453:5
**relating** [5] - 1354:4, 1445:6, 1445:9, 1445:10, 1452:2
**relation** [1] - 1405:17
**relationship** [7] - 1401:22, 1408:21, 1416:3, 1425:11, 1425:14, 1435:19, 1443:5
**release** [1] - 1382:17
**released** [2] - 1380:24, 1382:9
**releases** [1] - 1477:15
**relevance** [8] - 1367:10, 1380:13, 1402:14, 1404:6, 1404:20, 1405:21, 1408:23, 1450:8
**relevant** [5] - 1348:22, 1392:19, 1462:17, 1466:23, 1473:23
**religion** [1] - 1375:24
**remain** [2] - 1400:24, 1468:20
**remainder** [5] - 1354:5, 1354:9, 1359:21, 1369:5, 1397:15
**remained** [3] - 1354:7, 1354:12, 1448:21
**remember** [11] - 1367:24, 1418:1, 1420:9, 1423:17, 1423:19, 1427:1, 1427:2, 1437:10, 1443:1, 1460:22, 1461:10
**remind** [2] - 1346:11, 1352:2
**removal** [2] - 1382:14, 1382:17
**renewal** [1] - 1471:21
**renewed** [1] - 1465:7
**rent** [2] - 1413:24, 1414:8
**repeat** [2] - 1346:12, 1458:8
**repeats** [1] - 1367:19
**rephrase** [1] - 1436:7
**report** [7] - 1366:3, 1404:14, 1432:21, 1437:22, 1437:25, 1438:3, 1440:13
**Reported** [1] - 1344:22
**REPORTER** [14] - 1348:6, 1356:6, 1359:19, 1389:8, 1403:5, 1407:19, 1410:17, 1415:6, 1415:8, 1437:19, 1438:17, 1451:14, 1468:13, 1473:10
**Reporter** [2] - 1478:1, 1478:2
**reporting** [1] - 1378:21
**represent** [1] - 1389:20
**represented** [1] - 1474:20
**representing** [1] - 1468:23
**request** [3] - 1381:12, 1442:18, 1465:3
**requested** [1] - 1345:11
**requesting** [1] - 1470:15
**require** [2] - 1356:16, 1460:17
**research** [1] - 1392:22
**researched** [1] - 1395:22
**residence** [5] - 1378:25, 1385:9, 1387:7, 1394:3, 1394:6
**residency** [1] - 1471:21
**residing** [1] - 1394:4

**resigned** [1] - 1391:11
**resolved** [1] - 1356:2
**Resources** [1] - 1393:16
**respect** [21] - 1349:14, 1350:1, 1353:17, 1355:17, 1359:20, 1361:25, 1370:25, 1371:24, 1372:6, 1373:12, 1377:8, 1378:9, 1378:17, 1380:3, 1382:23, 1389:13, 1390:18, 1394:22, 1450:11, 1460:25
**respectfully** [8] - 1358:12, 1381:11, 1402:9, 1463:14, 1464:16, 1465:1, 1465:3, 1465:22
**respective** [1] - 1458:18
**responded** [3] - 1366:11, 1370:22, 1373:10
**response** [5] - 1381:13, 1405:10, 1421:24, 1441:17, 1442:10
**responsible** [1] - 1404:4
**responsive** [1] - 1404:2
**responsiveness** [1] - 1404:4
**rest** [5] - 1354:12, 1390:15, 1433:24, 1456:15, 1465:8
**restate** [1] - 1369:25
**rested** [1] - 1462:8
**restrain** [1] - 1464:23
**result** [11] - 1368:16, 1368:21, 1406:20, 1408:19, 1429:19, 1435:17, 1457:20, 1458:12, 1462:24, 1466:14, 1476:18
**resulted** [1] - 1380:18
**Resumed** [1] - 1479:9
**resumes** [1] - 1420:19
**return** [3] - 1351:8, 1352:11, 1354:11
**returned** [4] - 1350:10, 1421:21, 1436:16, 1437:12
**returning** [2] - 1350:12, 1351:25
**reveal** [4] - 1351:7, 1364:24, 1379:11, 1406:4
**revealed** [2] - 1350:7, 1369:3
**reverse** [1] - 1463:8
**review** [12] - 1349:25, 1375:3, 1389:2, 1423:18, 1424:25, 1432:17, 1432:19, 1434:6, 1437:22, 1441:11, 1462:6
**reviewed** [17] - 1375:13, 1376:9, 1382:19, 1383:9, 1393:25, 1411:25, 1418:9, 1422:6, 1425:1, 1432:9, 1436:13, 1438:2, 1438:21, 1440:15, 1440:17, 1440:18, 1440:21
**reviewing** [4] - 1433:15, 1434:4, 1438:16, 1462:20
**revise** [1] - 1420:22
**revisit** [1] - 1475:19
**revoked** [1] - 1454:9
**Reyes** [3] - 1383:17, 1386:14, 1386:25
**Reyes'** [1] - 1383:20
**Richmond** [1] - 1474:19
**RICO** [1] - 1475:5
**rights** [7] - 1368:13, 1458:19, 1472:1, 1472:13, 1472:22, 1472:23, 1476:7
**RIGHTS**.................................. [1] - 1479:14

rise [4] - 1345:2, 1420:14, 1420:18, 1477:12
river [2] - 1407:3, 1407:4
RMR [2] - 1344:23, 1478:7
robbery [1] - 1371:14
rocks [1] - 1458:2
role [1] - 1431:16
roll [1] - 1442:22, 1454:6
rolled [1] - 1398:3
rolls [1] - 1397:12
room [3] - 1394:5, 1394:25, 1420:11
Room [1] - 1344:23
rose [1] - 1438:8
Route [2] - 1470:21
route [1] - 1457:16
routine [1] - 1455:3
rubbing [1] - 1348:2, 1348:8
rubric [1] - 1357:21
Ruiz [1] - 1426:6
rule [1] - 1408:21
ruling [2] - 1466:6, 1475:18
run [5] - 1352:22, 1365:2, 1407:4, 1415:4
running [7] - 1353:7, 1357:3, 1414:1, 1415:2, 1415:3, 1418:19, 1447:11
runs [1] - 1440:25
RUTER [77] - 1345:8, 1366:23, 1367:13, 1367:17, 1368:11, 1368:15, 1369:8, 1369:14, 1369:19, 1371:7, 1373:23, 1373:25, 1391:23, 1398:12, 1401:2, 1401:6, 1401:20, 1402:7, 1402:13, 1402:23, 1406:8, 1406:10, 1407:25, 1408:25, 1409:5, 1410:18, 1415:16, 1420:7, 1420:25, 1421:4, 1421:6, 1422:22, 1422:25, 1423:2, 1423:3, 1427:18, 1427:20, 1427:21, 1428:6, 1433:12, 1433:18, 1433:21, 1433:25, 1434:2, 1434:5, 1436:5, 1436:8, 1436:10, 1437:17, 1437:20, 1437:21, 1438:14, 1438:20, 1439:8, 1440:2, 1453:11, 1456:19, 1457:1, 1457:7, 1458:22, 1459:6, 1459:13, 1459:16, 1459:19, 1462:11, 1463:3, 1466:7, 1467:5, 1467:14, 1467:18, 1472:10, 1472:16, 1476:5, 1477:1, 1477:6, 1477:10, 1477:16
Ruter [16] - 1343:17, 1391:19, 1420:6, 1420:24, 1439:1, 1440:24, 1456:15, 1456:18, 1457:4, 1459:15, 1466:6, 1466:25, 1472:9, 1476:4, 1477:8, 1477:15
Ruter's [2] - 1459:5, 1473:1
RUTER................. [1] - 1479:10

## S

safe [1] - 1355:11
sake [1] - 1448:4
salute [1] - 1469:19

Salvador [1] - 1408:5
Sandra [1] - 1362:1
Santa [1] - 1375:20
Santiago [12] - 1364:6, 1364:8, 1364:20, 1364:24, 1365:6, 1365:12, 1365:24, 1366:14, 1369:3, 1378:1, 1425:3
Santiago's [1] - 1365:15
sat [1] - 1468:19
satisfied [1] - 1457:15
Saturday [3] - 1428:16, 1428:18, 1456:21
Saturdays [3] - 1467:21, 1472:12, 1476:6
saved [18] - 1356:12, 1362:17, 1377:17, 1377:19, 1377:23, 1379:20, 1379:24, 1383:9, 1383:10, 1383:11, 1383:13, 1383:14, 1383:16, 1383:19, 1387:24, 1388:2, 1392:8, 1396:13
saw [6] - 1383:3, 1389:16, 1412:9, 1417:8, 1469:21, 1471:1
scene [1] - 1405:12
schedule [2] - 1428:16, 1428:17
scheduling [2] - 1428:14, 1460:16
school [1] - 1461:24
scratch [1] - 1398:17
scream [1] - 1469:6
screen [1] - 1397:12
search [14] - 1347:12, 1385:25, 1387:6, 1399:21, 1403:23, 1405:24, 1405:25, 1409:7, 1410:13, 1411:22, 1412:17, 1449:8, 1449:23, 1455:9
searched [19] - 1347:25, 1384:21, 1403:19, 1404:11, 1404:19, 1404:24, 1405:18, 1410:25, 1411:6, 1411:11, 1411:16, 1411:20, 1411:22, 1455:2, 1455:6, 1455:7, 1455:14, 1455:22, 1455:23
searches [3] - 1410:24, 1411:2, 1455:24
Seat [1] - 1346:2
seat [1] - 1392:2
seated [3] - 1346:1, 1421:3, 1462:2
second [7] - 1377:9, 1418:13, 1423:9, 1423:13, 1436:8, 1461:23, 1474:7
seconds [3] - 1363:21, 1363:22, 1373:6
see [31] - 1354:16, 1357:10, 1357:11, 1363:4, 1365:11, 1365:22, 1370:10, 1371:15, 1372:16, 1372:20, 1373:14, 1376:23, 1378:17, 1388:5, 1389:18, 1392:7, 1394:11, 1401:25, 1402:16, 1413:14, 1419:18, 1423:17, 1429:22, 1429:24, 1429:25, 1434:1, 1461:12, 1461:17, 1463:10, 1468:11, 1469:24
seeing [4] - 1360:14, 1395:24, 1441:21, 1451:5
seeking [1] - 1356:1
seem [1] - 1401:24
seized [6] - 1384:4, 1415:22, 1445:16, 1445:19, 1447:16, 1447:19
seizing [1] - 1415:14
seizure [1] - 1415:22

selling [1] - 1409:23
semi [2] - 1375:21, 1375:23
semi-automatic [2] - 1375:21, 1375:23
send [5] - 1345:24, 1427:25, 1456:15, 1458:14, 1460:18
sending [2] - 1375:6, 1377:22
sense [3] - 1419:25, 1460:16, 1461:8
sent [5] - 1358:25, 1400:9, 1423:21, 1452:12, 1468:17
sentence [3] - 1474:21, 1476:18, 1476:21
sentencing [5] - 1459:7, 1459:20, 1459:22, 1460:8, 1476:17
Sentra [1] - 1387:5
separate [2] - 1408:14, 1417:1
September [38] - 1362:2, 1362:14, 1362:15, 1362:21, 1363:6, 1363:9, 1363:18, 1363:24, 1364:1, 1365:3, 1365:9, 1365:10, 1365:13, 1365:16, 1366:10, 1377:15, 1377:25, 1379:18, 1380:2, 1383:1, 1383:12, 1384:23, 1385:19, 1389:21, 1412:12, 1418:3, 1422:2, 1422:3, 1432:10, 1436:11, 1436:17, 1436:19, 1437:1, 1440:11, 1447:1, 1453:18, 1455:14
series [2] - 1346:22, 1398:16
serve [1] - 1393:16
served [1] - 1454:19
Service [1] - 1366:7
service [4] - 1395:8, 1395:10, 1454:15, 1454:22
Services [2] - 1422:16, 1439:21
serving [1] - 1474:23
session [4] - 1345:3, 1420:17, 1420:19, 1464:5
set [2] - 1464:24, 1469:11
seven [4] - 1376:7, 1407:9, 1408:12, 1462:12
several [9] - 1351:23, 1375:18, 1390:5, 1403:17, 1404:5, 1409:24, 1417:13, 1418:23, 1453:22
sex [9] - 1366:18, 1370:1, 1370:8, 1370:9, 1403:11, 1419:7, 1452:2, 1452:25, 1457:20
sex-trafficking [2] - 1366:18, 1370:1
sexual [1] - 1401:22
shape [2] - 1360:11, 1457:18
sheet [1] - 1366:8
sheets [3] - 1356:16, 1360:4, 1384:3
shirt [4] - 1352:4, 1352:7, 1352:17, 1465:19
shoot [1] - 1441:24
shop [1] - 1386:24
short [3] - 1378:13, 1420:15, 1423:14
shorter [1] - 1470:16
shot [2] - 1469:10, 1469:11
shotgun [1] - 1451:24
show [43] - 1345:9, 1347:14, 1348:1, 1350:16, 1351:20, 1353:11, 1355:17, 1355:9, 1361:20, 1361:21, 1362:23,

1364:17, 1366:4, 1371:18, 1372:12,
1375:13, 1375:16, 1377:5, 1383:23,
1393:12, 1394:7, 1395:3, 1396:17,
1396:19, 1397:10, 1397:20, 1398:18,
1400:4, 1401:16, 1404:14, 1405:14,
1416:20, 1417:9, 1422:24, 1423:1,
1428:3, 1430:8, 1441:22, 1450:15,
1452:9, 1456:19, 1469:1, 1469:2
**showed** [7] - 1350:19, 1354:7, 1426:15,
1429:12, 1431:10, 1433:9, 1470:12
**showing** [1] - 1357:8
**shown** [6] - 1359:8, 1405:15, 1452:10,
1464:11, 1465:17, 1470:25
**shows** [5] - 1352:15, 1361:22, 1363:6,
1363:10, 1366:10, 1402:15
**sic** [1] - 1377:18
**sick** [1] - 1413:3
**side** [3] - 1393:10, 1396:19, 1397:22
**sidearm** [1] - 1412:7
**sighting** [1] - 1381:21
**silence** [2] - 1469:4, 1473:17
**silent** [1] - 1468:20
**silver** [1] - 1465:18
**similar** [1] - 1383:11
**simple** [1] - 1415:9
**simply** [7] - 1357:21, 1368:3, 1463:14,
1464:17, 1464:19, 1465:1, 1473:17
**single** [3] - 1381:21, 1381:22, 1394:5
**single-family** [1] - 1394:5
**site** [1] - 1355:8
**sitting** [2] - 1357:12, 1466:17
**situation** [4] - 1370:2, 1370:14,
1405:11, 1469:7
**situations** [1] - 1402:1
**size** [1] - 1400:18
**slash** [1] - 1474:24
**Sledge** [1] - 1409:2
**sleeve** [1] - 1427:22
**slow** [1] - 1367:5
**slower** [2] - 1415:6, 1470:15
**small** [2] - 1375:6, 1378:7
**smaller** [1] - 1390:5
**smuggler** [1] - 1457:19
**snow** [1] - 1461:25
**Social** [2] - 1422:15, 1439:21
**soldiers** [2] - 1469:16, 1469:21
**someone** [13] - 1361:23, 1361:24,
1367:7, 1370:14, 1377:3, 1409:13,
1419:18, 1427:6, 1427:8, 1442:24,
1443:21
**somewhat** [1] - 1461:15
**somewhere** [2] - 1429:8, 1469:12
**Soriano** [10] - 1374:13, 1374:15,
1375:9, 1375:12, 1376:2, 1378:21,
1378:24, 1423:7, 1423:19, 1451:13
**sorry** [19] - 1363:7, 1369:1, 1369:2,
1373:18, 1373:23, 1394:11, 1395:15,
1398:2, 1415:7, 1420:22, 1431:11,
1438:13, 1438:18, 1451:14, 1451:16,
1455:19, 1459:2, 1468:13, 1471:14

**sort** [6] - 1382:10, 1456:13, 1464:19,
1465:15, 1465:20, 1465:21
**sought** [1] - 1378:23
**sound** [1] - 1440:25
**sounds** [2] - 1429:9, 1439:25
**source** [1] - 1358:15
**sources** [3] - 1376:17, 1403:17, 1412:5
**southbound** [1] - 1352:14
**southern** [1] - 1352:16
**Spanish** [12] - 1344:3, 1344:4, 1362:19,
1427:12, 1427:24, 1430:6, 1430:8,
1430:12, 1439:4, 1439:13, 1439:15,
1450:7
**speaking** [6] - 1368:19, 1380:8,
1429:22, 1431:20, 1432:10, 1433:4
**speaks** [1] - 1439:14
**Special** [42] - 1344:3, 1346:10, 1346:20,
1351:21, 1353:15, 1354:21, 1358:18,
1361:14, 1369:23, 1370:19, 1374:18,
1375:3, 1377:2, 1377:11, 1382:7,
1384:14, 1389:5, 1389:22, 1391:21,
1392:1, 1392:21, 1400:20, 1401:12,
1401:21, 1403:1, 1404:9, 1406:11,
1412:5, 1417:24, 1419:5, 1421:7,
1423:4, 1431:19, 1432:19, 1438:21,
1440:8, 1449:7, 1450:15, 1451:1,
1451:18, 1451:23, 1452:9
**specific** [3] - 1359:10, 1361:13, 1363:4
**specifically** [5] - 1348:21, 1355:16,
1418:17, 1419:8, 1444:8
**speculation** [1] - 1439:23
**spell** [1] - 1403:5
**spend** [2] - 1425:19, 1456:17
**spent** [5] - 1345:9, 1345:15, 1424:15,
1425:22, 1456:21
**spoken** [1] - 1356:21
**spot** [1] - 1407:5
**stamp** [2] - 1388:12, 1388:17
**stamps** [1] - 1388:11
**stand** [11] - 1356:22, 1369:7, 1391:21,
1418:12, 1457:4, 1466:8, 1466:18,
1473:21, 1474:2, 1475:18, 1475:21
**Stand**.............................. [1] - 1479:9
**standard** [1] - 1455:3
**stands** [2] - 1420:14, 1477:12
**start** [7] - 1351:22, 1389:12, 1389:24,
1404:6, 1461:16, 1461:19, 1473:11
**started** [4] - 1420:12, 1452:7, 1461:14,
1470:21
**starting** [7] - 1349:6, 1371:20, 1377:10,
1390:22, 1397:22, 1414:25, 1452:10
**starts** [1] - 1372:24
**state** [3] - 1351:3, 1351:5, 1401:23
**statement** [30] - 1360:8, 1409:17,
1417:11, 1417:25, 1418:7, 1419:11,
1419:15, 1422:3, 1422:5, 1432:16,
1432:17, 1432:20, 1432:21, 1433:14,
1439:2, 1439:11, 1439:18, 1439:25,
1441:9, 1442:11, 1443:7, 1444:11,
1447:6, 1447:17, 1448:10, 1453:20,

1453:21, 1454:18, 1454:21
**statements** [5] - 1357:19, 1441:2,
1475:16, 1475:20, 1476:11
**States** [3] - 1345:2, 1406:22, 1408:2
**STATES** [3] - 1343:1, 1343:4, 1479:2
**stating** [1] - 1443:1
**station** [1] - 1465:14
**statistical** [2] - 1444:5, 1444:6
**statue** [1] - 1375:20
**stay** [2] - 1413:3, 1440:11
**staying** [1] - 1395:1
**step** [5] - 1361:1, 1389:6, 1417:23,
1460:13, 1462:3
**still** [5] - 1345:20, 1346:11, 1384:13,
1461:1, 1474:24
**stipulate** [1] - 1357:14
**stolen** [1] - 1388:14
**stopped** [1] - 1457:11
**stopping** [1] - 1351:15
**story** [1] - 1417:18
**straight** [2] - 1373:19, 1382:17
**Street** [1] - 1344:24
**strictly** [1] - 1458:9
**strong** [1] - 1413:24
**stuff** [3] - 1411:25, 1413:13, 1455:12
**subject** [3] - 1382:13, 1456:12, 1465:12
**submit** [10] - 1358:12, 1402:9, 1457:20,
1462:13, 1462:25, 1463:14, 1464:16,
1465:1, 1465:22, 1465:25
**submitted** [3] - 1358:20, 1442:18,
1457:24
**subpoena** [1] - 1393:17
**subscriber** [4] - 1362:15, 1376:13,
1385:4, 1385:6
**subsequent** [6] - 1349:19, 1353:23,
1363:21, 1372:9, 1417:20, 1439:4
**subsequently** [5] - 1352:18, 1383:4,
1405:14
**substantial** [1] - 1396:1
**subtract** [1] - 1413:12
**subtracted** [1] - 1452:5
**success** [1] - 1403:22
**successful** [1] - 1415:21
**sufficient** [2] - 1464:13, 1466:2
**suggest** [4] - 1369:6, 1431:23, 1460:1,
1464:21
**suggested** [2] - 1442:23, 1464:21
**suggesting** [1] - 1357:16
**suggestion** [1] - 1465:12
**sum** [2] - 1390:5, 1390:23
**summarizing** [1] - 1368:8
**summary** [6] - 1355:25, 1356:1,
1358:17, 1358:25, 1367:18, 1376:9
**sums** [2] - 1415:15, 1415:17
**Sunday** [13] - 1350:14, 1358:25, 1359:1,
1359:2, 1359:4, 1397:25, 1426:20,
1427:2, 1427:3, 1428:9, 1428:13,
1428:14
**Sundays** [1] - 1426:18

**supplies** [1] - 1414:8
**support** [1] - 1439:10
**supported** [1] - 1358:21
**supposed** [1] - 1367:7
**supposedly** [1] - 1468:10
**suppressed** [1] - 1357:18
**surprise** [5] - 1410:4, 1410:7, 1454:23, 1454:24, 1455:1
**surprises** [1] - 1454:25
**surveillance** [6] - 1348:11, 1348:22, 1352:12, 1352:13, 1353:9, 1403:21
**surveilled** [1] - 1351:17
**suspect** [4] - 1357:21, 1431:23, 1435:2, 1464:4
**suspected** [3] - 1353:15, 1399:24, 1448:18
**sustain** [1] - 1404:5
**sustained** [9] - 1359:12, 1369:13, 1391:16, 1391:18, 1402:21, 1408:24, 1422:21, 1450:9
**SWORN** [1] - 1346:17

## T

**Tab** [3] - 1374:16, 1374:19, 1374:25
**table** [1] - 1400:25
**tabs** [1] - 1374:20
**tack** [1] - 1350:21
**tactic** [1] - 1458:10
**tags** [2] - 1352:21
**talks** [1] - 1377:3
**tape** [2] - 1441:12, 1442:20
**target** [1] - 1383:3
**targets** [1] - 1406:2
**technique** [2] - 1419:9, 1434:22
**techniques** [1] - 1434:24
**telephone** [1] - 1447:9
**telephones** [1] - 1354:22
**TELL** [1] - 1346:17
**tend** [1] - 1454:19
**tens** [1] - 1406:21
**terms** [5] - 1368:8, 1402:10, 1449:17, 1463:15, 1465:11
**terrain** [1] - 1458:2
**testified** [9] - 1348:15, 1353:4, 1356:12, 1382:2, 1392:25, 1438:6, 1440:15, 1440:21, 1463:12
**testify** [28] - 1345:11, 1345:19, 1345:20, 1366:14, 1391:12, 1457:16, 1458:24, 1463:25, 1464:2, 1466:10, 1466:11, 1466:16, 1467:23, 1468:2, 1472:14, 1473:2, 1473:13, 1473:15, 1473:21, 1475:22, 1476:1, 1476:9, 1476:14, 1476:15, 1477:5
**testifying** [4] - 1346:25, 1449:12, 1466:15, 1476:18
**testimony** [38] - 1345:13, 1356:11, 1358:21, 1359:7, 1359:8, 1361:25, 1362:1, 1362:5, 1363:15, 1365:15,

1365:19, 1365:22, 1366:16, 1367:20, 1367:25, 1368:16, 1368:19, 1368:22, 1369:6, 1377:7, 1379:3, 1382:1, 1383:11, 1391:14, 1400:21, 1401:18, 1415:24, 1416:2, 1418:17, 1421:22, 1432:4, 1442:7, 1442:22, 1444:3, 1464:7, 1464:11, 1468:9, 1476:19
**Texas** [2] - 1406:17, 1457:17
**text** [31] - 1375:12, 1375:13, 1377:19, 1377:21, 1377:22, 1396:7, 1396:19, 1397:3, 1397:7, 1397:9, 1397:11, 1397:12, 1397:15, 1397:18, 1398:10, 1398:16, 1398:20, 1398:21, 1398:23, 1399:3, 1399:7, 1399:13, 1400:5, 1400:13, 1426:18, 1427:8, 1427:25, 1428:25, 1429:12, 1451:5, 1451:13
**texted** [2] - 1428:24, 1429:7
**texts** [1] - 1426:16
**themselves** [2] - 1388:24, 1469:18
**theory** [3] - 1381:15, 1381:18, 1381:19
**therefore** [4] - 1356:23, 1356:24, 1367:10, 1467:9
**they've** [4] - 1470:20, 1471:25, 1472:1, 1472:6
**thickets** [1] - 1458:2
**thinking** [1] - 1423:13
**third** [1] - 1377:10
**thirteen** [1] - 1437:19
**thoroughly** [1] - 1438:3
**thoughts** [4] - 1367:4, 1432:6, 1435:3
**thousand** [1] - 1425:4
**thousands** [6] - 1406:20, 1406:21, 1406:23, 1406:24, 1406:25, 1413:14
**threatened** [3] - 1366:15, 1370:3, 1370:5
**threatening** [3] - 1374:7, 1374:14, 1423:11
**threats** [3] - 1374:9, 1423:19, 1423:20
**three** [6] - 1363:23, 1379:9, 1379:10, 1393:4, 1463:7, 1471:24
**throughout** [6] - 1348:23, 1378:13, 1389:25, 1425:23, 1448:21, 1468:17
**thumbtack** [1] - 1351:12
**tickets** [1] - 1465:15
**timing** [3] - 1380:14, 1381:2, 1381:8
**TO** [1] - 1346:17
**today** [8] - 1367:11, 1423:6, 1444:3, 1444:7, 1447:21, 1458:24, 1465:17, 1476:13
**together** [9] - 1393:11, 1402:16, 1417:6, 1422:11, 1425:20, 1425:22, 1426:1, 1426:10, 1477:4
**toll** [23] - 1355:5, 1361:15, 1362:6, 1362:24, 1364:18, 1365:2, 1370:24, 1372:18, 1373:18, 1373:20, 1376:21, 1376:23, 1378:3, 1378:4, 1378:10, 1383:1, 1383:2, 1389:23, 1389:25, 1424:12, 1444:4, 1446:25
**tolls** [7] - 1354:15, 1371:13, 1390:3, 1390:4, 1395:22, 1425:1, 1448:1

**tomorrow** [13] - 1458:15, 1459:3, 1459:7, 1459:17, 1460:21, 1461:2, 1461:4, 1461:5, 1461:12, 1461:17, 1461:18, 1461:19, 1477:13
**tongue** [1] - 1445:25
**took** [5] - 1356:8, 1356:22, 1427:6, 1448:15, 1474:20
**tool** [1] - 1358:11
**top** [2] - 1350:21, 1375:23, 1389:20
**topic** [1] - 1467:22
**tossed** [1] - 1386:25
**total** [4] - 1389:19, 1390:23, 1392:13, 1413:10
**toward** [1] - 1465:3
**towards** [2] - 1401:17, 1463:11
**towels** [1] - 1413:13
**tower** [9] - 1348:25, 1350:2, 1350:20, 1350:22, 1351:1, 1351:13, 1352:9, 1352:10, 1424:13
**towers** [4] - 1350:4, 1350:18, 1350:20, 1351:23
**Toyota** [2] - 1384:20, 1411:11
**Trabajo** [1] - 1362:18
**trabajo** [1] - 1362:18
**track** [1] - 1350:22
**tracking** [1] - 1382:10
**trade** [2] - 1410:9, 1418:18
**traffic** [2] - 1454:4, 1454:8
**trafficker's** [1] - 1449:17
**trafficking** [18] - 1366:18, 1370:1, 1370:8, 1370:9, 1370:10, 1403:10, 1403:11, 1406:13, 1407:10, 1408:13, 1418:25, 1419:7, 1419:19, 1443:11, 1443:24, 1452:2, 1453:1
**trailer** [1] - 1470:23
**trained** [1] - 1441:7
**training** [2] - 1449:12, 1450:2
**transcribed** [1] - 1442:17
**transcript** [18] - 1375:4, 1423:18, 1434:17, 1436:1, 1437:25, 1438:1, 1438:19, 1440:13, 1440:16, 1440:17, 1440:22, 1441:11, 1442:3, 1442:12, 1442:14, 1442:16, 1476:12, 1478:3
**transferred** [1] - 1447:24
**translation** [6] - 1397:17, 1400:12, 1400:16, 1430:10, 1439:4, 1439:5
**transport** [5] - 1353:23, 1463:16, 1465:10, 1465:12, 1465:13
**transportation** [2] - 1407:7, 1465:23
**transported** [1] - 1407:5
**trash** [4] - 1347:1, 1347:6, 1372:8, 1387:1
**traveled** [2] - 1350:9, 1350:11
**treat** [1] - 1420:4
**treated** [2] - 1435:8, 1464:22
**trees** [1] - 1458:2
**trial** [13] - 1345:12, 1354:23, 1356:20, 1359:8, 1368:14, 1402:11, 1403:2, 1441:21, 1458:10, 1469:16, 1473:7, 1474:22, 1475:16

**TRIAL** [2] - 1343:11, 1479:3
**tried** [1] - 1404:3
**trip** [1] - 1351:8
**Trojan** [1] - 1348:2
**truck** [1] - 1470:22
**true** [12] - 1352:22, 1402:20, 1410:11, 1417:18, 1425:12, 1425:16, 1426:5, 1430:18, 1435:3, 1435:4, 1449:16, 1449:20
**truth** [1] - 1477:5
**TRUTH** [1] - 1346:17
**truthfully** [1] - 1443:7
**try** [8] - 1398:8, 1417:15, 1419:20, 1419:24, 1440:1, 1442:25, 1459:15, 1459:17
**trying** [12] - 1368:3, 1373:19, 1398:7, 1420:1, 1420:22, 1421:15, 1424:11, 1434:22, 1437:8, 1443:11, 1443:13, 1466:15
**turn** [3] - 1361:13, 1379:4, 1468:20
**turned** [2] - 1401:12, 1457:14
**twice** [1] - 1368:15
**two** [40] - 1345:12, 1349:22, 1350:1, 1354:14, 1354:16, 1355:4, 1356:9, 1360:2, 1361:21, 1363:2, 1363:3, 1364:5, 1368:7, 1373:6, 1373:15, 1373:22, 1387:4, 1387:6, 1388:8, 1388:15, 1388:24, 1392:11, 1395:19, 1396:1, 1396:18, 1397:10, 1402:15, 1413:3, 1414:22, 1414:24, 1415:4, 1422:10, 1424:9, 1426:11, 1446:18, 1452:9, 1456:25, 1459:3, 1472:11, 1476:6
**type** [2] - 1371:15, 1394:3

## U

**U.S** [3] - 1343:14, 1343:15, 1344:23
**ultimately** [2] - 1435:23, 1455:14
**unanticipated** [1] - 1454:3
**uncommon** [1] - 1418:17
**under** [8] - 1346:12, 1357:21, 1401:25, 1402:1, 1403:9, 1431:4, 1443:1, 1466:23
**undertaken** [1] - 1463:9
**unfair** [1] - 1369:16
**unfortunate** [1] - 1457:9
**unfortunately** [1] - 1433:2
**ungentlemanly** [1] - 1471:16
**unhappy** [1] - 1391:11
**uniform** [1] - 1407:22
**unit** [1] - 1407:17
**UNITED** [3] - 1343:1, 1343:4, 1479:2
**United** [3] - 1345:2, 1406:22, 1408:2
**unless** [1] - 1373:20
**untruthful** [1] - 1476:20
**up** [39] - 1348:21, 1349:1, 1349:19, 1350:24, 1351:4, 1353:5, 1355:15, 1355:22, 1356:4, 1357:3, 1357:12,

1362:15, 1365:22, 1373:21, 1374:18, 1381:5, 1391:6, 1391:11, 1401:3, 1407:4, 1412:14, 1416:21, 1420:6, 1420:24, 1426:21, 1426:23, 1427:7, 1437:1, 1444:4, 1450:21, 1454:6, 1455:5, 1465:14, 1466:8, 1467:11, 1469:9, 1469:13, 1469:15, 1473:14
**upper** [1] - 1390:8
**usual** [1] - 1454:21
**uterus** [1] - 1395:14

## V

**valuables** [1] - 1455:10
**van** [2] - 1386:20, 1396:4
**various** [3] - 1388:24, 1407:6, 1448:9
**vehicle** [9] - 1352:4, 1352:7, 1353:9, 1411:1, 1411:4, 1411:9, 1412:17, 1413:23, 1455:5
**vein** [1] - 1464:25
**VENTURA** [16] - 1343:6, 1467:13, 1467:16, 1467:24, 1468:5, 1468:16, 1470:19, 1471:14, 1472:15, 1472:18, 1475:24, 1476:24, 1477:3, 1477:7, 1477:19, 1479:2
**Ventura** [88] - 1343:16, 1345:10, 1349:2, 1349:8, 1349:10, 1349:24, 1351:17, 1352:11, 1352:13, 1353:5, 1354:9, 1362:11, 1362:12, 1364:25, 1365:6, 1365:12, 1372:1, 1372:14, 1373:14, 1374:3, 1374:15, 1377:13, 1377:14, 1377:16, 1378:18, 1379:2, 1383:8, 1385:10, 1387:10, 1388:4, 1389:14, 1389:19, 1390:8, 1390:13, 1390:22, 1391:2, 1391:15, 1391:20, 1392:9, 1395:21, 1395:22, 1396:12, 1397:6, 1401:21, 1410:25, 1411:6, 1411:12, 1412:6, 1424:20, 1424:23, 1424:24, 1425:6, 1425:10, 1425:11, 1425:22, 1426:12, 1426:17, 1427:4, 1429:21, 1432:14, 1432:24, 1433:5, 1434:14, 1435:11, 1435:18, 1435:22, 1445:7, 1446:16, 1448:3, 1456:20, 1458:11, 1462:12, 1462:18, 1462:25, 1463:22, 1466:8, 1466:9, 1467:2, 1467:5, 1467:20, 1472:7, 1472:11, 1472:23, 1473:2, 1476:6, 1476:22, 1477:6, 1477:14
**Ventura's** [13] - 1352:4, 1362:25, 1364:19, 1378:25, 1383:13, 1386:19, 1387:7, 1390:18, 1390:24, 1395:24, 1396:3, 1446:22, 1448:22
**verb** [1] - 1443:4
**version** [1] - 1428:3
**vicinity** [2] - 1351:2, 1352:10
**victim** [7] - 1371:5, 1371:11, 1372:17, 1420:2, 1420:4, 1443:14, 1443:21
**victim's** [1] - 1371:4
**victims** [4] - 1376:18, 1418:25, 1419:16,

1443:10
**Victoria** [1] - 1344:3
**views** [1] - 1460:5
**VII** [2] - 1343:6, 1479:3
**violating** [1] - 1472:1
**violation** [1] - 1463:24
**violence** [1] - 1463:11
**violent** [1] - 1382:13
**Virginia** [35] - 1348:16, 1349:23, 1350:9, 1350:10, 1350:12, 1351:2, 1351:4, 1351:6, 1351:9, 1351:14, 1351:25, 1353:3, 1353:6, 1353:8, 1353:14, 1353:24, 1353:25, 1354:7, 1381:17, 1381:18, 1381:25, 1382:3, 1383:8, 1387:13, 1403:10, 1416:22, 1431:4, 1431:12, 1431:17, 1447:11, 1474:5, 1474:15, 1474:19, 1474:23, 1475:11
**visited** [1] - 1472:12
**vitamins** [1] - 1394:16
**voice** [1] - 1389:8
**VOL** [1] - 1479:3
**Volume** [1] - 1343:6
**voluminous** [2] - 1355:12, 1376:9
**voluntary** [2] - 1453:22, 1454:6

## W

**walk** [5] - 1367:3, 1367:14, 1384:9, 1386:10, 1407:5
**wall** [2] - 1393:7, 1469:10
**Walter** [3] - 1471:5, 1471:18
**wants** [2] - 1345:14, 1471:13
**war** [2] - 1469:17, 1469:22
**warrant** [14] - 1385:25, 1387:6, 1399:21, 1409:25, 1454:15, 1454:19, 1454:22, 1455:15, 1455:16, 1455:20
**WAS** [1] - 1346:17
**Washington** [5] - 1351:24, 1395:4, 1404:9, 1404:11, 1472:5
**Waste** [1] - 1393:9
**ways** [2] - 1355:14, 1387:20
**WDQ-10-0770** [1] - 1343:5
**weak** [1] - 1460:11
**weapon** [1] - 1469:19
**weapons** [10] - 1410:14, 1411:4, 1411:9, 1411:14, 1411:18, 1412:3, 1412:10, 1412:13, 1412:16, 1450:11
**week** [18] - 1345:12, 1354:5, 1354:7, 1354:10, 1354:12, 1356:20, 1399:22, 1399:25, 1400:22, 1412:24, 1413:3, 1413:5, 1414:2, 1414:4, 1418:21, 1418:22, 1419:2, 1428:15
**weekends** [1] - 1456:25
**weeks** [5] - 1363:23, 1395:12, 1414:12, 1419:1, 1473:7
**weight** [1] - 1439:11
**West** [1] - 1344:24
**whatsoever** [1] - 1402:3
**whereabouts** [1] - 1354:5

**whole** [7] - 1388:15, 1390:4, 1392:13, 1413:3, 1416:25, 1427:7, 1440:17
**wife** [4] - 1426:8, 1426:13, 1426:14, 1457:5
**William** [1] - 1345:4
**WILLIAM** [1] - 1343:11
**willing** - 1457:4
**wings** [1] - 1375:21
**Wireless** [1] - 1386:24
**wish** [1] - 1467:7
**wished** - 1467:23
**WITNESS** [23] - 1346:14, 1348:8, 1371:10, 1373:24, 1374:21, 1380:17, 1389:10, 1403:6, 1405:2, 1407:20, 1415:7, 1415:9, 1428:5, 1433:16, 1433:19, 1433:24, 1434:1, 1434:3, 1438:18, 1439:2, 1439:25, 1442:4, 1462:4
**Witness** [6] - 1396:10, 1433:15, 1434:4, 1438:16, 1462:5, 1479:12
**witness** [22] - 1347:16, 1360:25, 1361:25, 1367:9, 1367:18, 1367:20, 1367:21, 1367:22, 1368:2, 1391:12, 1419:10, 1419:13, 1421:10, 1431:20, 1432:7, 1434:23, 1435:2, 1438:6, 1456:16, 1466:18, 1469:3
**witness'** [3] - 1349:22, 1367:25, 1435:6
**WITNESSES** [1] - 1479:7
**witnesses** [5] - 1376:18, 1391:20, 1469:3, 1473:19, 1473:20
**wives** [1] - 1430:21
**woken** [1] - 1469:13
**woman** [16] - 1352:3, 1352:6, 1352:17, 1353:6, 1362:2, 1378:22, 1401:13, 1408:22, 1423:24, 1426:6, 1426:14, 1427:12, 1449:16, 1449:18, 1449:21, 1465:18
**women** [10] - 1409:19, 1413:6, 1418:18, 1424:3, 1425:23, 1426:4, 1435:9, 1449:14, 1471:8
**wonderful** [1] - 1458:22
**wondering** [1] - 1368:18
**word** [3] - 1429:9, 1429:23, 1444:5
**words** [2] - 1389:23, 1452:5
**worth** [1] - 1401:23
**wrapped** [1] - 1416:21
**write** [3] - 1422:15, 1422:16, 1436:15
**writing** [1] - 1476:12
**written** [2] - 1469:7, 1476:7

## Y

**Yasser** [11] - 1343:15, 1359:25, 1368:7, 1369:11, 1402:14, 1428:3, 1444:6, 1444:14, 1453:16, 1460:4, 1466:20
**YASSER** [86] - 1345:6, 1345:23, 1346:9, 1346:19, 1347:16, 1347:18, 1348:7, 1348:10, 1355:25, 1356:7, 1358:16, 1358:24, 1359:6, 1359:15, 1359:18,

1359:20, 1360:2, 1360:6, 1360:19, 1360:24, 1361:4, 1361:10, 1364:22, 1366:4, 1368:3, 1368:9, 1368:24, 1369:2, 1369:18, 1369:20, 1369:22, 1371:17, 1374:1, 1374:16, 1374:22, 1375:2, 1379:6, 1379:8, 1380:14, 1380:20, 1381:2, 1381:14, 1382:2, 1382:6, 1384:12, 1389:3, 1389:5, 1389:11, 1390:10, 1392:1, 1392:3, 1396:23, 1397:1, 1397:13, 1398:15, 1401:10, 1401:16, 1402:25, 1403:7, 1404:8, 1404:22, 1405:4, 1406:6, 1408:23, 1420:21, 1421:1, 1422:20, 1422:24, 1423:1, 1427:19, 1428:4, 1438:5, 1438:9, 1438:13, 1439:22, 1444:15, 1444:18, 1449:4, 1449:6, 1450:10, 1450:22, 1450:25, 1451:16, 1451:17, 1453:9, 1456:10
**Yasser's** [1] - 1360:12
**YASSER.......** [1] - 1479:10
**YASSER.............** [1] - 1479:11
**year** [9] - 1345:17, 1373:16, 1373:17, 1373:21, 1373:23, 1381:23, 1398:12, 1398:13, 1400:2
**years** [7] - 1366:18, 1406:17, 1407:9, 1408:12, 1430:17, 1459:11, 1471:24
**yell** [1] - 1469:5
**Yenis** [1] - 1426:6
**yesterday** [7] - 1346:20, 1348:12, 1357:4, 1359:21, 1367:6, 1382:1, 1463:12
**York** [2] - 1418:23, 1418:24
**younger** [4] - 1409:19, 1449:13, 1449:16, 1449:18
**youngest** [1] - 1450:6
**yourself** [3] - 1348:16, 1433:22, 1476:17
**yourselves** [3] - 1420:10, 1460:19, 1461:11

## § 

**§** [1] - 1466:1