1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF MARYLAND
2  NORTHERN DIVISION

3  _____
                                 )
4  UNITED STATES OF AMERICA      )
                                 )
5                                )
       v.                        ) Criminal Docket No. WDQ-10-0770
6                                ) Volume IX
   GERMAN de JESUS VENTURA and   )
7  KEVIN GARCIA FUERTES,         )
          Defendants             )
8  _____)
                                   Baltimore, Maryland
9                                  April 19, 2013
                                   9:34 AM to 3:32 PM
10
        **THE ABOVE-ENTITLED MATTER CONTINUED ON FOR**
11                   **JURY TRIAL**
      **BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.**
12
                  A P P E A R A N C E S
13
   On behalf of the Government:
14
        Michael Cunningham, Assistant U.S. Attorney
15      Rachel Yasser, Assistant U.S. Attorney

16 On behalf of Defendant German de Jesus Ventura:

17      Gerald Ruter, Esquire

18 On behalf of Defendant Kevin Garcia Fuertes:

19      Michael D. Montemarano, Esquire

20

21

22

23

24

25

1                    A P P E A R A N C E S (CONT.)

2       Also present:

3               HSI Special Agent Edward Kelly
                Victoria Kirchgessner, Spanish Interpreter
4               Marta Goldstein, Spanish Interpreter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                          Reported by:

23               Martin J. Giordano, RMR, CRR, FOCR
                 U.S. Courthouse, Room 5515
24               101 West Lombard Street
                 Baltimore, Maryland 21201
25               410-962-4504

| 1 | **PROCEEDINGS OF APRIL 19, 2013** |
|---|---|
| 2 | **THE CLERK:**  All rise.  The United States District |
| 3 | Court for the District of Maryland is now in session, The |
| 4 | Honorable William D. Quarles, Jr. presiding. |
| 5 | **THE COURT:**  Good morning.  Please be seated. |
| 6 | Counsel, are you ready for the jury? |
| 7 | **MR. MONTEMARANO:**  Two things, Your Honor, very |
| 8 | briefly.  Initially, we have been provided with a change to |
| 9 | the verdict sheet this morning -- |
| 10 | **THE COURT:**  Yes. |
| 11 | **MR. MONTEMARANO:**  -- by Ms. Kies. |
| 12 | **THE COURT:**  Very good. |
| 13 | **MR. MONTEMARANO:**  I want to make sure I'm |
| 14 | pronouncing her name right.  I'm a little sensitive about |
| 15 | that.  And I'd like to be heard on that at some point, on the |
| 16 | one. |
| 17 | Secondly, for the record, in terms of scheduling, |
| 18 | I'll be requesting a break before we begin my closing |
| 19 | argument, which will be a couple hours from now. |
| 20 | **THE COURT:**  To compose yourself? |
| 21 | **MR. MONTEMARANO:**  Well, I'd like to make sure the |
| 22 | jury is concentrating on me, and not their bladders. |
| 23 | **THE COURT:**  Okay.  Ready for the jury, folks? |
| 24 | **MR. RUTER:**  Yes, Your Honor. |
| 25 | **MS. YASSER:**  Yes, Your Honor. |

1          Oh, Your Honor, am I permitted to move the easels?

2          **THE COURT:**  You can, but we're trying to keep -- you

3     can do it now, because the connection is not necessary.  If

4     the connection should become necessary, then I'll ask you

5     to move it.  Yes, you may use it.

6          **MS. YASSER:**  Thank you, and let me know if I --

7          **THE COURT:**  Yes.

8          (Jury enters.)

9          **THE COURT:**  Good morning.

10         **JURORS:**  Good morning.

11         **THE COURT:**  Please be seated.

12         Members of the jury, we're entering the final phases

13    of the trial.  As I told you, this phase is the argument

14    phase.  This is where the lawyers get to tell you what they

15    think the evidence has proved.  So I will ask you to give them

16    your full attention.  The Government has promised to be no

17    more than 90 minutes in its opening close, and, again, give

18    the Government your full attention.  I will watch the clock

19    for you.

20         **MS. YASSER:**  Thank you, Your Honor.

21         May it please the Court, ladies and gentlemen.

22         This is a case about two men who profited from the

23    sale and exploitation of women, women already vulnerable

24    because of their status and their position in this country,

25    women who were from all over, and largely up and down the East

1    Coast, who were transported interstate by the Defendants to

2    engage in commercial sexual activity -- prostitution, usually

3    on dirty, mostly bare mattresses in the basements and back

4    rooms of squalor apartments, dark blankets covering the

5    windows so that no light could come in and the outside world

6    was shielded from seeing what was going on, seeing this

7    largely hidden criminal violation.

8         These women were expected to service upwards of 30

9    men a day, $30, 15 minutes, of which the women only kept half,

10   deductions made from that for the bare necessities of things

11   to protect themselves, like condoms, paper towels, rubbing

12   alcohol.  They were not permitted to leave, no fresh air, no

13   lights, only themselves and these men, and no communication

14   with the outside world.  They did that for six to seven days

15   in a row before they were shuttled, herded like cattle to the

16   next location where it would begin again, and all to line the

17   pockets of the men responsible for their exploitation,

18   Defendants Kerlin or Kevin Esquivel Fuertes and Defendant

19   German de Jesus Ventura.

20        And, with respect to Defendant Ventura, it wasn't

21   enough to profit from this illegal sexual commerce.  He wanted

22   to own it.  He wanted to control it.  And you saw, as he

23   demonstrated for you yesterday, what you already knew to be

24   true from all the evidence you had already heard in this case,

25   and that's this defendant's complete and utter disregard for

1    the rule of law, his complete and utter disregard for the

2    value of human life, his unrelenting desire to control the

3    people around him.

4           And you've learned over the course of this trial,

5    these many weeks, that, in order to control the sex-

6    trafficking trade in Annapolis, Mr. Ventura, along, in the

7    early stages, with the help from Kerlin Esquivel Fuentes, set

8    out on a campaign to intimidate and to eliminate the

9    competition through threats of and actual use of physical

10    violence -- a campaign that included intimidating anyone who

11    was perceived to have gotten in their way, starting with

12    El Pelon.

13           You heard from Carlos Campos during this trial.

14    Mr. Campos, if you can recall, was the gentleman who owned the

15    electronic repair shop in Annapolis.  He testified that he

16    knew El Pelon, the victim of the homicide, for about eight

17    years before he was murdered, and Ventura, who he called

18    Pancho, for five of those years.  Carlos Campos testified that

19    El Pelon was in the very same business as Ventura and Fuertes,

20    the prostitution business, and that he saw Fuertes, who he

21    called Flaco, distributing business cards in his neighborhood

22    around the area where Ventura was running brothels at that

23    time.

24           And Carlos Campos testified that, one day back in

25    March or April of 2008, Ventura and Fuertes came to see him

 1    about a car stereo, and, at that time, Ventura told him that

 2    he wanted his friend, Victor, El Pelon, out of Annapolis, out

 3    of his territory.  And, to make sure that they knew that

 4    Campos would take them seriously, Mr. Fuertes took a black

 5    Beretta out of the trunk of the car, and Ventura showed it to

 6    Mr. Campos in the hopes, of course, that he would pass on

 7    their threat to Mr. -- to El Pelon, to Victor.

 8            And you learned that, about five or six months after

 9    this interaction, after this threat, El Pelon was murdered

10    execution style, in the back of the head, and the woman, the

11    prostitute that he was transporting at the time, miraculously

12    was able to survive.  And you heard from a young woman named

13    Rebeca Dueñas, who testified and who was under control of

14    Mr. Ventura at the time that she saw Ventura and Fuertes that

15    night celebrating the murder of El Pelon, Fuertes with a gun.

16            The victim's girlfriend -- El Pelon's girlfriend

17    provided phone numbers to law enforcement.  Those phone

18    numbers were of people who were threatening El Pelon in the

19    months leading up to his execution-style murder, numbers that

20    were the same numbers that Mr. Campos provided for Pancho and

21    Flaco, Ventura and Fuertes, the same men who had come to him

22    to threaten Victor, and those numbers became a starting place

23    for Detective Hartlove, the man assigned to investigate the

24    murder of El Pelon.

25            And what that investigation revealed and what many

1    people testified over the course of this trial is that Ventura

2    used the murder of El Pelon in order to control the sex trade

3    in Annapolis.  Employees like Carlos Ascencio, Maximilliano

4    Zelaya Repalo heard Ventura accept responsibility and take

5    credit for the murder of El Pelon, and the reason -- the

6    reason Ventura was touting his violent achievements was

7    because, even though El Pelon was now out of the way, there

8    were still others who were infringing on his territory; two

9    men in particular, Freddy Soriano and his employee, Hector

10   Avila.

11          Former employees of Ventura like Carlos Ascencio,

12   Maximilliano Repalo among them, testified that Ventura planned

13   to kill the Dominican and his worker, Mr. Zelaya Repalo going

14   as far as driving around with Ventura and a firearm looking

15   for him.  And you saw the threatening text message and picture

16   message, and that's Exhibit 5c/7, and you heard the

17   threatening phone calls that Ventura placed to Freddy Soriano

18   and Hector Avila.

19          That's the picture of a semi-automatic, a magazine,

20   and a Santa Muerte statue, angel of death, that Ventura wished

21   upon Hector Avila and Freddy Soriano.  That message and 19a/6,

22   which was the one sent to Hector Avila, were sent from

23   Ventura's phone number, a phone Ventura was arrested with in

24   November of 2010.  That's the 3124 number that you heard so

25   much about during the trial.  And of course you know that that

 1    same statue was recovered in Ventura's house next to a window

 2    remarkably similar to the one that's depicted there.

 3           And, ladies and gentlemen, these threats of violence

 4    weren't just threats.  You heard that, on November 3rd of

 5    2010, Hector Avila was, in fact, assaulted with a pistol grip

 6    shotgun by one of Ventura's employees, Ferman Martinez

 7    Hernandez.  Who could forget him, right?  He testified here,

 8    and he told you that he set out to assault Hector Avila

 9    because Ventura told him to.  That's why he did that.  And

10    ultimately it was that assault, the escalating violence, that

11    led law enforcement to step in and take down Ventura's sex-

12    trafficking operation, an operation they had been

13    investigating for some time, and that ultimately led to the

14    indictment of, among others, the two men who sit before you

15    today.

16           Ladies and gentlemen -- and what that investigation

17    revealed is that Ventura and Fuertes didn't direct their

18    violence only to other men that were involved in the sex

19    trade.  You learned what happened to law-abiding citizens,

20    members of the community who opened their doors to women

21    working for Ventura.

22           Do you remember the woman Sandra Flores -- she came

23    in -- the hard-working Hispanic woman, the cleaning woman, who

24    lived in ███████████████████████████, during the time

25    period when Olivia Maldonado, the prostitute, was recovered

1       from the apartment downstairs?  She testified that the police

2       came to her and asked that she lend a place for Maldonado to

3       stay that night, because Ms. Maldonado, who was from out of

4       state, had nowhere to go.

5              Ms. Flores agreed, and Ms. Maldonado, likely scared

6       that Ventura would think that it was her that called the

7       police to that location on that day, asked to borrow

8       Ms. Flores' phone.  You saw the phone records.  You saw

9       Ms. Flores' phone records, so you can see who it was that

10      Olivia Maldonado called -- Mr. Ventura at his 0903 number.

11             And, almost -- I think less than an hour later, you

12      saw an incoming call from Ventura to Ms. Flores, and

13      Ms. Flores testified that Ventura called and threatened her

14      and her family.  He threatened to kill her and her family.  In

15      the weeks that followed, Ms. Flores' family was literally

16      terrorized.  They had gasoline placed in front of their

17      doorway, rocks and sticks thrown at their window, and the van

18      of her husband's car was smashed out, and that's all for

19      lending a hand to one of Ventura's women.

20             And it's no wonder that Olivia Maldonado was nervous

21      that this man would think that she called the police, because

22      you heard from Margarita Santiago exactly what he did when he

23      suspected people of calling the police on him.  Remember

24      Margarita Santiago?  She was arrested in September -- end of

25      September of 2009 at ███████████████.  She was with

1    Carlos Ascencio at the time.  Well, she testified that, after

2    that arrest, Ventura called her and threatened her.  He

3    threatened to kill her.  He was on a mission to find the

4    person responsible for calling the police.

5          You also heard that Ventura was easily angered when

6    he saw his women working for local competition, women that he

7    felt that he should control.  Hector Avila testified --

8    remember, Hector Avila is the man who was assaulted on

9    November 3rd, 2010, the competition, one of the competitors

10   for Mr. Ventura, and he testified that he saw, on one

11   occasion, working was a woman named Isabella, a prostitute

12   from Brazil, and, when he got a call for service with

13   Isabella, he went to pull out his car, but he was being

14   blocked.  So he got out of his car, and he saw the Defendant,

15   Ventura, in his green Ford Expedition.

16         And, while Hector Avila couldn't hear everything

17   that was said to Isabella that day, what he did hear was a

18   threat.  He threatened that she needed to get out of there, or

19   something would happen to her, that he knew -- he suspected

20   that she was the one that was working with Hector Avila, and

21   Hector Avila testified that he observed Isabella after that,

22   that she was visibly upset, that she was scared, and that she

23   asked Hector Avila to take her home, which he did.

24         Finally, in order to maximize his profits, Ventura

25   set out to coerce and to compel, through fraudulent means as

1   well as the use of force, a young woman named Rebeca Dueñas

2   Franco, a woman who was trying to get out of the prostitution

3   life.  This man made her false promises, and Ms. Dueñas, being

4   of limited education and limited means, believed him, and she

5   went with him.

6          Not before long, Ventura was harboring her in

7   dilapidated apartments for his own sexual purposes.  He put

8   her to work, keeping all of the proceeds for himself, and he

9   used threats of violence, guns, and actual physical abuse to

10  maintain control over her, and, for a period of time, Ventura

11  did so with the knowledge of his defendant, Fuertes, the man

12  who was at every location where Rebeca Dueñas Franco was being

13  held.

14         Now, as a result of their conduct, Ventura and

15  Fuertes have been charged in a multiple-count Superseding

16  Indictment.

17         If I may, Your Honor?

18         **THE COURT:**  Yes.

19         **MS. YASSER:**  These are multiple counts related to

20  the interstate transportation of women, conspiracy, as well as

21  sex trafficking by force, fraud, and coercion, and I'm going

22  to review these charges and their elements and the evidence

23  that supports these charges and the elements in just a moment,

24  but, before I do, I want to just take a moment to reintroduce

25  myself to you.

1          My name is Rachel Yasser, and I, along with my

2     colleague, Michael Cunningham, have both the privilege and the

3     responsibility of representing the United States in connection

4     with the charges against Mr. Ventura and Mr. Fuertes, and we,

5     together with Special Agent Ed Kelly of HSI, want to thank you

6     for the time that you've taken out of your personal lives to

7     be here and to pay attention to this very serious matter.

8          The Court is going to instruct you at the end of the

9     trial what elements support each and every one of the charges

10    in the Superseding Indictment, and your job as jurors -- and

11    then he'll instruct you on the law, and his instructions will

12    control, but your job as jurors will be to listen to the law,

13    and then apply the facts and the evidence as you heard them to

14    the law as instructed to you by the Court.

15         I want to do that with you now, and I want to start

16    with the discussion of Counts 1 and 2 together.  Count 1 is

17    conspiracy to entice, to travel, or to travel or to transport

18    interstate for purposes of prostitution.  Count 2 is the

19    actual interstate transportation for purposes of prostitution.

20         Starting with Count 1, conspiracy, there are a few

21    elements here -- three elements to the conspiracy charge.

22    First, that two or more persons entered into at least one of

23    the unlawful agreements charged; that is, either enticement to

24    travel interstate or the interstate transportation for

25    purposes of prostitution -- people came to an agreement,

 1    implicitly or explicitly; two, that the Defendant knowingly

 2    and willfully joined the conspiracy; and, three, that one of

 3    the members of the conspiracy, either the Defendants or other

 4    co-conspirators, knowingly committed at least one overt act in

 5    furtherance of the conspiracy, they did something -- they put

 6    some plans in action to make it happen.

 7            And there are several overt acts charged in the

 8    conspiracy.  The Judge will read them all for you.  I'm not

 9    going to do that now.  All you have to do is agree that one

10    act was made in furtherance of the conspiracy.  So this is a

11    fairly straightforward charge.  You just have to ask

12    yourselves:  Did Fuertes and Ventura agree, either implicitly

13    or explicitly, with each other or others involved in the

14    conspiracy to participate in an illegal operation that

15    included the transportation of women, the enticement of women

16    to come into Maryland for purposes of prostitution?

17            Count 2 is the actual physical or arrangement to

18    physically transport people in interstate commerce for

19    purposes of prostitution.  Elements are simple:  The

20    Defendants knowingly transported any individual in interstate

21    commerce, and the Defendants transported this individual with

22    the intent that they would engage in illegal sexual activity,

23    here prostitution.

24            Ladies and gentlemen, the evidence on these two

25    charges is fairly uncontroversial.  It's why the Defense told

1    you in opening statements that there was no disputing that

2    these two men were involved in prostitution, and you know now

3    from all the evidence that you heard in this case what kind of

4    prostitution that business was.  That model, you learned,

5    relied on the interstate transportation of women.  These women

6    came from all over, and they were on sort of a circuit,

7    because the men, as you heard -- the customers -- wanted

8    variety, and so the women would move interstate from one place

9    to another.

10          So what the Defense essentially told you in opening

11   statements and what I predict they'll tell you again is that

12   the Defendants are not guilty of these two charges because

13   they didn't force anyone to commit prostitution.  Well, as you

14   know from having just seen the elements of the these offenses,

15   there is no such requirement for these charges.  The bottom

16   line is it's unlawful for people to conspire to and then to

17   transport or offer people to travel in interstate commerce for

18   purposes of prostitution.  It's the actual conspiracy and then

19   the actual enticement and transportation that are separately

20   criminalized.  The question of voluntariness is simply not

21   relevant to these charges.

22          So let's talk a little bit about what is relevant.

23   What is relevant with respect to Count 1 is whether the

24   Defendants were members of the conspiracy related to

25   interstate transportation and, in Count 2, whether the

1    Defendants did, in fact, transport or arrange for the

2    transportation of some of these women for purposes of

3    prostitution.  The evidence that you've heard is overwhelming

4    as to both of these two counts.

5          I apologize to those on the end who can't see, but

6    you'll have these back with you in the jury room.

7          What you learned from multiple witnesses in this

8    trial is that Defendant Ventura was operating several brothels

9    in the Maryland area, as well as in Virginia -- I'm sorry --

10   the Annapolis area, Virginia, as well as Easton, and that, for

11   a significant period of time, Mr. Fuertes was working with

12   Mr. Ventura.  He handed out business cards.  He worked in the

13   brothels, collecting money to give to Ventura.  In addition to

14   working in the Maryland brothels, two of which he was actually

15   arrested in, he also worked in Virginia, you heard from a

16   couple of witnesses -- work that, of course, required the

17   interstate transportation of women as part of the circuit from

18   Maryland to Virginia and back.

19         In addition to the witness testimony that these two

20   men were engaged in interstate transportation and enticement,

21   you can be certain of the existence of this conspiracy based

22   on the physical evidence that was seized and that you saw over

23   the course of this trial, evidence that literally shows the

24   connections between these two people and their illegal

25   enterprise, the brothels that they were operating.

1          Starting with the September 2008 arrest of

2     Mr. Fuertes, you learned he was driving a Nissan Altima that

3     day, and that, after he gave a false name and a false birth

4     certificate, he was arrested, and his car was towed, and it

5     was later searched, and inside that car were 500 or so

6     prostitution business cards of which you've heard plenty

7     about, Crown condoms, and a machete.  And, if you recall the

8     registration on that vehicle, it was in the name of Amparo de

9     Jesus Gonzalez at ████████████████, a brothel where

10    Mr. Fuertes was, on another occasion, actually arrested.

11         Now, who is Amparo de Jesus Gonzalez?  Who knows?

12    Who cares?  It might not even be a real person, but what's

13    significant about this name is that it showed up throughout

14    this trial, and it shows the connection between these two

15    defendants.

16         Let's take a look at the business card that

17    Mr. Fuertes was arrested with.  That provides an address, ████

18    ████████████, the same address on the Nissan registration, as

19    well as a phone number.  The subscriber to that number is

20    Amparo de Jesus Gonzalez at ████████, and also, on a prior

21    occasion -- this is 36d -- a prior occasion, the address of

22    ████████████, Ventura's residence, the same place he was

23    arrested in and he admitted was his home.

24         The subscriber to the telephone number Fuertes gave

25    when he was arrested, the 5015 number -- and this is 36b --

1    Dulce Maria Benites Ventura.  And the number that Ventura was

2    also arrested with has a phone subscribed to ███

3    █████████████, and this is 36h.  That's 09 or a -- I'm

4    sorry -- that 0903 number.  And what you see from these

5    records is that number was first subscribed to German Ventura

6    at ██████████.  But, after the death of Pelon, even that number

7    changed to Amparo de Jesus Gonzalez at ████████████████.

8    These men are using the same aliases, the same addresses to

9    conduct their affairs, the same address that's actually

10   associated with a brothel in which Fuertes was arrested.

11        And you also saw the BG&E bills at that brothel, as

12   well as others, in the name of Amparo de Jesus Gonzalez, first

13   at the ██████████████ location, and then again, on another

14   instance months later, at the same location, all of which

15   establishes the connections between these two defendants and

16   their involvement in the same illegal enterprise.

17        Now, the next day after Mr. Fuertes was arrested in

18   the Nissan Altima, you learn that ██████████, his residence,

19   was searched, and you saw pictures of that residence.  Just as

20   an example.

21        (Photograph displayed.)

22        **MS. YASSER:**  There was no question what was going on

23   behind those doors.  That's in the basement.  There was

24   another picture similar to that one.

25        Rebeca Dueñas was present, and she testified that

1    she was working for Ventura at the time, and that was

2    Ventura's brothel, which Fuertes was responsible for running,

3    and her testimony was supported by the physical evidence

4    recovered there.  Her belongings were in an upstairs room

5    showing that she was living there; she wasn't just a temporary

6    resident like the other prostitutes that were there.  There

7    was a huge bag of condoms recovered in Fuertes' room, Crown

8    condoms that are manufactured out of this country and that are

9    commonly used in the sex trade.

10           Pancho's name and number was recovered in a notebook

11   there.  You know whose number that is, because he was arrested

12   with it some weeks later.  That's German de Jesus Ventura at

13   the top.  You also heard that there was a house phone seized

14   at ███████ on that day, a phone that, when law enforcement was

15   actually there, started calling in and asking for women.

16   That's the phone they used to generate their business, and you

17   can see -- and that was the 8198 number, I believe, or 8168

18   number.  And so, when you look at that number for evidence of

19   conspiracy, what you learn is that that house phone number at

20   ████████████████ -- this number had multiple contacts with

21   Mr. Ventura as well as Fuertes, the two numbers these

22   gentlemen had at the time.  We know they had them because they

23   were arrested with them.  315 contacts in a two-month period,

24   83 contacts in a five-day period.

25           And not only that, establishing their connection

1    between the brothel, the business of interstate

2    transportation, you can also see the contacts between each

3    other, between themselves, further evidence of people that are

4    involved in a conspiracy, because, frankly, who speaks 919

5    times in four months?  Who speaks 3,000 times over a period of

6    a year?  Men who are involved in business together.  You know

7    from the context, the evidence in this case, precisely what

8    that business was -- the business of interstate transportation

9    for purposes of prostitution.

10           About a year following Fuertes' arrest in his car

11   and at ███████ -- there was an interim arrest as well at ███████

12   ███████ -- Mr. Ventura was arrested with evidence that further

13   confirmed that he was the leader of this illicit business.  He

14   was arrested on September 24th of '09 with a large amount of

15   cash and tally sheets -- tally sheets with the names ██████ or

16   ██████, which is ██████, you heard, and ████████████, which is

17   the ██████████ operation.  Who has that kind of cash and

18   tally sheets with two locations but the leader and organizer

19   of a business?  And the names on those tally sheets of course

20   correspond to locations that you know were searched and that

21   were, in fact, brothels during the same time that Mr. Ventura

22   was arrested.  There is no question what was going on behind

23   those closed doors and in those basement rooms.

24           And, with respect to the ████████████ location that

25   was on Ventura's tally sheet, that was also a location where

1    Mr. Fuertes had been arrested just months prior.  He was

2    arrested there running that operation that belonged to

3    Ventura, and we know that, after that arrest, which was in the

4    March time frame of 2009, Fuertes was placed in deportation

5    proceedings, and he eventually FTA'd for an appearance

6    there -- failed to appear for an appearance there.  We later

7    learned where it was exactly that he was -- running one of

8    Ventura's operations in Virginia, ███████████.

9           You heard testimony from Carlos Ascencio that he

10   began -- Carlos Ascencio, who began working for Ventura about

11   four months prior to his arrest in September of 2009, met

12   Ventura at Alex's brothel.  Do you recall that testimony?  He

13   testified that he was initially -- Carlos Ascencio was

14   initially working for a man named Alex, a man who had a bad

15   eye, and that Ventura came to that brothel -- Alex's brothel

16   as a customer, and that he recruited Carlos Ascencio to work

17   for him in Maryland, and Carlos Ascencio, who was on

18   probation, decided that that was a good idea, to get a little

19   bit further outside of Washington, D.C. where he was.

20          Carlos Ascencio, if you remember, also testified --

21   and this will be relevant later -- that Ventura would come to

22   Alex's house looking for the most beautiful women to take as

23   his own.  Carlos Ascencio testified that, when he began

24   working for Ventura, it was the same as it was in D.C., that

25   these women came from out of state from New York -- I think he

1    said Boston and elsewhere -- and that, on at least on one

2    occasion, Ventura directed him to pick up a woman from New

3    York, from the bus station in D.C., and then transport her to

4    Maryland.  He, just like everyone else in this case, said that

5    these women were rotated on a weekly basis from brothel to

6    brothel and across state lines and back.  That is simply how

7    this business operated, and everyone knew it.

8         One of the places that Ventura rotated his women was

9    this brothel at █████████, the same brothel that Ventura was

10   surveilled bringing a woman to later in August of 2010, and

11   that, Carlos Ascencio -- what Carlos Ascencio told you is

12   where he met a man named Pacha and Juano and who he identified

13   in this courtroom as Defendant Fuertes.

14        Carlos Ascencio said that Fuertes was running that

15   location, and that he would later see -- after he went with

16   Ventura and this prostitute to Virginia, where he saw Fuertes,

17   that he would later see Fuertes also in Maryland at the end of

18   the week, when the week's work was done, bringing the cash

19   back to Ventura and dropping off the women from the Virginia

20   brothel back to the Maryland brothels.

21        That, ladies and gentlemen, constitutes specific

22   instances of transportation that support Count 2 as to both

23   Ventura and Fuertes.

24        The phone records you saw also corroborated this

25   testimony with respect to Mr. Fuertes and his connections to

Case 1:10-cr-00770-WDQ   Document 307   Filed 03/19/14   Page 23 of 201
Closing Argument by the Government
T-IX-1733

 1    the Virginia brothel.  You saw -- and this is 40f/1 on our

 2    association chart -- that this number, 4168, was saved under

 3    Ascencio's phone as Juano, the man he identified as Fuertes,

 4    and that same number was saved in Ventura's phone as Pacha,

 5    the other name for Mr. Fuertes that Ascencio identified; was

 6    also saved as Norfo, which is common; they save the names of

 7    the brothels as the names of the brothels.  It was also saved

 8    as Flaco on other phones connected to this case, ■ -- at ■

 9    ■, Ventura's residence in November of 2010.

10          So all the connections establish that this

11    particular phone number was Fuertes' number at the time, and

12    what you see between that number and Mr. Ventura are, again,

13    numerous connections evidencing their participation in a

14    conspiracy.

15          So, in conclusion on these two counts, it's

16    eyewitness testimony, the physical evidence that were seized

17    and that you saw in this courtroom, as well as the phone

18    records that establish the conspiracy between these two

19    individuals to engage in interstate transportation for

20    purposes of prostitution as well as the actual interstate

21    transportation of women for purposes of prostitution.

22          Now, Counts 3, 4, and 5 in the Indictment are what

23    we call substantive counts that involve Ventura and only

24    Ventura and his enticement and transportation of women on

25    specific dates that are certain in this investigation.  These

1    are dates where we actually know, although it's not required

2    under the law, but we actually do know the names and

3    identities of the women that were being transported, either

4    because they were caught on surveillance, or because they were

5    actually arrested in one of Ventura's brothels.

6         I want to start with Count 3, enticement to travel

7    interstate for transportation -- I'm sorry -- enticement to

8    travel interstate for purposes of prostitution.  And this

9    count relates to Margarita Santiago, September 2009, who you

10   heard from in the course of this trial, and the elements of

11   this offense are as follows.  The first is that the Defendant

12   knowingly persuaded or induced or enticed or coerced an

13   individual to travel in interstate commerce; that the

14   individual did, in fact, travel; and that the Defendant acted

15   with the intent that she engage in prostitution.

16        The foundation for this charge, as I indicated, is

17   the testimony of Margarita Santiago, a woman who, at the young

18   age of 16, was forced in her home country to engage in

19   prostitution.  She was sent here by the father of her

20   children, who was essentially keeping them captive in her home

21   country.  They were living with her mother -- with his mother.

22   She was forced to give all her earnings to her cousins -- his

23   cousins who were in New Jersey, and, if she did not send

24   money, she could not see her children.

25        So, in September of 2009, already engaged in

 1    prostitution, she got Ventura's number from another woman, who

 2    was also so engaged, and she called him, and Ventura offered

 3    her work as a prostitute here in Maryland.  He told her to

 4    come to D.C. on a bus where he would pick her up.  She

 5    testified that, upon her arrival here in Maryland after

 6    traveling from New Jersey, she called Ventura, and he picked

 7    her up in D.C. and transported her to Maryland.

 8            She worked for him for one week.  She went back up

 9    to New Jersey for one day to deliver the money, and then came

10    back per instructions, per agreement between her and Ventura

11    that he would, again, offer her work for the following week.

12    And you saw the phone records that corroborated her accounts.

13    You saw the contacts between her and Mr. Ventura up through

14    and including the day of her arrest on September 24th of 2009.

15            And Ms. Santiago testified that, when she came here

16    to Maryland, she did, in fact, work in Ventura's brothels, as

17    well as the brothel in Virginia.  And she testified that, when

18    she did so, she slept in the same room where she was meeting

19    her customers.  She was not permitted to go out, that the ones

20    that cared for the brothel would bring her her food and her

21    necessities.  She testified that she was sometimes treated

22    quite badly, and that, on one occasion, she was assaulted by

23    one of the customers -- an assault that she didn't report

24    because, as she described it, the customer would threaten to

25    call the police if she said anything to anyone about what had

1    happened.  In her mind, it was the same police who threatened

2    Immigration -- deportation upon her, and threatened to take

3    her children away.  It's no wonder that these women don't

4    report these crimes.

5              Margarita Santiago was arrested the third time she

6    came to Maryland to work for Mr. Ventura.  That was at █████

7    █████████████.  That was with Carlos Ascencio and another

8    woman, Helen, who came from D.C.  You saw the pictures of ████

9    ████.  There is no question what was going on there at that

10   date and time, and there was no question that Margarita

11   Santiago traveled from New Jersey to Maryland at Ventura's

12   direction to engage in prostitution.

13             Her testimony was uncontested, and it's unequivocal.

14   She would not have come here to Maryland on the occasion

15   charged in the Indictment if she had not had work offered to

16   her by Mr. Ventura.  It doesn't matter that she was willing.

17   It doesn't matter that she was engaged in prostitution.  She

18   only came to Maryland on that occasion -- I should say those

19   three occasions for the purpose of engaging in prostitution,

20   and that, ladies and gentlemen, makes the Defendant guilty on

21   Count 3.

22             Counts 4 and 5 are, as I said, specific instances of

23   transportation again.  Count 4 relates to Bridgett Alcivar and

24   the August 2nd, 2010 transportation of her from Maryland down

25   to Norfolk or, more specifically I guess, Portsmouth, Virginia

1    at ████████████.  You saw Ms. Alcivar on the surveillance

2    images, and you learned that this was on a Monday.  After

3    hearing all about how the operation worked, you know that

4    Bridgett Alcivar is coming to meet Ventura on a Monday.  You

5    see Ventura get out of his car, help her with her bags, and

6    then she goes into his car where surveillance tracks them

7    going into Portsmouth, Virginia.  ICE agents in Norfolk pick

8    up the surveillance and watch these two individuals go into ██

9    ████████████, a location that was confirmed by the

10   consensual calls to be a brothel.  Ms. Alcivar, we know, has a

11   history of prostitution arrests, and we know -- we know

12   without having to hear from her exactly what Ventura was

13   transporting her to do on that day.

14          You also, by the way, saw on Ventura's phone the

15   number that he had at the time, if you recall, the 3124

16   number.  You could physically see the phone crossing state

17   lines to take Ms. Alcivar down to Portsmouth, Virginia during

18   the time period that surveillance was not being conducted on

19   them.

20          Count 5, again, is the same substantive count with

21   respect to Mr. Ventura only and his transport of a woman named

22   Bonita Torres Moran.  This was the woman who was -- law

23   enforcement recovered with Mr. Ventura on the morning of his

24   arrest, November 15th, 2010.  This was a woman who had on her

25   person a number for Mr. Ventura.  You can see -- it might be

 1    difficult to see, but, if you see, about halfway through this

 2    calendar that was in her possession, Oscar Norfo, and a

 3    number, the 3124 number that we know that Ventura was arrested

 4    with that very same day, and you saw the contacts between

 5    those two numbers on that day, a Monday, the day where women

 6    are being brought to the next location to start their

 7    workweek.

 8         Ms. Bonita Torres Moran had a large amount of

 9    condoms on her person.  Mr. Ventura had prostitution business

10    cards as well as tally sheets on his person.  Surveillance

11    picked these two up in D.C., when Ms. Moran was already in the

12    vehicle with Mr. Ventura, after watching Mr. Ventura go into

13    D.C.  They then pick him up again.  She's in the car.  He

14    moves her across state lines on the way to ██████████████,

15    where he's arrested, and the items that I just described were

16    seized from the vehicle.

17         You know exactly what Mr. Ventura was taking

18    Ms. Moran to do that day -- to have sex with upwards of 30 men

19    in a dark, dirty basement room, no sheets, coverings on the

20    windows, making minimal amounts of money, with Mr. Ventura and

21    his co-conspirators keeping the rest for themselves.  And that

22    transportation, ladies and gentlemen, makes the Defendant

23    guilty as to Counts 4 and 5.

24         Count 6 relates to both defendants, and it's the sex

25    trafficking by force, fraud, or coercion.  You heard from a

1    young woman who, in addition to being trafficked interstate by

2    Ventura and Fuertes, was also the victim of coerced and forced

3    sex trafficking at the hands of Ventura, but also to the

4    financial benefit of Mr. Fuertes, and that is a separate

5    violation of law.  It's Count 6.

6              In the course of the time that Ms. Dueñas was made

7    to work for Ventura, you also learned that Ventura both

8    possessed and used firearms in connection with her

9    trafficking, and that, as to just Defendant Ventura, is

10   Count 7.  I'm going to review those elements with you now,

11   starting first with Count 6.

12             Count 6 requires the Government to prove beyond a

13   reasonable doubt first that the Defendants either knowingly

14   recruited, enticed, harbored, transported, provided, or

15   obtained a person by any means, or benefited financially from

16   participation in a venture so engaged, and I see some of you

17   writing, so I want to just remind you that you will have the

18   written instructions with you back in the jury room.

19             Two, the Defendants knew that force, fraud, or

20   coercion would be used with respect to this person; three,

21   that the Defendants knew that this person would be engaged in

22   a commercial sex act -- prostitution, exchange of money for

23   sex; and that the Defendants' conduct was in or affecting

24   interstate commerce, as simple as the movement across state

25   lines, the use of telephones, the use of condoms that are

1    manufactured out of the state.

2           And I submit to you that, with respect to

3    Elements 1, 3, and 4, it's largely uncontested with respect to

4    Ms. Dueñas.  The real question has to do with Element 2,

5    whether Defendants knew or had reason to know that force,

6    fraud, or coercion would be used with respect to Ms. Dueñas.

7           With respect to Count 7 -- and, again, this is just

8    the Defendant Ventura on Count 7 -- he's been charged with

9    possession of a firearm in connection with a crime of

10   violence, which is the sex trafficking of Ms. Dueñas.  Count 7

11   requires the Government to prove beyond a reasonable doubt,

12   first, the Defendant committed a crime of violence, which is

13   Count 6, that he did, in fact, sex traffic by force, fraud, or

14   coercion Ms. Dueñas, and that the Defendant knowingly

15   possessed or -- a firearm in furtherance or used or carried a

16   firearm in or in relation to that particular crime.

17          The victim of these counts, Rebeca Dueñas, was just

18   19 years old when she came into this country.  She came from a

19   small town in Guatemala named -- called Retantelco, where she

20   was removed by her parents from school at the age of eight or

21   nine years old, in third grade, so that she could help them

22   farm.  This is a young woman who came to Maryland knowing only

23   one person, knowing of only one person in the United States, a

24   woman that you heard about called Anna, and I say "knowing

25   of," because I think you also learned that this was somebody

1     who her mother's friend had gotten a number for, that

2     Ms. Dueñas had never met this particular woman before she came

3     into the United States.

4          And, when Ms. Dueñas arrived in the United States,

5     she had no family, no friends, no education, no English

6     skills, and no money.  She was illegally present in the United

7     States, and she was pregnant with a child that resulted from a

8     rape by a coyote during her transport here, an all-too-common

9     occurrence.

10         Ms. Dueñas came into this public courtroom.  She

11    testified in front of a group of people who she had never met

12    before, and she testified about things, I submit, that were

13    extremely painful for her to relive.  She talked about abuses

14    that she had suffered both before and after she met the

15    Defendants.

16         **DEFENDANT VENTURA:**  Excuse me.  Can you --

17         **INTERPRETER BLUMBERG:**  Excuse us one moment.  The

18    battery ran out.  Apologize.

19         Thank you, Ms. Yasser.

20         **MS. YASSER:**  Remember how I mentioned control?

21         **MR. RUTER:**  Objection.

22         **THE COURT:**  Overruled.  This is argument.

23         **MS. YASSER:**  It was clear that Ms. Dueñas was very,

24    very visibly upset, that she was -- felt some amount of shame

25    and embarrassment at the three years of prostitution for which

1    she was engaged.  She was terrified at confronting the men who

2    were responsible for trafficking her, and that came across in

3    her testimony.  She testified in front of you for over six

4    hours, over four of which she was subjected to cross-

5    examination by incredibly experienced defense counsel.

6         Can you imagine the toll that that takes upon a

7    person?  And Ms. Dueñas, though at times she did have to

8    compose herself and take a sip of water before she could

9    answer a question, I submit to you that she answered the

10   questions that were posed to her by the Government precisely

11   the same way that she answered the questions that were posed

12   to her by the Defense.  She was direct, she was not defensive,

13   she was not combative, and she was not evasive -- complete and

14   utter contrast to what this defendant did when he testified

15   here yesterday -- testimony that was so incredibly absurd that

16   I submit that you can just dismiss it outright.

17         Now, with few exceptions, exceptions I submit were

18   more result of confusion or lack of education, Ms. Dueñas'

19   testimony did not waver.  She was credible, and her account

20   was corroborated at every single turn.  Starting first, her

21   testimony about what she did for a relatively brief period of

22   time in the United States when she got here.  She talked about

23   her job at the recycling plant, and we saw a photograph of

24   Ms. Dueñas working at the recycling plant.

25         Not before long, she met a man named Alex, a man

Case 1:10-cr-00770-WDQ   Document 307   Filed 03/19/14   Page 33 of 201
Closing Argument by the Government
T-IX-1743

1    with a bad eye, a man who she met in a restaurant.  You heard

2    about Alex from other independent witnesses in this case.  You

3    heard about him from Carlos Ascencio, the same man with a bad

4    eye who was involved in prostitution.  You also heard about

5    him from Special Agent Kelly, who confirmed that a brothel was

6    searched in a location in D.C. that was attributable to Alex.

7    It's a real guy.

8              With respect to Ms. Dueñas, Alex at first was nice

9    to her.  He took her out to dinner.  He arranged for his aunt

10   to help care for his daughter.  He groomed her.  That's what

11   that is.  He softened her, and then he used her daughter

12   against her to get her to work in prostitution.  You've heard

13   that before.  That happens in these cases.  It's the same as

14   what happened to Margarita Santiago.  Suck them in.  They use

15   people they love against them, and they compel them to engage

16   in prostitution -- work that you know, as Margarita Santiago

17   testified, and has Rebeca Dueñas told the police back in

18   September of 2008, work that no woman wants to do -- no woman.

19             Sometime later, Ms. Dueñas met Ventura.  She

20   testified that Ventura was a customer in Alex's house, that he

21   was nice to her, that she told him that she wanted out of this

22   life, and that he offered to help her.  He offered to take

23   care of her and her daughter.  He promised her a better life,

24   one without the defacement of prostitution, and that too was

25   corroborated by an independent witness in this case, Carlos

1    Ascencio, who, before he worked for Ventura, worked for Alex,

2    and he testified that Ventura actually recruited him from

3    Alex's brothel and that Ventura would go there, and he would

4    look for the most beautiful women, the women who would bring

5    in the most amount of money, and he would go there to take

6    them as his own.  And that's exactly what he did with

7    Ms. Dueñas.  He went there, he saw she was young, she was

8    pretty, petite, and he knew that she would bring him a lot of

9    money.

10          Rather than using her as a regular prostitute, he

11   had a plan to lure her in, to build her trust, to make her

12   dependent on him for everything -- transportation, food, care

13   of her daughter, shelter -- and then, when he had her under

14   his control, he could direct her actions, keeping all the

15   money that she was made to earn for himself, and that, ladies

16   and gentlemen -- those false promises, those

17   misrepresentations to start is enough to support Count 6 as to

18   Mr. Ventura.  You'll hear from the Judge that fraud as defined

19   under that statute is simply defined as a misstatement or

20   omission of a material fact to entice someone to engage in

21   prostitution.

22          But there is a lot more than just fraud.  After

23   Ventura weakened her even more than she already was, he threw

24   her a box of condoms -- chocolates, I think she called them --

25   and told her it was time to get to work.  And, when she

1     resisted, she was beaten.  Some of those beatings left marks

2     on her body.  RDF testified -- Rebeca Dueñas Franco testified

3     that, on one occasion after being moved from ▆▆▆▆▆▆▆▆▆,

4     sometime following the police encounter there, she was moved

5     to ▆▆▆▆▆▆▆, which was a location outside -- just outside

6     Baltimore City, a location that was owned, as you heard from

7     Mr. Kim, the Korean owner at that location.  By Ventura, she's

8     moved there, and she was whipped with a belt when she refused

9     to have sex with Black men.

10           Now, it's safe to assume, based on the testimony of

11    others that you heard over the course of this trial, that the

12    Hispanic brothel model was such that the women had never been

13    asked -- that Ms. Dueñas had never been asked before to

14    perform commercial sex acts with men outside her own

15    community, and she told you that she refused to do so,

16    something that's not easy to admit.  She admitted it.

17           And what happened to her in response was that she

18    was whipped with a belt, a beating that Defendant Fuertes was

19    present for, and she testified that, after this beating and as

20    a result of it, she did engage in the commercial sex that she

21    was directed to do, sexual acts for which the proceeds were

22    then shared between Defendant Ventura and Defendant Fuertes,

23    and that incident, again, alone supports the finding of guilty

24    as to both Defendants on Count 6 -- Ventura because he was the

25    one who actually used the force to compel the prostitution

 1   acts, and as to Mr. Fuertes because he benefited financially

 2   with the knowledge that such abuse was done.

 3        Let me just say one thing about Fuertes before we

 4   move on to Count 7.  This is a man who was present at every

 5   single brothel where Ms. Dueñas is recovered over the course

 6   of this investigation.  He's there in 2008.  He's there again

 7   in March of 2009.  He's at ███████████ with Ms. Dueñas in

 8   April of 2009.  So, even without the testimony about this

 9   particular physical assault, I submit that this is a man that

10   had to have known what was going on.  He had to have known.

11   And, if he didn't know, he simply turned a blind eye to it.

12        And that, ladies and gentlemen, the Judge will tell

13   you, makes him just as guilty in the eyes of the law.  And

14   don't forget either that this is the man who helped

15   Mr. Ventura, who helped him with his dirty business, helped

16   him threaten El Pelon.  He had a gun.  This wasn't a man who

17   was going to object to mistreatment of women.  He wasn't going

18   to stop it, especially when it inured to his financial

19   benefit.

20        There is some level of forensic corroboration to

21   Ms. Dueñas' account as well.  You recall that the injury from

22   the belt to, I believe, her left thigh, as well as two others

23   that she testified Ventura was responsible for -- an injury to

24   her elbow where she was pushed down on rocks, as well as an

25   injury to her left -- lower left leg by her ankle where she

1    said she was sliced by Mr. Ventura, those were noted by a

2    doctor in this case, as she testified as an expert with

3    respect to cutaneous or skin findings, and Dr. Baker

4    actually -- she independently noted four significant injuries

5    to Ms. Dueñas, which she took down in her report, one of which

6    Ms. Dueñas, you know, doesn't attribute to the Defendant but

7    was a significant physical mark on her body caused by the car

8    door.

9           Dr. Baker saw, for example, the injury to Rebeca's

10   right thigh -- left -- I can't remember, but I believe left

11   thigh -- that was consistent with the tip of a belt.  She made

12   note of the injury to the elbow, which was precisely --

13   remember that star-like injury on the elbow?  What did she

14   call that -- that was consistent with being pushed down upon

15   rocks.  And she also felt and saw a scar -- a significant scar

16   to Ms. Dueñas' ankle that was consistent with being cut with a

17   knife.  She knew that because of the shape and the size and

18   its location, a location that was not consistent with self-

19   infliction of wounds, a finding that serves to further

20   corroborate Ms. Dueñas' testimony that Ventura sliced her

21   ankle for refusing to perform what she thought was a

22   distasteful sexual act with an inanimate object.

23          Ladies and gentlemen, it's not only the abuse, the

24   Judge will tell you, that the Defendant inflicted upon

25   Ms. Dueñas directly that matters in assessing the legitimacy

1    of her fear of Mr. Ventura and the reasonable belief of hers

2    that Ventura's threats of harm to her were real, but it's also

3    her observations of beatings and threats and acts of violence

4    that she witnessed against others, all of which served to

5    combine to create a general climate of fear around Ms. Dueñas.

6           For example, the time she witnessed Ventura beating

7    a woman named Cassandra, a prostitute who had worked for

8    Ventura and was suspected by Ventura of having called the

9    police to rob one of his brothels.  That also, by the way, was

10   in the presence of Fuertes, who did nothing to stop it.  The

11   time Ventura hit Colmillo, a male worker of his, that you

12   heard a little bit about throughout the trial.  Let me show

13   you Colmillo.  And the bottom row of this chart are the men

14   that were arrested in Mr. Ventura's brothels.  This is Reyes,

15   Colmillo.

16          And all the threats that she overheard being made to

17   competitor pimps.  And then, finally, her very reasonable

18   belief that Ventura and Fuertes, based on her observations

19   back in September of 2008, were, in fact, responsible for the

20   murder of El Pelon.  All of that is in Ms. Dueñas' head, and

21   all of it is relevant to assessing the reasonableness of her

22   fears.

23          Then of course, leading into Count 7, there are the

24   guns that Ms. Dueñas saw Ventura with and Fuertes with on

25   several occasions.  Ms. Dueñas, of course, was one of five

 1    people who came into this courtroom and testified under oath

 2    that they observed Ventura with guns on various occasions:

 3    Carlos Campos, Carlos Ascencio, Maximilliano Repalo, and

 4    Ferman Martinez Hernandez.  And of course he had guns.

 5    Mr. Ventura was the owner and operator of at least six or

 6    seven brothels in the Maryland and Virginia area, a business

 7    where many other men were involved in robberies, assaults.

 8    They would call the police on one another.

 9          You heard from the telephone calls -- the recorded

10    calls that he was involved in -- constantly involved in sort

11    of turf wars with these other men that were involved in sex

12    trafficking.  It's common sense that Ventura would have guns

13    in his operation, and simply because law enforcement recovered

14    only one of those guns as well as various machetes says

15    nothing about whether those guns existed on prior occasions.

16    Criminals get rid of their guns all the time.  It's what they

17    do.

18          With respect to Ms. Dueñas, she testified that she

19    saw Ventura with guns on multiple occasions, but two different

20    guns that she remembered.  One was a black automatic,

21    consistent with the same gun that Carlos Campos had seen, and

22    one was a silver gun with some cream color on it as well, or

23    maybe the cream was on the other one, and that she saw -- she

24    couldn't recall when the last time she saw that gun was,

25    whether it was before she was arrested or -- I'm sorry --

Case 1:10-cr-00770-WDQ   Document 307   Filed 03/19/14   Page 40 of 201
Closing Argument by the Government
T-IX-1750

1    before Ventura was arrested in November of 2010, but what she

2    did remember is that, on several occasions, Ventura would use

3    the gun against her, that he even, on one occasion, held it to

4    her head, and, though he said that he was just joking, just

5    playing around, that it made her feel afraid, that she was

6    scared of Mr. Ventura, and, because Ventura's possession and

7    use of these firearms helped to keep her subdued, helped to

8    maintain her fear, he is guilty as to Count 7 for using and

9    possessing them in connection with sex trafficking.

10         In light of all these surrounding circumstances and

11   in consideration of Ms. Dueñas' particular station in life,

12   her education, her lack of English skills, her physical and

13   mental condition, all of which the Judge will tell you is

14   relevant and appropriate to consider, all of this in

15   conjunction with the acts done by Mr. Ventura and Mr. Fuertes

16   allow you to find that Ms. Dueñas reasonably believed that she

17   didn't have a choice but to continue performing commercial sex

18   acts as directed by Ventura, and, to be sure that Ms. Dueñas

19   felt that she had no reasonable choice but to continue

20   engaging in these acts, all you have to do is ask yourself:

21   What pregnant woman chooses -- chooses, according to

22   Mr. Ventura -- to engage in prostitution?

23         Do you recall her testimony that Ms. Dueñas, when

24   she became pregnant with Mr. Ventura's child, was hopeful that

25   this would be the time when he would allow her to stop, but

1   that he did not let her stop, that she was, in fact, injured

2   as a result of seeing clients while pregnant, and you saw the

3   surveillance images from that trip to the hospital, and you

4   saw the hospital bill that was recovered in Ms. Dueñas' house.

5   I shouldn't say "house."  It was a room -- a basement room.

6          And you can literally see the misery on that woman's

7   face.  You can see the vacancy and the emptiness there.  And,

8   remember, she testified that, despite being pregnant and

9   despite this injury, she was made to keep working in

10  prostitution up to the day that Mr. Ventura was arrested in

11  November of 2010, the end of the investigation.

12         Ms. Dueñas was five or six months pregnant at the

13  time.  You know that because of when her son was born in March

14  of the following year, and you know that Special Agent Kelly

15  identified in Ms. Dueñas' -- not Ms. Dueñas' messages, but,

16  rather, the Defendant's messages, text exchanges between her

17  and the Defendant that indicated that Ms. -- what this is,

18  ladies and gentlemen -- this is a text sent by Ms. Dueñas to

19  Mr. Ventura that confirmed that she was indeed pregnant at the

20  time and working at the time, if you look at the following

21  three messages showing her texting of addresses related to

22  prostitution, related to brothels.  The first message was sent

23  on November 6th, 2010, and she sends a text at 1:35 a.m.  The

24  1:35 a.m. text, which is 39b/2, Mr. Cunningham.

25         She sends a text at 1:35 a.m. telling Mr. Ventura

1    that the baby is moving a lot -- a desperate, albeit failed,

2    plea to him to let him know that she doesn't want to work, but

3    the next text reveals that her appeal didn't work.  She's

4    still working, and that text is a address that she texted to

5    Ventura, consistent with her testimony that she had to text

6    him when she arrived at a new brothel or arrived at a location

7    where she was being a prostitute.

8            And, from a review of those recovered texts, you

9    also saw a text that I submit suggests this woman's complete

10   submissiveness to Mr. Ventura -- submissiveness in her voice

11   before she's encountered by law enforcement, and, at this

12   point in time, ladies and gentlemen, she's over two years in.

13   She's completely resigned to Ventura's demands.  You saw where

14   he had her living.  It was a small basement room, no food, no

15   real money, no means of transport, dependent on this man for

16   everything, exactly as he had initially planned.

17           Ladies and gentlemen, at the end of the day, this is

18   a case about two men who exploited, who made their living off

19   the sale and exploitation of women's bodies, of human

20   beings -- human beings who were easily exploitable because of

21   their desperate circumstances, people who are mistreated in

22   the most extreme, in the most debasing, in the most degrading

23   of ways.  It's a case of two men who used violence and threats

24   of violence in order to maximize their profits and to maintain

25   control of a business.  They used it in order to scare off the

 1    competition.  They used it to frighten law-abiding members of

 2    the community, to keep them quiet, and they used it to ensure

 3    for their sole use the earnings of Rebeca Dueñas.

 4           Ladies and gentlemen, you have heard all the facts

 5    and all the evidence that you need to support the charges in

 6    the Indictment beyond a reasonable doubt, and justice is

 7    nothing more than the dispassionate application of the law to

 8    the facts.  You are ready to do that now.  The Defendants

 9    deserve no more than that, and the people of Maryland and the

10    victims in this case deserve no less, and, when you return

11    from that jury room after applying the law, as you'll hear it

12    from the Judge, to the evidence in this case, you should

13    emerge with guilty verdicts on all counts as to all

14    defendants.

15           Thank you very much for your time.

16           **THE COURT:**  Thank you.

17           **MR. MONTEMARANO:**  May we approach, Your Honor?

18           **THE COURT:**  Yes.  Come up.

19           (Whereupon, the following discussion occurred at the

20    bench.)

21           **MR. MONTEMARANO:**  I need a bathroom break, Your

22    Honor, if Your Honor is not inclined to break.  I need a

23    bathroom break --

24           **THE COURT:**  Now and before your argument?

25           **MR. MONTEMARANO:**  It's a medication issue, Your

 1    Honor.

 2              **THE COURT:**  Okay.

 3              **MR. MONTEMARANO:**  I mean, I'm happy to step into the

 4    hall while people are setting up, cleaning up, if that's what

 5    you want to do, but -- like I said, I'd be happy to step into

 6    the hall next to the courtroom if Your Honor is not inclined

 7    to break formally, but --

 8              **THE COURT:**  Well, I assume you're going next,

 9    Mr. Ruter?

10              **MR. RUTER:**  I am.

11              **THE COURT:**  Can you miss a brief part of

12    Mr. Ruter's --

13              **MR. MONTEMARANO:**  He may not even start.

14              **MR. RUTER:**  Are you sure?  Are you sure?

15              (Whereupon, the bench conference was concluded.)

16              **THE COURT:**  Members of the jury, we're now going to

17    hear from Mr. Ruter.  He has promised to take no more than 45

18    minutes of your time, so, again, I will watch the clock for

19    you.  Please give him your full attention.

20              Mr. Ruter?

21              **MR. RUTER:**  Your Honor, thank you.

22              Good morning, ladies and gentlemen of the jury.

23              **JURORS:**  Good morning.

24              **MR. RUTER:**  You know who I am.  I represent

25    Mr. Ventura, and I, along with the others here, thank you for

1    continuing the tradition which you all learned about during my

2    opening of King Ethelred the Unready, who started the jury

3    system in the year about 960 A.D.  It's been refined a bit.

4    It's changed a bit.  You recall -- it was a long time ago --

5    that you folks would be called thegns, would have come from

6    different wapentakes, which were districts around where you

7    lived, would go out, and you'd go find the evidence, and you

8    would go seek out the truth and come back and report it to the

9    king.

10            We don't do that anymore.  Now the evidence is

11   brought to you, and you listen to the evidence.  You're

12   instructed about the law by the Court, and then you go back

13   into the jury room, and you make a decision as to innocence or

14   guilt in a criminal case.  So I am honored to be a part of a

15   tradition which spans over a century -- many centuries, and it

16   is my hope that it will continue for many centuries to come.

17            Now, folks, the Government has been investigating

18   Mr. Ventura, as you now are aware, for several years.  You

19   have heard that the Government has used lots of resources,

20   and, during this investigation, they have used many

21   cooperating witnesses.  Many folks have appeared before the

22   Grand Jury.  There has been multiple search warrants executed

23   on multiple locations throughout the state of Maryland and

24   elsewhere.  There have been multiple searches of cars from

25   time to time.  There have been consensual searches without

1    search warrants on multiple locations over the years.  There

2    have been cell phone subpoenas, GPS devices on cell phones,

3    and the list goes on.

4        The Government has a right to do that.  The

5    Government should do that.  I only want to point out that all

6    that Mr. Ventura has is me.  That's all that he had, and we

7    have the system in front of us, which is you, which stands

8    between him and the power of the United States of America.  We

9    ask you to make certain that you use wisely the authority and

10   power which has been granted you by our jury system.

11       Now, folks, the subject matter of this case has been

12   very unpleasant.  None of us, I am sure, enjoyed the story of

13   the unfortunate prostitution that's been going on.  None of us

14   enjoyed hearing, I think, about the fortunes of those ladies

15   involved in the business.  We've heard about the fact that

16   there are a lot of illegal immigrants that come into this

17   country hoping for a better place to live, and they end up

18   somehow or another doing illegal activities, this case in

19   prostitution.  We've heard of the murder of an individual who

20   was murdered allegedly because he was involved in the

21   prostitution business, one El Pelon, and we've heard of a lot

22   of threats going between various business owners and managers.

23   We've heard of possible assaults, possible attempts of taking

24   of people's lives, and the like.  But you, as the modern-day

25   thegns, have an obligation, like they did over a thousand

 1   years ago, to listen to the evidence and return a verdict

 2   without bias.

 3          There is a couple of categories of people I want to

 4   talk about, but, before I do, I want to enlist the words of a

 5   couple of folks that I think highly of.  One is John Adams,

 6   and John Adams said that, as to you, as to our jury system,

 7   that you are the heart and the lungs of liberty.

 8   Thomas Jefferson said, as to you folks standing and sitting in

 9   front of me, that the jury system is as the only anchor ever

10   imagined by man by which government can be held to the

11   principles of its constitution.  There is a lot of pressure,

12   then, riding on your shoulders given the history of King

13   Ethelred to King James to King John and the magna carta and

14   the likes of John Adams and Thomas Jefferson, and I think you

15   are up to the task.

16          Trials can be a messy thing, and this trial was a

17   messy thing.  Trials can evoke a lot of strong emotions, and I

18   think, in this case, emotions were brought to bear.

19   Ms. Yasser pointed out the plight of some of the ladies that

20   appeared before you, the prostitutes -- and I don't use that

21   word in a derogatory manner whatsoever.  I just don't know of

22   another word I can use of the business they were in.  And, if

23   you all felt sympathy and if you felt sorrow and you felt pity

24   for those ladies that you saw and heard about, you have every

25   right to do so.  It would be understandable, and no one would

 1   take issue with it.

 2          However, it is your obligation, when you enter that

 3   door and you begin your jury deliberations, to leave behind --

 4   you must leave behind those strong emotions that you may feel,

 5   because you cannot return a fair and just verdict if you allow

 6   those emotions to run rampant in that jury room at all.  You

 7   must set them aside, and you replace them with what you

 8   should -- that is, the facts and the law.  And, once you do

 9   that and you leave those emotions outside that jury room, you

10   probably will, in fact, return a just and true verdict.

11          Mr. Ventura took the witness stand yesterday.  You

12   saw him all day long, and you've seen him over the course of a

13   couple of weeks, and I am going to go out on a limb and say

14   that all of you may have some strong emotions about

15   Mr. Ventura.  You may not like him.  You may hate him.  You

16   may be angered and upset by him.  And, if you believe all of

17   the evidence, perhaps you would have a right to feel those

18   emotions, but, if you feel any of those emotions, you are

19   duty-bound to leave them outside the jury room, because, if

20   you do not, you cannot return a fair and impartial verdict in

21   this case, and I implore you to make certain that you leave

22   those raw emotions, if any, outside the jury room and concern

23   yourself only with what you have heard and what you have seen

24   inside of this courtroom over the course of this trial.  If

25   you do that, I am confident that you will, in fact, return a

1    just and true verdict.

2           This case is not about the murder of El Pelon.  This

3    case is not about the assault of Hector Avila.  This case is

4    not about the threats advanced to the Escobar family and many

5    other kinds of threats of violence that were heard throughout

6    the course of this trial.  They are classic red herrings, and

7    I will explain as I go from count to count in this case.  I'm

8    not going to show you any diagrams.  I'm not going to show you

9    more photographs.  I'm not going to show you more condoms or

10   K-Y Jelly, because I think you've seen enough of that.

11          Count 1 is, as the Government suggested, a very

12   straightforward count.  If you find that a couple people got

13   together and said, "You know what?  I think we're going to do

14   a prostitution business," and you think that that man played

15   any role in it, and you're convinced beyond a reasonable

16   doubt, that's the end of Count 1, and that's the end of my

17   explanation of Count 1.

18          The Government said, "Well, the Defense may stand up

19   and tell you that you have to consider force as to Count 1."

20   Well, I wouldn't do that, because that ain't the law.  Two

21   elements, that's it, and I'm not going to speak any further

22   about Count 1.

23          Count 2 is a -- Count 2, 4, and 5 are the same

24   counts with different kinds of dates and people associated

25   with them.  Count 2 is an actual interstate transportation for

1    the purpose of transportation (sic).  It took place -- this is

2    Count 2 now -- between, I think, September of '08 to March of

3    '09.  You saw lots of evidence that there was prostitution

4    going on.  I would dare say, after about one and a half days

5    of testimony, you would have been convinced beyond a

6    reasonable doubt that prostitution was going on.  It took a

7    bit longer for that evidently to come out throughout this

8    trial.  If you find that Mr. Ventura himself was involved in

9    interstate prostitution between March 8 and 2009 -- if you

10   find that beyond a reasonable doubt, then you will return a

11   verdict as you see fit.

12        In that regard, you have lots of photographs.  You

13   have lots of K-Y Jelly.  You have lots of rubbing alcohol, and

14   you have even more lots of condoms, at different places.  Some

15   were in Maryland, and some are in Virginia, and you've heard

16   from witnesses who saw Mr. Ventura here and there and

17   everywhere, and you'll have to decide whether or not you

18   believe that he was involved in the actual interstate movement

19   for prostitution purposes during that time frame.  And I will

20   speak no further about Count 2.

21        I want to skip forward to Count 4 and 5.  I'm going

22   to skip Count 3, because that's a different kind of a count.

23   Count 4, as pointed out to you, involves the actual interstate

24   movement for prostitution purposes of Bridgett Alcivar.  I may

25   not be pronouncing her name correctly.  And Ms. Yasser pointed

1    out she wasn't brought in, but you did see a photograph of

2    her.  She was standing near one vehicle, and Mr. Ventura was

3    standing near another vehicle.  This was on August the 2nd of

4    2010.  That's the date.  You'll have those photographs back

5    there with you.  And there was testimony from Special

6    Agent Kelly, I believe, that he said he followed that vehicle

7    from one place to the next, and he saw it travel interstate.

8            That's the testimony.  That's the evidence you have

9    as to Count 4.  The Government wants you then to take that

10   evidence and to extrapolate it and say, "Well, it's got to

11   be -- it's got to be obvious that the reason that that

12   transportation took place was for the purpose of

13   prostitution."

14           Now, folks, I beg to differ.  You need to be a

15   little bit more analytical about those matters than just

16   saying, "Well, there is some pictures, and there he is, and

17   there she is, and they did go from here to there."  What the

18   Government wants you to do is to assume that that was about to

19   happen -- that the movement interstate occurred for the

20   purpose of prostitution.

21           Now, I am not stupid, so I know you're not stupid.

22   Could it have been?  Could it have been for the purpose of

23   prostitution?  Yes, it could have.  But you have to find

24   beyond a reasonable doubt that that was the purpose for that

25   movement.  The Government says, "Well, you know, she was

1    arrested once for prostitution, that lady."  Well, that's

2    true.  Evidently, she was arrested once for prostitution.  So

3    the Government wants you then to extrapolate -- not a good

4    idea in law.  We have this thing called beyond a reasonable

5    doubt, so not a good idea at all.  They want you to take that

6    information and then -- and start over here, and they want you

7    to leap over here.

8         Folks, you cannot do that.  That evidence is not

9    adequate for you to be convinced beyond a reasonable doubt

10   that that was the purpose for that particular transportation

11   on that particular date, and we're asking you to return a

12   verdict of not guilty on Count 4.

13        Count 5 is the same act.  It's, once again, this

14   interstate transportation for purposes of prostitution, and it

15   deals with another lady.  You saw her photograph, and I have

16   already forgotten her name.  Ms. Yasser just told us her name.

17   That was Bonita Torres Moran, and we know -- and this count,

18   folks, is Count 5.  The date is November 15th, 2010.  And we

19   know from the testimony in this case that she was with

20   Mr. Ventura when they were -- when he was arrested, and she

21   had condoms on her and whatever else she had.  Condoms, I

22   think, is what the testimony was.  He picked her up in D.C.,

23   and they were arrested in Maryland.

24        Question:  Is it possible that they were going from

25   D.C. to Maryland for the purpose of her being involved in

 1   prostitution?  Of course it's possible, but that's not the

 2   test in our criminal justice system.  The test is:  Do you

 3   believe beyond a reasonable doubt that that was the reason

 4   that he picked her up and they were stopped in Maryland?  That

 5   is the question.

 6         You may believe that circumstantially.  You may not

 7   believe that circumstantially.  I submit to you that those

 8   facts alone simply should not carry the day in your minds if

 9   you leave any bias and any prejudice outside that jury room

10   door.  We ask you, therefore, to return a verdict of not

11   guilty as to Count 5.

12         Count 3, ladies and gentlemen, deals with

13   enticement.  That's enticing a person to commit interstate

14   prostitution, and His Honor will have -- there is a whole

15   bunch of pages, I think, that deal with that particular

16   instruction which he will read to you a little bit later on.

17         And Count 3 takes place in September of 2009.  So

18   we're talking here about September 2009, and we're only

19   talking about Margarita Laona Santiago.  So this is where it

20   becomes really important to be separating all this smoke

21   concerning all the violence swirling around everything, and

22   you have to hone in on the precise elements and precisely what

23   we're talking about.  We're talking here about September of

24   2009, and we're talking about Margarita Laona Santiago.

25         And Ms. Yasser did lay out the facts, as I recalled

 1    them.  What I recall of it doesn't count; it's only what you

 2    recall.  But my recollection was that she did say it is all

 3    unfortunate, it's all bad, it's all horrible that she was

 4    forced into prostitution by her husband when she was in the

 5    country of Mexico, her home country.  She was prostituting

 6    there because her husband made her.  And then he made her move

 7    to the United States to prostitute herself, and she did.  He

 8    sent her to New Jersey where he had some cousins, and she

 9    worked for them.  Evidently, she gave all the money to them,

10    and sometimes they'd send money back to her home country.

11          She had a friend, and the friend gave her

12    Mr. Ventura's phone number.  She called Mr. Ventura.  That's

13    what the Government said.  That's what Ms. Santiago said.  He

14    did not call her.  Ms. Yasser cleverly said that Mr. Ventura

15    offered her to come to work.  No, he didn't.  She offered him

16    to come work for him.

17          That's a very significant and important

18    differentiation.  She didn't call and then wait for

19    Mr. Ventura to say, "Is this a girl that wants to come and

20    prostitute herself?"  Of course not.  She called and said,

21    "This is who I am, and I'm looking for work -- prostitution

22    work," and she then said that Mr. Ventura said, "Well, fine.

23    Drive -- take a bus.  Take a bus."  He didn't send her money.

24    He didn't drive to New Jersey to get her.  She got on the bus,

25    and she came to D.C., and she, in fact, worked at

1    ████████████, she said.  At the end of the week's work, she

2    was paid.  She went back to D.C., back to New Jersey, stayed

3    overnight, gave all her money to her cousins, and drove back

4    by bus.  She did it again the second week.  She did it again

5    the third week.

6          Question:  Is that persuading her?  Did Mr. Ventura

7    do anything to persuade her to engage in interstate

8    prostitution?  He did not.  Did Mr. Ventura do anything to

9    induce her?  He did not.  Did he do anything to entice her?

10   He did not.  And did he do anything to coerce her?  He did

11   not.

12         Now, he's guilty of prostitution, folks, but he's

13   not charged in Count 3 with prostitution.  He's charged with

14   enticing a person to engage in interstate prostitution.

15   Clearly it's interstate, because she went from New Jersey to

16   Washington, D.C., to Maryland.  You all can forget that

17   element.  It's all been made out.  The problem is:  Was she

18   enticed or coerced, et cetera?  And the answer is, clearly and

19   unquestionably, she was not.  And, because of that, you must

20   find Mr. Ventura not guilty of Count 3.

21         Count 6 is captioned "Sex Trafficking By Force,

22   Fraud, or Coercion," and this too has a lot of moving parts,

23   and Judge Quarles will explain all that to you later, and this

24   occurred from September of '08 all the way through November of

25   2010.  The featured witness as outlined by Ms. Yasser is

 1    Ms. Rebeca Fuentes (sic).

 2         First thing you have to find, folks, was whether or

 3    not she was recruited, or was she enticed, or was she

 4    transported, or was she harbored?  You heard the Government's

 5    theory is that she was enticed, and Ms. Yasser wants you to

 6    believe that Mr. Ventura groomed her.  The testimony is, from

 7    I think Mr. Ventura -- and you can disregard all his testimony

 8    if you want, you can believe all if you want, or you can pick

 9    and choose as you want, because that's your prerogative.  You

10    are the finders of all the facts.

11         And that's just as true as to Ms. Dueñas Franco.

12    You can accept every word she said.  I'd suggest you not do

13    that, and I'll point out why in a moment.  You can take some

14    of what she says, or you can disregard everything that she

15    says, because that is your constitutional prerogative as the

16    trier of the facts in this case.

17         The enticement, says the Government, was because

18    Mr. Ventura went to Alex's brothel in Washington, D.C., and he

19    picked out the prettiest girls so he could bring them online

20    with him.  The testimony is that he did have sex with her at

21    Alex's brothel.  The testimony is evidently Mr. Ventura --

22    this is not through him; this is through some other witness,

23    and I've forgotten the name -- did frequent brothels.

24    Mr. Ventura testified that he liked women, a variety of women,

25    and evidently his conduct would seem to corroborate that given

1    the fact that he has children with Yenis, he's married to

2    Myra, he's had one child with Rebeca, perhaps a miscarriage

3    with Rebeca as well.  So certainly there is evidence to

4    corroborate that he enjoys the company of women.

5          Folks, you have to decide whether or not you believe

6    that the evidence does convince you beyond a reasonable doubt

7    that those encounters, whenever they occurred -- by the way,

8    we never did get dates.  We never really know where we are.

9    And that's as to Ms. Franco as well as anybody else who has

10   testified, a couple of folks, and sometimes you can nail it

11   down because the police happen to show up, and there is a

12   search warrant, and they took pictures.  You can nail that

13   down, but, when it comes to testimony of these witnesses, you

14   can't tell -- I can't tell what universe we're in or what

15   state we're in or what house we're in or what exactly

16   happened.  That's me.  You're the ones who count.  So,

17   notwithstanding, you have to find whether or not the purpose

18   that Mr. Ventura had when he went down there and slept and

19   paid Ms. Franco was to entice her to come work for him.

20          I do not believe the evidence shows that whatsoever.

21   He and she became romantically involved.  They -- I use the

22   word with caution -- dated one another.  She had sex with him

23   obviously without a condom.  It's a big deal.  I don't mean to

24   be crude.  It's a big deal because it's obvious that, when a

25   woman is working in prostitution, they are -- men are wearing

1    condoms.  That's why there are so many of these condoms here

2    in this courtroom, over there, and that was not the case.

3    It's a big deal.  It's a sign of affection, whether we like it

4    or not.  We have to deal with their reality; not our reality.

5    And so the relationship was being built.  There is no grooming

6    going on.  He cared for her, and she cared for him.

7           You have to find this recruitment, enticement,

8    transportation, or harboring.  You can't find, folks,

9    recruitment or enticement.  The question is:  Can you find

10   transportation or harboring?  You should disregard recruiting

11   or enticement.  Those are clearly not found.  The question,

12   though, is whether or not you can find beyond a reasonable

13   doubt that he transported or harbored her in interstate

14   commerce for the purpose of performing a commercial sex act.

15          That's a different story.  You might find that he

16   did that.  We don't concede that, but you may find that based

17   upon the myriad degree of evidence that you have.  I don't

18   think there is any evidence that there is surveillance of the

19   two of them going between D.C. and Maryland or between

20   Maryland and Virginia or whatever.  We do know this:  We have

21   photographs from the Virginia Beach.  That's a different

22   state.  That's interstate, but you have to decide whether or

23   not that interstate was for the purpose of performing a

24   commercial sex act.

25          She says it was.  Mr. Ventura says it wasn't.  You

 1    have to decide if you believe either one of them, but, other

 2    than that, I'm not aware of any other compelling evidence that

 3    you all can look at to support whether or not there was a

 4    transportation of Ms. Franco over state lines for the purpose

 5    of engaging in interstate prostitution.

 6              You must be cautious with Ms. Franco's testimony,

 7    folks.  Ms. Franco was raped before she ever made it into this

 8    country at a young age.  She worked in the prostitution

 9    business almost as soon as she got here with Alex.  She says

10    that Alex beat her repeatedly, without being specific when,

11    where, how, or why.  She said that she saw Alex and Ventura,

12    who were competitors, with a gun not too long before she was

13    arrested.  Doesn't know where it came from.  Alex took it

14    away.  Enemies -- enemies of each other, him playing with a

15    gun while she's standing around.

16              She had one story on direct examination when the

17    Government questioned her, and I think you all recall me going

18    to and from my trial table up to her with various documents in

19    my hands.  Those documents were prior interviews that she gave

20    with these folks, and what happened was her testimony changed

21    from the direct testimony of her questioner, whether it was

22    Mr. Cunningham or Ms. Yasser, to cross-examination when I was

23    questioning her.

24              Now, folks, this lady was interviewed by police on

25    September 28 of 2008.  She was interviewed by these folks and

1     tape-recorded twice on November 15th of 2010.  She appeared in

2     her Grand Jury on December 7th, 2010.  She was interviewed

3     again on May 2nd, 2011.  She was interviewed again on

4     October 19th, 2011.  She was interviewed again on

5     October 25th, 2011.  She appeared in the Grand Jury again on

6     July 27th, 2012.  And she then came in to this courtroom and

7     told a story, which she changed on cross-examination.

8          She is a witness that was promised on September 28th

9     of 2008 that, "We want to help you," says Detective

10    Carraballo.  "We will help you get your child back," who had

11    just been taken from her two days prior.  "If you feel unsafe,

12    we'll take care of you.  If you need a letter from us, being a

13    member of the Homicide Division of the Anne Arundel County

14    Police Department, we will write that letter.  We will help

15    you."

16         She left the police department, and, the next day,

17    she's continuing in prostitution.  You all can believe if you

18    want that she did that because she had no choice.  She was so

19    afraid and so concerned for her safety or the safety of her

20    daughter that she could not take the request -- the offer by

21    the Anne Arundel County Police Department and DSS.  She had to

22    return to her life of prostitution.  You can believe that if

23    you want, but you ought not given the history of Ms. Franco's

24    evolutionary testimony and her evolutionary ability to recall

25    the facts of her case.

 1            You not only have to find that she was enticed or

 2     recruited.  You then have to find that she was coerced by the

 3     use of force or fraud or threats of violence, and you have to

 4     find that that force or threats or fraud were the reason that

 5     she continued in prostitution.

 6            Now, folks, there is ample evidence that these two

 7     had a relationship, the kind of which none of you would wish

 8     to be involved in, but the fact is they were engaged in an

 9     extraordinarily toxic relationship as boyfriend and

10     girlfriend.  If you believe that she was beaten -- and I

11     submit that there is reason to believe that she was not beaten

12     by this man.  The only evidence you have is her word.  But, if

13     you believe that she was beaten, you have to find that she was

14     beaten for the purpose of engaging in interstate prostitution.

15            In other words, you have to exclude, beyond a

16     reasonable doubt, that this beating or beatings were not the

17     result of a toxic relationship, otherwise known as domestic

18     violence.  Is it possible that these beatings which she

19     described were the result of a toxic relationship which

20     involves domestic violence?  The answer is:  Absolutely and

21     positively.

22            Folks, it's important to note, I think, that, of

23     these various injuries that she said she sustained, she

24     indicated that only clearly that one of them occurred, she

25     says, as a result of being involved in the commercial sex

1    trade.  That was the belt to the thigh, because she alleges

2    that she would not have sex with a certain man that had come

3    to be there as a customer.  We don't know when that took

4    place.  We don't know whether Mr. Ventura was there on the

5    premises, which would be unusual, because no one else said he

6    ever was there on the premises, just to collect money, or

7    whether it happened at home, but she said that she went

8    through with the sex act.

9           Doesn't that infer, then, that Mr. Ventura was there

10   on the premises at the time and took his belt off and slapped

11   her with it, and then she had to go back in and have sex with

12   this man she didn't want to have sex with?  The answer is:

13   Yes.  That's the way it came out.  Is that likely?  Absolutely

14   not likely at all.  Mr. Ventura doesn't hang around the

15   brothel to watch the ladies perform.  The testimony is he

16   comes on occasion to pick up money.  That's the testimony.  So

17   that doesn't make any sense at all.

18          And then we have the fact that the other injuries,

19   we're told, came about because she refused to put an inanimate

20   object inside of herself, but we were never told who it was

21   that was supposed to put the inanimate object inside of her.

22   Was it Mr. Ventura?  Well, if it was Mr. Ventura, then he

23   wouldn't be trying to commit a commercial sex act with her.

24   He wasn't going to pay her.  It would have nothing to do, in

25   other words, with a commercial sex act.

1          I don't like it, and you don't like it either, but

2     you have to be analytical in deciding whether or not those

3     injuries which she says were sustained as a result of her

4     being cut, as a result of her hand being slammed in a door --

5     they didn't happen at the same time, I guess -- and then

6     another injury on her elbow when she was pushed down -- it

7     sounds like they occurred at different times.  You were never

8     told -- ever told that those injuries were sustained as a

9     result of her interstate prostitution or her failure to

10    perform, her disobedience to perform.  Folks, if those things

11    happened, they happened because of horrific domestic violence.

12    That's a separate crime not charged.

13          The Government is so desperate to prove to you that

14    Mr. Ventura is the one who actually performed these injuries

15    to Ms. Franco that they bring on Dr. Baker.  Dr. Baker was a

16    highly unusual expert witness, because experts usually give

17    you a conclusive response to a conclusive issue.  Well, what

18    did Dr. Baker tell you?  She told you that she had no opinion

19    about most of the injuries, I think with the exception of one,

20    until Ms. Franco told her what happened.

21          So she looked at an elbow.  It's got a star mark on

22    it, and she said, "Yep, that's a star mark.  You fell down."

23    "Ms. Franco, what happened?"

24          "Mr. -- Mr. Ventura pushed me down."

25          "Oh, that's what it is?  All right.  Mr. Ventura --"

1      that's her opinion.  That's not a professional opinion.

2      That's desperation.  That is desperation, and you don't even

3      know why she was pushed down to the ground.  It could be

4      because he's a nasty guy, and, if he is a nasty guy and he

5      pushed her down, and he did not push her down for the purpose

6      of her engaging in interstate prostitution, she has not made

7      out evidence which would convince you beyond a reasonable

8      doubt that the injury occurred as a result of her failure to

9      engage or engaging in interstate prostitution.

10             **THE COURT:**  Five minutes.

11             **MR. RUTER:**  Thank you, Judge.

12             You also have to find, folks, it's for pecuniary

13     gain.  This is, in fact, where we lawyers get paid to be

14     precise.  Ms. Franco told you that she never once saw a dollar

15     exchange hands.  I asked her specifically on cross-

16     examination, "Did you ever get paid?"

17             "No."

18             "Did you ever see any customer hand money to a

19     doorman?"

20             "No."

21             Now, do you think that money exchanged hands?  Well,

22     it could have, but the Government has not offered one piece of

23     evidence that any financial benefit occurred to Mr. Ventura,

24     and they're obligated to do that.  They're obligated to dot

25     their Is and to cross their Ts, and you're obligated to make

1    certain that they do it.

2         Count 7, folks, is the firearm charge.  The firearm

3    charge is tied directly to Count 6.  If you find Mr. Ventura

4    not guilty of Count 6, the verdict form which you're going to

5    see tells you, you needn't consider yourself with Count 7.

6    Why?  Because Count 7 alleges that the firearm was possessed

7    for the purpose -- the purpose of furthering the sex-

8    trafficking crime of Count 6, which only involves Rebeca

9    Franco.

10        So, if you find him not guilty of Count 6 -- and you

11   should -- then you must find him not guilty of Count 7.  And,

12   folks, if you were to find that there were any kinds of

13   threats of violence, if you were to find that he knocked her

14   down and hit her, that doesn't fulfill Count 7.  Remember,

15   it's got to be the gun.  It's got to be a firearm.

16        Yes, she testified that she had seen the firearm.

17   You have to decide:  When she viewed that firearm, when she

18   saw that firearm, did that further the sex-trafficking offense

19   as it relates to her and her alone?  There is no testimony,

20   once again, that can tell you beyond a reasonable doubt that,

21   when she saw those guns, whenever she saw them -- Lord knows.

22   We don't know when.  We don't know under what circumstances.

23   We know nothing.  But you have to find that those guns were

24   viewed by her, seen by her for the purpose of furthering the

25   sex crime of Count 6, and the Government has not given you one

 1    piece of evidence to connect those two together.

 2         What they gave you was all these red herrings about

 3    all this violence going on hoping that you all would go back

 4    in the jury room and say, "Boy, this is all a lot of violence

 5    going on here, and I'm going to stamp guilty on this."  That's

 6    what they're hoping for.  If you leave your raw emotions, if

 7    any, outside that jury room, you will find Mr. Ventura not

 8    guilty of Count 3, you will find him not guilty of Count 6,

 9    and you will find him not guilty of Count 7.  There is no

10    question about that.  The rest, I leave for your

11    consideration.

12         Folks, thank you so very much for these two weeks

13    together.

14         **THE COURT:**  Thank you, Mr. Ruter.

15         Members of the jury, we're going to take the morning

16    break now.  Please remember:  Don't discuss the case among

17    yourselves or with anyone else.  I will call for you at noon.

18         **THE CLERK:**  All rise.  This Honorable Court stands

19    in recess.

20         (Jury excused.)

21         (Recess taken, 11:36 a.m. - 11:56 a.m.)

22         **THE CLERK:**  All rise.  This Honorable Court now

23    resumes in session.

24         **THE COURT:**  Ready for the jury, counsel?

25         **MR. MONTEMARANO:**  Yes, Your Honor.

1          (Jury enters.)

2          **THE COURT:**  You may be seated.

3          Members of the jury, Mr. Montemarano has promised to

4     take no more than one hour, so, again, give him your full

5     attention.  I will watch the clock.

6          Mr. Montemarano?

7          **MR. MONTEMARANO:**  Thank you, Your Honor, counsel.

8          If I wait another five seconds, I can say good

9     afternoon, ladies and gentlemen.

10          When I got up this morning, I thought I was ready to

11    do this.  I finished my final draft and edit and redraft of an

12    outline for my closing argument, but, as some famous boxer

13    once said, "Everybody's got a plan until they get hit."  So I

14    look outside, and it's raining, so I realize I'm going to wear

15    older shoes that I don't really care about if they get wet,

16    and then of course I heard about the news from Boston.

17          So I suggest, ladies and gentlemen, when you go back

18    there in about an hour and a half after Mr. Cunningham and I

19    are both done, I want to take a moment to think about the

20    friends and family of the MIT police officer who died in the

21    line of duty last night protecting all of us.  It may not

22    sound like much, Campus Police, but he paid the ultimate price

23    in service, and, having spent five years in the south side of

24    Chicago in a not a very nice neighborhood in college, I have a

25    very fond memory of the UC Campus Police.

1        The officer, whose name I don't even know, died in

2    service of something bigger than me, and, ladies and

3    gentlemen, that's why we're here.  This is bigger than us.

4    It's bigger than these gentlemen.  What we have here is a

5    chance for the citizens to be the government, to play the role

6    the Constitution ordained to make decisions beyond a

7    reasonable doubt about people who are charged by the

8    Government with crimes.

9        I don't want to sound repetitive when I thank you

10    for your attentiveness.  I've been very impressed how

11    attentive you've been when this case has dragged a bit, but

12    it's only by doing that that you fulfill your role, by paying

13    attention and thinking and keeping your independent judgment.

14    And I suggest, ladies and gentlemen, it is that independent

15    judgment which is the ultimate protection for Kevin Fuertes.

16        I'm going to focus on only a few parts of the case.

17    I suggest to you that, if you come to the decision that's the

18    appropriate and correct one on those parts of the case,

19    everything else will fit together, like if you're putting

20    together a puzzle.  Once you get most of the pieces in, where

21    the last couple go is very obvious.  Also, I want to focus on

22    a few things, because -- let's be honest -- most of this case

23    had nothing to do with Kevin Fuertes.

24        What would you say?  Ten percent of the evidence had

25    something to do with him directly, his various arrests for

1    driving offenses, and about 10% had to do with his

2    interactions with Mr. Ventura.  Most of this case was all

3    about Mr. Ventura, but this case is not about Mr. Ventura.

4    I'm here to talk to you about Mr. Fuertes.

5            I suggest to you that, at the end of the day, this

6    case is all about Rebeca Dueñas Franco, and I'd like to talk

7    with you briefly about what she had to say in the various

8    times that she spoke with the police.  When she first spoke to

9    the police on the 28th and 29th, that night of September of

10   '08, she had been with Mr. Ventura for perhaps a month in her

11   testimony, let's say September -- three, four weeks.

12           She's willing to speak with police.  She admits her

13   role in prostitution.  She admits his role in prostitution.

14   She knows Detective Hartlove is there to investigate a murder.

15   She's asked about the murder.  She says nothing, not a word,

16   does not point a finger at Mr. Ventura, does not point the

17   finger at Mr. Fuertes.

18           Two years and two months later in November of 2010,

19   she's spoken to twice.  Those are tape-recorded.  Nothing.  A

20   month later, three weeks later, she's in front of the Grand

21   Jury.  "Do you know anything about El Pelon's murder?"

22           "No."

23           Only in May of 2011 does she now have her story

24   about what she said she saw on the night of El Pelon's murder.

25   Fine.  And all she can say is, "I saw blood stains on Kevin's

 1    clothing."  There is no description of the clothing, no

 2    description how that clothing might match with the eyewitness

 3    accounts of what the shooter wore, no forensic evidence.  And,

 4    if she saw stains, how would she know they're blood?  It's a

 5    good question.  Or did she not see anything?

 6            But let's talk about what else she told us,

 7    beginning in September and through her testimony.  She says

 8    Kevin Fuertes lived with her at ███████ and ██████████████.

 9    She tells them, when she met Kevin, she was, without any

10    question, German Ventura's girl.  They had a personal

11    relationship.  She was different than the other girls.

12            And we know that, ladies and gentlemen, because we

13    have seen the photographs.  They're in Section 26 of the

14    exhibit book.  You've seen them, ladies and gentlemen.  You've

15    seen all the elements.  This is just for you to remember.  And

16    these are taken years after she first talks to the police,

17    years after she's first offered assistance by the police,

18    years later.  Let's be honest.  That's what Kevin Fuertes knew

19    about her relationship with German Ventura.

20            And you remember her description of how the

21    relationship began:  Perfect.  Ladies and gentlemen, that word

22    is not equivocated.  There is no question of how she felt

23    about the relationship when it began, because she was special,

24    and she was different.  This was not a relationship based upon

25    sex in the sense of commercial sex.  They were boyfriend and

1    girlfriend, and she had her job, which doesn't make sense as

2    to why she gave her money to Mr. Ventura.  She was different.

3    They pooled their money.  It's no different than in suburbia

4    where one family might have one checkbook even if they have

5    two incomes.

6         You know her testimony about Mr. Ventura and the way

7    the relationship began is true, because she continued in this

8    role with him through 2010 when he was finally arrested.  It

9    continued when she testified in this building before the

10   Federal Grand Jury while she was pregnant with his child.

11        Now, I'm not going to try to pretend in any way,

12   shape, or form this is the perfect relationship.  I suggest to

13   you that, if you don't even consider it being a relationship,

14   you would not be wrong.  It involved a fair amount of

15   violence, domestic violence, prostitution, conduct which

16   should shock anybody, even an attorney with 25 years of

17   criminal defense experience.  You can't understand it, but

18   none of us have ever been Rebeca Franco.

19        And let's be honest.  It's undeniable that some

20   relationships involve yelling, fighting, hitting.  It

21   shouldn't happen.  It may not be the way you would conduct

22   your life, but we know it happens.  It's not unusual.  It's

23   not even rare.  That's you.  That's me.  It's not what

24   Rebeca's life involved.  Fair enough.

25        Now, my question then becomes:  Don't look at it

1    from your point of view.  Don't look at it from my point of

2    view.  Look at it from Kevin Fuertes, who came from Honduras,

3    illegal immigrant, and he sees German Ventura raise his hand

4    to Rebeca, one time.  That was Rebeca's testimony.  She said

5    that Kevin was present once when she was struck by German.

6    Must he be condemned for failing to object that one time?

7    Must he be condemned for saying that one time, "They don't get

8    along as well as they should.  German is an abusive lover"?

9            Does that mean he's buying into sex trafficking by

10   way of force, fraud, coercion?  I suggest not, ladies and

11   gentlemen.  There is no pattern for him to fit that into.

12   It's an outlier.  It's Rebeca's testimony that it happened one

13   time, and she and German -- and certainly this happened at

14   some point before March of 2009 when he left Maryland, because

15   Rebeca said it happened in Maryland as I understood her

16   testimony.  Your recollection controls.

17           So let's consider what happened thereafter.  This

18   happens no later than March of '09.  She continues through the

19   end of 2010 to make those photographs with German.  Does that

20   sound like someone who is necessarily oppressed?  Now, I'm not

21   saying Rebeca wasn't.  I'm not saying Rebeca wasn't abused.

22   I'm saying:  What did Kevin see?  What did Kevin know?  What

23   could he abstract from her remaining?

24           And that's not even including what we know about

25   Rebeca's conduct when she's blown off an opportunity to be

1    helped on September 29th, 2008 by the police, who offer to

2    write letters, who end up going to court on her behalf, and

3    she goes back to ███████.  Does that sound like someone who is

4    being oppressed at that point in time, or does that sound like

5    someone who is hopeful of rescuing, of saving, of continuing a

6    relationship which she considered perfect?

7            There is no testimony, I suggest to you, that we've

8    heard of violence by Kevin towards anybody.  There is no

9    testimony of violence by German towards any other girl.  Once

10   again, if German is abusing other women and abuses Rebeca,

11   that's willful blindness.  At some point, "What are you

12   doing?"  Quote, you know, Admiral Nelson, telescope to the

13   blind eye, "I don't see the signal."  That's what willful

14   blindness is, ladies and gentlemen.

15           No, this is not willful blindness.  This is not

16   reckless disregard.  Seeing something as plain as the nose on

17   your face and refusing to accept it for what it means, we have

18   nothing like that, because German doesn't do that to anybody

19   else.  Think about the testimony you heard consistently from

20   the people involved in prostituting -- Ascencio, Margarita

21   Santiago.  She called -- Margarita -- Ventura to get work.

22   She was not solicited.  She said, "I'd like to go to work,"

23   knowing of course he would know what that meant.  Is there any

24   force, coercion, any violence directed towards her?  Of course

25   not.  Would she come if there was?  Of course not.

1           Other times, we've heard testimony that Ventura

2    would call girls to get them to come work for him.  "Come do

3    me a favor."  Do you do favors for strangers?  Do you do

4    favors for violent individuals, or do you do favors for people

5    who treat you well and compensate you?  There is no force

6    there.

7           We heard the testimony from both Ascencio and from

8    Santiago, if a girl wanted to go, it was no big deal.  Even in

9    the middle of the week, leaving the pimp, Mr. Ventura,

10   shorthanded for the rest of the week.  The phrase was she

11   would cash out and leave, get paid, hit the bricks.  She'd be

12   replaced.  Girls come, girls go.  The brothel goes on.  It is

13   no big deal, because the girls were always paid.  Why?  Who

14   works for free?  At the end of the day, even as much as you

15   may enjoy your job, it's nice to get a paycheck, and I don't

16   suggest that these girls enjoyed their job, so they had to be

17   paid, didn't they?

18          Both Carlos Ascencio and Margarita used almost the

19   same language to describe that girls were paid, girls were

20   never forced.  And, using your common sense, doesn't that

21   figure?  After all, there are plenty of Hispanic brothels

22   operating.  You heard that -- lots of them.  Mr. Ventura

23   operated several, but let's -- I mean, there were other ones

24   and other people.  We had Alex.  We have all the other pimps.

25   The girls make the rounds from pimp to pimp, operator to

1    operator, week in, week out.

2         Do I want to go -- having been paid this week and

3    the week before, do I want to go to someone who I don't think

4    will pay me, who I have any suspicion won't pay me?  Does that

5    make any sense, if this is a job, if that's how you're

6    treating it?  If somebody gets a reputation for shorting the

7    girls, for cheating the girls, for treating them poorly, for

8    abusing them, for directing physical violence toward them,

9    what do the girls do?  Vote with their feet.  Common sense,

10   ladies and gentlemen.  It's the only way to understand how

11   this works.  And where would Ventura be then if they vote with

12   their feet, if he's abusive?

13        I invite your attention, ladies and gentlemen -- I'm

14   just going to show you one.  This is one I believe that

15   Mr. Cunningham showed you on behalf of Ms. Yasser during her

16   closing argument.  This is Exhibit 13b/1, but there is a whole

17   bunch of others.  There is 17g, 20l, and 21b.  So you

18   understand, the first number refers to where the evidence came

19   from.  It's grouped by the Government when it numbers them

20   regarding one address or another address.  So those are four

21   different digits I gave you -- 13b/1, 17g, 20l, 21b.  They're

22   from different brothels, they're from Ventura's home, they're

23   from Ventura's car, and they're, in every case, a tally sheet.

24        We understand what they are.  It's been explained.

25   The letters of the week in Spanish beginning with "L" for

1    lunes, which is Monday, as I understand, and I think Tuesday

2    is an "M" for martes like Mardi Gras, which is Fat Tuesday; I

3    know that much.  But it's more than that.  We had seized from

4    various places the playing cards with the hole punches as a

5    means of accounting, the tokens where people would keep track

6    of how many people they'd service by being given something as

7    a -- I can't think of the word -- an actual sign of the work

8    they've done and therefore should get paid for.

9         So what's this all about?  I'll tell what you it is.

10   It's what it seems to be.  It's a means by which to ensure the

11   girls get paid for the work they do.  It is kept by the

12   doormen.  The girls keep them in their own little notebooks.

13   You saw those in evidence.  Ventura keeps them in his home and

14   in his car.  He's keeping track, too.  Why?  To keep the girls

15   happy, to keep them coming back, because, if they come back,

16   he continues to make money.

17        I said to you -- excuse me -- two weeks ago this is

18   a case about prostitution, that there was no question that

19   prostitution took place.  Never suggested otherwise.  But of

20   course the case is not about just prostitution, and that's

21   where you come in, ladies and gentlemen.

22        In addition to the pay, it was a business without

23   coercion.  Let's be honest.  Girls didn't have to be coerced.

24   They chose to do this.  They called Mr. Ventura.  He solicited

25   them.  They came, they worked, they left.  No ropes, no

1    handcuffs, no flexi cuffs, no cable ties, no means of

2    restraint.  No weapons.  They weren't beaten, nothing.

3            And that's of a piece of what you heard about Kevin

4    Fuertes.  No violent conduct on his part.  No violent conduct

5    by German Ventura in his presence.  Why would he think there

6    is force, fraud, or coercion going on with regard to these

7    houses of prostitution?  Now, what you heard about

8    German Ventura is threats, promises.  German Ventura, as I

9    have written here, the windbag, running his mouth, and I wrote

10   this, ladies and gentlemen, not on Thursday night.  The first

11   draft I wrote on Wednesday night before Mr. Ventura's

12   performance yesterday.  So you know who Mr. Ventura is.

13           I think they say in Texas "all hat and no cattle."

14   He's so big and bad that not only does he not do anything; he

15   calls and has the police try to take care of the competition.

16   Mister big and bad, I don't think so.  That's what Kevin saw.

17   Of course the Government's going to argue, "Oh, but,

18   Mr. Ventura arranged to have Hector Avila attacked."  No

19   doubt.  November of 2010, no doubt.  That's a year and a half

20   after they tell you Kevin has left the jurisdiction.  He's all

21   gone from Maryland.

22           But here is the interesting part.  I'm going to take

23   you out of November 10 of 2010 and take you back to the murder

24   of El Pelon.  You heard Ms. Yasser characterize the claims of

25   Sylvia, the girlfriend of El Pelon about the threatening phone

1    calls, except we know the phone calls took place as much as

2    eight months before.  We have no testimony that she answered

3    the phone.  It's not her phone is being called.  It's

4    El Pelon's.  She has no idea what's said during those calls,

5    and she says they were threatening.  Fine.  There is no

6    question that the phone numbers of these individuals are on

7    El Pelon's phone.  Fine.  There is no linkage of the two.

8           But let's talk about what we don't hear.  Who here

9    has ever had the following been told to you, "You got a phone

10   call"?  Does that do you any good?  Normally you get told,

11   "You got a phone call.  Here is the number.  Here is who

12   called."  What am I talking about?  The testimony in this

13   trial is that Ventura knew El Pelon for at least five, if not

14   eight years.  He's talking to his inamorata, girlfriend,

15   wife -- I'm not sure what the relationship is between him and

16   Sylvia.  Would he not say to her, "I got a threat from that

17   jerk, Ventura.  I got a threat.  It's Ventura's number.  Why

18   is he doing that?  I thought he was my friend," or, "I'm

19   scared of Ventura," or anything like that?  We don't hear

20   that.

21          So ask yourself, ladies and gentlemen:  Does that

22   make sense?  "I got a threatening phone call, but I don't

23   happen to --" isn't that the first thing you want to know, is

24   who is threatening you?  I mean, just common sense.  When I

25   come to court, do I want to bring Mr. Fuertes' file, or my

1    other clients'?  I mean, just commonsensically, why are you

2    going to court for this case?  Well, then take your file for

3    that case.  Who is threatening you?  Not just, "I have seen

4    some sort of inchoate threat, some sort of threat out of the

5    ether."

6              So the evidence is clear that all Kevin saw and

7    therefore all Kevin could know was that one incident of

8    violence and German Ventura running his mouth about other

9    people and never acting upon it.  How is he to abstract from

10   this that this physical violence directed towards Rebeca was

11   for the purpose of keeping her involved in sex trafficking,

12   someone who was involved in sex trafficking before she ever

13   met Ventura, was involved in prostitution before she ever met

14   Ventura?

15             Remember:  You're obligated by your oath to consider

16   these individuals separately and to consider the charges

17   separately.  So it's not what Mr. Ventura knew.  It's what

18   Mr. Fuertes knew.  That's his state of mind, ladies and

19   gentlemen.  Do you believe the evidence shows Mr. Ventura's

20   guilt on one or more of the charges?  That's your call.

21   Mr. Ruter, my good friend, has done a masterful job with what

22   he had to work with, but I suggest to you the situation for

23   Kevin Fuertes is very, very different.

24             So let's talk about the charges in particular.  Sex

25   trafficking by force, fraud, or coercion.  Number one, force,

1    he's never, in any way, shape, or form, laid his hand on

2    anybody -- Kevin Fuertes.  He's never made a false promise or

3    anything like that.  You heard Rebeca's testimony.  He treated

4    her well.  He never took advantage of her.  She had every

5    opportunity on the stand when I asked her questions to condemn

6    him, and she did not.  He treated her well.  He never

7    restrained her.  He never threatened her.  He never held her

8    against her will.

9           Where is the coercion?  Where is the force?  Where

10   is the fraud?  He never even lied to her.  She had all -- she

11   had two days.  She had overnight to think about, "I've got to

12   tell them something more about Kevin, because he was so bad to

13   me."  Far from that, ladies and gentlemen.  Nothing was done

14   by Kevin with the intention of obtaining that result of

15   keeping her involved in sex trafficking.

16          More important, you heard no testimony that, in any

17   way, shape, or form, did she ever bring her dissatisfaction

18   with her job, with her role to his attention.  I'm not

19   suggesting she had an obligation to do it, but that's a

20   factor, ladies and gentlemen.  If she never complained to him,

21   notwithstanding what I tell my kids, I'm not a mind reader,

22   nor are you, nor is he.  How would he know if she doesn't

23   complain?

24          And, remember, even after he leaves the

25   jurisdiction, she's still with German.  A year and a half

1    later, she's in Virginia where he's gone, with German.  Is

2    this consistent with his understanding that she's so

3    oppressed?  Not that she wasn't, but what did he know?  What

4    did he see?  What was he able to perceive?  There is nothing,

5    ladies and gentlemen, for him to do that.  So not only is he

6    not aware; there is nothing for him to be in, to use the legal

7    phrase, reckless disregard of.  Reckless disregard is speeding

8    on a wet road.  You know it's wet.  You know it's dangerous,

9    but do it anyway.

10           What if you don't know if the road is dangerous?

11   There is a word for that.  Those of you who have driven,

12   you've heard about it.  You hear about it every time we get

13   bad weather here in Maryland in the winter.  It's black ice.

14   What's black ice?  It's ice you can't see, and you hit it, and

15   you're spinning, you're sliding.  You can't do anything about

16   it, and you wouldn't have done it if you had known about it.

17           From all indications that were apparent to Kevin,

18   she was involved in this voluntarily, insofar as there is a

19   measure of voluntariness.  She wanted to be with German.

20   That's Rebeca's testimony.  Now, at this late date, the

21   Government would like you to view this relationship between

22   German and Rebeca with traits they now claim are obvious so

23   that my client had to be in reckless disregard.  I suggest to

24   you they were not even apparent at the time, let alone being

25   obvious now.

1      You have a poor, uneducated girl from Hicksville,

2  El Salvador, who has come to America and desperately wants a

3  relationship to work to the point where she is prepared to

4  demean and degrade herself.  That's the only way to understand

5  a girl who, offered an opportunity to be helped by the

6  Annapolis Police Department, says, "No, thank you," and gets

7  taken by them back to ████████ -- taken back.  And why

8  would she?  You heard it.  Because that relationship was

9  perfect.

10      So how was Kevin supposed to figure it out?  He's

11  seen all these other girls run through the brothels, willing

12  to some degree or another, or maybe they're resigned to their

13  role.  Nobody is fighting to get out.  Girls who want to leave

14  are let -- permitted to leave, and girls are paid.  What's he

15  supposed to know?  What's he supposed to figure?

16      I'm not suggesting this to excuse his conduct.  I'm

17  not suggesting this is something you want your kids to get

18  involved in when they grow up.  What I'm asking you, ladies

19  and gentlemen, is:  In terms of what the law requires, they

20  have not made their case, not even close, because they don't

21  have any evidence to support this claim.

22      And, just so we're clear, you'll see on the jury

23  form -- the verdict form your having to make a decision

24  regarding sex trafficking, which only involves Rebeca, and was

25  there reckless disregard by Kevin after 23 December 2008?  Any

 1    conduct before that, there can be no reckless disregard.  The

 2    reckless disregard standard was put into the law only

 3    basically at Christmas of '08.  So he would have to be in

 4    reckless disregard only of conduct after Christmas and before

 5    March when he left town.  Anything before that, that doesn't

 6    even meet the legal standard.

 7            I suggest to you that we draw a lot more out of who

 8    Rebeca is and how Rebeca felt by other objective evidence.

 9    You heard the testimony she had been even -- she was laughing

10    right at the beginning.  "Oh, shoot, shoot, ask away.  I've

11    got no problem answering your questions."  Does that sound

12    like someone who was scared, who was oppressed, terrified of

13    German Ventura when her child is in DSS custody?

14            Let me ask you another question.  Remember this

15    photograph?  This is her arrest in March of '09.  Honestly,

16    does she look scared?  This is what Kevin knew and what Kevin

17    saw.

18            I am not suggesting that Rebeca wanted to do this,

19    liked doing this.  I am suggesting she did make to an nth

20    degree a choice to do this and a choice to continue.  There is

21    plenty of evidence she wanted to get out.  I have no question

22    she felt like she wanted to get out.  Nobody is obligated to

23    read minds or to act upon that which they do not see.  And

24    that, in its essence, ladies and gentlemen, is what the

25    Government is asking you to do.  They're asking you to be

 1   objective.  They're asking you to be dispassionate, and then

 2   they're telling you about this appalling crime.

 3          I only have boys.  I cannot imagine if it were my

 4   daughter who was subjected to this.  Actually, I can imagine.

 5   That's why we have guns.  That's another different story,

 6   ladies and gentlemen.  That's not what we have here.  This is

 7   a shocking and terrible crime.  There is no question about it.

 8   It's called prostitution.  It is not sex trafficking by force,

 9   fraud, and coercion.  It's not even close.

10          And then of course they're going to argue to you,

11   I'm sure -- I probably shouldn't try to do Mr. Cunningham's

12   job.  He'll do a better job than I will, but they'll suggest

13   that part of the force, fraud, and coercion was the adoption

14   of the murder of El Pelon, the adoption of Mr. Ventura racking

15   the gun.  You'll never hear any testimony from anyone that

16   Kevin said, "We did it."  That's Ventura's words, because he

17   needs to be tough.

18          You know, it's the old joke.  "I'm going to kick

19   your butt."

20          "Yeah, you and what Army?"

21          So, if you've got an Army, "Me and my Army are going

22   to kick your butt."  "We."  Make yourself bigger.  In urban

23   America, we have a word for that -- fronting.  It's what my

24   other clients would call that, but not these guys.  It's all

25   about posturing.  It's all about making yourself seem tougher,

1    but, until November, we don't even see that happening.  That's

2    November of 2010 with the assault on Hector Avila.  Before

3    then, it's all talk.

4         Over and over again, you heard Ms. Franco testify.

5    She would answer a question, "Sí."

6         Mr. Ruter would say, "Would you like to reconsider

7    your answer?  Let me show you your prior inconsistent

8    statement."

9         "Sí."

10        She's awfully suggestible.  She's vulnerable.  So,

11   when the police come to her again and again and again, "We

12   know he's involved.  Why don't you help us out.  Why don't you

13   tell us what you know," of course she'll say "yes" eventually.

14   And the police have no reason to disbelieve her, because it's

15   consistent with their theory, and the problem often is that

16   the police will take an hypothesis and find evidence to make

17   or break the hypothesis.  That's wrong.

18        You take evidence -- objective evidence, look at its

19   meaning and create your hypothesis from that.  They started

20   with, "We think Ventura is involved," and ignored everything

21   that didn't fit that.  You have heard no evidence by way of

22   forensics about the murder.  You have heard no evidence by way

23   of witnesses to the murder -- nothing.  I don't know what

24   happened, folks.  Honestly, neither do you, because we weren't

25   there.  We weren't in the room.  We've heard about what

1    happened, and we've heard about what people said.  That is not

2    enough to come to a decision beyond a reasonable doubt.  We

3    haven't even heard from the survivor of the murder, Nancy

4    Marin Ayala.  Has she just vanished?  We haven't even heard

5    where she is.

6         And, last but not least, again, let's go back to

7    common sense.  I asked you about common sense.  Would El Pelon

8    have said, "I was threatened by 'X,'" if "X" threatened him?

9    Let's accept the Government's theory.  I'm German Ventura.  I

10   want to take care of not a rival; another rival, Hector Avila.

11   So I have two options.  On one odd hand, "I can go and get my

12   trusted prior killer.  He whacked Pelon for me two years ago.

13   He's gotten away with it.  Two years on the street, nobody's

14   tied this to him or me.  I want somebody else killed.  I'm

15   going to get him to do it."  That's your one option.

16        Option number two:  "I'm going to get three yahoos

17   off the street, Ferman and his running mates."  Remember

18   Ferman Martinez Hernandez -- he testified for us -- him and

19   his shotgun?  Which way are you going to go, folks?  You're a

20   crime boss, the pimp from hell.  You want to kill somebody.

21   Are you going to go with your trusted expert?

22        I'm reminded of the movie *Philadelphia*.  When the

23   jury starts deliberating, there is the balding actor -- I

24   think he actually died not so long ago -- who was the foreman

25   of the jury, and he's listening to -- he's explaining the

 1    way -- his understanding of the testimony of the law firm.

 2    "Let's see.  I've got this really big, important case.  Do I

 3    give it to my ace, or do I give it to some yahoo?"  That's the

 4    exact same situation, ladies and gentlemen.  Criminals aren't

 5    that dumb, are they?  That's what they would have you believe,

 6    because that's the only way their story makes sense.

 7             Oh, but Kevin wasn't here.  That's right.  He was

 8    all the way in Virginia, just a phone call away if you accept

 9    the phone records.  They've never tied those phone numbers to

10    Kevin Fuertes except that he has acknowledged their being his

11    at one point a year before, and then they bring in toll calls

12    from a year later, all these contacts, thousands of calls,

13    that they've never shown one of them actually to have Kevin on

14    the other line, and let's be honest; phones are pretty easily

15    transferable.  That you've used a phone at one point doesn't

16    mean that someone else couldn't use it at another time.

17    That's handing the phones over.  No question whatsoever that's

18    how it could happen.  We don't know.

19             And we heard testimony that Kevin came back to

20    Baltimore from time to time -- I mean, back to Annapolis from

21    time to time.  Once again, it's not so hard to go get your

22    expert killer if you want the job done right, but their theory

23    says that's not what was done, and, if that makes sense to

24    you, that's fine.  It's your job to make the call.  Does it

25    really make sense to you?

1           Of course there is another alternative; they didn't

2     call Kevin because Kevin's no good for violence.  That's at

3     least as sensible as the Government's theory, if not a whole

4     lot more.  So that's why you don't call Kevin to whack

5     Hector Avila, because Kevin is not into violence, because

6     Kevin's never killed anybody, because Kevin's never had a gun,

7     never undertaken violence towards anybody.

8           Oh, yeah, one other question, just as a matter of

9     curiosity.  I hate to sort of feel like I'm piling on, but

10    that's exactly what it's like -- three or four or five guys

11    onto the pile.  Reminds me of my days playing football.  At

12    the end of her direct testimony, she was asked two questions I

13    was very happy with, by Ms. Yasser.

14          Question Number 1:  Do you fear Ventura -- German?

15    I don't recall how she referred to him, Chino, whatever.

16          Yes.

17          Question Number 2:  Do you fear Kevin, Flaco,

18    Fuertes, whatever -- whatever way Ms. Yasser posed the

19    question.  Before we get to the answer, remember:  This is

20    someone she believes -- she thinks was involved in a murder,

21    who allegedly had blood on his clothing, right?  Mr. Bad guy,

22    right?  The same guy that German could have called to kill

23    Avila.  And what is Rebeca's answer without hesitation?  She

24    doesn't look at me.  She doesn't look at him.  She doesn't

25    look at Ventura.  She looks Rachel Yasser right in the eye and

1    says, "No."

2          I'm sorry.  You think he killed somebody, you think

3    he's involved in a murder, and you don't fear him?  Or do you

4    not fear him because he wasn't involved in anything like that,

5    because he's never been anything but decent to you?  Like all

6    the rest of her testimony made amply clear.  I'm not asking

7    you to like Kevin Fuertes.  I'm not asking you to respect him,

8    except maybe his constitutional rights.  I'm asking you:  Does

9    this hold water?  Does this make sense?

10         Let's talk about Count 2.  That was Count 6.  That's

11   sex trafficking.  How about Count 2, interstate

12   transportation?  When did Kevin involve himself in the

13   transport of girls from out of state over state lines?  Let's

14   talk about the evidence we saw.

15         Tickets.  I believe that we saw a bus or a train

16   ticket or something at some point, people being picked up at

17   the bus station, like the photograph of Bridgett that

18   Mr. Ruter referred to and I think the Government even pulled

19   out.  I've got a tab back here.  There is a whole bucket load

20   of them, but this is the one I like the most, because you can

21   see very clearly her pink shirt.  That's the girl in the pink

22   shirt, remember?  There is a whole bunch of these photographs.

23         Oh, and who is picking her up?  German Ventura; not

24   Mr. Fuertes.  The fact is there is no evidence -- nothing that

25   you can rely upon to suggest that Mr. Fuertes was involved in

1    any way, shape, or form in interstate transportation of women

2    for purposes of prostitution.

3            I'll give you the prostitution part.  Ms. Yasser

4    went through the elements.  There is no question there was

5    prostitution, but was there involvement in the transport?  No,

6    not at all.  He never paid the rent when they were here.  You

7    heard one landlord, the only one who could identify

8    Mr. Fuertes, say, "He promised to pay, but he never did."  All

9    the other landlords -- Guillen, and the Caucasian woman -- I

10   can't remember her name now.  I've got it in my notes here.

11   "I don't know him.  He wasn't involved.  He didn't sign the

12   lease.  He didn't arrange for the rent."  You've never seen

13   anything.  The most that Kevin did is, when all the girls were

14   here, went out and got them food and went out and got them

15   condoms, and of course he's out passing out cards.  Nothing to

16   do with transport.

17           Now, there is -- let's be honest.  You'll hear an

18   instruction from Judge Quarles, and it is the law that there

19   is no obligation for the Government to undertake any

20   particular investigative techniques.  You can't hold it

21   against them that they didn't get fingerprints or DNA or

22   anything like that.  You can't hold it against them, but, when

23   you look at the sum total of the evidence, you can look at the

24   absence of things that might have persuaded you.  So, that

25   there is no evidence of Kevin having been involved in

1        transport in any way, or any of these other things, where

2        there is a lack of evidence, that is a part of your analysis.

3               And let's be honest.  Margarita Santiago was brought

4        down.  She looks at Kevin.  What does she say?  "I don't know

5        him."  Maximilliano Zelaya Repalo:  "I don't know him."  You

6        heard more people who didn't know Kevin than did.  The

7        Caucasian landlord, that was Kim Duvall.  They've utterly

8        failed to establish Mr. Garcia -- I mean, Mr. Fuertes' role in

9        any way, shape, or form involved in transportation, which

10       leaves us with Count 1, conspiracy.

11              The crime of conspiracy does not require action.  It

12       requires one act by one of the co-conspirators -- doesn't have

13       to be Mr. Fuertes -- in Maryland in furtherance of the

14       conspiracy.  Conspiracy is a crime involved around,

15       surrounding an agreement.  If I agree with you to rob a bank,

16       and one of us does one act in furtherance of the bank robbery,

17       gets some ski masks or pantyhose to disguise ourselves, gets a

18       map to sketch out our getaway, goes to the bank to check out

19       the floor plan and the hours, that's a conspiracy to commit

20       bank robbery.  See you later, 20 years' federal time.

21              Is there an agreement to transport women?  Maybe.

22       If you believe that, if you think there is evidence of that, I

23       can live with that.  I understand why you might feel that.

24       I'm arguing to you as Mr. Fuertes' attorney there is not, but

25       that's your call.  But let's be honest.  There is no evidence

1    of force, fraud, or coercion.  There is no evidence of a

2    conspiracy for the purpose of sex trafficking of Rebeca Dueñas

3    Franco, because there was no way of knowing that's what was

4    happening to her on the part of Kevin Fuertes.  He could not

5    have known.

6            This case is about guilt by association -- two

7    kinds:  Guilt by association with Annie (phon).

8            **THE REPORTER:**  I'm sorry, sir?

9            **MR. MONTEMARANO:**  Mr. Ventura.  I'm not going to

10   describe him any further.  You're welcome to all the

11   adjectives you like, and I'll join you.

12           And it's guilt by association with an infamous

13   crime -- not anything we should like, not anything maybe we

14   should even tolerate today, but we have to acknowledge it

15   happens.  You've got a poor, uneducated girl.  Does she have a

16   lot of other options?  I'm not condemning Rebeca for the

17   choice she made, and I give her all the credit in the world

18   that she's moved beyond that, and I regret terribly what

19   happened to her at the hands of Ventura, but it was at the

20   hands of Ventura.

21           The Government's chosen to bring certain charges

22   against my client and bring them to you with almost an utter

23   lack of evidence and an entire lack of compelling evidence,

24   the kind of evidence on which you can hang your hat.  They're

25   hoping that you will, like it or not, convict because of your

 1    revulsion.  They're hoping the twelve of you go back there,

 2    take turns puking up your breakfast over this case, and hang

 3    my client.  It doesn't work that way, folks.  They have to

 4    bring in evidence, and they haven't done it.  It's their

 5    obligation.  You heard from the very outset they have a burden

 6    of proof.  It's that burden of proof which protects all of us.

 7          The domination, subjugation, the abuse of Rebeca is

 8    awful, but it's not the basis for a verdict.  What is a basis

 9    for a verdict is a lack of evidence -- the fact that no gun

10    was ever seized from Kevin, no ammunition; his lack of

11    relation to interstate transport; his lack of relation to

12    force; his lack of relation to fraud; his lack of relation to

13    coercion; his lack of participation in the interstate

14    transport of anybody, in force; his lack of participation in

15    fraud; his lack of participation in coercion.  That's all a

16    basis for a verdict, ladies and gentlemen -- a verdict of not

17    guilty on Count 6, a verdict of not guilty on Count 2.

18          This is my last chance to speak to you.  The

19    Government, with its burden, has another shot at you.  So,

20    when they say things that don't quite jive with your

21    recollection and your understanding of the evidence, remember

22    it's your recollection and your understanding which controls,

23    and I hope you will do me the courtesy of asking the questions

24    that you think I might have wanted to ask, that Mr. Ruter

25    might have wanted to ask when Mr. Cunningham says things that

 1    don't quite fly for you.

 2             It's good that we do this today on April 19th.  It's

 3    a very important day for all of us.  Two hundred thirty-eight

 4    years ago, some brave men faced the power of one of the most

 5    important and powerful countries on the face of this earth --

 6    militiamen, defending their homes and their families on the

 7    Green at Lexington.  This is the real patriot state, ladies

 8    and gentlemen.

 9             What they give to us is for you to protect.  I know

10    you take your oath seriously.  I know you think very hard

11    about what you're doing.  I know that you are sickened as much

12    as anybody in this courtroom at what has happened over the

13    last few years in and around Annapolis.  But, if you make your

14    decisions based upon reason and careful consideration and

15    thought, you have to return verdicts of not guilty regarding

16    Kevin Fuertes.

17             Thank you.

18             **THE COURT:**  Mr. Cunningham?

19             **MR. CUNNINGHAM:**  Thank you, Your Honor.

20             Good afternoon, ladies and gentlemen, and I can

21    assure you that I will spare you a repeat of a lot of the

22    testimony you heard.  Certainly Ms. Yasser eloquently and

23    comprehensibly evaluated the evidence that the Government is

24    confident that, as you analyze it and assess it, you will do

25    exactly as the Defendants requested that you do, and that is

1    to objectively analyze it, conclude what the facts are, and

2    apply the facts to the law.  We are equally confident that

3    your verdicts will, unlike what they suggest they should be,

4    be that the Defendants are guilty as charged.

5         Now, I'm sure, when you reported for jury duty two

6    weeks ago, you didn't expect to learn with such detail the

7    practice of the sex-trafficking trade, especially within the

8    Hispanic community.  However, I do think -- and

9    notwithstanding the spin that perhaps Mr. Ventura might try to

10   put on it -- that everyone agrees that this is a rather

11   sordid, seamy, ugly environment, and the notion, any

12   suggestion that the women who worked in this trade did so

13   because of something other than the desperation forced upon

14   them by dire financial circumstances, by an upbringing in a

15   poor environment where they didn't get the education, where

16   they didn't get the life skills and the opportunities that are

17   afforded to many of us growing up -- not all, but many of

18   us -- growing up in the United States, left them with options

19   that were far fewer than most of us have enjoyed in life.

20        And it's within that *milieu* that the decisions that

21   they make, however difficult for us to understand and embrace,

22   have to be assessed.  It's within that *milieu* that you have to

23   consider the young woman who does, in fact, become subjected

24   to the control, the exploitation, the manipulation, the

25   physical and emotional violence of German Ventura.

1    German Ventura's desire to control was shown in a number of

2    ways.  As Ms. Yasser began during her opening statement, not

3    only did he engage in the sex trafficking business, but there

4    was a sector that he wanted to control, at least within the

5    Annapolis community.  Perhaps he fancied himself as another

6    Raudel or Alex, carve out my area of influence, and that's

7    where I'm going to assert control.

8             Now, it's kind of surprising.  You didn't hear much

9    of it in terms of counsel embracing or sponsoring the

10   Defendant -- I mean Defendant Ventura's loathsomeness and

11   loathsome regard for the Government, for law enforcement, and

12   particularly for Special Agent Kelly, and I hope you would

13   acknowledge, as the Government suggested in one comment to the

14   Court, that it's -- not only is it utterly reprehensible and

15   audacious to make such an allegation; it just flies in the

16   face of a man who has, the evidence is, spent a commendable,

17   long years of service to the United States providing the same

18   kind of defense of our rights, freedom, and liberty as

19   Mr. Montemarano suggested was done by the security officer at

20   MIT.

21            So I appreciate that neither Mr. Ruter nor

22   Mr. Montemarano embraced or suggested that there was any merit

23   whatsoever to those outrageous condemnations, but let me take

24   that as a point of departure for one overarching proposition.

25   It's a lot easier to stand here and talk to you.  Of course

 1    it's one-sided.  We don't have the luxury of dialogue where

 2    you might get to ask me, Mr. Ruter, Ms. Yasser, or

 3    Mr. Montemarano questions and engage in a back and forth, but

 4    I can assure you that trying to elicit a response from Ventura

 5    yesterday was one of the most unimaginably challenging things

 6    I've ever done as a lawyer of standing longer than

 7    Mr. Montemarano, of all things.

 8             It was that control that he wanted to exercise in

 9    this courtroom that was so palpably obvious.  I would submit

10    also that it was his prevarication, his attempt to manipulate,

11    his unwillingness to respond to a question that should suggest

12    to you that it was utterly without any credibility, and that

13    you should virtually flush anything he said -- the denial

14    about being involved in prostitution, the denial of knowing

15    anyone, not even willing to acknowledge that he knew people

16    who came -- the only person I think that he acknowledged that

17    he knew was Rebeca Dueñas.  Otherwise, it was this

18    wholehearted denial.

19             What it tells you:  Not only that you should

20    disregard the denials, but that someone who is willing to go

21    that far, willing to say those kinds of things, is doing it

22    for a big reason, and that's because the truth incriminates

23    him.  The truth is what makes him guilty.

24             Now, let me try to address, in the time that I have,

25    just a couple of the things that were mentioned by counsel,

1    and, with all due respect to Mr. Ruter, because, again,

2    harkening back to yesterday, I think you can appreciate, as

3    the Government does, the challenge of his responsibility,

4    which he undertook with honor and dispatched as he was

5    supposed to, as our Constitution requires him to do, and as

6    the Defendant, who will probably never understand, enjoyed a

7    right and a representation that our Constitution says he

8    deserves, and he got it, but the Constitution doesn't say a

9    guilty man gets acquitted.

10              There was a suggestion the Government introduced the

11   idea of the death of El Pelon as some sort of red herring.

12   Well, first of all, ladies and gentlemen, I would submit that,

13   were you to be considering whether these men are guilty of the

14   death of Pelon, that would certainly be something you could

15   take back and consider.  You wouldn't have to scrub it from

16   the get-go, but this case was not about the murder of

17   El Pelon.  You should not speculate about what's going on

18   outside this courtroom, this environment, and what your

19   considerations are.

20              The death of El Pelon and Ventura's ownership of it

21   was introduced for two reasons.  First of all, we have an

22   obligation to prove that these men are involved in the

23   conspiracy to engage in the prostitution business, and I

24   distinguish prostitution business from sex trafficking.  The

25   conspiracy count, as Mr. Montemarano acknowledged, doesn't

 1    require the force, fraud, and coercion.  It's just the sex

 2    traffic.  Excuse me.  It's just the prostitution angle of it.

 3         But think about it.  If you're making threats about

 4    murdering or killing or injuring the competition, if you're

 5    owning the death of a competitor, what's that tell you?

 6    You're involved in the business.  That's part of what we had

 7    to prove.  But, secondarily, and much more significantly for

 8    the purpose of considering Rebeca Dueñas --

 9         **DEFENDANT VENTURA:**  Why didn't you charge me for

10    murder, then?  Why did you charge me for prostitution, Mr. --

11         **THE COURT:**  Mr. Ventura, please be quiet.  Now,

12    you've been well behaved so far.  Please continue that.

13         **DEFENDANT VENTURA:**  This man's been lying a lot.

14         **THE COURT:**  Quiet, sir.

15         **MR. CUNNINGHAM:**  Like I suggested, ladies and

16    gentlemen, you shouldn't think about what happens outside this

17    courtroom.  Rebeca Dueñas, there is a lot of talk about

18    Rebeca Dueñas, and it was in that context that the discussions

19    about, the ownership about the El Pelon murder also factors in

20    to the attitude, the emotions, the shackles -- the mental

21    shackles -- not physical shackles, but the mental and

22    emotional shackles by which she was constrained by that man,

23    compelled, coerced --

24         **DEFENDANT VENTURA:**  That's why she came and

25    testified about me, because you gave her --

1              **THE COURT:**  Mr. Ventura, if you continue, I will

2    have you removed from the courtroom.

3              **DEFENDANT VENTURA:**  Why is he working it like you

4    want to kill me or something?

5              **THE COURT:**  Mr. Ventura, if you continue, I will

6    have you removed from the courtroom.

7              **MR. CUNNINGHAM:**  I don't want Mr. Ventura to be

8    killed.  I just want you to do justice.  If there was any

9    suggestion -- any question at all as to the utter

10   ridiculousness of certain things, it was, during testimony,

11   Mr. Ventura called Maria Theresa Baker that lying doctor.

12             Now, Dr. Baker came in for a very limited purpose,

13   and that was to provide her expert -- her expertise, training

14   and experience to you for the single purpose of saying, "The

15   observations I made were consistent with the account of

16   Rebeca Dueñas."  She didn't go farther to say, "This is how it

17   happened."  She didn't say who did it.  It was for a limited

18   purpose, and the Government didn't try to sponsor it for

19   anything more than that, but the idea that it was bought and

20   paid for is utterly ridiculous and, again, comes back to the

21   notion that the desperation of a guilty man would -- it was

22   palpably obvious during his testimony.

23             Now, with regard to Rebeca Dueñas, indeed she did

24   acknowledge that there were differences in her account or the

25   progression of her account to law enforcement over the course

1    of more than a year -- more than a year and a half of

2    providing information, but, as Ms. Yasser pointed out, this

3    was not an evasive person on the stand.  It was someone

4    certainly who was traumatized, and I invite you, as you

5    evaluate her testimony, to think about the trauma in her life.

6          There is no doubt that she probably had difficulty

7    figuring out with some specificity, when did this occur?

8    Well, most of us enjoy landmarks in our life history that help

9    us to set dates: good things, positive things; sometimes sad

10   things -- the death of a family member; the birth of a child.

11   You know, "Oh, I had a great vacation here."  When you think

12   about those kind of mnemonic devices, we, most of our lives,

13   are filled with those kinds of helpful things, but think of

14   what the life must be for a woman who, from week to week,

15   travels from one strange place to another, spends five or six

16   days in a shabby, seedy little residence where she sleeps on

17   the same stained, sheetless mattress on a floor on which she's

18   supposed to lay down with ten, fifteen, twenty strangers a day

19   to debase herself by having sex for money, when at least half

20   of the money goes to men like that.

21          It's no wonder that trying to figure out exactly

22   when something happened in a life like that -- it's not like

23   for us where I can say, "Oh, yes, I took my son off to some

24   camp," or, "We took a wonderful family vacation," "Oh, I

25   remember that Christmas."  She didn't have those kinds of

 1     landmarks.  So don't hold her responsible for some failures.

 2          But, secondarily, her tongue was tied up, was

 3     constrained by the man sitting over there, by the fear of that

 4     man.  When he got out -- or, frankly, he wasn't even

 5     incarcerated, because he -- he wasn't arrested when she was

 6     first arrested.  He didn't get arrested until November, and

 7     the fear of what he would do to her, this fear born of what he

 8     threatened to do to other people, what he claimed

 9     responsibility for doing to other people -- Cassandra, she saw

10     him with another prostitute.  She saw what he did to another

11     prostitute when she thought or -- excuse me -- when he thought

12     that prostitute was responsible for a robbery of one of his

13     brothels.

14          And, if she was really going to come in here and

15     fabricate completely, to really put it to both of these guys,

16     don't you think it would have been a whole lot more condemning

17     than it was?  What did she say?  One time, there was an

18     account of him using violence because of her unwillingness to

19     engage in a sex act -- one time.

20          Now, think about it.  If she was really going to

21     make this up and, since, after all, it's largely her word

22     versus his -- well, actually, it's just her word.  She would

23     have said a whole lot more than that, but it only takes that

24     one time.  It was that one time.  It was that environment.  It

25     was that climate of fear in which Defendant Fuentes

Case 1:10-cr-00770-WDQ  Document 307  Filed 03/19/14  Page 103 of 201
Rebuttal Argument by the Government
T-IX-1813

 1    participated, and that's why he's absorbed.

 2           Counsel are wise to concede the conspiracy.

 3    Mr. Ruter's wise to concede the counts which are so obvious

 4    from the evidence and testimony, but they don't want to

 5    concede the force, fraud, and coercion, because there is at

 6    least an opportunity here, if you challenge Rebeca Dueñas, to

 7    attack.  Well, you must evaluate her testimony carefully, and

 8    I submit that, when you do, you'll conclude that that young

 9    woman came in here, promised to tell the truth, and, through

10    the four hours-plus, did tell you the truth, and the evidence

11    that she presented does indeed support Count 6 as to both

12    Defendants.

13           I think I have a few minutes, and I just want to

14    make sure there is nothing that I -- Mr. Ventura -- excuse me.

15    Mr. Montemarano wanted to isolate Fuertes from this act by

16    using those dates.  The one thing Ms. Dueñas did say was this

17    act of violence, the striking, occurred at the ███████████

18    ███████, we're able by virtue of Mr. Kim's testimony, however

19    difficult it was, again, to elicit information across the

20    language barrier there, to essentially isolate that time frame

21    to after Fuertes' March '09 arrest, so we know he is still

22    working with Ventura, and it's here in Maryland, and it was

23    before he went to Virginia.

24           Now, this whole business about the assault on

25    Hector Avila, talk about red herrings.  I mean, Fuertes left

1    Maryland because he was under -- finally came to be under the

2    auspices of ICE.  Now, as a momentary aside, whatever else you

3    might think about the Immigration policies of the United

4    States, there is no doubt that we've got some problems.  We

5    have some problems in enforcement and what have you, but the

6    fact of the matter is that that's independent of this case

7    from the standpoint of the enforcement action, but Fuertes had

8    come under the umbrella of ICE enforcement, and the easiest

9    thing for him to do was to abscond, to leave the jurisdiction

10   and make sure that his presence was relatively limited; maybe

11   Sunday afternoons, come up from Virginia, return on Monday.

12   We saw that traffic.

13        But here is a guy who is still involved.  Look at

14   the telephone information.  You're going to have that

15   frequency chart to take back with you and evaluate it.

16        I wish I was as eloquent and adept as my colleague

17   in presenting all of the evidence to you, and I wouldn't take

18   exception with one thing that she said, except for one tiny

19   thing she said, and that was you're going to have the

20   organizational chart to take back with you.  Actually, we use

21   that as a demonstrative aid.  You won't have that

22   organizational chart when you go back into your deliberations,

23   but I'm going to show it to you once more.

24        This is the demonstrative chart that the Government

25   prepared based on the anticipated testimony.  And I say

1    "anticipated," because I showed you this during opening

2    statement, and I told you that this is what the evidence was

3    going to show you, was going to prove to you, and that is that

4    German Ventura was the top dog, that he had a couple of

5    lieutenants.  Fuertes was one of them.  How many times Fuertes

6    was arrested?  At least twice in brothels:  Once over at --

7    once at ███████, and once at ███████████.

8            And the other guy is El Colmillo.  How many people

9    talked about him?  A number of people.  Ventura operated these

10   brothels.  All the people here at the bottom, at various

11   times, in various police operations, were arrested.

12           Ventura wanted to carve out that niche.  That's the

13   rough organization that he created, using the fear, the

14   threats, the effort to control things that we saw part of in

15   this courtroom.  It's interesting Mr. Montemarano started his

16   statement with the account -- sad account in Boston and then

17   concluded with reference to Patriots Day.  Actually, another

18   small correction.  Patriots Day is actually celebrated --

19   was -- in fact, the first Patriots Day was April 19th.  It's

20   always celebrated -- it's a State holiday in Massachusetts,

21   always celebrated on the third Monday of the month of April,

22   and, sadly, it was this Monday, April 15th, when we were

23   sitting, that the tragic events occurred in that city during

24   the marathon, and we are appropriately reminded of our

25   responsibilities as citizens to operate within the law, to

1    function as a nation of laws, and we afford people in this

2    country, citizens or not, constitutional rights to a fair

3    trial by individuals like you, who will objectively,

4    dispassionately consider the evidence and render verdicts.

5           Those are important rights, not just to the

6    individuals who are sitting as defendants, but they're

7    important rights to all of us.  We're confident that, when you

8    do that, you will also respect the rights of the citizenry,

9    hold the Government to the standard we bear in every single

10   criminal case tried in this country -- proof beyond a

11   reasonable doubt.  It's part of what makes it a great country.

12   We have no doubt whatsoever that, when you do that, you'll

13   help keep it a great country and a safer country, and convict

14   these men of these crimes.

15          Good afternoon.

16          **THE COURT:**  Thank you, Mr. Cunningham.

17          Members of the jury, we're going to take a shorter

18   lunch break than usual.  That's okay, because we're delivering

19   your lunch to you, so it should work out.

20          We will resume at 2:00 p.m. with my instructions,

21   and then the case will be given to you for your decision.  As

22   I said, the instructions should take around about an hour, so

23   I would expect to give the case to you to begin your

24   deliberations sometime around 3 o'clock or so.

25          We are in recess.

 1          **THE CLERK:**  All rise.  This Honorable Court stands

 2     in recess until 2:00 p.m.

 3               (Jury excused.)

 4               (Luncheon recess -- 1:09 p.m.)

 5               (Afternoon session -- 1:59 p.m.)

 6          **THE CLERK:**  All rise.  This Honorable Court now

 7     resumes in session.

 8          **THE COURT:**  Yes, Mr. Montemarano?

 9          **MR. MONTEMARANO:**  Yes, Your Honor.  Ms. Kies

10     provided me when I came in today a revised version of the

11     verdict sheet, superseding the one provided last evening via

12     e-mail, for which I thank her.  That being said, it is my

13     understanding that the present version will permit a finding

14     of involvement in Count 6, alternatively, by reckless

15     disregard for after the 23rd of December --

16          **THE COURT:**  Yes.

17          **MR. MONTEMARANO:**  -- but only after the 23rd of

18     December is -- but I'm -- Maryann explained it to me, and I'd

19     like to be clear on the Court's understanding of the change,

20     because I'm not sure I'm following it.  My view is that they

21     can only find reckless disregard after the 23rd, and that,

22     absent that, they have to acquit on that prong, because there

23     is only one instance of conduct, so they cannot find on either

24     side of the 23rd.  It's got to be the one or the other.

25          **THE COURT:**  What was the date of the conduct that's

1    relied upon?

2              **MR. MONTEMARANO:**  Well, the Government's argument is

3    that it's in April.

4              **THE COURT:**  I understand it's argument.  So your

5    question?

6              **MR. MONTEMARANO:**  The Court's indulgence.

7              **THE COURT:**  I'll tell you what.  Why don't you look

8    for that while I'm reading my instructions.

9              **MR. MONTEMARANO:**  I'm --

10             **THE COURT:**  It will give you something to do other

11   than listening to the instructions.  Believe me, if I had

12   something to do other than listening to the instructions, I'd

13   do it.

14             Ready for the jury, counsel?

15             **MR. MONTEMARANO:**  Yes, Your Honor.

16             **THE COURT:**  Would you get them?

17             (Jury enters.)

18             **THE COURT:**  Please be seated.

19             Ladies and gentlemen, you are now about to enter

20   your final duty, which is to decide the fact issues in this

21   case.  Before you do that, I will instruct you on the law.

22             Now, as Ms. Yasser has told you, I am going to give

23   you copies of my instructions, so don't think that you have to

24   make a stenographic record of what I'm saying to you.  I will

25   give you several copies of the instructions along with several

1    copies of the verdict sheet that you'll take back with you in

2    addition to the evidence.  Now, if you want to take notes

3    about anything that strikes you during the instructions, feel

4    free to do that, but don't feel you're under any obligation to

5    have to record the instructions.  You're not.  You'll get

6    copies of them.

7         I ask you to pay close attention to me now.  I will

8    go slowly, and be as clear as possible.  It is evident to me

9    that you followed the testimony with close attention, so I'm

10   going to ask you to give me that same careful attention as I

11   instruct you about the law.  You have heard all the evidence

12   in the case, as well as the final arguments of the lawyers for

13   the parties.  My duty at this point is to instruct you about

14   the law.  It is your duty to accept these instructions of law

15   and apply them to the facts as you determine those facts.

16        On these legal matters, you must take the law as I

17   give it to you.  You should not single out any instruction as

18   alone stating the law, but you should consider my instructions

19   as a whole when you retire to deliberate in the jury room.

20   You should not, any of you, be concerned about the wisdom of

21   any rule that I state.  Regardless of any opinion that you may

22   have as to what the law may be -- or ought to be -- you must

23   base your verdict on the law that I will give you.

24        You, the members of the jury, on the other hand, are

25   the sole and exclusive judges of the facts.  You pass upon the

1   weight of the evidence.  You determine the credibility, which

2   is to say believability, of the witnesses, and you draw

3   whatever reasonable inferences you decide to draw from the

4   facts as you determined them.

5           In determining the facts, you must rely on your own

6   recollection of the evidence.  What the lawyers have said in

7   their opening statements, and their closing arguments, and in

8   their objections or in their questions is not evidence.  Nor

9   is anything I may have said during the trial or may say during

10  these instructions evidence.

11          The evidence before you consists of the answers

12  given by the witnesses -- the testimony they gave as you

13  recall it -- and the exhibits that were received into

14  evidence.  You may also consider stipulations, or agreements,

15  if any, as evidence.

16          Because you are the sole and exclusive judges of the

17  facts, I do not mean to indicate any opinion as to the facts

18  or what your verdict should be.  It is the duty of the

19  attorney for each side of the case to object when the other

20  side offers testimony or other evidence which the attorney

21  believes is not properly admissible.  The lawyers also have

22  the right and duty to ask me to make rulings of law and to

23  request conferences out of your hearing.  All these questions

24  of law have to be decided by me.  You should not show any

25  prejudice against some attorney or his or her client because

1   that attorney objected to the admissibility of evidence or

2   asked for a conference out of your hearing or asked me to make

3   a ruling of law.

4          As I have already said, my rulings on the

5   admissibility of evidence do not indicate any opinions that I

6   hold about the weight or effect of the evidence.  You are the

7   sole judges of the believability of all the witnesses and the

8   weight and effect of all the evidence.

9          You are to perform the duty of finding facts without

10  bias or prejudice against or sympathy for any party.  You are

11  to perform your final duty in an attitude of complete fairness

12  and impartiality.

13         Your verdict must be based solely upon the evidence

14  developed at trial or the lack of evidence.

15         It would be improper for you to consider, in

16  reaching your decision as to whether the Government met its

17  burden of proof, any personal feelings you may have about a

18  defendant's race, religion, national origin, sex, or age.  All

19  persons are entitled to the presumption of innocence, and the

20  Government has the burden of proof, as I will discuss in a

21  moment.

22         It would be equally wrong for you to allow any

23  feelings you might have about the nature of the crimes charged

24  to interfere with your decision-making process.

25         To repeat, your verdict must be based only on the

1    evidence or lack of evidence in the case.

2         The case is important to the Government, because the

3    enforcement of criminal law is a matter of prime concern to

4    the community.  Equally and obviously, the case is important

5    to the Defendants, who are charged with serious crimes.

6         The fact that this prosecution is brought in the

7    name of the United States of America entitles the Government

8    to no greater consideration than that would be given to any

9    other party in the lawsuit.  By the same token, the Government

10   is entitled to no less consideration.  All parties, whether

11   the Government or individuals, stand as equals at the bar of

12   justice.

13        Your verdicts should be based upon the facts as

14   found by you from the evidence and the law contained in these

15   instructions.

16        Although the Defendants have been indicted, you must

17   remember that an indictment is only an accusation; it is not

18   evidence.  Each defendant has pled not guilty to the

19   Indictment.  As a result of these pleas of not guilty, the

20   burden is on the prosecution to prove guilt beyond a

21   reasonable doubt.  This burden never shifts to a defendant for

22   the simple reason that the law never imposes upon a defendant

23   in a criminal case the burden or duty of calling any witness

24   or producing any evidence.

25        The law presumes a defendant to be innocent of all

Case 1:10-cr-00770-WDQ   Document 307   Filed 03/19/14   Page 113 of 201
Instructions to the Jury
T-IX-1823

1     the charges against him.  I therefore instruct you that the

2     Defendant, each defendant, is to be presumed by you to be

3     innocent throughout your deliberations until such time, if

4     ever, that you, as a jury, are satisfied that the Government

5     has proven that defendant guilty beyond a reasonable doubt.

6          Each defendant began the trial with a clean slate.

7     The presumption of innocence alone is sufficient to acquit a

8     defendant unless you, as jurors, are unanimously convinced

9     beyond a reasonable doubt of his guilt after a careful and

10    impartial consideration of all the evidence in the case.  If

11    the Government fails to sustain its burden, you must find the

12    Defendant not guilty.

13         The presumption of innocence was with each defendant

14    when the trial began, remains with each now, even as I speak

15    to you, and will continue with each defendant into your

16    deliberations unless and until you are convinced that the

17    Government has proven his guilt beyond a reasonable doubt.

18         One defendant chose not to testify in this case.

19    Under our Constitution, a defendant has no obligation to

20    testify or to present any evidence, because it is the

21    Government's burden to prove a defendant guilty beyond a

22    reasonable doubt.  A defendant is never required to prove that

23    he is innocent.

24         Therefore, you must not attach any significance to

25    the fact that a given defendant did not testify.  No adverse

1  inference against a defendant may be drawn by you because he

2  did not take the witness stand, and you may not consider it in

3  any way in your deliberations in the jury room.

4          In a criminal case, the Defendant cannot be required

5  to testify, but, if either one of the defendants here chooses

6  to testify, he is of course permitted to take the witness

7  stand on his own behalf.  In this case, a defendant decided to

8  testify.  You should examine and evaluate his testimony just

9  as you would the testimony of any witness with an interest in

10  the outcome of the case.

11          There are two types of evidence which you may

12  properly use in deciding whether a defendant is guilty or not

13  guilty.

14          One type of evidence is called direct evidence.

15  Direct evidence is where a witness testifies about what he saw

16  or heard or observed.  In other words, when a witness

17  testifies about what is known to him of his own knowledge by

18  virtue of his own senses -- what he sees, feels, touches, or

19  hears -- that is called direct evidence.

20          Circumstantial evidence is evidence which tends to

21  prove a disputed fact by proof of other facts.  You infer on

22  the basis of reason and experience and common sense from an

23  established fact the existence or nonexistence of some other

24  fact.

25          Circumstantial evidence is of no less value than

1    direct evidence.  As a general rule, the law makes no

2    distinction between direct and circumstantial evidence, but

3    simply requires that, before convicting a defendant, the jury

4    must be satisfied of his guilt beyond a reasonable doubt from

5    all the evidence in the case.

6         During the trial, you have heard the attorneys use

7    the term "inference," and, in their arguments, they have asked

8    you to infer on the basis of your reason, experience, and

9    common sense, from one or more established facts, the

10   existence of some other fact.

11        An inference is not a suspicion or a guess.  It is a

12   reasoned, logical decision to conclude that a disputed fact

13   does exist on the basis of another fact which you know does

14   exist.

15        There are times when different inferences may be

16   drawn from facts, whether proved by direct or circumstantial

17   evidence.  The Government may ask you to draw one set of

18   inferences, while the Defense may ask you to draw another.  It

19   is for you, and you alone, to decide what inferences you will

20   draw.

21        The process of drawing inferences from facts in

22   evidence is not a matter of guesswork or speculation.  An

23   inference is a deduction or conclusion which you, the jury,

24   may -- but you are not required to draw -- from the facts

25   which have been established by either direct or circumstantial

1    evidence.  In drawing inferences, you should exercise your

2    common sense.

3         So, while you are considering the evidence presented

4    to you, you are permitted to draw, from the facts which you

5    find to be proven, such reasonable inferences as would be

6    justified in light of your experience.

7         Here again, let me remind you that, whether based

8    upon direct or circumstantial evidence, or upon the logical,

9    reasonable inferences drawn from such evidence, you must be

10   satisfied of the guilt of a defendant beyond a reasonable

11   doubt before you may convict him.

12        The evidence in this case consists of the sworn

13   testimony of witnesses, the exhibits that were -- and the

14   exhibits that were received in evidence.

15        Exhibits which have been marked for identification

16   but not received into evidence may not be considered by you as

17   evidence.  Only those exhibits received into evidence may be

18   considered as evidence.  And we will be sending the evidence

19   back to you, so, if there is something that was mentioned at

20   trial that you don't have, that's because it was not admitted

21   into evidence, but everything that was admitted into evidence,

22   you will have access to.

23        You are to disregard any testimony when I have

24   ordered it stricken.  As I indicated before, only the

25   witnesses' answers are evidence, and you are not to consider a

1    question as evidence.  Also, statements made by the lawyers

2    are not evidence.

3            You should consider the evidence in light of your

4    own common sense and experience, and you may draw reasonable

5    inferences from the evidence.

6            Of course anything you may have seen or heard about

7    this case outside the courtroom is not evidence and must be

8    entirely disregarded.

9            The Government has presented exhibits in the form of

10   charts and summaries.  I decided to admit these charts and

11   summaries in place of the underlying documents that they

12   represent in order to save time and unnecessary inconvenience.

13   You should consider these charts and summaries as you would

14   any other evidence.

15           Any person who testifies, including a party, is a

16   witness.  You are the sole judges of whether testimony should

17   be believed.  In making this decision, you may apply your own

18   common sense and everyday experiences.  In determining whether

19   a witness should be believed, you should carefully judge all

20   the testimony and evidence and the circumstances under which

21   each witness has testified.

22           You should consider such things as the witness'

23   behavior on the stand and way of testifying, the witness'

24   opportunity to see or hear the things about which testimony

25   was given, the accuracy of the witness' memory, did the

1    witness have a motive not to tell the truth, does the witness

2    have an interest in the outcome of the case, was the witness'

3    testimony consistent, was the witness' testimony supported or

4    contradicted by other evidence, and whether and the extent to

5    which the witness' testimony in court was different from any

6    statement made by the witness on any previous occasion.

7          You need not believe any witness, even though the

8    testimony is not contradicted.  You may believe all, part, or

9    none of the testimony of any witness.

10          In this case, you have heard the testimony of

11    various law enforcement officials.  The fact that a witness

12    may be employed by a government as a law enforcement official

13    does not mean his testimony is necessarily deserving of more

14    or less consideration or greater or lesser weight than that of

15    an ordinary witness.

16          At the same time, it is quite legitimate for the

17    Defense attorneys to try to attack the believability of a law

18    enforcement witness on the grounds that his testimony may be

19    colored by a personal or professional interest in the outcome

20    of the case.

21          It is your decision, after reviewing all the

22    evidence, whether to accept the testimony of the law

23    enforcement witness and to give that testimony whatever

24    weight, if any, you find it deserves.

25          In this case, I permitted a witness, Dr. Mary

 1    Theresa Baker, to express her opinion about matters that are

 2    in issue.  A witness may be permitted to testify to an opinion

 3    on those matters about which he or she has special knowledge,

 4    skill, experience, and training.  Such testimony is presented

 5    to you on the theory that someone who is experienced and

 6    knowledgeable in a field can assist you in understanding the

 7    evidence or in reaching an independent decision on the facts.

 8            In weighing this opinion testimony, you may consider

 9    Dr. Baker's qualifications, her opinions, the reasons for

10    testifying, as well as all of the other considerations that

11    ordinarily apply when you are deciding whether or not to

12    believe a witness' testimony.  You may give her opinion

13    testimony whatever weight, if any, you find it deserves in

14    light of all the evidence in the case.  You should not,

15    however, accept her expert opinion testimony merely because I

16    allowed her to testify about her opinion, nor should you

17    substitute it for your own reason, judgment, and common sense.

18    I remind you that the determination of the facts in this case

19    rests solely with you.

20            The Government has been permitted to hand out typed

21    documents, which it prepared, containing the Government's

22    interpretation of what appears on recordings which have been

23    received as evidence.  Those were given to you as an aid or

24    guide to assist you in listening to them; however, they are

25    not in and of themselves evidence.  So, when the recordings

1    were played, I advised you to listen carefully to the

2    recordings themselves.

3         Now, there is one difference here.  That's when the

4    recordings are in another language.  In that case, the actual

5    interpretation on which you received on the transcript was

6    evidence.

7         You alone make your interpretation at what appears

8    in the evidence based on what you've heard or, in the case of

9    the testimony in foreign language, what the official

10   interpretation was.  Again, you are the sole judges of the

11   facts.

12        Languages other than English have been used for some

13   evidence during this trial.  When a witness testified in

14   another language, the witness did so through an official court

15   reporter -- sorry -- through an official court interpreter.

16   When recorded evidence was presented in another language,

17   there was an official court translation of the recording.

18        The evidence you are to consider and on which you

19   must base your decision is only the English-language

20   interpretation or translation provided through the official

21   court interpreters and translators.  Although some of you may

22   know the non-English languages used, you must disregard any

23   meaning of the non-English words that differ from the official

24   interpretation or translation.

25        You must not make any assumptions about a witness or

1   a party based solely on the use of an interpreter to assess

2   that witness or party.

3        You have heard evidence that a witness made a

4   statement on an earlier occasion which counsel argues is

5   inconsistent with the witness' trial testimony.  Evidence of a

6   prior inconsistent statement is not to be considered by you as

7   affirmative evidence bearing on a defendant's guilt.  Evidence

8   of the prior inconsistent statement was placed before you for

9   the more limited purpose of helping you decide whether to

10  believe the trial testimony of the witness who contradicted

11  himself or herself.  If you find that the witness made an

12  earlier statement that conflicts with his trial testimony, you

13  may consider that fact in deciding how much of his trial

14  testimony, if any, to believe.

15       In making this determination, you may consider

16  whether the witness purposely made a false statement, or

17  whether it was an innocent mistake; whether the inconsistency

18  concerns an important fact, or whether it had to do with a

19  small detail; whether the witness had an explanation for the

20  inconsistency, and whether that explanation appealed to your

21  common sense.

22       It is exclusively your duty, based upon all the

23  evidence and your own good judgment, to determine whether the

24  prior statement was inconsistent, and, if so, how much, if

25  any, weight to be given to the inconsistent statement in

1  determining whether to believe all or part of the witness'

2  testimony at trial.

3  During the trial, you have heard testimony of

4  witnesses and argument by counsel that the Government did not

5  use specific investigative techniques.  You may consider these

6  facts in deciding whether the Government has met its burden of

7  proof, because, as I told you, you should look to all of the

8  evidence or lack of evidence in deciding whether a defendant

9  is guilty; however, you are instructed that there is no legal

10  requirement that the Government use any specific investigative

11  technique to prove its case.  There is no requirement, for

12  example, to offer recordings in evidence.  Law enforcement

13  techniques are not your concern.

14  Your concern, as I have said, is to determine

15  whether or not, on the evidence or lack of evidence, a

16  defendant's guilt has been proved beyond a reasonable doubt.

17  This Indictment contains a total of seven counts.

18  Each count charges the Defendants with a different crime.  You

19  must consider each count separately and return a separate

20  verdict of guilty or not guilty for each, and, as was noted by

21  Mr. Montemarano in his argument, his client is not charged in

22  all seven counts.  So that will be clear during the

23  instructions and from the verdict sheet.

24  Whether you find a defendant guilty or not guilty as

25  to one offense should not affect your verdict as to any other

1   offense charged.

2        With these preliminary instructions in mind, let's

3   turn to the charges against the Defendants as contained in the

4   Indictment.  I remind you that an indictment is not evidence;

5   it merely describes the charges against the Defendants.  It is

6   an accusation.  It may not be considered by you as any

7   evidence of the guilt of any defendant.

8        In reaching your determination whether the

9   Government has proven any defendant guilty beyond a reasonable

10  doubt, you may consider only the evidence introduced or lack

11  of evidence against that defendant.

12       While we're on the subject of the elements of the

13  offenses, I draw your attention to the fact that it does not

14  matter if the Indictment charges that a specific act occurred

15  on or about a certain date and the evidence indicates that, in

16  fact, it was on another date.  The law only requires a

17  substantial similarity between the dates alleged in the

18  Indictment and the date established by testimony or exhibits.

19       We turn now to Count 1, conspiracy relating to

20  interstate prostitution.

21       Count 1 of the charging document charges the

22  Defendants with conspiracy related to interstate commercial

23  sex activity.  The charging document reads, in relevant part,

24  that the Grand Jury charged that, at all times relevant to the

25  charging document, Defendant German de Jesus Ventura, also

1    known as Chino, also known as Chalo, also known as Pancho,

2    also known as Chaco, was a native and citizen of El Salvador

3    and an illegal alien residing in Capitol Heights, Maryland.

4         The document charges that Defendant Kevin Garcia

5    Fuertes, also known as Kerlin Esau Esquivel Fuentes, also

6    known as Flaco, was a native and citizen of Honduras and an

7    illegal alien residing in Annapolis, Maryland, and Richmond,

8    Virginia.

9         The document then goes on to describe the criminal

10   charge.

11        Beginning at least in or about March 2008 through in

12   or about November 2010, in Maryland and elsewhere, the

13   Defendants did knowingly and voluntarily conspire, to agree,

14   and agree with themselves and others known and unknown to the

15   Grand Jury, to knowingly transport any individual in

16   interstate commerce with the intent that such individuals

17   engage in prostitution and sexual activity for which any

18   person can be charged with a criminal offense in violation of

19   the law, and to knowingly persuade, induce, entice, and coerce

20   any individual to travel in interstate commerce to engage in

21   prostitution and sexual activity for which any person can be

22   charged with a criminal offense in violation of the law.

23        The manner and means by which the conspiracy was

24   sought to be accomplished included, among other things, the

25   following:  It was part of the conspiracy that the Defendants

1    and others known and unknown to the Grand Jury established and

2    operated places of prostitution in Maryland and elsewhere.

3          It was further a part of the conspiracy that the

4    Defendants and others known and unknown to the Grand Jury

5    rented apartments and other dwellings that were used as places

6    of prostitution.

7          It was further a part of the conspiracy that the

8    Defendants and others known and unknown to the Grand Jury

9    recruited and employed prostitutes, the vast majority of whom

10   were aliens present in the United States unlawfully.

11         It was further a part of the conspiracy that the

12   Defendants and others known and unknown to the Grand Jury

13   advertised their places of prostitution using business cards.

14         It was a further part of the conspiracy that the

15   Defendants and others advertised, managed, and operated the

16   places of prostitution.

17         It was further a part of the conspiracy that the

18   Defendants and others purchased mattresses, K-Y Jelly,

19   condoms, paper towels, and rubbing alcohol, and other

20   materials for use in their places of prostitution.

21         It was further a part of the conspiracy that the

22   Defendants and others used cellular telephones and other means

23   of communication to arrange for the interstate transport of

24   women with the intent that these women engage in prostitution

25   in Maryland and elsewhere.

1   It was further a part of the conspiracy that the
2   Defendants and others arranged for vans and other vehicles to
3   transport women and transported women themselves to various
4   locations outside Maryland to Maryland, typically on Monday
5   mornings, with the intent that these women engage in
6   prostitution.

7   It was further part of the conspiracy that the
8   Defendants and others arranged for vans and other vehicles to
9   transport prostitutes and transported the prostitutes
10  themselves from Maryland to locations outside Maryland,
11  typically on Sunday evenings.

12  It was further part of the conspiracy that the
13  Defendants purchased or leased vehicles used to transport
14  prostitutes to and from Maryland.

15  It was further part of the conspiracy that the
16  Defendants and others traveled from destinations within and
17  outside of Maryland to facilitate the prostitution business.

18  It was further part of the conspiracy that the
19  Defendants and others collected and shared the cash proceeds
20  of the prostitution business.

21  It was further part of the conspiracy that the
22  Defendant German de Jesus Ventura reported criminal activity
23  by individuals allegedly engaged in prostitution activities in
24  order to divert the attention of law enforcement and
25  facilitate his own prostitution activities.

1    It was further part of the conspiracy that both

2    defendants threatened to use and used violence against those

3    also engaged in prostitution activities within Maryland.

4    It was further part of the conspiracy that the

5    Defendants threatened to use and used violence against certain

6    female prostitutes to coerce their continued participation in

7    the prostitution enterprise.

8    And it was further part of the conspiracy that

9    Defendant Ventura claimed responsibility for the murder of

10    multiple competitor pimps in order to intimidate competitor

11    pimps and his own employees and female prostitutes.

12    The Grand Jury charged that, in the course and in

13    furtherance of the conspiracy and to effect the objects of the

14    conspiracy, one or more of the co-conspirators committed or

15    caused to be committed at least one of the following acts,

16    among others, in the District of Maryland and elsewhere:

17    It is charged that, on or about September 25, 2008,

18    the Defendants and others operated a place of prostitution at

19    ██████████████, Annapolis, Maryland.

20    Between October 2008 through April 2009, the

21    Defendants physically assaulted a female illegal alien for

22    refusing to engage in prostitution and other sex acts and held

23    her against her will.

24    On or about March 25th, 2009, the Defendants

25    operated a place of prostitution at ████████████████████,

1    ▮▮▮▮▮▮▮, Annapolis, Maryland.

2         On or about September 1, 2009, Defendant Ventura and

3    others operated a place of prostitution at ▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮, Maryland, and a place -- Annapolis,

5    Maryland, and a place of prostitution at ▮▮▮▮▮▮▮ in

6    Annapolis, Maryland.

7         On or about September 1, 2009, Defendant Ventura

8    used a cellular telephone to lodge death threats against a

9    family who had provided temporary housing to one of his

10   prostitutes after she was arrested.

11        On or about September 24th, 2009, Defendant Ventura

12   and others operated a place of prostitution at ▮▮▮

13   ▮▮▮▮▮▮, Annapolis, Maryland.

14        On or about September 24th, 2009, Defendant Ventura

15   maintained tally sheets for the prostitution houses located at

16   ▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮,

17   both in Annapolis, Maryland, and possessed cash proceeds of

18   prostitution, cell phones, and a fake driver's license used in

19   furtherance of prostitution.

20        On or about March 1, 2010, Defendant Ventura

21   arranged for the rental of ▮▮▮▮▮▮▮, Annapolis, for

22   use as a place of prostitution.

23        On or about March 13, 2010, Defendant Ventura placed

24   threatening phone calls to an individual competing for

25   prostitution business in Annapolis, Maryland, and falsely

1   reported a kidnapping and rape to the police in order to

2   falsely implicate another individual with the crimes.

3           On or about April 3rd, 2010, Defendant Ventura

4   placed a threatening phone call to a person believed to be an

5   individual competing for prostitution business in Prince

6   George's County, Maryland.

7           On or about Monday, April 5th, 2010, German de Jesus

8   Ventura and others transported two prostitutes to his place of

9   prostitution at ███████████, Annapolis, Maryland, and

10  purchased condoms and paper towels for the operation of the

11  prostitution house.

12          On or about May 8, 2010, Defendant Ventura delivered

13  a mattress to ███████████, Easton, Maryland, in order to

14  establish a place of prostitution.

15          On or about July 6 and 7, 2010, Defendant Ventura

16  and others operated places of prostitution at ███████████

17  ███████, Easton, Maryland, and at ███████████, Annapolis,

18  Maryland.

19          On or about July 12, 2010, Defendant Ventura

20  transported a Hispanic female from Langley Park, Maryland, to

21  Portsmouth, Virginia for the purpose of engaging in

22  prostitution.

23          On or about Monday, August 2, 2010, Defendant

24  Ventura and others transported Hispanic females within

25  Maryland and from Hyattsville, Maryland, to Portsmouth,

1    Virginia, for the purpose of engaging in prostitution.

2         On or about August 3rd, 2010, Defendant Ventura used

3    a cellular telephone to send three threatening multimedia

4    messages depicting a semi-automatic pistol, the magazine for

5    the pistol, and an angel of death statue to an individual

6    competing for prostitution business in Maryland.

7         On or about Monday, September 13, 2010,

8    Defendant Ventura and others transported multiple Hispanic

9    females within the state of Maryland for the purpose of

10   engaging in prostitution.

11        On or about Sunday, September 19th, 2010, to Monday,

12   September 20, an employee of Defendant Ventura transported

13   multiple Hispanic females to various places of prostitution

14   within Maryland for the purpose of engaging in prostitution.

15        On or about October 18, 2010, an employee of

16   Defendant Ventura purchased minutes on a telephone, which was

17   subsequently used to facilitate the prostitution enterprise on

18   October 28, November 2, and November 3 in 2010.

19        On or about that November 3, 2010, Defendant Ventura

20   arranged for the assault of an individual competing for

21   prostitution in Maryland, for prostitution business, with a

22   pistol-grip shotgun.

23        On or about November 15, 2010, Defendant Ventura and

24   co-conspirators transported Hispanic women within Maryland and

25   across state lines for the purpose of engaging in

prostitution.

The law makes such conduct illegal.

In this case, each defendant is accused of having been a member of a conspiracy relating to transportation and enticement for interstate prostitution.  A conspiracy is a kind of criminal partnership or a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.

The crime of conspiracy to violate a federal law is an independent offense.  It is separate and distinct from the actual violation of any specific federal law, which the law refers to as substantive crimes.

Indeed, you may find a defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime which was the object of the conspiracy was not actually committed.  Moreover, you may find a defendant guilty of conspiracy despite the fact that he himself was incapable of committing the substantive crime.

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful.  This is because collective criminal activity poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

In order to satisfy its burden of proof, the

1   Government must prove each of the following things beyond a

2   reasonable doubt:  First, that two or more persons entered

3   into at least one of the unlawful agreements charged in the

4   charging document; second, that the Defendant knowingly and

5   willfully became a member of the conspiracy; and, third, that

6   one member of the conspiracy knowingly committed at least one

7   overt act in Maryland during the conspiracy to further some

8   objective of the conspiracy.

9           The first thing the Government must prove beyond a

10  reasonable doubt to establish the offense of conspiracy is

11  that two or more persons entered the unlawful agreement

12  charged in the charging document.

13          In order for the Government to satisfy this element,

14  you need not find that the alleged members of the conspiracy

15  met together and entered into any express or formal agreement.

16  Also, you need not find that the alleged conspirator stated,

17  in words or writing, what the scheme was -- its object or

18  purpose -- or every precise detail of the scheme, or the means

19  by which its object or purpose was to be accomplished.  What

20  the Government must prove is that there was a mutual

21  understanding, either spoken or unspoken, between two or more

22  people to cooperate with each other to accomplish an unlawful

23  act.

24          You may, of course, find that the existence of an

25  agreement to disobey or disregard the law has been established

1    by direct proof.  However, since conspiracy is, by its very

2    nature, characterized by secrecy, you may also infer its

3    existence from the circumstances of the case and the conduct

4    of the parties involved.

5            In a very real sense, in the context of conspiracy

6    cases, actions often speak louder than words.  In this regard,

7    you may, in determining whether an agreement existed here,

8    consider the actions and statements of all of those you find

9    to be participants as proof that a common design existed on

10   the part of the persons charged to act together to accomplish

11   an unlawful act.

12           The second thing that the Government must prove

13   beyond a reasonable doubt to establish the offense of

14   conspiracy is that a defendant knowingly, willfully, and

15   voluntarily became a member of the conspiracy.

16           If you are satisfied that the conspiracy charged in

17   the charging document existed, you must next ask yourself who

18   the members of that conspiracy were.  In deciding whether a

19   defendant was, in fact, a member of the conspiracy, you should

20   consider whether the Defendant knowingly and willfully joined

21   the conspiracy.  Did he participate in it with knowledge of

22   its unlawful purpose and with the specific intention of

23   furthering its business or objective as an associate or

24   worker?

25           In that regard, it has been said that, in order for

 1      a defendant to be deemed a participant in the conspiracy, he

 2      must have had a stake in the venture or its outcome.  You are

 3      instructed that, while proof of a financial interest in the

 4      outcome of the scheme is not essential, if you find that a

 5      defendant had such an interest, it is a factor which you may

 6      properly consider in determining whether or not a defendant

 7      was a member of the conspiracy charged in the Indictment.

 8              As I mentioned before, before a defendant can be

 9      found to have been a conspirator, you must first find that he

10      knowingly joined in the unlawful agreement or plan.  The key

11      question, therefore, is whether a defendant joined the

12      conspiracy with an awareness of at least some of the basic

13      aims and purposes of the unlawful agreement.

14              It is important for you to note that a defendant's

15      participation in the conspiracy must be established by

16      independent evidence of his own acts or statements, as well as

17      those of the other alleged co-conspirators, and the reasonable

18      inferences which may be drawn from them.

19              A defendant's knowledge is a matter of inference

20      from the facts proved.  In that connection, I instruct you

21      that, to become a member of the conspiracy, a defendant need

22      not have known the identities of each and every other member,

23      nor need he have been apprised of all of their activities.

24      Moreover, a defendant need not have been fully informed as to

25      all of the details or the scope of the conspiracy in order to

1    justify an inference of knowledge on his part.  Furthermore,

2    the Defendant need not have joined in all of the conspiracy's

3    unlawful objectives.

4         The extent of a defendant's participation has no

5    bearing on the issue of a defendant's guilt.  A conspirator's

6    liability is not measured by the extent or duration of his

7    participation.  Indeed, each member may perform separate and

8    distinct acts and may perform them at different times.  Some

9    conspirators play major roles, while others play minor parts

10   in the scheme.  An equal role is not what the law requires.

11   In fact, even a single act may be sufficient to draw the

12   Defendant within the ambit of the conspiracy.

13        Thus, a defendant may be convicted of conspiracy

14   without full knowledge of all of the conspiracy's details.  If

15   he joins the conspiracy with an understanding of the unlawful

16   nature thereof, and willfully joins in the plan on at least

17   one occasion, even though he may not have participated before,

18   might not participate again, and played only a minor role.

19        I want to caution you, however, that a defendant's

20   mere presence at the scene of an alleged crime does not by

21   itself make him a member of the conspiracy.  Also, mere

22   association with one or more members of the conspiracy does

23   not automatically make a defendant a member.  A person may

24   know or be friendly with a criminal without being a criminal

25   himself.  Mere similarity of conduct or the fact that they may

1    have assembled together and discussed common aims and

2    interests does not necessarily establish proof of the

3    existence of a conspiracy.

4         I also want to caution you that mere knowledge or

5    acquiescence without participation in the unlawful plan is not

6    sufficient.  Moreover, the fact that the acts of a defendant

7    without knowledge merely happened to further the purposes or

8    objectives of the conspiracy does not make the Defendant a

9    member.  More is required under the law.  What is necessary is

10   that the Defendant must have participated with knowledge of at

11   least some of the purposes or objectives of the conspiracy and

12   with the intention of aiding in the accomplishment of those

13   unlawful ends.

14        In sum, a defendant, with an understanding of the

15   unlawful character of the conspiracy, must have intentionally

16   engaged, advised, or assisted in it for the purpose of

17   furthering the illegal undertaking.  He thereby becomes a

18   willing and knowing participant in the unlawful agreement;

19   that is to say, a conspirator.

20        Finally, the Indictment alleges that the conspiracy

21   began in or about March 2008 and continued until in or about

22   November of 2010.  You need not find that the starting date of

23   the conspiracy coincides with the starting date alleged in the

24   Indictment in order to render a guilty verdict.  Rather, you

25   must find that the starting date of a conspiracy began anytime

1    in the window alleged in the Indictment.

2            The third thing which the Government must prove

3    beyond a reasonable doubt to establish the offense of

4    conspiracy is that at least one overt act was knowingly

5    committed by at least one of the conspirators in the course of

6    the conspiracy.

7            In order for the Government to satisfy this element,

8    it is only required that the Government prove one of the overt

9    acts charged in the Superseding Indictment.

10           Also, you need not find that the Defendant under

11   consideration committed the overt act.  It is sufficient for

12   the Government to show that one of the co-conspirators

13   knowingly committed an overt act in furtherance of the

14   conspiracy, since such an act becomes, in the eyes of the law,

15   the act of all the members of the conspiracy.

16           The Government must prove beyond a reasonable doubt

17   that at least one overt act was knowingly and willfully done,

18   by at least one conspirator, in furtherance of some object or

19   purpose of the unlawful agreement.  In this regard, you must

20   bear in mind that the overt act, standing alone, may be an

21   innocent, lawful act.  Frequently, however, an apparently

22   innocent act sheds its harmless character if it is a step in

23   carrying out, promoting, aiding, or assisting the

24   conspiratorial scheme.  You are therefore instructed that the

25   over act does not have to be an act which, in and of itself,

1    is criminal or constitutes an objective of the conspiracy.

2         You will recall that I have admitted into evidence

3    against the Defendants the acts and statements of other

4    persons because the Government charges that these acts and

5    statements were committed by persons who are also confederates

6    or co-conspirators of the defendants on trial.

7         The reason for allowing this evidence to be received

8    against a defendant has to do with the nature of the crime of

9    conspiracy.  A conspiracy is often referred to as a

10   partnership in crime.  Thus, as in other types of

11   partnerships, when people enter into a conspiracy to

12   accomplish an unlawful end, each and every member becomes an

13   agent for the other conspirators in carrying out the

14   conspiracy.

15        Accordingly, the reasonably foreseeable acts,

16   declarations, statements, and omissions of any member of the

17   conspiracy, which are done in furtherance of the common

18   purpose of the conspiracy, are deemed, under the law, to be

19   acts of all the members, and all of the members are

20   responsible for such acts, declarations, statements, and

21   omissions.

22        If you find beyond a reasonable doubt that a

23   defendant was a member of the conspiracy charged in the

24   Indictment, then any acts done or statements made in

25   furtherance of the conspiracy by persons also found by you to

1    have been members of that conspiracy may be considered against

2    the Defendant.  This is so even if the acts were done and the

3    statements were made in the Defendant's absence and without

4    his knowledge.

5            However, before you may consider the statements or

6    acts of a co-conspirator in deciding the issue of a

7    defendant's guilt, you must first determine that the acts and

8    statements were made during the existence and in furtherance

9    of the unlawful scheme.  If the acts were done or the

10   statements made by someone whom you do not find to have been a

11   member of the conspiracy, or if they were not done or said in

12   furtherance of the conspiracy, they may be considered by you

13   as evidence only against the member who did or said them.

14           Counts 2, 4, and 5 of the Indictment charge

15   interstate transportation for prostitution.

16           In Count 2, both defendants are charged with that

17   crime.  Interstate transportation of an individual with the

18   intent that that individual engage in prostitution or sexual

19   activity for which someone could be charged with a criminal

20   offense in violation of the law.  This happened from in or

21   about September 2008 through in or about March 2009 as

22   charged.

23           Count 2 reads that the Grand Jury charges that the

24   allegations stated in Paragraphs 1 and 2 and 4 through 20 of

25   Count 1 -- in other words, that long description of the

1    conspiracy that I read before -- are incorporated by reference

2    into this count.

3              From in or about September 2008 through in or about

4    March 2009, in Maryland and elsewhere, the Defendants did

5    knowingly and intentionally transport individuals in

6    interstate and foreign commerce, with the intent that those

7    individuals engage in prostitution and sexual activity for

8    which any person could be charged with a criminal offense.

9              In Counts 4 and 5, Defendant Ventura alone is

10   charged with the same crime, on or about August 2, 2010 and on

11   or about November 15, 2010 respectively.  Count 4 reads that

12   the Grand Jury charged Defendant Ventura first with all of the

13   allegations set forth in the first count that are incorporated

14   by reference here.

15             The Grand Jury charged that, on August 2nd, 2010,

16   Defendant Ventura did knowingly and intentionally transport

17   individuals in interstate and foreign commerce with the intent

18   that those individuals engage in prostitution and sexual

19   activity for which any person can be charged with a criminal

20   offense.

21             Count 5 of the Indictment charges that the

22   allegations set forth in that long list of things I read

23   before are incorporated by reference in the count, and, on or

24   about November 15th, 2010, in Maryland and elsewhere,

25   Defendant Ventura did knowingly and intentionally transport

1    individuals in interstate and foreign commerce with the intent

2    that those individuals engage in prostitution and sexual

3    activity for which any person can be charged with a criminal

4    offense.

5           In order to prove a defendant guilty of this crime,

6    the Government must prove each of the following things beyond

7    a reasonable doubt:  First, that the Defendant knowingly

8    transported individuals in interstate commerce as alleged in

9    the Indictment; second, that the Defendant transported said

10   individuals with the intent that those individuals would

11   engage in prostitution or illegal sexual activity.

12          I instruct you that prostitution means engaging in

13   sexual activity on account of which anything of value is given

14   to or received by any person.  An unlawful sexual activity

15   includes anything that would be a crime under Maryland law

16   that forbids engaging in prostitution.

17          Counts 2, 4, and 5, interstate transportation for

18   prostitution, the first element, as I said, is transport in

19   interstate commerce.

20          The first thing that the Government must prove

21   beyond a reasonable doubt in Counts 2, 4, and 5 is that a

22   defendant knowingly transported an individual in interstate

23   commerce.

24          "Interstate commerce" simply means movement between

25   one state and another.

The Government does not have to prove that the Defendant personally transported an individual across a state line.  It is sufficient to satisfy this element if the Defendant was actively engaged in the making of travel arrangements, such as by purchasing tickets for the individuals to travel as planned.

The Defendant must have knowingly transported, as I have defined that term, the individual in interstate commerce. This means that the Government must prove that the Defendant knew both that he was transporting the individual and that he was transporting the individual in interstate commerce.  To act knowingly means to act voluntarily and intentionally, not because of accident, mistake, or other innocent reason.

To find that the Government has proven this element beyond a reasonable doubt, all members of the jury must agree when the particular individual was transported in interstate commerce.  You need not determine the identity of the particular individual transported.

You have been instructed that, in order to sustain its burden of proof, the Government must prove that the Defendant acted knowingly.  A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness.  Whether the Defendant acted knowingly may be proven by the Defendant's conduct and by all of the facts and circumstances surrounding the case.

1          Counts 2, 4, and 5 require the Government to prove

2     an intent to engage in prostitution.

3          The direct proof of a person's intent is almost

4     never available.  It would be a rare case where it could be

5     shown that a person wrote or stated that, as of a given time,

6     he committed an act with a particular intent.  Such direct

7     proof is not required.  The ultimate fact of intent, though

8     subjective, may be established by circumstantial evidence

9     based upon the Defendant's outward manifestations -- his

10    words, his conduct, his acts -- and all the surrounding

11    circumstances disclosed by the evidence, and the rational or

12    logical inferences that may be drawn from them.

13          In order to establish this element, it is not

14    necessary for the Government to prove that engaging in

15    prostitution was the sole purpose for crossing the state line.

16    A person may have several different purposes or motives for

17    such travel, and each may prompt in varying degrees the act of

18    making the journey.  The Government must prove beyond a

19    reasonable doubt, however, that a significant or motivating

20    purpose of the travel across a state line was that said

21    individual would engage in prostitution; in other words, that

22    illegal activity must not have been merely incidental to the

23    trip.

24          Knowledge, willfulness, and intent involve the state

25    of a person's mind.  This is a fact you are called upon to

1      decide.

2              Medical science has not yet devised an instrument

3      which can record what was in one's mind in the distant past.

4      Rarely is direct proof available to establish the state of

5      one's mind.  This may be inferred by what one says or does --

6      his words, actions, and conduct -- as of the time of the

7      occurrence of certain events.

8              The intent with which an act is done is often more

9      clearly and conclusively shown by the act itself or by a

10     series of acts than by words or explanations of the act

11     uttered long after its occurrence.  Accordingly, intent,

12     willfulness and knowledge are usually established by

13     surrounding facts and circumstances as of the time the acts in

14     question occurred or the events took place, and the reasonable

15     inferences to be drawn from them.

16             Count 3 charges enticing interstate travel for

17     prostitution.

18             The Grand Jury charged that, first by incorporating

19     all of the long list of things I read in the first count,

20     that, in or about September 2009, in Maryland and elsewhere,

21     Defendant Ventura did knowingly persuade, induce, entice, and

22     coerce any individual to travel in interstate and foreign

23     commerce to engage in prostitution and sexual activity for

24     which any person can be charged with a criminal offense.

25             The Indictment charges a violation of the United

1  States law that forbids such activity.

2      In order to find the Defendant guilty of persuading

3  or enticing or inducing or coercing an individual to travel

4  for the purpose of prostitution or engaging in illegal sexual

5  activity, the Government must prove each of the following

6  things beyond a reasonable doubt:

7      First, that the Defendant knowingly persuaded or

8  induced or enticed or coerced an individual to travel in

9  interstate commerce as alleged in the Indictment.  To "induce"

10  can be defined as to lead or move by influence or persuasion,

11  to prevail upon, or, alternatively, to stimulate the

12  occurrence of, to cause.

13      The second thing that must be proven is that that

14  individual traveled in interstate commerce.

15      Third, that the Defendant acted with the intent that

16  that individual would engage in prostitution or illegal sexual

17  activity.

18      Count 3, again, involving enticing interstate travel

19  for prostitution, requires persuasion to travel in interstate

20  commerce.

21      The first thing that the Government must prove

22  beyond a reasonable doubt is that the Defendant knowingly

23  persuaded or induced or enticed or coerced an individual to

24  travel in interstate commerce as alleged in the Indictment.

25  As I earlier instructed you, an act is done "knowingly" if

1    it's done voluntarily and intentionally, and, as I also

2    instructed, "interstate commerce" is movement between one

3    state and another.

4         The second thing that must be proven to prove

5    enticement of interstate transportation for prostitution is

6    travel in interstate commerce, as alleged in the Indictment.

7         The third thing which the Government must prove

8    beyond a reasonable doubt is that the Defendant acted with the

9    intent that the individual would engage in prostitution or

10   illegal sexual activity.

11        As I earlier instructed you, "prostitution" is

12   sexual activity on account of which anything of value was

13   given to or received by any person.  An "unlawful sexual

14   activity" means, for example, engaging in prostitution in

15   violation of the law of Maryland.

16        Count 6 of the charging document charges the

17   Defendants with sex trafficking.

18        The Grand Jury, first of all, alleged and

19   incorporated all of the long list of things I read in the

20   first count, then charged that, from in or about September

21   2008 through in or about November 2010, in Maryland and

22   elsewhere, the Defendants did knowingly, in and affecting

23   interstate and foreign commerce, recruit, entice, harbor,

24   transport, provide, and obtain by any means a person --

25   namely, "R.D.F." -- and, as you'll recall, this is Rebeca

1    Dueñas Franco -- and did benefit financially and by receiving

2    anything of value from participation in the venture engaged in

3    such acts, knowing that force, fraud, and coercion could be

4    used to cause "R.D.F." to engage in a commercial sex act.

5            The Indictment charges violations of federal law.

6            In order to prove a defendant guilty of sex

7    trafficking, the Government must prove each of the following

8    things beyond a reasonable doubt:  First, that the Defendant

9    knowingly recruited or enticed or harbored or transported or

10   provided or obtained Esmirna Rebeca Dueñas Franco by any

11   means, or benefited, financially or by receiving anything of

12   value, from participation in such venture; second, that the

13   Defendant knew that force, fraud, or coercion would be used

14   with respect to this person; third, that the Defendant knew

15   that this person would be engaged in a commercial sexual

16   act -- and I will define that term for you; and, fourth, that

17   the Defendant's conduct was in or affecting interstate

18   commerce.

19           The first thing that must be proven is recruiting,

20   enticing, transporting, or harboring.

21           The first thing the Government must prove beyond a

22   reasonable doubt is that the Defendant knowingly transported

23   or recruited or enticed or harbored or provided or obtained

24   Esmirna Rebeca Dueñas Franco, by any means, or benefited,

25   financially or by receiving anything of value, from

1    participation in such a venture.

2            To "harbor" someone simply means to provide shelter

3    to that person.  As I said before, an act is done knowingly

4    when it's done purposely and intentionally as opposed to

5    mistakenly or inadvertently.

6            The second element of this offense which the

7    Government must prove beyond a reasonable doubt is that the

8    Defendant knew that force, fraud, or coercion would be used

9    with respect to Esmirna Rebeca Dueñas Franco.

10           Fraud, as I just used that term, means that the

11   Defendant knowingly made a misstatement or omission of a

12   material fact to entice Ms. Franco.  A material fact is one

13   which would reasonably be expected to be of concern to a

14   reasonable person in relying upon the representation or

15   statement in making a decision.

16           Coercion, as I have used that term, means a threat

17   of serious or physical restraint against a person.  A threat

18   is a serious statement expressing an intention to inflict

19   harm, at once or in the future, as distinguished from idle or

20   careless talk, exaggeration, or something said in a joking

21   manner.  A statement is a threat if it was made under such

22   circumstances that a reasonable person hearing the statement

23   would understand it as a serious expression of intent to cause

24   harm, or a reasonable person making the statement would

25   foresee that the recipient would understand it as a serious

1    expression of intent to cause harm.

2         The term "serious harm" includes both physical and

3    non-physical types of harm, including psychological,

4    financial, or reputational harm.  That is sufficient under all

5    the surrounding circumstances to compel a reasonable person of

6    the same background and in the same circumstances to perform

7    or to continue performing commercial sexual activity in order

8    to avoid incurring that harm.  In determining whether the

9    Defendant made a threat of serious harm that could reasonably

10   be believed by Ms. Franco, you should consider her particular

11   station in life, physical and mental condition, age,

12   education, training, experience, and intelligence.  A threat

13   of serious harm must be of a sufficient kind -- must of

14   sufficient in kind or degree to completely overcome the will

15   of an ordinary person having the same general station in life

16   as that of Ms. Franco, causing a reasonable belief that there

17   was no reasonable choice except to engage in the commercial

18   sexual act as directed by the Defendant.

19        Coercion, as I have used the term, also means that

20   the Defendant engaged in a course of behavior intended to

21   cause Ms. Franco to believe that, if she did not engage in a

22   commercial sex act, as directed by the Defendant, that she or,

23   for example, her family would suffer serious harm.

24        To satisfy this element, the Government must prove

25   that force, fraud, or coercion, as I have just defined those

1    terms, was used, and also that the Defendant knew it would be

2    used against the victim.

3            As I first instructed you, the second element of sex

4    trafficking by force, fraud, and coercion is that the

5    Defendant knew that force, fraud, or coercion would be used

6    with respect to Ms. Franco.  If you find that a defendant

7    transported or recruited or enticed or harbored or provided or

8    obtained Ms. Franco by any means, or benefited, financially or

9    by receiving anything of value, from participation in such a

10   venture after December 23rd, 2008, you need not find that that

11   defendant had actual knowledge that force, fraud, or coercion

12   would be used against her.  Instead, this element is satisfied

13   if you find that the Government has proved beyond a reasonable

14   doubt that the Defendant acted with reckless disregard of the

15   facts concerning the use of coercion.  The phrase "reckless

16   disregard of the facts" means deliberate indifference to facts

17   which, if considered and weighed in a reasonable manner,

18   indicate the highest probability that Ms. Franco was coerced

19   to engage in a commercial sex act.

20           The third thing which the Government must prove

21   beyond a reasonable doubt is that the Defendant knew that

22   Ms. Franco would be engaged in a commercial sex act.

23           A "commercial sex act" is any sex act on account of

24   which anything of value is given to or received by any person.

25           The fourth thing which the Government must prove

1    beyond a reasonable doubt is that the Defendant's conduct was

2    in or affecting interstate commerce.

3         Interstate commerce simply means the movement of

4    goods, services, money, and individuals between any two or

5    more states or between one state and the District of Columbia.

6         And that definition holds throughout the

7    instructions about the District of Columbia is considered a

8    state for purposes of interstate commerce.

9         Transporting a person across state lines for a

10   commercial purpose is conduct "in interstate commerce."  In

11   addition, acts and transactions which are economic in nature

12   and affect the flow of money in the stream of commerce to any

13   degree, however minimal, also "affect" interstate commerce.

14   For example, the use of hotels that service interstate

15   travelers or the use of condoms that travel in interstate

16   commerce is conduct that "affects" interstate commerce.

17        To satisfy this element, the Government must prove

18   that the Defendant's conduct affected interstate commerce in

19   any way, no matter how minimal.  You do not have to find that

20   Defendant's conduct actually affected interstate commerce if

21   you find that the Defendant's conduct would have affected

22   interstate commerce if the Defendant had successfully and

23   fully completed his actions.  Finally, the Government is not

24   required to prove that the Defendant knew he was affecting

25   interstate commerce.

1        Count 7 of the Indictment charges possession of a

2   firearm in furtherance of a crime of violence.  The count

3   charges that on or -- in or about November 2010, Defendant

4   Ventura did knowingly possess a firearm in furtherance of or

5   used and carried a firearm during and in relation to a crime

6   of violence; that is, sex trafficking.

7        The Grand Jury, of course, first realleged all of

8   the statements that I made in Count 1 and incorporate it here,

9   and further charged that, beginning at least in or about

10  September 2008 through in or about November 2010, in the

11  District of Maryland, Defendant Ventura did knowingly possess

12  a firearm in furtherance of and used and carried a firearm

13  during and in relation to a crime of violence for which he may

14  be prosecuted in a court of the United States, and, in so

15  doing, did brandish a firearm in violation of federal law.

16       To satisfy its burden as to Count 7, the Government

17  must prove each of the following things beyond a reasonable

18  doubt:  First, that the Defendant committed the crime of

19  violence charged in Count 6 of the Indictment, which is a

20  crime for which he might be prosecuted in a court of the

21  United States; and, second, that the Defendant knowingly

22  possessed a firearm in furtherance of or used and carried the

23  firearm in relation to the crime charged in Count 6.

24       The first thing the Government must prove beyond a

25  reasonable doubt is that the Defendant committed a crime of

1    violence for which he may be prosecuted in a court of the

2    United States.

3         A crime of violence under this section includes the

4    offense of sex trafficking.  I've already instructed you that

5    the offense of sex trafficking is a crime of violence.

6         If, during your deliberations, you determine that

7    the Government has failed to prove beyond a reasonable doubt

8    that the Defendant is guilty as to the crime of violence --

9    that is, sex trafficking -- as charged in Count 6, then you

10   will proceed no further with Count 7.

11        In reaching your verdict, you are to consider

12   evidence of the crime of violence only for the purpose of

13   determining whether this first element has been satisfied.

14        The second thing the Government must prove beyond a

15   reasonable doubt is that the Defendant knowingly possessed a

16   firearm in furtherance of or knowingly used or carried a

17   firearm during and in relation to the commission of a crime of

18   violence.

19        To prove that the Defendant possessed the firearm in

20   furtherance of the crime of violence, the Government must

21   prove that the Defendant had possession of the firearm and

22   that such possession was in furtherance of the crime.

23   Possession also means that the Defendant either had physical

24   possession of the firearm or on his person, or that he had

25   dominion and control over the place where the firearm was

1    located and the intention to exercise control over the

2    firearm.  To possess a firearm in furtherance of the crime

3    means that the firearm helped forward, advance, or promote the

4    commission of the crime.  The mere possession of the firearm

5    at the scene of the crime is not sufficient under this

6    definition.  The firearm must have played some part in

7    furthering the crime in order for this element to be

8    satisfied.

9         You must also find that the Defendant possessed the

10   firearm knowingly.  This means that he possessed it purposely

11   and voluntarily, and not by accident or mistake.  It also

12   means that he knew the weapon was a firearm as we commonly use

13   the word.  However, the Government is not required to prove

14   that the Defendant knew that he was breaking the law.

15        A "firearm" is any weapon which will, or is designed

16   to, or may be readily converted to expel a projectile by the

17   action of an explosive.

18        In order to prove that the Defendant used the

19   firearm, the Government must prove beyond a reasonable doubt

20   an active employment of the firearm by the Defendant during

21   and in relation to the commission of the crime of violence.

22   This does not mean that the Defendant must actually fire or

23   attempt to fire the weapon, although those would obviously

24   constitute use of the weapon.  Brandishing, displaying, or

25   even referring to the weapon so that others present knew that

1   the Defendant had the firearm available, if needed, all

2   constitute the use of the firearm.  However, the mere

3   possession of a firearm at or near the site of the crime

4   without active employment, as I have just described it, is not

5   sufficient to constitute the use of the firearm.

6          In order to prove that the Defendant carried the

7   firearm, the Government must prove beyond a reasonable doubt

8   that the Defendant had the weapon within his control in such a

9   way that could further the commission of the crime of

10  violence, or was an integral part of the commission of the

11  crime.  The Defendant did not necessarily have to hold the

12  firearm physically; that is, have actual possession of it on

13  his person.  If you find that the Defendant had dominion and

14  control over the place where the firearm was located and had

15  the power and intention to exercise control over the firearm

16  in such a way that it furthered the commission of the crime of

17  violence, you may find that the Government has proven that the

18  Defendant carried the weapon.  If applicable:  It is not

19  sufficient to prove carrying if all the Government has proven

20  is that the firearm was transported in a vehicle in which the

21  Defendant was riding.  There must be proof that the Defendant

22  knew of the weapon's presence and had the power and intention

23  to exercise control of the weapon so that it was available for

24  his use in the commission of the crime if the need arose.

25          To satisfy this element, you must also find that the

1    Defendant carried or used the firearm knowingly.  This means

2    that he carried the firearm purposely and voluntarily, and not

3    by accident or mistake.  It also means that he knew the weapon

4    was a firearm as we commonly use the word.  However, the

5    Government is not required that he knew that he was breaking

6    the law.

7          In this case, you may find the Defendant guilty of

8    possessing a firearm if you find beyond a reasonable doubt

9    either, one, that he was a member of a conspiracy, and the

10   crime of possessing a firearm was committed by others in

11   furtherance of that conspiracy, or, two, that he aided or

12   abetted the possession of a firearm.

13         The question of possible punishment of a defendant

14   is of no concern to you, and should not, in any sense, enter

15   into or influence your deliberations.  The duty of imposing

16   sentence rests entirely upon me.  Your function is to weigh

17   the evidence in the case and determine whether or not each

18   defendant is guilty beyond a reasonable doubt, solely upon the

19   basis of that evidence.  Under your oath as jurors, you cannot

20   allow a consideration of the punishment which may be imposed

21   upon a defendant, if he is convicted, to influence your

22   verdict in any way, or in any sense enter into your

23   deliberations.

24         You will be pleased to know I've now reached the

25   last part of these instructions, relating to the mechanics and

1    procedures for your deliberations.

2         When you retire to the jury room, you will select

3    one of yourselves to act as your foreperson.  The foreperson

4    will preside over your deliberations and be your spokesperson

5    here in court.

6         If it becomes necessary during your deliberations to

7    communicate with me, you may send a note by the Bailiff,

8    signed by your foreperson or by one or more members of the

9    jury.  No member of the jury should ever attempt to

10   communicate with me by any means other than a signed writing,

11   and I will never communicate with the jury on any subject

12   touching the merits of the case other than in writing or here

13   orally in open court.

14        You will note from the oath about to be taken by the

15   Bailiff that he and all other persons are forbidden to

16   communicate in any way with any member of the jury on any

17   subject touching the merits of the case.  Now, the Bailiff can

18   ask you if the room temperature is okay, if you have enough

19   note pads or pens, that sort of thing, but he cannot ask you

20   about or get involved in your deliberations at all.

21        Bear in mind also that you are never to reveal to

22   any person -- that includes me -- how you stand numerically or

23   otherwise until you've reached a unanimous verdict.  I never

24   need to know that there are so many of you for one position or

25   so many of you for another.  I cannot use that information.

1    Please do not communicate that information to me.

2         These verdict forms have been prepared for your

3    convenience, and, as you will see, there is a form for each of

4    the Defendants, and, as was noted, not all of the Defendants

5    are in each count, but the verdict forms will show you which

6    count each defendant is in, and you can use that as sort of a

7    guide not only to your deliberations, but to the instructions

8    themselves and which instructions pertain to each individual

9    defendant.

10        You will take these forms to the jury room, and,

11   when you have reached a unanimous verdict, you will have your

12   foreperson fill the verdict forms in, and then date and sign

13   them.  When you have reached a unanimous verdict, please tell

14   the Bailiff.

15        You will then be brought back into the courtroom,

16   and the Clerk will take roll and then your verdict.  She'll

17   ask you if you have agreed upon your verdict, and, if you

18   have, you'll say, "We have."

19        She will ask, "Who will speak for you?"

20        And you will reply, "Our foreperson."

21        The Clerk will then ask the foreperson for the

22   verdict.

23        The verdict must represent the considered judgment

24   of each of you.  To return a verdict, it is necessary that

25   each juror agree to it.  Your verdict must be unanimous.

1          It is your duty, as jurors, to consult with one

2   another and to deliberate with a view to reaching an

3   agreement, if you can do so without offense to your individual

4   judgment.  Each of you must decide the case for yourself, but

5   do so only after an impartial consideration of the evidence in

6   the case with your fellow jurors.  During your deliberations,

7   do not hesitate to reexamine your own views, and change your

8   opinion, if you are convinced it is wrong.  But do not

9   surrender your honest conviction about the weight or effect of

10  the evidence solely because of the opinion of your fellow

11  jurors or for the mere purpose of returning a verdict.

12          Remember at all times:  You are not partisans, you

13  are judges -- judges of the facts of this case.

14          Counsel, please approach.

15          (Whereupon, the following discussion occurred at the

16  bench.)

17          **THE COURT:**  There is a ▉▉▉▉▉▉▉.  Okay.

18          **MR. MONTEMARANO:**  Subject to the prior objections

19  and whining put on the record by the Defense, I don't think

20  there is any objections from the -- as to the instructions as

21  read to the jury.

22          **THE COURT:**  Thank you.  And I consider all of your

23  previous objections and statements fully restated here.

24          **MR. RUTER:**  Please.  Your Honor, thank you.

25          On Page 89 -- and this could be just my lack of

```
 1    intellect -- I'm trying to figure out whether or not the last
 2    paragraph of Page 89, which is Count 7, is an active statement
 3    of the law given the fact that this particular possession must
 4    revert back to Count 6.  Count 6, of course, has more of an
 5    element than just a conspiracy that deals with -- it deals
 6    with sex trafficking.  It has nothing to do with conspiracy.
 7    It has to do with sex trafficking, force, coercion, and so on.
 8    So I'm just not clear --
 9            THE COURT:  What's your proposal?
10            MR. RUTER:  That there be language, Your Honor --
11            THE COURT:  What's your language?
12            MR. RUTER:  I don't have my -- specifically at this
13    time, Your Honor.
14            THE COURT:  Propose language that you want me to
15    consider.
16            MR. CUNNINGHAM:  Well, Your Honor, coincidentally,
17    we noted that we don't think that the first clause of that
18    would be applicable in this case.
19            THE COURT:  Okay.  So it would be the -- the
20    co-conspirator conduct?
21            MR. MONTEMARANO:  Yes.
22            MR. CUNNINGHAM:  Correct, Your Honor.
23            THE COURT:  Okay.  What about the aiding and
24    abetting theory?  You're actually charging him with actual,
25    aren't you?
```

1          **MR. CUNNINGHAM:**  We're charging with actual, so --

2          **THE COURT:**  So we can just strike the last

3     paragraph?

4          **MR. CUNNINGHAM:**  Yes, Your Honor.

5          **THE COURT:**  Okay.  Belinda, may I have the mic back,

6     please.

7          (Whereupon, the bench conference was concluded.)

8          **THE COURT:**  Members of the jury, on Page 89 of the

9     instructions, there is a last paragraph that talked about

10    other theories for finding someone guilty of possessing a

11    firearm in furtherance of a crime of violence.

12         By agreement, that last paragraph should not be

13    considered by you.  That's not the theory.  The theory in this

14    case is that the Defendant Ventura himself actually possessed

15    the gun and used it in furtherance, or possessed it in

16    furtherance of the crime.  So, therefore, the other things

17    about a co-conspirator possessing or about aiding and abetting

18    possessing are not at issue here.  The Government's theory is

19    that Mr. Ventura himself personally possessed the weapon in

20    furtherance of a crime.

21         So that will not be in the instructions that you

22    receive, but, for those of you who have very good memories and

23    remember what I read, I want you to know that that's not a

24    part of your deliberations.

25         Thank you.

```
 1                    Bailiff.

 2             THE CLERK:  Raise your right hand.

 3             (Oath administered.)

 4             THE CLERK:  Will you state your name for the record,

 5      please.

 6             CSO:  Dennis Hooper.

 7             THE CLERK:  Thank you, sir.  All rise --

 8             THE COURT:  Wait a minute.  Alternates Number 1, 2,

 9      and 3, I want to thank you very much for your service.  You've

10      been my insurance policy the past two weeks, and, as you see,

11      we did actually need one of the alternates to fill in to the

12      jury.  However, the jury is intact, and we'll not be needing

13      your services further.

14             Yes, sir?

15             JUROR 12:  Can I come talk to you?

16             THE COURT:  Okay.  Come up.

17             Counsel?

18             (Whereupon, the following discussion occurred at the

19      bench.)

20             THE COURT:  Yes, Number 12?

21             JUROR:  I really can't handle this, because I don't

22      think my education is -- because I never did graduate, and I

23      only went to the ninth grade, so I don't think I can handle

24      this, and I don't think I'd be fair.

25             THE COURT:  Well, we all chose you because we had
```

1    faith in your ability to be fair, but are you asking to be --

2    are you asking to be excused from further service?

3            **JUROR:**  I surely am, because, when you first called

4    us up there for the first time when we started, I didn't know

5    what this was all about when you called everybody, when

6    everybody was up here.

7            **THE COURT:**  Okay.  Let me ask you to step back, if

8    you would, just to the rail of the box.  Don't go back into

9    the box.  If you would step back.

10           **JUROR:**  Okay.

11           **THE COURT:**  He's afraid of making a mistake.

12           **MR. MONTEMARANO:**  I never want anybody on a jury who

13   doesn't want to be there, for obvious reasons.

14           **MR. RUTER:**  Your Honor, if I could step back and

15   speak to Mr. Ventura?

16           **THE COURT:**  Yes.  Please consult.

17           **MR. RUTER:**  Thank you.

18           (Whereupon, the bench conference was concluded.)

19           (Counsel conferring with the Defendants.)

20           **MR. RUTER:**  May we approach, Your Honor?

21           **THE COURT:**  Please.

22           (Whereupon, the following conference was held at the

23   bench.)

24           **MR. RUTER:**  Your Honor, Mr. Ventura indicated that,

25   since he was not represented properly, it makes no difference,

1    and, therefore, I will assert my judgment and agree to his

2    being stricken.

3                **MR. MONTEMARANO:**  Likewise for Mr. --

4                **MR. CUNNINGHAM:**  Agreed, Your Honor.

5                **THE COURT:**  Thank you.

6                **MR. CUNNINGHAM:**  Do you want us to remain?

7                **THE COURT:**  Please.

8                Number 12, we have talked, and we have decided that

9    we are going to grant your request.  We all think that you're

10   not giving yourself enough credit.

11               **JUROR:**  Absolutely.

12               **THE COURT:**  We all felt complete comfort with you

13   involved in the decision-making process here.  We all feel

14   comfortable in your judgment and in your intelligence, but

15   this is your decision, and we're not going to try to convince

16   you to stay.  I do want to thank you for your service.  It's

17   been two weeks out of your life, and I appreciate that.

18               **JUROR:**  Yeah, but, if I had the education to

19   complete, you know --

20               **THE COURT:**  You don't have to apologize, sir.  We

21   understand, and we believe you are acting in good faith.

22               **JUROR:**  Yep.  Thank you.

23               **THE COURT:**  Anyway, if you will go back and sit

24   beside the Bailiff, that would be great, for a moment, because

25   we have a certificate for you.

1          **MR. RUTER:**  Okay.

2          (Whereupon, the bench conference was concluded.)

3          **THE COURT:**  Alternate Juror Number 1, please take

4     Seat Number 12.  You are now Juror Number 12.

5          Alternates, former Number 12, I want to thank you

6     again for your service.  There will be a small token of our

7     appreciation in the form of a certificate about that service.

8     You've provided a necessary and important assistance to us,

9     and we do appreciate that.  So you will have a certificate,

10    and you are excused.

11         You are excused, sir.

12         Members of the jury, you may use your notes during

13    the course of your deliberations.  Now, again, remember:  The

14    notes are not evidence, but the notes can help you recall what

15    the evidence was, so feel free to use them during your

16    deliberations.  We're going to take some time to organize

17    ourselves in terms of collecting the evidence to be brought

18    back to you, and perhaps you can take that time as well to

19    organize yourself and your deliberative process.

20         We will be here at your call.  You may begin your

21    deliberations.

22         (Jury excused.)

23         **THE COURT:**  Counsel, please examine all of the

24    evidence that goes back.  Please actually touch it, make sure

25    that nothing goes back that should not go back, and we will

1    await the return of the jury.

2            We're in recess.

3            **THE CLERK:**  All rise.  This Honorable Court stands

4    in recess until return of the jury.

5            (Proceedings adjourned.)

6

7

8    I, Martin J. Giordano, Registered Merit Reporter and Certified

9    Realtime Reporter, certify that the foregoing is a correct

10   transcript from the record of proceedings in the

11   above-entitled matter.

12

13   _____        _____

14     Martin J. Giordano, RMR, CRR                 Date

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2   UNITED STATES v. GERMAN de JESUS VENTURA, et al.

3          TRIAL - VOL VIII - APRIL 18, 2013

4

5

6                                                          PAGE

COMMENCEMENT OF PROCEEDINGS............................ 1713

7   CLOSING ARGUMENT BY THE GOVERNMENT..................... 1714

8   CLOSING ARGUMENT BY DEFENDANT VENTURA.................. 1754

9   CLOSING ARGUMENT BY DEFENDANT FUERTES.................. 1777

10  REBUTTAL ARGUMENT BY THE GOVERNMENT.................... 1804

11  INSTRUCTIONS TO THE JURY............................... 1818

12  PROCEEDINGS ADJOURNED................................. 1876

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$30** [1] - 1715:9

## '

**'08** [4] - 1760:2, 1765:24, 1779:10, 1793:3
**'09** [5] - 1730:14, 1760:3, 1782:18, 1793:15, 1813:21

## 0

**09** [1] - 1728:3
**0903** [2] - 1720:10, 1728:4

## 1

**1** [22] - 1723:16, 1723:20, 1725:23, 1740:3, 1759:11, 1759:16, 1759:17, 1759:19, 1759:22, 1798:14, 1801:10, 1833:19, 1833:21, 1838:2, 1838:7, 1838:20, 1849:24, 1849:25, 1862:8, 1872:8, 1875:3
**10** [1] - 1787:23
**10%** [1] - 1779:1
**101** [1] - 1712:24
**11:36** [1] - 1776:21
**11:56** [1] - 1776:21
**12** [7] - 1839:19, 1872:15, 1872:20, 1874:8, 1875:4, 1875:5
**13** [2] - 1838:23, 1840:7
**13b/1** [2] - 1785:16, 1785:21
**15** [3] - 1715:9, 1840:23, 1850:11
**15th** [5] - 1737:24, 1762:18, 1770:1, 1815:22, 1850:24
**16** [1] - 1734:18
**1713** [1] - 1877:6
**1714** [1] - 1877:7
**1754** [1] - 1877:8
**1777** [1] - 1877:9
**17g** [2] - 1785:17, 1785:21
**18** [2] - 1840:15, 1877:3
**1804** [1] - 1877:10
**1818** [1] - 1877:11
**1876** [1] - 1877:12
**19** [3] - 1711:9, 1713:1, 1740:18
**19a/6** [1] - 1718:21
**19th** [4] - 1770:4, 1804:2, 1815:19, 1840:11
**1:09** [1] - 1817:4
**1:35** [3] - 1751:23, 1751:24, 1751:25
**1:59** [1] - 1817:5

## 2

**2** [26] - 1723:16, 1723:18, 1724:17, 1725:25, 1732:22, 1740:4, 1759:23, 1759:25, 1760:2, 1760:20, 1798:17, 1799:10, 1799:11, 1803:17, 1839:23, 1840:18, 1849:14, 1849:16, 1849:23, 1849:24, 1850:10, 1851:17, 1851:21, 1853:1, 1872:8
**20** [3] - 1801:20, 1840:12, 1849:24
**2008** [18] - 1716:25, 1727:1, 1743:18, 1746:6, 1748:19, 1769:25, 1770:9, 1783:1, 1792:25, 1834:11, 1837:17, 1837:20, 1846:21, 1849:21, 1850:3, 1856:21, 1860:10, 1862:10
**2009** [22] - 1720:25, 1731:4, 1731:11, 1734:9, 1734:25, 1735:14, 1746:7, 1746:8, 1760:9, 1763:17, 1763:18, 1763:24, 1782:14, 1837:20, 1837:24, 1838:2, 1838:7, 1838:11, 1838:14, 1849:21, 1850:4, 1854:20
**2010** [45] - 1718:24, 1719:5, 1721:9, 1732:10, 1733:9, 1736:24, 1737:24, 1750:1, 1751:11, 1751:23, 1761:4, 1762:18, 1765:25, 1770:1, 1770:2, 1779:18, 1781:8, 1782:19, 1787:19, 1787:23, 1792:5, 1834:12, 1838:20, 1838:23, 1839:3, 1839:7, 1839:12, 1839:15, 1839:19, 1839:23, 1840:2, 1840:7, 1840:11, 1840:15, 1840:18, 1840:19, 1840:23, 1846:22, 1850:10, 1850:11, 1850:15, 1850:24, 1856:21, 1862:3, 1862:10
**2011** [4] - 1770:3, 1770:4, 1770:5, 1779:23
**2012** [1] - 1770:6
**2013** [3] - 1711:9, 1713:1, 1877:3
**20l** [2] - 1785:17, 1785:21
**21201** [1] - 1712:24
**21b** [2] - 1785:17, 1785:21
**23** [1] - 1792:25
**23rd** [5] - 1817:15, 1817:17, 1817:21, 1817:24, 1860:10
**24th** [4] - 1730:14, 1735:14, 1838:11, 1838:14
**25** [2] - 1781:16, 1837:17
**25th** [2] - 1770:5, 1837:24
**26** [1] - 1780:13
**27th** [1] - 1770:6
**28** [2] - 1769:25, 1840:18
**28th** [2] - 1770:8, 1779:9
**29th** [2] - 1779:9, 1783:1
**2:00** [2] - 1816:20, 1817:2
**2nd** [4] - 1736:24, 1761:3, 1770:3, 1850:15

## 3

**3** [16] - 1733:22, 1734:6, 1736:21, 1740:3, 1760:22, 1763:12, 1763:17, 1765:13, 1765:20, 1776:8, 1816:24, 1840:18, 1840:19, 1854:16, 1855:18, 1872:9
**3,000** [1] - 1730:5
**30** [2] - 1715:8, 1738:18
**3124** [2] - 1718:24, 1737:15, 1738:3
**315** [1] - 1729:23
**36b** [1] - 1727:21
**36d** [1] - 1727:21
**36h** [1] - 1728:3
**39b/2** [1] - 1751:24
**3:32** [1] - 1711:9
**3rd** [4] - 1719:4, 1721:9, 1839:3, 1840:2

## 4

**4** [17] - 1733:22, 1736:22, 1736:23, 1738:23, 1740:3, 1759:23, 1760:21, 1760:23, 1761:9, 1762:12, 1849:14, 1849:24, 1850:9, 1850:11, 1851:17, 1851:21, 1853:1
**40f/1** [1] - 1733:1
**410-962-4504** [1] - 1712:25
**4168** [1] - 1733:2
**45** [1] - 1754:17

## 5

**5** [15] - 1733:22, 1736:22, 1737:20, 1738:23, 1759:23, 1760:21, 1762:13, 1762:18, 1763:11, 1849:14, 1850:9, 1850:21, 1851:17, 1851:21, 1853:1
**500** [1] - 1727:5
**5015** [1] - 1727:25
**5515** [1] - 1712:23
**5c/7** [1] - 1718:16
**5th** [1] - 1839:7

## 6

**6** [25] - 1738:24, 1739:5, 1739:11, 1739:12, 1740:13, 1744:17, 1745:24, 1765:21, 1775:3, 1775:4, 1775:8, 1775:10, 1775:25, 1776:8, 1799:10, 1803:17, 1813:11, 1817:14, 1839:15, 1856:16, 1862:19, 1862:23, 1863:9, 1870:4
**6th** [1] - 1751:23

## 7

**7** [18] - 1739:10, 1740:7, 1740:8,

1740:10, 1746:4, 1748:23, 1750:8,
1775:2, 1775:5, 1775:6, 1775:11,
1775:14, 1776:9, 1839:15, 1862:1,
1862:16, 1863:10, 1870:2
**7th** [1] - 1770:2

## 8

**8** [2] - 1760:9, 1839:12
**8168** [1] - 1729:17
**8198** [1] - 1729:17
**83** [1] - 1729:24
**89** [3] - 1869:25, 1870:2, 1871:8

## 9

**90** [1] - 1714:17
**919** [1] - 1730:4
**960** [1] - 1755:3
**9:34** [1] - 1711:9

## A

**A.D** [1] - 1755:3
**a.m** [5] - 1751:23, 1751:24, 1751:25,
1776:21
**abetted** [1] - 1866:12
**abetting** [2] - 1870:24, 1871:17
**abiding** [2] - 1719:19, 1753:1
**ability** [2] - 1770:24, 1873:1
**able** [3] - 1717:12, 1791:4, 1813:18
**ABOVE** [1] - 1711:10
**above-entitled** [1] - 1876:11
**ABOVE-ENTITLED** [1] - 1711:10
**abscond** [1] - 1814:9
**absence** [2] - 1800:24, 1849:3
**absent** [1] - 1817:22
**absolutely** [3] - 1771:20, 1772:13,
1874:11
**absorbed** [1] - 1813:1
**abstract** [2] - 1782:23, 1789:9
**absurd** [1] - 1742:15
**abuse** [4] - 1722:9, 1746:2, 1747:23,
1803:7
**abused** [1] - 1782:21
**abuses** [2] - 1741:13, 1783:10
**abusing** [2] - 1783:10, 1785:8
**abusive** [2] - 1782:8, 1785:12
**accept** [6] - 1718:4, 1766:12, 1783:17,
1796:9, 1797:8, 1819:14, 1828:22,
1829:15
**access** [1] - 1826:22
**accident** [4] - 1852:13, 1852:23,
1864:11, 1866:3
**accomplish** [4] - 1841:7, 1842:22,
1843:10, 1848:12
**accomplished** [2] - 1834:24, 1842:19
**accomplishment** [1] - 1846:12

**according** [1] - 1750:21
**accordingly** [2] - 1848:15, 1854:11
**account** [11] - 1742:19, 1746:21,
1810:15, 1810:24, 1810:25, 1812:18,
1815:16, 1851:13, 1856:12, 1860:23
**accounting** [1] - 1786:5
**accounts** [2] - 1735:12, 1780:3
**accuracy** [1] - 1827:25
**accusation** [2] - 1822:17, 1833:6
**accused** [1] - 1841:3
**ace** [1] - 1797:3
**achievements** [1] - 1718:6
**acknowledge** [4] - 1802:14, 1806:13,
1807:15, 1810:24
**acknowledged** [3] - 1797:10, 1807:16,
1808:25
**acquiescence** [1] - 1846:5
**acquit** [2] - 1817:22, 1823:7
**acquitted** [1] - 1808:9
**act** [51] - 1724:4, 1724:10, 1739:22,
1747:22, 1762:13, 1768:14, 1768:24,
1772:8, 1772:23, 1772:25, 1793:23,
1801:12, 1801:16, 1812:19, 1813:15,
1813:17, 1833:14, 1842:7, 1842:23,
1843:10, 1843:11, 1845:11, 1847:4,
1847:11, 1847:13, 1847:14, 1847:15,
1847:17, 1847:20, 1847:21, 1847:22,
1847:25, 1852:12, 1853:6, 1853:17,
1854:8, 1854:9, 1854:10, 1855:25,
1857:4, 1857:16, 1858:3, 1859:18,
1859:22, 1860:19, 1860:22, 1860:23,
1867:3
**acted** [6] - 1734:14, 1852:21, 1852:24,
1855:15, 1856:8, 1860:14
**acting** [2] - 1789:9, 1874:21
**action** [4] - 1724:6, 1801:11, 1814:7,
1864:17
**actions** [5] - 1744:14, 1843:6, 1843:8,
1854:6, 1861:23
**active** [3] - 1864:20, 1865:4, 1870:2
**actively** [1] - 1852:4
**activities** [5] - 1756:18, 1836:23,
1836:25, 1837:3, 1844:23
**activity** [23] - 1715:2, 1724:22, 1833:23,
1834:17, 1834:21, 1836:22, 1841:22,
1849:19, 1850:7, 1850:19, 1851:3,
1851:11, 1851:13, 1851:14, 1853:22,
1854:23, 1855:1, 1855:5, 1855:17,
1856:10, 1856:12, 1856:14, 1859:7
**actor** [1] - 1796:23
**acts** [31] - 1724:7, 1745:14, 1745:21,
1746:1, 1748:3, 1750:15, 1750:18,
1750:20, 1837:15, 1837:22, 1844:16,
1845:8, 1846:6, 1847:9, 1848:3,
1848:4, 1848:15, 1848:19, 1848:20,
1848:24, 1849:2, 1849:6, 1849:7,
1849:9, 1852:21, 1853:10, 1854:10,
1854:13, 1857:3, 1861:11
**actual** [17] - 1716:9, 1722:9, 1723:19,
1724:17, 1725:18, 1725:19, 1733:20,

1759:25, 1760:18, 1760:23, 1786:7,
1830:4, 1841:11, 1860:11, 1865:12,
1870:24, 1871:1
**Adams** [3] - 1757:5, 1757:6, 1757:14
**addition** [6] - 1726:13, 1726:19, 1739:1,
1786:22, 1819:2, 1861:11
**address** [8] - 1727:17, 1727:18,
1727:21, 1728:9, 1752:4, 1785:20,
1807:24
**addresses** [2] - 1728:8, 1751:21
**adept** [1] - 1814:16
**adequate** [1] - 1762:9
**adjectives** [1] - 1802:11
**adjourned** [1] - 1876:5
**ADJOURNED**................................ [1] -
1877:12
**administered** [1] - 1872:3
**Admiral** [1] - 1783:12
**admissibility** [2] - 1821:1, 1821:5
**admissible** [1] - 1820:21
**admit** [2] - 1745:16, 1827:10
**admits** [2] - 1779:12, 1779:13
**admitted** [5] - 1727:23, 1745:16,
1826:20, 1826:21, 1848:2
**adoption** [2] - 1794:13, 1794:14
**advance** [1] - 1864:3
**advanced** [1] - 1759:4
**advantage** [1] - 1790:4
**adverse** [1] - 1823:25
**advertised** [2] - 1835:13, 1835:15
**advised** [2] - 1830:1, 1846:16
**affairs** [1] - 1728:9
**affect** [3] - 1832:25, 1861:12, 1861:13
**affected** [3] - 1861:18, 1861:20, 1861:21
**affecting** [5] - 1739:23, 1856:22,
1857:17, 1861:2, 1861:24
**affection** [1] - 1768:3
**affects** [1] - 1861:16
**afford** [1] - 1816:1
**afforded** [1] - 1805:17
**afraid** [3] - 1750:5, 1770:19, 1873:11
**Afternoon** [1] - 1817:5
**afternoon** [3] - 1777:9, 1804:20,
1816:15
**afternoons** [1] - 1814:11
**age** [5] - 1734:18, 1740:20, 1769:8,
1821:18, 1859:11
**agent** [1] - 1848:13
**Agent** [6] - 1712:3, 1723:5, 1743:5,
1751:14, 1761:6, 1806:12
**agents** [1] - 1737:7
**ago** [7] - 1755:4, 1757:1, 1786:17,
1796:12, 1796:24, 1804:4, 1805:6
**agree** [8] - 1724:9, 1724:12, 1801:15,
1834:13, 1834:14, 1852:15, 1868:25,
1874:1
**agreed** [3] - 1720:5, 1868:17, 1874:4
**agreement** [15] - 1723:25, 1735:10,
1801:15, 1801:21, 1841:6, 1842:11,

1842:15, 1842:25, 1843:7, 1844:10, 1844:13, 1846:18, 1847:19, 1869:3, 1871:12

**agreements** [3] - 1723:23, 1820:14, 1842:3

**agrees** [1] - 1805:10

**aid** [2] - 1814:21, 1829:23

**aided** [1] - 1866:11

**aiding** [4] - 1846:12, 1847:23, 1870:23, 1871:17

**aims** [2] - 1844:13, 1846:1

**ain't** [1] - 1759:20

**air** [1] - 1715:12

**al** [1] - 1877:2

**albeit** [1] - 1752:1

**Alcivar** [6] - 1736:23, 1737:1, 1737:4, 1737:10, 1737:17, 1760:24

**alcohol** [3] - 1715:12, 1760:13, 1835:19

**Alex** [12] - 1731:14, 1742:25, 1743:2, 1743:6, 1743:8, 1744:1, 1769:9, 1769:10, 1769:11, 1769:13, 1784:24, 1806:6

**Alex's** [7] - 1731:12, 1731:15, 1731:22, 1743:20, 1744:3, 1766:18, 1766:21

**aliases** [1] - 1728:8

**alien** [3] - 1834:3, 1834:7, 1837:21

**aliens** [1] - 1835:10

**all-too-common** [1] - 1741:8

**allegation** [1] - 1806:15

**allegations** [3] - 1849:24, 1850:13, 1850:22

**alleged** [12] - 1833:17, 1842:14, 1842:16, 1844:17, 1845:20, 1846:23, 1847:1, 1851:8, 1855:9, 1855:24, 1856:6, 1856:18

**allegedly** [3] - 1756:20, 1798:21, 1836:23

**alleges** [3] - 1772:1, 1775:6, 1846:20

**allow** [5] - 1750:16, 1750:25, 1758:5, 1821:22, 1866:20

**allowed** [1] - 1829:16

**allowing** [1] - 1848:7

**almost** [5] - 1720:11, 1769:9, 1784:18, 1802:22, 1853:3

**alone** [11] - 1745:23, 1763:8, 1775:19, 1791:24, 1819:18, 1823:7, 1825:19, 1830:7, 1841:20, 1847:20, 1850:9

**Alternate** [1] - 1875:3

**alternates** [3] - 1872:8, 1872:11, 1875:5

**alternative** [1] - 1798:1

**alternatively** [2] - 1817:14, 1855:11

**Altima** [2] - 1727:2, 1728:18

**AM** [1] - 1711:9

**ambit** [1] - 1845:12

**America** [4] - 1756:8, 1792:2, 1794:23, 1822:7

**AMERICA** [1] - 1711:4

**ammunition** [1] - 1803:10

**amount** [5] - 1730:14, 1738:8, 1741:24, 1744:5, 1781:14

**amounts** [1] - 1738:20

**Amparo** [5] - 1727:8, 1727:11, 1727:20, 1728:7, 1728:12

**ample** [1] - 1771:6

**amply** [1] - 1799:6

**analysis** [1] - 1801:2

**analytical** [2] - 1761:15, 1773:2

**analyze** [2] - 1804:24, 1805:1

**anchor** [1] - 1757:9

**angel** [2] - 1718:20, 1840:5

**angered** [2] - 1721:5, 1758:16

**angle** [1] - 1809:2

**ankle** [3] - 1746:25, 1747:16, 1747:21

**Anna** [1] - 1740:24

**Annapolis** [20] - 1716:6, 1716:15, 1717:2, 1718:3, 1726:10, 1792:6, 1797:20, 1804:13, 1806:5, 1834:7, 1837:19, 1838:1, 1838:4, 1838:6, 1838:13, 1838:17, 1838:21, 1838:25, 1839:9, 1839:17

**Anne** [2] - 1770:13, 1770:21

**Annie** [1] - 1802:7

**answer** [8] - 1742:9, 1765:18, 1771:20, 1772:12, 1795:5, 1795:7, 1798:19, 1798:23

**answered** [3] - 1742:9, 1742:11, 1788:2

**answering** [1] - 1793:11

**answers** [2] - 1820:11, 1826:25

**anticipated** [2] - 1814:25, 1815:1

**anytime** [1] - 1846:25

**anyway** [2] - 1791:9, 1874:23

**apartment** [1] - 1720:1

**apartments** [3] - 1715:4, 1722:7, 1835:5

**apologize** [3] - 1726:5, 1741:18, 1874:20

**appalling** [1] - 1794:2

**apparent** [2] - 1791:17, 1791:24

**appeal** [1] - 1752:3

**appealed** [1] - 1831:20

**appear** [1] - 1731:6

**appearance** [2] - 1731:5, 1731:6

**appeared** [4] - 1755:21, 1757:20, 1770:1, 1770:5

**applicable** [2] - 1865:18, 1870:18

**application** [1] - 1753:7

**apply** [5] - 1723:13, 1805:2, 1819:15, 1827:17, 1829:11

**applying** [1] - 1753:11

**appreciate** [4] - 1806:21, 1808:2, 1874:17, 1875:9

**appreciation** [1] - 1875:7

**apprised** [1] - 1844:23

**approach** [3] - 1753:17, 1869:14, 1873:20

**appropriate** [3] - 1750:14, 1778:18, 1841:19

**appropriately** [1] - 1815:24

**APRIL** [2] - 1713:1, 1877:3

**April** [11] - 1711:9, 1716:25, 1746:8,

1804:2, 1815:19, 1815:21, 1815:22, 1818:3, 1837:20, 1839:3, 1839:7

**area** [5] - 1716:22, 1726:9, 1726:10, 1749:6, 1806:6

**argue** [2] - 1787:17, 1794:10

**argues** [1] - 1831:4

**arguing** [1] - 1801:24

**ARGUMENT** [4] - 1877:7, 1877:8, 1877:9, 1877:10

**argument** [10] - 1713:19, 1714:13, 1741:22, 1753:24, 1777:12, 1785:16, 1818:2, 1818:4, 1832:4, 1832:21

**arguments** [3] - 1819:12, 1820:7, 1825:7

**Army** [3] - 1794:20, 1794:21

**arose** [1] - 1865:24

**arrange** [3] - 1726:1, 1800:12, 1835:23

**arranged** [6] - 1743:9, 1787:18, 1836:2, 1836:8, 1838:21, 1840:20

**arrangement** [1] - 1724:17

**arrangements** [1] - 1852:5

**arrest** [10] - 1721:2, 1727:1, 1730:10, 1730:11, 1731:3, 1731:11, 1735:14, 1737:24, 1793:15, 1813:21

**arrested** [38] - 1718:23, 1720:24, 1726:15, 1727:4, 1727:10, 1727:17, 1727:23, 1727:25, 1728:2, 1728:10, 1728:17, 1729:11, 1729:23, 1730:12, 1730:14, 1730:22, 1731:1, 1731:2, 1734:5, 1736:5, 1738:3, 1738:15, 1748:14, 1749:25, 1750:5, 1751:10, 1762:1, 1762:2, 1762:20, 1762:23, 1769:13, 1781:8, 1812:5, 1812:6, 1815:6, 1815:11, 1838:10

**arrests** [2] - 1737:11, 1778:25

**arrival** [1] - 1735:5

**arrived** [3] - 1741:4, 1752:6

**Arundel** [2] - 1770:13, 1770:21

**Ascencio** [21] - 1718:3, 1718:11, 1721:1, 1731:9, 1731:10, 1731:13, 1731:16, 1731:17, 1731:20, 1731:23, 1732:11, 1732:14, 1733:5, 1736:7, 1743:3, 1744:1, 1749:3, 1783:20, 1784:7, 1784:18

**Ascencio's** [1] - 1733:3

**aside** [2] - 1758:7, 1814:2

**assault** [8] - 1719:8, 1719:10, 1735:23, 1746:9, 1759:3, 1795:2, 1813:24, 1840:20

**assaulted** [4] - 1719:5, 1721:8, 1735:22, 1837:21

**assaults** [2] - 1749:7, 1756:23

**assembled** [1] - 1846:1

**assert** [2] - 1806:7, 1874:1

**assess** [2] - 1804:24, 1831:1

**assessed** [1] - 1805:22

**assessing** [2] - 1747:25, 1748:21

**assigned** [1] - 1717:23

**assist** [2] - 1829:6, 1829:24

**assistance** [2] - 1780:17, 1875:8

**Assistant** [2] - 1711:14, 1711:15
**assisted** [1] - 1846:16
**assisting** [1] - 1847:23
**associate** [1] - 1843:23
**associated** [2] - 1728:10, 1759:24
**association** [5] - 1733:2, 1802:6, 1802:7, 1802:12, 1845:22
**assume** [3] - 1745:10, 1754:8, 1761:18
**assumptions** [1] - 1830:25
**assure** [2] - 1804:21, 1807:4
**attach** [1] - 1823:24
**attack** [2] - 1813:7, 1828:17
**attacked** [1] - 1787:18
**attempt** [3] - 1807:10, 1864:23, 1867:9
**attempts** [1] - 1756:23
**attention** [13] - 1714:16, 1714:18, 1723:7, 1754:19, 1777:5, 1778:13, 1785:13, 1790:18, 1819:7, 1819:9, 1819:10, 1833:13, 1836:24
**attentive** [1] - 1778:11
**attentiveness** [1] - 1778:10
**attitude** [2] - 1809:20, 1821:11
**Attorney** [2] - 1711:14, 1711:15
**attorney** [6] - 1781:16, 1801:24, 1820:19, 1820:20, 1820:25, 1821:1
**attorneys** [2] - 1825:6, 1828:17
**attributable** [1] - 1743:6
**attribute** [1] - 1747:6
**audacious** [1] - 1806:15
**August** [7] - 1732:10, 1736:24, 1761:3, 1839:23, 1840:2, 1850:10, 1850:15
**aunt** [1] - 1743:9
**auspices** [1] - 1814:2
**authority** [1] - 1756:9
**automatic** [3] - 1718:19, 1749:20, 1840:4
**automatically** [1] - 1845:23
**available** [4] - 1853:4, 1854:4, 1865:1, 1865:23
**Avila** [19] - 1718:10, 1718:18, 1718:21, 1718:22, 1719:5, 1719:8, 1721:7, 1721:8, 1721:16, 1721:20, 1721:21, 1721:23, 1759:3, 1787:18, 1795:2, 1796:10, 1798:5, 1798:23, 1813:25
**avoid** [1] - 1859:8
**await** [1] - 1876:1
**aware** [3] - 1755:18, 1769:2, 1791:6
**awareness** [1] - 1844:12
**awful** [1] - 1803:8
**awfully** [1] - 1795:10
**Ayala** [1] - 1796:4

# B

**baby** [1] - 1752:1
**background** [1] - 1859:6
**bad** [9] - 1731:14, 1743:1, 1743:3, 1764:3, 1787:14, 1787:16, 1790:12, 1791:13, 1798:21

**badly** [1] - 1735:22
**bag** [1] - 1729:7
**bags** [1] - 1737:5
**bailiff** [1] - 1872:1
**Bailiff** [5] - 1867:7, 1867:15, 1867:17, 1868:14, 1874:24
**Baker** [8] - 1747:3, 1747:9, 1773:15, 1773:18, 1810:11, 1810:12, 1829:1
**Baker's** [1] - 1829:9
**balding** [1] - 1796:23
**Baltimore** [4] - 1711:8, 1712:24, 1745:6, 1797:20
**bank** [4] - 1801:15, 1801:16, 1801:18, 1801:20
**bar** [1] - 1822:11
**bare** [2] - 1715:3, 1715:10
**barrier** [1] - 1813:20
**base** [1] - 1819:23, 1830:19
**based** [15] - 1726:21, 1745:10, 1748:18, 1768:16, 1780:24, 1804:14, 1814:25, 1821:13, 1821:25, 1822:13, 1826:7, 1830:8, 1831:1, 1831:22, 1853:9
**basement** [5] - 1728:23, 1730:23, 1738:19, 1751:5, 1752:14
**basements** [1] - 1715:3
**basic** [1] - 1844:12
**basis** [8] - 1732:5, 1803:8, 1803:16, 1824:22, 1825:8, 1825:13, 1866:19
**bathroom** [2] - 1753:21, 1753:23
**battery** [1] - 1741:18
**Beach** [1] - 1768:21
**bear** [4] - 1757:18, 1816:9, 1847:20, 1867:21
**bearing** [2] - 1831:7, 1845:5
**beat** [1] - 1769:10
**beaten** [6] - 1745:1, 1771:10, 1771:11, 1771:13, 1771:14, 1787:2
**beating** [4] - 1745:18, 1745:19, 1748:6, 1771:16
**beatings** [4] - 1745:1, 1748:3, 1771:16, 1771:18
**beautiful** [2] - 1731:22, 1744:4
**became** [5] - 1717:22, 1750:24, 1767:21, 1842:5, 1843:15
**become** [3] - 1714:4, 1805:23, 1844:21
**becomes** [6] - 1763:20, 1781:25, 1846:17, 1847:14, 1848:12, 1867:6
**BEFORE** [1] - 1711:11
**beg** [1] - 1761:14
**began** [11] - 1731:10, 1731:23, 1780:21, 1780:23, 1781:7, 1806:2, 1823:6, 1823:14, 1846:21, 1846:25
**begin** [5] - 1713:18, 1715:16, 1758:3, 1816:23, 1875:20
**beginning** [5] - 1780:7, 1785:25, 1793:10, 1834:11, 1862:9
**behalf** [6] - 1711:13, 1711:16, 1711:18, 1783:2, 1785:15, 1824:7
**behaved** [1] - 1809:12
**behavior** [2] - 1827:23, 1859:20

**behind** [4] - 1728:23, 1730:22, 1758:3, 1758:4
**beings** [2] - 1752:20
**belief** [3] - 1748:1, 1748:18, 1859:16
**believability** [3] - 1820:2, 1821:7, 1828:17
**believes** [2] - 1798:20, 1820:21
**Belinda** [1] - 1871:5
**belonged** [1] - 1731:2
**belongings** [1] - 1729:4
**belt** [6] - 1745:8, 1745:18, 1746:22, 1747:11, 1772:1, 1772:10
**bench** [8] - 1753:20, 1754:15, 1869:16, 1871:7, 1872:19, 1873:18, 1873:23, 1875:2
**benefit** [4] - 1739:4, 1746:19, 1774:23, 1857:1
**benefited** [5] - 1739:15, 1746:1, 1857:11, 1857:24, 1860:8
**Benites** [1] - 1728:1
**Beretta** [1] - 1717:5
**beside** [1] - 1874:24
**better** [3] - 1743:23, 1756:17, 1794:12
**between** [29] - 1726:24, 1727:14, 1728:15, 1730:1, 1730:2, 1730:3, 1733:12, 1733:18, 1735:10, 1735:13, 1738:4, 1745:22, 1751:16, 1756:8, 1756:22, 1760:2, 1760:9, 1768:19, 1788:15, 1791:21, 1825:2, 1833:17, 1837:20, 1842:21, 1851:24, 1856:2, 1861:4, 1861:5
**beyond** [55] - 1739:12, 1740:11, 1753:6, 1759:15, 1760:5, 1760:10, 1761:24, 1762:4, 1762:9, 1763:3, 1767:6, 1768:12, 1771:15, 1774:7, 1775:20, 1778:6, 1796:2, 1802:18, 1816:10, 1822:20, 1823:5, 1823:9, 1823:17, 1823:21, 1825:4, 1826:10, 1832:16, 1833:9, 1842:1, 1842:9, 1843:13, 1847:3, 1847:16, 1848:22, 1851:6, 1851:21, 1852:15, 1853:18, 1855:6, 1855:22, 1856:8, 1857:8, 1857:21, 1858:7, 1860:13, 1860:21, 1861:1, 1862:17, 1862:24, 1863:7, 1863:14, 1864:19, 1865:7, 1866:8, 1866:18
**BG&E** [1] - 1728:11
**bias** [3] - 1757:2, 1763:9, 1821:10
**big** [6] - 1767:23, 1767:24, 1768:3, 1784:8, 1784:13, 1787:14, 1787:16, 1797:2, 1807:22
**bigger** [4] - 1778:2, 1778:3, 1778:4, 1794:22
**bill** [1] - 1751:4
**bills** [1] - 1728:11
**birth** [2] - 1727:3, 1811:10
**bit** [9] - 1725:22, 1731:19, 1748:12, 1755:3, 1755:4, 1760:7, 1761:15, 1763:16, 1778:11
**black** [4] - 1717:4, 1749:20, 1791:13, 1791:14

**Black** [1] - 1745:9
**bladders** [1] - 1713:22
**blankets** [1] - 1715:4
**blind** [2] - 1746:11, 1783:13
**blindness** [3] - 1783:11, 1783:14, 1783:15
**blocked** [1] - 1721:14
**blood** [3] - 1779:25, 1780:4, 1798:21
**blown** [1] - 1782:25
**BLUMBERG** [1] - 1741:17
**bodies** [1] - 1752:19
**body** [2] - 1745:2, 1747:7
**Bonita** [3] - 1737:22, 1738:8, 1762:17
**book** [1] - 1780:14
**born** [2] - 1751:13, 1812:7
**borrow** [1] - 1720:7
**boss** [1] - 1796:20
**Boston** [3] - 1732:1, 1777:16, 1815:16
**bottom** [3] - 1725:15, 1748:13, 1815:10
**bought** [1] - 1810:19
**bound** [1] - 1758:19
**box** [3] - 1744:24, 1873:8, 1873:9
**boxer** [1] - 1777:12
**boy** [1] - 1776:4
**boyfriend** [2] - 1771:9, 1780:25
**boys** [1] - 1794:3
**brandish** [1] - 1862:15
**brandishing** [1] - 1864:24
**brave** [1] - 1804:4
**Brazil** [1] - 1721:12
**break** [8] - 1713:18, 1753:21, 1753:22, 1753:23, 1754:7, 1776:16, 1795:17, 1816:18
**breakfast** [1] - 1803:2
**breaking** [2] - 1864:14, 1866:5
**bricks** [1] - 1784:11
**Bridgett** [4] - 1736:23, 1737:4, 1760:24, 1799:17
**brief** [2] - 1742:21, 1754:11
**briefly** [2] - 1713:8, 1779:7
**bring** [11] - 1735:20, 1744:4, 1744:8, 1766:19, 1773:15, 1788:25, 1790:17, 1797:11, 1802:21, 1802:22, 1803:4
**bringing** [2] - 1732:10, 1732:18
**brothel** [26] - 1727:9, 1728:10, 1728:11, 1729:2, 1730:1, 1731:12, 1731:15, 1732:5, 1732:6, 1732:9, 1732:20, 1733:1, 1735:17, 1735:20, 1737:10, 1743:5, 1744:3, 1745:12, 1746:5, 1752:6, 1766:18, 1766:21, 1772:15, 1784:12
**brothels** [22] - 1716:22, 1726:8, 1726:13, 1726:14, 1726:25, 1730:21, 1732:20, 1733:7, 1734:5, 1735:16, 1748:9, 1748:14, 1749:6, 1751:22, 1766:23, 1784:21, 1785:22, 1792:11, 1812:13, 1815:6, 1815:10
**brought** [8] - 1738:6, 1755:11, 1757:18, 1761:1, 1801:3, 1822:6, 1868:15,

---

1875:17
**bucket** [1] - 1799:19
**build** [1] - 1744:11
**building** [1] - 1781:9
**built** [1] - 1768:5
**bunch** [3] - 1763:15, 1785:17, 1799:22
**burden** [14] - 1803:5, 1803:6, 1803:19, 1821:17, 1821:20, 1822:20, 1822:21, 1822:23, 1823:11, 1823:21, 1832:6, 1841:25, 1852:20, 1862:16
**bus** [4] - 1732:3, 1735:4, 1764:23, 1764:24, 1765:4, 1799:15, 1799:17
**business** [39] - 1716:19, 1716:20, 1716:21, 1725:4, 1726:12, 1727:6, 1727:16, 1729:16, 1730:1, 1730:6, 1730:8, 1730:13, 1730:19, 1732:7, 1738:9, 1746:15, 1749:6, 1752:25, 1756:15, 1756:21, 1756:22, 1757:22, 1759:14, 1769:9, 1786:22, 1806:3, 1808:23, 1808:24, 1809:6, 1813:24, 1835:13, 1836:17, 1836:20, 1838:25, 1839:5, 1840:6, 1840:21, 1843:23
**butt** [2] - 1794:19, 1794:22
**buying** [1] - 1782:9
**BY** [4] - 1877:7, 1877:8, 1877:9, 1877:10

---

# C

**cable** [1] - 1787:1
**calendar** [1] - 1738:2
**camp** [1] - 1811:24
**campaign** [2] - 1716:8, 1716:10
**Campos** [9] - 1716:13, 1716:14, 1716:18, 1716:24, 1717:4, 1717:6, 1717:20, 1749:3, 1749:21
**Campus** [2] - 1777:22, 1777:25
**cannot** [9] - 1758:5, 1758:20, 1762:8, 1794:3, 1817:23, 1824:4, 1866:19, 1867:19, 1867:25
**Capitol** [1] - 1834:3
**captioned** [1] - 1765:21
**captive** [1] - 1734:20
**car** [14] - 1717:1, 1717:5, 1720:18, 1721:13, 1721:14, 1727:4, 1727:5, 1730:10, 1737:5, 1737:6, 1738:13, 1747:7, 1785:23, 1786:14
**card** [1] - 1727:16
**cards** [7] - 1716:21, 1726:12, 1727:6, 1738:10, 1786:4, 1800:15, 1835:13
**care** [7] - 1743:10, 1743:23, 1744:12, 1770:12, 1777:15, 1787:15, 1796:10
**cared** [3] - 1735:20, 1768:6
**careful** [3] - 1804:14, 1819:10, 1823:9
**carefully** [3] - 1813:7, 1827:19, 1830:1
**careless** [1] - 1858:20
**carelessness** [1] - 1852:23
**cares** [1] - 1727:12
**Carlos** [23] - 1716:13, 1716:18, 1716:24,

---

1718:3, 1718:11, 1721:1, 1731:9, 1731:10, 1731:13, 1731:16, 1731:17, 1731:20, 1731:23, 1732:11, 1732:14, 1736:7, 1743:3, 1743:25, 1749:3, 1749:21, 1784:18
**Carraballo** [1] - 1770:10
**carried** [9] - 1740:15, 1862:5, 1862:12, 1862:22, 1863:16, 1865:6, 1865:18, 1866:1, 1866:2
**carry** [1] - 1763:8
**carrying** [2] - 1847:23, 1848:13, 1865:19
**cars** [1] - 1755:24
**carta** [1] - 1757:13
**carve** [1] - 1806:6, 1815:12
**case** [85] - 1714:22, 1715:24, 1725:3, 1730:7, 1732:4, 1733:8, 1743:2, 1743:25, 1747:2, 1752:18, 1752:23, 1753:10, 1753:12, 1755:14, 1756:11, 1756:18, 1757:18, 1758:21, 1759:2, 1759:3, 1759:7, 1762:19, 1766:16, 1768:2, 1770:25, 1776:16, 1778:11, 1778:16, 1778:18, 1778:22, 1779:2, 1779:3, 1779:6, 1785:23, 1786:18, 1786:20, 1789:2, 1789:3, 1792:20, 1797:2, 1802:6, 1803:2, 1808:16, 1814:6, 1816:10, 1816:21, 1816:23, 1818:21, 1819:12, 1820:19, 1822:1, 1822:2, 1822:4, 1822:23, 1823:10, 1823:18, 1824:4, 1824:7, 1824:10, 1825:5, 1826:12, 1827:7, 1828:2, 1828:10, 1828:20, 1828:25, 1829:14, 1829:18, 1830:4, 1830:8, 1832:11, 1841:3, 1843:3, 1852:25, 1853:4, 1866:7, 1866:17, 1867:12, 1867:17, 1869:4, 1869:6, 1869:13, 1870:18, 1871:14
**cases** [2] - 1743:13, 1843:6
**cash** [6] - 1730:15, 1730:17, 1732:18, 1784:11, 1836:19, 1838:17
**Cassandra** [2] - 1748:7, 1812:9
**categories** [1] - 1757:3
**cattle** [2] - 1715:15, 1787:13
**Caucasian** [2] - 1800:9, 1801:7
**caught** [1] - 1734:4
**caused** [1] - 1747:7, 1837:15
**causing** [1] - 1859:16
**caution** [3] - 1767:22, 1845:19, 1846:4
**cautious** [1] - 1769:6
**celebrated** [3] - 1815:18, 1815:20, 1815:21
**celebrating** [1] - 1717:15
**cell** [2] - 1756:2, 1838:18
**cellular** [3] - 1835:22, 1838:8, 1840:3
**centuries** [2] - 1755:15, 1755:16
**century** [1] - 1755:15
**certain** [11] - 1726:21, 1733:25, 1756:9, 1758:21, 1772:2, 1775:1, 1802:21, 1810:10, 1833:15, 1837:5, 1854:7
**certainly** [5] - 1767:3, 1782:13, 1804:22,

1808:14, 1811:4
**certificate** [4] - 1727:4, 1874:25, 1875:7, 1875:9
**Certified** [1] - 1876:8
**certify** [1] - 1876:9
**cetera** [1] - 1765:18
**Chaco** [1] - 1834:2
**challenge** [2] - 1808:3, 1813:6
**challenging** [1] - 1807:5
**Chalo** [1] - 1834:1
**chance** [2] - 1778:5, 1803:18
**change** [3] - 1713:8, 1817:19, 1869:7
**changed** [4] - 1728:7, 1755:4, 1769:20, 1770:7
**character** [2] - 1846:15, 1847:22
**characterize** [1] - 1787:24
**characterized** [1] - 1843:2
**charge** [9] - 1723:21, 1724:11, 1734:16, 1775:2, 1775:3, 1809:9, 1809:10, 1834:10, 1849:14
**charged** [42] - 1722:15, 1723:23, 1724:7, 1736:15, 1740:8, 1765:13, 1773:12, 1778:7, 1805:4, 1821:23, 1822:5, 1832:21, 1833:1, 1833:24, 1834:18, 1834:22, 1837:12, 1837:17, 1842:3, 1842:12, 1843:10, 1843:16, 1844:7, 1847:9, 1848:23, 1849:16, 1849:19, 1849:22, 1850:8, 1850:10, 1850:12, 1850:15, 1850:19, 1851:3, 1854:18, 1854:24, 1856:20, 1862:9, 1862:19, 1862:23, 1863:9
**charges** [29] - 1722:22, 1722:23, 1723:4, 1723:9, 1724:25, 1725:12, 1725:15, 1725:21, 1753:5, 1789:16, 1789:20, 1789:24, 1802:21, 1823:1, 1832:18, 1833:3, 1833:5, 1833:14, 1833:21, 1834:4, 1848:4, 1849:23, 1850:21, 1854:16, 1854:25, 1856:16, 1857:5, 1862:1, 1862:3
**charging** [9] - 1833:21, 1833:23, 1833:25, 1842:4, 1842:12, 1843:17, 1856:16, 1870:24, 1871:1
**chart** [6] - 1733:2, 1748:13, 1814:15, 1814:20, 1814:22, 1814:24
**charts** [3] - 1827:10, 1827:13
**cheating** [1] - 1785:7
**check** [1] - 1801:18
**checkbook** [1] - 1781:4
**Chicago** [1] - 1777:24
**child** [7] - 1741:7, 1750:24, 1767:2, 1770:10, 1781:10, 1793:13, 1811:10
**children** [4] - 1734:20, 1734:24, 1736:3, 1767:1
**Chino** [2] - 1798:15, 1834:1
**chocolates** [1] - 1744:24
**choice** [5] - 1750:17, 1750:19, 1770:18, 1793:20, 1802:17, 1859:17
**choose** [1] - 1766:9
**chooses** [3] - 1750:21, 1824:5
**chose** [3] - 1786:24, 1823:18, 1872:25

**chosen** [1] - 1802:21
**Christmas** [3] - 1793:3, 1793:4, 1811:25
**circuit** [2] - 1725:6, 1726:17
**circumstances** [12] - 1750:10, 1752:21, 1775:22, 1805:14, 1827:20, 1843:3, 1852:25, 1853:11, 1854:13, 1858:22, 1859:5, 1859:6
**circumstantial** [7] - 1824:20, 1824:25, 1825:2, 1825:16, 1825:25, 1826:8, 1853:8
**circumstantially** [2] - 1763:6, 1763:7
**citizen** [2] - 1834:2, 1834:6
**citizenry** [1] - 1816:8
**citizens** [4] - 1719:19, 1778:5, 1815:25, 1816:2
**city** [1] - 1815:23
**City** [1] - 1745:6
**claim** [2] - 1791:22, 1792:21
**claimed** [2] - 1812:8, 1837:9
**claims** [1] - 1787:24
**classic** [1] - 1759:6
**clause** [1] - 1870:17
**clean** [1] - 1823:6
**cleaning** [2] - 1719:23, 1754:4
**clear** [8] - 1741:23, 1789:6, 1792:22, 1799:6, 1817:19, 1819:8, 1832:22, 1870:8
**clearly** [6] - 1765:15, 1765:18, 1768:11, 1771:24, 1799:21, 1854:9
**CLERK** [9] - 1713:2, 1776:18, 1776:22, 1817:1, 1817:6, 1872:2, 1872:4, 1872:7, 1876:3
**Clerk** [2] - 1868:16, 1868:21
**cleverly** [1] - 1764:14
**client** [5] - 1791:23, 1802:22, 1803:3, 1820:25, 1832:21
**clients** [2] - 1751:2, 1794:24
**clients'** [1] - 1789:1
**climate** [2] - 1748:5, 1812:25
**clock** [3] - 1714:18, 1754:18, 1777:5
**close** [5] - 1714:17, 1792:20, 1794:9, 1819:7, 1819:9
**closed** [1] - 1730:23
**CLOSING** [3] - 1877:7, 1877:8, 1877:9
**closing** [4] - 1713:18, 1777:12, 1785:16, 1820:7
**clothing** [4] - 1780:1, 1780:2, 1798:21
**co** [11] - 1724:4, 1738:21, 1801:12, 1837:14, 1840:24, 1844:17, 1847:12, 1848:6, 1849:6, 1870:20, 1871:17
**co-conspirator** [3] - 1849:6, 1870:20, 1871:17
**co-conspirators** [8] - 1724:4, 1738:21, 1801:12, 1837:14, 1840:24, 1844:17, 1847:12, 1848:6
**Coast** [1] - 1715:1
**coerce** [5] - 1721:25, 1765:10, 1834:19, 1837:6, 1854:22
**coerced** [9] - 1734:12, 1739:2, 1765:18, 1771:2, 1786:23, 1809:23, 1855:8,

1855:23, 1860:18
**coercing** [1] - 1855:3
**Coercion** [1] - 1765:22
**coercion** [29] - 1722:21, 1738:25, 1739:20, 1740:6, 1740:14, 1782:10, 1783:24, 1786:23, 1787:6, 1789:25, 1790:9, 1794:9, 1794:13, 1802:1, 1803:13, 1803:15, 1809:1, 1813:5, 1857:3, 1857:13, 1858:8, 1858:16, 1859:19, 1859:25, 1860:4, 1860:5, 1860:11, 1860:15, 1870:7
**coincidentally** [1] - 1870:16
**coincides** [1] - 1846:23
**colleague** [2] - 1723:2, 1814:16
**collect** [1] - 1772:6
**collected** [1] - 1836:19
**collecting** [2] - 1726:13, 1875:17
**collective** [1] - 1841:21
**college** [1] - 1777:24
**Colmillo** [4] - 1748:11, 1748:13, 1748:15, 1815:8
**color** [1] - 1749:22
**colored** [1] - 1828:19
**Columbia** [2] - 1861:5, 1861:7
**combative** [1] - 1742:13
**combination** [1] - 1841:6
**combine** [1] - 1748:5
**comfort** [1] - 1874:12
**comfortable** [1] - 1874:14
**coming** [2] - 1737:4, 1786:15
**COMMENCEMENT** [1] - 1877:6
**commendable** [1] - 1806:16
**comment** [1] - 1806:13
**commerce** [40] - 1715:21, 1724:18, 1724:21, 1725:17, 1734:13, 1739:24, 1768:14, 1834:16, 1834:20, 1850:6, 1850:17, 1851:1, 1851:8, 1851:19, 1851:23, 1851:24, 1852:8, 1852:11, 1852:17, 1854:23, 1855:9, 1855:14, 1855:20, 1855:24, 1856:2, 1856:6, 1856:23, 1857:18, 1861:2, 1861:3, 1861:8, 1861:10, 1861:12, 1861:13, 1861:16, 1861:18, 1861:20, 1861:22, 1861:25
**commercial** [21] - 1715:2, 1739:22, 1745:14, 1745:20, 1750:17, 1768:14, 1768:24, 1771:25, 1772:23, 1772:25, 1780:25, 1833:22, 1857:4, 1857:15, 1859:7, 1859:17, 1859:22, 1860:19, 1860:22, 1860:23, 1861:10
**commission** [7] - 1863:17, 1864:4, 1864:21, 1865:9, 1865:10, 1865:16, 1865:24
**commit** [5] - 1725:13, 1763:13, 1772:23, 1801:19, 1841:14
**committed** [14] - 1724:4, 1740:12, 1837:14, 1837:15, 1841:16, 1842:6, 1847:5, 1847:11, 1847:13, 1848:5, 1853:6, 1862:18, 1862:25, 1866:10
**committing** [1] - 1841:18

**common** [18] - 1733:6, 1741:8, 1749:12, 1784:20, 1785:9, 1788:24, 1796:7, 1824:22, 1825:9, 1826:2, 1827:4, 1827:18, 1829:17, 1831:21, 1843:9, 1846:1, 1848:17
**commonly** [3] - 1729:9, 1864:12, 1866:4
**commonsensically** [1] - 1789:1
**communicate** [5] - 1867:7, 1867:10, 1867:11, 1867:16, 1868:1
**communication** [2] - 1715:13, 1835:23
**community** [6] - 1719:20, 1745:15, 1753:2, 1805:8, 1806:5, 1822:4
**company** [1] - 1767:4
**compel** [4] - 1721:25, 1743:15, 1745:25, 1859:5
**compelled** [1] - 1809:23
**compelling** [2] - 1769:2, 1802:23
**compensate** [1] - 1784:5
**competing** [4] - 1838:24, 1839:5, 1840:6, 1840:20
**competition** [6] - 1716:9, 1721:6, 1721:9, 1753:1, 1787:5, 1809:4
**competitor** [4] - 1748:17, 1809:5, 1837:10
**competitors** [2] - 1721:9, 1769:12
**complain** [1] - 1790:23
**complained** [1] - 1790:20
**complete** [7] - 1715:25, 1716:1, 1742:13, 1752:9, 1821:11, 1874:12, 1874:19
**completed** [1] - 1861:23
**completely** [3] - 1752:13, 1812:15, 1859:14
**compose** [2] - 1713:20, 1742:8
**comprehensibly** [1] - 1804:23
**concede** [4] - 1768:16, 1813:2, 1813:3, 1813:5
**concentrating** [1] - 1713:22
**concern** [6] - 1758:22, 1822:3, 1832:13, 1832:14, 1858:13, 1866:14
**concerned** [2] - 1770:19, 1819:20
**concerning** [2] - 1763:21, 1860:15
**concerns** [1] - 1831:18
**conclude** [3] - 1805:1, 1813:8, 1825:12
**concluded** [5] - 1754:15, 1815:17, 1871:7, 1873:18, 1875:2
**conclusion** [2] - 1733:15, 1825:23
**conclusive** [2] - 1773:17
**conclusively** [1] - 1854:9
**condemn** [1] - 1790:5
**condemnations** [1] - 1806:23
**condemned** [2] - 1782:6, 1782:7
**condemning** [2] - 1802:16, 1812:16
**condition** [2] - 1750:13, 1859:11
**condom** [1] - 1767:23
**condoms** [17] - 1715:11, 1727:7, 1729:7, 1729:8, 1738:9, 1739:25, 1744:24, 1759:9, 1760:14, 1762:21, 1768:1, 1800:15, 1835:19, 1839:10,

1861:15
**conduct** [29] - 1722:14, 1728:9, 1739:23, 1766:25, 1781:15, 1781:21, 1782:25, 1787:4, 1792:16, 1793:1, 1793:4, 1817:23, 1817:25, 1841:2, 1841:23, 1843:3, 1845:25, 1852:24, 1853:10, 1854:6, 1857:17, 1861:1, 1861:10, 1861:16, 1861:18, 1861:20, 1861:21, 1870:20
**conducted** [1] - 1737:18
**confederates** [1] - 1848:5
**conference** [6] - 1754:15, 1821:2, 1871:7, 1873:18, 1873:22, 1875:2
**conferences** [1] - 1820:23
**conferring** [1] - 1873:19
**confident** [4] - 1758:25, 1804:24, 1805:2, 1816:7
**confirmed** [4] - 1730:13, 1737:9, 1743:5, 1751:19
**conflicts** [1] - 1831:12
**confronting** [1] - 1742:1
**confusion** [1] - 1742:18
**Congress** [1] - 1841:19
**conjunction** [1] - 1750:15
**connect** [1] - 1776:1
**connected** [1] - 1733:8
**connection** [9] - 1714:3, 1714:4, 1723:3, 1727:14, 1729:25, 1739:8, 1740:9, 1750:9, 1844:20
**connections** [5] - 1726:24, 1728:15, 1732:25, 1733:10, 1733:13
**consensual** [2] - 1737:10, 1755:25
**consider** [33] - 1750:14, 1759:19, 1775:5, 1781:13, 1782:17, 1789:15, 1789:16, 1805:23, 1808:15, 1816:4, 1819:18, 1820:14, 1821:15, 1824:2, 1826:25, 1827:3, 1827:13, 1827:22, 1829:8, 1830:18, 1831:13, 1831:15, 1832:5, 1832:19, 1833:10, 1843:8, 1843:20, 1844:6, 1849:5, 1859:10, 1863:11, 1869:22, 1870:15
**consideration** [10] - 1750:11, 1776:11, 1804:14, 1822:8, 1822:10, 1823:10, 1828:14, 1847:11, 1866:20, 1869:5
**considerations** [2] - 1808:19, 1829:10
**considered** [11] - 1783:6, 1826:16, 1826:18, 1831:6, 1833:6, 1849:1, 1849:12, 1860:17, 1861:7, 1868:23, 1871:13
**considering** [3] - 1808:13, 1809:8, 1826:3
**consistent** [10] - 1747:11, 1747:14, 1747:16, 1747:18, 1749:21, 1752:5, 1791:2, 1795:15, 1810:15, 1828:3
**consistently** [1] - 1783:19
**consists** [2] - 1820:11, 1826:12
**conspiracy** [108] - 1722:20, 1723:17, 1723:20, 1723:21, 1724:2, 1724:3, 1724:5, 1724:8, 1724:10, 1724:14, 1725:18, 1725:24, 1726:21, 1729:19,

1730:4, 1733:14, 1733:18, 1801:10, 1801:11, 1801:14, 1801:19, 1802:2, 1808:23, 1808:25, 1813:2, 1833:19, 1833:22, 1834:23, 1834:25, 1835:3, 1835:7, 1835:11, 1835:14, 1835:17, 1835:21, 1836:1, 1836:7, 1836:12, 1836:15, 1836:18, 1836:21, 1837:1, 1837:4, 1837:8, 1837:13, 1837:14, 1841:4, 1841:5, 1841:9, 1841:14, 1841:16, 1841:17, 1841:20, 1841:21, 1842:5, 1842:6, 1842:7, 1842:8, 1842:10, 1842:14, 1843:1, 1843:5, 1843:14, 1843:15, 1843:16, 1843:18, 1843:19, 1843:21, 1844:1, 1844:7, 1844:12, 1844:15, 1844:21, 1844:25, 1845:12, 1845:13, 1845:15, 1845:21, 1845:22, 1846:3, 1846:8, 1846:11, 1846:15, 1846:20, 1846:23, 1846:25, 1847:4, 1847:6, 1847:14, 1847:15, 1848:1, 1848:9, 1848:11, 1848:14, 1848:17, 1848:18, 1848:23, 1848:25, 1849:1, 1849:11, 1849:12, 1850:1, 1866:9, 1866:11, 1870:5, 1870:6
**conspiracy's** [2] - 1845:2, 1845:14
**conspirator** [7] - 1842:16, 1844:9, 1846:19, 1847:18, 1849:6, 1870:20, 1871:17
**conspirator's** [1] - 1845:5
**conspiratorial** [1] - 1847:24
**conspirators** [11] - 1724:4, 1738:21, 1801:12, 1837:14, 1840:24, 1844:17, 1845:9, 1847:5, 1847:12, 1848:6, 1848:13
**conspire** [2] - 1725:16, 1834:13
**constantly** [1] - 1749:10
**constitute** [3] - 1864:24, 1865:2, 1865:5
**constitutes** [2] - 1732:21, 1848:1
**constitution** [1] - 1757:11
**Constitution** [5] - 1778:6, 1808:5, 1808:7, 1808:8, 1823:19
**constitutional** [3] - 1766:15, 1799:8, 1816:2
**constrained** [2] - 1809:22, 1812:3
**consult** [2] - 1869:1, 1873:16
**CONT** [1] - 1712:1
**contacts** [7] - 1729:20, 1729:23, 1729:24, 1730:2, 1735:13, 1738:4, 1797:12
**contained** [2] - 1822:14, 1833:3
**containing** [1] - 1829:21
**contains** [1] - 1832:17
**context** [3] - 1730:7, 1809:18, 1843:5
**continue** [9] - 1750:17, 1750:19, 1755:16, 1793:20, 1809:12, 1810:1, 1810:5, 1823:15, 1859:7
**continued** [5] - 1771:5, 1781:7, 1781:9, 1837:6, 1846:21
**CONTINUED** [1] - 1711:10
**continues** [2] - 1782:18, 1786:16
**continuing** [3] - 1755:1, 1770:17,

1783:5
**contradicted** [3] - 1828:4, 1828:8, 1831:10
**contrast** [1] - 1742:14
**control** [23] - 1715:22, 1716:2, 1716:5, 1717:13, 1718:2, 1721:7, 1722:10, 1723:12, 1741:20, 1744:14, 1752:25, 1805:24, 1806:1, 1806:4, 1806:7, 1807:8, 1815:14, 1863:25, 1864:1, 1865:8, 1865:14, 1865:15, 1865:23
**controls** [2] - 1782:16, 1803:22
**convenience** [1] - 1868:3
**converted** [1] - 1864:16
**convict** [3] - 1802:25, 1816:13, 1826:11
**convicted** [2] - 1845:13, 1866:21
**convicting** [1] - 1825:3
**conviction** [1] - 1869:9
**convince** [3] - 1767:6, 1774:7, 1874:15
**convinced** [6] - 1759:15, 1760:5, 1762:9, 1823:8, 1823:16, 1869:8
**cooperate** [1] - 1842:22
**cooperating** [1] - 1755:21
**copies** [4] - 1818:23, 1818:25, 1819:1, 1819:6
**correct** [3] - 1778:18, 1870:22, 1876:9
**correction** [1] - 1815:18
**correctly** [1] - 1760:25
**correspond** [1] - 1730:20
**corroborate** [3] - 1747:20, 1766:25, 1767:4
**corroborated** [4] - 1732:24, 1735:12, 1742:20, 1743:25
**corroboration** [1] - 1746:20
**counsel** [14] - 1713:6, 1742:5, 1776:24, 1777:7, 1806:9, 1807:25, 1813:2, 1818:14, 1831:4, 1832:4, 1869:14, 1872:17, 1873:19, 1875:23
**count** [21] - 1722:15, 1734:9, 1737:20, 1759:7, 1759:12, 1760:22, 1762:17, 1764:1, 1767:16, 1808:25, 1832:18, 1832:19, 1850:2, 1850:13, 1850:23, 1854:19, 1856:20, 1862:2, 1868:5, 1868:6
**Count** [89] - 1723:16, 1723:18, 1723:20, 1724:17, 1725:23, 1725:25, 1732:22, 1734:6, 1736:21, 1736:23, 1737:20, 1738:24, 1739:5, 1739:10, 1739:11, 1739:12, 1740:7, 1740:8, 1740:10, 1740:13, 1744:17, 1745:24, 1746:4, 1748:23, 1750:8, 1759:11, 1759:16, 1759:17, 1759:19, 1759:22, 1759:23, 1759:25, 1760:2, 1760:20, 1760:21, 1760:22, 1760:23, 1761:9, 1762:12, 1762:13, 1762:18, 1763:11, 1763:12, 1763:17, 1765:13, 1765:20, 1765:21, 1775:2, 1775:3, 1775:4, 1775:5, 1775:6, 1775:8, 1775:10, 1775:11, 1775:14, 1775:25, 1776:8, 1776:9, 1799:10, 1799:11, 1801:10, 1803:17, 1813:11, 1817:14, 1833:19, 1833:21,

1849:16, 1849:23, 1849:25, 1850:11, 1850:21, 1854:16, 1855:18, 1856:16, 1862:1, 1862:8, 1862:16, 1862:19, 1862:23, 1863:9, 1863:10, 1870:2, 1870:4
**countries** [1] - 1804:5
**country** [15] - 1714:24, 1729:8, 1734:18, 1734:21, 1740:18, 1756:17, 1764:5, 1764:10, 1769:8, 1816:2, 1816:10, 1816:11, 1816:13
**counts** [10] - 1722:19, 1726:4, 1733:15, 1733:23, 1740:17, 1753:13, 1759:24, 1813:3, 1832:17, 1832:22
**Counts** [9] - 1723:16, 1733:22, 1736:22, 1738:23, 1849:14, 1850:9, 1851:17, 1851:21, 1853:1
**County** [3] - 1770:13, 1770:21, 1839:6
**couple** [10] - 1713:19, 1726:16, 1757:3, 1757:5, 1758:13, 1759:12, 1767:10, 1778:21, 1807:25, 1815:4
**course** [40] - 1716:4, 1717:6, 1718:1, 1718:25, 1726:16, 1726:23, 1730:19, 1734:10, 1739:6, 1745:11, 1746:5, 1748:23, 1748:25, 1749:4, 1758:12, 1758:24, 1759:6, 1763:1, 1764:20, 1777:16, 1783:23, 1783:24, 1783:25, 1786:20, 1787:17, 1794:10, 1795:13, 1798:1, 1800:15, 1806:25, 1810:25, 1824:6, 1827:6, 1837:12, 1842:24, 1847:5, 1859:20, 1862:7, 1870:4, 1875:13
**COURT** [62] - 1711:1, 1713:5, 1713:10, 1713:12, 1713:20, 1713:23, 1714:2, 1714:7, 1714:9, 1714:11, 1722:18, 1741:22, 1753:16, 1753:18, 1753:24, 1754:2, 1754:8, 1754:11, 1754:16, 1774:10, 1776:14, 1776:24, 1777:2, 1804:18, 1809:11, 1809:14, 1810:1, 1810:5, 1816:16, 1817:8, 1817:16, 1817:25, 1818:4, 1818:7, 1818:10, 1818:16, 1818:18, 1869:17, 1869:22, 1870:9, 1870:11, 1870:14, 1870:19, 1870:23, 1871:2, 1871:5, 1871:8, 1872:8, 1872:16, 1872:20, 1872:25, 1873:7, 1873:11, 1873:16, 1873:21, 1874:5, 1874:7, 1874:12, 1874:20, 1874:23, 1875:3, 1875:23
**court** [13] - 1783:2, 1788:25, 1789:2, 1828:5, 1830:14, 1830:15, 1830:17, 1830:21, 1862:14, 1862:20, 1863:1, 1867:5, 1867:13
**Court** [11] - 1713:3, 1714:21, 1723:8, 1723:14, 1755:12, 1776:18, 1776:22, 1806:14, 1817:1, 1817:6, 1876:3
**Court's** [2] - 1817:19, 1818:6
**courtesy** [1] - 1803:23
**Courthouse** [1] - 1712:23
**courtroom** [17] - 1732:13, 1733:17, 1741:10, 1749:1, 1754:6, 1758:24, 1768:2, 1770:6, 1804:12, 1807:9,

1808:18, 1809:17, 1810:2, 1810:6, 1815:15, 1827:7, 1868:15
**cousins** [4] - 1734:22, 1734:23, 1764:8, 1765:3
**covering** [1] - 1715:4
**coverings** [1] - 1738:19
**coyote** [1] - 1741:8
**cream** [2] - 1749:22, 1749:23
**create** [2] - 1748:5, 1795:19
**created** [1] - 1815:13
**credibility** [2] - 1807:12, 1820:1
**credible** [1] - 1742:19
**credit** [3] - 1718:5, 1802:17, 1874:10
**crime** [53] - 1740:9, 1740:12, 1740:16, 1773:12, 1775:8, 1775:25, 1794:2, 1794:7, 1796:20, 1801:11, 1801:14, 1802:13, 1832:18, 1841:9, 1841:13, 1841:15, 1841:18, 1841:20, 1845:20, 1848:8, 1848:10, 1849:17, 1850:10, 1851:5, 1851:15, 1862:2, 1862:5, 1862:13, 1862:18, 1862:20, 1862:23, 1862:25, 1863:3, 1863:5, 1863:8, 1863:12, 1863:17, 1863:20, 1863:22, 1864:2, 1864:4, 1864:5, 1864:7, 1864:21, 1865:3, 1865:9, 1865:11, 1865:16, 1865:24, 1866:10, 1871:11, 1871:16, 1871:20
**crimes** [7] - 1736:4, 1778:8, 1816:14, 1821:23, 1822:5, 1839:2, 1841:12
**criminal** [23] - 1715:7, 1755:14, 1763:2, 1781:17, 1816:10, 1822:3, 1822:23, 1824:4, 1834:9, 1834:18, 1834:22, 1836:22, 1841:6, 1841:22, 1841:24, 1845:24, 1848:1, 1849:19, 1850:8, 1850:19, 1851:3, 1854:24
**Criminal** [1] - 1711:5
**criminalized** [1] - 1725:20
**criminals** [2] - 1749:16, 1797:4
**cross** [5] - 1742:4, 1769:22, 1770:7, 1774:15, 1774:25
**cross-examination** [2] - 1769:22, 1770:7
**crossing** [2] - 1737:16, 1853:15
**Crown** [2] - 1727:7, 1729:7
**CRR** [2] - 1712:23, 1876:14
**crude** [1] - 1767:24
**CSO** [1] - 1872:6
**cuffs** [1] - 1787:1
**Cunningham** [9] - 1711:14, 1723:2, 1751:24, 1769:22, 1777:18, 1785:15, 1803:25, 1804:18, 1816:16
**CUNNINGHAM** [9] - 1804:19, 1809:15, 1810:7, 1870:16, 1870:22, 1871:1, 1871:4, 1874:4, 1874:6
**Cunningham's** [1] - 1794:11
**curiosity** [1] - 1798:9
**custody** [1] - 1793:13
**customer** [5] - 1731:16, 1735:24, 1743:20, 1772:3, 1774:18
**customers** [3] - 1725:7, 1735:19,

1735:23
**cut** [2] - 1747:16, 1773:4
**cutaneous** [1] - 1747:3

# D

**D.C** [16] - 1731:19, 1731:24, 1732:3, 1735:4, 1735:7, 1736:8, 1738:11, 1738:13, 1743:6, 1762:22, 1762:25, 1764:25, 1765:2, 1765:16, 1766:18, 1768:19
**dangerous** [2] - 1791:8, 1791:10
**dare** [1] - 1760:4
**dark** [2] - 1715:4, 1738:19
**date** [13] - 1736:10, 1761:4, 1762:11, 1762:18, 1791:20, 1817:25, 1833:15, 1833:16, 1833:18, 1846:22, 1846:23, 1846:25, 1868:12
**Date** [1] - 1876:14
**dated** [1] - 1767:22
**dates** [7] - 1733:25, 1734:1, 1759:24, 1767:8, 1811:9, 1813:16, 1833:17
**daughter** [6] - 1743:10, 1743:11, 1743:23, 1744:13, 1770:20, 1794:4
**days** [6] - 1715:14, 1760:4, 1770:11, 1790:11, 1798:11, 1811:16
**de** [13] - 1711:6, 1711:16, 1715:19, 1727:8, 1727:11, 1727:20, 1728:7, 1728:12, 1729:12, 1833:25, 1836:22, 1839:7, 1877:2
**deal** [7] - 1763:15, 1767:23, 1767:24, 1768:3, 1768:4, 1784:8, 1784:13
**deals** [4] - 1762:15, 1763:12, 1870:5
**death** [9] - 1718:20, 1728:6, 1808:11, 1808:14, 1808:20, 1809:5, 1811:10, 1838:8, 1840:5
**debase** [1] - 1811:19
**debasing** [1] - 1752:22
**December** [5] - 1770:2, 1792:25, 1817:15, 1817:18, 1860:10
**decent** [1] - 1799:5
**decide** [11] - 1760:17, 1767:5, 1768:22, 1769:1, 1775:17, 1818:20, 1820:3, 1825:19, 1831:9, 1854:1, 1869:4
**decided** [5] - 1731:18, 1820:24, 1824:7, 1827:10, 1874:8
**deciding** [8] - 1773:2, 1824:12, 1829:11, 1831:13, 1832:6, 1832:8, 1843:18, 1849:6
**decision** [15] - 1755:13, 1778:17, 1792:23, 1796:2, 1816:21, 1821:16, 1821:24, 1825:12, 1827:17, 1828:21, 1829:7, 1830:19, 1858:15, 1874:13, 1874:15
**decision-making** [2] - 1821:24, 1874:13
**decisions** [3] - 1778:6, 1804:14, 1805:20
**declarations** [2] - 1848:16, 1848:20
**deduction** [1] - 1825:23

**deductions** [1] - 1715:10
**deemed** [3] - 1841:19, 1844:1, 1848:18
**defacement** [1] - 1743:24
**defendant** [55] - 1722:11, 1742:14, 1822:18, 1822:21, 1822:22, 1822:25, 1823:2, 1823:5, 1823:6, 1823:8, 1823:13, 1823:15, 1823:18, 1823:19, 1823:21, 1823:22, 1823:25, 1824:1, 1824:7, 1824:12, 1825:3, 1826:10, 1832:8, 1832:24, 1833:7, 1833:9, 1833:11, 1841:3, 1841:13, 1841:17, 1843:14, 1843:19, 1844:1, 1844:5, 1844:6, 1844:8, 1844:11, 1844:21, 1844:24, 1845:13, 1845:23, 1846:6, 1846:14, 1848:8, 1848:23, 1851:5, 1851:22, 1857:6, 1860:6, 1860:11, 1866:13, 1866:18, 1866:21, 1868:6, 1868:9
**DEFENDANT** [7] - 1741:16, 1809:9, 1809:13, 1809:24, 1810:3, 1877:8, 1877:9
**Defendant** [118] - 1711:16, 1711:18, 1715:18, 1715:20, 1721:14, 1724:1, 1726:8, 1732:13, 1734:11, 1734:14, 1736:20, 1738:22, 1739:9, 1740:8, 1740:12, 1740:14, 1745:18, 1745:22, 1747:6, 1747:24, 1751:17, 1806:10, 1808:6, 1812:25, 1823:2, 1823:12, 1824:4, 1833:25, 1834:4, 1836:22, 1837:9, 1838:2, 1838:7, 1838:11, 1838:14, 1838:20, 1838:23, 1839:3, 1839:12, 1839:15, 1839:19, 1839:23, 1840:2, 1840:8, 1840:12, 1840:16, 1840:19, 1840:23, 1842:4, 1843:20, 1845:2, 1845:12, 1846:8, 1846:10, 1847:10, 1849:2, 1850:9, 1850:12, 1850:16, 1850:25, 1851:7, 1851:9, 1852:2, 1852:4, 1852:7, 1852:9, 1852:21, 1852:23, 1854:21, 1855:2, 1855:7, 1855:15, 1855:22, 1856:8, 1857:8, 1857:13, 1857:14, 1857:22, 1858:8, 1858:11, 1859:9, 1859:18, 1859:20, 1859:22, 1860:1, 1860:5, 1860:14, 1860:21, 1861:22, 1861:24, 1862:3, 1862:11, 1862:18, 1862:21, 1862:25, 1863:8, 1863:15, 1863:19, 1863:21, 1863:23, 1864:9, 1864:14, 1864:18, 1864:20, 1864:22, 1865:1, 1865:6, 1865:8, 1865:11, 1865:13, 1865:18, 1865:21, 1866:1, 1866:7, 1871:14
**defendant's** [10] - 1715:25, 1821:18, 1831:7, 1832:16, 1844:14, 1844:19, 1845:4, 1845:5, 1845:19, 1849:7
**Defendant's** [9] - 1751:16, 1849:3, 1852:24, 1853:9, 1857:17, 1861:1, 1861:18, 1861:20, 1861:21
**Defendants** [49] - 1711:7, 1715:1, 1715:18, 1724:3, 1724:20, 1724:21, 1725:12, 1725:24, 1726:1, 1739:13,

1739:19, 1739:21, 1740:5, 1741:15, 1745:24, 1753:8, 1804:25, 1805:4, 1813:12, 1822:5, 1822:16, 1832:18, 1833:3, 1833:5, 1833:22, 1834:13, 1834:25, 1835:4, 1835:8, 1835:12, 1835:15, 1835:18, 1835:22, 1836:2, 1836:8, 1836:13, 1836:16, 1836:19, 1837:5, 1837:18, 1837:21, 1837:24, 1848:3, 1850:4, 1856:17, 1856:22, 1868:4, 1873:19
**defendants** [9] - 1727:15, 1728:15, 1738:24, 1753:14, 1816:6, 1824:5, 1837:2, 1848:6, 1849:16
**Defendants'** [1] - 1739:23
**defending** [1] - 1804:6
**Defense** [7] - 1724:25, 1725:10, 1742:12, 1759:18, 1825:18, 1828:17, 1869:19
**defense** [3] - 1742:5, 1781:17, 1806:18
**defensive** [1] - 1742:12
**define** [1] - 1857:16
**defined** [5] - 1744:18, 1744:19, 1852:8, 1855:10, 1859:25
**definition** [2] - 1861:6, 1864:6
**degrade** [1] - 1792:4
**degrading** [1] - 1752:22
**degree** [5] - 1768:17, 1792:12, 1793:20, 1859:14, 1861:13
**degrees** [1] - 1853:17
**deliberate** [3] - 1819:19, 1860:16, 1869:2
**deliberating** [1] - 1796:23
**deliberations** [19] - 1758:3, 1814:22, 1816:24, 1823:3, 1823:16, 1824:3, 1863:6, 1866:15, 1866:23, 1867:1, 1867:4, 1867:6, 1867:20, 1868:7, 1869:6, 1871:24, 1875:13, 1875:16, 1875:21
**deliberative** [1] - 1875:19
**deliver** [1] - 1735:9
**delivered** [1] - 1839:12
**delivering** [1] - 1816:18
**demands** [1] - 1752:13
**demean** [1] - 1792:4
**demonstrated** [1] - 1715:23
**demonstrative** [2] - 1814:21, 1814:24
**denial** [3] - 1807:13, 1807:14, 1807:18
**denials** [1] - 1807:20
**Dennis** [1] - 1872:6
**Department** [3] - 1770:14, 1770:21, 1792:6
**department** [1] - 1770:16
**departure** [1] - 1806:24
**dependent** [2] - 1744:12, 1752:15
**depicted** [1] - 1719:2
**depicting** [1] - 1840:4
**deportation** [2] - 1731:4, 1736:2
**derogatory** [1] - 1757:21
**describe** [3] - 1784:19, 1802:10, 1834:9
**described** [4] - 1735:24, 1738:15,

1771:19, 1865:4
**describes** [1] - 1833:5
**description** [4] - 1780:1, 1780:2, 1780:20, 1849:25
**deserve** [2] - 1753:9, 1753:10
**deserves** [3] - 1808:8, 1828:24, 1829:13
**deserving** [1] - 1828:13
**design** [1] - 1843:9
**designed** [1] - 1864:15
**desire** [2] - 1716:2, 1806:1
**desperate** [3] - 1752:1, 1752:21, 1773:13
**desperately** [1] - 1792:2
**desperation** [4] - 1774:2, 1805:13, 1810:21
**despite** [3] - 1751:8, 1751:9, 1841:17
**destinations** [1] - 1836:16
**detail** [3] - 1805:6, 1831:19, 1842:18
**details** [2] - 1844:25, 1845:14
**Detective** [3] - 1717:23, 1770:9, 1779:14
**determination** [3] - 1829:18, 1831:15, 1833:8
**determine** [8] - 1819:15, 1820:1, 1831:23, 1832:14, 1849:7, 1852:17, 1863:6, 1866:17
**determined** [1] - 1820:4
**determining** [7] - 1820:5, 1827:18, 1832:1, 1843:7, 1844:6, 1859:8, 1863:13
**developed** [1] - 1821:14
**devices** [2] - 1756:2, 1811:12
**devised** [1] - 1854:2
**diagrams** [1] - 1759:8
**dialogue** [1] - 1807:1
**died** [3] - 1777:20, 1778:1, 1796:24
**differ** [2] - 1761:14, 1830:23
**difference** [2] - 1830:3, 1873:25
**differences** [1] - 1810:24
**different** [21] - 1749:19, 1755:6, 1759:24, 1760:14, 1760:22, 1768:15, 1768:21, 1773:7, 1780:11, 1780:24, 1781:2, 1781:3, 1785:21, 1785:22, 1789:23, 1794:5, 1825:15, 1828:5, 1832:18, 1845:8, 1853:16
**differentiation** [1] - 1764:18
**difficult** [3] - 1738:1, 1805:21, 1813:19
**difficulty** [1] - 1811:6
**digits** [1] - 1785:21
**dilapidated** [1] - 1722:7
**dinner** [1] - 1743:9
**dire** [1] - 1805:14
**direct** [18] - 1719:17, 1742:12, 1744:14, 1769:16, 1769:21, 1798:12, 1824:14, 1824:15, 1824:19, 1825:1, 1825:2, 1825:16, 1825:25, 1826:8, 1843:1, 1853:3, 1853:6, 1854:4
**directed** [7] - 1732:2, 1745:21, 1750:18, 1783:24, 1789:10, 1859:18, 1859:22
**directing** [1] - 1785:8

**direction** [1] - 1736:12
**directly** [3] - 1747:25, 1775:3, 1778:25
**dirty** [3] - 1715:3, 1738:19, 1746:15
**disbelieve** [1] - 1795:14
**disclosed** [1] - 1853:11
**discuss** [2] - 1776:16, 1821:20
**discussed** [1] - 1846:1
**discussion** [4] - 1723:16, 1753:19, 1869:15, 1872:18
**discussions** [1] - 1809:18
**disguise** [1] - 1801:17
**dismiss** [1] - 1742:16
**disobedience** [1] - 1773:10
**disobey** [1] - 1842:25
**dispassionate** [2] - 1753:7, 1794:1
**dispassionately** [1] - 1816:4
**dispatched** [1] - 1808:4
**displayed** [1] - 1728:21
**displaying** [1] - 1864:24
**disputed** [2] - 1824:21, 1825:12
**disputing** [1] - 1725:1
**disregard** [21] - 1715:25, 1716:1, 1766:7, 1766:14, 1768:10, 1783:16, 1791:7, 1791:23, 1792:25, 1793:1, 1793:2, 1793:4, 1807:20, 1817:15, 1817:21, 1826:23, 1830:22, 1842:25, 1860:14, 1860:16
**disregarded** [1] - 1827:8
**dissatisfaction** [1] - 1790:17
**distant** [1] - 1854:3
**distasteful** [1] - 1747:22
**distinct** [2] - 1841:10, 1845:8
**distinction** [1] - 1825:2
**distinguish** [1] - 1808:24
**distinguished** [1] - 1858:19
**distributing** [1] - 1716:21
**District** [6] - 1713:2, 1713:3, 1837:16, 1861:5, 1861:7, 1862:11
**DISTRICT** [2] - 1711:1, 1711:1
**districts** [1] - 1755:6
**divert** [1] - 1836:24
**DIVISION** [1] - 1711:2
**Division** [1] - 1770:13
**DNA** [1] - 1800:21
**Docket** [1] - 1711:5
**doctor** [2] - 1747:2, 1810:11
**document** [10] - 1833:21, 1833:23, 1833:25, 1834:4, 1834:9, 1842:4, 1842:12, 1843:17, 1856:16
**documents** [4] - 1769:18, 1769:19, 1827:11, 1829:21
**dog** [1] - 1815:4
**dollar** [1] - 1774:14
**domestic** [4] - 1717:17, 1771:20, 1773:11, 1781:15
**domination** [1] - 1803:7
**Dominican** [1] - 1718:13
**dominion** [2] - 1863:25, 1865:13
**done** [24] - 1732:18, 1746:2, 1750:15,

1777:19, 1786:8, 1789:21, 1790:13, 1791:16, 1797:22, 1797:23, 1803:4, 1806:19, 1807:6, 1847:17, 1848:17, 1848:24, 1849:2, 1849:9, 1849:11, 1854:8, 1855:25, 1856:1, 1858:3, 1858:4
**door** [4] - 1747:8, 1758:3, 1763:10, 1773:4
**doorman** [1] - 1774:19
**doormen** [1] - 1786:12
**doors** [3] - 1719:20, 1728:23, 1730:23
**doorway** [1] - 1720:17
**dot** [1] - 1774:24
**doubt** [59] - 1739:13, 1740:11, 1753:6, 1759:16, 1760:6, 1760:10, 1761:24, 1762:5, 1762:9, 1763:3, 1767:6, 1768:13, 1771:16, 1774:8, 1775:20, 1778:7, 1787:19, 1796:2, 1811:6, 1814:4, 1816:11, 1816:12, 1822:21, 1823:5, 1823:9, 1823:17, 1823:22, 1825:4, 1826:11, 1832:16, 1833:10, 1842:2, 1842:10, 1843:13, 1847:3, 1847:16, 1848:22, 1851:7, 1851:21, 1852:15, 1853:19, 1855:6, 1855:22, 1856:8, 1857:8, 1857:22, 1858:7, 1860:14, 1860:21, 1861:1, 1862:18, 1862:25, 1863:7, 1863:15, 1864:19, 1865:7, 1866:8, 1866:18
**down** [19] - 1714:25, 1719:11, 1736:24, 1737:17, 1746:24, 1747:5, 1747:14, 1767:11, 1767:13, 1767:18, 1773:6, 1773:22, 1773:24, 1774:3, 1774:5, 1775:14, 1801:4, 1811:18
**downstairs** [1] - 1720:1
**Dr** [3] - 1747:9, 1747:9, 1773:15, 1773:18, 1810:12, 1828:25, 1829:9
**draft** [2] - 1777:11, 1787:11
**dragged** [1] - 1778:11
**draw** [11] - 1793:7, 1820:2, 1820:3, 1825:17, 1825:18, 1825:20, 1825:24, 1826:4, 1827:4, 1833:13, 1845:11
**drawing** [2] - 1825:21, 1826:1
**drawn** [6] - 1824:1, 1825:16, 1826:9, 1844:18, 1853:12, 1854:15
**drive** [2] - 1764:23, 1764:24
**driven** [1] - 1791:11
**driver's** [1] - 1838:18
**driving** [3] - 1718:14, 1727:2, 1779:1
**dropping** [1] - 1732:19
**drove** [1] - 1765:3
**DSS** [2] - 1770:21, 1793:13
**due** [1] - 1808:1
**Dueñas** [53] - 1717:13, 1722:1, 1722:3, 1722:12, 1728:25, 1739:6, 1740:4, 1740:6, 1740:10, 1740:14, 1740:17, 1741:2, 1741:4, 1741:10, 1741:23, 1742:7, 1742:24, 1743:8, 1743:17, 1743:19, 1744:7, 1745:2, 1745:13, 1746:5, 1746:7, 1747:5, 1747:6, 1747:25, 1748:5, 1748:24, 1748:25,

1749:18, 1750:16, 1750:18, 1750:23, 1751:12, 1751:18, 1753:3, 1766:11, 1779:6, 1802:2, 1807:17, 1809:8, 1809:17, 1809:18, 1810:16, 1810:23, 1813:6, 1813:16, 1857:1, 1857:10, 1857:24, 1858:9

**Dueñas'** [9] - 1742:18, 1746:21, 1747:16, 1747:20, 1748:20, 1750:11, 1751:4, 1751:15

**Dulce** [1] - 1728:1

**dumb** [1] - 1797:5

**duration** [1] - 1845:6

**during** [34] - 1716:13, 1718:25, 1719:24, 1730:21, 1737:17, 1741:8, 1755:1, 1755:20, 1760:19, 1785:15, 1788:4, 1806:2, 1810:10, 1810:22, 1815:1, 1815:23, 1819:3, 1820:9, 1825:6, 1830:13, 1832:3, 1832:22, 1842:7, 1849:8, 1862:5, 1862:13, 1863:6, 1863:17, 1864:20, 1867:6, 1869:6, 1875:12, 1875:15

**duty** [14] - 1758:19, 1777:21, 1805:5, 1818:20, 1819:13, 1819:14, 1820:18, 1820:22, 1821:9, 1821:11, 1822:23, 1831:22, 1866:15, 1869:1

**duty-bound** [1] - 1758:19

**Duvall** [1] - 1801:7

**dwellings** [1] - 1835:5

## E

**e-mail** [1] - 1817:12

**early** [1] - 1716:7

**earn** [1] - 1744:15

**earnings** [2] - 1734:22, 1753:3

**earth** [1] - 1804:5

**easels** [1] - 1714:1

**easier** [1] - 1806:25

**easiest** [1] - 1814:8

**easily** [3] - 1721:5, 1752:20, 1797:14

**East** [1] - 1714:25

**Easton** [3] - 1726:10, 1839:13, 1839:17

**easy** [1] - 1745:16

**economic** [1] - 1861:11

**Ed** [1] - 1723:5

**edit** [1] - 1777:11

**education** [8] - 1722:4, 1741:5, 1742:18, 1750:12, 1805:15, 1859:12, 1872:22, 1874:18

**Edward** [1] - 1712:3

**effect** [4] - 1821:6, 1821:8, 1837:13, 1869:9

**effort** [1] - 1815:14

**eight** [5] - 1716:16, 1740:20, 1788:2, 1788:14, 1804:3

**either** [14] - 1723:23, 1724:3, 1724:12, 1734:3, 1739:19, 1746:14, 1769:1, 1773:1, 1817:23, 1824:5, 1825:25, 1842:21, 1863:23, 1866:9

**El** [33] - 1716:12, 1716:16, 1716:19, 1717:2, 1717:7, 1717:9, 1717:15, 1717:16, 1717:18, 1717:24, 1718:2, 1718:5, 1718:7, 1746:16, 1748:20, 1756:21, 1759:2, 1779:21, 1779:24, 1787:24, 1787:25, 1788:4, 1788:7, 1788:13, 1792:2, 1794:14, 1796:7, 1808:11, 1808:17, 1808:20, 1809:19, 1815:8, 1834:2

**elbow** [5] - 1746:24, 1747:12, 1747:13, 1773:6, 1773:21

**electronic** [1] - 1716:15

**Element** [1] - 1740:4

**element** [16] - 1765:17, 1842:13, 1847:7, 1851:18, 1852:3, 1852:14, 1853:13, 1858:6, 1859:24, 1860:3, 1860:12, 1861:17, 1863:13, 1864:7, 1865:25, 1870:5

**elements** [14] - 1722:22, 1722:23, 1723:9, 1723:21, 1724:19, 1725:14, 1734:10, 1739:10, 1759:21, 1763:22, 1780:15, 1800:4, 1833:12

**Elements** [1] - 1740:3

**elicit** [2] - 1807:4, 1813:19

**eliminate** [1] - 1716:8

**eloquent** [1] - 1814:16

**eloquently** [1] - 1804:22

**elsewhere** [10] - 1732:1, 1755:24, 1834:12, 1835:2, 1835:25, 1837:16, 1850:4, 1850:24, 1854:20, 1856:22

**embarrassment** [1] - 1741:25

**embrace** [1] - 1805:21

**embraced** [1] - 1806:22

**embracing** [1] - 1806:9

**emerge** [1] - 1753:13

**emotional** [2] - 1805:25, 1809:22

**emotions** [11] - 1757:17, 1757:18, 1758:4, 1758:6, 1758:9, 1758:14, 1758:18, 1758:22, 1776:6, 1809:20

**employed** [2] - 1828:12, 1835:9

**employee** [3] - 1718:9, 1840:12, 1840:15

**Employees** [1] - 1718:3

**employees** [3] - 1718:11, 1719:6, 1837:11

**employment** [2] - 1864:20, 1865:4

**emptiness** [1] - 1751:7

**encounter** [1] - 1745:4

**encountered** [1] - 1752:11

**encounters** [1] - 1767:7

**end** [16] - 1720:24, 1723:8, 1726:5, 1732:17, 1751:11, 1752:17, 1756:17, 1759:16, 1765:1, 1779:5, 1782:19, 1783:2, 1784:14, 1798:12, 1848:12

**ends** [1] - 1846:13

**enemies** [2] - 1769:14

**enforcement** [18] - 1717:17, 1719:11, 1729:14, 1737:23, 1749:13, 1752:11, 1806:11, 1810:25, 1814:5, 1814:7, 1814:8, 1822:3, 1828:11, 1828:12,

1828:18, 1828:23, 1832:12, 1836:24

**engage** [36] - 1715:2, 1724:22, 1733:19, 1734:15, 1734:18, 1736:12, 1743:15, 1744:20, 1745:20, 1750:22, 1765:7, 1765:14, 1774:9, 1806:3, 1807:3, 1808:23, 1812:19, 1834:17, 1834:20, 1835:24, 1836:5, 1837:22, 1849:18, 1850:7, 1850:18, 1851:2, 1851:11, 1853:2, 1853:21, 1854:23, 1855:16, 1856:9, 1857:4, 1859:17, 1859:21, 1860:19

**engaged** [16] - 1726:20, 1734:25, 1735:2, 1736:17, 1739:20, 1739:21, 1742:1, 1771:8, 1836:23, 1837:3, 1846:16, 1852:4, 1857:2, 1857:15, 1859:20, 1860:22

**engaging** [16] - 1736:19, 1750:20, 1769:5, 1771:14, 1774:6, 1774:9, 1839:21, 1840:1, 1840:10, 1840:14, 1840:25, 1851:12, 1851:16, 1853:14, 1855:4, 1856:14

**English** [6] - 1741:5, 1750:12, 1830:12, 1830:19, 1830:22, 1830:23

**English-language** [1] - 1830:19

**enjoy** [2] - 1784:15, 1811:8

**enjoyed** [5] - 1756:12, 1756:14, 1784:16, 1805:19, 1808:6

**enjoys** [1] - 1767:4

**enlist** [1] - 1757:4

**ensure** [2] - 1753:2, 1786:10

**enter** [5] - 1758:2, 1818:19, 1848:11, 1866:14, 1866:22

**entered** [4] - 1723:22, 1842:2, 1842:11, 1842:15

**entering** [1] - 1714:12

**enterprise** [4] - 1726:25, 1728:16, 1837:7, 1840:17

**enters** [3] - 1714:8, 1777:1, 1818:17

**entice** [8] - 1723:17, 1744:20, 1765:9, 1767:19, 1834:19, 1854:21, 1856:23, 1858:12

**enticed** [11] - 1734:12, 1739:14, 1765:18, 1766:3, 1766:5, 1771:1, 1855:8, 1855:23, 1857:9, 1857:23, 1860:7

**enticement** [14] - 1723:23, 1724:15, 1725:19, 1726:20, 1733:24, 1734:6, 1734:7, 1763:13, 1766:17, 1768:7, 1768:9, 1768:11, 1841:5, 1856:5

**enticing** [6] - 1763:13, 1765:14, 1854:16, 1855:3, 1855:18, 1857:20

**entire** [1] - 1802:23

**entirely** [2] - 1827:8, 1866:16

**ENTITLED** [1] - 1711:10

**entitled** [3] - 1821:19, 1822:10, 1876:11

**entitles** [1] - 1822:7

**environment** [4] - 1805:11, 1805:15, 1808:18, 1812:24

**equal** [1] - 1845:10

**equally** [3] - 1805:2, 1821:22, 1822:4

**equals** [1] - 1822:11
**equivocated** [1] - 1780:22
**Esau** [1] - 1834:5
**escalating** [1] - 1719:10
**Escobar** [1] - 1759:4
**Esmirna** [3] - 1857:10, 1857:24, 1858:9
**especially** [2] - 1746:18, 1805:7
**Esquire** [2] - 1711:17, 1711:19
**Esquivel** [3] - 1715:18, 1716:7, 1834:5
**essence** [1] - 1793:24
**essential** [1] - 1844:4
**essentially** [3] - 1725:10, 1734:20, 1813:20
**establish** [10] - 1733:10, 1733:18, 1801:8, 1839:14, 1842:10, 1843:13, 1846:2, 1847:3, 1853:13, 1854:4
**established** [9] - 1824:23, 1825:9, 1825:25, 1833:18, 1835:1, 1842:25, 1844:15, 1853:8, 1854:12
**establishes** [1] - 1728:15
**establishing** [1] - 1729:25
**et** [2] - 1765:18, 1877:2
**Ethelred** [2] - 1755:2, 1757:13
**ether** [1] - 1789:5
**evaluate** [4] - 1811:5, 1813:7, 1814:15, 1824:8
**evaluated** [1] - 1804:23
**evasive** [2] - 1742:13, 1811:3
**evening** [1] - 1817:11
**evenings** [1] - 1836:11
**events** [2] - 1815:23, 1854:14
**eventually** [2] - 1731:5, 1795:13
**everyday** [1] - 1827:18
**everywhere** [1] - 1760:17
**evidence** [170] - 1714:15, 1715:24, 1722:22, 1723:13, 1724:24, 1725:3, 1726:3, 1726:22, 1726:23, 1729:3, 1729:18, 1730:3, 1730:7, 1730:12, 1733:16, 1753:5, 1753:12, 1755:7, 1755:10, 1755:11, 1757:1, 1758:17, 1760:3, 1761:8, 1761:10, 1762:8, 1767:3, 1767:6, 1767:20, 1768:17, 1768:18, 1769:2, 1771:6, 1771:12, 1774:7, 1774:23, 1776:1, 1778:24, 1780:3, 1785:18, 1786:13, 1789:6, 1789:19, 1792:21, 1793:8, 1793:21, 1795:16, 1795:18, 1795:21, 1795:22, 1799:14, 1799:24, 1800:23, 1800:25, 1801:2, 1801:22, 1801:25, 1802:1, 1802:23, 1802:24, 1803:4, 1803:9, 1803:21, 1804:23, 1806:16, 1813:4, 1813:10, 1814:17, 1815:2, 1816:4, 1819:2, 1819:11, 1820:1, 1820:6, 1820:8, 1820:10, 1820:11, 1820:14, 1820:15, 1820:20, 1821:1, 1821:5, 1821:6, 1821:8, 1821:13, 1821:14, 1822:1, 1822:14, 1822:18, 1822:24, 1823:10, 1823:20, 1824:11, 1824:14, 1824:15, 1824:19, 1824:20, 1824:25, 1825:1, 1825:2, 1825:5, 1825:17,

1825:22, 1826:1, 1826:3, 1826:8, 1826:9, 1826:12, 1826:14, 1826:16, 1826:17, 1826:18, 1826:21, 1826:25, 1827:1, 1827:2, 1827:3, 1827:5, 1827:7, 1827:14, 1827:20, 1828:4, 1828:22, 1829:7, 1829:14, 1829:23, 1829:25, 1830:6, 1830:8, 1830:13, 1830:16, 1830:18, 1831:3, 1831:5, 1831:7, 1831:23, 1832:8, 1832:12, 1832:15, 1833:4, 1833:7, 1833:10, 1833:11, 1833:15, 1844:16, 1848:2, 1848:7, 1849:13, 1853:8, 1853:11, 1863:12, 1866:17, 1866:19, 1869:5, 1869:10, 1875:14, 1875:15, 1875:17, 1875:24
**evidencing** [1] - 1733:13
**evident** [1] - 1819:8
**evidently** [5] - 1760:7, 1762:2, 1764:9, 1766:21, 1766:25
**evoke** [1] - 1757:17
**evolutionary** [1] - 1770:24
**exact** [1] - 1797:4
**exactly** [10] - 1720:22, 1731:7, 1737:12, 1738:17, 1744:6, 1752:16, 1767:15, 1798:10, 1804:25, 1811:21
**exaggeration** [1] - 1858:20
**examination** [5] - 1742:5, 1769:16, 1769:22, 1770:7, 1774:16
**examine** [2] - 1824:8, 1875:23
**example** [7] - 1728:20, 1747:9, 1748:6, 1832:12, 1856:14, 1859:23, 1861:14
**except** [5] - 1788:1, 1797:10, 1799:8, 1814:18, 1859:17
**exception** [2] - 1773:19, 1814:18
**exceptions** [2] - 1742:17
**exchange** [2] - 1739:22, 1774:15
**exchanged** [1] - 1774:21
**exchanges** [1] - 1751:16
**exclude** [1] - 1771:15
**exclusive** [2] - 1819:25, 1820:16
**exclusively** [1] - 1831:22
**excuse** [7] - 1741:16, 1741:17, 1786:17, 1792:16, 1809:2, 1812:11, 1813:14
**excused** [6] - 1776:20, 1817:3, 1873:2, 1875:10, 1875:11, 1875:22
**executed** [1] - 1755:22
**execution** [2] - 1717:10, 1717:19
**execution-style** [1] - 1717:19
**exercise** [5] - 1807:8, 1826:1, 1864:1, 1865:15, 1865:23
**Exhibit** [2] - 1718:16, 1785:16
**exhibit** [1] - 1780:14
**exhibits** [7] - 1820:13, 1826:13, 1826:14, 1826:15, 1826:17, 1827:9, 1833:18
**exist** [2] - 1825:13, 1825:14
**existed** [4] - 1749:15, 1843:7, 1843:9, 1843:17
**existence** [7] - 1726:21, 1824:23, 1825:10, 1842:24, 1843:3, 1846:3,

1849:8
**expect** [2] - 1805:6, 1816:23
**expected** [2] - 1715:8, 1858:13
**Expedition** [1] - 1721:15
**expel** [1] - 1864:16
**experience** [8] - 1781:17, 1810:14, 1824:22, 1825:8, 1826:6, 1827:4, 1829:4, 1859:12
**experienced** [2] - 1742:5, 1829:5
**experiences** [1] - 1827:18
**expert** [6] - 1747:2, 1773:16, 1796:21, 1797:22, 1810:13, 1829:15
**expertise** [1] - 1810:13
**experts** [1] - 1773:16
**explain** [2] - 1759:7, 1765:23
**explained** [2] - 1785:24, 1817:18
**explaining** [1] - 1796:25
**explanation** [3] - 1759:17, 1831:19, 1831:20
**explanations** [1] - 1854:10
**explicitly** [2] - 1724:1, 1724:13
**exploitable** [1] - 1752:20
**exploitation** [4] - 1714:23, 1715:17, 1752:19, 1805:24
**exploited** [1] - 1752:18
**explosive** [1] - 1864:17
**express** [2] - 1829:1, 1842:15
**expressing** [1] - 1858:18
**expression** [2] - 1858:23, 1859:1
**extent** [3] - 1828:4, 1845:4, 1845:6
**extraordinarily** [1] - 1771:9
**extrapolate** [2] - 1761:10, 1762:3
**extreme** [1] - 1752:22
**extremely** [1] - 1741:13
**eye** [6] - 1731:15, 1743:1, 1743:4, 1746:11, 1783:13, 1798:25
**eyes** [2] - 1746:13, 1847:14
**eyewitness** [2] - 1733:16, 1780:2

**F**

**fabricate** [1] - 1812:15
**face** [4] - 1751:7, 1783:17, 1804:5, 1806:16
**faced** [1] - 1804:4
**facilitate** [3] - 1836:17, 1836:25, 1840:17
**fact** [46] - 1719:5, 1726:1, 1730:21, 1734:14, 1735:16, 1740:13, 1744:20, 1748:19, 1751:1, 1756:15, 1758:10, 1758:25, 1764:25, 1767:1, 1771:8, 1772:18, 1774:13, 1799:24, 1803:9, 1805:23, 1814:6, 1815:19, 1818:20, 1822:6, 1823:25, 1824:21, 1824:23, 1824:24, 1825:10, 1825:12, 1825:13, 1828:11, 1831:13, 1831:18, 1833:13, 1833:16, 1841:17, 1843:19, 1845:11, 1845:25, 1846:6, 1853:7, 1853:25, 1858:12, 1870:3

**factor** [2] - 1790:20, 1844:5
**factors** [1] - 1809:19
**facts** [37] - 1723:13, 1753:4, 1753:8, 1758:8, 1763:8, 1763:25, 1766:10, 1766:16, 1770:25, 1805:1, 1805:2, 1819:15, 1819:25, 1820:4, 1820:5, 1820:17, 1821:9, 1822:13, 1824:21, 1825:9, 1825:16, 1825:21, 1825:24, 1826:4, 1829:7, 1829:18, 1830:11, 1832:6, 1844:20, 1852:25, 1854:13, 1860:15, 1860:16, 1869:13
**failed** [4] - 1731:6, 1752:1, 1801:8, 1863:7
**failing** [1] - 1782:6
**fails** [1] - 1823:11
**failure** [2] - 1773:9, 1774:8
**failures** [1] - 1812:1
**fair** [7] - 1758:5, 1758:20, 1781:14, 1781:24, 1816:2, 1872:24, 1873:1
**fairly** [2] - 1724:11, 1724:25
**fairness** [1] - 1821:11
**faith** [2] - 1873:1, 1874:21
**fake** [1] - 1838:18
**false** [6] - 1722:3, 1727:3, 1744:16, 1790:2, 1831:16
**falsely** [2] - 1838:25, 1839:2
**families** [1] - 1804:6
**family** [11] - 1720:14, 1720:15, 1741:5, 1759:4, 1777:20, 1781:4, 1811:10, 1811:24, 1838:9, 1859:23
**famous** [1] - 1777:12
**fancied** [1] - 1806:5
**far** [5] - 1718:14, 1790:13, 1805:19, 1807:21, 1809:12
**farm** [1] - 1740:22
**Fat** [1] - 1786:2
**father** [1] - 1734:19
**favor** [1] - 1784:3
**favors** [3] - 1784:3, 1784:4
**fear** [12] - 1748:1, 1748:5, 1750:8, 1798:14, 1798:17, 1799:3, 1799:4, 1812:3, 1812:7, 1812:25, 1815:13
**fears** [1] - 1748:22
**featured** [1] - 1765:25
**Federal** [1] - 1781:10
**federal** [5] - 1801:20, 1841:9, 1841:11, 1857:5, 1862:15
**feelings** [2] - 1821:17, 1821:23
**feet** [2] - 1785:9, 1785:12
**fell** [1] - 1773:22
**fellow** [2] - 1869:6, 1869:10
**felt** [11] - 1721:7, 1741:24, 1747:15, 1750:19, 1757:23, 1780:22, 1793:8, 1793:22, 1874:12
**female** [4] - 1837:6, 1837:11, 1837:21, 1839:20
**females** [3] - 1839:24, 1840:9, 1840:13
**Ferman** [4] - 1719:6, 1749:4, 1796:17, 1796:18
**few** [6] - 1723:20, 1742:17, 1778:16,

1778:22, 1804:13, 1813:13
**fewer** [1] - 1805:19
**field** [1] - 1829:6
**fifteen** [1] - 1811:18
**fighting** [2] - 1781:20, 1792:13
**figure** [5] - 1784:21, 1792:10, 1792:15, 1811:21, 1870:1
**figuring** [1] - 1811:7
**file** [2] - 1788:25, 1789:2
**fill** [2] - 1868:12, 1872:11
**filled** [1] - 1811:13
**final** [5] - 1714:12, 1777:11, 1818:20, 1819:12, 1821:11
**finally** [6] - 1721:24, 1748:17, 1781:8, 1814:1, 1846:20, 1861:23
**financial** [4] - 1739:4, 1746:18, 1774:23, 1805:14, 1844:3, 1859:4
**financially** [4] - 1739:15, 1746:1, 1857:1, 1857:11, 1857:25, 1860:8
**finders** [1] - 1766:10
**findings** [1] - 1747:3
**fine** [5] - 1764:22, 1779:25, 1788:5, 1788:7, 1797:24
**finger** [2] - 1779:16, 1779:17
**fingerprints** [1] - 1800:21
**finished** [1] - 1777:11
**fire** [2] - 1864:22, 1864:23
**firearm** [51] - 1718:14, 1740:9, 1740:15, 1740:16, 1775:2, 1775:6, 1775:15, 1775:16, 1775:17, 1775:18, 1862:2, 1862:4, 1862:5, 1862:12, 1862:15, 1862:22, 1862:23, 1863:16, 1863:17, 1863:19, 1863:21, 1863:24, 1863:25, 1864:2, 1864:3, 1864:4, 1864:6, 1864:10, 1864:12, 1864:15, 1864:19, 1864:20, 1865:1, 1865:2, 1865:3, 1865:5, 1865:7, 1865:12, 1865:14, 1865:15, 1865:20, 1866:1, 1866:2, 1866:4, 1866:8, 1866:10, 1866:12, 1871:11
**firearms** [2] - 1739:8, 1750:7
**firm** [1] - 1797:1
**first** [47] - 1723:22, 1728:5, 1728:12, 1734:11, 1739:11, 1739:13, 1740:12, 1742:20, 1743:8, 1751:22, 1766:2, 1779:8, 1780:16, 1780:17, 1785:18, 1787:10, 1788:23, 1808:12, 1808:21, 1812:6, 1815:19, 1842:2, 1842:9, 1844:9, 1849:7, 1850:12, 1850:13, 1851:7, 1851:18, 1851:20, 1854:18, 1854:19, 1855:7, 1855:21, 1856:18, 1856:20, 1857:8, 1857:19, 1857:21, 1860:3, 1862:7, 1862:18, 1862:24, 1863:13, 1870:17, 1873:3, 1873:4
**fit** [4] - 1760:11, 1778:19, 1782:11, 1795:21
**five** [11] - 1716:18, 1717:8, 1729:24, 1748:25, 1751:12, 1774:10, 1777:8, 1777:23, 1788:13, 1798:10, 1811:15
**five-day** [1] - 1729:24

**Flaco** [5] - 1716:21, 1717:21, 1733:8, 1798:17, 1834:6
**flexi** [1] - 1787:1
**flies** [1] - 1806:15
**floor** [2] - 1801:19, 1811:17
**Flores** [4] - 1719:22, 1720:5, 1720:12, 1720:13
**Flores'** [3] - 1720:8, 1720:9, 1720:15
**flow** [1] - 1861:12
**flush** [1] - 1807:13
**fly** [1] - 1804:1
**FOCR** [1] - 1712:23
**focus** [2] - 1778:16, 1778:21
**folks** [29] - 1713:23, 1755:5, 1755:17, 1755:21, 1756:11, 1757:5, 1757:8, 1761:14, 1762:8, 1762:18, 1765:12, 1766:2, 1767:5, 1767:10, 1768:8, 1769:7, 1769:20, 1769:24, 1769:25, 1771:6, 1771:22, 1773:10, 1774:12, 1775:2, 1775:12, 1776:12, 1795:24, 1796:19, 1803:3
**followed** [3] - 1720:15, 1761:6, 1819:9
**following** [18] - 1730:10, 1735:11, 1745:4, 1751:14, 1751:20, 1753:19, 1788:9, 1817:20, 1834:25, 1837:15, 1842:1, 1851:6, 1855:5, 1857:7, 1862:17, 1869:15, 1872:18, 1873:22
**follows** [1] - 1734:11
**fond** [1] - 1777:25
**food** [4] - 1735:20, 1744:12, 1752:14, 1800:14
**football** [1] - 1798:11
**FOR** [2] - 1711:1, 1711:10
**forbidden** [1] - 1867:15
**forbids** [2] - 1851:16, 1855:1
**force** [33] - 1722:1, 1722:21, 1725:13, 1738:25, 1739:19, 1740:5, 1740:13, 1745:25, 1759:19, 1771:3, 1771:4, 1782:10, 1783:24, 1784:5, 1787:6, 1789:25, 1790:9, 1794:8, 1794:13, 1802:1, 1803:12, 1803:14, 1809:1, 1813:5, 1857:3, 1857:13, 1858:8, 1859:25, 1860:4, 1860:5, 1860:11, 1870:7
**Force** [1] - 1765:21
**forced** [6] - 1734:18, 1734:22, 1739:2, 1764:4, 1784:20, 1805:13
**Ford** [1] - 1721:15
**foregoing** [1] - 1876:9
**foreign** [6] - 1830:9, 1850:6, 1850:17, 1851:1, 1854:22, 1856:23
**foreman** [1] - 1796:24
**forensic** [2] - 1746:20, 1780:3
**forensics** [1] - 1795:22
**foreperson** [6] - 1867:3, 1867:8, 1868:12, 1868:20, 1868:21
**foresee** [1] - 1858:25
**foreseeable** [1] - 1848:15
**forget** [3] - 1719:7, 1746:14, 1765:16
**forgotten** [2] - 1762:16, 1766:23

**form** [11] - 1775:4, 1781:12, 1790:1, 1790:17, 1792:23, 1800:1, 1801:9, 1827:9, 1868:3, 1875:7
**formal** [1] - 1842:15
**formally** [1] - 1754:7
**former** [2] - 1718:11, 1875:5
**forms** [4] - 1868:2, 1868:5, 1868:10, 1868:12
**forth** [3] - 1807:3, 1850:13, 1850:22
**fortunes** [1] - 1756:14
**forward** [2] - 1760:21, 1864:3
**foundation** [1] - 1734:16
**four** [8] - 1730:5, 1731:11, 1742:4, 1747:4, 1779:11, 1785:20, 1798:10, 1813:10
**fourth** [2] - 1857:16, 1860:25
**frame** [3] - 1731:4, 1760:19, 1813:20
**Franco** [29] - 1722:2, 1722:12, 1745:2, 1766:11, 1767:9, 1767:19, 1769:4, 1769:7, 1773:15, 1773:20, 1773:23, 1774:14, 1775:9, 1779:6, 1781:18, 1795:4, 1802:3, 1857:1, 1857:10, 1857:24, 1858:9, 1858:12, 1859:10, 1859:16, 1859:21, 1860:6, 1860:8, 1860:18, 1860:22
**Franco's** [2] - 1769:6, 1770:23
**frankly** [2] - 1730:4, 1812:4
**Fraud** [1] - 1765:22
**fraud** [28] - 1722:21, 1738:25, 1739:19, 1740:6, 1740:13, 1744:18, 1744:22, 1771:3, 1771:4, 1782:10, 1787:6, 1789:25, 1790:10, 1794:9, 1794:13, 1802:1, 1803:12, 1803:15, 1809:1, 1813:5, 1857:3, 1857:13, 1858:8, 1858:10, 1859:25, 1860:4, 1860:5, 1860:11
**fraudulent** [1] - 1721:25
**Freddy** [3] - 1718:9, 1718:17, 1718:21
**free** [3] - 1784:14, 1819:4, 1875:15
**freedom** [1] - 1806:18
**frequency** [1] - 1814:15
**frequent** [1] - 1766:23
**frequently** [1] - 1847:21
**fresh** [1] - 1715:12
**friend** [6] - 1717:2, 1741:1, 1764:11, 1788:18, 1789:21
**friendly** [1] - 1845:24
**friends** [2] - 1741:5, 1777:20
**frighten** [1] - 1753:1
**front** [6] - 1720:16, 1741:11, 1742:3, 1756:7, 1757:9, 1779:20
**fronting** [1] - 1794:23
**FTA'd** [1] - 1731:5
**Fuentes** [4] - 1716:7, 1766:1, 1812:25, 1834:5
**FUERTES** [1] - 1711:7
**Fuertes** [69] - 1711:18, 1715:18, 1716:19, 1716:20, 1716:25, 1717:4, 1717:14, 1717:15, 1717:21, 1719:17, 1722:11, 1722:15, 1723:4, 1724:12,

1726:11, 1727:2, 1727:10, 1727:17, 1727:24, 1728:10, 1728:17, 1729:2, 1729:21, 1731:1, 1731:4, 1732:13, 1732:14, 1732:16, 1732:17, 1732:23, 1732:25, 1733:3, 1733:5, 1739:2, 1739:4, 1745:18, 1745:22, 1746:1, 1746:3, 1748:10, 1748:18, 1748:24, 1750:15, 1778:15, 1778:23, 1779:4, 1779:17, 1780:8, 1780:18, 1782:2, 1787:4, 1789:18, 1789:23, 1790:2, 1797:10, 1798:18, 1799:7, 1799:24, 1799:25, 1800:8, 1801:13, 1802:4, 1804:16, 1813:15, 1813:25, 1814:7, 1815:5, 1834:5
**Fuertes'** [7] - 1729:7, 1730:10, 1733:11, 1788:25, 1801:8, 1801:24, 1813:21
**FUERTES................** [1] - 1877:9
**fulfill** [2] - 1775:14, 1778:12
**full** [5] - 1714:16, 1714:18, 1754:19, 1777:4, 1845:14
**fully** [3] - 1844:24, 1861:23, 1869:23
**function** [2] - 1816:1, 1866:16
**furtherance** [26] - 1724:5, 1724:10, 1740:15, 1801:13, 1801:16, 1837:13, 1838:19, 1847:13, 1847:18, 1848:17, 1848:25, 1849:8, 1849:12, 1862:2, 1862:4, 1862:12, 1862:22, 1863:16, 1863:20, 1863:22, 1864:2, 1866:11, 1871:11, 1871:15, 1871:16, 1871:20
**furthered** [1] - 1865:16
**furthering** [5] - 1775:7, 1775:24, 1843:23, 1846:17, 1864:7
**furthermore** [1] - 1845:1
**future** [1] - 1858:19

## G

**gain** [1] - 1774:13
**GARCIA** [1] - 1711:7
**Garcia** [3] - 1711:18, 1801:8, 1834:4
**gasoline** [1] - 1720:16
**general** [3] - 1748:5, 1825:1, 1859:15
**generate** [1] - 1729:16
**gentleman** [1] - 1716:14
**gentlemen** [46] - 1714:21, 1719:3, 1719:16, 1724:24, 1729:22, 1732:21, 1736:20, 1738:22, 1744:16, 1746:12, 1747:23, 1751:18, 1752:12, 1752:17, 1753:4, 1754:22, 1763:12, 1777:9, 1777:17, 1778:3, 1778:4, 1778:14, 1780:12, 1780:14, 1780:21, 1782:11, 1783:14, 1785:10, 1785:13, 1786:21, 1787:10, 1788:21, 1789:19, 1790:13, 1790:20, 1791:5, 1792:19, 1793:24, 1794:6, 1797:4, 1803:16, 1804:8, 1804:20, 1808:12, 1809:16, 1818:19
**George's** [1] - 1839:6
**Gerald** [1] - 1711:17
**GERMAN** [2] - 1711:6, 1877:2

**German** [33] - 1711:16, 1715:19, 1728:5, 1729:12, 1780:10, 1780:19, 1782:3, 1782:5, 1782:8, 1782:13, 1782:19, 1783:9, 1783:10, 1783:18, 1787:5, 1787:8, 1789:8, 1790:25, 1791:1, 1791:19, 1791:22, 1793:13, 1796:9, 1798:14, 1798:22, 1799:23, 1805:25, 1806:1, 1815:4, 1833:25, 1836:22, 1839:7
**get-go** [1] - 1808:16
**getaway** [1] - 1801:18
**Giordano** [3] - 1712:23, 1876:8, 1876:14
**girl** [8] - 1764:19, 1780:10, 1783:9, 1784:8, 1792:1, 1792:5, 1799:21, 1802:15
**girlfriend** [4] - 1717:16, 1771:10, 1781:1, 1787:25, 1788:14
**girls** [22] - 1766:19, 1780:11, 1784:2, 1784:12, 1784:13, 1784:16, 1784:19, 1784:25, 1785:7, 1785:9, 1786:11, 1786:12, 1786:14, 1786:23, 1792:11, 1792:13, 1792:14, 1799:13, 1800:13
**given** [17] - 1757:12, 1766:25, 1770:23, 1775:25, 1786:6, 1816:21, 1820:12, 1822:8, 1823:25, 1827:25, 1829:23, 1831:25, 1851:13, 1853:5, 1856:13, 1860:24, 1870:3
**Goldstein** [1] - 1712:4
**Gonzalez** [5] - 1727:9, 1727:11, 1727:20, 1728:7, 1728:12
**goods** [1] - 1861:4
**Government** [96] - 1711:13, 1714:16, 1714:18, 1739:12, 1740:11, 1742:10, 1755:17, 1755:19, 1756:4, 1756:5, 1759:11, 1759:18, 1761:9, 1761:18, 1761:25, 1762:3, 1764:13, 1766:17, 1769:17, 1773:13, 1774:22, 1775:25, 1778:8, 1785:19, 1791:21, 1793:25, 1799:18, 1800:19, 1803:19, 1804:23, 1806:11, 1806:13, 1808:3, 1808:10, 1810:18, 1814:24, 1816:9, 1821:16, 1821:20, 1822:2, 1822:7, 1822:9, 1822:11, 1823:4, 1823:11, 1823:17, 1825:17, 1827:9, 1829:20, 1832:4, 1832:6, 1832:10, 1833:9, 1842:1, 1842:9, 1842:13, 1842:20, 1843:12, 1847:2, 1847:7, 1847:8, 1847:12, 1847:16, 1848:4, 1851:6, 1851:20, 1852:1, 1852:9, 1852:14, 1852:20, 1853:1, 1853:14, 1853:18, 1855:5, 1855:21, 1856:7, 1857:7, 1857:21, 1858:7, 1859:24, 1860:13, 1860:20, 1860:25, 1861:17, 1861:23, 1862:16, 1862:24, 1863:7, 1863:14, 1863:20, 1864:13, 1864:19, 1865:7, 1865:17, 1865:19, 1866:6, 1866:5
**government** [3] - 1757:10, 1778:5, 1828:12
**Government's** [9] - 1766:4, 1787:17,

1796:9, 1798:3, 1802:21, 1818:2, 1823:21, 1829:21, 1871:18
**GOVERNMENT...................** [1] - 1877:10
**GOVERNMENT...................** [1] - 1877:7
**GPS** [1] - 1756:2
**grade** [2] - 1740:21, 1872:23
**graduate** [1] - 1872:22
**Grand** [18] - 1755:22, 1770:2, 1770:5, 1779:20, 1781:10, 1833:24, 1834:15, 1835:1, 1835:4, 1835:8, 1835:12, 1837:12, 1849:23, 1850:12, 1850:15, 1854:18, 1856:18, 1862:7
**grant** [1] - 1874:9
**granted** [1] - 1756:10
**Gras** [1] - 1786:2
**great** [4] - 1811:11, 1816:11, 1816:13, 1874:24
**greater** [3] - 1822:8, 1828:14, 1841:22
**Green** [1] - 1804:7
**green** [1] - 1721:15
**grip** [2] - 1719:5, 1840:22
**groomed** [2] - 1743:10, 1766:6
**grooming** [1] - 1768:5
**ground** [1] - 1774:3
**grounds** [1] - 1828:18
**group** [1] - 1741:11
**grouped** [1] - 1785:19
**grow** [1] - 1792:18
**growing** [2] - 1805:17, 1805:18
**Guatemala** [1] - 1740:19
**guess** [3] - 1736:25, 1773:5, 1825:11
**guesswork** [1] - 1825:22
**guide** [2] - 1829:24, 1868:7
**Guillen** [1] - 1800:9
**guilt** [15] - 1755:14, 1789:20, 1802:6, 1802:7, 1802:12, 1822:20, 1823:9, 1823:17, 1825:4, 1826:10, 1831:7, 1832:16, 1833:7, 1845:5, 1849:7
**guilty** [49] - 1725:12, 1736:20, 1738:23, 1745:23, 1746:13, 1750:8, 1753:13, 1762:12, 1763:11, 1765:12, 1765:20, 1775:4, 1775:10, 1775:11, 1776:5, 1776:8, 1776:9, 1803:17, 1804:15, 1805:4, 1807:23, 1808:9, 1808:13, 1810:21, 1822:18, 1822:19, 1823:5, 1823:12, 1823:21, 1824:12, 1824:13, 1832:9, 1832:20, 1832:24, 1833:9, 1841:13, 1841:17, 1846:24, 1851:5, 1855:2, 1857:6, 1863:8, 1866:7, 1866:18, 1871:10
**gun** [13] - 1717:15, 1746:16, 1749:21, 1749:22, 1749:24, 1750:3, 1769:12, 1769:15, 1775:15, 1794:15, 1798:6, 1803:9, 1871:15
**guns** [13] - 1722:9, 1748:24, 1749:2, 1749:4, 1749:12, 1749:14, 1749:15, 1749:16, 1749:19, 1749:20, 1775:21, 1775:23, 1794:5

**guy** [7] - 1743:7, 1774:4, 1798:21, 1798:22, 1814:13, 1815:8
**guys** [3] - 1794:24, 1798:10, 1812:15

# H

**half** [7] - 1715:9, 1760:4, 1777:18, 1787:19, 1790:25, 1811:1, 1811:19
**halfway** [1] - 1738:1
**hall** [2] - 1754:4, 1754:6
**hand** [9] - 1720:19, 1773:4, 1774:18, 1782:3, 1790:1, 1796:11, 1819:24, 1829:20, 1872:2
**handcuffs** [1] - 1787:1
**handed** [1] - 1726:12
**handing** [1] - 1797:17
**handle** [2] - 1872:21, 1872:23
**hands** [6] - 1739:3, 1769:19, 1774:15, 1774:21, 1802:19, 1802:20
**hang** [1] - 1772:14, 1802:24, 1803:2
**happy** [4] - 1754:3, 1754:5, 1786:15, 1798:13
**harbor** [2] - 1856:23, 1858:2
**harbored** [6] - 1739:14, 1766:4, 1768:13, 1857:9, 1857:23, 1860:7
**harboring** [4] - 1722:6, 1768:8, 1768:10, 1857:20
**hard** [3] - 1719:23, 1797:21, 1804:10
**hard-working** [1] - 1719:23
**harkening** [1] - 1808:2
**harm** [11] - 1748:2, 1858:19, 1858:24, 1859:1, 1859:2, 1859:3, 1859:4, 1859:8, 1859:9, 1859:13, 1859:23
**harmless** [1] - 1847:22
**Hartlove** [2] - 1717:23, 1779:14
**hat** [2] - 1787:13, 1802:24
**hate** [2] - 1758:15, 1798:9
**head** [3] - 1717:10, 1748:20, 1750:4
**hear** [13] - 1721:16, 1721:17, 1737:12, 1744:18, 1753:11, 1754:17, 1788:8, 1788:19, 1791:12, 1794:15, 1800:17, 1806:8, 1827:24
**heard** [75] - 1713:15, 1715:24, 1716:13, 1717:12, 1718:4, 1718:16, 1718:24, 1719:4, 1720:22, 1721:5, 1723:13, 1725:3, 1725:7, 1726:3, 1726:15, 1727:6, 1729:13, 1730:16, 1731:9, 1734:10, 1738:25, 1740:24, 1743:1, 1743:3, 1743:4, 1743:12, 1745:6, 1745:11, 1748:12, 1749:9, 1753:4, 1755:19, 1756:15, 1756:19, 1756:21, 1756:23, 1757:24, 1758:23, 1759:5, 1760:15, 1766:4, 1777:16, 1783:8, 1783:19, 1784:1, 1784:7, 1784:22, 1787:3, 1787:7, 1787:24, 1790:3, 1790:16, 1791:12, 1792:8, 1793:9, 1795:4, 1795:21, 1795:22, 1795:25, 1796:1, 1796:3, 1796:4, 1797:19, 1800:7, 1801:6, 1803:5, 1804:22,

1819:11, 1824:16, 1825:6, 1827:6, 1828:10, 1830:8, 1831:3, 1832:3
**hearing** [5] - 1737:3, 1756:14, 1820:23, 1821:2, 1858:22
**hears** [1] - 1824:19
**heart** [1] - 1757:7
**Hector** [18] - 1718:9, 1718:18, 1718:21, 1718:22, 1719:5, 1719:8, 1721:7, 1721:8, 1721:16, 1721:20, 1721:21, 1721:23, 1759:3, 1787:18, 1795:2, 1796:10, 1798:5, 1813:25
**Heights** [1] - 1834:3
**held** [6] - 1722:13, 1750:3, 1757:10, 1790:7, 1837:22, 1873:22
**Helen** [1] - 1736:8
**hell** [1] - 1796:20
**help** [12] - 1716:7, 1737:5, 1740:21, 1743:10, 1743:22, 1770:9, 1770:10, 1770:14, 1795:12, 1811:8, 1816:13, 1875:14
**helped** [8] - 1746:14, 1746:15, 1750:7, 1783:1, 1792:5, 1864:3
**helpful** [1] - 1811:13
**helping** [1] - 1831:9
**herded** [1] - 1715:15
**Hernandez** [3] - 1719:7, 1749:4, 1796:18
**herring** [1] - 1808:11
**herrings** [3] - 1759:6, 1776:2, 1813:25
**herself** [7] - 1742:8, 1764:7, 1764:20, 1772:20, 1792:4, 1811:19, 1831:11
**hesitate** [1] - 1869:7
**hesitation** [1] - 1798:23
**Hicksville** [1] - 1792:1
**hidden** [1] - 1715:7
**highest** [1] - 1860:18
**highly** [2] - 1757:5, 1773:16
**himself** [10] - 1722:8, 1744:15, 1760:8, 1799:12, 1806:5, 1831:11, 1841:18, 1845:25, 1871:14, 1871:19
**Hispanic** [9] - 1719:23, 1745:12, 1784:21, 1805:8, 1839:20, 1839:24, 1840:8, 1840:13, 1840:24
**history** [4] - 1737:11, 1757:12, 1770:23, 1811:8
**hit** [5] - 1748:11, 1775:14, 1777:13, 1784:11, 1791:14
**hitting** [1] - 1781:20
**hold** [7] - 1799:9, 1800:20, 1800:22, 1812:1, 1816:9, 1821:6, 1865:11
**holds** [1] - 1861:6
**hole** [1] - 1786:4
**holiday** [1] - 1815:20
**home** [9] - 1721:23, 1727:23, 1734:18, 1734:20, 1764:5, 1764:10, 1772:7, 1785:22, 1786:13
**homes** [1] - 1804:6
**homicide** [1] - 1716:16
**Homicide** [1] - 1770:13
**Honduras** [2] - 1782:2, 1834:6

hone [1] - 1763:22
honest [9] - 1778:22, 1780:18, 1781:19, 1786:23, 1797:14, 1800:17, 1801:3, 1801:25, 1869:9
honestly [2] - 1793:15, 1795:24
Honor [28] - 1713:7, 1713:24, 1713:25, 1714:1, 1714:20, 1722:17, 1753:17, 1753:22, 1754:1, 1754:6, 1754:21, 1763:14, 1776:25, 1777:7, 1804:19, 1817:9, 1818:15, 1869:24, 1870:10, 1870:13, 1870:16, 1870:22, 1871:4, 1873:14, 1873:20, 1873:24, 1874:4
honor [1] - 1808:4
HONORABLE [1] - 1711:11
Honorable [6] - 1713:4, 1776:18, 1776:22, 1817:1, 1817:6, 1876:3
honored [1] - 1755:14
Hooper [1] - 1872:6
hope [3] - 1755:16, 1803:23, 1806:12
hopeful [2] - 1750:24, 1783:5
hopes [1] - 1717:6
hoping [3] - 1756:17, 1776:3, 1776:6, 1802:25, 1803:1
horrible [1] - 1764:3
horrific [1] - 1773:11
hospital [2] - 1751:3, 1751:4
hotels [1] - 1861:14
hour [4] - 1720:11, 1777:4, 1777:18, 1816:22
hours [4] - 1713:19, 1742:4, 1801:19, 1813:10
hours-plus [1] - 1813:10
house [9] - 1719:1, 1729:13, 1729:19, 1731:22, 1743:20, 1751:4, 1751:5, 1767:15, 1839:11
houses [2] - 1787:7, 1838:15
housing [1] - 1838:9
HSI [2] - 1712:3, 1723:5
huge [1] - 1729:7
human [3] - 1716:2, 1752:19, 1752:20
hundred [1] - 1804:3
husband [2] - 1764:4, 1764:6
husband's [1] - 1720:18
Hyattsville [1] - 1839:25
hypothesis [3] - 1795:16, 1795:17, 1795:19

**I**

ICE [3] - 1737:7, 1814:2, 1814:8
ice [3] - 1791:13, 1791:14
idea [6] - 1731:18, 1762:4, 1762:5, 1788:4, 1808:11, 1810:19
identification [1] - 1826:15
identified [4] - 1732:12, 1733:3, 1733:5, 1751:15
identify [1] - 1800:7
identities [2] - 1734:3, 1844:22
identity [1] - 1852:17

idle [1] - 1858:19
ignorance [1] - 1852:22
ignored [1] - 1795:20
illegal [18] - 1715:21, 1724:14, 1724:22, 1726:24, 1728:16, 1756:16, 1756:18, 1782:3, 1834:3, 1834:7, 1837:21, 1841:2, 1846:17, 1851:11, 1853:22, 1855:4, 1855:16, 1856:10
illegally [1] - 1741:6
illicit [1] - 1730:13
images [2] - 1737:2, 1751:3
imagine [3] - 1742:6, 1794:3, 1794:4
imagined [1] - 1757:10
immigrant [1] - 1782:3
immigrants [1] - 1756:16
Immigration [2] - 1736:2, 1814:3
impartial [3] - 1758:20, 1823:10, 1869:5
impartiality [1] - 1821:12
implicate [1] - 1839:2
implicitly [2] - 1724:1, 1724:12
implore [1] - 1758:21
important [14] - 1763:20, 1764:17, 1771:22, 1790:16, 1797:2, 1804:3, 1804:5, 1816:5, 1816:7, 1822:2, 1822:4, 1831:18, 1844:14, 1875:8
imposed [1] - 1866:20
imposes [1] - 1822:22
imposing [1] - 1866:15
impressed [1] - 1778:10
improper [1] - 1821:15
IN [1] - 1711:1
inadvertently [1] - 1858:5
inamorata [1] - 1788:14
inanimate [3] - 1747:22, 1772:19, 1772:21
incapable [1] - 1841:18
incarcerated [1] - 1812:5
inchoate [1] - 1789:4
incident [2] - 1745:23, 1789:7
incidental [1] - 1853:22
inclined [2] - 1753:22, 1754:6
included [3] - 1716:10, 1724:15, 1834:24
includes [4] - 1851:15, 1859:2, 1863:3, 1867:22
including [4] - 1735:14, 1782:24, 1827:15, 1859:3
incomes [1] - 1781:5
incoming [1] - 1720:12
inconsistency [2] - 1831:17, 1831:20
inconsistent [5] - 1795:7, 1831:5, 1831:6, 1831:8, 1831:24, 1831:25
inconvenience [1] - 1827:12
incorporate [1] - 1862:8
incorporated [4] - 1850:1, 1850:13, 1850:23, 1856:19
incorporating [1] - 1854:18
increases [1] - 1841:23
incredibly [2] - 1742:5, 1742:15

incriminates [1] - 1807:22
incurring [1] - 1859:8
indeed [5] - 1751:19, 1810:23, 1813:11, 1841:13, 1845:7
independent [8] - 1743:2, 1743:25, 1778:13, 1778:14, 1814:6, 1829:7, 1841:10, 1844:16
independently [1] - 1747:4
INDEX [1] - 1877:1
indicate [3] - 1820:17, 1821:5, 1860:18
indicated [5] - 1734:16, 1751:17, 1771:24, 1826:24, 1873:24
indicates [1] - 1833:15
indications [1] - 1791:17
indicted [1] - 1822:16
Indictment [26] - 1722:16, 1723:10, 1733:22, 1736:15, 1753:6, 1822:19, 1832:17, 1833:4, 1833:14, 1833:18, 1844:7, 1846:20, 1846:24, 1847:1, 1847:9, 1848:24, 1849:14, 1850:21, 1851:9, 1854:25, 1855:9, 1855:24, 1856:6, 1857:5, 1862:1, 1862:19
indictment [3] - 1719:14, 1822:17, 1833:4
indifference [1] - 1860:16
individual [32] - 1724:20, 1724:21, 1734:13, 1734:14, 1756:19, 1834:15, 1834:20, 1838:24, 1839:2, 1839:5, 1840:5, 1840:20, 1841:23, 1849:17, 1849:18, 1851:22, 1852:2, 1852:8, 1852:10, 1852:11, 1852:16, 1852:18, 1853:21, 1854:22, 1855:3, 1855:8, 1855:14, 1855:16, 1855:23, 1856:9, 1868:8, 1869:3
individuals [21] - 1733:19, 1737:8, 1784:4, 1788:6, 1789:16, 1816:3, 1816:6, 1822:11, 1834:16, 1836:23, 1850:5, 1850:7, 1850:17, 1850:18, 1851:1, 1851:2, 1851:8, 1851:10, 1852:6, 1861:4
induce [4] - 1765:9, 1834:19, 1854:21, 1855:9
induced [3] - 1734:12, 1855:8, 1855:23
inducing [1] - 1855:3
indulgence [1] - 1818:6
infamous [1] - 1802:12
infer [4] - 1772:9, 1824:21, 1825:8, 1843:2
inference [6] - 1824:1, 1825:7, 1825:11, 1825:23, 1844:19, 1845:1
inferences [12] - 1820:3, 1825:15, 1825:18, 1825:19, 1825:21, 1826:1, 1826:5, 1826:9, 1827:5, 1844:18, 1853:12, 1854:15
inferred [1] - 1854:5
inflict [1] - 1858:18
inflicted [1] - 1747:24
infliction [1] - 1747:19
influence [4] - 1806:6, 1855:10, 1866:15, 1866:21

**information** [6] - 1762:6, 1811:2, 1813:19, 1814:14, 1867:25, 1868:1
**informed** [1] - 1844:24
**infringing** [1] - 1718:8
**injured** [1] - 1751:1
**injuries** [7] - 1747:4, 1771:23, 1772:18, 1773:3, 1773:8, 1773:14, 1773:19
**injuring** [1] - 1809:4
**injury** [9] - 1746:21, 1746:23, 1746:25, 1747:9, 1747:12, 1747:13, 1751:9, 1773:6, 1774:8
**innocence** [4] - 1755:13, 1821:19, 1823:7, 1823:13
**innocent** [7] - 1822:25, 1823:3, 1823:23, 1831:17, 1847:21, 1847:22, 1852:13
**inside** [4] - 1727:5, 1758:24, 1772:20, 1772:21
**insofar** [1] - 1791:18
**instance** [2] - 1728:14, 1817:23
**instances** [2] - 1732:22, 1736:22
**instead** [1] - 1860:12
**instruct** [8] - 1723:8, 1723:11, 1818:21, 1819:11, 1819:13, 1823:1, 1844:20, 1851:12
**instructed** [11] - 1723:14, 1755:12, 1832:9, 1844:3, 1847:24, 1852:19, 1855:25, 1856:2, 1856:11, 1860:3, 1863:4
**instruction** [3] - 1763:16, 1800:18, 1819:17
**INSTRUCTIONS** [1] - 1877:11
**instructions** [25] - 1723:11, 1735:10, 1739:18, 1816:20, 1816:22, 1818:8, 1818:11, 1818:12, 1818:23, 1818:25, 1819:3, 1819:5, 1819:14, 1819:18, 1820:10, 1822:15, 1832:23, 1833:2, 1861:7, 1866:25, 1868:7, 1868:8, 1869:20, 1871:9, 1871:21
**instrument** [1] - 1854:2
**insurance** [1] - 1872:10
**intact** [1] - 1872:12
**integral** [1] - 1865:10
**intellect** [1] - 1870:1
**intelligence** [2] - 1859:12, 1874:14
**intended** [1] - 1859:20
**intent** [21] - 1724:22, 1734:15, 1834:16, 1835:24, 1836:5, 1849:18, 1850:6, 1850:17, 1851:1, 1851:10, 1853:2, 1853:3, 1853:6, 1853:7, 1853:24, 1854:8, 1854:11, 1855:15, 1856:9, 1858:23, 1859:1
**intention** [7] - 1790:14, 1843:22, 1846:12, 1858:18, 1864:1, 1865:15, 1865:22
**intentionally** [8] - 1846:15, 1850:5, 1850:16, 1850:25, 1852:12, 1852:22, 1856:1, 1858:4
**interaction** [1] - 1717:9
**interactions** [1] - 1779:2

**interest** [5] - 1824:9, 1828:2, 1828:19, 1844:3, 1844:5
**interesting** [2] - 1787:22, 1815:15
**interests** [1] - 1846:2
**interfere** [1] - 1821:24
**interim** [1] - 1730:11
**interpretation** [6] - 1829:22, 1830:5, 1830:7, 1830:10, 1830:20, 1830:24
**INTERPRETER** [1] - 1741:17
**interpreter** [2] - 1830:15, 1831:1
**Interpreter** [2] - 1712:3, 1712:4
**interpreters** [1] - 1830:21
**Interstate** [1] - 1849:17
**interstate** [88] - 1715:1, 1722:20, 1723:18, 1723:19, 1723:24, 1724:18, 1724:20, 1725:5, 1725:8, 1725:17, 1725:25, 1726:17, 1726:20, 1730:1, 1730:8, 1733:19, 1733:20, 1734:7, 1734:8, 1734:13, 1739:1, 1739:24, 1759:25, 1760:9, 1760:18, 1760:23, 1761:7, 1761:19, 1762:14, 1763:13, 1765:7, 1765:14, 1765:15, 1768:13, 1768:22, 1768:23, 1769:5, 1771:14, 1773:9, 1774:6, 1774:9, 1799:11, 1800:1, 1803:11, 1803:13, 1833:20, 1833:22, 1834:16, 1834:20, 1835:23, 1841:5, 1849:15, 1850:6, 1850:17, 1851:1, 1851:8, 1851:17, 1851:19, 1851:22, 1851:24, 1852:8, 1852:11, 1852:16, 1854:16, 1854:22, 1855:9, 1855:14, 1855:18, 1855:19, 1855:24, 1856:2, 1856:5, 1856:6, 1856:23, 1857:17, 1861:2, 1861:3, 1861:8, 1861:10, 1861:13, 1861:14, 1861:15, 1861:16, 1861:18, 1861:20, 1861:22, 1861:25
**interviewed** [5] - 1769:24, 1769:25, 1770:2, 1770:3, 1770:4
**interviews** [1] - 1769:19
**intimidate** [2] - 1716:8, 1837:10
**intimidating** [1] - 1716:10
**introduced** [3] - 1808:10, 1808:21, 1833:10
**inured** [1] - 1746:18
**investigate** [2] - 1717:23, 1779:14
**investigating** [2] - 1719:13, 1755:17
**investigation** [6] - 1717:25, 1719:16, 1733:25, 1746:6, 1751:11, 1755:20
**investigative** [3] - 1800:20, 1832:5, 1832:10
**invite** [2] - 1785:13, 1811:4
**involve** [4] - 1733:23, 1781:20, 1799:12, 1853:24
**involved** [44] - 1719:18, 1724:13, 1725:2, 1730:4, 1730:6, 1743:4, 1749:7, 1749:10, 1749:11, 1756:15, 1756:20, 1760:8, 1760:18, 1762:25, 1767:21, 1771:8, 1771:25, 1781:14, 1781:24, 1783:20, 1789:11, 1789:12, 1789:13, 1790:15, 1791:18, 1792:18,

1795:12, 1795:20, 1798:20, 1799:3, 1799:4, 1799:25, 1800:11, 1800:25, 1801:9, 1801:14, 1807:14, 1808:22, 1809:6, 1814:13, 1843:4, 1867:20, 1874:13
**involvement** [3] - 1728:16, 1800:5, 1817:14
**involves** [4] - 1760:23, 1771:20, 1775:8, 1792:24
**involving** [1] - 1855:18
**Isabella** [4] - 1721:11, 1721:13, 1721:17, 1721:21
**isolate** [2] - 1813:15, 1813:20
**issue** [7] - 1753:25, 1758:1, 1773:17, 1829:2, 1845:5, 1849:6, 1871:18
**issues** [1] - 1818:20
**items** [1] - 1738:15
**itself** [3] - 1845:21, 1847:25, 1854:9
**IX** [1] - 1711:6

# J

**James** [1] - 1757:13
**Jefferson** [2] - 1757:8, 1757:14
**Jelly** [3] - 1759:10, 1760:13, 1835:18
**jerk** [1] - 1788:17
**Jersey** [8] - 1734:23, 1735:6, 1735:9, 1736:11, 1764:8, 1764:24, 1765:2, 1765:15
**JESUS** [2] - 1711:6, 1877:2
**Jesus** [11] - 1711:16, 1715:19, 1727:9, 1727:11, 1727:20, 1728:7, 1728:12, 1729:12, 1833:25, 1836:22, 1839:7
**jive** [1] - 1803:20
**job** [13] - 1723:10, 1723:12, 1742:23, 1781:1, 1784:15, 1784:16, 1785:5, 1789:21, 1790:18, 1794:12, 1797:22, 1797:24
**John** [4] - 1757:5, 1757:6, 1757:13, 1757:14
**join** [2] - 1802:11, 1841:7
**joined** [5] - 1724:2, 1843:20, 1844:10, 1844:11, 1845:2
**joins** [2] - 1845:15, 1845:16
**joke** [1] - 1794:18
**joking** [2] - 1750:4, 1858:20
**journey** [1] - 1853:18
**JR** [1] - 1711:11
**Jr** [1] - 1713:4
**Juano** [2] - 1732:12, 1733:3
**Judge** [9] - 1724:8, 1744:18, 1746:12, 1747:24, 1750:13, 1753:12, 1765:23, 1774:11, 1800:18
**judge** [1] - 1827:19
**judges** [7] - 1819:25, 1820:16, 1821:7, 1827:16, 1830:10, 1869:13
**judgment** [8] - 1778:13, 1778:15, 1829:17, 1831:23, 1868:23, 1869:4, 1874:1, 1874:14

**July** [3] - 1770:6, 1839:15, 1839:19
**jurisdiction** [3] - 1787:20, 1790:25, 1814:9
**juror** [1] - 1868:25
**Juror** [2] - 1875:3, 1875:4
**JUROR** [7] - 1872:15, 1872:21, 1873:3, 1873:10, 1874:11, 1874:18, 1874:22
**jurors** [7] - 1723:10, 1723:12, 1823:8, 1866:19, 1869:1, 1869:6, 1869:11
**JURORS** [2] - 1714:10, 1754:23
**jury** [52] - 1713:6, 1713:22, 1713:23, 1714:12, 1726:6, 1739:18, 1753:11, 1754:16, 1754:22, 1755:2, 1755:13, 1756:10, 1757:6, 1757:9, 1758:3, 1758:6, 1758:9, 1758:19, 1758:22, 1763:9, 1776:4, 1776:7, 1776:15, 1776:24, 1777:3, 1792:22, 1796:23, 1796:25, 1805:5, 1816:17, 1818:14, 1819:19, 1819:24, 1823:4, 1824:3, 1825:3, 1825:23, 1852:15, 1867:2, 1867:9, 1867:11, 1867:16, 1868:10, 1869:21, 1871:8, 1872:12, 1873:12, 1875:12, 1876:1, 1876:4
**Jury** [24] - 1714:8, 1755:22, 1770:2, 1770:5, 1776:20, 1777:1, 1779:21, 1781:10, 1817:3, 1818:17, 1833:24, 1834:15, 1835:1, 1835:4, 1835:8, 1835:12, 1837:12, 1849:23, 1850:12, 1850:15, 1854:18, 1856:18, 1862:7, 1875:22
**JURY** [1] - 1711:11
**JURY**.............................. [1] - 1877:11
**justice** [4] - 1753:6, 1763:2, 1810:8, 1822:12
**justified** [1] - 1826:6
**justify** [1] - 1845:1

## K

**keep** [9] - 1714:2, 1750:7, 1751:9, 1753:2, 1786:5, 1786:12, 1786:14, 1786:15, 1816:13
**keeping** [8] - 1722:8, 1734:20, 1738:21, 1744:14, 1778:13, 1786:14, 1789:11, 1790:15
**keeps** [1] - 1786:13
**Kelly** [6] - 1712:3, 1723:5, 1743:5, 1751:14, 1761:6, 1806:12
**kept** [2] - 1715:9, 1786:11
**Kerlin** [3] - 1715:18, 1716:7, 1834:5
**KEVIN** [1] - 1711:7
**Kevin** [45] - 1711:18, 1715:18, 1778:15, 1778:23, 1780:8, 1780:9, 1780:18, 1782:2, 1782:5, 1782:22, 1783:8, 1787:3, 1787:16, 1787:20, 1789:6, 1789:7, 1789:23, 1790:2, 1790:12, 1790:14, 1791:17, 1792:10, 1792:25, 1793:16, 1794:16, 1797:7, 1797:10, 1797:13, 1797:19, 1798:2, 1798:4,

1798:5, 1798:17, 1799:7, 1799:12, 1800:13, 1800:25, 1801:4, 1801:6, 1802:4, 1803:10, 1804:16, 1834:4
**Kevin's** [4] - 1779:25, 1798:2, 1798:6
**key** [1] - 1844:10
**kick** [2] - 1794:18, 1794:22
**kidnapping** [1] - 1839:1
**kids** [2] - 1790:21, 1792:17
**Kies** [2] - 1713:11, 1817:9
**kill** [6] - 1718:13, 1720:14, 1721:3, 1796:20, 1798:22, 1810:4
**killed** [4] - 1796:14, 1798:6, 1799:2, 1810:8
**killer** [2] - 1796:12, 1797:22
**killing** [1] - 1809:4
**Kim** [2] - 1745:7, 1801:7
**Kim's** [1] - 1813:18
**kind** [11] - 1725:3, 1730:17, 1760:22, 1771:7, 1802:24, 1806:8, 1806:18, 1811:12, 1841:6, 1859:13, 1859:14
**kinds** [7] - 1759:5, 1759:24, 1775:12, 1802:7, 1807:21, 1811:13, 1811:25
**King** [4] - 1755:2, 1757:12, 1757:13
**king** [1] - 1755:9
**Kirchgessner** [1] - 1712:3
**knife** [1] - 1747:17
**knocked** [1] - 1775:13
**knowing** [8] - 1740:22, 1740:23, 1740:24, 1783:23, 1802:3, 1807:14, 1846:18, 1857:3
**knowingly** [43] - 1724:1, 1724:4, 1724:20, 1734:12, 1739:13, 1740:14, 1834:13, 1834:15, 1834:19, 1842:4, 1842:6, 1843:14, 1843:20, 1844:10, 1847:4, 1847:13, 1847:17, 1850:5, 1850:16, 1850:25, 1851:7, 1851:22, 1852:7, 1852:12, 1852:21, 1852:24, 1854:21, 1855:7, 1855:22, 1855:25, 1856:22, 1857:9, 1857:22, 1858:3, 1858:11, 1862:4, 1862:11, 1862:21, 1863:15, 1863:16, 1864:10, 1866:1
**knowledge** [15] - 1722:11, 1746:2, 1824:17, 1829:3, 1843:21, 1844:19, 1845:1, 1845:14, 1846:4, 1846:7, 1846:10, 1849:4, 1853:24, 1854:12, 1860:11
**knowledgeable** [1] - 1829:6
**known** [18] - 1746:10, 1771:17, 1791:16, 1802:5, 1824:17, 1834:1, 1834:2, 1834:5, 1834:6, 1834:14, 1835:1, 1835:4, 1835:8, 1835:12, 1844:22
**knows** [3] - 1727:11, 1775:21, 1779:14
**Korean** [1] - 1745:7
**KY** [3] - 1759:10, 1760:13, 1835:18

## L

**lack** [19] - 1742:18, 1750:12, 1801:2,

1802:23, 1803:9, 1803:10, 1803:11, 1803:12, 1803:13, 1803:14, 1803:15, 1821:14, 1822:1, 1832:8, 1832:15, 1833:10, 1869:25
**ladies** [48] - 1714:21, 1719:3, 1719:16, 1724:24, 1732:21, 1736:20, 1738:22, 1744:15, 1746:12, 1747:23, 1751:18, 1752:12, 1752:17, 1753:4, 1754:22, 1756:14, 1757:19, 1757:24, 1763:12, 1772:15, 1777:9, 1777:17, 1778:2, 1778:14, 1780:12, 1780:14, 1780:21, 1782:10, 1783:14, 1785:10, 1785:13, 1786:21, 1787:10, 1788:21, 1789:18, 1790:13, 1790:20, 1791:5, 1792:18, 1793:24, 1794:6, 1797:4, 1803:16, 1804:7, 1804:20, 1808:12, 1809:15, 1818:19
**lady** [3] - 1762:1, 1762:15, 1769:24
**laid** [1] - 1790:1
**landlord** [2] - 1800:7, 1801:7
**landlords** [1] - 1800:9
**landmarks** [2] - 1811:8, 1812:1
**Langley** [1] - 1839:20
**language** [10] - 1784:19, 1813:20, 1830:4, 1830:9, 1830:14, 1830:16, 1830:19, 1870:10, 1870:11, 1870:14
**languages** [2] - 1830:12, 1830:22
**Laona** [2] - 1763:19, 1763:24
**large** [2] - 1730:14, 1738:8
**largely** [4] - 1714:25, 1715:7, 1740:3, 1812:21
**last** [12] - 1749:24, 1777:21, 1778:21, 1796:6, 1803:18, 1804:13, 1817:11, 1866:25, 1870:1, 1871:2, 1871:9, 1871:12
**late** [1] - 1791:20
**laughing** [1] - 1793:9
**law** [72] - 1716:1, 1717:17, 1719:11, 1719:19, 1723:11, 1723:12, 1723:14, 1729:14, 1734:2, 1737:22, 1739:5, 1746:13, 1749:13, 1752:11, 1753:1, 1753:7, 1753:11, 1755:12, 1758:8, 1759:20, 1762:4, 1792:19, 1793:2, 1797:1, 1800:18, 1805:2, 1806:11, 1810:25, 1815:25, 1818:21, 1819:11, 1819:14, 1819:16, 1819:18, 1819:22, 1819:23, 1820:22, 1820:24, 1821:3, 1822:3, 1822:14, 1822:22, 1822:25, 1825:1, 1828:11, 1828:12, 1828:17, 1828:22, 1832:12, 1833:16, 1834:19, 1834:22, 1836:24, 1841:2, 1841:9, 1841:11, 1842:25, 1845:10, 1846:9, 1847:14, 1848:18, 1849:20, 1851:15, 1855:1, 1856:15, 1857:5, 1862:15, 1864:14, 1866:6, 1870:3
**law-abiding** [2] - 1719:16, 1753:1
**lawful** [1] - 1847:21
**laws** [1] - 1816:1
**lawsuit** [1] - 1822:9
**lawyer** [1] - 1807:6

**lawyers** [6] - 1714:14, 1774:13, 1819:12, 1820:6, 1820:21, 1827:1
**lay** [2] - 1763:25, 1811:18
**lead** [1] - 1855:10
**leader** [2] - 1730:13, 1730:18
**leading** [2] - 1717:19, 1748:23
**leap** [1] - 1762:7
**learn** [3] - 1728:18, 1729:19, 1805:6
**learned** [11] - 1716:4, 1717:8, 1719:19, 1725:4, 1726:7, 1727:2, 1731:7, 1737:2, 1739:7, 1740:25, 1755:1
**lease** [1] - 1800:12
**leased** [1] - 1836:13
**least** [23] - 1723:22, 1724:4, 1732:1, 1749:5, 1788:13, 1796:6, 1798:3, 1806:4, 1811:19, 1813:6, 1815:6, 1834:11, 1837:15, 1842:3, 1842:6, 1844:12, 1845:16, 1846:11, 1847:4, 1847:5, 1847:17, 1847:18, 1862:9
**leave** [13] - 1715:12, 1758:3, 1758:4, 1758:9, 1758:19, 1758:21, 1763:9, 1776:6, 1776:10, 1784:11, 1792:13, 1792:14, 1814:9
**leaves** [2] - 1790:24, 1801:10
**leaving** [1] - 1784:9
**led** [2] - 1719:11, 1719:13
**left** [13] - 1745:1, 1746:22, 1746:25, 1747:10, 1770:16, 1782:14, 1786:25, 1787:20, 1793:5, 1805:18, 1813:25
**leg** [1] - 1746:25
**legal** [4] - 1791:6, 1793:6, 1819:16, 1832:9
**legitimacy** [1] - 1747:25
**legitimate** [1] - 1828:16
**lend** [1] - 1720:2
**lending** [1] - 1720:19
**less** [5] - 1720:11, 1753:10, 1822:10, 1824:25, 1828:14
**lesser** [1] - 1828:14
**letter** [2] - 1770:12, 1770:14
**letters** [2] - 1783:2, 1785:25
**level** [1] - 1746:20
**Lexington** [1] - 1804:7
**liability** [1] - 1845:6
**liberty** [2] - 1757:7, 1806:18
**license** [1] - 1838:18
**lied** [1] - 1790:10
**lieutenants** [1] - 1815:5
**life** [17] - 1716:2, 1722:3, 1743:22, 1743:23, 1750:11, 1770:22, 1781:22, 1781:24, 1805:16, 1805:19, 1811:5, 1811:8, 1811:14, 1811:22, 1859:11, 1859:15, 1874:17
**light** [5] - 1715:5, 1750:10, 1826:6, 1827:3, 1829:14
**lights** [1] - 1715:13
**likelihood** [1] - 1841:24
**likely** [3] - 1720:5, 1772:13, 1772:14
**likewise** [1] - 1874:3
**limb** [1] - 1758:13

**limited** [6] - 1722:4, 1810:12, 1810:17, 1814:10, 1831:9
**line** [7] - 1715:16, 1725:16, 1777:21, 1797:14, 1852:3, 1853:15, 1853:20
**lines** [8] - 1732:6, 1737:17, 1738:14, 1739:25, 1769:4, 1799:13, 1840:25, 1861:9
**linkage** [1] - 1788:7
**list** [4] - 1756:3, 1850:22, 1854:19, 1856:19
**listen** [4] - 1723:12, 1755:11, 1757:1, 1830:1
**listening** [4] - 1796:25, 1818:11, 1818:12, 1829:24
**literally** [3] - 1720:15, 1726:23, 1751:6
**live** [2] - 1756:17, 1801:23
**lived** [2] - 1719:24, 1755:7, 1780:8
**lives** [3] - 1723:6, 1756:24, 1811:12
**living** [4] - 1729:5, 1734:21, 1752:14, 1752:18
**load** [1] - 1799:19
**loathsome** [1] - 1806:11
**loathsomeness** [1] - 1806:10
**local** [1] - 1721:6
**located** [3] - 1838:15, 1864:1, 1865:14
**location** [21] - 1715:16, 1720:7, 1722:12, 1728:13, 1728:14, 1730:24, 1730:25, 1732:15, 1737:9, 1738:6, 1743:6, 1745:5, 1745:6, 1745:7, 1747:18, 1752:6
**locations** [2] - 1730:18, 1730:20, 1755:23, 1756:1, 1836:4, 1836:10
**lodge** [1] - 1838:8
**logical** [3] - 1825:12, 1826:8, 1853:12
**Lombard** [1] - 1712:24
**look** [19] - 1727:16, 1729:18, 1744:4, 1751:20, 1769:3, 1777:14, 1781:25, 1782:1, 1782:2, 1793:16, 1795:18, 1798:24, 1798:25, 1800:23, 1814:13, 1818:7, 1832:7
**looked** [1] - 1773:21
**looking** [3] - 1718:14, 1731:22, 1764:21
**looks** [2] - 1798:25, 1801:4
**Lord** [1] - 1775:21
**louder** [1] - 1843:6
**love** [1] - 1743:15
**lover** [1] - 1782:8
**lower** [1] - 1746:25
**lunch** [2] - 1816:18, 1816:19
**Luncheon** [1] - 1817:4
**lunes** [1] - 1786:2
**lungs** [1] - 1757:7
**lure** [1] - 1744:11
**luxury** [1] - 1807:1
**lying** [2] - 1809:13, 1810:11

# M

**machete** - 1727:7

**machetes** [1] - 1749:14
**magazine** [2] - 1718:19, 1840:4
**magna** [1] - 1757:13
**mail** [1] - 1817:12
**maintain** [3] - 1722:10, 1750:8, 1752:24
**maintained** [1] - 1838:15
**major** [1] - 1845:9
**majority** [1] - 1835:9
**Maldonado** [6] - 1719:25, 1720:2, 1720:3, 1720:5, 1720:10, 1720:20
**male** [1] - 1748:11
**man** [29] - 1717:23, 1720:21, 1721:8, 1722:3, 1722:11, 1731:14, 1732:12, 1733:3, 1742:25, 1743:1, 1743:3, 1746:4, 1746:9, 1746:14, 1746:16, 1752:15, 1757:10, 1759:14, 1771:12, 1772:2, 1772:12, 1806:16, 1808:9, 1809:22, 1810:21, 1812:3, 1812:4
**man's** [1] - 1809:13
**managed** [1] - 1835:15
**managers** [1] - 1756:22
**manifestations** [1] - 1853:9
**manipulate** [1] - 1807:10
**manipulation** [1] - 1805:24
**manner** [4] - 1757:21, 1834:23, 1858:21, 1860:17
**manufactured** [2] - 1729:8, 1740:1
**map** [1] - 1801:18
**marathon** [1] - 1815:24
**March** [18] - 1716:25, 1731:4, 1746:7, 1751:13, 1760:2, 1760:9, 1782:14, 1782:18, 1793:5, 1793:15, 1813:21, 1834:11, 1837:24, 1838:20, 1838:23, 1846:21, 1849:21, 1850:4
**Mardi** [1] - 1786:2
**Margarita** [14] - 1720:22, 1720:24, 1734:9, 1734:17, 1736:5, 1736:10, 1743:14, 1743:16, 1763:19, 1763:24, 1783:20, 1783:21, 1784:18, 1801:3
**Maria** [2] - 1728:1, 1810:11
**Marin** [1] - 1796:4
**mark** [3] - 1747:7, 1773:21, 1773:22
**marked** [1] - 1826:15
**marks** [1] - 1745:1
**married** [1] - 1767:1
**Marta** [1] - 1712:4
**martes** [1] - 1786:2
**Martin** [3] - 1712:23, 1876:8, 1876:14
**Martinez** [3] - 1719:6, 1749:4, 1796:18
**Mary** [1] - 1828:25
**Maryann** [1] - 1817:18
**MARYLAND** [1] - 1711:1
**Maryland** [80] - 1711:8, 1712:24, 1713:3, 1724:16, 1726:9, 1726:14, 1726:18, 1731:17, 1732:4, 1732:17, 1732:20, 1735:3, 1735:5, 1735:7, 1735:16, 1736:6, 1736:11, 1736:14, 1736:18, 1736:24, 1740:22, 1749:6, 1753:9, 1755:23, 1760:15, 1762:23, 1762:25, 1763:4, 1765:16, 1768:19,

1768:20, 1782:14, 1782:15, 1787:21, 1791:13, 1801:13, 1813:22, 1814:1, 1834:3, 1834:7, 1834:12, 1835:2, 1835:25, 1836:4, 1836:10, 1836:14, 1836:17, 1837:3, 1837:16, 1837:19, 1838:1, 1838:4, 1838:5, 1838:6, 1838:13, 1838:17, 1838:25, 1839:6, 1839:9, 1839:13, 1839:17, 1839:18, 1839:20, 1839:25, 1840:6, 1840:9, 1840:14, 1840:21, 1840:24, 1842:7, 1850:4, 1850:24, 1851:15, 1854:20, 1856:15, 1856:21, 1862:11

**masks** [1] - 1801:17
**Massachusetts** [1] - 1815:20
**masterful** [1] - 1789:21
**match** [1] - 1780:2
**material** [3] - 1744:20, 1858:12
**materials** [1] - 1835:20
**mates** [1] - 1796:17
**matter** [12] - 1723:7, 1736:16, 1736:17, 1756:11, 1798:8, 1814:6, 1822:3, 1825:22, 1833:14, 1844:19, 1861:19, 1876:11
**MATTER** [1] - 1711:10
**matters** [5] - 1747:25, 1761:15, 1819:16, 1829:1, 1829:3
**mattress** [1] - 1811:17, 1839:13
**mattresses** [2] - 1715:3, 1835:18
**Maximilliano** [4] - 1718:3, 1718:12, 1749:3, 1801:5
**maximize** [2] - 1721:24, 1752:24
**mean** [14] - 1754:3, 1767:23, 1782:9, 1784:23, 1788:24, 1789:1, 1797:16, 1797:20, 1801:8, 1806:10, 1813:25, 1820:17, 1828:13, 1864:22
**meaning** [2] - 1795:19, 1830:23
**means** [33] - 1721:25, 1722:4, 1739:15, 1752:15, 1763:17, 1786:5, 1786:10, 1787:1, 1834:23, 1835:22, 1842:18, 1851:12, 1851:24, 1852:9, 1852:12, 1856:14, 1856:24, 1857:11, 1857:24, 1858:2, 1858:10, 1858:16, 1859:19, 1860:8, 1860:16, 1861:3, 1863:23, 1864:3, 1864:10, 1864:12, 1866:1, 1866:3, 1867:10
**meant** [1] - 1783:23
**measure** [1] - 1791:19
**measured** [1] - 1845:6
**mechanics** [1] - 1866:25
**medical** [1] - 1854:2
**medication** [1] - 1753:25
**meet** [2] - 1737:4, 1793:6
**meeting** [1] - 1735:18
**member** [22] - 1770:13, 1811:10, 1841:4, 1842:5, 1842:6, 1843:15, 1843:19, 1844:7, 1844:21, 1844:22, 1845:7, 1845:21, 1845:23, 1846:9, 1848:12, 1848:16, 1848:23, 1849:11, 1849:13, 1866:9, 1867:9, 1867:16
**members** [21] - 1714:12, 1719:20,

1724:3, 1725:24, 1753:1, 1754:16, 1776:15, 1777:3, 1816:17, 1819:24, 1842:14, 1843:18, 1845:22, 1847:15, 1848:19, 1849:1, 1852:15, 1867:8, 1871:8, 1875:12
**memories** [1] - 1871:22
**memory** [2] - 1777:25, 1827:25
**men** [28] - 1714:22, 1715:9, 1715:13, 1715:17, 1717:21, 1718:9, 1719:14, 1719:18, 1725:2, 1725:7, 1726:20, 1728:8, 1730:6, 1738:18, 1742:1, 1745:9, 1745:14, 1748:13, 1749:7, 1749:11, 1752:18, 1752:23, 1767:25, 1804:4, 1808:13, 1808:22, 1811:20, 1816:14
**mental** [4] - 1750:13, 1809:20, 1809:21, 1859:11
**mentioned** [4] - 1741:20, 1807:25, 1826:19, 1844:8
**mere** [7] - 1845:20, 1845:21, 1845:25, 1846:4, 1864:4, 1865:2, 1869:11
**merely** [4] - 1829:15, 1833:5, 1846:7, 1853:22
**Merit** [1] - 1876:8
**merit** [1] - 1806:22
**merits** [2] - 1867:12, 1867:17
**message** [4] - 1718:15, 1718:16, 1718:21, 1751:22
**messages** [4] - 1751:15, 1751:16, 1751:21, 1840:4
**messy** [2] - 1757:16, 1757:17
**met** [14] - 1731:11, 1732:12, 1741:2, 1741:11, 1741:14, 1742:25, 1743:1, 1743:19, 1780:9, 1789:13, 1821:16, 1832:6, 1842:15
**Mexico** [1] - 1764:5
**mic** [1] - 1871:5
**Michael** [3] - 1711:14, 1711:19, 1723:2
**middle** [1] - 1784:9
**might** [15] - 1727:12, 1737:25, 1768:15, 1780:2, 1781:4, 1800:24, 1801:23, 1803:24, 1803:25, 1805:9, 1807:2, 1814:3, 1821:23, 1845:18, 1862:20
**milieu** [1] - 1805:20, 1805:22
**militiamen** [1] - 1804:6
**mind** [9] - 1736:1, 1789:18, 1790:21, 1833:2, 1847:20, 1853:25, 1854:3, 1854:5, 1867:21
**minds** [2] - 1763:8, 1793:23
**minimal** [3] - 1738:20, 1861:13, 1861:19
**minor** [2] - 1845:9, 1845:18
**minute** [1] - 1872:8
**minutes** [6] - 1714:17, 1715:9, 1754:18, 1774:10, 1813:13, 1840:16
**miraculously** [1] - 1717:11
**miscarriage** [1] - 1767:2
**misery** [1] - 1751:6
**misrepresentations** [1] - 1744:17
**miss** [1] - 1754:11
**mission** [1] - 1721:3

**misstatement** [2] - 1744:19, 1858:11
**mistake** [6] - 1831:17, 1852:13, 1852:23, 1864:11, 1866:3, 1873:11
**mistakenly** [1] - 1858:5
**mister** [1] - 1787:16
**mistreated** [1] - 1752:21
**mistreatment** [1] - 1746:17
**MIT** [2] - 1777:20, 1806:20
**mnemonic** [1] - 1811:12
**model** [2] - 1725:4, 1745:12
**modern** [1] - 1756:24
**modern-day** [1] - 1756:24
**moment** [7] - 1722:23, 1722:24, 1741:17, 1766:13, 1777:19, 1821:21, 1874:24
**momentary** [1] - 1814:2
**Monday** [12] - 1737:2, 1737:4, 1738:5, 1786:1, 1814:11, 1815:21, 1815:22, 1836:4, 1839:7, 1839:23, 1840:7, 1840:11
**money** [25] - 1726:13, 1734:24, 1735:9, 1738:20, 1739:22, 1741:6, 1744:5, 1744:9, 1744:15, 1752:15, 1764:9, 1764:10, 1764:23, 1765:3, 1772:6, 1772:16, 1774:18, 1774:21, 1781:2, 1781:3, 1786:16, 1811:19, 1811:20, 1861:4, 1861:12
**Montemarano** [2] - 1711:19, 1777:3, 1777:6, 1806:19, 1806:22, 1807:3, 1807:7, 1808:25, 1813:15, 1815:15, 1817:8, 1832:21
**MONTEMARANO** [22] - 1713:7, 1713:11, 1713:13, 1713:21, 1753:17, 1753:21, 1753:25, 1754:3, 1754:13, 1776:25, 1777:7, 1802:9, 1817:9, 1817:17, 1818:2, 1818:6, 1818:9, 1818:15, 1869:18, 1870:21, 1873:12, 1874:3
**month** [4] - 1729:23, 1779:10, 1779:20, 1815:21
**months** [9] - 1717:8, 1717:19, 1728:14, 1730:5, 1731:1, 1731:11, 1751:12, 1779:18, 1788:2
**Moran** [5] - 1737:22, 1738:8, 1738:11, 1738:18, 1762:17
**moreover** [1] - 1841:16, 1844:24, 1846:6
**morning** [9] - 1713:5, 1713:9, 1714:9, 1714:10, 1737:23, 1754:22, 1754:23, 1776:15, 1777:10
**mornings** [1] - 1836:5
**most** [17] - 1731:22, 1744:4, 1744:5, 1752:22, 1773:19, 1778:20, 1778:22, 1779:2, 1799:20, 1800:13, 1804:4, 1805:19, 1807:5, 1811:8, 1811:12
**mostly** [1] - 1715:3
**mother** [2] - 1734:21
**mother's** [1] - 1741:1
**motivating** [1] - 1853:19
**motive** [1] - 1828:1

**motives** [1] - 1853:16
**mouth** [2] - 1787:9, 1789:8
**move** [6] - 1714:1, 1714:5, 1725:8, 1746:4, 1764:6, 1855:10
**moved** [4] - 1745:3, 1745:4, 1745:8, 1802:18
**movement** [8] - 1739:24, 1760:18, 1760:24, 1761:19, 1761:25, 1851:24, 1856:2, 1861:3
**moves** [1] - 1738:14
**movie** [1] - 1796:22
**moving** [2] - 1752:1, 1765:22
**MR** [46] - 1713:7, 1713:11, 1713:13, 1713:21, 1713:24, 1741:21, 1753:17, 1753:21, 1753:25, 1754:3, 1754:10, 1754:13, 1754:14, 1754:21, 1754:24, 1774:11, 1776:25, 1777:7, 1802:9, 1804:19, 1809:15, 1810:7, 1817:9, 1817:17, 1818:2, 1818:6, 1818:9, 1818:15, 1869:18, 1869:24, 1870:10, 1870:12, 1870:16, 1870:21, 1870:22, 1871:1, 1871:4, 1873:12, 1873:14, 1873:17, 1873:20, 1873:24, 1874:3, 1874:4, 1874:6, 1875:1
**MS** [7] - 1713:25, 1714:6, 1714:20, 1722:19, 1728:22, 1741:20, 1741:23
**Muerte** [1] - 1718:20
**multimedia** [1] - 1840:3
**multiple** [12] - 1722:15, 1722:19, 1726:7, 1729:20, 1749:19, 1755:22, 1755:23, 1755:24, 1756:1, 1837:10, 1840:8, 1840:13
**multiple-count** [1] - 1722:15
**murder** [23] - 1717:15, 1717:19, 1717:24, 1718:2, 1718:5, 1748:20, 1756:19, 1759:2, 1779:14, 1779:15, 1779:21, 1779:24, 1787:23, 1794:14, 1795:22, 1795:23, 1796:3, 1798:20, 1799:3, 1808:16, 1809:10, 1809:19, 1837:9
**murdered** [3] - 1716:17, 1717:9, 1756:20
**murdering** [1] - 1809:4
**must** [77] - 1758:4, 1758:7, 1765:19, 1769:6, 1775:11, 1782:6, 1782:7, 1811:14, 1813:7, 1819:16, 1819:22, 1820:5, 1821:13, 1821:25, 1822:16, 1823:11, 1823:24, 1825:4, 1826:9, 1827:7, 1830:19, 1830:22, 1830:25, 1832:19, 1842:1, 1842:9, 1842:20, 1843:12, 1843:17, 1844:2, 1844:9, 1844:15, 1846:10, 1846:15, 1846:25, 1847:2, 1847:16, 1847:19, 1849:7, 1851:6, 1851:20, 1852:7, 1852:9, 1852:15, 1852:20, 1853:18, 1853:22, 1855:5, 1855:13, 1855:21, 1856:4, 1856:7, 1857:7, 1857:19, 1857:21, 1858:7, 1859:13, 1859:24, 1860:20, 1860:25, 1861:17, 1862:17, 1862:24, 1863:14, 1863:20, 1864:6, 1864:9,

1864:19, 1864:22, 1865:7, 1865:21, 1865:25, 1868:23, 1868:25, 1869:4, 1870:3
**mutual** [1] - 1842:20
**Myra** [1] - 1767:2
**myriad** [1] - 1768:17

# N

**nail** [2] - 1767:10, 1767:12
**name** [16] - 1713:14, 1723:1, 1727:3, 1727:8, 1727:13, 1728:12, 1729:10, 1733:5, 1760:25, 1762:16, 1766:23, 1778:1, 1800:10, 1822:7, 1872:4
**named** [9] - 1717:12, 1721:11, 1722:1, 1731:14, 1732:12, 1737:21, 1740:19, 1742:25, 1748:7
**namely** [1] - 1856:25
**names** [5] - 1730:15, 1730:19, 1733:6, 1733:7, 1734:2
**Nancy** [1] - 1796:3
**nasty** [2] - 1774:4
**nation** [1] - 1816:1
**national** [1] - 1821:18
**native** [2] - 1834:2, 1834:6
**nature** [5] - 1821:23, 1843:2, 1845:16, 1848:8, 1861:11
**near** [3] - 1761:2, 1761:3, 1865:3
**necessarily** [4] - 1782:20, 1828:13, 1846:2, 1865:11
**necessary** [7] - 1714:3, 1714:4, 1846:9, 1853:14, 1867:6, 1868:24, 1875:8
**necessities** [2] - 1715:10, 1735:21
**need** [19] - 1753:5, 1753:21, 1753:22, 1761:14, 1770:12, 1828:7, 1842:14, 1842:16, 1844:21, 1844:23, 1844:24, 1845:2, 1846:22, 1847:10, 1852:17, 1860:10, 1865:24, 1867:24, 1872:11
**needed** [2] - 1721:18, 1865:1
**needing** [1] - 1872:12
**needn't** [1] - 1775:5
**needs** [1] - 1794:17
**neighborhood** [2] - 1716:21, 1777:24
**Nelson** [1] - 1783:12
**nervous** [1] - 1720:20
**never** [40] - 1741:2, 1741:11, 1745:12, 1745:13, 1767:8, 1772:20, 1773:7, 1774:14, 1784:20, 1786:19, 1789:9, 1790:1, 1790:2, 1790:4, 1790:6, 1790:7, 1790:10, 1790:20, 1794:15, 1797:9, 1797:13, 1798:6, 1798:7, 1799:5, 1800:6, 1800:8, 1800:12, 1808:6, 1822:21, 1822:22, 1823:22, 1853:4, 1867:11, 1867:21, 1867:23, 1872:22, 1873:12
**new** [1] - 1752:6
**New** [10] - 1731:25, 1732:2, 1734:23, 1735:6, 1735:9, 1736:11, 1764:8, 1764:24, 1765:2, 1765:15

**news** [1] - 1777:16
**next** [10] - 1715:16, 1719:1, 1728:17, 1738:6, 1752:3, 1754:6, 1754:8, 1761:7, 1770:16, 1843:17
**nice** [4] - 1743:8, 1743:21, 1777:24, 1784:15
**niche** [1] - 1815:12
**night** [7] - 1717:15, 1720:3, 1777:21, 1779:9, 1779:24, 1787:10, 1787:11
**nine** [1] - 1740:21
**ninth** [1] - 1872:23
**Nissan** [3] - 1727:2, 1727:18, 1728:18
**nobody** [2] - 1792:13, 1793:22
**nobody's** [1] - 1796:13
**non** [3] - 1830:22, 1830:23, 1859:3
**non-English** [1] - 1830:22, 1830:23
**non-physical** [1] - 1859:3
**none** [5] - 1756:12, 1756:13, 1771:7, 1771:18, 1828:9
**nonexistence** [1] - 1824:23
**noon** [1] - 1776:17
**Norfo** [2] - 1733:6, 1738:2
**Norfolk** [2] - 1736:25, 1737:7
**normally** [1] - 1788:10
**NORTHERN** [1] - 1711:2
**nose** [1] - 1783:16
**note** [4] - 1747:12, 1771:22, 1844:14, 1867:7, 1867:14, 1867:19
**notebook** [1] - 1729:10
**notebooks** [1] - 1786:12
**noted** [5] - 1747:1, 1747:4, 1832:20, 1868:4, 1870:17
**notes** [5] - 1800:10, 1819:2, 1875:12, 1875:14
**nothing** [19] - 1748:10, 1749:15, 1753:7, 1772:24, 1775:23, 1778:23, 1779:15, 1779:19, 1783:18, 1787:2, 1790:13, 1791:4, 1791:6, 1795:23, 1799:24, 1800:15, 1813:14, 1870:6, 1875:25
**notion** [2] - 1805:11, 1810:21
**notwithstanding** [3] - 1767:17, 1790:21, 1805:9
**November** [28] - 1718:24, 1719:4, 1721:9, 1733:9, 1737:24, 1750:1, 1751:11, 1751:23, 1762:18, 1765:24, 1770:1, 1779:18, 1787:19, 1787:23, 1795:1, 1795:2, 1812:6, 1834:12, 1840:18, 1840:19, 1840:23, 1846:22, 1850:11, 1850:24, 1856:21, 1862:3, 1862:10
**nowhere** [1] - 1720:4
**nth** [1] - 1793:19
**Number** [9] - 1798:14, 1798:17, 1872:8, 1872:20, 1874:8, 1875:3, 1875:4, 1875:5
**number** [38] - 1718:23, 1718:24, 1720:10, 1727:19, 1727:24, 1727:25, 1728:1, 1728:4, 1728:5, 1728:6, 1729:10, 1729:11, 1729:17, 1729:18, 1729:19, 1729:20, 1733:2, 1733:4,

1733:11, 1733:12, 1735:1, 1737:15,
1737:16, 1737:25, 1738:3, 1741:1,
1764:12, 1785:18, 1788:11, 1788:17,
1789:25, 1796:16, 1806:1, 1815:9
**numbers** [10] - 1717:17, 1717:18,
1717:19, 1717:20, 1717:22, 1729:21,
1738:5, 1785:19, 1788:6, 1797:9
**numerically** [1] - 1867:22
**numerous** [1] - 1733:13

# O

**o'clock** [1] - 1816:24
**oath** [5] - 1749:1, 1789:15, 1804:10,
1866:19, 1867:14
**Oath** [1] - 1872:3
**object** [10] - 1746:17, 1747:22, 1772:20,
1772:21, 1782:6, 1820:19, 1841:15,
1842:17, 1842:19, 1847:18
**objected** [1] - 1821:1
**objection** [1] - 1741:21
**objections** [4] - 1820:8, 1869:18,
1869:20, 1869:23
**objective** [6] - 1793:8, 1794:1, 1795:18,
1842:8, 1843:23, 1848:1
**objectively** [2] - 1805:1, 1816:3
**objectives** [3] - 1845:3, 1846:8, 1846:11
**objects** [1] - 1837:13
**obligated** [5] - 1774:24, 1774:25,
1789:15, 1793:22
**obligation** [8] - 1756:25, 1758:2,
1790:19, 1800:19, 1803:5, 1808:22,
1819:4, 1823:19
**observations** [3] - 1748:3, 1748:18,
1810:15
**observed** [3] - 1721:21, 1749:2,
1824:16
**obtain** [1] - 1856:24
**obtained** [4] - 1739:15, 1857:10,
1857:23, 1860:8
**obtaining** [1] - 1790:14
**obvious** [9] - 1761:11, 1767:24,
1778:21, 1791:22, 1791:25, 1807:9,
1810:22, 1813:3, 1873:13
**obviously** [3] - 1767:23, 1822:4,
1864:23
**occasion** [14] - 1721:11, 1727:10,
1727:21, 1732:2, 1735:22, 1736:14,
1736:18, 1745:3, 1750:3, 1772:16,
1828:6, 1831:4, 1845:17
**occasions** [6] - 1736:19, 1748:25,
1749:2, 1749:15, 1749:19, 1750:2
**occur** [1] - 1811:7
**occurred** [14] - 1753:19, 1761:19,
1765:24, 1767:7, 1771:24, 1773:7,
1774:8, 1774:23, 1813:17, 1815:23,
1833:14, 1854:14, 1869:15, 1872:18
**occurrence** [4] - 1741:9, 1854:7,
1854:11, 1855:12

**October** [5] - 1770:4, 1770:5, 1837:20,
1840:15, 1840:18
**odd** [1] - 1796:11
**OF** [4] - 1711:1, 1711:4, 1713:1, 1877:6
**offense** [20] - 1734:11, 1775:18,
1832:25, 1833:1, 1834:18, 1834:22,
1841:10, 1841:14, 1842:10, 1843:13,
1847:3, 1849:20, 1850:8, 1850:20,
1851:4, 1854:24, 1858:6, 1863:4,
1863:5, 1869:3
**offenses** [3] - 1725:14, 1779:1, 1833:13
**offer** [5] - 1725:17, 1735:11, 1770:20,
1783:1, 1832:12
**offered** [9] - 1735:2, 1736:15, 1743:22,
1764:15, 1774:22, 1780:17, 1792:5
**offers** [1] - 1820:20
**officer** [3] - 1777:20, 1778:1, 1806:19
**official** [7] - 1828:12, 1830:9, 1830:14,
1830:15, 1830:17, 1830:20, 1830:23
**officials** [1] - 1828:11
**often** [4] - 1795:15, 1843:6, 1848:9,
1854:8
**old** [3] - 1740:18, 1740:21, 1794:18
**older** [1] - 1777:15
**Olivia** [3] - 1719:25, 1720:10, 1720:20
**omission** [2] - 1744:20, 1858:11
**omissions** [2] - 1848:16, 1848:21
**ON** [1] - 1711:10
**once** [16] - 1758:8, 1762:1, 1762:2,
1762:13, 1774:14, 1775:20, 1777:13,
1778:20, 1782:5, 1783:9, 1797:21,
1814:23, 1815:6, 1815:7, 1858:19
**one** [133] - 1713:16, 1716:24, 1718:22,
1719:2, 1719:6, 1720:19, 1721:9,
1721:10, 1721:20, 1723:9, 1723:22,
1724:2, 1724:4, 1724:9, 1725:8,
1728:24, 1731:7, 1732:1, 1732:8,
1734:5, 1735:8, 1735:9, 1735:22,
1735:23, 1740:23, 1741:17, 1743:24,
1745:3, 1745:25, 1746:3, 1747:5,
1748:9, 1748:25, 1749:8, 1749:14,
1749:20, 1749:22, 1749:23, 1750:3,
1756:21, 1757:5, 1757:25, 1760:4,
1761:2, 1761:7, 1767:2, 1767:22,
1769:1, 1769:16, 1771:24, 1772:5,
1773:14, 1773:19, 1774:22, 1775:25,
1777:4, 1778:18, 1781:4, 1782:4,
1782:6, 1782:7, 1782:12, 1785:14,
1785:20, 1789:7, 1789:20, 1789:25,
1796:11, 1796:15, 1797:11, 1797:13,
1797:15, 1798:8, 1799:20, 1800:7,
1801:12, 1801:16, 1804:4, 1806:13,
1806:24, 1807:1, 1807:5, 1811:15,
1812:12, 1812:17, 1812:19, 1812:24,
1813:16, 1814:18, 1815:5, 1817:11,
1817:23, 1817:24, 1823:18, 1824:5,
1824:14, 1825:9, 1825:17, 1830:3,
1832:25, 1837:14, 1837:15, 1838:9,
1842:3, 1842:6, 1845:17, 1845:22,
1847:4, 1847:5, 1847:8, 1847:12,

1847:17, 1847:18, 1851:25, 1854:5,
1856:2, 1858:12, 1861:5, 1866:9,
1867:3, 1867:8, 1867:24, 1869:1,
1872:11
**one's** [2] - 1854:3, 1854:5
**one-sided** [1] - 1807:1
**ones** [3] - 1735:19, 1767:16, 1784:23
**online** [1] - 1766:19
**open** [1] - 1867:13
**opened** [1] - 1719:20
**opening** [7] - 1714:17, 1725:1, 1725:10,
1755:2, 1806:2, 1815:1, 1820:7
**operate** [1] - 1815:25
**operated** [10] - 1732:7, 1784:23, 1815:9,
1835:2, 1835:15, 1837:18, 1837:25,
1838:3, 1838:12, 1839:16
**operating** [3] - 1726:8, 1726:25,
1784:22
**operation** [8] - 1719:12, 1724:14,
1730:17, 1731:2, 1737:3, 1749:13,
1839:10
**operations** [2] - 1731:8, 1815:11
**operator** [3] - 1749:5, 1784:25, 1785:1
**opinion** [13] - 1773:18, 1774:1, 1819:21,
1820:17, 1829:1, 1829:2, 1829:8,
1829:12, 1829:15, 1829:16, 1869:8,
1869:10
**opinions** [2] - 1821:5, 1829:9
**opportunities** [1] - 1805:16
**opportunity** [5] - 1782:25, 1790:5,
1792:5, 1813:6, 1827:24
**opposed** [1] - 1858:4
**oppressed** [4] - 1782:20, 1783:4,
1791:3, 1793:12
**option** [2] - 1796:15, 1796:16
**options** [3] - 1796:11, 1802:16, 1805:18
**orally** [1] - 1867:13
**ordained** [1] - 1778:6
**order** [25] - 1716:5, 1718:2, 1721:24,
1752:24, 1752:25, 1827:12, 1836:24,
1837:10, 1839:1, 1839:13, 1841:25,
1842:13, 1843:25, 1844:25, 1846:24,
1847:7, 1851:5, 1852:19, 1853:13,
1855:2, 1857:6, 1859:7, 1864:7,
1864:18, 1865:6
**ordered** [1] - 1826:24
**ordinarily** [1] - 1829:11
**ordinary** [2] - 1828:15, 1859:15
**organization** [1] - 1815:13
**organizational** [2] - 1814:20, 1814:22
**organize** [2] - 1875:16, 1875:19
**organizer** [1] - 1730:18
**origin** [1] - 1821:18
**Oscar** [1] - 1738:2
**otherwise** [4] - 1771:17, 1786:19,
1807:17, 1867:23
**ought** [2] - 1770:23, 1819:22
**ourselves** [2] - 1801:17, 1875:17
**outcome** [5] - 1824:10, 1828:2,
1828:19, 1844:2, 1844:4

**outlier** [1] - 1782:12
**outline** [1] - 1777:12
**outlined** [1] - 1765:25
**outrageous** [1] - 1806:23
**outright** [1] - 1742:16
**outset** [1] - 1803:5
**outside** [18] - 1715:5, 1715:14, 1731:19, 1745:5, 1745:14, 1758:9, 1758:19, 1758:22, 1763:9, 1776:7, 1777:14, 1808:18, 1809:16, 1827:7, 1836:4, 1836:10, 1836:17
**outward** [1] - 1853:9
**overarching** [1] - 1806:24
**overcome** [1] - 1859:14
**overheard** [1] - 1748:16
**overnight** [2] - 1765:3, 1790:11
**overruled** [1] - 1741:22
**overt** [9] - 1724:4, 1724:7, 1842:7, 1847:4, 1847:8, 1847:11, 1847:13, 1847:17, 1847:20
**overwhelming** [1] - 1726:3
**own** [18] - 1715:22, 1722:7, 1731:23, 1744:6, 1745:14, 1786:12, 1820:5, 1824:7, 1824:17, 1824:18, 1827:4, 1827:17, 1829:17, 1831:23, 1836:25, 1837:11, 1844:16, 1869:7
**owned** [2] - 1716:14, 1745:6
**owner** [2] - 1745:7, 1749:5
**owners** [1] - 1756:22
**ownership** [2] - 1808:20, 1809:19
**owning** [1] - 1809:5

# P

**p.m** [4] - 1816:20, 1817:2, 1817:4, 1817:5
**Pacha** [2] - 1732:12, 1733:4
**pads** [1] - 1867:19
**PAGE** [1] - 1877:6
**Page** [3] - 1869:25, 1870:2, 1871:8
**pages** [1] - 1763:15
**paid** [15] - 1765:2, 1767:19, 1774:13, 1774:16, 1777:22, 1784:11, 1784:13, 1784:17, 1784:19, 1785:2, 1786:8, 1786:11, 1792:14, 1800:6, 1810:20
**painful** [1] - 1741:13
**palpably** [2] - 1807:9, 1810:22
**Pancho** [3] - 1716:18, 1717:20, 1834:1
**Pancho's** [1] - 1729:10
**pantyhose** [1] - 1801:17
**paper** [3] - 1715:11, 1835:19, 1839:10
**paragraph** [4] - 1870:2, 1871:3, 1871:9, 1871:12
**Paragraphs** [1] - 1849:24
**parents** [1] - 1740:20
**Park** [1] - 1839:20
**part** [37] - 1726:17, 1754:11, 1755:14, 1787:4, 1787:22, 1794:13, 1800:3, 1801:2, 1802:4, 1809:6, 1815:14,

1816:11, 1828:8, 1832:1, 1833:23, 1834:25, 1835:3, 1835:7, 1835:11, 1835:14, 1835:17, 1835:21, 1836:1, 1836:7, 1836:12, 1836:15, 1836:18, 1836:21, 1837:1, 1837:4, 1837:8, 1843:10, 1845:1, 1864:6, 1865:10, 1866:25, 1871:24
**participant** [2] - 1844:1, 1846:18
**participants** [1] - 1843:9
**participate** [3] - 1724:14, 1843:21, 1845:18
**participated** [3] - 1813:1, 1845:17, 1846:10
**participation** [14] - 1733:13, 1739:16, 1803:13, 1803:14, 1803:15, 1837:6, 1844:15, 1845:4, 1846:7, 1846:5, 1857:2, 1857:12, 1858:1, 1860:9
**particular** [17] - 1718:9, 1733:11, 1740:16, 1741:2, 1746:9, 1750:11, 1762:10, 1762:11, 1763:15, 1789:24, 1800:20, 1841:24, 1852:16, 1852:18, 1853:6, 1859:10, 1870:3
**particularly** [1] - 1806:12
**parties** [3] - 1819:13, 1822:10, 1843:4
**partisans** [1] - 1869:12
**partnership** [2] - 1841:6, 1848:10
**partnerships** [1] - 1848:11
**parts** [4] - 1765:22, 1778:16, 1778:18, 1845:9
**party** [5] - 1821:10, 1822:9, 1827:15, 1831:1, 1831:2
**pass** [2] - 1717:6, 1819:25
**passing** [1] - 1800:15
**past** [2] - 1854:3, 1872:10
**patriot** [1] - 1804:7
**Patriots** [3] - 1815:17, 1815:18, 1815:19
**pattern** [1] - 1782:11
**pay** [7] - 1723:7, 1772:24, 1785:4, 1786:22, 1800:8, 1819:7
**paycheck** [1] - 1784:15
**paying** [1] - 1778:12
**pecuniary** [1] - 1774:12
**Pelon** [28] - 1716:12, 1716:16, 1716:19, 1717:2, 1717:7, 1717:9, 1717:15, 1717:18, 1717:24, 1718:2, 1718:5, 1718:7, 1728:6, 1746:16, 1748:20, 1756:21, 1759:2, 1787:24, 1787:25, 1788:13, 1794:14, 1796:7, 1796:12, 1808:11, 1808:14, 1808:17, 1808:20, 1809:19
**Pelon's** [5] - 1717:16, 1779:21, 1779:24, 1788:4, 1788:7
**pens** [1] - 1867:19
**people** [38] - 1716:3, 1717:18, 1718:1, 1720:23, 1723:25, 1724:18, 1725:16, 1725:17, 1726:24, 1730:3, 1741:11, 1743:15, 1749:1, 1752:21, 1753:9, 1754:4, 1757:3, 1759:12, 1759:24, 1778:7, 1783:20, 1784:4, 1784:24, 1786:5, 1786:6, 1789:9, 1796:1,

1799:16, 1801:6, 1807:15, 1812:8, 1812:9, 1815:8, 1815:9, 1815:10, 1816:1, 1842:22, 1848:11
**people's** [1] - 1756:24
**per** [2] - 1735:10
**perceive** [1] - 1791:4
**perceived** [1] - 1716:11
**percent** [1] - 1778:24
**perfect** [4] - 1780:21, 1781:12, 1783:6, 1792:9
**perform** [10] - 1745:14, 1747:21, 1772:15, 1773:10, 1821:9, 1821:11, 1845:7, 1845:8, 1859:6
**performance** [1] - 1787:12
**performed** [1] - 1773:14
**performing** [4] - 1750:17, 1768:14, 1768:23, 1859:7
**perhaps** [6] - 1758:17, 1767:2, 1779:10, 1805:9, 1806:5, 1875:18
**period** [8] - 1719:25, 1722:10, 1726:11, 1729:23, 1729:24, 1730:5, 1737:18, 1742:21
**permit** [1] - 1817:13
**permitted** [9] - 1714:1, 1715:12, 1735:19, 1792:14, 1824:6, 1826:4, 1828:25, 1829:2, 1829:20
**person** [44] - 1721:4, 1727:12, 1737:25, 1738:9, 1738:10, 1739:15, 1739:20, 1739:21, 1740:23, 1742:7, 1763:13, 1765:14, 1807:16, 1811:3, 1827:15, 1834:18, 1834:21, 1839:4, 1845:23, 1850:8, 1850:19, 1851:3, 1851:14, 1852:21, 1853:5, 1853:16, 1854:24, 1856:13, 1856:24, 1857:14, 1857:15, 1858:3, 1858:14, 1858:17, 1858:22, 1858:24, 1859:5, 1860:24, 1861:9, 1863:24, 1865:13, 1867:22
**person's** [2] - 1853:3, 1853:25
**personal** [4] - 1723:6, 1780:10, 1821:17, 1828:19
**personally** [2] - 1852:2, 1871:19
**persons** [10] - 1723:22, 1821:19, 1841:7, 1842:2, 1842:11, 1843:10, 1848:4, 1848:5, 1848:25, 1867:15
**persuade** [3] - 1765:7, 1834:19, 1854:21
**persuaded** [4] - 1734:12, 1800:24, 1855:7, 1855:23
**persuading** [2] - 1765:6, 1855:2
**persuasion** [2] - 1855:10, 1855:19
**pertain** [1] - 1868:8
**petite** [1] - 1744:8
**phase** [2] - 1714:13, 1714:14
**phases** [1] - 1714:12
**Philadelphia** [1] - 1796:22
**phon)** [1] - 1802:7
**phone** [39] - 1717:17, 1718:17, 1718:23, 1720:8, 1720:9, 1727:19, 1728:2, 1729:13, 1729:14, 1729:16, 1729:19, 1732:24, 1733:3, 1733:4, 1733:11,

1733:17, 1735:12, 1737:14, 1737:16, 1756:2, 1764:12, 1787:25, 1788:1, 1788:3, 1788:6, 1788:7, 1788:9, 1788:11, 1788:22, 1797:8, 1797:9, 1797:15, 1838:24, 1839:4

**phones** [5] - 1733:8, 1756:2, 1797:14, 1797:17, 1838:18

**Photograph** [1] - 1728:21

**photograph** [5] - 1742:23, 1761:1, 1762:15, 1793:15, 1799:17

**photographs** [7] - 1759:9, 1760:12, 1761:4, 1768:21, 1780:13, 1782:19, 1799:22

**phrase** [3] - 1784:10, 1791:7, 1860:15

**physical** [18] - 1716:9, 1722:9, 1724:17, 1726:22, 1729:3, 1733:16, 1746:9, 1747:7, 1750:12, 1785:8, 1789:10, 1805:25, 1809:21, 1858:17, 1859:2, 1859:3, 1859:11, 1863:23

**physically** [4] - 1724:18, 1737:16, 1837:21, 1865:12

**pick** [6] - 1732:2, 1735:4, 1737:7, 1738:13, 1766:8, 1772:16

**picked** [6] - 1735:6, 1738:11, 1762:22, 1763:4, 1766:19, 1799:16

**picking** [1] - 1799:23

**picture** [3] - 1718:15, 1718:19, 1728:24

**pictures** [4] - 1728:19, 1736:8, 1761:16, 1767:12

**piece** [3] - 1774:22, 1776:1, 1787:3

**pieces** [1] - 1778:20

**pile** [1] - 1798:11

**piling** [1] - 1798:9

**pimp** [4] - 1784:9, 1784:25, 1796:20

**pimps** [4] - 1748:17, 1784:24, 1837:10, 1837:11

**pink** [2] - 1799:21

**pistol** [4] - 1719:5, 1840:4, 1840:5, 1840:22

**pistol-grip** [1] - 1840:22

**pity** [1] - 1757:23

**place** [26] - 1717:22, 1720:2, 1725:8, 1727:22, 1756:17, 1760:1, 1761:7, 1761:12, 1763:17, 1772:4, 1786:19, 1788:1, 1811:15, 1827:11, 1837:18, 1837:25, 1838:3, 1838:4, 1838:5, 1838:12, 1838:22, 1839:8, 1839:14, 1854:14, 1863:25, 1865:14

**placed** [6] - 1718:17, 1720:16, 1731:4, 1831:8, 1838:23, 1839:4

**places** [10] - 1732:8, 1760:14, 1786:4, 1835:2, 1835:5, 1835:13, 1835:16, 1835:20, 1839:16, 1840:13

**plain** [1] - 1783:16

**plan** [6] - 1744:11, 1777:13, 1801:19, 1844:10, 1845:16, 1846:5

**planned** [3] - 1718:12, 1752:16, 1852:6

**plans** [1] - 1724:6

**plant** [2] - 1742:23, 1742:24

**play** [3] - 1778:5, 1845:9

**played** [4] - 1759:14, 1830:1, 1845:18, 1864:6

**playing** [4] - 1750:5, 1769:14, 1786:4, 1798:11

**plea** [1] - 1752:2

**pleas** [1] - 1822:19

**pleased** [1] - 1866:24

**pled** [1] - 1822:18

**plenty** [3] - 1727:6, 1784:21, 1793:21

**plight** [1] - 1757:19

**plus** [1] - 1813:10

**PM** [1] - 1711:9

**pockets** [1] - 1715:17

**point** [17] - 1713:15, 1752:12, 1756:5, 1766:13, 1779:16, 1782:1, 1782:14, 1783:4, 1783:11, 1792:3, 1797:11, 1797:15, 1799:14, 1806:24, 1819:13

**pointed** [4] - 1757:19, 1760:23, 1760:25, 1811:2

**Police** [5] - 1770:14, 1770:21, 1777:22, 1777:25, 1792:6

**police** [27] - 1720:1, 1720:7, 1720:21, 1720:23, 1721:4, 1735:25, 1736:1, 1743:17, 1745:4, 1748:9, 1749:8, 1767:11, 1769:24, 1770:16, 1777:20, 1779:8, 1779:9, 1779:12, 1780:16, 1780:17, 1783:1, 1787:15, 1795:11, 1795:14, 1795:16, 1815:11, 1839:1

**policies** [1] - 1814:3

**policy** [1] - 1872:10

**pooled** [1] - 1781:3

**poor** [3] - 1792:1, 1802:15, 1805:15

**poorly** [1] - 1785:7

**Portsmouth** [5] - 1736:25, 1737:7, 1737:17, 1839:21, 1839:25

**posed** [3] - 1742:10, 1742:11, 1798:18

**poses** [1] - 1841:22

**position** [2] - 1714:24, 1867:24

**positive** [1] - 1811:9

**positively** [1] - 1771:21

**possess** [3] - 1862:4, 1862:11, 1864:2

**possessed** [12] - 1739:8, 1740:15, 1775:6, 1838:17, 1862:22, 1863:15, 1863:19, 1864:9, 1864:10, 1871:14, 1871:15, 1871:19

**possessing** [6] - 1750:9, 1866:8, 1866:10, 1871:10, 1871:17, 1871:18

**possession** [13] - 1738:2, 1740:9, 1750:6, 1862:1, 1863:21, 1863:22, 1863:23, 1863:24, 1864:4, 1865:3, 1865:12, 1866:12, 1870:3

**possible** [7] - 1756:23, 1762:24, 1763:1, 1771:18, 1819:8, 1866:13

**posturing** [1] - 1794:25

**power** [5] - 1756:8, 1756:10, 1804:4, 1865:15, 1865:22

**powerful** [1] - 1804:5

**practice** [1] - 1805:7

**precise** [3] - 1763:22, 1774:14, 1842:18

**precisely** [4] - 1730:7, 1742:10,

1747:12, 1763:22

**predict** [1] - 1725:11

**pregnant** [8] - 1741:7, 1750:21, 1750:24, 1751:2, 1751:8, 1751:12, 1751:19, 1781:10

**prejudice** [2] - 1763:9, 1820:25, 1821:10

**preliminary** [1] - 1833:2

**premises** [3] - 1772:5, 1772:6, 1772:10

**prepared** [4] - 1792:3, 1814:25, 1829:21, 1868:2

**prerogative** [2] - 1766:9, 1766:15

**presence** [5] - 1748:10, 1787:5, 1814:10, 1845:20, 1865:22

**present** [10] - 1712:2, 1728:25, 1741:6, 1745:19, 1746:4, 1782:5, 1817:13, 1823:20, 1835:10, 1864:25

**presented** [5] - 1813:11, 1826:3, 1827:9, 1829:4, 1830:16

**presenting** [1] - 1814:17

**preside** [1] - 1867:4

**presiding** [1] - 1713:4

**pressure** [1] - 1757:11

**presumed** [1] - 1823:2

**presumes** [1] - 1822:25

**presumption** [3] - 1821:19, 1823:7, 1823:13

**pretend** [1] - 1781:11

**prettiest** [1] - 1766:19

**pretty** [2] - 1744:8, 1797:14

**prevail** [1] - 1855:11

**prevarication** [1] - 1807:10

**previous** [2] - 1828:6, 1869:23

**price** [1] - 1777:22

**prime** [1] - 1822:3

**Prince** [1] - 1839:5

**principles** [1] - 1757:11

**privilege** [1] - 1723:2

**probability** [1] - 1860:18

**probation** [1] - 1731:18

**problem** [2] - 1765:17, 1793:11, 1795:15

**problems** [2] - 1814:4, 1814:5

**procedures** [1] - 1867:1

**proceed** [1] - 1863:10

**PROCEEDINGS** [2] - 1713:1, 1877:12

**Proceedings** [1] - 1876:5

**proceedings** [2] - 1731:5, 1876:10

**PROCEEDINGS............................** [1] - 1877:6

**proceeds** [4] - 1722:8, 1745:21, 1836:19, 1838:17

**process** [4] - 1821:24, 1825:21, 1874:13, 1875:19

**producing** [1] - 1822:24

**professional** [2] - 1774:1, 1828:19

**profit** [1] - 1715:21

**profited** [1] - 1714:22

**profits** [2] - 1721:24, 1752:24

**progression** [1] - 1810:25
**projectile** [1] - 1864:16
**promise** [1] - 1790:2
**promised** [7] - 1714:16, 1743:23, 1754:17, 1770:8, 1777:3, 1800:8, 1813:9
**promises** [3] - 1722:3, 1744:16, 1787:8
**promote** [1] - 1864:3
**promoting** [1] - 1847:23
**prompt** [1] - 1853:17
**prong** [1] - 1817:22
**pronouncing** [2] - 1713:14, 1760:25
**proof** [17] - 1803:6, 1816:10, 1821:17, 1821:20, 1824:21, 1832:7, 1841:25, 1843:1, 1843:9, 1844:3, 1846:2, 1852:20, 1853:3, 1853:7, 1854:4, 1865:21
**properly** [4] - 1820:21, 1824:12, 1844:6, 1873:25
**proposal** [1] - 1870:9
**propose** [1] - 1870:14
**proposition** [1] - 1806:24
**prosecuted** [3] - 1862:14, 1862:20, 1863:1
**prosecution** [2] - 1822:6, 1822:20
**prostitute** [13] - 1717:11, 1719:25, 1721:11, 1732:16, 1735:3, 1744:10, 1748:7, 1752:7, 1764:7, 1764:20, 1812:10, 1812:11, 1812:12
**prostitutes** [10] - 1729:6, 1757:20, 1835:9, 1836:9, 1836:14, 1837:6, 1837:11, 1838:10, 1839:8
**prostituting** [2] - 1764:5, 1783:20
**prostitution** [152] - 1715:2, 1716:20, 1722:2, 1723:18, 1723:19, 1723:25, 1724:16, 1724:19, 1724:23, 1725:2, 1725:4, 1725:13, 1725:18, 1726:3, 1727:6, 1730:9, 1733:20, 1733:21, 1734:8, 1734:15, 1734:19, 1735:1, 1736:12, 1736:17, 1736:19, 1737:11, 1738:9, 1739:22, 1741:25, 1743:4, 1743:12, 1743:16, 1743:24, 1744:21, 1745:25, 1750:22, 1751:10, 1751:22, 1756:13, 1756:19, 1756:21, 1759:14, 1760:3, 1760:6, 1760:9, 1760:19, 1760:24, 1761:13, 1761:20, 1761:23, 1762:1, 1762:2, 1762:14, 1763:1, 1763:14, 1764:4, 1764:21, 1765:8, 1765:12, 1765:13, 1765:14, 1767:25, 1769:5, 1769:8, 1770:17, 1770:22, 1771:5, 1771:14, 1773:9, 1774:6, 1774:9, 1779:13, 1781:15, 1786:18, 1786:19, 1786:20, 1787:7, 1789:13, 1794:8, 1800:2, 1800:3, 1800:5, 1807:14, 1808:23, 1808:24, 1809:2, 1809:10, 1833:20, 1834:17, 1834:21, 1835:2, 1835:6, 1835:13, 1835:16, 1835:20, 1835:24, 1836:6, 1836:17, 1836:20, 1836:23, 1836:25, 1837:3, 1837:7, 1837:18, 1837:22, 1837:25,

1838:3, 1838:5, 1838:12, 1838:15, 1838:18, 1838:19, 1838:22, 1838:25, 1839:5, 1839:9, 1839:11, 1839:14, 1839:16, 1839:22, 1840:1, 1840:6, 1840:10, 1840:13, 1840:14, 1840:17, 1840:21, 1841:1, 1841:5, 1849:15, 1849:18, 1850:7, 1850:18, 1851:2, 1851:11, 1851:12, 1851:16, 1851:18, 1853:2, 1853:15, 1853:21, 1854:17, 1854:23, 1855:4, 1855:16, 1855:19, 1855:5, 1856:9, 1856:11, 1856:14
**protect** [2] - 1715:11, 1804:9
**protecting** [1] - 1777:21
**protection** [1] - 1778:15
**protects** [1] - 1803:6
**prove** [52] - 1739:12, 1740:11, 1773:13, 1808:22, 1809:7, 1815:3, 1822:20, 1823:21, 1823:22, 1824:21, 1832:11, 1842:1, 1842:9, 1842:20, 1843:12, 1847:2, 1847:8, 1847:16, 1851:5, 1851:6, 1851:20, 1852:1, 1852:9, 1852:20, 1853:1, 1853:14, 1853:18, 1855:5, 1855:21, 1856:4, 1856:7, 1857:6, 1857:7, 1857:21, 1858:7, 1859:24, 1860:20, 1860:25, 1861:17, 1861:24, 1862:17, 1862:24, 1863:7, 1863:14, 1863:19, 1863:21, 1864:13, 1864:18, 1864:19, 1865:6, 1865:7, 1865:19
**proved** [5] - 1714:15, 1825:16, 1832:16, 1844:20, 1860:13
**proven** [11] - 1823:5, 1823:17, 1826:5, 1833:9, 1852:14, 1852:24, 1855:13, 1856:4, 1857:19, 1865:17, 1865:19
**provide** [3] - 1810:13, 1856:24, 1858:2
**provided** [12] - 1713:8, 1717:17, 1717:20, 1739:14, 1817:10, 1817:11, 1830:20, 1838:9, 1857:10, 1857:23, 1860:7, 1875:8
**provides** [1] - 1727:17
**providing** [2] - 1806:17, 1811:2
**psychological** [1] - 1859:3
**public** [2] - 1741:10, 1841:22
**puking** [1] - 1803:2
**pull** [1] - 1721:13
**pulled** [1] - 1799:18
**punches** [1] - 1786:4
**punishment** [2] - 1866:13, 1866:20
**purchased** [4] - 1835:18, 1836:13, 1839:10, 1840:16
**purchasing** [1] - 1852:5
**purpose** [42] - 1736:19, 1760:1, 1761:12, 1761:20, 1761:22, 1761:24, 1762:10, 1762:25, 1767:17, 1768:14, 1768:23, 1769:4, 1771:14, 1774:5, 1775:7, 1775:24, 1789:11, 1802:2, 1809:8, 1810:12, 1810:14, 1810:18, 1831:9, 1839:21, 1840:1, 1840:9, 1840:14, 1840:25, 1841:8, 1842:18, 1842:19, 1843:22, 1846:16, 1847:19,

1848:18, 1853:15, 1853:20, 1855:4, 1861:10, 1863:12, 1869:11
**purposely** [4] - 1831:16, 1858:4, 1864:10, 1866:2
**purposes** [21] - 1722:7, 1723:18, 1723:19, 1723:25, 1724:16, 1724:19, 1725:18, 1726:2, 1730:9, 1733:20, 1733:21, 1734:8, 1760:19, 1760:24, 1762:14, 1800:2, 1844:13, 1846:7, 1846:11, 1853:16, 1861:8
**push** [1] - 1774:5
**pushed** [6] - 1746:24, 1747:14, 1773:6, 1773:24, 1774:3, 1774:5
**put** [8] - 1722:7, 1724:5, 1772:19, 1772:21, 1793:2, 1805:10, 1812:15, 1869:19
**putting** [1] - 1778:19
**puzzle** [1] - 1778:20

## Q

**qualifications** [1] - 1829:9
**QUARLES** [1] - 1711:11
**Quarles** [3] - 1713:4, 1765:23, 1800:18
**questioned** [1] - 1769:17
**questioner** [1] - 1769:21
**questioning** [1] - 1769:23
**questions** [9] - 1742:10, 1742:11, 1790:5, 1793:11, 1798:12, 1803:23, 1807:3, 1820:8, 1820:23
**quiet** [3] - 1753:2, 1809:11, 1809:14
**quite** [4] - 1735:22, 1803:20, 1804:1, 1828:16
**quote** [1] - 1783:12

## R

**R.D.F** [2] - 1856:25, 1857:4
**race** [1] - 1821:18
**Rachel** [3] - 1711:15, 1723:1, 1798:25
**racking** [1] - 1794:14
**rail** [1] - 1873:8
**raining** [1] - 1777:14
**raise** [2] - 1782:3, 1872:2
**rampant** [1] - 1758:6
**ran** [1] - 1741:18
**rape** [2] - 1741:8, 1839:1
**raped** [1] - 1769:7
**rare** [2] - 1781:23, 1853:4
**rarely** [1] - 1854:4
**rather** [4] - 1744:10, 1751:16, 1805:10, 1846:24
**rational** [1] - 1853:11
**Raudel** [1] - 1806:6
**raw** [2] - 1758:22, 1776:6
**RDF** [1] - 1745:2
**reached** [4] - 1866:24, 1867:23, 1868:11, 1868:13

**reaching** [5] - 1821:16, 1829:7, 1833:8, 1863:11, 1869:2
**read** [9] - 1724:8, 1763:16, 1793:23, 1850:1, 1850:22, 1854:19, 1856:19, 1869:21, 1871:23
**reader** [1] - 1790:21
**readily** [1] - 1864:16
**reading** [1] - 1818:8
**reads** [3] - 1833:23, 1849:23, 1850:11
**ready** [6] - 1713:6, 1713:23, 1753:8, 1776:24, 1777:10, 1818:14
**real** [7] - 1727:12, 1740:4, 1743:7, 1748:2, 1752:15, 1804:7, 1843:5
**reality** [2] - 1768:4
**realize** [1] - 1777:14
**realleged** [1] - 1862:7
**really** [9] - 1763:20, 1767:8, 1777:15, 1797:2, 1797:25, 1812:14, 1812:15, 1812:20, 1872:21
**Realtime** [1] - 1876:9
**reason** [4] - 1718:5, 1718:6, 1740:5, 1761:11, 1763:3, 1771:4, 1771:11, 1795:14, 1804:14, 1807:22, 1822:22, 1824:22, 1825:8, 1829:17, 1848:7, 1852:13
**reasonable** [70] - 1739:13, 1740:11, 1748:1, 1748:17, 1750:19, 1753:6, 1759:15, 1760:6, 1760:10, 1761:24, 1762:4, 1762:9, 1763:3, 1767:6, 1768:12, 1771:16, 1774:7, 1775:20, 1778:7, 1796:2, 1816:11, 1820:3, 1822:21, 1823:5, 1823:9, 1823:17, 1823:22, 1825:4, 1826:5, 1826:9, 1826:10, 1827:4, 1832:16, 1833:9, 1842:2, 1842:10, 1843:13, 1844:17, 1847:3, 1847:16, 1848:22, 1851:7, 1851:21, 1852:15, 1853:19, 1854:14, 1855:6, 1855:22, 1856:8, 1857:8, 1857:22, 1858:7, 1858:14, 1858:22, 1858:24, 1859:5, 1859:16, 1859:17, 1860:13, 1860:17, 1860:21, 1861:1, 1862:17, 1862:25, 1863:7, 1863:15, 1864:19, 1865:7, 1866:8, 1866:18
**reasonableness** [1] - 1748:21
**reasonably** [4] - 1750:16, 1848:15, 1858:13, 1859:9
**reasoned** [1] - 1825:12
**reasons** [3] - 1808:21, 1829:9, 1873:13
**Rebeca** [39] - 1717:13, 1722:1, 1722:12, 1728:25, 1740:17, 1743:17, 1745:2, 1753:3, 1766:1, 1767:2, 1767:3, 1775:8, 1779:6, 1781:18, 1782:4, 1782:15, 1782:21, 1783:10, 1789:10, 1791:22, 1792:24, 1793:8, 1793:18, 1802:2, 1802:16, 1803:7, 1807:17, 1809:8, 1809:17, 1809:18, 1810:16, 1810:23, 1813:6, 1856:25, 1857:10, 1857:24, 1858:9
**Rebeca's** [8] - 1747:9, 1781:24, 1782:4, 1782:12, 1782:25, 1790:3, 1791:20,

1798:23
**REBUTTAL** [1] - 1877:10
**recalled** [1] - 1763:25
**receive** [1] - 1871:22
**received** [10] - 1820:13, 1826:14, 1826:16, 1826:17, 1829:23, 1830:5, 1848:7, 1851:14, 1856:13, 1860:24
**receiving** [4] - 1857:1, 1857:11, 1857:25, 1860:9
**recess** [6] - 1776:19, 1816:25, 1817:2, 1817:4, 1876:2, 1876:4
**Recess** [1] - 1776:21
**recipient** [1] - 1858:25
**reckless** [12] - 1783:16, 1791:7, 1791:23, 1792:25, 1793:1, 1793:2, 1793:4, 1817:14, 1817:21, 1860:14, 1860:15
**recollection** [5] - 1764:2, 1782:16, 1803:21, 1803:22, 1820:6
**reconsider** [1] - 1795:6
**record** [7] - 1713:17, 1818:24, 1819:5, 1854:3, 1869:19, 1872:4, 1876:10
**recorded** [4] - 1749:9, 1770:1, 1779:19, 1830:16
**recording** [1] - 1830:17
**recordings** [5] - 1829:22, 1829:25, 1830:2, 1830:4, 1832:12
**records** [7] - 1720:8, 1720:9, 1728:5, 1732:24, 1733:18, 1735:12, 1797:9
**recovered** [10] - 1719:1, 1719:25, 1729:4, 1729:7, 1729:10, 1737:23, 1746:5, 1749:13, 1751:4, 1752:8
**recruit** [1] - 1856:23
**recruited** [9] - 1731:16, 1739:14, 1744:2, 1766:3, 1771:2, 1835:9, 1857:9, 1857:23, 1860:7
**recruiting** [2] - 1768:10, 1857:19
**recruitment** [2] - 1768:7, 1768:9
**recycling** [2] - 1742:23, 1742:24
**red** [4] - 1759:6, 1776:2, 1808:11, 1813:25
**redraft** [1] - 1777:11
**reexamine** [1] - 1869:7
**reference** [4] - 1815:17, 1850:1, 1850:14, 1850:23
**referred** [3] - 1798:15, 1799:18, 1848:9
**referring** [1] - 1864:25
**refers** [2] - 1785:18, 1841:12
**refined** [1] - 1755:3
**refused** [3] - 1745:8, 1745:15, 1772:19
**refusing** [3] - 1747:21, 1783:17, 1837:22
**regard** [7] - 1760:12, 1787:6, 1806:11, 1810:23, 1843:6, 1843:25, 1847:19
**regarding** [3] - 1785:20, 1792:24, 1804:15
**regardless** [1] - 1819:21
**Registered** [1] - 1876:8
**registration** [2] - 1727:8, 1727:18
**regret** [1] - 1802:18

**regular** [1] - 1744:10
**reintroduce** [1] - 1722:24
**related** [5] - 1722:19, 1725:24, 1751:21, 1751:22, 1833:22
**relates** [4] - 1734:9, 1736:23, 1738:24, 1775:19
**relating** [3] - 1833:19, 1841:4, 1866:25
**relation** [10] - 1740:16, 1803:11, 1803:12, 1862:5, 1862:13, 1862:23, 1863:17, 1864:21
**relationship** [18] - 1768:5, 1771:7, 1771:9, 1771:17, 1771:19, 1780:11, 1780:19, 1780:21, 1780:23, 1780:24, 1781:7, 1781:12, 1781:13, 1783:6, 1788:15, 1791:21, 1792:3, 1792:8
**relationships** [1] - 1781:20
**relatively** [2] - 1742:21, 1814:10
**relevant** [8] - 1725:21, 1725:22, 1725:23, 1731:21, 1748:21, 1750:14, 1833:23, 1833:24
**relied** [2] - 1725:5, 1818:1
**religion** [1] - 1821:18
**relive** [1] - 1741:13
**rely** [2] - 1799:25, 1820:5
**relying** [1] - 1858:14
**remain** [1] - 1874:6
**remaining** [1] - 1782:23
**remains** [1] - 1823:14
**remarkably** [1] - 1719:2
**remember** [25] - 1719:22, 1720:23, 1721:8, 1731:20, 1741:20, 1747:10, 1747:13, 1750:2, 1751:8, 1775:14, 1776:16, 1780:15, 1780:23, 1789:15, 1790:24, 1793:14, 1798:19, 1799:22, 1800:10, 1803:21, 1811:25, 1822:17, 1869:12, 1871:23, 1875:13
**Remember** [1] - 1796:17
**remembered** [1] - 1749:20
**remind** [4] - 1739:17, 1826:7, 1829:18, 1833:4
**reminded** [2] - 1796:22, 1815:24
**reminds** [1] - 1798:11
**removed** [2] - 1740:20, 1810:2, 1810:6
**render** [2] - 1816:4, 1846:24
**rent** [2] - 1800:6, 1800:12
**rental** [1] - 1838:21
**rented** [1] - 1835:5
**repair** [1] - 1716:15
**Repalo** [5] - 1718:4, 1718:12, 1718:13, 1749:3, 1801:5
**repeat** [2] - 1804:21, 1821:25
**repeatedly** [1] - 1769:10
**repetitive** [1] - 1778:9
**replace** [1] - 1758:7
**replaced** [1] - 1784:12
**reply** [1] - 1868:20
**report** [4] - 1735:23, 1736:4, 1747:5, 1755:8
**reported** [3] - 1805:5, 1836:22, 1839:1

**Reported** [1] - 1712:22
**REPORTER** [1] - 1802:8
**reporter** [1] - 1830:15
**Reporter** [2] - 1876:8, 1876:9
**reprehensible** [1] - 1806:14
**represent** [3] - 1754:24, 1827:12, 1868:23
**representation** [2] - 1808:7, 1858:14
**represented** [1] - 1873:25
**representing** [1] - 1723:3
**reputation** [1] - 1785:6
**reputational** [1] - 1859:4
**request** [3] - 1770:20, 1820:23, 1874:9
**requested** [1] - 1804:25
**requesting** [1] - 1713:18
**require** [3] - 1801:11, 1809:1, 1853:1
**required** [11] - 1726:16, 1734:1, 1823:22, 1824:4, 1825:24, 1846:9, 1847:8, 1853:7, 1861:24, 1864:13, 1866:5
**requirement** [3] - 1725:15, 1832:10, 1832:11
**requires** [9] - 1739:12, 1740:11, 1792:19, 1801:12, 1808:5, 1825:3, 1833:16, 1845:10, 1855:19
**rescuing** [1] - 1783:5
**residence** [5] - 1727:22, 1728:18, 1728:19, 1733:9, 1811:16
**resident** [1] - 1729:6
**residing** [2] - 1834:3, 1834:7
**resigned** [2] - 1751:3, 1792:12
**resisted** [1] - 1745:1
**resources** [1] - 1755:19
**respect** [19] - 1715:20, 1725:23, 1730:24, 1732:25, 1737:21, 1739:20, 1740:2, 1740:3, 1740:6, 1740:7, 1743:8, 1747:3, 1749:18, 1799:7, 1808:1, 1816:8, 1857:14, 1858:9, 1860:6
**respectively** [1] - 1850:11
**respond** [1] - 1807:11
**response** [3] - 1745:17, 1773:17, 1807:4
**responsibilities** [1] - 1815:25
**responsibility** [5] - 1718:4, 1723:3, 1808:3, 1812:9, 1837:9
**responsible** [9] - 1715:17, 1721:4, 1729:2, 1742:2, 1746:23, 1748:19, 1812:1, 1812:12, 1848:20
**rest** [4] - 1738:21, 1776:10, 1784:10, 1799:6
**restated** [1] - 1869:23
**restaurant** [1] - 1743:1
**restrained** [1] - 1790:7
**restraint** [2] - 1787:2, 1858:17
**rests** [2] - 1829:19, 1866:16
**result** [13] - 1722:14, 1742:18, 1745:20, 1751:2, 1771:17, 1771:19, 1771:25, 1773:3, 1773:4, 1773:9, 1774:8, 1790:14, 1822:19

**resulted** [1] - 1741:7
**resume** [1] - 1816:20
**resumes** [2] - 1776:23, 1817:7
**Retantelco** [1] - 1740:19
**retire** [2] - 1819:19, 1867:2
**return** [16] - 1753:10, 1757:1, 1758:5, 1758:10, 1758:20, 1758:25, 1760:10, 1762:11, 1763:10, 1770:22, 1804:15, 1814:11, 1832:19, 1868:24, 1876:1, 1876:4
**returning** [1] - 1869:11
**reveal** [1] - 1867:21
**revealed** [2] - 1717:25, 1719:17
**reveals** [1] - 1752:3
**revert** [1] - 1870:4
**review** [3] - 1722:22, 1739:10, 1752:8
**reviewing** [1] - 1828:21
**revised** [1] - 1817:10
**revulsion** [1] - 1803:1
**Reyes** [1] - 1748:14
**Richmond** [1] - 1834:7
**rid** [1] - 1749:16
**ridiculous** [1] - 1810:20
**ridiculousness** [1] - 1810:10
**riding** [1] - 1757:12, 1865:21
**rights** [6] - 1799:8, 1806:18, 1816:2, 1816:5, 1816:7, 1816:8
**rise** [7] - 1713:2, 1776:18, 1776:22, 1817:1, 1817:6, 1872:7, 1876:3
**rival** [2] - 1796:10
**RMR** [2] - 1712:23, 1876:14
**road** [2] - 1791:8, 1791:10
**rob** [2] - 1748:9, 1801:15
**robberies** [1] - 1749:7
**robbery** [3] - 1801:16, 1801:20, 1812:12
**rocks** [3] - 1720:17, 1746:24, 1747:15
**role** [11] - 1759:15, 1778:5, 1778:12, 1779:13, 1781:8, 1790:18, 1792:13, 1801:8, 1845:10, 1845:18
**roles** [1] - 1845:9
**roll** [1] - 1868:16
**romantically** [1] - 1767:21
**room** [24] - 1726:6, 1729:4, 1729:7, 1735:18, 1738:19, 1739:18, 1751:5, 1752:14, 1753:11, 1755:13, 1758:6, 1758:9, 1758:19, 1758:22, 1763:9, 1776:4, 1776:7, 1795:25, 1819:19, 1824:3, 1867:2, 1867:18, 1868:10
**Room** [1] - 1712:23
**rooms** [2] - 1715:4, 1730:23
**ropes** [1] - 1786:25
**rotated** [2] - 1732:5, 1732:8
**rough** [1] - 1815:13
**rounds** [1] - 1784:25
**row** [2] - 1715:15, 1748:13
**rubbing** [3] - 1715:11, 1760:13, 1835:19
**rule** [3] - 1716:1, 1819:21, 1825:1
**ruling** [1] - 1821:3
**rulings** [2] - 1820:22, 1821:4

**run** [2] - 1758:6, 1792:11
**running** [8] - 1716:22, 1729:2, 1731:2, 1731:7, 1732:14, 1787:9, 1789:8, 1796:17
**RUTER** [15] - 1713:24, 1741:21, 1754:10, 1754:14, 1754:21, 1754:24, 1774:11, 1869:24, 1870:10, 1870:12, 1873:14, 1873:17, 1873:20, 1873:24, 1875:1
**Ruter** [12] - 1711:17, 1754:9, 1754:17, 1754:20, 1776:14, 1789:21, 1795:6, 1799:18, 1803:24, 1806:21, 1807:2, 1808:1
**Ruter's** [2] - 1754:12, 1813:3

## S

**sad** [2] - 1811:9, 1815:16
**sadly** [1] - 1815:22
**safe** [1] - 1745:10
**safer** [1] - 1816:13
**safety** [3] - 1770:19, 1841:22
**sale** [2] - 1714:23, 1752:19
**Salvador** [2] - 1792:2, 1834:2
**Sandra** [1] - 1719:22
**Santa** [1] - 1718:20
**Santiago** [15] - 1720:22, 1720:24, 1734:9, 1734:17, 1735:15, 1736:5, 1736:11, 1743:14, 1743:16, 1763:19, 1763:24, 1764:13, 1783:21, 1784:8, 1801:3
**satisfied** [7] - 1823:4, 1825:4, 1826:10, 1843:16, 1860:12, 1863:13, 1864:8
**satisfy** [8] - 1841:25, 1842:13, 1847:7, 1852:3, 1859:24, 1861:17, 1862:16, 1865:25
**save** [2] - 1733:6, 1827:12
**saved** [4] - 1733:2, 1733:4, 1733:6, 1733:7
**saving** [1] - 1783:5
**saw** [60] - 1715:22, 1716:20, 1717:14, 1718:15, 1720:8, 1720:12, 1721:6, 1721:10, 1721:14, 1726:22, 1728:11, 1728:19, 1732:16, 1732:24, 1733:1, 1733:17, 1735:12, 1735:13, 1736:8, 1737:1, 1737:14, 1738:4, 1742:23, 1744:7, 1747:9, 1747:15, 1748:24, 1749:19, 1749:23, 1749:24, 1751:2, 1751:4, 1752:3, 1752:13, 1757:24, 1758:12, 1760:3, 1760:16, 1761:7, 1762:15, 1769:11, 1774:14, 1775:18, 1775:21, 1779:24, 1779:25, 1780:4, 1786:13, 1787:16, 1789:6, 1793:17, 1799:14, 1799:15, 1812:9, 1812:10, 1814:12, 1815:14, 1824:15
**scar** [2] - 1747:15
**scare** [1] - 1752:25
**scared** [6] - 1720:5, 1721:22, 1750:6, 1788:19, 1793:12, 1793:16

**scene** [2] - 1845:20, 1864:5
**scheduling** [1] - 1713:17
**scheme** [6] - 1842:17, 1842:18, 1844:4, 1845:10, 1847:24, 1849:9
**school** [1] - 1740:20
**science** [1] - 1854:2
**scope** [1] - 1844:25
**scrub** [1] - 1808:15
**seamy** [1] - 1805:11
**search** [3] - 1755:22, 1756:1, 1767:12
**searched** [4] - 1727:5, 1728:19, 1730:20, 1743:6
**searches** [2] - 1755:24, 1755:25
**Seat** [1] - 1875:4
**seated** [4] - 1713:5, 1714:11, 1777:2, 1818:18
**second** [11] - 1765:4, 1842:4, 1843:12, 1851:9, 1855:13, 1856:4, 1857:12, 1858:6, 1860:3, 1862:21, 1863:14
**secondarily** [2] - 1809:7, 1812:2
**secondly** [1] - 1713:17
**seconds** [1] - 1777:8
**secrecy** [1] - 1843:2
**Section** [1] - 1780:13
**section** [1] - 1863:3
**sector** [1] - 1806:4
**security** [1] - 1806:19
**see** [36] - 1716:25, 1720:9, 1726:5, 1728:4, 1729:17, 1730:2, 1732:15, 1732:17, 1733:12, 1734:24, 1737:5, 1737:16, 1737:25, 1738:1, 1739:16, 1751:6, 1751:7, 1760:11, 1761:1, 1774:18, 1775:5, 1780:5, 1782:22, 1783:13, 1791:4, 1791:14, 1792:22, 1793:23, 1795:1, 1797:2, 1799:21, 1801:20, 1827:24, 1868:3, 1872:10
**seedy** [1] - 1811:16
**seeing** [4] - 1715:6, 1751:2, 1783:16
**seek** [1] - 1755:8
**seem** [2] - 1766:25, 1794:25
**sees** [2] - 1782:3, 1824:18
**seized** [4] - 1726:22, 1729:13, 1733:16, 1738:16, 1786:3, 1803:10
**select** [1] - 1867:2
**self** [1] - 1747:18
**semi** [2] - 1718:19, 1840:4
**semi-automatic** [2] - 1718:19, 1840:4
**send** [5] - 1734:23, 1764:10, 1764:23, 1840:3, 1867:7
**sending** [1] - 1826:18
**sends** [2] - 1751:23, 1751:25
**sense** [25] - 1749:12, 1772:17, 1780:25, 1781:1, 1784:20, 1785:5, 1785:9, 1788:22, 1788:24, 1796:7, 1797:6, 1797:23, 1797:25, 1799:9, 1824:22, 1825:9, 1826:2, 1827:4, 1827:18, 1829:17, 1831:21, 1843:5, 1866:14, 1866:22
**senses** [1] - 1824:18
**sensible** [1] - 1798:3

**sensitive** [1] - 1713:14
**sent** [6] - 1718:22, 1734:19, 1751:18, 1751:22, 1764:8
**sentence** [1] - 1866:16
**separate** [6] - 1739:4, 1773:12, 1832:19, 1841:10, 1841:20, 1845:7
**separately** [4] - 1725:19, 1789:16, 1789:17, 1832:19
**separating** [1] - 1763:20
**September** [34] - 1720:24, 1720:25, 1727:1, 1730:14, 1731:11, 1734:9, 1734:25, 1735:14, 1743:18, 1748:19, 1760:2, 1763:17, 1763:18, 1763:23, 1765:24, 1769:25, 1770:8, 1779:9, 1779:11, 1780:7, 1783:1, 1837:17, 1838:2, 1838:7, 1838:11, 1838:14, 1840:7, 1840:11, 1840:12, 1849:21, 1850:3, 1854:20, 1856:20, 1862:10
**series** [1] - 1854:10
**serious** [10] - 1723:7, 1822:5, 1858:17, 1858:18, 1858:23, 1858:25, 1859:2, 1859:9, 1859:13, 1859:23
**seriously** [2] - 1717:4, 1804:10
**served** [1] - 1748:4
**serves** [1] - 1747:19
**service** [7] - 1715:8, 1721:12, 1777:23, 1778:2, 1786:6, 1806:17, 1861:14, 1872:9, 1873:2, 1874:16, 1875:6, 1875:7
**services** [2] - 1861:4, 1872:13
**session** [5] - 1713:3, 1776:23, 1817:5, 1817:7
**set** [8] - 1716:7, 1719:8, 1721:25, 1758:7, 1811:9, 1825:17, 1850:13, 1850:22
**setting** [1] - 1754:4
**seven** [4] - 1715:14, 1749:6, 1832:17, 1832:22
**several** [9] - 1724:7, 1726:8, 1748:25, 1750:2, 1755:18, 1784:23, 1818:25, 1833:16
**sex** [68] - 1716:5, 1718:2, 1719:11, 1719:18, 1722:21, 1729:9, 1738:19, 1738:24, 1739:3, 1739:22, 1739:23, 1740:10, 1740:13, 1745:9, 1745:14, 1745:20, 1749:11, 1750:9, 1750:17, 1766:20, 1767:22, 1768:14, 1768:24, 1771:25, 1772:2, 1772:8, 1772:11, 1772:12, 1772:23, 1772:25, 1775:7, 1775:18, 1775:25, 1780:25, 1782:9, 1789:11, 1789:12, 1789:24, 1790:15, 1792:24, 1794:8, 1799:11, 1802:2, 1805:7, 1806:3, 1808:24, 1809:1, 1811:19, 1812:19, 1821:18, 1833:23, 1837:22, 1856:17, 1857:4, 1857:6, 1859:22, 1860:3, 1860:19, 1860:22, 1860:23, 1862:6, 1863:4, 1863:5, 1863:9, 1870:6, 1870:7
**Sex** [1] - 1765:21
**sex-trafficking** [2] - 1775:18, 1805:7

**sexual** [24] - 1715:2, 1715:21, 1722:7, 1724:22, 1745:21, 1747:22, 1834:17, 1834:21, 1849:18, 1850:7, 1850:18, 1851:2, 1851:11, 1851:13, 1851:14, 1854:23, 1855:4, 1855:16, 1856:10, 1856:12, 1856:13, 1857:15, 1859:7, 1859:18
**shabby** [1] - 1811:16
**shackles** [4] - 1809:20, 1809:21, 1809:22
**shame** [1] - 1741:24
**shape** [6] - 1747:17, 1781:12, 1790:1, 1790:17, 1800:1, 1801:9
**shared** [2] - 1745:22, 1836:19
**sheds** [1] - 1847:22
**sheet** [6] - 1713:9, 1730:25, 1785:23, 1817:11, 1819:1, 1832:23
**sheetless** [1] - 1811:17
**sheets** [7] - 1730:15, 1730:18, 1730:19, 1738:10, 1738:19, 1838:15
**shelter** [2] - 1744:13, 1858:2
**shielded** [1] - 1715:6
**shifts** [1] - 1822:21
**shirt** [2] - 1799:21, 1799:22
**shock** [1] - 1781:16
**shocking** [1] - 1794:7
**shoes** [1] - 1777:15
**shoot** [2] - 1793:10
**shooter** [1] - 1780:3
**shop** [1] - 1716:15
**shorter** [1] - 1816:17
**shorthanded** [1] - 1784:10
**shorting** [1] - 1785:6
**shot** [1] - 1803:19
**shotgun** [2] - 1719:6, 1796:19, 1840:22
**shoulders** [1] - 1757:12
**show** [12] - 1748:12, 1759:8, 1759:9, 1767:11, 1785:14, 1795:7, 1814:23, 1815:3, 1820:24, 1847:12, 1868:5
**showed** [4] - 1717:5, 1727:13, 1785:15, 1815:1
**showing** [1] - 1729:5, 1751:21
**shown** [4] - 1797:13, 1806:1, 1853:5, 1854:9
**shows** [4] - 1726:23, 1727:14, 1767:20, 1789:19
**shuttled** [1] - 1715:15
**sic** [2] - 1760:1, 1766:1
**sickened** [1] - 1804:11
**side** [4] - 1777:23, 1817:24, 1820:19, 1820:20
**sided** [1] - 1807:1
**sign** [4] - 1768:3, 1786:7, 1800:11, 1868:12
**signal** [1] - 1783:13
**signed** [2] - 1867:8, 1867:10
**significance** [1] - 1823:24
**significant** [7] - 1726:11, 1727:13, 1747:4, 1747:7, 1747:15, 1764:17,

1853:19

**significantly** [1] - 1809:7

**silver** [1] - 1749:22

**similar** [2] - 1719:2, 1728:24

**similarity** [2] - 1833:17, 1845:25

**simple** [3] - 1724:19, 1739:24, 1822:22

**simply** [10] - 1725:20, 1732:6, 1744:19, 1746:11, 1749:13, 1763:8, 1825:3, 1851:24, 1858:2, 1861:3

**single** [6] - 1742:20, 1746:5, 1810:14, 1816:9, 1819:17, 1845:11

**sip** [1] - 1742:8

**sit** [2] - 1719:14, 1874:23

**site** [1] - 1865:3

**sitting** [4] - 1757:8, 1812:3, 1815:23, 1816:6

**situation** [2] - 1789:22, 1797:4

**six** [6] - 1715:14, 1717:8, 1742:3, 1749:5, 1751:12, 1811:15

**size** [1] - 1747:17

**sketch** [1] - 1801:18

**ski** [1] - 1801:17

**skill** [1] - 1829:4

**skills** [3] - 1741:6, 1750:12, 1805:16

**skin** [1] - 1747:3

**skip** [2] - 1760:21, 1760:22

**slammed** [1] - 1773:4

**slapped** [1] - 1772:10

**slate** [1] - 1823:6

**sleeps** [1] - 1811:16

**slept** [2] - 1735:18, 1767:18

**sliced** [2] - 1747:1, 1747:20

**sliding** [1] - 1791:15

**slowly** [1] - 1819:8

**small** [5] - 1740:19, 1752:14, 1815:18, 1831:19, 1875:6

**smashed** [1] - 1720:18

**smoke** [1] - 1763:20

**softened** [1] - 1743:11

**sole** [7] - 1753:3, 1819:25, 1820:16, 1821:7, 1827:16, 1830:10, 1853:15

**solely** [5] - 1821:13, 1829:19, 1831:1, 1866:18, 1869:10

**solicited** [2] - 1783:22, 1786:24

**someone** [16] - 1744:20, 1782:20, 1783:3, 1783:5, 1785:3, 1789:12, 1793:12, 1797:16, 1798:20, 1807:20, 1811:3, 1829:5, 1849:10, 1849:19, 1858:2, 1871:10

**sometime** [3] - 1743:19, 1745:4, 1816:24

**sometimes** [4] - 1735:21, 1764:10, 1767:10, 1811:9

**son** [2] - 1751:13, 1811:23

**soon** [1] - 1769:9

**sordid** [1] - 1805:11

**Soriano** [3] - 1718:9, 1718:17, 1718:21

**sorrow** [1] - 1757:23

**sorry** [7] - 1726:9, 1728:4, 1734:7,

1749:25, 1799:2, 1802:8, 1830:15

**sort** [8] - 1725:6, 1749:10, 1789:4, 1798:9, 1808:11, 1867:19, 1868:6

**sought** [1] - 1834:24

**sound** [6] - 1777:22, 1778:9, 1782:20, 1783:3, 1783:4, 1793:11

**sounds** [1] - 1773:7

**south** [1] - 1777:23

**Spanish** [3] - 1712:3, 1712:4, 1785:25

**spans** [1] - 1755:15

**spare** [1] - 1804:21

**speaks** [2] - 1730:4, 1730:5

**Special** [6] - 1712:3, 1723:5, 1743:5, 1751:14, 1761:5, 1806:12

**special** [2] - 1780:23, 1829:3

**specific** [9] - 1732:21, 1733:25, 1736:22, 1769:10, 1832:5, 1832:10, 1833:14, 1841:11, 1843:22

**specifically** [3] - 1736:25, 1774:15, 1870:12

**specificity** [1] - 1811:7

**speculate** [1] - 1808:17

**speculation** [1] - 1825:22

**speeding** [1] - 1791:7

**spends** [1] - 1811:15

**spent** [2] - 1777:23, 1806:16

**spin** [1] - 1805:9

**spinning** [1] - 1791:15

**spoken** [2] - 1779:19, 1842:21

**spokesperson** [1] - 1867:4

**sponsor** [1] - 1810:18

**sponsoring** [1] - 1806:9

**squalor** [1] - 1715:4

**stages** [1] - 1716:7

**stained** [1] - 1811:17

**stains** [2] - 1779:25, 1780:4

**stake** [1] - 1844:2

**stamp** [1] - 1776:5

**stand** [10] - 1758:11, 1759:18, 1790:5, 1806:25, 1811:3, 1822:11, 1824:2, 1824:7, 1827:23, 1867:22

**standard** [3] - 1793:2, 1793:6, 1816:9

**standing** [7] - 1757:8, 1761:2, 1761:3, 1769:15, 1807:6, 1841:20, 1847:20

**standpoint** [1] - 1814:7

**stands** [4] - 1756:7, 1776:18, 1817:1, 1876:3

**star** [3] - 1747:13, 1773:21, 1773:22

**star-like** [1] - 1747:13

**start** [6] - 1723:15, 1734:6, 1738:6, 1744:17, 1754:13, 1762:6

**started** [5] - 1729:15, 1755:2, 1795:19, 1815:15, 1873:4

**starting** [9] - 1716:11, 1717:22, 1723:20, 1727:1, 1739:11, 1742:20, 1846:22, 1846:23, 1846:25

**starts** [1] - 1796:23

**state** [29] - 1720:4, 1731:25, 1732:6, 1737:16, 1738:14, 1739:24, 1740:1,

1755:23, 1767:15, 1768:22, 1769:4, 1789:18, 1799:13, 1804:7, 1819:21, 1840:9, 1840:25, 1851:25, 1852:2, 1853:15, 1853:20, 1853:24, 1854:4, 1856:3, 1861:5, 1861:8, 1861:9, 1872:4

**State** [1] - 1815:20

**statement** [18] - 1795:8, 1806:2, 1815:2, 1815:16, 1828:6, 1831:4, 1831:6, 1831:8, 1831:12, 1831:16, 1831:24, 1831:25, 1858:15, 1858:18, 1858:21, 1858:22, 1858:24, 1870:2

**statements** [17] - 1725:1, 1725:11, 1820:7, 1827:1, 1843:8, 1844:16, 1848:3, 1848:5, 1848:16, 1848:20, 1848:24, 1849:3, 1849:5, 1849:8, 1849:10, 1862:8, 1869:23

**states** [1] - 1861:5

**STATES** [3] - 1711:1, 1711:4, 1877:2

**States** [19] - 1713:2, 1723:3, 1740:23, 1741:3, 1741:4, 1741:7, 1742:22, 1756:8, 1764:7, 1805:18, 1806:17, 1814:4, 1822:7, 1835:10, 1841:14, 1855:1, 1862:14, 1862:21, 1863:2

**stating** [1] - 1819:18

**station** [3] - 1732:3, 1750:11, 1799:17, 1859:11, 1859:15

**statue** [3] - 1718:20, 1719:1, 1840:5

**status** [1] - 1714:24

**statute** [1] - 1744:19

**stay** [2] - 1720:3, 1874:16

**stayed** [1] - 1765:2

**stenographic** [1] - 1818:24

**step** [7] - 1719:11, 1754:3, 1754:5, 1847:22, 1873:7, 1873:9, 1873:14

**stereo** [1] - 1717:1

**sticks** [1] - 1720:17

**still** [5] - 1718:8, 1752:4, 1790:25, 1813:21, 1814:13

**stimulate** [1] - 1855:11

**stipulations** [1] - 1820:14

**stop** [4] - 1746:18, 1748:10, 1750:25, 1751:1

**stopped** [1] - 1763:4

**story** [7] - 1756:12, 1768:15, 1769:16, 1770:7, 1779:23, 1794:5, 1797:6

**straightforward** [2] - 1724:11, 1759:12

**strange** [1] - 1811:15

**strangers** [2] - 1784:3, 1811:18

**stream** [1] - 1861:12

**street** [2] - 1796:13, 1796:17

**Street** [1] - 1712:24

**stricken** [2] - 1826:24, 1874:2

**strike** [1] - 1871:2

**strikes** [1] - 1819:3

**striking** [1] - 1813:17

**strong** [3] - 1757:17, 1758:4, 1758:14

**struck** [1] - 1782:5

**stupid** [1] - 1761:21

**style** [2] - 1717:10, 1717:19

**subdued** [1] - 1750:7
**subject** [5] - 1756:11, 1833:12, 1867:11, 1867:17, 1869:18
**subjected** [3] - 1742:4, 1794:4, 1805:23
**subjective** [1] - 1853:8
**subjugation** [1] - 1803:7
**submissiveness** [2] - 1752:10
**submit** [12] - 1740:2, 1741:12, 1742:9, 1742:16, 1742:17, 1746:9, 1752:9, 1763:7, 1771:11, 1807:9, 1808:12, 1813:8
**subpoenas** [1] - 1756:2
**subscribed** [2] - 1728:2, 1728:5
**subscriber** [2] - 1727:19, 1727:24
**subsequently** [1] - 1840:17
**substantial** [1] - 1833:17
**substantive** [5] - 1733:23, 1737:20, 1841:12, 1841:15, 1841:18
**substitute** [1] - 1829:17
**suburbia** [1] - 1781:3
**success** [1] - 1841:24
**successful** [1] - 1841:21
**successfully** [1] - 1861:22
**suck** [1] - 1743:14
**suffer** [1] - 1859:23
**suffered** [1] - 1741:14
**sufficient** [11] - 1823:7, 1845:11, 1846:6, 1847:11, 1852:3, 1859:4, 1859:13, 1859:14, 1864:5, 1865:5, 1865:19
**suggest** [16] - 1766:12, 1777:17, 1778:14, 1778:17, 1779:5, 1781:12, 1782:10, 1783:7, 1784:16, 1789:22, 1791:23, 1793:7, 1794:12, 1799:25, 1805:3, 1807:11
**suggested** [6] - 1759:11, 1786:19, 1806:13, 1806:19, 1806:22, 1809:15
**suggestible** [1] - 1795:10
**suggesting** [5] - 1790:19, 1792:16, 1792:17, 1793:18, 1793:19
**suggestion** [3] - 1805:12, 1808:10, 1810:9
**suggests** [1] - 1752:9
**sum** [2] - 1800:23, 1846:14
**summaries** [3] - 1827:10, 1827:11, 1827:13
**Sunday** [3] - 1814:11, 1836:11, 1840:11
**Superseding** [3] - 1722:15, 1723:10, 1847:9
**superseding** [1] - 1817:11
**support** [7] - 1723:9, 1732:22, 1744:17, 1753:5, 1769:3, 1792:21, 1813:11
**supported** [2] - 1729:3, 1828:3
**supports** [2] - 1722:23, 1745:23
**supposed** [6] - 1772:21, 1792:10, 1792:15, 1808:5, 1811:18
**surely** [1] - 1873:3
**surprising** [1] - 1806:8
**surrender** [1] - 1869:9

**surrounding** [6] - 1750:10, 1801:15, 1852:25, 1853:10, 1854:13, 1859:5
**surveillance** [8] - 1734:4, 1737:1, 1737:6, 1737:8, 1737:18, 1738:10, 1751:3, 1768:18
**surveilled** [1] - 1732:10
**survive** [1] - 1717:12
**survivor** [1] - 1796:3
**suspected** [3] - 1720:23, 1721:19, 1748:8
**suspicion** [2] - 1785:4, 1825:11
**sustain** [2] - 1823:11, 1852:19
**sustained** [3] - 1771:23, 1773:3, 1773:8
**swirling** [1] - 1763:21
**sworn** [1] - 1826:12
**Sylvia** [2] - 1787:25, 1788:16
**sympathy** [2] - 1757:23, 1821:10
**system** [6] - 1755:3, 1756:7, 1756:10, 1757:6, 1757:9, 1763:2
**Sí** [1] - 1795:5
**sí** [1] - 1795:9

## T

**tab** [1] - 1799:19
**table** [1] - 1769:18
**talks** [1] - 1780:16
**tally** [8] - 1730:15, 1730:18, 1730:19, 1730:25, 1738:10, 1785:23, 1838:15
**tape** [2] - 1770:1, 1779:19
**tape-recorded** [2] - 1770:1, 1779:19
**task** [1] - 1757:15
**technique** [1] - 1832:11
**techniques** [3] - 1800:20, 1832:5, 1832:13
**telephone** [6] - 1727:24, 1749:9, 1814:14, 1838:8, 1840:3, 1840:16
**telephones** [2] - 1739:25, 1835:22
**telescope** [1] - 1783:12
**temperature** [1] - 1867:18
**temporary** [2] - 1729:5, 1838:9
**ten** [2] - 1778:24, 1811:18
**tends** [1] - 1824:20
**term** [7] - 1825:7, 1852:8, 1857:16, 1858:10, 1858:16, 1859:2, 1859:19
**terms** [5] - 1713:17, 1792:19, 1806:9, 1860:1, 1875:17
**terrible** [1] - 1794:7
**terribly** [1] - 1802:18
**terrified** [2] - 1742:1, 1793:12
**territory** [2] - 1717:3, 1718:8
**terrorized** [1] - 1720:16
**test** [2] - 1763:2
**testified** [44] - 1716:15, 1716:18, 1716:24, 1717:13, 1718:1, 1718:12, 1719:7, 1720:1, 1720:13, 1721:1, 1721:7, 1721:10, 1721:21, 1728:25, 1731:13, 1731:20, 1731:23, 1735:5, 1735:15, 1735:17, 1735:21, 1741:11,

1741:12, 1742:3, 1742:14, 1743:17, 1743:20, 1744:2, 1745:2, 1745:19, 1746:23, 1747:2, 1749:1, 1749:18, 1751:8, 1766:24, 1767:10, 1775:16, 1781:9, 1796:18, 1809:25, 1827:21, 1830:13
**testifies** [3] - 1824:15, 1824:17, 1827:15
**testify** [9] - 1795:4, 1823:18, 1823:20, 1823:25, 1824:5, 1824:6, 1824:8, 1829:2, 1829:16
**testifying** [2] - 1827:23, 1829:10
**testimony** [97] - 1726:19, 1729:3, 1731:9, 1731:12, 1732:25, 1733:16, 1734:17, 1736:13, 1742:3, 1742:15, 1742:19, 1742:21, 1745:10, 1746:8, 1747:20, 1750:23, 1752:5, 1760:5, 1761:5, 1761:8, 1762:19, 1762:22, 1766:6, 1766:7, 1766:20, 1766:21, 1767:13, 1769:6, 1769:20, 1769:21, 1770:24, 1772:15, 1772:16, 1775:19, 1779:11, 1780:7, 1781:6, 1782:4, 1782:12, 1782:16, 1783:7, 1783:9, 1783:19, 1784:1, 1784:7, 1788:2, 1788:12, 1790:3, 1790:16, 1791:20, 1793:9, 1794:15, 1797:1, 1797:19, 1798:12, 1799:6, 1804:22, 1810:10, 1810:22, 1811:5, 1813:4, 1813:7, 1813:18, 1814:25, 1819:9, 1820:12, 1820:20, 1824:8, 1824:9, 1826:13, 1826:23, 1827:16, 1827:20, 1827:24, 1828:3, 1828:5, 1828:8, 1828:9, 1828:10, 1828:13, 1828:18, 1828:22, 1828:23, 1829:4, 1829:8, 1829:12, 1829:13, 1829:15, 1830:9, 1831:5, 1831:10, 1831:12, 1831:14, 1832:2, 1832:3, 1833:18
**Texas** [1] - 1787:13
**text** [10] - 1718:15, 1751:16, 1751:18, 1751:23, 1751:24, 1751:25, 1752:3, 1752:4, 1752:5, 1752:9
**texted** [1] - 1752:4
**texting** [1] - 1751:21
**texts** [1] - 1752:8
**thegns** [2] - 1755:5, 1756:25
**themselves** [10] - 1715:11, 1715:13, 1730:3, 1738:21, 1829:25, 1830:2, 1834:14, 1836:3, 1836:10, 1868:8
**theories** [1] - 1871:10
**theory** [10] - 1766:5, 1795:15, 1796:9, 1797:22, 1798:3, 1829:5, 1870:24, 1871:13, 1871:18
**thereafter** [1] - 1782:17
**thereby** [1] - 1846:17
**therefore** [9] - 1763:10, 1786:8, 1789:7, 1823:1, 1823:24, 1844:11, 1847:24, 1871:16, 1874:1
**thereof** [1] - 1845:16
**Theresa** [2] - 1810:11, 1829:1
**they've** [4] - 1786:8, 1797:9, 1797:13, 1801:7

**thigh** [4] - 1746:22, 1747:10, 1747:11, 1772:1

**thinking** [1] - 1778:13

**thinks** [1] - 1798:20

**third** [10] - 1736:5, 1740:21, 1765:5, 1815:21, 1842:5, 1847:2, 1855:15, 1856:7, 1857:14, 1860:20

**thirty** [1] - 1804:3

**thirty-eight** [1] - 1804:3

**Thomas** [2] - 1757:8, 1757:14

**thousand** [1] - 1756:25

**thousands** [1] - 1797:12

**threat** [13] - 1717:7, 1717:9, 1721:18, 1788:16, 1788:17, 1789:4, 1841:22, 1858:16, 1858:17, 1858:21, 1859:9, 1859:12

**threaten** [3] - 1717:22, 1735:24, 1746:16

**threatened** [13] - 1720:13, 1720:14, 1721:2, 1721:3, 1721:18, 1736:1, 1736:2, 1790:7, 1796:8, 1812:8, 1837:2, 1837:5

**threatening** [11] - 1717:18, 1718:15, 1718:17, 1787:25, 1788:5, 1788:22, 1788:24, 1789:3, 1838:24, 1839:4, 1840:3

**threats** [18] - 1716:9, 1719:3, 1719:4, 1722:9, 1748:2, 1748:3, 1748:16, 1752:23, 1756:22, 1759:4, 1759:5, 1771:3, 1771:4, 1775:13, 1787:8, 1809:3, 1815:14, 1838:8

**three** [11] - 1723:21, 1724:2, 1736:19, 1739:20, 1741:25, 1751:21, 1779:11, 1779:20, 1796:16, 1798:10, 1840:3

**threw** [1] - 1744:23

**throughout** [7] - 1727:13, 1748:12, 1755:23, 1759:5, 1760:7, 1823:3, 1861:6

**thrown** [1] - 1720:17

**Thursday** [1] - 1787:10

**ticket** [1] - 1799:16

**tickets** [3] - 1799:15, 1852:5

**tied** [4] - 1775:3, 1796:14, 1797:9, 1812:2

**ties** [1] - 1787:1

**tiny** [1] - 1814:18

**tip** [1] - 1747:11

**TO** [1] - 1877:11

**today** [4] - 1719:15, 1802:14, 1804:2, 1817:10

**together** [12] - 1723:5, 1723:16, 1730:6, 1759:13, 1776:1, 1776:13, 1778:19, 1778:20, 1841:7, 1842:15, 1843:10, 1846:1

**token** [2] - 1822:9, 1875:6

**tokens** [1] - 1786:5

**tolerate** [1] - 1802:14

**toll** [2] - 1742:6, 1797:11

**tongue** [1] - 1812:2

**took** [17] - 1717:4, 1743:9, 1747:5,

1758:11, 1760:1, 1760:6, 1761:12, 1767:12, 1769:13, 1772:3, 1772:10, 1786:19, 1788:1, 1790:4, 1811:23, 1811:24, 1854:14

**top** [2] - 1729:13, 1815:4

**Torres** [2] - 1737:22, 1738:8, 1762:17

**total** [2] - 1800:23, 1832:17

**touch** [1] - 1875:24

**touches** [1] - 1824:18

**touching** [2] - 1867:12, 1867:17

**tough** [1] - 1794:17

**tougher** [1] - 1794:25

**touting** [1] - 1718:6

**toward** [1] - 1785:8

**towards** [5] - 1783:8, 1783:9, 1783:24, 1789:10, 1798:7

**towed** [1] - 1727:4

**towels** [3] - 1715:11, 1835:19, 1839:10

**town** [2] - 1740:19, 1793:5

**toxic** [3] - 1771:9, 1771:17, 1771:19

**track** [2] - 1786:5, 1786:14

**tracks** [1] - 1737:6

**trade** [7] - 1716:6, 1718:2, 1719:19, 1729:9, 1772:1, 1805:7, 1805:12

**tradition** [2] - 1755:1, 1755:15

**traffic** [3] - 1740:13, 1809:2, 1814:12

**trafficked** [1] - 1739:1

**Trafficking** [1] - 1765:21

**trafficking** [33] - 1716:6, 1719:12, 1722:21, 1738:25, 1739:3, 1739:9, 1740:10, 1742:2, 1749:12, 1750:9, 1775:8, 1775:18, 1782:9, 1789:11, 1789:12, 1789:25, 1790:15, 1792:24, 1794:8, 1799:11, 1802:2, 1805:7, 1806:3, 1808:24, 1856:17, 1857:7, 1860:4, 1862:6, 1863:4, 1863:5, 1863:9, 1870:6, 1870:7

**tragic** [1] - 1815:23

**train** [1] - 1799:15

**training** [3] - 1810:13, 1829:4, 1859:12

**traits** [1] - 1791:22

**transactions** [1] - 1861:11

**transcript** [2] - 1830:5, 1876:10

**transferable** [1] - 1797:15

**translation** [3] - 1830:17, 1830:20, 1830:24

**translators** [1] - 1830:21

**transport** [25] - 1723:17, 1724:18, 1725:17, 1726:1, 1732:3, 1737:21, 1741:8, 1752:15, 1799:13, 1800:5, 1800:16, 1801:1, 1801:21, 1803:11, 1803:14, 1834:15, 1835:23, 1836:3, 1836:9, 1836:13, 1850:5, 1850:16, 1850:25, 1851:18, 1856:24

**transportation** [37] - 1722:20, 1723:19, 1723:24, 1724:15, 1725:5, 1725:19, 1725:25, 1726:2, 1726:17, 1726:20, 1730:2, 1730:8, 1732:22, 1733:19, 1733:21, 1733:24, 1734:7, 1736:23, 1736:24, 1738:22, 1744:12, 1759:25,

1760:1, 1761:12, 1762:10, 1762:14, 1768:8, 1768:10, 1769:4, 1799:12, 1800:1, 1801:9, 1841:4, 1849:15, 1849:17, 1851:17, 1856:5

**transported** [27] - 1715:1, 1724:20, 1724:21, 1734:3, 1735:7, 1739:14, 1766:4, 1768:13, 1836:3, 1836:9, 1839:8, 1839:20, 1839:24, 1840:8, 1840:12, 1840:24, 1851:8, 1851:9, 1851:22, 1852:2, 1852:7, 1852:16, 1852:18, 1857:9, 1857:22, 1860:7, 1865:20

**transporting** [6] - 1717:11, 1737:13, 1852:10, 1852:11, 1857:20, 1861:9

**trauma** [1] - 1811:5

**traumatized** [1] - 1811:4

**travel** [23] - 1723:17, 1723:24, 1725:17, 1734:6, 1734:8, 1734:13, 1734:14, 1761:7, 1834:20, 1852:4, 1852:6, 1853:17, 1853:20, 1854:16, 1854:22, 1855:3, 1855:8, 1855:18, 1855:19, 1855:24, 1856:6, 1861:15

**traveled** [3] - 1736:11, 1836:16, 1855:14

**travelers** [1] - 1861:15

**traveling** [1] - 1735:6

**travels** [1] - 1811:15

**treat** [1] - 1784:5

**treated** [3] - 1735:21, 1790:3, 1790:6

**treating** [2] - 1785:6, 1785:7

**trial** [33] - 1714:13, 1716:4, 1716:13, 1718:1, 1718:25, 1723:9, 1726:8, 1726:23, 1727:14, 1734:10, 1745:11, 1748:12, 1757:16, 1758:24, 1759:6, 1760:8, 1769:18, 1788:13, 1816:3, 1820:9, 1821:14, 1823:6, 1823:14, 1825:6, 1826:20, 1830:13, 1831:5, 1831:10, 1831:12, 1831:13, 1832:2, 1832:3, 1848:6

**TRIAL** [2] - 1711:11, 1877:3

**trials** [2] - 1757:16, 1757:17

**tried** [1] - 1816:10

**trier** [1] - 1766:16

**trip** [2] - 1751:3, 1853:23

**true** [6] - 1715:24, 1758:10, 1759:1, 1762:2, 1766:11, 1781:7

**trunk** [1] - 1717:5

**trust** [1] - 1744:11

**trusted** [2] - 1796:12, 1796:21

**truth** [6] - 1755:8, 1807:22, 1807:23, 1813:9, 1813:10, 1828:1

**try** [8] - 1781:11, 1787:15, 1794:11, 1805:9, 1807:24, 1810:18, 1828:17, 1874:15

**trying** [6] - 1714:2, 1722:2, 1772:23, 1807:4, 1811:21, 1870:1

**Ts** [1] - 1774:25

**Tuesday** [2] - 1786:1, 1786:2

**turf** [1] - 1749:11

**turn** [3] - 1742:20, 1833:3, 1833:19

**turned** [1] - 1746:11

**turns** [1] - 1803:2
**twelve** [1] - 1803:1
**twenty** [1] - 1811:18
**twice** [3] - 1770:1, 1779:19, 1815:6
**two** [60] - 1713:7, 1714:22, 1718:8, 1719:14, 1723:22, 1724:1, 1724:24, 1725:2, 1725:12, 1726:4, 1726:14, 1726:19, 1726:24, 1727:14, 1728:15, 1729:21, 1729:23, 1730:18, 1733:15, 1733:18, 1737:8, 1738:5, 1738:11, 1739:19, 1746:22, 1749:19, 1752:12, 1752:18, 1752:23, 1759:20, 1768:19, 1770:11, 1771:6, 1776:1, 1776:12, 1779:18, 1781:5, 1786:17, 1788:7, 1790:11, 1796:11, 1796:12, 1796:13, 1796:16, 1798:12, 1802:6, 1804:3, 1805:5, 1808:21, 1824:11, 1839:8, 1841:7, 1842:2, 1842:11, 1842:21, 1861:4, 1866:11, 1872:10, 1874:17
**two-month** [1] - 1729:23
**type** [1] - 1824:14
**typed** [1] - 1829:20
**types** [3] - 1824:11, 1848:10, 1859:3
**typically** [2] - 1836:4, 1836:11

## U

**U.S** [3] - 1711:14, 1711:15, 1712:23
**UC** [1] - 1777:25
**ugly** [1] - 1805:11
**ultimate** [3] - 1777:22, 1778:15, 1853:7
**ultimately** [2] - 1719:10, 1719:13
**umbrella** [1] - 1814:8
**unanimous** [4] - 1867:23, 1868:11, 1868:13, 1868:25
**unanimously** [1] - 1823:8
**uncontested** [2] - 1736:13, 1740:3
**uncontroversial** [1] - 1724:25
**undeniable** [1] - 1781:19
**under** [22] - 1717:13, 1733:2, 1734:2, 1744:13, 1744:19, 1749:1, 1775:22, 1814:1, 1814:8, 1819:4, 1823:19, 1827:20, 1846:9, 1847:10, 1848:18, 1851:15, 1858:21, 1859:4, 1863:3, 1864:5, 1866:19
**underlying** [1] - 1827:11
**understandable** [1] - 1757:25
**understood** [1] - 1782:15
**undertake** [1] - 1800:19
**undertaken** [1] - 1798:7
**undertaking** [1] - 1846:17
**undertook** [1] - 1808:4
**uneducated** [2] - 1792:1, 1802:15
**unequivocal** [1] - 1736:13
**unfortunate** [2] - 1756:13, 1764:3
**unimaginably** [1] - 1807:5
**UNITED** [3] - 1711:1, 1711:4, 1877:2
**United** [19] - 1713:2, 1723:3, 1740:23, 1741:3, 1741:4, 1741:6, 1742:22,

1756:8, 1764:7, 1805:18, 1806:17, 1814:3, 1822:7, 1835:10, 1841:14, 1854:25, 1862:14, 1862:21, 1863:2
**universe** [1] - 1767:14
**unknown** [5] - 1834:14, 1835:1, 1835:4, 1835:8, 1835:12
**unlawful** [21] - 1723:23, 1725:16, 1841:8, 1842:3, 1842:11, 1842:22, 1843:11, 1843:22, 1844:10, 1844:13, 1845:3, 1845:15, 1846:5, 1846:13, 1846:15, 1846:18, 1847:19, 1848:12, 1849:9, 1851:14, 1856:13
**unlawfully** [1] - 1835:10
**unless** [2] - 1823:8, 1823:16
**unlike** [1] - 1805:3
**unnecessary** [1] - 1827:12
**unpleasant** [1] - 1756:12
**unquestionably** [1] - 1765:19
**Unready** [1] - 1755:2
**unrelenting** [1] - 1716:2
**unsafe** [1] - 1770:11
**unspoken** [1] - 1842:21
**unusual** [3] - 1772:5, 1773:16, 1781:22
**unwillingness** [2] - 1807:11, 1812:18
**up** [37] - 1714:25, 1717:19, 1727:13, 1732:2, 1735:4, 1735:7, 1735:8, 1735:13, 1737:8, 1738:11, 1738:13, 1751:10, 1753:18, 1754:4, 1756:17, 1757:15, 1759:18, 1762:22, 1763:4, 1767:11, 1769:18, 1772:16, 1777:10, 1783:2, 1792:18, 1799:16, 1799:23, 1803:2, 1805:17, 1805:18, 1812:2, 1812:21, 1814:11, 1872:16, 1873:4, 1873:6
**upbringing** [1] - 1805:14
**upset** [3] - 1721:22, 1741:24, 1758:16
**upstairs** [1] - 1729:4
**upwards** [2] - 1715:8, 1738:18
**urban** [1] - 1794:22
**usual** [1] - 1816:18
**utter** [5] - 1715:25, 1716:1, 1742:14, 1802:22, 1810:9
**uttered** [1] - 1854:11
**utterly** [4] - 1801:7, 1806:14, 1807:12, 1810:20

## V

**vacancy** [1] - 1751:7
**vacation** [2] - 1811:11, 1811:24
**value** [9] - 1716:2, 1824:25, 1851:13, 1856:12, 1857:2, 1857:12, 1857:25, 1860:9, 1860:24
**van** [1] - 1720:17
**vanished** [1] - 1796:4
**vans** [2] - 1836:2, 1836:8
**variety** [2] - 1725:8, 1766:24
**various** [13] - 1749:2, 1749:14, 1756:22, 1769:18, 1771:23, 1778:25, 1779:7,

1786:4, 1815:10, 1815:11, 1828:11, 1836:3, 1840:13
**varying** [1] - 1853:17
**vast** [1] - 1835:9
**vehicle** [7] - 1727:8, 1738:12, 1738:16, 1761:2, 1761:3, 1761:6, 1865:20
**vehicles** [3] - 1836:2, 1836:8, 1836:13
**VENTURA** [7] - 1711:6, 1741:16, 1809:9, 1809:13, 1809:24, 1810:3, 1877:2
**Ventura** [243] - 1711:16, 1715:19, 1715:20, 1716:6, 1716:17, 1716:19, 1716:22, 1716:25, 1717:1, 1717:5, 1717:14, 1717:21, 1718:1, 1718:4, 1718:6, 1718:11, 1718:12, 1718:14, 1718:17, 1718:20, 1718:23, 1719:9, 1719:17, 1719:21, 1720:6, 1720:10, 1720:12, 1720:13, 1721:2, 1721:5, 1721:10, 1721:15, 1721:24, 1722:6, 1722:10, 1722:14, 1723:4, 1724:12, 1726:8, 1726:12, 1726:13, 1728:1, 1728:5, 1729:1, 1729:12, 1729:21, 1730:12, 1730:21, 1731:3, 1731:10, 1731:12, 1731:15, 1731:21, 1731:24, 1732:2, 1732:8, 1732:9, 1732:16, 1732:19, 1732:23, 1733:12, 1733:23, 1733:24, 1735:2, 1735:6, 1735:10, 1735:13, 1736:6, 1736:16, 1737:4, 1737:5, 1737:12, 1737:21, 1737:23, 1737:25, 1738:3, 1738:9, 1738:12, 1738:17, 1738:20, 1739:2, 1739:3, 1739:7, 1739:9, 1740:8, 1743:19, 1743:20, 1744:1, 1744:2, 1744:3, 1744:18, 1744:23, 1745:7, 1745:22, 1745:24, 1746:15, 1746:23, 1747:1, 1747:20, 1748:1, 1748:6, 1748:8, 1748:11, 1748:18, 1748:24, 1749:2, 1749:5, 1749:12, 1749:19, 1750:1, 1750:2, 1750:6, 1750:15, 1750:18, 1750:22, 1751:10, 1751:19, 1751:25, 1752:5, 1752:10, 1754:25, 1755:18, 1756:6, 1758:11, 1758:15, 1760:8, 1760:16, 1761:2, 1762:20, 1764:12, 1764:14, 1764:19, 1764:22, 1765:6, 1765:8, 1765:20, 1766:6, 1766:7, 1766:18, 1766:21, 1766:24, 1767:18, 1768:25, 1769:11, 1772:4, 1772:9, 1772:14, 1772:22, 1773:14, 1773:24, 1773:25, 1774:23, 1775:3, 1776:7, 1779:2, 1779:3, 1779:10, 1779:16, 1780:19, 1781:2, 1781:6, 1782:3, 1783:21, 1784:1, 1784:9, 1784:22, 1785:11, 1786:13, 1786:24, 1787:5, 1787:8, 1787:12, 1787:18, 1788:13, 1788:17, 1788:19, 1789:8, 1789:13, 1789:14, 1789:17, 1793:13, 1794:14, 1795:20, 1796:9, 1798:14, 1798:25, 1799:23, 1802:9, 1802:19, 1802:20, 1805:9, 1805:25, 1807:4, 1809:11, 1810:1, 1810:5, 1810:7, 1810:11,

1813:14, 1813:22, 1815:4, 1815:9, 1815:12, 1833:25, 1836:22, 1837:9, 1838:2, 1838:7, 1838:11, 1838:14, 1838:20, 1838:23, 1839:3, 1839:8, 1839:12, 1839:15, 1839:19, 1839:24, 1840:2, 1840:8, 1840:12, 1840:16, 1840:19, 1840:23, 1850:9, 1850:12, 1850:16, 1850:25, 1854:21, 1862:4, 1862:11, 1871:14, 1871:19, 1873:15, 1873:24

**Ventura's** [32] - 1718:23, 1719:1, 1719:6, 1719:11, 1720:19, 1727:22, 1729:2, 1730:25, 1731:8, 1733:4, 1733:9, 1734:5, 1735:1, 1735:16, 1736:11, 1737:14, 1748:2, 1748:14, 1750:6, 1750:24, 1752:13, 1764:12, 1780:10, 1785:22, 1785:23, 1787:11, 1788:17, 1789:19, 1794:16, 1806:1, 1806:10, 1808:20

**VENTURA................** [1] - 1877:8

**venture** [7] - 1739:16, 1841:24, 1844:2, 1857:2, 1857:12, 1858:1, 1860:10

**verdict** [41] - 1713:9, 1757:1, 1758:5, 1758:10, 1758:20, 1759:1, 1760:11, 1762:12, 1763:10, 1775:4, 1792:23, 1803:8, 1803:9, 1803:16, 1803:17, 1817:11, 1819:1, 1819:23, 1820:18, 1821:13, 1821:25, 1832:20, 1832:23, 1832:25, 1846:24, 1863:11, 1866:22, 1867:23, 1868:2, 1868:5, 1868:11, 1868:12, 1868:13, 1868:16, 1868:17, 1868:22, 1868:23, 1868:24, 1868:25, 1869:11

**verdicts** [5] - 1753:13, 1804:15, 1805:3, 1816:4, 1822:13

**version** [2] - 1817:10, 1817:13

**versus** [1] - 1812:22

**via** [1] - 1817:11

**victim** [4] - 1716:16, 1739:2, 1740:17, 1860:2

**victim's** [1] - 1717:16

**victims** [1] - 1753:10

**Victor** [3] - 1717:2, 1717:7, 1717:22

**Victoria** [1] - 1712:3

**view** [5] - 1782:1, 1782:2, 1791:21, 1817:20, 1869:2

**viewed** [2] - 1775:17, 1775:24

**views** [1] - 1869:7

**VIII** [1] - 1877:3

**violate** [1] - 1841:9

**violation** [9] - 1715:7, 1739:5, 1834:18, 1834:22, 1841:11, 1849:20, 1854:25, 1856:15, 1862:15

**violations** [1] - 1857:5

**violence** [50] - 1716:10, 1719:3, 1719:10, 1719:18, 1722:9, 1740:10, 1740:12, 1748:3, 1752:23, 1752:24, 1759:5, 1763:21, 1771:3, 1771:18, 1771:20, 1773:11, 1775:13, 1776:3, 1776:4, 1781:15, 1783:8, 1783:9,

1783:24, 1785:8, 1789:8, 1789:10, 1798:2, 1798:5, 1798:7, 1805:25, 1812:18, 1813:17, 1837:2, 1837:5, 1862:2, 1862:6, 1862:13, 1862:19, 1863:1, 1863:3, 1863:5, 1863:8, 1863:12, 1863:18, 1863:20, 1864:21, 1865:10, 1865:17, 1871:11

**violent** [4] - 1718:6, 1784:4, 1787:4

**Virginia** [23] - 1726:9, 1726:10, 1726:15, 1726:18, 1731:8, 1732:16, 1732:19, 1733:1, 1735:17, 1736:25, 1737:7, 1737:17, 1749:6, 1760:15, 1768:20, 1768:21, 1791:1, 1797:8, 1813:23, 1814:11, 1834:8, 1839:21, 1840:1

**virtually** [1] - 1807:13

**virtue** [2] - 1813:18, 1824:18

**visibly** [2] - 1721:22, 1741:24

**voice** [1] - 1752:10

**VOL** [1] - 1877:3

**Volume** [1] - 1711:6

**voluntarily** [8] - 1791:18, 1834:13, 1843:15, 1852:12, 1852:22, 1856:1, 1864:11, 1866:2

**voluntariness** [2] - 1725:20, 1791:19

**vote** [2] - 1785:9, 1785:11

**vulnerable** [2] - 1714:23, 1795:10

# W

**wait** [3] - 1764:18, 1777:8, 1872:8

**wants** [7] - 1743:18, 1761:9, 1761:18, 1762:3, 1764:19, 1766:5, 1792:2

**wapentakes** [1] - 1755:6

**warrant** [1] - 1767:12

**warrants** [2] - 1755:22, 1756:1

**wars** [1] - 1749:11

**Washington** [3] - 1731:19, 1765:16, 1766:18

**watch** [5] - 1714:18, 1737:8, 1754:18, 1772:15, 1777:5

**watching** [1] - 1738:12

**water** [2] - 1742:8, 1799:9

**waver** [1] - 1742:19

**ways** [2] - 1752:23, 1806:2

**WDQ-10-0770** [1] - 1711:5

**weakened** [1] - 1744:23

**weapon** [10] - 1864:12, 1864:15, 1864:23, 1864:24, 1864:25, 1865:8, 1865:18, 1865:23, 1866:3, 1871:19

**weapon's** [1] - 1865:22

**weapons** [1] - 1787:2

**wear** [1] - 1777:14

**wearing** [1] - 1767:25

**weather** [1] - 1791:13

**Wednesday** [1] - 1787:11

**week** [14] - 1732:18, 1735:8, 1735:11, 1765:4, 1765:5, 1784:9, 1784:10, 1785:1, 1785:2, 1785:3, 1785:25, 1811:14

**week's** [2] - 1732:18, 1765:1

**weekly** [1] - 1732:5

**weeks** [11] - 1716:5, 1720:15, 1729:12, 1758:13, 1776:12, 1779:11, 1779:20, 1786:17, 1805:6, 1872:10, 1874:17

**weigh** [1] - 1866:16

**weighed** [1] - 1860:17

**weighing** [1] - 1829:8

**weight** [8] - 1820:1, 1821:6, 1821:8, 1828:14, 1828:24, 1829:13, 1831:25, 1869:9

**welcome** [1] - 1802:10

**welfare** [1] - 1841:23

**West** [1] - 1712:24

**wet** [3] - 1777:15, 1791:8

**whack** [1] - 1798:4

**whacked** [1] - 1796:12

**whatsoever** [5] - 1757:21, 1767:20, 1797:17, 1806:23, 1816:12

**whining** [1] - 1869:19

**whipped** [2] - 1745:8, 1745:18

**whole** [9] - 1763:14, 1785:16, 1798:3, 1799:19, 1799:22, 1812:16, 1812:23, 1813:24, 1819:19

**wholehearted** [1] - 1807:18

**wife** [1] - 1788:15

**willful** [3] - 1783:11, 1783:13, 1783:15

**willfully** [6] - 1724:2, 1842:5, 1843:14, 1843:20, 1845:16, 1847:17

**willfulness** [2] - 1853:24, 1854:12

**WILLIAM** [1] - 1711:11

**William** [1] - 1713:4

**willing** [7] - 1736:16, 1779:12, 1792:11, 1807:15, 1807:20, 1807:21, 1846:18

**windbag** [1] - 1787:9

**window** [3] - 1719:1, 1720:17, 1847:1

**windows** [2] - 1715:5, 1738:20

**winter** [1] - 1791:13

**wisdom** [1] - 1819:20

**wise** [2] - 1813:2, 1813:3

**wisely** [1] - 1756:9

**wish** [2] - 1771:7, 1814:16

**wished** [1] - 1718:20

**witness** [36] - 1726:19, 1743:25, 1758:11, 1765:25, 1766:22, 1770:8, 1773:16, 1822:23, 1824:2, 1824:6, 1824:9, 1824:15, 1824:16, 1827:16, 1827:19, 1827:21, 1828:1, 1828:6, 1828:7, 1828:9, 1828:15, 1828:18, 1828:23, 1828:25, 1829:2, 1830:13, 1830:14, 1830:25, 1831:2, 1831:3, 1831:10, 1831:11, 1831:16, 1831:19

**witness'** [9] - 1827:22, 1827:23, 1827:25, 1828:2, 1828:3, 1828:5, 1829:12, 1831:5, 1832:1

**witnessed** [2] - 1748:4, 1748:6

**witnesses** [12] - 1726:7, 1726:16, 1743:2, 1755:21, 1760:16, 1767:13, 1795:23, 1820:2, 1820:12, 1821:7,

1826:13, 1832:4
**witnesses'** [1] - 1826:25
**woman** [29] - 1717:10, 1717:12,
1719:22, 1719:23, 1721:11, 1722:1,
1722:2, 1732:2, 1732:10, 1734:17,
1735:1, 1736:8, 1737:21, 1737:22,
1737:24, 1739:1, 1740:22, 1740:24,
1741:2, 1743:18, 1748:7, 1750:21,
1767:25, 1800:9, 1805:23, 1811:14,
1813:9
**woman's** [2] - 1751:6, 1752:9
**women** [45] - 1714:23, 1714:25, 1715:8,
1715:9, 1719:20, 1720:19, 1721:6,
1722:20, 1724:15, 1725:5, 1725:8,
1726:2, 1726:17, 1729:15, 1731:22,
1731:25, 1732:5, 1732:8, 1732:19,
1733:21, 1733:24, 1734:3, 1736:3,
1738:5, 1744:4, 1745:12, 1746:17,
1766:24, 1767:4, 1783:10, 1800:1,
1801:21, 1805:12, 1835:24, 1836:3,
1836:5, 1840:24
**women's** [1] - 1752:19
**wonder** [3] - 1720:20, 1736:3, 1811:21
**wonderful** [1] - 1811:24
**word** [14] - 1757:21, 1757:22, 1766:12,
1767:22, 1771:12, 1779:15, 1780:21,
1786:7, 1791:11, 1794:23, 1812:21,
1812:22, 1864:13, 1866:4
**words** [13] - 1757:4, 1771:15, 1772:25,
1794:16, 1824:16, 1830:23, 1842:17,
1843:6, 1849:25, 1853:10, 1853:21,
1854:6, 1854:10
**wore** [1] - 1780:3
**worker** [3] - 1718:13, 1748:11, 1843:24
**works** [2] - 1784:14, 1785:11
**workweek** [1] - 1738:7
**world** [3] - 1715:5, 1715:14, 1802:17
**wounds** [1] - 1747:19
**write** [2] - 1770:14, 1783:2
**writing** [4] - 1739:17, 1842:17, 1867:10,
1867:12
**written** [2] - 1739:18, 1787:9
**wrote** [3] - 1787:9, 1787:11, 1853:5

## Y

**yahoo** [1] - 1797:3
**yahoos** [1] - 1796:16
**Yasser** [22] - 1711:15, 1723:1, 1741:19,
1757:19, 1760:25, 1762:16, 1763:25,
1764:14, 1765:25, 1766:5, 1769:22,
1785:15, 1787:24, 1798:13, 1798:18,
1798:25, 1800:3, 1804:22, 1806:2,
1807:2, 1811:2, 1818:22
**YASSER** [7] - 1713:25, 1714:6, 1714:20,
1722:19, 1728:22, 1741:20, 1741:23
**year** [10] - 1730:6, 1730:10, 1751:14,
1755:3, 1787:19, 1790:25, 1797:11,
1797:12, 1811:1

**years** [21] - 1716:17, 1716:18, 1740:18,
1740:21, 1741:25, 1752:12, 1755:18,
1756:1, 1757:1, 1777:23, 1779:18,
1780:16, 1780:17, 1780:18, 1781:16,
1788:14, 1796:12, 1796:13, 1804:4,
1804:13, 1806:17
**years'** [1] - 1801:20
**yelling** [1] - 1781:20
**Yenis** [1] - 1767:1
**yesterday** [6] - 1715:23, 1742:15,
1758:11, 1787:12, 1807:5, 1808:2
**York** [2] - 1731:25, 1732:3
**young** [9] - 1717:12, 1722:1, 1734:17,
1739:1, 1740:22, 1744:7, 1769:8,
1805:23, 1813:8
**yourself** [11] - 1713:20, 1750:20,
1758:23, 1775:5, 1788:21, 1794:22,
1794:25, 1843:17, 1869:4, 1874:10,
1875:19
**yourselves** [3] - 1724:12, 1776:17,
1867:3

## Z

**Zelaya** [3] - 1718:4, 1718:13, 1801:5